IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re<br><br>Alexander E. Jones,<br><br>             Debtor, | Bankruptcy<br>Case No. 22-33553 (CML)<br><br>Chapter 11 |
| David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as Chapter 7 Trustee for the Estate of Erica Lafferty<br><br>             Plaintiffs,<br><br>      v.<br><br>Alexander E. Jones and Free Speech Systems, LLC,<br><br>             Defendants. | Adv. Pro. No.: 22-03037 (CML) |

**STATEMENT OF UNCONTESTED MATERIAL FACTS  IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden,

Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto,

Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan,

as Chapter 7 Trustee for the Estate of Erica Lafferty (collectively, "Plaintiffs") submit the

following Statement of Uncontested Material Facts in support of their Motion for Summary

Judgment:

1.      On May 23, 2018, thirteen of the Sandy Hook Families filed a complaint in the

Judicial District of Fairfield at Bridgeport in Connecticut Superior Court, captioned *Lafferty, et al.*

v. *Jones, et al.*, UWY-CV-18-6046436-S, and assigned to Judge Barbara N. Bellis.  *See* Exhibit

attached to the Declaration of Alinor C. Sterling ("Sterling Ex.") 1.

2.      In December 2018 and January 2019, two substantively identical complaints—captioned *Sherlach, et al.* v. *Jones, et al.*, UWY-CV-18-6046437-S and *Sherlach, et al.* v. *Jones, et al.*, UWY-CV-18-6046438-S—were consolidated with the first complaint (collectively, the "Connecticut Action"). Sterling Exs. 2, 3.

3.      The Connecticut Action was brought against (i) Alex Jones; (ii) FSS; (iii) various additional entities wholly owned and operated by Jones (Infowars, LLC; Infowars Health, LLC; and Prison Planet TV, LLC); and (iv) some additional defendants not relevant here and who were not a party to the case at the time the judgment was entered.  Sterling Ex. 4.

4.      Plaintiffs asserted five causes of action: (i) invasion of privacy by false light, (ii) defamation and defamation *per se*, (iii) intentional infliction of emotional distress, (iv) negligent infliction of emotional distress, and (v) violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), codified at Conn. Gen. Stat. § 42-110a *et seq.*  Sterling Ex. 1.

5.      On November 21, 2018, Jones filed a special motion to dismiss the case under Connecticut's anti-SLAPP statute, arguing that the "claims are based on speech on an issue of public concern."  Sterling Ex. 5.

6.      A month later, the Connecticut Superior Court granted limited discovery to respond to the motion as provided by the anti-SLAPP statute.  Sterling Ex. 6.

7.      Jones resisted discovery, refused to produce basic analytics data that would inform Plaintiffs of daily traffic flows on Infowars.com and its mirror websites and other significant information.  Sterling Ex. 10.

8.      The limited documents that Jones did produce included child pornography.  Sterling Ex. 7 at 2:26–3:7.

9.    On June 14, 2019, Jones falsely claimed that Plaintiffs' counsel planted the child pornography in his email and offered a bounty to his audience for retribution. Sterling Ex. 7 at 3:25–4:11 and 7:2–5.

10.    On June 18, 2019, the Connecticut trial court entered sanctions against Jones because "the discovery in this case has been marked with obfuscation and delay on the part of the defendants, who . . . have still not fully and fairly complied with their discovery obligations." Sterling Ex. 7 at 1:9–19. The court also described a number of "examples where Jones either directly harasses or intimidates [Plaintiffs'] Attorney Mattei" and stated that "the 20-minute deliberate tirade and harassment and intimidation against Attorney Mattei and his firm is unacceptable and sanctionable. And the Court will sanction here." Sterling Ex. 7 at 4:14–7:7 and 7:27-8:3.

11.    The court, as a sanction for Alex Jones's discovery misconduct, denied Jones the opportunity to pursue the special motion under Connecticut's anti-SLAPP statute. Sterling Ex. 7 at 8:4–8.

12.    The court further cautioned that it would default Jones and other defendants "if they from this point forward continue with their behavior with respect to discovery." Sterling Ex. 7 at 8:12–23.

13.    On July 23, 2020, the Connecticut Supreme Court affirmed this sanction, determining that Jones's behavior "posed an imminent and likely threat to the administration of justice" and was "one part of a whole picture of bad faith litigation misconduct." Sterling Ex. 8 at 9, 27.

14.    The case returned to the Connecticut trial court in September 2020. Over the next two years, Jones continued actively defending the case, including by deposing every plaintiff but

one.  Declaration of Alinor Sterling ¶ 12.

15.     In the very first deposition of a plaintiff—and even while that deposition was ongoing—Jones violated the protective order by using testimony designated as "Confidential-Attorneys Eyes Only" as the basis for a motion to depose former presidential candidate Hillary Clinton.  Sterling Ex. 9.

16.     Plaintiffs filed a motion for sanctions, which Jones opposed.  The Connecticut court stated in its August 5, 2021 order that Jones's  opposition argument was "frightening" and that it had "grave concerns that [defendants'] actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public."  Sterling Ex. 9 at 2.

