# EXHIBIT 14

| NO.   X06-UWY-CV18-6046436-S | : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | OCTOBER 6, 2021 |

| NO.   X06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | OCTOBER 6, 2021 |

| NO.   X06-UWY-CV18-6046438-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | OCTOBER 6, 2021 |

## MEMORANDUM IN SUPPORT OF DEFAULT BASED ON
## THE JONES DEFENDANTS' LITIGATION MISCONDUCT

In June 2019, the Court "decline[d] to default" the Jones defendants and entered a lesser sanction. DN 269, 6/18/19 Hrg. Tr. at 8:12–13. The Court then warned that further misconduct would result in default: "As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the Alex Jones defendants." *Id.* at 8:16–23. Since the case returned to this Court in September 2020, the Jones defendants have continued "their obfuscation and delay and tactics," leading to a new series of warnings, including that noncompliance with a discovery order "may result in sanctions," DN 326.10, 5/5/21 Order; that "obstructive tactics are sanctionable . . . [i]t's really that simple," DN 336, 5/6/21 Status Conf. Tr. 13–16; that "invok[ing]

1

the Rules of Professional Conduct as a procedural weapon" and "to gain tactical advantage" was

inappropriate and sanctionable, DN 337.20, 6/7/21 Order; and that failure to comply with its

longstanding discovery orders "may result in sanctions including but not limited to a default," DN

348.10, 6/2/21 Order.

Additionally, the Court recently found the following conduct requires sanctions:

- That the Jones defendants' "blatantly disregard[ed]" the protective order in violating it, that their arguments defending their actions were "baseless," "absurd," and "frightening," that "[g]iven the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses," and "the court will address sanctions at a future hearing." DN 394.10, 8/5/21 Order.

- That "[d]espite the court orders, and although the information exists, is maintained by FSS, and could have been produced by Flores as was required by the court orders, the documents were not produced," that it "rejects the statement of the accountant retained by FSS . . . as not credible in light of the circumstances," that "[t]here is no excuse for the defendants' disregard of not only their discovery obligations, but the two court orders, that "that the failure to comply with the production request has prejudiced the plaintiffs their ability to both prosecute their claims and conduct further depositions in a meaningful manner, and "[s]anctions will be addressed at a future hearing." DN 428.10, 428.20, 8/6/21 Orders.

- That the Jones defendants have not complied with the Court's discovery orders: "The Jones defendants . . . seem to take the position that the rules of practice do not apply to them. The court rejects their baseless argument that the practice book does not require formality with respect to the production of documents. There is no dispute here that the Jones defendants failed to follow the rules as they relate to discovery. The actions they took, as they themselves outlined . . . fall far short of meeting their obligations under our rules. . . . In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply. Similarly, the social media analytics that the Jones defendants previously represented as having been produced, and now claim was not produced due to inadvertence . . . falls short both procedurally and substantively. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the appropriate sanctions at the next status conference." DN 450.20, 9/30/21 Order.

Additional motions for orders are currently pending regarding the manipulation of financial document produced in discovery, DN 457; and improper handling of confidential settlement information possessed by the Jones defendants in violation of the Court's explicit order otherwise. The only reason there are not more motions pending is that the plaintiffs cannot keep up with the constant misconduct.[1]

The Jones defendants' two-and-a-half-year-plus campaign of obfuscation, delay, and "tactics," is, as it was in 2019, "continuing misconduct" that "demonstrates a deliberate disregard for the court's orders." *Lafferty*, 336 Conn. at 380–81. All considerations warrant the entry of a disciplinary default: "[t]he nature and frequency" of the Jones defendants' misconduct is deliberate and constant; the "notice of the possibility of a [default]" was given in June 2019 and has been given again since; "lesser available sanctions" have already failed, and "the [party's] participation in or knowledge of the misconduct" is obvious, given that the misconduct continues no matter who is counsel. *See Ridgaway v. Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 73 (2018) (approving of these factors in sanctions analysis). The Court should enter a default against the Jones defendants.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Because sanctions rulings require express factual findings, *see Ridgaway*, 328 Conn. at 82–83, we set forth here an overview of the factual and procedural history on the Court's recent sanctions rulings. The Argument section contains additional facts. Further details can be found in the plaintiffs' previous motions for sanctions.

### A.     The Court's Previous Sanctions and the Misconduct that Led to Them

Throughout 2019, despite numerous warnings, the Jones defendants "repeatedly ignored court deadlines and continued to challenge the underlying merits of discovery, even after the court

---

[1] The plaintiffs are preparing motions concerning the Jones defendants' failure to produce additional responsive materials.

3

found the requisite good cause to allow discovery." *Lafferty*, 336 Conn. at 376. Based on this pattern of "obfuscation and delay" and other litigation misconduct, the Court imposed sanctions. *Id.* It "decline[d] to default the Alex Jones defendants" at "this point." DN 269, 6/18/19 Hrg. Tr. 8:12–23. The Court warned that if their "obfuscation and delay and tactics" continued, it would "not hesitate after a hearing and an opportunity to be heard to default the Alex Jones defendants." *Id.* Those sanctions were affirmed by the Connecticut Supreme Court, *Lafferty*, 336 Conn. at 376, which returned the case to this Court on July 23, 2020. DN 290.50, Remand Order.

### B.    Deliberate Delays and Document Dumps

In January 2019, the Court ordered the Jones defendants to produce materials responsive to the plaintiffs' Requests for Production Nos. 15, 16, and 17, which covered marketing, sales, and web-analytics data. DN 148, 1/10/19 Order. The 2019 sanction was based in part on the Jones defendants' failure to comply with this court-ordered discovery. *Lafferty*, 336 Conn. at 376.

After sanctions were affirmed, the Jones defendants continued to obfuscate and delay production. The intent to delay was clear. They argued that their discovery should be stayed based on their petition for *certiorari* to the U.S. Supreme Court, DN 300, 10/23/21 Mot. for Cont. Stay at 2, and based on their co-defendants' special motions to dismiss, *id.* at 3–7. Their intent to avoid discovery was also clear. They re-raised arguments against the Court's original order granting discovery. *Id.*

When the Court ended the stay, the plaintiffs contacted the Jones defendants' counsel requesting compliance and received no response, then moved re-compel it yet again. DN 309, 11/12/20 Mot. to Re-Compel Compliance. The Jones defendants took the position that they had

no obligation to comply with existing discovery. DN 313, 11/18/20 Aff. of Meet & Confer ¶ 15.[2]
They argued that the sanctions order—which had been based in large part on their refusal to
produce exactly these materials—"necessarily terminated" their production obligations, DN 332,
5/5/21 Mem. in Opp. to Mot. at 1–2, and continued to attack the Court's original discovery order,
*id.* at 2. On May 14, 2021, the Court rejected their arguments. DN 339.10. It set a final deadline
of June 28, 2021 for production of the "already overdue supplemental compliance," including
Google and any other web analytics. DN 348.10. It warned the Jones defendants that their failure
to produce the analytics by the final deadline of June 28, 2021 "may result in sanctions including
but not limited to a default." *Id*.

On June 28, 2021, the Jones defendants produced 34,444 documents.[3] If this production
had been made when it was due on March 20, 2019, DN 196.10, or even close to when it was due,
the plaintiffs would have had the opportunity to review it and tailor their discovery plan
accordingly. Instead, they were forced to sort through another undifferentiated document dump
when they should have been conducting depositions.

### C.      Withholding of and Misrepresentations Regarding Web Analytics Data

The Court's already-overdue final deadline of June 28, 2021 was a Monday. On the
Thursday afternoon before it, counsel for the Jones defendants sent a letter to plaintiffs' counsel
representing that the Google Analytics data "cannot be produced as an export," and therefore could
not be provided. Ex. B, 6/24/21 Wolman to Mattei Letter. Instead, for the first time, the Jones

---

[2] The next day, the Jones defendants noticed removal for the second time in this case. DN 312,
11/16/20 Not. of Removal. On remand, the case returned to this Court's docket for the third time.
DN 316, 3/5/21 Remand.

[3] Only 6,789 of these documents—and, it appears, only *one* email—were produced in native
format. The vast majority were produced as PDFs, without metadata. The Jones defendants have
understood they were obligated to produce documents in native format since at least April 30,
2019—for more than two years. Ex. A, 4/30/19 Hrg. Tr. 13–16.

defendants proposed a "sandbox approach," where the plaintiffs would be allowed to access the Jones defendants' Google Analytics accounts and "inspect the dataset" for a limited period of time under the supervision of the Jones defendants. *Id.* The plaintiffs rejected this proposal. Ex. C, 6/25/21 Mattei to Wolman Letter.

In their June 2021 efforts to avoid producing the Google Analytics data, the Jones defendants repeatedly represented that utilizing the Google Analytics "export method" required "a premier membership" that "would cost at least $150,000." Ex. D, 6/2/21 Hrg. Tr. 15:10–16. The Court rejected these arguments, noting that it "decline[d] the Jones defendants' invitation to address, again, the scope of appropriate discovery." DN 348.10, 6/2/21 Order. In the Thursday letter, they again advanced this excuse for not producing the Google Analytics data. In a letter to plaintiffs' counsel, counsel claimed that "to export the raw data, one must be an Analytics 360 member, i.e. a premium member." Ex. E, 6/25/21 Wolman to Mattei Letter. "Free Speech Systems is not an Analytics 360 member," he continued. "[T]herefore it is impossible for it to export the data." *Id.* In a meet-and-confer telephone call on July 13, 2021, counsel for the Jones defendants reaffirmed this statement. DN 426, 7/26/21 Pls.' Meet & Confer Aff. ¶ 10. He was asked: "So you're telling me that what data you do have access to through their Google Analytics platform, they cannot download or export?" *Id.* He responded: "Yes. Google does not allow it for non-Analytics 360 members, [the Jones defendants] do not have a 360 membership, ergo, it cannot be produced." *Id.*

These representations were false. "Like all Google Analytics users, the users of the Infowars.com Google Analytics account have access to the Export function." Ex. F, Affidavit of Jordan Campbell ¶ 9. Indeed, the "EXPORT button is clearly visible on" the very screenshots the Jones defendants provided as an exhibit to their motion for a protective order on May 30, 2021.

*Id.* This export function allows the user to export the Google Analytics data in 4 different formats: PDF, Google Sheets, XLSX and CSV." *Id.* ¶ 8. "Exporting in those formats keeps the data organized and allows it to be manipulated by the recipient, as the original user could do." *Id.* Using an expert protocol, the data ordered by the Court could be exported using this basic EXPORT function. *Id.* ¶ 10. "[I]t is not true that 'to export the dataset, one must be a Google Analytics 360 user.'" *Id.* ¶ 11. In short, the Jones defendants' persistent and inaccurate claim that an expensive Google 360 membership was required for them to comply—even after the Court said that argument was no excuse for noncompliance—is exactly the kind of obfuscating and delaying conduct that led to the June 2019 sanction.

The plaintiffs moved for sanctions based on this noncompliance on August 24, 2021. DN 450. In their Opposition, for the first time in this litigation, the Jones defendants claimed that they had actually made a limited production of certain Google Analytics materials. DN 462. In their Reply, the plaintiffs demonstrated that, for several reasons, this was untrue. DN 468.

The Court found it "not necessary . . . to resolve the issue of whether the [Jones defendants'] purported transmission was actually sent" because, either way, "it cannot be considered proper compliance under our rules." DN 450.20, 9/30/21 Order. It further noted that "[t]he Jones defendants . . . seem to take the position that the rules of practice do not apply to them." *Id.* It found "there is no dispute here that the Jones defendants failed to follow the rules as they relate to discovery" and that "[t]he actions they took . . . fall short of meeting their obligations." *Id.* The court "reject[ed] their baseless argument" to the contrary and held that "after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply." *Id.* The Court indicated that it would respond to the Jones defendants' "continued failure to meet their discovery obligations in violation

of the court's order, to the prejudice of the plaintiffs," by addressing "appropriate sanctions at the next status conference." *Id.*

### D. The Jones Defendants' Failure to Produce and Misrepresentations Regarding Social Media Audience Data

In addition to the analytics discussed above, the Court's order of January 10, 2019 ordered the production of all "communications and/or documents concerning marketing data or analytics concerning" all the major social media platforms. DN 146, Defs.' Obj. ¶ 17; DN 148. In April 2019, they responded to the plaintiffs' interrogatories regarding social media analytics by stating, "All responsive documents have been provided to plaintiff's counsel." DN 218–222. During a subsequent hearing, the Jones defendants were asked explicitly about marketing and analytics, and their counsel responded, "[W]e have provided everything." Ex. G, 5/7/19 Hrg. Tr. 14:26–15:15.[4]

On June 23, 2021, during the deposition of FSS's corporate designee, counsel for the Jones defendants waited until plaintiffs' counsel questioned the deponent about certain documents, and only then shared four documents through the Zoom chat function. Ex. I, FSS Dep. at 36–37. The documents were responsive to the plaintiffs' request for production and existed at the time they were ordered to be produced. The plaintiffs moved for sanctions based on this noncompliance on August 24, 2021. DN 450. On September 30, this Court ruled that the Jones defendants' production on this point "falls short both procedurally and substantively," and that "[i]n light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the

---

[4] Discovery consistently reveals that unless forced to do so by a sanctions motion, the Jones defendants make no effort to collect responsive social media and analytics information. Misleading statements have resulted. For example, Louis Serrtuche, FSS social media manager, testified that he was not "aware of [whether anyone] attempt[ed] to retain the data concerning the performance of tweets" from the Jones defendants' accounts. Ex. H, Serrtuche Dep. at 108:9–14. Likewise, he testified that he was not aware of whether anyone at FSS "attempt[ed] to retain an archive of" the Jones defendants' Facebook accounts he managed. *Id.* at 109:11–16. In truth, he possessed these documents himself.

plaintiffs, the court will address the appropriate sanctions at the next status conference." DN 450.20, 9/30/21 Order.

### E.   The Jones Defendants' Violation of the Protective Order During the First Plaintiff's Deposition

Based on "written motions filed by the plaintiffs and the Jones defendants, the court, in entering the protective orders, found good cause for both the issuance of the original protective order and its modification" to include a 'Confidential – Attorneys Eyes Only' designation." DN 394.10, 8/5/21 Order. "In the midst of taking the first deposition of a plaintiff, the Jones defendants [except for Alex Jones][5] . . . filed a motion to depose Hillary Clinton, using deposition testimony that had just been designated as 'Confidential-Attorneys Eyes Only,' and completely disregarding the court ordered procedures." *Id.* They did not take "any steps to correct their improper filing." *Id.* at 2. In doing so, they "blatantly disregard[ed]" the "court ordered procedure" and made "the confidential information available on the internet by filing it in the court file." *Id.*

The plaintiffs moved for sanctions based on this misconduct. *Id.* Seeking to avoid sanctions, the Jones defendants took "the absurd position that the court ordered protective order . . . did not need to be complied with, and should not be enforced by the court." *Id.* The Court characterized this argument as "frightening." *Id.* "Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition," the Court noted it had "grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the

---

[5] It appears that the choice to exclude Alex Jones from the filing was a deliberate attempt to insulate him from what the Jones defendants knew was an improper and sanctionable violation of the protective order and an abuse of court process.

public." *Id.* The Court stated it would "address sanctions at a future hearing." *Id.*

### F. Refusal to Produce Court-Ordered Subsidiary Ledgers and Obfuscation Regarding Nonproduction

The Court ordered the Jones defendants to produce FSS's trial balances, including subsidiary ledgers, by May 14, 2021. DN 428.10, 8/26/21 Order. "The court stated in writing that failure to comply with the order may result in sanctions." *Id.* "The subsidiary ledger information also referred to as account detail was easily accessible to Flores[.]" *Id.* "Despite the court orders, and although the information exists, is maintained by FSS, and could have been produced by Flores as was required by the court orders, the documents were not produced." *Id.*

The plaintiffs moved for sanctions based on this misconduct. *Id.* The Court found that "[t]here is no excuse for the defendants' disregard of not only their discovery obligations, but the two court orders." *Id.* It found "that the failure to comply with the production request has prejudiced the plaintiffs their ability to both prosecute their claims and conduct further depositions in a meaningful manner." *Id.* It announced that "[s]anctions will be addressed at a future hearing." DN 428.11, 8/6/21 Continued Order.

In addition to the non-production of these Court-ordered documents, the Court must also consider the Jones defendants' obfuscating conduct. First, they said they represented that they had produced subsidiary ledgers when they had not. Ex. J, Defs.' Responses for RFPs for Flores & Karpova Deps. 4–5, May 14, 2021; Ex. K, Flores Dep. 98:5–20, May 27, 2021. Then they produced an expert affidavit stating they had no subsidiary ledgers, DN 427 (Ex. A), Roe Aff. ¶ 10, even though their own Accounting Manager testified they did. Ex. K, Flores Dep. 95:10–96:24. In short, not only did they refuse to produce these Court-ordered documents, they introduced false evidence in an effort to cover up for their non-production.

### G.     The Jones Defendants' Manipulation of Documents Provided in Discovery

In attempting to excuse their noncompliance on the subsidiary ledgers, the Jones defendants provided an affidavit admitting that they had manipulated the trial balances they *had* provided. The trial balance documents were not what they purported to be. Instead, the Jones defendants' accountant had manipulated them by "combin[ing] certain accounts." DN 427 (Ex. A), Roe Aff. ¶ 7. He claimed that the existing trial balances contained in Quickbooks were somehow "misleading," and that his alterations made them "accurate." *Id.* He then created his own "PDF versions," captioned them with the header "Free Speech Systems, LLC," and provided them to FSS for production. *Id.* After realizing that he had made errors in preparing these altered trial balances, he later changed them again. *Id.* ¶ 8. When they provided these altered documents, the Jones defendants made no mention of the fact that they had been manipulated. Instead, they simply represented that "Free Speech Systems hereby produces such Trial balances, incorporating the Subsidiary Ledgers." Ex. J, Defs.' Resp. for Flores & Karpova Deps. 4–5, May 14, 2021. Further, when the Jones defendants later produced "adjusted" trial balances, they did not describe the specific manner in which the trial balances had been adjusted. The plaintiffs moved for sanctions based on this conduct. DN 457, 9/9/21 Pls.' Mot. for Sanctions.

### H.     The Jones Defendants' Obtaining of Information on Matters the Court Barred Them from Obtaining, Concealment of Their Possession, and Gratuitous Public Filing of Information About Their Contents

This Court barred the Jones defendants from obtaining or inquiring into matters related to settlement in early July. *See* DN 389, 7/2/21 Order (barring Jones defendants from seeking information from plaintiffs related to settlement and ruling it "not a proper line of inquiry"); DN 378.10, 7/21/21 Order (ordering that "no inquiry may be made regarding any settlement between the plaintiffs and Halbig . . . nor may any testimony be offered in that regard"). In its oral ruling,

the Court further noted that this line of inquiry was "literally . . . a fishing expedition." DN 398, 7/2/21 Hrg. Tr. 49–51.

On September 2, the Jones defendants filed a "Notice." DN 454. The Notice revealed that they received documents covered by these orders on July 9, 2021, just one week after the Court's initial ruling that the Jones defendants were not entitled to obtain them through discovery. *Id.* During the 55 days following July 9, they did not reveal their possession of the documents to the plaintiffs or the Court. More particularly, during a July 21 status conference discussion, defense counsel said nothing about having already received settlement documents from Halbig, despite the fact that the prohibition on Halbig conveying settlement information was specifically discussed. In what seemed at the time like a stray remark, defense counsel volunteered, "while I understand that the plaintiff's [sic] are looking for consistency in the Court's rulings, in the event, and I -- Mr. Halbig is an interesting character -- and in the event he spontaneously utters something about the settlement without us prompting, I don't think that we should necessarily be precluded from making any further inquiries on that." DN 422, 7/21/21 Status Conf. Tr. 33–34.[6] The court "noted [their] position," *id.* at 34, and then ruled that "by order of the court, no inquiry may be made regarding any settlement between the plaintiffs and Halbig, including but not limited to the terms or value of those settlements, nor may any testimony be offered in that regard," DN 378.10, 7/21/21 Order.

The Notice, which was a public filing, gratuitously described some contents of the documents. DN 454. It also advertised this information in the public description of the filing on the face of the docket itself. *Id.* The Jones defendants refused the plaintiffs' requests to delete the

---

[6] When this remark was made, the Jones defendants *already knew* that Mr. Halbig wished to provide them information regarding the settlement (because he already had). Once again, this is precisely the kind of obfuscating and tactical conduct that led to sanctions in 2019.

materials or treat them as confidential. They stated that they believed that they had no ethical obligation even to disclose their possession of these documents to plaintiffs' counsel or the Court. It is unclear how they came to this conclusion, as CT Eth. Op. 96-4, 1996 WL 285557 (Conn. Bar. Ass'n 1996) adopted ABA Formal Op. 94-382, which created a strict obligation on attorneys to disclose possession of, and not to exploit, confidential or privileged materials received inadvertently. *Id.* (agreeing that "a lawyer may not normally hold on to and make use of confidential or privileged documents absent waiver or other proper legal authorization").[7]

## I.    Entry of Disciplinary Default Due to Discovery Abuse in Parallel Texas Cases

Multiple cases arising from Alex Jones's promotion of the lie that Sandy Hook was a hoax are pending in the state trial court in Texas.[8] On September 27, 2021, the Texas trial court entered defaults in all three cases. Ex. M, *Pozner* 9/27/21 Sanctions Order; Ex. N, *Lewis* 9/27/21 Sanctions Order; Ex. O, *Heslin* 9/27/21 Sanctions Order.

In its default order in the *Pozner* case, the Texas trial court found as follows:

On May 29, 2018, Plaintiffs served written discovery on Defendant Free Speech Systems, LLC. Twenty-eight days after service of the requests, Defendants filed a TCPA Motion [the equivalent of a Connecticut Anti-SLAPP Special Motion to Dismiss], which was subsequently denied and appealed. Following remand, Defendants failed to provide responses.

One month after remand, on July 2, 2021, Plaintiffs wrote to the Defendants inquiring about overdue responses. Plaintiffs offered an additional 14 days for Defendants to provide responses, in which case Plaintiffs agreed to waive any complaint about their timeliness. That same day, Defendants' counsel requested that Plaintiffs' counsel provide a copy of the *Pozner* discovery requests. More than three weeks later, on July 27, 2021, with no responses provided, Plaintiffs brought the instant motion. Defendants have never answered the discovery requests.

---

[7] The record is full of similar abuses. In a recent deposition, for example, counsel for the Jones defendants persisted in asking the deponent if he would search his smartphone for responsive documents—immediately *after* the Court had ruled that such a request was "just not appropriate." *See* Ex. L, Jacobson Deposition 132:17–135:25; DN 464, 9/17/21 Conf. Tr. 8:2–9:5.

[8] These cases are *Pozner v. Jones, et al.*, (D-1-GN-18-001842); *Lewis v. Jones, et al.* (D-1-GN-18-06623); and *Heslin v. Jones, et al.* (D-1-GN-18-004651).

The Court finds Defendants unreasonably and vexatiously failed to comply with their discovery duties. The Court finds that Defendants' failure to comply with discovery in this case is greatly aggravated by Defendants' consistent pattern of discovery abuse throughout the other similar cases pending before this Court. Prior to this latest discovery failure, Defendants repeatedly violated this Court's discovery orders in *Lewis v. Jones, et al.* (D-1-GN-18-006623, *Heslin v. Jones, et al.* (D-1-GN-18-004651, all of which are related cases involving Defendants' publications about the Sandy Hook Elementary School shooting. Defendants also failed to timely answer discovery in *Fontaine v. Infowars, LLC, et al.*, (D-1-GN-18-1605), a similar defamation lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones*, a similar defamation lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. The Court finds that Defendants' discovery conduct in this case is the result of flagrant bad faith and callous disregard for the responsibilities of discovery under the rules.

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remains consistent.

Ex. M, *Pozner* 9/27/21 Sanctions Order at 1–3.

## II.    LEGAL STANDARD

Practice Book § 13-14 authorizes the Court to impose sanctions for a party's failure to comply with discovery orders. Prac. Book § 13-14(a). Section 13-14(b) sets forth a non-exhaustive list of potential penalties, including entry of non-suit and default, the award of fees associated with enforcement of court orders, and evidentiary restrictions. The Court also has inherent power to order sanctions. *Ridgaway v. Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 70 (2018); *Millbrook Owners Ass'n, Inc. v. Hamilton Standard*, 257 Conn. 1, 14 (2001).

"[A] court may, either under its inherent power to impose sanctions in order to compel observance of its rules and orders, or under the provisions of [Practice Book] § 13-14, impose sanctions[.]" *Evans v. Gen. Motors Corp.*, 277 Conn. 496, 522–24 (2006) (citation omitted); *Ridgaway*, 328 Conn. at 70 n.6 (same). Appellate review of factual findings is under the clearly-

erroneous standard because the trial court "is in the best position to evaluate the evidence and the demeanor of the parties." *Id.* at 70. The decision "to enter sanctions . . . and, if so, what sanction or sanctions to impose, is a matter within the sound discretion of the trial court." *Evans*, 277 Conn. at 522–24.

Default and dismissal are the severest sanctions.[9] In general, Connecticut "practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure." *Millbrook Owners Ass'n*, 257 Conn. at 16. "[T]he court's discretion should be exercised mindful of the policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court[.]" *Evans*, 277 Conn. at 523 (quoting *Millbrook Owners Ass'n, Inc.,* 257 Conn. at 14). But "'where a party [has] show[n] a deliberate, contumacious or unwarranted disregard for the court's authority,' dismissal of the entire case may constitute an appropriate sanction." *MacCalla v. Am. Med. Response of Connecticut, Inc.*, 188 Conn. App. 228, 239 (2019) (quoting *Emerick v. Glastonbury*, 177 Conn. App. 701, 736 (2017) and affirming sanction of dismissal for attorney's improper behavior in deposition). Under such circumstances, the ultimate sanction "serves not only to penalize those whose conduct warrants such a sanction but also to deter those who might be tempted to such conduct in the absence of such deterrent." *Pavlinko v. Yale-New Haven Hosp.*, 192 Conn. 138, 145 (1984) (citation omitted).

