# EXHIBIT 15

1

```
XO6 UWY CV18-6046436-S      :    SUPERIOR COURT

ERICA LAFFERTY, ET AL       :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021

---------------------------------------------------------------

XO6 UWY CV18-6046437-S      :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021

---------------------------------------------------------------

XO6 UWY CV18-6046438-S      :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021
```

B E F O R E:

      THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S:

  Representing the Plaintiffs:

     ATTORNEY CHRISTOPHER MATTEI
     ATTORNEY ALINOR STERLING
     ATTORNEY MATTHEW BLUMENTHAL
     Koskoff Koskoff & Bieder
     350 Fairfield Avenue
     Bridgeport, Connecticut  06604

2

Representing the Defendants:

ATTORNEY JAY MARSHALL WOLMAN
Randazza Legal Group
100 Pearl Street
Hartford, Connecticut  06103

ATTORNEY CAMERON L. ATKINSON
Pattis & Smith
383 Orange Street
New Haven, Connecticut  06511

ATTORNEY MARIO CERAME
Brignole Bush & Lewis
73 Wadsworth Street
Hartford, Connecticut  06106

                              Recorded and Transcribed By:
                              Patricia Sabol
                              Court Monitor
                              400 Grand Street
                              Waterbury, Connecticut  06702

3

1          THE COURT:  All right.  We're on the record in
2     the Lafferty versus Jones, three consolidated cases.
3     The Waterbury docket number for the Lafferty matter is
4     18-6046436.  For the record, this is Judge Bellis.  I
5     understand that Mr. Ferraro is contacting Attorney
6     Cerame to see if he is intending to appear.

7          In the meantime, I'll just give everyone the
8     general reminders that I say every time.  Please mute
9     your device.  As you know, I do the same thing.  I
10    sometimes forget to unmute it, but it's just a lot
11    easier for the court reporter feedback-wise if
12    everyone has their device muted, unless they're
13    addressing the Court.  And, also, just to help the
14    court reporter out, please just restate your name each
15    time you readdress the Court.

16         So, Mr. Ferraro, were you able to get through to
17    Attorney Cerame?  I'm not sure he wants to attend.
18    Technically, this doesn't involve him.  Although
19    certainly we would wait for him.

20         COURT OFFICER:  Yes, your Honor.  I did get in
21    touch with him.  He said he would be on in a couple of
22    minutes.  He was a little confused because I think
23    there was also a deposition scheduled for right now in
24    the case.  He wasn't sure what was going on.  He did
25    say he had another matter at eleven o'clock that he
26    would bring up with you.  If he doesn't need to be
27    here, he may just actually leave there at eleven

4

1     o'clock or slightly before then.

2        THE COURT:  All right.  So we can wait for him to

3     sign in.

4        In the meantime, starting with plaintiff's

5     counsel, I'll just have counsel identify themselves

6     for the record, please.  And good morning to everyone.

7        ATTY. MATTEI:  Good morning, your Honor.  Chris

8     Mattei on behalf of the plaintiffs, joined today by my

9     colleagues, Alinor Sterling and Matthew Blumenthal.

10        THE COURT:  For the Jones defendants.

11        ATTY. WOLMAN:  Good morning, your Honor.  Jay

12     Wolman of Randazza Legal Group for Mr. Jones, Free

13     Speech Systems, LLC, Infowars, LLC, Infowars Health,

14     LLC and Prison Planet TV, LLC.  I'm joined by my

15     colleague, Attorney Cameron Atkinson of Pattis & Smith

16     who represents the LLC defendants.

17        Before we begin, your Honor, I'd like to

18     apologize for the missed redaction in the motion for

19     protective order.  That was -- we filed a document

20     from a Texas public filing into here, and it just

21     didn't click that the unredacted filing there would

22     need to be redacted here.

23        THE COURT:  It's not a problem.  I actually think

24     I caught it within minutes, and that does happen with

25     more frequency than you'd like.  So I did seal it.

26     And, obviously, just get that redacted document in

27     right away.

1      ATTY. WOLMAN:  It was the date of birth, right,

2 your Honor?

3      THE COURT:  Yes.  Well, to be honest, Mr. Wolman,

4 I saw that and I just immediately sealed.  So I would

5 suggest you have your staff sort of scour through the

6 --

7      ATTY. WOLMAN:  I want to make sure that I caught

8 whatever your Honor caught.

9      THE COURT:  Right.  And then I stopped there.

10 Just look at four seven and match it up.  It may very

11 well be the only thing.

12      ATTY. WOLMAN:  I'm not used to dates of birth

13 being on an affidavit and just for a generic matter.

14 Apparently that's what they do in Texas.

15      THE COURT:  Sure.

16      I suppose while we're waiting for Attorney Cerame

17 to log in, I was going to start off by asking if

18 anyone had any matters that were ready to be

19 adjudicated or needed a briefing schedule.  So,

20 Attorney Wolman, since you have the floor, why don't I

21 start with you?  Since we last met, anything that you

22 filed that either needs to be adjudicated that's

23 ready, in your opinion, or needs a briefing schedule?

24      ATTY. WOLMAN:  Just so your Honor is aware, we're

25 going to be filing a response on the motions for

26 commissions to the social media entities today.  That

27 is our due date.  That will be filed at some point

1    today.  And I know there are some motions to seal that

2    are being adjudicated on Wednesday.  And we'll be

3    filing our responses before then.  Otherwise, with the

4    exception of this motion for protective order in which

5    your Honor has now ruled, at least there's nothing

6    since November 5th, I believe.

7         THE COURT:  Okay.  Same questions to plaintiffs.

8    Anything that in your mind since we last met is either

9    ready to be adjudicated or needs a briefing schedule,

10   anything that you filed?

11        ATTY. MATTEI:  Not that I'm aware of, your Honor.

12        THE COURT:  I suppose we can -- I'm not sure if

13   Attorney Cerame was even near a computer.  And this

14   argument doesn't involve him.  So I'm comfortable

15   starting it, and we can stop when I see him joining

16   and I can just tell him what's transpired.  Since I

17   always order a transcript, he'll have that available,

18   unless somebody feels strongly the other way.  I just

19   don't know if it could be half an hour or twenty

20   minutes.  I just don't want you wasting your time.

21   Does anybody have -- oh, Mr. Ferraro?

22        COURT OFFICER:  Yes, your Honor.  Attorney Cerame

23   just emailed me that he can't find the link, so I just

24   forwarded it to him.

25        THE COURT:  It sounds like it will just be matter

26   of minutes, so we'll wait.

27        One thing I did want to mention, I know we're

1    going to address the trial balance issue today.  But I

2    also in re-reviewing the materials, I would like both

3    sides to also address the entities that they believe

4    sanctions should or should not enter against.  Because

5    when I read the filings, it looks like the plaintiffs

6    are asking for sanctions as to all the defendants.  Of

7    course, the defendants are arguing sanctions should

8    not enter.  But I'd like to hear argument more on

9    where sanctions are or are not appropriate.  If you

10   would address that, please.

11       So we'll just stand by then and wait for Attorney

12   Cerame.

13       ATTY. CERAME:  Good morning.  This is Mario

14   Cerame.  I'm sorry I'm having some technical problems

15   here.

16       THE COURT:  That's okay, Attorney Cerame.  Are

17   you able to hear me okay?  This is Judge Bellis.

18       ATTY. CERAME:  Yes, your Honor.  I can hear you

19   perfectly well.  I apologize once again.

20       THE COURT:  It's not a problem at all.  No

21   worries.  I don't see a video on you.  I'm okay with

22   that.  I just want to make sure you can hear and see

23   what you need to hear and see.

24       I also wanted to tell you while we were waiting

25   for you to join, what we did is, I asked counsel to

26   address which entities, if any, sanctions should enter

27   against with respect to the Jones defendants.  I also

8

1    had them go over what, since our last status

2    conference, was ready to be adjudicated or needs a

3    briefing schedule, which was nothing new.  So what I'd

4    like to know from you, is there anything that you have

5    filed since we last spoke that is either ready to be

6    adjudicated or needs a briefing schedule?

7        ATTY. CERAME:  No, your Honor.

8        THE COURT:  I didn't think so, but I didn't want

9    to leave you out of the discussions.  So I'll ask that

10   you mute your device, as well, during the argument

11   which I'm going to do, as well.

12       I do want to remind everybody that we do have the

13   motions to seal.  There's quite a few of them down for

14   Wednesday.  So that will go forward.  The show cause

15   hearing, as you've probably seen from the order, I

16   continued to our next status conference so that we can

17   get the sealing issues addressed.  So at this point, I

18   believe the only thing we have on Wednesday are the

19   many motions to seal that need to be adjudicated.

