# EXHIBIT 20

| | | | |
|---|---|---|---|
| **NO.** | **X06-UWY-CV-18-6046436-S** | **:** | **SUPERIOR COURT** |
| **ERICA LAFFERTY, ET AL.** | | **:** | **COMPLEX LITIGATION DOCKET** |
| **V.** | | **:** | **AT WATERBURY** |
| **ALEX EMRIC JONES, ET AL.** | | **:** | **OCTOBER 21, 2022** |

| | | | |
|---|---|---|---|
| **NO.** | **X06-UWY-CV-18-6046437-S** | **:** | **SUPERIOR COURT** |
| **WILLIAM SHERLACH** | | **:** | **COMPLEX LITIGATION DOCKET** |
| **V.** | | **:** | **AT WATERBURY** |
| **ALEX EMRIC JONES, ET AL.** | | **:** | **OCTOBER 21, 2022** |

| | | | |
|---|---|---|---|
| **NO.** | **X06-UWY-CV-18-6046438-S** | **:** | **SUPERIOR COURT** |
| **WILLIAM SHERLACH, ET AL.** | | **:** | **COMPLEX LITIGATION DOCKET** |
| **V.** | | **:** | **AT WATERBURY** |
| **ALEX EMRIC JONES, ET AL.** | | **:** | **OCTOBER 21, 2022** |

<u>**PLAINTIFFS' MEMORANDUM OF FACT AND LAW ON**</u>
<u>**CUTPA PUNITIVE DAMAGES**</u>

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................1

I.   THE STANDARD FOR AWARDING CUTPA PUNITIVES IS
ALREADY MET ...........................................................................................1

II.  THE DEFENDANTS ACTED WITH THE HIGHEST POSSIBLE
DEGREE OF BLAMEWORTHINESS AND REPREHENSIBILITY ............................2

      A.     THE DEFENDANTS' CONDUCT WAS INTENTIONAL,
MALICIOUS, AND EVIL ...................................................................3

            1.    The Defendants' Attacks on the Plaintiffs Were Certain
to Cause Massive Harm ........................................................5

            2.    The Defendants Actually Knew They Were Harming the
Plaintiffs and Attacked the Plaintiffs Over and Over and
Over Again Regardless ..........................................................9

            3.    The Defendants' Attacks on the Plaintiffs During this Trial
Prove the Most Reprehensible State of Mind Possible .............18

      B.     ADDITIONAL ASPECTS OF REPREHENSIBILITY .......................19

III. THE DEFENDANTS ARE PROFIT-MOTIVATED CON-ARTISTS,
WHOSE FULL SCOPE OF WRONGDOING IS STILL NOT KNOWN ......................20

      A.     DEFENDANTS' PROFIT MOTIVE ...................................................20

      B.     DEFENDANTS' CONCEALMENT OF THE FULL SCOPE
OF THEIR WRONGDOING ...............................................................21

      C.     THE PLAINTIFFS' LOW INCENTIVE TO BRING THIS
ACTION ..............................................................................................25

      D.     THE NEED FOR DETERRENCE AND THE DEFENDANTS'
INCORRIGIBILITY ...........................................................................26

      E.     THE CATASTROPHIC HARM TO THE PLAINTIFFS ...................30

      F.     CIVIL PENALTIES AUTHORIZED BY CUTPA ............................30

IV. THE AMOUNT OF PUNITIVE DAMAGES TO BE AWARDED ...............................31

Within three hours of the devastating shooting at Sandy Hook, Alex Jones began his attack against that shattered community. Jones's attack on the families and the first responder who are plaintiffs in this case has gone on for nearly 10 years and shows no signs of letting up. In fact, as recently as September 30, 2022, even after the heart-wrenching testimony by twelve of the fifteen plaintiffs in this case was in evidence and available for him to see, Jones sadistically stated that he "totally enjoy[s] it."[1]

Alex Jones perpetrates this attack for one reason: greed. This campaign of lies feeds Jones's bank accounts, fills his cryptocurrency wallets, and defines his brand. No lie about these plaintiffs is too cruel, too immoral, or too dangerous. Alex Jones will never treat them like real people, because they are too valuable to him as targets. Our caselaw is replete with corporations that have lost their way as a result of greed, but the leveraging of intentional cruelty for profit exhibited in this case may be unparalleled in American history. Justice requires that the Court's punitive damages award punish and deter this evil conduct. Only a punitive damages assessment of historic size will serve those purposes.

## I.   THE STANDARD FOR AWARDING CUTPA PUNITIVES IS ALREADY MET

As a result of the default, the allegations of the complaint alone entitle the plaintiffs to an award of punitive damages,[2] and support an expansive award. As already briefed and argued to the Court, *see* DN 992, Reply ISO Mtn to Enforce *in Limine* Rulings at 20-21, CUTPA punitives may be assessed on the allegations of the complaint alone. *See Smith v. Snyder*, 267 Conn. 456, 467-68 (2004); *Tang v. Bou-Fakhreddine*, 75 Conn. App. 334, 340 (2003) (plaintiffs' allegations,

---

[1] See Pl. Trial Ex. 595 (video clip from the Alex Jones Show).
[2] *See, e.g.*, Compl. at ¶¶ 419, 421, 423, 434, 436, 441, 442, 445, 446, 449, 466, 471. All references to the Complaint ("Compl.") throughout this Memorandum are to the Complaint in the *Sherlach II* case, docket no. X06-UWY-CV-18-6046438S.

which "characterize[ed] . . . the defendant's actions as 'outrageous,' 'intentional' or 'wilful,'… are sufficient to establish liability for the purpose of awarding punitive damages."); *Whitaker v. Taylor*, 99 Conn. App. 719, 734 (2007) (same conclusion); *Richey v. Main St. Stafford, LLC*, 110 Conn. App. 209, 223 (2008) (same conclusion).

The Court may also consider that the jury found the common law standard for punitive damages proven. "In order to award punitive or exemplary damages [under CUTPA], evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights.... In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." *Ulbrich v. Groth*, 310 Conn. 375, 446 (2013); *see* DN 1010 Verdict Form at 17 (*"*We the jury find that the standard charged for the assessment of attorney's fees and costs has been met," "yes" checked); Court Ex. II, Jury Charge at 23:27-24:3 (charging that punitive damages may be awarded "if you find that the defendants' actions in this case were wilful wanton or malicious," and defining how those states of mind are proven).

## II.     THE DEFENDANTS ACTED WITH THE HIGHEST POSSIBLE DEGREE OF BLAMEWORTHINESS AND REPREHENSIBILITY

The essence of the punitive damages inquiry is "the degrees of relative blameworthiness, i.e., whether the defendant's conduct was reckless, intentional or malicious." *Ulbrich*, 310 Conn. at 454; s*ee also id.* at 446 (punitives evidence must reveal "a reckless indifference to the rights of others or an intentional and wanton violation of those rights.... In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence."); *id.* at 455 ("degree of reprehensibility of the

defendant's conduct" is leading consideration described in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). [3]

### A.   THE DEFENDANTS' CONDUCT WAS INTENTIONAL, MALICIOUS, AND EVIL

The defendants' conduct was not merely reckless. Their actions were intentional and malicious: "A wilful and malicious injury is one inflicted intentionally without just cause or excuse. It does not necessarily involve the ill will or malevolence shown in express malice. Nor is it sufficient to constitute such an injury that the act resulting in the injury was intentional in the sense that it was the voluntary action of the person involved. *Not only the action producing the injury but the resulting injury must be intentional....* A wilful or malicious injury is one caused

---

[3] The United States Supreme Court has explained that "[s]tates necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 569 (1996). "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition.... *No one doubts that a State may protect its citizens by prohibiting deceptive trade practices*...." *Id.* (emphasis added). The Connecticut Supreme Court has held that the determination of punitive damages is "reserved to the discretion of the trial court." *Ulbrich*, 310 Conn. at 451. To assist trial courts in exercising that discretion, the Connecticut Supreme Court has adopted various factors identified by the United States Supreme Court in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008). *See Ulbrich*, 310 Conn. at 454. Additionally, the Connecticut Supreme Court has cited the three guidelines applied by the United States Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). *See Ulbrich*, 310 Conn. at 455. Notably, however, the United States Supreme Court applies the *State Farm* factors to address whether a punitive damages award reached by a *jury* is excessive in violation of the Due Process Clause of the Fourteenth Amendment. *See State Farm*, 538 U.S. at 418. While the *State Farm* factors may also assist a court in determining the appropriate amount of CUTPA punitives, the concerns of jury prejudice underlying the *State Farm* decision are not applicable to a trial court's exercise of its sound discretion to determine CUTPA punitives. *See Ulbrich*, 310 Conn. at 452 (explaining that the legislature's decision to vest authority to determine CUTPA punitives in court instead of jury provides "safeguard" against awards motivated by prejudice").

by design." *Markey v. Santangelo*, 195 Conn. 76, 76–78 (1985) (emphasis added, citations omitted). [4]

Willfulness and malice may be proved by evidence of subjective intent or by objective evidence of the defendants' conduct and the circumstances. "Wilfulness and malice alike import intent.... [Its] characteristic element is the design to injure … to be implied from the conduct and circumstances" or "actually entertained." *Markey*, 195 Conn. at 76-78. "The intentional injury aspect may be satisfied if the resultant …. harm was the direct and natural consequence of the intended act." In other words, the intentional injury element is satisfied when the defendant "acts knowing that the consequence is substantially certain to result." Restatement (Third) of Torts: Phys. & Emot. Harm § 1 (2010); *see also* J. Stein, Personal Injury Damages, § 4:9 ("The law also presumes an intent to injure if the defendant's acts are done with the knowledge or belief that injury or contact is 'substantially certain' to occur."). [5]

---

[4] It is accepted that punitive damages are awarded for a spectrum of conduct, with the most significant damages being awarded for the most reprehensible conduct. *See, e.g. TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) (endorsing the consideration of "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred") (emphasis in original); *Jennings v. Yurkiw*, 18 F.4th 383, 391 (2d Cir. 2021) (same), Clarence Morris, *Punitive Damages in Tort Cases*, 44 Harv. L. Rev. 1173, 1181 (1931) ("The probable result of a defendant's behavior is an important consideration in determining whether it is desirable to discourage such behavior in the future; the probable result is the measure of the 'seriousness' of his wrong.").

[5] Substantial certainty that harm will result is also used in other jurisdictions to establish willful misconduct for purposes of punitive damages. *See Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 675 (7th Cir. 2003) ("substantial certainty" that harm would result from defendant's conduct was "sufficient evidence of "willful and wanton conduct" for purposes of punitive damages); *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1312-14 (11th Cir. 2007) (when defendant's conduct is "substantially certain" to cause harm, statutory cap on punitive damages was lifted); *Brabson v. The Friendship House of W. New York, Inc.*, 1997 WL 411915, at *2 (W.D.N.Y. June 30, 1997) (where defendant's conduct, *inter alia*, posed "substantial certainty of causing [plaintiff's] emotional distress," "there is no doubt" that the evidence

The evidence before the Court establishes both that it was objectively certain that the defendants' conduct would harm the plaintiffs and that the defendants "actually entertained" the intent to harm the plaintiffs. It also establishes a malevolence and evil intent far beyond what is ever seen in civil litigation. Knowing the harm they were causing, the defendants chose to continue inflicting harm on the plaintiffs *for ten years, including during this trial*. The only possible conclusion the Court can draw is that the defendants find attacking the plaintiffs so profitable that they will keep on attacking them unless the damages award against them is so large and so final that they can no longer draw even a penny from harming these families.

1.    **The Defendants' Attacks on the Plaintiffs Were Certain to Cause Massive Harm**

Alex Jones and Free Speech Systems, LLC[6] sell supplements with lies. The infrastructure they developed to do this is formidable: programming designed to go viral; websites and mirror-sites, air-time on 150 nationally syndicated radio stations; specially headlined segments posted

_____

"warrant[ed] exemplary damages"), *aff'd sub nom. Brabson v. The Friendship House of W. New York*, 46 F. App'x 14 (2d Cir. 2002); *Neal v. Carey Canadian Mines, Ltd.*, 548 F. Supp. 357, 381 (E.D. Pa. 1982) ("[T]he Court finds that there is sufficient evidence for an award of punitive damages against Celotex because Philip Carey failed to warn the plaintiffs of the risks that each had an asbestos-related condition when Philip Carey knew or believed that a failure to warn of this risk would be substantially certain to cause or aggravate each plaintiff's injuries."), *aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3d Cir. 1985); *Schroeder v. Auto Driveaway Co.*, 523 P.2d 662, 671 (Cal. 1974) ("The jury in the present case could reasonably infer that defendants acted in callous disregard of plaintiffs' rights, knowing that their conduct was substantially certain to vex, annoy, and injure plaintiffs. Such behavior justifies the award of punitive damages."); *Vernon v. Perrien*, 390 S.W.3d 47, 62 (Tex. App. 2012) (under Texas law, punitive damages may be awarded when defendant "believes the consequences are substantially certain to result" from his conduct).

[6] Free Speech Systems, LLC is fully owned, controlled, and operated by Alex Jones. FSS is legally responsible for Alex Jones' conduct, and vice versa. *See* Court Ex. II, Jury Charge at 6 ("I instruct you that Free Speech Systems, LLC, is owned, controlled and operated by Alex Jones and it is employed to hold and generate revenue for him. I further instruct you that under the law applicable to this case, Alex Jones and Free Speech Systems are legally responsible for each other's wrongful conduct and are each responsible for the entirety of the harm to the plaintiffs in this case.").

without fail on YouTube, Twitter, Facebook; a business plan to "emulate spikes;" the regular use of analytics to monitor and grow those spikes; the deliberate activation of a loyal and fearful audience. The plaintiffs proved all this – and it is just the tip of the iceberg. Despite all of the plaintiffs' efforts and the Court's many sanctions rulings, the defendants have concealed the full scope of their wrongdoing.

At the time of the Sandy Hook shooting in December 2012, the defendants had built corporate infrastructure designed to spread their content as far as possible, and to activate their audience members to act on it. At that time, the defendants were broadcasting via Infowars.com to an audience of "tens of millions of listeners and viewers each month." Pl. Trial Ex. 212 (2013 Web Media Kit); were also broadcasting on 150 nationally syndicated radio stations, Pl. Trial Ex. 217 (2016 Media Kit); and were re-posting content systematically to YouTube, Twitter, and Facebook through multiple accounts, *see, e.g.*, Ex. A, 9/14/22 Trial Tr. (Vol. I) at 55:21-56:6 (Brittney Paz testifying that it was the defendants' practice to upload every clip produced from the Alex Jones show to every online platform they controlled, including Facebook, Twitter, and YouTube); Ex. B, 9/16/22 Trial Tr. (Vol. I) at 76:15-19 (Brittney Paz responding "right" to question, "[a]nd all of the content that Free Speech Systems pushes out, … goes to all of these social media platforms, right?").

The plaintiffs' expert on the internet, social media, and the spread of the defendants' on-line content, Clint Watts, explained the importance of infrastructure in spreading content:

> Method is what distinguishes those with outside influence from those that just have a message one time. Or a messenger one time. So you could think through any organization that communicates in the media on any given day. They have infrastructure. They have the tools, and they have the manpower to actually build the content. Not only build the content but host it. Not only host the content, but to disseminate it to a wide audience. Separately they have a process for doing that, which makes it - it increases the speed at which they can communicate. So if you wanted to react, let's say to an incident, and you wanted to do it in video, and you were by yourself and you had to do all of the parts.

6

Content creation, editing, hosting, hosting, sharing and distribution. That's very difficult to do without a dedicated process and a team to do it. And the last part is analytics. If you wanted to be prolific over time and sustain your audience engagement, you have to understand what your audience likes. You'll remember over the many decades of television, they have ratings. Ratings determine what kind of content the different television programs of networks would want to host. Based on those ratings, that's the shows that stay and endure. And poor ratings lead to shows that don't stay on and don't endure.

Ex. C, 9/20/22 Trial Tr. (Vol. I) at 84:25-85:21. Mr. Watts explained that the defendants' infrastructure at the time of the Sandy Hook shooting allowed them to engage a "massive audience" of 49 million users on their website alone:

> Q    But can we go to google analytics and show the jury the analytics from 2012…. [S]o sessions is some measurement of how well they're doing with their audience, or engaging their audience?
> A    Yes. That's the number of times a user comes to the website.
> Q    All right. I'm going to need this – so we're on 2012.
>      ….So sessions, I'm going to try – I'll write large here so …. 2012 sessions, 119,107,058….  Is that correct?
> A    Yes.
> Q    Okay. Now we have something called users. And that is 49,029,313.
> A    Correct....
> Q    Okay. Now this was for the most part, this is the infrastructure that was in place at the time of the Sandy Hook shooting on December 14, 2012. Is that correct?
> A    Yes.
> Q    So can you just, as somebody who studied networks and spheres of influence. Can you just describe to the jury the scale of what we're talking about.
> A    It's extremely large. Compared to other organizations or entities that I've looked at, to achieve – I think the middle number is the one to focus on, the 49 million. To achieve 49 million users in any given year is a massive audience.

Ex. C, 9/20/22 Trial Tr. (Vol. I) at 100:13-100:24.

Jones groomed his audience to believe that he – and only he – would tell them the truth.

Jones's tagline on Infowars was "the frontline of truth journalism." Pl. Trial Ex. 216 (2014 Media Kit), and Infowars was marketed as "the House that Truth Built," Pl. Trial Ex. 212 (2013 Web Media Kit). FSS's corporate designee confirmed this at trial:

> Q.    Free Speech Systems agrees that Alex Jones' has built a very loyal following. Correct?

A.      Sure.

Q.      Okay. A very engaged following?

A.      Yes.

Q.      His credibility with his audience is essential to his ability to sell them products. Correct?

A.      I think he said that too so, yes.

Q.      And that's what he tells them, that when they come to Info Wars, he'll give them the truth and nothing but. Right?

A.      I think that's one of his tag lines so, yes.

Q.      And he calls his audience, truth seekers. Correct?

A.      Yes.

Q.      And even though Alex Jones is not a journalist, he tells his audience that he will deliver them the truth in journalism. Correct?

A.      I think that's also a tag line, yes.

Ex. D, 9/14/22 Trial Tr. (Vol. II) at 49:11-50:18 (Paz). The defendants know that their customers will act on what the defendants tell them: "our customers are so loyal to us that they believe in what we're doing to such a degree that if we say something is good for you and is a good value they're going to buy it and buy a lot of it." Pl. Trial Ex. 336a, 5/16/19 David Jones Dep. Tr. at 30:21-30:24 (played to the jury on 9/29/22).

The defendants' business model is not just to activate customers to buy supplements, it is also to activate consumers as "infowarriors." When Jones attacks someone or something, he intends his audience to attack after him: "I am a precision guided heavy munition, coming in on top of you. I'm here to stand up for the innocents. I don't like you. I don't like you getting away with what you do. You make me sick. So, I hit the barbed wire, and everybody else comes in over me." Pl. Trial Ex. 37a, clip from June 12, 2017 video "Alex Jones Warns Megyn Kelly, Exposes Psychological Warfare Operation." *See* Pl. Trial Ex. 508, 9/18/22 video (Jones: "So don't *ever* as dark as the hour is, and as out of control things are, don't you *ever* not realize how important you are and what you've done with your word of mouth and your action. And I'm talking to people that went to that puppet courthouse in Connecticut and put Infowars stickers up everywhere. We commend you!"); Pl. Trial Ex. 13d, 2/3/14 video (Jones speaking on air to

Matthew Mills, Infowars follower who grabbed mic at Superbowl and repeated Jones' lies about 9/11 being an "inside job": "I mean you're really doing a great job and you're another example of how we're gonna defeat the enemy if people just realize they are the future, they are the resistance. I mean, anybody can do this, folks if you just decide to grow some guts and take action."); Pl. Trial Ex. 27, 6/3/15 video (Dan Bidondi following and accosting officials after FOIA hearing: "The Sandy Hook truth is coming out. You're going to jail. You can smile all you want, you're going to jail for fraud. Plain and simple.").

