# EXHIBIT 22

```
NO: X06-UWY-CV18-6046436-S        : SUPERIOR COURT

ERICA LAFFERTY                    : COMPLEX LITIGATION DOCKET

v.                                : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046437-S        : SUPERIOR COURT

WILLIAM SHERLACH                  : COMPLEX LITIGATION DOCKET

v.                                : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  : November 10, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO: X06-UWY-CV18-6046438-S        : SUPERIOR COURT

WILLIAM SHERLACH                  : COMPLEX LITIGATION DOCKET

v.                                : AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  : November 10, 2022
```

    In these three consolidated cases, the plaintiffs,[1] various
immediate family members of victims and a first responder to

---

[1] In *Lafferty* v. *Jones*, Docket No. X06-UWY-CV-18-6046436-S, the
current named plaintiffs are David Wheeler, Francine Wheeler,
Jacqueline Barden, Mike Barden, Nicole Hockley, Ian Hockley,
Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto,
Jillian Soto and William Aldenberg.  Each of the first eleven of
these individuals are either a parent of a student or a close
relative of a school employee who died in the Sandy Hook tragedy.

the December 14, 2012 Sandy Hook school shooting, have brought suit against the defendants, Alex Emric Jones and Free Speech Systems, LLC.[2]  In the operative complaints,[3] the plaintiffs allege the following relevant facts against the defendants. Jones is a radio and internet personality who resides in Austin, Texas.  He is the host of "The Alex Jones Show" and he owns and operates the websites Inforwars.com and PrisonPlanet.com. Infowars, LLC is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars.  Free Speech Systems, LLC is a Texas limited liability company that owns Infowars.com.

---

Aldenberg is a first responder who responded to the scene on the date of the shooting.  Additionally, the original plaintiff Erica Lafferty was replaced as a plaintiff by her bankruptcy trustee Richard Coan on October 20, 2021. In both *Sherlach* v. *Jones* cases, docket numbers X06-CV-18-6046437-S and X06-CV-18-6046438-S, the named plaintiffs are William Sherlach and Robert Parker.  Sherlach is the spouse of a school psychologist and Parker is the parent of a student who were murdered by Adam Lanza during the Sandy Hook incident.

[2] Although there were many additional defendants when these cases were originally brought, the only remaining defendants at this juncture are Alex Emric Jones and Free Speech Systems, LLC.

[3] As the operative complaints in the three cases allege largely the same facts, they will be discussed simultaneously.

Similarly, Infowars Health, LLC and Prison Planet TV, LLC are also Texas-based companies. All of the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by the defendant Alex Jones and are employed to hold and generate revenue for him. The Alex Jones Show is syndicated on more than sixty radio stations and it has an audience of two million people. Jones and Infowars have an audience of millions more, including 2.3 million subscribers to Jones' YouTube channel.

The plaintiffs allege that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate and propagate . . . false statements" regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax—and he never has." The plaintiffs assert that Jones has developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary

gain.   In fact, by May, 2013, Jones was alleged to make approximately $10 million annually.  Specifically, Jones began telling his audience that the Sandy Hook shooting was "a government-sponsored hoax designed to lead to gun control . . . ."   In furtherance of this objective, Jones began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs. For example, on January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax." Jones appeared in the video and commented that: "evidence is beginning to come out that points more and more in [the] direction" that the Sandy Hook shooting was "a staged event" and that there "appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."   In that video, Jones stated that plaintiff Robert Parker, who lost a daughter in the shooting, was laughing and asking if he should read off a card.  Similarly, on March 14, 2013, Jones stated: "We've clearly got people where it's actors

playing different parts of people. I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

