# EXHIBIT 25

```
1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2   ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

3   v.                      :  AT WATERBURY, CONNECTICUT

4   ALEX EMERIC JONES       :  SEPTEMBER 13, 2022
    ..............................................................
5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

7   v                       :  AT WATERBURY, CONNECTICUT

8   ALEX EMERIC JONES       :  SEPTEMBER 13, 2022
    ..............................................................
9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10  WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

11  v                       :  AT WATERBURY, CONNECTICUT

12  ALEX EMERIC JONES       :  SEPTEMBER 13, 2022

13          BEFORE THE HONORABLE BARBARA BELLIS, JUDGE

14  VOLUME II OF III
    WITNESS:  WILLIAM ALDENBERG  BEGINNING AT 12:42 to 3:54
15
    A P P E A R A N C E S:
16

17     Representing the Plaintiffs:
           ATTORNEY CHRISTOPHER MATTEI
18         ATTORNEY ALINOR STERLING
           ATTORNEY JOSHUA KOSKOFF
19         ATTORNEY MATTHEW BLUMENTHAL

20

21
       Representing the Defendant:
22         ATTORNEY NORMAN PATTIS

23
                            RECORDED BY:
24                          Darlene Orsatti
                            Janet Orozco
25                          TRANSCRIBED BY:
                            Linda Coon, RPR
26                          Court Monitor/Court Reporter
                            400 Grand Street
27                          Waterbury, CT   06702
```

```
1              THE COURT:  You may call your first witness.
2              ATTY. MATTEI:  Thank you, Your Honor.
3               The plaintiffs call Bill Aldenberg.
4              THE COURT:  Very well.
5               Good afternoon, sir.  Just watch your step.
6              THE WITNESS: Yes, Your Honor.
7              THE COURT:  Make yourself as comfortable as you
8         can.
9              THE WITNESS: Yes, Your Honor.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
```

```
1    W I L L I A M   A L D E N B E R G.

2       having been called as a witness, was duly sworn,

3    testified as follows:

4              THE WITNESS: Yes, sir.

5              THE CLERK:  You may be seated.

6              And, sir, I just need you to spell your --

7         state your name, spell your last name for the record,

8         and the town in which you live.

9              THE WITNESS:  Name is William Aldenberg,

10        A-l-d-e-n-b-e-r-g, and I live in Sturbridge,

11        Massachusetts.

12             THE CLERK:  Thank you.

13             THE COURT:  All right, sir.  I see you brought

14        your own water, otherwise I would offer.  You could

15        always refill if you need.  There should be -- is

16        there a pitcher down there?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Yeah.  So, help yourself at any

19        time.

20             And you may inquire whenever you are ready,

21        Counsel.

22             ATTY. MATTEI:  Thank you, Your Honor.

23   DIRECT EXAMINATION BY ATTY. MATTEI:

24   Q   And good afternoon, Bill.

25   A   Good afternoon.

26   Q   Bill, I just wanted to, just to orient the jury, am I

27   correct that on December 14, 2012, you were a member of the
```

1    FBI SWAT Team in Connecticut that responded to the Sandy

2    Hook School?

3        A    Yes, sir.

4        Q    And you are also a plaintiff in this case?

5        A    Yes.

6        Q    Okay.  Bill, why don't we start by having you tell

7    the jury a little bit about yourself.

8                Oh, and I should also say, you are not here in

9    your capacity as an FBI agent; correct?

10       A    No.  To clarify, people keep saying I'm retired.  I'm

11   not retired.

12       Q    You are not retired?

13       A    No, sir.

14       Q    Right.

15       A    I'm here in my personal capacity, but I am an FBI

16   agent, but I'm here in my personal capacity.

17       Q    Okay.  And I just wanted to make that clear.

18               So, please, would you please tell the jury a

19   little bit about yourself, both your personal background and

20   your professional background?

21       A    Yes, sir.  I -- my name is Bill Aldenberg.  I

22   currently work for the FBI.  I grew up in north of Boston in

23   a town called Lynnfield.

24               ATTY. PATTIS:  Judge, I'm having a hard time

25          hearing the witness.

26       A    Certainly.

27               I grew up in a town called Lynnfield, north of

1    Boston.   I went to Norwich University.   I graduated in '91

2    with a degree in criminal justice, was commissioned in the

3    Army Reserve.   Spent 14 years in the Army Reserve as an

4    infantry officer.   I, in 1998, went to the Police Academy

5    and became a police officer in my Hometown, and in 2002,

6    July 2002, I went to the FBI academy, Quantico, Virginia and

7    became an FBI agent.   I'm married.   My wife and I have been

8    married for 24 years, and I have three children.   Well, my

9    son is in graduate school, a daughter that's in college, and

10   my son -- my youngest is in seventh grade.

11       Q    I can see that just taking the stand is emotional for

12   you today?

13       A    Yes, sir.

14       Q    We can take a break at any time that you would like.

15       A    No.   We are good.   Thank you.

16       Q    You testified many times as an FBI agent in the past;

17   right?

18       A    Yes.   More than I could count.   Testified multiple

19   trials, multiple grand juries, state trials, things like

20   that.

21       Q    But you've never testified in a setting like this?

22       A    Not in my personal capacity, no, sir.

23       Q    How long have you been married, Bill?

24       A    Twenty-four years.

25       Q    You said you joined the FBI in 2002, you were a

26   police officer before that?

27       A    Yes.

1    Q    Why did you decide to go into public service?

2    A    Like a lot of the guys -- like a lot of us say ever

3    since I was a kid, I wanted to be a police officer.  And

4    when I graduated in '91, there weren't a lot of police jobs

5    like there are today and, so, I did some private eye work

6    for a while and still couldn't get a police job, and so then

7    I decided to go to law school, and I went to law school.  I

8    graduated law school in '98 just before I went into the

9    police academy.

10   Q    Did you think that getting a law degree would help

11   you to be able to get into the police department?

12   A    That's what I was hoping.  Yes.

13   Q    And have you found your career in public service

14   fulfilling, Bill?

15   A    Yes.  Yeah.

16   Q    Tell me about that?

17   A    I've had the opportunity to work a number of

18   investigations over my career, and wide ranging:  Gangs,

19   gang cases in Hartford for several years, and drug cases.

20   I've had a number of successful public corruption cases, and

21   civil rights investigations.  I've had a wide range of

22   experience in the FBI.  They've treated me very well.

23   Q    Have you considered it part of your own personal

24   mission to do what you could to protect the public?

25   A    Yes.  Yes, sir.

26   Q    Is that why you tried to become a member of the FBI

27   SWAT Team?

 1      A    Yes.

 2      Q    Can you tell the jury a little bit about that, what

 3  that entails?

 4      A    Sure.  2004, I tried out for the FBI SWAT Team in New

 5  Haven.  You have to meet certain qualifications, physical

 6  qualifications, tactical, firearms.  I made it through the

 7  training and I've been on the FBI New Haven team from 2004

 8  to 2019.

 9      Q    And as part of the FBI, and in particular, as part of

10  the SWAT Team, can you tell the jury a little bit about how

11  you consider the importance of your own personal integrity

12  and professionalism in how you carry out your job?

13      A    Do you think you could clarify that, sir?  Do you

14  know --

15      Q    Yeah.  I mean, obviously, as an FBI agent, you have a

16  lot of responsibility as a SWAT Team member?

17      A    Yes, sir.

18      Q    You are taking on the responsibility?

19          ATTY. PATTIS:  Objection.  Leading.

20          THE COURT:  Sustained.

21          ATTY. MATTEI:  Sorry.  I was just trying to

22          clarify, Your Honor, but --

23      Q    Tell the jury the role that integrity and

24  professionalism plays both in your job as an FBI agent and

25  as a SWAT Team member?

26      A    As FBI agent, if you don't have integrity, you can't

27  do your job.  It would be hard.  Everything you do is based

1   on our integrity.  You have to have integrity to even

2   survive in the job.

3      Q   Bill, on the morning of December 14th, 2012, where

4   were you first thing in the morning?

5      A   It was a SWAT training day.  We had -- we are

6   required to train so many days a month.  That particular

7   day, was a SWAT training day.  We were at the range in

8   Middletown, Connecticut, so I would have gone from my

9   residence directly to the range.

10     Q   And when you say the range, you are talking about

11  firearms training range in Middletown?

12     A   Yes, sir.

13     Q   Okay.  And that's a state police facility that's also

14  used by the FBI for them?

15     A   Yes.

16     Q   Were other members of your team there that morning?

17     A   It's actually at the Middletown Police facility

18  that's used by the FBI, sir.

19     Q   Oh, okay.

20     A   But, there are -- there were other -- yes, there were

21  other FBI team members there that morning.

22     Q   How many?

23     A   Altogether, I would say approximately nine, maybe

24  ten.

25     Q   Did you have a doctor who was also part of your team

26  there?

27     A   Yes.  We have a doctor assigned to the team.  He's a

1    doctor, currently he works for UCONN Medical.  As part of

2    his job, he's assigned to tactical teams in the state.

3        Q    And why does a doctor get assigned to the SWAT Team?

4        A    Because the missions you do are extremely dangerous.

5    For example --  you are arresting the most violent people or

6    the most dangerous situations where something really bad

7    could happen.  So, we have a doctor on the team in case

8    something happens to one of us or to someone in the building

9    or a residence that we were entering.  You know, it's

10    very -- it gives you a sense of calmness to have an

11    emergency doctor with you when you are hitting a door, and,

12    you know, people could possibly get shot or killed.

13        Q    That morning when you were at the range in

14    Middletown, did your team receive a call to respond to a

15    location?

16        A    The team doctor received a call from what I believed

17    to be the medical.

18                ATTY. PATTIS:  Objection.  Speculation, hearsay.

19                ATTY. MATTEI:  I'm not offering anything for the

20        truth, Your Honor we are offer --

21                THE COURT:  Overruled.

22                ATTY. MATTEI:  Thank you.

23        Q    You can continue, Bill.

24        A    The team doctor received a call from one of the

25    paramedics from the state police team.  There was something

26    about -- something in Newtown.

27        Q    That call came into the team doctor?

1    A    Yes.

2    Q    As a result of that call, did you and your team

3 understand that you were to go to Newtown?

4    A    Yes.  Basically it was some type of active shooter

5 situation at a school in Newtown.  And I didn't work that

6 end of the state, so my first thing was, well where is

7 Newtown, because I didn't even -- because I worked the

8 Hartford area, the Meriden area, Bridgeport covers Newtown.

9 And, yes, paramedics needed Rich to come to Newtown.

10    Q    Rich is the doctor?

11    A    Yes.  And Rich has a personal car, he doesn't have an

12 emergency vehicle.

13    Q    Okay.

14    A    So, at some point, it was decided by my bosses or

15 someone.

16         ATTY. PATTIS:  Objection.  Speculative,

17         nonresponsive at this point.

18    A    No, I --

19         THE COURT:  Sustained.

20    Q    It's okay.  I'll take it step-by-step.

21         I take it that as a result of that call, your

22 team was dispatched down to the active shooter situation in

23 Newtown?

24    A    Yes, sir.

25    Q    Okay.  Now, obviously, you weren't expecting that

26 that morning; correct?

27    A    No, sir.  No.  We were expecting to do training at

1    the range.

2        Q    Okay.  For reasons that will become clear to the jury

3    later, I want you to tell them about what your gear

4    situation --

5                ATTY. PATTIS:  Objection to the narrative about

6            the purpose of the question, Judge.

7                THE COURT:  Sustained.

8        Q    What was your gear situation that day, Bill?

9        A    So, I had just received, either that day or the day

10   or so before, a new vest.  They update our vests every

11   couple years or however often because the material breaks

12   down.  So, I received a new vest.  I was in the range house

13   which is a small room with multiple folding tables.  I have

14   my stuff laid out on the folding tables, and I was moving my

15   equipment from my old vest to my new vest.

16       Q    And when you say your equipment, would that include,

17   for example, a patch identifying you as an FBI SWAT Team

18   member?

19       A    Yes, sir.

20       Q    Would it include --

21               ATTY. PATTIS:  Objection.  Leading, Judge.

22               THE COURT:  It's preliminary, Attorney Pattis.

23                Overruled.

24       Q    Would it include communication systems like a radio?

25       A    Yes.

26       Q    What else?

27       A    Medical kit, ammo pouches, flashbang pouches,

insignia, flashlight holder, you know, different pouches for different things.

Q    When you got the call to report down to the active shooter, how quickly did you guys get out of there?

A    Well, we probably left the range within less than five minutes if not quicker.

Q    Did you have a chance to move over all of your gear to your new vest?

A    No.  I just took my -- grabbed my stuff and threw it in the trunk of my bucar(PHONETIC) bureau vehicle.

Q    Now, do you recall whether you realized at the time you were initially called, or some point thereafter, that the location you were responding to was a school?

A    I'm pretty certain that when we were leaving the range I knew we were going to a school.

Q    How did you all get down there?

A    We had a caravan of four or five vehicles, maybe six.

        ATTY. MATTEI:  Can we pull up Exhibit 402 which has been admitted as full, please?

