# EXHIBIT 26

```
DOCKET NO: UWY-CV18-6046436-S    :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL         :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL          :  SEPTEMBER 13, 2022
------------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S    :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                 :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 :  SEPTEMBER 13, 2022

------------------------------------------------------------
```

VOLUME 3 OF 3

WITNESS: CARLEE SOTO PARISI

**BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE**


A P P E A R A N C E S:

    Representing the Plaintiff(s):

        ATTORNEY JOSHUA KOSKOFF
        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        KOSKOFF, KOSKOFF & BIEDER
        350 FAIRFIELD AVENUE
        BRIDGEPORT, CONNECTICUT 06604

    Representing Defendant(s): Free Speech Systems LLC, Infowars
    LLC, Infowars Health LLC, and Prison Planet TV, LLC.

        ATTORNEY NORMAN PATTIS
        PATTIS & SMITH, LLC
        383 ORANGE STREET
        1ST FLOOR
        NEW HAVEN, CONNECTICUT 06511


                    Recorded and Transcribed By:

                    Janet M. Orozco
                    Court Recording Monitor
                    Waterbury Superior Court
                    400 Grand Street
                    Waterbury, Connecticut 06702

1    (VOLUME 3: RESUMED FROM AFTER A RECESS)

2              (Begin sidebar)

3              THE COURT:  So, two things: first, Attorney

4         Pattis, your microphone is picking things up that I

5         don't think you want to be picked up.

6              ATTY. PATTIS:  Okay, okay.

7              THE COURT:  So, I would just --

8              ATTY. PATTIS:  Got it.

9              THE COURT:  Got to be careful, number one.

10             Number two: First day, all right, I'm not going to

11        call a sidebar next time I feel like there's any

12        misbehavior.  The jury's there, and I'm going to just deal

13        with it in front of the jury.  So, everybody's on notice.

14        All right?

15             ATTY. PATTIS:  Yes.

16             THE COURT:  I don't want any colloquy with each

17        other, any -- any of that.  I'm just not going to have it.

18        Okay?

19             ATTY. PATTIS:  Understood.

20             THE COURT:  I don't want to have discussion.  I'm

21        just telling you, because I don't blindside anybody.

22             ATTY. PATTIS:  Understood.

23             THE COURT:  Okay.  And we'll end around quarter of

24        5:00.

25             ATTY. PATTIS:  Judge, I may not be prepared to take

26        this witness today.  Can we wait until tomorrow morning

27        for her?  I didn't understand that she was being called.

1              I thought we had --

2                    THE COURT:  I have to fill this -- I -- I would --

3                    ATTY. PATTIS:  I don't want to do a filibuster

4        cross, but I was -- it was my understanding that they were

5        -- that Ms. Paz was going to be first today.  I had her

6        here at 2 o'clock.

7                    THE COURT:  Is she here?

8                    ATTY. PATTIS:  She is here.

9                    THE COURT:  Oh.

10                   ATTY. PATTIS:  And she has been here.

11                   ATTY. KOSKOFF:  We're not calling Ms. Paz right now.

12       We're calling Carlee Soto.  I don't -- I -- I understand

13       that Attorney Pattis thought that.  I did not tell him

14       that Ms. Paz was going to be the first witness.  What I

15       told him was that we might get to her at the end of the

16       day.  That's what I told him.

17                   ATTY. PATTIS:  I thought we had a discussion about

18       order of witnesses and that would have encompassed that --

19                   THE COURT:  How long --

20                   ATTY. PATTIS:  -- but that's my mistake.

21                   THE COURT:  How long do you think you'll be with

22       her?  We're only going to go 45 minutes today.  So, we can

23       maybe start, and then that will give you -- because I'm

24       not going to do that.

25                   ATTY. PATTIS:  Depending on what she says, I may not

26       have anything, but, you know --

27                   THE COURT:  All right.

1        ATTORNEY KOSKOFF:  Plus or minus thirty minutes I

2     would say?  I'm sorry, thirty --

3        THE COURT:  So, why don't we do that.  Why don't you

4     do your direct.  If you need time, then we'll pick it up

5     tomorrow.

6        ATTY. PATTIS:  Thank you.

7        THE COURT:  Okay?

8        ATTY. KOSKOFF:  Well, the question is, does she

9     remain, how long --

10        Can we just have one moment, Judge?

11        THE COURT:  Sure.

12        (Discussion between Attorney Koskoff and Attorney

13     Mattei)

14        THE CLERK:  Hey, Judge, they're out in the jury

15     room.

16        THE COURT:  Oh.

17        ATTY. KOSKOFF:  We're trying to --

18        THE COURT:  This is such a big bench.

19        ATTY. MATTEI:  I know, I know, you -- Sorry.

20        I know you said you prefer not to end now.  We don't

21     like the idea of bringing Carlee back for a second day --

22        ATTY. KOSKOFF:  She said Thursday morning.

23        ATTY. MATTEI:  I think we might be able to -- So, my

24     suggestion is that we just end, if that's what you want to

25     do.

26        THE COURT:  I wanted to fill the days up.  I mean --

27        ATTY. KOSKOFF:  We could show -- we could show a

1      couple of videos, if that works.

2           THE COURT:  Do that.

3           ATTY. KOSKOFF:  That works.  The deposition videos

4      are short.

5           ATTY. MATTEI:  Well --

6           ATTY. KOSKOFF:  Sorry, Chris.

7           ATTY. MATTEI:  Hey.  I don't think that's going to

8      take any time.  And that's -- that's not how I was

9      planning to do it.  I'm just concerned about Carlee.  I'm

10     just concerned about her coming back a second time.

11          ATTY. PATTIS:  Why not start with Paz.  She's --

12     She's under a subpoena and will be here as necessary.

13          ATTY. KOSKOFF:  Because I took twenty minutes -- we

14     took twenty minute for -- I can -- or maybe we could --

15          ATTORNEY MATTEI:  I may not be --

16          ATTY. KOSKOFF:  She may not be able to come back

17     tomorrow, I'm just saying, because I told her she could --

18          THE COURT:  Wait a minute.  I think that we might

19     start her and see where it goes.

20          ATTY. KOSKOFF:  Yeah, when she -- she may just want

21     to --

22          THE COURT:  Okay.

23          All right.  So, we'll bring the jury panel out.

24          (End sidebar)

25          (The jury was escorted into the courtroom.)

26          THE COURT:  All right.  Welcome back.

27          All I do now is count to ten to make sure

1        everyone's here.

2              The record will reflect that the entire panel

3        has returned.

