# EXHIBIT 30

```
 1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

 2   ERICA LAFFERTY         :  COMPLEX LITIGATION DOCKET

 3   v.                     :  AT WATERBURY, CONNECTICUT

 4   ALEX EMERIC JONES      :  SEPTEMBER 16, 2022
     .......................................................
 5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

 6   WILLIAM SHERLACH       :  COMPLEX LITIGATION DOCKET

 7   v                      :  AT WATERBURY, CONNECTICUT

 8   ALEX EMERIC JONES      :  SEPTEMBER 16, 2022
     .......................................................
 9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10   WILLIAM SHERLACH       :  COMPLEX LITIGATION DOCKET

11   v                      :  AT WATERBURY, CONNECTICUT

12   ALEX EMERIC JONES      :  SEPTEMBER 16, 2022

13           BEFORE THE HONORABLE BARBARA BELLIS, JUDGE AND JURY

14   VOLUME II OF II
     WITNESS:  DIRECT AND CROSS ATTORNEY BRITTANY PAZ AT 10:00 to
15   2:00

16   A P P E A R A N C E S:

17

18     Representing the Plaintiffs:
         ATTORNEY CHRISTOPHER MATTEI
         ATTORNEY ALINOR STERLING
19       ATTORNEY JOSHUA KOSKOFF

20

21

22     Representing the Defendant:
         ATTORNEY NORMAN PATTIS

23

24                         RECORDED BY:
                           LINDA COON
                           TRANSCRIBED BY:
25                         LINDA COON, RPR
                           Court Monitor/Court Reporter
26                         400 Grand Street
                           Waterbury, CT   06702

27
```

```
1              THE COURT:  We our now on the record, day four
2         of the Lafferty v. Jones matter.
3              Good morning, everyone.
4              If counsel could please identify themselves for
5         the record?
6              ATTY. MATTEI:  Good morning, Your Honor.
7              Chris Mattei on behalf of the plaintiffs,
8         joined by my colleague Alinor Sterling and Josh
9         Koskoff.
10             ATTY. STERLING:  Good morning, Your Honor.
11             ATTY KOSKOFF:  Good morning, Your Honor.
12             THE COURT:  Good morning.
13             ATTY. PATTIS:  Good morning, Judge.
14             Norm Pattis.  I've got John Bruce here with me
15        again today.
16             THE COURT:  All right.  Good morning.
17             MR. BRUCE:  Good morning, Your Honor.
18             THE COURT:  So, we are going to take up an
19        issue; correct?
20             ATTY. MATTEI:  Yes, Your Honor.  I think that
21        would be helpful.
22             THE COURT:  Okay.
23             ATTY. MATTEI:  We expect to finish with Miss Paz
24        some time this morning.  We filed a brief -- a day or
25        so ago relating to the scope of cross-examination
26        given that Miss Paz is a corporate representative and
27        presented by the defendant.  And, so, we wanted to
```

```
 1          advise the Court and apprise defense counsel of our

 2          view that because she has testified quite clearly

 3          that she has no personal knowledge of any of the

 4          matters on which she has testified, that she

 5          cannot -- the defense cannot, through her, offer

 6          substantive testimony based on hearsay.  So -- and,

 7          the reason that we raise this, is because we,

 8          obviously, have concerns that we've already raised

 9          concerning nullification in other matters, and so we

10          just want to be very very clear that as far as we are

11          concerned, there is very little of substance that

12          Miss Paz would be competent to testify to, at all,

13          through the defense because --

14               THE COURT:  All right.  Most of what she said

15          were admissions.

16               ATTY. MATTEI:  Correct.  We offered them as

17          admissions of a party opponent.

18               THE COURT:  I understand.

19               ATTY. MATTEI:  And, so, we wanted to raise that

20          for the Court so that we can have an understanding of

21          exactly what's going to be happening and perhaps an

22          offer of proof as to what, if anything, Miss Paz is

23          actually competent to testify to in the defense case.

24               And I would just add that, you know, the the

25          defense had the option of presenting a witness who

26          could testify to certain matters based on personal

27          knowledge if they had wished.  Daria Karpova, long
```

1          time employee, was presented as a corporate --

2               THE COURT:  I thought she was on the witness

3          list?

4               ATTY. MATTEI:  She is.  She is not going to be

5          called here because the defense cannot present her

6          live in our case.  But she was presented as the

7          corporate representative in Texas, in the Texas

8          litigation, and was permitted to testify to certain

9          things on cross --

10              THE COURT:  I'm sorry.  I'm not understanding.

11               So, why can't she be called here if Attorney

12         Pattis wanted to call her?

13              ATTY. MATTEI:  Because, under our agreement in

14         the bankruptcy court, if the defense was going to

15         call any witnesses, they had to make them available

16         to testify live in the plaintiff's case if we wished.

17         Miss Karpova was not made available --

18              THE COURT:  Oh.

19              ATTY. MATTEI:  -- to testify live.  And so --

20              THE COURT:  I can't speak to that.

21              ATTY. MATTEI:  Pardon me?

22              THE COURT:  I can't speak to that.  That's not

23         my agreement or issue but, okay.

24              ATTY. MATTEI:  Yeah.  I mean, we would have been

25         willing to call her had she been able to testify

26         live.  The point is, that Free Speech Systems, as the

27         defendant here, could have presented anybody to

1       testify as the corporate representative and somebody

2       who had personal knowledge.  They chose not to do

3       that, they also chose to refuse Miss Paz' requests to

4       give her certain information so that she could

5       testify competently, and it appears, based on her

6       testimony, that they lied to her about the use of

7       Google Analytics.  And so it just -- it seems to us

8       that they have presented somebody as a corporate

9       representative and for very very strategic reasons,

10      and so they shouldn't be permitted to take advantage

11      of that by offering otherwise inadmissible testimony

12      through her.

13         THE COURT:  All right.  So, I think as I'm

14      understanding, Attorney Pattis, the issue is

15      inadmissible hearsay?

16         ATTY. PATTIS:  Judge, it's our view, Judge, that

17      Miss Paz was offered as a corporate representative

18      and in any number of occasions asked to opine not as

19      Miss Paz, but as Free Speech.  And I've objected any

20      number of times on relevance, competence, speculation

21      on the grounds that --

22         THE COURT:  Well, I just want to make sure I

23      understand.  So, I thought we were talking about not

24      relevance, not competent -- that we were -- the issue

25      that the plaintiff was raised was inadmissible

26      hearsay -- not relevance, not competence, nothing

27      else.

 1            ATTY. PATTIS:  I'm setting that up, the

 2       argument, Judge.  I didn't take it as a motion in

 3       limine.  It was a bench memo.  I thought, you know,

 4       okay, bench memo, you would submit a bench memo,

 5       great --

 6            THE COURT:  Okay.

 7            ATTY. PATTIS:  --but I'll construe it as a

 8       motion in limine.

 9            Our position is that experts can -- excuse me,

10       that corporate reps are akin to experts, and they are

11       asked to assume the position of the corporation in

12       the courtroom.  As this Court knows, corporations are

13       legal fictions.  They can -- may I finish please?

14            THE COURT:  No. I'm just going to ask you,

15       because I will forget.  So, is there any caselaw that

16       supports that statement that corporate

17       representatives are experts?  Because, if there is

18       any, I need to review it.   I am unaware of that.

19            ATTY. PATTIS:  Didn't see any, didn't see any to

20       the contrary.  But this Court knows that corporations

21       legal fictions, they are not -- they don't have

22       persons.  They have personhood ascribed to them as a

23       matter of law for limited purposes.  A corporate rep

24       is -- and, in this case, the corporate rep was asked

25       to opine, is it Free Speech's position that, it came

26       in any number of occasions.  And all she would --

27       and she wasn't asked, did Alex Jones say, did Owen

1      Shroyer say, did Daria Karpova say?  She was asked,

2      does Free Speech take that position?  And it's our

3      view, that in treating this legal fiction has a

4      person, they've effectively cloaked her in the mantle

5      of an expert.

6          I don't intend to ask -- I don't intent to go

7      through rebuttal or contextualisations of admissions

8      of party opponents, but I do intend to ask her, you

9      know, how she did her work, what she went to see, who

10     she talked -- took to, and what conclusions she

11     reached.  Now, in fairness, Judge, in reaching those

12     conclusions, there may be foundation issues, because

13     she's going to reach those conclusions based not just

14     on what she saw, but on what she heard from others.

15         And in other contexts, this has gone not to the

16     admissibility of the deference statement, but as to

17     their weight.  So, for example, in ***Federal Deposit***

18     ***Insurance Corporation v.  Carabetta at 55 Conn. App.***

19     ***384***, I believe this is at page 390.  The witness'

20     personal knowledge goes to the weight of the evidence

21     not to the admissibility.  And it seems to me that,

22     in this case, the plaintiffs elected to elicit and to

23     impeach a defendant in this case through it's

24     corporate rep asking if it was it's position as the

25     corporate rep that X, Y, or Z, was the case.  I think

26     within the scope and limits of that, I am permitted

27     to ask her why she has that opinion, and what it's

1    based on, does she care to revise it.  I expect there

2    will be more cross-examination today.  As corporate

3    rep, are you saying?  I've tried to object that a

4    corporate rep can't say anything.  The corporation

5    can't speak.  It exists -- it no more exists than

6    does the State of Connecticut.  It exists for

7    purposes of administrative convenience but it speaks

8    through it's officers.  And if a party elects to call

9    an officer and treat that officer -- and treat the

10   abstraction as a person through the officer, they

11   waived the right to complain about what that officer

12   says when they are asked about things clearly within

13   the scope of what they've inquired on.

14        THE COURT:  So, Attorney Mattei, on the one

15   issue, the minor issue that was mentioned when

16   Attorney Pattis just said that he wants to inquire

17   about what she looked into to prepare what she

18   researched, that kind of thing, that you don't have

19   an issue with?

20        ATTY. MATTEI:  I think if he asks her, who did

21   you speak to, what documents did you review, I don't

22   have any issue with that.

23        THE COURT:  Right.

24        ATTY MATTEI:  But if he asks her, which is

25   really what he wants to ask her, what conclusions did

26   you personally draw as a result of your -- the

27   collection of evidence that you reviewed.  That is

```
 1          very much expert testimony about corporate practices
 2          that -- first of all, there's been no disclosure,
 3          there is no support for the idea that a corporate rep
 4          can just opine.  We didn't ask for her opinions.  We
 5          asked her what the fact was.  And any number of
 6          times, actually, you remember, Judge, Miss Paz said I
 7          can't speculate as to what was in his head.  Right?
 8          So, she was called here to testify about what the
 9          corporation can state as a fact or not a fact.  And
10          all of that was based on a lack of personal knowledge
11          but only on what she gained by virtue of hearsay
12          conversations she had.  And, so, you know --
13              THE COURT:  Well, it wasn't all gained by way of
14          hearsay conversations, was it?
15              ATTY. MATTEI:  Well, I have suppose other than
16          her review of videos.
17              THE COURT:  She reviewed videos, she reviewed
18          documents, I thought.
19              ATTY. MATTEI:  She may have reviewed some
20          documents.  But- and if she wanted -- if Attorney
21          Pattis wants to present her with a document that she
22          reviewed.  I mean, it's not at all clear from her
23          testimony what documents were made available to her.
24          So --
25              ATTY. PATTIS:  Judge, I got to -- I'm sorry.
26              ATTY. MATTEI:  And I think all she can testify
27          to is the contents of the document.  So, you know,
```

1          what we can't have here is a situation where Miss Paz

2          is kind of holding forth about her views of how Free

3          Speech Systems works, and it's a very chaotic

4          environment, and Alex Jones, you know, kind of

5          operates on the the fly, and all of that.  So,

6          that's --

7                THE COURT:  So, Attorney Mattei, if Attorney

8          Pattis wanted to obtain the position of free speech

9          systems on -- along the lines of how you elicited

10         their position, how would he do it?

11               ATTY. MATTEI:  Well, it's not a -- to call it a

12         position, Miss Paz is not here to take a legal

13         position.  She's here to assert facts, and so --

14               THE COURT:  Well, I thought you had asked her

15         several times, what is Free Speech's position on

16         whether Sandy Hook happened, and what is Free

17         Speech's position on whether, you know, whatever it

18         was.  And I thought that she testified.  I don't

19         understand -- is it your -- no pun intended, is it

20         your position that now Attorney Pattis can't cross?

21         How would we ever --

22               ATTY. MATTEI:  It is my position that to the

23         extent Miss Paz formulated any position based on

24         information provided to her by others, that is

25         hearsay.

26               THE COURT:  All right.

27               ATTY. PATTIS:  I think Attorney Mattei has

1    proven my argument with his argument, Judge.  They've

2    called Free Speech, asked her as Free Speech, I think

3    she's entitled to testify as Free Speech.  I don't

4    think what I'm entitled to do is say, you know, when

5    Alex said whatever, the grass was green, you know, I

6    don't think I get to say what else did he say about

7    the grass.  I think that's correct.  I do believe --

8         ATTY. MATTEI:  Your Honor.

9         ATTY. PATTIS:  May I --  excuse me, excuse me.

10        ATTY. MATTEI:  Your Honor, I don't know why

11   Attorney Paz is in the courtroom.

12        ATTY. PATTIS:  Well, you should have asked

13   for her -- what about this decorum rule, Judge.  I

14   didn't cut him off.

15        ATTY. MATTEI:  I just realized it.

16        THE COURT:  So, I'll have a sidebar, please?

17         (SIDEBAR)

18        ATTY. MATTEI:  She shouldn't be hearing this,

19   Judge.

20        THE COURT:  Well, then you should ask her to

21   step out guys.

22        ATTY. MATTEI:  (INDISCERNIBLE).

23        THE COURT:  So, I thought we were past this.

24        ATTY. MATTEI:  Oh, Your Honor, I just --

25        THE COURT:  No. No.  You interrupted.

26        ATTY. MATTEI:  Yes.  I apologize.

27        THE COURT:  No.  I really.  I can't have it.  I

```
 1              (INDISCERNIBLE).

 2              ATTY. MATTEI:  I apologize.

 3              THE COURT:  I don't know what is it?  Is it

 4         that --

 5              ATTY. MATTEI:  No.  It's just I just realized

 6         that she was here for the first.

 7              THE COURT:  No, no.  I mean the cutting each

 8         other off like that in front of me.

 9              ATTY. MATTEI:  Oh --

10              ATTY. PATTIS:  I did that once, and I'm sorry.

11         I apologize.

12              THE COURT:  Well, you both did it.  You both did

13         it.  Do I not control the proceedings good enough?  I

14         mean, what is it?  Would you do this in front of

15         Judge Ford?  Do you remember Judge Ford?

16              ATTY. PATTIS:  I probably would have and I

17         probably would have gotten in more trouble than I

18         have here.

19              THE COURT:  Right.

20              He wouldn't be offering you coffee.

21              So, can you just please, for the record, can we

22         please -- at least the two of you stop doing that,

23         please?  Okay.

24              ATTY. MATTEI:  Yes, Your Honor.

25              ATTY. PATTIS:  Got it.

26              THE COURT:  Okay.  Now, I don't know --

27              ATTY. PATTIS:  If you would like Attorney Paz to
```

```
1     step out of the proceeding, I'll ask her.  I didn't
2     even think about it.
3          THE COURT:  I didn't of it either.  If I had
4     thought of it, I would have brought it up.   But none
5     of us did.
6          ATTY. PATTIS:  Would you like me to?
7          ATTY. MATTEI:  Yes, please.
8          THE COURT:  Okay.  So, we'll do that, and we'll
9     go back on.
10         (END SIDEBAR).
11         ATTY. PATTIS:  As I was saying, Judge -- I'll
12    wait for Attorney Paz to leave the room.
13          Attorney Mattei proved my argument with his,
14    and so I have nothing further to say.
15         THE COURT:  Anything further, Attorney Mattei?
16         ATTY. MATTEI:  You didn't need to hear anything
17    more on the expert analogy, did you, Judge?
18         THE COURT:  No, no.
19         ATTY. MATTEI:  Okay.  All right.
20          Nothing further, Your Honor.
21         THE COURT:  Absolutely not.
22          So, I think -- I can't see issuing a blanket
23    ruling now but, certainly, if she has personal
24    knowledge based on her own personal review of a
25    document or a video, that's one thing, but if she is
26    basing anything on inadmissible hearsay, then it just
27    doesn't come in.  It came in -- a lot came in on
```

1          Attorney Mattei's examination as an admission of a

2          party opponent, and that's not the case here.  So, I

3          think she'll be able to offer some testimony.  And,

4          certainly, if she -- if she put forth a position of

5          Free Speech System, and it's not based on hearsay,

6          then I think that that's -- that's perfectly fine.

7          If it is based on hearsay, that's a different issue.

8          So, I think we have to see what different areas we

9          are talking about.  Okay.

10              ATTY. PATTIS:  Got it.

11              THE COURT:  All right.  When did -- when would

12          you like to deal with the issue of the every day I

13          bring it up, and every day we punt, Free Speech

14          Systems and PQPR?  Do you maybe want to -- I

15          understand -- Mr. Ferraro told me that we think that

16          maybe the witnesses will end today at 3:00 or 3:30 or

17          so, that's what I got secondhand?

18              ATTY. PATTIS:  May I speak to Attorney Mattei,

19          Judge?

20              THE COURT:  Absolutely.

21              (COUNSEL CONFERRING).

22              ATTY. MATTEI:  May we approach, Judge?

23              THE COURT:  You may.

24              (SIDEBAR).

25              ATTY. MATTEI:  Attorney Ferraro was correct.  It

26          appears that Attorney Pattis may be playing some

27          complete videos through Miss Paz that are very

1          lengthy.

2                 ATTY. PATTIS:  Just two.

3                 ATTY. MATTEI:  So, when I gave Ron that

4          estimate, I didn't realize the cross would go that

5          long.

6                 THE COURT:  (INDISCERNIBLE).

7                 ATTY. MATTEI:  Yeah.  Yeah, I mean.  It's, also,

8          Your Honor, if you want to end early and then we can

9          think about it.

10                 THE COURT:  I wouldn't be --  I wouldn't be --

11                 ATTY. MATTEI:  It all depends on how Miss Paz --

12                 THE COURT:  Well, I want to end.  I don't want

13          to bring the jury in for half a day.

14                 ATTY. MATTEI:  No, no.

15                 THE COURT:  But I would not be opposed.  It's

16          been a long week and I'm driving to New Jersey

17          tonight, so --

18                 ATTY. PATTIS:  I could -- I would -- I responded

19          this morning to a memo I saw yesterday.  And,

20          quickly, I would like an opportunity to think about

21          it a little more.  And I did --

22                 THE COURT:  On which one?

23                 ATTY. PATTIS:  The one that was filed regarding

24          enforcement of orders.  The claim that I argued

25          nullifications.  Report was filed on the 15th.  I got

26          in early this morning to crank out a response.

