# EXHIBIT 31

```
DKT NO:  X06-UWY-CV186046436-S     :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                     :  JUDICIAL DISTRICT WATERBURY.

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                   :  SEPTEMBER 20, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

                    TRIAL A.M. SESSION

         BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
                         AND A JURY


A P P E A R A N C E S :


    Representing the Plaintiff(s):


        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        ATTORNEY MATTHEW BLUMENTHAL
        Koskoff, Koskoff & Bieder
        350 Fairfield Ave. Ste 501
        Bridgeport, Connecticut 06604


        ATTORNEY NORMAN PATTIS for Jones Defendants


                              Recorded By:
                              Darlene Orsatti

                              Transcribed By:
                              Darlene Orsatti
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, CT 06702

1          THE COURT:  Good morning, marshal.  Good

2     morning, everyone.  Please be seated.

3          ATTY. MATTEI:  Good morning, your Honor.

4          ATTY. STERLING:  Good morning, your Honor.

5          THE COURT:  All right.  And for the record, we

6     are on week two, day five of our trial in Lafferty

7     versus Jones.  If counsel could please identify

8     themselves for the record.

9          ATTY. MATTEI:  Yes.  Good morning, your Honor.

10    Chris Mattei on behalf of the plaintiffs, joined by

11    my colleagues Alinor Sterling and Josh Koskoff.

12         ATTY. STERLING:  Good morning, your Honor.

13         THE COURT:  Good morning.

14         ATTY. PATTIS:  I thought there were more.  Norm

15    Pattis on behalf of Alex Jones and Free Speech

16    Systems.  And Judge, Mr. Reynal is not counsel of

17    record.  Not admitted in Connecticut.  I don't know

18    if he was supposed to sit before or behind the bar. I

19    just learn –

20         THE COURT:  Not at counsel table, but he can sit

21    where he is.  That's fine.

22         ATTY. PATTIS:  Thank you.

23         THE COURT:  Good morning, Attorney Reynal.

24         ATTY. REYNAL:  Good morning, your Honor.

25         THE COURT:  I hope everyone had a nice weekend.

26    So any issues before we resume?

27         ATTY. MATTEI:  Your Honor, I think the one issue

1      that we'd like to argue if the Court is prepared to

2      resolve it, is the issue of political motivation,

3      which I think both parties now would agree has been

4      briefed.  And Attorney Sterling will handle that if

5      the Court is ready.

6          THE COURT:  All right.  And I've read

7      everything.  Thank you for filing it on time.

8      Whenever you're ready.

9          ATTY. STERLING:  Yes.

10          THE COURT:  Before – I'm sorry, I'm already

11      interrupting you.  I just want to announce in

12      accordance with Judicial Branch Policy.  There can be

13      no unauthorized recording, whether it's by cell phone

14      or Apple watch or any other device.  Video recording,

15      audio recording or photographs.  If you do so, your

16      device will be confiscated and you will be removed

17      from the courtroom, if not the courthouse.  And I'm

18      sure the marshals already said it.  I do the same

19      thing, please turn your Apple watch or whatever

20      device you have, either off or to a silent mode,

21      please?

22          ATTY. PATTIS:  And there's one other issue after

23      this, Judge.  I received this morning at 7 o'clock, a

24      list of amended exhibits with – purporting to amend

25      certain things that are already admitted.  I haven't

26      had a chance to review them today.  I'd like a chance

27      to discuss them with counsel before I take a position

1    on them.  But I would object I think at this point to

2    the removal of any exhibits that's in full already.

3         THE COURT:  Is there a -

4         ATTY. MATTEI:  I don't believe that that's what

5    we've done.  As I told Attorney Pattis earlier, I

6    believe that what we've done is amended the exhibit

7    was to reflect what happened last week in terms of

8    new exhibits.  But I want to have a fulsome

9    conversation with him, and I'm sure we'll work it

10   out.

11        THE COURT:  Perfect.  Okay.  So whenever you're

12   ready.

13        ATTY STERLING:  Yes, your Honor.  Good morning

14   again.  So this is docket number 985, which is our

15   motion to enforce the in limine rulings and limit

16   questioning and argument regarding the plaintiff's

17   supposed political motivations.  The opposition brief

18   is at docket number 987, and our reply brief is at

19   docket number 992.

20        And your Honor, what we are asking for in this

21   motion is for the Court to enforce its in lime

22   rulings, and also to preclude any further questioning

23   regarding the plaintiffs supposed political biases.

24   And the reason for that, your Honor is because those

25   arguments regarding the plaintiffs supposed political

26   biases are essentially clickbait for Infowars.

27   That's the first reason, and that's something that

1        the Court really needs to be aware of.  And I don't

2        think I need to do more than point the Court to page

3        6 of our reply memorandum, where we took a screengrab

4        from Infowars of Bill Aldenberg's trial video.

5              THE COURT:  Yeah, I saw that.  Here's the thing.

6        The Code of Evidence is the Code of Evidence.  And if

7        it turns out to be good for headlines or clickbait,

8        that's not what I'm driven by.  So I think that we

9        need to focus on what's admissible under our code and

10       under our case law.

11             ATTY. STERLING:  Your Honor, that's understood.

12       On the other hand, we do need to point out to the

13       Court that this lawsuit is being used to continue to

14       harass our plaintiff's by Infowars.  So in terms of

15       turning to the Code of Evidence, these are jury

16       nullification arguments.  They have absolutely no

17       relevance to the issues before the Court in this

18       hearing in damages.  You know, in cases where

19       politics is directly an issue, a very, very limited

20       examination may be made.  But this is not a case

21       where politics is an issue at all.  This is a hearing

22       in damages where the wrongful conduct has been

23       established, and the only remaining question is the

24       nature of the plaintiff's damages.

25             So for that reason -

26             THE COURT:  Well, there's really two separate

27       issues, right?

1          ATTY. STERLING:  Yes.

2          THE COURT:  There's the issues of politics.

3     Trump, Clinton, all that.  The who funded the –

4     allegedly funded the lawsuits.  Why the lawsuits were

5     filed at a certain point.  That's one issue.  But

6     then there's the other issue and the point that

7     Attorney Pattis makes about possible bias or

8     prejudice.

9          So obviously they are – the defendants are

10     permitted to address the extent of the damages.  They

11     don't have to roll over on that.  And as I'm

12     understanding, and of course Attorney Pattis will

13     articulate it better, as I'm understanding it, their

14     position or one of their positions is that the

15     injuries claimed are exaggerated.  And partly because

16     of bias or prejudice or whatever you want to call it

17     that the plaintiffs might have towards the defendants

18     because of the issue of guns.

19          ATTY. STERLING:  Your Honor, no.  That

20     absolutely cannot come into evidence in this case.

21     And the reason why is, first of all, this is intended

22     to open the door on the Soto issues.  That's

23     absolutely –

24          THE COURT:  Well that door is closed.

25          ATTY. STERLING:  - where this is headed.

26          THE COURT:  And it's not going to be reopened

27     and it's not going to be reargued, or we'll be done.

1          But the cross on the issue of – limited cross on the

2     issue of guns.  Why would that not be appropriate.

3          ATTY. STERLING:  Because it's not a gun case,

4     your Honor.  It's not a gun case.  It's a case about

5     a wrongful course of conduct, and the damages that

6     resulted from it.

7          the court:  But why can't Attorney Pattis

8     explore, not by extrinsic evidence, just by cross-

9     examination, whether or not based on what he's filed

10    here, whether or not the plaintiffs are exaggerating

11    their injuries because they have such opposite views

12    on guns and that's – and given the underlying nature

13    of the tragedy, which involved guns.  Why is – why

14    would he not be permitted some limited inquiry along

15    those lines?

16         ATTY. STERLING:  Just one moment, your Honor.

17         THE COURT:  Along the lines of what reasons

18    would they have to, according to what I'm

19    understanding in the briefs, to exaggerate their

20    injuries.  That's really what I'm focused on.  I mean

21    essentially, although not evidence, the opening was,

22    the plaintiffs wanted to stop Alex Jones because of

23    the lies and the damage that he inflicted, and that

24    shouldn't happen to the next family.

25         ATTY. STERLING:  That's correct, your Honor.

26         THE COURT:  I imagine that the defendant's

27    position is different, that they believe that the

1    lawsuit is brought because the plaintiffs don't like

2    Mr. Jones' positions and politics on guns.  So why

3    not some brief cross-examination on that?

4         ATTY. STERLING:  Your Honor, because again, and

5    I am repeating myself.  But it's because I do think

6    it is so clear.  Because there is a course of

7    wrongdoing that is established in this case that has

8    to do with lives.  It is established that the

9    plaintiffs are damaged.  And so now I understand the

10   Courts point –

11        THE COURT:  Reasons for them to exaggerate.  Why

12   can't he explore briefly, I'm not talking about

13   making this into a gun case by any means, but no

14   extrinsic – but why can't he briefly explore that

15   issue?

16        ATTY. STERLING:  It gets into collateral issues

17   very rapidly, your Honor.  That's one major problem

18   with it.  And the other reason is because – it - the

19   plaintiffs' interest in however they feel about guns,

20   I mean that doesn't go to a bias about damages.  And

21   what their testimony would be about damages.  It's

22   like in a malpractice case.  You wouldn't allow – or

23   a car wreck case, you wouldn't allow someone to

24   cross-examine on bias against the defendant in

25   connection with their damages.  It's just – it's

26   beyond the scope of what a normal damages inquiry

27   would look like.

1          And there is an interest in injecting politics

2     into this case.  There is an interest in expanding

3     this case into political theater, but that's not what

4     it is.  It needs to stay confined to the facts and

5     the evidence.

6          THE COURT:  All right.  Attorney Pattis.

7          ATTY. PATTIS:  These are not jury nullification

8     arguments.  You'll note in the request to charge, I

9     made a request to argue nullification at the end

10    under first, second and sixth, the law of the case

11    right now is not that I'm not permitted.  I get it.

12    I think that as a matter of right, I am always

13    permitted, any defendant in any case, is permitted to

14    inquire in motive, bias, and interest in the outcome.

15    And to a bridge that is reversable error.  I do

16    concede the Court had power to limit its scope within

17    its discretion.

18         And what I've heard the Court inquire of

19    Attorney Sterling is, what would be wrong with that?

20    The answer is it's an attempt to get at Soto v.

21    Bushmaster.  Your ruling could not be clearer that

22    that's not coming into evidence.  I don't intend to

23    open the door.  If it's opened, I know what the

24    procedure is.  Ask to speak to you outside the

25    presence of the jury and do so.  I note however, an

26    anomaly in the case that I think the Court needs to

27    resolve at some level.  And that is during voir dire

1    and at various points in sidebar communications,

2    there've been discussions about the practical

3    consequence of the default on the complaint.  The

4    plaintiffs at various times have deemed it admitted.

5        Every allegation in the complaint is an

6    admission.  They want to transform the complaint into

7    a request to admit.  The injects politics and I

8    believe Soto versus Bushmaster into the case because

9    it's in their complaint.  And so on a default, if I

10   take their view – and the Court hasn't ruled yet

11   there, so I don't know what the Courts going to say.

12   But if every fact in the complaint is admitted, then

13   everything they complain about is going to be before

14   the jury.

15       THE COURT:  So my – whatever rulings that I've

16   entered on motions in limine or other rulings, trumps

17   everything else.  So Soto versus Bushmaster, there's

18   no need to ever say those words again because it's

19   done.  Right or wrong it's done.

20       ATTY. PATTIS:  Judge, this is not – everybody –

21   I may be Alex Jones' lawyer, but I'm still an Officer

22   of the Court.  And I think I understand the rulings.

23   This isn't my first rodeo.  I'm not going there, and

24   I'm tired of being mischaracterized, not by you, but

25   by my adversaries.  I think I'm entitled to ask

26   whether – the only issue for this jury is the extent

27   of the damages.  And I think the case law is clear.

1    Fault has been determined by the Court.  Causation of

2    something has been caused.  The extent of it is up to

3    the plaintiffs to prove.  My view is if they seek to

4    elect – it they're that concerned about guns and

5    whatnot in this case, don't call the plaintiffs.

6    Submit it to the jury.  But then they don't get what

7    they want, which is millions.  If they're going to

8    seek millions, they have to earn millions, and I

9    think as a matter of right I am inquired – I'm

10   permitted to inquire into motive to exaggerate.  And

11   that's the extent of it.

12       the court:  And just – can you give me if you

13   can, some idea of what you're looking to do?  Asking

14   about their activities?

15       ATTY. PATTIS:  Yes.  Briefly, activities –

16   activities, statements, views of Jones.  Probably

17   those three areas.

18       THE COURT:  Say – I couldn't hear that.

19       ATTY. PATTIS:  Their activities –

20       THE COURT:  Activities –

21       ATTY. PATTIS:  Statements and their views of

22   Jones.

23       THE COURT:  Attorney Sterling.

24       ATTY. STERLING:  Activities, statements, views

25   of Jones, was what I just heard.

26       THE COURT:  That's what I heard.

27       ATTY. STERLING:  Okay.  So I'm not hearing how

1    those are limited to guns, your Honor.  I'm frankly

2    just not understanding where the proposed limitation

3    would lie.

4         THE COURT:  Well I think my question unless I

5    didn't get it out right.  Was meant to be along the

6    issues of their positions on guns.

7         ATTY. PATTIS:  Correct.

8         ATTY. STERLING:  Right.

9         THE COURT:  And I understood the answer to be

10   their activities, their statements, and their

11   opinions on Mr. Jones.

12        ATTY. STERLING:  So, your Honor, again, I think

13   that that is an expansive inquiry.  It's going to be

14   way beyond the scope of what their damages evidence

15   is.

16        THE COURT:  But this is cross-examination of a

17   witness, and parties whether it's a hearing in

18   damages or not, have a right to explore bias and

19   motive and prejudice.  That's my understanding.

20        ATTY. STERLING:  Your Honor, is there a way – I

21   understand the Courts inclination.  I do think that

22   one thing that is really important as we move

23   forward, is to have some very clear direction about

24   what's permitted and what's not.  There was a

25   representation, this would be a very limited inquiry.

26   As I said, activities,  statements, and view of Jones

27   regarding guns, sounds quite expansive.  And so is

1    there –

2         THE COURT:  I don't think so.  I remember pretty

3    clearly when Mr. Pattis was even talking about his

4    cross-examination of plaintiff.  I believe the words

5    were something along the lines of very short if at

6    all.  So I can't imagine that it's going to be

7    expansive, given that representation.

8         But listen, I think that is the ruling.  And I

9    don't think Mr. Pattis will exceed that, and if he

10   does, you'll object.  So I think that is proper

11   fodder for cross-examination on those issues.

12        ATTY. STERLING:  Thank you, your Honor.  We

13   understand your ruling.

14        THE COURT:  All right.  Anything else?  No?

15        ATTY. PATTIS:  No, Judge.

16        ATTY. STERLING:  Your Honor, let me just check

17   back through the relief that we had requested and see

18   if there is anything else.  The other issues really

19   had to do with the enforcement of the Courts existing

20   orders.  So, I mean obviously, I understand the Court

21   wouldn't issue new orders, but we did want to raise

22   those.

23        THE COURT:  Okay.  All right.  So I think we're

24    ready for the jury, Mr. Ferraro.

25        ATTY. PATTIS:  Judge, you want Attorney Paz on

26   the stand?

27        THE COURT:  Sure.  You might as well come up

1      now.  Good morning.

2              THE WITNESS:  Good morning.

3              (Jury panel enters the courtroom).

4              THE COURT:  Good morning, everyone.  Welcome

5      back.  Good morning.  Good morning.  Hope everyone

6      had a nice long weekend.  Good morning.  Good

7      morning.  Welcome back.  Ron will hand you you're

8      your notepads, which we kept secure.  Please be

9      seated.  And counsel will stipulate that the entire

10     panel has returned?

11             ATTY. PATTIS:  I do.

12             ATTY. MATTEI:  Yes, your Honor.

13             THE COURT:  All right.  So I know we had a long

14     weekend.  I know you all understand your obligations

15     and the Courts orders on the rules of juror conduct.

16     Mr. Ferraro did not give me any note from any of the

17     jurors indicating that they were unable to avoid any

18     media exposure, or that they were concerned about

19     improper activity.  So that's a good thing.  So I

20     would just of course continue to remind you.  I know

21     it's not easy, but you'll continue to obey your

22     obligations.  But if something does happen, you'll

23     just give Ron and note, and we will deal with it.

24     Okay.

25             So Ms. Paz remains under oath, and Attorney

26     Mattei, you may continue whenever you're ready.  Take

27     your time.

1          ATTY. MATTEI:  Thank you, and good morning, your

2     Honor.

1          B R I T T A N Y   P A Z ,having been previously

2          sworn, testified under oath as follows:

3     REDIRECT EXAMINATION BY ATTY. MATTEI:

4      Q   Good morning, ladies and gentlemen, and good morning

5     Ms. Paz.

6      A   Good morning.

7      Q   Ms. Paz, when we left off on Friday, you and I were

8     looking over an organizational chart.  Do you remember that?

9      A   I do.  Yes.

10     Q   Did you do any additional preparation over the

11    weekend, ma'am?

12     A   No.

13     Q   Okay.  So getting back to your role here.  I take it

14    that if we wanted to know about whether Free Speech Systems

15    maintained an organizational chart, there are people at Free

16    Speech Systems that Free Speech Systems could have selected

17    to testify about that.  Correct?

18     A   I'm not aware of that, no.

19     Q   Okay.  Well, as we talked about at the very

20    beginning, Free Speech Systems has about 70 employees, is

21    that right?

22     A   Right.

23     Q   Several of them have served as corporate

24    representatives for Free Speech Systems, right?

25     A   At various points.  Yes.

26     Q   Right.  And several of them have been employed by

27    Free Speech Systems for a long time.  Even going back to

1    2009 and earlier, correct?

2       A    Yes.

3       Q    Okay.  And so there are people within the

4    organization who very well may have known about the

5    existence of an organizational chart.  Correct?

6             ATTY. PATTIS:  Objection.  Calls for

7         speculation.

8             THE COURT:  Sustained.

9       Q    You don't know that, right?

10            ATTY. PATTIS:  Objection.  Asked and answered.

11            THE COURT:  Overruled.

12      A    I don't have any information to suggest that anybody

13   had that information.

14      Q    Okay.  But what you do know is that you certainly had

15   no idea there was an organizational chart.

16      A    I had never seen that before.  Correct.

17      Q    Right.  And that's because nobody gave it to you,

18   correct?

19      A    Correct.

20      Q    Okay.  And if Free Speech Systems wanted to present

21   somebody to this jury who could testify about google

22   analytics, we saw the emails where Tim Fruget was sending

23   around on google analytics, right?

24      A    Yeah, I remember them.  Yup.

25      Q    We saw Lydia involved in those emails, right?

26      A    Some of them.

27      Q    All right.  Lydia, you'll remember - Lydia Hernandez

```
 1  was the accounting director for Free Speech Systems,

 2  correct?

