# EXHIBIT 32

```
NO:  X06-UWY-CV18-6046436-S      :  SUPERIOR COURT

ERICA LAFFERTY                   :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 20, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046437-S      :  SUPERIOR COURT

WILLIAM SHERLACH                 :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 20, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046438-S      :  SUPERIOR COURT

WILLIAM SHERLACH                 :  COMPLEX LITIGATION DOCKET

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                :  SEPTEMBER 20, 2022
```

BEFORE THE HONORABLE BARBARA BELLIS, JUDGE
AND JURY


VOLUME III OF III
WITNESS:  CLINTON WATTS BEGINNING AT 3:37 TO 4:25


A P P E A R A N C E S :


   Representing the Plaintiff:

       ATTORNEY CHRISTOPHER MATTEI
       ATTORNEY ALINOR STERLING
       ATTORNEY JOSHUA KOSKOFF
       ATTORNEY MATTHEW BLUMENTHAL



   Representing the Defendant:

       ATTORNEY NORMAN PATTIS



                 Recorded By:
                 Kendyl Henaghan

                 Transcribed By:
                 Shannon LeRoy
                 Court Recording Monitor
                 300 Grand Street
                 Waterbury, CT  06702

1       (A sidebar conference took place.)

2       THE COURT:  First of all (inaudible).  Again,

3   say what you have to say.

4       ATTY. KOSKOFF:  Sorry.  Got it.

5       THE COURT:  Okay.  I was (inaudible) at the end

6   with leading.  How many times do you have to say

7   leading?  Again -

8       ATTY. KOSKOFF:  I don't know what he's talking

9   about.

10      THE COURT:  But that's not it.  So (inaudible)

11  because of other incidences, there's some kind of

12  something from somebody. (Inaudible).

13      ATTY. PATTIS:  Okay, thank you.

14      THE COURT:  Okay, so –

15      ATTY. KOSKOFF:  That's going to happen now?

16      THE COURT:  (Inaudible).

17      THE COURT:  Okay, I think we are ready for our

18  panel now.

19      (THE JURY ENTERED THE COURTROOM.)

20      THE COURT:  Welcome back everyone from the

21  afternoon break.  And the record will reflect that

22  the entire panel has returned.  Please take your

23  seats and make yourselves comfortable.

24      Whenever you're ready, Attorney Koskoff.

25      ATTY. KOSKOFF:  Thank you, Your Honor.

26

27

```
1    C L I N T O N   W A T T S,

2         having been called as a witness, was previously duly

3         sworn, examined and testified as follows:

4    DIRECT EXAMINATION BY ATTORNEY KOSKOFF CONTINUED:

5    Q   Mr. Watts, I want to turn now to asking you whether

6    or not there came a time when we asked you and your team to

7    make your best efforts to determine the total reach of Alex

8    Jones' Sandy Hook lies across all platforms.

9    A   Yes, you asked that but I was not able to do that.

10   Q   Okay.  And why were you – why were you not able to

11   provide a reasonable estimate as to the total amount of – or

12   I'm sorry, the total reach of Alex Jones Sandy Hook lies

13   across all platforms?

14   A   There were several categories of missing data.  The

15   first one was Facebook, we had no real Facebook data in

16   terms of the post seens that were there, so we couldn't see

17   what the engagements were like.  An engagement would be

18   individuals discussing or reacting or resharing the content,

19   meaning they share outside of Info Wars social media

20   handles.  So we're really blind to what was on Facebook,

21   other than a couple samples from reports on Sprout Social.

22   Q   Okay, you're kind of going very fast.  Why don't you

23   make the list and I'll come back.

24   A   Yeah.  The second was Twitter.  We were able to pull

25   snapshots of Twitter but we were not able to see all of the

26   engagements, all of the posts, all of the content on

27   Twitter.  And that came only from the reports that were
```

1    provided to us, which were some snapshots but not all.

2        Next in terms of Google Analytics, which we discussed

3    a few times today.  We had reports but we didn't have all of

4    the data so we don't know what all of the traffic is to the

5    website.  So we don't – don't really have an understanding

6    of that and we don't understand over the course of all Sandy

7    Hook content what that traffic was like.

8        And then in relation to videos, whether it be Youtube

9    videos, videos posted to Youtube or even videos that are

10   posted to Info Wars.  We don't have measurements around what

11   that reach was in terms of the content.

12   Q   Okay.  I'm going to go back over this just to

13   clarify.  And so – and by the way, let me clarify.  At the

14   time we asked you to project only from a six year time

15   period from 2012 to 2018.  Is that right?

16   A   Correct.

17   Q   Okay.  And let's start with the data, the Facebook

18   Data.  You said you had some but not the engagements?

19   A   Correct.  We didn't –

20   Q   What –

21   A   Yes.

22   Q   Explain the engagements and why that data is – is

23   relevant or significant to your ability to provide a total –

24   a total projection across all platforms of his spreading of

25   the lies?

26   A   When a piece of content goes onto Facebook there are

27   several things that you can learn.  One, you can learn how

1  many people viewed it or how many times was it seen

2  potentially by someone who has a Facebook account.  That

3  would be known as impressions.  You'll see impressions in

4  some of the charts, even from the reports.

5      Next you don't see the degree to which people

6  converse or discuss the content.  Or even in some cases it's

7  possible to take the content that's initially put into

8  Facebook, take it as your own and then resend it to other

9  people, which would be additional layers of traffic in

10 Facebook.

11 Q   Okay.  And so whatever projections you made, they did

12 not count the additional reach that you would have been able

13 to ascertain by the engagements?

14 A   Correct.

15 Q   Okay.  By the way, just to ask you the other

16 question.  Were you at least able to come up with a

17 determination as to a minimal reach across certain platforms

18 of Alex Jones' spreading of the Sandy Hook lies?

19 A   For Sandy Hook lies, we could do a bare minimum

20 reach, meaning we could account for some travel and social

21 media in terms of the reach just on platforms.

22 Q   Just on social media?

23 A   Correct.

24 Q   Okay.  Did you have – and so – you said – Facebook

25 you told us, limitations in Facebook data.  You said there

26 was Youtube data.as  Was there Youtube data?

27 A   There is Youtube data, some.

1    Q   Okay.  Was that provided by Free Speech Systems or

2   did you have –

3            ATTY. PATTIS:  Objection, foundation, hearsay.

4            THE COURT:  Sustained.

5   BY ATTORNEY KOSKOFF:

6    Q   You reviewed – did you have – did you yourself and

7   your team have to dig up Youtube data?

8    A   We had to recreate a way to understand what the

9   Youtube data was by using the Way Back Machine, which is an

10  archive.  It essentially takes a picture of that page on

11  Youtube and it will show counts that are just a place in

12  time.  So they're not all views ever but it gives you a

13  snapshot of a place and time, how many views were on that

14  video.

15   Q   Now you mentioned Sprout –

16   A   Social.

17   Q   Sprout Social.  Can you tell the jury what – that

18  came up in the testimony of the court representative.  Could

19  you just tell the jury what Sprout Social is?

20   A   Sprout Social is a analytics platform that you sign

21  up for a license, you can then run all of your social media

22  handles, your personas on all platforms through it and it

23  will aggregate all the analytics to understand literally how

24  your contents sprouts all across social media.

25   Q   Is this a pay service or –

26   A   It is.

27   Q   Okay.  And do you know whether or not Info Wars used

1  Sprout Social for the time period of 2012 to 2018 at least?

2  A   Yes.

3  Q   What is that, they did or –

4  A   They did use it and I've seen the deposition.

5  Q   Okay.  The deposition, you mean when somebody says

6  something about – a deposition, did you see any data though?

7  A   Yes, I've seen some data around Sprout Social, what

8  they were able to retrieve.

9  Q   Were you able to – did you – were you ever produced

10  the entire data setup?

11  A   No, it was not entirely available because we didn't

12  understand or have any access or visibility into some

13  platforms, Facebook being one.  The second is really

14  Infowars.com and the websites.

15  Q   And does that – is that the type of thing that

16  prevents you from giving us a estimate as the total reach of

17  Alex Jones Sandy Hook lies across all platforms?

18  A   Yes.

19  Q   Okay.  But you – did you – did you try to ascertain

20  the minimal reach based on the information that you had?

21  A   Correct.  For the information we could gain we did

22  come up with an estimated minimum reach.

23  Q   Okay.  And that was – I think you said that it was

24  based on Facebook, Youtube and Twitter.

25  A   Correct.

26  Q   And you didn't have – did you have all the

27  information for all those sites or did you have to project –

1   make certain projections?