17.     On another occasion, after the court ordered Alex Jones and FSS to produce trial balances for FSS, the court stated in an order dated August 6, 2021:  "There is no excuse for the defendants' disregard of not only their discovery obligations, but the two court orders. . . . Sanctions will be addressed at a future hearing."  Sterling Ex. 10 at 1.

18.     On another occasion, Jones and FSS failed to produce Google Analytics data in violation of multiple court orders.  After the Plaintiffs filed a motion for sanctions, Sterling Ex. 11, the Connecticut court found the misconduct sanctionable:  "The Jones defendants, however, seem to take the position that the rules of practice do not apply to them. . . . the court will address the appropriate sanctions at the next status conference."  Sterling Ex. 12 at 1.

19.     At a hearing on October 20, 2021, the Connecticut court imposed sanctions, holding that Jones's "behavior really is unconscionable."  Sterling Ex. 13 at 77:18–19.

20.     Plaintiffs filed a motion for default judgment on October 6, 2021, which Alex Jones

and FSS actively opposed.  Sterling Ex. 14.

21.     In a ruling on November 15, 2021, on the record, the court entered default judgment against Jones and FSS, finding them liable for invasion of privacy by false light, defamation, intentional infliction of emotional distress, and violation of CUTPA.  Sterling Ex. 74.  Plaintiffs withdrew the negligent infliction of emotional distress claim during trial.  The default judgment conclusively established facts about Jones's knowledge and intent that were alleged in the complaint, including that:

- "Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has."

- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."

- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people," including "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

- "Jones's outrageous, cruel and malicious conduct was the cause of the plaintiff's distress."

- "In light of [his] prior experience with similar sorts of reckless and false statements, [Jones] knew that [his] publications could cause the plaintiffs to suffer harassment and potential violence."

- Jones "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and . . . did so for profit."

- "In broadcasting [his] campaign of outrageous and false statements about the plaintiffs, [Jones] intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of [his] conduct."

Sterling Ex. 1 at ¶¶ 9, 11, 13–14, 341, 361, 377, and 386.

22.     The court stated:  "Here the Jones defendants were not just careless.  Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to

conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims. . . . The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was caused by the Jones defendants willful noncompliance, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims." Sterling Ex. 74 at 56–57.

23.    Following default judgment, Jones and the other defendants filed a notice of defenses. Sterling Ex. 16.

24.    In a December 24, 2021 order, the court struck those defenses, finding that Jones and other defendants were "prohibited from contesting liability or raising affirmative defenses in light of the disciplinary default entered against them. Therefore, the notice of defenses is stricken, and the case will proceed as a hearing in damages as to these defendants." Sterling Ex. 17.

25.    On September 13, 2022, following the default judgment, the Connecticut Action proceeded to a trial on damages, in which Jones and his counsel participated. Sterling Ex. 22 at 8. The testimony of twenty-five witnesses was presented, including Jones; Brittany Paz, FSS's designee; and FSS current and former employees David Jones, Rob Dew, Tim Fruge, Joshua Owens, Robert Jacobson, and Jacob Acosta. Each Plaintiff testified. 405 full exhibits were entered in evidence. Declaration of Alinor Sterling ¶ 23.

26.    On September 22, 2022, the seventh day of trial, Plaintiffs called Jones to the stand. Jones admitted that he "said it looked like Robbie Parker was acting." Sterling Ex. 35 at 37:8–10. He further admitted to mocking Plaintiff Robert Parker because he thought Parker's video "looked fake." Sterling Ex. 78 at 8:6–10. He testified that "of [his] many, many, many, millions of audience members, . . . many of them believe what [he] say[s]." Sterling Ex. 78 at 9:24-10:7." During his testimony, the court threatened Jones with contempt. While on the stand, Jones was

asked: "[I]f someone were to falsely claim that a group of families who have lost loved ones were actors and had faked the deaths of their loved ones, that would be a horrible thing to say, correct?" He responded, "In the context, it could be, yes." Sterling Ex. 35 at 38:7–11. Jones admitted that a video critical of Plaintiff Aldenberg, and featuring his image, was posted to Jones's website during the trial, even after Jones had heard Aldenberg testify about the threats and harassment he'd received as a result of Jones's prior attacks. Sterling Ex. 77 at 41:16-44:14. When it was Jones's turn to present evidence, he called no witnesses and chose not to testify on direct. Jones's counsel played only one video, which was already in evidence, and rested. Declaration of Alinor Sterling ¶ 24.

27.     Following the close of evidence, the court instructed the jury on October 7, 2022 to "award those damages [they] find to have been proven by a preponderance of the evidence[.]" The court further instructed that, in addition to compensatory damages, common law "[p]unitive damages may be awarded if you find that the defendants' actions in this case were willful[,] wanton or malicious." Sterling Ex. 18 at 23–24.