In considering the proportionality of a sanction of dismissal or default, courts have considered "the factors that courts have identified as relevant to that consideration, namely, the nature and frequency of the misconduct, notice of the possibility of a nonsuit, lesser available

---

[9] The standard for dismissal and for default is equivalent. *See Evans*, 277 Conn. at 523–24 (applying standard from *Millbrook Owners Ass'n*, which was a dismissal case, to review of default). For this reason, while this Motion emphasizes default cases, it refers at times to dismissal cases as well.

sanctions, and the [party's] participation in or knowledge of the misconduct." *Ridgaway*, 328 Conn. at 73 (approving of factors). Connecticut courts have "upheld the imposition of a sanction of nonsuit when there is evidence of repeated refusals to comply with a court order." *Id.* (collecting cases). While the Supreme Court has not specifically determined whether a single act can warrant dismissal or default, it has noted that "courts in other jurisdictions have concluded that a single act could warrant nonsuit or dismissal if the act is sufficiently egregious, particularly when the improper conduct involves the perpetration of a deception on the court." *Id.* at 74 (citing cases). "[W]hen the court exercises its inherent authority to impose sanctions for misconduct before the court, other than for the failure to obey a court order, . . . the court's analysis will focus on whether there was willful conduct showing deliberate disregard for the court's authority and whether a nonsuit is a sanction proportionate to that conduct." *Ridgaway*, 328 Conn. at 73 n.7.

Additionally, "a significant factor" in whether dismissal or default is upheld "has been that the trial court put the plaintiff on notice that noncompliance would result in a nonsuit." *Id.* (collecting cases). Such sanctions are not upheld "when there were available alternatives to dismissal that would have allowed a case to be heard on the merits while ensuring future compliance with court orders." *Id.* at 75 (collecting cases). And lastly, "[w]hether the misconduct was solely attributable to counsel and not to the party also has been a factor in assessing whether a less severe sanction than a nonsuit or dismissal should have been ordered." *Id.*

## III.   ARGUMENT

For two and a half years, the Jones defendants have obfuscated and delayed compliance with the Court's order that they produce sales, marketing, and web-analytics data that is highly relevant to the plaintiffs' claims. For years, they improperly withheld court-ordered discovery on social media audience data and analytics, then shared minimal and incomplete information in a

manner calculated to make it as useless as possible. They have refused to provide court-ordered financial documents with "no excuse for [their] disregard of not only their discovery obligations, but . . . two court orders." DN 428.10, 8/6/21 Order. They surreptitiously manipulated the financial documents they *did* provide and presented misleading deposition testimony to hide the manipulation. They "blatantly disregarded" the protective order in a manner calculated to intimidate the plaintiffs giving deposition testimony. DN 394.10, 8/5/21 Order at 1. They obtained confidential documents the Court has barred them from seeking, concealed the fact of their possession of them for almost two months, and then alerted the Court in a public filing that disclosed some facts revealed in the confidential documents. They did all this despite numerous warnings from the Court.

In determining the proportionality of a sanction of default, Connecticut courts have "considered the severity of the sanction imposed and the materiality of the evidence sought . . . whether the violation was inadvertent or willful . . . and whether the absence of the sanction would result in prejudice to the party seeking the sanction." *Forster v. Gianopoulos*, 105 Conn. App. 702, 711 (2008) (internal citations omitted); *Spatta v. Am. Classic Cars, LLC*, 150 Conn. App. 20, 27 (2014) (noting the "trial court may consider not only the presence of mistake, accident, inadvertence, misfortune or other reasonable cause . . . factors such as [t]he seriousness of the default, its duration, the reasons for it and the degree of contumacy involved . . . but also, the totality of the circumstances, including whether the delay has caused prejudice to the nondefaulting party"). Each of these factors supports the entry of default in this case. Indeed, the Jones defendants' misconduct far exceeds cases in which default has been affirmed.

### A. There Is Absolutely No Evidence that Any of the Jones Defendants' Noncompliance or Misconduct Has Been the Result of Mistake, Inadvertence, or Any Reasonable Cause

In determining whether to award a default, a court may consider "whether noncompliance was caused by inability, rather than willfulness, bad faith or other fault." *Millbrook Owners Ass'n*, 257 Conn. at 15; *see also Forster*, 105 Conn. App. at 711 (considering "whether the violation was inadvertent or willful"); *Spatta*, 150 Conn. App. at 27 (considering "the presence of mistake, accident, inadvertence, misfortune or other reasonable cause"). There is no evidence that the Jones defendants' noncompliance or misconduct in this case has been inadvertent, or the result of inability, mistake, accident, inadvertence, or any other reasonable cause. In fact, all the evidence is to the contrary: that the Jones defendants' repeated misconduct is willful and deliberate.

### B. The Jones Defendants' Misconduct Has Been Longstanding, Repeated, and in Willful Disregard of the Court's Orders and Its Authority

Our Supreme and Appellate Court has found a sanction of default appropriate where the misconduct was repeated or longstanding in a matter that displayed disregard for the court's authority. *Ridgaway*, 328 Conn. at 73. This appears to be the most important and common factor justifying such a sanction. *See id.* at 73 n.7.

In *Spatta*, for instance, the court found it significant that the plaintiff "had been trying to obtain" the discovery "for over a year, without success, even in the face of multiple court orders mandating compliance with his requests." 150 Conn. App. at 29. Likewise, the court in *Forster* found the trial court "well within its discretion" to issue a sanction of default because, after eight months of noncompliance and "delay tactics," the sanctioned parties failed "to set forth any good faith reason for their noncompliance." 105 Conn. App. at 712. "On the basis of the defendants' nonchalant attitude toward the court's . . . discovery orders," it noted, "it would be difficult for us to conclude that the defendants' violation of the [later] order was anything but willful." *Id.* at 712.

It also found that there would be prejudice absent the sanction of default: as previous sanctions had not caused the defendants to produce the relevant documents, no other sanction was likely to do so. *Id.* at 712 n.11.

### 1. The Jones Defendants' Misconduct Is Longstanding and Persistent Despite Many Warnings by the Court

The Appellate Court has found default or dismissal justified by discovery noncompliance over significantly shorter periods than has occurred here. It has found dismissal justified after noncompliance over seven months, *Null v. Jacobs*, 165 Conn. App. 339, 349 (2016), "over a year," *Spatta*, 150 Conn. App. at 29, and eight months, *Forster*, 105 Conn. App. at 711. The Jones defendants' noncompliance with discovery stretches over multiple years. The Jones defendants have been under court order to produce Google Analytics and audience data regarding their social media accounts' reach for over two and a half years. DN 148. Further, the pattern of obfuscation and delay that led to the June 2019 sanction began as soon as the appellate stay lifted in September 2020 and has continued to the present.

According to the Supreme Court, "a significant factor" in whether dismissal or default is an appropriate sanction is whether "the trial court put the [party] on notice that noncompliance would result in a nonsuit." *Ridgaway*, 328 Conn. at 74 (collecting cases). Here, the Court has admonished the Jones defendants against misconduct numerous times, warned that further misconduct would lead to sanctions, and even specified the sanctions that would follow:

- They were warned as far back as 2019 that the Court would "not hesitate . . . to default the Alex Jones defendants" if they engaged in "continued obfuscation and delay and tactics." DN 269, 6/18/19 Hrg. Tr. 8:12–23.

- They were warned that their compliance was overdue, and that their "obligation . . . to fully and fairly comply with the discovery requests was not extinguished." DN 309.10, 5/14/21 Order.

- They were warned that "failure to comply" timely with the order to produce the financial documents "may result in sanctions." DN 325.10, 5/6/21 Order.

- They were warned regarding "candor to the tribunal," that "dilatory practices" in discovery "may be misconduct," that "obstructive tactics are sanctionable," and against making a "frivolous discovery request" or "fail[ing] to make reasonably diligent efforts to comply with a legally proper discovery request." DN 336, 5/6/2021 Hrg. Tr. 13:20–16.

- They were warned to limit their filings to the substance of the legal and factual matters in issue, noting that "filings that are not relevant and material to the matter before the Court are subject to sanctions." DN 372, 6/16/21 Hrg. Tr. 2–3.

- They were warned that the accusations made in their filings were "lacking in propriety," that "ad hominem criticism of the court is inappropriate," and that "counsel and the defendants are cautioned that the court will impose sanctions should they continue to engage in inappropriate commentary in pleadings filed with the court." DN 376.10, 6/30/21 Order.

- When the Court set its final deadline for production of the "already overdue supplemental compliance" for June 28, 2021, it expressly warned that "[f]ailure to comply with this order may result in sanctions including but not limited to a default." DN 348.10, 6/2/21 Order.

The Jones defendants' continuing misconduct in defiance of the Court's many warnings strongly warrants the entry of default.

### 2.        The Jones Defendants' Conduct Has Demonstrated Deliberate and Willful Disregard for the Court's Orders and Its Authority

Connecticut courts have "upheld the imposition of a sanction of nonsuit when there is evidence of repeated refusals to comply with a court order." *Ridgaway*, 328 Conn. at 73 (collecting cases).[10] Indeed, our Supreme and Appellate Courts have time and again found discovery and

---

[10] While it has never had opportunity to rule specifically on the question, the Supreme Court has noted approvingly that "courts in other jurisdictions have concluded that a single act could warrant nonsuit or dismissal if the act is sufficiently egregious, particularly when the improper conduct involves the perpetration of a deception on the court." *Ridgaway*, 328 Conn. at 74 (citing cases). Here, the Jones defendants' conduct was repeated. This question is therefore not directly material. However, it is notable that many of the Jones defendants' instances of misconduct were egregious, and several, including its repeatedly misleading representations about Google Analytics, social media audience data, its manipulation and misleading presentation of court-ordered financial

litigation misconduct far less egregious than the Jones defendants' in this case sufficiently willful to justify a default or dismissal. *See Pavlinko v. Yale-New Haven Hosp.*, 192 Conn. 138, 144–46 (1984) (affirming dismissal of wrongful-death case based on plaintiff-administrator's refusal to answer deposition questions based on claimed Fifth Amendment privilege); *Null*, 165 Conn. App. at 349 (affirming sanction of dismissal after plaintiff violated discovery orders three times over seven months); *Levine v. Hite*, 189 Conn. App. 281, 301 (2019) (affirming sanction of dismissal for plaintiff's "failure to comply with three previous orders of the court concerning discovery"); *Biro v. Hill*, 231 Conn. 462, 464 (1994) (affirming sanction of nonsuit after party failed "to comply, even partially, with the discovery requests on three previously entered deadlines for compliance"); *Weldon Bus. Grp. v. Schweitzer*, 22 Conn. App. 552, 555 (1990) (affirming sanction of default where the defendant failed to timely comply with discovery or to oppose motion for default); *Skyler Ltd. P'ship v. S.P. Douthett & Co.*, 18 Conn. App. 245, 248 (1989) (affirming a sanction of default after the defendant failed to appear for his deposition that had been noticed to his counsel four times). The noncompliance in *Spatta* was for just "over a year," 150 Conn. App. at 29, while that in *Forster* encompassed only eight months. 105 Conn. App. at 711.

The Jones defendants were sanctioned for willful misconduct in 2019, and that sanction was affirmed on appeal. Nonetheless, their willful violations have continued.

### a.      The Google Analytics Noncompliance Was Willful

Even after being sanctioned for nonproduction in 2019, they continued to attack the Court's original discovery order. DN 332 at 2. That was exactly the kind of misconduct the 2019 sanction was meant to remedy. *See Lafferty*, 336 Conn. at 374 (noting approvingly trial court's justification for sanction that the Jones defendants "continue[d] to object to . . . discovery" while not producing

---

documents, and suborning misleading testimony about the financial data, involved deception of the plaintiffs and/or the Court.

it). Simultaneously, the Jones defendants took the position that they need not comply with the Court's order because the sanctions order "necessarily terminated" any production obligation. DN 313, 332. The record belied the Jones defendants' claims that they advanced this position in good faith. *See* DN 348.10 (noting that "[n]owhere in the email chain [concerning discovery matters while the appeal was pending] did counsel for the Jones defendants indicate that they were compiling their discovery only if they prevailed on their appeal"). Despite the warning that "[f]ailure to comply with this order may result in sanctions including but not limited to a default," *id.*, the Jones defendants did not comply. "In short, after protracted objections and arguments by the Jones defendants over whether they had the ability to produce ANY Google Analytics data, to date they have still failed to comply." DN 450.21, 9/30/21 Order at 1. Under even their own representations of production—which have been shown false by the plaintiffs—they "fall far short of meeting their obligations under our rules." *Id.* As the Court observed, they "seem to take the position that the rules of practice do not apply to them." *Id.*

### b. The Failure to Produce Court-Ordered Social Media Audience Analytics Was Willful

For almost two and a half years, the Jones defendants repeatedly represented that they had no such data. DN 218–222; Ex. G, 5/7/19 Hrg. Tr. at 14:26–15:15; Ex. H, Serrtuche Dep. 108:9–14, 109:11–16. Then, during the deposition of FSS's corporate designee, counsel for the Jones defendants shared four reports on the Jones defendants' social media account performance for four years. They had been readily available. Ex. I, FSS Dep. 50:23–51:25. The plaintiffs still have not received social media audience analytics, including these reports, through formal discovery. They have no way to know whether there exist other reports or data that have not yet been produced. The Court has already rejected the Jones defendants' arguments otherwise as "baseless," finding that their purported production on this point "falls short both procedurally and substantively." DN

450.20. It found that this noncompliance represented part of a "continued failure to meet their discovery violations in violation of the Court's order." *Id.*

### c.     The Refusal to Produce the Subsidiary Ledgers Was Willful

The Court ordered the Jones defendants to produce financial information, including subsidiary ledgers, in advance of the deposition of Melinda Flores on May 14, 2021. DN 428.10, 8/6/21 Order. "The court stated in writing that failure to comply with the order may result in sanctions." *Id.* "Despite the court orders, and although the information exists, is maintained by FSS, and could have been produced by Flores as was required by the court orders, the documents were not produced." *Id.* The Court found that "[t]here is no excuse for the defendants' disregard of not only their discovery obligations, but the two court orders." *Id.* (rejecting as "not credible" the after-the-fact "statement of the accountant retained by FSS that FSS does not 'maintain or utilize' subsidiary ledgers"). It also found that "the failure to comply with the production request has prejudiced the plaintiffs their ability to both prosecute their claims and conduct further depositions in a meaningful manner." *Id.*

### d.     The Jones Defendants' Manipulation and Misleading Presentation of Financial Documents Was Willful

In attempting to excuse their noncompliance on the subsidiary ledgers, the Jones defendants provided an affidavit admitting that the trial balances they had provided were not what they had purported to be. Instead, the Jones defendants' accountant had manipulated them by "combin[ing] certain accounts." DN 427 (Ex. A), Roe Aff. ¶ 7. When they provided these altered documents, the Jones defendants made no mention of the fact that they had been manipulated. Instead, they simply represented that "Free Speech Systems hereby produces such Trial balances, incorporating the Subsidiary Ledgers." Ex. J, Defs.' Resp. to RFP of Docs for Flores & Karpova Deps. 4–5, May 14, 2021. At the deposition of Ms. Flores, counsel for the Jones defendants did

not clarify that the documents they had produced were not the documents Ms. Flores had run and allowed her to testify as if they were.[11]

> ### e.    The Jones Defendants' Violation of the Protective Order Was Willful

"[I]n the midst of taking the first deposition of a plaintiff," the Jones defendants "filed a motion to depose Hillary Clinton, using deposition testimony that had just been designated as 'Confidential-Attorneys Eyes Only,' and completely disregarding the court ordered procedures." DN 394.10, 8/5/21 Order 1. "At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court ordered to be followed, nor have they since taken any steps to correct their improper filing." *Id.* at 1–2. The Court found that they had "blatantly disregard[ed]" the protective order, and characterized their position that they did not need to comply with the protective order as "absurd" and "frightening." *Id.* "Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition," this Court evinced "grave concerns" about "their actions[] in the future." *Id.* (noting concerns that they "will have a chilling effect on the testimony of witnesses").[12]

---

[11] At deposition, when being questioned on the trial balances the Jones defendants had produced, Melinda Flores testified that she merely ran the trial balances and produced them. Ex. K, Flores Dep. 17:8–12 ("With respect to the trial balances that were produced in response to request Number 5, did you any -- did you do anything before producing them to determine whether they were complete and accurate? A. No."). She identified the trial balances as the "trial balance reports" that she "ran . . . for [FSS's] CPA to -- review." *Id.* at 90:1–2. She testified she "didn't enter any data," but rather, "just pressed a button and ran these reports." *Id.* at 90:20–25. She testified she sent them to Mr. Roe, the "outside CPA," via email, *id.* at 91:1–93:20, and that she did not have "any understanding of what happened to these trial balances once [she] sent them to Mr. Roe," but that she "learn[ed] that the trial balances that [she] generated had ultimately been produced to [the plaintiffs]." *Id.* at 93:21–94:7. "Mr. Wolman notified [her] that the items that were requested on [her] notice . . . had been sent to the appropriate folks." *Id.* at 94:4–11.

[12] In addition to violating the protective order, the Jones defendants' motion to depose Clinton made improper use of legal process to attack a personal and political antagonist with no relation to the case. Even after it was denied and a motion for sanctions granted, counsel for the Jones defendants was undeterred, telling the press, "We're calling on Hillary to voluntary [sic] appear in

### f. The Jones Defendants' Mishandling of Improperly Obtained Settlement Documents Was Willful

In early July, after repeated attempts to question the plaintiffs on the subject, the Court barred the Jones defendants from obtaining or inquiring into matters related to settlement. *See* DN 378.10 (ordering that "no inquiry may be made regarding any settlement between the plaintiffs and Halbig . . . nor may any testimony be offered in that regard"); DN 389 (barring Jones defendants from seeking information from plaintiffs related to settlement and ruling it "not a proper line of inquiry"). Nonetheless, the Jones defendants received copies of settlement documents from Wolfgang Halbig and retained them for 55 days without alerting the Court or the plaintiffs. *See* DN 454, 9/2/21 Notice. When they finally did notify the plaintiffs and the Court, they did so in a way designed to draw public attention and to demonstrate to the plaintiffs their willingness to reveal Court-ordered confidential information to the public. *See id.*[13]

---

Connecticut," adding, "We have questions." Rob Ryser, *Alex Jones' lawyers won't get to question Hillary Clinton in Sandy Hook defamation case. Here's why.*, NewsTimes (Aug. 5, 2021), perma.cc/7L6R-597Y.

[13] The Jones defendants have attempted to excuse their secret retention of the documents by relying on a purported ethics opinion, which they have not presented to the Court. Whether the Jones defendants' conduct violated the Rules of Professional Conduct need not be decided because they violated this Court's order. However, it appears that the appropriate course of action under our rules was *not* to review the documents, to immediately notify plaintiffs' counsel, and to destroy them at plaintiffs' counsel's request. *See* CT Eth. Op. 96-4 (adopting principle that "a lawyer may not normally hold on to and make use of confidential or privileged documents absent waiver or other proper legal authorization" (citing ABA Formal Op. 94-382)). While ABA Formal Op. 94-382 was formally withdrawn by ABA Formal Op. 06-440, the Connecticut Committee on Professional Ethics seems never to have retracted CT Ethics Op. 96-4's adoption of Op. 94-382's principles. Even ABA Formal Op. 06-440 notes that, depending on the conduct of the sender, "a lawyer who receives and uses the [confidential] materials may be subject to sanction by a court" and "other liabilities." *Id.* n.8 (citation omitted); *Cf. MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712, 718 (D. Conn. 1991) (Burns, J.) ("[t]here can be no doubt that the spirit of the ethical norms adhered to in this district, if not the letter of the Rules of Professional Conduct themselves, precludes an attorney from acquiring, inadvertently or otherwise, confidential or privileged information about his adversary's litigation strategy" (disqualifying counsel based on principle)).

In sum, the record overwhelmingly demonstrates that the Jones defendants' discovery abuses are willful. The extent of their willful and repeated misconduct, without further consideration of any other factor other than whether the sanction is proportional, warrants default. *Spatta*, 150 Conn. App. at 29; *Forster*, 105 Conn. App. at 711; *Ridgaway*, 328 Conn. at 73 n.7 (noting that where the sanction does not involve violation of a court order court should "focus on whether there was willful conduct showing deliberate disregard for the court's authority and whether a nonsuit is a sanction proportionate to that conduct").

## C.     The Jones Defendants' Misconduct Has Prejudiced the Plaintiffs

A sanction of default is warranted where the aggrieved party has been prejudiced by misconduct. This is especially true where material information is withheld. For example, in *Spatta*, the Appellate Court affirmed a sanction of default, finding it proportionate in part because "the documents sought by the plaintiff were central to his case." 150 Conn. App. at 29. Meeting this factor does not appear to be required. *See Forster*, 105 Conn. App. at 711 (affirming sanction of default where court expressly found discovery at issue was "immaterial to the determination of liability"). Regardless, it is met here in spades.

### 1.     The Court-Ordered Google Analytics and Social Media Audience Analytics Are Material and the Jones Defendants' Refusal to Produce It Has Prejudiced the Plaintiffs

As the Court has already found, the Jones defendants' "continued failure to meet their discovery obligations in violation of the court's order" has been "to the prejudice of the plaintiffs." Order, DN 450.20. The Google Analytics and social media audience data are significant to important aspects of the plaintiffs' case. The plaintiffs' complaint alleges that Jones's "false narratives about the Sandy Hook shooting, the victims, and their families" are "part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year." Compl.

¶ 11. It alleges that "the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money . . . not because they are eager to educate or even to entertain their audience." *Id.* ¶ 97. These allegations are significant to the plaintiffs' Connecticut Unfair Trade Practices Act claims. *Id.* ¶¶ 385–394 (alleging that the Jones defendants "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit," a "deceptive practice and offended public policy").

This information is also significant because the Jones defendants' motivations are highly relevant not only for assessing what punitive damages are appropriate, but also in evaluating the intentionality of their actions, and/or whether their broadcasts were done with actual malice. Courts have held that "pressure to produce sensationalistic or high-impact stories *with little or no regard for their accuracy* would be probative of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 796–97 (D.C. Cir. 1987) (*en banc*) (emphasis in original). Likewise, "evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence." *Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005). For instance, if the Jones defendants' analytics correlate the release of hoax-lie content to spikes in site traffic or audience numbers, then they are significantly probative of malice.

Moreover, the Jones defendants themselves argue that the Google Analytics data is highly material—although they claim it helps their case. They claimed that their "records show that, at most, they made $342.55 from article and page referrals that contained the term 'Sandy Hook' out of a total of $10.6 million in overall sales generated from site traffic." DN 348, Defs.' Emerg. Mot. at 3. They argue that that amount contradicts "the whole theory of the [plaintiffs'] case," which

according to them, "is that [the Jones defendants] are somehow motivated to do Sandy Hook stories to get money." Ex. D, 6/2/21 Hrg. Tr. 17:19–18:6 (emphasis added).[14] The Jones defendants' argument only underscores the prejudice to the plaintiffs: both parties agree—although for contradictory reasons—that this information is material, but only the Jones defendants have the information.[15]

Web analytics and social media data are also relevant both to explain how the Jones defendants' business operates and to establish how far the Jones defendants spread their lies about the plaintiffs. For example, the complaint alleges that "[t]he false claim that the Sandy Hook shooting was a government-sponsored hoax" "augment[ed]" and "agitat[ed] Jones's audience." Compl. ¶ 92. Google and social media audience analytics data would help show audience engagement—and thus, whether that was true.

Moreover, the Jones defendants have argued that the law of defamation looks to "publications" to assess damages. Web analytics can help measure how far these lies were spread, and thus the plaintiffs' damages. So can the Jones defendants' social media audience analytics. Social media audience data from platforms such as Facebook and YouTube will demonstrate that the Jones defendants "republished" their original broadcasts, showing both that they continued and

---

[14] The Jones defendants' claims that this information is material date back to mid-June 2019, when the Jones defendants were arguing against the production of this information the first time. On June 12, 2019, the Jones defendants broadcast an episode of the Alex Jones Show entitled "GOOGLE'S ANALYTICS PROVE INFOWARS HAS NO SANDY HOOK MARKETING: Specialist destroys MSM agenda." Ex. P, Alex Jones Show, *Google's Analytics Prove Infowars Has No Sandy Hook Marketing*, Infowars.com (June 12, 2019). In it, FSS IT manager Michael Zimmerman joined Jones "to show and prove how, contrary to Democrat attorneys and judges, Infowars has no alleged 'Sandy Hook marketing' and makes no money from Sandy Hook video views, which happen to be less than 1% of all views." *Id.*

[15] The plaintiffs absolutely do not accept the Jones defendants' unlikely and unverified claims concerning what the Google Analytics data establishes, and as noted on the following page of this Memorandum, evidence revealed in discovery has rebutted it.

extended their tortious conduct and on these platforms and how far they spread their lies. This information goes to malice, causation, damages, and the continuing violation tolling doctrine. The plaintiffs should have received analytics material produced by FSS's corporate designee years ago. They should have been able to depose the Jones defendants' social media manager *with* reports regarding the performance of their social media. They should have been able to plan their approach to discovery based on a thorough analysis of both the withheld Google Analytics data and the late-produced and partial social media audience data. Instead, the Google Analytics data has still not been produced.