20       So I am going to mute, and I will turn the floor

21   over to Attorney Mattei.  And then Attorney Wolman

22   will be given an opportunity to respond.  Whenever

23   you're ready, please.

24       ATTY. MATTEI:  Thank you.  And good morning

25   again, your Honor.

26       I wanted to mention at the outset, because it's

27   not clear from the correspondence we've received from

9

1      the Jones defendants, whether they have notified the

2      Court that on Friday they filed an application to file

3      a public interest appeal with the Connecticut Supreme

4      Court based on your denial of their motion to recuse.

5      So I just wanted to make sure that the Court was aware

6      of that in the event it was not aware of that and give

7      the Court an opportunity to do anything it felt it

8      needed to do there.

9          THE COURT:  I was not aware, but thank you.  We

10     can proceed.

11         ATTY. MATTEI:  Your Honor, if it's okay, I'll

12     take up the trial balance argument first and then

13     address the issue that the Court raised as to which

14     defendant sanctions should enter against.

15         So we're here for, I think, the third argument

16     relating to the plaintiff's motion for default and

17     sanctions.  And today I'm going to address the issue

18     of the trial balances.  The trial balances, it's just

19     an accounting term for balance sheets, as the Court is

20     aware.  We requested that the Jones defendants produce

21     trial balances and subsidiary ledgers through their

22     managing agent, Melinda Flores.  This was back in the

23     fall of last year.

24         On the eve of the Court deciding whether or not

25     Ms. Flores was a managing agent and, therefore,

26     subject to deposition and production on notice, the

27     Jones defendant removed the case to federal court.  It

10

1       came back in the spring of this year.  And we again

2       sought compliance from the Jones defendants and

3       production of Ms. Flores.

4           The Court ordered that Ms. Flores produce

5       subsidiary ledgers and trial balances on behalf of

6       Free Speech Systems at her deposition.  The Jones

7       defendants sought an emergency protective order

8       preventing that deposition from going forward.  The

9       Court then ordered again the documents to be produced

10      by May 14, 2021 and warned that failure to comply with

11      its order might result in sanctions.

12          On May 14 of 2021, the defense counsel staff

13      transmitted documents purporting to be trial balances

14      to the plaintiffs and advised the plaintiffs that they

15      were being produced from Melinda Flores, Free Speech

16      Systems' accounting manager, and incorporating the

17      subsidiary ledgers.  When we received those balance

18      sheets, we had every reason to believe that Ms. Flores

19      had produced them.  She had been identified by Free

20      Speech Systems in its own internal documents as their

21      accounting manager.  She is the top person within the

22      organization with accounting responsibilities at Free

23      Speech Systems.  For these reasons, we specifically

24      directed our requests to Ms. Flores because we

25      believed she was best positioned not only to produce

26      the documents, but to testify about their contents.

27          So when we received that transmittal, we prepared

1      to depose Ms. Flores on May 27th, believing that the

2      documents they had produced were the documents Ms.

3      Flores had generated.  We had no idea that the

4      documents they had produced were, in fact, created by

5      an outside accountant they had retained in this

6      litigation named Robert Roe.  We were completely

7      unaware as to the basis for them indicating that the

8      trial balances contained subsidiary ledgers.  So we

9      prepared to question Ms. Flores about these documents

10     believing that they were the ones that she had

11     produced.

12          When we commenced that deposition and presented

13     those documents to Ms. Flores, it was clear that she

14     believed them to be the trial balances that she had

15     produced.  She testified that, in fact, they were.

16     The only person during that deposition who was aware

17     that the trial balances -- oh, I see Attorney Ferraro

18     trying to get my attention.

19          COURT OFFICER:  I'm sorry, Attorney Mattei.  Your

20     Honor, I just got the email from the Connecticut

21     Public Radio people we didn't address whether or not

22     they could record this morning, as we have in the

23     past.

24          THE COURT:  Okay.  That is correct.  Was that

25     request conveyed to counsel?

26          COURT OFFICER:  Yes, your Honor.

27          THE COURT:  Did any counsel have any objection to

1     that?  If you do, just state --

2          ATTY. MATTEI:  No, your Honor, we did not.

3          ATTY. WOLMAN:  We do not have an objection, your

4     Honor.

5          ATTY. CERAME:  No objection.

6          THE COURT:  So the recording can begin.

7          COURT OFFICER:  Thank you, your Honor.  I'm

8     sorry.

9          ATTY. MATTEI:  And, your Honor, I wanted to

10    mention that the document identifying Ms. Flores as

11    the accounting manager for Free Speech Systems is, I

12    think, attached as Exhibit I to our original motion

13    for sanctions relating to this.

14         When I commenced to question Ms. Flores about the

15    trial balances, she testified that she believed that

16    the trial balances that had been produced by us were

17    the ones that she had generated which she testified

18    she generated with ease.

19         As of today, we still do not have the trial

20    balances that she produced.  Even today we don't.  And

21    the only person during that deposition who was aware

22    that the trial balances we were using, believing Ms.

23    Flores had produced, was defense counsel.  And defense

24    counsel said nothing during the deposition at any time

25    to correct Ms. Flores' testimony that the trial

26    balances were the ones she had generated.

27         She also testified, as you know, that she had not

1  been asked to produce subsidiary ledgers and did not

2  produce subsidiary ledgers even though she understood

3  how and even though she acknowledged that subsidiary

4  ledgers are necessary to support the balances

5  contained in the balance sheets.

6      The one thing we did know about these trial

7  balances when they were produced was that several of

8  them did not balance.  The whole purpose of the

9  balance sheet is to show credits and debits balancing.

10  And several of them did not.  So that at least raised

11  a question in our mind about the integrity of the

12  documents that had been produced and whether they, in

13  fact, accurately reflected the underlying finances of

14  Free Speech Systems.

15      When we asked Ms. Flores about them, she wasn't

16  able to explain why there were imbalances in the trial

17  balances.  This is what prompted Free Speech Systems

18  to later produce what they I guess described as

19  additional trial balances from Mr. Roe because they

20  knew that they were going to have to explain why there

21  were imbalances in the trial balances and they knew

22  that their own accounting manager could not.  So

23  that's when they disclosed the documents that they had

24  produced were, in fact, created by Mr. Roe.

25      Mr. Roe's explanation for what he did with the

26  trial balances that Ms. Flores created were incomplete

27  and nonsensical.  He essentially admitted initially

1    that there had only been a few formatting errors.

2    That's the initial explanation we received, that there

3    were formatting errors in the trial balances he

4    produced.

5         As time went on and we had to litigate whether or

6    not Free Speech Systems had subsidiary ledgers and

7    then whether they had to produce them, we deposed the

8    corporate designee for all of the corporate entities

9    of the Jones defendants.  That corporate designee,

10   Michael Zimmerman, testified specifically that

11   Infowars, LLC, one of the corporate defendants,

12   participated in no financial transactions.  He

13   testified that he minimized the extent to which there

14   were any financial transactions between the other

15   codefendants and Free Speech Systems.  And we had no

16   subsidiary ledgers at that point to use in our

17   examination of Mr. Zimmerman, and we only had

18   inaccurate trial balances.

19        They later produced subsidiary ledgers at this

20   Court's order after the Court found that it was

21   sanctionable for them not to have done so originally

22   and after the Court discredited Mr. Roe's initial

23   affidavit as to whether or not subsidiary ledgers

24   existed at all.

25        When we reviewed the subsidiary ledgers, it

26   became obvious that Mr. Roe had not simply had some

27   formatting errors in his trial balances, but that he

15

1    had wholly misrepresented Free Speech Systems'

2    finances in those trial balances.  And the only way we

3    were able to determine that is because the subsidiary

4    ledgers had been produced at this Court's order.  If

5    the Court had not seen through their effort to

6    withhold and conceal their subsidiary ledgers, there

7    is no way we would have understood the extent of Mr.

8    Roe's manipulations and, more importantly, the

9    underlying finances that are at issue in this case.

10        Here's what we now know Mr. Roe did with Ms.

11    Flores' trial balances, which we still don't have:  He

12    deleted accounts.  He simply deleted accounts that are

13    in active use and that are material to Free Speech

14    Systems' finances.  And we lay this out both in our

15    reply, your Honor, and in our sur-surreply.  Mr. Roe

16    does not dispute it.  He acknowledges that there are

17    accounts in active use at Free Speech Systems that he

18    simply not include in his trial balances that would

19    have been included in Ms. Flores' trial balances

20    because she testified that she ran them directly from

21    Quick Books.  Those accounts that he deleted prove

22    financial relationships between the codefendants.