The defendants offered no evidence whatsoever to refute the nature of their business infrastructure, their on-line reach, or the nature of their audience.

### 2.      The Defendants Actually Knew They Were Harming the Plaintiffs and Attacked the Plaintiffs Over and Over and Over Again Regardless

Given the reach of the defendants' platforms and the infrastructure they had built, even one lie about the plaintiffs would have caused profound harm. The defendants attacked the plaintiffs over and over and over again – starting the day of the shooting. *See* Pl. Trial Ex. 1 (video "Connecticut School Massacre Looks Like False Flag Says Witnesses," from 12/14/12 show). At trial, FSS admitted that this click-bait headline was false – there were no witnesses who said such a thing. Jones said: "They have hit the ground running in a buildup and I have said, this is the attack.… They are going to come after our guns," activating his audience of millions.  Pl. Trial Ex. 1e (clip from 12/14/12 video "Connecticut School Massacre Looks Like False Flag Says Witnesses"). The defendants followed this up by attacking Robbie Parker "pretty immediately" after he issued his statement about his daughter Emilie. *See* Pl. Trial Ex. 550 (clip from "Sandy Hook Film Censorship Efforts Backfire" 12/12/14).

They attacked the plaintiffs over and over again in the months following the shooting. Three years later, Jones was still attacking the plaintiffs, and told his audience that "Sandy Hook

is a synthetic, completely fake, with actors, in my view manufactured." Pl. Trial Ex. 23a (clip

from 1/1/15 Alex Jones Show). Jones continues to target the plaintiffs to this day, and during his

show on September 29, 2022 he told his audience "now that I've seen the trial's rigged, and how

it all looks, I mean – it's definitely – the whole thing's deep state, that's all I can say. So, I think

the public's original instinct about it was right. I don't know what really happened there, but it is,

it is synthetic as hell." Pl. Trial Ex. 594 (clip from 9/29/22 Alex Jones Show).

Jones has repeatedly mocked the plaintiffs' grief and cited their tears as evidence of their

"acting." *See, e.g.*, Pl. Trial Ex. 6b, 1/27/13 video (Jones mocking Robbie Parker: "And when

you watch the footage, I know grieving parents do strange things but he – it looks like he's

saying 'okay do I read off the card' he's laughing, and then he goes over and starts um basically

breaking down and crying. So let's show that clip."); Pl. Trial Ex. 17f, 5/13/14 video (Jones:

"you got parents laughing going 'ha ha ha watch this' and then they're going [imitating fake

crying] method acting [imitating fake crying] I mean it's just ridiculous"); Pl. Trial Ex. 19i,

9/29/14 video (Jones: "If you've got a school of a hundred kids and then nobody can find them,

and then you got parents laughing going 'ha ha ha' and then they walk over and see the camera

and go [fake crying], and I mean not just one but a bunch of parents doing this, and then photos

of kids that are still alive they said died. I mean they think we're so dumb that it's – it's really

hidden in plain view."); Pl. Trial Ex. 20a, 12/27/14 (Jones: "when I just saw the heavy, heavy,

heavy scripting, that was what was so clear and then the parents laughing and then one second

later doing the actor breathing to cry, I mean it's just it's – it's just over the top."); Pl. Trial Ex.

35c, 11/18/16 video (Jones: [fake sobs and makes a gesture as if wiping away tears] "I mean he's

a worse actor than Glenn Beck, when Glenn Beck's fake crying. Okay? I mean this is disgusting." [Shows footage of Robbie Parker at the press conference].).[7]

They knew their lies were false from the beginning. Jones had claimed Aurora was staged, *see, e.g.*, Ex. D, 9/14/22 Trial Tr. (Vol. II) at 52:13-25 (Paz). When Sandy Hook occurred, the defendants hurried to find reasons to claim it was also a hoax. *See, e.g.*, Pl. Trial Ex. 105 (email from FSS employee Adan Salazar sent one week after the shooting, saying "[t]here is a vicious rumor" that a movie review posted to the website aslashabove.com "shows foreknowledge or prior planning" of the Sandy Hook shooting and that "we thought this was surely ridiculous, however, we're (Infowars.com) going to point it out in an article anyway…."); see also Compl. at ¶ 9 ("Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax – and he never has."). They made no attempt to investigate the shooting before publishing their lies to millions. *See* Ex. E, 9/15/22 Trial Tr. (Vol. III) at 5:19-26 (Paz) ("Q: … from the day of the shooting until today, Free Speech Systems has not done any investigation on the circumstances surrounding the event itself; correct? A: Independent investigation? No. That's correct. Q: Right. So, when Alex Jones says to his audience, I've done deep research, that's a lie; correct? A: It's not accurate. That's correct.").

If there were any question whether the defendants knew they were harming the plaintiffs by their actions – and there is none based on objective and/or subjective proof – Mr. Pozner's plea to Jones to stop and Jones' decision to ignore that plea resolve that issue in the plaintiffs'

---

[7]  There is not space or time to recap every broadcast discussed at trial. Moreover, in addition to the defendants' Sandy Hook video broadcasts and articles that are in evidence, Ms. Paz testified that the defendants have failed to produce videos for over 100 more broadcasts of the Alex Jones Show in which Sandy Hook was discussed. *See* Pl. Trial Ex. 50 (list of broadcasts in which Jones discussed Sandy Hook, but for which defendants did not produce videos); Ex. B, 9/16/22 Trial Tr. (Vol. I) at 42:8-43:21 (Paz testifying that these videos were not produced).

favor. Barely six weeks after the shooting, on January 29, 2013, Mr. Pozner emailed the

defendants, telling them that he and other families were being attacked:

> Alex,
> I am very disappointed to see how many people are directing more anger at
> families that lost their children in Newtown. Accusing us of being
> actors...Haven't we had our share of pain and suffering? All these accusations of
> government     involvement, false flag terror, new world order etc..
> I used to enjoy listening to your shows prior to 12-14-12.
> Now I feel that your type of show created these hateful people and they need to be
> reeled in!

Pl. Trial Ex. 109. Mr. Pozner's email shows the defendants had actual notice that their actions

were harming the plaintiffs. Of course, because the defendants understood their own business

model, they knew this without Mr. Pozner's email – his email is just more proof that the

defendants' business infrastructure (their "method" in Mr. Watts' terminology) was working

exactly as it was designed to. They were targeting the plaintiffs repeatedly, that activated their

audience, and their audience then followed Jones in over the "barbed wire" of the plaintiffs'

personal privacy.

After Mr. Pozner's email the defendants chose to keep targeting the plaintiffs. On March

27, 2013, Alex Jones invited Steve Pieczenik on his show as a guest caller. During this

broadcast, Pieczenik stated that "Sandy Hook was a total false flag." Later in that segment, Alex

Jones indicated that he was interested in airing more of Pieczenik's Sandy Hook content, and

told Pieczenik "You coming on and saying 'it's a false flag' is big. When can you come back on

this week or next week for a full hour?" Pl. Trial Ex. 7a (clip from "Dr. Steve Pieczenik: Sandy

Hook was A Total False Flag").  Pieczenik appeared on Alex Jones's show again on April 1,

2013. During this broadcast, Jones asked him "What is your take on, on Sandy Hook? Is it just

all the clear scripting, and how they were ready minute one, and now it's come out that

Bloomberg was ready months before, and, and all the people that look and act like actors?

What's your take as an expert on this?" Pieczenik responded, "Well, this is a total script…" and then continued to discuss Sandy Hook being faked by actors.  Pl. Trial Ex. 8a (clip from "Crisis Actors Used at Sandy Hook: Special Report"). A few days later, Alex Jones again told his audience that Sandy Hook was staged, stating, "and I'll tell you right now, there's – it's open and shut. It's a government operation at the movie theater. No doubt. … Sandy Hook, it's got inside job written all over it." Pl. Trial Ex. 9a, clip from "Obama Gun Grab Psyop" 4/9/13).

The Office of the State's Attorney published an exhaustive report of the shooting in November 2013, yet another moment when the defendants could have and should have stopped their attacks on the plaintiffs. The report gave the lie to any notion that the shooting was a hoax, *see* Pl. Trial Ex. 397a (cover sheet of State's Attorney report), but the defendants chose to continue, *see* Ex. F, 9/14/22 Trial Tr. (Vol. IV) at 16:2-12 ("Q. You're aware that in November of 2013, eleven months after the shooting, the Connecticut State Attorney's Office responsible for investigating the shooting released its report. Correct? [Paz]: Yes. Q. That report concluded that 26 people had been murdered at Sandy Hook Elementary School. Correct? [Paz]: Yes. Q. That…Adam Lanza was the lone shooter. Correct? [Paz]: Yes."). The deposition testimony of Rob Dew, the video recording of which was offered at trial, underscores the willfulness of the defendants' persistent wrongdoing:

> Q. As you sit here today, you have no recollection of having read the State's attorney's report of his investigation on the circumstances surrounding the Sandy Hook shooting, correct?
> A. Correct.
> Q. Don't you think that that would have been a source of information that you would have wanted to consult if you were interested in the facts and circumstances surrounding the shooting?
> MR. PATTIS: Objection.
> A. I don't know what I was thinking at the time.

Pl. Trial Ex. 377 at 0:06:03-0:06:57 (video deposition of Rob Dew).

Rather than backing off their lies after Mr. Pozner's plea and the State's Attorney Report, the defendants chose to capitalize on the engaged audience they had developed around the Sandy Hook narrative. In 2014 and 2015, Jones and Wolfgang Halbig generated and publicized new Sandy Hook hoax content. On September 24, 2014, the defendants published the "FBI Says No One Killed at Sandy Hook" article, describing the shooting as a "carefully-scripted false flag event." Pl. Trial Ex. 67. The article drove new social media traffic, resulting in massive spikes in visits and pageviews to Infowars.com. *See* Pl. Trial Ex. 134 (analytics showing spikes in visits and pageviews to Infowars.com due to this article); Pl. Trial Ex. 135 (analytics showing spike in daily social media sessions from 131,391 on 9/23 to 1,185,307 on 9/25, and the spike in visitors coming to Infowars.com from social media); Ex. G, 9/15/22 Trial Tr. (Vol. II) at 26:24-49:14 (Paz testifying concerning these spikes). The spikes in audience engagement led to spikes in sales revenue in the following days:

| orderDate | SumOfOrderAmount |
|---|---|
| 9/23/2014 | $ 56,597.27 |
| 9/24/2014 | $ 48,229.61 |
| 9/25/2014 | $ 232,825.10 |
| 9/26/2014 | $ 128,854.68 |
| 9/27/2014 | $ 63,315.15 |
| 9/28/2014 | $ 49,227.88 |
| 9/29/2014 | $ 75,764.70 |

Pl. Trial Ex. 278a.

The defendants were monitoring audience engagement with this article – as they did in general – and they noticed the massive spikes caused by the article. On October 4, 2014, Tim

14

Fruge sent an email to Adan Salazar, the article's author, with the subject line "screenshots," which included screenshots of analytics data for Infowars.com in the days after the defendants published "FBI Says No One Killed at Sandy Hook":



Pl. Trial Ex. 134.

Again, this is the defendants' intended business model at work – profits from sales related to Sandy Hook lies is *exactly* why they kept targeting the plaintiffs – and it is why they keep targeting them today. David Jones, Alex Jones' father and an employee of FSS, acknowledged that they "emulate spikes" in sales by broadcasting more of the content that goes viral:

> A. … if there have been days where we had extraordinarily good sales someone will say what was Alex saying when that happened and so we like to emulate spikes.
> …

Q. I see, okay. And on those occasions where there have been spikes in sales, as you said, that's something that Free Speech Systems would reasonably try to emulate?
A. Yes.
…
Q. Understood. Understood. Just going back a moment to those times where sales spikes or revenue spikes and correlating that to whatever was happening on the air. Who would be most knowledgeable within the organization about -- about those sales trends that you described from 2012 to today?
A. Alex Jones.

Pl. Trial Ex. 336a (David Jones deposition testimony) at 3-4.

Timothy Fruge, FSS's operations manager, said the same thing:

Q. And you were in touch with him on a daily basis about the store's performance, correct?
A. Correct.
Q. In fact, he would call you pretty much every day after his program to discuss the store's performance during the show, right?
A. Yes.
Q. Because Mr. Jones, during every show, would pitch his products and encourage his audience to buy them, correct?
A. Yes.
Q. And so he would check with you on the effectiveness of his pitch to his audience, effectiveness measured by the amount of sales that were transacted during the show, correct?
A. That's correct.

Pl. Trial Ex. 363a (Fruge deposition testimony) at 3.

The profits that the defendants derived from attacking the Sandy Hook families led them to "emulate" that content over and over and over. The defendants continued to promote the lies that the families were actors and also elevated Wolfgang Halbig and his aggressive hoaxing in 2014 and 2015. *See, e.g.*, Pl. Trial Ex. 17e, 5/13/14 video (Jones saying "I mean clearly it's a drill. Just like the Boston Bombing. What do you think's happening here?" and Halbig responding, "I can tell you children did not die, teachers did not die on December 14, 2012. It just could not have happened." and video shows clip of Robbie Parker with caption, "Odd Parent Reaction from Sandy Hook"); Pl. Trial Ex. 19f, 9/25/14 video (Jones: "I do want to send some

16

reporters up there with you as part of an investigation soon. Wolfgang is our guest. Sandyhookjustice.com. Support him. He has a lot of courage and a sterling record, and he's putting it all on the line to expose what we all know is pure bull."); Pl. Trial Ex. 19j, 9/25/14 video (Jones promoting Halbig's website: "sandyhookjustice.com, folks. Get in there and help this investigation, fund it."); Pl. Trial Ex. 26b, 5/29/15 video (Infowars Nightly News airing Dan Bidondi interviewing Wolfgang Halbig at FOIA hearing); Pl. Trial Ex. 28c, 7/7/15 video (Jones: "It's all, so, I mean, I guess totally made up, with green screens, everything. And we've got 'em on green screens. I mean what is going on here? That's how evil these people are? Is that they can have CNN involved, all these people. It's like a Manhattan Project of the gun grabbers.").

Even based on the inadequate disclosure of videos, we know that the defendants' attacks continued unabated. *See, e.g.*, Pl. Trial Ex. 35b, 11/18/16 video (Jones: "All I know is, the official story of Sandy Hook has more holes in it than Swiss cheese"); Pl. Trial Ex. 35d, 11/18/16 video (Jones: "Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training where he's laughing and joking and then they say 'hey, we're live' and he goes 'oh' (Jones starts mocking Robbie Parker crying). And maybe that's real. I'm sure it is."); Pl. Trial Ex. 35e, 11/18/16 video (Jones: "So, if children were lost in Sandy Hook, my heart goes out to each and every one of those parents, and the people that say they are parents that I see on the news. The only problem is, I've watched a lot of soap operas, and I've seen actors before, and I know when I'm watching a movie and when I'm watching something real."); Pl. Trial Ex. 43a, 10/26/17 video (Jones: "[Sandy Hook is] as phony as the three dollar bill.") Pl. Trial Ex. 46, 5/23/18 video (in broadcast titled, "Soros Lawfare Exposed – Phony Sandy Hook Lawsuits Filed By FBI Agent And Families," Jones attacks plaintiffs' claims as "frivolous" and "electronic lynching").

In sum, the defendants' conduct was not just certain to harm the plaintiffs, it was certain to harm them catastrophically. At a bare minimum, looking at social media alone, and looking only at the time period 2012-2018, the defendants published their Sandy Hook hoax lies 550,000,000 times:

> A    Adding together Youtube, Twitter and the Facebook calculation together just related to lies about Sandy Hook, the minimum audience that we could measure was 550 million off just social media. That doesn't include any – any individuals that were going straight to the website.
>
> Q     No Info Wars, no Prison Planet, not radio, no other avenues of getting the information?
>
> A    Correct.
>
> Q    Okay. And the time period of that was between what?
>
> A    I – 2012 to 2018.

Ex. H, 9/20/22 Trial Tr. (Vol III) at 16:20-17:2 (Clint Watts). The full reach of the defendants' lies could not be determined because of information that the defendants failed to produce. *Id.* at 2-8 (Watts describing categories of missing data); *see also* DN 1006, Pl. Mot. for Charge on Missing Evidence (describing missing videos, website analytics, and social media analytics).

**3**.    **The Defendants' Attacks on the Plaintiffs During this Trial Prove the Most Reprehensible State of Mind Possible**

The degree of reprehensibility shown by the defendants in this case must be named for what it is. It is beyond "intentional and wanton." A better characterization is "evil motive and violence." *See Ulbrich*, 310 Conn. at 446 (punitives evidence must reveal "a reckless indifference to the rights of others or an intentional and wanton violation of those rights.... In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence.").

The defendants continued to attack the plaintiffs *during this trial*. *See* Pl. Trial Ex. 552b (Infowars broadcast on 9/23/22, showing Robbie Parker in footage from livestream of trial and mocking him for "shaking with emotion by the mere presence of Alex Jones"); Pl. Trial Ex. 594

18

(Jones broadcasting on 9/29/22, saying "Take the Sandy Hook thing…. The whole thing's deep state…. It is synthetic as hell."). They used this trial as another opportunity to harass and target the plaintiffs. And once again, the defendants showed the Court exactly why they continue these attacks – because attacking the plaintiffs in this case drives the defendants' profits and sales. *See, e.g.*, Pl. Trial Ex. 506 (video clip, "Lawyer and Judge Caught Conspiring", in which Jones says, "you see these monsters and who they are" and calls for audience donations); Pl. Trial Ex. 513 (screengrab of video "FBI Sues Alex Jones To Destroy First Amendment," attacking Bill Aldenberg and featuring a "Diet Force" ad); Pl. Trial Ex. 504 (screengrab of Infowars Special Report: "Watch: Highlights From The Alex Jones Sandy Hook Kangaroo Court Hearings" and featuring a "Brain Force Plus" ad banner); Pl. Trial Ex. 512 (screengrab of video titled "Alex Jones Indicts The Elite In Press Conference At Sandy Hook Trial" and showing ad banner for storable food); Pl. Trial Ex. 552a (clip of video, "Abomination of Justice" utilizing trial footage to advertise crypto currency).

In sum, the undisputed evidence establishes the most reprehensible and blameworthy course of conduct that could exist in a civil case – a course of conduct that was certain to cause catastrophic harm to the plaintiffs, that the defendants knew was certain to cause catastrophic harm to the plaintiffs, and that the defendants chose to continue for nearly ten years, up to and including this trial.

## B.    ADDITIONAL ASPECTS OF REPREHENSIBILITY

As already explained, "the reprehensibility of a defendant's conduct is the most important" consideration. *Ulbrich*, 310 Conn. at 455. In addition to the degree of the defendant's blameworthiness, which we have discussed at length above, whether harm "was physical as opposed to economic," whether "the target of the conduct had financial vulnerability," and

whether "the conduct involved repeated actions or was an isolated incident" are all reprehensibility considerations. *Id.* at 455-56 (quotation marks omitted). Here, all of these considerations support the assessment of the highest possible punitive damages award. The harm here was to the plaintiffs' emotional wellbeing and to their reputations. It was not merely economic. The plaintiffs were extremely vulnerable at the time the attacks began. And the defendants attacked the plaintiffs over and over and over again.