As further examples of Jones' statements, on May 13, 2014, Jones hosted a Sandy Hook denier named Wolfgang Halbig on his show. Jones commented: "I mean it's fake . . . it's fake . . . you've got parents acting . . . . It is just the fakest thing since the three-dollar bill." On September 25, 2014, Jones asserted on his radio show that FBI statistics demonstrated that nobody was killed at Sandy Hook. The plaintiffs specifically allege that "[t]his was a false statement. FBI statistics showed no such thing." Thereafter, on December 28, 2014, Jones took a call from a listener named Kevin who purported to live close to Newtown. Jones then stated: "[t]he whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax. . . . The general public doesn't know the school was

actually closed the year before.  They don't know that they've sealed it all, demolished the building.  They don't know that they had the kids going in circles in and out of the building as a photo-op.  Blue screens, green screens, they got caught using."  On July 7, 2015, Jones stated: "[b]ut what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids. . . .  [I]t's like the same P.R. company is running this." Additionally, on November 17, 2016, Jones told his audience that he's seen "weird videos of reported parents of kids laughing and then all of sudden they do the hyperventilating to cry and go on TV."  Jones has also repeatedly asked his listeners to "investigate" the events surrounding the Sandy Hook shooting and that has led to individuals such as the plaintiffs being subjected to "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

Throughout their complaints in each of the three cases, the plaintiffs allege many more examples of comments made by

Jones and his associates where they questioned if the shooting occurred and whether the plaintiffs' relatives actually died. The plaintiffs allege the following causes of action against the defendants: (1) count one—invasion of privacy by false light; (2) count two—defamation and defamation per se; (3) count three—intentional infliction of emotional distress; (4) count four—negligent infliction of emotional distress and (5) count five—violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.   Each of the plaintiffs' first four causes of action affix the additional label "civil conspiracy."[4]

On October 6, 2021, the plaintiffs moved for a disciplinary default against the defendants claiming litigation misconduct on the part of the defendants.   Essentially, the plaintiffs argued that liability should be conclusively established against the defendants because of their repeated discovery violations

---

[4] On November 18, 2021, this court denied the defendants' motion to strike all counts of the plaintiffs' complaint.

throughout the course of the litigation.   The defendants filed
a memorandum of law in opposition, and following a hearing
conducted on November 15, 2021, the court entered a default
against the defendants, ruling "(T)he case will proceed as a
hearing in damages as to the defendants.   The court notes Mr.
Jones is the sole controlling authority of all the defendants,
and that the defendants filed motions and signed off on their
discovery issues jointly. And all of the defendants have failed
to fully and fairly comply with their discovery obligations."[5]

Evidence commenced in a hearing in damages before a jury
commenced on September 13, 2022..  On October 12, 2022, the jury
reached its verdict as to the various plaintiffs.  Specifically,
the jury awarded the following damages: (1) as to Robert Parker,

---

[5] The defendants in these cases have repeatedly engaged in conduct
designed to thwart their discovery obligations or otherwise avoid
the administration of justice.  For example, the Supreme Court
previously upheld this court's decision to revoke the defendants'
opportunity to file a motion to dismiss under the anti-SLAPP
statute, General Statutes § 52-196a, because the defendants "had
violated numerous discovery orders and that Jones personally had
engaged in harassing and intimidating behavior directed at the
plaintiffs' counsel, Attorney Christopher Mattei."  *Lafferty* v.
*Jones*, 336 Conn. 332, 337-38, 246 A.3d 429 (2020).

$120 million; (2) as to David Wheeler, $55 million; (3) as to Francine Wheeler, $54 million; (4) as to Jacqueline Barden, $28.8 million; (5) as to Mark Barden, $57.6 million; (6) as to Nicole Hockley, $73.6 million; (7) as to Ian Hockley, $81.6 million; (8) as to Jennifer Hensel, $52 million; (9) as to Donna Soto, $48 million; (10) as to Carlee Soto Parisi, $66 million; (11) as to Carlos Matthew Soto, $57.6 million; (12) as to Jillian Soto-Marino, $68.8 million; (13) as to William Aldenberg, $90 million; (14) as to Erica Lafferty, $76 million and (15) as to William Sherlach, $36 million. Additionally, the jury awarded reasonable attorney's fees and costs, in an amount to be determined by the court at a later date.

Following the jury's verdict, on October 21, 2022, the plaintiffs filed a brief regarding CUTPA punitive damages. Thereafter, on October 28, 2022, the defendants submitted a memorandum of law in opposition to an award of punitive damages. The plaintiffs filed a bench brief on attorneys' fees and costs on November 3, 2022, and a reply brief to the defendants'

memorandum of law in opposition to the award of punitive damages on November 4, 2022. The court heard oral argument on the issue of punitive damages on November 7, 2022.