        ATTY. PATTIS:  What was the number, sir?

        ATTY. MATTEI:  402.

        ATTY. PATTIS:  Thank you, sir.

        ATTY. MATTEI:  Can you just blow that up, please, Pritika, if you wouldn't mind?

Q    Special --  I'm sorry, Bill, it's a little bit hard to see here but, obviously, you see that this map depicts the area from Meriden down to Newtown?

```
 1       A    Yes.

 2       Q    Which route did you all travel to get down to Newtown

 3  that morning?

 4       A    We left the range and got onto 691.

 5            ATTY. MATTEI:  May I approach, Your Honor?

 6            THE COURT:  You may.

 7       Q    691 here between Middletown and Meriden?

 8       A    Yes.  691 to -- we took 691 all the way to 84 and

 9  then 84.

10       Q    Through Waterbury?

11       A    Through Waterbury.  Yes, sir.

12       Q    Okay.

13       A    To Exit -- well, Exit 10.  That's what it was at the

14  time, I don't know what it is now.

15            ATTY. MATTEI:  If you can pull that up, please,

16       Pritika?

17            Thank you.

18       Q    Exit 10 off of I-84 into Newtown?

19       A    Yes, sir.

20       Q    How fast were you traveling to get down there?

21            ATTY. PATTIS:  Objection.  Relevance, Judge.

22            THE COURT:  Overruled.

23       A    Um, fast.  Fast.

24       Q    Did you have the sirens on?

25       A    Yes.

26       Q    Lights?

27       A    Yes.
```

```
 1      Q    When you got off the exit to Route 10, am I correct
 2   at that point you were traveling to Sandy Hook Elementary
 3   School?
 4      A    I'm sorry, sir?
 5      Q    You were traveling to Sandy Hook Elementary School?
 6      A    Yes, sir.
 7               ATTY. MATTEI:  Can we pull up Exhibit Number
 8           401, please?
 9               Just if you could --
10      Q    Do you see the intersection there, Bill?
11      A    Yes.
12      Q    Do you recognize this intersection?
13      A    Yes.
14      Q    What's this intersection of?
15      A    It's -- it's the -- right there on the right is the
16   access road to the school.
17      Q    So, were you and your team coming this direction on
18   Riverside Drive?
19      A    Yes.
20      Q    Went to school up this way?
21      A    Yes, sir.
22      Q    What's this building here?
23      A    I believe it's the firehouse.
24               ATTY. MATTEI:  Pull up Exhibit Number 399,
25           please?
26               Thank you.
27      Q    If you are looking here, Bill, Exhibit 399, do you
```

1    recognize what's depicted here?

2        A    Yes, sir.

3        Q    The building you just referred to as the firehouse,

4    is that this building here in the upper left quadrant?

5        A    Yes.

6        Q    Coming down through the access road here?

7        A    Yes.

8        Q    To Sandy Hook School?

9        A    Yes, sir.

10       Q    Am I pointing here to the front of the school?

11       A    Yes.

12       Q    Do you know what time you arrived?

13       A    Within 30 minutes of when they called.  We were

14   there, I think within 30 to 40 minutes of the shooting.

15       Q    As you approached the intersection of Riverside and

16   Dickinson, the access drive up to the school, do you know

17   what you saw there?

18       A    That's where coming up the access road after we got

19   our gear?

20       Q    No, no, no.  When you were approaching the

21   intersection at the firehouse?

22       A    Oh.  I just remembered there was a lot of cars and a

23   lot of people.

24       Q    And what did you all do next?

25       A    The three -- the four of us that pulled our vehicles

26   in at the bottom of the access road by the firehouse.

27       Q    Okay.  And then what?

1      A    We geared up and we were waiting for directions on

2   what to do.  We were waiting to hear from our team leader.

3   They instructed us to go up the access road to the school.

4      Q    When you say you geared up, that would include, I

5   take it, all your -- the tactical equipment you had?

6      A    Yes, sir.

7      Q    Okay.  Rifles?

8      A    Yes, sir.

9      Q    Helmets?

10      A    Yes.

11      Q    Kevlar vests?

12      A    Yes.

13      Q    Did you have all the equipment you would normally

14   have on at the time?

15      A    There was stuff missing from my vest because I went

16   with my old vest.  I just grabbed the old vest and that's

17   what I used.

18      Q    Okay.  And as you approached the school, tell me what

19   happened next?

20      A    After we -- the four of us FBI agents, we got our

21   gear, we moved up the access road to meet the rest of the

22   team.  The rest of the team had pulled up to the parking

23   lot.

24      Q    Okay.  Did you see any other law enforcement and

25   personnel that you recognized as you approached the school?

26      A    So, as first as -- excuse me.  As coming up the road,

27   I see a uniformed trooper and, again, I wasn't really sure

```
1   what was going on.  I just know that whatever it was, there
2   had been a shooting.  And I came up the road, and there was
3   a uniformed Connecticut trooper who was being led away by
4   his co-worker or someone else and he was, like, in
5   hysterics.  And what the -- what's going on?  In our
6   world --
7               ATTY. PATTIS:  Objection.
8                That's nonresponsive at this point, Judge.
9               ATTY. MATTEI:  That's not nonresponsive,
10          actually.
11              THE COURT:  Overruled.
12      A    That's unusual.  Most law enforcement guys are --
13  law enforcement people are, you know, they don't get too
14  emotional and I just -- I saw that and I was, like, what's
15  going on?  What's happened?  And then we got passed him and
16  we got to the front of the school and I saw another state
17  trooper that I -- that I worked cases with over the years
18  and I knew pretty well.  And he saw me, and I said, Dave,
19  what's going on?  He says, oh, it's bad, or something
20  that -- paraphrasing.  It was bad.  And --
21      Q    I'm going to stop you right here, Bill.  Let me just
22  stop you for a minute.
23              THE COURT:  Attorney Mattei, might this be a
24          good time to break?
25              ATTY. MATTEI:  This would be a fine time, Judge,
26          thank you.
27              THE COURT:  Okay.
```

1          So, we will take the luncheon recess now.  One

2     hour.

3          It is imperative that you abide by all the

4     rules of juror conduct that I told you.

5          For those of you -- I don't know if it's

6     raining anymore, but for those of you who are

7     venturing outside of the building, make sure that you

8     take the route that Mr. Ferraro tells you about and

9     you'll avoid, of course, anyone connected with this

10    case or the media.

11         Mr. Ferraro will collect your note pads and

12    writing utensils, and he will give them back to you

13    when we start again at 2 p.m.

14         So, we will take the recess.

15         (JURY EXITS).

16         (LUNCH RECESS).

17         (2:00 IN SESSION).

18         THE COURT:  Good afternoon.  Please be seated.

19         ATTY. PATTIS:  Judge, two brief issues?

20         I didn't want to object because I couldn't

21    think of a one-word objection, but I would object to

22    the continuously referring to the plaintiffs by their

23    first name.  I think it's unduly prejudicial, it

24    curries favor, and creates a false sense of intimacy.

25    They are not going to call Mr. Jones, Alex, I

26    suspect.

27         THE COURT:  I think that I heard you call him

1        Alex, didn't I, during your opening?

2              ATTY. PATTIS:  I did.

3              THE COURT:  Right.  So, I will overrule your

4        objection.

5              ATTY. PATTIS:  Are they going to be directed to

6        refer to Mr. Jones as Alex?

7              THE COURT:  Excuse me, Mr. Pattis?

8              ATTY. PATTIS:  My question was, is the plaintiff

9        going to be directed to refer to Mr. Jones as Alex?

10             THE COURT:  This is not a question and answer

11       situation.  Your objection referred to Mr. Mattei

12       referring to his clients by their first name.  That's

13       what I ruled on.

14              Please be seated.

15             ATTY. PATTIS:  All right.  May I have a

16       housekeeping matter that's by agreement of the

17       parties?

18             THE COURT:  Yes.

19             ATTY. PATTIS:  Would the Court consider

20       permitting us to file our preliminary request to

21       charge on Monday the 19th rather than the 15th which

22       is the current order?  We have an agreement, if you

23       would.

24             THE COURT:  That's fine with me.

25             ATTY. STERLING:  Your Honor, we have no

26       objection here.

27             THE COURT:  That's fine.

```
 1              ATTY. PATTIS:  Thank you.

 2              THE COURT:  Are we all set to go.

 3              THE CLERK:  Yes.  The jury is down, Your Honor.

 4              THE COURT:  Okay.  Did you take care of the

 5         button -- the sticker on that one juror?

 6              THE CLERK:  Yes.  It was actually on her shirt.

 7         The sweater was covering it.

 8              THE COURT:  I didn't see it.  Okay, terrific.

 9              THE CLERK:  Yes.  No problem.  And I have some

10         with me in case we need them again.

11              THE COURT:  All righty.

12              (JURY ENTER).

13              THE COURT:  All right.  Welcome back.

14              Take your regular seat, or mix it up, as you

15         will.

16              And, counsel, stipulate that the entire panel

17         has returned?

18              ATTY. MATTEI:  Yes, Your Honor.

19              ATTY. PATTIS:  Yes, Your Honor.

20              THE COURT:  Mr. Ferraro is redistributing the

21         note pads.

22              Sir, you may resume the stand.

23              There you are.

24              And, of course, you remain under oath, as you

25         know.

26              THE WITNESS:  Certainly.

27              THE COURT:  Attorney Mattei, whenever you are
```

```
 1          ready.
 2                  ATTY. MATTEI:  Thank you, Your Honor.
 3  CONTINUED DIRECT EXAMINATION OF WILLIAM ALDENBERG
 4  BY ATTY. MATTEI:
 5      Q   Bill, when we left off, you were just describing your
 6  approach to the school?
 7      A   Yes.
 8      Q   Okay.  And I think after you were describing seeing
 9  some of the troopers who were coming down from the school,
10  you were about to talk about meeting up with the rest of
11  your team members.  Can you just continue from there,
12  please?
13      A   Yes, sir.
14                  So, once -- can you put the photo up?
15      Q   You want the photo up?  Yes.
16                  ATTY. MATTEI:  Let's put 399 back up, please?
17      A   Once we got to the --
18      Q   And just hold on one second, Bill.
19                  And if you could just try and keep your voice
20  up --
21      A   Yes.
22      Q   -- if you wouldn't mind?
23                  THE COURT:  I was going to say the same thing.
24          I just want to make sure that Attorney Pattis and
25          everyone can hear you, okay?
26                  THE WITNESS:  Yes, Your Honor.
27      A   So, we made our way up to the access -- up through
```

1    the access road to the front of the school, that's where I

2    saw the officer from the state police there that I've known

3    from past investigations.

4        Q   Okay.

5        A   He seemed to be -- so I had a brief conversation with

6    him and then our team leader brought our team together in

7    front of the school.

8            ATTY. MATTEI:  May I approach the screen, Your

9        Honor?

10           THE COURT:  You may.

11       Q   Just to remind the jury, this here, where I'm

12   directing your attention, that's the front area of the

13   school where you grouped up with your team leader and the

14   rest of your team?

15       A   Yes, sir.

16       Q   And when you gathered together, did you receive

17   orders for what you and your team were to do next?

18       A   Yes.  Yes, sir.

19           It was my understanding that we were going to

20   assist the state police SWAT Team with clearing the school.

21       Q   And were you aware at that time whether the active

22   shooter situation at that point was no longer ongoing?

23       A   Um, yes, sir.  It was my understanding at that point,

24   yes, sir, the active shooter, um -- yes.  It was done.  It

25   was over.  Yes, sir.

26           ATTY. MATTEI:  Your Honor, may I have one

27       moment, please?

```
 1                THE COURT:  Take your time.

 2                ATTY. MATTEI:  Thank you, Your Honor.

 3      Q   Bill, I am going to -- I'm going to ask you to

 4  describe --

 5                ATTY. MATTEI:  Well, let's pull up Exhibit

 6        Number 398, please?

 7      Q   Now, what we are seeing here, Bill, is the school but

 8  from the front entrance; right?

 9      A   Yes, sir.

10      Q   Okay.  And, so, now we are looking in the other

11  direction, and this is the front of the school; right?

12      A   Yes, sir.

13      Q   And as I'm pointing at here, this is the covered,

14  front entryway to the school?

15      A   Yes, sir.

16      Q   And can you just describe for the jury where you and

17  your team were located as you were about to enter the

18  school?

19      A   Do you want me to get up and point or do you want me

20  to --

21                We are to the left of the front entrance, sir.

22      Q   Here?

23      A   Yeah.  The left of the front entrance.

24                ATTY. MATTEI:  Can we show Exhibit 405, please?

25      Q   This is the front entrance of the school?

26      A   Yes, sir.

27      Q   On the left side of the photograph, adjacent to the
```

1    front entrance, do you see vertical windows going up to the

2    roof?

3        A    Yes, sir.

4        Q    I'm just going to get --  this area here, do you see

5    that?

6        A    Yes, sir.

7        Q    What area is that?

8        A    That's the first classroom.

9        Q    Describe for the jury your entrance to the school,

10    please?

11        A    Our team entered through that door and we met the

12    state police team in the lobby is what I recall.