4              Please be seated.

5              And you may call your next witness.

6              ATTY. KOSKOFF:  Thank you very much.  Thank you

7        very much, Your Honor.

8              Carlee -- Carlee Soto Parisi.

9              (The witness entered the courtroom)

10             THE COURT:  Good afternoon.  Just watch your

11       step.

12             (The witness took the witness stand.)

13             THE COURT:  Another person who brought their own

14       water bottle, Ron.  They don't like our water.

15             He'll swear you in.

16

17          *                    *                       *

18

19

20

21

22

23

24

25

26

27

1   C A R L E E   S O T O   P A R I S I,

2   Called as a witness, was placed under oath and testified as

3   follows:

4           THE CLERK:  Please raise your right hand.

5           Do you solemnly swear or sincerely affirm that

6       the evidence you shall give concerning this case

7       shall be the truth, the whole truth, and nothing but

8       the truth; so help you God, or upon penalty of

9       perjury?

10          THE WITNESS:  I do.

11          THE CLERK:  Thank you.

12          Please be seated.

13          THE CLERK:  And I just want you to state your --

14      go ahead and sit down -- state your name, slowly

15      spelling your last name for the record, and the town

16      in which you live.

17          THE WITNESS:  Carlee, S-o-t-o, space, P-a-r-i-s-

18      i, in Stratford.

19          THE CLERK:  Thank you.

20          THE COURT:  You may inquire.

21          ATTY. KOSKOFF:  Thank you, Your Honor.

22   DIRECT EXAMINATION BY ATTY. KOSKOFF:

23      Q   Good afternoon, Carlee.

24      A   Good afternoon.

25      Q   I hope you indulge us and start by just telling the

26   jury a little bit about yourself, where you -- you're from

27   Stratford, and where you grew up and went to school.

1    A    My name is Carlee, I am -- no, I'm sorry -- I'm 29

2  years old, I live in Stratford, Connecticut, I'm a mom to

3  three, and I went to Stratford High School and graduated

4  from Housatonic Community College.

5    Q    Okay.  And your current job, I understand, is quite

6  difficult.  What is it?

7    A    I'm a stay-at-home mom.

8    Q    Okay.  We've got -- by my calculation, a three-month-

9  old, is that right?

10    A    Yes.

11    Q    And your husband is not here, or is he?

12    A    He's currently taking care of all three of our

13  children.

14    Q    Okay.  And you were here when he -- in this courtroom

15  when Bill Aldenberg testified about his observations?

16    A    And, yes, I was.

17    Q    Okay.  And, as you know, Mr. Aldenberg was --

18  responded as a -- part of his job; but you responded, as

19  well, to the Sandy Hook shooting.  Is that right?

20    A    Yes, I did.

21    Q    And you had a different role.  You were that of a

22  sister?

23    A    Yes.

24    Q    Okay.  Let's first introduce the jury to your family.

25         ATTY. KOSKOFF:  And I'd like to pull up No. 327

26         -- or 328, one of those two.  Okay.

27         ATTY. PATTIS:  Which one is it, Judge?  I can't

1    see that.

2         ATTY. MATTEI:  327.

3         ATTY. PATTIS:  Thank you.

4    BY ATTY. KOSKOFF:

5    Q   Here we have what appears -- this is not a J. Crew

6    catalog, is it?

7         ATTY. PATTIS:  Objection, Judge.

8    Q   Here -- can you -- can you -- First of all, this

9    photograph, do you recognize it?

10   A   Yes, it was my last Easter with my sister.

11   Q   So, Easter is in April?

12   A   Yes, of 2012.

13   Q   Okay.  So, this was April in the year of the

14   shooting.

15        Now, it looks like when you say sister, that doesn't

16   -- can you identify who we're looking at, from left to

17   right?

18   A   My brother is on the left, that's Carlos Matthew

19   Soto; and then myself; and then my older sister, Victoria

20   Soto; and then on her side is my other sister, Jillian Soto

21   Marino.

22   Q   Okay.  And do you know where this photograph was

23   taken?

24   A   This was taken at the sea wall in Stratford.

25   Q   The sea wall in Stratford, okay.  So, this was about

26   eight months before the shooting.  Is that right?

27   A   Yes.

1   Q   And you're -- you're -- you call him your little

2   brother still?

3   A   He'll always be my little brother.

4   Q   Okay.  His name is Matthew, right?

5   A   Yes.

6   Q   And how old was Matthew, roughly, in this picture, do

7   you know?

8   A   I was 19, so he was probably 13.

9   Q   And you said that Victoria is seated between you and

10  Jillian.  Is that right?

11  A   Yes.

12  Q   But Jillian -- Victoria was the oldest?

13  A   Yes.

14  Q   And how old was Victoria in this photo?

15  A   She would have been 26.

16  Q   Okay.  When was her birthday?

17  A   November 4th.

18  Q   Okay.  So, she had just turned -- she turns 27 in

19  November of 2012?

20  A   Yes.

21  Q   And then you have Jillian.  And how old was Jillian?

22  A   Oh, I'm bad at math here.  In her twenties.

23  Q   Okay.  She's not here, so that's good.

24      She -- So, now were you all living in the same house

25  in Stratford at about the time this photo was taken?

26  A   Yes, all four of us still lived at home.

27  Q   And is it the house you all grew up in?

1    A    Yes.

2    Q    And you grew up in that house with your mother,

3    Donna, who's here?

4    A    Yes, we did.

5    Q    And your dad, Carlos --

6    A    Uh-hmm.

7    Q    -- for a time?

8    A    Yes.

9    Q    Are your parents divorced?

10   A    Yes, they did get divorced.

11   Q    Okay.  And do you still live with your mother?

12   A    Yes.

13   Q    Okay.  And what does your mother do?

14   A    My mother is a nurse at Bridgeport Hospital.

15   Q    What kind of nursing?

16   A    She's now a discharge nurse.

17   Q    Okay.  And has she been at Bridgeport Hospital for a

18   while?

19   A    Oh, I think she's been at Bridgeport Hospital since

20   she was like sixteen years old.