27                 THE COURT:  We don't have to deal with that

```
1            today.
2                    ATTY. MATTEI: No
3                    THE COURT:  What about the --
4                    ATTY. MATTEI:  We had a couple of plaintiffs
5            lined up for today and they are (INDISCERNIBLE).
6                    THE COURT:  We could play it by ear too.
7                    ATTY. MATTEI:  Yeah.
8                    THE COURT:  But, I would be happy not to go to
9            4:45 or 4:30.
10                   ATTY. PATTIS:  I did -- I wasn't entirely clear
11           with Attorney Mattei yesterday, because I expected an
12           hour, an hour and a half, and then I'm thinking about
13           it overnight.  I gave him a heads up this morning
14           about the videos.  I'm just kind of --
15                   THE COURT:  All right.  We'll play it by ear.
16           But I think we probably would all prefer not to do it
17           at 4:30, 4:45.
18                   ATTY. MATTEI:  Sure.
19                   THE COURT:  How about that?  Okay.
20                   (SIDEBAR END).
21                   THE COURT:  All right.  So, getting back to
22           when, are we punting again, or do we want?  When do
23           we want to do the FSS PQPR issue?
24                   ATTY. STERLING:  Your Honor, we can take it up
25           now.
26                   THE COURT:  Well, I don't -- I should have been
27           a little clearer.  I want to do it with -- not to
```

```
1        inconvenience the jury.  So, we can, you know, we can
2        do it either at the end of the day, we can do it --
3        we could come in Tuesday and do it at 9:45 if you
4        want.  I just don't want to do it when the jury is
5        waiting.  I just didn't know when we needed to decide
6        it by.
7             ATTY. MATTEI:  Given what Attorney Pattis has
8        said, he expects to do the cross on Miss Paz.  I
9        suppose so long as she doesn't say anything on the
10       radar of my direct, we probably don't need to do it.
11            ATTY. PATTIS:  I have no intention to get into
12       that --
13            THE COURT:  Oh, okay.
14            ATTY. PATTIS:  -- that area.
15            THE COURT:  Okay.
16            ATTY. PATTIS:  If it changes, I'll alert the
17       Court, but I don't --
18            THE COURT:  Sure.
19            ATTY. PATTIS:  -- you know.
20            ATTY. STERLING:  So, Your Honor, then can we do
21       it late in afternoon?  I think we do need a ruling,
22       for the record.
23            THE COURT:  All right.  So, why don't we
24       tentatively plan on doing it at the end of the day,
25       tentatively, and if not, we'll do it Tuesday morning,
26       9:45.  How is that?
27            ATTY. PATTIS:  Perfect.
```

```
1              THE COURT:  Okay.  Perfect.
2              ATTY. PATTIS:  You can take the papers from our
3         perspective.  I've said all I have to say on it.
4              THE COURT:  Do you want argument on it?
5              ATTY. STERLING:  Yes.  Yes, Your Honor.
6              THE COURT:  All right.
7              Okay.  I think we are ready for the panel.
8              And while we are waiting to bring the panel
9         out, I will just remind everyone that in accordance
10        with judicial branch policy, only those entities who
11        has been specifically authorized to film or otherwise
12        record or photograph the proceedings, are permitted
13        to do so.  If anyone violates the policy, your device
14        will likely be confiscated by me and you may be
15        removed from the courtroom or courthouse.  So,
16        please, just obey the rules.
17             (JURY PANEL ENTERS).
18             THE COURT:  Good morning.
19             JUROR VOICE:  Good morning.
20             THE COURT:  Welcome back.  Good to see everyone.
21        Good morning, good morning, good morning.  Welcome
22        back everyone.  Good morning.
23             JUROR VOICE:  Good morning.
24             THE COURT:  Please be seated.
25             Ron will get you your notebooks, and counsel
26        stipulates that the entire panel is present in the
27        jury box?
```

```
1              ATTY. PATTIS:  I do.

2              ATTY. MATTEI:  Yes, Your Honor.

3              THE COURT:  All righty.  I know you have been a

4       very conscientious jury here on time.  By the way, we

5       actually started at 10:00.  We had some legal issues

6       to address and some motions to argue.  So, we are

7       sorry we got a little bit of a late start, but we are

8       very grateful that you are so punctual every morning,

9       after every break, after lunch, so that we can move

10      smoothly and efficiently.

11             Ron has not advised me of any written note, so

12      I am -- I assume that everyone has been able to

13      comply with the rules, avoid any media coverage, and

14      is not concerned with any issues relating to the

15      conduct of the proceedings but, if something does

16      arise at any time, please make sure that you let

17      Mr. Ferraro know so that we can immediately address

18      it.

19             All right.  Thank you.

20             Attorney Mattei, whenever you are ready?

21             THE WITNESS: May I?

22             THE COURT:  Miss Paz, you may take the stand.

23             Of course you remain under oath.

24             And while you are making yourself comfortable.

25      Just as a reminder, I did tell everyone -- I believe

26      I told everyone during jury selection and maybe even

27      the first day -- that September 30th -- which is a
```

```
1              Friday, right Mr. Ferraro?

2                   THE CLERK:  Yes, Your Honor.

3                   THE COURT:  We will not be in session.  So, that

4              will be a shorter week for you.  That will be a

5              Tuesday, Wednesday, and Thursday.  I think that's the

6              last week of the month.  Just so you -- for your

7              planning purposes, that week, not only will you have

8              Monday off, but you will have Friday, September 30th

9              off.  Okay?

10                  You may inquire whenever you are ready,

11             Attorney Mattei.

12                  ATTY. MATTEI:  Thank you.

13                  Good morning, ladies and gentlemen, good

14             morning Miss Paz.

15                  THE WITNESS: Good morning.

16   CONTINUED DIRECT EXAMINATION OF BRITTANY PAZ

17   BY ATTY. MATTEI:

18   Q   Yesterday, Miss Paz, we started in March, of 2014,

19   when Mr. Halbig was first invited on the Alex Jones show;

20   correct?

21   A   Yes.

22   Q   And we continued all the way through the end of 2016,

23   and we ended the day yesterday with a broadcast that Alex

24   Jones made which he called, his Final Statement on Sandy

25   Hook; correct?

26   A   Yes, I remember.

27   Q   And I think you acknowledge that not withstanding the
```

1  title, that actually wasn't final statement on Sandy Hook;

2  correct?

3      A   He has mentioned it after that, yes.

4      Q   Okay.  All right.  And the -- he continued into 2017.

5  On April 22, 2017, he broadcast a video that he titled,

6  *Sandy Hook Vampires Exposed*; are you familiar with that

7  video?

8      A   I am.  I don't recall the date but, I do recall that

9  title, yes.

10     Q   Would it be helpful to have that chart just up for

11  you so you could confirm the date?

12     A   Yes.  Yes.

13         ATTY. MATTEI:  Why don't we bring up that chart

14         Miss Paz has been reviewing to check the dates just

15         for her, please?

16     Q   Do you have that before you, Ma'am?

17     A   I do, yes.  So, what date was it again?  I'm sorry.

18     Q   Yup.  This would be April 22, 2017?

19         THE WITNESS:  Can we scroll up?  Thank you.

20     A   Yes, I have see it.  That's the correct date.

21     Q   Okay.  And in this video, do you recall yesterday

22  when I showed you -- I believe it was the final statement on

23  Sandy Hook.  There was a segment of that video where Alex

24  Jones was trying to convince his audience that they should

25  believe Sandy Hook was fake, in part, because CNN had faked

26  it's location.  Do you recall that?

27     A   That was one of the reasons listed in that video,

1   yes.

2       Q   Right.  Right.  And there was an article that went up

3   with with two women reporters that Infowars had published;

4   correct?

5       A   Yes.  That was one of the clips that was played.

6       Q   And I asked you the question whether or not what he

7   was saying was that those two female reporters had been at

8   Sandy Hook claiming to be in different locations but they

9   were actually in the same location.  I think your response

10  was, I don't know what he was talking -- what location he

11  was talking about; right?

12      A   Right.  He doesn't -- I don't think he says that in

13  the video and I didn't ask him specifically.

14      Q   Okay.  So, I would like you to pay special attention

15  to that issue as we watch this first clip.

16              ATTY. MATTEI:  This will be 36A, *Sandy Hook*

17          *Vampires Exposed*.

18              (VIDEO PLAYED)

19      Q   Miss Paz, what I actually want to ask you about on

20  the clip we just saw, is Mr. Jones' reference to himself as

21  a "precision guided heavy munition"; did you hear that?

22      A   I heard him say that, yes.

23      Q   And he's referring to himself as a weapon of war;

24  correct?

25      A   I don't know what he means by that.

26      Q   Okay.  You do know what the words "precision guided

27  heavy munition" means; right?

1    A   I know it is a weapon that is traditionally used by

2    the military, but I don't know how he's using it in this

3    context.  I didn't know what he means.  I didn't ask him

4    specifically about it.

5    Q   And then you heard him say, "I'm going on the barbed

6    wire and everybody else is coming in after me"; correct?

7    A   That's what he said, yes.

8    Q   And he's referring to his audience there; isn't he?

9         ATTY. PATTIS:  Objection, Judge.  Asking to

10        comment on the contents of another mind.

11        THE COURT:  Overruled.

12   A   I don't know what he means by it.  He doesn't say,

13   specifically.

14        ATTY. MATTEI:  Okay.  Let's play the second

15        clip.  This will be 36B, please?

16        (VIDEO PLAYED)

17   Q   This is just repeating some of these same claims we

18   went over?

19   A   Correct.

20   Q   Yeah.

21        So, this is April 2017; correct?

22   A   Yes.  I believe that's the date we said, April 22nd.

23        ATTY. MATTEI:  May I have just one moment, Your

24        Honor?

25        THE COURT:  Take your time.

26        ATTY. MATTEI:  Oh.  I'm told that I originally

27        said 37A, I meant 36A.  This is why I was confused.

1    Q    Miss Paz, I apologize.

2    A    Oh, we saw the wrong video?  Okay.

3    Q    I apologize.

4         36A, *Sandy Hook Vampires Exposed*.  Okay.  This

5    is what I wanted to play when it came to the two female

6    reporters that I first mentioned; okay?

7    A    Okay.

8    Q    All right.

9         ATTY. MATTEI: Let's play 36A.  Thank you.

10        (VIDEO PLAYED).

11        ATTY. MATTEI:  Stop it right there.

12   Q    Did you hear the part where he was talking about the

13   female lawyer with the fake southern accent?

14   A    Yes.

15   Q    You know that to be Nancy Grace; correct?

16   A    I'm not sure what her name is.  I don't watch CNN,

17   but I'll accept that's who it is.

18   Q    No, no, no.  But you understand -- you saw the

19   article that we reviewed yesterday; right?

20   A    Yes.  I saw the clips.

21   Q    Okay.  So, is it clear to you now that when he was

22   referring to that article, he was referring to those two

23   reporters being in the same location at Sandy Hook?

24   A    Yes.

25        ATTY. PATTIS:  Same objection.  Speculation.

26        Contents of another mind.

27        THE COURT:  Overruled.

1      A    That's not clear to me by that clip.  He seems to be

2    talking about the Anderson Cooper interview.  He says,

3    clearly, a site at Sandy Hook.  Then he's talking about that

4    separate video footage with the two ladies from CNN.  It's

5    hard to tell if he means that they are the same thing, in

6    the same place.  He never says.  So, I can't tell from this.

7      Q    I guess it would be hard for his audience to tell as

8    well?

9            ATTY. PATTIS:  Objection, Judge.  Attorney Paz

10           was not finished.

11     Q    I'm sorry.  I didn't mean to cut you off.

12     A    That's okay.

13            It seems to me he's talking about two separate

14    things, but he doesn't specifically say that they are the

15    same in the video.

16            ATTY. MATTEI:  Let's pull up Article --  this is

17           Exhibit 65.  Already in evidence.

18            THE CLERK:  I do not have 65 as a full exhibit.

19            ATTY. MATTEI:  Oh.  It's agreed to.  It's

20           previously been agreed to.

21            ATTY. PATTIS:  I don't have that, but I won't

22           object.

23            THE COURT:  All right.  It's a full exhibit.

24     Q    Okay.  Do you see this article?  *CNN Anchors Fake a*

25    *Satellite Interview in the Same Parking Lot*?

26     A    Yes.

27     Q    Okay.  This is published May 9, 2013, by Infowars?

```
1       A    That's what it appears, yes.

2       Q    Okay.  And if we go down to --

3            ATTY. MATTEI:  No.  You can stay up there.  I'm

4       sorry.

5       Q    If we go down to this third paragraph.  "Tricky, CNN,

6   very tricky.  We understand, though, when a major crime

7   story like the Cleveland Kidnapping breaks, you have to send

8   Nancy Grace.  However, since Nancy Grace is a

9   poorly-medicated vengeance demon who is always just a bad

10  morning away from ending up on our show, you always send in

11  a real anchor with whom she can correspond?"

12      A    That's what it says.

13      Q    All right.  And, so, this article, published May 9,

14  2013, was referring to some claim about the reporters being

15  in Cleveland, not Sandy Hook; correct?

16      A    That's what it looks like.  Yes.

17      Q    So, later in 2017 --

18           ATTY. MATTEI:  You can pull that down.

19      Q    -- Alex Jones gave an interview to Megyn Kelley;

20  correct?

21      A    Yes.

22      Q    And Megyn Kelley is a fairly famous media

23  personality; yes?

24      A    Yes.

25      Q    She once worked at Fox, she later worked at NBC?

26      A    Yes.

27      Q    And Alex Jones agreed to give her an interview; yes?
```

1     A    He did.

2     Q    And before that interview aired, he became very

3  unhappy about what was going to be aired; correct?

4     A    That's -- that's a very brief way of saying it but,

5  yes, he was not happy with the interview that was aired.

6     Q    Okay.

7     Q    And, in particular, he wasn't happy with how he

8  claimed the interview was presenting his claims about Sandy

9  Hook; is that fair?

10     A    That was one of his problems with it, yes.

11     Q    He had many many problems, he was very upset?

12     A    He was very upset about it, yes.

13     Q    And, so, he went on the air to talk about that;

14  right?

15     A    He did.

16     Q    And I think that's when he -- part of what he was

17  doing, that video we just saw where he said, "Here's my

18  message to Megyn Kelley, Chelsea Clinton, and all these sea

19  hags of the new world order, I'm not trying to get out of

20  this alive"?

21     A    That may have been what he --

22     Q    Well, was it or not?

23     A    I don't know.  I didn't specifically ask him, but he

24  does mention Megyn Kelley.

25     Q    Okay.  Well that Exhibit 37 is actually entitled,

26  *Alex Jones Warns Megyn Kelley, Exposes Psychological Warfare*

27  *Operation*; correct?

 1     A    Yes.  I think that might have been the video where he
 2   addresses the interview.
 3     Q    When did the interview happen?
 4     A    I can't recall the date.  I'm sorry.
 5     Q    Okay.  You knew I was going to ask you about this,
 6   right?
 7     A    Yes.  I just cannot recall the date.
 8     Q    Can you recall the month?
 9     A    I'm sorry, I don't.
10     Q    All right.  In any event, what Mr. Jones did is he
11   took to the airwaves to complain about it; yes?
12     A    Yes.
13          ATTY. MATTEI:  Okay.  Let's pull up 39A.
14          THE COURT:  That's a full exhibit, Ron?
15          THE CLERK:  Yes, Judge.
16          ATTY. MATTEI:  One moment, Your Honor?
17          THE COURT:  Take your time.
18     Q    One of the individuals who gave an interview in
19   connection with that Megyn Kelley broadcast, was a gentleman
20   named Neil Heslin; correct?
21     A    Yes.  I believe Mr. Heslin did give an interview.
22     Q    Neil Heslin is the father of Jesse Lewis who was
23   murdered at Sandy Hook; correct?
24     A    Right.
25     Q    And during that interview with Megyn Kelley,
26   Mr. Heslin said that after the shooting he had held his
27   child and that his child had a bullet hole in his head;

```
 1   correct?

 2        A    Yes.  I believe he said that.

 3        Q    And after that interview, Infowars ran a video

 4   entitled Zero Hedge Discovers Anomaly in Alex Jones Hit

 5   Piece; correct?

 6        A    Yes.  I believe that's the title.

 7        Q    And that video was hosted Owen Shroyer; correct?

 8        A    It was, yes.

 9        Q    Owen Shroyer is the gentleman who hosts the War Room,

10   another broadcast that comes on right after Alex Jones;

11   correct?

12        A    Yes.

13        Q    He reports directly to Alex Jones; correct?

14        A    As does everybody.  Yes.

15             ATTY. MATTEI:  Let's play Exhibit Number 41.

16             THE CLERK:  That is a full exhibit, Your Honor.

17             THE COURT:  Thank you.

18             ATTY. MATTEI:  And for the record, Your Honor,

19        this video was broadcasted.

20        Q    And you could look at your chart if you would like,

21   Miss Paz.

22             ATTY. MATTEI:  June 26, 2017.

23             (VIDEO PLAYED)

24        Q    Miss Paz, the first thing I want to ask you about is

25   the entire source for what Owen Shroyer just did there was

26   an article by Zero Hedge; right?

27        A    Right.
```

1    Q    *Zero Hedge* is a website; correct?

2    A    It is a website.

3    Q    All right.  And it runs articles with anonymous

4    authors; correct?

5    A    Sometimes they are anonymous.  I don't think they are

6    always anonymous, but --

7    Q    Well, what's your basis for saying that?

8    A    I don't know anything about *Zero Hedge* so I can't say

9    they are always anonymous.  I don't know anything about it.

10    Q    I think you just testified that you don't think they

11    are always anonymous, so which is it?  Do you know or you

12    don't know?

13    A    I don't know that they are always anonymous.

14    Q    You knew I was going to ask about this video;

15    correct?

16    A    Yes.

17    Q    You knew I was going to ask you about *Zero Hedge*;

18    correct?

19    A    Well, I don't know anything about *Zero Hedge* I don't

20    represent *Zero Hedge*, so I can't testify as to *Zero Hedge*.

21    I could testify as to the article that he was reciting

22    but --

23    Q    Let me see if I can ask you my question again?

24    A    Sure.

25         ATTY. PATTIS:  Objection, Judge.  She wasn't

26         finished answering his question.

27         THE COURT:  I think she was.

1    Q   You knew I was going to ask you about *Zero Hedge;* yes

2  or no?

3    A   About the company *Zero Hedge*?  About the website how

4  it operates?

5    Q   Let me ask it again.

6          ATTY. PATTIS:  Objection.

7    Q   You knew I was going to ask you about *Zero Hedge*?

8          THE COURT:  One second, please.

9          ATTY. PATTIS:  I'll withdraw it.  I didn't

10         stand.

11   Q   You knew I was going to ask you about *Zero Hedge;* yes

12  or no?

13   A   I knew you were going to ask me about these articles,

14  yes.

15   Q   There is one article, yes.

16   A   *Zero Hedge* is a source that *Infowars* will routinely

17  use, yes, but I don't know much website *Zero Hedge*.

18   Q   I'm going to just see if I can ask you my question

19  again, please?  I can tell that this might be difficult

20  today.

21         ATTY. PATTIS:  Objection.  Move to strike.

22         THE COURT:  Sustained. I'll strike that.

23         Miss Paz, listen to the question and answer the

24         question that's asked, not the question that you want

25         to answer.  Answer the question that's asked.

26   A   Did I know that you were going to ask me about *Zero*

27  *Hedge*?  I didn't think that I would have to answer questions

 1  about the website *Zero Hedge* so, no.

 2      Q    So *Free Speech Systems* came in here today knowing

 3  that I was going to ask you about this video, knowing that

 4  it relied upon a *Zero Hedge* article for the claim that Neil

 5  Heslin was lying, and you don't know anything about it --

 6  about -- about *Zero Hedge.*

 7                  ATTY. PATTIS:  I'm going to renew my objection.

 8                  THE COURT:  All right.

 9                  ATTY. PATTIS:  Free Speech -- there is a

10          corporate rep here.  If Free Speech is here, that's

11          different.

12                  Objection.  Relevance.  Speculation.

13                  THE COURT:  So, I think I will sustain the

14          objection.

15                  If you could move on.

16      Q    You know that the author of the article that Free

17  Speech Systems was relying on was anonymous; correct?

18      A    For this article, yes.

19      Q    And you know that the videos that Mr. Shroyer showed

20  in this of the Medical Examiner, Dr. Wayne Carver, was

21  cutoff at the end; correct?

22      A    Yes.

23      Q    And it was cut off for the purpose of lying to talk

24  to the audience about whether or not parents were allowed to

25  come into contact with their children?

26                  ATTY. PATTIS:  Objection.  Speculating about the

27          contents of another mind or the purpose of.

```
1              THE COURT:  Overruled.
2       A    I can't testify as to the reason why it was cut off.
3       Q    Okay.  So, Free Speech Systems is here today to
4    testify about this video that showed a video of Dr. Carver
5    cut off, cannot tell this jury why it was cut off?
6              ATTY. PATTIS:  Same Objection, Judge.
7              Speculation.
8              THE COURT:  Overruled.
9       A    I don't know why because I can't say --
10      Q    Excuse me.  That was a yes or no question.
11      A    And my answer is, I don't know.
12      Q    The answer is, you can't tell this jury why it was
13   cut off; correct?
14      A    That's correct.  Yes.
15      Q    He also showed a video at the end of another couple;
16   correct?  A couple that lost their child at Sandy Hook?
17      A    Yes.
18      Q    That video was cut off before it ended; correct?
19      A    It was cut off, yes.
20      Q    Why was it cut off?
21      A    Same answer, I don't know.
22      Q    Free Speech Systems doesn't know?
23      A    Correct.
24             ATTY. PATTIS:  Objection.
25      Q    It knows that they cut it off.
26             THE COURT:  There is an objection.
27             ATTY. PATTIS:  May I have a standing objection
```

```
 1              to any -- the form of any question Free Speech
 2              Systems?  If she's here as a legal representative,
 3              she's not the corporation, Your Honor.
 4                   ATTY. MATTEI:  I don't think we need a speaking
 5              objection, Your Honor.
 6                   ATTY. PATTIS:  I'm just asking for a standing
 7              objection.
 8                   THE COURT:  Very well.
 9    Q    Miss Paz, do you know that the Medical Examiner's
10  statement, if it had been allowed to continue, would have
11  confirmed that after the children were identified, the
12  parents were allowed to see their children; do you know
13  that?
14    A    Yes.  I know that there is a longer piece of that
15  interview.
16    Q    And that that's what it shows?
17    A    Yes.
18    Q    But Free Speech Systems chose to cut the video off
19  there; correct?
20    A    It was cut off, yes.
21    Q    And Owen Shroyer said, I guess we are not going to
22  hear any explanation from Mr. Heslin on this; right?
23    A    Um --
24    Q    Do you recall that?
25    A    I don't know if he said it like that, but he said,
26  maybe we have clarification from Mr. Heslin and/or Megyn
27  Kelley.  I think that's what he said.
```

Q   And Free Speech Systems chose to run this video to retaliate against Mr. Heslin for having cooperated in the Megyn Kelley piece; right?