 3     A   At one point, yes.

 4     Q   Okay.  And one of those emails that Mr. Fruget sent

 5  was to a Don Salizar, correct.  Remember that?

 6     A   I do remember that.

 7     Q   And one was to a gentleman named Rob at Infowars.com.

 8  Right?

 9     A   I remember that.  Yes.

10     Q   So if Free Speech Systems wanted to present anybody

11  to testify about the google analytics that were attached to

12  those emails, they could have done that.  Correct?

13     A   I believe we did talk about those emails and the

14  google analytics in the emails.

15     Q   Right.  But you had never seen them before.

16     A   There were some google analytics that I did review in

17  connection with my – with the documents that were provided

18  to me.

19     Q   Just see if you can answer the question I asked you.

20            ATTY. PATTIS:  Objection to hectoring, Judge.

21            THE COURT:  Overruled.  Just listen to the

22         question, please?

23     Q   The question I asked you was, you had never reviewed

24  those emails before I showed them to you during this trial.

25  Right?

26     A   Those specific emails about –

27     Q   Right.
```

1    A    - the social media attachments.  Is that the one

2  you're referring to?

3    Q    Had you reviewed any of the emails I showed you

4  dealing with google analytics?

5    A    I think I had seen because some of them were

6  discussed in Blake's deposition.  So, I had seen a couple of

7  what had been attached in that deposition.  But aside from

8  that, I don't think I had seen any other ones.  So I'm not

9  sure which one's you're referring to.

10    Q    Okay.  So that sounds like a difference from what you

11  testified last week, Ms. Paz.  Are you testifying now that

12  you reviewed Blake Roddy's deposition that was taken here in

13  Connecticut?

14    A    I think I had said that already, that I reviewed Mr.

15  Roddy's deposition and I had talked to him about it.

16    Q    Okay.  Hold on.  Hold on a second.

17    A    Um-hum.

18    Q    You reviewed his deposition transcript.

19    A    I did.

20    Q    Okay.  He discussed google analytics in his

21  deposition.  That's your recollection.

22    A    I believe he did.

23    Q    You then had a meeting with him where he told you

24  that Free Speech Systems doesn't use google analytics.

25    A    I had a phone call with him.  Yes.

26    Q    A phone call with him.

27    A    Right.

```
1    Q    Where he said, Free Speech Systems doesn't use google
2  analytics, right?
3    A    Right.
4    Q    That's what you told this jury.
5    A    Correct.
6    Q    Okay.  And my question to you is, had Free Speech
7  Systems wanted to present somebody to this jury who could
8  actually talk about those emails, they could have presented
9  Tim Fruge, correct?
10   A    I mean Tim Fruge is available to subpoena.  So he
11 could testify.  Sure.
12   Q    Okay.  Well, Tim Fruge is – when you say available to
13 subpoena, Ms. Paz, you know that they could have asked Tim
14 Fruge to testify on behalf of Free Speech Systems.  Correct?
15   A    I don't think he was willing to do that.  So –
16   Q    So Ms. Paz, really the question I asked you is, could
17 they have?
18        ATTY. PATTIS:  Objection to the hectoring,
19        Judge.
20   A    No.
21        THE COURT:  Sustained.  So we're going to stop.
22        Just listen to the question that's asked and answer
23        that question, please.
24   A    Could they have?  No, because he was not willing.
25        ATTY. MATTEI:  Your Honor, I ask that the answer
26        be stricken as non-responsive.
27        ATTY. PATTIS:  I object.
```

```
1              THE COURT:  So ordered.

2              ATTY. MATTEI:  Thank you.

3    BY ATTY. MATTEI:

4       Q   Have you spoke to Tim Fruge?

5       A   I believe I had a phone call with him.

6       Q   Okay.  And Mr. Fruge you know was deposed in this

7    case, correct?

8       A   Yes.

9       Q   You know that he still has an ongoing business

10   relationship with Mr. Jones, correct?

11      A   I don't believe he works there anymore.  But I don't

12   know –

13      Q   Ms. Paz –

14      A   - what the nature of their current business

15   relationship is.

16             ATTY. MATTEI:  Your Honor, I'd ask that the

17        answer be stricken and -

18             THE COURT:  So ordered.

19             ATTY. PATTIS:  Objection.

20             ATTY. MATTEI:  Thank you.

21             THE COURT:  So the question – overruled.  So the

22        question is a yes or no.

23      A   I don't know the answer.

24      Q   You don't know if he has an ongoing relationship with

25   Mr. Jones.

26      A   Correct.

27      Q   Okay.  So you're not aware that he – Mr. Jones sent
```

1    him out to set up a website called Freeworldoutlet.com?

2       A    No.

3       Q    And you're not aware – and you don't know what

4    Freeworldoutlet.com is.

5       A    I do not know.

6       Q    And you have no idea if Free Speech Systems has a

7    financial interest in that.  Correct?

8       A    No.

9       Q    Even though you're Free Speech Systems corporate

10   representative here right now.

11      A    I was no briefed on that, so no.

12      Q    Okay.

13      A    I don't know.

14      Q    Because nobody told you.

15      A    Correct.

16      Q    Okay.  Now the only lawyer in Connecticut that you

17   delt with in this case is Mr. Pattis.  Correct?

18      A    Yeah.

19      Q    And his office.

20      A    Yes.  Since I was retained in January.  Correct.

21      Q    Right.  And in February you asked Attorney Pattis to

22   share with you all of the depositions that were given in

23   Connecticut.  Correct?

24      A    All of the Connecticut materials.  Not just the

25   depositions, but all of the Connecticut materials.

26      Q    So let's just start with depositions.

27      A    Sure.

1  Q    You asked him to share with you all of the

2  Connecticut depositions, correct?

3  A    Yes.

4  Q    And he did not do that, correct?

5  A    I don't think I received all of the Connecticut

6  depositions.

7  Q    So the answer is correct, he did not do that.

8  A    Correct.  I don't have them all.

9  Q    Because he didn't give them to you.

10  A    Correct.

11  Q    Okay.  And in addition to the Connecticut material,

12  and in addition to the depositions, you asked him to share

13  all of the documents that Free Speech Systems had produced

14  in Connecticut.  Correct?

15  A    Yes.

16  Q    And he didn't give you access to those.  Correct?

17  A    Think there was an issue with that.  But, yes.

18  Q    Okay.  The issue is he didn't give you access to

19  them, right?

20  A    Correct.  I didn't have access to it, so –

21  Q    Right.  Because he didn't give you access to it.

22  A    Whoever was in charge of it didn't give me access.

23  So I don't know who was in charge of it, but I did not get

24  it.

25  Q    The person you asked is Mr. Pattis.  Yes?

26  A    I asked Mr. Pattis' office.

27          ATTY. PATTIS:  Objection.  Actually, that's not

1           – well.

2      Q    Okay.   You asked Mr. Pattis –

3                THE COURT:   Overruled.

4      Q    And in fact, you repeated that request since February

5   to have access to the Connecticut depositions and the

6   documents that were produced here.   Correct?

7      A    I've asked more than once.

8      Q    Right.   And they've never been given to you.

9   Correct?

10     A    I have not had access to any of the Connecticut

11  materials.

12     Q    You asked as recently as last week before this trial.

13  You asked Mr. Pattis to give you that material, correct?

14     A    Last week what I asked for specifically was my

15  depositions in the Connecticut cases.

16     Q    And –

17     A    In the past week.

18     Q    And he didn't give them to you.

19     A    I received two out of four of the days.

20     Q    When?

21     A    Not last week but the week before.

22     Q    You still haven't seen Alex Jones' deposition, right?

23     A    The most recent one, no.

24     Q    Meaning you haven't seen the deposition that he gave

25  in Connecticut.   Correct?

26     A    Correct.

27     Q    Okay.

1    A    Right.  The one he gave in; I want to say June.

2    Q    Okay  I'm sure that you asked when you were retained

3  in this case to see an organizational chart, right?

4    A    I asked if organizational charts existed.

5    Q    Who did you ask that?

6    A    I think I had asked – I had those conversations with

7  counsel at the time in Texas, when I went, and I traveled

8  there.  So I asked Attorney Blot.

9    Q    Okay.  Did you ever ask Attorney Pattis?

10    A    I don't know that he and I had ever had that

11  conversation.

12    Q    Okay.  So the answer is you don't know if you ever

13  asked him?

14    A    I don't think I ever specifically asked him that.

15    Q    Okay.

16    A    No.

17    Q    But you wanted to see an organizational chart because

18  that lays out the relationships between people who work at

19  the company, right?

20    A    Sure.

21    Q    You didn't know anything about the company when you

22  first started.

23    A    No.  I mean, I sought to try to find out as time

24  progressed.

25    Q    Right.  And an organizational chart tells you who

26  reports to whom.  Correct?

27    A    Such that they do report to somebody.  Yes.

```
 1    Q   Who's in charge.  Yes.

 2    A   If there is somebody in charge.  Yes.

 3    Q   Right.  And who works in which departments, right?

 4    A   Yes.

 5    Q   And which departments may exist.

 6    A   Yes.

 7    Q   Okay.  And you were told that one didn't exist,

 8 correct?

 9    A   I was not given any, so, I don't know if they

10 answered me and said there are none.  But I was not given

11 one.

12    Q   Let's try this – let's just try this.  You asked

13 Attorney Blot is there an organizational chart.

14    A   Right.

15    Q   Right.

16        ATTY. PATTIS:  Well, Judge, we're going to get

17        into attorney/client communications at this point?

18        ATTY. MATTEI:  I don't think that that's an

19        attorney/client communication for the purpose of

20        seeking of -

21        THE COURT:  I don't think so.  So overruled.

22    Q   You asked Attorney Blot, right?

23    A   Yes.

24    Q   She represented Free Speech Systems.

25    A   At the time, yes.

26    Q   Attorney Pattis put you in touch with her.

27    A   Yes.
```

1    Q   Okay.  She said what to you in response.

2            ATTY. PATTIS:  Same objection.

3    A   I don't recall if she said that there was none, or

4    she didn't know whether there was one.  And I want to be

5    fair to her, so I'm not sure if it was – that there was

6    none, or she was not aware whether there was one.

7    Q   And you didn't follow up, right?

8    A   Not with her.  No.

9    Q   But the first – one of the first questions that

10   Attorney Pattis asked you here last week was whether there

11   was an organizational chart.  Correct?

12   A   I think that's what his question was.

13   Q   And you said there isn't one.  Correct?

14   A   Well, as far as I was aware there wasn't one.

15   Q   That's what you testified.

16   A   Correct.  As far as I was aware.

17   Q   Okay.  And that was false, correct?

18   A   Well, I don't know what that was and when it was

19   prepared.  So I can't really answer as to information

20   concerning that chart.

21   Q   Did I show you an Infowars organizational chart last

22   week?

23   A   Yes.

24   Q   Okay.  And I showed you a base number that you

25   acknowledged and that had been produced by Infowars to us in

26   this case.  Correct?

27   A   I saw the bates number, yes.

1    Q   Okay.  And so your testimony that there wasn't a

2  organizational chart was false, correct?

3            ATTY. PATTIS:  Objection.  Argumentative.

4            THE COURT:  Sustained.

5    Q   Okay.  Was it inaccurate?

6    A   I don't know anything about that chart so I can't

7  answer anything about the chart.

8    Q   Okay.  Why don't we bring it up.  Did you know

9  whether Mr. Pattis knew anything about the chart when he

10 asked you the question?

11            ATTY. PATTIS:  Objection.  Speculation.

12            THE COURT:  Sustained.

13            ATTY. MATTEI:  All right.  Well, let's bring it

14        up.  And for the record, this your Honor, is – was

15        admitted last week.

16            THE CLERK:  It's number 480, counsel.

17            ATTY. MATTEI:  Number 480.

18            ATTY. PATTIS:  Cumulative, Judge.  Asked and

19        answered.

20            THE COURT:  Overruled.

21 BY ATTY. MATTEI:

22    Q   You worked with spread sheets before, ma'am?

23    A   Minimally, but yes.

24    Q   Okay.  And you know that there – and documents that

25 need a format have what's called Metadata, yes?

26    A   I'm not that technologically savvy, but I'll accept

27 your representation.

1    Q    You know that Metadata is basically data imbedded

2   within the document that tells you a little bit about it.

3   Yes.

4    A    Sure.

5    Q    Okay.  Well, why don't we go to the about page of

6   this document.  Okay.  And I want you to look at the right-

7   hand side, and do you see related dates there?  Do you see

8   that on your spreadsheet, ma'am?

9    A    I see it, yes.

10    Q    And do you see created?

11    A    Yes, I see a date there.

12    Q    What's the date there?

13    A    11/6/2011.

14    Q    Okay.  And do you see the last printed.  Do you see

15   that?

16    A    Yes.

17    Q    And what date is that?

18    A    6/19/2017.

19    Q    And who's the author?

20    A    It says Lydia Hernandez.

21    Q    Okay.  That's the former accountant.  Right?

22    A    Yes, at one point.

23    Q    All right.  Did you review the testimony of Daria

24   Karpova, that she gave in this case?

25    A    Yes, I did.

26    Q    In Connecticut.

27    A    I believe I did.  I definitely read her deposition.