2           ATTY. PATTIS:  Asked and answered at this point,

3       Judge.

4           ATTY. KOSKOFF:  This - it's complicated so I'll

5       rephrase it.

6           THE COURT:  Overruled.

7   BY ATTORNEY KOSKOFF:

8   A   For Youtube we used the Way Back Machine to look for

9   videos related to Sandy Hook that were put out by Alex Jones

10  and Free Speech Systems.  They - we then looked at those

11  counts.  That's how we came up with the estimate for

12  Youtube.  And that's a bear minimum count because we know

13  that more people could have watched it after that, we just

14  have no way of looking at it.  And it's only the videos we

15  could service on the Way Back Machine.

16  Q   Okay.  And in terms of - we've showed the jury Info

17  Wars content and can you just describe for the jury what

18  type of website Infowars.com is in terms of its scale as an

19  original website?

20  A   Yes, due to the duration that it's been in existence,

21  it has created an enormous direct traffic, meaning while

22  social media redirects some people to the website, many

23  people go directly to the website.  And you can see that in

24  Google Analytics, some of the (inaudible) we showed you it

25  says direct, that means someone went directly to

26  Infowars.com.

27  Q   And is that - is it unusual or is there anything

1    unusual about the degree to which Info Wars gets direct

2    traffic in terms of the types of –

3       A    Yes.  Based on my experience evaluating websites,

4    Infowars.com gets a very high percentage of direct

5    engagement to the website.  Meaning people come there for

6    the information, it's not – they're not routed there through

7    social media.

8       Q    And can you – did you and your team maybe quantify

9    that?

10       A    We couldn't get any real estimates other than the

11   Google Analytics pages we already reviewed.

12       Q    Okay.  And so – and you were – did not have the

13   direct content from – or the direct data from Infowars.com

14   to factor in this question about determining the total reach

15   of Alex Jones Sandy Hook lies across all platforms.

16   Correct?

17       A    Correct.

18       Q    Okay.  And then what about – is that also true for

19   Prison Planet, one of its sister sites?

20       A    Correct.

21       Q    All right.  And what about radio, do you have

22   significant data from radio?

23       A    Radio I had no significant data.

24       Q    Okay.

25       A    Other than the media kits that were provided.

26       Q    All right.  So now tell us about what you and your

27   team did in terms of trying to come up with at least a

1  minimum projection based on what the platforms that we spoke

2  of, Youtube, Twitter, Facebook.

3    A  For those three platforms we did the following.  For

4  Youtube we went to the Way Back Machine, we looked for Sandy

5  Hook related content and then we aggregated the number of

6  views as a place in time.

7    Q  Okay, hang on one second.  Aggregate, what does that

8  mean?

9    A  That means we added the numbers together from every

10  snapshot that we could find related to Sandy Hook content.

11    Q  And how did you go about finding the content in the

12  first place?

13    A  We went to the Way Back Machine knowing that videos

14  been put out.  We then searched that to search snapshots on

15  Youtube.

16    Q  Okay.  And you – aggregated means you added the views

17  and the time together?

18    A  For each video.

19    Q  Okay, all right.  And that's – is that a complicated

20  thing or not?

21    A  It's time consuming and – and takes quite a bit of

22  time to find all those and know that you have come close to

23  finding as much of the information as you can.

24    Q  Okay.  So it's time consuming but is it particularly

25  complicated?

26    A  No.

27    Q  Okay.  So – and then in terms of Twitter – sorry, and

1   what were - what were those numbers?

2       A   It was just over nine million views that we could

3   speak to just the minimum number of views for Sandy Hook

4   related content on Youtube.

5       Q   For a period of time?

6       A   Over a period of time.

7       Q   Okay.  And in terms of Twitter, how did you go about

8   calculating Twitter or these views?

9       A   For Twitter we used the Sprout Social data that was

10  provided.  We went back through and looked at what was the

11  number of views on days where Sandy Hook related content was

12  discussed on Info Wars.

13      Q   Okay.  And is this a rough science or -

14      A   It's as close as we can get.

15      Q   Okay.  And it was a time consuming enterprise as

16  well?

17      A   Yes.

18      Q   How do you - are we at the point where you searched

19  terms?

20      A   Yes.  At times we would use search terms to try and

21  figure out from the Sprout Social data and from just all of

22  Info Wars content over time, which days were related to

23  Sandy Hook.

24      Q   And did you hundreds and hundreds of search terms?

25      A   We did.

26      Q   And can you give the jury an example of what type of

27  search terms you would have used?

1    A    Sandy Hook actor crises, crises actor, different

2    combinations like that.

3    Q    Okay.  Did you have to use some of the plaintiffs'

4    names?

5    A    Yes.

6    Q    Okay.  And through a combination of using those

7    search terms and Twitter or Sprout –

8    A    Sprout Social.

9    Q    Thank you, Sprout Social, you were able to come up

10   with a number, an estimate?

11   A    Yes.

12   Q    And what was that?

13   A    It came in right around 100 million in terms of

14   views.

15   Q    Okay.  And then in terms of – now what about

16   Facebook?  You didn't have – you didn't have the Facebook

17   data, I think you said –

18   A    Correct.

19   Q    – engagement.  So how did you go about calculating

20   Facebook?

21   A    In one of the charts from Google Analytics, it's

22   called a flow chart.  It had the redirect, meaning when did

23   social media direct back to Infowars.com.  And based on that

24   we were able to build a rough estimate of if this many

25   Twitter tweets essentially redirected back to Info Wars, you

26   could see the ratio of how many from Facebook redirected

27   back.

1    Q    And just in terms of your experience in this area

2  for, what was it, almost 20 years looking at social media

3  and networks and things like that.

4    A    2005 to present, 17.

5    Q    Can you just give the jury kind of a scale of

6  Facebook as it compares to like Youtube or something?

7    A    Facebook has an enormous reach.  If your moving

8  content and creating dialog and discussion, if you're

9  getting it onto channels, which are pages on Facebook, or if

10  you're trying to build an audience, Facebook is the primary

11  platform for that.

12    Q    And again, the projections you're making are for the

13  years 2012 to 2018.  Right?

14    A    Correct.

15    Q    Okay.  And – and so is Facebook – is Facebook larger

16  than Youtube in its reach?

17    A    Far larger.

18    Q    And twitter?

19    A    Yes.

20    Q    Okay.  So I think the document – so did you have to

21  make some estimations or projections based on data that you

22  did have to determine the Facebook reach?

23    A    That is correct.

24    Q    All right.  I think you talked about a flow chart.

25  Why don't we bring that up, Exhibit 454 for the jury?

26              THE CLERK:  That is not a full exhibit.

27              ATTY. KOSKOFF:  It's not a full exhibit?

1          ATTY. PATTIS:  I didn't hear a foundation,

2      Judge.  I have to hear a foundation.

3          ATTY. KOSKOFF:  Okay, we move to introduce 454

4      as a full, it's a flow chart that was testified to by

5      the witness.

6          THE COURT:  Objection, lack of foundation.  So

7      can you lay a foundation?

8          ATTY. KOSKOFF:  This was one of the handful of

9      Google documents that they produced.

10          ATTY. PATTIS:  I still haven't heard a

11      foundation, Judge.

12          ATTY. KOSKOFF:  It's just been identified.

13  BY ATTORNEY KOSKOFF:

14    Q   Is it up on your screen, sir?

15    A   Yes.

16    Q   Is that the Google document that you used to

17  evaluate – to make your projection as to the reach of

18  Facebook during the calendar years 2012 to 2018?

19    A   Yes.

20          ATTY. PATTIS:  No objection, Judge.

21          ATTY. KOSKOFF:  Can we show that – I'd like to

22      show that to the jury.  Move to admit as full,

23      Attorney Ferraro.

24          THE COURT:  So ordered.

25          ATTY. KOSKOFF:  Thank you, Judge.

26  BY ATTORNEY KOSKOFF:

27    Q   So this is not helping right now because it's hard to

1    see.  Can we just blow that up?  Is this the document that

2    you used to help make this estimate?

3        A    Yes.  It shows the flow from social media to

4    Infowars.com.

5        Q    Okay.  So what are we looking at here in terms of –

6    please explain more about what – how you were able to

7    extrapolate these numbers by using this analytics?

8        A    Yes.  If you look to the left, the three social media

9    platforms that are listed from top to bottom are Facebook,

10   Twitter and Youtube.  Starting from Youtube, that's where we

11   started our foundation.  You'll see that it shows about 3.9

12   million redirects.  Then you'll see Twitter as 33 million,

13   and then you see Facebook is 151 million.

14            So what we did is we just created the ratio to make

15   the estimate.  Meaning we looked at if there is 33 million,

16   how does that relate to 151 million.  That's roughly five

17   times in terms of ratio.