28.     In the jury charge concerning defamation damages, the court explained that Jones was liable for defamation *per se*, which is defamation from statements "considered to be so harmful in and of themselves that the person to whom they relate is entitled to recover general damages for injury to reputation without proving that any special or actual damages were caused by the statements." Sterling Ex. 18 at 14. The trial court explained that Jones was liable for defamation *per se*, and described Jones's conduct as necessarily causing harm: "[I]n this case, the court has determined that the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at large. The law presumes that there is injury to the plaintiffs' reputations." Sterling Ex. 18 at 21.   The trial

court also charged that: "[I]t has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public and by urging their audience and the public to investigate and look into the plaintiffs and to stop people supposedly behind the Sandy Hook hoax, resulting in members of the of defendants' audience and the public cyberstalking, attacking, harassing and threatening the plaintiffs, as you have heard in the evidence in this case."  Sterling Ex. 18 at 15.

29.     The court charged the jury that it could award "substantial damages" for defamation if "substantial harm" had been done to the plaintiffs' reputation.  Sterling Ex. 18 at 22.

30.     In its discussion of "emotional distress damages," the court explained to the jury that Jones was liable for IIED based on determinations that Jones "intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of [his] conduct," and that Jones's conduct was "extreme and outrageous."  Sterling Ex. 18 at 12.

31.     On October 12, 2022, the jury rendered a verdict assessing damages against Jones and FSS.  Sterling Ex. 19.

32.     The verdict form reflected that the jury awarded Plaintiffs two types of compensatory damages: (i) defamation damages and (ii) emotional distress damages.  Sterling Ex. 19 at 2.

33.      After receiving this charge and considering the evidence, the jury returned a verdict awarding Plaintiffs $403,600,000 in defamation damages.  Sterling Ex. 19.

34.     The jury also awarded emotional distress damages of $561,400,000.   Sterling Ex. 19.

35.     The court charged the jury that Jones was liable for violating CUTPA because his "business conduct was predicated on damaging the plaintiffs and was immoral, unethical,

oppressive, or unscrupulous," and instructed that CUTPA damages were "included in the other damages measures" described in the charge. Sterling Ex. 18.

36.     The jury awarded Plaintiffs $965 million in compensatory damages. The jury also found that Plaintiffs were entitled to common law punitive damages, which in Connecticut are capped at attorneys' fees and costs. Sterling Ex. 19 at 17.

37.     On October 21, 2022, Alex Jones and FSS moved to set aside the verdict and for remittitur to reduce the jury's assessment of damages. That same day, the parties began briefing the issue of CUTPA punitive damages, which are determined by the court under the statute.

38.     On October 28, 2022, Alex Jones and FSS opposed the award of punitive damages under CUTPA. Sterling Ex. 21.

39.     On November 10, 2022, the court issued a 45-page opinion assessing common law punitive damages and CUTPA punitive damages. Sterling Ex. 22.

40.     The court assessed approximately $322 million in common law punitive damages, rejecting Alex Jones's arguments that full common law punitive damages should not be awarded, and fully compensated Plaintiffs' attorneys' fees and costs (attorneys' fees and costs are the measure of common law punitive damages under Connecticut law). Sterling Ex. 22 at 20.

41.     As to CUTPA punitive damages—determined by the court under Connecticut law—the Connecticut court stated that it had assessed a number of factors, including (i) the degree of relative blameworthiness, i.e., whether the defendant's conduct was reckless, intentional, or malicious; (ii) whether the defendant's action was taken or omitted to augment profit; (iii) whether the wrongdoing was hard to detect; (iv) whether the injury and compensatory damages was small, providing a low incentive to bring the action; and (v) whether the award will deter the defendant and others from similar conduct. Sterling Ex. 22 at 29–30.

42.     In its discussion of the first and "most important consideration"—the "degrees o[f] relative blameworthiness"—the court held that Jones's conduct was not merely "reckless." Sterling Ex. 22 at 43.

43.     The court continued: "The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the 'infowarriors.' The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial—wanton, malicious, and heinous conduct that caused harm to the plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness." Sterling Ex. 22 at 44.

44.     The court further held that plaintiffs had clearly established that defendants' conduct was motivated by profit and that "defendants' concealment of their conduct and wrongdoing . . . militates in favor of a substantial award of punitive damages." Sterling Ex. 22 at 41. The court stated: "[P]laintiffs clearly established that the defendants' conduct was motivated by profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article 'FBI Says No One Killed at Sandy Hook,' and their use of the plaintiffs even during the trial to make money." Sterling Ex. 22 at 40–41.

45.     The court also described "the magnitude of the injuries" and held that the "trial record establishes that the defendants remain in the unique position of having—and continuing to utilize—an immense media platform and audience to continue to target the plaintiffs, as well as

mocking the plaintiffs' attorneys, the court, and the very jury that they selected.  It is, quite simply, unprecedented in American jurisprudence."  Sterling Ex. 22 at 42.

46.     The court also held that the deterrent effect of punitive damages favored an award of CUTPA punitive damages.  Sterling Ex. 22 at 42–43.

47.     Based on these factual findings, the court awarded $10 million in CUTPA punitive damages to each of the 15 plaintiffs in the Connecticut Action, for a total of $150 million.  Sterling Ex. 22 at 44–45.