Meanwhile, Jones defendants' representations that they did not have, did not use, or had fully complied on relevant social media and web-analytics data, *e.g.*, DN 218–222; Ex. G, 5/7/19 Hrg. Tr. 14:26–15:15; Ex. H, Serrtuche Dep. 108:9–14, 109:11–16, have been repeatedly belied by evidence that has dripped out in discovery, *e.g.*, Fruge-Hamman Email, DN 468 (Ex. D); Ex. L, Jacobson Dep. 119:23–120:4 ("Alex did go to Alexa[16] [web-analytics] ratings service quite a lot. And he would book people who would give him good returns on Alexa. . . . I have heard Alex say those who don't, where the ratings drop, they don't want . . . that guest on the air anymore."), *Id.* at 142:4–21 (this was reason Halbig appeared repeatedly); Acosta Dep. (Tr. forthcoming) (testifying that Alex Jones and others consulted Alexa web analytics to make decisions about sales and advertising and to assess the performance of certain articles). Misrepresentations like these, whether caused by gross negligence or deception, have undermined the integrity of the discovery process. At this point, the plaintiffs and the Court have no reason to believe that the Jones

---

[16] Alexa Internet, Inc. ("Alexa"), is a web-traffic analysis company that provides web-traffic data, global rankings, and other information on websites meant to "empower customers through compelling and actionable insights that drive measurable results for their business." ALEXA: ABOUT US, https://www.alexa.com/about (last visited Oct. 6, 2021).

defendants' responses represent complete and fair compliance, rather than a skewed, partial, self-serving picture.

### 2. The Court-Ordered Financial Documents Are Material and the Jones Defendants' Refusal to Produce Them Was Prejudicial

Likewise, the Jones defendants' refusal to produce court-ordered financial documents is prejudicial. In "disregard[ing] . . . not only their discovery obligations, but the two court orders," they "prejudiced the plaintiffs their ability to both prosecute their claims and conduct further depositions in a meaningful manner." DN 428.10. The financial documents are material to the plaintiffs' case for reasons similar to those for the Google Analytics and the social-media audience reach data. In addition, understanding the Jones defendants' business structure is essential to careful discovery. The Jones defendants' withholding of the subsidiary ledgers until after Ms. Flores had been deposed, a sanctions motion had been filed, and yet another ordered issued, was, once again, obstructive and delaying. Over and over, instead of being able to devote their energy to take discovery in an orderly manner, the plaintiffs must file sanctions, seek more court orders, and, in Ms. Flores's case, re-depose witnesses.

The Jones defendants' misleading manipulation of the financial documents they *did* provide is prejudicial misconduct of another sort. Without informing the plaintiffs, the Jones defendants' accountant had manipulated financial statements by "combin[ing] certain accounts." DN 427, Roe Aff. ¶ 7 (Ex. A). (In fact, he did so multiple times. *Id.* ¶ 8.) These documents were misleadingly represented as original documents including subsidiary ledgers. Ex. J, Defs.' Resp. to RFP of Docs. for Flores & Karpova Deps. 4–5, May 14, 2021 ("Free Speech Systems hereby produces such Trial balances, incorporating the Subsidiary Ledgers."). Like their concealment (and potentially still-incomplete production) of the social media audience data they possessed, this

misconduct illustrates that the Jones defendants' misconduct has compromised the discovery and litigation process as a whole.

### 3. The Jones Defendants' Violation of the Protective Order Prejudiced the Plaintiffs

Finally, the Jones defendants' violation of the protective order is prejudicial. "Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition," this Court has indicated "grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public." DN 394.10. This chilling effect must be considered in view of the Jones defendants' previous behavior, including a "deliberate tirade and harassment and intimidation" against plaintiffs' counsel to Jones's millions of followers. *Lafferty*, 336 Conn. at 377. In the past, some of these followers have engaged in threats, harassment, and violence in response to Jones's tirades. *See* Compl. ¶¶ 45–57. Indeed, two non-party witnesses familiar with Jones have shared with plaintiffs' counsel their concern that Jones or people acting for him will harass or endanger them because of their testimony in this case.

The Court is correct to have these concerns. The plaintiffs in this case are not easily intimidated, but all endure the threat that the Jones defendants will ignore the protective order and disclose their personal information. The violation of the protective order during the first deposition of a plaintiff heightens these concerns. Alex Jones's attack and placement of a bounty on plaintiffs' counsel, including publishing and pounding on counsel's photograph on air, also shows how justified these concerns are. The Jones defendants have shown little hesitation about using litigation misconduct to affirmatively harm the plaintiffs and their counsel.

These improper disclosures have already prejudiced the plaintiffs. But they are also a harbinger of prejudice to come. They illustrate the real danger that the Jones defendants will engage in similar or worse misconduct when the stakes are even higher.

### D. The Jones Defendants Have Demonstrated They Are Incorrigible, No Sanction Other Than Default Will Remedy Their Misconduct, and the Danger Posed by Their Disregard for the Court's Authority Will Significantly Increase

Generally, a sanction of default or dismissal should be imposed only when there are no "available alternatives to dismissal that would have allowed a case to be heard on the merits while ensuring future compliance with court orders." *Ridgaway*, 328 Conn. at 75 (collecting cases). It therefore makes sense that the Appellate Court has specially justified a sanction of default by reference to the ineffectiveness of previous warnings or sanctions. In *Forster*, for instance, it found that there would be prejudice absent the sanction of default: as previous sanctions had not caused the defendants to produce the relevant documents, no other sanction was likely to do so. 105 Conn. App. at 712 n.11. Likewise, *Spatta* noted that "the discipline imposed was progressive yet unavailing." 150 Conn. App. at 29. However, it is not necessary that progressive discipline have actually been exercised. *See Pavlinko*, 192 Conn. at 144–46 (rejecting notion that dismissal was inappropriate because the court could have instead ordered the plaintiff-administrator to answer the deposition questions, noting there was "nothing in the record . . . to suggest . . . if so ordered, he would respond to [the] questions").

Moreover, as then-Judge Chase Rogers noted, "[m]isconduct may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *Stanley Shenker & Assocs., Inc. v. World Wrestling Fed'n Ent., Inc.*, 48 Conn. Supp. 357, 371

(Super. Ct. 2003) (Rogers, J.) (quoting *Barnhill v. United States,* 11 F.3d 1360, 1367 (7th Cir. 1993)). After all, "[i]t is a long and well established principle, both in Connecticut courts and in state and federal courts throughout the country, that where a litigant's conduct abuses the judicial process, whether through flagrant discovery violations or through other serious litigation misconduct, dismissal is an appropriate sanction." *Id.* (citing *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976)).

This factor militates in favor of default here. The Jones defendants have received significant sanctions for litigation misconduct from this Court. Alex Jones and Free Speech Systems, LLC were recently defaulted in Texas.[17] As of two years ago, the Court found the Jones defendants had engaged in "continuing and deliberate misconduct . . . [that] demonstrated . . . deliberate disregard for the court's orders." *Lafferty*, 336 Conn. at 380–81 (approvingly quoting Appellate Court decision upholding sanction of dismissal). The Court sanctioned the Jones defendants by dismissing their special motion to dismiss. *Id.* Meanwhile, in associated cases in Texas, the Jones defendants were ordered to pay roughly $150,000 in attorneys' fees as sanctions for frivolous filings and other obstruction. *See Jones v. Heslin*, 2020 WL 1452025, at *6 (Tex. App. Mar. 25, 2020) ($22,250), *rev. denied* (Jan. 22, 2021); Ex. Q, *Heslin* 12/20/19 Sanctions Order 1 ($34,323.80); Ex. R, *Heslin* 12/20/19 Sanctions Order 2 ($65,825); Ex. S, Heslin 10/18/19 Contempt Order ($25,875). Those monetary sanctions were imposed before the Jones defendants'

---

[17] The Court may consider the Jones defendants' misconduct in other cases in determining the appropriate sanction in this one. *See Ginise v. Benchmark Senior Living, LLC*, 2014 WL 10920370, at *5 (Conn. Super. Ct. Nov. 25, 2014) (Povodator, J.) (considering evidence of behavior by same counsel in another case in determining appropriateness of sanctions); *Ziemba v. Lynch*, 2011 WL 4633117, at *2 (D. Conn. Oct. 4, 2011) (Underhill, J.) (holding admissible information about party's behavior in other cases as "central to the evidentiary hearing regarding whether the plaintiff committed litigation abuses" in the instant case); *Burke v. Miron*, 2010 WL 1240972, at *1 (D. Conn. Mar. 22, 2010) (Chatigny, J.) (noting approvingly that Judge Kravitz had imposed a sanction in the instant case because of a party's non-payment of sanctions in another case).

most recent spate of misconduct in this Court. Additionally, a sanction of default was recently imposed against the Jones defendants in all three Texas cases. Ex. M, *Pozner* 9/27/21 Sanctions Order; Ex. N, *Lewis* 9/27/21 Sanctions Order; Ex. O, *Heslin* 9/27/21 Sanctions Order.

As previously described in this Memorandum, this Court has repeatedly warned the Jones defendants that additional misconduct could lead to a sanction of default. But their behavior has not changed—if anything, it has worsened. At this point, this Court has no "available alternatives" that will allow it to move forward with any confidence that it can "ensur[e] future compliance with court orders." *Ridgaway*, 328 Conn. at 75 (collecting cases). The Jones defendants' recent conduct has proven just the opposite. In defense of these actions, they have made arguments that this Court has found "absurd" and "frightening." DN 394.10. "Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition," this Court has evinced "grave concerns" about "their actions[] in the future." *Id.* The stakes will only increase. The Jones defendants have conducted a number of depositions of plaintiffs covering highly sensitive information. They will soon gain access to the plaintiffs' confidential medical, psychological, and other personal documents. Their next instance of misconduct may have devastating and irreversible results.

### E.    The Jones Defendants' Misconduct Is Not Solely Attributable to Counsel

Lastly, in a few cases, "[w]hether the misconduct was solely attributable to counsel and not to the party also has been a factor in assessing whether a less severe sanction than a nonsuit or dismissal should have been ordered." *Ridgaway*, 328 Conn. at 75. "However, some courts will apply a presumption that the client had notice of and, in turn, liability for counsel's actions." *Id.* (citing *Sousa v. Sousa*, 173 Conn. App. 755, 773 n.6 ("[a]n attorney is the client's agent and his knowledge is imputed to the client"); *see also Link v. Wabash Railroad Co.*, 370 U.S. 626, 633–

34 (1962) (no merit to contention that dismissal of petitioner's claim on basis of counsel's unexcused conduct imposes unjust penalty because party is deemed bound by acts of his lawyer and is considered to have notice of all facts known to his attorney). It is noteworthy that, in the few cases where this factor has been considered, the lawyer admitted to the misconduct, averred that the client had nothing to do with it, and there was no reason in the record to believe otherwise. *See Ridgaway*, 328 Conn. at 75. Additionally, it seems only to have mattered where there has been only a single episode of misconduct. *See id.* (citing such cases). Further, as the Texas trial court pointed out, the Jones defendants have had multiple counsel. The misconduct has been consistent regardless of counsel here, as well.

## IV.   CONCLUSION

For all the foregoing reasons, the plaintiffs' motion should be granted and enter a default against the Jones defendants.

THE PLAINTIFFS,

By:   */s/ Christopher M. Mattei*
      CHRISTOPHER M. MATTEI
      ALINOR C. STERLING
      MATTHEW S. BLUMENTHAL
      KOSKOFF KOSKOFF & BIEDER, P.C.
      350 FAIRFIELD AVENUE
      BRIDGEPORT, CT  06604
      asterling@koskoff.com
      cmattei@koskoff.com
      mblumenthal@koskoff.com
      Telephone:   (203) 336-4421
      Fax:         (203) 368-3244
      JURIS #32250

## CERTIFICATION

This is to certify that a copy of the foregoing has been emailed and/or mailed, this day, postage prepaid, to all counsel and *pro se* appearances as follows:

***For Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC:***
Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103
jmw@randazza.com
P: 702-420-2001

Norman A. Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT  06511
P:  203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

***For Genesis Communications Network, Inc.***
Mario Kenneth Cerame, Esq. (and via USPS)
Brignole & Bush LLC
73 Wadsworth Street
Hartford, CT  06106
mario@brignole.com
mcerame@brignole.com
P: 860-527-9973

*/s/ Christopher M. Mattei*
CHRISTOPHER M. MATTEI
ALINOR C. STERLING
MATTHEW S. BLUMENTHAL

# EXHIBIT A

```
NO:  UWY-CV18-6046437 S       :   SUPERIOR COURT
SHERLACH, WILLIAM             :   JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                            :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.           :   APRIL 30, 2019
```
----------------------------------------------------------------
```
NO:  UWY-CV18-6046438 S       :   SUPERIOR COURT
LAFFERTY, ERICA, ET AL.       :   JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                            :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.     :   APRIL 30, 2019
```
----------------------------------------------------------------
```
NO:  UWY-CV18-6046436 S       :   SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.     :   JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                            :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.     :   APRIL 30, 2019
```

            BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S :
    Representing the Plaintiffs:
        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        Koskoff, Koskoff & Bieder, PC
        350 Fairfield Avenue
        Bridgeport, CT  06604

    Representing the Defendants Alex Jones; Infowars, LLC; Free
    Speech Systems, LLC; Infowars Health, LLC; and Prison Planet
    TV, LLC:
        ATTORNEY KEVIN SMITH
        Pattis & Smith, LLC
        383 Orange Street
        1st Floor
        New Haven, CT  06511

    Representing the Defendant Cory Sklanka:
        ATTORNEY KRISTAN JAKIELA
        Regnier, Taylor, Curran & Eddy
        100 Pearl Street
        14th Floor
        Hartford, CT  06103

    Representing the Defendant Midas Resources, Inc.:
        ATTORNEY COLLEEN VELLTURO
        Wilson Elser Moskowitz Edelman & Dicker
        1010 Washington Boulevard
        Stamford, CT  06901

                            Recorded By:
                            Colleen Birney
                            Transcribed By:
                            Colleen Birney
                            Court Recording Monitor
                            1061 Main Street
                            Bridgeport, CT  06604
```

1        And the Practice Book also contemplates that just

2     with its language which says it needs to be produced

3     in the manner in which it is ordinarily stored.  They

4     haven't done that.  They haven't produced emails in

5     Outlook format; they produced them in PDFs, which

6     exclude metadata.  The same is true, for example, the

7     Word documents that would ordinarily be produced as -

8     - as Word documents rather than as PDFs, so they

9     don't include metadata.

10        The reason that's a problem for us, I can just

11    give you a few examples, you know, they produced a

12    whole raft of material that was apparently created by

13    Wolfgang Halbig, and somehow sent to Free Speech

14    Systems or Infowars relating to Sandy Hook, including

15    materials that appear to have been created around

16    2013, 2014.  We have no idea who they were sent to,

17    who received them, who accessed them because no

18    metadata is included.

19        THE COURT:  What section of the Practice Book am

20    I looking at?

21        ATTY. MATTEI:  You are looking at -- just one

22    second, Your Honor.  13-9(e).

23        THE COURT:  Just give me a minute, okay?  What -

24    - what subsection?  The electronically stored,

25    subsection E?

26        ATTY. MATTEI:  Yeah.  I have it as 13-9 --

27        THE COURT:  E.

1        ATTY. MATTEI:  -- paren, E.  Yup.

2        THE COURT:  If information has been

3   electronically stored and if a request for production

4   does not specify a form for producing a type of

5   electronically stored information, the responding

6   party shall produce the information in a form in

7   which it is ordinarily maintained or in a form that

8   is reasonably useable.  The party need not produce

9   the same electronically stored information in more

10  than one form.

11       So you asked for it?

12       ATTY. MATTEI:  We asked for it in native format,

13  which --

14       THE COURT:  Okay.

15       ATTY. MATTEI:  -- includes metadata.  Just to

16  the extent, you know, the language here and the rule

17  doesn't expressly say native format, we think that's

18  what it describes.  But we asked for it in that

19  particular format.

20       THE COURT:  All right.  And may I -- what is the

21  problem with producing it in that form?

22       ATTY. SMITH:  Your Honor, that's really not

23  necessarily a problem.  The first that we had --

24       THE COURT:  Oh.

25       ATTY. SMITH:  -- an indication of this was April

26  22nd when we got the motion for the compliance.  We -

27  - I see the head-shaking going on, but I -- this is

```
1     our understanding of it.  We were providing those
2     documents to them.
3          THE COURT:  I stopped listening when you said
4     it's not going to be a problem for us to do it.  So
5     why don't you just then --
6          ATTY. SMITH:  That's what we were trying to do,
7     Your Honor.  We had --
8          THE COURT:  Okay.
9          ATTY. SMITH:  -- gone back to them and we said
10    how quickly can we get this stuff in the native
11    format, et cetera.
12         THE COURT:  Okay.  Okay.
13         ATTY. SMITH:  So we're trying to work that out.
14         THE COURT:  All right.
15         ATTY. MATTEI:  Your Honor, that's great to hear.
16     And perhaps we can get some information from the
17    Defense within the next couple days as to how long
18    they think that will take, because obviously --
19         THE COURT:  I have no idea.  How -- do you have
20    any idea, Counsel, at this point how long it would
21    take?  I'd be guessing.
22         ATTY. SMITH:  Not just at this point, Your
23    Honor.  But that is a question that we have out that
24    is pending, again.
25         THE COURT:  So we can address that next time.
26         ATTY. SMITH:  That's what we would ask, yes,
27    Your Honor.
```

1    ATTY. MATTEI:  Thank you.

2    THE COURT:  All right.  What else today?

3    ATTY. MATTEI:  Just moving through that motion,

4  Your Honor, number 2, the source of production.  So -

5  -

6    THE COURT:  Just give me a moment, all right?

7    ATTY. MATTEI:  Yeah.  This is page 4 of our

8  motion, section 2.

9    ATTY. SMITH:  And just so I'm clear, Your Honor,

10  which motion is this when you say section 2?  We're

11  no longer on 234, we're now on --

12    THE COURT:  I'm on -- I'm still on 234, April

13  22nd, 2019.  I thought the only things in that motion

14  were the depositions and then the issue about the

15  metadata.

16    ATTY. SMITH:  That's correct.

17    ATTY. MATTEI:  Oh, I see.

18    THE COURT:  Yeah.

19    ATTY. MATTEI:  We also raised the metadata in

20  the other one.  Okay.

21    THE COURT:  Right.

22    ATTY. MATTEI:  Thank you, Judge.  Yeah.

23    THE COURT:  So this -- 234, we're done with.

24    ATTY. SMITH:  Yes, Your Honor.

25    THE COURT:  All right.  So just give me a

26  moment, if you don't mind.  All right?

27    ATTY. MATTEI:  Yup.

```
NO:   UWY-CV18-6046437 S          :   SUPERIOR COURT
SHERLACH, WILLIAM                 :   JUDICIAL DISTRICT
                                      OF FAIRFIELD
v.                                :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.               :   APRIL 30, 2019
```

```
NO:   UWY-CV18-6046438 S          :   SUPERIOR COURT
LAFFERTY, ERICA, ET AL.           :   JUDICIAL DISTRICT
                                      OF FAIRFIELD
v.                                :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.         :   APRIL 30, 2019
```

```
NO:   UWY-CV18-6046436 S          :   SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.         :   JUDICIAL DISTRICT
                                      OF FAIRFIELD
v.                                :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.         :   APRIL 30, 2019
```

## C E R T I F I C A T I O N

    I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Fairfield, at Bridgeport, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 30th day of April, 2019.

    Dated this 6th day of May, 2019, in Bridgeport, Connecticut.

                                          Colleen Birney
                                          Court Recording Monitor

# EXHIBIT B



**RANDAZZA**
LEGAL GROUP

**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**24 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

Matthew Blumenthal
<mblumenthal@koskoff.com>

Alinor Sterling
<asterling@koskoff.com>

**Re:     *June 28, 2021 | Deadline for Production of Google Analytics***

Dear Counsel,

As discussed today, and as you are aware, the deadline for production of the Google Analytics is on June 28, 2021. The full dataset cannot be produced as an export, which thus means the only method of production is by live access to the dataset for your inspection. And, the Court previously declined to order us to provide you with a log-in. As a result, the only method for your inspection is the sandbox approach referenced during today's deposition. I recall previously making this offer to you, either during a telephone conversation or during the June 2 hearing (the transcript of which we are requesting to verify), but was not memorialized in writing and which Attorney Mattei did not recollect.

This method of inspection is akin to traditional paper discovery, where the requesting party is let into the storeroom of documents organized as kept in the ordinary course of business. You will have full liberty to run whatever searches Google Analytics permits and have full access to inspect the dataset. We envision two possible ways for this sandbox approach--we can provide you with a TeamViewer access to a Free Speech Systems computer connected to the Google Analytics or we can meet you at an agreed-upon location with a clean, new computer, where we will log-in the computer during the period of your inspection.

//

//

//

//

//

Randazza Legal Group
Page 2 of 2



Let us know which approach you prefer so that we can know if we are to meet up with you on or before the 28th.

Thank you for your attention to this matter.

Sincerely,

Jay M. Wolman

# EXHIBIT C



KOSKOFF KOSKOFF & BIEDER PC

June 25, 2021

Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103

    **Re:**    **Erica Lafferty, et al. vs. Alex Emric Jones, et al.**

Attorney Wolman:

I write in response to your letter, dated June 24, 2021, concerning data contained in your client's Google Analytics software application.

During yesterday's deposition of Free Speech Systems' corporate designee, you raised for the first time that your client is not prepared to produce its Google Analytics data by June 28 as the Court directed. You had not previously raised this issue with anybody in our office.

As it stands, your client is required to produce that long overdue data by June 28 in accordance with the Court's Order, dated June 2, 2021 (DN 348.10).

We do not agree with your statement that the Google Analytics "cannot be produced as an export." Your position is not consistent with information you provided to the Court on June 2, 2021, nor is it consistent with our understanding of Google Analytics' capability.

Finally, your proposal is not acceptable in any way. You propose to retain sole possession of the data the Court has ordered produced. You propose to permit us to view the data for a limited period of time under conditions you set. You propose to observe us during the period of time we have access to the data in a manner that would allow you to retain a record of our activity.

You proposed this on the evening of Thursday, June 24, and ask that we make ourselves available on or before Monday, June 28.

We expect complete production of the Google Analytics data in compliance with the Court's orders.

Sincerely,

Christopher M. Mattei

# EXHIBIT D

1

```
DKT NO:  X06-UWY-CV18046436-S   :  COMPLEX LITIGATION

ERICA LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY
v.                              :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                :  JUNE 2, 2021


DKT NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES
```

STATUS CONFERENCE

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S :

```
  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY ALINOR STERLING

  Representing the Defendant (s):
    ATTORNEY JAY MARSHALL WOLMAN for the defendant Alex Jones
```

```
                        Recorded and Transcribed by:
                        Debbie Ellis
                        Court Recording Monitor
                        400 Grand Street
                        Waterbury, CT  06702
```

1    there's never a question that I'm not getting what I'm

2    asking for.  So, you know --

3         THE COURT:  Can you give me one moment, please,

4    and I'll let you continue.

5         Thank you.  On that point, I was just referencing

6    the Practice Book because I thought there were Practice

7    Book provisions that dealt with that issue that you

8    just raised about how, in what form and such, but in

9    any event, go ahead.  Continue.

10        ATTY. WOLMAN:  Thank you, your Honor.

11        And so we asked for that information as to how

12   they wanted it and she would not provide it saying you

13   figure it out.  Throwing her hands up.  So, you know,

14   I've asked our IT people and they said that there is an

15   export method and that you have to be a premier member.

16   And it would cost at least $150,000 to do so.

17        As to the inability to deduplicate based on what

18   Attorney Pattis had produced, we have at this time we

19   have an electronic discovery vendor.  At the time

20   Attorney Pattis was doing it, one was not being used.

21   So to be able to integrate what he produced into that

22   and figure out and deduplicate that is not something

23   that we are currently able to do because it's not from

24   the same time.

25        Similarly we cannot simply eliminate and sort for

26   things with attorney's names or domain names on it

27   because it appears often in messages where somebody

1    information in more than one form.

2        So I know you were saying you asked in what form

3    and you didn't get an answer but doesn't the Practice

4    Book control on that?

5        ATTY. WOLMAN:  If it's kept in a form not by us.

6    It's not under our control.

7        THE COURT:  The Practice Book doesn't --

8        ATTY. WOLMAN:  We do not ordinarily maintain it in

9    a form.

10       THE COURT:  Attorney Wolman, the Practice Book

11   controls here since it wasn't -- it doesn't matter.

12   You're the producing party and that's what that

13   Practice Book section refers to.  So I would just, you

14   should probably just take a look at that if there are

15   any further issues.  Okay.

16       ATTY. WOLMAN:  It will cost, my understanding is

17   150,000 and the cost should be borne by them.

18       THE COURT:  Okay.  All right.  Anything else, sir?

19       ATTY. WOLMAN:  Just that the amount of labor

20   otherwise required is not proportionate to the needs of

21   this case and I want to highlight that again.  Three

22   thousands of a percent barely scratches the surface of

23   any justification for the whole theory of the case, is

24   that our clients are somehow motivated to do Sandy Hook

25   stories to get money.  Seems like this is a loser of a

26   story in terms of moneymaking.  It doesn't make money.

27   There's no evidence of that.  We now have this data and

1     so the court should look at it from a cost benefit

2     analysis that all this labor, if it's going to take me

3     if I have to do, you know, April to review 1,000

4     e-mails a day because I've got other cases and I'm the

5     only attorney here admitted in Connecticut, then that's

6     going to take me 300 work days.

7          THE COURT:  Okay.  So I will rule on it in writing

8     probably within the hour.  Okay.  Anything else that we

9     need to deal with today that doesn't involve the other

10    defendant, I don't want to have any discussions that

11    will impact him since he's not here?  We are all on the

12    same page as to what other filings, the deadlines are

13    for the other filings?

14         ATTY. STERLING:  We are, your Honor.  This is

15    Attorney Sterling for the record.  I have one issue.

16    We will be filing a motion to amend the protective

17    order shortly.  We'd like to add an attorneys' eyes

18    only designation.  When we do file that, your Honor, I

19    think it would be important to set a briefing schedule

20    because we'd like to have that ruling in place before

21    our clients are deposed or we respond with written

22    production.  So I just wanted to flag that to the court

23    and inquire whether we should e-mail Attorney Ferraro

24    when we file it or file an RFA.

25         THE COURT:  Can I suggest that you talk to

26    Attorney Wolman first because you definitely don't have

27    any problems agreeing on briefing schedules as far as I

22