23        THE COURT:  Can you back up a second, Attorney

24    Mattei?  Because I might have confused myself.  With

25    respect to the trial balances and the subsidiary

26    ledgers, you never got the trial balances that Ms. --

27    your position is you never got the trial balances that

1          Ms. Flores ran, correct?

2              ATTY. MATTEI:   Correct.

3              THE COURT:   The subsidiary ledgers, what did you

4      end up getting with respect to the subsidiary ledgers?

5              ATTY. MATTEI:   On August 24th, I believe, your

6      Honor, after the Court found that subsidiary ledgers

7      did exist and that Mr. Roe's affidavit was not

8      credible, they produced to us what they described as

9      supposed subsidiary ledgers, which contain -- which

10     Mr. Roe in his affidavits describe as transaction

11     reports.  But essentially what they are are

12     spreadsheets showing account activity within the

13     general accounts listed on the trial balances that Mr.

14     Roe produced.  We -- it is not clear whether they are,

15     in fact, subsidiary ledgers because subsidiary ledgers

16     contain opening balances, opening account balances.

17     These do not, which Mr. Roe explained I think in his

18     second affidavit, but at least they are or purport to

19     be transaction detail reports for the years in

20     question.

21          And so what's included -- and, your Honor, I

22     think we list the accounts that are contained in the

23     subsidiary ledgers and Mr. Campanelli's affidavits and

24     in our pleadings.  We certainly list all of the ones

25     that were deleted from Mr. Roe's trial balances.

26          So I'm going to continue to describe these as

27     subsidiary ledgers because they were produced

1    following the Court's finding that subsidiary ledgers

2    exist and that they had been withheld.  So these

3    subsidiary ledgers --

4         I'm sorry, your Honor.  Also, going back to your

5    first question there, Ms. Flores testified that she

6    ran trial balances in accordance with what she

7    believed her obligations to be.  She testified that

8    she was informed by defense counsel that they had gone

9    to the appropriate people and she believed, when I

10   presented her with the trial balances, that they were

11   the ones that she ran.  What's clear is we do not

12   have -- whatever trial balances she ran we do not have

13   and we have never had because Mr. Roe testified that

14   whatever he received from Ms. Flores he then

15   manipulated -- I'm sorry -- he attested in his

16   affidavit.

17        Among his manipulations -- and this is getting

18   back to where I left off -- were the deletion of these

19   accounts.  We list them in our pleadings, your Honor.

20   These are accounts showing relationships between the

21   codefendants.  They are accounts showing Mr. Jones'

22   own draw from Free Speech Systems and, therefore, his

23   own personal incentive in the publications that he

24   makes.  They are accounts that show the relationship

25   between Mr. Jones' primary revenue generating entity,

26   which is the supplement business he runs through the

27   Infowars store and Free Speech Systems.  They are

18

1    accounts that are crucial to understanding Free Speech

2    Systems' finances and Mr. Roe deleted them.  They

3    simply did not exist on his trial balances.

4         He also consolidated certain accounts into one

5    new account that had no previous existence.  Those are

6    four accounts which are described as cost of goods

7    sold.  Among the accounts he consolidated and which we

8    would have never known existed was a third party

9    promotion account showing that Free Speech Systems

10   pays others to promote its products.  He created an

11   entirely new account, an entirely new name for it and

12   consolidated four accounts into it.  This is true for

13   every year for which we have trial balances that he

14   created.

15        He also -- there are also wild discrepancies

16   which we describe between dozens of accounts listed in

17   his trial balances and what the subsidiary ledgers

18   show.  He attempts to explain some of this by saying,

19   well, there aren't opening account balances for some

20   number of those accounts.  He doesn't describe which

21   ones they are, and fails entirely to even attempt to

22   explain the discrepancies between the trial balances

23   and the subsidiary ledgers with respect to other

24   accounts.

25        So what's clear is that the Jones defendants

26   produced documents that do not accurately reflect

27   their underlying finances, that they did it

1   purposefully in order to prevent the plaintiffs from
2   conducting meaningful discovery about their finances.
3   That they didn't disclose it until they were caught.
4   And that now, according to Mr. Campanelli, our expert
5   accountant, there's no reliance he would be able to
6   place on any of the financial documents they've
7   provided because of the discrepancies that are
8   unexplained and because of the deleted accounts that
9   Mr. Roe offers no explanation as to why they were
10  deleted, but in our mind, given the nature of the
11  accounts, it's obvious.  And this was all orchestrated
12  by the Jones defendants, frankly, without Ms. Flores'
13  knowledge, who is the managing agent they produced to
14  testify about this and without our knowledge.
15       The reason I think the Court can infer that they
16  did this is related both to the financial records that
17  they wrongfully withheld and fabricated and the
18  analytics information that we saw.  What we have
19  attempted to discover here is information showing the
20  relationship between their publication platforms,
21  their websites and what they publish and their
22  revenue.  And on both scores, the Jones defendants
23  have withheld information, lied about the information
24  they do have with respect to their financial
25  information.  They've produced fabricated documents
26  that have prevented us entirely from relying on what
27  it is that they've produced and what they've said they

20

1    have.

2         All of this, your Honor, has happened over the

3    course of years, has been deliberate and willful and

4    has prejudiced us, our ability to prove our claims,

5    all of our claims, but including claims under CUTPA.

6    And we believe, given the entire course of conduct,

7    was a deliberate and willful strategy chosen by the

8    Jones defendants to basically deny the authority of

9    the Court to order them to produce this information.

10   And then when the Court made clear that it was

11   discoverable, to do everything that they could to hide

12   it.  And now what they've left us with is a batch of

13   financial records that are totally unreliable,

14   misrepresentative of their underlying finances and

15   analytics production that is entirely incomplete and

16   does nothing to tell the story that we believe had

17   they provided us with evidence that's solely within

18   their possession would prove the relationship between

19   Mr. Jones' multiyear campaign to spread the lie that

20   Sandy Hook didn't happen and the expansion of his

21   audience and the expansion of his revenue.

22        So with that, I don't know if you'd like me to

23   now address the issue of which defendant sanctions

24   should enter against or whether you want counsel to

25   respond to the substance of the trial balance

26   argument.

27        THE COURT:  I think you can address it now,

21

1      please.

2           ATTY. MATTEI:  Your Honor, in their sworn

3      discovery responses, the Jones defendants have

4      attested that Mr. Jones is the sole controlling

5      authority of all of the corporate entities.

6      Deposition testimony has confirmed that from Mr. Dew,

7      from Mr. Zimmerman, from others.  It's not

8      meaningfully contested that Mr. Jones has the

9      authority and the ability to produce the information

10     the Court has ordered him to produce, to instruct

11     others to produce it and because the information that

12     we've sought, especially on the analytics side --

13     well, on both sides -- pertains to all defendants.  So

14     although -- so it appears to us based on everything

15     that we've received that Infowars Health, LLC, Prison

16     Planet TV, LLC, Infowars, LLC, they are all controlled

17     by Mr. Jones and by their relationship with Free

18     Speech Systems -- I'm sorry, your Honor.  I just have

19     to click out of what I got here.

20          So they have their corporate designees for Free

21     Speech -- I'm sorry.  The corporate designees for

22     Prison Planet TV, LLC, Infowars Health, LLC and

23     Infowars, LLC have all testified essentially that they

24     have a limited purpose and their purpose is solely in

25     relationship to Free Speech Systems and to Mr. Jones.

26          So sanctions as to all defendants should enter

27     for this misconduct with respect to the analytics.

1    Analytics have never been produced for Prison Planet

2    dot net, the website.  So we believe that the

3    analytics requests which were directed to all

4    defendants should apply to their own failure to

5    produce the analytics.  The same with financial

6    information.

7        But what's clear is that Mr. Jones is the one,

8    Mr. Jones personally is the one who has the authority

9    to require that his companies produce the information

10   they've been required to produce.  He sits at the top

11   of all of them.  And he is the one, we believe, who

12   has directed this willful misconduct throughout the

13   case.

14       So if the Court would like additional briefing on

15   that, I think what we've relied upon mainly are their

16   own responses in discovery that Mr. Jones controls and

17   has full authority as to --

18       THE COURT:  Just as an example, what discovery

19   request has been directed against Infowars Health,

20   LLC, just as an example, that they have failed to

21   fully and fairly comply with?

22       ATTY. MATTEI:  Well, your Honor, I believe that

23   we directed all of our discovery requests to all of

24   the defendants.  And what we have typically received,

25   and I think the Court has noted previously that the

26   Jones defendants have not complied with all of their

27   compliance obligations when it comes to filing notices

1    of compliance and how they transmit discovery, but

2    what we have received have been discovery responses on

3    behalf of all the defendants.  So they do not

4    distinguish between what's being produced on behalf of

5    Prison Planet, what's being produced on behalf of

6    Infowars Health, what's being produced on behalf of

7    Infowars, LLC.  And so that's my understanding as to

8    how discovery has went.  So it's very difficult for me

9    to sit here and say what has been produced by one

10   defendant as opposed to others.  The course of conduct

11   in this case has essentially been that all defendants

12   -- responses are made on behalf of all defendants.