## III.   THE DEFENDANTS ARE PROFIT-MOTIVATED CON-ARTISTS, WHOSE FULL SCOPE OF WRONGDOING IS STILL NOT KNOWN

### A.   DEFENDANTS' PROFIT MOTIVE

An additional consideration when determining the amount of CUTPA punitive damages is "whether the defendant's [a]ction [was] taken or omitted in order to augment profit…." *Ulbrich*, 310 Conn. at 454. The profit motive of the defendants could not be clearer. The plaintiffs have described above only some of the evidence that the defendants were and are motivated by profit, but any casual observer to the case would readily conclude the same, and the Court was hardly a casual observer. Some additional examples of the defendants' profit motive are Alex Jones's texts to Tim Fruge, in which he obtains sales figures every morning, Pl. Trial Ex. 195, and the testimony of Clint Watts on the basis of his review of the defendants' social media activities and their website analytics – including the analytics for the "FBI Says No One Killed at Sandy Hook" article – that the defendants continued to publish their Sandy Hook lies year after year to drive sales:

> Q.   Do you know whether or not -- did you draw any conclusions as to whether Mr. Alex Jones used the Sandy Hook shooting to drive profit for his company?
> A.   If he was talking about Sandy Hook over and over to create engagement with his audience, that engagement was designed to bring more sales over time.

Ex. I, 9/20/22 Trial Tr. (Vol II) at 16:18-23.

The defendants' attacks on the plaintiffs during this trial prove their malice and intent to harm and their incorrigibility – and they also prove their relentless use of the plaintiffs to make money. *E.g.,* Pl. Trial Ex. 552b (Infowars broadcast on 9/23/22, mocking Robbie Parker for "shaking with emotion by the mere presence of Alex Jones"); Pl. Trial Ex. 506 (video clip, "Lawyer and Judge Caught Conspiring", calling for audience donations); Pl. Trial Ex. 513 (screengrab of video "FBI Sues Alex Jones To Destroy First Amendment," attacking Bill Aldenberg and featuring a "Diet Force" ad); Pl. Trial Ex. 504 (screengrab of Infowars Special Report: "Watch: Highlights From The Alex Jones Sandy Hook Kangaroo Court Hearings" featuring a "Brain Force Plus" ad banner); Pl. Trial Ex. 512 (screengrab of video titled "Alex Jones Indicts The Elite In Press Conference At Sandy Hook Trial" showing ad banner for storable food); Pl. Trial Ex. 552a (clip of video, "Abomination of Justice" utilizing trial footage to advertise crypto currency).

The evidence is overwhelming that the defendants targeted the plaintiffs and spread their Sandy Hook lies to satisfy their greed.

### B.   DEFENDANTS' CONCEALMENT OF THE FULL SCOPE OF THEIR WRONGDOING

The defendants' attempts to conceal their wrongdoing also warrant the imposition of punitive damages. *See Ulbrich*, 310 Conn. at 454 (listing as a factor "whether the wrongdoing was hard to detect"). In *Jennings v. Yurkiw*, 18 F.4th 383 (2d Cir. 2021), the Second Circuit explained that increased punitive damages "are warranted where the misconduct was designed to escape detection." 18 F.4th at 392. The court cited Chief Judge Posner's decision in *Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996), in which he explained, "[w]hen a tortious act is concealable, a judgment equal to the harm done by the act will underdeter. Suppose a person who goes around assaulting other people is caught only half the time. Then in comparing the costs, in the form of

anticipated damages, of the assaults with the benefits to him, he will discount the costs (but not the benefits, because they are realized in every assault) by 50 percent, and so in deciding whether to commit the next assault he will not be confronted by the full social cost of his activity." 79 F.3d at 35; *see also Ciraolo v. City of New York*, 216 F.3d 236, 243 (2d Cir. 2000) (Calabresi, J., concurring) ("Where the injurer makes active efforts to conceal the harm, this problem is of course exacerbated.").

The defendants have worked from the outset of this case to conceal the full scope of their wrongdoing. They engaged in repeated, willful violations of the Court's discovery orders in order to deprive the plaintiffs of evidence of their wrongdoing (and also to conceal the extent of their profit-motive, use of analytics, and wrongdoing from their audience). As a result, the Court defaulted the defendants. DN 574, Mem. of Decision on Default at 13:13, 14:15-17, 15:4.

Even after the entry of default, the defendants continued to withhold evidence from the plaintiffs in violation of their ongoing discovery obligations. On the Friday before the presentation of evidence began, the defendants produced documents purporting to be Google Analytics reports that their corporate designee had referred to in her deposition months earlier. When the plaintiffs had requested and then moved to compel the production of those Google Analytics documents, the defendants had repeatedly denied their existence in pleadings and in direct statements to the Court and the plaintiffs. Incredibly, even after producing these Google Analytics reports on the eve of trial, the defendants continued to maintain that "Google Analytics reports are not used or maintained by FSS in the ordinary course of its business." DN 974, Mot. for Order, at Ex. C (affidavit of Blake Roddy). The Court sanctioned the defendants for "this stunningly cavalier attitude with respect to their discovery obligations," Ex. J, 9/13/22 Trial Tr.

(Vol. I) at 14:27-15:1, and precluded them from presenting evidence or argument that they did not profit from their Sandy Hook coverage, DN 974.20, Order.

The defendants even tried to conceal the extent of their wrongdoing by presenting an unprepared corporate designee. In the first day of her trial testimony, Ms. Paz testified that the defendants "do[] not actively use" Google Analytics information concerning the defendants' websites. Ex. A, 9/14/22 Trial Tr. (Vol. I) at 67:18. When the plaintiffs showed her several exhibits, including internal emails, in which the defendants were clearly using and referencing Google Analytics data, Ms. Paz then revised her testimony to be that FSS "[does not] know at this point what [FSS does] or [doesn't] do with [Google Analytics]." Ex. K, 9/15/22 Trial Tr. (Vol I.) at 57:21-22. Her contradictory and uncredible testimony was based on the defendants' deliberate lies to her that they do not use Google Analytics:

> Q. [Discussing Plaintiffs' Trial Exhibit 212:] Okay. And it gives the number of visitors to the websites per month, the number of unique visitors per month, the number of 30 million page views per month. Right?
> A. Yes, that's what it says.
> Q. Okay. Ms. Paz, isn't this Free Speech Systems using Google Analytics?
> A. I don't know how they got those numbers.
> Q. Well we've seen the Google Analytics where these numbers are presented. Correct?
> A. We've seen Google Analytics numbers, yes.
> Q.  Right. Where else would they have got them?
> A. I don't know. I don't know where those numbers come from.
> Q. But you know that they didn't use it, that's what you told the Judge.
> A. I told the Court what information was relayed to me, that they did not regularly use the Google Analytics in terms of their marketing.
> Q. What you told the Judge was, because the Judge asked you, is that a yes or no, in response to the question, does Free Speech Systems use Google Analytics. She said, is that a yes or no? And you said, that's a no. Right?
> A. Right.
> Q. And the reason you think it's a no is because that's what Info Wars and Alex Jones told you. Correct?
> A. I don't believe Alex told me that but I think I said, Blake Roddy told me that.
> Q. And it's not true. Is it?

A.      I can only convey to you what – what I discussed with the employees and what I've reviewed. So that's based on my review.

Ex. D, 9/14/22 Trial Tr. (Vol II.) at 20:14-21:17.

The defendants also withheld social media analytics from the plaintiffs and their own corporate representative, despite their obligation to produce that data in response to discovery requests. *See* DN 1006, Pl. Mot. for Charge on Missing Evidence, Exs. M and P (explaining that defendants used the social media facilitator and analytics platform Sprout Social to collect their Facebook and Twitter analytics, that defendants had the ability to produce that data well into 2019, after the plaintiffs requested it in discovery, and failed to produce it). In addition to failing to preserve or produce their Sprout Social analytics data, the defendants withheld the very existence of their Sprout Social account from their corporate designee, despite her requests that they provide social media analytics information to her:

Q.      Okay. And you've never even heard of something called Sprout Social. Correct?
A.      You mean as I sit here today, have I ever heard of it?
Q.      Right.
A.      That does not sound familiar to me.
Q.      Okay. You have no idea if Infowars had a Sprout Social analytics program, correct?
A.      No, I don't.
Q.      And you wouldn't even know what that does.
A.      No.

Ex. C, 9/20/22 Trial Tr. (Vol. I) at 38:5-15 (Paz).[8]

---

[8] Because of the defendants' egregious misconduct, the Court instructed the jury on the defendants' failure to produce important evidence:
    While the plaintiffs requested all Sandy Hook videos broadcast by the defendants and all analytics regarding Infowars social media, website and marketing materials and financial data, the defendants did not produce complete information in response and as a result, the plaintiffs had no ability to present the missing information to you.
Ex. L, 10/6/22 Trial Tr. (Vol. II) at 44:25-45:4.

The defendants' concealment of evidence made the full extent of their wrongdoing "hard[er] to detect", *Ulbrich*, 310 Conn. at 454, and they must not be permitted to benefit from their deceptions and deliberate discovery misconduct. For this reason as well, very substantial punitive damages are necessary.

## C.    THE PLAINTIFFS' LOW INCENTIVE TO BRING THIS ACTION

*Ulbrich* states that the Court may consider "whether the injury and compensatory damages were small, providing a low incentive to bring the action…." *Ulbrich*, 310 Conn. at 454. Here, the injuries are catastrophic and the compensatory damages substantial – but because of the defendants' use of the case to attack the plaintiffs, the incentive to bring this action was nonetheless extremely low.

The plaintiffs have brought this lawsuit at great personal sacrifice and only because they determined that someone had to stand up to this bully. It would have been much safer for the plaintiffs *not* to add their names to this case against Jones. Jones also made sure it was painful to be a plaintiff in this lawsuit. He retaliated against the plaintiffs by claiming they were pawns in a Clinton/Soros/globalist scheme to attack him. The defendants' counsel sought and obtained extensive and invasive discovery and conducted abusive depositions of some plaintiffs. The defendants immediately attacked Bill Aldenberg, the very first plaintiff to testify at trial, in what was surely an attempt to deter the rest from testifying. Pl. Trial Ex. 513 (screengrab of 9/15/22 video defendants posted on banned.video showing Bill Aldenberg with the title "FBI Sues Alex Jones to Destroy First Amendment"); DN 992, Reply ISO Mtn to Enforce *in Limine* Rulings at 6-8, Ex. F, Ex. G (showing defendants attacking Bill Aldenberg during trial on their banned.video website). They used trial to target Robbie Parker again and to again accuse the plaintiffs of being complicit in a "synthetic" shooting.  *See* Pl. Trial Ex. 552b (Infowars

25

broadcast on 9/23/22, showing Robbie Parker in footage from livestream of trial and mocking him for "shaking with emotion by the mere presence of Alex Jones"); Pl. Trial Ex. 594 (Jones broadcasting on 9/29/22, saying "Take the Sandy Hook thing…. The whole thing's deep state…. It is synthetic as hell.");

Not only do these repeated attacks of the plaintiffs during trial underscore the reprehensibility of the defendants' conduct, *see Gore*, 517 U.S. at 576-77, they demonstrate the very real risks the plaintiffs bear as plaintiffs in this action. Because of Jones's retaliations, the the plaintiffs' "incentive to bring the action," *Ulbrich*, 310 Conn. at 454, is non-existent, and the Court's punitive damages award should recognize that.

### D.     THE NEED FOR DETERRENCE AND THE DEFENDANTS' INCORRIGIBILITY

"[P]unishment and deterrence are proper purposes of an award of punitive damages under [CUTPA]." *Ulbrich*, 310 Conn. at 454 n.64. Deterring the defendants from future attacks on the plaintiffs is a crucial consideration. Deterrence of attacks on other similar victims is also an important purpose of the punitive damages award.  *TXO Prod. Corp.*, 509 U.S. at 460 ("[i]t is appropriate to consider … the possible harm to other victims that might have resulted if similar future behavior were not deterred"); *see also Kemezy*, 79 F.3d at 35 (Posner, C.J.) (deterrent "function of punitive damages is particularly important in areas such as defamation and sexual assault, where the tortfeasor may, if the only price of the tort is having to compensate his victim, commit the tort because he derives greater pleasure from the act than the victim incurs pain."). Just days before the close of evidence in this case, Alex Jones lied again about the plaintiffs, saying that Sandy Hook was "synthetic as hell." Pl. Trial Ex. 594. The defendants mocked the plaintiffs on their broadcasts attacking the proceedings as a "kangaroo court," knowing in graphic detail from the plaintiffs' depositions, discovery productions of harassing material

26

directed to them, and from their trial testimony exactly how the defendants' audience would respond. *See* Pl. Trial Ex. 552b.

Only the most significant punitives award will have any chance of deterring these incorrigible defendants. They are contemptuous of the Court, the judicial process, and the requirements of the law. Alex Jones repeatedly held press conferences on the steps of the courthouse during trial, decrying the proceedings as a "show trial" and accusing the Court of bias. He publicly called on the jury to do their own research despite the Court's orders that the jury decide the case only on the evidence presented by the parties. *See* DN 996, Pl. Mot. for Orders to Protect Against Mistrial at 2. The defendants accused the Court of being a "tyrant" in their programming, depicting the Court with lasers shooting out of its eyes. *See* Pl. Trial Ex. 477.

*Ulbrich* indicates that a defendant's financial resources are relevant to determining the amount of punitive damages necessary for deterrence. *See Ulbrich*, 310 Conn. at 454 n.64 (financial standing of defendant relevant to deterrence analysis) (citing *Boulevard Associates v. Sovereign Hotels, Inc.*, 861 F.Supp. 1132, 1139 (D.Conn. 1994)).[9] If the defendants wanted to argue that their finances warranted mitigation of a deterrent punitive damages award, they would have provided adequate discovery of their financial condition, disclosed a financial expert, and presented testimony at trial. They chose not to do so, and that choice speaks volumes. "The incompleteness of the record as to [the defendant's] net worth is not a basis for reducing the punitive damages award against him, for *it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.*" *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d

---

[9] This is because a wealthy defendant is more able to absorb the cost of punitive damages without being deterred. *See* Restatement (Second) of Torts § 908, cmt. e (1979) ("The wealth of the defendant is also relevant, since the purposes of exemplary damages are to punish for a past event and to prevent future offenses, and the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of the guilty person.").

363, 373 (2d Cir. 1988) (emphasis added); *see also, e.g.*, *Zarcone v. Perry*, 572 F.2d 52, 56 (2d

Cir. 1978) (" [T]he decided cases and sound principle require that a defendant carry the burden

of showing his modest means – facts peculiarly within his power – if he wants this considered in

mitigation of damages."); *Kemezy*, 79 F.3d at 33-34 (Posner, C.J.) (adopting the "majority rule,

which places no burden" on the plaintiff to "introduce evidence concerning the defendant's net

worth for purposes of equipping the jury with information essential to a just measurement of

punitive damages."); *Woods-Drake v. Lundy*, 667 F.2d 1198, 1203 n.9 (5th Cir. 1982) ("it is

defendant, and not plaintiff, who must carry the burden of introducing evidence of net worth if

defendant wishes these facts to be considered in awarding punitive damages."); *Fishman v.

Clancy*, 763 F.2d 485, 490 (1st Cir. 1985) ("Defendants chose not to offer proof of their financial

conditions despite their awareness of plaintiff's request for punitive damages. Thus, we reject

both the argument that these awards are so excessive on their face that they cannot stand, and the

argument that the amounts are shocking specifically with regard to these defendants."); *Greater

Providence Deposit Corp. v. Jenison*, 485 A.2d 1242, 1245 (R.I. 1984) ("Case law … and logic

demand that a defendant carry the burden of showing his modest means, facts particularly within

his power, if he wants this matter considered in mitigation of damages."); *Hall v. Wal-Mart

Stores, Inc.*, 959 P.2d 109, 113 (Utah 1998) ("The plaintiff is not required to introduce evidence

of a defendant's relative wealth….").

    Rather than present complete and accurate financial information, the defendants

obfuscated and concealed their finances throughout discovery and continued to do so at trial. In

its order defaulting the defendants, the Court found that the defendants produced "sanitized,

inaccurate" trial balances that "were simply not responsive to the plaintiff's [discovery] request

or to the Court's order." DN 574, Mem. of Decision on Default at 9:19-21. At trial, the

defendants produced a shockingly unprepared corporate designee. She testified that the

defendants have earned "hundreds of millions" of dollars over the last ten years:

> Q.      Right? And that huge audience growth translated into hundreds of millions of dollars in sales. Correct?
> A.      Over a broad period of time. What time period are we talking about?
> Q.      Well let's take 2012 till today, 2012 to this very moment.
> A.      So the last ten years.
> Q.      The last ten years. Hundreds of millions of dollars. Right?
> A.      I don't know what the exact figure is but it's – it's quite substantial. I don't know if it's hundreds of millions of dollars but –
> Q.      Well let's – this is kind of important. Right?
> A.      Right.
> Q.      It's Free Speech's revenue…. You knew you were supposed to talk about this. Right?
> A.      Yes.
> Q.      Okay. And all I'm asking you – I'm not even asking you for a precise number.
> A.      Okay.
> Q.      Okay. Hundreds of millions. Yes?
> A.      I believe so.
> Q.      Okay. More than five hundred?
> A.      I don't know the exact number, which is why I said I wasn't sure about the exact number.

Ex. D, 9/14/22 Trial Tr. (Vol. II) at 33:10-34:12 (Paz). Later, she said Free Speech Systems

earned over a hundred million dollars and up to a billion dollars:

> Q. So, now I'm focusing on this range, that at least you're willing to testify to this range, and the range that I just heard you testify to is you can tell this jury that Free Speech Systems has made over a hundred million dollars since 2012 and between a billion dollars, but that's as specific as you can get. Right?
>
> A. Without seeing documents, yes.

Ex. G, 9/15/22 Trial Tr. (Vol. II) at 52:14-23 (Paz). The true range is certainly substantially

higher, given the defendants' choice not to prepare their designee on this issue. *Cf. Motorola*

*Credit Corp. v. Uzan*, 509 F.3d 74, 84-85 (2d Cir. 2007) (affirming punitive damages award of

$1 billion against family, when family did not produce information on its net worth, and district

29

court applied an adverse inference and relied on publicly available estimates of family's net worth).

In sum, only the highest possible punitive damages award has any hope of deterring the defendants from continuing to attack the plaintiffs. *See Kemezy*, 79 F.3d at 34 (Posner, C.J.) ("Knowing that he will have to pay compensation for harm inflicted, the potential injurer will be deterred from inflicting that harm unless the benefits to him are greater. If we do not want him to balance costs and benefits in this fashion, we can add a dollop of punitive damages to make the costs greater."). The highest possible award is also necessary to deter Jones copycats.

### E.      THE CATASTROPHIC HARM TO THE PLAINTIFFS

*Ulbrich* also indicates that the Court may consider "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award…." *Ulbrich*, 310 Conn. at 455 (drawing this consideration from *State Farm Mut. Auto. Ins. Co.*, 538 U.S. 408). The actual harm suffered by the plaintiffs was catastrophic, as the jury found in awarding fair, just, and reasonable compensatory damages totaling $965 million. A punitive damages award that recognizes the gravity of this harm is required.