<u>Common Law Punitive Damages</u>

The Connecticut Supreme Court has most recently described the well-settled common law rule followed in Connecticut pertaining to punitive damages in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 447-49, 152 A.3d 1183 (2016): "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 235, 477 A.2d 988 (1984)], this court declined to reconsider limits that it had placed on the recovery of punitive damages. In doing so, the court explained: 'Long ago, in *Hanna* v. *Sweeney*, 78 Conn. 492, 62 A. 785 (1906), this court set forth the rule which we have since followed regarding the appropriate measure of [common-law] punitive damages. In limiting our measure to the expense of litigation less taxable costs, the court noted that under the typical [common-law] rule the jury was permitted to exercise a virtually unchecked discretion to

award damages not only to make the injured person whole, but to punish the wrongdoer. . . . The court further recognized that the doctrine of punitive damages which permits recovery beyond compensation prevailed in most jurisdictions, but, nonetheless, it refused to adopt such a rule characterizing it as a hybrid between a display of ethical indignation and the imposition of a criminal fine. . . . Thus, such a rule was found to be at a variance with the generally accepted rule of compensation in civil cases. . . . Since *Hanna*, we have consistently adhered to this view. . . .

"'The subject of punitive damages has been one of great debate throughout the course of American jurisprudence. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of

such damages assessed in such a manner may have a chilling effect on desirable conduct. . . .

"'In permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award.  Further, although our rule is a limited one, when viewed in light of the ever rising costs of litigation, our rule does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim.  Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' . . . *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.,* supra, 193

Conn. 236-38." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 447-49.

"In Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature. See *Bodner* v. *United Services Auto. Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (in Connecticut, common-law punitive damages 'are limited to the plaintiff's attorney's fees and nontaxable costs, and thus serve a function that is both compensatory and punitive'); see also *Hylton* v. *Gunter*, 313 Conn. 472,493, 97 A.3d 970 (2014) (*McDonald, J.*, dissenting) (common-law punitive damages are compensatory in nature, but also serve 'a punitive and deterrent function'). 'To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. . . . *If awarded, [common-law] punitive damages are limited to the costs of litigation less*

*taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier.* . . . Limiting punitive damages to litigation expenses, including attorney's fees, fulfills the salutary purpose of fully compensating a victim for the harm inflicted . . . while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury. . . . We have long held that in a claim for damages, proof of the expenses paid or incurred affords some evidence of the value of the services . . . . *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 335-36, 852 A.2d 703 (2004); but cf. *Berry* v. *Loiseau*, [223 Conn. 786, 827, 614 A.2d 414 (1992)] (common-law punitive damages, when viewed in the light of the increasing costs of litigation, also [serve] to punish and deter wrongful conduct).' . . . *Hylton* v. *Gunter*, supra, 313 Conn. 486 n.14.

"Juries in Connecticut have been awarding punitive damages for 'wanton or malicious injuries' for more than two hundred years. See, e.g., *Linsley* v. *Bushnell*, 15 Conn. 225, 235 (1842),

and cases cited therein.  More recently, in *Bifolck* v. *Philip Morris, Inc.*, [supra, 324 Conn. 451], our Supreme Court confirmed that, in a jury trial, the question of the amount of punitive damages is for the jury, not the court, when the parties do not agree to have the court decide that issue.  As our Supreme Court explained: 'Indeed, it was precisely because juries assessed the amount of punitive damages that this court was motivated to adopt the common-law rule, limiting the exercise of the jury's discretion by tying such damages to litigation expenses.'  Id.  In reaching this conclusion, the court distinguished common-law punitive damages from the award of punitive damages or attorney's fees under certain statutory causes of action that specifically provide that the court, not the jury, is to determine the amount to be awarded.  Id., 449-51.

"The [purpose] of awarding [common law] punitive damages is not to punish the defendant for his offense, but to compensate the plaintiff for his injuries. . . . The rule in this state as

to torts is that punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . An award of punitive damages is discretionary, and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 166, 30 A.3d 703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).