13            ATTY. MATTEI:  Can we pull up Exhibit 406,

14        please?  And just zoom in on the -- just the front

15        entrance, please?  That's fine.

16        Q    Bill, do you see the window pane on the right side of

17    the entrance shattered with a hole through it?

18        A    Yes, sir.

19        Q    Was that the condition of that window when you

20    arrived and prepared entry to the school?

21        A    Yes, sir.

22        Q    Please describe the next action that you took?

23        A    Once we linked up with the state police team, our

24    team leader told us that we were going to search one side of

25    the school and the state police were going to search the

26    other side of the school.  We actually -- we had some state

27    police officers with our team.  So, one team was going to go

1   to the right, and one team was going to go to the left.  And

2   what we were looking for, you know, any survivors, anyone

3   hiding, things like that.

4      Q   Okay.

5              ATTY. MATTEI:  Can you pull out --  zoom out of

6          that photograph, please?  And just zoom in on the

7          right side of the photograph, if you wouldn't mind?

8      Q   Do you see, Bill, to the right there is a hallway

9   going back towards the rear of the school?

10     A   Yes.

11     Q   And your team, which direction were you ordered to go

12  in?

13     A   We went down that hallway to the right.

14     Q   Okay.

15     A   Down the right side to the right.

16     Q   And the other team went to the left?

17     A   Yes.

18     Q   And as you entered --

19             ATTY. MATTEI:  Can you pull out and zoom out of

20         that, please?

21     Q   The area just beyond the front door, is that the

22  lobby to the school?

23     A   Yes, sir.

24     Q   As you entered the front door and came through the

25  lobby, what did you see?

26     A   On the corner -- if you go through those double doors

27  there, the hallway goes to the left, and there were two

1    victims on the right on the corner or at the -- they were

2    sitting in the corner, two adult females.

3        Q    Did you come to learn that one of the women who were

4    laying there were the principal, Dawn Hocksprung, and the

5    school psychologist, Mary Sherlach?

6        A    Yeah.  I learned that within -- I learned that

7    before, I think, I left the school I learned it.

8        Q    But your team was to go to the right?

9        A    Yes.

10       Q    Okay.

11       A    Yes.

12       Q    And you had doctor -- the doctor with you; correct?

13       A    The doctor was with us.  I just don't know if he was

14   helping us, he wouldn't help us clear.  He will be there to

15   assist, you know, with injuries and stuff.  So, he wouldn't

16   have assisted with the clearing, but he certainly was, I

17   could tell you, he was in the school.

18       Q    Okay.  Did you observe other EMTs in the school as

19   you were there?

20       A    Later on, I saw at least two EMTs or firemen come out

21   with a -- they were Newtown firefighters in the hallway.

22               ATTY. MATTEI:  Can we pull up Exhibit 415,

23          please?

24               Okay.  And just zoom in on the diagram?

25               THE CLERK:  I'm sorry, Your Honor, I don't have

26          that as a full exhibit unless I missed something.

27               ATTY. MATTEI:  Why don't we take it down.

```
 1                  I know it's agreed upon.
 2                  ATTY. PATTIS:  Well, can I --  may I have a
 3            moment, Judge?
 4                  THE COURT:  Take your time.
 5                  THE CLERK:  It was not on the list we had this
 6            morning.
 7                  ATTY. PATTIS:  It's not, but I don't object.
 8                  THE COURT:  All right.  So, we'll mark it as a
 9            full exhibit.
10                  ATTY. MATTEI:  Thank you, Your Honor.
11       Q    Do you recognize this to be the layout of the school?
12   Do you see that, Bill?
13       A    Yes, sir, it is.
14       Q    And you see -- indicate here is the patio and the
15   lobby; right?
16       A    Yes, sir.
17       Q    And, so, when you came in with your team, I take it
18   that you came down this hallway to the right?
19       A    Yes.
20       Q    Can you describe for the jury that process, please?
21       A    We went -- there was a team on the right side that
22   cleared those rooms on the right, there was a team on the
23   left side that cleared the rooms on the left.  I recall
24   being on that right side team as we went down the hallway.
25       Q    And was this side of the hallway empty?
26       A    Yes.
27       Q    Did you go through each room with your team searching
```

1    for any survivors or anybody that might be hidden?

2        A    Yes, sir.

3        Q    Okay.  And describe for me how that process ended?

4        A    We were in a number of classes, and then I think the

5    last -- the last room I remember being in was a, what I

6    would call a boiler room.  Another agent and myself were in

7    this, you know, like a maintenance or boiler room, and we

8    were checking behind metal -- metal cabinet doors or metal

9    doors that opened up into pipes and stuff.

10       Q    And did you and your team satisfy yourselves that

11   this side of the school was just essentially empty, that

12   everybody had evacuated?

13       A    I just -- I know that the people in charge determined

14   that, yes, we had cleared that side.

15       Q    Okay.  Tell the jury what you did next?

16       A    We returned to the lobby and then, what I recall, is

17   that we went back out to the front of the school.

18       Q    Okay.  Continue.

19       A    And then at some point it was determined -- I'm

20   sorry.  I guess they had either found, like, one -- they had

21   found, like, an adult female or two adult females alive.

22   They were hiding somewhere is a, what I recall that they

23   were in, an office or something.  This was after --  not

24   where we had searched, and so they determined that they

25   wanted the whole process done again.  That these, either

26   staff members, or --  were hiding, obviously, hiding for

27   their lives and it was determined that they wanted the whole

1    place done again.

2        Q   So, did you and your team have to reenter the school

3    at that time?

4        A   Yes.  Along with the state police team.

5        Q   It was determined that your team this time would go

6    to the left; correct?

7        A   Yes, sir.

8            ATTY. MATTEI:  Can you pull up -- focus in on

9            the hallway to the left?  No.  I'm sorry.  Close to

10           the front parking lot here?

11           I'll help you.

12           Just zoom out of this, please, Pritika.  Just

13           on this area here, please?

14       Q   When you came to the school and entered the left,

15   where did you go first?

16       A   So, I was the first in what they call the "stack", so

17   I know I was first.  And then there were two other guys

18   with -- two other of my teammates with me when we entered

19   the first classroom.  Sorry.  We entered that classroom

20   through the door, the first classroom.

21       Q   Bill, no.  I'm not going to ask you --

22           What you saw in that classroom was very real,

23   wasn't it?

24       A   Yes, sir.  Um, when I went -- I'm so sorry.  I'm so

25   sorry these people have to -- that they have to listen to

26   this my --

27       Q   Stop.

```
1        A    Oh man.  Sorry.

2        Q    When you came through that first classroom door --

3        A    Yes, sir.

4        Q     -- did you then enter the second classroom?

5        A    Stepped in the first classroom, cleared it, and then

6    we went through the -- there is a -- the classrooms are

7    divided by, I guess, like a middle door.  The two classrooms

8    were attached by a middle door.  We entered into the second

9    classroom.

10       Q    That was Vicki Soto's classroom?

11       A    I learned that after, yes.

12       Q    You learned after that Miss Soto was killed when she

13   was --

14            ATTY. PATTIS:  Objection.  Leading, Judge.

15       A    I --

16            THE COURT:  Sustained.

17       A    No, I --

18       Q    What did you --

19       A    I --

20       Q    I'm sorry.  Let me -- hang on a second, Bill.  There

21   was an objection.  That's fine.

22            Did you observe Miss Soto where she laid in

23   that classroom?

24       A    I observed a teacher who I learned later was Mrs.

25   Soto, so yes.

26       Q    (INDISCERNIBLE) say anything about -- do you remember

27   anything about Miss Soto's telephone?
```

```
 1        A    I just -- I mean it -- certain things -- certain

 2   things I remember that day.  Like, there is probably six or

 3   seven of them, but I do -- I remember that next to the

 4   teacher who I later learned was Mrs. Soto, I remember there

 5   was a phone.  And I remember the phone.  Like, I remember

 6   the phone was, like, lighting up, but I later learned

 7   from --

 8                ATTY. PATTIS:  Objection.  Hearsay.

 9        Nonresponsive.

10                THE COURT:  Sustained.

11        Q    Do you remember the phone was lighting up?

12        A    Yes, sir.

13        Q    Did you believe it was ringing?

14        A    I couldn't, like --

15        Q    I'm sorry?

16        A    Our senses were -- and that is like --  it overwhelms

17   your senses.  I don't know.  I don't know what I heard, I

18   just know that what I saw.  It overwhelms your senses.  It's

19   freaking horrible.

20        Q    Did you finish clearing that side of the school,

21   Bill?

22        A    Yes, sir.  So, we went through the two classrooms.

23   We cleared each room down the hallways and we caught -- I

24   know there was one room that we found -- we didn't find

25   anything.  Like, we didn't find anything in any of the other

26   classrooms.  We were in such a --  like, we were in such a

27   panic, or at least I was in a panic.  I just didn't want to
```

```
1    look at it.  (INDISCERNIBLE) they were all (INDISCERNIBLE)

2    everywhere.  I just wanted to find something.  So, anyway,

3    we saw some blood and then later on down the hallway or in

4    another classroom, I don't recall exactly, but later on, we

5    were told that that was, like, one of the --

6              ATTY. PATTIS:  Objection.  Hearsay at that

7         point, Judge.

8              THE COURT:  Sustained.

9              ATTY. MATTEI:  Not offering it for the truth of

10        the matter, Your Honor.

11             ATTY. PATTIS:  Relevance then.

12             THE COURT:  Can you just ask the next question,

13        okay?

14    Q    Did you learn, as a result of that, that one of the

15    children --

16             ATTY. PATTIS:  Leading, Judge.

17    Q    -- had been previously found and transported for

18    medical attention?

19    A    At some point, I learned.

20             ATTY. PATTIS:  Leading.

21             THE COURT:  Attorney Pattis.

22             Can you ask it in a nonleading way?

23             ATTY. MATTEI:  Sure, Judge.

24    Q    What was the significance, Bill, of the fact that you

25    and your team found blood but no body nearby?

26    A    I just -- either I assumed or later on I learned a

27    child, or a child or children, were transported to the
```

1   hospital and that's what the blood was from, and then that

2   a -- maybe one of the first -- the officers that were

3   initially there had tried to transport --

4               ATTY. PATTIS:  Objection, Judge.  Well beyond.

5           Narrative.

6               ATTY. MATTEI:  Claim it.

7               ATTY. PATTIS:  Objection.

8               THE COURT:  Overruled.

9               Attorney Pattis, can I have a sidebar, counsel?

10              (SIDEBAR).

11              THE COURT:  Now, granted, I don't have my

12          glasses on, but were you on your feet when you were

13          (INDISCERNIBLE).

14              ATTY. PATTIS:  No, I will be henceforth.  Okay.

15          Sorry.

16              (END SIDEBAR).

17   CONTINUED DIRECT EXAMINATION BY ATTY. MATTEI:

18   Q    When you and your team and the state police team had

19   clear the school, you gathered outside the school to wait

20   for your next orders?

21   A    Yes, sir.

22              We gathered out in front of the school but

23   further down the end, and that's when I remember seeing

24   other members of our team arriving.  Guys who were -- guys

25   who were deployed from other locations and other divisions

26   were arriving, and our team leader, at some point, told us

27   later on, maybe an hour or so later, we ended up going to

1    what we would call an emergency operation center they had

2    set up.

3        Q    Okay.  Let me ask you, do you recall --

4             ATTY. MATTEI:  And you can take this exhibit

5             down, please?

6        Q    Do you recall approximately what time it may have

7    been when you completed your work at the school and came out

8    with your team?

9        A    I mean, we probably were in there --

10            I mean, I guess ten years ago, so I would say

11   it was -- it was probably like an hour, maybe an hour and a

12   half, probably more like an hour.

13       Q    Did you have any idea who Alex Jones was at that

14   time?

15       A    No, sir.

16       Q    Was what you saw in that school fake?

17       A    No.  Not.  No, sir.

18       Q    Was it synthetic?

19       A    No, sir.  No, sir.

20       Q    Did you see any actors that day, Bill?

21       A    No, sir.  No.

22       Q    Were those children real?

23       A    It's awful.  It's awful.  It was awful.

24       Q    Were you aware that at that very moment, Alex Jones

25   was telling his audience of millions, that what you had just

26   seen was staged?