21   Q    Okay.  We won't -- we won't do the math, for her

22   benefit, but -- Now, you guys live in Stratford.  And I want

23   to ask you some questions about Vicky, Victoria -- when I

24   say Vicky, that's --

25   A    Uh-hmm.

26   Q    What did you call her?  Did you --

27   A    Vicky.

```
 1    Q    Okay.  I'm sure you had other names, as well, but --
 2    A    Yeah.
 3    Q    -- that's the polite one.  So, can you tell us, Vicky
 4  was -- she was a teacher.  Is that right?
 5    A    Yes.
 6    Q    And we have a photograph of Vicky.
 7              ATTY. KOSKOFF:  If we could pull up 470.
 8    Q    She -- here she is with what appears to be many
 9  diplomas.  What -- Can you tell us when was this photograph
10  taken, if you know?
11    A    This was at her college graduation.  She graduated a
12  dual major in education and in social studies.
13    Q    Okay.  Did she ever take any acting lessons?
14    A    No.
15    Q    Okay.  She was a -- Was she a serious student?
16    A    Yes, very.
17    Q    And what -- and did she really get two degrees at the
18  same time or…?
19    A    Yes.
20    Q    Okay.  And can you tell us whether Vicky was the
21  first in your family to go to college?
22    A    She was.
23    Q    Was there some debate in your family about this or…?
24    A    No.
25    Q    Okay.  Your mother had gone to nursing school for a
26  nursing degree?
27    A    Yes.
```

```
1    Q    Didn't that count?

2    A    Yes, it does.

3    Q    Okay.  But -- So, Vicky does count?

4    A    Yes, it did.

5    Q    And Vicky -- When did she become a teacher, if you

6    know, at the Sandy Hook Elementary School?

7    A    2012 was her third year of her own first grade

8    classroom.  She was a student teacher there, prior to that.

9    Q    Okay.  And from time to time did you and Matthew and

10   Jillian help decorate her class?

11   A    I was -- I was there when she set up her very first

12   classroom.  I went into her classroom to help decorate the

13   windows with her students.

14   Q    And she was a real teacher, wasn't she?

15   A    Very much.

16   Q    And did Vicky try to instill the importance of

17   education on her siblings to the best of her ability?

18   A    Yes.  I had graduated in 2011.  And it wasn't an

19   option, I was going to college.  I wanted to take a year

20   off, and she said, no, you're going, it's not an option.

21   Q    Wait, who was the mother here?

22   A    She -- Education was very important to her and she

23   took me to school, she helped me sign up for classes.

24   Q    And can you tell us a little bit about Vicky's -- how

25   -- whether she -- what she thought of her job as a first

26   grade teacher?

27   A    She loved teaching.  She wanted to be a teacher since
```

1    she was a little girl.  Her godmother is a teacher, and

2    that's why she wanted to become one.  And when she started

3    teaching at Sandy Hook, she knew she wanted to stay there.

4       Q    Okay.  Now, you understand -- You were here for

5    opening statements, and you understand that there's a

6    gentleman named Alex Jones who has a media operation who has

7    been calling Sandy Hook a hoax since 2012.  Is that right?

8       A    Yes.

9       Q    Okay.  Was there anything fake about Victoria's love

10   of teaching?

11      A    No.

12           ATTY. PATTIS:  Objection.  Relevance, Judge, on

13           that.

14      Q    Was the right thing?

15           ATTY. PATTIS:  I'm sorry.  Objection, relevance.

16           ATTY. KOSKOFF:  Well, we haven't established his

17           wrongdoing.

18           THE COURT:  All right.  Overruled.

19   BY ATTY. KOSKOFF:

20      Q    Was there anything fake about her pride in her

21   diplomas?

22      A    No.

23      Q    Was there anything fake about you going and helping

24   around her classroom?

25      A    No.

26      Q    And can you tell us about your last recollection of

27   your sister in real life, what was your last recollection

1   when you interacted with her?

2      A    Thursday night we had went out to dinner, my mother

3   and my brother and I, and we were picking up food for my

4   sister to bring home; she wasn't able to come with us.  And

5   when I got home -- well, when she got home, I was sitting on

6   my mom's bed, picking out my college classes.  And she had

7   walked in the room, and there was a stack of papers, she

8   picked up the papers and just threw them at me.  And we were

9   just goofing off.  We were throwing candy at each other, and

10  my mom was scolding us that she didn't want the dogs to get

11  the candy.  And we were just goofing off.

12     Q    What, she didn't want the dogs to get the candy?

13     A    Yes.

14     Q    Okay.

15     A    But we were just goofing off, having fun, like

16  sisters.

17     Q    And were you looking to her for advice and help -- on

18  helping to select your college classes?

19     A    Yes, I took her opinion on what classes to take very

20  seriously, because, like I said, education was a really big

21  thing to her.

22     Q    And you said Thursday, and I think -- I'm not sure

23  it's been established -- the shooting at Sandy Hook occurred

24  on Friday, November -- December 14, 2012.  Is that right?

25     A    Yes.

26     Q    So, this was the night before?

27     A    Yes.

1    Q   And you had gone to dinner with the family.  Where

2  was Vicky?

3    A   Vicky had accidentally dropped her phone in the

4  toilet.

5    Q   Oh.

6    A   So, she had to go to Apple to purchase a new phone.

7    Q   Oops.

8    A   And then she went to a Scholastic Book Fair to pick

9  up books for her classroom.

10    Q   Okay.  And did she come home with books?

11    A   She came home with a big bag of books --

12    Q   How about --

13    A   -- and she was very excited.

14    Q   Did she come home with a new iPhone or…?

15    A   Yes, and a new iPhone.

16    Q   Okay.  And was she -- she was -- The books were for

17  the holiday season, or just for the class?

18    A   Just for her classroom.  She also purchased a book

19  for her friend that was a teacher, and the book was titled,

20  *I'll Love You For Always,* or *I'll Love You Forever* -- one of

21  the two.

22    Q   Kid's book?

23    A   Yes.

24    Q   And when was -- Did you see her -- Now, how far is --

25  How far is Stratford from Sandy Hook Elementary School, if

26  you know?

27    A   About 30 minutes.

1    Q    Okay.  So, that would be what Vicky would travel

2  every day to and from the school?

3    A    Yes.  And she was one of the first in the building

4  and one of the last to leave the building.

5    Q    So, when she left, it was in the dark; and when she

6  came home, it was in the dark?

7    A    Yes.

8    Q    And did she get up before you?

9    A    Yes.

10   Q    And was she very delicate in her morning routine?

11   A    No.  She -- I lived in the basement and she would

12  very loudly walk around in her boots for school.  And I do

13  remember that the morning of the -- she was stomping her

14  feet -- and I don't think it was purposely, she just wasn't

15  very elegant with it.

16   Q    And did you see her that morning?

17   A    Unfortunately, no.

18   Q    Okay.  And did this really happen, everything you're

19  saying?

20   A    Yes.

21   Q    Okay.  And did there come a time --

22        ATTY. KOSKOFF:  You can take the picture down.

23   Q    Did there come a time -- Rather, what did you do that

24  day, if you recall, before -- It was early in the morning, I

25  know, you said, when she left, but what do you recall doing

26  that day prior to being made aware that something was going

27  on at Sandy Hook?