ATTY. PATTIS:  Same objection.  Standing.

A   I can't testify as to why he ran it.  I know Owen was deposed on this issue.

ATTY. MATTEI:  Excuse me, Your Honor.

Q   So, you have don't know?

A   If your question was, if it was retaliatory?  No, I can't say whether it was retaliatory.

Q   You met with Alex Jones; correct?

A   I did.

Q   You met with Owen Shroyer; correct?

A   I don't think I was able to speak to Owen while I was there.  I don't recall speaking with Owen.  I read his deposition.

Q   How many on-air hosts does Free Speech Systems have?

A   We have Mr. Knight, we have Mr. Dew, we have Mr. Shroyer, we have Mr. Jackson at one point.

Q   David Knight was fired two years ago; wasn't he?

A   Right.  I mean, during the time here.

Q   I'm asking right now.

A   Oh.  Honestly, I'm not sure right now.  But he doesn't work there now, Mr. Knight.

Q   No. No.

So, how many on-air hosts does Free Speech System have right now?

```
 1              ATTY. PATTIS:  Objection.  Relevance, Judge.
 2              THE COURT:  Overruled.
 3              ATTY. PATTIS:  What's that have to do with the
 4         complaint?
 5              THE COURT:  Overruled.
 6    A    Three or four?
 7    Q    Was that a guess?
 8    A    I'm not sure.  Three or four.
 9    Q    So, Free Speech Systems, coming here to testify,
10  can't tell this jury how many on-air hosts it has; correct?
11              ATTY. PATTIS:  Same objection as to the form.
12              THE COURT:  Overruled.
13    A    Three or four.
14    Q    Okay.  Who are they?
15    A    Mr. Dew, obviously, Alex, Owen is still there, and
16  maybe one other.
17    Q    Miss Paz, Mr. Dew no longer works for Free Speech
18  Systems, does he?
19    A    I don't think he works there currently, but he was --
20    Q    So, he's not an on-air host is he?
21              ATTY. PATTIS:  Excuse me, Judge.  Objection.
22         She's not finished.
23              ATTY. MATTEI:  I think she was finished.
24              ATTY. PATTIS:  I don't.
25              THE COURT:  I think she was finished too.
26              THE WITNESS: I wasn't finished.
27              THE COURT:  Okay.  Well, we'll move onto the
```

```
1              next question.

2                     THE WITNESS:  Okay.

3                     THE COURT:  But I think what you are doing is

4              not answering the question that's asked.

5                     THE WITNESS:  Oh, okay.  I'm sorry.  I'm trying

6              to answer his question.

7                     THE COURT:  So, he will ask the next question.

8       A    When I was there and I interviewed --

9       Q    There is no question pending?

10                    THE COURT:  There is not a question now.

11      Q    Okay.

12             I just want to please understand whether you

13     can tell this jury how many on-air hosts Infowars has.  You

14     started out by saying three or four, then you said, I'm not

15     sure, then up went back to three or four.  I asked you to

16     name them.  You said, Alex, you said, Rob Dew.  Do you agree

17     with me Rob Dew is not employed by Free Speech Systems right

18     now; yes or no?

19      A    Yes.

20      Q    Okay.  So, Rob Dew is not an on-air host; right?

21                    ATTY. PATTIS:  Objection.  That's argumentative

22              that he made --

23                    THE COURT:  Overruled.

24      Q    Right?

25      A    Presently?

26      Q    Yes.

27      A    No.
```

1      Q    Okay.  So, you got Alex, you got Owen; right?

2      A    Right.

3      Q    Who else?

4      A    I'm not sure.  People come and go a lot, so I'm

5  honestly not sure as I sit here.

6      Q    So, the only on-air hosts that you are sure about are

7  Owen Shroyer and Alex Jones; correct?

8      A    Those are ones I'm sure about, yes.

9      Q    Okay.  And you knew that you were going to be asked

10  about this video with Owen Shroyer; correct?

11      A    Yes.

12      Q    There are only two on-air hosts that you know of;

13  right?

14      A    Presently, yes.

15      Q    And you decided not to speak to one of them; right?

16      A    It's not that I didn't -- decided not to speak to

17  him, it's just wasn't available to happen for whatever

18  reason.  I can't recall.

19      Q    You testified on the first day here, Ma'am, that you

20  have an independent duty when you are coming here to testify

21  under oath before this jury, to find out what you need to

22  find out, to speak on behalf of the company; correct?

23      A    Yes.

24      Q    You were given Owen Shroyer's phone number; weren't

25  you?

26      A    Yes.  I believe I have his phone number.

27      Q    Did you call him?

```
1    A    I did not call him; no.
2    Q    Okay.  Do you recall a broadcast on October 26, 2017?
3         ATTY. MATTEI:  Why don't we bring up the chart
4         for Miss Paz; please?
5    A    What was the date?
6    Q    October 26th?
7    A    Okay.  Yes, I see it.
8    Q    It's another video in which Mr. Jones talks about
9  Sandy Hook; right?
10   A    Can I have it back up?  I'm sorry.
11        The title is *JFK Assassination Documents to
12  Drop Tonight Full Show*, but I do believe he's mentioned
13  Sandy Hook in that broadcast.
14   Q    Right.  Right.
15        ATTY. MATTEI:  Let's play clip 40 --
16        Actually, Your Honor, we offer 43A, please?
17        It's not yet in evidence.
18        THE CLERK:  It's a full exhibit.
19        ATTY. PATTIS:  Yeah, it is.  Yeah.
20        ATTY. MATTEI:  Oh, we agree it's in.  I better
21        get better at that.
22        Sorry, Attorney Ferraro.
23        THE COURT:  That's why we have Mr. Ferraro here.
24        ATTY. MATTEI:  Let's play the video?
25        (VIDEO PLAYED)
26   Q    "Phony as a $3 bill".  We've heard that before;
27  right?
```

1    A    He's said that quite a few times.

2    Q    Mm-hmm.

3         And the records -- the records that he

4    referenced that the CIA then went to Adam Lanza's house;

5    what records is he talking about there?

6         ATTY. PATTIS:  Objection. Speculation.  Contents

7         of another mind.

8         THE COURT:  Overruled.

9    A    I don't know.  He doesn't say.

10   Q    He doesn't say there, but he must have said to you

11   when you interviewed him; right?

12   A    He did not say that when I interviewed him, no.

13   Q    And that was October of 2017; yes?

14   A    Yes, I think that's the date.

15   Q    Nearly five years after the shooting, he's still

16   going at it; isn't he?

17   A    This is almost five years later, yes.

18   Q    Now, Miss Paz --

19        ATTY. MATTEI:  You could take that down.  Thank

20        you.

21   Q    -- you know that the plaintiffs demanded that

22   *Infowars* produce videos that it broadcasts concerning Sandy

23   Hook; correct?

24   A    Right.

25   Q    And it produced some; yes?

26   A    Right.

27   Q    There were a number of videos that we had -- the

1    plaintiffs had to find on their own; correct?

2        A    I believe that's right.

3        Q    Including a whole number of videos that Infowars

4    didn't produce to us; correct?

5        A    I'm sure that's accurate, yes.

6        Q    And as we've gone over before, Infowars has no idea

7    how many videos and articles it published concerning

8    Mr. Jones lies about Sandy Hook; correct?

9        A    Do I know whether there is a specific number, is that

10   the question?

11       Q    No.  But the question was, you testified earlier that

12   Infowars has no idea how many videos or articles it

13   published about Mr. Jones' lies about Sandy Hook; you

14   testified to that, correct?

15       A    Right.

16       Q    Thank you.

17            But one of the things that Free Speech Systems

18   maintains are radio logs; correct?

19       A    You mean like show logs?  The logs of the shows?

20       Q    Radio logs.  That's what they -- they were produced

21   to us as radio logs; do you know that?

22       A    Okay.  Yes.

23       Q    And radio logs are basically outlines of the show;

24   yes?

25       A    Right.  It's kind of, like, minutes for the show,

26   what is spoken about, at what time.  It makes it easier to

27   find things later.

1    Q   It doesn't really give you the substance, but it

2   gives you the topics?

3    A   Right.  Correct.

4    Q   And Infowars doesn't have radio logs for all the

5   years but it had some; yes?

6    A   Right.  I don't know they had started making those

7   until later, so they didn't always make those.

8           ATTY. MATTEI:  Why don't we pull up Exhibit 50.

9           And let me just confirm with Attorney Ferraro

10        that that's already in?

11          THE CLERK:  50 is in as a full exhibit.

12          ATTY. PATTIS:  It is.

13   Q   And you know -- have you seen this before?

14   A   I have not seen a summary chart, no.

15   Q   Okay.  I'll represent to you that this has been

16   admitted as a chart of all Sandy Hook related broadcasts as

17   described in radio logs for which there are no videos; okay?

18   A   Okay.

19   Q   So, all of the videos that we've seen about Sandy

20   Hook, they are not on this --

21   A   Okay.

22   Q   -- right?

23          This is a summary chart just for radio logs

24   showing that Sandy Hook was talked about for which no videos

25   have been produced; okay?

26   A   Okay.

27   Q   And let's go to the first page.  The first date

1    there, what do you see, Miss Paz?

2        A    April 8, 2013.

3        Q    Okay.

4            ATTY. MATTEI:  Let's just kind of scroll

5            through.

6        Q    What is the last date there?

7        A    October 4, 2021.

8        Q    It's about eight years?

9        A    After Sandy Hook, is that the question?

10       Q    No.  No.  These broadcasts about Sandy Hook cover

11   about eight years; do they not?

12       A    From 2013 to 2021.

13       Q    And if the jury wanted to see any of these videos,

14   they can't because Infowars didn't produce them; correct?

15       A    Well, I can't say whether we have them or not, but

16   they were not produced.  Whether we have them is different,

17   but --

18       Q    Well, if you have them, they should have been

19   produced; right?

20       A    I can't say that we have them, but they have not been

21   produced.  Correct.

22            ATTY. MATTEI:  Pull up Exhibit 2016, please?

23            216, I'm sorry.

24            THE CLERK:  That is a full exhibit.

25            ATTY. PATTIS:  Agreed.

26       Q    You will recall, Miss Paz, that we've looked at this

27   exhibit before.  This is the Media Kit for 2014; right?

1          A    Yes, I require.

2          Q    And this is the one with the language that neither

3     one of us could understand?

4          A    Oh, yes.  I remember.

5               ATTY. MATTEI:  Let's go down.  I think so.

6          A    Right.

7          Q    But there is a part here that I did want to look at

8     here.  You see, Kings of Their Domains down here?

9          A    Yes.

10         Q    And then I want to look at that Topping the Chart

11    section here.  All right.  Now we looked at this a little

12    bit before?

13         A    Yup.

14         Q    And the point of this Media Kit is to show potential

15    advertisers just how dominant Infowars is in the

16    marketplace; correct?

17         A    Right.  This is why you should want to advertise

18    here.

19         Q    Right.  Because Infowars and prisonplanet.com are

20    significantly bigger and more popular than the other

21    websites listed; correct?

22         A    Right.

23         Q    And the third website listed, is GlennBeck.com;

24    right?

25               ATTY. PATTIS:  Judge.  Asked and answered.  We

26          did this yesterday.

27               THE COURT:  Overruled.

```
 1        A    That's what it says.

 2        Q    And Glenn Beck is a -- also a media personality;

 3   right?

 4        A    I believe so, yes.

 5        Q    Quite conservative; correct?

 6        A    I don't know a lot about him, but I believe he is a

 7   conservative commentator --

 8        Q    Okay.

 9        A    -- similar to Rush Limbaugh.

10        Q    Similar to Rush Limbaugh, correct?

11        A    Correct.

12        Q    Rush Limbaugh, at one time, was a very popular and

13   widely listened to radio host; correct?

14        A    Right.  I don't know if he's still on the air.  He

15   might still be on the air but --

16        Q    Also very conservative, yes?

17        A    Sure.

18        Q    Both men fairly -- considered fairly controversial

19   and provocative; yes?

20        A    I mean, I don't know a lot about them as I said, so.

21        Q    Okay.  And as far as Free Speech Systems knows,

22   neither one of them said a word about Sandy Hook; correct?

23             ATTY. PATTIS:  Objection to the form.

24             THE COURT:  Overruled.

25        A    I don't know the answer to that.  I don't know if

26   they've ever spoken about Sandy Hook, I don't know.

27        Q    Okay.  So, as you sit here right now, Free Speech
```

1    Systems has no basis to say whether or not they've ever said

2    a word about Sandy Hook; correct?

3         A    No.   I don't know anything about their shows.

4         Q    What about Newsmax?  Do you understand Newsmax via --

5    Newsmax.com is a website and Newsmax itself is a news

6    company; fair to say?

7         A    Yes.

8         Q    A news company that's considered fairly conservative?

9         A    Yes.

10        Q    Do you have any idea whether Newsmax has ever said

11   anything about Sandy Hook?

12        A    I don't know.  I don't know anything about Newsmax.

13             ATTY. MATTEI:  We'll get out of that.

14        Q    Now let's go to --

15             I want to go back to Dan Bidondi.

16        A    Okay.

17        Q    Now, Dan Bidondi is the gentleman who is chasing down

18   and harassing the lawyer for the Town of Newtown and the

19   chief of police for the Town of Newtown yesterday; right?

20   We saw that video?

21        A    Yes.

22        Q    This is the gentleman who the jury heard was

23   described, laughingly, by Mr. Jones, as the Kraken; correct?

24        A    Correct.

25        Q    "When we send Dan Bidondi on a mission, we say

26   'release the Kraken'"?

27        A    He has said that, yes.

1    Q    And after Mr. Bidondi sent that footage into

2    Infowars, they had him on for an interview; correct?

3    A    After -- oh yes, they did.  Correct.

4    Q    They had him on to talk about what he had done on the

5    sidewalk there; right?

6    A    They did, yes.

7    Q    All right.

8         ATTY. MATTEI:  One moment, Your Honor?

9    Q    You've reviewed a video in the past called Fight For

10   Information --  "Fight For Freedom of Information At Sandy

11   Hook"?

12   A    Yes, I believe so.

13   Q    And this is an interview that Rob Dew, then employed

14   by Infowars, did with Dan Bidondi about his coverage of the

15   FOIA hearing?

16   A    Yes.

17   Q    Okay.

18        ATTY. MATTEI:  This is going to be 478, Your

19        Honor.

20        THE CLERK:  That is not a full exhibit, Your

21        Honor.

22        ATTY. PATTIS:  It's a late addition.

23         May I speak to Attorney Mattei again?

24        THE COURT:  Certainly.

25        ATTY. PATTIS:  May we approach, Judge?

26             (SIDEBAR).

27        ATTY. MATTEI:  Your Honor, this is a video that

1      we disclosed to Attorney Pattis, we inadvertently

2      omitted it from the list and realized that last

3      night.  She's seen it.  There is no reason

4      (INDISCERNIBLE) what it is.  We'll offer it.

5      Attorney Pattis I think has a late -- late notice

6      issue.

7          ATTY. PATTIS:  I don't know that I want to

8      necessarily want to raise that issue. I didn't see

9      the pleading last night that it was in there.

10         ATTY. MATTEI:  No.  It was not a pleading.

11         ATTY. PATTIS:  I mean, I didn't see any -- the

12     thing in -- did you file something in court?

13         ATTY. MATTEI:  No.  We did not.

14         THE COURT:  Do you want a recess so you can

15     watch it?

16         ATTY. PATTIS:  No.  But --

17         THE COURT:  I'm happy to recess if you want to

18     watch it.

19         ATTY. PATTIS:  It's a long video, Your Honor.

20         ATTY. MATTEI:  No.  It's not.  It's like

21     30 seconds.

22         ATTY. PATTIS:  Okay.  No, I don't want to do

23     that today.  I want to know are there others that

24     were added last night?  Because there are two blank

25     spots on the exhibit list, 473 and 4 that I heard --

26     2 and 3, and now this one.  I'm worried about what

27     anything else.

```
1              ATTY. MATTEI:  Oh no.  There will be additional
2         exhibits.  I don't think there is going to be any
3         additional exhibits (INDISCERNIBLE).
4              ATTY. PATTIS:  (INDISCERNIBLE) but for her right
5         now, this is it?
6              ATTY. MATTEI:  Yeah.  This is it for videos.
7              ATTY. PATTIS:  Okay.  I won't object -- I'll
8         withdraw the objection.
9              THE COURT:  Can we put it on his screen for him
10        to see it?  Do you need to see it?
11             ATTY. PATTIS:  No, I don't need it.  I know what
12        it is.  I just -- I'm more concerned about the tip of
13        iceberg.
14             THE COURT:  Got ya.
15              All right.  So, no objection?
16             ATTY. PATTIS:  Correct.
17             THE COURT:  All right.  Full exhibit.
18   Q    Before we do that, Miss Paz, do you remember when I
19   was showing you the Glenn Beck, and the Rush Limbaugh, and
20   the Newsmax; right?
21   A    Yup.
22   Q    They never said that Sandy Hook was a hoax, did they?
23   A    I'm sorry?
24   Q    They never said Sandy Hook was a hoax?
25   A    I don't know if they did or didn't.  I don't know
26   anything about them.
27   Q    They never said it was fake?
```

```
 1       A    I don't know.

 2       Q    They never said it was synthetic?

 3       A    I don't know.

 4       Q    They never said nobody died there; did they?

 5       A    I don't know.

 6       Q    They never called these families actors; did they?

 7       A    I don't know.

 8            ATTY. MATTEI:  Why don't we pull up.  This is

 9       July 8, 2015.  We are going to play that clip.

10            Play the clip?

11            (VIDEO PLAYED)

12       Q    So, they had Mr. Bidondi back on; right?

13       A    Yes.

14       Q    They, obviously, seen the footage, they aired it;

15  correct?

16       A    Yes.  They were airing pieces of those footage.

17       Q    They had him on to call the town lawyer --

18            ATTY. PATTIS:  Objection, Judge.  Who is "they"?

19       Q    Free Speech Systems, the company you represent, had

20  him on to call the lawyer for the Town of Newtown, somebody

21  representing corruption; correct?

22       A    That's what he says.

23       Q    Somebody who had a central casting; correct?

24       A    That's what he said.

25       Q    Just another actor; right?

26       A    I believe that's what he said.

27       Q    Now, when Infowars was sued, Alex Jones got very
```

1    nervous about it's relationship with Dan Bidondi; didn't it?

2              ATTY. PATTIS:  Objection to the form.

3        A    I don't know.

4        Q    Now, you never read Alex Jones' depositions that he

5    gave in Connecticut; did you?

6        A    Right.  I think we went over this yesterday.

7        Q    But you did read a deposition that he gave in Texas;

8    correct?

9        A    I did.

10       Q    And you read Alex Jones' false testimony that the

11   last thing Dan Bidondi ever did for Infowars, was cover the

12   Boston Marathon bombing in April of 2013; correct?

13             ATTY. PATTIS:  Objection to the form.

14             Argumentative.  Assumes a fact not in evidence.

15             THE COURT:  Overruled.

16       A    Did he testify that Dan Bidondi didn't work with

17   Inforwars after the Boston bombing.

18       Q    Let me ask you that question again.

19       A    Okay.

20       Q    Mr. Jones testified, falsely, that the last thing Dan

21   Bidondi ever did for Infowars is cover the Boston Marathon

22   lie; correct?