```
 1   Was this her corporate rep deposition?  No, it wasn't.  So
 2   I'm not sure if I read that one.
 3      Q   Okay.
 4      A   I definitely read her corporate representative.
 5      Q   Okay.
 6      A   Deposition.
 7      Q   Okay.  She didn't serve as a corporate representative
 8   in Connecticut –
 9      A   No, I don't believe she did.
10      Q   Okay.  And so you don't know if you read her
11   deposition here in Connecticut.
12      A   I'm not sure.
13      Q   All right.  I'm going to – may I approach, your
14   Honor?
15              THE COURT:  You may.
16      Q   This has been marked as Exhibit 350.  And why don't
17   you just take a look at that and see if you can identify
18   that.
19      A   It looks like Daria's deposition remotely on August
20   6, 2021.
21      Q   Okay.  And –
22      A   You want that back?  Sure.
23      Q   Yup.  And you're a lawyer.  You've worked for
24   depositions before, right?
25      A   Um-hum.
26      Q   And if I point you to page 3 here, who conducted the
27   examination on behalf of Free Speech Systems?
```

1      A    Attorney Pattis.

2      Q    Okay.  And what I'm going to do now is turn to page

3  55.  Oh, before I do that.  In the table of contents, you'll

4  see here Exhibit 4 is described as what?

5      A    It says Excel Spreadsheet.

6      Q    Okay.  And you know an exhibit when it's presented at

7  a deposition, is somewhat the way it's presented here.  You

8  ask the witness about it.  Right?

9      A    Sure.

10      Q    And if we go to page 55, I'm sorry 56, do you see the

11  question here?

12      A    Do you want me –

13      Q    Why don't I – I'm going read it to you.

14      A    - read it?

15      Q    I'll read it to you.

16      A    Oh, okay.  Go ahead.

17      Q    Okay.  Okay.  I'm going to move to the next tab,

18  which is 2015.  You can keep the spreadsheet out.  I'm going

19  to move to the next tab, which is 2015.  One sec.  Okay.  I

20  moved to the next tab of Plaintiff's Exhibit 4, which is

21  marked 2015.  And this appears to be an organizational chart

22  for Free Speech Systems, LLC, as well.  And what's her

23  answer?

24      A    Okay.

25      Q    And then the question is.  And if you look on the

26  right side of the document below production, under radio

27  show producers, it has your name there as well.  Answer.

1    A    I see it.  Yes.

2    Q    Okay.  And then the question is, why does it have

3    your name there as a producer in 2015.  And who speaks next?

4    A    Attorney Pattis has an objection.

5    Q    Okay.  Thank you.  And so when Attorney Pattis asked

6    you last week, does Free Speech Systems have an

7    organizational chart.  Am I correct that he was at this

8    deposition where this exhibit was shown?

9    A    It appears so.

10   Q    Okay.

11   A    Assuming that's the same Excel Spreadsheet we're

12   talking about.

13   Q    And you said it does not.  Correct?  It does not have

14   an organizational chart.

15   A    Well, as far as I was aware.

16   Q    Right.  And he didn't correct that testimony, did he?

17   A    I don't recall that he did.

18   Q    Okay.  So if we go to 2015 here – and let's zoom out

19   so everybody can see it.  Just for a second.  Okay.  So this

20   is the 2015 tab.  Free Speech Systems, LLC.  Alex Jones at

21   the very top.  Right?

22   A    Right.

23   Q    And to the left is Dr. Jones.  Right?

24   A    I see that, yes.

25   Q    That's David Jones, yes?

26   A    Right.  His father.

27   Q    And do you see his title there?

1    A    HR Consultant.

2    Q    Right.  And last week Attorney Pattis, do you

3    remember him asking you whether there was anybody who did an

4    HR function at Free Speech Systems?

5    A    I think – right, and I had answered –

6    Q    Do you remember him asking you that question?

7    A    I do.  Yes.

8    Q    Okay.  And you said, nobody has that title, but

9    Melinda Flores does some of that.

10    A    Right.

11    Q    Right.

12    A    Well according to what I believed based on what I had

13    seen.  Right.

14    Q    Well, okay.  And so nobody told you that Dr. Jones

15    actually had an HR function, right?

16    A    Nobody conveyed anything like that to me during the

17    course of my investigation here.

18    Q    Right.  Right.  And you actually asked to speak to

19    David Jones.  Right?

20    A    I don't think I asked to speak to Dr. Jones.  No.

21    Q    You didn't.  Okay.

22    A    No.

23    Q    You know that as part of his HR role, Dr. Jones and

24    Free Speech Systems requires all of its employees to sign a

25    non-disclosure agreement.  Did you know that?

26    A    I do know that now.

27    Q    Okay.

1    A    They do now require that.

2    Q    They do now.

3    A    Yes.

4    Q    When did that start?

5    A    I'm sorry, I can't recall the date.

6    Q    Okay.  Let's go to 2017.  All right.  So this is

7    2017.  And you see Alex Jones at the very top.  Right?

8    A    Yes.

9    Q    Dr. Jones there still listed.  Yes.

10   A    I see that.  Yes.

11   Q    And he's right below Alex Jones, and then also on the

12   other side is Tim Fruge.  Right?

13   A    Right.

14   Q    And the department listed for Tim Fruge is sales new

15   product and advertising.  Correct?

16   A    Yes, that's what it says.

17   Q    Okay.  And if you go further down, 2017, according to

18   this chart we're going to go to the departments now.  The

19   organization was broken up into one, two, three, four, five,

20   six, seven departments.  Yes.  We'll start from the left –

21   A    Yes, I see it.  Yes.

22   Q    Procurement in inventory.

23   A    Yes.

24   Q    Right.  And that's the function basically over at the

25   warehouse you talked about where they're ordering you

26   supplement products; they're inventorying them and they're

27   preparing them to be shipped.  Right?

1    A    That's what that would mean to me, yes.

2    Q    Okay.  And you see there they have, one, two, three,

3  four, five, six, seven, eight, nine, ten, 11, 12, 13, 14,

4  15, 16 or thereabouts employees in that department.  Yes.

5    A    That's what it looks like.  Yes.

6    Q    Okay.  And then the next department is operations.

7  And Tim Fruge was running that, in addition to the sales

8  department that we saw earlier.  Yes.

9    A    Yes.  Not sure what operations means, but - yes.

10    Q    Okay.  Well let's see if we could tell from this

11  subdepartments.  One is security, correct?

12    A    That's what it says, yes.

13    Q    Okay.  There's a lot of security at Free Speech

14  Systems offices, correct?

15    A    I mean there is a security system there.  Yes.

16    Q    You have to swipe in to get in the building.

17    A    Correct.

18    Q    And then you have to swipe to get into different

19  parts of the building.

20    A    Correct.

21    Q    Okay.  And Mr. Jones himself has a security team.

22  Correct?

23    A    I believe he does, yes.

24    Q    Okay.  And then there's customer service and online

25  stores.  Right.

26    A    That's what it says, yes.

27    Q    And the online stores is making sure that the online

1  retail platforms are functioning properly.

2   A   Right.

3   Q   Transacting business.

4   A   Right.

5   Q   And customer service.  Anybody who calls up, say, hey

6  I didn't get my - I didn't get my shipment of DNA force

7  plus.  These people are here to respond.

8   A   Right.

9   Q   Okay.  And then there's an IT Department.  Right.

10   A   Yes, I see that.

11   Q   IT, obviously just like any business.  You got a

12  bunch or computers, correct?

13   A   Sure.

14   Q   You have a server, correct?

15   A   Sure.

16   Q   You have printers that need to be trouble-shoted, all

17  that stuff, right?

18   A   Yeah.

19   Q   Okay.  And then there's a programmer there, that's

20  Timothy Thrift, right?

21   A   That's what is says.  Yes.

22   Q   He helps write computer code for Free Speech Systems

23  to help their online platforms work properly.  Correct?

24   A   I believe so, yes.

25   Q   And then you have graphics design.  And graphics

26  design, they design kind of the ad copy that they put up for

27  things like DNA force plus, and iodine and things like that.

1    A    Yeah, I'm sure they design the ads and design other

2   things associate with the website.

3    Q    Okay.  And then over here you have the writers and

4   editors.  And writers and – those are the folks who

5   basically write the stuff that comes up on Infowars.com.

6   Right.

7    A    Right.  The articles.  Right.

8    Q    Newswars.com.

9    A    Correct.

10    Q    Kit Daniels supervises that, right?

11    A    I don't know if he supervised it at this time period.

12   I know he became a supervisor at some point.

13    Q    Okay.

14    A    I'm just not sure what time period he became a

15   supervisor.  But he was a writer there at this time period.

16    Q    Adan Salazar still in there.

17    A    Correct.

18    Q    All right.  And then you have the production side of

19   things.  And this is – you know, what happens in the studio.

20   Right?  Putting on the Alex Jones Show, right?

21    A    Correct.

22    Q    The War room is another show they have.

23    A    Correct.

24    Q    The American Journalist, the show they have in the

25   morning.  Yeah.

26    A    Yes.

27    Q    And here you have – we talked about Nico Costa last

1    night.  He's there, he's in charge of the radio show, that's

2    the Alex Jones Show.  Yeah.

3        A    Right.  He was one of the producers.  Yes.

4        Q    And over here, the Nightly News, that's Rob Dew.

5    He's in charge of that and all these people are part of the

6    production team.  Yeah.

7        A    Sure.  That's what it says in the column.

8        Q    Okay.  Last week and today, this is the first time

9    you've ever seen this.

10       A    Yes.

11       Q    You also were asked about google analytics on your

12   cross-examination, right?

13       A    I think so.

14       Q    Okay.  Now did you review the deposition that Michael

15   Zimmerman gave in Connecticut.

16       A    I definitely reviewed a deposition by Michael

17   Zimmerman, but I'm not sure if it was in Connecticut or in

18   Texas.

19       Q    Okay.

20       A    It might have been the one where he was designated as

21   a corporate rep.  So, it might not have been the Connecticut

22   one.

23       Q    Okay.  I'm not – if you're not sure, I won't –

24       A    I'm not sure.

25       Q    – I won't waste everybody's time.  In addition to

26   google analytics, you talked about Quantcast analytics.

27   Right.

1    A    Yes.  That was in some of the emails that we saw.

2    Q    Right.  But you've never been presented with

3    Quantcast data yourself, right?

4    A    No, I've not seen anything like that.

5    Q    Okay.  And you've never even heard of something

6    called Sprout Social.  Correct?

7    A    You mean as I sit here today, have I ever heard of

8    it?

9    Q    Right.

10   A    That does not sound familiar to me.

11   Q    Okay.  You have no idea if Infowars had a Sprout

12   Social analytics program, correct?

13   A    No, I don't.

14   Q    And you wouldn't even know what that does.

15   A    No.

16   Q    Mr. Pattis asked you whether you saw any files when

17   you were at Infowars that contained sales reports.  Right?

18   Do you remember that?

19   A    Files containing sales reports.  I don't recall the

20   exact line of questioning you're referring to.

21   Q    Okay.  You know that Free Speech Systems produce what

22   they claim to be sales reports in this case.

23   A    Daily sales reports.

24   Q    Yes.

25   A    Yes.

26   Q    And you produced those in connection with your

27   deposition, right?

1    A    I believe so, yes.

2    Q    Okay.  Those were for the platforms we talked about

3  for Infowarsshop.com.

4    A    Right.

5    Q    Infowarsstore.com.

6    A    Yes.

7    Q    Amazon.

8    A    Yes.

9    Q    eBay.

10   A    Yes.

11   Q    Right.  You never saw any sales reports from

12  Infowarslife, right?

13           ATTY. PATTIS:  I didn't hear the question,

14       Judge.  I'm sorry.

15   Q    You never saw any sales reports for Infowarslife.

16  Right?

17   A    I don't recall seeing anything for Infowarslife.

18   Q    Right.  And I think you just testified that you have

19  no idea what Freeworldoutlet.com is, right?

20   A    No.

21   Q    Okay.  You have no idea what Preparedtoday.com is.

22   A    No.

23   Q    Okay.  You never heard of the website

24  PreparewithAlex.com.

25   A    No.

26   Q    And you never heard of the website 50percentoff.com.

27   A    No.

1    Q    Okay.  So you have no idea if any of those websites

2    are also online retail platforms for Infowars, correct?

3    A    No.

4    Q    So let's just talk about all the things that Free

5    Speech Systems does.  Okay.  So they manage payroll for

6    about 70 employees, right?

7    A    Sure.

8    Q    They have a payroll processor ADP, correct?

9    A    Sure.

10   Q    They install the manage security at their office,

11   correct?

12   A    Yes.

13   Q    They broadcast to millions and millions of people

14   every day.  Right.

15   A    Yes.

16   Q    That requires them to have a production staff that

17   can do three lives shows, including the Alex Jones Show.

18   Correct?

19   A    Yes.  We have a production staff.

20   Q    The War room, correct?

21   A    Yes.

22   Q    The American Journal?

23   A    Yes.

24   Q    And they have staff that maintain relationships with

25   all of their radio affiliates.  Correct?

26   A    Right.  There is somebody that performs that

27   function.

1    Q    They're able to manage their – all of their multiple

2    websites.  Correct?

3    A    Yes.

4    Q    They have writers posting content every day.

5    A    Yes.

6    Q    They're soliciting advertisers.  Yes.

7    A    At various points.  Yes.

8    Q    And they have to manage those relationships.

9    Correct?

10   A    I don't know what they do to manage them, but, I'm

11   sure that they have to do something.

12   Q    Right.  And they manage dozens of social media

13   platforms.  Correct?

14   A    Yes.  We have many platforms.

15   Q    And they have to have people pumping out content

16   every day to those social media platforms.  Correct?

17   A    Yes.

18   Q    Okay.  They edit their videos, and they post their

19   videos.  Somebody has to do that.

20   A    Right.

21   Q    They manage thousands of units of inventory.  Those

22   are the supplements, correct?

23   A    You mean at the warehouse?  Yes.

24   Q    Yeah.  At a facility that you I think said was about

25   3 ½ football fields big.

26   A    It was very big.  Yes.

27   Q    So they have heavy equipment there as well.

```
 1     A    Like forklifts and stuff –

 2     Q    Right.

 3     A    - to lift everything.  Yes.

 4     Q    Right.  They have to manage accounting and all of

 5   their books.  Yes.

 6     A    Sure.

 7     Q    They have to manage their facilities.  Right.

 8     A    Sure.

 9     Q    And all of this, and I think your testimony is that

10   over the past ten years this whole organization has

11   generated up to about a billion dollars in revenue.

12   Although you don't know the precise amount, correct?

13     A    Well, I said I wasn't sure what the exact number is.

14     Q    Right.

15     A    But –

16     Q    You put a range on it of a 100 million to a billion.

17   Correct?

18     A    Well, I think that was your range.  I just said I

19   wasn't sure what the number was.

20     Q    Okay.  Well, I think the jury will remember that

21   testimony.

22              ATTY. PATTIS:  Objection.  Move to strike.

23              THE COURT:  Overruled.

24     Q    And Alex Jones owns and manages all of this, correct?

25     A    He owns Free Speech.  So, yes.  And he's at the top.

26   He's the person that to whom everybody reports.

27     Q    Right.  But he only met with you for about an hour
```

1   and a half.

2     A    About.

3     Q    Okay.  And they do all of these things, but they

4   wouldn't email you any depositions that you wanted, right?

5     A    I'm sorry, I don't understand the question.

6     Q    They do all of these things we've just been talking

7   about.  But when you asked for deposition transcripts you

8   didn't get them, right?

9     A    I didn't get what I requested.

10    Q    And when you asked to see documents, they didn't give

11  them to you, right?

12    A    I didn't get what I requested.

13         ATTY. MATTEI:  Nothing further, your Honor.

14         THE COURT:  Attorney Pattis.

15  CROSS-EXAMINATION BY ATTY. PATTIS:

16    Q    Alex Jones owns and manages all this, right?

17    A    To the extent the word manages means something.

18    Q    Why are you reluctant to say – why do you say to the

19  extent the word management means something?

20         ATTY. MATTEI:  Objection, your Honor.

21         THE COURT:  Overruled.

22    A    I think like a lot of people that own and run a

23  business; Alex is just really focused on being on the air.

24  And Alex doesn't take a real big interest on the day to

25  day –

26         ATTY. MATTEI:  Objection, your Honor.

27    A    – interaction or responsibilities of –

```
1              THE COURT:  Overruled.

2    A   - of the running of the company.

3    Q   You're aware that the plaintiffs took more than 50

4  depositions in this case?

5    A   I'm aware there were a lot of depositions, yes.

6    Q   That they've marked for the jury's consideration

7  portions of each one to show them during trial.

8              ATTY. MATTEI:  Objection, your Honor.

9    Q   Are you aware of that?

10             THE COURT:  What's the basis of the objection?

11             ATTY. MATTEI:  Hearsay.

12             ATTY. PATTIS:  That's not hearsay.

13             THE COURT:  Overruled.

14   Q   You're aware of that.

15   A   I'm aware that there have been many of those marked.

16  Yes.

17   Q   Do you think there's some reason that you should read

18  what they're going to show the jury, or do you think that

19  the jury can read it for itself?

20             ATTY. MATTEI:  Objection, your Honor.

21             THE COURT:  Sustained.

22   Q   You testified that Rob Dew had served as a corporate

23  rep.

24   A   At one point, yes.

25   Q   Daria Karpova had served as a corporate rep.

26   A   Yes.

27   Q   Mike Zimmerman had served as a corporate rep.
```

1    A    Yes.

2    Q    You testified that none were willing to at this

3  point.

4         ATTY. MATTEI:  Objection, your Honor.  Based on

5  hearsay and beyond the scope.

6         ATTY. PATTIS:  It was in the scope.

7         THE COURT:  Overruled.

8    Q    You testified none were willing to.

9    A    They were not willing to do it again.  That's

10  correct.

11   Q    You heard Mr. Mattei indirectly attack me a number of

12  times in his cross-examination.

13   A    Yes.

14   Q    Do you think those kind of attacks has something to

15  do with why they weren't willing to serve as corporate reps

16  here.

17        ATTY. MATTEI:  Objection, your Honor.

18        THE COURT:  Sustained.

19   Q    How many thousand – how many documents were you shown

20  in this case?

21   A    Thousands.

22   Q    Can you estimate tens of thousands?

23   A    Probably tens of thousands.

24   Q    Do you know how many that were produced?

25   A    Between Connecticut and Texas, I don't know how many

26  were produced.  But many tens of thousands of documents.

27   Q    You had an hour and a half with Mr. Jones.

```
 1     A    About.  Thereabouts.

 2     Q    You formed impressions of his organizational ability.

 3     A    Of his ability?

 4     Q    Yes.

 5     A    Yes, I did.

 6     Q    If you'd spent ten more hours with him, would it have

 7   mattered?