18       Q    So you took the twitter numbers and you multiplied it

19   times five?

20       A    Yes.

21       Q    And is this in accordance – I mean this isn't the

22   first – how many times have you looked at data like this,

23   you and your team, in – for governments or for financial

24   institutions or those kinds of organizations?

25       A    I've looked at hundreds of these.

26       Q    Okay.  And is that – is that ratio consistent with

27   your experience?

1   A   It depends on who the audience is receiving this.

2   Facebook is very high for this audience.

3   Q   Okay.  And we saw that – I believe we just saw the

4   pie charts –

5   A   Correct.

6   Q   Okay.  And so if you can tell us then or we can – oh,

7   I want to ask you this.  Right down in the – what are these

8   analytics showing right under the 178 million starting

9   sessions there?

10   A   Yeah, so in addition to just lands on Infowars.com

11   it's also showing you specific pages which drew a

12   significant amount of traffic.  And so those are pages,

13   watch Alex Jones and then the one that we had actually

14   discussed earlier, which is regarding FBI, it says nobody

15   killed at Sandy Hook.  So that is in and of itself just in

16   terms of redirects, 2.8 million.

17   Q   So does this – what is the significance of this

18   evidence in relationship to the degree to which Sandy Hook

19   played a prominent – not prominent role in the growth of

20   Info Wars since December 14th, 2012?

21   A   From this chart alone, you can see that it's one of

22   the top five landing pages across all the Info Wars

23   platform.

24   Q   Okay.  And in fact, it's about – it's not in fact –

25           ATTY. PATTIS:  Objection, leading.

26   BY ATTORNEY KOSKOFF:

27   Q   Is it – okay, so withdrawn.  Down at the – it says 12

1    more pages.  So what does that mean, 12 more pages, 6

2    million?

3        A    Meaning adding 12 pages together the way to interpret

4    this, it comes to 6 million.

5        Q    Okay.  And the FBI says Sandy Hook article with the

6    story is almost half of that next 12?

7        A    Yes.

8        Q    Okay.

9        A    That's from social media redirect to Infowars.com.

10       Q    Okay.  We can take that down.  So let me ask you now.

11   You shared with us the methodology you just went over in

12   which you arrived at a projection.  Is that the methodology

13   you and your team used?

14       A    Yes.

15       Q    Okay.  So let me ask you, can you tell us to – what

16   your conclusions were about what a minimum reach was based

17   on these three platforms, the information you learned from

18   these three platforms of Alex Jones Sandy Hook lies across

19   these three platforms?

20       A    Adding together Youtube, Twitter and the Facebook

21   calculation together just related to lies about Sandy Hook,

22   the minimum audience that we could measure was 550 million

23   off just social media.  That doesn't include any – any

24   individuals that were going straight to the website.

25       Q    No Info Wars, no Prison Planet, not radio, no other

26   avenues of getting the information?

27       A    Correct.

1    Q    Okay.  And the time period of that was between what?

2    A    I - 2012 to 2018.

3    Q    Okay.  Thank you, very much.  I appreciate it.

4    A    Thank you.

5          THE COURT:  Attorney Pattis, cross examination?

6          ATTY. PATTIS:  Thank you, Judge.  May we

7    approach, Your Honor?

8          THE COURT:  You may.

9          (A sidebar conference took place.)

10         ATTY. PATTIS:  We're not going to finish today.

11   I don't know what that does.  And I'm told he won't

12   be able to be back tomorrow.  Is that right?

13         ATTY. KOSKOFF:  (Inaudible).

14         ATTY. PATTIS:  No, I'm ready to go, I just

15   wanted to make sure that you were aware of it.

16         THE COURT:  I will explain to the jury

17   (inaudible)

18         ATTY. PATTIS:  Perfect.

19         THE COURT:  (Inaudible).

20         ATTY. PATTIS:  May we have an order that he is

21   not to discuss his testimony during the pendency of

22   the cross examination?

23         THE COURT:  What?  I've never heard that.

24         ATTY. PATTIS:  It's routine in criminal cases.

25   I know we're not in Criminal Court (inaudible).

26         THE COURT:  I can tell him not to talk to your

27   clients or your witnesses.

1      ATTY. PATTIS:  We're in the middle of cross

2   examination.

3      THE COURT:  Yeah.  But listen, I'm going to tell

4   the jury though that he'll be back on Friday.  Right?

5      ATTY. PATTIS:  Yes, ma'am.

6      ATTY. KOSKOFF:  You can describe that that

7   happens from time to time with experts.

8      THE COURT:  Yes.

9      ATTY. KOSKOFF:  Sorry, Judge.  This is my first

10   trial.

11      THE COURT:  This isn't my first trial either.

12   Right?  Okay.

13      I'm actually going to tell the jury about the

14   sidebar we just had so that they can know what's

15   coming down the pike.

16      So we're – Attorney Pattis will start with his

17   cross examination of this witness now.  We are going

18   to end at 4:30 today.  Hopefully if I lose track of

19   the time, Mr. Ferraro, you will let me know.

20      And then we are going to pick this witness'

21   testimony up on Friday.  Okay?

22      This is routine in cases.  Not anything unusual

23   about it, nothing for you to worry about.  But just

24   so that you know, we'll go to 4:30, leave a little

25   early today and then we'll see Mr. Watts again on

26   Friday.  Okay?

27      All right.  Whenever you're ready, Attorney

1      Pattis.  Take your time.

2           ATTY. PATTIS:  Thank you, Judge.

3   CROSS EXAMINATION BY ATTORNEY PATTIS:

4      Q   Good afternoon, Mr. Watts.  How are you?

5      A   I'm good.

6      Q   My name is Norm Pattis.  We've never met before?

7      A   No, not that I'm aware of.

8      Q   And you – I'd like to thank you for your service

9   obviously in the military.  You've written a book called

10  Messing with the Enemy, Surviving in a Social Media World of

11  Hackers, Terrorists and Fake News.  Correct?

12     A   Correct.  That's not the full title but, yeah.

13     Q   That's how it's listed on – well actually, you're

14  right.  Messing with the Enemy, Surviving in a World of

15  Media – in a Social Media World of Hackers, Terrorists,

16  Russians and Fake News.  That's how it's listed on the

17  website as foreign policy research –

18     A   Correct.

19     Q   And that's what it says on the dust jacket.  Correct?

20     A   Yes.

21     Q   And you were quite autobiographical in that book.

22  Correct?

23     A   Correct.

24     Q   You describe your reasons for going to West Point.

25  Correct?

26     A   Yes.

27     Q   You weren't quite big enough to make the football

1  team and got an interest in military history and told your

2  mother when you were about 15, I'm going to West Point.

3  Correct?

4     A   Yes.

5     Q   And you did go to West Point.

6     A   I did.

7     Q   And while you were at West Point there's a – is it a

8  fixed curriculum for all cadets there, sir?

9     A   For the first half of it, yes.

10     Q   And –

11     A   And then you chose your major.

12     Q   You also – yeah, that's right.  You get to pick a

13  concentration.  Correct?

14     A   Correct.

15     Q   So when you described it as a liberal arts education,

16  certainly it's a well-rounded education.

17     A   It is.

18     Q   The purpose is to support an officers more capable of

19  meeting – leading our military in whatever foreign challenge

20  we may face.

21     A   Yes.

22     Q   Would that be a challenge foreign or domestic?

23     A   For the military it's foreign.

24     Q   Well, when you take your oath –

25     A   The oath is foreign and domestic, yes.

26     Q   When you take your oath to protect and defend the

27  Constitution against – of the United States against all

1   enemies foreign and domestic.

2      A    Correct.

3      Q    Is Alex Jones a domestic enemy?

4      A    No.

5      Q    Now the – and West Point was a difficult curriculum.

6   Correct?

7      A    Yes.

8      Q    And it could be somewhat, I don't know if this is the

9   right term, brutalizing for a young cadet.  Correct?

10  There's a certain amount of hazing that goes on.

11     A    Correct.

12     Q    And the cadets get some frustration and have to work

13  that frustration out in a number of was.

14     A    Yes.

15     Q    And you wrote about your doing so.

16     A    I did.

17     Q    A fellow named Carpheze (phonetic) was a target of a

18  lot of your pranks.  Correct?

19     A    Correct.

20     Q    Carpheze was the person who operated the meat

21  purchasing –

22     A    Yes.

23     Q    – in the food service and you found a list of phone

24  numbers.  Correct?

25     A    Yes.

26     Q    And you impersonated other people at the institution

27  and gave Carpheze any number of messages, false messages.