48.     On December 22, 2022, the court denied a motion by Jones and the other defendants for a new trial and remittitur, holding that "the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform to spread lies to a massive audience clearly supports the verdicts, and that the verdicts are within the limits of a fair and just award of damages."  Sterling Ex. 23 at 5.

49.     On December 29, 2022, Jones and other defendants filed an appeal, which is currently pending.  Sterling Ex. 24.

50.     As a result of the jury's damages verdict, Jones owes debts to the Sandy Hook Families for compensatory, common law punitive, and statutory punitive damages in the total amount of $1,438,139,555.94 (the "Connecticut Judgment").  The Connecticut Judgment comprises 15 separate debts owed to the 15 different Plaintiff creditors, as reflected in the following table.

| Plaintiffs | Compensatory Damages | Common Law Punitive Damages | CUTPA Punitive Damages | Total |
|---|---|---|---|---|
| Robert Parker | $120,000,000 | $40,099,304 | $10,000,000 | $170,099,304 |
| David Wheeler | $55,000,000 | $18,429,304 | $10,000,000 | $83,429,304 |
| Francine Wheeler | $54,000,000 | $18,099,304 | $10,000,000 | $82,099,304 |
| Jacqueline Barden | $28,800,000 | $9,699,304 | $10,000,000 | $48,499,304 |
| Mark Barden | $57,600,000 | $19,299,304 | $10,000,000 | $86,899,304 |
| Nicole Hockley | $73,600,000 | $24,629,304 | $10,000,000 | $108,229,304 |
| Ian Hockley | $81,600,000 | $27,299,304 | $10,000,000 | $118,899,304 |
| Jennifer Hensel | $52,000,000 | $17,429,304 | $10,000,000 | $79,429,304 |
| Donna Soto | $48,000,000 | $16,099,304 | $10,000,000 | $74,099,304 |
| Carlee Soto Parisi | $66,000,000 | $22,099,304 | $10,000,000 | $98,099,304 |
| Carlos M. Soto | $57,600,000 | $19,299,304 | $10,000,000 | $86,899,304 |
| Jillian Soto-Marino | $68,800,000 | $23,029,304 | $10,000,000 | $101,829,304 |
| William Aldenberg | $90,000,000 | $30,099,304 | $10,000,000 | $130,099,304 |
| Richard M. Coan, chapter 7 trustee for the estate of Erica Lafferty | $76,000,000 | $25,429,304 | $10,000,000 | $111,429,304 |
| William Sherlach | $36,000,000 | $12,099,304 | $10,000,000 | $58,099,304 |
| **TOTAL** | $965,000,000 | $323,139,556 | $150,000,000 | **$1,438,139,556** |

51.     In addition to the foregoing, the record in the Connecticut action established the following facts.

52.     Alex Jones is a supplement salesman who resides in Austin, Texas.   Sterling Ex. 1 ¶ 30.

53.     Alex Jones owns, operates, and controls the websites Infowars.com and PrisonPlanetTV.com, and other websites, and he is the star of "The Alex Jones Show."   Sterling Ex. 1 ¶ 30.

54.     Jones's tagline on Infowars was "the frontline of truth journalism," Sterling Ex. 66, and Infowars was marketed as "the House that Truth Built."   Sterling Ex. 65.

55.     At the time of the Sandy Hook shooting, Jones was broadcasting via Infowars.com to an audience of "tens of millions of listeners and viewers each month," Sterling Ex. 65, on 150 nationally syndicated radio stations, Sterling Ex. 67, and systematically re-posting content to YouTube, Twitter, and Facebook through multiple accounts.   Sterling Ex. 27 at 55:21–56:6

(Brittney Paz testifying that it was the defendants' practice to upload every clip produced from the Alex Jones show to every online platform they controlled, including Facebook, Twitter, and YouTube); Sterling Ex. 30 at 76:15–19; (Brittney Paz responding "right" to question, "[a]nd all of the content that Free Speech Systems pushes out, … goes to all of these social media platforms, right?").

56.     Jones's infrastructure at the time of the Sandy Hook shooting allowed him to engage an audience of 49 million users on his website.  Sterling Ex. 31 at 99:1–100:24:

> Q.  But can we go to google analytics and show the jury the analytics from 2012 . . . [S]o sessions is some measurement of how well they're doing with their audience, or engaging their audience?
>
> A   Yes. That's the number of times a user comes to the website.
>
> Q   All right. I'm going to need this – so we're on 2012. . . . So sessions, I'm going to try – I'll write large here so  . . . 2012 sessions, 119,107,058 . . . Is that correct?
>
> A   Yes.
>
> Q   Okay. Now we have something called users. And that is 49,029,313.
>
> A   Correct . . .
>
> Q   Okay. Now this was for the most part, this is the infrastructure that was in place at the time of the Sandy Hook shooting on December 14, 2012. Is that correct?
>
> A   Yes.
>
> Q   So can you just, as somebody who studied networks and spheres of influence. Can you just describe to the jury the scale of what we're talking about.
>
> A   It's extremely large. Compared to other organizations or entities that I've looked at, to achieve – I think the middle number is the one to focus on, the 49 million. To achieve 49 million users in any given year is a massive audience.