```
1
2     DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION
3     ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
      v.                               :  AT WATERBURY, CONNECTICUT
4     ALEX EMRIC JONES                 :  JUNE 2, 2021
5
      DKT NO: X06-UWY-CV186046437-S
6
      WILLIAM SHERLACH
7     V.
      ALEX EMRIC JONES
8
9     DKT NO:  X06-UWY-CV186046438-S
10    WILLIAM SHERLACH
      V.
11    ALEX EMRIC JONES
12
                      E L E C T R O N I C
13                 C E R T I F I C A T I O N
14          I hereby certify the electronic version is a true and
15    correct transcription of the audio recording of the
16    above-referenced case, heard in Superior Court, G.A. 4 of
17    Waterbury, Connecticut before the Honorable Barbara N. Bellis,
18    Judge, on June 2, 2021.
19
20          Dated this 3rd day of June, 2021 in Waterbury,
21    Connecticut.
22
23
24
25    _____
26              Debbie A. Ellis
               Court Recording Monitor
27
```

# EXHIBIT E



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**25 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

   ***Re:***   ***Lafferty v. Jones | Google Analytics***

Dear Attorney Mattei:

To be clear, there is no inconsistency.  As set forth on June 2, to export the raw data, one must be an Analytics 360 member, i.e. a premium member.  Free Speech Systems is not an Analytics 360 member, therefore it is impossible for it to export the data.  As further offered on June 2, if Plaintiffs wish to make Free Speech Systems an Analytics 360 member, they have been welcome to do so.  This offer was made on the record.  Plaintiffs have declined this manner of production so far.

         Sincerely,

         Jay M. Wolman

cc:   mblumenthal@koskoff.com, asterling@koskoff.com

# EXHIBIT F

DocuSign Envelope ID: EE54F1C0-84B3-4A58-B8EE-52A83F0636F3

| NO.   X06-UWY-CV-18-6046436-S | : | SUPERIOR COURT |
|---|---|---|
| ERICA LAFFERTY, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 23, 2021 |

| NO.   X-06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 23, 2021 |

| NO.   X06-UWY-CV-18-6046438-S | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH, ET AL. | : | COMPLEX LITIGATION DOCKET |
| V. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | AUGUST 23, 2021 |

## AFFIDAVIT OF JORDAN CAMPBELL

I, JORDAN CAMPBELL, declare as  follows:

1.      I am over eighteen and believe in the obligation of an oath.

2.      I make this affidavit after consideration of the Notice of Compliance dated June 28, 2021 filed by Alex Jones and Free Speech Systems, LLC, and the correspondence between Attorneys Christopher Mattei and Jay Wolman on June 24 and 25, 2021.

3.      I am the owner and operator of Good Soup Media, an online marketing agency, in London, Ontario, Canada.

4.      I am an expert in the use of Google Analytics and have worked extensively with

1

the program for 3+ years. I have spent upwards of $20,000 on online courses and education materials in order to increase my knowledge and expertise in my field. I have been working alongside my clients in their website development, monitoring and advertising efforts including, but not limited to the use of Google Ads, LinkedIn Advertising, Google Analytics, Website Design and Website Maintenance.

5.      In connection with the preparation of this affidavit, I have reviewed what I understand to be the production of the Google Analytics summary reports produced to date by Defendant Free Speech Systems, LLC in this litigation, which include one recently produced 5-page document consisting of screenshots of some Google Analytics information (Exhibit A) and one 35-page set of scanned images of more Google Analytics information (Exhibit B).  I have also reviewed the Jones defendants' Emergency Motion for Protective Order, to which the 5 pages of Google Analytics screen shots were attached. I have also reviewed the Notice of Compliance concerning the production of Google Analytics data and correspondence between Jay Wolman and Christopher Mattei dated June 24 and 25, 2021 (Exhibits C and D, respectively).

### What Google Analytics Does

6.      Google Analytics is a web analytics service offered by Google that is specifically built to collect, track, and report on website traffic and visitor information. Google Analytics collects and stores website visitor data. Some well-known examples of data that Google Analytics collects are: Users (number of website visitors), Sessions (number of times the website has been accessed), Average Time Spent on Site, Bounce Rate (percentage of users who leave after one page visit without interacting), Pages/Session (number of pages a user visits before leaving the site) etc.

7.      Google Analytics also has an ecommerce tracking function. "Ecommerce tracking is a feature of Google Analytics that tracks shopping activity on your website." https://www.hotjar.com/google-analytics/glossary/ecommerce-tracking/. The sales and payments data collected using the ecommerce function can be used in reports or exported like other Google Analytics data. It appears from the information shown on Exhibit A, in the Revenue column, that a user of the Infowars.com site set up ecommerce tracking within their Google Analytics account, so that ecommerce data is being collected as well.

**How to Export Data Collected by Google Analytics**

8.      Google Analytics data may be exported using the application's built-in function to export data. This export function allows the user to export the Google Analytics data in 4 different formats: PDF, Google Sheets, XLSX and CSV. Exporting in those formats keeps the data organized and allows it to be manipulated by the recipient, as the original user could do. Clicking the EXPORT button enables direct export of the selected data in a format, *e.g.,* as an Excel spreadsheet, suitable for analysis. Data so exported will be the actual data with 100% accuracy. In order to use the export function, the account user uses the report function to define the data to be exported and clicks the EXPORT button located at the top of the page.

9.      Like all Google Analytics users, the users of the Infowars.com Google Analytics account have access to the Export function. The EXPORT button is clearly visible on Exhibit A, as shown through the highlight below:



10.     It is my understanding that the Jones defendants have been ordered to produce the data from the relevant Google Analytics accounts for multiple years. While that is a substantial amount of data, by using the free export function described above, a user of the relevant account could easily export complete, accurate and readily useable data as Excel (xlsx) files.  In preparation to make this affidavit I considered and tested the export mechanism, and it is simple to use and functions correctly. I believe exporting the data would take a computer literate user following a simple protocol under a week to complete the exports and possibly would require even less time. (By a computer literate user, I mean someone with simple data entry skills.) The development of

4

an appropriate export approach took me approximately 30 minutes. Following a step-by-step protocol, which could be provided, would be a simple process.

11.     The Jones Defendants state in the Notice of Compliance that "Free Speech Systems understands that, to export the dataset, one must be a Google Analytics 360 user. See https://marketingplatform.google.com/about/analytics/compare/ (noting that "access to raw data" is checked off only for Analytics 360, the non-free solution)." As described above, it is not true that "to export the dataset, one must be a Google Analytics 360 user." There are multiple ways to export the dataset, one of which I have described above.

**The Google Analytics Information that Has Been Produced**

12.     The Google Analytics information that has been produced in this case has not been produced either in the format in which Google Analytics information is usually stored or in another comparably usable format. Exhibit A appears to be screenshots of what appears to be a Google Analytics report. Exhibit B appears to be image copies of PDF reports. These formats deprive the recipient of the ability to access and manipulate the underlying data directly.

13.     The Google Analytics information that has been produced through Exhibits A and B also contain only a tiny fraction of the Google Analytics data that the application collects. For example, the information on Exhibits A and B is not organized day by day, but rather, the information is presented in yearly increments (and in some cases random time intervals). Daily data is available, and provides a far more complete dataset which, if produced in a format, such as Excel files, would be immediately suitable for and ready for analysis. These exhibits also do not provide any data related to Demographics (Age and Gender of website visitors), Location (where in the world the users accessed the website from), Ad Campaign Performance (including keywords used in campaigns and searches used to find the site), Source of the Traffic (where visitors were

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F0638F3

before arriving on the Jones Defendants' website), User Interests, Browser and Operating System Information, or Custom Variables (metrics created by the Jones Defendants to track website specific performance). The reports provide very limited information on Individual Page Performance, Language, New vs. Returning Users, and Ecommerce information (sales performance, time to purchase, etc.).

14.     Exhibit A, unlike Exhibit B, contains some revenue data. Revenue data is available through Google Analytics' ecommerce function. In order for the ecommerce function to work, the user must set up ecommerce tracking. Google Analytics instructs:

> To see Ecommerce data in your Analytics reports, you need to:
> Enable Ecommerce for each view in which you want to see data.
> Add code to your site to collect the ecommerce data and send it to Analytics. To complete this task, you need to be comfortable editing HTML and coding in JavaScript, or have help from an experienced web developer.

https://support.google.com/analytics/answer/1009612?hl=en#zippy=%2Cin-this-article.    A user with the technical capability to set up ecommerce tracking would certainly have the technical capability to understand that there are multiple means to export Google Analytics data.

15.     The Jones defendants state in their Emergency Motion for Protective Order that "In fact, Defendants' records show that, at most, they made $342.55 in sales from article and video page referrals that contained the term "Sandy Hook" out of a total of $10.6 million in overall sales generated from site traffic." In support of this statement, they reference the information that is attached to my affidavit as Exhibit A. (This same information was attached as Exhibit C in support of their Emergency Motion for Protective Order.) For the Google Analytics application to capture e-commerce data – that is, revenue information – for the time period shown on Exhibit A (Dec. 14, 2012 to March 29, 2021), the e-commerce function would have had to be enabled on or before December 14, 2012. If the e-commerce function was enabled throughout that entire period, then there is very significant additional

revenue data available that has not been provided to the plaintiffs. If the e-commerce function was not enabled as of December 14, 2012, then Google Analytics data cannot establish revenue for the entire period, and the claim that revenue is $342.55 is not supported by Exhibit A.

16.     Based on the description provided in their correspondence of June 24 and 25, 2021 (Exhibits C and D), the Jones defendants' proposed "sandbox approach" suffers from multiple technical defects. First, it offers the plaintiffs only limited-time access to the data. Second, through mirroring or other methods, it would allow the Jones defendants to observe, surveil, and/or record all the plaintiffs' actions within the Google Analytics account, including any searches or other analysis that the plaintiffs or their experts might perform on the data while they had access to it. Under this arrangement, plaintiffs or their experts would be unable to assure or verify that the Jones defendants did not do so. Having access to this information could give the Jones defendants key insight into plaintiffs' counsel's mental impressions, conclusions, opinions, or legal theories.

17.     I attach a copy of my curriculum vitae as Exhibit E.


        I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Jordan Campbell*
JORDAN CAMPBELL


Subscribed and sworn to before me this 23 day of August, 2021.


*Kerry McGladdery Dent*
Notary Public

My commission expires: <u>N/A  LSO# 59685G</u>

This affidavit was sworn by the affiant present in the City of London, in the County of Middlesex, in
the Province of Ontario, via videoconferencing technology, before me, a Commissioner of Oaths,
present in the City of London, in the County of Middlesex, in the Province of Ontario, pursuant to O.
Reg. 431/20: Administering Oath Or Declaration Remotely.

This is Exhibit **"A"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry MacGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

All accounts › Infowars Shop
All Web Site Data ▾

Q  Try searching "Top channels by users"   Loading...

**Referral Traffic** ✓

🖫 SAVE   ⬇ EXPORT   ⮜ SHARE   ✎ EDIT   ⟳ INSIGHTS

ALL › SOURCE: infowars.com ▾

Dec 14, 2012 - Mar 29, 2021 ▾

| ◯ All Users 0.00% Users | ◯ + Add Segment |
|---|---|

**Explorer**

Summary   Site Usage   Ecommerce

Users ▾

Day | Week | Month | 📈 | ⁂

Primary Dimension: **Referral Path**   Other ▾

Secondary dimension ▾   Sort Type: Default ▾

sandy-hook   ⊗ Q   advanced   ▦ ◉ Ξ ⇄ ⊞ ⦚

| Referral Path | Acquisition | | | Behavior | | | Conversions | | |
|---|---|---|---|---|---|---|---|---|---|
| | Users ↓ | New Users | Sessions | Bounce Rate | Pages / Session | Avg. Session Duration | Goal Conversion Rate | Goal Completions | Goal Value |
| | **0**<br>% of Total: 0.00% (0) | **395**<br>% of Total: 0.03% (1,401,851) | **537**<br>% of Total: 0.03% (2,097,965) | **58.47%**<br>Avg for View: 48.61% (20.30%) | **2.80**<br>Avg for View: 3.62 (-22.58%) | **00:02:51**<br>Avg for View: 00:03:26 (-18.00%) | **0.00%**<br>Avg for View: 0.00% (0.00%) | **0**<br>% of Total: 0.00% (0) | **$0.00**<br>% of Total: 0.00% ($0.00) |
| 1.  /boston-mayor-vice-president-guaranteed-gun-control-reform-before-sandy-hook-shooting/ | 0  (0.00%) | 1  (0.25%) | 2  (0.37%) | 50.00% | 1.50 | 00:00:07 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 2.  /christie-vetoes-gun-control-bill-angers-sandy-hook-parents/ | 0  (0.00%) | 1  (0.25%) | 4  (0.74%) | 50.00% | 3.00 | 00:02:16 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 3.  /confirmed-section-of-gotham-renamed-sandy-hook-in-latest-dark-knight-release/ | 0  (0.00%) | 5  (1.27%) | 7  (1.30%) | 85.71% | 2.57 | 00:00:39 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 4.  /connecticut-town-to-burn-violent-video-games-as-sandy-hook-returns-to-school/ | 0  (0.00%) | 0  (0.00%) | 1  (0.19%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 5.  /connecticut-tries-to-hide-sandy-hook-truth/ | 0  (0.00%) | 98  (24.81%) | 136  (25.33%) | 65.44% | 2.18 | 00:02:10 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 6.  /dark-knight-rises-shows-sandy-hook-written-on-map/ | 0  (0.00%) | 2  (0.51%) | 2  (0.37%) | 0.00% | 8.50 | 00:13:11 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 7.  /exposed-sandy-hook-shooters-biggest-threat-still-lives/ | 0  (0.00%) | 6  (1.52%) | 8  (1.49%) | 37.50% | 5.38 | 00:03:22 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 8.  /father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/ | 0  (0.00%) | 2  (0.51%) | 3  (0.56%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 9.  /fbi-releases-heavily-redacted-sandy-hook-records/ | 0  (0.00%) | 39  (9.87%) | 56  (10.43%) | 46.43% | 3.41 | 00:05:19 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 10.  /full-police-investigation-into-sandy-hook-shooting-released/ | 0  (0.00%) | 1  (0.25%) | 1  (0.19%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 11.  /glenn-beck-to-devote-whole-show-to-debunking-conspiracy-theories-about-sandy-hook/ | 0  (0.00%) | 1  (0.25%) | 1  (0.19%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 12.  /mayan-calendar-sandy-hook-peace-prize-obama-your-entire-reality-has-been-scripted-by-the-manipulation-masters/ | 0  (0.00%) | 1  (0.25%) | 1  (0.19%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 13.  /msnbc-edit-portrays-gun-owners-as-heckling-father-of-sandy-hook-victim/ | 0  (0.00%) | 1  (0.25%) | 1  (0.19%) | 0.00% | 2.00 | 00:00:11 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 14.  /newtown-conn-voters-accept-50-million-to-demolish-rebuild-sandy-hook-school/ | 0  (0.00%) | 1  (0.25%) | 1  (0.19%) | 0.00% | 4.00 | 00:01:08 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 15.  /piers-morgan-admits-he-is-standing-on-the-graves-of-sandy-hook-victims/ | 0  (0.00%) | 1  (0.25%) | 1  (0.19%) | 100.00% | 1.00 | 00:00:00 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 16.  /revealed-sandy-hook-truth-exposed/ | 0  (0.00%) | 10  (2.53%) | 15  (2.79%) | 53.33% | 3.33 | 00:02:38 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 17.  /school-shooting-expert-threatened-over-sandy-hook-investigation/ | 0  (0.00%) | 218  (55.19%) | 290  (54.00%) | 57.59% | 2.89 | 00:02:47 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 18.  /state-of-connecticut-crafts-special-act-to-hide-sandy-hook-evidence/ | 0  (0.00%) | 2  (0.51%) | 2  (0.37%) | 50.00% | 5.00 | 00:05:59 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 19.  /video-were-crisis-actors-used-in-sandy-hook-massacre/ | 0  (0.00%) | 1  (0.25%) | 1  (0.19%) | 0.00% | 6.00 | 00:04:51 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |
| 20.  /why-people-think-sandy-hook-is-a-hoax/ | 0  (0.00%) | 4  (1.01%) | 4  (0.74%) | 75.00% | 1.75 | 00:00:43 | 0.00% | 0  (0.00%) | $0.00  (0.00%) |

Show rows: 50 ▾   Go to: 1   1 - 20 of 20   ‹ ›

This report was generated on 3/29/21 at 12:20:22 PM - Refresh Report

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F06368F3

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F0636F3





Free Speech Systems, L... > Infowars Store
All Web Site Data

Try searching "Top channels by users"

Loading...

SAVE EXPORT SHARE EDIT INSIGHTS

## Referral Traffic

ALL » SOURCE: infowars.com

Dec 14, 2012 - Mar 29, 2021

All Users
+ Add Segment

Explorer

Summary Site Usage Goal Set 1 Goal Set 2 Ecommerce

Users

Day Week Month

Primary Dimension: Referral Path Other

Secondary dimension Sort Type: Default

sandy-hook advanced

| Referral Path | Users (Acquisition) | New Users (Acquisition) | Sessions (Acquisition) | Bounce Rate (Behavior) | Pages / Session (Behavior) | Avg. Session Duration (Behavior) | Ecommerce Conversion Rate (Conversions: eCommerce) | Transactions (Conversions: eCommerce) | Revenue (Conversions: eCommerce) |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 309 | 520 | 40.38% | 3.82 | 00:02:06 | 0.96% | 5 | $342.55 |
| 1. /1-in-1000-infowars-wins-sandy-hook-appeal-request/ | 0 | 1 | 2 | 50.00% | 11.00 | 00:07:25 | 0.00% | 0 | $0.00 |
| 2. /alex-jones-final-statement-on-sandy-hook/ | 0 | 32 | 88 | 43.18% | 3.75 | 00:02:38 | 2.27% | 2 | $53.50 |
| 3. /alex-jones-full-statement-on-frivolous-sandy-hook-lawsuit/ | 0 | 9 | 10 | 60.00% | 2.50 | 00:00:42 | 0.00% | 0 | $0.00 |
| 4. /alex-jones-official-statement-on-roku-ban-and-sandy-hook/ | 0 | 2 | 4 | 50.00% | 4.50 | 00:01:20 | 0.00% | 0 | $0.00 |
| 5. /alex-jones-responds-to-sandy-hook-anti-free-speech-lawsuit/ | 0 | 7 | 11 | 72.73% | 3.45 | 00:01:11 | 0.00% | 0 | $0.00 |
| 6. /alex-jones-sandy-hook-trial-could-change-history/ | 0 | 2 | 3 | 33.33% | 1.33 | 00:00:27 | 0.00% | 0 | $0.00 |
| 7. /confirmed-section-of-gotham-renamed-sandy-hook-in-latest-dark-knight-release/ | 0 | 1 | 2 | 50.00% | 1.50 | 00:00:27 | 0.00% | 0 | $0.00 |
| 8. /connecticut-tries-to-hide-sandy-hook-truth/ | 0 | 7 | 12 | 41.67% | 4.92 | 00:01:57 | 0.00% | 0 | $0.00 |
| 9. /conspiracy-theorist-arrested-after-calling-sandy-hook-shooting-fake/ | 0 | 4 | 4 | 25.00% | 2.50 | 00:00:13 | 0.00% | 0 | $0.00 |
| 10. /dark-knight-rises-shows-sandy-hook-written-on-map/ | 0 | 5 | 5 | 40.00% | 1.80 | 00:00:36 | 0.00% | 0 | $0.00 |
| 11. /exclusive-alex-jones-responds-to-sandy-hook-child-porn-set-up/ | 0 | 14 | 17 | 64.71% | 2.65 | 00:02:57 | 0.00% | 0 | $0.00 |
| 12. /exposed-media-caught-in-huge-sandy-hook-trial-lie/ | 0 | 1 | 2 | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 13. /fake-news-cnns-jim-acosta-claims-1552-mass-shootings-since-sandy-hook/ | 0 | 0 | 5 | 20.00% | 5.20 | 00:03:23 | 0.00% | 0 | $0.00 |
| 14. /farook-lawyer-compares-san-bernardino-massacre-to-sandy-hook/ | 0 | 1 | 2 | 50.00% | 4.00 | 00:00:43 | 0.00% | 0 | $0.00 |
| 15. /father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/ | 0 | 2 | 3 | 33.33% | 4.67 | 00:01:47 | 0.00% | 0 | $0.00 |
| 16. /fbi-releases-heavily-redacted-sandy-hook-investigation-docs/ | 0 | 20 | 26 | 57.69% | 4.62 | 00:03:57 | 3.85% | 1 | $150.20 |
| 17. /fbi-says-no-one-killed-at-sandy-hook/ | 0 | 31 | 42 | 54.76% | 2.95 | 00:01:17 | 0.00% | 0 | $0.00 |
| 18. /glenn-beck-to-devote-whole-show-to-debunking-conspiracy-theories-about-sandy-hook/ | 0 | 1 | 1 | 0.00% | 2.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 19. /howard-stern-mocks-dead-sandy-hook-children/ | 0 | 0 | 1 | 0.00% | 5.00 | 00:01:26 | 0.00% | 0 | $0.00 |
| 20. /internet-censors-viral-sandy-hook-truth-documentary/ | 0 | 1 | 1 | 0.00% | 2.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 21. /judge-allows-sandy-hook-families-to-sue-remington-firearms-over-massacre/ | 0 | 77 | 109 | 1.83% | 4.05 | 00:00:40 | 0.00% | 0 | $0.00 |
| 22. /judge-rules-docs-taken-from-sandy-hook-shooters-house-must-stay-secret/ | 0 | 1 | 2 | 0.00% | 2.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 23. /live-alex-jones-responds-to-sandy-hook-vampire/ | 0 | 19 | 47 | 51.06% | 2.98 | 00:01:57 | 2.13% | 1 | $62.41 |
| 24. /live-saturday-broadcast-lawyer-breaks-down-the-real-sandy-hook-conspiracy-more/ | 0 | 5 | 16 | 62.50% | 3.81 | 00:02:19 | 0.00% | 0 | $0.00 |
| 25. /mayan-calendar-sandy-hook-peace-prize-obama-your-entire-reality-has-been-scripted-by-the-manipulation-masters/ | 0 | 1 | 1 | 0.00% | 14.00 | 00:02:57 | 0.00% | 0 | $0.00 |
| 26. /mega-massive-cover-up-retired-fbi-agent-investigates-sandy-hook/ | 0 | 3 | 5 | 60.00% | 1.40 | 00:00:00 | 0.00% | 0 | $0.00 |
| 27. /msm-uses-tragic-suicide-of-sandy-hook-dad-to-smear-alex-jones/ | 0 | 0 | 3 | 66.67% | 12.67 | 00:20:49 | 0.00% | 0 | $0.00 |
| 28. /mystery-sandy-hook-victim-dies-again-in-pakistan/ | 0 | 3 | 3 | 33.33% | 2.00 | 00:00:41 | 0.00% | 0 | $0.00 |
| 29. /ny-times-releases-bizarre-sandy-hook-2nd-shooter-story/ | 0 | 2 | 5 | 60.00% | 2.80 | 00:00:49 | 0.00% | 0 | $0.00 |
| 30. /posts/alex-jones-tim-pool-lays-out-infowars-real-relationship-with-sandy-hook/ | 0 | 4 | 8 | 37.50% | 13.38 | 00:05:56 | 0.00% | 0 | $0.00 |
| 31. /robert-barnes-makes-major-announcements-in-sandy-hook-hoax/ | 0 | 1 | 1 | 0.00% | 3.00 | 00:00:23 | 0.00% | 0 | $0.00 |
| 32. /robert-barnes-makes-major-announcements-in-sandy-hook-media-hoax/ | 0 | 3 | 6 | 33.33% | 11.17 | 00:09:46 | 16.67% | 1 | $76.44 |
| 33. /sandy-hook-truth-book-banned-by-amazon/ | 0 | 1 | 1 | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 34. /sandy-hooks-case-against-bushmaster-and-why-the-gun-debate-is-already-over/ | 0 | 1 | 1 | 0.00% | 2.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 35. /school-shooting-expert-threatened-over-sandy-hook-investigation/ | 0 | 2 | 3 | 66.67% | 1.33 | 00:00:00 | 0.00% | 0 | $0.00 |
| 36. /the-sandy-hook-secret-inside-hillarys-plan-to-end-free-speech/ | 0 | 1 | 3 | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 37. /ultimate-fake-news-psy-op-msm-falsely-claims-alex-jones-loses-sandy-hook-defamation-case/ | 0 | 1 | 2 | 50.00% | 3.00 | 00:00:28 | 0.00% | 0 | $0.00 |
| 38. /university-seeks-to-fire-professor-for-questioning-sandy-hook/ | 0 | 0 | 1 | 100.00% | 1.00 | 00:00:00 | 0.00% | 0 | $0.00 |
| 39. /video-we-need-to-talk-about-sandy-hook/ | 0 | 1 | 1 | 0.00% | 12.00 | 00:04:29 | 0.00% | 0 | $0.00 |
| 40. /watch-alex-jones-has-respectful-message-for-sandy-hook-parents/ | 0 | 0 | 4 | 50.00% | 2.00 | 00:02:33 | 0.00% | 0 | $0.00 |
| 41. /what-alex-jones-really-believes-about-sandy-hook/ | 0 | 35 | 42 | 57.14% | 3.07 | 00:02:15 | 0.00% | 0 | $0.00 |
| 42. /why-people-think-sandy-hook-is-a-hoax/ | 0 | 3 | 3 | 66.67% | 1.33 | 00:00:38 | 0.00% | 0 | $0.00 |
| 43. /youtube-censoring-sandy-hook-videos/ | 0 | 4 | 12 | 41.67% | 4.08 | 00:05:42 | 0.00% | 0 | $0.00 |

Show rows: 50 Go to: 1 1 - 43 of 43

This report was generated on 3/29/21 at 12:19:24 PM - Refresh Report

DocuSign Envelope ID: EE54F1C9-84B3-4A88-B8EE-52A83F0636F3



This is Exhibit **"B"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

Kerry McGladdery Dent
A COMMISSIONER FOR TAKING AFFIDAVITS

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F0636F3



.il Analytics    http://www.infowars.com
www.infowars.com                              Go to report ↗

## Audience Overview

All Users
100.00% Users

Jan 1, 2012 - Dec 31, 2012

Overview



● Users
1,000,000

600,000

March 2012    May 2012    July 2012    September 2012    November 2012

■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 40,152,262 | 38,413,391 | 119,107,058 |



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.97 | 284,866,233 | 2.39 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:05:22 | 56.41% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | service provider corporation | 1,137,641 | 13.16% |
| 2. | cellco partnership dba verizon wireless | 809,503 | 9.37% |
| 3. | comcast cable communications inc. | 567,629 | 6.57% |
| 4. | road runner holdco llc | 530,693 | 6.14% |
| 5. | sprint nextel corporation | 407,969 | 4.72% |
| 6. | at&t internet services | 376,275 | 4.35% |
| 7. | verizon online llc | 369,602 | 4.28% |
| 8. | (not set) | 238,061 | 2.75% |
| 9. | t-mobile usa inc. | 208,989 | 2.42% |
| 10. | cox communications | 190,163 | 2.20% |

DocuSign Envelope ID: EE54F129-84B3-4A58-B8EE-52A83F0638F3



**.I| Analytics** http://www.infowars.com
www.infowars.com

Go to report ☑

## Audience Overview



⭘ **All Users**
100.00% Users

Jan 1, 2013 - Dec 31, 2013

Overview



● Users

3,000,000

2,000,000

1,000,000

| March 2013 | May 2013 | July 2013 | September 2013 | November 2013 |

■ New Visitor   ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 60,896,317 | 58,454,408 | 179,324,958 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.94 | 436,145,187 | 2.43 |

22.3%

77.7%

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:17:02 | 60.25% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | service provider corporation | 2,376,251 | 10.28% |
| 2. | cellco partnership dba verizon wireless | 1,569,696 | 6.79% |
| 3. | comcast cable communications inc. | 1,294,506 | 5.60% |
| 4. | (not set) | 1,269,750 | 5.50% |
| 5. | at&t internet services | 1,021,110 | 4.42% |
| 6. | sprint nextel corporation | 905,939 | 3.92% |
| 7. | verizon online llc | 881,541 | 3.82% |
| 8. | amazon.com inc. | 846,380 | 3.66% |
| 9. | time warner cable internet llc | 778,211 | 3.37% |
| 10. | road runner holdco llc | 646,535 | 2.80% |

© 2019 Google



.▮ Analytics    http://www.infowars.com
www.infowars.com

Go to report

## Audience Overview

⬤ All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

Overview



● Users
1,500,000

1,000,000

500,000

| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

| Users | New Users | Sessions |
|---|---|---|
| 57,506,817 | 55,869,830 | 183,862,383 |

■ New Visitor  ■ Returning Visitor



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.20 | 411,548,207 | 2.24 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:19:31 | 64.73% |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 3,446,870 | 11.36% |
| 2. | service provider corporation | 2,385,219 | 7.86% |
| 3. | time warner cable internet llc | 1,961,074 | 6.46% |
| 4. | cellco partnership dba verizon wireless | 1,498,303 | 4.94% |
| 5. | at&t internet services | 1,450,113 | 4.78% |
| 6. | comcast cable communications inc. | 1,402,659 | 4.62% |
| 7. | sprint nextel corporation | 1,311,061 | 4.32% |
| 8. | verizon online llc | 1,158,766 | 3.82% |
| 9. | charter communications | 867,052 | 2.86% |
| 10. | t-mobile usa inc. | 780,604 | 2.57% |

© 2019 Google

 **Analytics**  http://www.infowars.com  www.infowars.com

Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview



● Users

3,000,000

2,000,000

1,000,000

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

| Users | New Users | Sessions |
|---|---|---|
| 64,126,790 | 62,914,640 | 191,984,644 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.99 | 393,422,524 | 2.05 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:50 | 65.06% |

■ New Visitor   ■ Returning Visitor



19.7%

80.3%

| Service Provider | Users | % Users |
|---|---|---|
| 1. (not set) | 7,885,701 | 18.74% |
| 2. time warner cable internet llc | 2,246,416 | 5.34% |
| 3. service provider corporation | 2,058,158 | 4.89% |
| 4. at&t mobility llc | 1,707,000 | 4.06% |
| 5. verizon online llc | 1,562,156 | 3.71% |
| 6. cellco partnership dba verizon wireless | 1,420,387 | 3.38% |
| 7. charter communications | 1,174,115 | 2.79% |
| 8. comcast cable communications inc. | 1,131,853 | 2.69% |
| 9. at&t internet services | 1,087,285 | 2.58% |
| 10. cox communications | 795,294 | 1.89% |

© 2019 Google



Analytics   http://www.infowars.com
www.infowars.com

Go to report ☑

## Audience Overview

○ All Users
  100.00% Users

Jan 1, 2016 - Dec 31, 2016

Overview



● Users
2,000,000

1,000,000

March 2016       May 2016       July 2016       September 2016       November 2016

■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 73,749,848 | 72,118,976 | 218,709,812 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.97 | 462,481,331 | 2.11 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:03 | 60.39% |

21.3%

78.7%

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 14,714,613 | 27.85% |
| 2. | time warner cable internet llc | 2,772,965 | 5.25% |
| 3. | at&t mobility llc | 2,717,392 | 5.14% |
| 4. | service provider corporation | 1,999,756 | 3.79% |
| 5. | charter communications | 1,660,629 | 3.14% |
| 6. | cellco partnership dba verizon wireless | 1,159,158 | 2.19% |
| 7. | comcast cable communications inc. | 1,078,205 | 2.04% |
| 8. | mci communications services inc. d/b/a verizon business | 1,039,698 | 1.97% |
| 9. | at&t internet services | 1,022,195 | 1.93% |
| 10. | comcast ip services l.l.c. | 1,010,817 | 1.91% |

© 2019 Google

.ıl Analytics    http://www.infowars.com
www.infowars.com                                                    Go to report ⎙

**Audience Overview**

| ◯ | All Users<br>100.00% Users | Jan 1, 2017 - Dec 31, 2017 |

Overview



● Users

1,500,000

1,000,000

500,000

March 2017    May 2017    July 2017    September 2017    November 2017

■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 54,966,386 | 52,108,330 | 178,788,381 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.25 | 388,814,008 | 2.17 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:04 | 57.48% |

21.4%

78.6%

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 12,491,560 | 34.25% |
| 2. | at&t mobility llc | 1,787,472 | 4.90% |
| 3. | time warner cable internet llc | 1,756,709 | 4.82% |
| 4. | mci communications services inc. d/b/a verizon business | 1,071,697 | 2.94% |
| 5. | charter communications | 1,022,690 | 2.80% |
| 6. | at&t internet services | 680,720 | 1.87% |
| 7. | comcast ip services l.l.c. | 618,121 | 1.69% |
| 8. | cellco partnership dba verizon wireless | 592,009 | 1.62% |
| 9. | comcast cable communications inc. | 580,920 | 1.59% |
| 10. | qwest communications company llc | 568,042 | 1.56% |

© 2019 Google

 **Analytics** http://www.infowars.com
www.infowars.com

Go to report

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

Overview



● Users

600,000

400,000

200,000

| March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

| Users | New Users | Sessions |
|---|---|---|
| **35,143,582** | **33,373,209** | **132,867,188** |

🔲 New Visitor  ■ Returning Visitor



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **3.78** | **322,660,710** | **2.43** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:03:20** | **53.46%** |

| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 4,661,056 | 19.56% |
| 2. | cellco partnership dba verizon wireless | 1,562,546 | 6.56% |
| 3. | time warner cable internet llc | 1,388,162 | 5.82% |
| 4. | comcast cable communications llc | 1,180,283 | 4.95% |
| 5. | at&t mobility llc | 815,034 | 3.42% |
| 6. | charter communications | 717,740 | 3.01% |
| 7. | mci communications services inc. d/b/a verizon business | 707,107 | 2.97% |
| 8. | at&amp;t mobility llc | 605,826 | 2.54% |
| 9. | t-mobile usa inc. | 568,875 | 2.39% |
| 10. | at&amp;t corp. | 393,428 | 1.65% |

© 2019 Google

Analytics   Infowars Store
All Web Site Data

Go to report ⬚

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

**Overview**

● Users

30,000

20,000

10,000

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 319,533 | 319,533 | 481,817 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.51 | 2,014,486 | 4.18 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:01 | 54.01% |

| Language | | Users | % Users |
|---|---|---|---|

There is no data for this view.

© 2019 Google



| Language | Users | % Users |
|----------|-------|---------|
| 1. en-us | 89,342 | 83.60% |
| 2. c | 8,158 | 7.63% |
| 3. en-gb | 3,913 | 3.66% |
| 4. en-ca | 1,855 | 1.74% |
| 5. en-au | 792 | 0.74% |
| 6. nl | 216 | 0.20% |
| 7. de | 215 | 0.20% |
| 8. en | 168 | 0.16% |
| 9. sv-se | 163 | 0.15% |
| 10. fr | 144 | 0.13% |

© 2019 Google

 Analytics    Infowars Store    All Web Site Data                                    Go to report ☑

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2017 - Dec 31, 2017

Overview



◆ Users

40,000

20,000

March 2017        May 2017        July 2017        September 2017        November 2017

| Users | New Users | Sessions |
|---|---|---|
| **3,132,247** | **3,057,641** | **7,531,369** |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **2.40** | **34,282,728** | **4.55** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:03:42** | **48.64%** |

■ New Visitor   ■ Returning Visitor



23.7%

76.3%

| Language | Users | % Users |
|---|---|---|
| 1. en-us | 2,780,017 | 88.50% |
| 2. en-gb | 123,241 | 3.92% |
| 3. en-ca | 58,528 | 1.86% |
| 4. en-au | 23,738 | 0.76% |
| 5. c | 21,569 | 0.69% |
| 6. es-419 | 10,074 | 0.32% |
| 7. en | 9,623 | 0.31% |
| 8. es | 9,140 | 0.29% |
| 9. de | 8,876 | 0.28% |
| 10. pt-br | 8,249 | 0.26% |

© 2019 Google



**Audience Overview**

Infowars Store
All Web Site Data

Go to report ☑

All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

Overview

| Users | New Users | Sessions |
|---|---|---|
| 2,319,702 | 2,249,348 | 5,887,859 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 2.54 | 27,081,597 | 4.60 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:37 | 46.86% |

■ New Visitor   ■ Returning Visitor

25.5%
74.5%

| Language | Users | % Users |
|---|---|---|
| 1. en-us | 2,100,574 | 90.19% |
| 2. en-gb | 77,136 | 3.31% |
| 3. en-ca | 45,789 | 1.97% |
| 4. en-au | 18,442 | 0.79% |
| 5. de-de | 7,040 | 0.30% |
| 6. en | 6,950 | 0.30% |
| 7. sv-se | 4,642 | 0.20% |
| 8. nl-nl | 4,504 | 0.19% |
| 9. pt-br | 4,120 | 0.18% |
| 10. es-es | 3,912 | 0.17% |

© 2019 Google

Analytics   Infowars.Shop
All Web Site Data

Go to report ☒

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

● Users



| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|-------|-----------|----------|
| 1,402,377 | 1,401,792 | 2,097,803 |

| Number of Sessions per User | Pageviews | Pages / Session |
|-----------------------------|-----------|-----------------|
| 1.50 | 7,594,153 | 3.62 |

| Avg. Session Duration | Bounce Rate |
|-----------------------|-------------|
| 00:03:28 | 48.60% |

**Language**                                                                 Users   % Users

There is no data for this view.

© 2019 Google

.▌ Analytics   Store.Infowars.com
All Web Site Data

Go to report ⎘

## Audience Overview

◯ **All Users**
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**



● Users

| | March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 638,543 | 633,189 | 1,227,787 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.92 | 8,610,108 | 7.01 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:20 | 14.19% |

| Service Provider | | Users   % Users |
|---|---|---|
| There is no data for this view. | | |

© 2019 Google

## Analytics
Store.infowars.com
All Web Site Data

Go to report

### Audience Overview

All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

**Overview**



● Users

1,000,000

500,000

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
| --- | --- | --- |
| 12,427,399 | 12,366,595 | 31,089,027 |

| Number of Sessions per User | Pageviews | Pages / Session |
| --- | --- | --- |
| 2.50 | 82,033,098 | 2.64 |

| Avg. Session Duration | Bounce Rate |
| --- | --- |
| 00:02:52 | 59.53% |

| Service Provider | | Users | % Users |
| --- | --- | --- | --- |

There is no data for this view.

© 2019 Google



| | Store.infowars.com | | |
| Analytics | All Web Site Data | | Go to report |

## Audience Overview

 All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

**Overview**

● Users

15,000

10,000

5,000

| March 2016 | May 2016 | July 2016 | September 2016 | November 2016 |

| Users | New Users | Sessions |
| 1,238,750 | 1,186,990 | 2,064,364 |

■ New Visitor  ■ Returning Visitor



29.2%

78.8%

| Number of Sessions per User | Pageviews | Pages / Session |
| 1.67 | 15,840,378 | 7.67 |

| Avg. Session Duration | Bounce Rate |
| 00:03:48 | 0.67% |

| Service Provider | Users | % Users |
|---|---|---|
| 1. (not set) | 8,370 | 35.31% |
| 2. time warner cable internet llc | 1,146 | 4.84% |
| 3. at&t mobility llc | 1,116 | 4.72% |
| 4. charter communications | 855 | 3.61% |
| 5. mci communications services inc. d/b/a verizon business | 591 | 2.49% |
| 6. qwest communications company llc | 464 | 1.96% |
| 7. at&t internet services | 453 | 1.91% |
| 8. cellco partnership dba verizon wireless | 389 | 1.64% |
| 9. comcast ip services l.l.c. | 376 | 1.59% |
| 10. service provider corporation | 360 | 1.52% |

© 2019 Google

 Analytics

Store.infowars.com
All Web Site Data

Go to report ☑

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2017 - Dec 31, 2017

Overview



● Users
10,000

5,000

| March 2017 | May 2017 | July 2017 | September 2017 | November 2017 |

■ New Visitor  ■ Returning Visitor

| Users | New Users | Sessions |
|---|---|---|
| 573,653 | 565,648 | 887,608 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.55 | 6,634,137 | 7.47 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:26 | 0.24% |

17.7%

82.7%

| Service Provider | Users | % Users |
|---|---|---|
| 1.  (not set) | 96,570 | 34.01% |
| 2.  time warner cable internet llc | 11,541 | 4.07% |
| 3.  at&t mobility llc | 9,652 | 3.40% |
| 4.  charter communications | 7,875 | 2.77% |
| 5.  mci communications services inc. d/b/a verizon business | 6,523 | 2.33% |
| 6.  qwest communications company llc | 4,644 | 1.64% |
| 7.  comcast ip services l.l.c. | 3,696 | 1.30% |
| 8.  at&t internet services | 3,525 | 1.24% |
| 9.  comcast cable communications inc. | 3,500 | 1.23% |
| 10. cellco partnership dba verizon wireless | 3,395 | 1.20% |

© 2019 Google

 **Analytics** Store.infowars.com
All Web Site Data

Go to report ↗

## Audience Overview

| ⭘ All Users 100.00% Users | Jan 1, 2018 - Dec 31, 2018 |

**Overview**



● Users

| Users | New Users | Sessions |
|---|---|---|
| **219,487** | **213,073** | **326,323** |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **1.49** | **2,161,727** | **6.62** |

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:02:57** | **0.30%** |

■ New Visitor  ■ Returning Visitor



| | Service Provider | Users | % Users |
|---|---|---|---|
| 1. | (not set) | 22,232 | 19.19% |
| 2. | hughes network systems | 4,491 | 3.88% |
| 3. | time warner cable internet llc | 4,443 | 3.84% |
| 4. | cellco partnership dba verizon wireless | 4,288 | 3.70% |
| 5. | comcast cable communications llc | 3,136 | 2.71% |
| 6. | at&t mobility llc | 2,397 | 2.07% |
| 7. | charter communications | 2,357 | 2.03% |
| 8. | t-mobile usa inc. | 2,351 | 2.03% |
| 9. | mci communications services inc. d/b/a verizon business | 2,031 | 1.75% |
| 10. | shaw communications inc. | 1,842 | 1.59% |

© 2019 Google

## Analytics — prisonplanet.tv

Go to report

### Audience Overview

○ **All Users**
100.00% Users

Jan 1, 2012 - Dec 31, 2012

**Overview**

● Users

20,000

10,000

| March 2012 | May 2012 | July 2012 | September 2012 | November 2012 |

There is no data for this view.

**Users**
1,764,974

**New Users**
1,732,093

**Sessions**
5,786,016

**Number of Sessions per User**
3.28

**Pageviews**
9,879,368

**Avg. Session Duration**
00:01:47

**Bounce Rate**
57.38%

*Prison Planet*

*TV Subscriptions*

*now*
*free (kate 2018)*

*— website data*

**Language**

Th

**% Users**

© 2019 Google

**Analytics** prisonplanet.tv

Go to report ☑

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2013 - Dec 31, 2013

Overview



● Users

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,920,622 | 1,865,236 | 7,064,061 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.68 | 22,317,587 | 3.16 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:30 | 30.19% |

| Language | | Users | % Users |
|---|---|---|---|

There is no data for this view.

© 2019 Google

.ıl Analytics  prisonplanet.tv

http://prisonplanet.tv

Go to report

## ᴸudience Overview

◯ All Users
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

● Users

20,000

10,000



| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

**Users**
1,127,638

**New Users**
1,071,115

**Sessions**
3,569,978

**Number of Sessions per User**
3.17

**Pageviews**
11,021,098

**Pages / Session**
3.09

**Avg. Session Duration**
00:03:11

**Bounce Rate**
30.58%

| Language | | Users | % Users |
| --- | --- | --- | --- |
| There is no data for this view. | | | |

© 2019 Google

.ıl **Analytics**  All Web Site Data

Go to report 

## Audience Overview

○ **All Users**
100.00% Users

Jan 1, 2014 - Dec 31, 2014

**Overview**

● Users

20,000

10,000



| March 2014 | May 2014 | July 2014 | September 2014 | November 2014 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 478,463 | 478,244 | 1,533,631 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.21 | 4,642,383 | 3.03 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:44 | 31.90% |

| Language | Users | % Users |
|---|---|---|

There is no data for this view.

© 2019 Google

Analytics   All Web Site Data

Go to report

**Audience Overview**

○ All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

Overview

● Users

15,000

10,000

5,000

| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 1,084,793 | 1,058,039 | 3,570,065 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 3.29 | 10,779,174 | 3.02 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:02:36 | 31.81% |

| Language | | Users | % Users |
|---|---|---|---|

There is no data for this view.

© 2019 Google

**Analytics** All Web Site Data

Go to report

**Audience Overview**

⬤ All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

Overview

⬤ Users
15,000



10,000

5,000

| March 2016 | May 2016 | July 2016 | September 2016 | November 2016 |

| Users | New Users | Sessions |
|---|---|---|
| **926,919** | **898,954** | **2,944,151** |

■ New Visitor ■ Returning Visitor

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| **3.18** | **8,423,176** | **2.86** |



37.5%

62.5%

| Avg. Session Duration | Bounce Rate |
|---|---|
| **00:02:18** | **35.69%** |

| | Language | Users | % Users |
|---|---|---|---|
| 1. | en-us | 25,923 | 88.41% |
| 2. | en-gb | 1,257 | 4.29% |
| 3. | en-ca | 552 | 1.88% |
| 4. | en-au | 206 | 0.70% |
| 5. | en | 94 | 0.32% |
| 6. | de | 89 | 0.30% |
| 7. | c | 86 | 0.29% |
| 8. | fr | 73 | 0.25% |
| 9. | nl-nl | 66 | 0.23% |
| 10. | nl | 59 | 0.20% |

© 2019 Google

**Analytics** All Web Site Data

Go to report ☑

**Audience Overview**

○ All Users
100.00% Users

Jan 1, 2017 - Dec 31, 2017

Overview

● Users

10,000

5,000



| March 2017 | May 2017 | July 2017 | September 2017 | November 2017 |

**Users**
506,221

**New Users**
490,104

**Sessions**
1,651,783

■ New Visitor   ■ Returning Visitor



20.2%

78.8%

**Number of Sessions per User**
3.26

**Pageviews**
4,764,686

**Pages / Session**
2.88

**Avg. Session Duration**
00:02:24

**Bounce Rate**
35.25%

| Language | Users | % Users | |
|---|---|---|---|
| 1. en-us | 449,908 | | 88.65% |
| 2. en-gb | 21,075 | 4.15% | |
| 3. en-ca | 9,808 | 1.93% | |
| 4. en-au | 3,555 | 0.70% | |
| 5. en | 1,703 | 0.34% | |
| 6. fr | 1,598 | 0.31% | |
| 7. c | 1,523 | 0.30% | |
| 8. zh-cn | 1,291 | 0.25% | |
| 9. de | 1,224 | 0.24% | |
| 10. pt-br | 966 | 0.19% | |

**Analytics** All Web Site Data

Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

### Overview



● Users

| | | | | | |
|---|---|---|---|---|---|
| March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

■ New Visitor   ■ Returning Visitor



| | | |
|---|---|---|
| **Users** 287,199 | **New Users** 276,141 | **Sessions** 918,042 |
| **Number of Sessions per User** 3.20 | **Pageviews** 2,722,174 | **Pages / Session** 2.97 |
| **Avg. Session Duration** 00:02:38 | **Bounce Rate** 36.35% | |

| | Language | Users | % Users | |
|---|---|---|---|---|
| 1. | en-us | 261,387 | | 90.59% |
| 2. | en-gb | 8,739 | 3.03% | |
| 3. | en-ca | 5,103 | 1.77% | |
| 4. | en-au | 1,996 | 0.69% | |
| 5. | c | 1,227 | 0.43% | |
| 6. | de-de | 791 | 0.27% | |
| 7. | nl-nl | 636 | 0.22% | |
| 8. | fr | 635 | 0.22% | |
| 9. | pt-br | 620 | 0.21% | |
| 10. | zh-cn | 606 | 0.21% | |

.**ı** Analytics infowarshealth.com

Go to report ☑

Audience Overview

⭕ All Users
100.00% Users

Jan 1, 2012 - Dec 31, 2012

Overview

● Users

3,000

2,000

1,000

March 2012          September 2012          November 2012

There is no data for this view.

**Users**
61,002

**Number of Sessions per User**
1.21

**Avg. Session Duration**
00:01:07

| Language | | Users | % Users |
|---|---|---|---|
| | There is no data for this view. | | |

© 2019 Google

**Analytics**  infowarshealth.com

Go to report ☑

## Audience Overview

All Users
100.00% Users

Jan 1, 2013 - Dec 31, 2013

### Overview

● Users

2,000

1,000



March 2013          May 2013          July 2013          September 2013          November 2013

There is no data for this view.

| Users | New Users | Sessions |
|---|---|---|
| 135,193 | 133,084 | 182,012 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.35 | 256,625 | 1.41 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:35 | 75.49% |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

Analytics infowarshealth.com

Go to report

## Audience Overview

⭕ **All Users**
100.00% Users

Jan 1, 2014 - Dec 31, 2014

Overview

● Users
1,000

500



March 2014    May 2014    July 2014    September 2014    November 2014

| Users | New Users | Sessions |
|-------|-----------|----------|
| **57,814** | **55,127** | **75,585** |

There is no data for this view.

| Number of Sessions per User | Pageviews | Pages / Session |
|-----------------------------|-----------|-----------------|
| **1.31** | **105,682** | **1.40** |

| Avg. Session Duration | Bounce Rate |
|-----------------------|-------------|
| **00:01:25** | **75.07%** |

| Language | | Users | % Users |
|----------|---|-------|---------|

There is no data for this view.

© 2019 Google

Analytics infowarshealth.com

Go to report ☑

## Audience Overview

◯ All Users
100.00% Users

Jan 1, 2015 - Dec 31, 2015

**Overview**

● Users



| March 2015 | May 2015 | July 2015 | September 2015 | November 2015 |

| Users | New Users | Sessions |
|---|---|---|
| 44,152 | 42,868 | 58,145 |

There is no data for this view.

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.32 | 84,199 | 1.45 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:01:39 | 73.93% |

| Language | | Users | % Users |
|---|---|---|---|
| There is no data for this view. | | | |

© 2019 Google

**Analytics** infowarshealth.com

Go to report

## Audience Overview

All Users
100.00% Users

Jan 1, 2016 - Dec 31, 2016

### Overview



● Users

600

400

200

March 2016    May 2016    July 2016    September 2016    November 2016

| Users | New Users | Sessions |
|---|---|---|
| 25,260 | 24,727 | 33,387 |

| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.32 | 197,181 | 5.91 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:03:09 | 24.73% |

■ New Visitor



100%

| | Language | Users | % Users |
|---|---|---|---|
| 1. | ru | 13 | 76.47% |
| 2. | ru-ru | 4 | 23.53% |

Analytics  infowarshealth.com

Go to report

Audience Overview

○ **All Users**
100.00% Users

Jan 1, 2017 - Dec 31, 2017

Overview



● Users

| March 2017 | May 2017 | July 2017 | September 2017 | November 2017 |

| Users | New Users | Sessions |
|---|---|---|
| 220 | 218 | 247 |

■ New Visitor  ■ Returning Visitor



| Number of Sessions per User | Pageviews | Pages / Session |
|---|---|---|
| 1.12 | 254 | 1.03 |

| Avg. Session Duration | Bounce Rate |
|---|---|
| 00:00:10 | 97.17% |

| | Language | Users | % Users |
|---|---|---|---|
| 1. | ru | 160 | 72.73% |
| 2. | ru-ru | 55 | 25.00% |
| 3. | en-us | 3 | 1.36% |
| 4. | c | 1 | 0.45% |
| 5. | zh-cn | 1 | 0.45% |

© 2019 Google

Analytics  infowarshealth.com

Go to report

## Audience Overview

○ All Users
100.00% Users

Jan 1, 2018 - Dec 31, 2018

**Overview**

● Users
1

0.5

| March 2018 | May 2018 | July 2018 | September 2018 | November 2018 |

| Users | New Users | Sessions |
|-------|-----------|----------|
| 2 | 2 | 2 |

■ New Visitor

100%

| Number of Sessions per User | Pageviews | Pages / Session |
|-----------------------------|-----------|-----------------|
| 1.00 | 3 | 1.50 |

| Avg. Session Duration | Bounce Rate |
|-----------------------|-------------|
| 00:00:04 | 50.00% |

| Language | Users | % Users |
|----------|-------|---------|
| 1. en-us | 2 | 100.00% |

© 2019 Google





August 16, 2018

**VIA FEDEX**

Philipp Schindler
Senior Vice President
Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

Dear Mr. Schindler:

We represent Free Speech Systems, LLC ("Free Speech") in certain federal court matters. Free Speech has forwarded to us your letter of August 9, 2018 regarding notice of termination of a Content Hosting Services Agreement ("CHSA"), dated December 12, 2013 and as amended on July 24, 2015. In accordance with its obligations in the court cases referenced above (as well as other litigated matters), Free Speech is required to preserve evidence including documents and videos posted pursuant to the CHSA.

It is not clear from your letter the specific grounds upon which Google is relying to terminate the CHSA. It is also not clear what is meant by your statement that "your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain." Please clarify what you mean by this statement and send us a copy of the CHSA, including all amendments, and any other documents that define "Content Owner" as referenced in the statement above.

Further, in light of its preservation obligations, Free Speech asks that Google refrain from deleting, destroying, dissolving, or otherwise rendering inoperable any videos or other documents posted by Free Speech or Alex Jones (or others at their direction) until Free Speech has retrieved all of the materials. We understand that Free Speech is currently unable to access these materials because its account is frozen.

You can email a copy of the CHSA to me at . Please do so as soon as possible.



EXHIBIT

August 16, 2018
Page 2

Thank you for your attention to this matter and please feel free to contact me if you have any
questions or would like to discuss further.

Sincerely,

Partner



August 9, 2018                                                    Via Federal Express and Email

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043

**Attn:** Alex Jones and Buckley Hamman
Free Speech Systems, LLC (**"Partner"**)
3019 Alvin DeVane Blvd Suite 350
Austin Texas 78741
rt.warsman76@gmail.com, buckley@infowars.com

**Attention: Legal Department**
**Re: Termination of Content Agreements**

Dear Sir

We write on behalf of Google LLC f/k/a Google Inc. ("**Google**") to inform you that we are exercising our contractual rights to terminate the Content Hosting Services Agreement ("**CHSA**"), dated December 12, 2013, and as amended on July 24, 2015. This letter serves as written notice that Google is exercising its right to terminate the **CHSA** on 30 days prior written notice under section 11.2.

Accordingly, the **CHSA** will be terminated as of **September 10, 2018**. The Sections that are described as surviving in the **CHSA** will survive termination. Upon termination, your Content Owner will be dissolved, but any active channels within that Content Owner and any live videos on those channels will remain.

This notice is not a waiver of any claims or defenses available to Google, including those set forth under the agreements

Signed by an authorized representative of Google:

By:

Name:      Hakop Sidoyan        **2018.08.10**
           Salesman Engineer    **07:08:00 -07'00'**

Date



EXHIBIT
**2**

This is Exhibit **"C"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

—DocuSigned by:

*Kerry MacGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

DocuSign Envelope ID: EE54F1C9-8493-4A58-B8EE-52A83F0639F2



**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**24 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

Matthew Blumenthal
<mblumenthal@koskoff.com>

Alinor Sterling
<asterling@koskoff.com>

   **Re:**  *June 28, 2021 | Deadline for Production of Google Analytics*

Dear Counsel,

As discussed today, and as you are aware, the deadline for production of the Google Analytics is on June 28, 2021. The full dataset cannot be produced as an export, which thus means the only method of production is by live access to the dataset for your inspection. And, the Court previously declined to order us to provide you with a log-in. As a result, the only method for your inspection is the sandbox approach referenced during today's deposition. I recall previously making this offer to you, either during a telephone conversation or during the June 2 hearing (the transcript of which we are requesting to verify), but was not memorialized in writing and which Attorney Mattei did not recollect.

This method of inspection is akin to traditional paper discovery, where the requesting party is let into the storeroom of documents organized as kept in the ordinary course of business. You will have full liberty to run whatever searches Google Analytics permits and have full access to inspect the dataset. We envision two possible ways for this sandbox approach- -we can provide you with a TeamViewer access to a Free Speech Systems computer connected to the Google Analytics or we can meet you at an agreed-upon location with a clean, new computer, where we will log-in the computer during the period of your inspection.

//

//

//

//

//

---

DocuSign Envelope ID: EE54F1C9-84B3-4A58-B8EE-52A83F0639F2

Randazza Legal Group
Page 2 of 2



Let us know which approach you prefer so that we can know if we are to meet up with you on or before the 28th.

Thank you for your attention to this matter.

Sincerely,

Jay M. Wolman

This is Exhibit **"D"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS



**RANDAZZA**
LEGAL GROUP

**Jay Marshall Wolman, JD**
Licensed in CT, MA, NY, DC

**25 June 2021**

<u>Via Email Only</u>

Christopher Mattei
<cmattei@koskoff.com>

   ***Re:* *Lafferty v. Jones* | *Google Analytics***

Dear Attorney Mattei:

To be clear, there is no inconsistency.  As set forth on June 2, to export the raw data, one must be an Analytics 360 member, i.e. a premium member.  Free Speech Systems is not an Analytics 360 member, therefore it is impossible for it to export the data.  As further offered on June 2, if Plaintiffs wish to make Free Speech Systems an Analytics 360 member, they have been welcome to do so.  This offer was made on the record.  Plaintiffs have declined this manner of production so far.

        Sincerely,

        Jay M. Wolman

cc:  mblumenthal@koskoff.com, asterling@koskoff.com

This is Exhibit **"E"** referred to in the

Affidavit of Jordan Campbell sworn before me,

this 23rd day of August, 2021.

DocuSigned by:

*Kerry McGladdery Dent*

A COMMISSIONER FOR TAKING AFFIDAVITS

# Jordan Campbell

**275 Callaway Road, Unit 80 ● London, Ontario CANADA N6G 0N8**
**Phone: (1) 416-500-2105 ● E-Mail: goodsoupmedia@gmail.com**

## Experience

**Digital Marketing Consultant**                          **2017 - Present**
**Good Soup Media – London, Canada**

Development and implementation of online marketing strategies for companies across North America including the use of Google Search and Display Ads, LinkedIn Sponsored Content and Sponsored Messaging Ads, Google Analytics tracking, Facebook Advertising and Email Campaign Planning & Distribution. Providing website design and website analysis services.

- Designing unique and custom-made online marketing strategies for clients
- Set-up and install appropriate website-based tracking tags for Google Analytics and ads purposes
- Detailed weekly reporting on campaign results and impact on website/landing page traffic

## Education

**Digital Social Media Consulting Course (DSMC)**
**Tai Lopez Knowledge Society - Online**                   **2019**
Focus on the latest software developments for streamlining workflows and developing the most up to date advertising strategies. Strategic planning for ad campaign design and metrics reporting.

**Social Media Master Plan Seminar**
**Tai Lopez Knowledge Society - Seminar**               **2018**
In person intensive course designed to provide the latest and hands on experience in working with all online advertising platforms and data tracking/analysis programs (including Google, Facebook, Instagram, Snapchat, Twitter etc.) Detailed one-on-one coaching from professional online marketers.

**Social Media Marketing Agency (SMMA)**
**Tai Lopez Knowledge Society - Online**                  **2016-2017**
Had the opportunity to learn some of the most cutting-edge sales strategies and online marketing techniques based on the latest cognitive research and software tools available from one of the most successful online marketers of the last decade, Tai Lopez.

## Skills

- Google Analytics
- Google Ads
- LinkedIn Advertising
- Facebook Business Manager
- Website Design
- Email Marketing
- Social Media Content Development

# EXHIBIT G