13        THE COURT:  Anything further?

14        ATTY. MATTEI:  No, Judge.  Thank you.

15        THE COURT:  Attorney Wolman, I assume you're

16   arguing for the defendants?

17        ATTY. WOLMAN:  Yes, your Honor.  Thank you.

18        THE COURT:  Whenever you're ready.

19        ATTY. WOLMAN:  I would start with a point Mr.

20   Mattei made at the beginning of his argument which

21   relates to one he just lied about at the end of his

22   argument.  That the responses were purportedly on

23   behalf of all defendants.  They were not.  Neither

24   were responses from Ms. Flores with respect to the

25   requests directed to her produced by her.  We

26   specifically set forth that they were being produced

27   by Free Speech Systems, LLC in the written response

1    signed by me, not some cover email sent by a

2    paralegal, but the actual signed one by counsel.  And

3    we said this last time.  Yet Mr. Mattei repeated this

4    misrepresentation to the Court here.

5        What happened and as Ms. Flores testified, which

6    Mr. Mattei overlooks, is that on page 93 of her

7    deposition, she says -- she testifies that she sent --

8        And who did you send this to at Acuity?

9    Answer:  Bob Roe.

10    Did Mr. Roe acknowledge that he received them?

11    Answer:  Yes.

12    Question:  And what's your understanding of what

13    Mr. Roe did with these trial balances when you sent

14    them to him?

15    Answer:  I don't.

16    She clearly set forth to them that once it left

17    her hands and went through an accountant.  This wasn't

18    just some random employee or anything.  This is why we

19    have certified public accountants, your Honor.  A

20    bookkeeper, which is what Ms. Flores is, generated,

21    took the raw data out of Quick Books and gave it to

22    the accountant to prepare trial balances because that

23    is what accountants do.  Bookkeepers do not prepare

24    trial balances.  I don't know where they get this

25    from, but we had an accountant do this, and there

26    should be no reason why any sanctions are warranted

27    against Free Speech Systems at the outset.  If an

1    accountant made a mistake, you know, you cross-examine

2    him on the stand.  You correct that.  You take

3    discovery, whatever it is.  But there's no reason that

4    Free Speech Systems should be responsible for an

5    accountant's error when they relied on what that

6    accountant did.

7        And other than a formatting error in the initial

8    production, which was caught by Mr. Mattei -- thank

9    you -- where a couple of lines were accidentally

10   hidden, so it was fixed and then produced again, we're

11   not aware of anything that Mr. Roe did wrong.  He

12   combined accounts because the way Quick Books data had

13   been organized was misleading and misrepresentative

14   and he did not want to present misleading and

15   misrepresentative data.  He fixed the names of

16   accounts because when accounts had been changed in

17   their names over the years, then that needed to be

18   fixed retroactively because when you print today, it

19   doesn't tell you what it actually was years ago if

20   you've renamed it in the interim.

21       Mr. Roe may disagree with Mr. Campanelli.  Mr.

22   Campanelli may disagree with Mr. Roe.  That's what

23   competing experts are for.  This is not a sanctions

24   issue.  This is a way to try to circumvent, trying to

25   prevail on the merits, your Honor.  The plaintiffs

26   cannot circumvent the merits.  They are trying to find

27   a needle in a haystack where there is no needle.  This

1          is a classic fishing expedition.

2              Your Honor allowed this over our objection, but

3          what we're talking about here is a handful of times

4          Mr. Jones or a guest on Infowars and an article was

5          published and made appear.  Mr. Jones is on air six

6          days a week.  Over the five, six years, you're talking

7          about thousands of hours, tens of thousands of hours

8          of which you have minimal articles, minimal interviews

9          being about the Sandy Hook incident.  This is not

10         something that would happen where we'd be looking at

11         this -- if the New York Times published a handful of

12         articles on Sandy Hook, we would not be hunting and

13         pecking through their finances.

14             What we have here is they asked for trial

15         balances and they were given trial balances.  What

16         they're complaining about is that they didn't get

17         misleading documents.  We find that ridiculous, your

18         Honor, and offensive to the administration of justice.

19         They're complaining they didn't get misleading

20         documents.  We had an accountant prepare the correct

21         documents, as he set forth.  And if he got something

22         wrong, well, that should be on him.  Accountants can

23         commit malpractice, but we have no reason to believe

24         that he did so.  Did he do something a little

25         differently than another accountant may have?  Sure.

26         But attorneys do things differently than other

27         attorneys.  Doctors do things than other doctors that

1    don't constitute malpractice.  All professionals do

2    things a little different than their compatriots.  But

3    they've pointed to no violation of any accounting

4    standard or any error.

5         The plaintiffs need to examine Mr. Roe, take his

6    expert deposition.  They can attempt that certainly.

7    But this is not sanctionable conduct, your Honor.

8    There has been no prejudice.  They've pointed to

9    nothing that even suggests any prejudice.  These

10   accounts that were combined with respect to transfer

11   of payments between entities, well, they already knew

12   that there was a relationship.  That's never been

13   hidden.

14        The corporate representative for Infowars Health

15   said that Infowars Health collected advertising

16   revenue from a third party when something called

17   Youngevity was advertised.  A Prison Planet TV

18   corporate representative testified that it collected

19   subscription fees on behalf of Free Speech Systems

20   basically acting as a payment processor, which, by the

21   way, your Honor, trying not to merge arguments, but

22   Mr. Mattei mentioned that, well, they received no

23   analytics for Burning Prison Planet dot net.  Well,

24   that's not Prison Planet TV, LLC's website.  It's

25   owned and operated by Free Speech Systems.  He's

26   misrepresenting things here in order to try and get in

27   one fell swoop what he's not entitled to.

28

THE COURT:  Attorney Wolman, you're telling me
that Free Speech Systems owns and operates Prison
Planet TV website.  Is it your representation that
those analytics were all produced, sir?

ATTY. WOLMAN:  I don't believe analytics on
behalf of that website were generated and produced,
no, your Honor.  I don't know if there are analytics,
and I have not been made aware that particular website
had analytics from Google.

THE COURT:  My recollection when I originally way
back when had to rule on the discovery objections
relating, I thought that request was made.  Is it your
position that you weren't obligated or you just don't
-- because if your position is that you weren't
obligated to do so, I want to stop and give you both
an opportunity to look back to see if that's something
that would be owed or not because you may have a
disagreement as to that.  Do we need to take a break?

ATTY. WOLMAN:  I've just not been made aware that
there are -- that Google Analytics runs on that.

THE COURT:  Any analytics.  So that's what I'm
trying to figure out.  I'm just trying to figure out
do you agree that it was owed or not because if you
don't know the answer or you don't agree, I want to
take a --

ATTY. WOLMAN:  Your Honor's broad order would
have included that website.  I just don't know -- I've

29

1    not been made aware that there were any documents to

2    produce.

3         THE COURT:  Well, you would know, sir, correct?

4    You would know at this point because they would be

5    overdue.  If no such documents exist, that's a

6    perfectly fine answer, but that would be the answer.

7    "I don't know" is not full and fair compliance.  There

8    were either documents or there are no documents.

9         ATTY. WOLMAN:  I understand, your Honor.  And we

10   asked our clients to generate or produce whatever was

11   required.  We turned over, in fact, originally in June

12   2019 and then reproduced what we knew there to be --

13   what I knew there to be.

14        THE COURT:  Attorney Wolman, look at me.  I do

15   not want to put you on the spot here, okay.  I mean

16   what I say.  So I'm not looking to put you on the

17   spot.  What I'm trying to figure out, though, because

18   I want to make sure I have an understanding.  I just

19   want to know if any -- so I understand you're saying

20   that -- well, actually, now that I'm hearing myself,

21   I'm not sure I know what you're saying.  So if you

22   want to take a short break to check, that's fine with

23   me because what I'm trying to figure out were any kind

24   of analytics produced for that Prison Planet TV

25   website?

26        ATTY. WOLMAN:  None have been produced, and I'm

27   not aware of any existing.