### F.      CIVIL PENALTIES AUTHORIZED BY CUTPA

Finally, the Court should consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Ulbrich*, 310 Conn. at 455 (quoting *State Farm*, 538 U.S. at 418).

In considering this factor, a court may look to civil penalties that could be imposed for the wrongs done by the defendants. *See State Farm*, 538 U.S. at 428. CUTPA authorizes the Attorney General to recover penalties of up to $5,000 for each wilful use of an unfair or deceptive trade practice. Gen. Stat. § 42-110o(b). A "wilful violation occurs when the party

committing the violation knew or should have known that his conduct was a violation of section 42-110b." Gen. Stat. § 42-110o(b). Section 42-110o(b) "vest[s] the trial court with discretion to award relief and impose penalties as it deems appropriate under the circumstances of each case." *State v. Cardwell*, 246 Conn. 721, 742 (1998). "Nowhere does this section require the court to consider, in determining whether to assess a penalty, whether the defendant was easily accessible to the public or whether anyone was actually harmed by the unfair or deceptive trade practice. In addition, the section does not require that the defendant have had actual knowledge that the practice was unfair or deceptive." *Id.* at 745.

In *State v. Macko*, 2016 WL 4268383, at *14 (Conn. Super. Ct. Aug. 1, 2016) (Peck, J.T.R.), the court ordered civil penalties for 24,659 separate CUTPA violations at $5 each, for a total civil penalty of $123,295, against a dentist and his dental practice who billed the state for dental procedures wrongfully performed by unlicensed individuals. In the present case, the evidence shows that the defendants violated CUTPA 550 million times, *at an absolute minimum*. If each of the 550 million violations were assessed at the $5,000 statutory maximum, the total civil penalty would be $2,750,000,000,000 ($2.75 trillion).

In sum, the only appropriate punitive damages award in this case is the largest award within the Court's power. The defendants have acted willfully, maliciously and evilly, in full knowledge of the harm they are causing people who had no means to fight back, except to bring this case. And when these plaintiffs had the courage to fight back by bringing this case, the defendants used it to harm them again.

## IV.    THE AMOUNT OF PUNITIVE DAMAGES TO BE AWARDED

The Court's discretion in setting the amount of CUTPA punitive damages due is expansive. Its damages assessment need not be tied to compensatory damages or capped at a

certain multiple of compensatory damages: CUTPA "clearly imposes no specific limit on the ratio of punitive damages to compensatory damages." *Ulbrich*, 310 Conn. at 454. A court may award CUTPA punitive damages and attorney's fees even if the plaintiff receives only nominal CUTPA compensatory damages, *see Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 498-99, 509-10 (1995), and even when a plaintiff does not seek *any* CUTPA compensatory damages, *see Associated Inv. Co. P'ship v. Williams Assocs. IV*, 230 Conn. 148, 152, 161 n.16 (1994).[10]

What the Court must do is craft an award that is tailored to the facts of this particular case. That award must account for the following:

1) The defendants acted wilfully, maliciously, and evilly – that is, with the highest possible degree of reprehensibility and blameworthiness, *see Ulbrich*, 310 Conn. at 456 ("intentional malice" is the most reprehensible level of culpability); *id.* at 454 (trial court "should consider" "whether the defendant's conduct was reckless, intentional or malicious…."). Moreover, the defendants repeatedly attacked the plaintiffs over what is now nearly a decade, *see Ulbrich*, 310 Conn. at 455 (appropriate to consider whether wrongdoing involved "repeated actions" not "an

---

[10] A wide range of multiples of compensatory damages has been awarded under CUTPA. In *Ulbrich*, a case where the defendant bank's conduct was merely reckless, the trial court awarded three times compensatory damages, and the Supreme Court affirmed. *Id.* at 382. Higher multiples of compensatories are also awarded under CUTPA. *See Murillo v. A Better Way Wholesale Autos, Inc.*, 2019 WL 3081062 (D. Conn. July 15, 2019) (Bryant, J.) ("Connecticut law clearly establishes that there is no set cap on the permissible amount of a punitive damages award for CUTPA violations."); *Larobina*, 76 Conn. App. at 590 n.5 (upholding a punitive damages award of $1,000, ten times the $100 actual damages, based on a finding that the defendant's conduct was reckless); *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn. App. 99, 149 (2011) (affirming a punitives award of $120,000, six times compensatories damages); *Benham v. Wallingford Auto Park, Inc.*, 2003 WL 22905163, at *5 (Conn. Super. Ct. Nov. 26, 2003) (awarding seven times compensatories).

isolated incident"), and were successful in concealing, to a significant extent, the full scope of their wrongdoing.[11]

2) The harm the defendants caused is catastrophic. At an absolute minimum, the defendants generated 550,000,000 impressions of their lies about the plaintiffs on social media alone, between 2012 and 2018 alone. They began doing so at the moment of the plaintiffs' greatest vulnerability – as they mourned their lost loved ones or, in Bill Aldenberg's case, confronted the trauma of responding to the horror of the massacre.

3) The defendants are incorrigible. They used this trial to escalate their attacks on the plaintiffs and increase their profits. *See Gore*, 517 U.S. at 576-77 ("[E]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law…. Our holdings that a recidivist may be punished more severely than a first offender [in awarding punitive damages] recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.").

Any one of these considerations taken alone would warrant a very significant punitive damages award. All three considerations should be accounted for. The wrongdoing in this case is historic in its scale, in the wrongdoers' utter lack of repentance, and in the certainty of the

---

[11] A wrongdoer's attempts to cover up their misconduct is relevant to assessing the reprehensibility of his conduct. *See Jennings v. Yurkiw*, 18 F.4th 383, 391 (2d Cir. 2021) (affirming punitive damages award and noting that "[t]he reprehensible nature of the officers' conduct is underscored by the elaborate steps they took to cover up their misconduct."); *see also Gore*, 517 U.S. at 579 (considering whether defendant engaged in "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive").

wrongdoers' intention to continue harming the plaintiffs. To ignore the degree of the defendants' blameworthiness, the harm intentionally caused, or the defendants' unrepentant intent to continue attacking the plaintiffs would excuse conduct that cannot be excused. CUTPA punitive damages are typically assessed as a multiple of compensatory damages, and that approach is surely appropriate here; it will be for the Court to determine what multiple makes the appropriate punitive and deterrent response to the defendants' wrongdoing. That decision lies within the Court's sound discretion.

**THE PLAINTIFFS,**

**By**     */s/ Alinor C. Sterling*
            **ALINOR C. STERLING**
            **CHRISTOPHER M. MATTEI**
            **JOSHUA D. KOSKOFF**
            KOSKOFF KOSKOFF & BIEDER
            350 FAIRFIELD AVENUE
            BRIDGEPORT, CT  06604
            asterling@koskoff.com
            cmattei@koskoff.com
            jkoskoff@koskoff.com
            Telephone: (203) 336-4421
            Fax: (203) 368-3244
            JURIS #32250

## <u>CERTIFICATION</u>

I certify that a copy of the above was or will immediately be mailed or delivered electronically or nonelectronically on this date to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were or will immediately be electronically served.

***For Alex Emric Jones & Free Speech Systems, LLC:***
Norman A. Pattis, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT 06511
P: 203-393-3017
npattis@pattisandsmith.com

*/s/ Alinor C. Sterling*
**ALINOR C. STERLING**
**CHRISTOPHER M. MATTEI**
**JOSHUA D. KOSKOFF**

# EXHIBIT A

```
DKT NO: X06-UWY-CV186046436-S      :  COMPLEX LITIGATION DKT

ERICA V. LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                   :  SEPTEMBER 14, 2022


DOCKET NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMERIC JONES
```

**A.M. SESSION**
**VOLUME 1 OF 4**

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
AND A JURY


A P P E A R A N C E S:


   Representing the Plaintiff(s):

      ATTORNEY CHRISTOPHER MATTEI
      ATTORNEY JOSHUA KOSKOFF
      ATTORNEY ALINOR STERLING


   Representing Defendant(s):

      ATTORNEY NORMAN PATTIS
      ATTORNEY ZACHARY REILAND


                 Recorded By:
                 Kendyl Henaghan

                 Transcribed By:
                 Kendyl Henaghan
                 Court Recording Monitor
                 Waterbury Superior Court
                 300 Grand Street
                 Waterbury, Connecticut 06702

1        was, in fact, Alex Jones's practice to title every

2        single clip from the 'Alex Jones Show', correct?

3             MS. PAZ: I don't recall, I'm sorry.

4             ATTY. MATTEI: All right, well, the Jury will see

5        that.

6             MS. PAZ: Sure.

7             ATTY. MATTEI: In any event, every single clip

8        was uploaded to Facebook, correct?

9             MS. PAZ: Every single clip – I know a lot of

10      clips were uploaded to Facebook, I don't know if

11      every clip was always uploaded to Facebook, I don't

12      recall.

13            ATTY. MATTEI: Let's do it this way . . .

14            MS. PAZ: Sure.

15            ATTY. MATTEI: . . . the practice at Infowars was

16      to upload every single clip that Alex Jones would

17      play from his show to Facebook, right?

18            MS. PAZ: I don't recall whether it's every

19      single clip; I know a lot of clips have been

20      uploaded.

21            ATTY. MATTEI: But I asked you if that was the

22      practice, wasn't it?

23            MS. PAZ: To upload clips to Facebook, yes.

24            ATTY. MATTEI: Yeah, and it was the practice to

25      upload clips from the 'Alex Jones Show' to Twitter,

26      correct?

27            MS. PAZ: Yes.

1     ATTY. MATTEI: It was the practice to upload them

2     to YouTube, right?

3     MS. PAZ: Yes.

4     ATTY. MATTEI: It was a practice to upload them

5     to every online platform he had, correct?

6     MS. PAZ: Yes.

7     ATTY. MATTEI: If you go to Banned.Video right

8     now, you can see the full broadcast of the 'Alex

9     Jones Show', correct?

10     MS. PAZ: Yes.

11     ATTY. MATTEI: And you can see every clip he made

12     of it, correct?

13     MS. PAZ: I believe so, yes.

14     ATTY. MATTEI: Okay, and the reason that he did

15     that, is because Alex Jones knew that video is the

16     most engaged medium online, correct?

17     MS. PAZ: I don't know how to answer that, I

18     don't know what he knows about the videos. I know

19     that that's what he does, I can't say what he knows.

20     ATTY. MATTEI: Okay, well aren't you responsible

21     for knowing what he knows? Isn't that your – your

22     duty?

23     MS. PAZ: My responsibility here was to figure

24     out what Free Speech Systems knew at the time.

25     ATTY. MATTEI: Right.

26     MS. PAZ: So, I wasn't in Alex Jones's head, so I

27     can't say what he thought about videos.

1   from Infowars, showing Google Analytics data, correct?

2         MS. PAZ: Yes.

3         ATTY. MATTEI: Okay, does Free Speech Systems use

4   Google Analytics to track its website performance?

5         MS. PAZ: So, we talked about this a lot in our

6   depositions, as far as whether . . .

7         ATTY. MATTEI: Wait, hang on a second Ms. Paz,

8   hold on a second.

9         MS. PAZ: Yes.

10        ATTY. MATTEI: I don't want to know what we

11   talked about in our depositions . . .

12        MS. PAZ: Sure.

13        ATTY. MATTEI: I just want to know yes or no, as

14   Free Speech Systems, sitting here right now, does it

15   use Google Analytics to track its website

16   performance?

17        MS. PAZ: It is available according to my

18   investigation. It does not actively use this

19   information.

20        THE COURT: Is that a yes or a no?

21        MS. PAZ: No.

22        ATTY. PATTIS: Now I'm confused, Judge. I don't

23   mean rude, is it 'no' to you or 'no' to the question?

24        THE COURT: I assume it was 'no' to the question.

25        MS. PAZ: That's what I – that, I'm sorry. It was

26   'no' to the question.

27        ATTY. PATTIS: Okay, I didn't understand the

```
DKT NO: X06-UWY-CV186046436-S      :  COMPLEX LITIGATION DKT

ERICA V. LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                   :  SEPTEMBER 14, 2022


DOCKET NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMERIC JONES
```

### C E R T I F I C A T I O N


I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 14th day of September, 2022.


Dated this 15th day of September, 2022, in Waterbury, Connecticut.


*Kendyl Henaghan*
Kendyl Henaghan
Court Recording Monitor

# EXHIBIT B

```
1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2   ERICA LAFFERTY           :  COMPLEX LITIGATION DOCKET

3   v.                       :  AT WATERBURY, CONNECTICUT

4   ALEX EMERIC JONES        :  SEPTEMBER 16, 2022
    ......................................................
5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6   WILLIAM SHERLACH         :  COMPLEX LITIGATION DOCKET

7   v                        :  AT WATERBURY, CONNECTICUT

8   ALEX EMERIC JONES        :  SEPTEMBER 16, 2022
    ......................................................
9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10  WILLIAM SHERLACH         :  COMPLEX LITIGATION DOCKET

11  v                        :  AT WATERBURY, CONNECTICUT

12  ALEX EMERIC JONES        :  SEPTEMBER 16, 2022
```

13          BEFORE THE HONORABLE BARBARA BELLIS, JUDGE AND JURY

14  **VOLUME II OF II**
    **WITNESS:  DIRECT AND CROSS ATTORNEY BRITTANY PAZ AT 10:00 to**
15  **2:00**

16  A P P E A R A N C E S:

17

        Representing the Plaintiffs:
18          ATTORNEY CHRISTOPHER MATTEI
            ATTORNEY ALINOR STERLING
19          ATTORNEY JOSHUA KOSKOFF

20

21
        Representing the Defendant:
22          ATTORNEY NORMAN PATTIS

23
                            RECORDED BY:
24                          LINDA COON
                            TRANSCRIBED BY:
25                          LINDA COON, RPR
                            Court Monitor/Court Reporter
26                          400 Grand Street
                            Waterbury, CT   06702
27

1      Q   It doesn't really give you the substance, but it
2  gives you the topics?
3      A   Right.  Correct.
4      Q   And Infowars doesn't have radio logs for all the
5  years but it had some; yes?
6      A   Right.  I don't know they had started making those
7  until later, so they didn't always make those.
8           ATTY. MATTEI:  Why don't we pull up Exhibit 50.
9           And let me just confirm with Attorney Ferraro
10          that that's already in?
11          THE CLERK:  50 is in as a full exhibit.
12          ATTY. PATTIS:  It is.
13     Q   And you know -- have you seen this before?
14     A   I have not seen a summary chart, no.
15     Q   Okay.  I'll represent to you that this has been
16  admitted as a chart of all Sandy Hook related broadcasts as
17  described in radio logs for which there are no videos; okay?
18     A   Okay.
19     Q   So, all of the videos that we've seen about Sandy
20  Hook, they are not on this --
21     A   Okay.
22     Q   -- right?
23          This is a summary chart just for radio logs
24  showing that Sandy Hook was talked about for which no videos
25  have been produced; okay?
26     A   Okay.
27     Q   And let's go to the first page.  The first date

1   there, what do you see, Miss Paz?

2       A    April 8, 2013.

3       Q    Okay.

4            ATTY. MATTEI:  Let's just kind of scroll

5            through.

6       Q    What is the last date there?

7       A    October 4, 2021.

8       Q    It's about eight years?

9       A    After Sandy Hook, is that the question?

10      Q    No.  No.  These broadcasts about Sandy Hook cover

11   about eight years; do they not?

12      A    From 2013 to 2021.

13      Q    And if the jury wanted to see any of these videos,

14   they can't because Infowars didn't produce them; correct?

15      A    Well, I can't say whether we have them or not, but

16   they were not produced.  Whether we have them is different,

17   but --

18      Q    Well, if you have them, they should have been

19   produced; right?

20      A    I can't say that we have them, but they have not been

21   produced.  Correct.

22            ATTY. MATTEI:  Pull up Exhibit 2016, please?

23            216, I'm sorry.

24            THE CLERK:  That is a full exhibit.

25            ATTY. PATTIS:  Agreed.

26      Q    You will recall, Miss Paz, that we've looked at this

27   exhibit before.  This is the Media Kit for 2014; right?

1    Q   So, let's good to page two.  A cover of page there.

2    Social Media Reconnaissance Report, February 20, 2021;

3    right?

4    A   I see it, yes.

5    Q   Okay.  And if we go to the last sentence there, that

6    paragraph, the following report details the results of

7    current social media recon of Infowars and Alex Jones, 2021;

8    right?

9    A   That's when it says.

10         ATTY. MATTEI:  All right.  So, let's just start

11         scrolling through here.

12    Q   So, here, we have, these are all the different social

13    media platforms that he's on; right?

14    A   Yes.

15    Q   And all of the content that Free Speech Systems

16    pushes out, just as we've been discussing during the

17    timeframe that we were previously focusing on, goes to all

18    of these social media platforms; right?

19    A   Right.  So, I don't know when we would have set up

20    these particular platforms so, you know, I don't know if it

21    was around the same time period.  So, whenever the videos

22    with Sandy Hook started but, generally speaking, if we had

23    the platforms, all of our content gets uploaded to all of

24    the platforms.  Correct.

25    Q   Right.  And the idea they just want to reach as many

26    people as possible?

27    A   Correct.

```
1    X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2    ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

3    v.                      :  AT WATERBURY, CONNECTICUT

4    ALEX EMERIC JONES       :  SEPTEMBER 16, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
5    X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6    WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

7    v                       :  AT WATERBURY, CONNECTICUT

8    ALEX EMERIC JONES       :  SEPTEMBER 16, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
9    X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

11   v                       :  AT WATERBURY, CONNECTICUT

12   ALEX EMERIC JONES       :  SEPTEMBER 16, 2022
```

13
                        C E R T I F I C A T E
14

15        I, Linda A. Coon, hereby certify that this is a true

16   and accurate transcription of the above-referenced case,

17   heard in Superior Court, Judicial District of Waterbury,

18   Connecticut, before the Honorable Barbara N. Bellis, on this

19   16th day of September, 2022.