As an example, the court in *Bridgeport Harbour Place I, LLC*, upheld an award of common law punitive damages, explaining its reasoning as follows: "On the basis of the jury's finding against [the defendant] on the plaintiff's fraudulent misrepresentation claim, the [trial] court was satisfied that the plaintiff had proven a reckless indifference to its contractual and business interests to warrant an award of

punitive damages against [the defendant].  The [trial] court further found that the plaintiff's fee agreement with counsel was 30 percent of the first $6 million recovered and therefore the plaintiff was seeking $54,600 in attorney's fees.  The [trial] court agreed with the plaintiff that it could consider its fee agreement with counsel to determine its award of attorney's fees.  [The Appellate Court] conclude[d] that the [trial] court's award of attorney's fees did not constitute an abuse of its discretion, as it is consistent with the guidance provided by our Supreme Court." (Footnote omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 168, citing *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 268-70, 828 A.2d 64 (2003), and *Sorrentino* v. *All Seasons Services, Inc.*, 245 Conn. 756, 773-77, 717 A.2d 150(1998).

As set forth above, the court is tasked with determining the amount of attorneys fees and costs to be awarded as common law punitive damages, following the jury's award of attorneys fees and costs. Awarding attorneys fees under the terms of a

reasonable retainer agreement "protects the plaintiff's jury award by ensuring that the fees ordered are sufficient to cover the plaintiff's financial obligation, under the contingency fee agreement, to its attorney." *Schoonmaker* v. *Brunoli*, 265 Conn. at 210, 271 n.77 (2003). Based upon the court's review of the affidavit of Attorney James Horwitz and the agreement of the parties, the court finds that the terms of the plaintiffs' retainer agreements are reasonable.

"A trial court should not depart from a reasonable fee agreement in the absence of a persuasive demonstration that enforcing the agreement would result in substantial unfairness to the defendant." Schoonmaker 265 Conn. at 270 (quoting Sorrentino, 245 Conn. at 776). The defendants here urge the court to engage in such departure by awarding only nominal damages, essentially arguing that the size of the jury verdicts is punitive and serves to deter, and that the verdict already reflects the default sanction and is punishment enough. The court finds this argument unpersuasive. The law presumes that

the jury followed the law set forth in their instructions. See, e.g., Willow Springs Condo. Ass'n, Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 44 (1998) ("Absent clear evidence to the contrary, we assume that the jury acted in accordance with the charge."). The defendants also take the position that awarding more than nominal damages would serve a hardship on the defendants, including Free Speech Systems, LLC., which has filed for bankruptcy. The record does not support this conclusory claim of hardship with respect to Alex Jones, and the mere fact that Free Speech Systems, LLC. has filed for bankruptcy does not justify a nominal award of common law punitive damages. Thus, to the extent that the defendants argue that enforcing the retainer agreements would result in substantial unfairness to the defendants, the court is not persuaded. Additionally, the court rejects the defendants' due process argument for an award of nominal damages only, as on these facts, a common law punitive damages award limited to attorneys fees and costs pursuant to the terms of a reasonable retainer agreement

comports with due process. Simply put, there is no sound reason for the court not to fully compensate the plaintiffs for their financial obligations under their reasonable retainer agreements.

For the foregoing reasons, the court awards common law punitive damages as follows: As to Robert Parker, $40 million; as to David Wheeler, $18.33 million; as to Francine Wheeler, $18 million; as to Jacqueline Barden, $9.6 million; as to Mark Barden, $19.2 million; as to Nicole Hockley, $24.53 million; as to Ian Hockley, $27.2 million; as to Jennifer Hensel, $17.33 million; as to Donna Soto, $16 million; as to Carlee Soto Parisi, $22 million; as to Carlos Matthew Soto, $19.2 million; as to Jillian Soto-Marino, $22.93 million; as to William Aldenberg, $30 million; as to Erica Lafferty, $25.33 million; and as to William Sherlach, $12 million. Non-taxable costs are awarded to each plaintiff in the amount of $99,303.73, representing 1/15th of the plaintiffs' total claimed non-taxable costs of $1,489,555.94.