27            ATTY. PATTIS:  Objection, Judge.  Leading.

```
1              THE COURT:  Sustained.
2    A   No.  No, I could never --
3              ATTY. PATTIS:  Objection.  Move to strike.
4              THE COURT:  Sir.
5              ATTY. PATTIS:  Excuse me.  Move to strike.
6              THE COURT:  I'll strike it and the jury will
7         disregard it.
8               So, when I sustain an objection, just --
9              THE WITNESS: Yes, Your Honor.  I'm sorry.  Yes,
10        Your Honor.
11             THE COURT:  -- wait for the next question.
12              No problem.
13             THE WITNESS:  Yes, Your Honor.
14   Q   Did you know that Alex Jones was on the air at that
15   time?
16   A   No, sir.
17             ATTY. PATTIS:  Objection.  Relevance throughout.
18             THE COURT:  Overruled.
19             ATTY. MATTEI:  If you could pull up Exhibit 120,
20        page of, please, 2012 chart?
21              It's already in, Judge.
22   Q   This was admitted as analytics data from infowars.com
23   website, the year 2012.  Do you see the year totals down
24   there, Bill?
25   A   Yes, sir.
26   Q   Did you know that Mr. Jones' website that year had
27   286 million paid views?
```

```
 1              ATTY. PATTIS:  Objection, Judge.  He's a fact
 2         witness, not expert.  Relevance.  He didn't even know
 3         who Mr. Jones was.
 4              ATTY. MATTEI:  I'm not asking his opinion.
 5              THE COURT:  Overruled.
 6              If he knows the answer, he knows on his own
 7         knowledge, and if he doesn't, he doesn't.
 8    A    I didn't know that, sir.
 9              ATTY. MATTEI:  Can you pull that up?  Just the
10         December.  I'm sorry.  Just December.
11    Q    Did you know that infowars.com had 24.9 million paid
12    views just in the month of December alone?
13    A    No, sir.
14              ATTY. MATTEI:  Can you pull up Exhibit 286,
15         please?
16              THE CLERK:  I do not have that as a full exhibit
17         yet.
18              ATTY. MATTEI:  It should be 286 and 289.
19              THE CLERK:  No, I have 291 to 293.
20              ATTY. MATTEI:  May we have 286 by 289 by
21         agreement?
22              ATTY. PATTIS:  I don't know.  Give me a minute.
23              No Objection, Judge.
24              ATTY. MATTEI:  Thank you.
25              THE COURT:  All right.  So ordered.  Full
26         exhibits.
27              ATTY. MATTEI:  286, please?
```

1    Q   Can you tell the jury about what's happening in this

2  photograph?

3    A   Yes, sir.  That's me, the center of three of my other

4  teammates.  That's when we were -- initially arrived.  At

5  least I believe it's when we initially arrived and we were

6  coming up the access road to the school.

7    Q   Do you know whether this photo was later published by

8  any media?

9    A   Yeah.  That photo was in -- it was on the front page

10  of papers all over the country from what I recall.

11    Q   Now, I just want to point out to the jury, Bill, do

12  you see how your teammates here have their FBI insignia on

13  their vests?

14    A   Yes, sir.

15    Q   But you don't; right?

16    A   Correct.

17    Q   And that's what you were referring to earlier when

18  you were describing -- you weren't able to get geared up

19  because you were changing to a new vest; is that right?

20    A   Yeah.  I was taking -- I was taking items off of this

21  vest here and putting on a new one they just issued me.

22    Q   And you see that the teammate to your right has what

23  appear to be canisters or containers on that part of his

24  vest; do you see that?  Did you know what these are?

25    A   They are ammo pouches, sir.

26    Q   Did you have those on your vest?

27    A   No, sir.

```
1              ATTY. MATTEI:  Can we go to the next picture,
2         please?
3              This will be 287, Your Honor.
4    Q    Do you see yourself depicted here, Bill?
5    A    Yes.
6    Q    And what's happening here?
7    A    That is the vest I had taken all the stuff off of,
8 sir.
9              THE COURT:  Sir, just make sure you keep your
10        voice up.
11   A    That's the vest I had taken all of the stuff off of,
12 sir.
13             ATTY. MATTEI:  Also, you can pull out, please.
14        Thanks.
15   Q    Also that morning at Sandy Hook?
16   A    Yes, sir.
17             ATTY. MATTEI:  288, please?
18   Q    Similar to the photo we just saw earlier?
19   A    Right.  I think it's the same photo, but okay.
20   Q    Okay.
21             ATTY. MATTEI:  289?
22   A    Yes, sir.  That's the photo that was on, I think, The
23 Hartford Courant.
24             THE COURT:  Just, as best you can, I'm sorry.
25   Q    This is on the Hartford --
26             THE COURT:  I'm sorry.
27   A    That was --
```

```
1              THE WITNESS: Oh, I'm sorry.
2              THE COURT:  Just have to make sure that everyone
3        can hear you.
4              THE WITNESS: Yes.  Yes, Your Honor.
5     Q    You said that at some point you were sent to an
6  emergency management facility?
7     A    There is some type of -- there is another school in
8  Newtown.  I don't know, a private school maybe, or -- like,
9  it's another school where they set up an emergency operation
10  center which is typical in crisis management.  And, so, if
11  you have a crisis, they'll set up essentially a headquarters
12  to operate the crisis from.
13     Q    And that's where you were staying until you were
14  discharged?
15     A    Yes.  We went to -- we drove to it.  We met with
16  our -- our senior leader from New Haven.  We met with her
17  and for briefing, and then they -- they sent us home.
18     Q    When you left the school that day, did you have to go
19  back down to your vehicle and you see the firehouse?
20     A    Yes.  I came down --  yes.  Yes, sir.
21     Q    Did you understand that parents and families had been
22  asked to gather at the firehouse?
23     A    Yes.
24     Q    After that day, did you return to Sandy Hook the
25  following week or at some point soon thereafter?
26     A    Yeah.  Within a --
27     Q    Why?
```

```
 1      A    Within a day or so, yes, sir.

 2      Q    Why?

 3      A    There were threats being made -- some type of threats

 4  to the children's funerals that people were going to come

 5  and cause trouble at the funerals and so I recall.

 6              ATTY. PATTIS:  Objection on hearsay.  Objection

 7          on hearsay, Judge.  Unless it's being offered not for

 8          the truth of the matter asserted.

 9              ATTY. MATTEI:  I am offering it for the truth of

10          the matter.

11              ATTY. PATTIS:  Objection.  Move to strike on

12          hearsay grounds.

13              THE COURT:  Overruled.

14      Q    You can continue, Bill.  Had you finished?

15      A    That's what we were briefed.  We were briefed that

16  this is -- you'll be assigned to cover funerals.  And there

17  were a number of guys on the team that probably covered.

18  They were there like two or three days and I was there maybe

19  one or two -- one or two days.

20      Q    And were you aware as part of your responsibilities

21  with the FBI, within a few days that the families -- the

22  victims had been targeted for harassment?

23              ATTY. PATTIS:  Objection.  Leading.

24              THE COURT:  Sustained.

25      A    I --

26      Q    I'll ask you the next?

27              THE COURT:  Just wait for the next question.
```

```
1              THE WITNESS: Yes, Your Honor.  Sorry.

2      Q    Did you become aware in the week or so following the

3  shooting, whether or not families had been targeted for

4  harassment?

5      A    Yes.

6      Q    How did you become aware of that?

7      A    I would have received that information through my,

8  either team leader or my supervisor, or through the state --

9  through the state police.

10     Q    And were you part of a team that actually did try and

11 provide security for one of the funerals?

12     A    Yes.

13     Q    Was that at Trinity Episcopal Church?

14     A    Yes.

15     Q    I would like to move forward, Bill, into January,

16 now, of 2013?

17     A    Yes, sir.

18     Q    Prior to that time, I think you described it, what

19 was your position at the FBI?

20     A    So, in 2012, I would have been working out of the

21 Meriden (INDISCERNIBLE) agency which is part of New Haven

22 Division and I was working public corruption and civil

23 rights matterS.

24     Q    In January, were you -- did you assume a new

25 position?

26     A    I was put into a position they called Chief Division

27 Counsel which is the head attorney for that FBI Division.
```

1    You get legal counsel to the leadership of the division.  I
2    was put in that position temporarily and then about a month
3    later, I was appointed to that position.
4        Q   So, you were the top lawyer providing advice to the
5    FBI in Connecticut?
6        A   Yeah.  In-house.  Yes, sir.
7        Q   In-house.
8        A   Yes, sir.
9        Q   And in that capacity, did you have any responsibility
10   for managing the FBI's response to complaints of threats,
11   harassment, and other activity directed at the families of
12   Sandy Hook?
13       A   So, in the position I held, I had a number of people
14   I supervised, and one of the programs I was responsible for,
15   was the Victim Services Program, Victim Witness Program, and
16   so I supervised the victim's specialist in New Haven.
17       Q   Okay.  She was part of your team?
18       A   She was on my team, yes.  I was her supervisor.
19       Q   And can you describe for the jury beginning when you
20   assumed that role of managing the FBI's -- well, first of
21   all, describe for the jury what your offices, including the
22   victim specialist, what their role was in assisting the
23   families after Sandy Hook?
24       A   I can tell you on the day of --  on that day, our
25   victim's specialists and a number of other FBI people were
26   there to assist in various roles.  So, that's our -- our
27   victim specialist did.  She is interactive with a number of

```
1    the families and assisted them in a number of ways for

2    months, if not -- it was probably like 18 months after.  It

3    was 99 percent of her work, that's all she did.

4        Q    When you say she assisted them, what did she assist

5    them with?

6              ATTY. PATTIS:  Objection.  Foundation.  Hearsay,

7              relevance.

8              THE COURT:  Overruled.

9        A    The majority of it was harassing complaints.

10       Q    And you managed her in fielding those complaints?

11       A    I managed her in fielding those complaints and then,

12   went directed to the appropriate supervisors, depending

13   on -- and it was usually to the Bridgeport supervisor

14   because Newtown was covered by Bridgeport.

15       Q    And were the families who lost children and loved

16   ones at Sandy Hook, directed to contact your team if they

17   were experiencing harassing or threatening behavior?

18       A    To be honest, I'm not sure if they were directed to.

19   I just know that the victim specialist had a pretty close

20   relationship with a number of --  a number of the victim's

21   families, and also with a number of -- or at least a couple

22   officers from Newtown.

23       Q    You said 99 percent of what she did for 18 months was

24   helping the families respond to complaints of threatening

25   and harassing behavior directed towards them?

26       A    Yes, sir.

27       Q    Describe that for the jury?  And did that start as
```

1    soon as you took over as Chief Division Counsel in January?

2        A   From what I recall, yes, because I remember

3    dealing -- it was an awkward situation.  Right.  Why is the

4    division counsel supervising victim services?  So, I was new

5    to it, and so I relied on her heavily.  She was --  she was

6    somewhat new herself, but she was awesome.  She was very

7    good and --

8        Q   I'm sorry.  Go ahead.

9        A   And I interacted with her multiple times a day and it

10   was, um, Newtown all the time.  And it was constant.

11       Q   Describe -- I mean, you call it constant.  Can you

12   describe for the jury the general nature of the type of

13   harassment and threatening behavior that was directed at

14   these families?

15           ATTY. PATTIS:  Objection.  Hearsay.  What did he

16       see?

17           Excuse me.  Objection.  Hearsay.

18       A   I could tell --

19           THE COURT:  Without, sir, repeating what someone

20       else said.  Okay?  So don't when you testify.

21           ATTY. MATTEI:  I can rephrase it, Your Honor.  I

22       can rephrase it.

23           THE COURT:  Okay.

24           ATTY. MATTEI:  I can rephrase it.

25       Q   In carrying out your role supervising the FBI's

26   response to complaints of harassment and threatening

27   behavior, was it crucial to you to understand the types of

1   threats and harassment that these families were dealing

2   with?

3   A   Of course it was.  Absolutely.

4   Q   And that had formed your response to it?

5   A   That -- yeah.  Of course.  Yes, sir.  Yes.

6   Q   So, can you describe for the jury, please, the types

7   of threatening behavior and harassment that these families

8   were suffering that you were called to respond to?

9            ATTY. PATTIS:  Objection, Judge.

10            Can he describe the reports he received?  He

11        can't testify to the truth of the reports.

12   A   So --

13            ATTY. PATTIS:  Objection.

14            THE COURT:  Sustained.

15   Q   Special Agent Aldenberg --  I'm sorry, Bill, tell the

16   jury the types of the reports that you received and that

17   you, as the FBI, managing the FBI's response, responded to?

18   A   Death threats.  People calling all kinds of numbers

19   in Newtown saying that this is Adam Lanza, I'm going to come

20   and kill you all.  Telling people their children aren't dead

21   that they are actors.  That's what I'm referring to.  All

22   the time.  The families aren't real, the children weren't

23   real, the death threats and serious stuff, seriously

24   disturbed people.

25   Q   And this went on for 18 months with --

26   A   Well, it went on much longer than 18 months.  It went

27   on 18 months for that particular victim specialist, because

```
1    she ended up transferring.
2        Q    It continued on?
3        A    It continued.  It's going to continue after today.
4    You and I --
5              ATTY. PATTIS:  Objection.  Move to strike.
6         Speculative.  Nonresponsive.
7              THE COURT:  So, I will --
8        A    It's not speculative.
9              ATTY. PATTIS:  Objection.  Move to strike.
10             THE COURT:  I am going to sustain the objection
11        and strike that answer.
12       Q    It continued throughout the entire time you were
13   Chief Division Counsel?
14       A    It's been going on for ten years.
15       Q    And during time -- during this whole time, as a
16   result of your supervision of the FBI's response to this
17   type of stuff, did you become aware of who Alex Jones was?
18       A    Yes.
19       Q    How?
20       A    Through conversations with the victim's specialist.
21       Q    And did you have an understanding at that time what
22   the genesis of this type of behavior was?
23             ATTY. PATTIS:  Objection.  Calls for hearsay at
24        this point.
25             THE COURT:  Overruled.
26       A    Can you clarify the question, sir?
27       Q    What was your understanding as to Alex Jones' role in
```

1    creating this barrage?