1    A   I had went to a doctor's appointment early in the

2    morning.  I had -- came home, and I wanted to go back to

3    bed, it was still early in the morning.  And my mom kept

4    calling me and calling me, and I thought she had just wanted

5    me to do something around the house.  But I finally

6    answered, and when I did, she had told me that there was a

7    shooting at Vicky's school.

8    Q   Okay.  And can you -- just -- We're doing a family

9    perspective; we heard from Bill.  Can you just tell us what

10   happened next?

11   A   After she had told me that there was a shooting, she

12   left the hospital and picked me up at home.  And then we

13   proceeded to pick up my brother who was in high school.  And

14   with all three of us in the car, we drove up to Sandy Hook.

15   Q   And what happened when you got there?

16   A   There were so many people running, holding their

17   kids, kids were crying.  I had asked out the window if

18   anyone had seen Mrs. Soto, and they said, no, park and go up

19   to the firehouse.  And so, we did.  My mom parked the car,

20   and I ran.  She told me just to run.  And so, I ran, and she

21   walked with my brother.  And when I got to the firehouse, I

22   started asking teachers that I was familiar with, that I

23   knew, you know, where's Vicky?  Where's Mrs. Soto?  And they

24   all just looked at me and they said they didn't know; they

25   didn't know where she was.

26   Q   Carlee, the firehouse -- you mentioned the firehouse,

27   and I think that Bill Aldenberg mentioned the firehouse, as

1  well.  What was -- What was going on at the firehouse?

2    A   Everyone that was missing a loved one, we were all

3  put in the firehouse, in this back room, and we were asked

4  to put our loved one's name on a piece of paper.  And after

5  that, a state trooper was issued to us, and we had to give

6  our loved one's description.  And because I didn't see her

7  that day, I had asked a teacher, you know, what was Vicky

8  wearing?  And she had described Vicky had, you know,

9  multiple shirts on, with tank tops underneath, her high

10  boots, and a green scarf; and I relayed that information to

11  the state trooper, and I remember telling him, she looks

12  just like me.

13    Q   We -- Did you and/or your mom, and/or your brother or

14  your other sister -- we're you trying to contact Vicky

15  during this time?

16    A   The whole way up to the school I was texting her and

17  all I wanted to do was see those three little dots on the

18  iPhone saying that she was replying.  I called, leaving

19  voicemail, just saying, Vicky, please, just call us back,

20  just say that you're okay, that you're taking care of the

21  kids.

22          ATTY. KOSKOFF:  And can we pull up -- play

23      Exhibit 290.

24          THE COURT:  Which -- What exhibit was that

25      Attorney Koskoff?

26          ATTY. KOSKOFF:  290.

27          THE COURT:  Thank you.

1      THE CLERK:  Your Honor, I do not have that as a

2  full exhibit.

3      ATTY. KOSKOFF:  One moment, please?

4      THE COURT:  Take your time.

5      ATTY. KOSKOFF:  Why don't we take it down.  And

6  I'll make sure it's marked as a full exhibit.

7      ATTY. MATTEI:  What's this, 290?

8      ATTY. PATTIS:  No objection, Judge.

9      THE COURT:  All right.  So ordered.  Is a full

10  exhibit.

11  BY ATTY. KOSKOFF:

12  Q   And is this a photograph that you -- Is that you in

13  the photograph?

14  A   Yes.

15  Q   And was that a photograph that became widely

16  distributed, to your knowledge?

17  A   Yes, it was.

18  Q   And is this you trying to reach or -- or speaking to

19  somebody else about Vicky?

20  A   Yes, I had called my friend.  We were told that there

21  were multiple casualties, and at this time we had known that

22  there was kids that were killed.

23  Q   Sorry, you did know or did not know?

24  A   We knew that some kids were killed, but at this time

25  I didn't know that Vicky was dead for sure.

26  Q   And what was this time?

27  A   This is before we were informed.  I was standing at a

1  barrier at the end of the access road that went out to Sandy

2  Hook, and they had a barricade where no one could go up to

3  the school.  And I was just standing there waiting, hoping

4  that she was going to come down -- come down the hill

5  holding her kids' hand.

6      Q    Was this, Carlee, within -- would you say this was

7  within two or three hours of the shooting?

8      A    Yes.

9      Q    Did you ever hear of a man named Alex Jones prior --

10  prior to the shooting?

11     A    No.

12     Q    Did you ever publish any lies about him, do anything

13  to him?

14     A    No.

15     Q    Did you know that within three hours of the shooting,

16  in Austin, Texas, Alex Jones was going on air talking about

17  the shooting?

18     A    No, sir.

19     Q    Did you know that he had tens of millions of

20  listeners?

21     A    No.

22     Q    Did you know at the time that you knew that there

23  were children dead, that he was already at work questioning

24  the shooting?

25     A    No.

26     Q    Was there anybody at the scene who was questioning

27  the shooting?

1    A    No.  Everyone was just questioning where there loved

2    one was.

3    Q    Did you see any frauds or imposters or actors on the

4    scene?

5    A    No.

6    Q    Were people taking it seriously?

7            ATTY. PATTIS:  Objection -- Sorry, objection.

8            It calls for a conclusion (indiscernible.)

9    BY ATTY. KOSKOFF:

10   Q    Did it appear to you that people were taking it

11   seriously?

12   A    Yes.  Everyone was in tears, everyone -- Everyone

13   knew that something serious had happened.  It was traumatic

14   being in that firehouse.

15   Q    Did -- Did there come a time when you learned that

16   your sister had -- had died?

17   A    We were told that we would be -- we'd be at the

18   firehouse well into the night.  And when this was said, a

19   parent of a child stood up and yelled, where are they?  What

20   hospital are they at?  Just tell us so we can go be with

21   them.  And right after, they we were told that everyone had

22   expired -- those exact words, that everyone in that room had

23   lost someone.

24   Q    And who uttered those words?

25   A    I believe it was the Governor.

26   Q    And where were those words uttered?

27   A    In the firehouse.

1   Q   And what happened next?  I assume you went -- I mean,

2   just -- because I don't want to drag you with more of this.

3   Can you just tell us -- at some point you decided to -- Tell

4   us what happened, leading up to your leaving.

5   A   When we were told that everyone had expired, I ran

6   out of the room; I ran out of the room and fell into a

7   firefighter's arms, who was standing outside.

8         And my dad had came up behind me, and he said we need

9   to go.  We need to go home.  We -- There's no reason for us

10  to stay here anymore.