23             ATTY. PATTIS:  Same Objection, Judge.

24             THE COURT:  Overruled.

25       A    I don't recall the testimony.  If you would like to

26   show it to me, I would be happy to look at it.

27       Q    Let me see if I can get you to recall just the basic

1   fact.  You do know that Alex Jones testified in Texas?

2      A   Yes.

3      Q   You know that he testified about Dan Bidondi?

4      A   I do.

5      Q   You know that he testified about the timing of when

6   Dan Bidondi was last associated with Infowars; correct?

7      A   I believe he did, yes.

8      Q   And you know that he said that the last time that Dan

9   Bidondi was associated with Infowars, was the Boston

10  Marathon bombing; correct?

11     A   I don't recall.

12     Q   Okay.  So, that's the one thing you don't recall

13  about?

14     A   I just don't recall the specific testimony.  I

15  apologize.

16     Q   We'll bring that up for you a little bit later?

17     A   Sure.

18     Q   You know, though, that that's not true; correct?

19     A   That he worked for Infowars after the Boston bombing?

20     Q   Right.

21     A   Oh, right.  Well, this is after the Boston bombing;

22  correct.

23     Q   He worked for Infowars into 2016; correct?

24     A   I'm not sure the exact date that they severed the

25  connection, but he was a contractor after that.  So, yes.

26     Q   You don't know when the last time he actually did

27  anything for Infowars was?

```
 1      A    I can't recall the exact date.

 2      Q    You know it's 2016 though?

 3      A    That's somewhere thereabouts, yes.

 4      Q    Right, right.  Because he was thrown out of a

 5   political rally and, finally, they decided not to use him

 6   anymore; right?

 7      A    Yes.  There was an issue and he was asked to return

 8   all the gear and stuff.

 9      Q    But after Alex Jones was deposed in Texas, are you

10   aware that Dan Bidondi went on his -- went on a podcast and

11   said that Alex Jones had lied about what he did for

12   Infowars; correct?

13      A    If he went on his own podcast.

14      Q    He went on a podcast --

15      A    Okay.

16      Q    -- and said that Alex Jones had lied about his

17   relationship with Dan Bidondi; right?

18      A    I have not heard any of Mr. Bidondi's podcasts.

19      Q    And you know -- but you snow that as Free Speech

20   System's corporate representative, don't you?

21           ATTY. PATTIS:  Objection.  Form.  Foundation.

22           Corporations don't know things, Judge.

23           ATTY. MATTEI:  Your Honor, the speaking

24           objections should stop, I think.

25           THE COURT:  Yeah.

26           Based on your investigation.

27      A    I have not --
```

```
 1              THE COURT:  Overruled.
 2     A   I have not reviewed any of his podcasts, so I don't
 3   know that.
 4     Q   No.  You never did view his podcasts, but you've
 5   spoken with people at Infowars who know that Dan Bidondi
 6   went on a podcast and said that Alex Jones had lied about
 7   their relationship?
 8     A   I don't think I had any conversations with anybody
 9   about Mr. Bidondi's podcasts.
10     Q   And that after -- after Alex Jones became aware that
11   Dan Bidondi was concerned, Alex Jones called him; correct?
12              ATTY. PATTIS:  Foundation.  Objection.
13              THE COURT:  Overruled.
14     A   I don't know.
15     Q   Have you reviewed Mr. Bidondi's deposition?
16     A   I don't know.  I don't recall reviewing his
17   deposition.
18     Q   You don't recall if you did?
19     A   I don't recall.  I'm sorry.
20     Q   Are you aware that Alex Jones called Dan Bidondi in
21   the presence of a lawyer to speak with him?
22     A   I am not aware of that, no.
23     Q   Are you aware that Alex Jones apologized to Dan
24   Bidondi and invited him down to Texas for dinner?
25     A   No.
26     Q   And put him on the phone with a lawyer?
27     A   No.
```

1    Q    Do you know who that lawyer was?

2    A    No.

3    Q    Are you aware that when Dan Bidondi received his

4    subpoena, he sent some text messages to Rob Dew?

5    A    Did Mr. Bidondi text Mr. Dew?

6    Q    Yes.

7    A    I'm not aware of text messages.  I haven't seen them.

8    Q    Are you aware that Rob Dew texted him back?

9    A    No.

10   Q    So, you haven't seen those text messages?

11   A    No.

12   Q    Do you know what happened to them?

13   A    No.

14   Q    But one can understand why Alex Jones wouldn't want

15   this jury to know that Dan Bidondi was associated with him;

16   right?

17            ATTY. PATTIS:  Argumentative.  Speculative.

18            THE COURT:  Sustained.

19            ATTY. MATTEI:  Let's go to Exhibit 182.

20   Q    Do you remember Steve Pieczenick?

21   A    Yes.

22   Q    Steve Pieczenick is the gentleman that Alex Jones

23   invited on in the spring of 2013, so a few months after

24   Sandy Hook, to say that the parents were crisis actors and

25   the children were actors; yes?

26   A    That's what he said on the video, yes.

27   Q    Okay.

1        ATTY. MATTEI: Before we pull it up, I just want

2     to make sure it's a full exhibit?

3        THE CLERK:  It is a full exhibit.

4        ATTY. PATTIS:  Agreed.

5        ATTY. MATTEI:  Okay.

6     Q    Exhibit 182 has been admitted as a text messages --

7   a text message, Miss Paz, between Alex Jones and his

8   producer, Niko Acosta.  And I want you to look at this first

9   part here.  This is a text message from Alex to Niko.

10  Bullets flew for four minutes as armed deputy waited

11  outside.  It's a link; right?

12    A    Yes.  That's what it looks like.

13    Q    Okay.  This is, by the way, February 23, 2018; right?

14    A    That's what it says on the text.

15    Q    Five years after Steve Pieczenick was on the show

16  claiming that the parents and the children were actors; yes?

17    A    Five years after Mr. Pieczenick was on, yes.

18    Q    And who's coming on, according to Niko, on

19  February 23, 2018?

20        ATTY. MATTEI:  Just the blue ones, please?

21    A    It's a Syrian girl at noon, DR.  D-R period, I assume

22  means doctor, Pieczenick at 1 p.m., and Doug Hagmann doing

23  fourth hour.

24    Q    Okay.  And so in 2018, Alex Jones was still having

25  Steve Pieczenick on the show; right?

26    A    That's what it looks like.  He was on before that

27  too.

```
 1      Q   Have you ever seen this text message before I just
 2   showed it to you?
 3      A   No.
 4      Q   Have you looked at any of the Alex Jones' text
 5   messages?
 6      A   I have not seen any of Alex's text messages.
 7      Q   Why not?
 8      A   I don't know.
 9      Q   Did you ask for them?
10      A   I don't think I specifically asked for text messages,
11   no.
12      Q   What did you specifically ask for other than his
13   deposition and your deposition?
14      A   I asked for all of the depositions.  I did ask for
15   access to all of the Connecticut discovery.  I know that
16   there was an issue getting access to the Connecticut
17   discovery, but I did ask for it.
18      Q   Okay.  So, let's go one by one.  You asked for a copy
19   of all depositions; right?
20      A   Right.
21      Q   Okay.  You just testified you don't know if you read
22   Dan Bidondi's; right?
23      A   Yeah, I don't know.  I'm not sure.
24      Q   Do you know whether it was given to you?
25      A   I don't recall.
26      Q   Okay.  So --
27      A   It might have been amongst the Texas material.  So, I
```

1    did have access to a drop box of Texas --

2        Q    I'll represent to you that Dan Bidondi wasn't

3    deposed.

4        A    Okay.  So, then, it may not have been in that

5    material.  I don't recall.

6        Q    Okay.  So, as you sit here right now, you asked for

7    the Dan Bidondi deposition, but you have no idea whether you

8    received it?

9        A    Well, I asked for all of the depositions, so that

10   wouldn't necessarily include that.

11       Q    And you said you asked for all the Connecticut

12   discovery material.  That means the material that Infowars

13   produced to our plaintiffs here in Connecticut; correct?

14       A    Correct.

15       Q    And when you were deposed by me earlier this spring,

16   you couldn't say whether you reviewed any of it; correct?

17       A    The Connecticut discovery.

18       Q    Right.

19       A    Right.  Correct.  There was an issue with getting the

20   access to the Connecticut discovery.

21       Q    Okay.  But the fact of the matter is, when you showed

22   up for your deposition, you couldn't say that you had

23   reviewed any of the discovery that had been produced in

24   Connecticut; correct?

25       A    Correct.

26       Q    Okay.  So, we saw Pieczenick, Bidondi.

27              ATTY. MATTEI:  Let's pull up Exhibit 191,

 1           please?

 2                This is already in evidence.

 3      Q    Do you remember when I was asking you yesterday --

 4                ATTY. PATTIS:  That's not actually.

 5                THE CLERK:  Not 191 as an exhibit.

 6                ATTY. PATTIS:  I don't object.

 7                ATTY. MATTEI:  I thought we offered it

 8           yesterday.

 9                Just let me check one second?  I want to make

10           sure I'm right.

11                ATTY. PATTIS:  No objection.

12                ATTY. MATTEI:  Sorry, I had the wrong one.  It's

13           my mistake.  204, this should be in evidence.

14                THE CLERK:  204 is a full exhibit.

15                ATTY. PATTIS:  Agreed on 204.

16      Q    All right.  Now, do you remember I was asking you

17      yesterday when Rob Dew had most recently communicated with

18      Wolfgang Halbig; right?

19      A    Yes.  I remember we talked about this.

20      Q    All right.  So, if we go down here, this is

21      November 17, 2020; right?

22      A    That's what it says from --

23      Q    Okay.

24      A    --  Rob at his personal e-mail.

25      Q    This is two years ago.  Rob using his personal

26      e-mail.  You know Rob Dew is an Infowars employee at this

27      time; correct?

```
1        A    At that time, yes.

2        Q    Yes.

3                  Can you read it, please?

4        A    Hay, Wolfgang.  "Great talking with you today.

5   Please don't mention anything about the Federal Court move.

6   We do not --  we do not many to tip anyone off."  Inaccurate

7   phrase in there.  "Also, please send me the three names from

8   you depo list and any including information.  Thanks, Rob."

9        Q    Right.  Do you think he probably meant to say, we do

10  not want to tip anyone off?

11       A    We do not -- right.  It's probably --  he probably

12  said "many" in stayed of want.

13       Q    Now, you've never reviewed this e-mail I take it?

14       A    I've never seen this, right.

15       Q    Okay.  But you do know that there was a point while

16  this lawsuit was pending where in for wars tried to remove

17  the case to Federal Court; do you know that?

18       A    Yes.

19       Q    And it was right around this time, wasn't it?

20       A    I'm not sure of the time period.

21       Q    And what Mr. Halbig -- I'm sorry -- what Rob Dew,

22  Mr. Jones -- one of Mr. Jones top employees is doing, is

23  sharing information about this lawsuit that he doesn't want

24  Wolfgang to share with anybody else; correct?

25       A    He's saying please don't mention anything about

26  Federal Court, so it sounds like they had talked about

27  Federal Court --
```

```
 1      Q    Right?

 2      A    --  in whatever conversation he's referencing.

 3      Q    Right.  And then he's asking him to send him the

 4   their names from Halbig's depo list; right?

 5      A    Right.  That might have been referencing the list of

 6   people that Mr. Halbig wanted to depose.

 7      Q    And this was two years into this case; correct?

 8      A    Right.  This case was filed in 2018.

 9      Q    Okay.  When was -- when did Mr. Dew next talk to

10   Mr. Halbig?

11      A    I don't know.  I haven't seen this e-mail, so, I

12   don't know if there is any after this.

13      Q    Well, let's go up and see.

14                 So, Wolfgang responds; right?

15      A    That's what it look like, yes.

16      Q    So, let's just chart this out real nice.  Let's go

17   down to the bottom.  Great talking with you today.  Right.

18   So, there's a phone call; yes?

19      A    It doesn't say how they spoke, it just says that they

20   spoke.

21      Q    Might have been FaceTime, might have been Skype;

22   right?

23      A    It might have been text, it might have been e-mail,

24   it might have been --

25      Q    Well --

26      A    I don't know.

27      Q    He said, "Great talking to you"; didn't he?
```

1    A    I don't know what that means.  It could mean a lot of

2    things, so.  It just means to me that they communicated.  I

3    don't know how.

4    Q    Okay.  But anyway, follows up with an e-mail, and

5    then Wolfgang e-mails him back; right?

6    A    That's what it looks like.  The next day.

7    Q    And he's giving him suggestions for who Infowars, the

8    company you represent, should depose in this case; isn't he?

9    A    Seems to be in response to his request to say, send

10   me your list of people you want to depose.  So, these are

11   the people that Mr. Halbig would like to depose.

12   Q    And he says, "Have Alex demand under the CT Freedom

13   of Information Public Record Request, a copy of the

14   Connecticut State Trooper One Helicopter Radio

15   Transmission."  Do you see that?

16   A    I do see that, yes.

17   Q    Did Alex do that, do you know?

18   A    I don't know where any information -- FOI requests

19   that Alex has filed.

20   Q    Okay.

21           ATTY. MATTEI:  Let's go to exhibit -- before you

22       pull it up.  I don't believe this is yet in evidence.

23           Why don't we pull it up just for Miss Paz,

24       please?

25           ATTY. PATTIS:  Number, please?

26           ATTY. MATTEI:  198.

27   Q    Miss Paz, you testified yesterday that Paul Watson

```
1    was the editor of the Infowars website back in 2013;

2    correct?

3        A    Yes.  I believe that's what he did at that time.

4        Q    And he is still associated with Infowars, is he not?

5        A    Yes.

6        Q    And the text message that you see here is a text

7    message that Paul Watson sent to Alex Jones in April of

8    2020; correct?

9             ATTY. PATTIS:  No objection to it's admission in

10            full, Judge.

11       A    Yes.  April 2020.  That's what it says.

12       Q    Have you seen this textbook message before?

13       A    No.

14            ATTY. MATTEI:  I'll offer it, Your Honor.

15            THE COURT:  There is no objection.  So, so

16            ordered.

17            THE CLERK:  That was 198, Your Honor.

18            THE COURT:  Thank you.

19            ATTY. MATTEI:  Let's pull up just the first --

20            there you go.

21       Q    So, this is a text message from Paul Watson, April 6,

22   2020.  He sends him -- sends Alex Jones a screenshot of an

23   article on infowars.com; right?

24       A    That's what it looks like.

25       Q    Right.

26       A    It's hard to see.

27       Q    And the headline says --  a little bit is cut off,
```

```
1    but see if you'll accept this.  This is how it looks to you.

2    Staged?  Video shows hospitals using dummies in E.R. for

3    Corona Virus footage; right?

4        A    That's what it looks like.  It is a little bit cut

5    off but that's what it looks like.

6        Q    Okay.  And, obviously, in April, COVID had just hit

7    within the last couple of months; right?

8        A    Right.

9        Q    And what Alex Jones was telling his audience was,

10   number one, the globalists had released COVID upon them to

11   kill them; yes?

12       A    Are you asking me about the Corona Virus footage or

13   COVID?

14       Q    I'm asking you about, generally, the claim that

15   Infowars put out that Corona Virus was intentionally

16   released by the United States Government to kill them.

17       A    I haven't reviewed anything related to COVID coverage

18   so, I mean, I'm generally aware that he covered the COVID-19

19   pandemic?

20       Q    Did I just describe what he said accurately or no --

21   or you don't know?

22       A    I just don't know because I haven't reviewed the

23   COVID coverage.

24       Q    That's fine.

25            In any event, Paul Watson sends Alex Jones this

26   text message, and what does it say?

27       A    This is a video of a medical student training to
```

1  intubate, makes us look ridiculous, suggesting this means

2  COVID is fake, Sandy Hook all over again.

3     Q   Go down to Mr. Jones' response.  What does he say?

4     A   He responds, I get it, and then he posts a few hours

5  later a video --  on Band Video, or he text him a link to

6  Band Video.

7     Q   Actually, I don't think it's a few hours later.  If

8  you look, Ma'am, it's the next day; isn't it?

9     A   Oh, yes.  You are right.  I'm sorry, it is the next

10  day.

11     Q   "This is a video of a medical student training to

12  intubate.  Makes us look ridiculous suggesting this means

13  COVID is fake.  Sandy Hook all over again."  And Mr. Jones

14  says, "I get it"; right?

15     A   That's what it says.

16     Q   Do you know that that article that Mr. Jones said he

17  understood it was ridiculous, remained on Infowars website

18  for two years?

19     A   I don't know anything about that article.

20         ATTY. MATTEI:  It's a good time for our break,

21       Your Honor?

22         THE COURT:  I think so.

23         All right.  So, we'll take our 15-minute

24       morning recess.

25         Ron will collect your notebooks.

26         You will, of course, continue to obey the rules

27       of juror conduct.  And we will be back in session at

```
1          11:45 promptly.

2                  All right.  Have a nice break.

3                  (RECESS).

4                  (IN SESSION).

5                  THE COURT:  Good morning, again.

6                   Please be seated.

7                  ATTY. PATTIS:  Judge, before the jury returns --

8                  THE COURT:  Mm-hmm.

9                  ATTY. PATTIS:  You know I want to -- I made my

10         colleagues aware of this.  These proceedings are

11         being televised, and apparently Wolfgang Halbig is

12         watching these and he has left an unusual message on

13         my client's -- on my representative's phone.  And I

14         know he's been flooding the court with complaints of

15         a feeling that he's being defamed in these

16         proceedings.

17                 THE COURT:  Attorney Pattis, when you say "The

18         Court", I'm not aware of anything, personally.

19                 ATTY. PATTIS:  The clerk has forwarded

20         material -- I don't mean to suggest that you --

21                 THE COURT:  Yeah.

22                 ATTY. PATTIS:  -- I don't know, has forwarded

23         material.  We have no contact with Mr. Halbig.  Miss

24         Paz is not going to return the call.  If I may speak

25         to Halbig through these proceedings?

26                  Knock it off.  Okay?

27                  But I want to make everybody aware of it
```

1          because I don't know where this is going.  They've

2          become increasingly urgent, his communications, in

3          the last few days.

4              THE COURT:  Have you received any communications

5          that you want to mention, Attorney Mattei?

6              ATTY. MATTEI:  Are you asking me, Your Honor --

7              THE COURT:  Yeah.

8              ATTY. MATTEI:  -- I'm sorry?

9              I think all we have received is what was

10         forwarded to us by Attorney Ferraro.

11             THE COURT:  Which I have not seen, 0because it

12         has not been forwarded to me, and I don't need it

13         forwarded to me.  Thank you very much.

14             Okay.  But so noted.

15             Are we ready for the panel?

16             (JURY ENTER).

17             THE COURT:  Welcome back.  I hope everybody had

18         a nice break.

19             All right.  The record will reflect that the

20         entire panel has returned.

21             Please be seated.

22             Whenever you are ready, Attorney Mattei.

23             ATTY. MATTEI:  Thank you very much, Your Honor.

24  CONTINUED DIRECT EXAMINATION BY ATTY. MATTEI:

25     Q    Miss Paz, welcome back.

26             So, we've kind of gone through the videos,

27  we've gone through the Summary Chart videos since 2021.

1  And, really, I think is it fair to say that ever since 2012,

2  and right up until the present day, Infowars is aggressively

3  trying to build it's audience; correct?

4      A    You mean over the last ten years, is that the goal of

5  the business?  Sure.  Yes.  That is the goal of Free Speech

6  is to grow it's viewership, expand, things like that.

7      Q    And I don't want to retread all of this, but the

8  whole idea here is, the more people putting their eyeballs

9  on Infowars content, whether it be on social media, or the

10  website, or anywhere else, the more people can get funneled

11  to the store to buy stuff; right?

12      A    Yes.  That's the business model, essentially.

13      Q    Let's take a look at Exhibit 183 not yet in evidence.

14          ATTY. MATTEI:  So, please, let's just put it up

15      for Miss Paz?

16      Q    And please let me know when you have it in front of

17  you?

18      A    Sure.

19          Yes, I see it.

20      Q    Okay.  And you see that this is an e-mail regarding

21  an affiliate, One Sheet, dated April 2, 2018; see that?

22      A    Yes.

23      Q    Okay.  And this affiliate, One Sheet, relates to

24  Infowars audience numbers; yes?

25          THE WITNESS: Can you -- can I see the whole

26      e-mail, please?  Thank you.

27      A    Okay, yes.  The radio audience numbers through the

1   radio affiliates, yes.