 8               ATTY. MATTEI:  Objection, your Honor.

 9               THE COURT:  Sustained.

10               ATTY. PATTIS:  Nothing further, Judge.

11               THE COURT:  Attorney Mattei.

12               ATTY. MATTEI:  Nothing further, your Honor.

13               THE COURT:  All right.  You may step down.

14          Thank you.

15               THE WITNESS:  Thank you.

16               (WITNESS STEPS DOWN)

17               THE COURT:  All right.  You may call your next

18          witness.

19               ATTY. KOSKOFF:  Thank you, your Honor.  Mr.

20          Clint Watts.

21               ATTY. PATTIS:  May I speak to Attorney Mattei

22          for a moment, Judge?

23               THE COURT:  Take your time.

24               ATTY. PATTIS:  May I have one moment with Ms.

25          Paz?

26               THE COURT:  You may.  Good morning.  Just watch

27          your step.  Mr. Watts, there's water in that pitcher.
```

```
1          Are there cups down there?  I can't see.

2               THE WITNESS:  There are.

3               THE COURT:  So you help yourself at any time.

4          Okay.

5               THE WITNESS:  Okay.  Thank you.

6               THE COURT:  Attorney Koskoff.  Sorry about that.

7           Whenever you're ready.

8               THE COURT:  Thank you, your Honor.  Thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
```

1          C L I N T O N   W A T T S, of Coldspring, New

2          York, having been duly sworn, testified under oath as

3          follows:

4    DIRECT EXAMINATION BY ATTY. KOSKOFF:

5    Q    Good morning, Mr. Watts.  You just heard that Free

6    Speech Systems is a structured organization of about 70 or

7    so employees.  Is that right?

8    A    Correct.

9    Q    You are not one of them.

10   A    No.

11   Q    Is that right?  You also understand that there are 15

12   plaintiffs in this case, and you are not a plaintiff or a

13   member of their family, correct?

14   A    Correct.

15   Q    And you had no dealings in the factual matters

16   themselves, as they were occurring in this case.  Is that

17   correct?

18   A    No.

19   Q    Good.  So that leaves you with a defined role here,

20   and that would be as an expert witness?

21   A    Correct.

22   Q    And just to give big overview.  Your field of

23   expertise, how would you say that in its most general terms?

24   A    It's identifying analytics and analysis around social

25   media, the internet, and how it influences people's

26   behavior.

27   Q    And is this grounded in decades of understanding how

```
 1   human beings, organizations, terrorist networks,

 2   governments, influence human behavior.

 3       A    Yes.  The last two at least.

 4       Q    Okay.  The last two, I forgot I made such a long

 5   list.

 6       A    2002 to present.

 7               ATTY. PATTIS:  Government terrorist

 8           organizations, Judge.

 9               ATTY. KOSKOFF:  Okay.

10       Q    And so why don't we provide at this point - I'd like

11   to provide the jury with your background as an expert in

12   this case.  And if you would indulge me, first of all, where

13   were you born and raised, sir?