1    A    I impersonated – yes, in his organization, yes.

2    Q    Yeah, in the hierarchy at West Point.  Correct?

3    A    Yes.

4    Q    Carpheze, bring me more meat patties, the kids are

5    starving up here, and then you'd hang up on him.  Correct?

6    A    Yes.

7    Q    And you tried to impersonate the voices of others so

8    that Carpheze would fall for it.  Correct?

9    A    Correct.

10   Q    And Carpheze ultimately said to you, words to the

11   effect of, why are you fucking with me like this?

12   A    Yes.  He didn't use that word but –

13   Q    What were you doing?

14   A    It was something as a prank joke that we did there.

15   Q    Okay, okay.  And certainly nothing in this case

16   suggests to you that anybody was involved in a prank joke.

17   Correct?

18   A    No.

19   Q    Now at West Point in the liberal arts portion of the

20   curriculum you read a number of classics.  Correct?

21   A    Yes.

22   Q    Including the Art of War by Sun Tzu.  Correct?

23   A    Different excerpts, yes.

24   Q    And you understood that in Sun Tzu's mind politics is

25   warfare by – and you also read Carl Von Clausewitz.

26   Corrects?

27   A    At different times, yes.

1    Q    And you recognize that Clausewitz relying on Sun Tzu

2  taught cadets politics is war by other means.  Correct?

3    A    Yes.

4    Q    And you in your career has come – have come to

5  realize that social media is politics by other means,

6  particularly (inaudible)dangerous form of politics.

7  Correct?

8    A    With respect to Russia in particular, yes.

9    Q    In the United States too.

10   A    Yes.  Not where I focus my energy but, yes.

11   Q    Well you've taken aim in your book on what you call

12  social media nationalist.  Correct?

13   A    Yes.

14   Q    And click bate populism.  Correct?

15   A    Correct.

16   Q    That undermines the intelligence, basically a crowd,

17  it's the people.  Correct?

18   A    Yes.

19   Q    It posses in your mind an existential threat to the

20  health and security of the republic.  Correct?

21   A    It can.

22   Q    It does.  Doesn't it?

23   A    I didn't say that.

24   Q    It's hard to know how to respond to social media.

25  Isn't it?

26   A    I don't know, it depends on each individual's

27  familiarity with social media.

1    Q   You wrote that on – that we want to have a free

2  exchange of ideas.  Correct?

3    A   Yes.

4    Q   But how to deal with that in a world of (inaudible)

5  and social media, that's the challenge that we don't know

6  how to meet yet.  Correct?

7    A   It depends on which country and which place.

8    Q   Well let's talk about the United States right here

9  right now.  Social media poses a threat to our civic norms.

10  Does it not?

11          ATTY. KOSKOFF:  Objection.

12  BY ATTORNEY PATTIS:

13    A   I didn't say that.  It can.

14          THE COURT:  Just wait.

15          ATTY. KOSKOFF:  Your Honor, objection.

16          THE COURT:  Basis?

17          ATTY. KOSKOFF:  Motions in limine – or it's

18       beyond the scope of what he's testified to.

19          ATTY. PATTIS:  It's getting –

20          THE COURT:  Well, why don't we go on and see

21       where we're going.  But this case is not about

22       politics.

23  BY ATTORNEY PATTIS:

24    Q   You knew about Info Wars before you were retained by

25  Attorney Koskoff and his firm in January of this year.

26  Correct?

27    A   Yes.

1     Q    And you wrote about Info Wars.  Correct?

2     A    I think I mentioned Info Wars at different times in

3  several things I've written over the years.

4     Q    You included criticism of it for being controversial.

5  Correct?

6     A    You'd have to reference what it is.  I don't have it

7  at my fingertips.

8     Q    Okay.

9     A    I've written – just for reference, I've written

10  several books and several hundred articles, so if you can

11  refresh my memory what you're pointing to.

12     Q    Well, one of the books you wrote was fiction.

13  Correct?  Real Fake, it's about 70 pages long.  That's your

14  effort to write fiction.  Isn't it?

15     A    It was –

16     Q    That's you.  Isn't it?

17     A    It was with a team, yes.

18     Q    That's you writing fiction.  Is it?

19     A    Yes, it was –

20     Q    What was the other book you wrote?

21     A    It was called Bug Bites.

22     Q    Called what?

23     A    Bug Bites.  It's the same series.

24     Q    Well that's another piece of fiction?

25     A    Yes.

26              THE COURT:  Sorry, I just need to make sure I

27         and the jury can follow.  Just make sure that we're

```
 1            not interrupting.
 2   BY ATTORNEY PATTIS:
 3      Q    So you wrote – you've written three books, the book
 4   on social media, World of Hackers, Terrorist –
 5      A    Can I correct you because that's not correct.
 6      Q    – and two pieces of fiction.  Correct?
 7      A    Okay.
 8                 THE COURT:  So I lost that question.  Do you
 9            mind –
10                 ATTY. PATTIS:  Let me try it again, I'll do it
11            again, Judge, and I'll slow down.  I'm sorry, it's
12            the end of the day.
13   BY ATTORNEY PATTIS:
14      Q    You've written three books.
15      A    No.  I wrote one book, I co-authored two others.
16      Q    You participated in the writing – well you told us
17   before about books, plural.  So you – these are the books
18   we're talking about.  Correct?
19      A    Yes.
20      Q    One book entitled, Messing with the Enemy, Surviving
21   in a Social Media World of Hackers, Terrorists, Russians and
22   Fake News.  That's nonfiction?
23      A    Correct.
24      Q    And two pieces of fiction that you wrote with others.
25   Correct?
26      A    Yes.
27      Q    Any other books?
```

```
1    A    No.

2    Q    You wrote a series of articles, maybe hundreds of

3    articles.  Correct?

4    A    Probably.

5    Q    You also worked with something called the Foreign

6    Policy Research Institute.  Correct?

7    A    Yes.

8    Q    Are you still there?

9    A    Yes, I'm still a Fellow there.

10   Q    You're not just a Fellow, you're a Distinguished

11   Fellow there.  Correct?

12   A    Correct.

13   Q    And you're also a Non-resident Fellow at the Alliance

14   for Securing Democracy.  Correct?

15   A    Correct.

16   Q    You're a National Security Consultant for NBC News.

17   Correct?

18   A    Yes.

19   Q    And for MSNBC?

20   A    NBC News, MSNBC, CNBC.

21   Q    How about Fox?

22   A    No.

23   Q    Why not?

24   A    I'm hired by NBC News.

25   Q    I didn't ask that.  Have you ever - you've never been

26   a commentator on Fox News?

27   A    I've been on Fox News.
```

1    Q    Okay.  Now among the articles that you wrote, you

2    wrote a recent article at least in April – well you wrote

3    something in April of 2022, Climate Change in National

4    Security.  Correct?

5    A    That was a podcast series.

6    Q    And –

7    A    Had a written header that went with the six – or

8    excuse me, three on climate change.

9    Q    You have a – have you ever – okay.  So you've never

10   written an article called, Climate Change in National

11   Security for Orbis?

12   A    I – yes, I contributed to it.  It was a part of a

13   bundle of podcasts, yes.

14   Q    You also wrote a piece in the Washington Post in 2018

15   called, Artificial Intelligence is Transforming Social Media

16   and American Democracy Survive.  You wrote that?

17   A    Correct.

18   Q    And you wrote something in January of 2018, Terrorism

19   in Social Media, is Big Tech Doing Enough.  Correct?

20   A    Yes.

21   Q    Was that a review of Shoshana Zuboff's book,

22   Surveillance Capitalism?

23   A    No.

24   Q    Do you know Shoshana Zuboff's work?

25   A    Vaguely, yes.

26   Q    You've not read it?

27   A    No.

1    Q    You've not read the Age of Surveillance Capitalism?

2    A    I've read about the book, yes.

3    Q    But you've not read it?

4    A    No.

5    Q    You know that –

6              (Inaudible, the parties spoke over each other.)

7              ATTY. KOSKOFF:  Hold on.  He doesn't have

8         knowledge, he hasn't read the book and now he's going

9         to talk about Shoshana Zuboff.

10             THE COURT:  He can ask the question, if he

11        knows –

12   BY ATTONREY PATTIS:

13   A    I understand the concept of surveillance capitalism,

14   yes.

15   Q    That wasn't my question, sir.  You know that Shoshana

16   Zuboff is a Professor at Harvard?

17   A    Yes.

18   Q    In the business school.

19   A    I – maybe, yes.  I just know she's affiliated with

20   Harvard.

21   Q    And surveillance capitalism, you say you're familiar

22   with the concept.  That overlaps – well withdrawn.  That is

23   a social media phenomena.  Is it not?