57.     Between 2012–2018, Alex Jones's broadcasts about Sandy Hook secured an absolute minimum of 550 million impressions on social media alone.  *See* Sterling Ex. 32 at 16:20–17:2:

> A   Adding together YouTube, Twitter and the Facebook calculation together just related to lies about Sandy Hook, the minimum audience that we could measure was 550 million off just social media. That doesn't include any – any individuals that were going straight to the website.

Q   No Info Wars, no Prison Planet, not radio, no other avenues of getting the information?

A   Correct.

Q   Okay. And the time period of that was between what?

A   2012 to 2018.

58.     David Jones, Alex Jones's father, has testified that: "our customers are so loyal to us that they believe in what we're doing to such a degree that if we say something is good for you and is a good value they're going to buy it and buy a lot of it."  Sterling Ex. 69 at 30:21–30:24; Sterling Ex. 1 ¶¶ 93–94.

59.     When Jones attacks someone or something, he intends his audience to attack too.

60.     For example, on June 12, 2017, Jones broadcast a video in which he stated: "I am a precision guided heavy munition, coming in on top of you. I'm here to stand up for the innocents. I don't like you. I don't like you getting away with what you do. You make me sick. So, I hit the barbed wire, and everybody else comes in over me."  Sterling Ex. 57; *see also* Sterling Ex. 70 (Jones: "So don't ever as dark as the hour is, and as out of control things are, don't you ever not realize how important you are and what you've done with your word of mouth and your action. And I'm talking to people that went to that puppet courthouse in Connecticut and put Infowars stickers up everywhere. We commend you!");  Sterling Ex. 47 (Jones speaking on air to Matthew Mills, Infowars follower who grabbed mic at Superbowl and repeated Jones' lies about 9/11 being an "inside job": "I mean you're really doing a great job and you're another example of how we're gonna defeat the enemy if people just realize they are the future, they are the resistance. I mean, anybody can do this, folks if you just decide to grow some guts and take action."); Sterling Ex. 54 at 00:03:30 (Dan Bidondi following and telling officials after FOIA hearing: "The Sandy Hook truth is coming out. You people are going to jail. You can smile all you want, you're going to jail for fraud. Plain and simple."); Sterling Ex. 1 ¶¶ 41–57.

61.     On December 14, 2012, a young man shot his way into Sandy Hook Elementary School with a semi-automatic Bushmaster XM15-E2S rifle, and in less than five minutes, he killed 20 first-grade children and six adults while wounding two others.

62.     Hours after the shooting, Jones published headlines stating that, according to "witnesses," the shooting was a "false flag."  Sterling Ex. 44 (video "Connecticut School Massacre Looks Like False Flag Says Witnesses," from 12/14/12 show).

63.     FSS has since admitted that there were no witnesses who said the shooting was a false flag.  Sterling Ex. 27 at 59:3–11.  FSS further admitted that it had "not done any investigation on the circumstances surrounding the" shooting and that Jones's statements to his audience that he has "done deep research" are "not accurate."  Sterling Ex. 75 5:19-26.

64.     The day after the shooting, Plaintiff Robert Parker made a press statement to thank all those who had reached out to his family, to remember his six-year old daughter Emilie, and to express his forgiveness to the shooter's family.  Sterling Ex. 71.

65.     On December 19, 2012, Jones published an article titled "Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear-Jerking Press Conference," which claimed that Mr. Parker had read off a card at this press conference.  Sterling Ex. 59.  The article included a statement from Jones: "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."  Sterling Ex. 59.

66.     On January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax."  In the video, Jones claimed that the shooting "was a staged event" due in part to "what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."  Sterling Ex. 79.  Jones then played a video

of Mr. Parker's statement the day after the shooting.

67.     As the video of Mr. Parker played, Jones commented that "I haven't touched this," and that "all I know is they're seizing on it.  They staged fast and furious. . . .  Our government, to blame the Second Amendment, they'd stage anything."  Sterling Ex. 46.  Jones continued: "This needs to be investigated.  They're clearly using this to go after our guns."  Sterling Ex. 80; Sterling Ex. 1 ¶¶ 111–117.

68.     On January 29, 2013, Leonard Pozner—the father of a Sandy Hook shooting victim and a plaintiff in cases brought in Texas—emailed Jones to explain the harm Jones's comments were causing and asked him to stop: "Alex, I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown.  Accusing us of being actors . . . .  Haven't we had our share of pain and suffering?  All these accusations of government involvement, false flag terror, new world order etc.  I used to enjoy listening to your shows prior to 12-14-12.  Now I feel that your type of show created these hateful people and they need to be reeled in!"  Sterling Ex. 61.  On April 9, 2013, Jones again told his audience that Sandy Hook was staged, stating, "and I'll tell you right now, there's—it's open and shut.  It's a government operation at the movie theater.  No doubt . . . .  Sandy Hook, it's got inside job written all over it."  Sterling Ex. 81.  In November 2013, the Connecticut State's Attorney General published an exhaustive report of the Sandy Hook shooting, which again gave lie to any notion that the Sandy Hook shooting was a hoax.  Sterling Ex. 83.