```
NO:  UWY-CV18-6046437 S      :  SUPERIOR COURT
SHERLACH, WILLIAM            :  JUDICIAL DISTRICT
                               OF FAIRFIELD
v.                          :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.          :  MAY 7, 2019
```
...............................................................
```
NO:  UWY-CV18-6046438 S      :  SUPERIOR COURT
LAFFERTY, ERICA, ET AL.      :  JUDICIAL DISTRICT
                               OF FAIRFIELD
v.                          :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.    :  MAY 7, 2019
```
...............................................................
```
NO:  UWY-CV18-6046436 S      :  SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.    :  JUDICIAL DISTRICT
                               OF FAIRFIELD
v.                          :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.    :  MAY 7, 2019
```


              BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S :
     Representing the Plaintiffs:
          ATTORNEY CHRISTOPHER MATTEI
          ATTORNEY ALINOR STERLING
          Koskoff, Koskoff & Bieder, PC
          350 Fairfield Avenue
          Bridgeport, CT  06604

     Representing the Defendants Alex Jones; Infowars, LLC; Free
     Speech Systems, LLC; Infowars Health, LLC; and Prison Planet
     TV, LLC:
          ATTORNEY KEVIN SMITH
          Pattis & Smith, LLC
          383 Orange Street
          1st Floor
          New Haven, CT  06511

     Representing the Defendant Cory Sklanka:
          ATTORNEY KRISTAN JAKIELA
          Regnier, Taylor, Curran & Eddy
          100 Pearl Street
          14th Floor
          Hartford, CT  06103

     Representing the Defendant Midas Resources, Inc.:
          ATTORNEY COLLEEN VELLTURO
          Wilson Elser Moskowitz Edelman & Dicker
          1010 Washington Boulevard
          Stamford, CT  06901


                              Recorded By:
                              Colleen Birney
                              Transcribed By:
                              Colleen Birney
                              Court Recording Monitor
                              1061 Main Street
                              Bridgeport, CT  06604
```