30

```
 1            THE COURT:  So you're --

 2            ATTY. WOLMAN:  Maybe -- so that's all I can say

 3       about that.

 4            THE COURT:  So your representation is -- all

 5       right.  So none were produced.  You would be obligated

 6       to produce them.  None were produced.  And your

 7       representation is that none exist, to your knowledge?

 8            ATTY. WOLMAN:  None exist, to my knowledge, your

 9       Honor.  To my knowledge, personally.

10            THE COURT:  Well --

11            ATTY. WOLMAN:  I'm a lawyer.  We ask our clients

12       for documents.  All lawyers do.  And the clients then

13       give them to us, whatever they have.

14            THE COURT:  Okay.

15            ATTY. WOLMAN:  That's how discovery always works.

16       You ask the client for whatever and --

17            THE COURT:  All right.  Well, then just address,

18       if you would, whether your clients have fully and

19       fairly complied with the discovery request as it

20       relates to any kind of analytics for the Prison Planet

21       TV website.  I understand you're saying that you --

22            ATTY. WOLMAN:  I'm not a testifying witness, your

23       Honor.

24            THE COURT:  Right.  So I'm not asking what you

25       personally have.  The obligation, of course, rests on

26       the party that the discovery request was directed to.

27       So I'm just trying to figure out if, in your opinion
```

1    -- are you arguing that they fully and fairly complied

2    with the analytic request as it relates to Prison

3    Planet TV?  Are you making that argument?

4         ATTY. WOLMAN:  I have no reason to believe that

5    they haven't.

6         THE COURT:  And then continue --

7         ATTY. WOLMAN:  I must repeat, your Honor, we did

8    offer the plaintiffs the opportunity to access and,

9    you know, explore Google Analytics for themselves.

10        THE COURT:  All right.  So continue with your

11   argument.  And I note when you started out, you

12   briefly touched upon the Flores request and who

13   answered that request.  And I know you have more to

14   say about the trial balances, and I know you're going

15   to tell me more about -- I know your position is no

16   sanctions should enter.  And you'll address if

17   sanctions were to enter, should they enter against all

18   the defendants or any particular defendants.  But one

19   thing for example that is a little confusing and it's

20   along the lines of what Attorney Mattei said.  So

21   maybe you could address it.  So once I put that order

22   in that you have to file your notice of compliance

23   with the Court so that we had no disagreement as to

24   what compliance was being made, so, for example, I

25   just pulled up your notice of compliance dated

26   November 4th.  It's entry number 556.  And so it looks

27   to me -- I don't have the deposition notice, but it

1    looks to me like there was a deposition notice for

2    Owen Shroyer, who is a Free Speech Systems, LLC

3    employee and it requested documents.  But the document

4    request -- I mean, I don't know.  I assume the -- I

5    assume the request for documents went to just Free

6    Speech Systems.  I don't know.  The notice of

7    compliance to Owen Shroyer as an employee of Free

8    Speech Systems, LLC is signed by all the Jones

9    defendants, Mr. Jones individually and the LLC's.  And

10   then if I look at the next document, 557, which is the

11   objections, again, that is filed on behalf of all the

12   defendants.  So it looks to me like that -- just using

13   that as an example, because that's a recent one, that

14   the discovery request is to a Free Speech Systems

15   employee, but all the Jones defendants are signing off

16   on the objections and signing off on the notice of

17   compliance.  So would you want to address that, as

18   well?  What is the Court to do if discovery requests

19   have been filed on behalf of all the defendants and

20   let's just assume for the sake of argument that they

21   were not full and fair compliance.

22        ATTY. WOLMAN:  Sure, your Honor.

23        THE COURT:  Thank you.

24        ATTY. WOLMAN:  On that issue, your Honor's order

25   from the summer where you required both Mr. Pattis and

26   I to sign off on everything necessitated this because

27   arguably I could not then respond simply myself on

33

behalf of Mr. Jones because that would somehow require
Mr. Pattis or someone from his firm to also sign off
under this Court's order even though they don't
represent Mr. Jones individually.  So we've certainly
taken the position that when we sign something, we
have to sign it for everybody based upon this Court's
order.

However, the requests to Ms. Flores, she was an
employee of Free Speech Systems, only an employee of
Free Speech Systems.  The only party that can compel
her to appear was Free Speech Systems.  The same with
Mr. Shroyer, the same with Mr. Daniels.  The only
parties that can compel them to appear are Free Speech
Systems.  And the responses -- or Ms. Flores
explicitly said that they were from Free Speech
Systems, and the notice of the compliance explicitly
states Owen Shroyer as an employee of Free Speech
Systems.  It identified who the party was that is
responsible because the plaintiffs are trying to
reverse veil pierce or set forth alterego status
without evidence in support of reverse veil piercing
or alterego status.  I don't want veil piercing to get
to Mr. Jones because Free Speech Systems makes an
error.  Yes, Mr. Jones is the owner of that and
managing member, but that doesn't mean the case
against him individually should be sanctioned, worthy
of sanctions.  He is separately a party.  One could

34

 1   imagine that the plaintiffs could have filed suit

 2   against him separately from Free Speech Systems.

 3   Joinder is not mandatory.  And so if this were two

 4   separate lawsuits, you wouldn't be sanctioning Mr.

 5   Jones in one lawsuit for Free Speech Systems' error in

 6   another.  That wouldn't be happening there, and it

 7   shouldn't happen here merely because permissive

 8   joinder occurred.

 9       And definitely there's nothing to suggest

10   Infowars, LLC, which does nothing, Infowars Health,

11   LLC which collects advertising regarding Youngevity,

12   which there's no evidence that Youngevity was ever

13   advertised during any Sandy Hook broadcast or Prison

14   Planet TV, LLC which collected subscription fees for

15   Prison Planet website -- that's all it did, nothing to

16   do with any particular content -- are worthy of

17   sanctions.

18       And I should also note that the error in the

19   motion regarding Mrs. Clinton, that was an error by

20   counsel, and it wasn't on behalf of all of the

21   defendants either.  There were specific defendants

22   identified there.  The plaintiffs want to lump them

23   all together, but there is no basis to do so.  Neither

24   is there any reason why any significant sanction

25   should issue, your Honor.  We've been in compliance.

26       I should also note that although the sanctions

27   terminating the anti-SLAPP motion went to all of our

35

clients, when looking at that in the totality, one
should also recall that they were based on discovery
responses where three of those LLC's that I mentioned
already produced and where Mr. Jones appeared on a
Free Speech Systems broadcast and that's it.  The
other three entities had nothing to do with it.  So in
the totality, you've got three entities against who
really no sanctions should issue at all, unless
you're, without evidence, trying to lump them in
together.

  And as to Mr. Jones, he was sanctioned by losing
the anti-SLAPP motion, and that's the only thing where
he was personally involved there.  Everything else is
a corporation, working through its accountants,
working through personnel trying to produce whatever
they have.  Mr. Jones can direct employees to comply
at the end of the day.  The employees have to do what
they're supposed to do.  And one hopes that they have.
You know, if a witness was not going to appear at a
deposition, Mr. Jones certainly, if they were noticed,
Mr. Jones would terminate their employment.  He's
threatened to do so at least once in this case for an
employee who did not want to appear.  But he has made
sure that they comply.  That's what he can do in
controlling the entities.  That's what any employer
can do, threaten to fire them if they don't do the job
or actually do so if they don't or otherwise

1    discipline an employee.

2         But Free Speech Systems did its best job.  It

3    doesn't collect these analytics on an ordinary basis.

4    It's not part of its practice.  When they request it,

5    produced whatever it was able to do so and has offered

6    an opportunity for the plaintiffs to review.  These

7    subsidiary ledgers, its accountant tells them they

8    don't have except as where there were sub-accounts

9    listed or otherwise included, the totality of the

10   information is included within the trial balances and

11   yet -- and the only thing that says that they really

12   do have subsidiary ledgers is because this Court

13   decides to agree with the plaintiffs' nonexpert who

14   said that subsidiary ledgers equal sub-ledgers, equals

15   this general detail in Quick Books.  So once that was

16   made clear, it was produced, but the accountant still

17   says, no, it's not something they prepared.  No actual

18   ledgers are generally kept, subsidiary ledgers.  And

19   then the accountant has produced the trial balances

20   because that's what accountants do.  And he went

21   through and took the data that was generated by Quick

22   Books, trial balances had been produced since before

23   Quick Books existed.  You collect all the bookkeeping

24   data and you prepare them.  It needs to be prepared

25   even by hand.  And that's what Mr. Roe did.  He

26   prepared the trial balances for the corporation, the

27   one corporation that had any, Free Speech Systems, the

37

1    one corporation to whom that request was directed,

2    Melinda Flores the employee of Free Speech Systems.

3    So unless the Court is looking to --

4         THE COURT:  All right.  Let's stand by.  I think

5    he lost his connection.  We'll stand by.