20

21        Dated this 17th day of September, 2022, in Waterbury,

22   Connecticut.

23

24

25                         Linda A. Coon,  RPR
                           Court Monitor/ Court Reporter
26

27

# EXHIBIT C

```
DKT NO:  X06-UWY-CV186046436-S     :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                     :  JUDICIAL DISTRICT WATERBURY.

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                   :  SEPTEMBER 20, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

                      TRIAL A.M. SESSION

          BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
                          AND A JURY


A P P E A R A N C E S :


    Representing the Plaintiff(s):


        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        ATTORNEY MATTHEW BLUMENTHAL
        Koskoff, Koskoff & Bieder
        350 Fairfield Ave. Ste 501
        Bridgeport, Connecticut 06604


        ATTORNEY NORMAN PATTIS for Jones Defendants


                              Recorded By:
                              Darlene Orsatti

                              Transcribed By:
                              Darlene Orsatti
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, CT 06702

1    A    Yes.  That was in some of the emails that we saw.

2    Q    Right.  But you've never been presented with

3    Quantcast data yourself, right?

4    A    No, I've not seen anything like that.

5    Q    Okay.  And you've never even heard of something

6    called Sprout Social.  Correct?

7    A    You mean as I sit here today, have I ever heard of

8    it?

9    Q    Right.

10    A    That does not sound familiar to me.

11    Q    Okay.  You have no idea if Infowars had a Sprout

12    Social analytics program, correct?

13    A    No, I don't.

14    Q    And you wouldn't even know what that does.

15    A    No.

16    Q    Mr. Pattis asked you whether you saw any files when

17    you were at Infowars that contained sales reports.  Right?

18    Do you remember that?

19    A    Files containing sales reports.  I don't recall the

20    exact line of questioning you're referring to.

21    Q    Okay.  You know that Free Speech Systems produce what

22    they claim to be sales reports in this case.

23    A    Daily sales reports.

24    Q    Yes.

25    A    Yes.

26    Q    And you produced those in connection with your

27    deposition, right?

1  activity.  Mobilizing people to target an induvial under

2  false pretenses.  Governments, foreign governments against

3  the United States have used it to actually try and convince

4  people of things that aren't true.  To build anger within a

5  population.  And then I think the one over the consistently

6  through my career is extremists.  Meaning that terrorist

7  groups use this sort of information, manipulation, and make

8  people angry to pursue things as a target.

9      Q   So where now we got message, messenger and medium.

10  So of - as far as these three are concerned, is it - can you

11  tell us whether the more powerful and the message it's

12  conveying fear, anger, demonization.  The more citing,

13  charismatic, bombastic, emotionally driven the messenger,

14  and the more effective the medium video.  The branding.

15  What does that say?

16      A   Graphics.

17      Q   Cutaways.

18      A   Graphics, cutaways and imbedding of other media -

19      Q   And emotions.  Okay.  And the more that saturates the

20  public, the greater the potential for things like harassment

21  and threats.

22      A   Correct.

23      Q   Okay.  And in terms of method.  Can you tell us about

24  method.

25      A   Yeah.  Method is what distinguishes those with

26  outside influence from those that just have a message one

27  time.  Or a messenger one time.  So you could think through

1  any organization that communicates in the media on any given

2  day.  They have infrastructure.  They have the tools, and

3  they have the manpower to actually build the content.  Not

4  only build the content but host it.  Not only host the

5  content, but to disseminate it to a wide audience.

6  Separately they have a process for doing that, which makes

7  it - it increases the speed at which they can communicate.

8  So if you wanted to react, let's say to an incident, and you

9  wanted to do it in video, and you were by yourself and you

10  had to do all of the parts.  Content creation, editing,

11  hosting, hosting, sharing and distribution.  That's very

12  difficult to do without a dedicated process and a team to do

13  it.  And the last part is analytics.  If you wanted to be

14  prolific over time and sustain your audience engagement, you

15  have to understand what your audience likes.  You'll

16  remember over the many decades of television, they have

17  ratings.  Ratings determine what kind of content the

18  different television programs of networks would want to

19  host.  Based on those ratings, that's the shows that stay

20  and endure.  And poor ratings lead to shows that don't stay

21  on and don't endure.

22    Q   And could you just spend a little more time on what

23  you mean by, I think you said proliferation over time.  What

24  role does that play in evaluating the efficacy of a

25  structure like this?

26    A   Yeah.  So if you want to change someone's belief or

27  sell products and services over time, there are really three

1    Q   2012 sessions, 119,107.058.  I'd like to start this

2    chart over with the Court's permission - all right.  Okay.

3    So sessions in 2012, 119,107 - of course everybody could

4    read it.  But 107,058.  Right?  Is that correct?

5    A   Yes.

6    Q   Okay.  Now we have something called users.  And that

7    is 49,029,313.

8    A   Correct.

9    Q   And then we have page views.  And that is 286

10   million - I'm just going to round it up because I'm running

11   out of space.  So is that right?

12   A   Yes.

13   Q   Okay.  Now this was for the most part, this is the

14   infrastructure that was in place at the time of the Sandy

15   Hook shooting on December 14, 2012.  Is that correct?

16   A   Yes.

17   Q   So can you just, as somebody who studied networks and

18   spheres of influence.  Can you just describe to the jury the

19   scale of what we're talking about.

20   A   It's extremely large.  Compared to other

21   organizations or entities that I've looked at, to achieve -

22   I think the middle number is the one to focus on, the 49

23   million.  To achieve 49 million users in any given year is a

24   massive audience.

25   Q   Was there anybody operating in Alex Jones sphere of

26   influence, to your knowledge having studied this, that came

27   remotely close?

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 20, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

C E R T I F I C A T I O N


I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #4, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 20th day of September, 2022.


Dated this 21st day of September, 2022 in Waterbury, Connecticut.


Darlene Orsatti
Court Recording Monitor

# EXHIBIT D

```
NO:  X06-UWY-CV18-6046436-S      :  SUPERIOR COURT

ERICA LAFFERTY                    :  COMPLEX LITIGATION DOCKET

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                 :  SEPTEMBER 14, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046437-S      :  SUPERIOR COURT

WILLIAM SHERLACH                  :  COMPLEX LITIGATION DOCKET

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                 :  SEPTEMBER 14, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046438-S      :  SUPERIOR COURT

WILLIAM SHERLACH                  :  COMPLEX LITIGATION DOCKET

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                 :  SEPTEMBER 14, 2022
```

BEFORE THE HONORABLE BARBARA BELLIS, JUDGE
AND JURY


**VOLUME II 0F IV**
**WITNESS:  BRITTANY PAZ BEGINNING AT 11:34 TO 12:54**


A P P E A R A N C E S :


   Representing the Plaintiff:

      ATTORNEY CHRISTOPHER MATTEI
      ATTORNEY ALINOR STERLING
      ATTORNEY JOSHUA KOSKOFF
      ATTORNEY MATTHEW BLUMENTHAL


   Representing the Defendant:

      ATTORNEY NORMAN PATTIS
      ATTORNEY ZACHARY REILAND


                 Recorded By:
                 Kendyl Henaghan

                 Transcribed By:
                 Shannon LeRoy
                 Court Recording Monitor
                 300 Grand Street
                 Waterbury, CT  06702

1    Q    You don't recall that it was on the day of the Boston

2  Marathon bombing?

3    A    I don't recall the date, I'm sorry.

4    Q    All right.  So let's go down here.  And what I'd like

5  to do is go down to the second page.  All right, now let's

6  pull up kings of their domains and just pull up the – yeah,

7  that's okay.  Here he is saying, in terms of web popularity,

8  Infowars.com and Prisonplanet.com are on top of their class.

9  Right?

10    A    That's what it says, yes.

11    Q    All right.  And this is 2013.  Correct?

12    A    I think that's the date that was on the document,

13  yes.

14    Q    Okay.  And it gives the number of visitors to the

15  websites per month, the number of unique visitors per month,

16  the number of 30 million page views per month.   Right?

17    A    Yes, that's what it says.

18    Q    Okay.  Ms. Paz, isn't this Free Speech Systems using

19  Google Analytics?

20    A    I don't know how they got those numbers.

21    Q    Well we've seen the Google Analytics where these

22  numbers are presented.  Correct?

23    A    We've seen Google Analytics numbers, yes.

24    Q    Right.  Where else would they have got them?

25    A    I don't know.  I don't know where those numbers come

26  from.

27    Q    But you know that they didn't use it, that's what you

1    told the Judge.

2    A    I told the Court what information was relayed to me,

3    that they did not regularly use the Google Analytics in

4    terms of their marketing.

5    Q    What you told the Judge was, because the Judge asked

6    you, is that a yes or no, in response to the question, does

7    Free Speech Systems use Google Analytics.  She said, is that

8    a yes or no?  And you said, that's a no.  Right?

9    A    Right.

10   Q    And the reason you think it's a no is because that's

11   what Info Wars and Alex Jones told you.  Correct?

12   A    I don't believe Alex told me that but I think I said,

13   Blake Roddy told me that.

14   Q    And it's not true.  Is it?

15   A    I can only convey to you what – what I discussed with

16   the employees and what I've reviewed.  So that's based on my

17   review.

18   Q    Because Info Wars doesn't want this jury to know just

19   how closely it was tracking his audience growth as Alex

20   Jones was saying that Sandy Hook was a lie.  Right?

21   A    I don't think that's accurate.

22   Q    Let's go down to the next page here.  You don't think

23   that's accurate because somebody told you that?

24   A    Do I think I want the jury not to know about the –

25   Q    Not you, not you.

26   A    Alex Jones.

27   Q    Whoever claimed to you that they don't use Google

1    business model?

2      A    Yes.

3      Q    Maximize that audience, get them all to the content

4    websites and then send them to the store.  Right?

5      A    Uh-huh.

6      Q    Right.  Because if you have billions of audience

7    members, some percentage of those people are going to end up

8    buying your stuff.

9      A    Sure.

10      Q    Right?  And that huge audience growth translated into

11    hundreds of millions of dollars in sales.  Correct?

12      A    Over a broad period of time.  What time period are we

13    talking about?

14      Q    Well let's take 2012 till today, 2012 to this very

15    moment.

16      A    So the last ten years.

17      Q    The last ten years.  Hundreds of millions of dollars.

18    Right?

19      A    I don't know what the exact figure is but it's – it's

20    quite substantial.  I don't know if it's hundreds of

21    millions of dollars but –

22      Q    Well let's – this is kind of important.  Right?

23      A    Right.

24      Q    It's Free Speech's revenue.  You know that you were

25    supposed to talk about it, how –

26            ATTY. PATTIS:  Objection, Judge.  Can we have a

27        question?

```
 1   BY ATTORNEY MATTEI:

 2      Q    You knew you were supposed to talk about this.

 3   Right?

 4      A    Yes.

 5      Q    Okay.  And all I'm asking you - I'm not even asking

 6   you for a precise number.

 7      A    Okay.

 8      Q    Okay.  Hundreds of millions.  Yes?

 9      A    I believe so.

10      Q    Okay.  More than five hundred?

11      A    I don't know the exact number, which is why I said I

12   wasn't sure about the exact number.

13      Q    What - what would you want to look at to figure that

14   out?

15      A    I believe we produced yearly, the revenue from the

16   websites so…

17      Q    Did you look at them?

18      A    Have I seen them?  Yes.

19      Q    Okay, but you don't remember anything other -

20      A    The numbers off the top of my head?

21      Q    Just anything close - more closely if possible than

22   just hundreds of thousands.

23      A    I just don't want to guess is my point.

24      Q    I don't want you guessing.  And as a result of all

25   that revenue, it's fair to say that Alex Jones is becoming a

26   very, very rich man.

27      A    Well, Alex Jones owns the company and the website is
```

1    Q    And a way, am I correct, that Alex Jones has been

2    able to convince his audience to buy this stuff is by

3    convincing them that he is the only one who's telling the

4    truth about this.  Right?

5              ATTY. PATTIS:  Objection as to the form, Judge.

6         It calls for speculation on the contents of other

7         minds.

8              THE COURT:  Can you rephrase the question?

9              ATTY. MATTEI:  Sure.

10   BY ATTORNEY MATTEI:

11   Q    Free Speech Systems agrees that Alex Jones' has built

12   a very loyal following.  Correct?

13   A    Sure.

14   Q    Okay.  A very engaged following?

15   A    Yes.

16   Q    His credibility with his audience is essential to his

17   ability to sell them products.  Correct?

18   A    I think he said that too so, yes.

19   Q    And that's what he tells them, that when they come to

20   Info Wars, he'll give them the truth and nothing but.

21   Right?

22   A    I think that's one of his tag lines so, yes.

23   Q    And he calls his audience, truth seekers.  Correct?

24   A    Yes.

25   Q    And even though Alex Jones is not a journalist, he

26   tells his audience that he will deliver them the truth in

27   journalism.  Correct?

1    A    I think that's also a tag line, yes.

2    Q    Do you recall at David Jones' deposition when he was

3    asked, you have a very unique audience that is highly loyal

4    to you and purchases products based on essentially Alex

5    Jones' credibility with them.  Is that fair – do you recall

6    his testimony was, yes?

7    A    I do recall that, yes.

8         ATTY. MATTEI:  We want to take the lunch at 1,

9         Judge?

10        THE COURT:  I think 1 to 2 is what we plan on

11        doing.

12        ATTY. MATTEI:  Okay.

13   BY ATTORNEY MATTEI:

14   Q    And not only was he telling his audience that they

15   count on him for the truth and that he's offering them truth

16   in journalism but that he would reveal the truth to them

17   where others wouldn't.  Right?

18   A    I believe he's said that, yes.

19   Q    Because to him the mainstream, what he calls the

20   mainstream media, they're in on this conspiracy to kill

21   people.  Right?

22   A    He said that, yes.

23   Q    All right.  Let's play –

24        ATTY. MATTEI:  One moment, Your Honor.

25   BY ATTORNEY MATTEI:

26   Q    All right, Ms. Paz, you're aware that on the day of

27   the Boston Marathon bombing Alex Jones was broadcasting.

```
 1  2013.

 2     A    Sure.

 3     Q    Five months after Sandy Hook.  Correct?

 4     A    I'll take your representation that it was five months

 5  later.

 6     Q    Okay.  They staged Sandy Hook, the evidence is

 7  overwhelming.  Right?

 8     A    Amongst other events but, yes.

 9     Q    I'm asking you about Sandy Hook right now.

10     A    Yes, he says Sandy Hook in the video, yes.

11     Q    Okay.  The evidence is overwhelming.  Right?

12     A    Yes.

13     Q    You'd agree with me that – well you heard him say

14  also that they staged Arora.  Right?

15     A    I did hear that, yes.

16     Q    What was he talking about there?

17     A    The shooting at the movie theater at Arora, Colorado.

18     Q    There was a shooting at a movie theater in Arora in

19  August of 2012.  Right?

20     A    I don't recall the date of that shooting but it was

21  prior to this video.

22     Q    A few months before Sandy Hook.

23     A    Yeah.

24     Q    And he said that was staged.

25     A    Yes.

26     Q    Because one of the things that Alex Jones does is he

27  tells them that these horrible mass shootings are actually
```

| | | |
|---|---|---|
| NO:  X06-UWY-CV18-6046436-S | : | SUPERIOR COURT |
| ERICA LAFFERTY | : | COMPLEX LITIGATION DOCKET |
| v. | : | AT WATERBURY, CONNECTICUT |
| ALEX EMERIC JONES | : | SEPTEMBER 14, 2022 |

| | | |
|---|---|---|
| NO:  X06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| v. | : | AT WATERBURY, CONNECTICUT |
| ALEX EMERIC JONES | : | SEPTEMBER 14, 2022 |

| | | |
|---|---|---|
| NO:  X06-UWY-CV18-6046438-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| v. | : | AT WATERBURY, CONNECTICUT |
| ALEX EMERIC JONES | : | SEPTEMBER 14, 2022 |

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 14th day of September, 2022.

Dated this 14th day of September, 2022 in Waterbury, Connecticut.

Shannon LeRoy
Court Recording Monitor

# EXHIBIT E

```
1    X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2    ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

3    v                       :  AT WATERBURY, CONNECTICUT

4    ALEX EMRIC JONES         :  SEPTEMBER 15, 2022
     ...............................................................
5    X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6    WILLIAM SHERLACH         :  COMPLEX LITIGATION DOCKET

7    v                       :  AT WATERBURY, CONNECTICUT

8    ALEX EMRIC JONES         :  SEPTEMBER 15, 2022
     ...............................................................
9    X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10   WILLIAM SHERLACH         :  COMPLEX LITIGATION DOCKET

11   v                       :  AT WATERBURY, CONNECTICUT

12   ALEX EMRIC JONES         :  SEPTEMBER 15, 2022

13         BEFORE THE HONORABLE BARBARA BELLIS, JUDGE AND JURY

14   VOLUME III OF IV
     WITNESS:  ATTORNEY BRITTANY PAZ AT 2:00 to 3:00
15   Corrected Transcript page 34 line 17  area to air.

16   A P P E A R A N C E S:

17

        Representing the Plaintiffs:
18         ATTORNEY CHRISTOPHER MATTEI
           ATTORNEY ALINOR STERLING
19         ATTORNEY JOSHUA KOSKOFF
           ATTORNEY MATTHEW BLUMENTHAL
20

21

        Representing the Defendant:
22         ATTORNEY NORMAN PATTIS

23

24                         RECORDED BY:
                           KENDYL HENAGHAN
25                         TRANSCRIBED BY:
                           Linda Coon, RPR
26                         Court Monitor/Court Reporter
                           400 Grand Street
27                         Waterbury, CT   06702
```

1    recall that?

2        A    Yes.   Again, I just don't recall the date, but yes, I

3    recall a video with that title.

4        Q    Okay.  All right.

5                ATTY. MATTEI: And this has been marked, Your

6            Honor, and admitted as Exhibit 22, America The False

7            Democracy, identified as a video published by

8            Infowars on December 28, 2014.

9                THE CLERK:  And that is a full exhibit, Your

10           Honor.

11               ATTY. PATTIS:  Agreed.

12               ATTY. MATTEI:  I would like to play Clip 22A,

13           please?

14               ATTY. PATTIS:  May I speak to Attorney Mattei

15           for a moment, please?

16               THE COURT:  You may.

17               (COUNSEL CONFERRING).

18               (VIDEO PLAYED).

19       Q    I think you testified yesterday that from the day of

20   the shooting until today, Free Speech Systems has not done

21   any investigation on the circumstances surrounding the event

22   itself; correct?

23       A    Independent investigation?  No.   That's correct.

24       Q    Right.  So, when Alex Jones says to his audience,

25   I've done deep research, that's a lie; correct?

26       A    It's not accurate.   That's correct.

27       Q    Now, the beginning of that video, the first thing

```
 1   X06-UWY-CV18-6046436-S :   SUPERIOR COURT

 2   ERICA LAFFERTY          :   COMPLEX LITIGATION DOCKET

 3   v                       :   AT WATERBURY, CONNECTICUT

 4   ALEX EMRIC JONES         :   SEPTEMBER 15, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 5   X06-UWY-CV18-6046437-S :   SUPERIOR COURT

 6   WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

 7   v                       :   AT WATERBURY, CONNECTICUT

 8   ALEX EMRIC JONES         :   SEPTEMBER 15, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 9   X06-UWY-CV18-6046438-S :   SUPERIOR COURT

10   WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

11   v                       :   AT WATERBURY, CONNECTICUT

12   ALEX EMRIC JONES         :   SEPTEMBER 15, 2022
```

13
                    C E R T I F I C A T E
14

15       I, Linda A. Coon, hereby certify that this is a true

16   and accurate transcription of the above-referenced case,

17   heard in Superior Court, Judicial District of Waterbury,

18   Connecticut, before the Honorable Barbara N. Bellis, on this

19   15th day of September, 2022.

20

21       Dated this 15th day of September, 2022, in Waterbury,

22   Connecticut.

23       Recertified this 3rd day of October, 2022, in

24       Waterbury, Connecticut.

25

26                        Linda A. Coon,  RPR
                          Court Monitor/ Court Reporter

27

# EXHIBIT F

```
DOCKET NO: UWY-CV18-6046436-S    :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL         :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL          :  SEPTEMBER 14, 2022
------------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S    :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                 :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 :  SEPTEMBER 14, 2022

-------------------------------------------------------------
                    VOLUME 4 OF 4

                WITNESS: BRITTANY PAZ


        BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE



A P P E A R A N C E S:


    Representing the Plaintiff(s):


        ATTORNEY JOSHUA KOSKOFF
        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        KOSKOFF, KOSKOFF & BIEDER
        350 FAIRFIELD AVENUE
        BRIDGEPORT, CONNECTICUT 06604

    Representing Defendant(s): Free Speech Systems LLC, Infowars
    LLC, Infowars Health LLC, and Prison Planet TV, LLC.