<u>Punitive Damages Pursuant to the Connecticut Trade Practices
Act (CUTPA), General Statutes § 42-110a et seq.</u>

General Statutes § 42-110g provides in relevant part: "(a)
Any person who suffers any ascertainable loss of money or
property, real or personal, as a result of the use or employment
of a method, act or practice prohibited by section 42-110b, may
bring an action . . . to recover actual damages. . . . *The court
may, in its discretion, award punitive damages* and may provide
such equitable relief as it deems necessary or proper."
(Emphasis added.)  "The language is clear and unambiguous; the
awarding of punitive damages is within the discretion of the
trial court."  (Internal quotation marks omitted.)  *Bridgeport
Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 139, 30 A.3d
703, cert. granted, 303 Conn. 904, 31 A.3d 1179 (2011) (appeal

withdrawn January 27, 2012), and cert. granted, 303 Conn. 905, 31 A.3d 1180 (2011) (appeal withdrawn January 26, 2012).[6]

For various policy reasons, punitive damages under CUTPA are determined by the court, not the jury. "It is reasonable to conclude that the legislature provided that a claim for punitive damages under CUTPA should be submitted to the trial court, and not the jury, because it believed that the court would be aware of the range of punitive damages that have been

---

[6] The Supreme Court has held that punitive damages awarded pursuant to CUTPA are separate and distinct from awards of attorney's fees. "[T]he legislature did not intend to limit punitive damages awards pursuant to § 42-110g (d) to 'the expenses of bringing the legal action, including attorney's fees, less taxable costs. . . . Section 42-110g (a) expressly authorizes the trial court to award punitive damages in addition to the award of attorney's fees authorized by § 42-110g (d). Nothing in the language of the statute suggests that punitive damages are the same as attorney's fees, consistent with the common-law rule. If the legislature had intended to impose such a limitation, it presumably would have done so either by authorizing the trial court to award double attorney's fees or by authorizing it to award double punitive damages. The fact that the legislature enacted two distinct provisions indicates that it contemplated two distinct types of awards. . . . Moreover, as we have indicated, both this court and the Appellate Court have repeatedly, over the course of many years, upheld multiple damages under the punitive damages provision of CUTPA . . . and the legislature has never amended the statute to provide otherwise." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 449-50, 78 A.3d 76 (2013).

awarded for similar CUTPA violations, that it would be less likely to be swayed by appeals to emotion and prejudice, and, therefore, it would be less likely to render an award that was an outlier. Cf. *Gill* v. *Petrazzuoli Bros., Inc.*, [10 Conn. App. 22, 34, 521 A.2d 212 (1987)] ("[t]o foreclose the possibility of prejudice entering the decision-making process, the award of attorney's fees [under CUTPA] has been placed in the hands of the court" instead of jury); see also *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, [273 Conn. 634, 673-74, 872 A.2d 423] (*Zarella, J.*, dissenting) (legislature vested authority to make punitive damages award under CUTPA in court instead of in jury to safeguard against risk of excessive awards) [cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005)]. Accordingly, the concerns that underlie the common-law limitation on punitive damages have far less weight when the claim is submitted to the trial court instead of the jury." *Ulbrich* v. *Groth*, 310 Conn. 375, 451-52, 78 A.3d 76 (2013).

"Unlike punitive damages under Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) (punitive damages aimed at deterrence and retribution); *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 509, 656 A.2d 1009 (1995) (CUTPA remedy not limited to compensatory damages; court may award punitive damages and attorney's fees); *Lord* v. *Mansfield*, 50 Conn. App. 21, 27, 717 A.2d 267 (punitive damages intended not merely to deter defendant but to deter others from committing similar wrongs), cert. denied, 247 Conn. 943, 723 A.2d 321 (1998) [overruled on other grounds by *Hylton* v. *Gunter*, 313 Conn. 472, 97 A.3d 970 (2014)]; *Lenz* v. *CNA Assurance Co.*, 42 Conn. Sup. 514, 630 A.2d 1082 (1993) (financial circumstances of defendant relevant and material to deterrent of noncommon-law punitive damages)." *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 140.