2                ATTY. PATTIS:  Objection.  Hearsay.

3                THE COURT:  Overruled.

4    A   My understanding, at the time, was that the -- there

5    was this person who had a radio show or an internet program

6    that was saying that Sandy Hook never happened, that people

7    were -- that we were crisis actors, and that the children

8    and the families weren't real people, that they were crisis

9    actors.

10   Q   Did there come a time, Bill, during the years in

11   which you were involved in the FBI's response to this, in

12   which you, yourself, became targeted?

13   A   Yes, sir.

14   Q   And when was that?

15   A   I've thought about this a lot, especially lately.

16   There were key moments when I became aware of it, but I

17   would say that somewhere from spring to summer of 2015.

18                ATTY. MATTEI:  Your Honor, may I have just one

19            moment to get a sip of water?

20                THE COURT:  Certainly.  Take your time.

21   Q   You said, Bill, that you first became targeted in the

22   spring/summer of 2015.  When I say targeted, do you have an

23   understanding of what I mean?

24   A   Yes, sir.

25   Q   Describe for the jury what that was?

26   A   That they basically had taken some of those

27   photographs that you see and tore it apart.  You know, this

1    guy is not a real FBI agent, he's not an FBI agent because

2    he's not wearing an FBI logo, he doesn't have the right

3    uniform on, he doesn't match -- you know, he doesn't match

4    with the other agents.  He's an actor.

5        Q   And let's just back up for a second, Bill, because

6    there has got to be some way that you find out about this.

7    How do you find out about it to begin with?

8        A   So, I find out -- what I remember, is that I found

9    out about it at work one day and I came home and I said to

10   my wife, there is something going on online and I'm not

11   really sure what it is.  And, literally, as I'm sitting my

12   wife down at the table -- not the table, the computer desk

13   so she can take a look at it, my -- the oldest son who would

14   have been, you know, a freshman in high school going into

15   his freshman year came to the door.  He said, dad, there is

16   stuff online.  You know, kids are more attuned to that.  At

17   least, certainly, my kids were more attuned to what was

18   going on online than I was.  And he's, like, dad, you've got

19   to come upstairs.  You've got to see this.  And I just said,

20   oh -- I said, oh, well, whatever it is, we'll figure it out.

21   And that would be probably the first time.  That would have

22   been either, like, in early spring or summer of 2015.

23       Q   And your son's name is William like you?

24       A   Yes, sir.

25       Q   So, when Will comes and says to you there's something

26   going on online, and you had kind of heard that something

27   was going on online at the bureau, did you, yourself, then

1    try and figure out what is it that's happening?

2        A    So, then I was pulling it all up, and it was --

3    essentially they were saying that Mr. Wheeler and I were the

4    same person.  And that comparing my photographs to

5    Mr. Wheeler, that we were one in the same and that that was

6    proof that -- one of the proofs that Sandy Hook never

7    happened.

8        Q    You and Mr. Wheeler, you are referring to David

9    Wheeler?

10       A    Yes, sir.

11       Q    David Wheeler whose son, Ben, was killed at Sandy

12   Hook?

13       A    Yes, sir.

14       Q    And there were photos of you next to Mr. Wheeler?

15       A    Yes, sir.  They would, basically, superimpose our

16   face with arrows and they were focused on parts of our --

17   they were focused on parts -- like, they were focused on my

18   ear lobes -- ear lobes.  There was, like, videos.  And there

19   were like hours long videos about it.

20       Q    Can you describe for the jury the volume of stuff you

21   were seeing?

22       A    I can only describe it that if you pull up Google and

23   there would usually be like ten lines of things that you

24   Google, you know, whatever the topic might be and there is

25   ten entries, and then you can hit the next page.  And I can

26   just tell you, it went on for page --  it went on, it went

27   on.  It seemed like forever.

1   Q   What was your reaction to this when you were seeing

2   yourself all over the internet?

3   A   It's -- you can't even describe it.  I don't even

4   know how to describe it.  It's crushing.  It's -- I mean,

5   you are -- basically, you are under attack and you can't

6   even defend yourself.

7   Q   What about it made you --  I mean, I take it that you

8   weren't a very online person?

9   A   No.  I would not describe -- I don't have social

10  media or anything like that.  I don't have social media

11  myself, but people create social media accounts with my name

12  and spread this filth.

13  Q   But when you say that you felt under attack and

14  defenseless, what is it about seeing this stuff online

15  saying that you are an actor, and that your experience at

16  Sandy Hook was fake, what is it that was overwhelming to

17  you?

18  A   It's -- it's one of the worst things that ever

19  happened if not the worst thing that ever happened here;

20  right?  What happened to them.  And people go on to say this

21  didn't happen.  And then they want to get rich off of it.

22  That's the worst part.  Like, you know what?  You can say

23  whatever you want about me, I don't care, just say whatever

24  you want.  I'm a big boy, I can take it, but they want to

25  make profits, they want to make millions and millions of

26  dollars.  They want to destroy people's lives.  Their

27  children got slaughtered.  I saw it myself.  And now they

```
1   have to sit here and listen to me say this.  And, these

2   people made millions, upon millions, upon millions.  They

3   destroyed everybody.  They don't give a damn, that's why.

4   That's what's upsetting about it.  And they'll make excuses.

5       Q   Hang on a second, Bill.  Hang on a second here.

6               Since 2015 until now, how have you dealt with

7   this -- these license being on the internet?  How have you

8   dealt with that?

9       A   You just have to -- at some point, you have to just

10  accept it and --

11              Alex Jones and his company, these are very

12  powerful people.  And I'm not anybody.  And so someone like

13  me can't -- you just can't defend yourself.  At some point,

14  you have to accept it.  And, like any crisis that we all

15  deal with in our lives, I guess we have to just -- I mean,

16  you just have to deal with it.

17      Q   But how do you deal with it?  That's what I'm asking

18  you, is what steps do you take, if anything?

19      A   Well, I tried to get help.  I tried to get the bureau

20  to help me, and then I called the agent's association to see

21  if they could help me.  And that ended up, um, you know, it

22  didn't result in anything.  They basically just gave me the

23  runaround.  And then, finally, you know, the only person

24  that ever to even listen was Mr. Koskoff.  He -- you know,

25  he was a gentleman and gracious enough to listen to me --

26              ATTY. PATTIS:  Objection, Judge.  Is there going

27          to be a waiver?  Objection.  Relevance unless there
```

```
 1              is going to be a waiver of the attorney/ client
 2              privilege.
 3                   ATTY. MATTEI:  I'll withdraw it, Your Honor.
 4                   THE COURT:  Okay.
 5                   ATTY. PATTIS:  Move to strike.
 6                   THE COURT:  That's (INDISCERNIBLE).
 7         Q    Bill, what -- in addition to the stuff online about
 8    you being an actor, have you received threats yourself?
 9         A    Yes, sir.
10         Q    Tell the jury about that?
11         A    Probably beginning -- and I can give you multiple
12    examples, but probably beginning of 2015 there was a guy
13    from New London, Connecticut, who was so obsessed with
14    Mr. Wheeler and I.
15                   ATTY. PATTIS:  Objection to the characterization
16              of him.  What did he see?  What did he hear?
17                   THE COURT:  Sustained.
18         Q    You were explaining the nature of the threat that you
19    received.  You understood it to come from the gentleman in
20    New London?
21         A    Yes.
22         Q    And what was the nature of the threat that was
23    directed at you?
24         A    He -- well, it went on for months and he would call,
25    along with others, would call my extension in New Haven and
26    leave, like, violent, threatening messages.  You are not
27    Bill Aldenberg, you are David Wheeler.  You are not an FBI
```

```
1    agent.  And he ended up -- he talked -- this guy from New
2    London talked to a couple of agents in New Haven who were so
3    concerned about his behavior, they came and saw me.  They
4    said, you really have to be careful, this guy sounds like he
5    could do something.  And Mr. Santiago -- this guy's name was
6    Shawn Santiago.  His Facebook photo -- you know, you have a
7    Facebook account, like, a profile photo was --
8              ATTY. PATTIS:  Objection.  Hearsay.
9    Q    Have you seen it?
10   A    Yeah.  I've seen it multiple --
11             ATTY. PATTIS:  Objection.  Hearsay.  Have you
12             seen a document not in evidence?  Best evidence.
13   Q    You've personally seen it, haven't you?
14   A    Yes, sir.
15   Q    Okay.  Tell the jury what it is?
16             ATTY. PATTIS:  Objection.  Hearsay, best
17             evidence.
18             THE COURT:  Overruled.
19   A    It's a photograph.  On his Facebook account, there is
20   a photograph of Mr. Wheeler's face and my face next to each
21   other.  That's his Facebook profile picture.
22   Q    Do you know whether this gentleman is connected to
23   Wolfgang Halbig?
24   A    Yes.
25   Q    Who's Wolfgang Halbig?
26   A    Wolfgang Halbig is an associate of Mr. Jones and
27   Infowars.
```

1      Q    How did you become aware of that?

2      A    How did I become aware of Halbig or how did --

3      Q    Halbig.

4      A    So, Halbig was also one of the people that was

5  writing harassing stuff about me and sending multiple

6  e-mails and phone calls to the FBI saying that I wasn't who

7  they -- the FBI said I was.

8      Q    And you became aware that you said that Mr. Halbig

9  was associated with Mr. Jones?

10     A    Yeah.  Mr. Halbig was on Mr. Jones' show.

11     Q    Do you know whether Mr. Jones supported Halbig's

12  activities up here in Connecticut?

13              ATTY. PATTIS:  Objection.  Foundation.

14              THE COURT:  Overruled.

15     A    Well, I know that Mr. Halbig was on Infowars spewing

16  all of this crap, and Mr. Halbig was in -- I knew that he

17  was in Newtown harassing people.

18     Q    Did you know that Mr. Jones directed his audience to

19  go to Mr. Halbig's website?

20              ATTY. PATTIS:  Objection.  Leading.

21              THE COURT:  Sustained.

22     Q    Did Mr. Jones direct his audience to Mr. Halbig's

23  website?

24     A    To be honest, certain, I just don't recall that.  I

25  don't.

26     Q    Do you know whether this garbage about you and David

27  Wheeler was on --

```
1              ATTY. PATTIS:  Objection.  Argumentative.
2         Argumentative.
3              ATTY. MATTEI:  I don't think I'm arguing with
4         Bill, so --
5              THE COURT:  I don't think so.
6               Overruled.
7              ATTY. MATTEI:  Thanks.
8    Q    Do you know, Bill, whether this stuff about
9    Mr. Wheeler and you, were on Halbig's website?
10   A    Yes.
11   Q    Were they?
12   A    The stuff about me?
13   Q    Yeah.
14   A    Was on Halbig's website.
15   Q    Now, Bill, you described a couple of examples of the
16   type of threatening, harassing behavior.  Is it fair to say
17   those are just examples of the countless types of things
18   that you come across?
19              ATTY. PATTIS:  Objection, Judge.
20              THE COURT:  Sustained.
21   Q    Could you even try to calculate or quantify the
22   number of threats and harassing behavior that you
23   encountered?
24   A    It probably would be tough to quantify, sir.
25   Q    Hmm?
26   A    It would probably be tough to give it a number, but
27   it's over -- it's significant.  Huge.
```

1    Q    When you were advised that at least one of these

2    hoaxers, in the FBI's estimation, you need to go look out

3    for because he might do something --

4    A    Yes.

5    Q     --  what did you understand that to mean?

6    A    That he would either do harm to me or do harm to, you

7    know, my family or something, or -- that's the way I

8    understand it.  These people are -- some of these people are

9    very deranged.  They'll -- the defense will tell you, oh --

10            ATTY. PATTIS:  Objection, Judge.  I could speak

11        to myself --

12            THE COURT:  Sustained.

13    Q    During the course of your time supervising the FBI's

14    response to the hoax, complaints, and harassment, did I come

15    to understand the size, even in general terms, of Mr. Jones'

16    audience?

17            ATTY. PATTIS:  Foundation.  From whom, Judge?

18        Foundation.  I don't know if we are going to get

19        anymore of this stuff from Mr. Koskoff or not.

20            THE COURT:  Sustained.

21    Q    Did you come to learn that by virtue of your role at

22    the FBI?

23    A    At some point, I came to learn the power and enormity

24    of this whole Infowars, Alex Jones thing.

25    Q    And what impact did the enormity of it have on your

26    own feelings of security for yourself and your family?

27    A    Well, I can tell you, I mean, I have -- I've -- I've

1    had concern -- I'm not worried about -- I'm not worried

2    about myself, I'm worried about my family.  I mean, I could

3    defend myself.  But, you know, my family can't defend

4    themselves.  And, when I learned, you know, really what

5    Infowars is and what Mr. Jones is, and the influence that

6    Mr. Jones has, I mean, he's affiliated with some very

7    powerful people, I mean, I figured I was done.  I just have

8    to accept it.