11        And so, we were all ushered into cop cars -- well, at

12  least my family, I can't -- I don't know what really

13  happened with everyone else.  And we were brought in cop

14  cars, and we were driven home.  And I remember my mom was in

15  the back seat, just calling people, saying that she was

16  dead.  And it was the most bizarre thing that had ever

17  happened to me because I couldn't believe my older sister,

18  who's a teacher, was shot.

19  Q   How many -- How many people would you say were on the

20  scene?  Were there hundreds, or thousands, or somewhere --

21  A   I want to say hundreds.

22  Q   And did there come a time -- and your sister -- Your

23  sister's buried where?

24  A   My sister is buried at Union Cemetery in Stratford.

25  Q   Now, did there come a time, Carlee, where you became

26  aware that there were people who believed that Sandy Hook

27  was a hoax?

1    A    Yes.

2    Q    And can you tell us your first recollection of about

3  when you became aware of this?

4    A    Within the first couple of months it started, people

5  posting the picture that you just saw alongside of other

6  pictures of young women crying from -- anywhere from the

7  Boston bombing to Aurora -- other tragedies.  And my picture

8  was put alongside of them, saying this is the crisis actor,

9  she's everywhere, how can she be in multiple places at once?

10  And from there it just -- it felt like it snowballed; it

11  just got worse.

12    Q    And when you say there are people everywhere, it

13  snowballed, it got worse, in what way were you made aware of

14  this and --

15        ATTY. PATTIS:  Objection.  It calls for

16        speculation.

17  BY ATTY. KOSKOFF:

18    Q    Well, how did you -- how did you get exposed to all

19  this?  I mean, you know how you got exposed.

20    A    Friends of mine that sent me articles, other people

21  would tag me in the post.  So, I would look on social media

22  and I would have -- on Twitter and on Facebook and

23  Instagram, there were posts that were just made, and it

24  would be people arguing back and forth, and I would finally

25  get tagged into the conversation.  And I just remember that

26  I had no idea why somebody would make this up.  I was so

27  confused.

```
1    Q   When you say tagged, I mean, you -- you'll have to
2    excuse some of our non-Facebook -- is it Facebook that tags
3    people or some --
4    A   Instagram and Twitter.
5    Q   Oh, okay.  So, what is tagging?
6    A   Somebody, like, comments your name on a post, and
7    then that way you're able to see what the post is.  And
8    without being tagged, you would never know the post was
9    there.
10   Q   And once you became first aware of that, did you see
11   a volume, a tremendous volume of things that had been posted
12   that you didn't know about?
13   A   A huge amount.  There was so many.  And you feel so
14   small, like you can't do anything about it, that you're just
15   this one person and there's hundreds of people making these
16   pictures and these graphics of you, and you're just one
17   person, what are you supposed to do?
18   Q   And can you -- can you tell -- can you give us -- and
19   I know this is upsetting, but -- but can you give us some
20   idea of what kinds of things people were saying about you or
21   about Sandy Hook?
22              ATTY. PATTIS:  Objection, relevance --
23              THE COURT:  Overruled.
24              ATTY. PATTIS:  -- hearsay.
25              THE COURT:  Overruled.
26   BY ATTY. KOSKOFF:
27   A   That -- That I was fake, that my hair was too
```

1  straight, or that my arm was bent the wrong way; they said

2  that my sister wasn't real, that none of this ever happened,

3  she didn't have a first grade classroom, she wasn't shot,

4  that me and my whole family were crisis actors.

5    Q   And did you -- and what is it like to have hundreds

6  of people who you don't know accusing you of faking your

7  sister's death and faking everything about Sandy Hook?

8    A   It makes me angry, because I'm not a liar, I -- one

9  of my biggest pet peeves is people lying, and I don't lie,

10 and for a huge amount of people to say you're lying, this

11 never happened, it's hurtful, it's devastating, it's

12 crippling, you can't grieve properly because you're

13 constantly defending yourself and your family and your loved

14 ones.

15   Q   Did these lies -- did these statements about you and

16 your faking of it, did these reach your own community?

17   A   Yes.

18   Q   Can you describe that for the jury?

19   A   I was hanging out with some friends and one of the

20 girls I was hanging out with said, you know, this girl that

21 we went to school with, she thinks that it was all a hoax,

22 she doesn't believe you -- and I went to school with this

23 girl, we went to school from middle school on, together.

24 And she didn't believe that I had a sister that died.  She

25 thought I was an actress.  And I just couldn't wrap my head

26 around that.

27   Q   What is it like to be in a community -- well, you

1   grew up in Stratford, right?

2   A   Yes.

3   Q   And you considered a -- your community, your home?

4   A   Yes.

5   Q   And what was it like to have your community infected

6   with these lies?

7   A   Stratford was like our safe place.  You didn't -- we

8   didn't live in Newtown; we weren't surrounded by the

9   tragedy.  So, when we were in Stratford, it wasn't

10  everywhere.  But with all these lies, we weren't sure of who

11  believed it or who didn't; you didn't know who thought you

12  were really grieving or who thought you were acting.

13  Q   And what's that like?  I mean, what do you mean by

14  that?  So what?  You understand that the argument of Mr.

15  Jones and his attorney is, essentially, so what, no big

16  deal.  Right?

17  A   Uh-hmm.

18  Q   Why don't you tell the jury what it's like to live in

19  your own community and to have to ask those questions.

20          ATTY. PATTIS:  Objection, Judge, the question's

21          plural asked; there's been no foundation that she was

22          repeatedly asked this by anyone.  So, there's no

23          foundation for the question.

24          ATTY. KOSKOFF:  Asking yourself those questions

25          about who's -- I think it was pretty clear -- I'll --

26  BY ATTY. KOSKOFF:

27  Q   You understand the question?

1    A    Uh-hmm.

2    Q    And let me just -- let me --

3         ATTY. KOSKOFF:  Actually, that's not true.  She

4    did say there are people in her community and that --

5    and --

6         ATTY. PATTIS:  She said, one, a friend.

7    BY ATTY. KOSKOFF:

8    Q    Okay.  Were there multiple people in your community

9    that you became aware of that --

10   A    Yes.

11   Q    Okay.  And were you -- So, can you just now please

12   answer, to the best of your ability, to the jury just

13   explain what that's like?

14   A    For the most part when somebody said, you know, are

15   you -- are you related to Vicky, I would be overjoyed to say

16   yes, because she died a hero and I was proud of her.  But

17   there have been times where I said no, because I didn't

18   know, I didn't know were you on my side, or do you think I'm

19   an actor, do you think this is all made up?  And instead of

20   getting into an argument with somebody I didn't know, it was

21   just easier to say, no, I'm not related to her, I don't know

22   what you're talking about.