2       Q   And there are some other numbers on there as well,

3   right --

4       A   There is some --

5       Q   -- views, paid views?

6       A   There is some -- there is some YouTube information as

7   well as some other things; yes.

8               ATTY. MATTEI:  I'll offer it, Your Honor.

9               ATTY. PATTIS:  Can I see the top of it, please?

10              No Objection, Judge.

11              THE COURT:  All right.  Full exhibit.

12      Q   All right.  So, this is an e-mail between several

13  Infowars employees April 2, 2018; correct?

14      A   That's what it looks like, yes.

15      Q   And who's Scott Bronson?

16      A   I'm not sure.  I didn't speak to Mr. Bronson.

17      Q   Okay.  You don't know what position he has?

18      A   I'm not sure, no.

19      Q   What about Mr. Castaneda, do you know what position

20  he has?

21      A   Same.  No.

22      Q   John Hanson?

23      A   No.

24              ATTY. MATTEI:  Let's pull up the body of the

25          e-mail.  Here we go.  Yeah.

26      Q   So, it says, "Robert, here's the information we want

27  to put on the Affiliate One Sheet we spoke about on Friday.

1    Any questions, feel free to ask John or myself."  And the

2    Affiliate One Sheet is kind of the audience numbers Alex

3    Jones sends to new radio stations to get them to carry his

4    show; right?

5        A    Yes.  So, it's a one-page information about the show

6    to provide to other stations.

7        Q    Right.

8        A    Right.

9        Q    And right now, he's got more than 200 affiliates

10    around the country; right?

11        A    Right.  I'm not sure the exact number, but it's

12    something to that effect.

13        Q    It's about that?

14        A    About.  Yes.

15        Q    Okay.

16                  And if we go down to number two, Market Region

17    Stats.  There it is.  200 plus AM/FM stations; right?

18        A    That's what it says, yes.

19        Q    6 million daily listeners; yes?

20        A    That's what it says, yes.

21        Q    Okay.  And with respect to YouTube, 2.3 million

22    subscribers?

23        A    Yes.

24        Q    1.5 billion views; yes?

25        A    Yes.

26        Q    And it says, Alex is the number one guest on the Joe

27    Rogan podcast of all times with over 5.5 million views; yes?

```
1         A    That's what it says, yes.

2         Q    And did you recall that when Bill Aldenberg

3    testified, he testified that one of the reasons Alex Jones

4    is so powerful is because he has these platforms?

5                   ATTY. PATTIS:  Foundation, Judge.  She wasn't in

6              the room when he was testifying.

7                   ATTY. MATTEI:  No, she wasn't.  She watched

8              clips, I think, Judge.

9         A    I'm not sure whether I watched that clip or not.

10        Q    You don't recall?  Okay.

11        A    I don't recall.  Yup.  Sorry.

12        Q    It's okay.

13             And then it goes from radio, to YouTube, to

14   Infowars.com.  And here it's providing, you know, some of

15   those data points we saw from Google Analytics yesterday;

16   right?  11.2 million visits?

17        A    Yes, I see that.

18        Q    Okay.  3.5 million Uniques; yes?

19        A    3.4 million, yes.

20        Q    Thank you, I'm sorry?

21        A    That's okay.

22        Q    25.7 million views.  And this is all in the last

23   30 days from when this e-mail was sent?

24        A    That's what it says, yes.

25        Q    Okay.  Then there was some audience demographics

26   breakdown here?

27        A    That's what it looks like.
```

1    Q    They break it down along gender lines, age lines,

2    educational level, racial lines, and income; correct?

3    A    Yes.

4    Q    Okay.  Then you go down further.  And Mr. Jones,

5    also, and I don't think we've mentioned this before, can be

6    reached through Satellite TV; right?

7    A    That's what it says on here, yes.

8    Q    And you know that to be the case; right?

9    A    I think it's on some channels there, yes.

10   Q    And we are good on the radio.

11                  Streaming audio and video.  This is where he's

12   talking about the podcast; right?

13   A    That's where he would have talked about podcasts,

14   yes.

15   Q    Right.  So, like, the Alex Jones show, the War Room,

16   another way you could get it was because they would just

17   take the show, turn it into a podcast, load it up on, you

18   know, wherever you get your podcast as they say; right?

19   A    Sure.  Right.

20                  ATTY. MATTEI:  Okay.  We can get out of that

21        here.

22                  All right, thank you.

23   Q    Now, I want to take you forward to, I believe, we

24   wanted to do 189 --  no, I'm sorry.  190.  Not yet in

25   evidence.

26                  ATTY. MATTEI:  Why don't we just pull it up for

27        Miss Paz screen?

```
1        A    I see it.

2        Q    You see that.  And this is --

3             ATTY. PATTIS:  No Objection, Judge.

4             ATTY. MATTEI:  I'll offer it.  No objection?

5             THE COURT:  So ordered.

6        Q    All right.  This is an e-mail from a gentleman named

7    Tom Pappert; yes?

8        A    Yes.

9        Q    He's an Infowars employee?

10       A    Yes.

11       Q    And what does he do for them?

12       A    I'm not sure what his title is.

13       Q    Okay.  Do you know, like, what is responsibilities

14   are even though you don't know his title?

15       A    He was involved with the marketing, but as far as

16   what he did for that, I'm not sure.

17       Q    And you are getting that just from having read --

18       A    Correct.

19       Q    --  his sign-off there, his signature; right?

20       A    Correct.

21       Q    Okay.  And he's sending this out to Lisa at

22   everydaymedia,com; yes?

23       A    That's what it says, yes.

24       Q    All right.  He says, "My name is Tom Pappert, and I

25   work with Infowars.  I was referred by Dan Clayton-Luce at

26   Henry U.S.A.  We would be a great fit for Henry and I'm

27   interested to see if we can find a way to start a
```

1    relationship".  What's Henry USA?

2        A    Henry is a gun manufacturer.

3        Q    Okay.  Okay.  So, would it be fair to say, then, that

4    what they are looking to do is have Henry USA start

5    advertising it's product with Infowars?

6        A    That's what it sounds like from this e-mail.

7        Q    Okay.  And as a way to kind of induce that, he says,

8    "The Alex Jones has 6 million daily radio listeners, about

9    900,000 online TV viewers, not including our over-the-air

10   and cable affiliates, and receives about 45 to 50 million

11   visitors per month?"

12       A    That's what it says, yes.

13       Q    All right. Okay?

14       A    Mm-hmm.

15       Q    And then he attaches a rate card and demographics.

16   And this was in November of 2019, wasn't it?

17       A    That's what the date says, yes.

18            ATTY. MATTEI:  And why don't we pull up Exhibit

19            Number 41.  I believe this is in as full but I just

20            ask?

21            THE CLERK:  It is a full exhibit.

22            ATTY. MATTEI:  All right.  So why don't we pull

23            up Exhibit 471?

24            THE CLERK:  Oh, I'm sorry.  I thought you said

25            41.

26            ATTY. MATTEI:  Oh, hold on.

27            THE CLERK:  471?

1         ATTY. MATTEI:  Yes, sir.

2         THE CLERK:  That is not a full exhibit.

3         ATTY. MATTEI:  All right.  I think this is

4     agreed to as there being no objection?

5         ATTY. PATTIS:  I don't remember what it is.  It

6     wasn't on the original list.

7         Thank you, sir.

8         No Objection, Judge.

9         THE COURT:  All right.  So ordered.

10    Q   All right.  Now, this is an e-mail from Gabriella

11    Tolentino, Infowars employee; yes?

12    A   Yes.  I see it.

13    Q   And she is sending this directly to Alex Jones;

14    correct?

15    A   Yes.  That's what it looks like.

16    Q   AJ76@AlexJones.net; correct?

17    A   Yes.

18    Q   Okay.  And you know that that's the e-mail address

19    that he uses?

20    A   I know that's his e-mail address.

21    Q   Okay.  And if we -- let's start to scroll through

22    this.  It says, attach an updated version for I.W, that's

23    Infowars social media; correct?

24    A   Yes.

25    Q   And as it stands today, Miss Paz, Infowars has a vast

26    network of social media platforms it's on; correct?

27    A   It's on many platforms, yes.

Q   So, let's good to page two.  A cover of page there.
Social Media Reconnaissance Report, February 20, 2021;
right?

A   I see it, yes.

Q   Okay.  And if we go to the last sentence there, that
paragraph, the following report details the results of
current social media recon of Infowars and Alex Jones, 2021;
right?

A   That's when it says.

        ATTY. MATTEI:  All right.  So, let's just start
        scrolling through here.

Q   So, here, we have, these are all the different social
media platforms that he's on; right?

A   Yes.

Q   And all of the content that Free Speech Systems
pushes out, just as we've been discussing during the
timeframe that we were previously focusing on, goes to all
of these social media platforms; right?

A   Right.  So, I don't know when we would have set up
these particular platforms so, you know, I don't know if it
was around the same time period.  So, whenever the videos
with Sandy Hook started but, generally speaking, if we had
the platforms, all of our content gets uploaded to all of
the platforms.  Correct.

Q   Right.  And the idea they just want to reach as many
people as possible?

A   Correct.

1    Q    So, it's MINDS, GAB, MEWE.  Let's just keep scrolling

2    through here.  Telegram, Parlor, VK, SUBSCRIBE STAR.

3            ATTY. MATTEI:  We'll just scroll down so people

4        can see.

5    A    I'm not going to make you count these all up, Miss

6    Paz, okay.  POLITCHATTER, TRUMPBOOK, MAGABOOK.

7            ATTY. MATTEI:  Just keep going.  Keep going.

8            Oh, hold on here.

9    Q    So, now, we are seeing some livestream platforms;

10   right?

11   A    Yes.

12   Q    Twitch, VIMEO, D-LIVE, Trovo, et cetera?

13   A    Right.

14   Q    And this is in addition to him streaming live to his

15   own website, band.video?

16   A    Correct.

17   Q    And infowars.com; yes?

18   A    Correct.

19           ATTY. MATTEI:  Okay.  Keep going down.

20   Q    Text message alerts.  Okay.  So, this is another way

21   that Alex Jones reaches his audience.  He'll send people who

22   have given his phone number, text messages; right?

23   A    Right.  If they sign up to receive the messages, then

24   there is a program that he can automatically send the text

25   messages to the subscribers.

26   Q    Similar to his daily e-mail newsletter?

27   A    Right.

1      Q    That we talked about earlier?

2      A    Right.

3      Q    How many people have signed up to be contacted by

4  text by Alex Jones?

5      A    I'm sorry, I don't know the number.

6      Q    Okay.

7           ATTY. MATTEI:  Just keep going down.

8      Q    Here's his podcasts; right?  You can pick him up

9  wherever --

10     A    Right.  That's where it's available.

11     Q    Okay.  Got it.

12     A    Right.

13     Q    And, then, just all the links if you want to click;

14  right?

15     A    Right.

16     Q    Okay.  And all of this audience growth has led to

17  ever greater financial success for Alex Jones; correct?

18     A    Yes.  I mean, during this time period, the sales have

19  increased, so, yes.

20     Q    And one of the ways that Alex Jones keeps track of --

21          ATTY. MATTEI:  You can take that down.

22     Q    -- keeps track of just how well the sales have

23  increased, is by getting daily sales reports from Mr. Fruge

24  in the past; correct?

25     A    Right.  He gets the, daily --  maybe not daily, but

26  almost every day.

27     Q    He wants to see it every day?

```
1        A    He does.
2        Q    And, so, when Tim Fruge, I just remind everybody
3    Mr. Jones' long-time business director, his business
4    director, he would be sending him daily sales reports every
5    day; right?
6        A    Right.
7        Q    And he would have sales over Infowarsstore.com; yes?
8        A    Right.
9        Q    And, like, how many units for moving, meaning top
10   selling supplements for that day?
11       A    Right.
12            ATTY. MATTEI:  So, why don't we pull up
13            Exhibit 195 and we'll go to page 25.  I don't believe
14            there's -- I think these are already in.
15            THE CLERK:  195 is a full exhibit.
16            ATTY. PATTIS:  Agreed.
17       Q    All right.  I'll represent to you, Ma'am, that these
18   are text messages between Tim Fruge and Alex Jones.  And
19   what I want to do is just pull up, if we could -- just the
20   bottom there with the date.  There we go.
21            All right.  So, we see here on January 27,
22   2020, Tim Fruge is sending Alex Jones a text message at
23   7:49 p.m.  He says, we are at 205,000 right now.  You
24   understand that to be for the day; right?
25       A    Correct.
26       Q    And just on Infowarsstore.com; right?
27       A    He doesn't say where the numbers are from, but -- so,
```

1    I don't know by looking at this text message.

2        Q    Okay.  And it says the newsletter is performing great

3    right now; right?

4        A    Yes.  Yes, he does.

5        Q    And what that means is, they send out an e-mail

6    earlier in the day in which people could click on it and

7    come to the store and say, that e-mail is really generating

8    a lot of revenue for us?

9        A    Right.

10       Q    Okay.  And he says, hopefully, it will continue

11   through the evening; right?

12       A    That's what it says, yes.

13       Q    Okay.  And then he tells them, 110,000 in gross sales

14   in food.  Equates to almost 70,000 in pure profit; right?

15       A    That's what it says.

16       Q    And 2020 got better for Mr. Jones as it went on;

17   correct?

18       A    How do you mean?

19       Q    I mean, those daily sales really started going up

20   didn't they?

21       A    Oh.  I don't recall.  I would have to look at the

22   numbers.

23       Q    Okay.  Well, why don't we do that.

24           ATTY. MATTIE:  Why don't we go to page 32.

25       Q    Tim Fruge, again, giving his daily reports here.

26           The jury may remember this from opening where,

27   in late February, Alex Jones reaches out at 7:02 in the

1   morning on February 26th; right?  Do you see that?

2      A    Okay.  Yes, I see it.  Just wondering how money

3   dollar where.

4      Q    Yeah.  And right before that he had said, I know it's

5   early?

6      A    Okay.

7      Q    But it's 7 a.m., he's reaching out, he wants to know

8   what's going on; right?

9      A    That's what it says, yes.

10     Q    And Tim Fruge says, we ended up about 810,000

11  yesterday; right?

12     A    That's what it says.

13     Q    It's going it take me a bit to calculate what

14  percentage of that was food.  Obviously, percentage in food

15  is important because we sell it at profit margin; right?

16     A    I don't know if that's the reason why it's important,

17  or they were just trying to monitor whether it's something

18  they wanted to continue, increase sale of, just monitor how

19  it's doing.

20     Q    Exactly, right?

21     A    Right.

22     Q    Because Alex Jones decides, you know, what sales he's

23  going to run; right?

24     A    Correct.

25     Q    What's working; right?

26     A    Correct.

27     Q    He thinks about what he wants to talk about to figure

1   out, you know, what's going to sell well; yes?

2      A   Correct.

3      Q   And he goes, it's going to take me a bit to calculate

4   what percentage of that was food, but it's looking like 650

5   to 700,000 in food sales.  We are already over 100K today at

6   6:45 in morning.  Crazy; right?

7      A   I see it, yes.

8      Q   Alex Jones with his thumbs up.

9      A   He gives a praying emoji, and a thumbs up, and then a

10  ghost emoji.

11     Q   What's the ghost mean?

12     A   It's just a ghost with a tongue sticking out his

13  tongue.

14     Q   And an eye patch?

15     A   I don't know if that's an eye patch, but it's just --

16  I don't know.

17     Q   Just having fun?

18     A   It's a cute emoji.

19     Q   And this, actually, this kind of rate of revenue has

20  continued to increase even since 2020; correct?

21            ATTY. PATTIS:  Objection.  Fact not in evidence.

22            THE COURT:  Overruled.

23     A   I think that the daily sales fluctuate a lot.  So, if

24  you want to look at annual sales, I think that's a little

25  bit more helpful, but sales in general have increased, but

26  daily sales will fluctuate.

27     Q   Mm-hmm.  And -- right.  And just recently, is it fair

1    to say, that Infowars is doing just about a million dollars

2    a week in revenue?

3        A    Oh, I'm sorry. I don't -- I can't recall the exact

4    number of revenue.  You mean presently?

5        Q    Yeah.  Presently?

6        A    I don't know the number, I'm sorry.

7        Q    You don't.

8        A    No.

9        Q    Okay.  You are not aware whether Free Speech Systems

10   has made any representations that it's doing about a million

11   dollars a week?

12       A    I don't -- I don't know if I'm allowed to make

13   reference to the other proceedings.

14       Q    Well, no.  I'm not asking you --

15       A    Okay.

16       Q    -- about any other proceedings.  I'm asking you

17   whether you are aware that Free Speech Systems has

18   represented that it's doing about a million dollars in

19   revenue a week?

20       A    I don't know what the dollar figure is.  I know that

21   there are representations that are being made as far as the

22   income that the company makes and that's --

23       Q    But you are not prepared to tell this jury what it

24   is?

25       A    -- what the number is, right.

26       Q    Does it sound about right?

27       A    I don't know what the number is.

```
1      Q    And I think a lot of what you said is that, you know,
2   Free Speech Systems -- Alex Jones decides, you know, what's
3   going to make him some money, and covers topics in order to
4   make that happen; right?
5                ATTY. PATTIS:  Objection.  Compound.
6                ATTY. MATTEI:  I'll withdraw it.  I'll withdraw
7           it.  I'll withdraw it.
8      Q    You just said, Alex Jones talks about things in the
9   news that he thinks is going to drive revenue; yes?
10     A    He talks about things in the news that he finds
11  interesting.
12     Q    I'm going to ask you just to answer the question.
13               ATTY. PATTIS:  Objection, she's answering.
14     A    A but --
15               THE COURT:  She's not answering the question
16          that was asked.  Do you need to played back?
17               THE WITNESS:  No, I don't.
18                Is that the sole reason why he says things that
19          he says?  No.  But --
20     Q    Miss Paz?  Miss Paz?
21     A    --but is that a reason?  Sure.
22     Q    Miss Paz, you know what question I asked you.
23               ATTY. PATTIS:  Objection.  Badgering.
24               THE COURT:  So --
25     A    Is he saying things for revenue --
26     Q    Ma'am, I think the Judge wants to have a word?
27               THE COURT:  Miss Paz, don't speak while I'm
```

```
1              speaking.
2                   THE WITNESS: Sure.
3                   THE COURT:  Do you need the question played
4              back?  You need to answer the question that was asked
5              not the question you want to answer.  Would you like
6              the question read back?  I can have that done,
7              because you made several efforts and you are not
8              answering the question that was asked.
9                   THE WITNESS: If Attorney Mattei could just
10             repeat it.
11                  THE COURT:  No.  No.  That's not what I said.
12                  Do you have the question or do you want the
13             Court Reporter to play it back?
14                  THE WITNESS: Can I ask what the question was in
15             if it was did he do it.
16                  THE COURT:  I'll have the question played back
17                  THE WITNESS:  Sure.
18                  MONITOR: Yes, Your Honor.  One second.
19                  THE COURT:  Take your time.
20                  ATTY. MATTEI:  You know what, Your Honor, I
21             think I could do it a little bit faster because I
22             think we've covered this.
23      Q    Okay.  Miss Paz --
24                  THE COURT:  Just -- wait until we get back on
25             the record.
26      Q    I'll withdraw that.
27                  Do you remember I think it was Tuesday -- I
```

1    forget which date it was, maybe Wednesday, we talked about

2    how Alex Jones covers things like increased radiation in the

3    news so he could sell iodine.  Remember we talked about

4    that?

5        A    Sure.

6        Q    He talks about food shortages being inflicted on the

7    world so he can sell storable food; right?

8            ATTY. PATTIS:  Compound, Judge?

9            THE COURT:  Overruled.

10       A    Does he say -- talk about food shortages and then

11   plug an add for food?  Yes.

12       Q    He talks about chemical pollutants being used to

13   decrease human libido, depopulate the world, and so he can

14   sell super male and super female vitality; correct?

15           ATTY. PATTIS:  Objection.  Compound,

16           argumentative.

17           THE COURT:  Overruled.

18       A    Yes.

19       Q    And he's been talking about this trial, this week,

20   because he thinks that's going to make him money; correct?

21       A    I don't think that that's the reason.

22       Q    You've been watching the show this week?

23       A    Have I been watching the show?

24       Q    Yeah.

25       A    No.  I don't generally watch the show.

26       Q    Okay.  So, generally, though, what Mr. Jones does, is

27   he's trying to attract audience so that he can send them to

1    the store; right?

2    A    That's the business model we've been talking about,

3    yes.