14       A    O'Fallon, Missouri.

15       Q    I'm sorry.

16       A    O'Fallon, Missouri.

17       Q    O'Fallon?

18       A    Yes.

19       Q    Big town?

20       A    Not too big when I was there.

21       Q    Okay.  Did it grow?

22       A    Massively.

23               ATTY. PATTIS:  Objection.  Relevance, Judge.

24               ATTY. KOSKOFF:  It's background.

25               THE COURT:  Overruled.

26       Q    And so that's what we call the mid - you're from the

27   Mid-West?
```

1    A    Yes.

2    Q    And you – why don't we take it up.  You graduated

3    obviously from – or not obviously, but you graduated from

4    high school.

5    A    Yes.

6    Q    And you went to college at some point?

7    A    I did.

8    Q    And can you tell the jury where you went to college?

9    A    I went to the U.S. Military Academy at West Point.

10   Q    Okay.  West Point is where?

11   A    West Point, New York.

12   Q    Okay.  And what is – as an institution, can you just

13   describe to the jury what West Point is?

14   A    Yeah.  West Point is designed to train the next

15   generation of officers for the United States Army through a

16   four-year liberal arts degree.

17   Q    Okay.  And how does somebody get into West Point?

18   A    It's two parts.  First you apply to the institution,

19   just like you would a normal college.  But you also have to

20   be in the second part nominated by a congressman, Vice

21   President.

22   Q    Okay.  And so you checked both those boxes?

23   A    I did.

24   Q    And is West Point upon grad – it's a four-year

25   program?  I'm sorry.

26   A    Yes.

27   Q    And upon graduating from West Point, what did you do

1  next?

2    A   I went into the U.S. Army and served as an infantry

3  officer.  I served at the 101'st Airborne Division in

4  Kentucky.  U.S. Forces Korea, and then came back to second

5  infantry division in Fort Lewis, Washington.

6    Q   I'm sorry, I didn't catch it.  What was the last one?

7    A   Second infantry division at Fort Lewis, Washington.

8    Q   Fort Lewis.

9    A   Lewis.

10   Q   Fort Lewis.  Okay.  Sorry.  And so just – now, by the

11  way, I know you have – we're going to get into your many

12  things that you've done and your – over the decades.  But

13  one thing have you ever testified in court before?

14   A   I have not.

15   Q   Okay.  So this is your first time?

16   A   Yes.

17   Q   Okay.  And during that – so how long were you in the

18  Armed Forces?

19   A   A little over seven years.

20   Q   All right.  And can you just give us – you said

21  Airborne Division, that was one of your –

22   A   Yes.  I was an infantry officer and went to airborne

23  and ranger school, and then all of the infantry courses so

24  that I could lead troops as a platoon leader, and later an

25  infantry company commander.

26   Q   Okay.  And the military has different ranks, right?

27   A   Correct.

1    Q    And over the course of you say seven years?

2    A    Yes.

3    Q    Over the course of the seven years, did you – what's

4    the first rank, by the way?

5    A    Second lieutenant.

6    Q    Is that where you ended up?

7    A    No.  I finished as a captain.

8    Q    Okay.  And so you – what do you call it?  You left

9    the military after seven years?

10   A    Yes.

11   Q    And what did you do next?

12   A    I went to the FBI Academy and the FBI as a Special

13   Agent on a joint terrorism task force in Portland, Oregon.

14   Q    So the FBI, you said as a Special Agent.  Do you just

15   walk into the FBI and become a Special Agent or –

16   A    No.  You have to be qualified at the FBI Academy at

17   Quantico, Virginia.

18   Q    Okay.  Is Quantico home base for the FBI?

19   A    Between there and headquarters in Washington DC, yes.

20   Q    Okay.  So just if you could maybe slow down a little

21   bit.  I – maybe I'm the only one having a hard time catching

22   all the words.  So you after seven years in the armed

23   services, you left with the designation of captain and went

24   to join the FBI what?

25   A    As a Special Agent.

26   Q    Okay.  And that started with some stint at Quantico?

27   A    Yes.  A little over four months.

1    Q    Okay.  Just give us a general flavor of how you break

2    into something like that.

3    A    It was after September 11th attacks.  The FBI was

4    recruiting more agents into counterterrorism.  I had been in

5    the military and went through the interview process and was

6    selected.  Then upon training you go – you receive legal

7    training on search warrants.  Some sort of internet-based

8    training, which is kind of where I got my start in cyber-

9    related activity.  Then you go through the full gamut of how

10   to actually investigate a case.

11   Q    Okay.  And when you say in a generic way, when you

12   say investigate a case, what generically does that entail?

13   A    That essentially is going through the procedures of

14   evidence.  How to gather data.  Then how to apply that to

15   the law, in terms of bringing up evidence so that it could

16   be used in terms of different levels of searches.

17   Essentially gathering the evidence to support the

18   prosecution of a crime.

19   Q    Okay.  And you started your career in this area back

20   around 2000, what, 5?  Or –

21   A    Two.

22   Q    2002.

23   A    2002.

24   Q    All right.  Right, you said in the aftermath of 911,

25   correct?

26   A    Yes.

27   Q    And back – I might be losing track of time.  But back

1   in 2002, was the internet really up and running?

2     A   It was up and running, but it still was in its, what

3   I would say first decade.  It was still just becoming part

4   of everything that was going on in the world.  And since

5   then it's grown.

6     Q   Okay.  And so an investigation, even from your early

7   days in 2002, would involve understanding what about the

8   internet and the relationships of what you're investigating.

9     A   How the internet works, also most importantly how

10  people communicate on the internet, particularly in the

11  early era.  And that was the start of understanding how in

12  that case, and the cases that I was working on, terrorist,

13  you know, affiliated with different organizations would try

14  and recruit or communicate with each other using the

15  internet.

16    Q   Okay.  All right.  And you did – how long did you

17  last in that capacity with – I shouldn't say last, I mean,

18  how long did you serve in that capacity?

19    A   Yeah.  Less than a year the first time working for

20  the FBI.

21    Q   All right.  What happened?  Did they fire you or –

22    A   No.  I chose – I left on my own.  I went to graduate

23  school.

24    Q   All right.  And can you tell the jury where you went

25  to graduate school?

26    A   At the time it was called Monetary Institute

27  International Studies.  Now it's called Middlebury

1  Institute, it's since been acquired by Middlebury.

2     Q    Okay.  And you earned a Masters in something called

3  Specialization in International Security and Development.

4     A    Correct.

5     Q    All right.  And following that did you continue –

6  what did you do next after that?

7     A    I went to the Combatting Terrorism Center at West

8  Point, where I served as the executive officer.  So I would

9  lead research projects on different terrorist groups.

10  Al-Qaeda was the group that we focused on at that time.  And

11  in particular we were looking at and examining their move to

12  the internet.  As their way of surviving at a time when they

13  were being hunted around the world.  And then their

14  migration to social media applications.  The first one that

15  I looked at was YouTube.

16     Q    Interesting.  So your career in this part of – your

17  career at this time involved – did it involve deep dives on

18  how or – organizations, networks, like terrorist networks,

19  communicate with other – let me just take that question and

20  throw it in the garbage.  Did this involve deep dives on

21  internet relationships with potential –

22              ATTY. PATTIS:  Objection.  Leading, Judge.  It's

23  well beyond preliminary –

24              ATTY. KOSKOFF:  Well, it's background.

25              THE COURT:  Sustained.

26     Q    Help me out.  Tell us what this involved in terms if

27  anything involving research and the internet.

1    A    Yes.  So we would look at how different terror groups

2  used the internet to network.  So in the beginning it was

3  how they would communicate and organize and then plan

4  operations.  Later with the add then of social media, it

5  moved.  And in that movement, it was then how do they

6  radicalize?  How do they recruit?  How do they reach out to

7  other people that normally would not be exposed to the

8  content to try and bring them into the organization.

9    Q    Okay.  And did you become familiar with the tools by

10  which an organization, more broadly can influence and

11  manipulate its audience?

12    A    Yes.  Principally during the period of Iraq, we were

13  looking at how al-Qaeda and Iraq used YouTube to reach out

14  to large audiences by filming videos of what they were doing

15  on different battle fields, vis-a-vis, U.S. Soldiers.  And

16  then how they'd use that for promotional material to reach

17  out to others to try and join the ranks.

18    Q    Okay.  Just to hit a couple of other points of your

19  background.  You served at the U.S. Special Operations

20  Command.  Can you just describe what that is?

21    A    Yes.  During the period with the combatting terrorism

22  center, and even after, I work on different projects for

23  U.S. Special Operations command overseas.  Same jobs that

24  would be occurring during that time.  I would try and

25  identify different terror networks that are operating on

26  different social media platforms, to figure out what they

27  were trying to do.  Who they were trying to recruit.  And

1  then if they were being recruited, why they had an infinity

2  essentially to believe in that cause.

3     Q   Okay.  And have you – is that – have you brought in

4  that specialization beyond a terrorist network?

5     A   Yes.

6     Q   Into commercial networks.

7     A   Yes.  At different times that's been for financial

8  institutions trying to understand how hackers might try and

9  penetrate banks or how they might try and organize to go

10  after customers of different companies.  At other times it's

11  been based on foreign nations, namely Russia, Iran, and

12  China.  How they use social media to try and infiltrate

13  foreign countries to mobilize people to do things they would

14  not otherwise do, by being somebody that they are not when

15  they're in the online space.

16     Q   Did you say mobilize people to do things that they

17  wouldn't otherwise do.

18     A   That's correct.  Under false pretenses are based on

19  the idea that they might be part of a country.  And so they

20  masquerade or impersonate people in another country, and

21  then they try and get them to go and do something in that

22  country.  Let's say the United States.  They try and get

23  them to mobilize to a place to do some sort of act.

24     Q   Okay.  And you have a couple of – well, you're a

25  consultant for research trainer in Boston.  Have you been in

26  consulting essentially every – since leaving the military?

27     A   No.  So I first went to the FBI, then I went to the

1    Combatting Terrorism Center.  From that period forward, I

2    again worked at FBI Headquarters.  I served in the Counter

3    Terrorism Division.  Working on how to build intelligence

4    programs.  Very similar to what you – I was talking about in

5    terms of social media.  Then also worked to help build

6    training programs for counterterrorism in the FBI.  The last

7    time I was there was 2012.

8       Q    And you founded a, was it a company called Mib - how

9    do you pronounce it, Miburo.

10      A    Miburo.

11      Q    Miburo Solutions.  Can you just describe to the jury?

12   Give us a flavor of what Miburo Solutions did.  I understand

13   it was recently acquired.  Is this right?

14      A    Correct.

15      Q    Okay.  Go ahead.

16      A    So, yeah.  Miburo essentially brought together

17   analyst of a variety of disciplines.  And the goal at Miburo

18   was always to try and spot and assess and then disrupt any

19   sort of what we call malign influence.  That means a foreign

20   nation trying to mettle in United States, using a social

21   media platform like any of us would use to try and get

22   people do things they wouldn't normally do.  Or try and

23   convince them that things weren't try.

24      Q    Okay.  And when you say convince them the things that

25   weren't true?  Is that what you said?

26      A    Yes.

27      Q    What do you mean by that?

1    A    For example, election defense is a big part of what

2  we do against Russia, Iran, and China.  We're trying to

3  identify foreign actors trying to masquerade as Americans to

4  try and confuse them about election.  How it's conducted.

5  Who voted.  How did they vote.  Those sorts of things.

6    Q    And your company, you described it as a consulting

7  company providing custom training and research insights to

8  the financial industry.  The U.S. Department of Defense.

9  The Federal, State and local law enforcement and the

10  intelligence community implementing enterprise-wide

11  solutions for organizations -

12              ATTY. PATTIS:  Judge, he's reading from a

13          document not in evidence.  Leading.

14              ATTY. KOSKOFF:  It's background.  It's his CV.

15              THE COURT:  I'll sustain the -

16              ATTY. PATTIS:  Why not just admit the CV?

17              THE COURT:  Attorney Pattis, I sustained the

18          objection.

19              ATTY. KOSKOFF:  It's his CV -

20              ATTY. PATTIS:  You're right, Judge.  You're

21          right.  You're right.

22              ATTY. KOSKOFF:  I will gladly - sorry, your

23          Honor.

24              THE COURT:  No, no, Attorney Koskoff.  Why don't

25          we just move to the next question.

26  BY ATTY. KOSKOFF:

27    Q    Actually - so I was going - I'm glad because I wanted

1    to ask you what is that.  Give us a flavor of all those

2    different things.  Department of Defense and financial

3    history.  Little bit about that.

4      A    Yeah.  Sure.  So sometimes they want us to do an

5    investigation.  So we'll look at principally two things.

6    One, what language are people communicating in around the

7    world, and how does that transcend to the United States or

8    another democracy.  Second, we do a lot of data analytics.

9    Essentially taking in tremendous amounts of data.  Trying to

10   find those anomalies in there that don't look natural, so we

11   can understand what they're trying to do.

12     Q    And has it been your – can you describe what if any

13   role the detection of threat or malign influence plays, has

14   played in your career?

15     A    Yes.  So at the time when we were hunting essentially

16   al-Qaeda and Islamic State ISIS members in Iraq and Syria,

17   we came across a network that was operated by Russia.  We

18   then tracked that entity all the way into the election in

19   2016, trying to identify how that sort of influence was

20   confusing Americans about the election.

21     Q    And now when you say – when you say we, let's be

22   clear –

23     A    Yes.

24     Q    You're not a one-man shop?

25     A    No.  No.

26     Q    So just tell the jury who we are.

27     A    Yeah.  So Miburo has about two dozen analysts at any

1    given time.  We speak up to a dozen or more languages,

2    depending on what the mix of actors that we're trying to

3    track.  And so we're looking in foreign audiences to see

4    what kind of information is being shared that's any tip or

5    lead to understand about false information.  Or in the case,

6    many cases hacked materials.  Citizens being targeted.

7    Their information being stolen and then it being dumped out

8    on the internet.

9      Q    Okay.  And when you keep saying hacked and stolen

10   material on the internet.  Does all your work generally

11   involve some exploration of the internet and its connections

12   with an organization.

13     A    Yes.

14     Q    All right.  And you have specialist who are – you

15   have data analysts and things like that?

16     A    Correct.

17     Q    And did there come a time when we asked you – when I

18   say we, that we, our law firm asked you to review certain

19   materials to determine whether or not you could be of help

20   in helping us understand the Alex Jones network?

21     A    Yes.  January of this year.

22     Q    And did there come a time when you were asked to help

23   us understand and Infowars influences customers to purchase

24   goods, for example.

25     A    Correct.

26     Q    And how their – and how they message their audience

27   in a way that subjects potentially innocent people to harm.

1          ATTY. PATTIS:  Objection.

2          THE COURT:  Sustained.

3     Q    What else did we – what else were you asked to look

4   at?  You said you talked about being involved in – well,

5   harm prevention.  Is that right?

6     A    Correct.

7     Q    So what other things did we ask you to do?

8     A    You asked us to look at what would the effect be of

9   false content over time as posted by Free Speech Systems,

10  LLC, and Alex Jones.  And what the effect would be on the

11  audience.  How might that change their behavior or their

12  perceptions around reality.

13    Q    Okay.  And we're going to get into that in some

14  detail.  Well, let me just ask this general question.  And

15  did you and your – with the help of your team reach certain

16  conclusions based on the information you were provided and

17  based on your education, training, and extensive experience.

18    A    Yes.

19    Q    Okay.  And in terms of what you were provided.  Were

20  you provided with voluminous materials to review?

21    A    Yes.

22    Q    And tens of thousands of pages of various

23  information.

24    A    Yes.

25    Q    And did you and your team review those in detail?

26    A    We did.

27    Q    And were you provided with depositions?  For example,

1   depositions of Alex Jones?

2     A   Correct.  Yes.

3     Q   And those were three volumes of deposition's, is that

4   right?

5     A   Yes.

6     Q   And did you and your team review those in detail?

7     A   We did.

8     Q   And other depositions, like depositions of Tim Fruge,

9   and others at Infowars?

10    A   Yes.

11    Q   Okay.  And did you also conduct extensive research on

12   your own to help fill in blanks from the material provided?

13    A   We has to.

14    Q   Can you explain to the jury what you mean by that?

15    A   We didn't have all of the data, in terms of what was

16   asked for, but also in terms of what was available from

17   different social media platforms.  So as best we could, we

18   had to recreate data that was available on the open web.

19    Q   And did that effort take quite a bit of time between

20   you and your team?

21    A   Tremendous.

22    Q   Okay.  And you racked up a bill for this?  Sorry to

23   put it so bluntly, but…

24    A   Yes.

25    Q   And so can you tell the jury about approximate how

26   much all this cost?

27    A   As of the last month, I believe it was $158,000

1   roughly.

2   Q   All right.  And so did you have to spend an extensive

3   amount of time trying to recreate documents that were not

4   available from Infowars and Alex Jones.

5   A   Yes.  We had to use what is known as the Wayback

6   machine.  The Wayback Machine, you may have heard of it in

7   other testimony.  Is a system where you can go back and look

8   at an archive of what was available on the website.  Takes

9   quite a bit of time to go back and look at each one of those

10  archives, and then compile all of the data into one place.

11  Q   And so if Infowars and Alex Jones had provided the

12  full gamut of information, your charges would be

13  substantially less.  Is that correct?

14  A   Yes.

15          ATTY. PATTIS:  Objection.  Argumentative.

16          THE COURT:  Sustained.

17  Q   How would – let me rephrase it.  How would the

18  failure of Infowars to provide the full gamut of its

19  documents have reflected in your charges?

20          ATTY. PATTIS:  Objection.  Argumentative.

21          THE COURT:  Overruled.

22  A   Our charges are based on time.  The more time it

23  takes to aggregate the data, the more it will cost.  If the

24  data's provided up front, we would require much less time to

25  do all of that work.

26  Q   Now you talked about – oh, by the way, have you – in

27  addition to consulting with various governmental and private

1   organizations, have you also been called on to educate the

2   next generation of – what would you call them?  FBI Agents

3   and others?

4       A    Yes.

5       Q    Can you describe to the jury about how many, I call

6   them FBI Agents, but is it the broader –

7       A    Much broader.  Yeah.

8       Q    Okay.  Can you just describe the nature of those that

9   you've educated over the decades?

10      A    Yeah.  Since 2005, if I wasn't doing the analysis

11  myself, often times I and some of my colleagues would do

12  training.  And training was principally for law enforcement.

13  I've trained tens of thousands of law enforcement officers.

14  Many were FBI Agents, but many were state and local law

15  enforcement.  I worked for L.A. P.D., Los Angeles Police

16  Department at one time.  New Jersey State Police.  Have

17  briefed many dozen times at different police departments

18  around the country.  And then the other part is the military

19  and the U.S. Intelligence Community.  I've acted as an

20  instructor at the FBI Academy.  I've also acted as an

21  instructor for the U.S. Intelligence Community, and many

22  times thousands of soldiers, air men, Marines, sailors, over

23  the years I've done training for.

24      Q    Okay.  And can you just give us a category by

25  category what types of things you've trained on.

26      A    Yes.  Usually one of three distinct kind of parts.

27      Q    Okay.

1    A    In the, especially in the beginning during the mid-

2   2000's, we'd be on terrorist and terrorist organizations and

3   then counter-terrorism.  Processes for investigation.

4   Through that there usually was a great deal of intelligence

5   and investigation training.  That was kind of the second

6   component, which is how do you actually evaluate a network?

7   How do you understand an organization?  How do you

8   understand that motives?  The financing?  The operations of

9   different elicit organizations all the way from criminal

10  groups to extremist groups.  And then nation states.  And

11  then the third has been really over the last decade, which

12  is about social media.  As the rise of social medias

13  occurred, all bad actors of all categories have gone to

14  social media to do their activity.  And by doing that, we're

15  always trying to, not only just to understand, but train

16  different people to understand how to understand what a

17  network is doing on social media.

18   Q   So there's a – to understand that somebody needs to

19  have a technological ability to understand the connections.

20  Is that right?

21   A   Yes.  We do two versions of it.  One, sort of the

22  barebones, just understanding the principles of the

23  technology.  The other is like how to actually use the

24  technology.

25   Q   Okay.  And do some of these presentations last for

26  days or –

27   A   Many days.  Full weeks sometimes.

1    Q    Okay.  So why don't we do the – we'll do the shorter

2    version.

3    A    Yes.

4    Q    So – and by the way, is there a methodology that you

5    and your – well, just keep it to you, that you have employed

6    over the years in helping to figure out the four corners of

7    how an organization operates?

8    A    Yes.  We use several different ones.  In terms of

9    groups.  But in terms of social media, I think relevant to

10   here, is how to advance an information campaign, which is

11   called the four M's.

12   Q    Okay.  So if you don't mind, I'd like you to take us

13   through these four M's.

14           ATTY. KOSKOFF:  And your Honor, I'd ask the

15           witness to step down.  With the Courts permission.

16           THE COURT:  I just need Attorney Pattis to be

17           able to see it too.

18           ATTY. KOSKOFF:  That's – if Attorney Pattis

19           could move over there, he could get a shot at this.

20           But if I move it way back there, it's not going to be

21           useful.

22           THE COURT:  Well, what would you like to do,

23           Attorney Pattis.  Do you want to remain seated -

24           ATTY. PATTIS:  I've got all my notes for this

25           fella.  I don't want to be away from them.

26           THE COURT:  Sure.  Or we could take the – we

27           could take the morning recess now.

1          ATTY. KOSKOFF:  Yeah.

2          THE COURT:  And figure it out.  I think that's a

3     good idea.  So why don't we do that.  We'll take our

4     coffee break.  Our morning recess.  Ron will be in

5     charge of your notepads.  You'll continue to obey the

6     rules of juror conduct.  And we will resume at 11:32.

7     All right.  We'll take a recess.

8          (Recess.  Resumed).

9          THE COURT:  Please be seated.  All right.  I

10    think we're ready for our jury.

11          THE CLERK:  Yes, your Honor.

12          THE COURT:  Thank you.

13          ATTY. PATTIS:  Am I good here, Judge?

14          THE COURT:  As long as you're comfortable.  You

15    worked it out?  Good.

16          (Jury panel enters the courtroom.)

17          THE COURT:  Welcome back.  Doing my count to

18    ten.  All right.  Counsel stipulate that our entire

19    panel has returned.

20          ATTY. PATTIS:  Yes.

21          THE COURT:  All right.  Please be seated.

22    Attorney Koskoff, whenever you're ready, sir.

23          ATTY. KOSKOFF:  Thank you, your Honor.

24  BY ATTY. KOSKOFF:

25    Q   Before we broke for our coffee break, you were - had

26  explained to us about the four M's to the jury.  Do you

27  recall that?

1    A    Correct.

2    Q    And the four M's, and we're going to go over them in

3  a second.  Does this methodology apply to an evaluation of

4  commercial purchases, goods, things like that?

5    A    Correct.

6    Q    And these principles apply to organizations and

7  government actors who may not be acting - well, like people

8  who want to go to war with other - countries that want to go

9  to war with other countries?

10    A    That's correct.  I use it to diagnose in either

11  situation.

12    Q    Okay.  So they're broadly applicable, is that right?

13    A    Yes.

14    Q    All right.  So let's talk about these four M's, and

15  if it would help and I got this set up.  If you wouldn't

16  mind stepping down.  I'll try to not occur the wrath of the

17  court reporter here.  Good?  And so first of all, can you

18  talk about - make sure the jury can see you here.  You can

19  turn your back to me, but not - and so what are the four M's

20  that we were discussing?

21    A    Yeah.  Generally we're looking for four M's to try

22  and diagnose essentially what the information is that's

23  coming from a person or an organization.  The four are

24  first, the message.  So what is message?  What is it doing

25  to try and engage with the audience.  Is it exciting?  Is it

26  enraging?  And if you're trying to enrage an audience to get

27  them to mobilize, or move or shift their belief, you tend to

1   focus on things like fear, anger, and demonization.

2   Directing that energy, that emotion, in a way that it

3   focuses on a specific entity or a target.  The second part

4   is the messenger.

5       Q   And hang on.  Oh, sorry.

6       A   You want to talk message –

7       Q   Well, I do.  You're -

8       A   Sure.  I'll lay them out.

9       Q   Okay.

10      A   The next is the messenger.

11          ATTY. PATTIS:  I can't see the board.

12      A   A messenger is what makes a message move.  Can they

13  connect in an emotional way?  In an exciting way?  In an

14  engaging way with the audience.  What are the things that

15  they do?  So things that you look for is, does the messenger

16  create an outside audience and how do they do that.  Do they

17  connect by being exciting in some cases.  Charismatic or

18  bombastic.  Do they communicate in a way that brings the

19  audience in through emotion?  This could be jumping up and

20  down with excitement.  It could be crying or panting.  It's

21  communicating or essentially bringing the idea of the

22  emotion to the audience and connecting it with the message.

23  The next part we try to evaluation is the medium.  By

24  medium, it is essentially the type of communication.  You

25  might think of print for newspapers, audio for radio

26  broadcast.  Video for any sort of television broadcast, or

27  even video on the internet.  Video is king.  Video is king

1  because its communications emotion in a much more dramatic

2  way.  You can do it with others, but if you can do video and

3  you can do it a very high quality, then you can essentially

4  communicate with the audience in a repetitive way.  That's

5  why you'll see whether its television shows, news broadcast.

6  Whatever it might be, they and use a consistent format.  The

7  format is everything from colors and logos, quick cutaways,

8  graphics and in beds.  Meaning you take audio or visual from

9  interviews, cutaways, charts.  Any sort of discussion that

10 might be out of there, and you can cut that in.  The medium

11 matters because it differentiates anybody with their phone,

12 from somebody who can reach a wide audience.  The last part

13 that we look at is the method.  Anyone can communicate one

14 video one time in an emotional way, on an emotional topic.

15 But to do it over and over again, it's about just a few

16 things.  One is infostructure.  Repeating the process over

17 and over.  Doing it on scale, so that you hit a wide

18 audience every day.  That requires info structure.  The next

19 is a process.  How do they get information out there?  Do

20 they just host it on one single website?  Do they use lots

21 of websites?  Do they use lots of websites with social

22 media?  And did they use that with other entities?  And then

23 the last part of method that is maybe the most important is

24 analytics.  Can the organization or entity evaluate the

25 content that they're putting out, and now whether it travels

26 in the audience space?  If they know what travels in the

27 audience space, then it helps them build an idea about how

1    to repeat it.

2       Q    Okay.  And thank you.  What does – by the way, what

3    about algorithms?  Is that something or –

4       A    Yes.  So when I talk about analytics, analytics are

5    essentially trying to understand that algorithms that are

6    moving content around social media.  So for example, in the

7    social media space or even on the internet website, you can

8    go through the analytics.  You'll know who touches the

9    content, in terms of their demographics.  That could be

10   their age, that could be their sex, that could be in some

11   cases their race or ethnicity.  You can understand where

12   they're located geographically.  You can understand what

13   time of day that they engage with that content.  So it helps

14   you understand when people use that information to then go

15   ahead and create more information like it.  Most

16   importantly, particularly for businesses, analytics help

17   them figure out how to sell more things.  They can see the

18   conversion from someone engaging with a piece of content,

19   whatever it might be, and going ahead and doing what we call

20   behavior change.  Changing the way they act.  Meaning they

21   do something based on the information they're consuming.  It

22   changes their belief and perception.  Could be around a

23   product, could be around an idea.  And then they convert

24   that to actual action.  In this case with a business, it

25   might be selling things.  If it's for a cause, it could be

26   showing up to participate in something.  Or in the worst

27   cases when we look at violent groups that I've looked at

1    over the last 20 years, it's immobilization to violence.

2    That's what we look for over time.

3       Q   Okay.  And so let's talk about, let's drill down a

4    little bit on the message part of the equation.  Can you

5    give us an example of messages that promote something fear

6    or anger?  Any examples that can help us understand the

7    relationship between that and potential threats or harm.

8       A   Yeah.  And a recent example over the last six month

9    that I've worked on quite a bit, it's Russia's invasion of

10   Ukraine.  So they use messages of fear to excite people.

11   When you're afraid you tend to believe things sometimes that

12   you would not normally believe.  It raises your survival

13   instincts.  So in the case of Russia, they threatened

14   nuclear war, a chemical war.  Next, in terms of anger.

15   They'll make false allegations of the Ukrainians.

16   Ukrainians did this, when actually maybe they did.  That is

17   to make people enraged at home in the case of Russia.  And

18   that comes to demonization, which is it's not just good

19   enough to raise people's fears.  It's not just good enough

20   to make them angry.  You have direct that.  So they will

21   make false claims about Ukrainians' in packages all in one

22   message.

23      Q   And you talk – that's what you have observed

24   recently?

25      A   Yes, the last six months.

26      Q   Okay.  And can you give us an example of a false

27   claim that demonizes a more specific individual or

1  individuals?

2      A    Sure.  And I think in terms of the one that we're

3  here for today, that's a large reason why we're here.  Which

4  is if you demonized an individual false pretense.  For

5  example, if you say that they're acting, or that an event

6  didn't really occur.  You anger them that they have been

7  betrayed.  This is under false pretenses, but it makes the

8  audience angry, and then you strike fear in them.  That it's

9  an existential threat is what we say.  It's if this threat

10  is not dealt with, then you as an individual will not

11  survive.  It's a direct threat to your rights, your beliefs,

12  whatever it might be in this cause.  I think that's why

13  we're here today.

14      Q    Well, I want to get into – I want to stay now more

15  general in these general principles.  And I know you haven't

16  done this before, but we'll get to that after we do this

17  part of it.  But are there examples, for example, outside of

18  – you know, general examples that you've encountered on this

19  idea of a false narrative stirring up these kinds of

20  emotions.

21      A    Yeah.  I think in the case of Ukraine, they claim

22  that the Ukrainians are Nazi's.  That stirs up emotions of

23  World War II, for example, and Germany, which is where

24  Russian and Germany battled during World War II, Ukraine was

25  one of those places.  They claim that the Ukrainians are

26  Nazi's.  This falls apart upon inspection because they

27  actually have a president of Jewish decent.  It is really

1   about trying to create this conspiracy that an entire

2   country should be demonized, really to make them angry

3   around why they should go and support this war.

4       Q    Okay.  And have they made more specific false

5   narratives regarding citizens of Ukraine to stir up,

6   influence and manipulate?

7       A    Yeah.  They make false stories about children being

8   killed.  Anytime you make targeted stories about children

9   being killed, it tends to strike at emotions.  They've done

10  that in Ukraine repeatedly.  False stories about children

11  being killed by Ukrainian drills, false stories about the

12  Ukrainian killing people as a false flag or a stunt to try

13  and provoke the Russian aggression.

14      Q    Okay.  And so you and your team will look at the

15  message when evaluating a situation, whether it's an

16  organization or a private company or other motive – or

17  motive – where you're looking for somebody's motive or

18  operations?

19      A    Correct.  Where we're trying to understand what's the

20  objective of the message.  What are they trying to achieve.

21      Q    Okay.  And now let's talk about the messenger.  Does

22  the personality of the messenger matter in these analysis?

23      A    Absolutely.  In many cases, particularly in the

24  social media era, the messenger is more important than the

25  message often times.  They – if you have an audience that

26  comes to you for a message over and over again, you'll be

27  able to push many messages, because they have developed a

1   very tight relationship with that messenger.  So if they are

2   exciting and charismatic, or if they speak in a way that

3   communicates to the target audience.  And they can do that

4   in a repeated way.  The audience will come back to them to

5   try and get some sort of ascertain what the truth might be.

6       Q    Okay.  And is building trust a part of an effective

7   messenger?

8       A    Yes.

9       Q    With their audience?

10      A    Yes.  Yes.  As a messenger you want to build trust

11  with the audience.  If you're wanting to sell a product, you

12  need to have the trust of the audience in order to convince

13  them to buy a product.  Or if you want to shape what they

14  believe, you need to build trust within as well, so that

15  they will take your version of the truth as a messenger into

16  that audience base.

17      Q    And does the degree to which messenger builds trust

18  with the messenger's audience, no many how many millions of

19  people those are, factor into the effectiveness, for

20  example, selling products?

21      A    Absolutely.  That's why you'll see often times that

22  if a company is trying to sell a product, they will have

23  testimonials from messengers, or people that have used the

24  product.  That is trying to build a trusted relationship.

25  Or they'll do it for experts of various different types that

26  might relate to a product.  So if it's a healthcare product,

27  they might have a doctor.  If it's a car mechanic, they'll

1    probably be talking about auto parts.