24   A    To some degree but not entirely.

25   Q    If it involves the use of anger to manipulate people.

26   Correct?

27   A    In – for surveillance capitalism?

```
1    Q    Yeah.

2    A    It can.

3    Q    And fear.  Correct?

4    A    It can.

5    Q    And demonization.  Correct?

6    A    Yes, it can be used.

7    Q    The concept is that by giving us access to social

8    media sites like Twitter, Facebook and whatnot for free,

9    we're actually giving something of value to those who offer

10   up these things for free. Correct?

11   A    It's a part of the agreement.

12   Q    We are making a digital footprint.  Correct?

13   A    Yes.

14   Q    That digital footprint yields with information about

15   us.  Correct?

16   A    It does.

17   Q    That information yields information about us that can

18   be used to manipulate us.  Correct?

19   A    It can be.

20   Q    Because it will target us based on what we fear.

21   Because what they draw – the ways these firms are designed

22   is they draw us in based on what attracts us and what

23   attracts us –

24   A    Yes.

25   Q    – is dispute, anger, demonization.

26   A    Yes.

27   Q    So and when you wrote your piece –
```

1          ATTY. PATTIS:  May I have a moment, Judge?

2          THE COURT:  Take your time.

3    BY ATTORNEY PATTIS:

4    Q   When you wrote your piece about big tech, were you

5    concerned about big tech's manipulation of the general

6    public based on its pedaling fear to harvest our data -

7    A   No, it was about -

8    Q   - to sell us things?

9    A   No.

10   Q   Okay.  Have you ever written about that?

11   A   About big tech or manipulators?

12   Q   About big tech as a manipulator harvesting our data

13   for free to manipulate us for commercial purposes?

14   A   The article was not in relation to that as the actor,

15   no.

16   Q   I didn't ask you about that article.

17   A   No.

18   Q   Have you ever written about it?

19   A   About big tech, as in the companies?

20   Q   Yeah.

21   A   The companies manipulating people?

22   Q   Yeah, exactly.

23   A   I've written about -

24   Q   You know exactly what I'm talking about.

25   A   I've written about how the platforms can be used to

26   manipulate people.

27          ATTY. KOSKOFF:  I'm sorry -

```
 1              THE COURT:  All right,
 2  BY ATTORNEY PATTIS:
 3     Q   Have you ever written –
 4              THE COURT:  Excuse me.  Thank you.  So I think
 5         that we just need to not interrupt each other.
 6              ATTY. KOSKOFF:  Right.
 7              THE COURT:  I think you're both interrupting
 8         each other.  So let's slow it down a little bit so we
 9         can follow.
10  BY ATTORNEY PATTIS:
11     Q   What have you written about big tech's manipulation
12  of us on the basis of negative emotions to sell us things
13  and control things?
14     A   Again, I don't think your question is stated in a way
15  that I can answer.
16     Q   Okay, then don't.
17     A   You're saying the actor is big tech.  I'm saying,
18  it's people that use technology to manipulate.
19     Q   You don't think people that own big tech companies
20  use technology to manipulate?  Is that your testimony, sir?
21     A   No.  I think they're trying to offer a service to the
22  public that they have some responsibility for how the
23  conduct of activity is on that platform.  But I'm not saying
24  that the companies are going and trying to do the
25  manipulation themselves.
26     Q   Really?
27     A   Correct.
```

1   Q   That's your sworn testimony under oath in this

2   courtroom?

3   A   I - I have not seen a company that's trying to

4   manipulate people from the corporate perspective.  You can

5   pick companies that use it.

6   Q   Okay, that's fine.  You've testified in Congress a

7   number of times.  Correct?

8   A   Correct.

9   Q   In 2015 you testified about Isis.  Correct?

10   A   Yes.

11   Q   In 2015 you testified about the Paris attacks

12   involving Charlie Hebdo.  Correct?

13   A   Yes.

14   Q   In 2016 you testified about Brussels terrorist

15   attack.  Correct?

16   A   Correct.  I believe -

17   Q   And you testified -

18   A   - it was 2016 for that.

19   Q   That's what - I thought I said that.  If I mistaken -

20   A   The previous one you said 2015.  I think all of those

21   were related to one hearing.

22   Q   Okay.  Let's - well, are you sure about that?  Have

23   you ever read your Wikipedia page, sir?

24   A   I have.

25   Q   And if your Wikipedia talks about your testifying

26   multiple times at US Congress and it lists one as the 2015

27   regarding Isis, another as the Paris attacks in 2015,

1    another as Brussels in 2016.  You think that your page is

2    wrong?

3        A    I know my page is wrong because you can go to the

4    edits on that page and you'll see that there have been many

5    manipulations on two include eastern European bots and IP

6    addresses.

7        Q    Oh, so the Russians are messing with you?

8        A    I don't know.  Are they?

9        Q    You tell me, you're the expert.

10       A    This I knew with the Wikipedia page, yes.

11       Q    So the bots are after ya, are they?

12       A    I didn't say that.

13       Q    What were you trying to suggest with that testimony,

14   sir?

15       A    I'm just saying that with regards to Wikipedia, you

16   asked me if I'd read it and I have.  I've also read where it

17   is manipulated as well.

18       Q    And you testified about Russian interference in the

19   elections in 2016.  Correct?

20       A    I testified in 2017 about the manipulations in 2016.

21       Q    Okay.  And you testified in 2017.  Didn't you?

22       A    Correct.

23       Q    And you've testified in front of the United States

24   Armed Services Subcommittee on cyber security.  Correct?

25       A    Correct.

26       Q    And among the topics you testified to at that

27   committee hearing was artificial intelligence in social

```
1   media.  Correct?

2      A   No.

3      Q   Russian black propaganda.  Correct?

4      A   Yes.

5      Q   While you were at West Point – well withdrawn.  I

6   guess I can ask it that way.  While you were at West Point

7   did you develop a view that propaganda was politics by

8   another means?  You remember the extension, politics is

9   warfare by another means propaganda social media is politics

10  by other means.  Did you develop that viewpoint at West

11  Point or thereafter?

12     A   Thereafter.

13     Q   Okay.  While you were at West Point – and you went

14  from West Point – I forgot when you graduated, was it 91?

15     A   No.

16     Q   What year?

17     A   No, 1995.

18     Q   Oh.

19     A   I'm not sure what my Wikipedia page says but 1995.

20     Q   I'm not asking about your Wikipedia page, I didn't

21  get it from there.  What year did you graduate from West

22  Point?

23     A   1995.

24     Q   Okay.  And you worked for the – you worked for the

25  FBI briefly.  Correct?

26     A   Yes.

27     Q   About a year.
```

1    A    Three times.

2    Q    You worked for the FBI briefly after graduating

3  college.  Correct?

4    A    No, after I left the army.

5    Q    Okay.  And you went to the army for 7 years.

6  Correct?

7    A    Correct.

8    Q    And then you went to the Monterey Institute of

9  International Studies.  Correct?

10   A    Correct.

11   Q    It's now I guess – did Middlebury College in

12  Vermont –

13   A    They were acquired by Middlebury.

14   Q    Were you at the Monterey Institute while – at the

15  time Middlebury purchased it?

16   A    No.

17   Q    Or acquired it.

18   A    After, after I had graduated.

19   Q    What did you study at the Monterey Institute?

20   A    International Security and Development.

21   Q    Now in the course of your education at West Point and

22  at the Monterey Institute, you became familiar with the

23  works of a German Sociologist named Max Weber.  Correct?

24   A    Yes, in graduate school.

25   Q    And you obviously read, I'm assuming you read his

26  essay, Politics is a Vocation.  Correct?

27   A    I don't recall.

1    Q    Do you recall his discussion –

2    A    I've read several of his works, I don't know which

3   ones.

4    Q    You recall his discussion of charismatic authority?

5    A    No.

6    Q    You don't?

7    A    I don't.

8    Q    What did you read (inaudible)?

9    A    It was 17 years ago at least, maybe 18, I'm not sure.

10   Q    So are you familiar with the distinction between

11   charismatic, bureaucratic congressional authority in Max

12   Weber's work?

13   A    No.

14   Q    Okay.  Now you testified earlier today about the

15   course of your career.  Was it 7 years you were in the

16   military?

17   A    Yes.

18   Q    When out to the FBI, went to Quantico.  Correct?

19   A    Correct.

20   Q    Spent four months at Quantico.  Correct?

21   A    And in Quantico, the four months you spent there,

22   that was for the training that all Agents receive.  Correct?

23   A    Truth.

24   Q    And upon completing that training, all Agents are

25   called Special Agents.