69.     In a May 13, 2014 video on YouTube titled "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," Jones featured Sandy Hook denier Wolfgang Halbig and stated, "You're saying a motive for the locals to go along with the fraud is money."  Sterling Ex. 82.  Jones continued that, "it's fake  . . . it's fake . . . you've got parents acting . . . it

is just the fakest thing since the three-dollar bill." In this same "interview" with Halbig, Jones played a video of Plaintiff Robert Parker at the December 15, 2012 press conference, and stated: "I mean, it's fake! Blue screens, it's fake! . . . You got parents laughing [mocking laughing], 'Watch this,' and then [mocking crying] method acting [mocking crying and wailing], 'Oh, my child!' I mean, it's just ridiculous! You've got coroners that start laughing—and I don't mean uncomfortably, I mean like laughing—with the State Police when they're giving press conferences." Sterling Ex. 82.

70.     On September 24, 2014, Jones published an article on his website, Infowars.com, titled "FBI Says No One Killed at Sandy Hook," which described the shooting as a "carefully-scripted false flag event." Sterling Ex. 60.

71.     This article drove new social media traffic, resulting in large increases in visits and pageviews to Infowars.com. Sterling Ex. 62.

72.     FSS monitored audience engagement with this article—as Jones generally did—and circulated screenshots of analytics data for Infowars. Sterling Ex. 62 (analytics showing spikes in visits and pageviews to Infowars.com due to this article); Sterling Ex. 63 (analytics showing spike in daily social media sessions from 131,391 on 9/23 to 1,185,307 on 9/25, and the spike in visitors coming to Infowars.com from social media); Sterling Ex. 29 at 26:24–49:14 (Paz testifying concerning these spikes); Sterling Ex. 68. Jones personally focused on his store's performance after each broadcast, and Jones sought to "emulate spikes" by repeating and generating similar content. Sterling Ex. 69 at 35:21-36:1.

73.    The increase in audience engagement led to increased sales revenue in the following days.  Sterling Ex. 68:

| orderDate | SumOfOrderAmount |
|-----------|------------------|
| 9/23/2014 | $ 56,597.27 |
| 9/24/2014 | $ 48,229.61 |
| 9/25/2014 | $ 232,825.10 |
| 9/26/2014 | $ 128,854.68 |
| 9/27/2014 | $ 63,315.15 |
| 9/28/2014 | $ 49,227.88 |
| 9/29/2014 | $ 75,764.70 |

74.    Throughout the years following the shooting, Jones asked for and received sales numbers on a daily basis, providing him a detailed look into how his lies drove website traffic and profits.  Sterling Ex. 73.

75.    Plaintiffs' expert Clinton Watts explained that Jones exploited the Sandy Hook shooting with messaging based in fear and anger to create engagement with his audience designed to bring more sales over time.  Sterling Ex. 31 at 87:15–21, 106:25–108:20.

76.    On December 28, 2014, during his radio show, Jones took a call from a listener name Kevin who claimed to live close to Newtown, Connecticut.  Jones told Kevin, "[t]he whole thing is a giant hoax. . . .The general public doesn't know the school was actually closed the year before . . . They don't know they've sealed it all, demolished the building.  They don't know that they had the kids going in circles in and out of the building as a photo-op.  Blue screen, green screens, they got caught using."  He stated that "the whole thing was fake" and concluded, "I did deep research—and my gosh, it just pretty much didn't happen."  Sterling Ex. 52; Sterling Ex. 1

18

¶¶ 171–176.

77.     Between April 8, 2013 and October 4, 2021, Alex Jones discussed the Sandy Hook shooting on his radio show over 100 times.  Sterling Ex. 58 (list of broadcasts in which Jones discussed Sandy Hook, but for which defendants did not produce videos).  The full reach of the defendants' lies could not be determined because of information that the defendants failed to produce.  Sterling Ex. 32 at 2:5–8:25 at 2-8 (Watts describing categories of missing data).

78.     On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Alex Jones proclaimed:  "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured."  Sterling Ex. 53; Sterling Ex. 1 ¶¶ 185–186.

79.     In December 2015, Infowars Chief Editor Paul Watson told Jones that, "This Sandy Hook stuff is killing us.  It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway.  Plus it makes us look really bad to align with people who harass the parents of dead kids."  Sterling Ex. 64.

80.     On November 18, 2016, during an Infowars broadcast, Jones stated, "the only problem is I've watched a lot of soap operas and I've seen actors before, and I know when I'm watching a movie and when I'm watching something real.  Let's look into Sandy Hook."  Sterling Ex. 56.