1         week, at least give them 24 hours beforehand.  Okay?

2              ATTY. SMITH:  Yes, Your Honor.

3              THE COURT:  All right.

4              ATTY. MATTEI:  The sixth item I think has been

5         resolved by Attorney Pattis's response.

6              THE COURT:  All right.

7              ATTY. MATTEI:  And I think that that's it with

8         respect to that motion, Your Honor.

9              THE COURT:  All right.  What do you have next?

10        Or what do any of the defendants have that needs to

11        be adjudicated?

12             ATTY. MATTEI:  So this is number 5, Your Honor.

13         This has to do with their responses to requests for

14        production relating to marketing a business

15        materials.  In their response on file with the court,

16        what they've said is we have no records relating to

17        marketing specific to the Sandy Hook massacre.  The

18        request for production is much broader than that.

19        And in their filing today they've clarified that we

20        have no -- you have all the marketing materials of

21        any kind that are responsive to this request.

22             I guess what we'd ask is that the request for

23        production be updated to reflect that, just as you

24        had them do previously.  And the reason that's

25        important is because we've reviewed the --

26             THE COURT:  I agree that it should be updated.

27        I don't think that's burdensome to update it and then

1         there can be no confusion.

2              ATTY. MATTEI:  Yeah.

3              ATTY. SMITH:  To -- to update as regards to

4         marketing and the analytics, Your Honor?

5              THE COURT:  Right.  Because the --

6              ATTY. SMITH:  If we have some, yes.  As a -- to

7         this point, we have provided everything.  And then I

8         think that --

9              THE COURT:  Right.  But I think that you just

10        need to update the production response to indicate

11        that.

12             ATTY. MATTEI:  That's correct.

13             THE COURT:  That's it.  That's not burdensome.

14        Just so there can be no confusion.  All right.  What

15        else does the plaintiff have?

16             ATTY. MATTEI:  That's it, Your Honor.

17             THE COURT:  Okay.  What do the defense have?  I

18        did read Attorney Pattis's comments about having

19        regular status conferences.  And listen, I'm happy to

20        have them never or as often as you need them to keep

21        you on track.  So I defer -- I've deferred to the

22        group of you every time.  I will tell you, every time

23        you've come here, we have needed to tackle these

24        issues.  So what's the thought now about the next

25        time we have to reconvene?

26             ATTY. SMITH:  I suspect it should be after the

27        depositions.  So I would say maybe two weeks, three

```
NO:  UWY-CV18-6046437 S        :  SUPERIOR COURT
SHERLACH, WILLIAM              :  JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                             :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.            :  MAY 7, 2019
NO:  UWY-CV18-6046438 S        :  SUPERIOR COURT
LAFFERTY, ERICA, ET AL.        :  JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                             :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.      :  MAY 7, 2019
NO:  UWY-CV18-6046436 S        :  SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.      :  JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                             :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.      :  MAY 7, 2019
```

C E R T I F I C A T I O N

        I hereby certify the foregoing pages are a true and

correct transcription of the audio recording of the above-

referenced case, heard in Superior Court, Judicial District of

Fairfield, at Bridgeport, Connecticut, before the Honorable

Barbara N. Bellis, Judge, on the 7th day of May, 2019.



        Dated this 17th day of May, 2019, in Bridgeport,

Connecticut.


                              _____
                              Colleen Birney
                              Court Recording Monitor

# EXHIBIT H

```
NO. X06-UWY-CV-18-6046436S  )SUPERIOR COURT
                            )
ERICA LAFFERTY, ET AL.      )COMPLEX LITIGATION DOCKET
                            )
vs.                         )AT WATERBURY
                            )
ALEX EMRIC JONES, ET AL.    )MAY 19, 2021

----------------------------------------------------------

NO. X06-UWY-CV-18-6046437-S )SUPERIOR COURT
                            )
WILLIAM SHERLACH            )COMPLEX LITIGATION DOCKET
                            )
vs.                         )AT WATERBURY
                            )
ALEX EMRIC JONES, ET AL.    )MAY 19, 2021

----------------------------------------------------------

NO. X06-UWY-CV-18-6046438S  )SUPERIOR COURT
                            )
WILLIAM SHERLACH, ET AL.    )COMPLEX LITIGATION DOCKET
                            )
vs.                         )AT WATERBURY
                            )
ALEX EMRIC JONES, ET AL.    )MAY 19, 2021

----------------------------------------------------------
```

ORAL/VIDEOTAPED DEPOSITION OF

LOUIS SERRTUCHE

MAY 20, 2021

----------------------------------------------------------

CONFIDENTIAL

ORAL/VIDEOTAPED DEPOSITION OF LOUIS

SERRTUCHE, produced as a witness at the instance of

the Plaintiff and duly sworn, was taken in the

above-styled and numbered cause on May 20, 2021, from

9:57 a.m. to 2:14 p.m., before Maribel C. Arredondo,

1    those two accounts, correct?

2         A.   Yes.

3         Q.   And you attempted to do it multiple times?

4         A.   Yes.

5              MR. WOLMAN:  Objection.

6         Q.  (BY MR. MATTEI) And your testimony is that

7    you were unable to do that?

8         A.   Yes.

9         Q.   Did you or anybody else at Free Speech

10   Systems that you're aware of attempt to retain the

11   data concerning the performance of tweets sent from

12   those accounts?

13             MR. WOLMAN:  Objection.

14        A.   No.

15        Q.  (BY MR. WOLMAN) Okay.  Did you have access to

16   the same analytics data for the Facebook accounts?

17   That is, data concerning the reach of Facebook posts?

18             MR. WOLMAN:  Objection.

19        A.   Yes.

20        Q.  (BY MR. WOLMAN) So you had access to the

21   number of likes of Facebook posts sent out on the two

22   Facebook accounts you managed, correct?

23             MR. WOLMAN:  Objection.

24        A.   Yes.

25        Q.  (BY MR. WOLMAN) You had access to data

1    concerning the number of shares that a Facebook post

2    you had published had, correct?

3          A.   Yes.

4          Q.   You had access to the overall number of

5    impressions that a Facebook post you had published

6    had, correct?

7          A.   I'm not sure.

8          Q.   Did -- when was Mr. Jones and Infowars

9    banned from Facebook?

10         A.   I believe it was around the same time, 2016.

11         Q.   Did you or anybody else at Free Speech

12   Systems who you're aware of attempt to retain an

13   archive of those two Facebook accounts?

14         A.   No.

15         Q.   Do you know why not?

16         A.   No.

17         Q.   I want to show you Exhibit No. 15.

18              (Exhibit No. 15 is marked.)

19         Q.   (BY MR. WOLMAN) What is a meme war?

20              MR. WOLMAN:  Have you showed the --

21              MR. MATTEI:  I haven't showed the

22   exhibit yet.

23              MR. WOLMAN:  Okay.

24         A.   I think that's a website.

25         Q.   (BY MR. MATTEI) Okay.

```
 1   STATE OF TEXAS

 2   COUNTY OF DALLAS

 3

 4                  REPORTER'S CERTIFICATE

 5        ORAL/VIDEOTAPED DEPOSITION OF LOUIS SERRTUCHE

 6                     May 20, 2021

 7

 8        I, the undersigned Certified Shorthand Reporter

 9   in and for the State of Texas, certify that the facts

10   stated in the foregoing pages are true and correct.

11        I further certify that I am neither attorney or

12   counsel for, related to, nor employed by any parties

13   to the action in which this testimony is taken and,

14   further, that I am not a relative or employee of any

15   counsel employed by the parties hereto or financially

16   interested in the action.

17        SUBSCRIBED AND SWORN TO under my hand and seal of

18   office on this the _____ day of

19   _____, _____.

20

21

22        _Maribel Arredondo_____
          Maribel C. Arredondo, Texas CSR 8597
23        Expiration Date: 12/31/2018
          US Legal Support
24        Firm Registration No. 343
          8411 Walnut Hill Lane
25        Dallas, TX 75231
             214.741.6001 - Telephone
```

# EXHIBIT I

```
NO. X06-UWY-CV-18-6046436S     )  SUPERIOR COURT
                               )
ERICA LAFFERTY, ET AL,         )  COMPLEX LITIGATION DOCKET
                               )
VS.                            )  AT WATERBURY
                               )
ALEX EMRIC JONES, ET AL,       )  JUNE 24, 2021
                               )
_____ )
                               )
NO. X-06- UWY-CV18-6046437-S   )  SUPERIOR COURT
                               )
WILLIAM SHERLACH,              )  COMPLEX LITIGATION DOCKET
                               )
VS.                            )  AT WATERBURY
                               )
ALEX EMRIC JONES, ET AL.       )  JUNE 24, 2021
                               )
_____ )
                               )
NO. X06-UWY-CV-18-6046438S     )  SUPERIOR COURT
                               )
WILLIAM SHERLACH, ET AL.,      )  COMPLEX LITIGATION DOCKET
                               )
VS.                            )  AT WATERBURY
                               )
ALEX EMRIC JONES, ET AL.       )  JUNE 24, 2021
```

-----------------------------------

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF
FREE SPEECH SYSTEMS, LLC
BY
MICHAEL ZIMMERMANN
JUNE 24, 2021

-----------------------------------


     ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL ZIMMERMANN,

produced as a witness at the instance of the PLAINTIFF, and

duly sworn, was taken in the above-styled and -numbered cause

on JUNE 24, 2021, from 9:00 a.m. to 4:10 p.m., before

1   correct?

2        A.    Correct.

3        Q.    And the purpose of that was to continue to prepare

4   for this deposition?

5        A.    That's correct.

6        Q.    Okay.  And so describe for me what you did in

7   preparation yesterday while you were at Free Speech Systems?

8                   MR. WOLMAN:  Objection, asked and answered.  You

9   can ans- -- answer.

10       A.    I spoke to Blake Roddy regarding those tools that are

11  mentioned in this notice.  You know, the -- the purpose of

12  things like Criteo and Google Analytics.  I wanted to ensure

13  that I had proper answers for that.

14                  I spoke to Louis again to confirm, you know,

15  what information he had available regarding stats or any

16  tracking information with the social media profiles.

17                  And then, I also spoke Mr. Jones to ask him some

18  questions about the -- his different entities and if he had

19  knowledge of the relationship between them.

20       Q.    (BY MR. MATTEI) Okay.  So did you speak with anybody

21  else besides those three individuals?

22       A.    I spoke to Mr. Wolman on the phone.

23       Q.    Were you provided with any documents yesterday?

24       A.    Yes.  I was provided four documents from Louis and

25  then also one, you know, URL or web page.

1      Q.   I'm sorry.  One what?

2      A.   A web page.  A link to a web page from Louis.

3      Q.   And -- and Louis provided you with that, as well?

4      A.   That's correct.

5      Q.   Do you have those documents with you today?

6      A.   I do.  And Mr. Wolman has PDF copies of them.

7              MR. MATTEI:  Okay.  Attorney Wolman, can you

8 please provide those to me?

9              MR. WOLMAN:  Yes.  I'll do so momentarily.  I'm

10 just finding the right documents.

11             MR. MATTEI:  Thank you.

12             THE WITNESS:  I additionally have one page of,

13 like, brief notes here that is just a few dates.  If you can

14 send that as well yesterday -- Mr. Blumenthal had me to hold it

15 up to the camera.  But it's essentially the, you know, say what

16 these different tools do and you know, dates for various

17 things.

18             MR. MATTEI:  Do you have that in a -- in a PDF,

19 as well, sir?

20             THE WITNESS:  I do.  Mr. -- Mr. Wolman has that,

21 too.

22             MR. MATTEI:  Okay.  So if you could just include

23 that, counsel, I'd appreciate it.

24      Q.  (BY MR. MATTIE)   Now with respect to -- to

25 Blake Roddy, was it your decision to consult with him or did

1          A.    That's correct.

2          Q.    All right.  And how long did your conversation with

3     Mr. Serrtuche last?

4          A.    It was about 15, 20 minutes because he had to -- he

5     went and searched through his computer to find the social media

6     reports.

7          Q.    Okay.  And -- and what you've just referred to as

8     social media reports, are those the documents that you brought

9     with you today and that Mr. Wolman has -- has provided during

10    this deposition?

11         A.    That's correct.

12         Q.    All right.  I'm sorry, I got -- I didn't realize I

13    was still sharing my screen.  Sorry about that.

14                    And for what purpose did Mr. Serrtuche access

15    and provide you with those reports?

16         A.    It was -- I requested that he do so.

17         Q.    You requested specific reports?

18         A.    I said I would like copies of any reports you have

19    that deal with social media and, you know, basically how much

20    traffic the social media accounts would get.

21         Q.    Okay.  And -- and what was his response to you?

22         A.    He said that he would look for them and -- and find

23    whichever ones he could.

24         Q.    How long did it take him to do that?

25         A.    About 20 minutes.

1       Q.   And did you review those reports in preparation for

2   today?

3       A.   I did.

4       Q.   We'll -- we'll go through them in -- in some detail,

5   but in summary what do those reports relate to?

6       A.   There's three diff- -- well, four different ones.

7   One of them has a bit more data as far as follower counts.

8   Basically, it's a -- a group report of what you started the

9   year at with that account and what you finished at when it

10  comes to -- to traffic on social media accounts.

11      Q.   Which social media platforms do they relate to?

12      A.   One of them -- well, if -- I think at least two of

13  the reports -- can I look at them?  I have them right here in

14  front of me.

15      Q.   Yeah, please.

16      A.   I don't want to misspeak.  Okay, so this December --

17  January 1st, 2014 through December 31st, 2014 Group Report, is

18  what it says on page one, includes reports from Twitter,

19  Facebook, and Instagram.

20                And then, the 2015 report also includes Twitter,

21  Facebook, Instagram, and Linkedin.

22                The 2016 report exclusively has Facebook pages.

23                And then, the 2017 report is exclusively

24  Facebook pages.

25      Q.   Okay.  You'd never seen those reports before

1    NO. X06-UWY-CV-18-6046436S    )   SUPERIOR COURT
                                    )

1    ERICA LAFFERTY, ET AL,        )   COMPLEX LITIGATION DOCKET
                                    )

1    VS.                                 )   AT WATERBURY
                                    )

1    ALEX EMRIC JONES, ET AL,    )   JUNE 24, 2021
                                    )

1    _____    )
                                    )

1    NO. X-06- UWY-CV18-6046437-S    )   SUPERIOR COURT
                                    )

1    WILLIAM SHERLACH,            )   COMPLEX LITIGATION DOCKET
                                    )

1    VS.                                 )   AT WATERBURY
                                    )

1    ALEX EMRIC JONES, ET AL.    )   JUNE 24, 2021
                                    )

1    _____    )
                                    )

1    NO. X06-UWY-CV-18-6046438S    )   SUPERIOR COURT
                                    )

1    WILLIAM SHERLACH, ET AL.,    )   COMPLEX LITIGATION DOCKET
                                    )

1    VS.                                 )   AT WATERBURY
                                    )

1    ALEX EMRIC JONES, ET AL.    )   JUNE 24, 2021

15                  REPORTER'S CERTIFICATION

16            DEPOSITION OF MICHAEL ZIMMERMANN

17                 JUNE 24, 2021

18

19      I, Rosalind Dennis, Notary in and for the State of Texas,

20   hereby certify to the following:

21      That the witness, MICHAEL ZIMMERMANN, was duly sworn by

22   the officer and that the transcript of the oral deposition is a

23   true record of the testimony given by the witness;

24      That the original deposition was delivered to Mr. Mattei.

25      That the amount of time used by each party at the

1  deposition is as follows:

2  MR. MATTEI     .....05 HOUR(S): 23 MINUTE(S)
   MR. WOLMAN     .....00 HOUR(S): 26 MINUTE(S)

3

4        That pursuant to information given to the deposition

5  officer at the time said testimony was taken, the following

6  includes counsel for all parties of record:

7  Mr. Mattei                 Attorney for the Plaintiff.

8  Mr. Wolman                 Attorney for the Defendant.

9        I further certify that I am neither counsel for, related

10  to, nor employed by any of the parties or attorneys in the

11  action in which this proceeding was taken, and further that I

12  am not financially or otherwise interested in the outcome of

13  the action.