6         I think I see you're back, Attorney Wolman.

7    You're muted, however.  I think he might be frozen.

8    So we'll stand by.  He may have to log in again.

9         Mr. Ferraro, maybe you can send him an email and

10   --

11        ATTY. WOLMAN:  I had a glitch there.  Unless the

12   Court was looking to avoid my client's due process,

13   which I'm sure the Court is not doing, this case needs

14   to be litigated on the merits, which means

15   adjudicating the pending motion to strike.  It means

16   testing should any claims survive, having a jury

17   decide whether or not liability exists because there's

18   been no prejudice to plaintiffs throughout this.  They

19   haven't pointed to a single thing that would show

20   anything that would overcome actual malice, that would

21   tend to overcome.  There's nothing in these trial

22   balances that would do so.  Nothing in these so-called

23   subsidiary ledgers that would do so.  Nothing in these

24   analytics that would do so.  And certainly not an

25   error on a motion with respect to unintentionally

26   revealing information marked confidential at that

27   time.

38

1        So we don't see any basis for the extreme
2   sanction of default.  If further discovery is
3   warranted, the Court has already said they can
4   redepose Ms. Flores.  If they need to depose Mr. Roe,
5   we can address that, but they've not actually suffered
6   any prejudice and the Court should not order a
7   windfall to the plaintiffs merely because Mr. Roe did
8   accounting the way accountants do accounting.
9        THE COURT:  Thank you, Attorney Wolman.  One
10   thing I wanted to point out to you and to all
11   counsel -- and there is Attorney Atkinson.  I lost his
12   picture for a second.  I see you.
13        The order that I entered on July 21st with regard
14   to signing of pleadings, and I'll just read it.  It's
15   only a sentence.  It says, quote:  Any pleading,
16   motion, request or any other filing filed with the
17   Court by a party must be signed by all counsel
18   representing that party, end quote.
19        So that simply would require, for example, if
20   Free Speech Systems was filing a protective order and
21   Free Speech Systems was represented by you, Attorney
22   Wolman, and by your office, Attorney Atkinson, then
23   moving forward from July 21st, both counsel would be
24   required to sign off on the pleading.  I did that to
25   avoid any gamesmanship.  I saw what was occurring in
26   some of the pleadings and then at the deposition
27   procedure.  So I wanted to have something very

1    consistent.  There's nothing in that order that

2    suggests that all the parties need to sign off on

3    everything.  So I just wanted to --

4         ATTY. WOLMAN:  (Indiscernible) I'm being

5    particular.

6         THE COURT:  I just wanted the record to reflect

7    that.

8         So, Attorney Mattei, if you wanted to respond,

9    but I would also like to hear your response on the

10   Prison Planet TV analytics.  I assume it's your

11   position that the request was made.  That was my

12   recollection.  It doesn't appear as if anything has

13   been produced by Free Speech Systems, I suppose, or

14   anyone on behalf of any analytics from Prison Planet

15   TV.  You've heard Attorney Wolman's indication that he

16   doesn't believe that there is anything to produce.  So

17   if you could address that and whatever else you wanted

18   to respond to.

19        ATTY. MATTEI:  Yes, thank you, your Honor.

20        Let me just first address the comment directed

21   towards me that he made at the outset with respect to

22   how the Jones defendants have responded to discovery

23   here.  In their response to our first request for

24   production, production was made on behalf of all

25   defendants, not distinguished between them, not

26   differentiated between them.  In response to our

27   request for admission, responses were made on behalf

 1    of all Jones defendants, no differentiation.  So when

 2    I was describing -- and as you indicated, your Honor,

 3    in the pleadings, they've presented themselves as a

 4    unit.  So when I was describing the overall course of

 5    discovery conduct here, that's what I was referring

 6    to.

 7          With respect to the analytics, I was very

 8    surprised to hear Attorney Wolman say that he's not

 9    aware of whether any such analytics exist for the

10    Prison Planet website and Infowars Health website

11    because in their own pleadings they've acknowledged

12    that such analytics do exist.  So if you look at

13    docket number 458, they included an e-mail --

14          THE COURT:  Attorney Mattei, just give everyone a

15    minute to get there.  So 458.

16          ATTY. MATTEI:  Docket number --

17          THE COURT:  Just hold off so everyone can get

18    there.  Are you all set, Attorney Wolman?  Yes?

19    Attorney Wolman, do you need a minute to pull up the

20    document?  You're muted.

21          ATTY. WOLMAN:  No.  Apparently I was muted, and I

22    said yes, your Honor.

23          THE COURT:  Okay.  Thank you.

24          Go ahead, Attorney Mattei.

25          ATTY. MATTEI:  This is their opposition to our

26    motion for sanctions based on web and social media

27    data and analytics.  They include as an exhibit to

41

1    that pleading an email purportedly sent from Michael

2    Zimmerman, who at the time was their IT manager, to

3    defense counsel in which he acknowledges that he had

4    not yet exported analytics for the other websites and

5    that he had only exported analytics for Infowars dot

6    com.   Then in an effort to stave off the production of

7    Google Analytics, they included in one of their

8    pleadings which we reproduced in our memorandum in

9    support of default a 35-page printout of what they

10   claimed to be Google Analytics.   You referenced this,

11   your Honor, in your order dated June 10, 2019 in which

12   you concluded that the 35-page printout was not -- was

13   simply not full and fair compliance, but in that

14   printout there's clear reference to analytics for

15   Infowars Health and Prison Planet TV, none of which

16   have ever been produced.   This is just for Google

17   Analytics.   This leaves aside the other analytics

18   platforms they use.   So it's simply not accurate to

19   say that those analytics don't exist.   By their own

20   admission they do.   They've just never been produced.

21       The other point I want to make, your Honor, has

22   to do with Ms. Flores.   Ms. Flores, not Mr. Roe, was

23   the one directed to produce trial balances.   Ms.

24   Flores did generate trial balances.   The Jones

25   defendants just elected not to produce them.   Instead,

26   produced fabricated documents created by Mr. Roe.   So

27   Mr. Wolman in his argument has repeatedly disparaged

1    Ms. Flores.  I think in his last argument he described

2    her as some bookkeeper and has elevated Mr. Roe.  The

3    reality is that Free Speech Systems through its

4    managing agent, Ms. Flores, was required to produce

5    its trial balances.  That is the evidence in the case.

6    And they declined to do that and instead created other

7    evidence which we've shown.  And Mr. Wolman did not

8    address at all the discrepancies between the

9    subsidiary ledgers and Mr. Roe's trial balances, the

10   deleted accounts.  But that's all laid out chapter and

11   verse in our pleadings.  I don't need to do that here.

12   But it was Mrs. Flores', as the managing agent of Free

13   Speech Systems, obligation to produce trial balances.

14   She appears to have attempted to do so.  They simply

15   declined to produce them.  That's all I have, Judge.

16        THE COURT:  Attorney Wolman, I'd like to give you

17   an opportunity to respond.  It looks like you would

18   actually like to take advantage of that.

19        ATTY. WOLMAN:  You know, it's an interesting

20   quandary then because in theory, what Ms. Flores

21   should have responded was, I have no such responsive

22   documents, that she did not have the trial balances

23   because what Quick Books could produce is not the

24   trial balances.  What Quick Books data then reviewed

25   by an accountant is and then made to accounting

26   standards, that's trial balances.  So let's be clear

27   then.  The proper response for Ms. Flores should be no

43

1   such responsive documents were in her possession,

2   custody or control because she didn't have trial

3   balances.  She had Quick Books data.  So that Quick

4   Books data was given to an accountant and used to

5   generate for Free Speech Systems, (indiscernible)

6   Court's order the trial balances.  So that's exactly

7   how it should be.  So let's not say that she had trial

8   balances because there's no evidence of that.  What

9   they wanted was Quick Books data that was not actual

10  trial balances.

11       Again, as to the other websites, I'm not aware of

12  again analytics existing.  That's all I can say on

13  that.

14       ATTY. MATTEI:  Your Honor, Ms. Flores testified

15  --

16       THE COURT:  I think I'm going to end the argument

17  at this point, and we'll take a five minute quick

18  break, not the morning recess.  Just a five-minute

19  break, and we'll be back at 10:45.

20       ATTY. WOLMAN:  I would just point out, Mr. Cerame

21  had something to say.

22       THE COURT:  Not on this motion.

23       ATTY. CERAME:  It's a nonsubstantial point as to

24  what "all defendants" means.

25       THE COURT:  No, thank you.

26       (A recess was taken, after which court resumed as

27  follows:)

44

THE COURT:  All right.  So I will order a copy of
the transcript of the following ruling, and I will
sign it and I will place it in the court file as my
decision for the purposes of any appeal.