        ATTORNEY NORMAN PATTIS
        PATTIS & SMITH, LLC
        383 ORANGE STREET
        1ST FLOOR
        NEW HAVEN, CONNECTICUT 06511

                            Recorded and Transcribed By:

                            Janet M. Orozco
                            Court Recording Monitor
                            Waterbury Superior Court
                            400 Grand Street
                            Waterbury, Connecticut 06702
```

1    A    No, you asked a question.

2    Q    You're aware that in November of 2013, eleven months

3    after the shooting, the Connecticut State Attorney's Office

4    responsible for investigating the shooting released its

5    report.  Correct?

6    A    Yes.

7    Q    That report concluded that 26 people had been

8    murdered at Sandy Hook Elementary School.  Correct?

9    A    Yes.

10    Q    That Alex Jones -- I'm sorry -- that Adam Lanza was

11    the lone shooter.  Correct?

12    A    Yes.

13    Q    That staff members within the school had acted

14    heroically to save children.  Correct?

15    A    Yes.

16    Q    That EMTs were in the school searching for survivors

17    and trying to treat anybody who might need medical

18    attention?

19    A    Yes, I did see that in the report.

20    Q    And on November 26, 2013, Rob Dew, one of Alex Jones

21    most trusted employees received a copy of that report.

22    Correct?

23    A    Yes, I do believe he was sent it in an email with an

24    attachment.

25    Q    Let's look at that.

26              ATTY. MATTEI:  Exhibit 112.

27              THE CLERK:  I do not have 112 as a full exhibit.

```
DOCKET NO: UWY-CV18-6046436-S    :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL         :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL          :  SEPTEMBER 14, 2022
-------------------------------------------------------------
DOCKET NO: UWY-CV18-6046437-S    :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                 :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 :  SEPTEMBER 14, 2022
-------------------------------------------------------------
```

## C E R T I F I C A T I O N

I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 14th day of September, 2022.

Dated this 15th day of September, 2022, in Waterbury, Connecticut.


*Janet M. Orozco*
Janet M. Orozco
Court Transcribing Monitor

```
DOCKET NO: UWY-CV18-6046436-S     :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL          :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL           :  SEPTEMBER 14, 2022
-------------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S     :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                  :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 14, 2022
-------------------------------------------------------------
```

# E L E C T R O N I C   C E R T I F I C A T I O N

I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 14th day of September, 2022.

Dated this 15th day of September, 2022, in Waterbury, Connecticut.

*Janet M. Orozco*
Janet M. Orozco
Court Recording Monitor

# EXHIBIT G

```
DOCKET NO: UWY-CV18-6046436-S     :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL          :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL           :  SEPTEMBER 15, 2022
------------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S     :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                  :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 15, 2022

-------------------------------------------------------------
                    VOLUME 2 OF 4

                 WITNESS: BRITTANY PAZ


         BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE



A P P E A R A N C E S:


    Representing the Plaintiff(s):


         ATTORNEY JOSHUA KOSKOFF
         ATTORNEY CHRISTOPHER MATTEI
         ATTORNEY ALINOR STERLING
         KOSKOFF, KOSKOFF & BIEDER
         350 FAIRFIELD AVENUE
         BRIDGEPORT, CONNECTICUT 06604

    Representing Defendant(s): Free Speech Systems LLC, Infowars
    LLC, Infowars Health LLC, and Prison Planet TV, LLC.

         ATTORNEY NORMAN PATTIS
         PATTIS & SMITH, LLC
         383 ORANGE STREET
         1ST FLOOR
         NEW HAVEN, CONNECTICUT 06511

                              Recorded and Transcribed By:

                              Janet M. Orozco
                              Court Recording Monitor
                              Waterbury Superior Court
                              400 Grand Street
                              Waterbury, Connecticut 06702
```

1          ATTY. PATTIS:  It is agreed to, Judge.

2          THE COURT:  So ordered.

3    BY ATTY. MATTEI:

4      Q    This is an email sent three days later by Wolfgang

5    Halbig to Nico Acosta.  Correct?

6      A    That's what it says, yes.

7      Q    Nico Acosta was the producer for the Alex Jones Show,

8    yes?

9      A    Yes.

10     Q    Can you read what Wolfgang writes to Nico?

11     A    You want me to read the whole thing?

12     Q    I do.

13     A    Sure.  "Nico, please thank Alex again for his great

14   work in helping our cause in funding our legal bill.  We are

15   receiving donations because of him.  Please ask him if he

16   would donate at least a dollar, as well as you, to -- as

17   well as you, to be on our Sandy Hook Justice team.  Thanks

18   again, Wolfgang."

19     Q    How much -- How much money did Wolfgang Halbig get as

20   a result of Alex Jones's encouraging his audience to

21   support?

22     A    I don't know.

23     Q    All right.  Now, let's talk about this article.

24          ATTY. MATTEI:  Can we pull up Exhibit 134,

25        please.

26          This is not yet in evidence, but it's agreed to,

27        Your Honor.

1            ATTY. PATTIS:  It is agreed, Judge.

2            THE CLERK:  It is a full exhibit, Your Honor.

3            ATTY. MATTEI:  I'm sorry, it's been -- I haven't

4        offered it.

5            THE CLERK:  It was admitted day one.

6            ATTY. MATTEI:  Oh, it was?

7            THE CLERK:  Yes.

8            ATTY. MATTEI:  Thank you very much.

9    BY ATTY. MATTEI:

10       Q    Now, this is an email from Tim Fruge, the business

11   director for Infowars, correct?

12       A    At that time, yes.

13       Q    Yes, at that time.

14       A    Uh-hmm.

15       Q    October 14, 2014.  Correct?

16       A    That's what it says.

17       Q    Three weeks after the article ran and the videos ran

18   that we just saw, right?

19       A    Yes.

20       Q    And it's to Adan Salazar, the author of that false

21   article.  Correct?

22       A    Yes, it is to Adan, yes.

23       Q    And it has some attachments.  The attachments are

24   entitled, Alexa Unique Visits.  Correct?

25       A    That's what it says, yes.

26       Q    Okay.  Now, Alexa, I think we talked about yesterday,

27   is another web-based program that allows you to kind of see

1   where your rankings are as a website.  Correct?

2     A   I believe that's correct, yes.

3     Q   We saw those rankings yesterday in one of the media

4   kits where Alex Jones was on top and then there were other

5   media outlets below him.  Correct?

6     A   Right.  I remember that.

7     Q   Right, right.  And none of those other media outlets

8   that we saw yesterday, they never said Sandy Hook was fake,

9   did they?

10    A   Which media outlets?  What do you mean?

11    Q   You remember we saw Rush Limbaugh?

12    A   Oh, okay.  I don't believe there's an -- any

13   allegations that they had said such things, so.

14    Q   Okay.  And then the second attachment is what?

15    A   It's says Google Analytics.jpg.

16    Q   Right.

17            ATTY. MATTEI:  So, let's go down to the second

18        page.

19            All right.  The jury will remember this from

20        opening.

21   BY ATTY. MATTEI:

22    Q   Do you see there a chart?

23    A   I see it.

24    Q   And this chart is Google Analytics.  Correct?

25    A   I don't know if it's Google or Alexa or -- one of

26   them.  But it looks like analytics.

27    Q   Check.  And what we see here are -- is a chart with

1  dates along the bottom.  Correct?

2      A    Yes, I see that date range from September 22nd

3  through October the 13th.

4      Q    And if you look at this line here -- and I know I'm a

5  little bit far away, but I want everybody to be able to see

6  it -- maybe it's easier if I go over there --

7              ATTY. MATTEI:  May I, Your Honor?  May I go over

8          there?

9  BY ATTY. MATTEI:

10     Q    So, let's see here.  You have September 22nd, right?

11     A    Yes.

12     Q    Okay.  And it's broken up into weeks.  So, you have

13  September 22nd to September 29, yes?

14     A    One-week period, yeah.

15     Q    Okay.  And there are, let's see -- one line, two

16  lines, three lines, four lines  -- so, it's looks like each

17  line represents about two days.  Yeah?

18     A    Sure.

19     Q    Okay.  So, we come to the second line, this would be

20  September 24, right?

21     A    Or thereabouts.

22     Q    Or thereabouts.

23     A    Sure.

24     Q    The third line might be September 26th or

25  thereabouts.

26     A    Or thereabout.

27     Q    Fourth line, September 28, somewhere in there, yes?

1    A    Sure.

2    Q    And what we're seeing here are a chart showing unique

3    visitors.  Correct?

4    A    Yes, that's what it says.

5    Q    And unique visitors are bumping along here in

6    September around, let's say, just shy of 500,000 a day; yes?

7    A    About.

8    Q    We're eyeballing it, right?

9    A    Right, right.  About.

10   Q    About 500,000 a day?

11   A    Sure, approximately.

12   Q    And right around between September 24 and September

13   25 -- and this article was published -- it spiked just under

14   two million.  Correct?

15   A    I mean, that some -- So, it looks like more than one-

16   and-a-half, I'll say that.  It's not quite two, but it's not

17   one-and-a-half; so, probably more than one-and-a-half.

18   Q    Okay.

19   A    Yes.

20   Q    You're not going to argue with me that there's a

21   spike?

22   A    It looks like a spike, yes.

23   Q    And that spike, you would say, goes from somewhere

24   south of 500,000 to somewhere between one-and-a-half, two

25   million unique visitors.  Correct?

26   A    Somewhere about one-and-a-half and less than two,

27   sure.

```
 1              ATTY. MATTEI:  Let's go to the next chart.

 2   BY ATTY. MATTEI:

 3      Q   Now, this one --

 4              ATTY. MATTEI:  -- no, no, no.  I'm sorry -- so

 5          you could do -- have the -- I want to do the next

 6          spiking.

 7              All right.

 8   BY ATTY. MATTEI:

 9      Q   Now, this one is measuring page views, yes?

10      A   Yes, I see that.

11      Q   Same idea.  You got the dates on the bottom.

12      A   Yes, I see that.

13      Q   All right.  And what you're seeing here is bumping

14   along, let's say, somewhere between one and two million,

15   right up until the article was published, right?

16      A   Yes.  So, somewhere above one-and-a-half, but less

17   than two.  I see that.

18      Q   And then it spikes up to about thee million.  Can you

19   agree?

20      A   About three, yeah, that's what it looks like.

21      Q   That's per day page views, yes?  That's what we're

22   measuring here, page views per day.

23      A   Measure page views, right -- well, in that two

24   day-ish period --

25      Q   Right.

26      A   Right.

27      Q   Right.  Over the past 28 days, what you see here is
```

```
1    that they had 34.2 million page views.

2       A    Right, that's what I said.

3       Q    Let's go to visits.

4             ATTY. MATTEI:  Is there a visits there?

5             ATTY. KOSKOFF:  Yep.

6    BY ATTY. MATTEI:

7       Q    So, now you see -- the same idea, but we're talking

8    about visits, right?

9       A    Yes.

10      Q    Bumping along here, let's say between -- I don't

11   know, 400,000 and 700,000 let's say, visits per day --

12      A    Yes.

13      Q    Right?

14      A    I see that.

15      Q    It spikes up to over 2 million when the article was

16   published and when the videos came out, yes?

17      A    In that period --

18      Q    Right.

19      A    -- right.

20      Q    Right.

21      A    I see that.

22      Q    All right.

23            ATTY. MATTEI:  Now, let's go to the next chart.

24   BY ATTY. MATTEI:

25      Q    You remember there were multiple attachments here.

26      A    I saw that, yeah.

27      Q    All right.
```

1          ATTY. MATTEI:  Let's stay on that one right

2     there.

3  BY ATTY. MATTEI:

4     Q   Okay.  Now, similar idea.  You obviously recognize

5  this to be Google Analytics, right?

6     A   Yes, I do.

7     Q   All right.  And do you see here -- again, dates along

8  the horizontal access -- axis, beginning September 15th,

9  right?

10    A   Yes.

11    Q   All right.  And Google Analytics, you testified

12 earlier, measures things like web performance, visitors,

13 clicks, all that stuff, right?

14    A   Sure.

15    Q   So, here we are, mid-September -- the week, you know,

16 between September 15th and September 22nd.  You're about,

17 oh, one, one-and-a-half million, right, page views here

18 we're talking about.  You see that?

19    A   Yes.  So, that's -- on September 15th it spikes up a

20 little bit above one-and-a-half -- I don't know, maybe --

21    Q   Oh, thank you.  Yeah, yeah, okay.  So, we're just

22 focusing on this first week.  Right.

23    A   Right.

24    Q   There's a little bit of a spike on September 15th,

25 isn't there?

26    A   Yes.

27    Q   Okay.  And then it's kind of cruising along below 1.5

1    million until September 22nd, right?

2        A    Right.  It hovers around one-and-a-half million and

3    drops off --

4        Q    Okay.  Let's pull back from the chart here --

5        A    Uh-hmm.

6        Q    -- just focus on my questions, Ms. Paz, okay?

7        A    Sure.

8        Q    And here again, in the next week, from September

9    22nd-September 29, do you agree with me that page views --

10            ATTY. PATTIS:  Object -- Objection to the form,

11         Judge.

12            ATTY. MATTEI:  Fine, Your Honor.

13   BY ATTY. MATTEI:

14       Q    Am I correct that page views jump up to just under 3

15   million over the two days when this article was published

16   and the videos were broadcast?

17       A    Yes, I do see the spikes that you're pointing to,

18   just under 3 million page views.

19       Q    And this period covers, let's say -- I don't know,

20   September 13th to about October 13th, right?  It's about a

21   month of data, yes?

22       A    Yeah, give or take.  It doesn't say the exact days,

23   but --

24       Q    And what Google Analytics is telling you here in this

25   chart is that 33.4 percent of all page views during this

26   month were new visitors.  Correct?

27       A    The green slice of the pie?

1    Q    That's right.

2    A    Yes.

3    Q    The green slice -- Green means new visitors, right?

4    A    Yes.

5    Q    Blue means returning visitor.

6    A    Yes.

7    Q    And for this month 33.4 percent of the people

8  visiting were new, right?

9    A    That's what it says, yeah.

10         ATTY. MATTEI:  Let's go to the next chart,

11       please.

12         Is that it for that one?  Okay, okay great.

13  BY ATTY. MATTEI:

14    Q    Now, Ms. Paz, having seen all that now -- By the way,

15  why did Tim Fruge send all those analytics to Adan Salazar,

16  who wrote that article?

17         ATTY. PATTIS:  Objection to the form, Judge.

18         THE COURT:  Overruled.

19  BY ATTY. MATTEI:

20    A    I don't know.  I didn't ask about it.

21    Q    "You don't know."

22         Having seen that, and now coupling that with all the

23  other emails we saw during the proceeding two months about

24  Google Analytics, will Free Speech Systems now tell this

25  jury that, yes, it did in fact use Google Analytics?

26    A    I'm sorry, I have just the same answer: I don't

27  know.

```
 1            ATTY. MATTEI:  Let's pull up Exhibit 135,
 2        please.
 3            It's agreed to, Your Honor.
 4            ATTY. PATTIS:  I think it's already in.
 5            ATTY. MATTEI:  If it is --
 6            THE CLERK:  135 is not in yet.
 7            ATTY. PATTIS:  Oh, agree.
 8  BY ATTY. MATTEI:
 9    Q   All right.  Now, here we are again, October 9th.
10  What was the date of the last, do you remember?  Okay.  I'll
11  tell you.  The email we just saw that Tim Fruge sent to Adan
12  Salazar was October 14th.  This is October 9th.  Just a few
13  days ago, yeah?
14    A   That's what it looks like, yeah.
15    Q   Okay.  It's Tim Fruge again --
16    A   Yes.
17    Q   -- sending a Google Analytics Facebook example to a
18  guy named R -- Rob R.  Who's that?
19    A   I'm not sure -- I'm not sure as I sit here, I'm
20  sorry.
21    Q   You can tell from the email address he's an Infowars
22  employee, yes?
23    A   Yes, yes.
24    Q   All right.
25            ATTY. MATTEI:  And let's bring up that analytics
26        Facebook example.
27  BY ATTY. MATTEI:
```

1    Q    All right.  Let's pull up -- Now, you see here, this

2  is September 23rd, right?

3    A    That's what it says, yeah.

4    Q    Am I correct, ma'am, I know Free Speech Systems'

5  testimony here, over and over again, is that it doesn't know

6  whether it used Google Analytics.  But do you know whether

7  Google Analytics was available to Infowars to also track its

8  performance on social media?

9    A    I don't.  I'm sorry.

10           ATTY. MATTEI:  Let's pull up this --

11  BY ATTY. MATTEI:

12    Q    -- just to pie-chart you with all the colors, okay --

13           ATTY. MATTEI:  -- I'm sorry, I should have said

14       with a date, as well.

15    Q    Now, can you remind the jury when that article, FBI

16  Says Nobody Killed at Sandy Hook, published?

17    A    Is that a question to me?

18    Q    It is.

19    A    I believe it's September 24th.

20    Q    Right.  So, this is the day before, right?

21    A    That's what it looks like.

22    Q    And what it shows here are the top channels through

23  which people are arriving to Infowars.com.  Correct?

24    A    Oh, how they're getting to the website, yeah, so --

25    Q    How they're getting to the website.

26    A    -- direct search or organic search.  Yes, that's what

27  it looks like.

1    Q    Right.  And so what you see here is direct visitors.

2  What that means is people just typing Infowars.com because

3  they want to go there, right?

4    A    Right.

5    Q    Organic search means people who are searching for

6  Infowars.com get sent to there.  Correct?

7    A    Or it's coming up on search terms.  If they're --

8  say, they search Alex Jones or they search a particular

9  topic and they're coming up on the Google search results

10  organically.

11    Q    Organically.

12    A    Right.  So, it would include search terms, not

13  necessarily just Infowars.

14    Q    Right.  So, somebody searching on Google, quote, FBI

15  Says Nobody Killed at Sandy Hook, they're coming to

16  Infowars, that's an organic search, right?

17    A    Right.

18    Q    And so, the direct -- On September 23rd -- I'm going

19  to come this way, away from the jury's way -- the direct --

20  and you have the screen in front of you, right?

21    A    Uh-hmm.

22    Q    On the day before they publish this article, is 39.3

23  percent of all visitors are coming direct.  They know they

24  want to go to Infowars.com, type it in, go.  Right?

25    A    That's what it says, yes.

26    Q    25 percent are searching for something on Google,

27  Infowars.com comes up, they click on it, they come; yes?

1    A    Right.

2    Q    24.2 percent are clicking on a link on social media.

3  Correct?

4    A    That's what that says, yes.

5    Q    And then they're coming to Infowars.com through that

6  link.

7    A    Right.

8    Q    Okay.  10 percent are being referred from another

9  website.  That means -- because you know that Infowars.com,

10  at this time, was paying to advertise itself on other

11  websites, right?

12    A    Right.

13    Q    And so they do that to get more visitors to their

14  site.  So, another website had referred them there, right?

15    A    Right.

16    Q    And then there's -- Okay.  And then it looks like

17  there's two other categories that are not -- because one is

18  email, right?

19    A    Yes.

20    Q    And you know that Infowars had a daily email

21  newsletter that would go out?

22    A    Yes, it has a newsletter.

23    Q    Okay.  And so, people can click on -- and that

24  newsletter contains links to all the stories that Infowars

25  runs that day.

26    A    Right.

27    Q    Okay.  So, you know, you get an email in your inbox:

1  good morning, here's the latest stories from Infowars.

2  Right?

3     A   Right.

4     Q   Okay.

5         All right.  Now, let's go to -- Now, let's go down

6  the page a little bit.  And, whereas the pie chart shows the

7  percentages, this shows the numbers; yes?

8     A   That's what it looks like, yes.

9     Q   And so, on September 23rd, the day before the article

10  runs, they had a total of 543,000 sessions.  Yeah?

11    A   Yes.

12    Q   31 percent of those were new.

13    A   New sessions, yes.

14    Q   New sessions, okay.  All right.  Great.

15           ATTY. MATTEI:  So, let's go down to the next

16       day.

17    Q   Here we are on September 24, right?

18    A   Yes.

19    Q   This is the day of the article now, yes?

20    A   Yes.

21    Q   And just to remind the jury, this is an email sent

22  three weeks after the article ran, right?

23    A   This chart is in the email?  I believe that's the

24  date, yes, in early October; right.

25    Q   Three weeks after the article runs, Tim Fruge, the

26  business director, is putting together numbers for these

27  dates.  Right?

1    A    That's what it looks like.

2    Q    On the day the article runs -- Do you remember on the

3  chart before --

4            ATTY. MATTEI:  Let's just go back up just for a

5            minute --

6            MS. SESHADRI:  (Indiscernible)

7            ATTY. MATTEI:  -- the pie chart, yeah.

8  BY ATTY. MATTEI:

9    Q    On September 23rd, you remember that social media was

10  24.2 percent of traffic to Infowars.com, right?

11    A    I see that, yeah.

12            ATTY. MATTEI:  Let's go to the next one.

13    Q    On the 24th, social media more than doubles as the

14  source for traffic to Infowars.com, right?

15    A    That's what it looks like, yes.

16    Q    It goes from 24 to 54 percent of all traffic coming

17  into Infowars.com is being sent from social media.  Correct?

18    A    That's what it says, yes.

19    Q    This is the year Alex Jones had 2.2 billion

20  impressions on social media.  Correct?

21    A    I don't recall the number, but I know we talked about

22  that yesterday.

23    Q    Right.

24    A    Yes.

25    Q    And whereas before the direct -- on the day before,

26  the direct traffic that people coming into Infowars.com is

27  now in half, right?

1    A    Right, that's what it says.

2    Q    Right.  And so, Ms. Paz, what we're seeing here,

3  according to Infowars Google Analytics is Adan Salazar's

4  false article is taking off on social media and resulting in

5  traffic into Infowars.com.  Correct?

6              ATTY. PATTIS:  Objection, Judge, argumentative.

7              THE COURT:  Overruled.

8  BY ATTY. MATTEI:

9    Q    That's what we're seeing.

10    A    I don't know what caused the spike.  But as we said

11  earlier, his article would have been posted to all of our

12  social media outlets.  So, I mean, its -- Could it have

13  been?  Yes, it could have been.

14    Q    Well --

15    A    I don't know from looking at this what they're

16  clicking on, from the what -- from social media.

17    Q    Right.  But you do know that the email we just showed

18  had Tim Fruge sending Adan Salazar, the author of the

19  article, similar data about performance over the weekend.

20  Correct?

21    A    I saw the email, yes.

22    Q    Okay.  And now we're seeing just a few days before

23  Tim Fruge putting this together for the exact same week.

24  Correct?

25    A    For the same two-day period, yes.

26    Q    Right.  And you know that over the same time period,

27  because of all this increased social media traffic coming to

1    Infowars, its revenue spiked, as well.  Correct?

2        A    I'd have to see the numbers, but --

3        Q    I'll show you that in a minute.

4        A    Sure.

5        Q    So, on the day the article is published, social media

6    accounts for more than half of all referrals to

7    Infowars.com, right?

8        A    That's what it says, yes.

9        Q    All right.

10            ATTY. MATTEI:  Let's go down to the next part of

11            this.  Okay.

12   BY ATTY. MATTEI:

13       Q    Now, again --

14            ATTY. MATTEI:  Thank you.  You read my mind.

15       Q    September 23rd, you'll recall that the total sessions

16   the day before the article was published was 543,000, right?

17       A    Yes.

18            ATTY. MATTEI:  Let's go to September 24th.  I

19            want to see the sessions.  It's down a little

20            further.  Thank you.

21   BY ATTY. MATTEI:

22       Q    Okay.  It goes from 540-something-thousand to 1

23   million sessions on the day it's published.  Correct?

24       A    I see that, yes.

25       Q    Yeah, 583,000.  More than half of it now coming from

26   social media.  Correct?

27       A    I see that, yeah.