"Punitive damages [under CUTPA] must be proven by a preponderance of the evidence." Id., 141. "[W]hen considering punitive damages, the evidence must be relevant, or directly related to the plaintiff's ascertainable loss." Id., 143 (rejecting plaintiff's argument that court should have considered evidence of misconduct unrelated to plaintiff's damages in calculating punitive damages award under CUTPA). "[T]he nature of the [defendants'] conduct, the actual harm to the plaintiff and the harm the [defendants] intended to inflict are all relevant considerations." (Internal quotation marks omitted.) Id., 144. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 446. "As compared to punitive damages under

Connecticut common law, punitive damages under CUTPA are focused on deterrence, rather than mere compensation. . . . Consequently, the defendants' financial condition is a relevant consideration. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages . . . then the financial standing of the party against whom damages are sought becomes relevant and material." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 144.

Our appellate courts have discussed several specific approaches to the calculation of appropriate punitive damages awards pursuant to CUTPA. "[T]he Appellate Court has observed that awarding an amount equal to the plaintiff's actual damages is a recognized method for determining punitive damages under CUTPA. . . . It is not an abuse of discretion to award punitive damages based on a multiple of actual damages. . . . [C]ourts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages. . . . Indeed, it

appears that in terms of consistency or frequency, punitive damages awards under CUTPA are generally equal to or twice the amount of the compensatory award." (Citations omitted; internal quotation marks omitted.) Id., 144-45.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 452-53, the Supreme Court discussed considerations applicable to common law awards of punitive damages before turning to a discussion of appropriate considerations pertaining to such awards under CUTPA. It explained: "In [*Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)], the defendant challenged the size of a punitive damages award that the jury had rendered against it under maritime law. Id., 489. The court concluded that the limits on such awards fell 'within a federal court's jurisdiction to decide in the manner of a common law court . . . .' Id., 489-90. After reviewing the history of punitive damages under the common law and the standards and limitations that various jurisdictions have applied to them, the court in *Exxon Shipping Co.* observed that several studies

had been done to determine 'the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards.' Id., 512. 'These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases . . . without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases . . . without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable

outlier cases that call the fairness of the system into question
are above the median . . . . Accordingly, given the need to
protect against the possibility (and the disruptive cost to the
legal system) of awards that are unpredictable and unnecessary,
either for deterrence or for measured retribution, we consider
that a 1:1 ratio, which is above the median award, is a fair
upper limit in such maritime cases.' . . . Id., 512-13." *Ulbrich*
v. *Groth*, supra, 310 Conn. 452-53.

In light of the differences between punitive damages claims
under CUTPA and the punitive damages claims under maritime law
at issue in *Exxon Shipping Co.*, the court in *Ulbrich* declined
to adopt the same a one-to-one ratio of punitive damages to
compensatory damages as an upper limit for punitive damages in
CUTPA cases. Id., 453-54. Nevertheless, the court adopted the
factors that were considered by the United States Supreme Court
in *Exxon Shipping Co.* in determining whether the amount of
punitive damages awarded pursuant to CUTPA is excessive. The
court explained that "in determining whether a punitive damages

award pursuant to § 42-110g (a) is so excessive as to constitute an abuse of discretion, the court should consider the factors that the court in *Exxon Shipping Co*. discussed.  These include the 'degrees of relative blameworthiness,' i.e., whether the defendant's conduct was reckless, intentional or malicious; *Exxon Shipping Co*. v. *Baker*, supra, 554 U.S. 493; whether the defendant's '[a]ction [was] taken or omitted in order to augment profit'; id., 494; see also id., 503 (some courts consider whether wrongful conduct was profitable to defendant); whether the wrongdoing was hard to detect; id., 494; whether the injury and compensatory damages were small, providing a low incentive to bring the action; id.; and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 454-56.

"[I]n determining the amount of punitive damages, the court may consider that a frequent or consistent range of punitive damages awarded under CUTPA is a ratio that is equal to or twice the amount of the compensatory damages, and that particularly when it is claimed that the award should exceed this range, the award ordinarily should be premised on aggravating factors that are identifiable and articulable. . . . [W]hen high punitive damages are being claimed, a consideration of the normative range of punitive awards and an identification of articulable, aggravating factors supporting an award outside this range are wholly consistent with a reasonable exercise of the court's

discretion to award punitive damages that are rational, predictable and consistent." (Internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 146.