9        Q    Bill, after Sandy Hook, am I correct that you and

10   your team members were provided counseling by the FBI?

11       A    Yeah.  That -- we -- well, the 15th -- the morning of

12   the 15th, they made us go to -- the FBI has an Employee

13   Assistance Program, the EAP Program, they made us all go to

14   EAP.

15       Q    And did you continue to seek counseling as a result

16   of the trauma that you suffered that day?

17       A    Yeah.  I've -- the EAP person, the EAP lady that I

18   dealt with is probably the best thing that ever happened for

19   me.

20       Q    Did you also seek treatment to assist you in dealing

21   with what you were suffering through as a result of the

22   hoax, harassment, and threats?

23       A    So -- so when I got a real grasp of this conspiracy

24   or these lies, the guy named Halbig, Jones stuff, I went and

25   saw -- I hadn't seen the EAP lady in a while but I went and

26   saw her.

27       Q    Why --

```
1        A    She came to New Haven.  I called her.  I tried to
2   explain to her what was going on.  And she's, oh, I'll come
3   up.  She works out of New York and she came up.
4        Q    Why did you go to EAP?
5        A    Again, it's -- this is -- this whole thing is messed
6   up.  This whole -- I mean, this is ten years of -- this is
7   just awful.  This is awful.  What are we even doing here?
8   Right?  We are here to --
9               ATTY. PATTIS:  Objection at this point, Judge.
10              THE COURT:  All right.  Just wait for the next
11          question.
12       Q    Bill, it's okay.
13              How often do you Google yourself?
14       A    I probably -- I check -- it depends, but probably
15   like once a week I Google -- I 0could look real quick to see
16   if there is anything new.
17       Q    Why do you do that?
18       A    Again, for the safety of my family.  I'm very
19   concerned about the safety of my family.  These -- these
20   people -- I mean, it's not an understatement to say that
21   some of these people are deranged.  There can be -- I mean,
22   when we walk out of the courthouse today, they could be
23   outside the courthouse.  These people are deranged.
24       Q    Bill, is it your understanding that the targeting of
25   you, at least initially, was based on the fact that you
26   didn't look like an FBI agent?
27       A    Yes, sir.
```

1    Q    What about you were, they were saying didn't look

2  like a FBI agent on the day you responded there?

3    A    Again, there was all about the uniforms and weapons,

4  and how I was carrying my M4 and things like that.

5            ATTY. PATTIS:  Judge, I'm having a hard time

6        hearing.

7    A    It was all about uniform, weapons, how I was caring

8  my M4, things like that.

9    Q    And how did you feel when you learned that as a

10  result of how you appeared, Mr. Wheeler had also been

11  targeted?

12    A    Right.  That's the worst part about this.  I'm sorry.

13  So -- it's the worst part about it.  And he's suffered

14  enough.  And then somehow, you know, you feel like, geez --

15  you maybe if I --at the range that day -- if I wasn't

16  freaking bullshitting with the guys as much, I would have

17  gotten my stuff done and then I would -- you know, before

18  all this happened.  I don't know, you know.  You just -- I

19  take some -- absolutely take some responsibility that -- of

20  what happened to Mr. Wheeler if not -- it's not right.  It's

21  not right.  And I'm sorry.

22            ATTY. MATTEI:  That's all I have, Your Honor.

23            THE COURT:  Would either counsel like to take an

24        early afternoon recess now or?

25            ATTY. PATTIS:  May we, Judge, please?

26            THE COURT:  Beg your pardon?

27            ATTY. PATTIS:  May we please?

```
 1              ATTY. MATTEI:  That's fine, Your Honor.
 2              THE COURT:  Okay.  So, we'll take our 15-minute
 3         afternoon recess now.
 4              Mr. Ferraro will collect your note pads and
 5         redistribute them.
 6              Continue, please, to obey the rules of juror
 7         conduct that I gave you.  And we will start, again,
 8         promptly in 15 minutes.  So, please plan accordingly.
 9              All right.  Take a recess.
10              (JURORS EXIT).
11              (RECESS).
12              (IN SESSION).
13              THE COURT:  Good afternoon, everyone.  Please be
14         seated.
15              All right.  We are ready to proceed?
16              ATTY. KOSKOFF:  Excuse me.  Your Honor, one
17         little quick housekeeping matter?
18              THE COURT:  Sure.
19              ATTY. KOSKOFF:  We've added a photograph.  There
20         is no objection.  And I just wanted to provide it to
21         Mr. Ferraro, Attorney Ferraro, and make sure this is
22         admitted as full.  It's number 470.
23              THE COURT:  So ordered.
24              ATTY. KOSKOFF:  Thank you, Your Honor.
25              THE COURT:  Please be seated, sir.
26              THE WITNESS: Yes, Your Honor.
27              THE COURT:  All right.  Thank you.
```

```
 1                    (JURY ENTER).

 2                    THE COURT:  Attorney Pattis, whenever you are

 3          ready for your cross.

 4                    ATTY. PATTIS:  Thank you, Judge.

 5                    THE COURT:  You're welcome.

 6   CROSS-EXAMINATION BY ATTY. PATTIS:

 7     Q    Good afternoon, Attorney Aldenberg.  How do I refer

 8   to you?  I don't think I know you well enough to call you

 9   Bill?

10     A    Just call me --  you can call me Bill, sir.  I'm

11   sorry.

12     Q    May I call you Mister?

13     A    That's fine, sir.  Yes, sir.

14     Q    Mr. Aldenberg, you've been a FBI agent for some time?

15     A    Twenty years, sir.

16     Q    And you trained as a lawyer?

17     A    Yes.

18     Q    And you've testified -- and you are a first

19   responder -- well, withdrawn.

20     A    No.

21     Q    Would you call yourself a first responder?

22     A    I'm not -- I would not call myself a first responder.

23   I was part of a team that -- like a secondary surge.  The

24   officers from Newtown and the state police were the first

25   responders.

26     Q    You arrived shortly thereafter and provided

27   assistance?
```

1    A    Yes, sir.  Yes, sir.

2    Q    And some of the things that you saw there, just are

3  images you cannot shake?

4    A    Correct.

5    Q    Too disturbing; correct?

6    A    Yes, sir.  Yes, sir.

7    Q    And I think you testified moments ago that in the

8  wake of your response to the shooting at Sandy Hook, you

9  were given access to an EAP, an Employee Assistance Program

10  person?

11    A    Yes, sir.

12    Q    What was that person's name?

13    A    That's Margaret Lane.

14    Q    And how many times did you see her when you were

15  first referred to her?

16    A    Anywhere from like six to a dozen, but a dozen is

17  probably high.

18    Q    Okay.  So, somewhere between six and a dozen, a dozen

19  is probably high.  Were you seeing her once a week?

20    A    No, no, no.  Every few months.

21    Q    Okay.  So, every couple of months would you call her

22  or would she call you?

23    A    Both.

24    Q    Okay.  And you would check in, how are you doing, are

25  you coping okay?

26    A    Yeah.  Sometimes phone calls, sometimes in person.

27    Q    And the phone calls -- so among those six to twelve

1   visits, would be included phone calls; correct?

2        A    Yes, sir.

3        Q    Some of them were very brief?

4        A    Probably -- if it was brief, it would be ten minutes.

5        Q    And if it was long?

6        A    Maybe 20 or 30, maybe.

7        Q    So, did you ever see her in person?

8        A    Oh, yes, sir.  I've met her multiple times in person.

9        Q    Did you ever see her to talk about the trauma of what

10  you had seen on Sandy Hook on December 14, 2012?

11       A    Yes, sir.  Yes, sir.

12       Q    And how long would those visits last?

13       A    Again, you know, probably in person, 30 minutes

14  maybe.

15       Q    So, is it fair to say you would maybe spend 67 hours

16  with her in the course of a couple of years prior to 2015?

17       A    That may be a little high, but somewhere in that

18  ballpark.

19       Q    And then you -- when did you first learn the name

20  Alex Jones, sir?

21       A    When -- I'm assuming -- I know I knew it when I was

22  chief division counsel, so I assume I learned it from our

23  victim's specialist.

24       Q    And when did you first learn that a man named

25  Wolfgang Halbig had associated you with Mr. Wheeler?

26       A    I learned that -- I may have learned that from this

27  call center was maybe receiving calls and someone from the

1   New Haven Division notified me that this guy, Halbig, was

2   spreading these lies.

3     Q  Was that the same person who informed you about

4   Mr. Santiago, John Santiago?

5     A  No.  I'm trying to think how I learned about

6   Santiago.  Santiago -- I may have learned with a direct call

7   to my extension.

8     Q  What you told us earlier is that you received calls

9   and he would call along with others and be violent and

10   threatening.  You are not Wheeler, you are not an FBI agent.

11   You talk to agents, we should do something about this.  You

12   need to be careful?

13     A  Right.

14     Q  And that's how you learned of Mr. Santiago; correct?

15          ATTY. MATTEI:  Objection.  Mischaracterizes the

16        evidence.

17          THE COURT:  Sustained.

18          Sir, wait for the next question, sir, if you

19        would.

20     Q  So, was Mr. Santiago ever arrested?

21     A  No.

22     Q  You are an FBI agent?

23     A  Right.

24     Q  Responsible for enforcing federal law?

25     A  Yes.

26     Q  It is a against federal law to use interstate

27   communication to threaten another person; correct?

1    A    Yes.

2    Q    Was anyone ever arrested for threatening you online?

3    A    No.

4    Q    How did you reach the conclusion that Mr. Halbig was

5    an associate of Mr. Jones?

6    A    I watched -- at some point, I watched videos of

7    Mr. Halbig on Mr. Jones' show.

8    Q    When is the first time you watched a video of

9    Mr. Halbig on Mr. Jones' show?

10   A    I would be guessing, sir, but I would say

11   approximately 2016.

12   Q    Where were you when you saw that?

13   A    I was sitting in my office on the second floor, FBI,

14   New Haven.

15   Q    And you didn't file a suit at that point in 2016?

16   A    No.  At that point, I couldn't get anybody to help

17   me.

18   Q    You were looking?

19   A    I was -- by then I -- pretty certain by 2016 I had

20   contacted the agents association.  I had been looking for

21   people.  I've been asking the U.S. Attorney's Office to help

22   me, I've been asking the FBI in New Haven to help me.  So,

23   yes, I was looking for help.

24   Q    You mentioned that you tried, after 2015 -- well, I

25   think what you told the jury this afternoon is, you know,

26   you can say whatever you want about me.  I can defend

27   myself.  I just accept it.  You have to deal with it?

1    A    Right.

2    Q    But you did find it emotionally distressing to be the

3    target of this sort of publicity; correct?

4    A    Yes.

5    Q    And you tried to get the bureau to do something;

6    correct?

7    A    Yeah.  I've had multiple conversations with people

8    from the bureau, yes.

9    Q    You said -- you told us this afternoon you tried to

10   get the bureau to do something and it wouldn't; correct?

11   A    I tried to get the agent's association to do

12   something.

13   Q    You said two things.

14   A    Okay.

15   Q    You said you tried to get the bureau and then you

16   said you try to get the agent's association?

17   A    That's fair.  Yes, sir.

18   Q    So, is it fair to say that whatever you were bringing

19   to the FBI in 2015 to 2016, they didn't respond in a way

20   that satisfied you; correct?

21   A    No.  They based -- as far as the FBI goes, no.  There

22   are individual people in the FBI that I'm thankful for the

23   help they tried to give me.  I could say it that way.

24   Q    No arrests?

25   A    No.  That's.  No.

26   Q    Now, you mentioned --  you reached a conclusion that

27   Halbig was an associate of Mr. Jones sometimes in 2016 when

1   you saw him on Mr. Jones' program?

2       A    Approximately 2016, yes, sir.

3       Q    Could it have been 2015?

4       A    It could have been, sir but, again, approximately

5   2016 is my answer.

6       Q    Okay.  Could it have been as late as 17?

7       A    I don't think so.

8       Q    Okay.  So, '15 --  probably '16 as you sit here

9   today?

10      A    That's a guess.

11      Q    Did you reach the conclusion that because he was on

12  Jones' show, he was an associate of his?

13      A    I concluded he was a associate because he was

14  spreading these lies about Sandy Hook and crisis actors, a

15  Mr. Jones was spreading lies but Sandy Hook and crisis

16  actors so, yes, I associated the two of them because they

17  were on the show together.

18      Q    Well, that's different.  Associating people together

19  in your mind is different than making them associates, you

20  would agree; correct?

21              ATTY. MATTEI:  Objection, Your Honor.

22              THE COURT:  Sustained.

23      A    Well --

24              THE COURT:  Just wait for the next question.

25              THE WITNESS: Yes, Your Honor.

26      Q    When did you first see a broadcast of Mr. Jones'?

27      A    That would have been when I watched it for the first

1    time in my office in New Haven Division.