23   Q    And can you describe -- at some point you actually

24   left the Stratford community for a while, is that right?

25   A    Yes.  I got married and I moved down south with my

26   husband who was a marine.

27   Q    Your husband, Brent --

1    A    Yes.

2    Q    -- is a marine, and he was stationed first in North

3  Carolina?

4    A    He was stationed in Jacksonville, North Carolina.

5    Q    Oh, okay.  Was that where he was stationed for

6  several years?

7    A    Yes.

8    Q    And did you come to learn that your community was not

9  the only community that would question whether you were an

10  actress or whether you were faking your sister's death for

11  attention, or for whatever purpose, for some global

12  conspiracy?

13    A    My husband's company had a get-together for all the

14  wives.  They were deploying and wanted to get all the wives

15  together to get to know each other so we would have a

16  support system.  And we were there and somebody had asked,

17  oh, you know, where you guys from?  And I said, Connecticut.

18  And they said, oh, you know, isn't that where the school

19  shooting was, you know, did that really happen?  And I just

20  stared at them.  And I'm, like, wow, these people really do

21  exist, these people really think that I'm an actor, like --

22  and it's -- people, just like every day, you and me, and it

23  wasn't some crazy -- just normal folk.

24    Q    And so these were people in North Carolina --

25    A    Yes.

26    Q    -- questioning or asking you about whether the

27  shooting -- or questions about the shooting as if it wasn't

```
 1   real?
 2     A    Yes.
 3     Q    Do you know -- and was your -- were there occasions,
 4   Carlee, where your information was broadcast to millions and
 5   millions of people?
 6     A    My -- Everyone's address is public knowledge, but my
 7   --
 8             ATTY. PATTIS:  Objection, Judge, nonresponsive,
 9         move to strike.
10             ATTY. KOSKOFF:  Well, let me -- I'll --
11             THE COURT:  So ordered.  The response is
12         stricken.
13             ATTY. KOSKOFF:  Okay.
14   BY ATTY. KOSKOFF:
15     Q    So -- So, did there come a time -- does there come a
16   time when your private information was -- or your
17   information was put online?
18     A    Yes, my --
19     Q    Can you tell the jury about that?
20     A    -- my address, my email address, who my siblings
21   were, who my spouse was, and this is when I was in North
22   Carolina, so it wasn't just my address in Connecticut, it
23   was also my address in North Carolina where me and my
24   husband were, and it was posted numerous times.  We had a
25   family friend who would do her best to get it taken down,
26   and within minutes it was shared on another platform.  And
27   it was copied and pasted, it wasn't -- it was like a picture
```

1   that they would just keep posting over and over again.

2   Q   And with what accompanying messages or in what

3   context?  Just give us a flavor of that.

4   A   Just nasty messages, like, you -- you know, this girl

5   needs help; somebody, you know, should go to her house, and

6   just awful messages.  We did have somebody leave a sticky-

7   note on our door in North Carolina saying that I needed to

8   go to church.

9   Q   So, your North Carolina address had been cut and

10  pasted to -- throughout the interweb -- throughout the

11  internet?

12  A   Yes.

13  Q   And it was all your information, and just right

14  there, easy to read, for anybody who wanted to -- wanted it?

15  A   Yes.

16  Q   What's that like?

17  A   Scary.  My husband would be gone, he would have to go

18  to the fields, and I was left in our apartment in North

19  Carolina alone with no protection, no family, and it was

20  terrifying.  And then I had a son who I was scared for, it

21  was just me and him in North Carolina, alone, and I feared

22  for our lives.

23  Q   And would some of these messages that accompanied

24  your information be particularly threatening?

25  A   Yes.

26  Q   Can you describe that to the jury?

27  A   I did end up having to go -- I can't remember the

1  occasion -- but I was in Connecticut and I frequently got

2  threatening emails and messages on all social media, and it

3  came -- it got to a point where it was -- they would use the

4  gun emoji, and I spoke with cops in Connecticut, and my

5  husband ended up having to speak with cops in North Carolina

6  because we were scared for our lives.

7      Q   What do you mean, the gun emoji?

8      A   On, like, Apple, there's emoji's, and they would use

9  the gun emoji and, like, a smiley face, and -- you know.

10     Q   And what about Twitter, did you get -- had similar

11 experiences with Twitter?

12     A   Yes.  People would dissect my Twitter from when I was

13 super-young, saying that I disliked my sister, and they

14 would post it everywhere.  They would post things that I had

15 said years prior, stuff that I wasn't proud of, but it was

16 out there.

17     Q   You mean, like things like you were mad at your

18 sister or your -- or was it worse than that?

19     A   There was a post that I said I hated my sister, and I

20 grew up with two older sisters and we fought, a lot.  We

21 loved each other a lot and we fought a lot, but --

22     Q   So, what would they do with these -- with these

23 Tweets?  I don't understand.

24     A   They would post them everywhere.  They would dissect

25 them, you know, how could she have lost somebody, she's

26 saying that she hates them.  They would turn, you know, a

27 normal conversation I was having and twist it the way that

1    they wanted it to be -- they wanted it to be told.

2              ATTY. PATTIS:  Objection, Judge, that -- I don't

3         even know what this is anymore.  Objection,

4         relevance, hearsay --

5              ATTY. KOSKOFF:  It's her damages.

6              ATTY. PATTIS:  -- best evidence, speculation.

7         It's commenting on the state of mind of another

8         person.

9              ATTY. KOSKOFF:  It's her damages.

10             THE COURT:  Overruled.

11   BY ATTY. KOSKOFF:

12   Q    Now, can you tell us the -- what is the Vicky Soto 5K

13   race?

14   A    It is a 5k that we've had every year since my

15   sister's passing.  We raise money for our foundation that

16   gives scholarships to seniors that are pursuing education --

17   pursuing further education and they want to become teachers.

18   We also use this money to give teachers supplies, books to

19   our teachers, everything that has to do with literacy.

20   Q    And did there come a time when you were threatened or

21   harassed at the 5K race?

22   A    Yes.

23   Q    Can you just tell us a little bit about that?

24   A    There was a gentleman that -- there's a gentleman

25   that showed up at our 5K, which just isn't a 5K, it's a

26   family fun event, a time to remember my sister.  And he

27   showed up to the 5K, waiving a picture, one that was similar

1    to the one that you guys saw from Easter, and saying, hey,

2    this never happened; you know, who are these people, these

3    are crisis actors, this -- just -- just outlandish things;

4    screaming at my sister, myself, my husband -- and he also

5    had a Team Vicky shirt on, just to make it worse.