4    Q    And the way he's been attracting audience this week,

5    while we have all been here, is by talking about this trial;

6    correct?

7              ATTY. PATTIS:  Objection.  That's not in

8         evidence.  She doesn't know.

9              THE COURT:  Sustained.

10   Q    Okay.  Well, let me show counsel Exhibit 479.

11             ATTY. MATTEI:  May I approach, Your Honor?

12             THE COURT:  You may.

13   Q    Do you see that?

14   A    I do.

15   Q    Do you see Mr. Jones' logo for band.video in the

16   corner?

17   A    I do.

18   Q    Do you see Bill Aldenberg depicted in that picture?

19   A    I do.

20   Q    Do you see lettering placed in the lower left-hand

21   corner of the screen that says, Alex Jones Kangaroo Court

22   Watch Day One?

23   A    I see that, yes.

24             THE COURT:  Do you have a bench copy?

25             ATTY. MATTEI:  Sorry Your Honor.

26              I would offer it.

27             ATTY. PATTIS:  It's not self-authenticating.

```
 1          Objection.
 2     Q    Miss Paz, you recognize this two, in fact be, a
 3   screen graph of footage that Mr. Jones played earlier this
 4   week; correct?
 5          ATTY. PATTIS:  She said she hadn't seen it,
 6          Judge.
 7     A    I hadn't read --
 8          THE COURT:  Overruled.
 9     A    I've never seen this, and I haven't seen the show,
10   and I haven't reviewed it, so I can't say what this is.
11     Q    Okay.  Mr. Jones and Free Speech Systems, as far as
12   you know, is the only company that controls the band.video
13   platform; correct?
14     A    As far as I'm aware.
15     Q    And do you see that logo right on there?
16     A    In the upper right-hand corner?
17     Q    Yes, ma'am.
18     A    I see it.
19     Q    Okay.
20          ATTY. MATTEI:  I would offer it, Your Honor.
21          ATTY. PATTIS:  Objection.  Not
22          self-authenticating.
23          THE COURT:  Sustained.
24          ATTY. PATTIS:  Move to strike the
25          representations made about what's in it.
26     Q    Has Alex Jones --
27          ATTY. PATTIS:  Objection.  I would like a
```

```
 1              ruling.  Move to strike.

 2                   THE COURT:  Overruled.

 3        Q    Has Alex Jones been calling this trial a kangaroo

 4   court this week?

 5                   ATTY. PATTIS:  Objection.  She just said she

 6              hadn't been watching.  Foundation.

 7                   THE COURT:  Well, she's speaking for Free Speech

 8              Systems, and she can have that information without

 9              having watched it.  I don't know who she's spoken

10              with or what she's done by way of her investigation.

11        A    I haven't spoken to anybody this week, so I don't

12   know.

13        Q    Has Infowars been calling this trial a kangaroo

14   court?

15        A    I don't know.

16        Q    Okay.  Let me show you 477.

17                   THE COURT:  This is 477?  For ID?

18                   ATTY. MATTEI:  For ID.

19        Q    What do you see there?

20        A    Do you want me to describe it?

21        Q    I do.

22                   ATTY. PATTIS:  I would object to describing a

23              document not in evidence.  If you would lay

24              foundation --

25        Q    Okay.

26                   ATTY. PATTIS:  -- that's a different question.

27        Q    Let's do it this way.  Let's me start it this way.
```

1    Look at the very bottom of that picture, do you see any

2    website address there?

3       A    I see a website address, yes.

4       Q    What's the website address?

5       A    Www.infowars.com/post/watch-highlights-from-ba-Alex-

6    Jones-SandyHook-kangaroo-courthearings.

7       Q    And you recognize that to be a website that's part of

8    the inforwars.com website; correct?

9       A    It looks like it's part of that website.

10      Q    Right.  And it depicts Judge Bellis, does it not?

11               ATTY. PATTIS:  Objection.  The document is not

12           in evidence.  No foundation to discuss it.

13               THE COURT:  You can ask her what it depicts.

14      Q    What does this depict?

15      A    It looks like that's what it depicts.

16      Q    Well, you are sitting right next to Judge Bellis.

17      A    That's what it looks like.

18      Q    Okay.  And that was published on an Infowars page

19   according to that URL address; correct?

20               ATTY. PATTIS:  Objection.  It's not

21           self-authenticating, Judge.

22               THE COURT:  Overruled.

23      A    I don't know aside from looking at the URL.

24      Q    Okay.  Well, you are Free Speech Systems; right?  You

25   know that that's an Infowars URL; right?

26      A    It looks like a URL.  I don't know anything about

27   this.  I haven't asked anybody, and I haven't talked to

1    anybody about it.

2        Q    No, no.  But the words on the bottom that you just

3    read --

4        A    Right.

5        Q     -- if someone were to click on that link, it would

6    take them to Infowars; correct?

7        A    I don't know.  I haven't clicked on the link.

8        Q    Ma'am, read the -- does it say www.Infowars.com?

9        A    I read it.

10       Q    Does it say www.infowars.com?

11       A    That's what it says.

12       Q    Okay.  You know that's your website address, Free

13   Speech Systems; right?

14       A    That is the website address, yes.

15       Q    If somebody clicks on it, that's where they are going

16   to go; right?

17       A    If they go to infowars.com, yes.

18       Q    Okay.  And then Infowars.com is the number of

19   subpages; correct?

20       A    Yes.

21       Q    It's got a video page; yes?

22       A    Yes.

23       Q    It's got a news page; right?

24       A    Yes.

25       Q    It's got a video page; right?

26       A    Yes.

27       Q    Okay.  And if you go to infowars.com and in those

1    subpages that are listed out further in the URL, it's going

2    to take you to infowars.com webpage; correct?

3        A    Yes.  But if you are asking me is this there, I don't

4    know, because I haven't looked for it.

5                    ATTY. MATTEI: I would offer it, Your Honor.

6                    ATTY. PATTIS:  No foundation.

7                    THE COURT:  Overruled.

8                    ATTY. MATTEI:  Let's publish this.

9        Q    Is Infowars taking this trial seriously?

10       A    I'm sorry, I don't know how to answer that.  Me, as

11   Free Speech?  I'm taking it seriously.  I've been here for

12   three days, so, yes.

13       Q    You're personally, Miss Paz, you're taking it

14   seriously?

15       A    No.  Me.

16       Q    Is the company?  Is the company that you represent,

17   that Alex Jones has one hundred percent ownership and

18   control over, is it taking it seriously?

19                    ATTY. PATTIS:  Objection.  Foundation.

20                    THE COURT:  Overruled.

21       A    Free Speech is taking it seriously, as I've sat here

22   for three days, so, yes.

23       Q    Well, you had to be here; right?  They paid you

24   $37,000 a year. Yes?  You were under subpoena to be here;

25   weren't you?

26       A    I'm under subpoena.

27       Q    Okay.  If you didn't show up here, you would have

```
 1    been in quite a bit of trouble; correct?

 2        A    Sure.

 3        Q    Okay.  So, you have to be here; right?  I'm asking

 4    about Infowars.  On a scale of 1 to 10.  Let's do a scale of

 5    1 to 10.  On a scale of 1 to 10, how seriously is Infowars

 6    taking this trial?

 7                 ATTY. PATTIS:  Objection, Judge.  That's

 8            meaningless.

 9                 THE COURT:  Overruled.

10        A    I don't know how to answer that.

11        Q    Well, you got ten options.  1 through 10?

12        A    Ten.  It's serious to me.

13        Q    Well, Miss Paz, if it was that serious to you, I

14    think you would have prepared a little bit more, don't you?

15        A    I prepared how I was able to prepare.

16        Q    Right.  And I don't think we should blame you for

17    that, because as you've said, you asked for everything, you

18    just didn't get it, did you?

19        A    I did not get everything that I asked for, that is

20    correct.

21        Q    And you know the plaintiffs haven't gotten everything

22    they asked for either; right?

23        A    I'm aware that there have been issues regarding the

24    discovery, yes.

25                 ATTY. PATTIS:  No further questions, Your Honor.

26                 THE COURT:  Attorney Pattis?

27                 ATTY. PATTIS:  I'll be brief.
```

```
 1                    Good morning, everyone.

 2              THE JURORS:  Good morning.

 3              ATTY. PATTIS:  I think it's still morning.

 4              Good afternoon.

 5  CROSS-EXAMINATION BY ATTY. PATTIS:

 6      Q    You are the corporate representative for Free Speech

 7  Systems?

 8      A    That is my role here, yes.

 9      Q    And you were paid a fee to testify?

10      A    I was.

11              ATTY. MATTEI:  Leading.  Objection leading.

12              ATTY. PATTIS:  I get to lead.  There is caselaw

13          on that.  I'll recite it if necessary.

14              THE COURT:  Overruled.

15      Q    You were paid $30,000 initially?

16      A    Yes.

17      Q    You were initially offered 20 to 25?

18      A    Yes.  That was based on our conversations, yes.

19      Q    And then you negotiated yourself a higher rate?

20      A    I did, yes.

21      Q    And you asked that it be supplemented?

22      A    I did.

23      Q    Why?

24      A    At the time, what I did was I tried to figure out how

25  much time it would take to review the material and do the

26  depositions.  I did do two days of Connecticut deposition,

27  and then there were requested, I believe, two more days.
```

1    And then it was going to be clear that I was going to be

2    called to testify here today, and so as much time as I had

3    spent on it, it was clear to me that the retainer needed to

4    be replenished.

5         Q    You were initially retained to serve as an expert in

6    Texas?

7         A    The corporate rep in Texas, yes.

8         Q    Because Mr. Jones --

9              ATTY. MATTEI:  Objection, Your Honor.

10              I think we maybe should do a sidebar on this.

11             THE COURT:  All right.

12              (SIDEBAR).

13             THE COURT:  She was an expert in Texas?

14             ATTY. PATTIS:  Yes.

15             ATTY. MATTEI:  No, she was not.

16             ATTY. PATTIS:  She was the corporate --  excuse

17         me, did I say expert?

18             THE COURT:  You sure did.

19             ATTY. PATTIS:  Then I'll withdraw that.  And I

20         may have misspoke.  It wasn't intentional.  You are

21         looking at me like I'm trying to play games.

22             THE COURT:  Well, because I think we talked

23         about that before.

24             ATTY. PATTIS:  I will withdraw it, and she was

25         the corporate rep I'll give you that.

26             ATTY. MATTEI:  (INDISCERNIBLE) substance

27         (INDISCERNIBLE).

1          ATTY. PATTIS:  I'm not getting into that.

2           (COVERED THE MICROPHONE).

3          THE COURT:  You need to -- we are on the record.

4          ATTY. PATTIS:  Oh, can I, I just worry about the

5     social media crowd.

6          ATTY. MATTEI:  (INDISCERNIBLE) so, she, it's our

7     view that she should not be permitted to say anything

8     about what she did in the Texas litigation.  She can

9     talk about what she did to prepare here.

10          ATTY. PATTIS:  I disagree because I knew she was

11     (INDISCERNIBLE) including the last comment about her

12     37,500, so I disagree.

13          THE COURT:  So, what is it that you are retained

14     to do?

15          ATTY. PATTIS:  You were retained as the

16     corporate rep in Texas, and I apologize to you, and I

17     apologize to you, more (indiscernible).

18          THE COURT:  You try that.

19          ATTY. PATTIS:  Of course I will.

20          And what did you do -- what did you do in terms

21     of the preparation?  How much time did you spend?

22     Did you appear for a deposition?  How much time did

23     that take?  In the course of that, did you become --

24          THE COURT:  What's wrong with this?  There is

25     nothing wrong.

26          ATTY. PATTIS:  There is nothing wrong

27     (INDISCERNIBLE).

1           ATTY. MATTEI:  I don't want to be getting into

2        (INDISCERNIBLE). You know the trial, the --

3           THE COURT:  We aren't getting into that.

4           ATTY. MATTEI:  Okay.  So,  all you want to do is

5        establish what she did and why?

6           ATTY. PATTIS:  Yes.

7           THE COURT:  We don't have an issue, do we?

8           ATTY. MATTEI:  No. But,(INDISCERNIBLE) the

9        suggestion to mean the suit it Texas. And it was very

10        lengthy. He's going (INDISCERNIBLE)

11           ATTY. PATTIS:  I'm not going to get into --

12        look, if you want to take an early lunch break and

13        relatively reassure, you might find, but I think I

14        heard the Court's ruling, and I think I've been doing

15        this for a few decades.  I kind of -- I kind of think

16        I know what I'm doing but --

17           THE COURT:  I think lool, Attorney Mattei

18        (INDISCERNIBLE).

19           (END SIDEBAR).

20    Q   I'm told I misspoke.

21    A   Yes.

22    Q   You are not an expert in this case?

23    A   No.  I think in my reply though, I did say I'm the

24  corporate rep.

25    Q   Well, my mistake and I apologize to the Court,

26  counsel, and to the jury.

27           Um, when were you first retained to serve as

1    the corporate rep in Texas?

2        A    It was some time in late January of this year.

3        Q    And did you work with a lawyer by the name of

4    Jacqueline Block (phonetic)?

5        A    Yes.

6        Q    Were there -- was the work that you did in

7    preparation for serving as a corporate rep in Texas related

8    to the Sandy Hook shootings?

9        A    Yes.

10       Q    There was a Sandy Hook litigation in Texas as well?

11       A    Yes.

12       Q    And was there overlap in the work that you did for --

13   as corporate rep in Texas and in Connecticut?

14       A    There was.  There was some additional material that

15   wasn't relevant here that was relevant in Texas, but there

16   was overlap, yes.

17       Q    When you -- when did you first speak -- and I don't

18   want you to tell me what anyone told you?

19       A    All of these questions are going to be your

20   communications or attempts to communicate with others.

21       A    Okay.

22       Q    When did you first speak with Attorney

23   Block(PHONETIC)?

24       A    It might have been sometime, like, maybe January 30,

25   31st, last week in January, first week in February.

26       Q    And did you subsequently travel to Texas to prepare

27   to testify as a corporate rep in the Texas case?

1      A    I did, yes.

2      Q    When did you travel to Texas to begin to prepare?

3      A    So, I had already begun reviewing material prior to

4   that, but the depositions were scheduled, I believe,

5   February 13th and 14th.  And then I was there the entire --

6   almost the entire week prior.

7      Q    Between the time that you were first retained and the

8   time you traveled to Texas, how much time did you spend

9   reviewing material?

10     A    I spent a lot of time reviewing material.  I spent a

11  lot of time watching videos, taking notes on the videos.  I

12  did have access, as I said earlier, to the drop box

13  material.  In the drop box material, were depositions,

14  there were e-mails, the company e-mails, there were a lot of

15  other documents associated with the financials of the

16  company, et cetera, et cetera.  So, I spent the weeks prior

17  to traveling down there, reviewing the material in the drop

18  box as well as the videos, and then I traveled to do my

19  observation, so to speak.

20     Q    Can you estimate how many e-mails you reviewed?

21     A    I definitely did not review all the e-mails.  There

22  were many many thousands of e-mails.  So, I was asked this

23  question at my depositions too.  I did try to narrow my

24  focus of the e-mail review just to make sure I was reviewing

25  what was relevant.

26          ATTY. MATTEI:  Objection, Your Honor.

27          Nonresponsive.

```
 1              THE COURT:  Overruled.

 2      Q    And what topics were you reviewing --  were you

 3   preparing to testify on?

 4      A    I was preparing to testify as to the Sandy Hook

 5   shooting, so, I tried to narrow my focus on Newtown, Sandy

 6   Hook, names of the plaintiffs to try to -- names of

 7   Mr. Halbig for example, just to narrow my focus on what I

 8   thought would be most relevant.  There is a lot of spam

 9   e-mail in there and such.

10      Q    And you mentioned that you -- did you review court

11   pleadings and so forth?

12      A    Such as the complaints?

13      Q    Right.

14      A    I did read the complaints, I did read some

15   interrogatories, admissions, things like that.

16      Q    And when you went down to Texas to prepare to testify

17   as the corporate rep in the Texas depos, did you go to the

18   Infowars facility or campus?

19      A    Yes, I was there.

20      Q    Describe it?

21      A    So, when you walk in, it's a little maze, like.  You

22   have to have key cards and you walk through doors to get to

23   other doors.  It's kind of -- there's boxes everywhere,

24   there's papers lying around everywhere.  There is really no

25   kind of rhyme or reason to the layout that I could see.  But

26   people were kind of spread out.  One side of the building

27   was kind of administrative and then the other side was where
```

1  the studios were.

2      Q    Different sides of one building or separate

3  buildings?

4      A    I want to say I walked through an area to get to

5  another side, but I wasn't in the studio, so he showed me

6  where the studios were.  So, it might have been a separate

7  building, I'm not sure.

8      Q    There was no receptionist there; was there?

9      A    Oh, no.  There was nobody there to greet you.

10     Q    There was no phone system in the building where

11 people can call one another; is there?

12     A    No, there's not.

13     Q    And there were somewhere between 60 and 80 employees

14 at that time; correct?

15     A    I believe that's correct.  That's correct.

16     Q    In your efforts to determine who did what to whom,

17 did you find out, did they even have a flow chart, an

18 organizational flow chart?

19     A    They did not.

20     Q    How difficult was it for you to get answers about the

21 questions on your mind?

22              ATTY. MATTEI:  Objection, Your Honor.

23              THE COURT:  Sustained.

24     Q    Did you make efforts to address -- you were asked

25 questions by Attorney Mattei about your duty --

26     A    Yes.

27     Q    -- to inform yourself; correct?

```
1     A    Yes.

2     Q    Did you take that duty seriously?

3     A    I did.

4     Q    Did you have difficulties performing that duty?

5     A    I found it to be difficult, yes.

6     Q    What was difficult about it?

7     A    I found it difficult to find out, like if I had a

8     question, to whom I should direct that question, who was

9     responsible for answering that question.  If there was a

10    person responsible for answering that question, if that

11    person was there during the time period of this litigation,

12    if information had been conveyed from the old person to the

13    new person.  Most people would not know who to talk to.

14    Most of my inquiries were --

15              ATTY. MATTEI:  Objection, Your Honor.

16              THE COURT:  Sustained.

17    A    Okay.

18    Q    Without an organizational flow chart, how did you

19    make determinations about who you were -- who to talk to and

20    when?

21    A    I would start with a person that I thought should be

22    responsible for such a thing, and then I would ask them, and

23    that person would either tell me whether they were or were

24    not and try to direct me elsewhere.

25    Q    Relying on what they said, would you go elsewhere?

26    A    I would, yes.

27    Q    How many times would you go through that process,
```

1    speak to somebody you thought you would have an answer, and

2    be directed to someone else, and in the end, not get any

3    information that you were looking for?

4        A    It was quite a few times.  It was often.

5        Q    Did you hear the name, Mark Enoch, while you were

6    there?

7        A    I did.

8        Q    He was a lawyer initially in Texas?

9        A    One of.

10       Q    And you heard the name T. Wade Jefferies?

11       A    Yes.

12       Q    He was another lawyer?

13       A    One of.

14       Q    And there was a guide named Brad Reeves?

15       A    Yes.

16       Q    Another lawyer?

17       A    Another.

18       Q    And they had replaced one another, seriatim; correct,

19   one after another?

20       A    Yes.

21       Q    There was another lawyer involved, although not

22   appearing, Jay Wolman?

23       A    Yes.

24       Q    Mark Randazza?

25           ATTY. MATTEI:  Your Honor, objection.  Objecting

26       to leading.  It's all leading.