2      Q   And just going back to demonization, you talked about

3    – talking about an example of Russia.  Went to like false

4    narratives about mothers killing children, or something like

5    that?

6              ATTY. PATTIS:  May we approach?

7              ATTY. KOSKOFF:  Your Honor if there's an

8         objection –

9              ATTY. PATTIS:  Objection.  May we approach?

10             ATTY. KOSKOFF:  What's the –

11             THE COURT:  Yes.

12             (Sidebar conversation begins.)

13             ATTY. PATTIS:  Can we go –

14             THE COURT:  They're having a hard time sometimes

15        picking up the objections on the sidebars.  I may

16        have to start excusing the jury, but what's the

17        objection?

18             ATTY. PATTIS:  We're done with the chart.  Can I

19        get back to the table?

20             ATTY. KOSKOFF:  No, I'm not done with the chart.

21             ATTY. PATTIS:  I don't think it's appropriate to

22        have him stand in the middle of the court and lecture

23        people for 20, 30, 40 minutes.

24             THE COURT:  Well, he's using a chart, that's why

25        I wanted you to be comfortable.

26             ATTY. PATTIS:  Well, I'd prefer to be at my

27        seat, but I'm not going to make an issue of it and

1        delay the trial.  I'm not going to do that.

2              THE COURT:  How long do you think you're going

3        to be?

4              ATTY. KOSKOFF:  I've used charts for 25 years.

5              THE COURT:  I know, it's just the configuration

6        of the courtroom.  So how long do you think he'll be?

7              ATTY. KOSKOFF:  I don't know.  Around ten, 20

8        minutes maybe?

9              THE COURT:  Ten minutes.

10             ATTY. PATTIS:  No case says he can't do it.  I'd

11        prefer to get back to my seat.

12             THE COURT:  I know.

13             ATTY. PATTIS:  I'd appreciate it.

14             THE COURT:  It's easier to write – well, how

15        about this?  As soon as you're done, have him sit

16        down so that Attorney Pattis -

17             ATTY. KOSKOFF:  Yeah, yeah.

18             THE COURT:  Is there something that could read -

19             ATTY. PATTIS:  I'll make do.  I'll make do.

20             THE COURT:  Okay.

21             (Sidebar conversation ends).

22             THE COURT:  Thank you for bearing with us with

23        the sidebars. It really is so much quicker than

24        having you get up and go in and come back.  So it's

25        much more efficient, so we appreciate your patience.

26   BY ATTY. KOSKOFF:

27   Q    Okay.  So, and we were getting back to where we were.

1    We were talking about demonization.  And is there – when a –

2    somebodies demonized a person or a group of people, have you

3    studied, and do you have expertise in how that exposes that

4    person to potential harassment, threats, and physical harm?

5    A    Yes.

6    Q    Describe that to the jury.

7    A    Yeah.  I think the reference that is most applicable

8    in this case is, a terrorist named Anwar Awlaki.  He was

9    really the first of al-Qaeda's leaders to go to the social

10   media space in a large way.  He was able to demonize

11   American's.  But he also communicated with the audience, and

12   he would not only just say these are his beliefs, but he

13   would try and communicate to the audience about what they

14   might do.  Which we call a call to action.  Something you

15   should consider doing.  Anwar Awlaki would say, rather than

16   coming and join in al-Qaeda, you should stay at home in the

17   United States and attack other Americans at home.  What the

18   result was, is this messenger by building that communication

19   and that connection with the American audience, was able to

20   what we would say, recruit people at a distance.  He planted

21   the seed; others would see that.  They would try and

22   communicate back with him as the leader, seeking guidance or

23   targeting specifics.  And then we would either condone or

24   say yes, this is something that you might pursue.

25   Q    So – just, that's a lot of information.  First of all

26   the gentleman's name again or-

27   A    Anwar Awlaki.

1    Q    Awlaki.  Okay.  And is this something you have

2   personal experience with evaluating?

3    A    Yes.

4    Q    And can you just tell the jury about that.

5    A    Yes.  I would evaluate the videos that would be out

6   in the online environment.  This is something anybody can

7   see from their home at the time.  And then I would evaluate

8   what the audience response to that would be.  So how much

9   does that message show up out in the information space?  How

10  much does the audience take that message and then re-amplify

11  it in the audience base.  And then how many people actually

12  call, comment, or say we should do something as he has

13  instructed, or this is a signal for me to do something.

14   Q    And he – how do you pronounce his name again?

15   A    Awlaki.

16   Q    Awlaki – he was affiliated with al-Qaeda?

17   A    Yes.

18   Q    And when you say you, did you or the F – and tell me

19  if you can't tell me this.

20   A    Yeah.

21   Q    But did you study this organization?

22   A    Yes.  I studied it, but this was – al-Qaeda rid large

23  during my different stents at the FBI.  But also on separate

24  projects, which were totally unclassified and open source.

25  Things that you could see from your house, as well.

26   Q    Now, do successful television personalities also

27  carry characteristics of effective messenger – being

1   effective messengers?

2       A    They have to.  You will not be successful in

3   television if you're not an effective messenger.  And you'll

4   often times even hear the phrase, meant for television, or

5   meant for radio.  Meaning that they have some sort of

6   characteristic about how they communicate that makes them

7   particularly good at communicating in whatever that medium

8   might be.

9       Q    So in this case, so there are ways in which –

10  effective messenger's use their platform in a way that is –

11  doesn't promote harm or manipulation of others.

12      A    That's correct.

13      Q    Okay.  And doesn't get – promote exploitation of

14  customers by certain means?

15      A    Correct.

16      Q    Products.  Okay.  And so – now let's talk a little

17  bit about medium.  You talked about video.  I think you said

18  video is king.  Can you just describe that to the jury?

19      A    If you want to communicate with an audience,

20  particularly in a social media era, video gets seen more

21  often than things get read.  It's much more easy for an

22  audience to come onto video content and consume it.  Second,

23  it's a much more immersive experience.  If you watch a

24  video, you can understand all of the dimensions of it.  As

25  opposed to just simply reading, or just simply listening.

26  You can do all of those things.  You can sense a motion; you

27  can see a motion.  You can see hand gestures.  You can see

1    the contours of people's faces.  This also allows you to do

2    other things like cutaways or speeding up or slowing down

3    video.  Or cutting away to different graphics.  So think of

4    a radio show where they're trying to describe something that

5    they see.  It's much more difficult, but if you're an

6    audience member consuming video, you can see what the

7    person's talking about.  You can see what they're pointing

8    to.  Much like now, this is much tougher for me to

9    communicate to you if you can't actually see this chart.

10       Q    And so video is effective in influencing behavior.

11       A    Yes.  It's all the non-verbal cues that you can see.

12       Q    And can a manipulation of a video, a manipulation of

13   a video also trigger fear, anger, demonization of human

14   beings?

15       A    Yes.  It allows for demonization for you to actually

16   pick the target and show what the target is.  In terms of

17   anger, if you can change or manipulate video or cut it short

18   or extend it long.  Slow the speed down or even change the

19   way that it's framed.  All of that can change your

20   understanding or make you more angry than what a video might

21   actually be.

22       Q    So for example, slowing down into slow motion, very

23   slow motion.

24            ATTY. PATTIS:  Judge, I can't see the witness.

25       Q    So for example, slowing down in very slow motion the

26   speed speech or the address of a grieving father in the

27   aftermath of his son's death, that can be used to promote a

1    false narrative.  Is that right?

2       A    Correct.  It can change what the context of the event

3    is, or how people understand what actually happened.

4       Q    Okay.  And that can be done for - and what is the -

5    is that sometimes then done to stoke, fear, anger,

6    demonization of the target?

7       A    Correct.  You can use any of those technics and video

8    to change the context and people's understanding.  Their

9    perception of what actually occurred.

10      Q    And when you are - when are using these emotions,

11   fear, anger, demonization against a target, do you have

12   experience - does that expose the target to increased risk

13   of harm?

14      A    It does.  If they used information to change people's

15   beliefs or perceptions, it will leave them at times to

16   pursue harms against the target.  If someone's been

17   demonized, they could be the target of something under

18   circumstances where the factual understanding the reality of

19   what actually happened, is changed.  Which leads them to do

20   things they may - might not already consider.  Meaning, they

21   heard a call to action.  They were told that something

22   occurred, because of a reason that is false, they may

23   undertake an action because of that.

24      Q    And have you observed and examined how these types of

25   narratives lead to harassment in an online community?

26      A    Absolutely.  The range is everything from harms

27   against children.  It can be involved in terms of criminal

1    activity.  Mobilizing people to target an induvial under

2    false pretenses.  Governments, foreign governments against

3    the United States have used it to actually try and convince

4    people of things that aren't true.  To build anger within a

5    population.  And then I think the one over the consistently

6    through my career is extremists.  Meaning that terrorist

7    groups use this sort of information, manipulation, and make

8    people angry to pursue things as a target.

9        Q    So where now we got message, messenger and medium.

10   So of – as far as these three are concerned, is it – can you

11   tell us whether the more powerful and the message it's

12   conveying fear, anger, demonization.  The more citing,

13   charismatic, bombastic, emotionally driven the messenger,

14   and the more effective the medium video.  The branding.

15   What does that say?

16       A    Graphics.

17       Q    Cutaways.

18       A    Graphics, cutaways and imbedding of other media –

19       Q    And emotions.  Okay.  And the more that saturates the

20   public, the greater the potential for things like harassment

21   and threats.

22       A    Correct.

23       Q    Okay.  And in terms of method.  Can you tell us about

24   method.

25       A    Yeah.  Method is what distinguishes those with

26   outside influence from those that just have a message one

27   time.  Or a messenger one time.  So you could think through

1   any organization that communicates in the media on any given

2   day.  They have infrastructure.  They have the tools, and

3   they have the manpower to actually build the content.  Not

4   only build the content but host it.  Not only host the

5   content, but to disseminate it to a wide audience.

6   Separately they have a process for doing that, which makes

7   it - it increases the speed at which they can communicate.

8   So if you wanted to react, let's say to an incident, and you

9   wanted to do it in video, and you were by yourself and you

10  had to do all of the parts.  Content creation, editing,

11  hosting, hosting, sharing and distribution.  That's very

12  difficult to do without a dedicated process and a team to do

13  it.  And the last part is analytics.  If you wanted to be

14  prolific over time and sustain your audience engagement, you

15  have to understand what your audience likes.  You'll

16  remember over the many decades of television, they have

17  ratings.  Ratings determine what kind of content the

18  different television programs of networks would want to

19  host.  Based on those ratings, that's the shows that stay

20  and endure.  And poor ratings lead to shows that don't stay

21  on and don't endure.

22      Q   And could you just spend a little more time on what

23  you mean by, I think you said proliferation over time.  What

24  role does that play in evaluating the efficacy of a

25  structure like this?

26      A   Yeah.  So if you want to change someone's belief or

27  sell products and services over time, there are really three

1   factors –

2      Q   Do you want to flip it over?

3      A   Sure.

4      Q   It's solid, so.

5      A   I can write it at the top.

6      Q   Strong.  Not that strong.

7      A   So when I'm evaluating with the team how prolific a

8   network would be.  I'm looking for three things.  One is

9   volume.  Volume is nothing more than the total amount of

10  content created by a messenger or the organization that's

11  working with the messenger.  Next is reach.  Reach is about

12  the audience, as in how many people actually saw the

13  content.  So I'll just jot a note here.  Reach is about

14  audience, volume is about content, creator.  And the last

15  one is time.

16     Q   And what is the role of time here as you're using it?

17     A   Time is important for changing people's perceptions

18  or beliefs or selling large volumes of whatever your product

19  might be.  Because if you can do it over time, your results

20  will be that more direct.  People tend to believe that which

21  they see the most.  Meaning, that which is created by a

22  content, creator in high volumes.  That which they're

23  exposed to in high volumes, and that which occurs over the

24  largest period of time.

25     Q   In terms of influencing human behavior, not hats or

26  time works.  What does that mean in terms of that part of

27  it?

1    A   So time is essentially the longer you hear about

2    something, the more likely you are to believe that you need

3    to buy it, lease it, rent it.  If it's a product.  Or that

4    it changes your perceptions about reality.  If you're

5    hearing it over and over again, audiences tend to challenge

6    and ask themselves, well if I keep hearing it then it must

7    be true.  It creates the inverse.  This has long been part

8    of advertising, which is how much advertising did you do?

9    How much do people see it?  And how long do you endure with

10   your campaign.

11   Q   So if somebody puts out one statement or – let's say

12   somebody puts out one false narrative at one point in time,

13   that can do – can that do significant harm in and of itself?

14   A   It can, but it has to reach a large audience.

15   Q   Okay.  And if somebody repeats that over time, is it,

16   and expert in this, does that increase the risk

17   exponentially?

18   A   Yes.

19   Q   Okay.  Does that also increase the efficacy of, for

20   example, sales, exponentially?

21   A   Correct.

22   Q   Okay.  So there's another part to this – I just want

23   to get this done.  Judge, thank you.  I'm sorry.  I'm just

24   going to make this another – a little time here with the

25   chart and we'll get you back on the stand.  But so we got to

26   talk – can you just now talk about social media, the

27   internet.

1    A    Yes.

2    Q    Some people call it interwebs.  The whole – and what

3    their role is and what your experiences with that.

4    A    So the internet, just at a high level, is really

5    undergone two generations.  The first generation is, I'll

6    just call it the worldwide web.  Which came about in the

7    1990's, and it really extended to about the mid-2000's.  The

8    worldwide web was a pull system.  Meaning you had to pull

9    content.  You had to find it.  And that's why you'll see

10   often times a magnifying glass when you go to the internet

11   to search, because you're trying to find content and then

12   pull it to you.  This was largely just internet websites

13   that posted content there.  Users would go, they either went

14   direct to the website and typed it into the search bar or

15   they went to a search engine, that you might be familiar

16   with.  Google, Bing, Yahoo.  Different search engines, which

17   then help you find the content so that you can pull that to

18   you.  The next era, which is really the second decade of the

19   internet.  Is social media.  Social media, as I mentioned

20   earlier, which I started focusing on it.  Really started in

21   the mid-2000's.  I like to use 2005.  That was when I

22   started being exposed to social media in terms of YouTube.

23   And that was different because now you had internet

24   websites.  Which I'll draw here.  Where users can still pull

25   content, but now we had new social media websites to start

26   up.  I'll just name some of them.  There are many of them

27   now.  YouTube, Facebook, Twitter.  And there are many

1  others.  When this occurred, it allowed all of us as

2  internet users to create our own persona.  Our own identity

3  on the internet.  And that changed how everything works.

4  Because instead of just pulling, we could then subscribe to

5  content and internet websites could post their content on

6  each of these platforms.  And when they do, your friends,

7  your followers, your co-workers, everybody you know on a

8  social media site, everyone that you friend, they can now

9  push content to you.  Which is different.  So as a consumer,

10  you can have content pushed to you.  You can then also go

11  and pull content from websites here, and then they can then

12  repurpose, regenerate, and create content.  So the key parts

13  of social are one, it's push – it's a push system.  Where

14  content gets delivered to you, but not always by the creator

15  of the content.  It could be somebody that you know.  And

16  this period, you find the content in the social media era,

17  the content finds you.

18    Q   And has the social media – you were in the trenches

19  so to speak, in this area of evaluating networks –

20    A   Yes.

21    Q   – and the advent of the social media – in the

22  advent – when social media was coming to its current state,

23  right?

24    A   Correct.

25    Q   And can you tell us what if anything that is done to

26  the ability to disrupt dis-information and demonization and

27  fear and anger, and those kinds of things.

1    A    It makes it much harder.  If you had just an internet

2    website, just the internet.  Think of it as your home

3    address in the digital world.  People had to come to it to

4    get things.  To pull it.  Nowadays in the social media era,

5    people can push it to each other.  So even if this part went

6    away, it's still posted on those social media platforms.

7    The social media platforms can then be subscribed to or

8    viewed.  It becomes much, much harder, because the contact

9    creation becomes expediential.  Meaning it's not just one to

10   one.  One piece of content, one sharer.  Now it's one to

11   hundreds.  It can take off on a life of its own.  You or I

12   as users can take that content, clip it out, screenshot it.

13   Talk about it.  We can send that to other people that we

14   know.  That creates an additional and just massive amount of

15   distribution of content over time.

16   Q    So if a individual or an organization or a

17   corporation, for example like Infowars.  Had effective

18   messaging, effective messenger, and effective medium; and an

19   infostructure and effect of method.  Does social media help

20   those types of organizations expand exponentially their

21   message?

22   A    Absolutely.  If its an effective message they engage

23   with the audience, in the second era, when the social media

24   era came to bay, the audience can then be a redistributor of

25   that content.

26   Q    And so the audience becomes a second, effectively a

27   second messenger?

1    A    That's right.  You can enlist the audience as

2    additional messengers.  So over time if you wanted to use

3    the four M's, and you were trying to reach a wider and wider

4    audience.  For whatever your reason might be.  You want to

5    engage your audience in such a way, that they also

6    redistribute your content.  They recruit other messengers

7    that support what you are saying.  Whether it's about a

8    product or it's about a belief system.  Above that, you can

9    receive information.  Tips and leads or even donations, or

10   sales, to help propel your infrastructure and your

11   organization.  All of those things help you sustain over

12   time, and the more you can sustain, the more you can grow

13   your audience.  The more you grow your audience, the more

14   you can challenge them and push your belief system on them.

15   The more they change their beliefs, the more likely they are

16   to undertake actions in the real world.

17   Q    Okay.  And so is it – so, can you trace certain false

18   narratives?  Is there ground zero.  If somebody's a – let me

19   withdraw the questions.  It's going off the rails.  If there

20   is an effective message, an effective messenger, and

21   effective medium with an infrastructure of deep roots going

22   back to say 911, and tens of millions of listeners, that

23   individual can affect secondary tertiary and what's four?

24   A    Four.

25   Q    Four.  It can affect everything down the line,

26   correct?

27   A    Correct.

1    Q    And but for that – all these things, that narrative

2    may never take hold.  Correct?

3    A    Correct.  This is what distinguishes an outsized

4    influence.  A messenger with enormous reach, and enormous

5    volume from just you or I, or anybody who just holds up

6    their phone and disseminate a message.  Anyone can say a

7    message, but does anyone hear it?  Anyone can be a

8    messenger, but does anyone pay attention?  Anyone can

9    produce content, but if it's not done well, it's done in a

10   gripping and emotional way with video, it's probably not

11   going to go very far.  Just ask yourself, how many video's

12   do you watch compared to how much you read.  And last if you

13   can't repeat it over and over again.  If you don't have the

14   method down in terms of content creation, distribution,

15   assessing what the effectiveness of it is.  You won't endure

16   over time.  You'll largely be forgotten in the modern

17   information space.

18   Q    And in peddling a false narrative, do messengers –

19   effective messengers, utilize others, for example, for roles

20   as experts of anything like that?

21   A    Yes.  Whether it's a true or false piece of

22   information, you're trying to expand the reach the of that

23   audience over time.  Or you want credibility or presume

24   credibility to a false message.  You would enlist other

25   messengers.  What would you look for?  You would look for

26   descriptors that would help add credence to it.  So maybe

27   it's a school safety officer.  Or somebody who worked as a

professor or an institution.  You would add those messengers

there, because they seem to have some sort of context

related to whatever the message is.

Q   And just one more question before I'll ask you to

resume the stand.  Which is, can you tell us and the jury,

what role if any building loyalty and trust with - between

the messenger and audience of potentially tens of millions,

plays in this whole scheme?

A   If you are pushing false information into an

information system, if there is no rebuttal, meaning the

audience comes directly to that messenger, and they believe

everything is truth.  There is no rebuttal, then there's

nowhere for the truth to creep into the audience.  It's

impossible for them to consider an alternative explanation

for something if they can't see it whatsoever.

Q   And once a person's developed a belief in something,

even if it's false.  What do you know, if anything about

whether or not people can be moved off even false beliefs -

ATTY. PATTIS:  Objection.

Q   What do you know if anything?

ATTY. PATTIS:  Calls for expertise.

ATTY. KOSKOFF:  No, I think it goes to -

THE COURT:  Overruled.

A   I'm sorry.

Q   You said rebuttal.  What do you know if anything

about how if somebody believes something, really believes

something, that no matter - is there - are there any facts -

1  I mean does that make it hard.  Let me start this again.

2  Have you had experience in learning about how human behavior

3  of people who fully believe something that is false, and

4  whether or not rebuttal of contradictory facts, other

5  evidence moves them – moves people off their original

6  position?  Or is –

7  A    No.  It's really about availability.  So in terms of

8  an audience, people tend to believe what they hear first.

9  That's speed.  What they hear the most.  That's really in

10 terms of method and volume.  That which comes from a trusted

11 messenger, which is building a loyal audience that comes

12 back all the time.  And hearing no rebuttal or no challenge

13 to that information.  So if that happens over and over

14 again, even if there is a rebuttal, but it's only one, and

15 meanwhile there are hundred falsehoods spread about an

16 individual, an entity or an organization.  People have to

17 weigh the body of evidence of which they heard.  So 100 to

18 one.  It's really about availability of information.

19 Q    Okay.  Thank you very much.  You can resume the

20 stand.  So I wanted to go and – I want to talk about first

21 the infostructure of Infowars/Alex Jones/Free Speech

22 Systems, prior to December 14th, 20122.  Okay.

23 A    Okay.

24 Q    And you are familiar through your extensive analysis

25 of this case with that infostructure?

26 A    Yes.

27 Q    And you studied how many infostructures or different

1  organizations over the years?

2     A   Dozen's.

3     Q   Okay.  And can you tell the jury about, in general

4  terms, just about the infostructure Infowars, it's – give us

5  a scale in context.

6     A   Infowars is what we would call an ecosystem, which

7  includes the internet and social media.  Over the course of

8  what we reviewed involved several different websites.

9  Infowars.com being the principle one that draws the largest

10  amount of traffic.  Prisonplanet.TV being another one that

11  drew sizable amounts of traffic.  And it hosted content in

12  nearly all forms, video, audio, and print.  Separately, over

13  the course of all of this period that we evaluated –

14            ATTY. PATTIS:  Objection.  Time – I

15            ATTY. KOSKOFF:  I –

16            ATTY. PATTIS:  If this was prior to 2012.  I'm

17        trying to make sure.

18            ATTY. KOSKOFF:  Yes.

19            THE COURT:  Sustained.  So -

20     Q   So just to be clear.  We're just talking about prior

21  to December 14, 2012.

22     A   Correct.

23     Q   And the reason I'm just asking.  You talked about how

24  infrastructure plays a role in this whole analysis of

25  influencing behavior.  Do you recall that?

26     A   Yes.

27     Q   And the greater more security infrastructure, the

1  more effective the message and the influence.

2    A   Yes.

3    Q   Okay.  And so we're just talking now before 2012.

4  What was the – how entrenched – what was the soil at the

5  infrastructure at Alex Jones Enterprises?

6    A   It was a website with a select group, or a few social

7  media handles.  Principally they had YouTube, Facebook, and

8  Twitter.

9    Q   Now it was – you said it Facebook and Twitter weren't

10  always available.  Is that right?

11    A   Correct.

12    Q   So can you tell us a little bit about Infowars and

13  Alex Jones prior to the advent of those social media

14  platforms?

15    A   I would say the first decade of Infowars, it was

16  about Infowars the website Infowars.com.

17    Q   Okay.  And did they use video?  Granted, it may not

18  have been as technologically feasible, but did they use

19  video to promote narratives?

20    A   Correct.

21    Q   Okay.  And over the course of the – over a decade,

22  did Infowars and Alex Jones build a dedicated and loyal

23  following?

24        ATTY. PATTIS:  Which decade, Judge?

25    Q   The decade before –

26    A   The 2000's.

27    Q   Yes.  Sorry.  The decade before the Sandy Hook

1  shooting?

2   A   Yes.

3   Q   It had by the time Sandy Hook shooting, had Infowars

4  built and audience of tens of millions?

5   A   Yes.

6   Q   Okay.  And how do you know that?

7   A   I reviewed the google analytics data that was

8  provided.  I looked at past iterations and Alexa ranks that

9  were offered from the materials turned over.  It was part of

10  the case.

11   Q   Okay.  So you did receive some google analytics, is

12  that correct?

13   A   Yes.

14   Q   You just simply didn't receive a complete google

15  analytics?

16   A   Correct.

17   Q   Okay.  And from what you could ascertain, you can say

18  that Infowars developed an audience of tens of millions.

19   A   Yes.

20   Q   Okay.  And so in terms of infrastructure and the

21  efficacy of the message and a campaign, what role does that

22  play?

23   A   It sets up a stage where they can repeat the

24  development of content in an ongoing way, which continues to

25  bring consumers of that information day after day.

26   Q   And is that – would it matter then if the first day

27  that Alex Jones went on the air was on December 14,2012.

1   Would it have been an – how would that have affected the

2   influence?

3      A    Yeah.  His message would not have been heard, because

4   he wouldn't have time to build an audience.

5      Q    That's that time factor.

6      A    Yes.

7      Q    And does it take time to build trust in an audience?

8      A    Yes.

9      Q    Okay.  And in terms of the – we'll just show what

10  this looks like in numbers.  It's 210.  210.  210.  You

11  talked about learning some information from google

12  analytics, to the extent it was available, correct?

13     A    Correct.

14     Q    Okay.  So let's just show the jury in numbers what

15  we're talking about.

16              THE COURT:  What exhibit is this?

17              ATTY. KOSKOFF:  Well, that's the –

18              ATTY. PATTIS:  Just for the record, Judge, we're

19          looking at 120.

20              ATTY. KOSKOFF:  Yeah.  So this is the front

21          page.  I guess this is Exhibit 120.

22              THE COURT:  Is that a full exhibit?

23              THE CLERK:  120 is a full exhibit, your Honor.

24              THE COURT:  Thank you.

25              ATTY. KOSKOFF:  210 must be another great

26          exhibit.

27  BY ATTY. KOSKOFF:

1    Q    But can we go to google analytics and show the jury
2  the analytics from 2012.  So there you go.  And if you can
3  just sort of maybe blow up the year totals.  The columns.
4  So let's go to the top to orient on the columns first, so
5  sessions – so sessions is some measurement of how well
6  they're doing with their audience, or engaging their
7  audience?
8    A    Yes.  That's the number of times a user comes to the
9  website.
10    Q    All right.  I'm going to need this – so we're on
11  2012.
12                THE COURT:  Attorney Koskoff?
13                ATTY. KOSKOFF:  Yes.  Sorry, Judge, I turned my
14          back to you.
15                THE COURT:  No.  I'm worried about Attorney
16          Pattis, not myself.  You're okay with that, Attorney
17          Pattis?
18                ATTY. PATTIS:  Not yet.
19                ATTY. KOSKOFF:  You don't have – Attorney
20          Pattis, I just move it all the way back.
21                THE COURT:  Okay.
22                ATTY. KOSKOFF:  That good?
23                ATTY. PATTIS:  It is.
24  BY ATTY. KOSKOFF:
25    Q    So sessions, I'm going to try – I'll write large here
26  so –
27                THE COURT: I'm fine.

1    Q  2012 sessions, 119,107.058.  I'd like to start this

2  chart over with the Court's permission - all right.  Okay.

3  So sessions in 2012, 119,107 - of course everybody could

4  read it.  But 107,058.  Right?  Is that correct?

5  A  Yes.

6    Q  Okay.  Now we have something called users.  And that

7  is 49,029,313.

8  A  Correct.

9    Q  And then we have page views.  And that is 286

10  million - I'm just going to round it up because I'm running

11  out of space.  So is that right?

12  A  Yes.

13    Q  Okay.  Now this was for the most part, this is the

14  infrastructure that was in place at the time of the Sandy

15  Hook shooting on December 14, 2012.  Is that correct?

16  A  Yes.

17    Q  So can you just, as somebody who studied networks and

18  spheres of influence.  Can you just describe to the jury the

19  scale of what we're talking about.

20  A  It's extremely large.  Compared to other

21  organizations or entities that I've looked at, to achieve -

22  I think the middle number is the one to focus on, the 49

23  million.  To achieve 49 million users in any given year is a

24  massive audience.

25    Q  Was there anybody operating in Alex Jones sphere of

26  influence, to your knowledge having studied this, that came

27  remotely close?

1    A    No.  I'm sure there was, what would be mainstream

2  sort of television channels or something that might have

3  that.  ESPN would have many more, for example, I would

4  guess.

5    Q    Okay.

6    A    But no, I'm not familiar with others.

7    Q    Okay.  And in certain fact I will look at media kits.

8  You review media kits?

9    A    Yes.

10   Q    And you've seen how Alex Jones compares to, at least

11 what is presented as his competition?

12   A    Correct.

13   Q    And he was on top by far, correct?

14   A    He was.

15   Q    All right.  Now in terms of – so this is now – do

16 these numbers primarily capture what the 2000 – primarily

17 capture the audience prior to Sandy Hook, given that Sandy

18 Hook happened in the last two weeks of December.

19   A    Yes.

20   Q    Okay.  Now let's go to 2013.  Now we have

21 179,324,958.  Right?

22   A    Yes.

23   Q    How are your math?

24   A    I went to West Point; I can do it.

25   Q    And can you give us a ballpark of that increase?

26   A    Over one year that would be roughly 70,000 divided by

27 17.  So a sizable number.  You're talking about a sizeable

1  increase in audience, more than 50 percent.

2      Q    I mean, I think I could have done that math.

3           ATTY. PATTIS:  Objection, Judge.

4           THE COURT:  Yeah.  Sustained.

5           ATTY. KOSKOFF:  Yeah.  I'm sorry.

6  BY ATTY. KOSKOFF:

7      Q    I don't mean to cross-examine you on your math

8  skills, but you know about percentage wise, what this clump

9  is.

10     A    It would be more than 50 percent audience share.

11     Q    Okay.  And then users goes from 49 thousand – sorry,

12  49 million to 73,237,164.

13     A    Correct.

14     Q    Another approximate bump of 50 percent?

15     A    About 50 percent.  Yes.

16     Q    Okay.  And then page views, 427 million, we'll do

17  million.  That's another – that's actually another almost 50

18  percent.  Right?

19     A    Correct.  I's slightly larger.  But page views is the

20  function of that multiple pages per session, 2.39.

21     Q    So prior to the Sandy Hook shooting, you were telling

22  us about how outsized his audience – an audience he had,

23  right?  How large his reach was, correct?

24     A    Correct.

25     Q    And how engaged they were in this – with his presence

26  online.

27     A    Yes.

1    Q    And did that already sizable audience increase by

2    approximately 50 percent according to google analytics?

3    A    Yes.

4    Q    In the year after the Sandy Hook shooting.

5    A    In one year.  Yes.

6    Q    Fifty percent.  Now the jury has seen some videos of

7    Alex Jones.  We're not going to show all the videos.  But -

8    so is it your - first of all, to this knowledge does this

9    cover the entire operation of Alex Jones Incorporated or

10   does it - is it specifically to Infowars.

11   A    The way I understand this chart, based on looking at

12   it here, it's just based on Infowars the website.

13   Q    So does this - does this - so this doesn't capture

14   Facebook?

15   A    No.

16   Q    It doesn't capture YouTube or Twitter, or Reddit or -

17   A    No.  It might - it would capture potentially

18   redirects off of those, but it doesn't capture all the views

19   of that content on other platforms.

20   Q    Okay.  And I'll go with - but the 2012 numbers and

21   the 2013 numbers, those are apples to apples.  Infowars to

22   Infowars.

23   A    Correct.

24   Q    Okay.  So it would be reasonable to say that the

25   corresponding platforms also increased a similar -

26            ATTY. PATTIS:  Objection, Judge.

27            THE COURT:  Sustained.

1              ATTY. KOSKOFF:  I'm sorry, Judge.

2      Q    The - okay.  So in terms of the video.  I do want to

3    show you what the juries already seen.  Which is our first

4    video from Alex Jones on 12/14/12.  1E2.0.  So -

5              ATTY. PATTIS:  Judge, may we approach?

6              THE COURT:  You may.

7              ATTY. KOSKOFF:  I can fit this - 2.0 this is

8         fine.

9              ATTY. PATTIS:  I'd like to hear it.

10             (Sidebar conversation begins.)

11             ATTY. PATTIS:  This is one that may have been

12        edited.  I have not had a chance to see it yet.

13             ATTY. KOSKOFF:  It's the same.  It's just a

14        different.

15             THE COURT:  I can take a five minute break if

16        you wanted to, because I need a bathroom break

17        anyway.  I tried to make it.

18             ATTY. PATTIS:  So ordered  So ordered.

19             THE COURT:  All right.  So we are going to take

20        a five-minute break, and Ron will bring you back, and

21        I'll see you in five minutes.

22             (Recess.  Resumed.)

23             THE COURT:  Please be seated.  Do you need a

24        little more time, which is fine.  You need a little

25        more time?

26             ATTY. MATTEI:  No, not on the issue here.

27        Ready for the jury.