26   A    Correct.

27   Q    I mean it's not this so there's two classes of

1   Agents, every FBI Agent is special.  Right?

2       A    Correct.

3       Q    And among the things that – that you were taught in

4   Quantico, I think you told us that you did some work on

5   searches and seizures.

6       A    Yes.

7       Q    On the basics of the law regarding crimes and so

8   forth –

9       A    Correct.

10      Q    – and how to investigate?  And you developed some

11  comprehension of the Rules of Evidence.  Correct?

12      A    Yes.

13      Q    Because the purpose was for you to prepare for a

14  career as an investigator of crimes.

15      A    Yes.

16      Q    And the – among the other classes that you took at

17  the FBI was a class in preparing you how to testify in

18  situations like this in court.

19      A    Yes.

20      Q    But you've never testified as an expert in a

21  courtroom before.

22      A    No.

23      Q    Have you ever testified in a courtroom before at all?

24      A    No.

25      Q    So this is your first time?

26      A    As I said, yes, testifying.

27      Q    But not – you have testified before Congressional

1    Committees.  Correct?

2      A    Correct.

3      Q    And you've appeared at a number of other – you told

4    us about what's that, lecturing to or presenting to the Los

5    Angeles Police Department?

6      A    At times, yes.

7      Q    The New Jersey State Police.  Correct?

8      A    Correct.

9      Q    Dozens of police departments across the country.

10     A    Yes.

11     Q    Anywhere in Connecticut?

12     A    No.

13     Q    So this is your first time talking to folks in

14   Connecticut?

15     A    I believe so, yes.

16     Q    Welcome to (inaudible).  You testified to US

17   Intelligence Officers or agencies.  Correct?

18     A    I didn't testify to them but I've talked to them.

19     Q    Presented I should say.

20     A    Presented.

21     Q    US Military.

22     A    Yes.

23     Q    You've taught at the FBI.

24     A    Yes.

25     Q    And your work with respect to the Intelligence

26   Committee that you made a point of saying that sometimes the

27   testimony was not classified, it was open source.  Correct?

1    A    Correct.

2    Q    Other times it was classified.  Correct?

3    A    Testimony to the Congressional Committees?

4    Q    No, sir.  I'm sorry if I was confusing, it's late in

5    the day.  I thought I heard you say earlier today that you

6    presented to Intelligence Committee or Intelligence

7    Organizations in the United States.

8    A    Intelligence Organizations, yes.

9    Q    And with – in response to a question Attorney Koskoff

10   asked you, you said some of that testimony was open source.

11   Correct?

12   A    Not testimony but yes, briefings and presentations

13   I've given are open source.

14   Q    Briefings statements.

15   A    Yes.

16   Q    Some of those briefings were confidential.  Correct?

17   A    Yes.

18   Q    Have you ever heard the expression, deep state

19   before?

20   A    Yes.

21   Q    What does that mean to you, sir?

22   A    Usually it's a reference, a derogatory one towards

23   the belief that there is a secret or a deep state or a

24   separate state that's running the government.

25   Q    Why do you say it's derogatory?

26   A    It's generally used to say that it's not an official

27   capacity.

1 Q I see.  Or sometimes it's used to say it is an

2 official capacity but there are secrets our government keeps

3 from us.  Correct?

4 A If they are classified, yes.

5 Q And you keep some of those secrets from us if you

6 believe them to be classified.  Correct?

7 A Yes, correct.

8 Q Have you ever read a book by a woman – in the course

9 of your studies and preparing to testify here, a book by a

10 woman named Anna Merlin called Republic of Lies?

11 A No.

12 Q Have you ever heard of the book?

13 A No.

14 Q Have you made any effort to read or read at all any

15 of the scholarly work on conspiracy theories authored by

16 social scientists?

17 A Yes, over the years.

18 Q Joseph Uscinski's work?

19 A No.

20 Q Okay, whose?

21 A Defonda I think is his name.

22 Q Okay.  Now you testified –

23 A The others – if I can just add to it.  The others

24 would be in a military context, military manuals that you

25 would read.

26 Q What's the military teaching you about conspiracy

27 theories?

1    A    Not about conspiracies, just about information.

2    Q    Okay.  My question may have been overly broad and I

3    apologize.  I'd asked you if you made any effort to read the

4    scholarly work on conspiracy theories in American light.

5    And –

6    A    Correct, Defonda's the only one that I can recall off

7    the top of my head.  I'm sure I've read other articles over

8    time.

9    Q    So when you get the call to prepare to testify

10   against – withdrawn.  You get the call to prepare to testify

11   as an expert in a case involving Alex Jones.

12   A    Correct.

13   Q    You were familiar with him and Info Wars when you got

14   the call.

15   A    Yes.

16   Q    You knew him to be a conspiracy theorist.  Correct?

17   A    I believe he advances conspiracies, yes.

18   Q    Did –

19        ATTY. KOSKOFF:  Objection, Your Honor.  It's not

20        a conspiracy theory, it's a lie.

21        THE COURT:  I didn't hear what you said.  What's

22        the basis?

23        ATTY. KOSKOFF:  We're not –

24        ATTY. PATTIS:  We're not -

25        (Inaudible, the parties spoke over each other.)

26        ATTY. KOSKOFF:  It's a lie, we established it's

27        a lie.

1           THE COURT:  Well I didn't hear a word either of

2      you just said.

3           ATTY. KOSKOFF:  Sorry, Your Honor.

4           THE COURT:  So what was the basis for the –

5           ATTY. KOSKOFF:  It's a lie.

6           ATTY. PATTIS:  We're not talking about Sandy

7      Hook, we haven't even gotten there.

8           ATTY. KOSKOFF:  Why –

9           THE COURT:  Can you just start your question

10      over because I lost it now.

11  BY ATTORNEY PATTIS:

12   Q   Sir, you get the call from the Koskoff Firm to

13  testify –

14   A   Correct.

15   Q   – about Alex Jones in January of this year.  Correct?

16   A   Yes.

17   Q   You knew a little bit about Info Wars because you've

18  written about it before.  Correct?

19   A   Yes, I'm sure I've written about it at some point.

20   Q   And you knew when you got the call that Alex Jones

21  was a conspiracy theorist.  Correct?

22   A   I knew what Alex Jones says, yes.

23   Q   Did you ever study him –

24   A   I knew what he said.

25   Q   – as part of your work with the FBI?

26   A   No.

27   Q   Had you ever studied him as part of your work for an

1    Intelligence Committee that you can talk about?

2       A    No.

3       Q    Okay.  So did you make any effort to understand him

4    in the context of American inautural (phonetic) history,

5    American life by reading scholarly works, trying to figure

6    out, who is this guy, what's this all about, independent of

7    Sandy Hook?  Did you make any effort to do that?

8       A    No, that was not the context of why I was brought on

9    to this.

10      Q    No, the context was to attack him in this sea of

11   lies.  Correct?

12                ATTY. KOSKOFF:  Objection.

13                THE COURT:  Sustained.

14   BY ATTORNEY PATTIS:

15      Q    Now you mentioned that you had a company, Miburo?

16      A    Miburo, yes.

17      Q    Miburo.  Where did that name come from, it's an

18   interesting name?

19      A    It's a Japanese name for a ronin samurai, it was a

20   group of ronin samurai.

21      Q    Okay.  Who did you sell the company to?

22      A    Microsoft.

23      Q    Okay.  Are you independent working now, working

24   independent?

25      A    No, I'm fulfilling – this is my last role with Miburo

26   right now.

27      Q    So was it Miburo and Microsoft that was retained to

1   represent –

2   A    No.

3   Q    – for – it was you?

4   A    Me.

5   Q    So how is it that testifying here fulfills your last

6   obligation for Miburo?

7   A    Because the acquisition has happened since I was

8   brought on by counsel.

9   Q    And you thus far generated fees of about $185,000?

10  A    No, 158, I said this morning.

11  Q    I'm dyslexic, thank you.  Had you been paid those

12  fees yet?

13  A    The 158, yes.

14  Q    Who paid them?

15  A    Koskoff.

16         ATTY. PATTIS:  May I have a moment, Judge?

17         THE COURT:  Take your time.

18  BY ATTORNEY PATTIS:

19  Q    How much time – withdrawn.  Who at the Koskoff firm

20  called you to ask you to consider testifying in this case?

21  A    Alinor Sterling was the first person.

22  Q    And were there – was there more than one conversation

23  before you decided to take on the challenge?

24  A    No, I think it was on the second conversation I

25  agreed to it.

26  Q    And was this with Alinor, with Attorney Sterling,

27  excuse me?

1    A    Attorney Sterling, yes.

2    Q    What did she tell you about Sandy Hook in that first

3    conversation?