81.     As recently as September 29, 2022, Jones told his audience, "now that I've seen the trial's rigged, and how it all looks, I mean—it's definitely—the whole thing's deep state, that's all I can say.  So, I think the public's original instinct about it was right.  I don't know what really happened there, but it is, it is synthetic as hell."  Sterling Ex. 72.  Jones has repeatedly claimed that Plaintiffs' grief is evidence of their "acting."  *See, e.g.*, Sterling Ex. 46 (Jones mocking Robbie Parker:  "And when you watch the footage, I know grieving parents do strange things but he – it

looks like he's saying 'okay do I read off the card' he's laughing, and then he goes over and starts um basically breaking down and crying. So let's show that clip."); Sterling Ex. 48 (Jones: "you got parents laughing going 'ha ha ha watch this' and then they're going [imitating fake crying] method acting [imitating fake crying] I mean it's just ridiculous"); Sterling Ex. 50 (Jones: "If you've got a school of a hundred kids and then nobody can find them, and then you got parents laughing going 'ha ha ha' and then they walk over and see the camera and go [fake crying], and I mean not just one but a bunch of parents doing this, and then photos of kids that are still alive they said died. I mean they think we're so dumb that it's – it's really hidden in plain view."); Sterling Ex. 51 (Jones: "when I just saw the heavy, heavy, heavy scripting, that was what was so clear and then the parents laughing and then one second later doing the actor breathing to cry, I mean it's just it's – it's just over the top."); Sterling Ex. 55 (Jones: [fake sobs and makes a gesture as if wiping away tears] "I mean he's a worse actor than Glenn Beck, when Glenn Beck's fake crying. Okay? I mean this is disgusting." [Shows footage of Robbie Parker at the press conference].).

82.     Plaintiff Mark Barden—whose son Daniel was killed in the shooting—testified that the "lie going on around [him] about [] being an actor[,] about Sandy Hook being a staged event, about Daniel being a fraud and never existed" was "harder beyond what we could ever imagine trying to deal with, trying to deal with the fact that our little boy had just been shot to death in his first grade classroom and how to literally manage one minute to the next, like literally manage from one minute to the next and then also still be parents to [his surviving children] and still be strong for them and still give them some sense of normalcy in what we didn't understand." Sterling Ex. 42 at 21:12–23:7.

83.     Plaintiff Jennifer Hensel testified: "I don't think you heal from something like this. I think you forever hold grief and you rebuild some joy back into your life, and it balances.  And

some days, on other days, one takes over the other and the other days the grief is just so awful. Then you add on the idea that people think that you made all this up for money, or that your child didn't exist—that compounds everything on top of anything you do, and you can't—I couldn't work. I write for a living, and I couldn't form sentences." Sterling Ex. 34 at 30:27–31:10.

84.     As a result of Jones's intentional conduct, the Sandy Hook Families endured, on a regular basis, physical confrontation and harassment, death threats, and a sustained barrage of verbal assault on social media.

85.     Plaintiff Robert Parker testified how the harassment he and his family suffered "would come in these waves, and it was almost like I knew when Alex Jones had said something, because we would get a huge wave of stuff." Sterling Ex. 39 at 24:14–25:4.

86.     Plaintiff William Aldenberg testified that people said he was "not a real FBI agent" and "an actor." Sterling Ex. 25 at 47:21–48:4.

87.     Plaintiff Erica Lafferty received a letter stating that she "should die, and then be buried next to [her] fake, dead mother," and she received rape threats. Sterling Ex. 33 at 17:25–18:15, 21:13–18.

88.     Plaintiffs Francine and David Wheeler received death threats at their child's funeral and intruders later invaded their home and "demanded to see" their son Ben, saying, "I know he's here. I know he's alive." Sterling Ex. 41 at 26:10–20; Sterling Ex. 75 at 32:17–33:1. Plaintiff David Wheeler further testified that "after the shock of . . . Ben's murder . . . I felt like I was under water and I didn't know—I didn't know which way was up." Sterling Ex. 76 at 28:25–29:8.

89.     Plaintiff Mark Barden testified that he was "getting letters in our mailbox and started seeing things online that were clearly death threats . . . [W]e were sharing things with the FBI. We were sharing things with Newtown Police Department like what is this and it looked

scary and dangerous." Sterling Ex. 42 at 23:11–24:3.

90.     FBI agent Plaintiff William Aldenberg testified to receiving "violent, threatening messages." Sterling Ex. 25 at 52:7–53:21.

91.     Plaintiff Ian Hockley—father of six-year-old Dylan—testified that someone left on his windshield a card showing Plaintiff Robert Parker purportedly laughing. Sterling Ex. 36 at 6:23–9:3.

92.     Plaintiff Carlee Soto Parisi—whose sister Victoria, a teacher, was killed in the Sandy Hook shooting trying to protect her students from the shooter—testified about how the hoax penetrated her own community:  "I was hanging out with some friends and one of the girls I was hanging out with said, you know, this girl that we went to school with, she thinks that it was all a hoax, she doesn't believe you—and I went to school with this girl, we went to school from middle school on, together.  And she didn't believe that I had a sister that died.  She thought I was an actress.  And I just couldn't wrap my head around that." Sterling Ex. 26 at 25:15–26.

93.     Plaintiff Mark Barden, father of Daniel, testified that he deleted his music website "because this hateful stuff threatening stuff, dangerous stuff was coming in so just shut it off." Sterling Ex. 42 at 23:6–7.