14        Certified to by me this 12th day of July, 2021.

15

16

17

18

19

20

21                                          ROSALIND DENNIS
                                            Notary in and for the
22                                          State of Texas
                                            Notary: 129704774
23                                          My Commission Expires: 10/8/2022
                                            US LEGAL SUPPORT
24                                          8144 Walnut Hill Lane
                                            Suite 120
25                                          Dallas, Texas 75231
                                            214-741-6001
                                            214-741-6821 (FAX)
                                            Firm Registration No. 343

# EXHIBIT J

Randazza Legal Group, PLLC
100 Pearl Street, 14ᴛʜ Floor, Hartford, CT 06103 Tel: 702-420-2001

| DOCKET NO: UWY-CV-18-6046436-S : | : | SUPERIOR COURT |
|---|---|---|
| ERICA LAFFERTY, ET AL., | : | COMPLEX LITIGATION DOCKET |
| VS. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | MAY 14, 2021 |

| DOCKET NO: UWY-CV-18-6046437-S : | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH, | : | COMPLEX LITIGATION DOCKET |
| VS. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | MAY 14, 2021 |

| DOCKET NO: UWY-CV-18-6046438-S : | : | SUPERIOR COURT |
|---|---|---|
| WILLIAM SHERLACH, ET AL., | : | COMPLEX LITIGATION DOCKET |
| VS. | : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | : | MAY 14, 2021 |

### DEFENDANTS' RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS ATTACHED TO DEPOSITION NOTICES TO MELINDA FLORES AND DARIA KARPOVA

Defendants Alex Jones, Infowars, LLC, Infowars Health, LLC, Free Speech Systems, LLC, and Prison Planet TV, LLC hereby provide their responses to the requests for production annexed to the deposition notices to Melinda Flores and Daria Karpova, as employees of Free Speech Systems, LLC.  All responses are on behalf of Free Speech Systems, LLC.  All prior objections are preserved to the extent necessary for appeal, but production is hereby made in light of the Orders of the Court overruling such objections.

### REQUESTS TO MELINDA FLORES

1.  A written job description for each position held by the deponent while employed by Free Speech Systems LLC ("FSS").

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly burdensome as Plaintiffs have already been provided a list of employees. Deponent's job description is not calculated to lead to the discovery of admissible evidence.  This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

OBJECTION OVERRULED

**Response:**  Free Speech Systems hereby produces the written job description of Ms. Flores.

2.  Any documents concerning any training provided by or on behalf of FSS to the deponent.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly burdensome and vague as "training" can consist of any number of formal or informal instructions, related to any matter, from human resources, to customer service, to use of software, and beyond. Deponent's training is not calculated to lead to the discovery of admissible evidence.  This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

OBJECTION SUSTAINED

3.  Any documents sufficient to show the period of the deponent's employment with FSS.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly burdensome as Plaintiffs have already been provided a list of employees. Deponent's period of employment is not calculated to lead to the discovery of admissible evidence.  This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

OBJECTION OVERRULED

**Response:**  Free Speech Systems hereby produces such document.

4.   All W-2s issued by FSS to the deponent.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly burdensome as Plaintiffs have already been provided a list of employees.  This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

This request I especially egregious as W-2s constitute a portion of an individual's tax return and there is "an expectation of confidentiality in tax returns which is not to be lightly ignored." *Opotzner v. Bass*, CV 96254963, 1998 Conn. Super. LEXIS 3704, at *9 (Super. Ct. Dec. 30, 1998).  One Connecticut Superior Court recently agreed that tax returns should not be produced unless (1) "it clearly appears they are relevant to the subject matter of the action or to the issues raised thereunder," and (2) "there is a compelling need therefor because the information contained therein is not otherwise readily obtainable." *Gonzales v. Walter D. Sullivan Co., Inc.*, No. KNLCV116009628S, 2014 Conn. Super. LEXIS 1454, at *8 (Super. Ct. June 10, 2014) quoting *Cooper v. Hallgarten & Co.*, 34 F.R.D. 482, 484 (S.D.N.Y. 1964).

REQUEST WITHDRAWN BY PLAINTIFFS

5.   Any organizational chart and/or personnel roster identifying FSS employees assigned to the FSS accounting department.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly burdensome as Plaintiffs have already been provided a list of employees.  This request is harassing and oppressive to the deponent.

OBJECTION OVERRULED

**Response:**  Such responsive document has previously been produced to Plaintiffs.

      6.      Trial balances for FSS as of each date listed in 6.a – 6.h.

          a.      December 31, 2012

          b.      December 31, 2013

          c.      December 31, 2014

          d.      December 31, 2015

          e.      December 31, 2016

          f.      December 31, 2017

          g.      December 31, 2018

          h.      December 31, 2019

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  The trial balances of FSS will not lead to the discovery of admissible evidence and are not themselves admissible for any purpose.  It is unduly burdensome as it requires digging through eight years of accounting.  This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

OBJECTION OVERRULED

**Response:**   Free Speech Systems hereby produces such Trial Balances, incorporating the Subsidiary Ledgers.

    7.  Any and all subsidiary ledgers for each account listed in the Trial balances produced in response to Request No. 6 above.

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof. The trial balances of FSS will not lead to the discovery of admissible evidence and are not themselves admissible for any purpose. It is unduly burdensome as it requires digging through eight years of accounting. This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

OBJECTION OVERRULED

**Response:** Free Speech Systems refers to the response to Request 6.

## REQUESTS TO DARIA KARPOVA

1. A written job description for each position held by the deponent while employed by Free Speech Systems LLC ("FSS").

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof. It is unduly burdensome as Plaintiffs have already been provided a list of employees. Deponent's job description is not calculated to lead to the discovery of admissible evidence. This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

OBJECTION OVERRULED

**Response:** No such responsive documents are within FSS's possession, custody, or control.

2. Any documents concerning any training provided by or on behalf of FSS to the deponent.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof. It is unduly burdensome and vague as "training" can consist of any number of formal or informal instructions, related to any matter, from human resources, to customer service, to use of software,

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

and beyond. Deponent's training is not calculated to lead to the discovery of admissible evidence. This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

OBJECTION SUSTAINED

3.   Any documents sufficient to show the period of the deponent's employment with FSS.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly    burdensome    as    Plaintiffs    have    already    been    provided    a    list    of employees. Deponent's period of employment is not calculated to lead to the discovery of admissible evidence. This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent.

OBJECTION OVERRULED

**Response:**  Free Speech Systems hereby produces such responsive document.

4.   All W-2s issued by FSS to the deponent.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly burdensome as Plaintiffs have already been provided a list of employees.  This request serves only to invade the privacy of the deponent and is harassing and oppressive to the deponent. This request I especially egregious as W-2s constitute a portion of an individual's tax return and there is "an expectation of confidentiality in tax returns which is not to be lightly ignored." *Opotzner v. Bass*, CV 96254963, 1998 Conn. Super. LEXIS 3704, at *9 (Super. Ct. Dec. 30, 1998).  One Connecticut Superior Court recently agreed that tax returns should not be produced unless (1) "it clearly appears they are relevant to the subject matter of the action or to the issues

raised thereunder," and (2) "there is a compelling need therefor because the information contained therein is not otherwise readily obtainable." *Gonzales v. Walter D. Sullivan Co., Inc*., No. KNLCV116009628S, 2014 Conn. Super. LEXIS 1454, at *8 (Super. Ct. June 10, 2014) quoting *Cooper v. Hallgarten & Co*., 34 F.R.D. 482, 484 (S.D.N.Y. 1964).

REQUEST WITHDRAWN BY PLAINTIFFS

5.   All electronically stored contact information for the deponent, Alex Jones and David Jones including, but not limited to, mobile telephone numbers, email addresses and residential addresses.

**Objection.** This request is overbroad, irrelevant, and disproportionate to the needs of the case. This request is unrelated to any claim or defense raised in the action or the elements thereof.  It is unduly burdensome as Plaintiffs have already been provided a list of employees. The direct contact information of deponent and Messrs. Jones & Jones are not calculated to lead to the discovery of admissible evidence and only serve to invade their personal privacy.  This request is harassing and oppressive to the deponent and would potentially require the production of the same information in multiple iterations, without any clearly defined method of extraction.

OBJECTION OVERRULED

**Response:**   Free Speech Systems hereby produces documents containing such responsive information.

//

//

//

//

//

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

Dated: May 14, 2021

Respectfully submitted,
ALEX EMRIC JONES, INFOWARS, LLC,
FREE SPEECH SYSTEMS, LLC,
INFOWARS HEALTH, LLC, PRISON
PLANET TV, LLC

By:/s/ Jay M. Wolman
Jay M. Wolman – Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
P: 702-420-2001
F: 305-437-7662
Their Attorneys

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

## <u>CERTIFICATION</u>

I hereby certify that a copy of the above was mailed or electronically delivered on this 14th day of May 2021 to all counsel and pro se parties of record for Plaintiffs and that written consent for electronic delivery was received from all counsel and pro se parties of record for Plaintiffs who were electronically served including:

Alinor C. Sterling
Christopher M. Mattei
Matthew S. Blumenthal
KOSKOFF KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, CT 06604
<asterling@koskoff.com>
<cmattei@koskoff.com>
<mblumenthal@koskoff.com>
*Attorneys for Plaintiffs*

/s/ Jay M. Woman 433791
Jay M. Wolman

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

# EXHIBIT K

NO. X06-UWY-CV-18-6046436S ) SUPERIOR COURT
       )
ERICA LAFFERTY, ET AL.   ) COMPLEX LITIGATION DOCKET
       )
V.      ) AT WATERBURY
       )
ALEX EMRIC JONES, ET AL.  ) MAY 17, 2021
_____

NO. X-06-UWY-CV18-6046437-S) SUPERIOR COURT
       )
WILLIAM SHERLACH    ) COMPLEX LITIGATION DOCKET
       )
V.     ) AT WATERBURY
       )
ALEX EMRIC JONES, ET AL.  ) MAY 17, 2021
_____

NO. X06-UWY-CV-18-6046438S ) SUPERIOR COURT
       )
WILLIAM SHERLACH, ET AL.  ) COMPLEX LITIGATION DOCKET
       )
V.     ) AT WATERBURY
       )
ALEX EMRIC JONES, ET AL.  ) MAY 17, 2021


*********************************************************

TRANSCRIPT OF THE CONFIDENTIAL

RemoteDepo™ DEPOSITION OF

MELINDA FLORES

APPEARING REMOTELY

TOOK PLACE ON:  MAY 27, 2021


*********************************************************

1    job description for you.

2          A.   Uh-huh.

3          Q.   Did you have any role in producing a

4    written job description?

5          A.   I don't recall if I did.  But I believe

6    document three would indicate my role.

7          Q.   Okay.  Thank you.

8               With respect to the trial balances that

9    were produced in response to request Number 5, did you

10   any -- did you do anything before producing them to

11   determine whether they were complete and accurate?

12         A.   No.

13         Q.   Okay.  Ms. Flores, where are you from

14   originally?

15         A.   Originally from Rio Hondo, Texas.

16         Q.   How old are you, ma'am?

17         A.   48.

18         Q.   Are you married?

19         A.   Yes.

20         Q.   Do you have any children?

21         A.   Yes.

22         Q.   How many?

23         A.   One.

24         Q.   And do you currently reside on Maxmillion

25   Lane in Buda?

1         A.   These -- I re -- I re -- ran report --
2    trial balance reports for our CPA to -- to review.
3         Q.   Okay.  And -- and when you ran those
4    reports, you understood that they were being generated
5    to be produced in connection with this lawsuit,
6    correct?
7         A.   Yes.
8         Q.   Okay.  And it was the CPA who asked you
9    to do that?
10        A.   No, it was -- it was on that order --
11   that order that I got.
12        Q.   Right.  The notice of deposition that we
13   reviewed earlier, correct?
14        A.   Right.
15        Q.   Why did you transmit these to the CPA
16   after you generated them?
17        A.   Any reporting that I do I send it over to
18   my CPA, or our CPA I should say, for a final review.
19   I'm only entering data.  I'm not confirming data.
20        Q.   Okay.  And, in this case, you didn't
21   enter any data.  You just pressed a button and ran
22   these reports, correct?
23             MR. WOLMAN:  Objection; form.
24        A.   Yes.  But ultimately, it's data that
25   we're entering our -- in -- in our QuickBooks.

1          Q.   (By Mr. Mattei)  Understood.  I -- I
2     guess what I'm trying to understand the -- these
3     questions are designed to -- so that I can understand
4     what the process was for you generating these
5     particular documents.
6          A.   Uh-huh.
7          Q.   As I understand it, for each trial
8     balance, you went into QuickBooks and you clicked an
9     option that allowed you to generate a trial balance for
10    each year, correct?
11         A.   Correct.
12         Q.   And what did that button say that you
13    clicked?
14         A.   Oh, I don't -- I don't know.  It's --
15    it's not in front of me, so I -- I don't know.
16         Q.   Okay.  But you were able to easily find
17    it when you did, you knew how?
18         A.   Yes.
19              MR. WOLMAN:  Objection.
20         Q.   (By Mr. Mattei)  Okay.  You didn't need
21    to consult with anybody to figure out how to run a
22    trial balance, right?
23         A.   Right.
24         Q.   Okay.  And you did that because the
25    notice of deposition that we reviewed earlier asked

1   that those trial balances be produced, correct?

2           A.   Right.

3           Q.   And who provided you with the notice of

4   deposition?

5           A.   Mr. Wolman sent me an e-mail of it.

6           Q.   Okay.  And, as a result of that

7   communication or that e-mail from Mr. Wolman, you

8   understood that you were to produce these trial

9   balances, correct?

10          A.   Right.  Yes.

11          Q.   Did anybody instruct you to send them to

12  the outside CPA?

13          A.   No.

14          Q.   How did you transmit them to the outside

15  CPA?

16          A.   Via e-mail.

17          Q.   Is that from your

18  melinda@freespeechsystems.com e-mail address?

19          A.   I don't know what e-mail it was from.  It

20  was either melinda@freespeechsystems or

21  melinda@infowars.

22          Q.   And did you send it directly to Mr. Love?

23          A.   We have a -- another CPA that I work with

24  on our -- our bookkeeping, and that is a company called

25  Acuity.

1          Q.   What -- what's their -- what's their
2     role?
3          A.   They review our day-to-day book --
4     bookkeeping entries to make sure that the invoices
5     entered, the entries made are correctly hitting the --
6     the correct general ledger accounts.
7          Q.   Okay.  Okay.  So it sounds like almost --
8     like they're a back up to QuickBooks.  Like, is that
9     how you see it?
10         A.   I do see them as a back up to QuickBooks
11    and so -- so that if any time we -- we need to run a --
12    a -- reports, it's a second set of eyes, if you will.
13         Q.   Okay.  And so who did you send this to at
14    Acuity?
15         A.   Bob Roe.
16         Q.   How do you spell his last name?
17         A.   R-O-E.
18         Q.   And did Mr. Roe acknowledge that he had
19    received them?
20         A.   Yes.
21         Q.   And what's your understanding of what
22    Mr. Roe did with these trial balances when you sent
23    them to him?
24         A.   I don't.
25         Q.   Okay.  Do you -- do you have any

1   understanding of what happened to these trial balances

2   once you sent them to Mr. Roe?

3        A.   No.

4        Q.   Did you ever learn that the trial

5   balances that you generated had ultimately been

6   produced to us?

7        A.   Yes.

8        Q.   How did you learn that?

9        A.   Mr. Wolman notified me that the items

10   that were requested on my notice, that they had been

11   sent to the appropriate folks.

12        Q.   Other than Mr. Wolman and Mr. Roe, did

13   you discuss with anybody the fact that you were

14   producing trial balances in connection with this

15   litigation?

16        A.   Mr. Randazza.

17        Q.   Okay.  Other than Mr. Randazza?

18             MR. WOLMAN:  Objection; form.

19        A.   No.

20        Q.   (By Mr. Mattei)  What's your

21   understanding of what a trial balance is?

22        A.   It's a listing of all of the general

23   ledger accounts and their debits or their credits.

24        Q.   And for these -- the general accounts,

25   looking now at just by way of example, the 2012 trial

1    balance, the general accounts are designated by numbers

2    going down the left-hand column, correct?

3            A.   Correct.

4            Q.   And with respect to each of these -- or

5    perhaps not each -- but with respect to many of these

6    general accounts, there is account detail that can be

7    accessed describing what composes each of the general

8    accounts, correct?

9            A.   Correct.

10           Q.   That's called a subsidiary ledger,

11   correct?

12               MR. WOLMAN:  Objection.

13           A.   I call it detail.  But, yeah,

14   essentially, yes.

15           Q.   (By Mr. Mattei)  Okay.  I mean, do you

16   understand that -- and let's just take an example here.

17   Do you see the General Account 40000?

18           A.   Yes.

19           Q.   Do you see that?  That is the general

20   account for advertising income to Free Speech Systems,

21   correct?

22           A.   Correct.

23           Q.   And within QuickBooks, you can access the

24   detail or subsidiary ledgers for that account, correct?

25               MR. WOLMAN:  Objection.

Melinda Flores  Confidential
May 27, 2021

1          A.    Correct.

2          Q.   (By Mr. Mattei)  And those subsidiary

3    ledgers would show the sources of the advertising

4    income, correct?

5               MR. WOLMAN:  Objection.

6          A.   Yes.

7          Q.   (By Mr. Mattei)  And that's information

8    that's easily available and accessible to you in

9    QuickBooks, correct?

10              MR. WOLMAN:  Objection.

11         A.   It's accessible, yes.

12         Q.   (By Mr. Mattei)  How would you access it?

13              MR. WOLMAN:  Objection.

14         A.   By clicking on the account.  And it would

15   take you to a different screen.

16         Q.   (By Mr. Mattei)  Okay.  So you go into

17   the advertising income account.  You click on that

18   account, right?

19         A.   Right.

20         Q.   That brings you to a screen in which each

21   of the subsidiary ledgers to the extent they exist for

22   advertising income appears, correct?

23              MR. WOLMAN:  Objection.

24         A.   Yes.

25         Q.   (By Mr. Mattei)  And with respect to

Melinda Flores  Confidential
May 27, 2021

1  asked to produce that subsidiary ledger information,

2  correct?

3          MR. WOLMAN:  Objection.

4      A.   Correct.

5      Q.   (Speaking simultaneously.)

6          MR. WOLMAN:  Hang on.  Hang on.  This is

7  calling attorney-client privilege information.

8              And, by the way, I represented, Chris, in

9  my answers when we provided these documents, if you

10 look at category 15000, for example, with the category

11 66700, those have subsidiary accounts on them.  The

12 subsidiary ledgers are incorporated into the trial

13 balance.

14          MR. MATTEI:  You -- you -- you can make

15 that argument to Judge Bellis.  But for now, please

16 just confine your objections to form.

17     Q.   (By Mr. Mattei)  Ms. Flores, you were not

18 aware -- well, you did not attempt to produce

19 subsidiary ledger information for any general account,

20 correct?

21          MR. WOLMAN:  Objection.

22     A.   I ran a trial -- a trial balance report.

23     Q.   (By Mr. Mattei)  Understood.  But you did

24 not attempt specifically to produce any subsidiary

25 ledger information, correct?

```
 1   NO. X06-UWY-CV-18-6046436S ) SUPERIOR COURT
                               )
 2   ERICA LAFFERTY, ET AL.    ) COMPLEX LITIGATION DOCKET
                               )
 3   V.               ) AT WATERBURY
                               )
 4   ALEX EMRIC JONES, ET AL.  ) MAY 17, 2021
     ─────────────────────────────────────────────────────
 5
     NO. X-06-UWY-CV18-6046437-S) SUPERIOR COURT
 6                             )
     WILLIAM SHERLACH          ) COMPLEX LITIGATION DOCKET
 7                             )
     V.            ) AT WATERBURY
 8                             )
     ALEX EMRIC JONES, ET AL.  ) MAY 17, 2021
 9   ─────────────────────────────────────────────────────
10   NO. X06-UWY-CV-18-6046438S ) SUPERIOR COURT
                               )
11   WILLIAM SHERLACH, ET AL.  ) COMPLEX LITIGATION DOCKET
                               )
12   V.            ) AT WATERBURY
                               )
13   ALEX EMRIC JONES, ET AL.  ) MAY 17, 2021
14
15   **************************************************
16                  REPORTER'S CERTIFICATION
17   THE STATE OF TEXAS:
     COUNTY  OF   BEXAR:
18
19        I, Dawn Melton, a Texas Certified Shorthand
20   Reporter, hereby certify to the following:
21
22        That the witness, MELINDA FLORES, was duly
23   sworn by the officer and that the transcript of the
24   RemoteDepo¢ deposition is a true record of the
25   testimony given by the witness;
```

1          That said proceedings were taken remotely

2    before me at the time and places therein set forth and

3    were taken down by me in shorthand and thereafter

4    transcribed into typewriting under my direction and

5    supervision;

6          That the deposition transcript was submitted on

7    June 11, 2021, to the witness, or to the

8    attorney for the witness, for examination, signature,

9    and return to U.S. Legal Support, Inc., by

10   July, 11 2021;

11

12         That the amount of time used by each party at

13   the deposition is as follows:

14

15              Mr. Christopher Mattei - 03:52
                Mr. Jay Marshall Wolman - 00:02
16

17         That pursuant to information given to the

18   Deposition officer at the time said testimony was

19   taken, the following includes counsel for all parties

20   of record:

21

          Mr. Christopher Mattei - Attorney for
22        Plaintiffs

23        Mr. Jay Marshall Wolman - Attorney for
          Defendant
24

25

1          I further certify that I am neither counsel

2     for, related to, nor employed by any of the parties or

3     attorneys in the action in which this proceeding was

4     taken, and further that I am not financially or

5     otherwise interested in the outcome of the action.

6

7          Further certification requirements pursuant to

8     Rule 203 of TRCP will be certified to after they have

9     occurred.

10

11          GIVEN UNDER MY HAND AND SEAL OF OFFICE,

12     on this the 10th day of June, 2021.

13

14

15

16     _____

17     DAWN MELTON
       TEXAS CSR NO. 8986
       Expiration Date:  4/30/21
18     U.S. LEGAL SUPPORT, INC.
       Firm Registration No. 122
19     P.O. Box 4772-14
       Houston, Texas  77210-4772
20     (713) 653-7100

21               JOB NO.  358318

22

23

24

25

# EXHIBIT L

```
                    SUPERIOR COURT
                COMPLEX LITIGATION DOCKET
                     AT WATERBURY

    * * * * * * * * * * * * * * *
    ERICA LAFFERTY, ET AL.          *
                                    *
                                    * UWY-CV-18-6046436-S
    V.                              *
                                    *
    ALEX EMRIC JONES, ET AL.        *
    * * * * * * * * * * * * * * *
```

_____

```
                    SUPERIOR COURT
                COMPLEX LITIGATION DOCKET
                     AT WATERBURY

    * * * * * * * * * * * * * * *
    WILLIAM SHERLACH                *
                                    * UWY-CV-18-6046437-S
    V.                              *
                                    *
    ALEX EMRIC JONES, ET AL.        *
    * * * * * * * * * * * * * * *
```

_____

```
                    SUPERIOR COURT
                COMPLEX LITIGATION DOCKET
                     AT WATERBURY

    * * * * * * * * * * * * * * *
    WILLIAM SHERLACH, ET AL.        *
                                    *
                                    * UWY-CV-18-6046438-S
    V.                              *
                                    *
    ALEX EMRIC JONES, ET AL.        * September 17, 2021
    * * * * * * * * * * * * * * *   16:31 UTC

                      — — —

        REMOTE VIDEOTAPED DEPOSITION OF ROBERT JACOBSON
              Includes Confidential Testimony:
              BY MR. WOLMAN - PAGE 20, LINE 14

              BY MR. MATTEI - PAGE 187, LINE 11
```

1    A.    No, I've never heard that name before.

2    Q.    Are you aware of any practice by Free Speech

3  Systems or Mr. Jones whereby a guest would be brought on

4  in order to specifically sell products?

5    A.    Yes, I was aware of that.

6    Q.    And in what circumstances would that happen?

7    A.    That happened with -- you know, the name slips

8  me, but he did survival foods.  That guy came on a lot.

9  I believe Ted came on, Ted Anderson, came on to sell gold

10 from time to time.  There was -- and several others.  The

11 ones that stands -- the one that stands out the most was

12 the gentleman who sold the survival foods.  He came on

13 quite a lot.

14    Q.    Was Mr. Halbig ever brought on in order to sell

15 particular products?

16    A.    Not that I'm aware of, no.

17    Q.    Do you know if Mr. Halbig was ever brought on

18 because he drew particular ratings?

19    A.    I believe -- I believe so, but I'm not -- I

20 mean, I don't have any factual evidence of that or -- but

21 I believe that's -- one of his draws is that he came on

22 and he would receive a lot of ratings.

23    Q.    How do you know this?

24    A.    Alex did go to Alexa ratings service quite a

25 lot.  And he would book people who would give him good

1  returns on Alexa.  And those that would -- and I have

2  heard Alex say those who don't, where the ratings drop,

3  they don't want them on the -- you know, they don't want

4  that guest on the air anymore.

5      Q.   Do you know if Sandy Hook stories were run in

6  order to boost particular sales?

7           MR. MATTEI:  Objection.

8           THE DEPONENT:  Again, I am not a business

9  strategist.  I don't know for what purpose there would --

10  I mean, run -- it could have been -- in my impersonation,

11  that could have been a reason to jump ratings.  It could

12  also be to have high ratings, which would have sold

13  products.