So I'll first address the Clinton deposition
issue and the conduct of July 1, 2021.  In the July
19, 2021 court filing by the defendants Infowars, LLC,
Free Speech Systems, LLC, Infowars Health, LLC and
Prison Planet, LLC, they described how in the motion
to depose Hillary Clinton, testimony designated by the
plaintiffs as highly confidential was filed in the
Clinton deposition motion.  They explained that this
was done because in their opinion, the plaintiffs did
not have a good-faith basis to designate the
deposition as highly confidential before the
deposition had commenced, despite the fact that the
Jones defendants had previously done so themselves.
And it is not lost on the Court that the highly
confidential information was improperly filed in the
middle of the first deposition of a plaintiff.

The July 19, 2021 filing is in sharp contrast to
the Jones defendants' position at the October 20, 2021
sanctions hearing where the Court addressed what, if
any, sanctions should enter.  At the October 20
hearing, the Jones defendants claim they could publish
confidential information as long as they did not
reveal the name of the witness.  That is, they argued

45

1    unconvincingly that they didn't understand the very
2    protective order that they themselves drafted and
3    asked the Court to approve as a Court order, which the
4    Court did.

5         The position of the Jones defendants at the
6    October 20, 2021 sanctions hearing did nothing but
7    reinforce the Court's August 5th, 2021 order and
8    findings that the cavalier actions on July 1st, 2021
9    constituted willful misconduct and violated the
10   Court's clear and unambiguous protective order.

11        The history of the attorneys who have appeared
12   for the defendants, Alex Jones, Infowars, LLC, Free
13   Speech Systems, LLC, Infowars Health, LLC and Prison
14   Planet TV, LLC is a convoluted one, even putting aside
15   the motions to withdraw appearance, the claims of
16   conflict of interest and the motions for stay advanced
17   by these five defendants.

18        As the record reflects, on June 28, 2018,
19   Attorney Wolman appeared for all five of the Jones
20   defendants.  Eight months later, on March 1st, 2019,
21   Attorney Wolman is out of the case and Pattis & Smith
22   filed an in-lieu-of appearance for all five
23   defendants.  On February 24, 2020, Attorney Latonica
24   also appeared for all five defendants.  Five months
25   later on July 7, 2020, Attorney Latonica and Pattis &
26   Smith is now out of the case and Attorney Wolman is
27   back in the case for all five defendants.  Then on

46

June 28, 2020, Pattis and Smith is back in the case, but now only appears for the four LLC defendants.

But what is perhaps more significant is the transparent attempt to cloud the issues by Pattis & Smith, for example, by listing the names of only three of the four clients they represent when filing the motion to take the deposition of Hillary Clinton and then listing all four clients in the July 19, 2021 filing relating to the issue.  And by Attorney Wolman who then argued in his October 20, 2021 file that Infowars, LLC had no involvement in the motion for commission because their lawyer did not list their name on the motion.  It is simply improper under our rules of practice for an attorney to do so.

Turning to the issue of the subsidiary ledgers. The five Jones defendants on November 6, 2020 filed with the Court their discovery objections relating to the deposition of Free Speech Systems' accounting manager and current employee, Melinda Flores.  In response to the plaintiff's request for subsidiary ledgers, the Jones defendants objected on the basis that the production of the subsidiary ledgers was oppressive, unduly burdensome, disproportionate, harassing and that it will require digging through eight years of accounting.  No objection was raised as to the term "subsidiary ledger", although parties frequently will object to a discovery request if they

47

consider it vague or confusing.

On April 29, 2021, the Court overruled the objection.  On May 6, 2021, the Court ordered the deposition of Flores to take place on June 4, 2021 and ordered the documents to be produced by the close of business on May 14, 2021 stating that failure to comply may result in sanctions.

On May 14, 2021, the five Jones defendants responded to the document request and Court order and stating that the subsidiary ledgers were incorporated into the trial balances and had been produced.

At her June 4, 2021 deposition, Flores, the accounting manager, testified that subsidiary ledgers or detail was easily accessible and available to her. She testified that it would show the sources of advertising income and she testified repeatedly that Free Speech Systems maintained subsidiary ledger information.  Flores did not believe she was obligated to produce the subsidiary ledgers, and it is unclear as to whether they have been produced.

It was impossible to reconcile the expert hired by Free Speech Systems with the November 6, 2020 objections filed with the Court and with Flores' deposition testimony.  While the Jones defendants in their May 5th, 2021 motion state that Flores would be the best employee to identify and produce the requested documents and further state that Flores

48

1     would be compelled by Free Speech Systems to produce

2     the requested documents at the deposition, the

3     defendants hired expert, Mr. Roe, said that Flores was

4     wrong and that Free Speech Systems doesn't use or have

5     subsidiary ledgers.

6          The Court, in its August 6, 2021 order, found

7     that the subsidiary ledger information was easily

8     accessible by Flores by clicking on each general

9     account, that, despite the Court orders and although

10    the information exists and is maintained by Free

11    Speech Systems and was required by the Court order to

12    be produced, it had not been produced.  And, again, it

13    is still unclear as to what documents have been

14    produced.

15         The Court rejected Roe's statements in his

16    affidavit as not credible in light of the

17    circumstances.  The Court found that the plaintiffs

18    were prejudiced in their ability to prosecute their

19    claims and conduct further meaningful depositions and

20    that sanctions would be addressed at a future hearing.

21         At the October, 2021 sanctions hearing, the Court

22    addressed whether sanctions should enter.  The Court

23    finds that sanctions are, in fact, appropriate in

24    light of the defendant's failure to fully and fairly

25    comply with the plaintiff's discovery request and the

26    Court's orders of April 29, 2021, May 6, 2021 and

27    August 6, 2021.

49

1           Turning to the trial balances.  In addition to

2      objecting to the deposition of Flores, the Jones

3      defendants, as I mentioned, filed discovery objections

4      to the request for production directed to Flores.  The

5      Court ruled in favor of the defendants on one

6      production request and ruled in favor of the

7      plaintiffs with respect to others.

8           In addition to the subsidiary ledgers, the Court

9      ordered production of the trial balances.  Flores had

10     run trial balances in the past unrelated to this

11     action.  Flores testified at her June 4, 2021

12     deposition that she personally accessed Quick Books

13     and selected the option to generate trial balances for

14     2012 to 2019.  She testified that she ran the reports

15     and printed them out and believed that the reports

16     were produced.  Her testimony the reports that she ran

17     were produced was left uncorrected by counsel at the

18     deposition.

19          The reports were not produced by the

20     Court-ordered deadline of May 14, 2021.  They were not

21     produced at her June 4, 2021 deposition, and they have

22     not been produced to date, despite their obligation to

23     do so.

24          While the Jones defendants, in their May 5, 2021

25     Court filing, emphasized that Flores would be the best

26     employee to identify and produce the requested

27     documents which would include the trial balances and

1   that Flores would be compelled by Free Speech Systems

2   to produce the documents at her deposition, not only

3   were the reports not produced, but the Jones

4   defendants in their October 7, 2021 filing now claim

5   that Flores, a mere bookkeeper, provided flawed

6   information to the defendants that the defendants,

7   through Roe, had to correct.  And the Court rejects

8   that position.

9       The Jones defendants argue that Roe combined some

10  accounts that were not used consistently and

11  consolidated some general accounts because various

12  transactions all involved the same account and those

13  records created by the Jones defendants' outside

14  accountant were the records that were produced.  But

15  these records that removed accounts and consolidated

16  accounts altered the information in the reports that

17  their own accounting manager had produced, and they

18  contain trial balances that did not balance.  These

19  sanitized, inaccurate records created by Roe were

20  simply not responsive to the plaintiff's request or to

21  the Court's order.

22      Turning to the analytics.  The date for the

23  parties to exchange written discovery has passed after

24  numerous extensions by the Court.  On May 14, 2021,

25  the Court ordered that the defendants were obligated

26  to fully and fairly comply with the plaintiff's

27  earlier request for disclosure and production.

51

On June 1, 2021, the defendants filed an
emergency motion for protective order apparently
seeking protection from the Court's own order where
the defendants again attempted to argue the scope of
appropriate discovery.

The Court, on June 2, 2021, declined to do so and
extended the deadline for final compliance to June 28,
2021 ordering the defendants to begin to comply
immediately on a rolling basis.  In its June 2nd
order, the Court warned that failure to comply would
result in sanctions including default.

With respect to analytics, including Google
Analytics and social media Analytics, the defendants
on May 7, 2019 represented that they had provided all
the analytics that they had.  They stated with respect
to Google Analytics that they had access to Google
Analytics reports, but did not regularly use them.  As
the Court previously set forth in its September 30,
2021 order, the defendants also claim that on June 17,
2019, they informally emailed zip files containing
Google Analytics reports to the plaintiffs, but not
the codefendants, an email the plaintiffs state they
did not receive and that the Court found would not
have been in compliance with our rules of practice.