```
 1              ATTY. MATTEI:  Let's go to September 25th --

 2         yeah, you had it -- there you -- yep.

 3    BY ATTY. MATTEI:

 4    Q   The pie chart, so you can get started.

 5         All right, September 25th.  September 25th is the day

 6    Alex Jones has Wolfgang Halbig on the show -- We saw that,

 7    right?

 8    A   Right.

 9    Q   -- to talk about the article.  Do you remember the

10    title?

11    A   Right.  He talked about other things too, but --

12    Q   Correct.

13    A   -- including the article, yeah.

14    Q   Right.  He talks about the cut-out, right?

15    A   Yes.

16    Q   He talks about the toxic waste dump, right?

17    A   Yes.

18    Q   Alex Jones does the mock crying.  Correct?

19    A   Yeah, he talks about a few things.

20    Q   He talks about a hundred kids that no longer can be

21    found, right?

22    A   He said that in the video, yes.

23    Q   He talks about photos of kids who they say died, were

24    still alive.  He talks about all that, yes?

25    A   He said that in the video, yeah.

26    Q   This is the day he did that.

27    A   I think that's the same day, yes.
```

1    Q    Right.  And now on this day -- we saw on the day

2   before, the day the article was published, social media went

3   from about 24 percent to over 50 percent, right, of the

4   referral bracket?

5    A    Yeah.

6    Q    Now, it's up to how much?

7    A    80 -- Is that an 8 -- 86.3.

8    Q    That looks like 63.

9    A    Okay, 66.3.

10   Q    That's what it looks like to me.

11   A    Sorry -- It's hard to tell on the screen -- 66.3.

12   Q    Okay, 66.3.  It spikes again, right?

13   A    That's what it looks like.

14   Q    Okay.  And now, direct traffic to Infowars.com,

15  people who actually know they want to go there, is only at

16  20 percent, yes?

17   A    Yes.

18   Q    So, everybody, all these extra people that are coming

19  to Infowars.com are getting there from social media.  Yes?

20   A    Yes.

21   Q    Okay.  And when they get there, they're seeing ads,

22  right?

23   A    When they get where, to the article?

24   Q    Infowars.com --

25   A    Oh, yes; yeah.

26   Q    -- they're seeing it.  I mean, we actually saw an ad

27  right next to the article for DNA Force Plus, right?

1     A    They're on all of the articles.

2     Q    Right.

3     A    Every article has an ad.

4     Q    Right now I'm only asking you about one of them.

5     A    Sure.  That article, there was an ad.

6     Q    And there was a 33 percent sale on DNA Force, right?

7     A    I think that's what it said.

8     Q    All right.  Now, here --

9          ATTY. MATTEI:  Let's go down to the numbers now

10        Pritika.

11    Q    On September 24 it was just over a million sessions

12   in the day, right?

13    A    I recall that, yes.

14    Q    Now, it's at 1.7 million, right?

15    A    That's what it says, yes.

16    Q    With 1.1 million coming from social.

17    A    That's what it says.

18    Q    Dwarfing all the other sources -- referrals.

19   Correct?

20    A    It is the largest source.

21         ATTY. MATTEI:  Okay.  Let's pull that now.

22        Let's go down to -- Is there one for the 26th?

23   BY ATTY. MATTEI:

24    Q    Now, still going here, right?  Now, the 26th, it's a

25   little bit down, it had been 66 percent on the day of the

26   video broadcast from Halbig.  Now, we're one day on, social

27   media is still way above where it was before the article was

1  written, but it's starting to ebb a little bit, down to 53

2  percent of all sources to the -- to Infowars.com.  Right?

3      A   Right.  I see that.

4      Q   Its down from 66 to 53.

5      A   To 53.  Yeah, I see that.

6          ATTY. MATTEI:  Let's go down to the numbers,

7          please.

8      Q   And, the day before, you had seen 1.7 million total

9  sessions; it's down to 950,000, right?

10     A   Yes.

11     Q   And the day earlier, on the day of the broadcast,

12 social media, as a source of referral, had been at about a

13 million, and now it's just over half-a-million; yes?

14     A   Yes.

15     Q   Okay.  So, now it's coming down, right?

16     A   Yeah.

17     Q   So, what we're seeing now is the backside of that

18 spike we saw on the other charts.  Correct?

19     A   That's what it looks like.

20     Q   All right.

21         ATTY. MATTEI:  Let's go down to the next -- if

22         there is a next.

23 By ATTY. MATTEI:

24     Q   Okay, 27.  And we're seeing that same phenomenon

25 here.  Now, we're two days after the video broadcast, right?

26     A   Yep.

27     Q   Social media is starting to come down again as a

1   source for referral, yes?

2    A    Slightly, yes.

3    Q    Right.  Well, it had been 50 --

4    A    Yeah, it was like 52 percent, or something to that

5   effect.

6    Q    Okay, so it's still down.  So, that article is still

7   doing okay, right?

8             ATTY. PATTIS:  Objection: speculative.

9             THE COURT:  Overruled.

10  By ATTY. MATTEI:

11   A    I think we said earlier, I'm not really sure how they

12  were getting there from social.  So, it's from social -- it

13  depends on how many posts there were that day and what posts

14  they were clicking on that day.

15   Q    Right.

16   A    So, I can't say for sure which posts they were

17  clicking on.

18   Q    Right.  So, you're -- You're not going to testify

19  here under oath, are you, that the article published on

20  September 24, 2014, and the video on September 24, 2015 --

21  September 25th -- September 25, 2014 -- you're not going to

22  tell this jury that that article and those videos are the

23  reasons for these spikes, are you?  You're not going to tell

24  them that.

25   A    I would be speculating.  I don't know for sure.

26   Q    Yeah.  I mean, you have all this evidence in front of

27  you, but you still believe it's speculation?

```
1              ATTY. PATTIS:  Objection.

2              THE COURT:  Sustained.

3   BY ATTY. MATTEI:

4       Q    So, on September 27, it's going down.  Now, direct

5   referrals are going -- creeping back up, right?

6       A    I see that, yeah.

7              ATTY. MATTEI:  So, now the 28th.

8       Q    And now you have direct, which is now in blue --

9   direct now comprises the virality, right, 34.8 percent of

10  all referrals are -- are now back to being direct.  Yes?

11      A    I see that, yeah.

12      Q    And social media, close behind, but now not the top

13  referrer.

14      A    I see that, yes.

15      Q    Okay.  All right.

16           Now, what I want to do, Ms. Paz, is I want to bring

17  up -- now you testified yesterday that you've heard the

18  testimony of David Jones and Timothy Fruge that the business

19  model here is maximize audience to the website and then send

20  them to the store and hopefully they buy stuff.  That's the

21  business model.

22      A    Right.

23      Q    All right.

24           So, what I'm going to do now --

25              ATTY. MATTEI:  One moment, Your Honor, if I may?

26              THE COURT:  Take your time.

27              ATTY. MATTEI:  Can we bring up Exhibit 278, for
```

```
1              THE COURT:  Overruled.

2    BY ATTY. MATTEI:

3       A   I don't think it's made a billion dollars.  So, no,

4    it hasn't.

5       Q   Okay.  So, your testimony, right now, is you're

6    testifying to this jury that you can testify under oath that

7    Free Speech Systems has made somewhere between a hundred

8    million dollars and a billion dollars between 2012 and

9    yesterday.  Correct?

10      A   No, I think what I said was I don't know what the

11   number is.

12      Q   I'm asking you a different question now.

13      A   Okay.

14      Q   You just testified that, yes, you can tell this jury

15   Infowars has made over a hundred million dollars, but you're

16   not willing to tell them that it's made a billion dollars.

17          So, now I'm focusing on this range, that at least

18   you're willing to testify to this range, and the range that

19   I just heard you testify to is you can tell this jury that

20   Free Speech Systems has made over a hundred million dollars

21   since 2012 and between a billion dollars, but that's as

22   specific as you can get.  Right?

23      A   Without seeing documents, yes.

24      Q   Okay.  So, let's look at -- You have the exhibit in

25   front of you, right?

26      A   Yes.

27      Q   Now, Infowars produced some sales revenue in this
```

```
DOCKET NO: UWY-CV18-6046436-S     :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL          :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL           :  SEPTEMBER 15, 2022
-------------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S     :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                  :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 15, 2022

-------------------------------------------------------------
```

### E L E C T R O N I C   C E R T I F I C A T I O N

I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 15th day of September, 2022.

Dated this 16th day of September, 2022, in Waterbury, Connecticut.

*Janet M. Orozco*
_____
Janet M. Orozco
Court Recording Monitor

# EXHIBIT H

```
NO:  X06-UWY-CV18-6046436-S      :  SUPERIOR COURT

ERICA LAFFERTY                   :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 20, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046437-S      :  SUPERIOR COURT

WILLIAM SHERLACH                 :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 20, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046438-S      :  SUPERIOR COURT

WILLIAM SHERLACH                 :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 20, 2022
```

BEFORE THE HONORABLE BARBARA BELLIS, JUDGE
AND JURY

VOLUME III OF III
WITNESS:  CLINTON WATTS BEGINNING AT 3:37 TO 4:25

A P P E A R A N C E S :


    Representing the Plaintiff:

        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        ATTORNEY JOSHUA KOSKOFF
        ATTORNEY MATTHEW BLUMENTHAL



    Representing the Defendant:

        ATTORNEY NORMAN PATTIS



                            Recorded By:
                            Kendyl Henaghan

                            Transcribed By:
                            Shannon LeRoy
                            Court Recording Monitor
                            300 Grand Street
                            Waterbury, CT  06702

1    C L I N T O N   W A T T S,

2         having been called as a witness, was previously duly

3         sworn, examined and testified as follows:

4    DIRECT EXAMINATION BY ATTORNEY KOSKOFF CONTINUED:

5    Q   Mr. Watts, I want to turn now to asking you whether

6    or not there came a time when we asked you and your team to

7    make your best efforts to determine the total reach of Alex

8    Jones' Sandy Hook lies across all platforms.

9    A   Yes, you asked that but I was not able to do that.

10   Q   Okay.  And why were you – why were you not able to

11   provide a reasonable estimate as to the total amount of – or

12   I'm sorry, the total reach of Alex Jones Sandy Hook lies

13   across all platforms?

14   A   There were several categories of missing data.  The

15   first one was Facebook, we had no real Facebook data in

16   terms of the post seens that were there, so we couldn't see

17   what the engagements were like.  An engagement would be

18   individuals discussing or reacting or resharing the content,

19   meaning they share outside of Info Wars social media

20   handles.  So we're really blind to what was on Facebook,

21   other than a couple samples from reports on Sprout Social.

22   Q   Okay, you're kind of going very fast.  Why don't you

23   make the list and I'll come back.

24   A   Yeah.  The second was Twitter.  We were able to pull

25   snapshots of Twitter but we were not able to see all of the

26   engagements, all of the posts, all of the content on

27   Twitter.  And that came only from the reports that were

1   provided to us, which were some snapshots but not all.

2        Next in terms of Google Analytics, which we discussed

3   a few times today.  We had reports but we didn't have all of

4   the data so we don't know what all of the traffic is to the

5   website.  So we don't – don't really have an understanding

6   of that and we don't understand over the course of all Sandy

7   Hook content what that traffic was like.

8        And then in relation to videos, whether it be Youtube

9   videos, videos posted to Youtube or even videos that are

10  posted to Info Wars.  We don't have measurements around what

11  that reach was in terms of the content.

12  Q   Okay.  I'm going to go back over this just to

13  clarify.  And so – and by the way, let me clarify.  At the

14  time we asked you to project only from a six year time

15  period from 2012 to 2018.  Is that right?

16  A   Correct.

17  Q   Okay.  And let's start with the data, the Facebook

18  Data.  You said you had some but not the engagements?

19  A   Correct.  We didn't –

20  Q   What –

21  A   Yes.

22  Q   Explain the engagements and why that data is – is

23  relevant or significant to your ability to provide a total –

24  a total projection across all platforms of his spreading of

25  the lies?

26  A   When a piece of content goes onto Facebook there are

27  several things that you can learn.  One, you can learn how

1  many people viewed it or how many times was it seen

2  potentially by someone who has a Facebook account.  That

3  would be known as impressions.  You'll see impressions in

4  some of the charts, even from the reports.

5        Next you don't see the degree to which people

6  converse or discuss the content.  Or even in some cases it's

7  possible to take the content that's initially put into

8  Facebook, take it as your own and then resend it to other

9  people, which would be additional layers of traffic in

10 Facebook.

11     Q   Okay.  And so whatever projections you made, they did

12 not count the additional reach that you would have been able

13 to ascertain by the engagements?

14     A   Correct.

15     Q   Okay.  By the way, just to ask you the other

16 question.  Were you at least able to come up with a

17 determination as to a minimal reach across certain platforms

18 of Alex Jones' spreading of the Sandy Hook lies?

19     A   For Sandy Hook lies, we could do a bare minimum

20 reach, meaning we could account for some travel and social

21 media in terms of the reach just on platforms.

22     Q   Just on social media?

23     A   Correct.

24     Q   Okay.  Did you have – and so – you said – Facebook

25 you told us, limitations in Facebook data.  You said there

26 was Youtube data.as  Was there Youtube data?

27     A   There is Youtube data, some.