In awarding punitive damage awards that exceed the normative range, the court should, therefore, identify "the factors that militate in favor of a high, rather than a low, award of punitive damages . . . ." See id. (noting that trial court, as directed by *Exxon Shipping Co.*, had identified such factors and concluding that court had not abused its discretion in awarding punitive damages in amount six times that of compensatory damage award). The court also may consider "the actual loss suffered by the [plaintiffs] and [whether] the compensatory damages awarded the [plaintiffs] militates against a high punitive damage award." Id., 146–47.

In *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147–49, the Appellate Court explained that the trial court "found that among the more vexing, competing

considerations presented to the court in determining the amount
of the punitive award in this case is, on one hand, the issue
of deterrence, particularly in light of the [defendants']
financial net worth, and on the other hand, the issue of the
overall reasonableness and rationality of a high punitive award
in light of the amount of the plaintiff's actual recovery and
the considerations highlighted by [*Exxon Shipping Co.* v. *Baker*,
supra, 554 U.S. 471] . . . [and] note[d] that because neither
compensation nor enrichment is a valid purpose of punitive
damages, an award should not be so large as to constitute a
windfall to the individual litigant. . . .

"The court also was mindful that, in addition to statutory
factors bearing on its discretion, a broader, threshold
consideration is that high punitive awards may implicate
constitutional concerns.   In *Bristol Technology, Inc.* v.
*Microsoft Corp.*, 114 F. Sup. 2d 59 (D. Conn. 2000), vacated on
other grounds, 250 F.3d 152 (2d Cir. 2001), the District Court
stated 'the United States Constitution imposes a substantive

limit on the size of punitive damages awards. . . . This is because [p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Still, [i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award [of punitive damages] can fairly be categorized as grossly excessive in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process].' . . . Id., 86.

"To satisfy federal due process concerns, the United States Supreme Court has 'instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties

authorized or imposed in comparable cases.'   *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 418. . . .

"The United States Supreme Court has 'been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. . . . We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.   Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.   In [*Pacific Mutual Life Ins. Co*. v. *Haslip*, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)], in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. . . . We cited that 4-to-1 ratio again in [*BMW of North America, Inc*. v. *Gore*, 517 U.S. 559, 581, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)].   The Court further

referenced a long legislative history, dating back over 700
years and going forward to today, providing for sanctions of
double, treble, or quadruple damages to deter and punish. . . .
While these ratios are not binding, they are instructive.  They
demonstrate what should be obvious: Single-digit multipliers
are more likely to comport with due process, while still
achieving the State's goals of deterrence and retribution, than
awards with ratios in range of 500 to 1 . . . .

   "'Nonetheless, because there are no rigid benchmarks that
a punitive damages award may not surpass, ratios greater than
those we have previously upheld may comport with due process
where a particularly egregious act has resulted in only a small
amount of economic damages. . . . The converse is also true,
however.  When compensatory damages are substantial, then a
lesser ratio, perhaps only equal to compensatory damages, can
reach the outermost limit of the due process guarantee.  The
precise award in any case, of course, must be based upon the
fact[s] and circumstances of the defendant's conduct and the

harm to the plaintiff.' . . . *State Farm Mutual Ins. Co.* v. *Campbell*, supra, 538 U.S. 424-25." (Citation omitted; internal quotation marks omitted.) *Bridgeport Harbour Place I, LLC* v. *Ganim*, supra, 131 Conn. App. 147-49.

In *Ulbrich* v. *Groth*, supra, 310 Conn. 446-47, the Supreme Court held that the trial court's award of punitive damages under CUTPA was not an abuse of discretion where the trial court reasonably could have found that the defendant's conduct was reckless. Id. (jury reasonably could have found that defendant bank's failure to inform plaintiffs that personal property located at property at time of auction was not included in sale "was not merely negligent, but involved a conscious decision to disregard acknowledged business norms" and gave rise to "substantial and unjustifiable" risk that plaintiffs would act on misleading information). Specifically, the court explained that "the trial court concluded that the best characterization of the bank's conduct . . . is that it proceeded with reckless or wilful ignorance and indifference to the risks that its

conduct posed to prospective bidders; that its conduct was inherently deceptive to bidders; that its effort to maximize the bids by including the business property as part of the auction was beneficial to the bank's interests; and that the bank had a high net worth.  On the other hand, the court also recognized that the jury's compensatory damages award was not small, that the bank's conduct was not of a criminal nature and that the punitive damages award should not constitute a windfall to the plaintiffs.  In addition, we note that there was no evidence that the bank's conduct constituted anything other than an isolated incident."   (Internal quotation marks omitted.) Id., 456.