2        Q    And would that have been at or about the time you saw

3    Halbig on the show?

4        A    Yes.

5        Q    So, prior to that, did you have other than what you

6    heard from the victim -- and who was that victim's

7    associate?  You know, the person you were supervising?  I

8    don't remember the --

9        A    The victim specialist was Ashley Hall.

10        Q    Ashley Hall.

11            Did Ashley Hall tell you about Alex Jones?

12            THE COURT:  Just one second, please?

13            ATTY. PATTIS:  My paper was on it, I apologize.

14            THE COURT:  I thought it was me.

15            ATTY. PATTIS:  No, it was me.

16            THE COURT:  Okay.  So, maybe start the question

17        over if you don't mind, because I don't think our

18        monitor got it.

19            ATTY. PATTIS:  Yes, ma'am.

20        Q    When did Ashley Hall first tell you that Alex Jones

21    was talking about Sandy Hook?

22        A    I don't recall, sir.  And you -- you first asked me

23    was Ashley Hall the one that told you and then you didn't

24    let me answer that.

25        Q    No.  I think the --

26            Okay.  Then please do.  I'm not going to ever

27    cut you off.

```
1     A    The --  I have to assume in relation to the --

2     Q    I can't let you assume.

3          ATTY. MATTEI:  Respectfully.

4          ATTY. PATTIS:  I'll withdraw the question and

5          ask a different question.

6     Q    Did Ashley Hall first tell you about Alex Jones?

7     A    I believe she was the one.

8     Q    And when was that?

9     A    That would have been in the 20 -- again, I was her

10   supervisor from January 2013 to when she left New Haven

11   which was some time in June of 2014.

12    Q    And you didn't seek out any information on Mr. Jones

13   from 2013 to 2014?

14    A    Can you clarify what you mean by seek out

15   information?

16    Q    Do I have to --

17    A    Well, do you mean did I investigate him?  Is that

18   what you mean, sir?

19    Q    No.  I mean, Alex Jones is talking trash about where

20   I was, did you want to know who is this guy?  What's he

21   saying?

22         ATTY. MATTEI:  Objection, Your Honor.

23         THE COURT:  Sustained.

24    Q    Did you take any steps to figure out who he was?

25    A    In 2014, sir?

26    Q    2013, let's start there?

27    A    In 2013, 2014, I did not -- I was not aware of stuff
```

1    related specifically to me.  What I was involved in is daily

2    conversations with Miss Hall about the harassment and the

3    threats related to the families from Newtown, the victim's

4    families.

5        Q    And --

6        A    And.

7        Q    I'm sorry.

8        A    And -- that's what I remember, sir.

9        Q    And Mr. Jones' name came up in those discussions?

10       A    From what I recall, yes, sir.

11       Q    Did you open an investigation of him?

12       A    I was not in an investigative position, sir.  What I

13   did is I forwarded any complaints to the appropriate

14   supervisors.

15       Q    Did anyone open an investigation on Mr. Jones for

16   engaging in interstate harassment?

17       A    I couldn't comment.

18            ATTY. MATTEI:  Objection, Your Honor.

19            Relevance.

20            THE COURT:  Sustained.

21            ATTY. PATTIS:  Can we see Exhibit 289, please?

22       Q    That's a photograph of you?

23       A    Yes, sir.

24       Q    Flanked by two other agents?

25       A    They are task force officers.

26       Q    These weren't guys on the SWAT Team, I presume?

27       A    No.  They were task force officers from Bridgeport.

1 Q All right.  And so you --  you mentioned that this

2 photograph was distributed worldwide in the newspapers?

3 A I don't know if it was that.

4   ATTY. MATTEI:  Objection.  Mischaracterizes the

5   evidence.

6   THE COURT:  Sustained.

7 Q Was this one of the photographs that was distributed

8 worldwide?

9 A I didn't say worldwide, but the -- I'm not sure, sir.

10 It's the other photograph, but I never said worldwide.

11 Q Okay.  A person looking at that, how would they know

12 you were an FBI agent?

13   ATTY. MATTEI:  Objection, Your Honor.  Calls for

14   speculation.

15 A They wouldn't.

16   THE COURT:  Overruled.

17 Q They wouldn't.

18   And, I don't want to drag too fine a point on

19 it.  I think what you told us earlier is when you told us it

20 was devastating for you to learn that people were

21 associating you with Mr. Wheeler, a man who lost a child;

22 correct --

23 A Yes, sir.

24 Q -- and you take some responsibility for that

25 association, you told us?

26 A Yes, sir.

27 Q You said maybe if I hadn't been, you know --  if I

```
1    hadn't been BSing with the guys as much that day, I might

2    have been able to get -- basically your full gear; correct?

3    Full regalia?  You might have had your FBI badge on;

4    correct?

5         A    Yes, sir.

6         Q    Now, in 2015, this guy, John Santiago --

7              THE COURT:  Can you just fix that microphone?

8         There we go.

9              Ron, can you help him?  Do you mind?  Why don't

10        you let Mr. Ferraro.

11             THE CLERK:  Sure.  That's if I turn this way it

12        will pick you up as well.

13             ATTY. PATTIS:  Thank you, sir.

14             THE COURT:  Just don't trip over that wire.

15        Q    In 15 to 16, you learned about John Santiago; right?

16        A    That would have been in early 2016.

17        Q    And at that point, did you reach out to the EAP

18   program?

19        A    I believe that's somewhere around the Santiago and

20   Halbig stuff, and the Jones stuff is when I reached out to

21   the EAP lady.

22        Q    Santiago stuff, those were the calls that you were

23   told about; correct, where your fellow agent said --

24        A    Santiago's calls, Halbig's calls, and there were

25   multiple callers.

26        Q    Oh, Halbig called you too?

27        A    Halbig called the FBI.  I didn't speak to him.
```

```
1     Q    How many times did Jones call you?

2     A    He didn't call me, sir.

3     Q    Did you ever see this photograph, 289, on Infowars?

4     A    I didn't.  No, sir.

5     Q    Do you know whether he ever talked about you on

6  Infowars -- Jones?

7     A    I don't know.

8     Q    If Halbig appears as a guest on a talk show, does

9  that make him affiliated with a talk show?

10     A    To me it does.

11     Q    So, if I appear on CNN tonight, I'm a CNN affiliate?

12     A    Yes, you are.

13             ATTY. MATTEI:  Objection, Your Honor.

14             ATTY. PATTIS:  Okay.

15             THE COURT:  Sustained.

16             ATTY. PATTIS:  Okay.

17             ATTY. MATTEI:  Your Honor, may we have a side

18         bar?

19             THE COURT:  Certainly.

20              (SIDEBAR).

21             ATTY. MATTEI:  The default has established that

22         Halbig and Jones are co-conspirators.

23             THE COURT: (INDISCERNIBLE).

24             ATTY. MATTEI:  And it is true, Pattis

25         questioning him on whether or not they are affiliated

26         or whether Jones is responsible for what Halbig did,

27         this is instructable error.
```

```
 1              THE COURT:  So, I can give a curative

 2         instruction.

 3              ATTY. MATTEI:  Thank you.

 4              THE COURT:  And then you move on?  What are you

 5         doing?

 6              ATTY. PATTIS:  I'm going to move on.  But, by

 7         submitting this witness to testimony at this point,

 8         they open him to cross.  They don't get

 9         (INDISCERNIBLE).

10              THE COURT:  So, here is what I'll say.  If you

11         are moving on, I'll deal with the instruction at the

12         end.

13              ATTY. PATTIS:  Okay.

14              THE COURT:  Okay.

15              ATTY. MATTEI:  (INDISCERNIBLE).

16              THE COURT:  These side bars actually work out

17         better for you folks because sometimes in trials, we

18         have the jury get up, leave, come back, leave, come

19         back; right, Mr. Ferraro?  So, many times it's like

20         you are getting your Fitbit steps in, so that's why

21         the sidebars are a little more efficient.  So, just

22         bear with us.

23              ATTY. PATTIS:  May I proceed, for the record?

24              THE COURT:  You may.

25              ATTY. PATTIS:  Thank you, Judge.

26    CONTINUED CROSS-EXAMINATION BY ATTY. PATTIS:

27    Q    So, when you went back to see the EAP person in
```

1    around 2016, how many times did you talk to her on the phone

2    in this period, 2016 and on?

3         A    2016, probably through -- just not too long ago.

4    Probably a few months ago.  Again, a dozen time.

5         Q    Same time thing, sometimes five-ten minutes,

6    sometimes as much as a half an hour?

7         A    I just remember when I first saw her in -- I saw her

8    in person in New Haven when all this stuff started up.

9         Q    What stuff?

10        A    All the lies from Halbig, and Jones, and everyone

11   else.  When all that started up, it was as if everything

12   had -- it was coming back.  And to be honest, it was not

13   that I was moving on because I think about this every day of

14   my life, okay, but I had it under control.  And when this

15   happened, the lies, and all that stuff, and then I just

16   remembered being overwhelmed again and that's when I saw

17   her.

18        Q    That picture was shown in 2013?

19        A    What's that, sir?  Oh, just put it like this stuff,

20   sir.  I'm just pointing a photo.

21        Q    I'm sorry, I looked at the photo.  I misinterpreted?

22        A    It's just this stuff, sir.

23        Q    I misinterpreted you.

24             So, in 2016 -- from 2016 to the present, you've

25   spoken to the EAP person maybe a dozen times?

26        A    That's fair.  Yes, sir.

27        Q    Maybe six hours total?

```
 1     A   It's hard to --  I wouldn't want to commit to numbers
 2   of hours, but that's fine.  It's probably around that
 3   ballpark.
 4     Q   Does it --  if it's more, just say so?
 5     A   I mean, I've talked to her a lot.  I've talk to her a
 6   lot in the last few years, so.  It probably is more than six
 7   hours.
 8     Q   Did you see, in 2016, Hilary Clinton raise Sandy Hook
 9   and Alex Jones as part of her campaign?
10          ATTY. MATTEI:  Objection, Your Honor.
11          THE COURT:  Sustained.
12     Q   Did you watch any part of the Megyn Kelly interview
13   in 2017?
14     A   Yes, sir.
15     Q   Were you one of the people who petitioned local NBC
16   affiliates not to show it in Connecticut?
17          ATTY. MATTEI:  Objection, Your Honor.
18          Relevance.
19          ATTY. PATTIS:  Bias, exaggeration, interesting
20          outcome, motive.
21          ATTY. MATTEI:  Objection, Your Honor.
22          I think if this is going to happen, we are
23          going to need to --
24          THE COURT:  All right.  So, I'm going to excuse
25          the jury for this.  The exercise that I told you
26          about, you are now going to get, okay.
27          So, Ron will collect your notepads and we
```

```
1            shouldn't be more than just a couple of minutes.
2                 THE CLERK:  I would just ask them to leave them
3            on their seats.
4                 THE COURT:  Sure.  Even better.
5                 THE CLERK:  Just leave them on your seat.
6                (JURY EXIT).
7                 THE COURT:  Please be seated.
8                All right.  So, where are you going,
9            Mr. Pattis?
10                ATTY. PATTIS:  As argued previously, it was
11           argued that the defense opened the door to politics
12           in this case by announcing that this was a case about
13           stopping Alex Jones.
14                THE COURT:  Well, we are on cross now, right.
15           So we have this witness on the stand.  You are
16           crossing him and now --
17                ATTY. PATTIS:  May the witness be excused during
18           arguments so he doesn't know what the issues are?
19                THE COURT:  Certainly.
20                (WITNESS EXITS).
21                ATTY. MATTEI:  Your Honor, if that's the case,
22           it probably makes sense for--  I was going to ask for
23           the Infowars (INDISCERNIBLE) to be excused as well.
24           But it appears she's in the courtroom.
25                ATTY. PATTIS:  Well, I believe there is an
26           objection that there is no sequestration.
27                THE COURT:  All right.  That's enough.
```

```
1          ATTY. PATTIS:  Um, the contention --

2          THE COURT:  So, let me backtrack.

3          So, we have this witness on the stand, you are

4     crossing the witness.

5          ATTY. PATTIS:  The timing of this --

6          THE COURT:  So, tell me now what your issue is?

7          ATTY. PATTIS:  He's testified about how he

8     became aware of Alex Jones, how he reached

9     conclusions about an association of Halbig and Jones,

10    and he's also brought -- a suit, his efforts to find

11    lawyers to help him bring a suit.  It's our

12    contention that this issue was largely dead until

13    Hilary Clinton made a campaign issue of it in 2016

14    blaming Jones for Sandy Hook and associating --

15         THE COURT:  Well, I already --

16         ATTY. PATTIS:  May I?

17         THE COURT:  Attorney Pattis, no, you may not

18    because I already ruled on the Clinton issue, and we

19    are moved on from that.  So, now, you talked about

20    Megyn Kelley, so let's address Megyn Kelley.

21         ATTY. PATTIS:  It's a similar issue to Clinton.

22         THE COURT:  Well, then stick with the Megyn

23    Kelley and I don't want to hear Hilary Clinton again.

24         ATTY. PATTIS:  His --

25         THE COURT:  If you want to address it, you can

26    deal with the Megyn Kelley and wherever else you were

27    going.
```

1          ATTY. PATTIS:  All right, with respect to

2     Megyn --

3          THE COURT:  Clinton has been ruled on.

4          ATTY. PATTIS:  --  it's our --  given the nature

5     of the argument that the plaintiffs made here, it's

6     our contention we are entitled to put on exaggeration

7     as a defense.  If this man --  when Megyn Kelley and

8     NBC did an interview of Jones in 2017, a number of

9     Connecticut residents petitioned local affiliates to

10    not air the 2017 interview with Jones.  I want to

11    know if this man is one of them.