6      Q   You have a -- I notice that you have a tattoo.

7      A   I do.  I have an apple on my wrist that says, No. 1

8    Teacher, Victoria Lee.

9              ATTY. KOSKOFF:  Your Honor, I think I would just

10             like to show one video and then we'll -- I'll be -- I

11             can -- 19 -- 19(I).

12             ATTY. MAITEI:  The one we were trying to show.

13             ATTY. KOSKOFF:  We need to turn that up.

14             THE COURT:  This is a full exhibit, Ron?

15             ATTY. MATTEI:  It is.

16             THE CLERK:  Yes, Your Honor.

17             ATTY. KOSKOFF:  It's the video we tried to show

18             earlier.  We got our technology working.

19             (States Exhibit 19(I), video was played)

20   BY ATTY. KOSKOFF:

21     Q   Did your sister live?

22             ATTY. PATTIS:  Objection, asked and answered,

23             Judge.

24             THE COURT:  Overruled.

25     A   No.

26     Q   Was Sandy Hook real?

27     A   Yes.

1    Q   Okay.

2             ATTY. KOSKOFF:  No further questions, Your

3        Honor.

4             THE COURT:  Attorney Pattis.

5             ATTY. PATTIS:  Can we approach?

6             (Begin sidebar)

7             ATTY. PATTIS:  I thought we were adjourning at

8        4:45, but it's --

9             THE COURT:  No, were getting -- get her done.

10       So, we have another eleven minutes.

11            ATTY. PATTIS:  All right.

12            (End sidebar)

13   CROSS-EXAMINATION BY ATTY. PATTIS:

14   Q   Good afternoon, Ms. Soto Parisi.  How are you?

15   A   Good afternoon.

16   Q   I think we've met once before, did we?

17   A   Yes.

18   Q   I took your deposition?

19   A   Yes, you did.

20   Q   When is the first time you heard of the name Alex

21   Jones?

22   A   Within the first year of my sister's passing.

23   Q   So, perhaps, in 2013, but no later than '14?

24   A   Yes.

25   Q   And when did you first learn that Mr. Jones was among

26   those who believed that nothing happened at Sandy Hook, that

27   it was a hoax?

```
 1    A    Within the first --
 2              ATTY. MATTEI:  Objection.  It's established that
 3          Mr. Jones -- sorry, Your Honor -- Objection,
 4          established by the default.
 5              THE COURT:  It is.
 6              ATTY. PATTIS:  I know, but I'm asking her when
 7          she first learned it.
 8              THE COURT:  How --
 9              ATTY. MATTEI:  No, no, that's not what he said.
10              ATTY. PATTIS:  It is what I did -- It is what I
11          said.
12              ATTY. MATTEI:  It's not a belief for the jury,
13          it's a lie.
14              THE COURT:  Can you ask the question again, Mr.
15          Pattis, so that we're all on the same page?
16              ATTY. PATTIS:  Yeah, I will.  I apologize, Judge
17          and Counsel.
18   BY ATTY. PATTIS:
19    Q    When did you first learn that Mr. Jones spread the
20   view, his view, that Sandy Hook never happened?
21              ATTY. MATTEI:  Objection.  It's not been -- It's
22          been established that Mr. Jones spread a lie.
23              ATTY. PATTIS:  It's not --
24              THE COURT:  Well, the question is when she first
25          learned --
26              ATTY. MATTEI:  -- learned about the lie.
27              THE COURT:  -- about the lie.
```

1  BY ATTY. PATTIS:

2    Q  When did you first learn that Mr. Jones was telling

3  people it didn't happen?

4    A  Within the first year.

5    Q  Did you watch him?

6    A  No, I didn't.

7    Q  When's the first time you watched it?

8    A  I don't recall.

9    Q  Have you ever watched him?

10    A  Yes.

11    Q  Have you ever watched him outside of your lawyer's

12  office?

13    A  Yes.

14    Q  How many times?

15    A  Maybe about five.

16    Q  And when was the first time?

17    A  I don't recall.

18    Q  When was the last time, besides what we just saw in

19  the courtroom?

20    A  Maybe within the last year or so.

21    Q  Would that have been in preparation for your

22  deposition?

23    A  No.

24    Q  Okay.  Do you know how many people were associated

25  with Mr. Jones saying that this isn't true?

26    A  I -- I'm sorry.  Can you repeat that?

27    Q  Mr. Jones asserted it wasn't true.  Correct?

1    A    Uh-hmm.

2    Q    Do you know how many other people did?

3    A    A lot.

4    Q    Do you believe that every time you were approached by

5  someone, they were -- it was because they were associated

6  with Mr. Jones?

7            ATTY. MATTEI:  Objection.  It's getting into

8        causation.

9            THE COURT:  Well, the causation's been

10        established.  So, I'm not sure what the relevance is.

11            ATTY. PATTIS:  I'm asking whether she -- It's

12        been established that Mr. Jones uttered words that

13        caused harm.  I'm asking her if each time she heard

14        those words, she associates that with herself or Mr.

15        Jones?

16            THE COURT:  Well, I think we're limited here to

17        the extent of the damage.  So, I will sustain the

18        objection.

19  BY ATTY. PATTIS:

20    Q    You've waited until 2018 to sue Mr. Jones?

21    A    Yes.

22    Q    Why?

23    A    Like I said, I'm just one person, I didn't think -- I

24  didn't think I had a voice.

25    Q    You went with your family members to visit a lawyer?

26    A    Yes.

27    Q    The Koskoff firm?

1          ATTORNEY MATTEI:  You know -- Objection.

2          THE COURT:  Sustained.

3   BY ATTY. PATTIS:

4     Q    How many -- How many folks -- or how many people do

5   you think have also sued in this lawsuit?

6     A    Excuse me?

7     Q    How many people have also sued in this lawsuit?

8     A    There are several of us.

9     Q    Sixteen, maybe, initially?

10         ATTORNEY MATTEI:  Your Honor, I'm just going to

11         object, it's beyond -- it's just -- objection, it's

12         relevant -- irrelevance.

13         THE COURT:  Where are you going with this, Mr.

14         Pattis?  What is this?

15         ATTY. PATTIS:  I'm trying to understand why

16         these outrages and so-alleged events since '13, '14,

17         '15 --

18         ATTORNEY MATTEI:  No, no.  He can't argue --

19         ATTY. PATTIS:  -- '16, '17 --

20         THE COURT:  No, no -- no, no, no, no --

21         ATTY. PATTIS:  -- didn't get sued on until 19 --

22         ATTORNEY MATTEI:  No, he -- This isn't --

23         ATTY. PATTIS:  -- until 2018 --

24         THE COURT:  All right.  So --

25         ATTY. PATTIS:  --- and how that happened.

26         THE COURT:  Okay.

27         ATTORNEY MATTEI:  Your Honor, may I just ask

1      those  -- that those comments be stricken?