27           ATTY. PATTIS:  I get to lead.

```
 1              ATTY. MATTEI:  This is --  I don't think.

 2              THE COURT:  I'll allow it.

 3              ATTY. MATTEI:  I don't think that's so, Your

 4         Honor.

 5              All right.

 6              ATTY. PATTIS:  If I need to get the case, I'll

 7         get it.

 8    A    I'm sorry, what was the question?

 9    Q    And then, ultimately, Miss Reynal --  excuse me, Miss

10    Blot(PHONETIC) was replaced as well; correct?

11    A    Yes.  She was my primary point person while I was

12    there, but then after I left she was subsequently replaced.

13    Q    Were you called upon to testify in a trial in Texas?

14    A    No.  I never testified in Texas.

15    Q    Did you make -- and this calls simply for a yes or

16    no.  Did you have any communications with Frederico Reynel

17    involving this case at any point?

18    A    No.  I've never spoken to him.

19    Q    Now, initially, one of the reasons you wanted to

20    supplement the retainer, is nobody really talked to you

21    about being the corporate rep in Connecticut when you first

22    appeared in Texas; correct?

23    A    That's one of the reasons.  I only thought it was for

24    Texas.

25    Q    When you came into account, you testified that you

26    were aware of other lawyers involved in the case; correct?

27    A    Yes.
```

```
 1      Q   Jay Wolman?

 2      A   Yes.

 3      Q   A fellow named Robert Barnes was at the periphery of

 4  it for a while?

 5      A   Yes.

 6      Q   I got involved?

 7      A   Yes.

 8      Q   And you and I had worked together?

 9      A   Yes.

10      Q   You left and went on to another firm?

11      A   I left and went on my own and then I was at another

12  firm for --

13      Q   And then when that didn't work out, you went on your

14  own?

15      A   Yes.

16      Q   And I called you and said I hear you are looking for

17  work; correct?

18      A   Yes.  You heard I had left and knew I would be

19  available.

20      Q   Based on your review of the material that was made

21  available to you, had other Infowars employees served as

22  corporate reps in either Texas or Connecticut?

23      A   Yes.

24      Q   Who?

25      A   I'm aware that Daria had previously testified as

26  corporate rep.  I know that Mr. Dew has, I believe

27  Mr. Zimmermann has on another topic.  There may have been
```

```
 1  another, but there have been others.

 2       Q    And as part of your work preparing for this case, did

 3  you review the depositions of them that had been broadcast

 4  on line by Texas counsel?

 5       A    I did.

 6            ATTY. MATTEI:  Objection, Your Honor.

 7            THE COURT:  Sustained.

 8       Q    Do you know whether they were willing to serve again?

 9  That calls for a yes or no?

10       A    I do know.

11       Q    And what were --  were they willing?

12       A    No.

13            ATTY. MATTEI:  Objection, Your Honor.

14            THE COURT:  Sustained.

15            ATTY. MATTEI:  Move to strike.

16            THE COURT:  So ordered.  Response is stricken.

17                The jury will disregard it.

18       Q    Have you received harassing e-mails in Texas in the

19  course of your testimony in this case?

20            ATTY. MATTEI:  Objection, Your Honor.

21            THE COURT:  What does this have anything to do

22         with what the jury has to decide.

23            ATTY. PATTIS:  Part of what the reason for it,

24         the fee is the difficulty of the work, and the

25         collateral consequences that company of doing it.

26            THE COURT:  Sustained.

27            ATTY. PATTIS:  Can Miss Paz be shown Exhibit
```

```
1              Number 245?
2                   THE CLERK:  I do not have that as a full
3              exhibit.
4                   ATTY. PATTIS:  That's why I said just Mrs. Paz.
5              I'm sorry, I should have been more clear.
6                   THE CLERK:  Sorry.
7         Q    That's a stipulation that the parties entered into?
8         A    Oh, I don't see it yet.
9         Q    Oh, I'm sorry?
10        A    Sorry.
11        Q    I don't have that screen here.
12        A    I see it, yes.
13        Q    And you've referred to it any number of times?
14        A    Yes.
15        Q    You've referred to it to refresh your recollection
16   about dates and topics --
17        A    Yes.
18        Q    -- of videos?
19        A    Yes.
20        Q    How many videos are on that list?
21        A    Do you want me to count them?
22        Q    Well, or estimate them.  If you can tell Mr. -- tell
23   Ron when you need to scroll down?
24        A    Yes.  Can we scroll down please?
25                   ATTY. MATTEI:  It shouldn't be up.  It hasn't
26              been offered, has it?
27                   ATTY. PATTIS:  No.  I said, Miss Paz only.  I'm
```

```
 1          sorry.

 2               THE WITNESS: Can you --

 3               ATTY. MATTEI:  Can we have a sidebar, please?

 4               THE COURT:  You did say that.

 5                (SIDEBAR).

 6               ATTY. MATTEI:  Yeah.  I agree with Mr. Pattis

 7          (INDISCERNIBLE) on this exhibits.  I'm

 8          (INDISCERNIBLE).

 9               ATTY. PATTIS:  I didn't --

10               ATTY. MATTEI:  (INDISCERNIBLE) he's asking why

11          as soon as issue (INDISCERNIBLE).

12               ATTY. PATTIS:  I didn't.

13               ATTY. MATTEI:  Told him that.

14               ATTY. PATTIS:  I asked Ron to do it.

15               THE COURT:  Who?

16               ATTY. PATTIS:  I said it to Ron.  I guess the

17          records clear.

18               THE COURT:  Ron.

19               ATTY. PATTIS:

20               THE COURT:  You were asking Ron?  Ron can't do

21          it.

22               ATTY. PATTIS:  I didn't realize he couldn't.

23          Okay.  My guy will do it.  Okay, that's fine.

24               THE COURT:  Well, what's the issue?

25               ATTY. MATTEI:  The issue is I'm not going to

26          have (INDISCERNIBLE) she can -- (INDISCERNIBLE)

27               THE COURT:  Did you ask him to do?
```

1          ATTY. PATTIS:  What?

2          THE COURT:  Did you ask him to did it.

3          ATTY. PATTIS:  Ron can do it.  It controlled the

4     control switch.

5          THE COURT:  Ron can't do that.

6          ATTY. PATTIS:  No no.  Excuse me.  My paralegal

7     is here for that purpose.

8          THE COURT:  Oh, okay.

9          ATTY. PATTIS:  And my understanding is Miss

10    Seshadri controls who has access to it.

11         ATTY. MATTEI:  She can get it over to him if you

12    want.

13         ATTY. PATTIS:  We did this in the past on a

14    prior witness.  You know what, Chris.  We will wait

15    rather than ask for a courtesy and work this out over

16    the lunch break.

17         ATTY. MATTEI:  (INDISCERNIBLE).

18         ATTY. PATTIS:  And I'm not going to get a

19    personal comment.  I'm ready to proceed.

20         THE COURT:  Please stop.  (INDISCERNIBLE).

21         (SIDEBAR END)

22         ATTY. PATTIS:  I would offer 245 as a judicial

23    admission.  It's a stipulation between the parties.

24         ATTY. MATTEI:  No objection.

25         THE COURT:  So ordered.

26         ATTY. PATTIS:  We do need some assistance,

27    Judge.  If they would be so kind as to flip the

1        switch.

2               ATTY. MATTEI:  Yeah.  He's got it.

3               THE COURT:  And the stipulation that was just

4        entered as evidence, you can accept it but you decide

5        what weight to give it.

6               And where are we at now?

7               ATTY. PATTIS:  245.  If that could be displayed,

8        please?

9               THE COURT:  Thank you.

10              ATTY. PATTIS:  Can we do back to the stop of

11       that, please, John?  And I said Ron before, I

12       apologize, Ron.  I forgot you couldn't do it.

13   Q   Could you read that stipulation, Attorney Paz, in

14   case it's too small to the jury to see?

15   A   Sure.  It just says, Stipulation Regarding

16   Authentication, and this is the list of the videos.

17   Q   Okay.  And what does it me to stipulate regarding the

18   authentication something?  You are a lawyer?

19   A   I am a lawyer, yes.

20              It means that Free Speech agrees that these are

21   the videos that were produced by the company at this

22   particular date.  These were the titles, and it also lists

23   the Unique name.  It's a combination of letters and numbers

24   that it was saved under.

25              ATTY. PATTIS: Can we go to the second page,

26       please?  Third page?  Well, let's go back to the

27       second.

1    Q    The Jones defendants do not dispute that all videos

2    produced by the plaintiffs to the Jones defendants is listed

3    in attach add -- in Chart B are true and accurate copies of

4    videos FSS, albachised(PHONETIC) or otherwise broadcast on

5    or about the dates correct?

6    A    That's what it says, yes.

7         ATTY. PATTIS:  Can we take --  go down one page,

8         please, John?

9    Q    Not all of these videos -- you've not reviewed all of

10   the videos in this courtroom, in this trial; correct?

11   A    In the courtroom?  No.

12        ATTY. PATTIS:  Could we go down to the next

13        page, please?

14   Q    Same with this list.  You've not reviewed all of

15   these in this courtroom in this trial; correct?

16   A    Right.  We've not spoken about all of these videos in

17   the court, correct.

18        ATTY. PATTIS:  Page page, please?  Next page?

19        Now we are on B.

20   Q    Same question as to this.  You've not looked at all

21   of them; correct?

22   A    In court?  No.

23   Q    In fact, some of them just say untitled broadcast in

24   the middle of the page?

25   A    Right.

26   Q    11-17-2016, you don't even know what that is;

27   correct?

```
1        A    I don't, know.

2              ATTY. PATTIS:  Next page?

3        Q    And then there is -- you know --

4              ATTY. PATTIS. Did you say something?

5              THE COURT:  I didn't say something.

6              ATTY. PATTIS:  Oh, I thought -- okay.

7        Q    Deep State Launches Martial Law Through Judicial

8    Tyranny, 11-16-2021.  Do you know what that video is about?

9        A    I do not.

10             ATTY. PATTIS:  You can take that down, John.

11       Q    Now, how many hours do you think you spent watching

12   videos?

13       A    I do have records, so I don't want to miss --

14       Q    Could you estimate without the records?

15       A    Sure.  Probably about, maybe 40 hours just watching

16   videos and taking notes on the videos.

17       Q    And how many hours did you spend reviewing e-mails?

18       A    I mean, I know how many hours I spent total in

19   connection with the case.  I didn't really break it down

20   that way.  I don't want to guess.

21       Q    Okay.  Do you think you overcharged in this case?

22       A    No, I don't.

23       Q    Do you think you undercharged?

24       A    I don't want to say I undercharged, but I don't think

25   I overcharged.

26             ATTY. PATTIS:  Can we watch Exhibit 45 please?

27       Q    This is a video entitled, Democrats File Suit to
```

```
1    Overturn 2016 Election as Megyn Kelly Reopens Sandy Hook
2    Wounds.
3            ATTY. MATTEI:  Your Honor, hold on one moment,
4         Your Honor?
5            THE CLERK:  45 is a full exhibit.
6    Q   And, Miss Paz, I'm going to show you two exhibits in
7    full.  You've seen a lot of clips here; correct?
8    A   Yes.
9    Q   Mr. Jones talks about a lot of things other than
10   Sandy Hook; correct?
11   A   He does.
12   Q   This is clip 45?
13           ATTY. MATTEI:  I'm sorry, is this a clip or an
14        exhibit?
15           ATTY. PATTIS:  It's an exhibit, excuse me.
16           THE COURT:  Can we not show this part of it?
17        It's getting me dizzy.
18           ATTY. PATTIS:  I can't -- I don't know how to do
19        that.
20           THE COURT:  I don't either.
21           THE WITNESS: It's off.
22           THE COURT:  I think maybe once he gets there we
23        can put it up, because it's -- we are not in a rush.
24        We have plenty of time.
25           ATTY. MATTEI:  Your Honor, may we just approach
26        real quick?
27           THE COURT:  Certainly.
```

1        ATTY. MATTEI:  Thank you, I'm sorry.

2          (SIDEBAR).

3        THE COURT:  I just want to say one thing before

4     you raise your issue.  After we let the jury go for

5     lunch, before I get off the bench, I want to talk to

6     you guys.  I want you to think about and tell me what

7     I can do -- what I can do, okay -- to make it, I

8     don't want to say easier on you, but just to smooth

9     things over to make things easier on you so that

10    there is not the -- so I don't have to deal with the

11    sniping and all that.

12        ATTY. PATTIS:  It's much better than I usually

13    am, Judge.

14        THE COURT:  No.  You know what I mean?  Like,

15    what I can do to help you so that we don't have that.

16        ATTY. PATTIS:  It's --

17        THE COURT:  Just think about it.  I don't need

18    a--(INDISCERNIBLE).

19        ATTY. PATTIS:  Is that a new chapter in

20    therapeutic jury (INDISCERNIBLE) being opened here?

21        THE COURT:  Just think about it and we'll talk

22    about it before lunch.  What I can do to help you.

23    Maybe take some of the caffein out of the coffee?

24        All right.  Attorney Mattei?

25        ATTY. MATTEI:  Just hoping Your Honor would see

26    the concern that I have here.

27        THE COURT:  This has to be on the record, and so

1          we in she can't you hear.

2               No she can't. Can you hear?

3               THE MONITOR:  It's very difficult.

4               ATTY. MATTEI:  What I understand Attorney Pattis

5          wants to do is play a full video which would exceed

6          the scope of anything I did with Miss Paz with

7          respect to this video,  so I'm objecting it's beyond

8          the scope of my direct of Miss Paz.

9               The video is how long, Attorney Pattis?

10              ATTY. PATTIS:  It's about 50 minutes.

11              THE COURT:  50?

12              ATTY. MATTEI:  Can we talk about

13         (INDISCERNIBLE).

14              ATTY. PATTIS:  Yo you know here is the problem.

15              ATTY. MATTEI:  No, no. Go ahead. Go ahead.

16              ATTY. PATTIS:  I forget what the judge wanted us

17         to do.

18              They have represented to, three times they've

19         used the following expression, and even in their

20         opening statements, that Alex Jones thinks that there

21         is a conspiracy among government --

22              THE COURT:  Mr. Pattis, I just want you to

23         (INDISCERNIBLE).  I'm trying to do it gently.  I

24         don't care what was said in the openings.  I care

25         about the evidence in the case,  so.

26              ATTY. PATTIS.  Okay.  In the evidence --

27              THE COURT:  What people said --

1          Should we do this without the jury?

2          ATTY. PATTIS:  No.

3          THE COURT:  I think we should because it's

4      getting close to lunch anyway.  It's hard for the

5      monitor to do it.  Let's just do it.

6          ATTY. PATTIS:  I don't want to have to come up

7      here stereophonically.  Who is going to speak

8      (INDISCERNIBLE)

9          THE COURT:  Hmm?

10         ATTY. PATTIS:  Who is going to speak to.

11         ATTY. MATTEI:  Okay.

12         THE COURT:  I'm going to let them go to lunch

13     and we'll deal with it on the record.

14          (END SIDEBAR).

15         THE COURT:  All right.  So, we have some issues

16     to discuss, so we -- I have made the decision, not

17     everyone agrees with it, to let you go for an early

18     lunch and we will stay on the record and continue

19     with our issues.

20         So, Mr. Ferraro will safeguard your notepads.

21     I know, I have faith in you that you will continue to

22     obey the rules of juror conduct.

23         We will start promptly at 2 p.m.

24         And I hope everyone has a nice lunch, and I

25     hear the weather is nice, so hopefully at least get a

26     little fresh air, and get to enjoy the weather.  And

27     if you do that, just be careful, as I say everyday,

1          to avoid contact.  I see everybody is wearing their

2          handy-dandy little stickers there, so hopefully

3          people will know to avoid you as well.

4               So, we'll see you at 2:00.

5               And you can step down, Attorney Paz.

6               (JURY EXIT).

7               THE WITNESS:  Do you want me to leave the room

8          too?

9               THE COURT:  Is it necessary for Miss Paz to

10         leave the courtroom?

11              ATTY. PATTIS:  She should probably be excused at

12         this point.

13              THE COURT:  We'll see you at 2 o'clock then.

14              THE WITNESS:  That's fine.

15              THE COURT:  All right.  So, I think we left off

16         that, Attorney Pattis, you were looking to play the

17         50-minute video.  Exhibit 45.

18              ATTY. PATTIS:  Yes.

19              THE COURT:  Is that where we left off?  All

20         righty.

21              ATTY. MATTEI:  Your Honor, this video was not

22         played at all during Miss Pattis [sic] direct.  It

23         was not played at all.  So, our first objection is

24         that it is beyond the scope of the direct.  Our

25         second objection, though, is that --

26              THE COURT:  Well, can I just ask for -- I have

27         no idea.  So, it's just for ID or is it a full

1      exhibit?

2           ATTY. PATTIS:  It's a full exhibit.

3           THE COURT:  Okay, and --

4           ATTY. PATTIS:  By agreement.

5           THE COURT:  And what's it about?  I don't know

6      if it's beyond the scope because I don't even know

7      what it's about.  Do I have to watch it first?

8      Because that will -- I can do it over lunch.

9           ATTY. PATTIS:  You may want to.  But, if it

10     relates to Megyn Kelley reopening the old Sandy Hook

11     wounds, democrats filing suit to overturn the 2016

12     election.

13          I think it is within the scope of the evidence,

14     and I know you don't want to hear about the opening

15     statement that has been offer by the defendants thus

16     far --

17          THE COURT:  Right.  If you could just keep your

18     comments to the.

19          ATTY. PATTIS:  -- of the plaintiffs thus far.

20          I am.

21          THE COURT:  --  to the actual evidence in the

22     case and not --

23          ATTY. PATTIS:  On two occasions -- excuse me, I

24     cut you off.

25          THE COURT:  No.  That's okay, I'm listening.

26          ATTY. PATTIS:  On two occasions when Agent

27     Aldenberg testified, Mr. Mattei went out of his way

1    to use this following locution, and it's almost

2    exact.  And Mr. Jones, you know, believes that there

3    -- or peddles the notion that there is, and this is

4    the quote that's almost exact, in a conspiracy of

5    global elites and business leaders in governments,

6    including people in our government, he said

7    breathlessly, on several occasions.  Then there has

8    been testimony about Megyn Kelley, his reaction to

9    Megyn Kelley.  They offered a video clip in which

10   Mr. Jones referred to, and I want to find the

11   language to Chelsea Clinton, and another democrat I

12   believe, as a sea hag.  These items have been -- sea

13   hags for the New World Order.  It was Chelsea Clinton

14   and Megyn Kelley as Sea Hags for the New World Order.

15   He grouped them together with the Clinton Foundation.

16   And this was in the clip involving his being a

17   precision-guided heavy munition coming in on top of

18   you.  I hit the barbed wire, everyone comes in over

19   me.

20       These items have been offered in isolation to

21   the jury to suggest that this represents some sort of

22   modus operandi of Jones to operationalize his people

23   as against Sandy Hook and others.

24       My view is, that taken in isolation, they've

25   mischaracterized the man and make a caricature of a

26   person who has far more to say than things about

27   Sandy Hook.  I'm aware of the Court's prior rulings

1     with respect to the motions in limine, and would have

2     expected that the party prevailing on them would have

3     trimmed it's exhibit lists and it's presentation of

4     evidence to avoid opening the door to these topics.

5     However, it is my view that they have done so.  And

6     to alert the Court -- there are two other exhibits

7     that I'll seek to show, just to get all these out at

8     once just so we don't have to do them over and over

9     again, I will be offering the Megyn Kelley profile

10    under Exhibit 40 which is not a full exhibit.  It's

11    in for a -- it's not even.  I guess it's not in for

12    identification, but it's on the list.  And I won't be

13    offering that for the truth of the matter that Miss

14    Kelly profiled, but for it's impact on Free Speech

15    Systems.  Clearly, that's a door that has been

16    opened in the course of the plaintiff's examination.

17         Finally, we will offer, and then I do mean

18    finally, Judge, the full 222 -- it's not 222. Excuse

19    me.  I have to check my notes.

20         THE COURT:  Take your time.

21         ATTY. PATTIS:  Actually, I'm not going to offer

22    222.  That's not a video.

23         THE COURT:  Right.

24         ATTY. PATTIS:  So, that's my offer as to the

25    videos, Judge.

26         THE COURT:  So, you have 45 -- 45 which is

27    50 minutes, you said, and then 40.

1          ATTY. PATTIS:  Which is approximately the same.

2     I won't watch the whole thing.  I'll stop it at some

3     point, but I don't, you know, gauge whether the jury

4     still has any interest or not.  But, I believe, that

5     the door has been opened to both of those.

6          And to the degree that there may be a

7     timeliness objection, you know, I just -- I feel like

8     Gilligan on Gilligan's Island.  We just endured

9     almost three days of repetitive examination of Miss

10    Paz.  I will be done within two hours.

11         THE COURT:  So, can you give me a summary?  I'll

12    hear regarding the objections, but can you summarize,

13    in your own words, what 45 and 40 are?