```
1              THE COURT:  You sure?
2              ATTY. PATTIS:  May I speak to Attorney Koskoff,
3         we may be able to reach an agreement.
4              THE COURT:  Sure.
5              ATTY. PATTIS:  I think we've got an agreement,
6         Judge.
7              THE COURT:  Very well.  So we're ready for the
8         jury?
9              ATTY. KOSKOFF:  Let me just make sure we're
10        ready.  Sorry, Judge.
11             THE COURT:  Okay.
12             ATTY. PATTIS:  Judge, I think the issue was the
13        2.0 threw me.  I didn't know if this new material.
14        It turns out to be simple an excerpt from something
15        already admitted.
16             THE COURT:  Okay.  Is it all queued up?  You
17        ready for them to come out, or do you need another
18        minute.
19             ATTY. KOSKOFF:  Yes.  My apologies for confusing
20        things, Judge.
21             THE COURT:  Yes, we need another minute, or yes,
22        we're ready to go?
23             ATTY. KOSKOFF:  I think we're good.
24             THE COURT:  Good.  Okay.  Thanks, Ron.
25             ATTY. MATTEI:  We're still just going to
26        1 o'clock, your Honor.  Notwithstanding the break we
27        just took?
```

1          (Jury panel enters the courtroom.)

2          THE COURT:  All right.  The record will reflect

3       that our entire panel is back.  Please be seated.

4       And whenever you're ready, Attorney Koskoff.

5          ATTY. KOSKOFF:  Thank you very much, your Honor.

6  BY ATTY. KOSKOFF:

7   Q   So Mr. Watts, I'd like to show the jury and you a

8  video that juries actually already seen but ask you some

9  questions about it.  And just to set it up.  It's your

10  understanding that the Sandy Hook shooting began at around

11  9:30, ended around 9:35.  Something like that?

12  A   Correct.

13  Q   Okay.  And I want you to assume that Alex Jones

14  within three hours had put together a show for Infowars that

15  day.  Okay.

16  A   Yes.

17  Q   And aired it that day.

18  A   Yes.

19  Q   All right.  And the juries seen this, but I want to

20  show it to you.  Okay.  1E.  This is the first video by Alex

21  Jones following the shooting.

22          (Video played)

23  Q   You've seen that video before?

24  A   Yes.

25  Q   I want to ask you about when you're teaching other

26  agents and investigators how to look into networks.  Tell me

27  about message.  Can you tell us what if anything Alex Jones

1   in employing here that is in furtherance of what describe to

2   the jury.

3       A    It's fear over loss of weapons, which he uses as the

4   justification.  His stokes anger by repeating that it was

5   some sort of a plot.  And he uses demonization by picking

6   the target for his – as in what the perpetrators or

7   existential threat to what they are behind, which in this

8   case he says is taking weapons.

9       Q    And in your career in intelligence and kind of

10  terrorism, and your investigations.  Is this something

11  you've seen before?

12      A    Yes.

13      Q    He talks about they.  They are coming, they are

14  coming, they are coming.  What if anything, what is the

15  significance of that if anything in terms of this influence

16  on an audience?

17      A    It characterizes the situation as two parties.  Us

18  versus them.  And that there is some sort of pending or

19  current conflict that's underway.

20      Q    And – is it – he doesn't – does he in this case, did

21  he identify who they were.  Is that right?

22      A    Correct.  He mentioned political figures at different

23  times.  But they is a morphos in the grand scheme of the

24  video.

25      Q    And what is the value of anything about designating

26  they versus being more specific about who a messenger like

27  this is talking about.

1    A    Using broad based terms like they allows over time,

2  if you're going to message over time to encapsulate a larger

3  audience under that pronoun.

4    Q    And does it help stoke division, demonization, anger,

5  and fear?

6    A    Yes.  It communicates to the audience that it's you

7  or us versus them or they.

8    Q    And does it help cement the bond between -

9              ATTY. PATTIS:  This is all leading, Judge.

10   Q    What if anything does it do to the relationship

11  between the messenger, in this case Alex Jones, and his tens

12  of millions of an audience?

13   A    When communicated particularly on social media, it

14  creates a community around this identity.

15   Q    Okay.  And in what affect – in any way does that

16  affect the efficacy of, for example, pitching products.

17   A    If you can identify with a product or a service, or

18  it's part of what your – what you believe your larger

19  community or social circles with, you're more enticed to

20  actually acquire that product.

21   Q    Okay.  And I'd like to now show the rest of – oh, let

22  me ask you a couple more questions.  Well, actually let's

23  show you the rest of the clip first.

24              (Video played)

25   Q    Okay.  So in terms of the they again.  He speaks of

26  they.  Are we any clearer about who the they are?

27   A    No.

1    Q   And what are globalist?

2    A   It's basically a large broad-based term that there is

3    some sort a global empire.  It's never well defined, and

4    often times characters move in and out of what is seen as

5    globalist.  It's their belief in a global system.

6    Q   Okay.  And this would have been within about two or

7    three hours of the shooting.  And is Alex Jones selling a

8    product here as well?

9    A   Yes, he offers subscriptions to the magazine during

10   the broadcast.

11   Q   And what if anything if the significance of him

12   offering something for sale and for profit, as he is sending

13   a message of they are coming, and they're going to take your

14   guns and so forth.

15   A   He's communicating that if you want to understand the

16   phenomenon which he's talking about, it's a fear-based

17   message based on anger and resentment and demonizing a

18   population, them.  The way to understand that is through his

19   subscription.

20   Q   Okay.  And does the - he says, call in with your

21   tips.  Or something to that nature.  Did you hear that?

22   A   Correct.

23   Q   And can you describe what that does in this eco-

24   system of influence?

25   A   If you rely on your audience to also provide you

26   tips, it allows for them to become part of what's going on.

27   They become part of the production.  It also at times can

1  lead to rewards.  Sometimes its fame.  They can be elevated

2  in terms of the status in their community.  They would be

3  put on air with Alex Jones or interviewed.  Or they could

4  receive things in terms of even a job or monetary

5  compensation, potentially.

6      Q    And is that one of the ways in which commercial

7  enterprises might engage somebody to make a purchase they

8  might not otherwise make?

9      A    Yes.

10     Q    Okay.  And what if anything does that do to the

11  relationship between the messenger and the audience?

12     A    It creates a system where there's some sort of

13  incentive to engage.  Meaning that if there's a call out

14  there to provide tips or to do something, a call to action,

15  it enables the audience to become part of the story.  Or in

16  some cases, to becomes part of the infrastructure.

17     Q    And from time to time through your evaluation of the

18  evidence in this case, does Alex Jones take those tips and

19  promote them to his tens of millions of listeners?

20     A    Yes.  It increases the messages and the messengers.

21     Q    Okay.  And does Alex Jones operate as kind of a hub

22  for promoting - never mind.  All right.  So we were talking

23  about the importance of reach.  Do you remember that, and

24  volume.

25     A    Yes.

26     Q    And I want to show you some information.  One of

27  things that you were provided, weren't you, were something

1  called media kits.

2     A    Correct.

3     Q    And if we could pull up 216.

4          THE CLERK:  That is a full exhibit, your Honor

5     Q    It is a full exhibit.  The jury seen parts of this.

6          THE COURT:  Thank you.

7     Q    And what is a media kit?

8     A    A media kit is something you would distribute to

9  potential advertisers or entities that might want to do

10 sales, by with or through your website or platform.

11    Q    Now if you could turn to – and this was a media kit

12 that was out – if you to the upper left.  Alex Jones

13 Infowars, Free Speech Systems.  Correct?

14    A    Correct.

15    Q    And if you go to first page it's page 1286.  There we

16 go.  You got ahead of me.  That's Alex Jones in a pensive

17 thought shot.  Is that right?

18    A    It appears so.

19    Q    Okay.  And he's – and if you back up to see the

20 headlines.  It says the house that truth built.  Do you know

21 whether that's a play on words on the house that Ruth built?

22 Yankee's –

23          ATTY. PATTIS:  Objection, Judge.

24          THE COURT:  Overruled.

25    A    Yes, it could be.  It sounds familiar.

26    Q    Now a Yankee fan.  All right.  And is borrowing from

27 popular cultural, one of things that influencers do like

1  this, to get their message out?

2    A    It is.  It helps the audience identify with the

3  content.

4    Q    Right.  Okay.  So a baseball fan who might know what

5  this term would be, might be draw more to this gentleman –

6              ATTY. PATTIS:  Objection, Judge.

7              ATTY. KOSKOFF:  I'll withdraw it.  I'll withdraw

8        it.

9    Q    The – this says that, meet Free Speech Systems, LLC

10  owner, documentary filmmaker.  Nationally syndicated radio

11  talk show host, Alex Jones.  Correct?

12    A    Yes.

13    Q    All right.  What if anything does promoting a

14  documentary film – what is the purpose of that?

15    A    It both spreads the message that a documentary film

16  maker wants to make.  And it also can increase sales if it's

17  for sale.

18    Q    And if I'm not mistaken, a feature film is a

19  fictionalized account.

20    A    Yes.

21    Q    And a documentary is of –

22              ATTY. PATTIS:  Objection.  Leading again, Judge.

23    Q    What is a documentary?

24    A    It tries to account for something that happened in

25  the real world.

26    Q    Okay.  So it covers something that's true.  Actually

27  happened.

1    A    Correct.

2    Q    Okay.  And if we could go to the second page of that,

3    or the bottom.  Sorry.  Says – and you've reviewed this

4    media kit before – materials, correct?

5    A    Yes.

6    Q    And this says, topping the charts, kings of their

7    domains.  And what does that refer to?

8    A    It means, the way I understand it that the platforms

9    of Free Speech Systems are at the top of the charts.  And in

10   terms of domains, that's websites.  Domains usually refers

11   to a website.

12   Q    Okay.  And by the way, what is the purpose of a media

13   kit like this?

14   A    It's to entice people to either broadcast of

15   advertise.  If it's a radio show, you might want to increase

16   your syndication.  If it's a website, it might be a way to

17   rehost or sell products and services.

18   Q    So this is something that's used for commercial

19   purposes to make money?

20   A    Yes.

21   Q    And to increase the bottom line?

22   A    Yes, it's promotional.

23   Q    Okay.  And when it comes to promoting Infowars to

24   advertisers, Infowars promoted their numbers.  Correct?

25   A    Correct.

26   Q    Do you understand that those numbers

27           ATTY. PATTIS:  Objection.  These are all