4    A    She told me the situation with the trial, that it was

5    with respect to damages and they were looking to assess the

6    volume and reach of Infowars.com, all of the social media

7    sites and handles that they're broadcasting on related to

8    Sandy Hook and different lies that were spoken.

9    Q    And then what – how much time passed between the

10   first conversation with Attorney Sterling and the second?

11   A    I don't know off the top of my head, a few days or a

12   week.

13   Q    And you decided you're in?

14   A    Yes, this would have been January, 2022.

15   Q    And what was your rate structure?

16   A    It was by hour, so it was based on the hours of

17   myself and my research team.

18   Q    Your hourly rate?

19   A    I believe is 935 I think.

20   Q    935?

21   A    Correct.

22   Q    You get more for testifying in court?

23   A    No.

24   Q    Okay.  She told you it was about damages?

25   A    That this was a second phase of the trial.  That it

26   was with respect to the trial had already had been in

27   process and were trying to assess.

1    Q    Okay.  That's what she told you?

2    A    No, it was trying to understand the scope and that

3    this is in terms of how the case would end.

4    Q    She –

5    A    I don't remember the exact words from January.

6    Q    Yeah, I got it.  But you understand this is a hearing

7    in damages?

8    A    I understood it to be that, yes.

9    Q    Where the plaintiffs have to prove the damages that

10    they're – that the jury should award them.  Correct?

11    A    The plaintiffs have to present a case and the jury

12    decides.

13    Q    Have you given this jury any information they can use

14    to calculate damages for any plaintiff?

15            ATTY. KOSKOFF:  Objection, Your Honor.  That's

16        a –

17            THE COURT:  Sustained.

18    BY ATTORNEY PATTIS:

19    Q    Now I gather than when you realized that you were

20    coming into a hearing in damages, your focus was on the harm

21    that Alex Jones and Info Wars caused these plaintiffs.

22    Correct?

23            ATTY. KOSKOFF:  Objection, Your Honor.

24            THE COURT:  Overruled.

25    BY ATTORNEY PATTIS:

26    A    My focus was on the internet traffic related to the

27    content that he produced and the social media reach.

1    Q    You testified earlier that you did – you used a

2  number of search terms in the course of your work.  Correct?

3    A    Correct.

4    Q    And there were actually 441 of those searches or –

5    A    Correct.

6    Q    – keywords and search terms are synonyms.  Correct?

7    A    Yes.

8    Q    Different words expressing the same concept.  Right?

9    A    Yes.

10    Q    Did you run the names of each of the plaintiffs in

11  this case in that search term?

12    A    I would have to go through the list to review.

13    Q    You don't recall?

14    A    I don't recall every single name.

15    Q    Do you recall seeing any other names like Robby

16  Parker in an Info Wars or Alex Jones broadcast?

17    A    I would have to review the data to know.

18    Q    You didn't do so before coming to court?

19    A    I reviewed the data but it was – there was a lot of

20  it.

21    Q    You understood you are here to testify in a hearing

22  in damages?

23    A    Yes.

24    Q    You had a duty to investigate, to inquire and be

25  thorough.  Correct?

26    A    Correct.

27    Q    Did you bring any notes with you to summarize

1   anything?

2      A   I did not.

3      Q   Your work early in your career in the military and in

4   intelligence was focused largely on the Middle East.

5   Correct?

6      A   For me Middle East and Africa.

7      Q   North of the horn of Africa.

8      A   Correct.

9      Q   And describe for the jury where the horn of Africa

10  is.

11     A   Those would be the countries furthest to the east,

12  namely Somalia, Kenya were the two.

13     Q   And that was an interest you acquired at Monterey I

14  believe.  Correct?

15     A   Correct.

16     Q   You went from the Military Academy you fulfilled your

17  service obligation, you went to the FBI stayed a year, went

18  to graduate school and you had an advisor I believe, who was

19  interested in that topic.

20     A   Yes.

21     Q   Were you an Arabic speaker at that time?

22     A   No.

23     Q   Are you now?

24     A   No.

25     Q   And you were first - it was through your fucus on

26  groups with a substantial nexus to countries in the horn of

27  Africa that you first became aware of how effective social

1   media could be to contact, recruit and basically weaponize

2   individual.  Correct?

3     A   Yes.

4     Q   And when you developed that interest you realized

5   that social media represented one phase of electronic

6   communication in a digital world, it replaced the internet.

7   Correct?

8     A   No.

9     Q   Well, I think what you told us earlier, in the

10   internet you find content and in the social media world

11   content finds you.

12     A   Correct.

13     Q   Does that make social media a qualitatively more

14   effective way of influencing large groups of people?

15     A   The work symbiotically, so if you do both it is more

16   effective.

17     Q   And one of the things that you focused on in your

18   work was the fact, and in fact you wrote about this in your

19   book.  The Islamic State overtook Al Qaeda because it was

20   better at using social media.  Correct?

21     A   I believe that to be correct, yes.

22     Q   And you likened social media - you likened Islamic

23   State's social media to – to group with an American

24   politics.  Didn't you?

25     A   The way that it was used, yes.  Meaning that

26   regardless of what the organization is, the methods for use

27   of which I referred to earlier were very consistent.

1    Q    And the groups that you likened to Al Qaeda, those

2  were groups located to the right of the political spectrum.

3  Correct?

4    A    In the book?

5    Q    Yeah.

6    A    I address two different generations of use of it on

7  both sides of the political aisle.

8    Q    What was the one on the left?

9    A    The Obama presidential campaign was known for its

10  being very dynamic in social media.

11    Q    Were they terrorists?

12    A    No.

13    Q    Were they hackers?

14    A    No.

15    Q    Were the republican party?

16    A    No.

17    Q    Now I assume when you got the call in January of 2022

18  to become an expert in this case you already heard of Sandy

19  Hook.

20    A    Correct.

21    Q    And you understood that you would be called upon to

22  testify.

23    A    Yes.

24    Q    And that you were – your intention obviously was to

25  review all the material you were provided from whatever

26  source.  Correct?

27    A    Yes. A

1   Q   And you weren't limited to what you were provided.

2   You also talked about doing searches of your own.  Correct?

3   A   Right, to identify missing data, yes.

4   Q   Did you do any other searches to place this case in

5   context?  For example, there's a reporter at the New York

6   Times named Elizabeth Williamson who wrote a book, Sandy

7   Hook an American Tragedy in the Balance of Truth.

8   A   Correct.

9   Q   Did you read that book?

10  A   Yes, I did.

11  Q   And she's here in the courtroom today.  Have you

12  talked to her today?

13  A   I did.  She introduced herself.

14  Q   You understand that this trial is not a chapter in

15  "Battle for Truth", it's a hearing in damages.  You

16  understand that?

17  A   Correct.

18  Q   Can we see Exhibit 1E, Mr. Bruce.

19          THE CLERK:  That is a full exhibit, Your Honor.

20          THE COURT:  Thank you.

21  BY ATTORNEY PATTIS:

22  Q   While that gets T'd up, what is a meme, sir?

23  A   It would –

24  Q   M-e-m-e?

25  A   It would be a short video that expresses some sort of

26  context around an event.  And usually they go viral, meaning

27  they're posted onto the internet.  Other people enjoy the

1  meme or take the meme or try to recreate a similar meme with

2  their own content.

3      Q    And it's not just a video, they can be words or catch

4  phrases.

5      A    It could words, it can be images, it can be videos.

6      Q    And one of the exhibits that was played today, I

7  heard the words, the answer to 1984 is 1776.  Did you hear

8  that today?

9      A    I'm not familiar with that.  Could you say that

10  again?

11      Q    You never heard the expression from Alex Jones or

12  anyone associated with him in the material that you

13  reviewed, the answer to 1984 is 1776?  Is that your

14  testimony?

15      A    Yes, I have heard that phrase.

16      Q    And you associate with Alex Jones?

17      A    I don't know that I would but…

18      Q    Okay.  Is that the sort of thing that would inspire

19  anger?

20      A    I'm confused by your question.

21      Q    You talked before in response to questions by

22  Attorney Koskoff.

23              ATTY. PATTIS:  May I have a moment, Judge?

24              THE COURT:  Take your time.

25  BY ATTORNEY PATTIS:

26      Q    About a message.

27      A    Correct.

1    Q    And the message might inspire fear.  Correct?

2    A    Correct.

3    Q    It might inspire anger.  Correct?

4    A    Yes. A

5    Q    It might demonize people.

6    A    It could.

7    Q    And in an effective message mobilizes people around

8    the negative emotions.  Correct?

9    A    That is one way to effective messaging.

10   Q    And so the answer when you hear the expression, the

11   answer to 1984, is that – does the year 1984 inspire any

12   thoughts as you sit here?