94.     Plaintiff Francine Wheeler—mother of Ben—testified that online harassers "took my videos, and my work of 20 years, and they doctored them, and they made fun of them, and they said, look, see, she's an actor.  And they took—they took my identity." Sterling Ex. 41 at 37:9–17.

95.     Plaintiff Carlos M. Soto—Victoria Soto's brother—testified to online comments "saying that I wasn't real.  Saying that [Victoria] wasn't real.  And that my family wasn't real." He stated that "[a]nytime there's another shooting, or anytime someone says something, our social

medias are flooded with another batch of comments." Sterling Ex. 40 at 14:8–16:12.

96.     Plaintiff Robert Parker testified to harassment on his daughter Emilie's memorial page: "[W]e had eight people that we had allowed to be administrators on the [Emilie memorial] page, who just spent as much free time as they could report-ban-delete, report ban-delete, report-ban-delete—trying to get rid of the stuff, just trying to get it far enough down on the page so that if anybody came to the page, the first thing they would see was something about Emilie and not all of this filth.  Then by the middle of January, I finally just turned the page off.  I couldn't—I couldn't—I felt like I couldn't protect Emilie's name or her memory anymore.  So, I had to get rid of it." Sterling Ex. 39 at 12:11–13:25.

97.     Plaintiff Ian Hockley testified to harassment on his memorial videos for his son: "I can't remember all the comments that that is what that video started to attract is people saying this must be fake.  He's an actor.  He's smiling . . . All those things started to appear until we took our video down." Sterling Ex. 37 at 33:17–34:6.

98.     Plaintiff Jennifer Hensel—whose daughter Avielle was killed in the Sandy Hook shooting—testified to the attack on her family through the Avielle Foundation:  "[F]iltering in were people who were attacking our idea and attacking us as actors, and telling us that Avielle didn't exist and that we [were] just trying to get money from the public—and how dare we do something like that." Sterling Ex. 34 at 28:2–6.

99.     Plaintiff Nicole Hockley—whose son Dylan was killed in the Sandy Hook shooting—testified that she bought a house "that is purposefully exposed, so you can't get near my house without someone else in the neighborhood seeing you from any angle.  I have security lights throughout the whole exterior of the house." Sterling Ex. 38 at 23:15–27:15.

100.     Plaintiff Mark Barden testified: "I have developed a layer of constant

hypervigilance, and it's exhausting.  It interferes with your sleep, it interferes with your conscious, it interferes with your thinking, your ability to process."  Sterling Ex. 43 at 19:19–20:24.

101.    Plaintiff Robert Parker testified that he moved away from Newtown, but the move did not protect his family:  "[W]e weren't even halfway through the remodel on this new house, and I see this video on YouTube of all of the county documents about the sale of our house—how much it cost, the address, and the person going through all of that and following—basically, following our steps and the steps of this house and everything.  So, immediately, that sense of security that I thought that we had was totally shattered."  Sterling Ex. 39 at 18:20–20:4.

102.    Three defamation lawsuits have also been filed in Texas against Jones and FSS based on the same underlying facts by other parents of children killed in the Sandy Hook shooting. Neil Heslin initiated the action *Heslin* v. *Jones, et al.*, Case No. D-1-GN-18-001835, in the 261st Judicial District Court of Travis County, Texas (the "Heslin Action").  Scarlett Lewis initiated the action *Lewis* v. *Jones, et al.*, Case No. D-1-GN-18-006623, in the 98th Judicial District Court of Travis County, Texas, which was subsequently consolidated with the Heslin Action (the "Heslin/Lewis Action").  Leonard Pozner and Veronique De La Rosa initiated the action *Pozner* v. *Jones, et al.*, Case No. D-1-GN-18-001842, in the 345th Judicial District Court of Travis County, Texas (the "Pozner/De La Rosa Action").

103.    On August 5, 2022, in the consolidated Heslin/Lewis Action, a jury ordered Jones to pay $45.1 million in punitive damages in addition to $4.1 million in compensatory damages already awarded.  The Pozner/De La Rosa Action may proceed to trial this year.

Respectfully submitted,

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, Texas  78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011

*Counsel to the Sandy Hook Families*

**KOSKOFF KOSKOFF & BIEDER PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, Connecticut  06604
Telephone:  (203) 336-4421

*Counsel to the Sandy Hook Families Other*
*Than Richard M. Coan, as Chapter 7 Trustee*
*for the Estate of Erica Lafferty*

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Daniel S. Sinnreich (admitted *pro hac vice*)
Daniel A. Negless (admitted *pro hac vice*)
Briana P. Sheridan (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990

*Counsel to the Sandy Hook Families Other*
*Than Richard M. Coan, as Chapter 7 Trustee*
*for the Estate of Erica Lafferty*

**ZEISLER & ZEISLER, PC**
Eric Henzy (admitted *pro hac vice*)
10 Middle Street, 15th Floor
Bridgeport, Connecticut  06604
Telephone:  (203) 368-5495

*Counsel to Richard M. Coan, as Chapter 7*
*Trustee for the Estate of Erica Lafferty*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on May 12, 2023.

*/s/ Ryan E. Chapple*
Ryan E. Chapple