14  BY MR. WOLMAN:

15      Q.   Doesn't every news organization want high

16  ratings?

17           MR. MATTEI:  Objection.

18           THE DEPONENT:  I believe the -- some -- you

19  know, in -- in my understanding of journalism, the least

20  reputable ones would run with sensationalism over

21  journalistic integrity.

22

23  BY MR. WOLMAN:

24      Q.   And do you know whether or not Free Speech

25  Systems ever tailored its opinions on factual events in

1  this status conference.  She may.  But I do expect that

2  she may want to review a portion of the rough transcript

3  around this issue of the -- you know, that Counsel and I

4  were discussing earlier in the cross-examination.

5       THE VIDEOGRAPHER:  Counsel, are we still on the

6  record, or would you like me to take us off?

7       MR. MATTEI:  Let's go off the record now.

8       THE VIDEOGRAPHER:  Time is currently 19:45 UTC

9  on September 17, 2021.  We are now off the record.

10      (The proceedings went off the record, and there

11  was a recess taken at 19:45 UTC.)

12      (The proceedings went back on the record, and

13  the deposition was resumed at 20:01 UTC.)

14      THE VIDEOGRAPHER:  Time is now 20:01 UTC,

15  September 17, 2021.  We are back on the record.  You may

16  proceed.

17  BY MR. WOLMAN:

18      Q.   Mr. Jacobson, did you speak with anybody during

19  this break?

20      A.   No, sir.

21      Q.   Did you look at any documents during this break?

22      A.   No, I didn't.

23      Q.   All right.  Judge Bellis has said that certainly

24  we can engage in motion practice regarding whether or not

25  you sufficiently searched for responsive documents prior

1  to the deposition and that she is not going to force you

2  here to search your phone.  But she also did not say you

3  could not do so if you had so desired.  Are you willing

4  to do so?

5          MR. MATTEI:  She said that it would be

6  inappropriate to ask a witness to do that during a

7  deposition, Attorney Wolman.  She said that.

8          MR. WOLMAN:  No, but she did not -- no.  She

9  said she wasn't going to force the witness to --

10          MR. MATTEI:  That is not true.

11          MR. WOLMAN:  She left it up to him to make his

12  own decisions --

13          MR. MATTEI:  She said it is inappropriate to ask

14  a witness to do that --

15          MR. WOLMAN:  He has the option -- he has the

16  option to do so.  I cannot compel him to do so.  He has

17  the option to do so --

18          MR. MATTEI: I can't believe you continue to

19  mischaracterize Judge Bellis's ruling on the record --

20          MR. WOLMAN:  I'm not mischaracterizing a single

21  thing.  She left open the possibility that he would do so

22  voluntarily.  So I'm asking to see if he would do so

23  voluntarily.  If he says no, that's it.  If he says yes,

24  great.

25          THE DEPONENT: I didn't bring a briefcase -- I

1  didn't bring a briefcase of documents.  I brought a phone

2  that provided me service that showed me instructions on

3  how to get to this office.  I wasn't aware that I was

4  bringing a pile of papers with me.  And that's it.  I

5  mean, if you're going to say that I deliberately brought

6  a pile of papers with me, which I also find to be, I

7  mean, deceptive, it's -- I just can't -- I mean, I

8  understand nobody here is representing me.  But out of my

9  own brain, I find -- you should be embarrassed for

10 yourself, man.  Like, honestly, it's a telephone that I

11 used as a map.  I did not come in with a big thing of

12 papers with me and you know that.

13          MR. WOLMAN:  Move to strike as nonresponsive.

14 BY MR. WOLMAN:

15     Q.   The question is:  Are you willing to search?  If

16 the answer is no, okay.  If the answer is yes, okay.

17     A.   No.

18          MR. WOLMAN:  Thank you.

19          MR. MATTEI: And let me just say, now that

20 Mr. Jacobson has answered no --

21          MR. WOLMAN:  No, we don't need to --

22          MR. MATTEI: -- that I think your conduct --

23          MR. WOLMAN: -- Chris, speechifying is

24 unnecessary here --

25          MR. MATTEI:  I'm going to make my record here.

```
 1   Because --
 2             MR. WOLMAN:  You know what, there is no
 3   record --
 4             MR. MATTEI:  -- this is going to be presented to
 5   Judge Bellis --
 6             MR. WOLMAN: -- this is a deposition --
 7             THE COURT REPORTER: I'm sorry, Counsel.  I
 8   can't -- I cannot hear both of you at the same time.
 9             MR. MATTEI:  I'll wait to make my comments.  Go
10   ahead.  I'll wait.
11             MR. WOLMAN:  This is not speechifying time.
12             MR. MATTEI: I'll wait, go ahead.
13             MR. WOLMAN:  The judge doesn't need any of that.
14   You can brief whatever you want.
15             MR. MATTEI:  Oh, no, no, no.  I'm making a
16   record --
17             MR. WOLMAN:  Your grandstanding here is not
18   going to get anything to happen here.
19             MR. MATTEI:  Ask your next question.
20             MR. WOLMAN: I will.  Thank you.
21   BY MR. WOLMAN:
22      Q.   Mr. Jacobson, have you understood the questions
23   I have asked today and that Mr. Mattei has asked today?
24      A.   Yes, sir.
25      Q.   Do you wish to change any of your answers?
```

1  website ranking as well.

2      Q.   And how did you know that Mr. Jones would

3  consult Alexa for that purpose?

4      A.   He verbally announced it.  He would actually say

5  the words, "Go to Alexa.  See what's going on."

6      Q.   And did you -- you described that Mr. Jones

7  would, in particular, check Alexa to assess how popular a

8  guest was; is that correct?

9      A.   Yeah.  He would see what his ratings were like

10  on that particular show.

11      Q.   And did I understand your testimony correctly

12  that if a guest had garnered positive ratings, Mr. Jones

13  would tend to have that guest back on?

14      A.   Yes.

15      Q.   Okay.  And was that the basis for your testimony

16  as to why Mr. Jones repeatedly had Mr. Halbig back on?

17          MR. WOLMAN:  Objection.

18          THE DEPONENT: I believe -- I believe that was a

19  definite reason, yeah.  If Mr. Halbig garnered low

20  ratings, I don't think he would have had him back on as

21  much.

22

23  BY MR. MATTEI:

24      Q.   Am I correct that you have no knowledge one way

25  or the other as to whether anybody at Free Speech Systems

1           C E R T I F I C A T I O N .

2

3       I, Qiana M. Burgess, Registered Professional

4   Reporter and a Notary Public within and for the State of

5   Connecticut, do hereby certify:

6       That the foregoing proceedings were taken before me

7   via Zoom at the time and place therein set forth, at

8   which time the witness, Robert Jacobson, was put under

9   oath remotely;

10      That the testimony of the witness, the questions

11  propounded, and all objections and statements made at the

12  time of the examination were recorded stenographically by

13  me and were thereafter transcribed.

14      I further certify that I am not related to the

15  parties hereto or their counsel, and that I am not in any

16  way interested in the events of said cause.

17      Dated at Woodbridge, Connecticut, this 29th day of

18  September, 2021.

19  _____

20                      Qiana M. Burgess, RPR

21                      Notary Public

22

23  My Commission Expires:

24  March 31, 2024

25

# EXHIBIT M

Filed in The District Court
of Travis County, Texas

AR    SEP 27 2021

D-1-GN-18-001842

At   3 : 30    P M.

Velva L. Price, District Clerk

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## ORDER ON PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR SANCTIONS

On this day, the Court considered Plaintiffs' Motion to Compel and Motion for Sanctions. The Court finds that the motions should be granted.

### BACKGROUND

On May 29, 2018, Plaintiffs served written discovery on Defendant Free Speech Systems, LLC. Twenty-eight days after service of the requests, Defendants filed a TCPA Motion, which was subsequently denied and appealed. Following remand, Defendants failed to provide responses.

One month after remand, on July 2, 2021, Plaintiffs wrote to the Defendants inquiring about the overdue responses. Plaintiffs offered an additional 14 days for Defendants to provide responses, in which case Plaintiffs agreed to waive any complaint about their timeliness. That same day, Defendants' counsel requested that Plaintiffs' counsel provide a copy of the *Pozner* discovery requests. More than three

1

weeks later, on July 27, 2021, with no responses provided, Plaintiffs brought the instant motion. Defendants have never answered the discovery requests.

## FINDINGS

The Court find that Defendants unreasonably and vexatiously failed to comply with their discovery duties. The Court finds that Defendants' failure to comply with discovery in this case is greatly aggravated by Defendants' consistent pattern of discovery abuse throughout the other similar cases pending before this Court. Prior to this latest discovery failure, Defendants repeatedly violated this Court's discovery orders in *Lewis v. Jones, et al.* (D-1-GN-18-006623), *Heslin v. Jones, et al.* (D-1-GN-18-001835), and *Heslin v. Jones, et al.*[1] (D-1-GN-18-004651), all of which are related cases involving Defendants' publications about the Sandy Hook Elementary School shooting. Defendants also failed to timely answer discovery in *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a similar defamation lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar defamation lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. The Court finds that Defendants' discovery conduct in this case is the result of flagrant bad faith and callous disregard for the responsibilities of discovery under the rules.

---

[1] Subsequently consolidated with D-1-GN-18-001835.

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remained consistent.

For these reasons, it is accordingly ORDERED that sanctions be assessed Defendants, including the following remedies allowed under Rule 215:

( )   an order disallowing any further discovery of any kind by the Defendants.

( )   an order charging all of the expenses of discovery or taxable court costs against the Defendants;

( )   an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; to wit,

_____

_____

_____.

( )   an order refusing to allow the Defendants to support or oppose designated claims or defenses, or prohibiting them from introducing designated matters in evidence.

(X)   a judgment by default against the Defendants, as this Court has considered less sanctions and determined they would be inadequate to cure the

3

violation in light of the history of Defendants' conduct in this Court. In reaching its decision, this Court has considered lesser remedies before imposing sanctions that preclude Defendants' ability to present the merits of their liability defense. However, the Court has more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective at deterring the abuse. This Court rejects lesser sanctions because they have proven ineffective when previously ordered. They would also benefit Defendants and increase the costs to Plaintiffs, and they would not adequately serve to correct the Defendants' persistent discovery abuses. Furthermore, in considering whether lesser remedies would be effective, this Court has also considered Defendants' general bad faith approach to litigation, Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are "show trials."

It is further ORDERED that Defendants shall pay reasonable attorney's fees in connection with Plaintiffs' Motion. Plaintiffs shall submit evidence regarding the reasonable value of the time expended by their attorneys related to their Motion.

Dated **September 27**, 2021.

Hon. Maya Guerra Gamble

4

# EXHIBIT N

Filed in The District Court
of Travis County, Texas

AR   SEP 27 2021
At   3:30   P.M.
Velva L. Price, District Clerk

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, | § | |
| LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## ORDER ON PLAINTIFF'S MOTION FOR CONTEMPT

On this day, the Court considered Plaintiff's Motion for Contempt. The Court finds that the motion should be granted.

### BACKGROUND

On January 25, 2019, this Court ordered Defendants to respond to court-approved discovery requests by February 25, 2019 and appear for depositions by March 25, 2019. Defendants refused to provide any documents, citing the reporter's privilege. In an order on March 8, 2019, this Court ordered Defendants to immediately produce all responsive documents. Thereafter, Defendants failed to produce any documents or prepare their corporate representative for deposition. After Defendants failed to comply with the discovery order, Plaintiff brought a motion for sanctions. A few days prior to the sanctions hearing on April 3, 2019, Defendants provided a set of documents. However, Defendants' counsel admitted at the hearing that the documents were incomplete and not sufficient. Defendants' counsel agreed

1

to pay $8,100 in attorney's fees and abandoned Defendants' TCPA arguments except for a sole legal issue to avoid being sanctioned at that time.

Defendants then unsuccessfully appealed the Court's denial on the TCPA motion. Following remand on June 4, 2021, Defendants took no action to comply with the January 25 discovery order, or any of the Court's other discovery orders, for over a month. Plaintiff then filed her Motion for Contempt under Rule 215 on July 6, 2021. Even after that motion was filed, Defendants continued to withhold discovery through July and August.

On August 26, 2021, a few days before the hearing on this matter, Defendants provided some additional documents to Ms. Lewis, but it is clear these documents do not satisfy Defendants' outstanding obligations. In addition, Defendants did not provide any supplemental discovery responses, nor did Defendants make efforts for a corporate representative deposition to cure their non-appearance. Nor have the Defendants fully and fairly responded to the discovery requests at issue.

## FINDINGS

This Court finds that Defendants have intentionally disobeyed the Court's order. The Court also finds that Defendants' failure to comply with the discovery order in this case is greatly aggravated by Defendants' consistent pattern of discovery abuse throughout the other similar cases pending before this Court. Defendants violated this Court's discovery orders in *Heslin v. Jones, et al.* (D-1-GN-18-001835) and

2

*Heslin v. Jones, et al.*[1] (D-1-GN-18-004651), both of which are related cases involving Defendants' publications about the Sandy Hook Elementary School shooting. Defendants also failed to timely answer discovery in *Pozner v. Jones, et al.* (D-1-GN-18-001842), another Sandy Hook lawsuit, as well as *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a similar lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. The Court finds that Defendants' discovery conduct in this case is the result of flagrant bad faith and callous disregard for the responsibilities of discovery under the rules.

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remained consistent.

It is accordingly ORDERED that sanctions be assessed Defendants, including the following remedies allowed under Rule 215:

( )   an order disallowing any further discovery of any kind by the Defendants.

( )   an order charging all of the expenses of discovery or taxable court costs against the Defendants;

---

[1] Subsequently consolidated with D-1-GN-18-001835.

3

( )    an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; to wit:

_____

_____

_____.

( )    an order refusing to allow the Defendants to support or oppose designated claims or defenses, or prohibiting them from introducing designated matters in evidence; to wit: _____

_____

_____.

☒    a judgment by default against the Defendants, as this Court has considered lesser sanctions and determined they would be inadequate to cure the violation in light of the history of Defendants' conduct *in this Court.* In reaching its decision, this Court has considered lesser remedies before imposing sanctions that preclude Defendants' ability to present the merits of their liability defense. However, the Court has more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective at deterring the abuse. This Court rejects lesser sanctions because they have proven ineffective when previously ordered. They would also benefit Defendants and increase the costs to Plaintiffs, and they would not adequately serve

4

to correct the Defendants' persistent discovery abuses. Furthermore, in considering whether lesser remedies would be effective, this Court has also considered Defendants' general bad faith approach to litigation, Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are "show trials."

It is further ORDERED that Defendants shall pay reasonable attorney's fees in connection with Plaintiff's Motion. Plaintiff shall submit evidence regarding the reasonable value of the time expended by her attorneys related to her Motion.

Dated **September 27**, 2021.

Hon. Maya Guerra Gamble

5

# EXHIBIT O

Filed in The District Court
of Travis County, Texas

AR   SEP 27 2021

At    3:30    P M.
Velva L. Price, District Clerk

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## ORDER ON PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

On this day, the Court considered Neil Heslin's Motion for Default Judgment. The Court finds that the Motion should be granted.

### BACKGROUND

On October 18, 2019, this Court ordered expedited discovery in Mr. Heslin's IIED claim, including written discovery and depositions. Defendants failed to comply with the order in numerous respects. On December 20, 2019, the Court assessed sanctions and held the Defendants in contempt for intentionally disobeying the order. At that time, the Court took under advisement all additional remedies based on representations by Defendants that discovery would be promptly supplemented during the appellate stay. As the Court stated in its prior order, the amount of supplemental discovery would be a factor when revisiting sanctions upon remand. Despite their promises, Defendants failed to supplement any discovery following the

1

2019 hearing and prior to remand. Defendants also failed to supplement any discovery for nearly three months following remand in June 2021.

On August 26, 2021, a few days before the hearing on this matter, Defendants provided some additional documents to Mr. Heslin, but it is clear these documents do not satisfy Defendants' outstanding obligations. In addition, Defendants did not provide any supplemental discovery responses, nor did Defendants make efforts for a corporate representative deposition to cure their non-appearance. Nor have the Defendants fully and fairly responded to the discovery requests at issue.

### FINDINGS

The Court now finds that a default judgment on liability should be granted. The Court finds that Defendants' discovery conduct in this case has shown flagrant bad faith and callous disregard for the responsibilities of discovery under the rules. The Court finds Defendants' conduct is greatly aggravated by the consistent pattern of discovery abuse throughout the other Sandy Hook cases pending before this Court. Prior to the discovery abuse in this case, Defendants also violated this Court's discovery orders in *Lewis v. Jones, et al.* (D-1-GN-18-006623) and *Heslin v. Jones, et al.* (D-1-GN-18-001835). After next violating the October 18, 2019 discovery order in this case, Defendants also failed to timely answer discovery in *Pozner v. Jones, et al.* (D-1-GN-18-001842), another Sandy Hook lawsuit, as well as *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a similar lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes that

Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar defamation lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. In sum, Defendants have been engaged in pervasive and persistent obstruction of the discovery process in general. The Court is also faced with Defendants' refusal to produce critical evidence. Defendants have shown a deliberate, contumacious, and unwarranted disregard for this Court's authority. Based on the record before it, this Court finds that Defendants' egregious discovery abuse justifies a presumption that its defenses lack merit.

In reaching its decision, this Court has considered lesser remedies before imposing sanctions that preclude Defendants' ability to present the merits of their liability defense and determined they would be inadequate in light of the history of Defendants' conduct in this court. However, the Court has more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective at deterring the abuse. This Court rejects lesser sanctions because they have proven ineffective when previously ordered. They would also benefit Defendants and increase the costs to Plaintiffs, and they would not adequately serve to correct the Defendants' persistent discovery abuses. Furthermore, in considering whether lesser remedies would be effective, this Court has also considered Defendants' general bad faith approach to litigation, Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are "show trials."

3

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remained consistent.

It is accordingly ORDERED that a default judgment be entered against Defendants with respect to liability in this lawsuit.

It is further ORDERED that Defendants shall pay reasonable attorney's fees in connection with Plaintiffs' Motion. Plaintiffs shall submit evidence regarding the reasonable value of the time expended by their attorneys related to their Motion for Default Judgment subsequent to the December 2019 hearing in this matter.

Dated _September 27_, 2021.

Hon. Maya Guerra Gamble

4

# EXHIBIT P

# GOOGLE'S ANALYTICS PROVE INFOWARS HAS NO SANDY HOOK MARKETING
## Specialist destroys MSM agenda

**The Alex Jones Show -** JUNE 12, 2019



IMAGE CREDITS: TSTOKES / PIXABAY.

**Michael Zimmerman joins Alex Jones live in-studio to show and prove how, contrary to Democrat attorneys and judges, Infowars has no alleged 'Sandy Hook marketing' and makes no money from Sandy Hook video views, which happen to be less than 1% of all views.**





*Don't miss:*

### Fake News Exploits Generational Tech Gap To Smear Alex Jones

*Many of America's governmental representatives are not familiar with how modern social media and Big Tech algorithms actually work. Alex exposes how fake news can be used to smear him and other patriots because of the generational technology gap.*

○ Bernie Sanders

○ Kamala Harris

○ Pete Buttigieg

○ Beto O'Rourke

Vote   View Results

INFOWARS

© 2019 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.

| | | |
|---|---|---|
| Radio | Archive | About Alex Jones Show |
| Video | Watch Alex Jones Show | Subscribe |
| NewsWars | Most Recent | Contact |
| PPTV | D.M.C.A. | |
| Store | Corrections | |
| Infowars Life | | |
| T.O.S. | | |

INFOWARS

© 2019 Infowars.com is a Free Speech Systems, LLC Company.
All rights reserved. Digital Millennium Copyright Act Notice.

# EXHIBIT Q

CAUSE NO. D-1-GN-19-004651

DEC 2 0 2019  JG
At ____4:41____ P.M.
Velva L. Price, District Clerk

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | 53rd DISTRICT COURT |
| *Defendants* | § | |

## ORDER DENYING DEFENDANTS' RULE 91a MOTION TO DISMISS

Having considered *Defendants' Rule 91a Motion to Dismiss* and the pleadings on file, the Court hereby ORDERS that:

1.    *Defendants' Rule 91a Motion to Dismiss* is DENIED.

2.    Defendants shall pay costs and reasonable and necessary attorney fees incurred with respect to the challenged cause of action in the trial court in the amount of $34,323.80, to be taxed as costs of court. This amount represents the fees detailed in the Mark Bankston's September 29 declaration, minus 12 hours related to *Plaintiff's Motion for Sanctions and Motion to Strike Unauthorized Filing*, which the court finds was not reasonable and necessary.

So ORDERED _December 20_, 20_19_.

_____
Scott Jenkins
Travis County District Judge

1

# EXHIBIT R

Filed in The District Court
of Travis County, Texas

DEC 20 2019 JG

At _____ 4:41 _____ M.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-19-004651

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, and | § | |
| FREE SPEECH SYSTEMS, LLC, | § | 261st DISTRICT COURT |
| *Defendants* | § | |

## ORDER ON PLAINTIFF'S MOTION FOR SANCTIONS AND DEFENDANTS' MOTION TO DISMISS UNDER THE TCPA

On December 18, 2019, the Court heard *Plaintiff's Motion for Sanctions and Motion for Default Judgment* (Motion for Sanctions) and *Defendants' Motion to Dismiss under the Texas Citizens Participation Act* (TCPA Motion). After hearing the arguments of counsel and considering the record, the Court finds that the Motion for Sanctions should be granted and the TCPA Motion should be denied.

It is hereby ORDERED that pursuant to Rule 215.2(b)(3), the matters regarding which the expedited discovery order dated October 18, 2019 was made (Plaintiff's burdens in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion.

It is further ORDERED that pursuant to Rule 215.2(b)(8), the Court must require Defendants to pay the reasonable expenses, including attorney fees, caused by the failure to obey the October 18 order because the Court does not find that the failure was substantially justified or that other circumstances make an award of expenses unjust. The Court orders costs and expenses of $65,825 to be paid by Defendants, to be taxed as costs of court. This amount represents the fees detailed in Mark Bankston's December 9 declaration, minus fees

1

related to the deposition of Paul Watson and fees related to Plaintiff's discovery motion. The discovery motion fees are already being awarded in a companion *Order Denying Defendants' Rule 91a Motion to Dismiss.*

It is further ORDERED that pursuant to Rule 215.2(b)(6), Defendants' failure to produce a corporate representative who was prepared to testify about a) sourcing and research for the videos described in Plaintiff's petition and b) internal editorial discussions regarding Free Speech System, LLC's coverage of the Sandy Hook Elementary School shooting should be treated as contempt of court. Defendants have been continuously represented in this case by competent Texas counsel. The same counsel who represented Defendants at the October 17 hearing regarding *Plaintiff's Motion for Expedited Discovery in Aid of Plaintiff's Response to Defendants' TCPA Motion* are representing Defendants now, with one additional attorney recently appearing. Surely this Court can assume that Defendants' counsel fulfilled their professional obligation to insure that Defendants understood this Court's October 18 order. And the order itself is clear and unmistakable, easily understood by any competent reader. On the record presented, the Court concludes that Defendants intentionally disregarded the October 18 order. The Court notes that a client's refusal to cooperate with an attorney may rise to good cause for the attorney's withdrawal under Texas Disciplinary Rule of Professional Conduct 1.15(b). Defendants are hereby ORDERED to pay a fine of $500, the maximum fine allowed under Government Code 21.002(b).

All additional remedies available pursuant to Rule 215.2(b), up to and including a default judgment against Defendants on liability, are taken under advisement and may be reconsidered by the Court after remand following the anticipated interlocutory appeal of the denial of the TCPA Motion. Defendants represented at the December 18 hearing that they

would continue to supplement discovery to belatedly comply with the October 18 order. The amount of supplemental discovery is a factor that will be considered if the Motion for Sanctions is reconsidered on remand.

It is further ORDERED that Defendants' TCPA Motion is in all respects DENIED.

It is further ORDERED that even without taking Plaintiff's burdens in responding to Defendants' TCPA Motion to be established in favor of Plaintiff pursuant to TRCP 215.2(b)(3), Defendants' TCPA Motion must nevertheless be, and is, DENIED.

So ORDERED _December 20_, 20_19_.


_____
Scott Jenkins
Travis County District Judge

3

# EXHIBIT S

Filed in The District Court
of Travis County, Texas

OCT 18 2019 RT

At ___4:16 P.___ M.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 53rd DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

## ORDER ON PLAINTIFF'S MOTION FOR CONTEMPT UNDER RULE 215 AND DEFENDANTS' MOTION TO DISMISS UNDER THE TCPA

---

On October 3rd, 2019, the Court heard Plaintiff's Motion for Contempt Under Rule 215 and Defendants' Motion to Dismiss under the Texas Citizens Participation Act (TCPA Motion). After hearing the arguments of counsel and considering the record, the Court finds that the Motion for Contempt should be granted and the TCPA Motion should be denied.

It is hereby ORDERED that pursuant to Rule 215.2(b)(3), the matters regarding which the August 31, 2018 order was made (Plaintiff's burdens in responding to Defendants' TCPA Motion) shall be taken to be established in favor of Plaintiff for the purposes of the TCPA Motion.

It is further ORDERED that pursuant to Rule 215.2(b)(8), the Court must require Defendants to pay the reasonable expenses, including attorney fees, caused by the failure to obey the August 31, 2018 order because the Court does not find that the failure was substantially justified or that other circumstances make an award of

1

expenses unjust. The Court orders costs and expenses of $25,875 to be paid by Defendants, to be taxed as costs of court.

It is further ORDERED that Defendants' TCPA Motion is in all respects DENIED.

It is further ORDERED that even without taking Plaintiff's burdens in responding to Defendants' TCPA Motion to be established in favor of Plaintiff pursuant to TRCP 215.2(b)(3), Defendants' TCPA Motion must nevertheless be, and is, DENIED.

So ORDERED October ___18___, 2019.


Scott Jenkins
Travis County District Judge

2