On June 28, 2021, the Jones defendants filed a
notice of compliance stating that complete final
supplemental compliance was made by the defendants,

52

1    Alex Jones and Free Speech Systems, LLC and that
2    Infowars, LLC, Infowars Health, LLC and Prison Planet,
3    LLC, quote:  Had previously produced all documents
4    required to be produced, end quote, representing that
5    with respect to the Google Analytics documents, Free
6    Speech Systems, LLC could not export the dataset and
7    that the only way they could comply was through the
8    sandbox approach.
9        Then on August 8, 2021, the Jones defendants for
10   the first time formally produced Excel spreadsheets
11   limited to Google Analytics apparently for Infowars
12   dot com and not for any of the other websites such as
13   Prison Planet TV or Infowars Health.  Importantly, the
14   Jones defendants to date have still not produced any
15   analytics data from any other platform such as Alexa,
16   Comcast or Criteo.
17       The Jones defendants production of the social
18   media analytics has similarly been insubstantial and
19   similarly has fallen far short both procedurally and
20   substantively, despite prior representations by the
21   Jones defendants that they had produced the social
22   media analytics and despite the May 25, 2021
23   deposition testimony of Louis Certucci, Free Speech
24   Systems social media manager for nearly a decade, that
25   there were no such documents.
26       At the June 28, 2021 deposition of Free Speech
27   Systems corporate designee Zimmerman, Mr. Zimmerman

53

1    testified that, in fact, he had obtained some

2    responsive documents from Certucci which were then

3    loaded into a deposition chat room by counsel for the

4    Jones defendants.  It appears that these documents

5    were minimal summaries or reports for Facebook and

6    Twitter, but not for other platforms used by the

7    defendants such as You Tube.

8         Any claim of the defendants that the failure to

9    produce these documents was inadvertent falls flat as

10    there was no evidence submitted to the Court that the

11    defendants had a reasonable procedure in place to

12    compile responsive materials within their power,

13    possession or knowledge.

14         Months later, on October 8, 2021, the Jones

15    defendants formally produced six documents for the

16    spring of 2017 for Facebook containing similar

17    information to the Zimmerman chat room documents, but

18    not included in the chat room documents and screen

19    shots of posts by Free Speech Systems to an

20    unidentified social media account with no analytics.

21         The defendants represented that they had produced

22    all the analytics when they had not done so.  They

23    represented in court filings that they did not rely on

24    social media analytics and this, too, is false.

25         I'm going to need to take a thirty second water

26    break, please.

27         (A short break in the proceedings occurred.)

54

1      This response was false.  The plaintiffs in

2  support of their motion for sanctions on the analytics

3  issue attached as exhibit D, an email dated December

4  15, 2014 between former Free Speech Systems business

5  manager Timothy Fruge and current Free Speech Systems

6  employee Buckley Hamman.  Fruge attaches annotated

7  charts of detailed analytics concerning Jones' 2014

8  social media audience including gender demographics

9  engagement and social media sites that refer people to

10  Infowars dot com.  As pointed out by the plaintiffs,

11  Fruge's annotations are even more telling than the

12  charts themselves and totally contradict the Jones

13  defendants misrepresentations to the Court that,

14  quote:  There is no evidence to suggest that Mr. Jones

15  or Free Speech Systems ever used these analytics to

16  drive content, end quote.

17      The next image on the document shows key

18  indicators on Twitter.  Those are engagement and

19  influence.  Again, this is reading from Fruge's notes.

20  Again, the next image shows the key indicators on

21  Twitter.  Those are engagement and influence.  Notice

22  our influence is great and our engagement is low.  I

23  bring this up -- again these are Fruge's notes --

24  because we should try and raise our engagement with

25  our audience.  Engagement is how well we are

26  communicating and interacting with our audience.  The

27  higher our engagement, the more valuable our audience

55

1    will become to our business.  And that is the end of

2    Fruge's notes.

3        I would note that regardless of this reliance on

4    social media analytics, the concept is simple.  The

5    defendants were ordered to produce the documents and

6    our law requires them to produce information within

7    their knowledge, possession or power.  Discovery is

8    not supposed to be a guessing game.  What the Jones

9    defendants have produced by way of analytics is not

10   even remotely full and fair compliance required under

11   our rules.

12       The Court finds that the Jones defendants have

13   withheld analytics and information that is critical to

14   the plaintiff's ability to conduct meaningful

15   discovery and to prosecute their claims.  This callous

16   disregard of their obligations to fully and fairly

17   comply with discovery and Court orders on its own

18   merits a default against the Jones defendants.

19       Neither the Court nor the parties can expect

20   perfection when it comes to the discovery process.

21   What is required, however, and what all parties are

22   entitled to is fundamental fairness that the other

23   side produces that information which is within their

24   knowledge, possession and power and that the other

25   side meet its continuing duty to disclose additional

26   or new material and amend prior compliance when it is

27   incorrect.

56

1       Here the Jones defendants were not just careless.
2   Their failure to produce critical documents, their
3   disregard for the discovery process and procedure and
4   for Court orders is a pattern of obstructive conduct
5   that interferes with the ability of the plaintiffs to
6   conduct meaningful discovery and prevents the
7   plaintiffs from properly prosecuting their claims.

8       The Court held off on scheduling this sanctions
9   hearing in the hopes that many of these problems would
10  be corrected and that the Jones defendants would
11  ultimately comply with their discovery obligations and
12  numerous Court orders, and they have not.

13      In addressing the sanctions that should enter
14  here, the Court is not punishing the defendants.  The
15  Court also recognizes that a sanction of default is
16  one of last resort.  This Court previously sanctioned
17  the defendants not by entering a default, but by a
18  lesser sanction, the preclusion of the defendant's
19  special motions to dismiss.  At this point entering
20  other lesser sanctions such as monetary sanctions, the
21  preclusion of evidence or the establishment of facts
22  is inadequate given the scope and extent of the
23  discovery material that the defendants have failed to
24  produce.

25      As pointed out by the plaintiffs, they are
26  attempting to conduct discovery on what the defendants
27  publish and the defendants' revenue.  And the failure

1     of the defendants to produce the analytics impacts the

2     ability of the plaintiffs to address what is published

3     and the defendants failure to produce the financial

4     records such as sub-ledgers and trial balances affects

5     the ability of the plaintiffs to address the

6     defendants' revenue.  The prejudice suffered by the

7     plaintiffs who had the right to conduct appropriate,

8     meaningful discovery so they could prosecute their

9     claims again, was caused by the Jones defendants

10     willful noncompliance, that is, the Jones defendants

11     failure to produce critical material information that

12     the plaintiff needed to prove their claims.

13         For these reasons, the Court is entering a

14     default against the defendants Alex Jones, Infowars,

15     LLC, Free Speech Systems, LLC, Infowars Health, LLC

16     and Prison Planet TV, LLC.  The case will proceed as a

17     hearing in damages as to the defendants.  The Court

18     notes Mr. Jones is sole controlling authority of all

19     the defendants, and that the defendants filed motions

20     and signed off on their discovery issues jointly.  And

21     all the defendants have failed to fully and fairly

22     comply with their discovery obligations.

23         As I said, I will order a copy of the transcript.

24     I will sign it and I will file it in the Court as the

25     Court's order.

26         So we're done for today.  And we will have our

27     next status conference this Wednesday.

58

1          We're adjourned.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

59

```
 1   XO6 UWY CV18-6046436-S    :    SUPERIOR COURT

 2   ERICA LAFFERTY, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

 3   V                         :    AT WATERBURY, CONNECTICUT

 4   ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

 5   -------------------------------------------------------------

 6   XO6 UWY CV18-6046437-S    :    SUPERIOR COURT

 7   WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

 8   V                         :    AT WATERBURY, CONNECTICUT

 9   ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

10   -------------------------------------------------------------

11   XO6 UWY CV18-6046438-S    :    SUPERIOR COURT

12   WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

13   V                         :    AT WATERBURY, CONNECTICUT

14   ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

15

16              C E R T I F I C A T I O N

17       I hereby certify the foregoing pages are a true and

18   correct transcription of the audio recording of the

19   above-referenced case, heard in the Superior Court, Judicial

20   District of Waterbury, at Waterbury, Connecticut, before the

21   Honorable Barbara N. Bellis, Judge, on the 15th day of

22   November, 2021.

23       Dated this 15th day of November, 2021, in Waterbury,

24   Connecticut.

25

26                          Patricia Sabol

27                          Court Monitor
```