```
 1      Q    Okay.  Was that provided by Free Speech Systems or
 2   did you have –
 3                ATTY. PATTIS:  Objection, foundation, hearsay.
 4                THE COURT:  Sustained.
 5   BY ATTORNEY KOSKOFF:
 6      Q    You reviewed – did you have – did you yourself and
 7   your team have to dig up Youtube data?
 8      A    We had to recreate a way to understand what the
 9   Youtube data was by using the Way Back Machine, which is an
10   archive.  It essentially takes a picture of that page on
11   Youtube and it will show counts that are just a place in
12   time.  So they're not all views ever but it gives you a
13   snapshot of a place and time, how many views were on that
14   video.
15      Q    Now you mentioned Sprout –
16      A    Social.
17      Q    Sprout Social.  Can you tell the jury what – that
18   came up in the testimony of the court representative.  Could
19   you just tell the jury what Sprout Social is?
20      A    Sprout Social is a analytics platform that you sign
21   up for a license, you can then run all of your social media
22   handles, your personas on all platforms through it and it
23   will aggregate all the analytics to understand literally how
24   your contents sprouts all across social media.
25      Q    Is this a pay service or –
26      A    It is.
27      Q    Okay.  And do you know whether or not Info Wars used
```

1  Sprout Social for the time period of 2012 to 2018 at least?

2     A    Yes.

3     Q    What is that, they did or –

4     A    They did use it and I've seen the deposition.

5     Q    Okay.  The deposition, you mean when somebody says

6  something about – a deposition, did you see any data though?

7     A    Yes, I've seen some data around Sprout Social, what

8  they were able to retrieve.

9     Q    Were you able to – did you – were you ever produced

10  the entire data setup?

11     A    No, it was not entirely available because we didn't

12  understand or have any access or visibility into some

13  platforms, Facebook being one.  The second is really

14  Infowars.com and the websites.

15     Q    And does that – is that the type of thing that

16  prevents you from giving us a estimate as the total reach of

17  Alex Jones Sandy Hook lies across all platforms?

18     A    Yes.

19     Q    Okay.  But you – did you – did you try to ascertain

20  the minimal reach based on the information that you had?

21     A    Correct.  For the information we could gain we did

22  come up with an estimated minimum reach.

23     Q    Okay.  And that was – I think you said that it was

24  based on Facebook, Youtube and Twitter.

25     A    Correct.

26     Q    And you didn't have – did you have all the

27  information for all those sites or did you have to project –

1  make certain projections?

2          ATTY. PATTIS:  Asked and answered at this point,

3      Judge.

4          ATTY. KOSKOFF:  This – it's complicated so I'll

5      rephrase it.

6          THE COURT:  Overruled.

7  BY ATTORNEY KOSKOFF:

8   A   For Youtube we used the Way Back Machine to look for

9  videos related to Sandy Hook that were put out by Alex Jones

10 and Free Speech Systems.  They – we then looked at those

11 counts.  That's how we came up with the estimate for

12 Youtube.  And that's a bear minimum count because we know

13 that more people could have watched it after that, we just

14 have no way of looking at it.  And it's only the videos we

15 could service on the Way Back Machine.

16  Q   Okay.  And in terms of – we've showed the jury Info

17 Wars content and can you just describe for the jury what

18 type of website Infowars.com is in terms of its scale as an

19 original website?

20  A   Yes, due to the duration that it's been in existence,

21 it has created an enormous direct traffic, meaning while

22 social media redirects some people to the website, many

23 people go directly to the website.  And you can see that in

24 Google Analytics, some of the (inaudible) we showed you it

25 says direct, that means someone went directly to

26 Infowars.com.

27  Q   And is that – is it unusual or is there anything

1   unusual about the degree to which Info Wars gets direct

2   traffic in terms of the types of –

3     A   Yes.  Based on my experience evaluating websites,

4   Infowars.com gets a very high percentage of direct

5   engagement to the website.  Meaning people come there for

6   the information, it's not – they're not routed there through

7   social media.

8     Q   And can you – did you and your team maybe quantify

9   that?

10     A   We couldn't get any real estimates other than the

11   Google Analytics pages we already reviewed.

12     Q   Okay.  And so – and you were – did not have the

13   direct content from – or the direct data from Infowars.com

14   to factor in this question about determining the total reach

15   of Alex Jones Sandy Hook lies across all platforms.

16   Correct?

17     A   Correct.

18     Q   Okay.  And then what about – is that also true for

19   Prison Planet, one of its sister sites?

20     A   Correct.

21     Q   All right.  And what about radio, do you have

22   significant data from radio?

23     A   Radio I had no significant data.

24     Q   Okay.

25     A   Other than the media kits that were provided.

26     Q   All right.  So now tell us about what you and your

27   team did in terms of trying to come up with at least a

1  more pages.  So what does that mean, 12 more pages, 6

2  million?

3      A    Meaning adding 12 pages together the way to interpret

4  this, it comes to 6 million.

5      Q    Okay.  And the FBI says Sandy Hook article with the

6  story is almost half of that next 12?

7      A    Yes.

8      Q    Okay.

9      A    That's from social media redirect to Infowars.com.

10     Q    Okay.  We can take that down.  So let me ask you now.

11  You shared with us the methodology you just went over in

12  which you arrived at a projection.  Is that the methodology

13  you and your team used?

14     A    Yes.

15     Q    Okay.  So let me ask you, can you tell us to – what

16  your conclusions were about what a minimum reach was based

17  on these three platforms, the information you learned from

18  these three platforms of Alex Jones Sandy Hook lies across

19  these three platforms?

20     A    Adding together Youtube, Twitter and the Facebook

21  calculation together just related to lies about Sandy Hook,

22  the minimum audience that we could measure was 550 million

23  off just social media.  That doesn't include any – any

24  individuals that were going straight to the website.

25     Q    No Info Wars, no Prison Planet, not radio, no other

26  avenues of getting the information?

27     A    Correct.

1   Q   Okay.  And the time period of that was between what?

2   A   I - 2012 to 2018.

3   Q   Okay.  Thank you, very much.  I appreciate it.

4   A   Thank you.

5           THE COURT:  Attorney Pattis, cross examination?

6           ATTY. PATTIS:  Thank you, Judge.  May we

7       approach, Your Honor?

8           THE COURT:  You may.

9           (A sidebar conference took place.)

10          ATTY. PATTIS:  We're not going to finish today.

11      I don't know what that does.  And I'm told he won't

12      be able to be back tomorrow.  Is that right?

13          ATTY. KOSKOFF:  (Inaudible).

14          ATTY. PATTIS:  No, I'm ready to go, I just

15      wanted to make sure that you were aware of it.

16          THE COURT:  I will explain to the jury

17      (inaudible)

18          ATTY. PATTIS:  Perfect.

19          THE COURT:  (Inaudible).

20          ATTY. PATTIS:  May we have an order that he is

21      not to discuss his testimony during the pendency of

22      the cross examination?

23          THE COURT:  What?  I've never heard that.

24          ATTY. PATTIS:  It's routine in criminal cases.

25      I know we're not in Criminal Court (inaudible).

26          THE COURT:  I can tell him not to talk to your

27      clients or your witnesses.

| NO:  X06-UWY-CV18-6046436-S | : | SUPERIOR COURT |
| ERICA LAFFERTY | : | COMPLEX LITIGATION DOCKET |
| v. | : | AT WATERBURY, CONNECTICUT |
| ALEX EMERIC JONES | : | SEPTEMBER 20, 2022 |

| NO:  X06-UWY-CV18-6046437-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| v. | : | AT WATERBURY, CONNECTICUT |
| ALEX EMERIC JONES | : | SEPTEMBER 20, 2022 |

| NO:  X06-UWY-CV18-6046438-S | : | SUPERIOR COURT |
| WILLIAM SHERLACH | : | COMPLEX LITIGATION DOCKET |
| v. | : | AT WATERBURY, CONNECTICUT |
| ALEX EMERIC JONES | : | SEPTEMBER 20, 2022 |

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 20th day of September, 2022.

Dated this 20th day of September, 2022 in Waterbury, Connecticut.

Shannon LeRoy
Court Recording Monitor

# EXHIBIT I

```
1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2   ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

3   v                       :  AT WATERBURY, CONNECTICUT

4   ALEX EMERIC JONES       :  SEPTEMBER 20, 2022
    .............................................................
5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

7   v                       :  AT WATERBURY, CONNECTICUT

8   ALEX EMERIC JONES       :  SEPTEMBER 20, 2022
    .............................................................
9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10  WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

11  v                       :  AT WATERBURY, CONNECTICUT

12  ALEX EMERIC JONES       :  SEPTEMBER 20, 2022

13        BEFORE THE HONORABLE BARBARA BELLIS, JUDGE AND JURY

14  VOLUME II OF III
    WITNESS:  DIRECT OF CLINTION WATTS 2:00 UNTIL P.M RECESS
15
    A P P E A R A N C E S:
16

17     Representing the Plaintiffs:
          ATTORNEY CHRISTOPHER MATTEI
18        ATTORNEY ALINOR STERLING
          ATTORNEY JOSHUA KOSKOFF
19        ATTORNEY MATTHEW BLUMENTHAL

20

21     Representing the Defendant:
          ATTORNEY NORMAN PATTIS
22

23                           RECORDED BY:
                             KENDYL HENAGHAN
24                           TRANSCRIBED BY:
                             LINDA COON, RPR
25                           Court Monitor/Court Reporter
                             400 Grand Street
26                           Waterbury, CT   06702

27
```

1    bring more viewers onto content, you can bring them onto

2    solicitations and adds such as this.

3        Q    And you talked about the -- the value of time in

4    relationship to a message and it's efficacy; right?

5        A    Correct.

6        Q    And we showed earlier a previous -- a previous

7    coverage of Sandy Hook; right?

8        A    Yes.

9        Q    And, so, did -- is it --do you, in your view, did you

10   note that whether or not Mr. Jones repeatedly, repeatedly

11   went back to Sandy Hook to draw listeners?

12       A    Yes.  Over many years he discussed Sandy Hook.

13       Q    And do you know whether or not as a matter of years,

14   Mr. Jones tried to hock products as a result of the Sandy

15   Hook shooting and the story?

16            ATTY. PATTIS:  Objection.  Argumentative.  Form.

17            ATTY. KOSKOFF:  I'll withdraw it.

18       Q    Do you know whether or not -- did you draw any

19   conclusions as to whether Mr. Alex Jones used the Sandy Hook

20   shooting to drive profit for his company?

21       A    If he was talking about Sandy Hook over and over to

22   create engagement with his audience, that engagement was

23   designed to bring more sales over time.

24       Q    And, in fact, why don't we show some evidence of that

25   if we can draw up the -- oh, sorry -- I forgot to write

26   down -- I forgot my pen.

27            So, we talked -- we just showed the jury the

```
1    X06-UWY-CV18-6046436-S :   SUPERIOR COURT

2    ERICA LAFFERTY          :   COMPLEX LITIGATION DOCKET

3    v.                      :   AT WATERBURY, CONNECTICUT

4    ALEX EMERIC JONES       :   SEPTEMBER 20, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
5    X06-UWY-CV18-6046437-S :   SUPERIOR COURT

6    WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

7    v                       :   AT WATERBURY, CONNECTICUT

8    ALEX EMERIC JONES       :   SEPTEMBER 20, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
9    X06-UWY-CV18-6046438-S :   SUPERIOR COURT

10   WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

11   v                       :   AT WATERBURY, CONNECTICUT

12   ALEX EMERIC JONES       :   SEPTEMBER 20, 2022
```

13
                    C E R T I F I C A T E
14

15        I, Linda A. Coon, hereby certify that this is a true

16   and accurate transcription of the above-referenced case,

17   heard in Superior Court, Judicial District of Waterbury,

18   Connecticut, before the Honorable Barbara N. Bellis, on this

19   20th day of September, 2022.

20

21        Dated this 20th day of September, 2022, in Waterbury,

22   Connecticut.

23

24

25                    Linda A. Coon,  RPR
                      Court Monitor/ Court Reporter
26

27

# EXHIBIT J

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 13, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

**A.M. SESSION**
(MOTIONS AND OPENING STATEMENTS)

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
AND A JURY

A P P E A R A N C E S :


   Representing the Plaintiff(s):

        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY JOSHUA KOSKOFF
        ATTORNEY MATTHEW BLUMENTHAL
        ATTORNEY ALINOR STERLING



   Representing the Defendant(s):

        ATTORNEY NORMAN PATTIS for defendant Alex Jones



                          Recorded By:
                          Darlene Orsatti

                          Transcribed By:
                          Darlene Orsatti
                          Court Recording Monitor
                          400 Grand Street
                          Waterbury, CT 06702

1    within their knowledge, possession, or power.  It is

2    the client, the defendant's, who must produce that

3    which is within their knowledge, possession, or

4    power.  And whether defense counsel knew or didn't

5    know whether or when Mr. Roddy was asked to create

6    google analytic documents in the Texas case is not an

7    excuse.  The fact of the matter is based on the

8    defendants' own filings, the Free Speech Systems

9    corporate designee that defense counsel picked, Free

10   Speech System employee, E commerce manager Mr. Roddy,

11   and the defendant's Texas attorneys were all well

12   aware of the existence of the google analytics report

13   half a year ago.

14        But in this case, the defendant's filed

15   pleadings with the Court, representing that Mr. Roddy

16   had no google analytics documents.  Didn't know what

17   the corporate represent – was referring to.  And

18   perhaps the most egregious representation in the

19   filings, states that the defendant contends and has

20   always contended that neither he nor the various

21   entities with which he is affiliated, has such data.

22   And that there was nothing more that could be done.

23        The defendant's knew of the existence of the

24   google analytic documents at a time these

25   representations were made to the Court by their

26   counsel.  So I'll make the following observation.

27   This stunningly cavalier attitude with respect to

1   their discovery obligations is what led to the

2   default in the first place.  The defendant's have

3   consistently engaged in dilatory and obstructive

4   discovery practices from the inception of these cases

5   right through to the trial.

6       And finally, I will note there is no notice in

7   this file to this minute of any supplemental

8   compliance producing the google analytic documents,

9   which is required by the Practice Book, but was also

10  required by clear Court order of September 30, 2021,

11  which apparently was not followed here.

12      So the motion is denied for these reasons, and

13  the Court hereby sanctions the defendants by

14  precluding them from presenting evidence or argument

15  that they did not profit from the Sandy Hook

16  coverage.  All right.  And now you're – is this the

17  Free Speech –

18      ATTY. STERLING:  Your Honor –

19      ATTY. PATTIS:  Judge, I think you granted the

20  motion.  You said you denied it.

21      THE COURT:  I'm sorry.  The motion's granted.

22      ATTY. STERLING:  Thank you, your Honor.

23      THE COURT:  And then last one is the Free Speech

24  System and PQPR issue?

25      ATTY. STERLING:  Yes, your Honor.

26      THE COURT:  All right.  Did I miss something in

27  the file?  Was a counter affidavit ever filed in the

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 13, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #4, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 13th day of September, 2022.


Dated this 14th day of September, 2022 in Waterbury, Connecticut.


*Darlene Orsatti*

Darlene Orsatti

Court Recording Monitor

# EXHIBIT K

```
NO:  X06-UWY-CV18-6046436-S      :  SUPERIOR COURT

ERICA LAFFERTY                   :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 15, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046437-S      :  SUPERIOR COURT

WILLIAM SHERLACH                 :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 15, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046438-S      :  SUPERIOR COURT

WILLIAM SHERLACH                 :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 15, 2022
```

BEFORE THE HONORABLE BARBARA BELLIS, JUDGE
AND JURY


VOLUME I OF IV
WITNESS:  BRITTANY PAZ BEGINNING AT 10:00 TO 11:22


A P P E A R A N C E S :


   Representing the Plaintiff:

       ATTORNEY CHRISTOPHER MATTEI
       ATTORNEY ALINOR STERLING
       ATTORNEY JOSHUA KOSKOFF




   Representing the Defendant:

       ATTORNEY NORMAN PATTIS



                    Recorded By:
                    Janet Orozco

                    Transcribed By:
                    Shannon LeRoy
                    Court Recording Monitor
                    300 Grand Street
                    Waterbury, CT  06702

1    Q   Right.  And if you see on the top right-hand corner

2   it shows a date range, March 31st, 2014 to June 29th, 2014.

3    A   I see that, yes.

4    Q   Okay.  And by the way, that happens to overlap with

5   the two appearances that Halbig made.  Right?

6    A   He was on right before that in earlier March but –

7    Q   Right, and he was on in May, we just saw that one.

8    A   And then he was on again, yes.

9    Q   Thank you.  And you see here, all the different data

10   that Tim Fruge is using to give to this potential

11   advertiser.  Correct?

12    A   That's what it looks like, yes.

13    Q   Okay.  Is it – is it still your testimony, Ms. Paz,

14   that Info Wars doesn't use Google Analytics?

15    A   I hadn't seen this before but like I said, I can only

16   convey what's been conveyed to me so…

17    Q   You've seen it now.

18    A   I have seen it, yes.

19    Q   Is it still your testimony that Info Wars doesn't use

20   Google Analytics?

21    A   I don't know at this point what they or don't do with

22   it.

23    Q   Well let me see if we can – let's go to Exhibit 126

24   not in evidence.  Just pull that up, please for Ms. Paz.  Do

25   you see that, Ms. Paz?

26    A   Yes.

27    Q   This is an email from Tim Fruge again, this time to a

```
NO:  X06-UWY-CV18-6046436-S        :  SUPERIOR COURT

ERICA LAFFERTY                     :  COMPLEX LITIGATION DOCKET

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                  :  SEPTEMBER 15, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046437-S        :  SUPERIOR COURT

WILLIAM SHERLACH                   :  COMPLEX LITIGATION DOCKET

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                  :  SEPTEMBER 15, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046438-S        :  SUPERIOR COURT

WILLIAM SHERLACH                   :  COMPLEX LITIGATION DOCKET

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                  :  SEPTEMBER 15, 2022
```

### C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 15th day of September, 2022.

Dated this 15th day of September, 2022 in Waterbury, Connecticut.

Shannon LeRoy
Court Recording Monitor

# EXHIBIT L

```
DKT NO:  X06-UWY-CV18046436-S   :  COMPLEX LITIGATION

ERICA LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY
v.                              :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                :  OCTOBER 6, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES
```

### P.M. SESSION, VOLUME I

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
AND A JURY


A P P E A R A N C E S :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY JOSHUA KOSKOFF
    ATTORNEY ALINOR STERLING

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS for defendant Alex Jones



                          Recorded By:
                          Debbie Ellis

                          Transcribed By:
                          Debbie Ellis
                          Court Recording Monitor
                          400 Grand Street
                          Waterbury, CT  06702

44

1    facts.  Let me give you an example of what I mean by

2    direct and circumstantial evidence.  If you're looking

3    out a third floor window and you see smoke rising

4    outside the window, that's direct evidence that there's

5    smoke outside.

6         It is also circumstantial evidence that there is a

7    fire of some sort below the window.  As a general rule,

8    the law makes no distinction between direct and

9    circumstantial evidence but simply requires that the

10   jury find the facts in accordance with a preponderance

11   of all the evidence in the case, both direct and

12   circumstantial.  Thus, both direct and circumstantial

13   evidence are permissible evidence and each type should

14   be treated equally.

15        In your consideration of the evidence, you are not

16   limited to the bald statements of the witness, that is,

17   the exact words that they use.  On the contrary, you

18   are permitted to draw from facts which you find to have

19   been proven such reasonable inferences as seem

20   justified in the light of your experience.  While you

21   may make inferences and rely on circumstantial

22   evidence, you should be careful not to resort to

23   guesswork or speculation or conjecture to determine the

24   facts in the case.

25        While the plaintiffs requested all Sandy Hook

26   videos broadcast by the defendants and all analytics

27   regarding Infowars social media, website and marketing

1      materials and financial data, the defendants did not

2      produce complete information in response and as a

3      result, the plaintiffs had no ability to present the

4      missing information to you.

5          The credibility of witnesses and the weight to be

6      given to their testimony are matters for you as jurors

7      to determine.  However, there are some things to keep

8      in mind.  It is the quality and not the quantity of

9      testimony that controls.  In weighing the testimony of

10      each witness, you may consider whether the witness has

11      any interest in the outcome of the trial.  You should

12      consider a witness's opportunity and ability to observe

13      facts correctly and to remember them truly and

14      accurately, and you should test the evidence each

15      witness gives you by your own knowledge of human nature

16      and the motives that influence and control human

17      actions.  You may consider the reasonableness of what

18      the witness says and the consistency or inconsistency

19      of his or her testimony.  You may consider his or her

20      testimony in relation to facts that you find to have

21      been otherwise proven.  You may believe all of what a

22      witness tells you, some of what a witness tells you or

23      none of what a particular witness tells you.  You need

24      not believe any particular number of witnesses and you

25      may reject uncontradicted testimony if you find it

26      reasonable to do so.

27          In short, you are to apply the same considerations

75

DKT NO:   X06-UWY-CV18046436-S     :   COMPLEX LITIGATION

ERICA LAFFERTY                     :   JUDICIAL DISTRICT WATERBURY
v.                                 :   AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                   :   OCTOBER 6, 2022

DKT NO:   X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES

DKT NO:   X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES

### C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of my stenographic notes of the above-referenced case, heard in Superior Court, G.A. 4 of Waterbury, Connecticut before the Honorable Barbara N. Bellis, Judge, on October 6th, 2022.

Dated this 7th day of October, 2022 in Waterbury, Connecticut.

_Debbie A. Ellis_
_____
Debbie A. Ellis
Court Recording Monitor