"Although the trial court's punitive damages award in [*Ulbrich*] undoubtedly was a large one, especially in light of the large size of the compensatory damages award, [the Supreme Court could not] conclude that the award constituted a manifest abuse of discretion or that an injustice was done. . . . Rather, [the Supreme Court concluded] that the trial court reasonably

could have concluded that the bank's reckless and deceptive
conduct, together with the fact that the motive for the conduct
was to increase the profitability of the auction to the bank,
the fact that the bank has a very high net worth and the fact
that there is an established practice in this state of awarding
multiple damages for CUTPA violations, warranted the amount of
the award. Accordingly, [the Supreme Court concluded] that the
size of the trial court's punitive damages award [which was
three times the compensatory award] did not constitute an abuse
of discretion."   (Citation omitted; footnote omitted.)   Id.,
456-57.

Here, the material allegations of the complaints, which
have been established by virtue of the defaults, entitle the
plaintiffs to an award of CUPTA punitive damages. In support of
their claim for CUTPA punitive damages, the plaintiffs, in their
briefs, support each Ulbrich factor with specific citations to
the record. The defendants, in taking the position that there
should be either no award of CUTPA punitive damages, or only a

nominal award, advance some of the same arguments raised in their opposition to a common law punitive damages award, arguing that the verdict reflects the nature of the plaintiffs' arguments at trial, that the future deterrent value of the verdict overlaps with the function of a punitive damages award under CUPTA, that any award beyond a 1:1 ration violates due process, that any award in excess of $1.3 billion serves no lawful purpose, and that the record is devoid of evidence regarding the defendants' financial resources such that the court cannot properly determine an amount of punitive damages necessary for deterrence.

In considering whether the defendants' actions were taken in order to augment profits, the court finds that despite the defendants' abject failure to meet their obligations to fully and fairly comply with discovery—and despite the defendants' failure to produce a knowledgeable corporate representative armed with sufficient information-the plaintiffs clearly established that the defendants' conduct was motivated by

profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.

With respect to whether the wrongdoing was hard to detect, the defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.

In addressing the size of the injuries and compensatory damages awards, and low incentive to bring the action, the court

concludes that despite the magnitude of the injuries and
ultimate outcome, there was a low incentive to bring and
maintain an action like this. The road to reach a verdict here
was a tortuous one, involving an unusual number of appeals, an
extraordinary number of court filings, and numerous forays into
federal court including bankruptcy court. Moreover, the trial
record establishes that the defendants remain in the unique
position of having-and continuing to utilize-an immense media
platform and audience to continue to target the plaintiffs, as
well as mocking the plaintiffs' attorneys, the court, and the
very jury that they selected. It is, quite simply, unprecedented
in American jurisprudence, and the court reaches the inescapable
conclusion that despite the magnitude of the harms caused to
the plaintiffs, there is little incentive to bring an action
like this against defendants such as these defendants, who have
continued to use their platform to attack.

With respect to deterrence, the defendants' financial
resources, and whether the award would financially destroy the

defendants, the court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.

Finally, the court turns to the most important consideration--the degrees or relative blameworthiness, that is, whether the defendants' conduct was reckless, intentional, or malicious. The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors." The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the

plaintiffs.   This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

The court recognizes that generally speaking, an award of punitive damages under CUTPA is equal to or double the amount of the compensatory award. Here, the court, having considered all the pertinent factors under the law as well as the substantial nature of the compensatory damages award, finds that a lesser ratio is appropriate. Having considered the factors in light of the record before the court, the court awards the sum of $10 million in CUTPA punitive damages to each of the fifteen plaintiffs.


Conclusion

In conclusion, the court awards common law punitive damages for attorneys fees in the total amount of $321,650,000.00 and

costs in the total amount of $1,489,555.94, and awards CUTPA
punitive damages in the amount of $150,000,000.00.


<u>421277</u>

<u>Barbara N. Bellis</u>