12         THE COURT:  How --  all right.

13          Attorney Mattei?

14         ATTY. MATTEI:  Your Honor, number one, first of

15    all, Attorney Pattis has no good faith basis for

16    asking the question even if it were relevant, which

17    it's not.  Mr. Aldenberg has been deposed.  There is

18    no evidence of any kind that he's part of it.  But

19    the larger issue here, which is what Attorney Pattis

20    is trying to inject in this case, is some sort of

21    echo of what he made the center piece of his opening,

22    which is that this lawsuit is an effort to silence

23    Mr. Jones.  And he was trying to get in through

24    Mr. Aldenberg that some unnamed group of people had

25    been involved in sending a letter to NBC for one

26    specific purpose, and that is to try to inject some

27    sort of political argument to the jury which is

1          impermissible, and which we objected to in opening.

2          And one to be heard about more broadly, the idea that

3          somehow Mr. Jones is being silenced, that people

4          judge --  members of the jury themselves should be

5          able to listen to what they want to listen to, all of

6          which touch on the First Amendment issues that are

7          foreclosed in this case.  And so this is just --

8          what we anticipate to be step one in this trial

9          strategy, which is designed to politicize this case

10         and to try to inject political issues in the case

11         that have no bearing and that are foreclosed by the

12         default.  And, so, this is, I think, a large issue

13         that we are going to be dealing with.  The Megyn

14         Kelley one is easy, but the reason I raised it and I

15         asked for the jury to be excused, is because we are

16         seeing it come up again.  And during the opening,

17         Judge, when I asked for a curative instruction, you

18         said that we are going to move on, but if I see it

19         again, I will issue a curative instruction.  This is

20         what's happening now.

21              THE COURT:  All right.

22              ATTY. PATTIS:  Judge, I --

23              THE COURT:  Did you want to respond briefly on

24         the Megyn Kelley issue before I rule?

25              ATTY. PATTIS:  Yes.

26              I'm not the one that told the jury in a hearing

27         in damages, stop Alex Jones, stop the bullies, speak

```
 1          out on behalf of the community, and didn't even raise
 2          in a hearing in damages for 35 minutes the question
 3          of damages and then said nothing about it.  The
 4          plaintiffs have made this case into a political
 5          broadside.  I understand the Court's causation rules,
 6          and I've carefully crafted my trial strategy around
 7          it.  However, when these folks --  the issue for the
 8          jury, at this point, is the extent of harm that Jones
 9          caused them.  And if --  and our defense is these
10          people are exaggerating largely for political
11          reasons.  And, you know, Mr. Mattei can laugh all he
12          likes, but it's true.
13               THE COURT:  All right.
14               ATTY. PATTIS:  They waited until 2018 to file
15          suit over five and six year old claims and they all
16          appeared at Koskoff's office miraculously, 15 people,
17          the same day.
18               THE COURT:  All right.  That's enough.
19               ATTY. MATTEI:  This is a show?
20               THE COURT:  Attorney Pattis.
21               ATTY. PATTIS:  It is.
22               THE COURT:  Attorney Pattis.
23               ATTY. PATTIS:  It is.
24               ATTY. MATTEI:  I'm going to --
25               THE COURT:  Attorney Pattis --
26               ATTY. PATTIS:  I just need to respond.
27               THE COURT:  No.  No.
```

```
1                    ATTY. Pattis:  No?

2               THE COURT:  No.

3               ATTY. MATTEI:  Okay.

4               THE COURT:  No.

5                The objection is sustained.

6               ATTY. MATTEI:  But, Your Honor, on the larger

7          issue, because who knows what his next question is

8          going to be.

9               THE COURT:  Well, I'm --  why don't we address

10         that now so that we don't get the jury upset moving

11         them in and out a million times.

12               Is there some.

13               ATTY. PATTIS:  You've told me I can't ask about

14         Megyn Kelley, I'm not going to.

15              THE COURT:  What's -- I --

16              ATTY. PATTIS:  I'm not going to.

17              THE COURT:  Okay.  I understand.  Well, of

18         course you are not.

19              ATTY. PATTIS:  I mean, so, I don't --  so I'm

20         not going to give the --

21              THE COURT:  Well, we did the Hilary Clinton, now

22         we did the Megyn Kelley, should we address what's

23         coming next?

24              ATTY. PATTIS:  No.

25              THE COURT:  Well, I think it might make sense.

26              ATTY. PATTIS:  Judge, there's --  I'm not -- I'm

27         not responsible for giving my adversaries a preview
```

```
 1              of what's to come anymore than apparently they were
 2              responsible to telling me what witnesses they were
 3              going to call today.  I understand your ruling.  This
 4              has been a contentious trial.  I'm not going to be at
 5              cross hairs with you on the first day, or second day,
 6              or fifteenth day of trial.
 7                   I understand your ruling.  I will move on.
 8                   THE COURT:  I would just say let's move on
 9              carefully.
10                   ATTY. PATTIS:  Understood.
11                   THE COURT:  Because I'm not going to have the
12              jury jumping up and down a million times.
13                   Okay.
14                   (WITNESS RESUMES STAND).
15                   (JURY ENTERS).
16                   THE COURT:  All right.  So, at this time, you
17              have to take the same seats because you've got to
18              hook up with your notebooks, all right.
19                   Counsel will stipulate that the entire panel is
20              present?
21                   ATTY. PATTIS:  I do.
22                   ATTY. MATTEI:  Yes, Your Honor.
23                   THE COURT:  All right.  Please be seated.
24                   Whenever you are ready, Attorney Pattis, you
25              may continue.
26                   ATTY. PATTIS:  Thank you, Judge.
27  CONTINUED CROSS-EXAMINATION BY ATTY. PATTIS:
```

```
1        Q    Other than the EAP person, had you sought counseling
2   from anyone else as a result of what you observed on
3   December 14, 2012?
4        A    No, sir.
5        Q    Other than the EAP person that you've mentioned, have
6   you sought counseling from anyone else over at the
7   distressing association of your image with Mr. Wheeler?
8        A    No, sir.
9             ATTY. PATTIS:  May I have one moment, Judge?
10            THE COURT:  Take your time, please, no rush.
11       Q    Who are the powerful people that Mr. Jones is
12   affiliated with?  I'm sorry?
13       A    Like, for example, I don't know if you know who a guy
14   named Joe Rogan is?  He's a pod caster.  A guy named Joe
15   Rogan.
16       Q    Is Joe Rogan harassing you too?
17       A    No.  Not at all.  No.  I'm just saying --
18       Q    Who else?
19       A    If I can answer the question.
20            ATTY. MATTEI:  If he can have one second, Your
21            Honor.  If he can answer the question instead of
22            being cut off?
23            ATTY. PATTIS:  He's not being cut off.
24       A    I can.
25       Q    Who other than Joe Rogan?
26            THE COURT:  All right.  No.  No.  Just one
27            second, gentleman.  All right.  Why don't we.  No.
```

```
 1              I now lost the question because I couldn't
 2         hear.
 3              ATTY. PATTIS:  Let me rephrase it.
 4              ATTY. MATTEI:  The question was, was Joe Rogan
 5         harassing --
 6              ATTY. PATTIS:  I'll withdraw it and ask another.
 7              THE COURT:  Okay.
 8              ATTY. MATTEI:  Now, wait a second.
 9              THE COURT:  No.  No.  That's all right.  So, why
10         don't we.
11              ATTY. MATTEI:  I guess he doesn't like the
12         answer.
13              ATTY. PATTIS:  No.  I think the answer is fine.
14         It's your chatter that I don't like.
15              THE COURT:  All right, so, counsel, let's just.
16     Q   Sir, who are the powerful people that Mr. Jones is
17   affiliated with?
18              THE COURT:  Well, that was asked and answered.
19         That was Joe Rogan.
20              ATTY. PATTIS:  No.  He mentioned Joe Rogan.
21              THE COURT:  No.
22              ATTY. PATTIS:  And that's --
23              THE COURT:  Counsel, sidebar.
24              (SIDEBAR).
25              THE COURT:  You cut it out.  I'm not going to
26         have that.  I'm not going to have it.  I'm not going
27         to have it.
```

```
1              ATTY. PATTIS:  My understanding.
2              THE COURT:  I --  I'm not going to have it.  Do
3         you understand?
4              ATTY. PATTIS:  I did.
5              THE COURT:  Do you understand?
6              ATTY. MATTEI:  Yes, Your Honor.
7              THE COURT:  Okay.  Nope.  You asked the
8         question.  He answered, ask the next question.  If
9         you are done, sit down.
10             ATTY. PATTIS:  May I be heard, please?
11             THE COURT:  That's it.  No.  Absolutely not.
12 CONTINUED CROSS-EXAMINATION BY ATTY. PATTIS:
13    Q   Do you believe Mr. Jones is associated with other
14 powerful people other than Mr. Rogan?
15    A   Well, yeah.  He has people on his show.  I mean, he
16 has -- yes, he has people on his show which I'm --  am I
17 thinking of anyone in particular right now?  No, sir.  I
18 mean --
19             ATTY. PATTIS:  Nothing further.
20             THE WITNESS: Good.
21             THE COURT:  Redirect?
22             ATTY. MATTEI:  Just one moment, Your Honor.
23             THE COURT:  Take your time.
24             ATTY. MATTEI:  Thank you.
25 REDIRECT EXAMINATION BY ATTY. MATTEI:
26    Q   Bill, you testified that you saw Mr. Halbig appear on
27 Mr. Jones' show; right?
```

1    A    Yes.

2    Q    And I think you said that you may have first seen

3    that some time around 2016, you weren't sure?

4    A    Well, I'm sure that it is -- it's going to be some

5    time after April, 2015, and the reason I know that is I,

6    clear as day, I watched the videos, and my second floor

7    office in New Haven, and I was no longer the chief division

8    counsel, I was in a different position.  So, I know I was

9    sitting in that office and I wouldn't have been in that

10   office until April, 2015.

11   Q    I take it that you don't know whether it was a live

12   broadcast or something that Mr. Jones had posted to his

13   website a prior broadcast?

14   A    Oh, no.  It wasn't live.  I Googled it.

15        ATTY. MATTEI:  Can you pull up Exhibit 19I,

16        please?

17            Your Honor, this is admitted as a broadcast of

18        Mr. Jones' on September 24, 2014.

19            She's going to turn up the volume, Your Honor.

20        ATTY. MATTEI:  Let's start it over, please?

21        THE COURT:  The exhibit number, again, please?

22        ATTY. MATTEI:  19.  And the clip is 19 I.

23        THE COURT:  Thank you.

24        ATTY. MATTEI:  So, 19 is already in, this is

25        19-I.

26            I think we are having trouble getting some

27        volume.

 1              Big wind up, here.  You know what, Your Honor?
 2          We'll do this some other time.  That's just fine.
 3              Bill, thank you very much.
 4              THE WITNESS: Sure.
 5              ATTY. MATTEI:  I don't have further.
 6              Thank you, Your Honor.
 7              THE COURT:  Nothing Further, Attorney Pattis?
 8              ATTY. PATTIS:  Correct.
 9              THE COURT:  You may step down, sir.  Just watch
10          your step, okay.
11              THE WITNESS: Yes.  Certainly.  Thank you.
12              (WITNESS EXCUSED).
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

```
 1   X06-UWY-CV18-6046436-S :   SUPERIOR COURT

 2   ERICA LAFFERTY          :   COMPLEX LITIGATION DOCKET

 3   v.                      :   AT WATERBURY, CONNECTICUT

 4   ALEX EMERIC JONES       :   SEPTEMBER 13, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 5   X06-UWY-CV18-6046437-S :   SUPERIOR COURT

 6   WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

 7   v                       :   AT WATERBURY, CONNECTICUT

 8   ALEX EMERIC JONES       :   SEPTEMBER 13, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 9   X06-UWY-CV18-6046438-S :   SUPERIOR COURT

10   WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

11   v                       :   AT WATERBURY, CONNECTICUT

12   ALEX EMERIC JONES       :   SEPTEMBER 13, 2022

13                E L E C T R O N I C   C E R T I F I C A T E

14

15        I, Linda A. Coon, hereby certify that this is a true

16   and accurate electronic version of the above-referenced

17   case, heard in Superior Court, Judicial District of

18   Waterbury, Connecticut, before the Honorable Barbara N.

19   Bellis, on this 13th day of September, 2022.

20

21        Dated this 13th day of September, 2022, in Waterbury,

22   Connecticut.

23

24

25                         Linda A. Coon,  RPR
                           Court Monitor/ Court Reporter
26

27
```