2           THE COURT:  I will strike those, improper,

3      entirely improper comments.  I will sustain the

4      objection.

5           Move on, Attorney Pattis.

6  BY ATTY. PATTIS:

7    Q   You heard your lawyer say that we have to stop Alex

8  Jones here.  Correct?

9    A   Yes.

10   Q   From doing what?

11          ATTORNEY MATTEI:  Objection.

12          THE COURT:  Sustained.

13          ATTY. PATTIS:  Nothing further.

14          THE COURT:  Redirect?

15          ATTORNEY MATTEI:  Thank you -- No, just thank

16     you, Carlee.

17          THE WITNESS:  Thank you.

18          ATTORNEY MATTEI:  Go ahead.

19          THE COURT:  All right.  You may step down.

20     Thank you.

21          (Witness was excused.)

22          THE COURT:  We ended a little bit later than we

23     would normally end, so I will try to be relatively

24     brief with my comments.

25          So, we're going to adjourn the trial for the

26     day.  Remember that you must obey the rules of juror

27     conduct.  You may be going home to people who'll be

1    curious about the case and about the trial, remember

2    that you've taken an oath that obligates you not to

3    talk to anyone about the trial or issues until after

4    have reached a verdict.  That means you cannot talk

5    to members of your family about it, friends, and

6    there are no exceptions.

7        As I said this morning, I'm going to say it

8    again, because this is so crucial: though your oaths

9    should be reason enough to obey this instruction,

10   there's a more practical reason, if you violate your

11   oath and you discuss this case at home or with

12   others, they might give you ideas or details, and

13   then you would have the problem, when you start your

14   deliberations, of trying to figure out what

15   information you heard in the courtroom and what

16   information you heard improperly somewhere else.  And

17   I can tell you that jurors often find that it's

18   difficult enough to decide issues without having the

19   added problem of trying to filter out the information

20   that you obtained improperly that was not part of the

21   trial.

22       So, do not talk to anyone about the case, nor

23   let anyone talk to you about it.  Do not do any kind

24   of posting on social media; honor the oath that

25   you've taken.  As I said earlier today, don't seek

26   out any information, don't do any research.  If there

27   is media coverage, which there likely will be, you

1    are not to read it, watch it, or listen to it.  If

2    you come across it, immediately exit from that area,

3    because you must honor the oath you have taken.

4         So, tomorrow we will start at 10 o'clock, and I

5    would ask that you be here at 9:30, quarter-of ten,

6    because, as you know, unless all ten of you are

7    together we cannot begin.

8         So, I will have Ron collect your notebooks.  He

9    will put them away for safe-keeping.  We will see you

10   tomorrow.

11        And I will stay on the record to address one

12   minor issue with Counsel.

13        Safe travels.  Hopefully, it's not raining

14   anymore.  When I came in this morning, it was

15   pouring.

16        And you're going to get the notebooks?

17        THE CLERK:  Yes, I have them put them on the

18   table and then I grab them.

19        (The jury was escorted out of the courtroom.)

20        THE COURT:  I was hoping to take up first thing

21   in the morning -- you may be seated -- I was hoping

22   to take up first thing in the morning the counter-

23   affidavit of Free Speech Systems and PQPR.  Do you

24   know if its reached the file yet?

25        ATTY. PATTIS:  I don't know, but we will -- I'm

26   sure that it occurs promptly on -- forthwith.

27        THE COURT:  Well, you -- yeah, because you can

 1          e-file around the clock.

 2                ATTY. PATTIS:  Right.

 3                THE COURT:  So, what I would like to do is --

 4          and I believe Attorney Mattei has already seen it.

 5          Correct?

 6                ATTY. STERLING:  Your Honor, we have seen it.

 7                THE COURT:  Okay.  So, then it would just be a

 8          matter of me taking a look at it, and I'll do that

 9          then at 10 a.m.  All right.

10                ATTY. PATTIS:  Yes, ma'am.

11                THE COURT:  So --

12                ATTY. PATTIS:  I said, yes, ma'am.

13                THE COURT:  Okay.

14                So, everyone, we are adjourned for the day.

15          Safe travels.  And we will see you tomorrow.

16                ATTORNEY MATTEI:  Thank you, Your Honor.

17                (Adjourned.)

18

19          *                    *                    *

20

21

22

23

24

25

26

27

```
DOCKET NO: UWY-CV18-6046436-S    :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL         :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL          :  SEPTEMBER 13, 2022
-------------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S    :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                 :  JUDICIAL DISTRICT
                                    OF WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 :  SEPTEMBER 13, 2022

-------------------------------------------------------------
```

C E R T I F I C A T I O N


I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 13th day of September, 2022.


Dated this 14th day of September, 2022, in Waterbury, Connecticut.



*Janet M. Orozco*
_____
Janet M. Orozco
Court Transcribing Monitor

```
DOCKET NO: UWY-CV18-6046436-S     :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL          :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL           :  SEPTEMBER 13, 2022
-----------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S     :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                  :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 13, 2022
-----------------------------------------------------------
```

E L E C T R O N I C   C E R T I F I C A T I O N


 correct transcription of the audio recording of the above-

referenced case, heard in Superior Court, Judicial District of

Waterbury, Waterbury, Connecticut, before the Honorable Barbara

Bellis, Judge, on the 13th day of September, 2022.


        Dated this 14th day of September, 2022, in Waterbury,

Connecticut.


                                   *Janet M. Orozco*
                                   _____
                                   Janet M. Orozco
                                   Court Recording Monitor

```
DOCKET NO: UWY-CV18-6046436-S     :  SUPERIOR COURT

ERICA V. LAFFERTY, ET AL          :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL           :  SEPTEMBER 13, 2022
-------------------------------------------------------------

DOCKET NO: UWY-CV18-6046437-S     :  SUPERIOR COURT
           UWY-CV18-6046438-S

WILLIAM SHERLACH                  :  JUDICIAL DISTRICT
                                     OF WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 13, 2022

-------------------------------------------------------------
```

## C E R T I F I C A T I O N

I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 13th day of September, 2022.

Dated this 14th day of September, 2022, in Waterbury, Connecticut.

Janet M. Orozco
Court Transcribing Monitor