14         ATTY. PATTIS:  Megyn Kelley -- so, Mr. Jones,

15    should he testify --  well, in fact, other exhibits

16    that are in full, and haven't been played by the

17    plaintiffs, at least not yet, are Alex reacting to

18    the Megyn Kelley interview.  And --

19         THE COURT:  I'm sorry -- I just want to make

20    sure I don't lose this.  I'm sorry.  No.  I'm not

21    understanding.  So, on your cross, do you want to

22    play Exhibit 45 --

23         ATTY. PATTIS:  Right.

24         THE COURT:  -- which is around 50 minutes?  And

25    then you want to play 40 with -- so, what I'm just

26    trying to figure out, because I haven't seen them, so

27    I don't know if it's beyond the scope.  I don't know

1     anything about these exhibits.  So, if you could

2     just, sort of, in your own words, sort of --

3         ATTY. PATTIS:  They are classic Alex Jones --

4         THE COURT:  Make an offer, I suppose.

5         ATTY. PATTIS:  -- doing exactly what Mr. Mattei

6     said he did, which is taking on what, you know, there

7     is another reference in another video today to the

8     Deep State, and to his belief, which is core to who

9     he is.

10        THE COURT:  All right.  So, can we break it

11    down?  So Exhibit 45.

12        ATTY. PATTIS:  Contains all of that.  His views

13    of the Deep State, his commentary on other things,

14    support for the notion that Mr. Mattei raised that he

15    believes that there is a global elite comprised of

16    business, financial, and governmental interests,

17    including people in our government, who are out to,

18    as Mr. Mattei put it on two occasions in the jury's

19    presence, enslave us and kill us.  And, you know,

20    that goes -- that's a little bit of an overstatement.

21    Certainly, Mr. Jones believes that We the People are

22    about to be enslaved by globalists, and certainly

23    there are --  and certainly he believes that

24    globalists want population reduction --

25        THE COURT:  I'm not interested so much in his

26    beliefs as opposed to what these exhibits that you

27    are offering --

1          ATTY. PATTIS:   They illustrate these points and
2      I want the jury --
3          THE COURT: Okay.
4          ATTY. PATTIS:   -- to see them in their context.
5          THE COURT:  And Exhibit 40, which is --
6          ATTY. PATTIS:  The Megyn Kelley interview.
7          THE COURT:  Okay.  Tell me about that.
8          ATTY. PATTIS:  So, Mr. Jones, there was some
9      testimony about his reaction to Megyn Kelley.  They
10     offered a video of his responding to Megyn Kelley and
11     Chelsea Clinton, that Sea Hag is the New World Order.
12     And it is his --  and they, I believe, even offered
13     an exhibit and had Attorney Paz read the headline
14     about Megyn Kelley.  I'm not sure they read the
15     headline about reopening the wounds, but Megyn
16     Kelly's use of Sandy Hook has come up.
17          Mr. Jones' contention is that this crisis was
18     largely done until it was reawakened by Megyn Kelley.
19          THE COURT:  This is his contention, Attorney
20     Pattis, in Exhibit 40?  Because, I thought this was
21     the --
22          ATTY. PATTIS:  This was the Megyn Kelley
23     interview, but because it has been referred to as an
24     item not in evidence, I want the jury to see it so
25     they can evaluate the plaintiff's characterization.
26          THE COURT:  Right.  And that's where his
27     position that --

1          ATTY. PATTIS:  Right.

2          THE COURT:  -- you are referring to is?

3          ATTY. PATTIS:  Right.

4          THE COURT:  All right.  Now, I'm understanding

5     you.  Okay.

6          Attorney Mattei?

7          ATTY. MATTEI:  Your Honor, in the 50-minute --

8     so, I think in order to assess the scope objection,

9     Attorney Pattis' representation that Exhibit 45 is

10    simply a demonstration of Mr. Jones' belief, to me,

11    is -- is not sufficient assurance that a 50-minute

12    video is not going to cover things that are

13    prejudicial, that are hearsay, that are totally off

14    topic, that are controversial, and provocative, and

15    can likely, you know, offer to support the improper

16    arguments of political bias and silencing that

17    Mr. Pattis made in his opening statements.

18         THE COURT:  All right.  So, let me ask Attorney

19    Pattis about that.  Because I agree that this is

20    likely to happen.  How are we -- I thought this was.

21         ATTY. PATTIS:  They are full exhibits.  They

22    marked the exhibit.  I agreed to it.  How do you say

23    my exhibit is unduly prejudicial?  He, eyes wide

24    open, said, do you want this?  I said, sure.

25         THE COURT:  40 is a full exhibit too?

26         ATTY. PATTIS:  Yes.

27         ATTY. MATTEI:  40 is not a full exhibit.

1          ATTY. PATTIS:  No, no.  40 is not.  45 -- but 45

2      is by agreement to full exhibit.

3          THE COURT:  All right.

4          ATTY. MATTEI:  But it still needs to be played

5      for relevant purpose to the appropriate witness.

6      And, so, what we are seeing here is, I asked Miss Paz

7      to confirm what Alex Jones' world view was.  She did.

8      She agreed.  That's it.  Okay.  I don't think we --

9      it would be appropriate to put up a video, published

10     apparently in 2018, in which Mr. Jones talks about

11     God knows what, for 50 minutes as reasonable and

12     within the scope on that limited, narrow, issue.

13     Especially, because you can see from the headline,

14     Judge, that he's talking about overturning the 2016

15     election.  Just from the title, an obviously

16     controversial topic, that we did not go into, and

17     that we studiously avoided with Miss Paz.  So, it's

18     well beyond the scope of the direct of her, and

19     creates all sorts of issues.

20         THE COURT:  Well, Attorney Pattis --

21         ATTY. PATTIS:  I'm stunned that my adversary --

22         THE COURT:  -- stand up.

23         ATTY. PATTIS:  --can say he doesn't know what's

24     in an exhibit he offered.

25         THE COURT:  All right.  But here is what I don't

26     know.  I know that the election is beyond the scope.

27     How do I -- you are giving me a --

1        ATTY. PATTIS:  I didn't offer the exhibit.  I
2    didn't elicit testimony about Hilary Clinton --
3        THE COURT:  No, no, no.
4        ATTY. PATTIS:  --is a sea hag.
5        THE COURT:  Attorney Pattis, I'm just trying to
6    figure out is this beyond the scope.  I don't
7    remember --
8        ATTY. PATTIS:  I hear you.
9        THE COURT:  -- anything about over turning the
10   election.
11       So, if you are offering the whole entire
12   50 minutes, I don't see how we handle this on the
13   spot, because there are certainly parts of it, maybe
14   all of it, maybe most of it, I don't know, that are
15   going to be beyond the scope.  So, I'm just not --
16       ATTY. PATTIS:  I don't know that that's the --
17   I mean, obviously, the Court will make that
18   determination, apparently, because we can't agree.
19       THE COURT:  Well, I'm not sure I can make that
20   determination.  I don't -- I have other things to do
21   at lunch time.  So, if you are now asking me -- other
22   business is what I mean, actually.
23       ATTY. PATTIS:  No, I understand that.
24       THE COURT:  So.
25       ATTY. PATTIS:  My claim is that when they
26   offered through Exhibit -- I can't remember the
27   number now.  It might have been -- it was the 36A

 1          references to Chelsea Clinton, Megyn Kelly, Sea Hags

 2          of the New World Order.  Alex demonizing the Clinton

 3          Foundation.  Together with the comments that

 4          Mr. Mattei has raised in the jury's presence through

 5          Aldenberg in a sneering, in my view, tone, about Alex

 6          believing that there is a global conspiracy

 7          consisting of financial elites government that want

 8          to enslave and even kill you, he said, in false

 9          drama.  I mean, I didn't put that in front of the

10          jury, and if that's not opening the door, I don't

11          know what is.

12               THE COURT:  So, here is what I would suggest.

13          I'm going to sustain the objection to playing the

14          whole 50 minutes, but certainly, if you want to,

15          during lunch, pinpoint some parts of this 50-minute

16          Exhibit 45 that I can look at and determine whether

17          it's within the scope or not, but we have to pinpoint

18          what that is, or it's going to be all afternoon of --

19               ATTY. PATTIS:  Well, I mean whether it's all

20          afternoon, Judge, I didn't --

21               THE COURT:  -- problems.

22               ATTY. PATTIS:  -- this is examination went on

23          for days --

24               THE COURT:  I understand.

25               ATTY. PATTIS:  -- it could have gone a day.

26               THE COURT:  That's my ruling.

27               All right.  So, now, Exhibit 40 is this Megyn

1      Kelley interview for 50 minutes.

2          Okay.  Do you want to be heard on that,

3      Attorney Mattei?

4          ATTY. MATTEI:  Yeah.

5          I think what attorney Pattis wants to do is put

6      in the entire 17 minute, NBC profile, of Alex Jones.

7      We have not offered it.  It's full of hearsay.  It's

8      full of, including Mr. Jones' own hearsay that they

9      want to offer for the truth of the matter.  He's

10     interviewed in it.  It deals with other issues in

11     which he's been involved.  It deals with his

12     affiliation to Donald Trump.  Obviously, another

13     attempt by Attorney Pattis to inject politics into

14     this case.  It deals with other allegations against

15     Mr. Jones related to Joe Biden and others, and it is

16     just full of hearsay and self-serving.  So, it's just

17     inadmissible.

18         ATTY. PATTIS:  Well, it's not.  "He", meaning

19     Attorney Mattei, at about 10:25 this morning was

20     asking questions about an interview with Megyn

21     Kelley, about giving her an interview, about he

22     wasn't happy with the interview and the claims

23     involving Sandy Hook.  He also -- I didn't put Trump

24     into the case.  It came in through one of their own

25     exhibits just this afternoon or earlier this morning.

26         So, you know, yes, I have a motive.  You

27     know what I want to argue.  I showed you in my

```
1        opening.  I've been transparent about that from the
2        get-go.  But, I believe that the door has been opened
3        to that, and you don't get to just give a whiff and
4        then say, well, this -- doesn't this smell without
5        showing or letting the jury smell it for themselves.
6        And if it's only 17 minutes, that's a lot -- it's
7        longer --
8             THE COURT:  All right.  So, I had written down
9        50 minutes.
10            ATTY. PATTIS:  I thought it was longer.
11            THE COURT:  All right.  So, it's 17 minutes?
12            ATTY. PATTIS:  Right.
13            THE COURT:  Can you pinpoint any part of that?
14       Because, clearly --
15            ATTY. PATTIS:  The whole thing.  Because, you
16       know --
17            THE COURT:  There is no hearsay issues in that,
18       in your mind?
19            ATTY. PATTIS:  I'm not offering it for the truth
20       of the matter asserted, but for Mr. Jones' state of
21       mind.  Mr. Mattei's direct question was, he wasn't
22       happy with how the interview made claims regarding
23       Sandy Hook.  We are not here to litigate the truth of
24       the matter as to Sandy Hook.  We are here to litigate
25       whether Mr. Jones caused discern -- in the CUTPA
26       claim, ascertainable economic harm to the plaintiffs,
27       and thus far, there is no testimony of that.
```

1      ATTY. MATTEI:  So --

2      ATTY. PATTIS:  And second --

3      ATTY. MATTEI:  Sorry.

4      ATTY. PATTIS:  -- we are here to evaluate

5  whether they can prove that they were damaged by

6  Jones.  That's why we are here.  Most of what we saw

7  in the last two days really pertained to a punitive

8  damage phase, trying to light the jury up, and it's

9  consistent with the improper purpose of plaintiffs

10  opening statement, which is we have to stop Alex

11  Jones.  That's no part of the compensatory damage

12  claim.

13      THE COURT:  So, I'm not, by not --  we may have

14  a disconnect --

15      ATTY. PATTIS:  We may.

16      THE COURT:  -- on what the plaintiff has to

17  prove here.

18       This --  you can challenge the extent of the

19  damages, but I think you just said that he has to

20  prove causation.

21      ATTY. PATTIS:  No, I didn't.  If I did, I

22  misspoke.

23      THE COURT:  Okay.

24      ATTY. PATTIS:  They do have the extent of the

25  damages, is clear, Judge.

26      THE COURT:  Then maybe I --  maybe I

27  misunderstood.

1          All right.   Attorney Mattei?

2          ATTY. MATTEI:  Your Honor, what I heard Attorney

3     Pattis say, is that it's being offered for the

4     purpose of establishing Alex Jones' state of mind.

5          THE COURT:  That's what I heard.

6          ATTY. MATTEI:  Okay.

7          Now, there is a number of segments in the video

8     that have nothing to do, at all, with Sandy Hook.

9     That's number one.  Okay?  And I believe what

10    Attorney Pattis is suggesting.  Is that it is Alex

11    Jones' state of mind in reaction to how his views

12    about Sandy Hook were characterized in the Megyn

13    Kelley video, is relevant.

14         So, number one, let's just assume that that's

15    what he's offering it for.  So, obviously, then, only

16    the segments about Mr. Jones' statements on Sandy

17    Hook would be offered for that purpose.  Now, the

18    statements that he makes about Sandy Hook have

19    nothing to do with his state of mind in reaction to

20    the Megyn Kelley interview.  Those are statements

21    that were made during interview.  So, they say

22    nothing about what his state of mind was in reacting

23    to it after-the-fact.  The statements he's making

24    during the interview are statements both about Sandy

25    Hook and other things, which we didn't offer, which

26    would be offered for the truth of the matter, and

27    would be hearsay and can't be offered in the defense

1      case.

2             ATTY. PATTIS:  Judge, it's a full exhibit, so

3      let's not forget --

4             ATTY. MATTEI:  No.  It's not.

5             ATTY. PATTIS:  Oh not --

6             THE COURT:  It is not.

7             ATTY. PATTIS:  You know, Judge.  I didn't ask

8      about the interview with Megyn Kelley.  The

9      plaintiffs did.  And, so, they -- you know, they come

10     in here and they tip toe around things, they put a

11     full exhibit in, they open the door, and then when I

12     say --

13            THE COURT:  All right.

14            ATTY. PATTIS:  -- let's look behind the door

15     they alluded to, they say, oh no, we can't do that.

16     That's ridiculous.

17            THE COURT:  Okay, Attorney Pattis, so, I'll look

18     at that since it's 17 minutes.

19             How would I do that, Ron?

20            THE CLERK:  I have a thumb drive it should be

21     on.

22            THE COURT:  All right.  Well, we can set that

23     up.

24             All right, so I'll look at that over lunch.

25             Anything else?

26            ATTY. PATTIS:  Nothing from the defense, Judge.

27            THE COURT:  So, I'll just see you on the sidebar

```
1              as promised, all of you.
2                   (SIDEBAR).
3              THE COURT:  So, just to get back to the personal
4         sniping, what can I do to get that out of the
5         picture?  Because, you know --
6              ATTY. PATTIS:  -- other than sing-kumbaya --
7              THE COURT:  No.  But, I'm not -- listen, I don't
8         want -- let's be honest.  I don't want to deal with
9         this sniping.  And I feel like I'm doing something
10        wrong that you are --
11             ATTY. PATTIS:  Well, you know, Judge --
12             THE COURT:  Because I find it very
13        unprofessional, myself.
14             ATTY. PATTIS:  I have been maligned continually
15        through this case with claims that I have not had a
16        good faith basis to do this.  There have been motions
17        for sanctions at the drop of a hat.  Everything has
18        been an emergency.  I came here to fight for Alex
19        Jones --
20             THE COURT:  I understand -- no.  No.
21             ATTY. PATTIS:  -- and I've just had enough of
22        the condescending --
23             THE COURT:  No.  No.  I'm talking about the
24        sidebars, the sniping in front of me, the way that
25        you are going after each other.
26             ATTY. PATTIS:  Well, you are right about that.
27             THE COURT:  That is not necessary.  So, what can
```

1          I do to stop the sniping?

2              ATTY. PATTIS:  Long weekend at Club Med for all

3      of us?

4              THE COURT:  Can you not -- can you not snipe

5      anymore?  Because I don't know that I'll have the

6      patients to deal with it for three more weeks.

7              ATTY. KOSKOFF:  Well, the good news is, I don't

8      think it's going to be that long.

9              THE COURT:  Do you agree?

10             ATTY. MATTEI:  I do.

11             ATTY. PATTIS:  We had a conversation yesterday.

12              THE COURT:  And your comment about Mr. Jones,

13     is he not testifying?

14             ATTY. PATTIS:  I don't -- I didn't understand.

15             THE COURT:  I think you said something along the

16     lines that, if he testifies.  I thought --

17             ATTY. PATTIS:  I don't know whether the

18     plaintiffs will, in fact, call him.  I mean, we have

19     an agreement to produce him.

20             THE COURT:  And when is that?

21             ATTY. PATTIS:  Next week.  And the judge --  the

22     Court, you seem to, perhaps to be unaware of an

23     agreement that was reached in bankruptcy Court.

24             THE COURT:  Yeah.  Three days --  somebody told

25     me about that.

26             ATTY. PATTIS:  So, he is available, Tuesday,

27     Wednesday, and Thursday, and longer if necessary, if

1          we start within that period.

2                  ATTY. MATTEI:  A whole week.

3                  ATTY. PATTIS:  There is --

4                  ATTY. MATTEI:(INDISCERNIBLE).

5                  ATTY. PATTIS:  Just check your notes.

6                  But, I mean, I'm not going to hold you to the

7          day.  I don't care.  I want to end the trial.  I just

8          don't know whether the plaintiffs will call him.  I

9          can imagine in a universe in which they don't.  Texas

10         counsel was very effective by not calling Mr. Jones

11         and making him the last witness.

12                 THE COURT:  So, getting back to the not sniping.

13         What's the answer, Josh?   Call on you.

14                 ATTY.  KOSKOFF: Judge, when you ask me that

15         question, I -- (INDISCERNIBLE)  I don't think -- I

16         don't feel I hear more sniping.  Frankly --

17                 THE COURT:  I don't want any.  We don't need any

18         sniping.  There should be no sniping.

19                 ATTY. PATTIS: (INDISCERNIBLE).

20                 ATTY. KOSKOFF:  (INDISCERNIBLE).  I'm thinking

21         about cases that we have.

22                 THE COURT: Hmm?

23                 ATTY. KOSKOFF:  I think about cases that I've

24         had (INDISCERNIBLE). My background is a little bit

25         jaded.

26                 ATTY. PATTIS:  I'll willing to extend a hand and

27         try --  I mean, I don't know what else to do.

1      THE COURT:  Because I'm not sniping; am I?

2   Right now?

3      ATTY. PATTIS:  Judge.  I may or may not have

4   views about some of the rulings and decisions you've

5   made related to this case, and I'm not going there;

6   okay?  I'm not going there.

7      THE COURT:  But I'm not sniping at you and you

8   shouldn't be sniping in front of me.  So --

9      ATTY. PATTIS:  Um, comments that the Court had

10   made about me to the press in the prior to a hearing

11   felt like sniping.

12      THE COURT:  Sniping in this case.

13      VOICE:  (INDISCERNIBLE).

14      THE COURT:  Yeah.  I'm not sniping.

15      ATTY. PATTIS:  But she said she hadn't been and

16   I might disagree.

17      THE COURT:  Well, I'm not sniping you here.

18   So --

19      ATTY. KOSKOFF:  We are not here because we are

20   complaining about the sniping, Judge, just to get it

21   on the table,  but --

22      ATTY. PATTIS:  So, I will do my best, that's all

23   I can offer you.

24      THE COURT:  Because I just -- just say what you

25   have to say without going after each other in front

26   of me.  If you want to do it somewhere else --

27      ATTY. PATTIS:  No, I don't want to do it

1          anywhere.

2                THE COURT:  -- then you can do that.  But just

3          don't did it with me, how about that?

4                ATTY. PATTIS:  Chris, let's take hands a

5          Mediterranean -- you can shake my hand.  You won't

6          catch anything.

7                THE COURT:  All right, guys.

8                 Have a nice lunch.  Take a recess.

9                (RECESS).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
 1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

 2   ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

 3   v.                      :  AT WATERBURY, CONNECTICUT

 4   ALEX EMERIC JONES       :  SEPTEMBER 16, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

 6   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

 7   v                       :  AT WATERBURY, CONNECTICUT

 8   ALEX EMERIC JONES       :  SEPTEMBER 16, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

11   v                       :  AT WATERBURY, CONNECTICUT

12   ALEX EMERIC JONES       :  SEPTEMBER 16, 2022
```

13                  C E R T I F I C A T E

14

15        I, Linda A. Coon, hereby certify that this is a true

16   and accurate transcription of the above-referenced case,

17   heard in Superior Court, Judicial District of Waterbury,

18   Connecticut, before the Honorable Barbara N. Bellis, on this

19   16th day of September, 2022.

20

21        Dated this 17th day of September, 2022, in Waterbury,

22   Connecticut.

23

24

25                              Linda A. Coon,  RPR
                                Court Monitor/ Court Reporter
26

27