```
1            leading.
2    Q    Do you understand whether – I'm sorry, I'll rephrase
3    it.  Withdrawn.  Do you understand whether those numbers
4    came from google analytics, that they've told the Court, the
5    jury, and as today, that they did use -
6            ATTY. PATTIS:  Objection.  Argumentative.
7            Compound.  Leading.
8            THE COURT:  So –
9            ATTY. KOSKOFF:  Okay.  Let me rephrase it.
10   Q    Do you understand whether those numbers come from
11   google analytics, that they claim not to have ever used?
12           ATTY. PATTIS:  Objection.  Compound.
13           Argumentative.  Leading.
14           THE COURT:  All right.  So why don't we – it's
15           almost lunch time.
16           ATTY. KOSKOFF:  Did I get it?
17           THE COURT:  Why don't we rephrase the question,
18           see how it goes.
19   Q    Do you understand whether those numbers that they are
20   using to promote their product, potential advertisers to
21   increase their bottom line, come from google analytics.
22   A    Based on what I'm reading, I believe those to be
23   google analytics numbers at the top and Alexa ranks, in
24   terms of the rankings.
25   Q    Okay.  So based on the evidence you've received, did
26   – this would support – or does this indicate that when it
27   came to bringing money in, Infowars used google analytics?
```

1    A    Yes.

2    Q    Okay.   Now in terms of Infowars relationship to other

3    what do you call these things?   Websites, I guess, right?

4    A    Correct.

5    Q    Okay.   And Infowars Prison Planet – what is Prison

6    Planet to your understanding?

7    A    It's just another website from the network of

8    websites that they run.

9    Q    Okay.   So it's like a sister website or -

10   A    Yeah.   It's  also referred to a mere sister website.

11   Q    By the way, what is in terms of the infrastructure

12   you're talking about.   That – and the reach, what does this

13   tell you about that infrastructure as of the time of the

14   Sandy Hook shooting?

15   A    That they had redundancy in their system.   Meaning

16   they could host content on one or more places, and they

17   could host the same content in the – in two different places

18   or more.

19   Q    Okay.   And to what value is that of a four-profit

20   company like Infowars?

21   A    It creates redundancy.   Just like you would have a

22   backup generator down in your house for electricity.   It

23   allows you to have multiple websites, so that if hosting

24   went down on one website, you'd still have one that was up

25   that people could access.

26   Q    And does it provide like a different doorway to the

27   information or is it simply a backup.

1    A    It does.  You could create varied content.

2  Potentially for different audiences, depending on what the

3  analytics were.  At the same point, it just gives you

4  multiple domains that you can operate.

5    Q    And Prison Planet- well, Infowars according to this

6  chart shows it standing out from the rest.  Is that right?

7    A    Yes.

8    Q    And why would – do you know why they would put up

9  these particular networks up, or websites up in this media

10  bit?

11    A    I would imagine although -

12         ATTY. PATTIS:  Objection.

13    Q    If you don't know, you don't know.

14    A    I don't know –

15         THE COURT:  Sustained.

16    A    - specifically.  I have thoughts.

17    Q    Okay.  That's fine.  The – and Prison Planet itself

18  was comparable looks like actually beating out Rush

19  Limbaugh.com.

20         ATTY. PATTIS:  Objection, Judge.  These are all

21         leading.

22    Q    Okay.

23         ATTY. PATTIS:  Objection.

24         ATTY. KOSKOFF:  Let me rephrase it.

25    Q    According to this chart, was Prison Planet Beating

26  Rush Limbaugh itself?

27    A    Yes.

1    Q    Okay.  And we went through this the other day.  But

2    are you familiar with Glenn Beck, Rush Limbaugh, Newsmax and

3    WMD?

4    A    Glenn  Beck, Rush Limbaugh, Newsmax.  Yes.

5    Q    Okay.

6    A    I've heard of WMD.

7    Q    Okay.  And who is Rush – who was Rush – who is or was

8    Rush Limbaugh?

9    A    He was a very successful conservative radio

10   broadcaster.

11   Q    And was he in his day very controversial?

12   A    He was controversial at times.

13   Q    Okay.  And did you and your team evaluate whether or

14   not Rush Limbaugh ever manufactured or passed any false

15   narratives about these Sandy Hook families being actors?

16   A    I did look, but no, I saw no evidence of that.

17   Q    Okay.  What about Glenn Beck?  Is he also

18   controversial, what do you call, personality?

19   A    Yes, he was on television, and he does radio and

20   internet broadcasts.  He sometimes known to be

21   controversial.

22   Q    Was Glenn Beck on the air within three hours talking

23   about cover-ups and using – staging a shooting to grab

24   people's guns?

25   A    Not that I'm aware.

26   Q    Did Glenn Beck ever manufacture or give way to any

27   opinions of others that questioned or accused these families

1  of being actors?

2     A    No not that I'm aware of.

3     Q    How about Newsmax?  Newsmax – what is Newsmax?

4     A    It's a news website, broadcasting.

5     Q    Was Newsmax on the air within three hours questioning

6  the motives of Sandy Hook?

7     A    Not that I'm aware of.

8     Q    Was Newsmax on the air within three hours saying

9  they're coming for your guns?

10    A    Not that I'm aware of.

11    Q    Was Newsmax on the air within there hours stokes

12  fear, anger, and demonization?

13    A    No.  Not that I'm aware of.

14             THE COURT:  We can break here for lunch if that

15        works.

16             ATTY. KOSKOFF:  Thank you, your Honor.

17             THE COURT:  Okay.  So we will take our one-hour

18        lunch break.  You'll continue of course to strictly

19        obey those rules of juror conduct.  In particular,

20        make sure you avoid any media.  Anyone associated

21        with this case.  Ron will safeguard your notebooks,

22        and we will start promptly at 2 p.m.  So please make

23        sure you get back around five minutes of.  Okay.

24             We'll take the recess.

25             (Lunch Recess.)

26

27

```
DKT NO:  X06-UWY-CV186046436-S      :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                      :  JUDICIAL DISTRICT WATERBURY

v.                                  :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                    :  SEPTEMBER 20, 2022
DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES

DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

C E R T I F I C A T I O N

I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #4, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 20th day of September, 2022.

Dated this 21st day of September, 2022 in Waterbury, Connecticut.

Darlene Orsatti

Court Recording Monitor