13   A    I'm assuming it relates to Orwell's book 1984.

14   Q    So George Orwell wrote what's called a dystopian

15   piece of fiction.  Correct?

16   A    Correct.

17   Q    About a world in which government controlled

18   everything regarding information.  Correct?

19   A    Yes.

20   Q    And lies became a way of life.  Correct?

21   A    In the book, yes.

22   Q    And that dystopian piece of fiction and the

23   protagonist, the hero was a man who just wanted his own

24   individual significance, he didn't want to buy the lie.

25   Correct?

26   A    It could be seen as that as one theme, yes.

27   Q    When you hear, the answer to 1984 is 1776, does that

1   sound like an appeal to anger or an appeal to fear?  Do you

2   draw a distinction between that?

3                ATTY. KOSKOFF:  Objection, Your Honor.

4           Objection, Your Honor.

5   BY ATTONREY PATTIS:

6       A   I've not spent much time thinking about that.

7                THE COURT:  Hold on just one second, sir.

8                ATTY. KOSKOFF:  We didn't talk about 1984 or

9           1776 or any other date other than the dates we talked

10          about, December 14th, 2012.

11               THE COURT:  Are you objection beyond the scope

12          or relevance or what?

13               ATTY. KOSKOFF:  Absolutely, well both.

14               ATTY. PATTIS:  It was raised in one of the

15          videos.

16               THE COURT:  I'll allow it, overruled.

17               ATTY. KOSKOFF:  He said he didn't – he said he

18          didn't – the witness – there's no foundation of when

19          he said he didn't hear it.  Now –

20               ATTY. PATTIS:  It's for the jury.

21               ATTY. KOSKOFF:  With what, to what –

22               THE COURT:  I'm going to overrule the objection.

23   BY ATTORNEY PATTIS:

24      Q   Show us 1E, Mr. Bruce, please.

25               (A video clip was played.)

26               MR. JONES:  They can hit the ground running and

27          build up and I said, this is the attack.  Look,

1        people got to find the (inaudible) these last two

2        months.  I said, they are watching attacks, they're

3        getting ready, I can see them warming up with Obama.

4        You know, they got a bigger majority in the commerce

5        now in the senate.  They are going to come after our

6        guns –

7             ATTY. PATTIS:  Okay, stop it.

8    BY ATTORNEY PATTIS:

9        Q    And you don't know who they are.

10       A    No, not based on this clip.

11       Q    But you're an experienced analysist.  Correct?

12       A    Yes.

13       Q    Educated at West Point.  Right?

14       A    Yes.

15       Q    And the institution now owned by Middlebury.

16   Correct?

17       A    Yes.

18       Q    Have you drawn any conclusions about who they might

19   be?

20       A    Just in the context of this, I believe he mentions

21   President Obama at one point.  I think it's in this clip.

22       Q    And globalists too.  Correct?

23       A    Globalists, yes.

24       Q    Can you play that again, John, or I mean start it

25   over, start it up again?

26             (A video clip was played.)

27             MR. JONES:  They can hit the ground running and

1        build up and I said, this is the attack.  Look,

2        people got to find the (inaudible) these last two

3        months.  I said, they are watching attacks, they're

4        getting ready, I can see them warming up with Obama.

5        You know, they got a bigger majority in the commerce

6        now in the senate.  They are going to come after our

7        guns, look for mass shootings.

8              ATTY. PATTIS:  Can you stop right there?

9   BY ATTORNEY PATTIS:

10     Q   And again, is that him appealing to anger or fear?

11     A   Yes.

12     Q   Which one?

13     A   He's trying to appeal the anger I believe in this.

14   He's claiming that this was premediated.

15     Q   Okay.  Maybe fear too?

16     A   It's usually more than one but yes, it could be fear

17   and anger.

18     Q   And anger is the flip side of fear.  Isn't it?

19     A   I don't know, it's your opinion.

20     Q   Actually it's not.  How much – did you bother – did

21   you get around to Aristotle's ethics at the Military

22   Academy?

23     A   I probably did somewhere in the neighborhood of 30

24   years ago.

25     Q   Not since?

26     A   No.

27     Q   Play the video again, John.

```
1                    (A video clip was played.)
2                    MR. JONES:  They can hit the ground running and
3               build up and I said, this is the attack.  Look,
4               people got to find the (inaudible) these last two
5               months.  I said, they are watching attacks, they're
6               getting ready, I can see them warming up with Obama.
7               You know, they got a bigger majority in the commerce
8               now in the senate.  They are going to come after our
9               guns, look for mass shootings.
10  BY ATTORNEY PATTIS:
11     Q   Go ahead John, please.
12                   (The video clip continued.)
13                   MR. JONES:  And then magically it happens.  They
14              are coming, they are coming, they are coming.
15              They've already taken over –
16  BY ATTORNEY PATTIS:
17     Q   They are coming, they are coming, they are coming.
18  Are those words that – are those words designed to appeal to
19  anger or fear or both?
20     A   Both.  Based on the image, both.
21     Q   But you don't know who they are.
22     A   It's not defined in this segment.
23     Q   You haven't reached any conclusions based on your
24  review of the material?
25     A   No.
26     Q   Do you think that Alex Jones genned up all these
27  viewers just by talking or in other words, did Alex Jones
```

1    gen up all the fear that attracted people to him or is he

2    appealing to something that people feel in the world and

3    then respond to it?  Do you know?

4    A    I don't know why viewers watch Alex Jones.

5    Q    Millions do though.

6    A    Yes.

7    Q    And they're a threat what they can do, that's a

8    threat to democracy.  Correct?  It's a part of social media

9    nationalism and click bate populism.  Isn't it?

10            ATTY. KOSKOFF:  Objection.

11   BY ATTORNEY PATTIS:

12   A    I didn't say that.

13            THE COURT:  Overruled.

14            ATTY. KOSKOFF:  Objection.

15            THE COURT:  Overruled.

16   BY ATTORNEY PATTIS:

17   Q    Some things are worthy of fear.  Are they not?

18   A    I'm not sure what the context of this is but, yes,

19   people can be scared.

20   Q    Legitimately so.

21   A    They could be.

22   Q    People can be angry.

23   A    Yes.

24   Q    Legitimately so.

25   A    Depends on what they see as legitimate.

26   Q    Others can be demonized.  Correct?

27   A    Correct.

1    Q    Legitimately so.

2    A    I didn't say that.

3    Q    Well when Paul Revere wrote from Concord to Lexington

4    saying the British are coming, the British are coming, the

5    British are coming, was he demonizing the British or was he

6    inviting them to tea?

7    A    He was sending a warning based on an invasion.

8    Q    And people were angry and afraid and they revolted.

9    Correct?  In 1776 we declared independence.  Correct?

10   A    Correct.

11   Q    And you're aware that for millions of Americans, that

12   sort of fight is brewing in the streets today.  Are you not?

13   A    No.

14            ATTY. KOSKOFF:  Objection.

15            THE COURT:  Sustained.

16            ATTY. KOSKOFF:  Move to strike Mr. Pattis'

17        comment.

18            THE COURT:  So ordered.  Let's move on.

19            ATTY. PATTIS:  I will.

20            THE COURT:  We can end here if you'd like.

21            ATTY. PATTIS:  That would be perfect.

22            THE COURT:  It's 4:25.

23            ATTY. PATTIS:  Thank you, Judge.

24            THE COURT:  Okay, so sir, we will see you back

25        on Friday.

26            I know that you know what the rules are.  Be

27        very careful when you leave the courthouse today to

1          avoid anyone associated with the case or any media.

2                Continue to make all reasonable efforts to avoid

3          any media coverage when you go home.

4                We'll start up promptly at 10 tomorrow.  Ron

5          will safeguard your notebooks and we will see you

6          then.

7                We are adjourned for the day.

8                (Court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
NO:  X06-UWY-CV18-6046436-S        :  SUPERIOR COURT

ERICA LAFFERTY                     :  COMPLEX LITIGATION DOCKET

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                  :  SEPTEMBER 20, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046437-S        :  SUPERIOR COURT

WILLIAM SHERLACH                   :  COMPLEX LITIGATION DOCKET

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                  :  SEPTEMBER 20, 2022
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
NO:  X06-UWY-CV18-6046438-S        :  SUPERIOR COURT

WILLIAM SHERLACH                   :  COMPLEX LITIGATION DOCKET

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES                  :  SEPTEMBER 20, 2022
```

C E R T I F I C A T I O N

    I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 20th day of September, 2022.

    Dated this 20th day of September, 2022 in Waterbury, Connecticut.

Shannon LeRoy
Court Recording Monitor