# EXHIBIT 33

```
 1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

 2   ERICA LAFFERTY        :  COMPLEX LITIGATION DOCKET

 3   v                     :  AT WATERBURY, CONNECTICUT

 4   ALEX EMERIC JONES      :  SEPTEMBER 21, 2022
     .......................................................
 5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

 6   WILLIAM SHERLACH      :  COMPLEX LITIGATION DOCKET

 7   v                     :  AT WATERBURY, CONNECTICUT

 8   ALEX EMERIC JONES      :  SEPTEMBER 21, 2022
     .......................................................
 9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10   WILLIAM SHERLACH      :  COMPLEX LITIGATION DOCKET

11   v                     :  AT WATERBURY, CONNECTICUT

12   ALEX EMERIC JONES      :  SEPTEMBER 21, 2022

13          BEFORE THE HONORABLE BARBARA BELLIS, JUDGE AND JURY

14   VOLUME III OF IV
     WITNESS:  CONTINUED EXAMINATION OF ERICA LAFFERTY 2:00 UNTIL
15   P.M RECESS

16   A P P E A R A N C E S:

17
        Representing the Plaintiffs:
18         ATTORNEY CHRISTOPHER MATTEI
           ATTORNEY ALINOR STERLING
19         ATTORNEY JOSHUA KOSKOFF
           ATTORNEY MATTHEW BLUMENTHAL
20

21
        Representing the Defendant:
22         ATTORNEY NORMAN PATTIS

23
                           RECORDED BY:
24                         KENDYL HENAGHAN
                           TRANSCRIBED BY:
25                         LINDA COON, RPR
                           Court Monitor/Court Reporter
26                         400 Grand Street
                           Waterbury, CT   06702
27
```

```
1              (IN SESSION)
2              THE COURT:  Good afternoon, marshal, good
3         afternoon, everyone.
4              Are we ready for the jury?
5              ATTY. MATTEI:  Yes, Your Honor.
6              Would you like Miss Lafferty to take the stand
7         now, Judge?
8              THE COURT:  Either way.  It doesn't matter.
9              ATTY. PATTIS:  While the jury is coming down,
10        can we do a sidebar?
11             THE COURT:  They are almost here.
12             ATTY. PATTIS:  Okay.
13             (JURY PANEL ENTER).
14             THE COURT:  Good afternoon, everyone.  Welcome
15        back.
16             I hope some of you got to enjoy the nice
17        weather.
18             Counsel stipulate that our entire panel has
19        returned?
20             ATTY. MATTEI:  Yes, Your Honor.
21             ATTY. PATTIS:  Yes.
22             THE COURT:  All right.  Please be seated.
23             ATTY. MATTEI:  Okay.  Miss Lafferty, can you
24        take the stand here?
25             THE COURT:  Absolutely.  Just watch your step.
26             Whenever you are ready, Attorney Mattei.
27             ATTY. MATTEI:   Thank you, Your Honor.
```

```
 1   ERICA LAFFERTY,

 2   CONTINUED DIRECT EXAMINATION BY ATTY. MATTEI:

 3       Q   Welcome back, Erica.

 4               So, when we left, I think we had gotten to

 5   around 2010 when you were talking about how your mom had

 6   been hired as the new principal at Sandy Hook Elementary

 7   School?

 8       A   Yes.

 9       Q   And could you give the jury a sense of what was

10   happening in your life at the time?  I think you would have

11   been around 25 around that time?

12       A   Yeah.  I was 25.  I spent the majority of my life in

13   sales of some capacity.  I did a lot with cell phones.

14               My sister, at that time, had three kids who

15   took up a large majority of my life.  I think more for my

16   purposes than theirs.  But, yeah, she had the three kids,

17   and I spent a ton of time with them.  My mom, you know, was

18   in the process of building her dream house in the

19   Aderondacks so I spent a lot of time up there.

20       Q   What about your grandma.  I think you mentioned

21   before, like, your grandparents had been involved when you

22   were --  when you were really young, you lived with them.

23   What was your relationship with them, like, around this

24   time?

25       A   So, my grandparents got divorced, I think I was about

26   ten, and my grandfather died in 2003.  My grandmother was

27   living in Waterbury in 2011, she retired and moved up to
```

1   family property in the Aderondacks.  So, my mom was also

2   helping to, like, kind of rehab her house, my grandma's

3   house, build her own house.  So, we were up there a ton.

4      Q   Was the idea that your grandma was going to retire up

5   there and your mom would have a place right near her?

6      A   Literally, right next door.  Yeah.  My grandmother

7   broke off a piece of her land and gave it to my mom to build

8   a house big enough to house our large family.

9      Q   And you went to -- did you say you went to high

10   school in Woodbury?

11      A   Yes.  I transferred from Naugatuck High School to

12   Nonnewaug.

13      Q   To where?

14      A   Nonnewaug, in Woodbury.

15      Q   Nonnewaug.

16         Okay.  And, then, after Nonnewaug, did you

17   pursue any postsecondary education?

18      A   I went to Naugatuck Valley, graduated with an

19   associates in legal studies, but my primary focus was always

20   work.

21      Q   And in 2010, now, this is when your mom took the job

22   at Sandy Hook, were you and she living together?

23      A   She called me her basement dweller because I was 27

24   and still kind of in and out.  Like, oh, I'm going to go

25   live with a friend, but I missed my mommy and I want to come

26   back home.  So, I had a bedroom in her house from birth to

27   the time I was 27.

1    Q    Okay.  27.  This is now moving --

2    A    2012.  Yeah.  Yeah.  I officially told her, okay, you

3  can eliminate my bedroom in the end of July right before the

4  shooting.

5    Q    Okay.  So, July of 2012, you finally move out?

6    A    At 27.  Yes, I'm going to own that.

7    Q    I take it, though, that even though you moved out, I

8  mean, you can't fully -- I guess, my wife would say, cut

9  those apron strings?

10    A    Yeah.

11    Q    So, did you continue to kind of see your mom a lot?

12    A    I was up -- I mean, at that point she was spending at

13  least every Saturday, Sunday.  Sometimes she would go up on

14  Friday after work, take a Friday off --

15    Q    I see?

16    A     --  take a long weekend because the house was --

17  her house was, you know, in the final stages of being built.

18  So, I was with her every single weekend.  Usually saw her at

19  my sister's house at least once a week, or I would be

20  driving to her house, like, hey, can you feed me, I can't

21  cook.

22    Q    Did she like that?  She didn't like that?  She would

23  pretend --

24    A    I mean, I think she had a love/hate relationship with

25  it.  But, yeah, sometimes she would kick me out and send me

26  to my sisters, like, let her feed you, she's doing the

27  things any way.

1    Q   Okay.  And, so, coming up on the 2012 school year,

2   were you and your mom discussing what she was hoping for out

3   of that 2012 school year at Sandy Hook?

4    A   Back to school was her favorite time of year.  She

5   was always excited to meet the kindergarten class.  She was

6   excited to watch teachers set up their classrooms, she was

7   excited to reorganize her office even though she never

8   really never made any major changes but, like, new pens

9   excited her because that's just the kind of person that she

10  was.  But in the 2012 to 13 school year, she was actually

11  planning a trip to China.  My understanding is it was some

12  kind of, like, teaching exchange situation that some of the

13  teachers in Newtown were going to participate in, and as

14  soon as she heard about it, she was like, yes, I am so in

15  for this trip to China.

16   Q   And did you become aware that at the beginning of

17  that school year, your mom decided to start a Twitter

18  account related to Sandy Hook Elementary School?

19   A   She did.  She did.  She was very active on Twitter.

20   Q   Okay.

21   A   For sure.

22   Q   And, we have --

23           By the way, is that Twitter account still

24  public and available?

25   A   It is.  Yes.

26           ATTY. MATTEI:  Why don't we -- why don't we pull

27           some of that up?  Let's start with Exhibit --

```
 1              I think these are in.  Correct me if I'm wrong,
 2        Attorney Ferraro, 440 through 445?
 3              ATTY. PATTIS:  They are in.
 4              THE CLERK:  Yes.  They are full exhibits.
 5              ATTY. MATTEI:  Okay.  And I also have 447
 6        through 450?
 7              THE CLERK:  Yes.  Full exhibits.
 8              ATTY. PATTIS:  Agreed.
 9              ATTY.  MATTEI:  Great.
10              Why don't we start just at 440 if we have it?
11              And we can blow it up and see if everybody can
12        see here.
13    Q    Okay.  So, Erica, this looks like a Twitter post,
14  TWEET, I guess, from your mom's account on September 24,
15  2012?
16    A    Yup.  It does.
17    Q    What are we seeing here?
18    A    That's, like, th, courtyard at the Sandy Hook School.
19  It looks like parents.  Is that parents?
20    Q    Parents Insuring Another Great Learning --
21    A    Yeah.
22    Q    You might have it right in front of you if it's
23  easier, so you don't have to --
24    A    Yeah.
25    Q    Parents Insuring Another Great Learning Space At
26  Sandy Hook?
27    A    Did they have the parents coming to the -- I don't
```

1   know.  That's kind of cool.

2              Yeah.  That's the courtyard.

3    Q   Is this the kind of thing that your mom would TWEET

4   out to kind of let the community know what was happening?

5    A   Absolutely.  Yeah.

6           ATTY. MATTEI:  Let's go to 441.

7    Q   And I take it that you had spent a fair amount of

8   time at the school itself visiting your mom; right?

9    A   All of her schools.  Always.  Yes.

10    Q   Okay.  So, let's pull this one up.  Okay. So, the

11   date on this one, Erica, is October 17, 2012.  So, maybe

12   three weeks later?

13    A   Yes.

14    Q   And Safety First At Sandy Hook.  It's A Beautiful Day

15   For Our Annual Evacuation Drill.  Do you see that?

16    A   Yup.  I'm like reading it and her, like little

17   singsong voice.

18    Q   In your mom's voice as if she was saying it?

19           So, this is just a fire drill; right?

20    A   Yup.

21           ATTY. MATTEI:  Let's go to the next one.  Let's

22         go to, I guess, 442.

23    Q   Okay.  October 18th, next day, Sandy Hook and

24   Education Connection Celebrate Fall.  Do you know what this

25   is about?

26    A   I don't.

27    Q   Okay.  Also at the cafeteria, maybe, kids getting

1    together in the cafeteria?

2        A    It does, yeah.  I recognize some of the teachers..

3            ATTY. MATTEI:  Okay.  Let's go to the next one.

4        Q    November 12, 2012.  Sandy Hook Says Thank You At Our

5    Annual Veteran's Day Breakfast.

6            Do you remember talking to your mom about this?

7        A    I remember that morning she was not happy that she

8    had to eat two breakfasts because her husband always wanted

9    to have breakfast with her and she was like, no, I have one

10   at school, so it was like a big thing.

11       Q    Okay.

12       A    So, she had to, like, pretend to eat a little bit at

13   home so that she can have the good stuff.

14       Q    At the Veteran's Day Breakfast?

15       A    At the Veteran's Day Breakfast.

16       Q    Okay.

17            THE COURT:  And just for the record, that's

18       Exhibit 444?

19            ATTY. MATTEI:  Yes, Your Honor.  Thank you.

20            And let's advance to 445, please.

21       Q    I want to show you this one.

22            November 14th, Sandy Hook Staff Raises Money

23   For Adopt-a-Family.  Do you remember this?

24       A    Yes.

25       Q    I want to direct your attention.  The young woman in

26   the center here, do you recognize who that is?

27       A    I do.  That's Victoria Soto.

1    Q    In the brown sweater there?

2    A    Yes.

3    Q    And Miss Soto's family are among the family's that

4    have brought this case as well; right?

5    A    Correct.

6    Q    And Miss Soto was murdered at Sandy Hook School?

7    A    She was.

8         ATTY. MATTEI:  Why don't we go to 447.

9    Q    Okay.  This is November 16th, the Sandy Hook Book

10   Fair.  Read With First Graders.  Keeping Books In Our Hearts

11   And In Our Minds.

12         This is first graders learning to read with a

13   fairy princess sign?

14   A    It is the book fairy.

15   Q    Book fairy.  Thank you.

16         It's also in the courtyard that we saw earlier?

17   A    It is.

18         ATTY. MATTEI:  Go to 448.

19   Q    More first graders.

20   Sandy Hook First Graders Learn About the Three A's Of

21   Concert Behavior:  Attention, Appreciation, and Applause.

22   Is that right?

23   A    Yes.

24   Q    The kids were getting ready for the holiday concert?

25   A    Yes.

26         ATTY. MATTEI:  Let's go to the next one, 449.

27         And here we are at the concert.

1          Sandy Hook students Enjoy the Rehearsal of Our

2          Fourth Grade Winter Concert.  Talented Group Led By

3          Maryrose Kristopik, yeah?

4     A    Yes.

5     Q    Do you remember this concert, your mom talking about

6     it, or did you go?

7     A    I remember that she borrowed a red scarf from the

8     librarian to wear with a gold sweater dress that she lost

9     the belt for, and she wanted something to accent her sweater

10    dress, so she borrowed a red scarf from the librarian which

11    she then returned the morning of December 14th.

12    Q    And this is just -- this is two days before?

13    A    Yes.

14          ATTY. MATTEI:  Let's go to the next photo.  This

15          will be 450.

16    Q    This is December 13, 2012.  Setting up for the Sandy

17    Hook Nonfiction Book Preview For Staff.  Common Core, Here

18    We Come.

19          I see you smiling there.  Is that because your mom

20    was talking about common core?

21    A    A lot.  Yeah.  She had a love/hate relationship with

22    changing math.

23    Q    There was some curriculum changes that were kind of

24    happening around this time; right?

25    A    Yes.  Yes.  And she was trying to be excited about it

26    for her staff, but was having some personal struggles with

27    the concept of it.  And she had a kid who was horrible with

 1    math, so that could be.

 2        Q    And your mom's Twitter account, which is Dawn

 3    Hocksprung, that's just her name; right?

 4        A    Part of it.

 5        Q    And that was -- oh, because you would refer to her as

 6    Dawn Lafferty-Hocksprung; right?

 7        A    I believe the only one, Dawn Lafferty-Hocksprung.

 8        Q    Okay.  These pictures were all for everybody to see,

 9    all following right up until the day of the shooting; right?

10        A    They are still available.

11        Q    They are still there?

12        A    Correct.

13        Q    Everyday?

14        A    Yes.

15        Q    This was just a regular school; right?

16        A    Yes.

17        Q    Kids come there everyday?

18        A    Yes.

19        Q    It was open?

20            ATTY. PATTIS:  Objection.  Leading, Judge.

21        Q    Was it open?

22        A    It was absolutely open.  I was there and helped

23    decorate.

24        Q    Was it a toxic waste dump?

25        A    Not by any means.

26        Q    In fact, did you know who the school custodian was?

27        A    Both of them.  Yes.

1      Q    What were their names?

2      A    Kevin Androloti(phonetic) was the lead custodian, and

3    then Rick, whose last name I can't recall.  But they took

4    great pride in the school, and were there in minutes --

5    within, absolute minutes, with any requests that my mom had

6    or probably any teacher.

7      Q    Did your mom love those guys?

8      A    More than anything.

9      Q    The jury has heard a video of Alex Jones calling this

10   school a cutout, stage.  Was it a stage?

11     A    No.  It was an elementary school.

12     Q    Erica, I'm not going to ask you -- I'm not going to

13   ask you to go into the morning of December 14, 2012, or even

14   that day.

15     A    Okay.

16     Q    You were here for Bill Aldenberg's testimony; yes?

17     A    Yes.

18     Q    Carlee Soto's testimony?

19     A    Yes.

20     Q    It was the worst day of your life; wasn't it?

21     A    Without a doubt.

22     Q    Okay.  At some point, did you learn about your mom's

23   last moments?

24     A    I did.  She was shot and killed confronting the

25   gunman.

26     Q    You learned that from investigators?

27     A    Yes.

```
1     Q    Did you learn anything about before that terrible
2   moment whether your mom had interacted with Vicki Soto
3   earlier that morning?
4              ATTY. PATTIS:  It's going to be hearsay, Judge.
5              ATTY. MATTEI:  I'm offering it to show the
6         impact on Miss Lafferty, and the impact of Mr. Jones'
7         subsequent denials of her mother's existence.
8              ATTY. PATTIS:  Compound.
9              THE COURT:  Overruled.
10    A    That morning, I was told by some of the faculty
11  members that Vicki had come into the office later than
12  usual, but by any normal standards, on-time, but just not
13  on-time for who Vicki and Dawn were, and she had spilled
14  coffee on her sweater.  And my mom was, of course, laughing
15  at her because that's what Dawn did, and helped her to, you
16  know, clean the coffee off of her sweater because I think
17  there were parents that were supposed to be going into
18  Vicki's classroom that day and she was, you know, obviously
19  embarrassed that she had spilled coffee on herself, so my
20  mom was helping to remedy that situation.
21    Q    The fact that your mom was killed confronting a
22  gunman as he entered the school, has it become important to
23  you in your memory and your understanding of who your mother
24  was?
25    A    It's probably one of the most important things I know
26  about her.
27    Q    Has that been a source of pride for you even as you
```

1    grieve the loss of your mother?

2        A    Absolutely.  I was very angry for a while because I

3    was told that she had identified noises that she heard to be

4    gunshots and decided to go out into the hallway any way.

5    But I can feel nothing but pride about that now because it's

6    just who she was.  She would have done anything -- did do

7    everything in her power to protect her staff and most

8    importantly, her students.  She acted no differently as she

9    would, if it was my sister and I in that school.

10       Q    Erica, I want you to -- in the days and weeks after

11   the shooting, I want to focus you now on why we are here.

12   Did there come a point where you started to realize that

13   something was happening, that is, that there were people who

14   were claiming that the shooting hadn't happened, that it was

15   fake?

16       A    Um, yes.  I don't recall specifically when, but

17   within weeks, I know that I was being tagged on Facebook and

18   Twitter.  I was getting direct messages on Facebook and

19   Twitter.  Sometimes it was my friends, like, saying, you

20   know, here is this article that's saying that Sandy Hook is

21   fake, and they were, like, no, this is her daughter.  And

22   they would tag me in it, or it would be a message on Twitter

23   just telling me that I'm part of a conspiracy, and it was

24   very frequent and very very early on.

25       Q    Let me ask you -- because I -- when you said that you

26   would -- somebody would tag you.  And I think Carlee may

27   have talked about this a little bit, but what does that --

how would you know that somebody had tagged you?  How does

that work?

    A   I think, now, you just type the person's name and it

gives you an option of, like, your friends, that you can

select, and the majority of the time it was on, like, a news

article.

    Q   So back up a second.

           So, how do you find out that somebody has

tagged you?  Do you get, like, an alert?

    A   It gives, like, a notification on my phone.

    Q   So, you had a Facebook account yourself?

    A   Correct.

    Q   And Facebook would alert you that somebody had tagged

you?

    A   Correct.

    Q   Meaning that they had kind of put your name next to

another piece of content?

    A   Yes.

    Q   And then that when you were tagged in these things,

is when you were starting to see this stuff saying that

Sandy Hook was fake?

    A   Yeah.  A hoax, conspiracy, actors.

    Q   And you said that your friends would -- what would

your friends be doing?

    A   I think they were trying to help by just saying,

like, this wasn't fake.  Like, Erica Lafferty, this is her

daughter.  And they would, basically, insert me into the

1    conversation or the comment section.

2        Q    So, like, what's your reactions when you are seeing

3    this?  I mean, had you ever heard of anything like this

4    before?

5        A    Absolutely not.

6        Q    So, when you are seeing this, you just lost your mom,

7    what's going through your head about how to deal with this?

8        A    How to deal with it.  I couldn't process the idea of

9    it in general so having to deal with it wasn't a thought.

10   I --

11       Q    Explain to the jury the volume -- so you were on

12   Facebook and you were on Twitter?

13       A    Yes.

14       Q    Okay.  Did you have an e-mail account as well?

15       A    Yes.

16       Q    So, just in that -- you said this started within an

17   amount of weeks?

18       A    Correct.

19       Q    Just explain to the jury, like, once this stuff

20   started, what -- how much was it?  Like, what's the volume

21   we are talking about?

22       A    Daily for sure.  Multiple times daily, as time went

23   on.  Over time, I wouldn't even know where to begin to

24   estimate a number.

25       Q    You mentioned that at the outset it was stuff like,

26   this is fake, you are an actress, it's a hoax.  Describe for

27   the jury, like, other types of --  when it first started, is

1    that the general type of stuff that you were getting?

2        A    Yes.  It was pretty generic at the beginning, and

3    then as time went on, it got more specific, and a lot more

4    scary.  You know, things would be mailed to my house.  There

5    were, you know, threats of rape and --

6        Q    Wait.  Wait, wait a second.  You were receiving

7    threats from people saying they were going to rape you?

8        A    Correct.

9        Q    Is this online?

10       A    Yes.

11       Q    Was this kind of thing, like, frequent, that type of

12   graphic, violent stuff?

13       A    Not as frequent as the hoax, and conspiracy, and

14   actress, situation, but the letters to my house, the random

15   death or rape threats would come in.  I attempted to report

16   it to the police department in the town that I lived in, and

17   I was just told that it wasn't specific enough, or they

18   couldn't track it, or, you know, the post had been deleted,

19   or taken down, or the account was deleted, and there was

20   just no way possible to keep up or do anything.

21       Q    So, just to orient the jury to the timeframe.  Are we

22   talking about this is, like, within the first six months,

23   say, of 2013, that this is happening where it's going from

24   the hoax to the more violent stuff?

25       A    It's in between 2013 to 2014.

26       Q    Did there come a point with you learned of a

27   gentleman named Alex Jones?

1    A    Yes.  It was either the end of March or early April

2    of 2013.

3    Q    Do you remember where you were when happened?

4    A    Yes.  I was at a restaurant with a colleague.  I was

5    tagged on video on Facebook.  I opened it.  My phone, like,

6    automatically played the videos when I opened Facebook.

7    And, it -- I don't recall exactly what video it was, but it

8    was just, you know, just saying that Sandy Hook was fake.

9    And the most wild and aggressive voice was just booming out

10   of my phone, and I shut it down within seconds and was,

11   like, I can't.  I just -- like, I'm with colleagues, I can't

12   do this right now.

13   Q    Alex Jones' voice just started booming out of your

14   phone and you shut it down?

15   A    I didn't know it to be Alex Jones at the time.  I did

16   see infowars.com on the video.  I then learned that it was

17   Alex Jones.

18   Q    At that point, did you do anything?

19          ATTY. PATTIS:  Which point is this?  I'm sorry.

20   Q    After you pulled this video up on your phone.  You

21   said you didn't know who it was at the time; right?  You

22   just knew -- it was Infowars --

23   A    Correct, yeah.  In the couple of seconds that I

24   watched the video, I did not know it to be Alex Jones at

25   that time.

26   Q    You hadn't heard -- as far as you know, had you heard

27   his name before?

1    A    Never, no.

2    Q    And so -- but you did see the infowars.com thing

3    associated with the video?

4    A    Yes.  And I took a screenshot of that because I was,

5    like, I'll deal with it later.

6    Q    And did you try to deal with it later?

7    A    I went to infowars.com either later that night or the

8    following morning, and the first thing that I saw was

9    something about a Sandy Hook.  I don't know if it was,

10   actors, or conspiracy, or hoax, or what the words were.  I

11   was just like, I -- it was just too much.  It was just too

12   much, and I -- I wasn't -- I wasn't in a place where I could

13   deal with that.

14   Q    So, you just X'd out of it?

15   A    Yeah.

16   Q    Put it aside?

17   Q    You talked about receiving letters at your home?

18   A    Yes.

19   Q    What were these letters about?

20   A    Objection.  Foundation, hearsay.

21   Q    Did you read them?

22   A    I don't recall the specifics but, yes, I did read

23   them.  The only thing I remember --

24           ATTY. PATTIS:  Foundation, hearsay.  Best

25       evidence.

26           ATTY. MATTEI:  Your Honor, these are being

27       offered --  Miss Lafferty reviewed them.

1          THE COURT:  Sustained.

2          ATTY. MATTEI:  Thank you.

3          THE COURT:  I'm sorry, overruled.

4          ATTY. MATTEI:  Thank you, Judge.

5     A    The only specific thing that I remember was the

6  common theme of the return address that was NR fifteen and

7  fifteen was spelled incorrectly.  And it was mailed from, I

8  don't know what town in California.

9     Q    So, you were getting repeatedly letters from this

10  supposed return address?

11    A    I would assume that it was the same person based on

12  the fact that fifteen was consistently spelled incorrectly.

13    Q    And were these letters more of the same, actress,

14  hoax, Sandy Hook didn't happen?

15    A    Yes.  That I should die, and then be buried next to

16  my fake, dead mother, however that's possible.

17    Q    These letters actually said that?

18    A    Yes.  Fake, dead mother.

19    Q    After -- well, during the 2013 timeframe, did your

20  sister, Tina, decide that she wanted to start a charity in

21  your mother's name?

22    A    I think that it may have been earlier than that, but

23  it was very shortly after the shooting, she started the Dawn

24  Lafferty-Hocksprung Memorial Fund.

25    Q    And what was her idea on that?

26    A    A way to honor my mom.  The premise of the foundation

27  is to -- we've raised -- we've done a ton of fundraisers and

1    raised money, and we give a scholarship away each year to a

2    Naugatuck High School student, because that's where my mom

3    went, who is looking to pursue a career in education --

4    someone who has Dawn-like qualities.

5        Q    And are you guys still doing that, giving out

6    scholarships every year --

7        A    Every year.

8        Q    -- to a Naugatuck Senior?

9        A    Every year.

10       Q    And when Tina first started this, I take it there was

11   a Facebook page that people could go to to learn about

12   charity?

13       A    Correct.

14            I started -- I don't remember how,

15   specifically, but I started a page on Facebook:  The Dawn

16   Lafferty-Hocksprung Memorial Fund, and it gave a little

17   write-up of who my mom was, and why we were raising the

18   money, who the money would go to, and a little bit about the

19   Dawn-Like qualities of, you know, the students who would be

20   eligible to receive the scholarship award.

21       Q    What happened to that Facebook page?

22       A    It was up for a couple of months, because there were

23   an influx of comments on every post, and an influx of

24   messages that would come into it telling me that I'm lying,

25   I'm, you know, raising money off of a skit.  Like, I'm

26   scamming people out of money, my mom never existed, Sandy

27   Hook never happened, and it was just too much for me to try

1    to deal with and I had to take that page down.

2    Q    Did you ever try, Erica, to, you know, a lot of this

3    is happening online, did you ever try to engage with any of

4    these people who are coming after you?

5    A    I did.  Many times and --

6    Q    Why?

7    A    For 27 years of my life, that woman was my best

8    friend, and for people to tell me that she didn't exist, how

9    do you just let that happen?  And I would engage with them,

10   I would send them pictures.  And then the volume was just so

11   great, that I couldn't keep up with it, and it was just

12   swallowing me whole.

13   Q    You would send them pictures of your mom to prove to

14   them she was real?

15   A    Pictures when, you know, me and her when I was

16   little, or her holding one of my sister's kids when they

17   were born, or a picture of my mom and my sister at my

18   sister's wedding.  I didn't get to have one of those.

19   Q    You said at some point you just stopped trying?

20   A    Yes.  There was too many of them and only one of me.

21   Q    These letters you got and the online threats you got,

22   what did that -- that caused you to fear for your own

23   safety?  I mean, you were worried about how these people got

24   your address, and, like, what did you do about all that?

25   A    I installed home security systems, I got more dogs.

26   I stopped really going out around town, I didn't really go

27   to grocery stores, I would have groceries delivered.  Amazon

1   became my best friend so I didn't have to go to, like, a

2   Target or something.

3       Q   Do you still live this way?

4       A   Yes.

5       Q   Have you been confronted in person by people who

6   claim that you are an actress and that your mother never

7   lived?

8       A   Yes.  Starting just a couple of weeks after the

9   shooting.

10      Q   Here in Connecticut?

11      A   Correct.  In my hometown.

12      Q   Woodbury?

13      A   Yes.

14      Q   Tell the jury about that?

15      A   I was on my way to a birthday party.  I think it was

16  early 2014.  I was at a gas station --

17      Q   So, this is a different one.  Not right after, this

18  is a different one?

19      A   Yeah.  I'm sorry.  Yeah, mm-hmm.  I'm flustered.

20          This is just after the two-year anniversary, I was on

21  my way to a birthday party, and I was at a gas station and

22  somebody just walked out and pointed.  And it was, like, you

23  are part of that Sandy Hook hoax or -- yeah, I think it was

24  that Sandy Hook hoax.  There was -- yeah -- there was

25  another time in a grocery store where I walked by and

26  somebody would just, you know, kind of, like, say on the

27  side (INDISCERNIBLE) crisis actress.  Like, how do you feel

1   comfortable going out in public when places that you know,

2   and trust, and have been going for years, you never know who

3   is going to say what.  Like, how do you trust anything?  How

4   do you trust your safety?  How do you trust your security?

5   How do you know that this isn't one of the people who's

6   sending a threat to your house or a threat to my Twitter

7   account?

8        Q    How many times have you moved since the shooting?

9        A    I've lived in six different places, and it's been

10   five moves.

11        Q    Why?

12        A    Mostly, so that people don't know where I am.

13        Q    In case they'll find you?

14        A    Yes.

15        Q    What other steps have you taken to protect your

16   identity?

17        A    When I travel, primarily for work, I'll use an alias

18   if I have to order an Uber, or some sort of car service, use

19   a different name when I check into hotels.

20        Q    You testified that one of the reasons, at least, for

21   a time you tried to engage these people, I'm paraphrasing,

22   but what I understood you to be saying was that you didn't

23   want this idea that your mother didn't exist to be

24   uncontested?

25        A    Correct.

26        Q    Did you have concerns about what your nephews and

27   niece might see as they grew older about their grandma?

 1     A    Very much.  I think we can -- it's safe to say that

 2   we are living in a world where information is widely

 3   available on line.  And my sister has four kids.  Her

 4   youngest was only six months old when my mom was killed.

 5   There's going to come a time where Alison is going to want

 6   to know about grandma outside of the stories we tell her.  I

 7   wanted to make sure I was, at least, taking steps to make

 8   sure the first thing that came up when she Googled her

 9   grandmother's name wasn't that she never existed, because

10   those kids deserve better than that.

11     Q    Is this still happening to you?

12     A    Yes.

13     Q    Your mom was very real, wasn't she?

14     A    Yes.

15     Q    And you are very real?

16     A    Yes.

17          ATTY. MATTEI:  I have nothing further, Your

18          Honor.

19          THE COURT:  Attorney Pattis?

20          ATTY. PATTIS:  Thank you, Your Honor.

21   CROSS-EXAMINATION BY ATTY. PATTIS:

22     Q    Do you need a moment, Miss Lafferty?

23     A    I'm fine, thank you.

24     Q    We've never met directly, have we?

25     A    No.

26     Q    I think I attended a deposition that somebody took of

27   you in this case; do you recall that?

```
 1      A    Yes.

 2      Q    That was Mr. Wolman?

 3      A    It was.

 4      Q    Do you need help with that?

 5      A    No.  Long arms.

 6      Q    Where do you work?

 7      A    I work for Every Town For Gun Safety.

 8      Q    Every Town -- and that's out of New York?

 9      A    Yes.

10      Q    And you have a grassroots organization as well?

11      A    Correct.

12      Q    And that grassroots organization was founded by a

13 woman named Shannon Watts?

14      A    Correct.

15      Q    And she's someone from Mom's Demand Action For Gun

16 Sense In America; correct?

17      A    Correct.

18      Q    You weren't working for that group before the death

19 of your mother?

20      A    It didn't exist before the death of my mother.

21      Q    Was it formed because of the Sandy Hook shootings?

22      A    Every Town For Gun Safety or Mom's Demand Action?

23      Q    First one.  Let's do Every Town For Gun Safety.

24      A    No.  I wouldn't say that it was formed because of the

25 Sandy Hook shooting.

26      Q    Do you know who funds it or funded it initially; is

27 that Michael Bloomberg?
```

1    A    He's one of the funders, yes.

2    Q    Former Mayor of New York?

3    A    Correct.

4    Q    And then Mom's For Gun Safety, who is that?

5    A    Mom's Demand Action for Gun Safety in America.

6    Q    Thank you.

7            Mom's Demand Action For Gun Safety in America;

8    was that founded in the wake of Sandy Hook?

9    A    Yes, it was.

10   Q    Did you have any interest in gun regulation prior to

11   the death of your mother, or gun control, gun safety?

12   A    I didn't really have any views on firearms.

13   Q    Did the death of your mother change those views?

14   A    It formed views.

15   Q    What views did it form?

16   A    That there should be some sort of safety and security

17   measures in place further than what I understood them to be

18   at the time.

19   Q    Do you -- do you have any idea --  withdrawn.

20           When did you first learn about Alex Jones?

21   A    I believe it was the end of March, or early April,

22   2013.

23   Q    So, shortly after your mother's death?

24   A    Correct.

25   Q    And I believe you said this is when you became aware,

26   because others had alerted you to what was going on?

27   A    I was being tagged in posts about the hoax.

1    Q    Okay.  At any point since that point, the moment that
2    you first learned the name Alex Jones, have you come to
3    have -- understand that he has a viewpoint -- 0that he
4    articulates a viewpoint on guns?
5    A    Not until I had sat in this courtroom last week.
6    Q    So, is it your testimony, ma'am, that until you came
7    into this courtroom, you never -- you didn't know that Alex
8    Jones had a position on guns?
9    A    I never watched his videos or --
10   Q    You never watched any of them?
11   A    -- or read anything that he wrote --
12   Q    Okay.  Did he ever --
13   A    -- outside of a couple of seconds that I testified to
14   earlier.
15   Q    Did he ever -- do you think he ever mentioned your
16   name, do you know?
17   A    I wouldn't know.  I never watched any of his videos.
18   Q    I didn't ask you whether you watched his video, I'm
19   asking you, do you know, has he ever mentioned your name?
20        ATTY. MATTEI:  Objection.  Asked and answered.
21   A    I wouldn't know.
22        ATTY. MATTEI:  I think she said she wouldn't
23        know.
24        ATTY. PATTIS:  No.  She answered a different
25        question.
26   Q    Has he ever mentioned your name?
27   A    I wouldn't know.

1    Q    Wouldn't you want to find out before you sued him?

2              ATTY. MATTEI:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    Q    Did you read the complaint that was filed in this

5    case before it was filed?

6              ATTY. MATTEI:  Objection, Your Honor.

7              THE COURT:  Sustained.

8              ATTY. MATTEI:  Move to strike.

9              THE COURT:  This is a hearing in damages.

10             ATTY. PATTIS:  Understood.

11   Q    And how many people sued Alex Jones would you to

12   know?

13             ATTY. MATTEI:  Objection, Your Honor.

14             THE COURT:  Sustained.

15   Q    How many plaintiffs are in this case -- are there in

16   this case?

17             ATTY. MATTEI:  Objection, Your Honor, relevance

18        to all of this.

19             THE COURT:  I'll have a side bar.

20             ATTY. PATTIS:  I'll withdraw it and move on,

21        Judge.

22   Q    You didn't sue --

23             ATTY. MATTEI:  Objection.

24             THE COURT:  And I'll just mention --

25             Excuse me.  I'll just mention to the jury that

26        we heard another political name a few minutes ago,

27        and I'll just remind you that this case is not about

```
 1              politics.  It's a hearing in damages.
 2      Q    What year did you sue Alex Jones in?
 3              ATTY. MATTEI:  Objection, Your Honor.  None of
 4           this is relevant.
 5              THE COURT:  I'll have to see counsel on the
 6           sidebar.
 7              (SIDEBAR).
 8              THE COURT:  This is a hearing in damages --
 9              ATTY. PATTIS:  Motive is never collateral.
10              THE COURT:  The issue -- the only thing they are
11           considering here, is the extent of the damages.
12              ATTY. PATTIS:  Motive is never collateral.  An
13           interest in the outcome.  She is working for a group
14           that is --
15              THE COURT:  Well, then, inquire --
16              ATTY. PATTIS:  I did.
17              THE COURT:  -- about her gun positions.  But
18           when liability is established --
19              ATTY. PATTIS:  Motive is -- I mean, the record
20           is what it is.  The law of the case is clear.
21              ATTY. MATTEI:  All right.  Are you done?
22              ATTY. PATTIS:  I don't know.
23              ATTY. MATTEI:  Oh I thought.  Well, wait a
24           second, your Honor.  Hold on.
25              Your Honor.  Okay.  She has now said several
26           times in response to questions, that she doesn't know
27           what Alex Jones what Alex Jones views on guns are.
```

1          That makes her views irrelevant to the question of

2          whether she's biased against Alex Jones.  So, there

3          shouldn't be any further questions about this.

4              THE COURT:  Now, I think we have a little bit of

5          a (INDISCERNIBLE) they can choose to leave it or not

6          leave it.  Right?

7              ATTY. MATTEI:  Oh, no.  I don't think so, Your

8          Honor.  They can't --

9              ATTY. PATTIS:  I think -- I'm sorry, I cut you

10         off.  I apologize.

11             ATTY. MATTEI:  Your Honor, the question here is,

12         can a reasonable juror infer that she's exaggerating

13         her damages as a way to get back at Alex Jones about

14         his gun views.  She's now said, she doesn't know

15         about this gun view are.

16             ATTY. PATTIS:  No, that's not what --

17             THE COURT:  And.

18             ATTY. PATTIS:  That's not what she said.

19             ATTY. MATTEI:  And there can be no reasonable

20         inference.

21             THE COURT:  Attorney Pattis --

22             ATTY. PATTIS:  That's not what she said.  What

23         she said is, until she sat in this courtroom and saw

24         things.  And she's testifying in this courtroom.  I

25         think I get to go to show here 1E and ask her.

26             THE COURT:  I think a (INDISCERNIBLE).

27             (END OF SIDEBAR).

```
1              ATTY. PATTIS:  Trying to refer to 1E.

2              (EXHIBIT E).

3              PARALEGAL:  He needs to have it up on the

4         screen.

5              THE COURT:  What exhibit is this?

6              ATTY. PATTIS:  1E, Judge.

7   CONTINUED CROSS-EXAMINATION BY ATTY. PATTIS:

8   Q   Ma'am, are you -- do you have a screen that --  I

9   don't know which one you are looking at.  There is one next

10  to you, look at any one you like.

11             You've seen this video in this trial; correct?

12  A   A portion of it, yes.

13  Q   Have you ever seen anything -- have you ever seen it

14  before -- before this trial?

15  A   No, I have not.

16             ATTY. PATTIS:  Would you play it, John?

17             (VIDEO PLAYED)

18  Q   Never heard anything about -- like that before until

19  you came into this trial; correct?

20             ATTY. MATTEI:  Objection.  Asked and answered.

21             THE COURT:  You can answer it.

22  A   That's correct.

23  Q   And as you sit here today, you don't know what

24  Mr. Jones' positions are about guns; correct?

25  A   I don't believe I said that.  I don't believe I said

26  that.

27  Q   Do you know now?
```

1      A    Having watched this, it sounds like he thinks that

2   the man on that magazine was coming for his guns.

3      Q    Who was the man on that magazines?

4      A    President Obama.

5           THE COURT:  And I'll just remind the jury,

6           again, that this case is not about Presidents,

7           Presidential Elections, politics.  This is a hearing

8           in damages where you are tasked with determining the

9           amount of damages to be awarded.

10      Q    And you've worked for Every Town For Gun Safety for

11   seven years now?

12      A    It will be nine, next month.

13      Q    And you never knew what Alex Jones' position is on

14   guns; correct?

15      A    Correct.

16      Q    Until this trial?

17      A    That's correct.

18           THE COURT:  Redirect?

19           ATTY. MATTEI:  Yes.

20   REDIRECT EXAMINATION BY ATTY. MATTEI:

21           ATTY.  MATTEI:  Let's play -- let's play clip

22           1C.  Same video.

23      A    Okay.

24           (VIDEO PLAYED)

25           ATTY. PATTIS:  Well, this is scope, Judge.  I

26           don't know that it matters.

27           ATTY. MATTEI:  It's the same video, Judge.

```
 1              (VIDEO PLAYED)
 2     Q    School Twitter photo of the kids lined up just a few
 3   months ago; did you hear that?
 4     A    Yes.
 5     Q    Did we see that photo earlier?
 6              ATTY. PATTIS:  Scope, Judge.
 7              ATTY. MATTEI:  Same video, Your Honor.
 8              THE COURT:  Overruled.
 9     A    Yes, I believe it
10              ATTY. PATTIS:  No, it's actually not.
11              ATTY. MATTEI:  Excuse me.  It is exactly --
12              THE COURT:  I'll see counsel on the sidebar,
13          please?
14              (SIDEBAR).
15              ATTY. PATTIS:  This is what I wanted --
16              THE COURT:  It is the same video, but here is
17          what I'm going to tell you.  I don't know how to say
18          no colloquy, no comments.  I don't -- what else do I
19          need to say?
20              ATTY. PATTIS:  If it's directed to me, I'm not
21          going to sit silently.
22              THE COURT:  No, no.  Well, you are commenting --
23              ATTY. PATTIS:  He's looking at me and telling me
24          it's the same video.  It's not.
25              THE COURT:  You are commenting --
26              ATTY. PATTIS:  I was showing 1E, he's showing
27          1C.  It's a part I didn't show.  It's beyond the
```

```
1          scope.  And he's going to --

2              I'm not going to take an admonishment in the

3          presence of the jury from my adversary.  I'm just not

4          going to take it.

5              ATTY. KOSKOFF:  Excuse me.  Sorry, Your Honor.

6          Everybody can hear Mr. Pattis.

7              Voice:  (INDISCERNBBLE).

8              ATTY. PATTIS:  We're ready.

9              THE COURT:  No.  Not yet.

10             I'll start with Attorney Mattei.  What do I

11         need to do to stop your comments and the colloquy?

12         Just tell me what I need to do?  Do I need to hold

13         you both in contempt?

14             ATTY. MATTEI:  Your Honor --

15             THE COURT:  Attorney Pattis?  I'm not going to

16         have the comments anymore.  I'm not going to have it.

17         I'm not going to have it.

18             ATTY. PATTIS:  Do you expect me to lay silently

19         when they are directed at me inappropriately?  Do you

20         expect me to rollover for my client?  It's not going

21         to happen.

22             VOICE:  Shhh (INDISCERNIBLE).

23             ATTY. PATTIS:  Can I just say --

24             THE COURT:  No.

25             (INDISCERNIBLE).

26             ATTY. PATTIS:  Okay.  Thank you, Judge.

27             ATTY. MATTEI:  (INDISCERNIBLE) Attorney Pattis
```

1      (INDISCERNIBLE) padding objections and it's not of

2      Sandy Hook.

3          ATTY. PATTIS:  It's not.  He told the jury it

4      was and it's --

5          ATTY. MATTEI:  That's just not --

6          ATTY. PATTIS:  No.  He.  I objected scope.  He

7      said it's the same video.  That's improper.  And I'm

8      not -- we showed 1E you are showing 1C.  You are show

9      different --

10         ATTY. MATTEI:  Same broadcast.

11         ATTY. PATTIS:  No -- (INDISCERNIBLE).

12         THE COURT:  (INDISCERNIBLE) it's not the same?

13         ATTY. PATTIS:  No, it's not.

14         THE COURT: No?

15         ATTY. MATTEI:  It's the same one.

16         ATTY. PATTIS:  No.  It's not the clip -- no.

17     It's not the clip that I showed.  That's the point of

18     scope.  And for him to turn out, I showed 1E, he

19     showing 1C.  It's a different clip.  It's beyond the

20     scope.  And he's telling me -- he announcing to the

21     jury it is.

22          So, he runs this courtroom?  He doesn't.

23         ATTY. MATTEI:  (INDISCERNIBLE) I think that the

24     scope objection --

25         THE COURT:  So, I'm going to overrule the

26     objection and I'm putting you both of you on notice

27     that I'm not going to have the comments anymore, the

1          colloquy.  Whoever is the unlucky person that's the

2          next one to do it --

3               ATTY. PATTIS:  Well, the next time it happens,

4          I'm going to ask to approach, then, and ask for an

5          admonishment of counsel --

6               THE COURT:  No.

7               ATTY. PATTIS:  -- because I'm not --

8               THE COURT:  No.  Attorney Pattis --

9               ATTY. PATTIS:  -- going to take it.

10              THE COURT:  You are not getting the last word in

11         here.  So, I would suggest you stop.  I will say

12         again, the next person who does it, will be on the

13         receiving end of a contempt, here.  That's it.

14              ATTY. KOSKOFF:  Excuse me, Your Honor.  A

15         proposal, can we take our 15-minute recess after

16         this?  We have a short day, and it would be a good

17         time to break.  We just have one more witness

18         (INDISCERNIBLE).

19              THE COURT:  After this?

20              ATTY. KOSKOFF: Yeah.

21              (END SIDEBAR).

22              ATTY. MATTEI:  May I continue, Your Honor?

23              THE COURT:  You may.

24    CONTINUED REDIRECT EXAMINATION BY ATTY. MATTEI:

25              ATTY. MATTEI:  Let's play that clip again.  It's

26         1C from the same broadcast.

27              ATTY. PATTIS:  Scope, Judge.  We played 1E.

```
 1              THE COURT:  I believe, Attorney Pattis, that you
 2         made your objection.  I overruled your objection.
 3         The record is clear.  And we don't have to keep
 4         restating the objection.  Thank you.
 5              (VIDEO PLAYED)
 6    Q    So, we saw a school Twitter photo of the kids lined
 7 up just a few months a go; right?
 8    A    Correct.  From my mom's Twitter account.
 9    Q    That school was opened; right?
10    A    Absolutely.
11    Q    Mr. Jones is referring to that photo, isn't he?
12    A    I believe so.
13    Q    Mr. Pattis asked you about your work at Every Town?
14    A    Correct.
15    Q    And your work in Every Town, am I correct, that you
16 are focused on a specific program?
17    A    Two primary programs, yes.
18    Q    And what are those?
19    A    The Smart, which focuses on child access prevention
20 and secure storage as well as suicide, and The One Thing You
21 Can Do Program that focuses on extreme risk protection laws.
22 Again, a focus on suicide prevention.
23    Q    And why did you decide to get into that work?
24    A    Because I care about people and I care about kids
25 just like my mom did.
26    Q    And you don't know, other than what you just saw
27 here, anything about Mr. Jones' view on guns; do you?
```

```
1      A    His view on guns?  Absolutely not.  I've never looked

2   into it.

3      Q    Do you care?

4      A    Absolutely not.

5      Q    Do you know what his view is on climate change?

6      A    No.

7      Q    Do you care?

8      A    No.

9      Q    Do you know what his view is on the economy?

10     A    No, I don't.

11          ATTY. PATTIS:  Objection, leading.

12     Q    Do you --

13          THE COURT:  Sustained.

14     Q    Do you know what his view is on the economy?

15          THE COURT:  You can ask her if she knows what

16     his views are.

17     Q    Do you know what his views are on that?

18     A    No.

19     Q    Do you care?

20     A    Absolutely not.

21     Q    Is that what this case is about?

22     A    This case was brought because there have been lies

23   about me and my family and they would not stop.

24          ATTY. MATTEI:  Thank you.  Nothing further.

25          THE COURT:  Attorney Pattis?

26          ATTY. PATTIS:  Can we continue with 1C, please?

27   RECROSS EXAMINATION BY  ATTY. PATTIS:
```

1          PARALEGAL:   Just give me a second to get that

2      up?  I apologize.

3          THE COURT:  Take your time.

4   Q   You never saw the video 1C before today either?

5   A   Was 1C the one with --

6   Q   That you were just shown?

7   A   That's correct.

8   Q   Or Mr. Jones refers to the children as little angels?

9 You never heard that either?

10  A   I wouldn't know that.

11  Q   Okay.

12         ATTY. PATTIS:  Nothing further.

13         THE COURT:  All right.  You may step down.  And

14     I think --

15         Just watch your step.

16         I think we'll take the afternoon recess at this

17     time.  Fifteen minutes.

18         So, we will reconvene at 3:15.

19         Ron will safeguard your notebooks, and we will

20     see you back at 3:15.

21         (JURY EXIT).

22         (RECESS).

23

24

25

26

27

```
1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2   ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

3   v                       :  AT WATERBURY, CONNECTICUT

4   ALEX EMERIC JONES        :  SEPTEMBER 21, 2022
    ...............................................................
5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

7   v                       :  AT WATERBURY, CONNECTICUT

8   ALEX EMERIC JONES        :  SEPTEMBER 21, 2022
    ...............................................................
9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10  WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

11  v                       :  AT WATERBURY, CONNECTICUT

12  ALEX EMERIC JONES        :  SEPTEMBER 21, 2022
```

13
14  C E R T I F I C A T E

15      I, Linda A. Coon, hereby certify that this is a true

16  and accurate transcription of the above-referenced case,

17  heard in Superior Court, Judicial District of Waterbury,

18  Connecticut, before the Honorable Barbara N. Bellis, on this

19  21st day of September, 2022.

20

21      Dated this 21st day of September, 2022, in Waterbury,

22  Connecticut.

23

24

25              Linda A. Coon,  RPR
                Court Monitor/ Court Reporter

26

27

```
1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2   ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

3   v                       :  AT WATERBURY, CONNECTICUT

4   ALEX EMERIC JONES       :  SEPTEMBER 21, 2022
    .....................................................
5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

7   v                       :  AT WATERBURY, CONNECTICUT

8   ALEX EMERIC JONES       :  SEPTEMBER 21, 2022
    .....................................................
9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10  WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

11  v                       :  AT WATERBURY, CONNECTICUT

12  ALEX EMERIC JONES       :  SEPTEMBER 21, 2022

13          E L E C T R O N I C   C E R T I F I C A T E

14

15      I, Linda A. Coon, hereby certify that this is a true

16  and accurate electronic version of the above-referenced

17  case, heard in Superior Court, Judicial District of

18  Waterbury, Connecticut, before the Honorable Barbara N.

19  Bellis, on this 21st day of September, 2022.

20

21      Dated this 21st day of September, 2022, in Waterbury,

22  Connecticut.

23

24                          _____

25                          Linda A. Coon,  RPR
                            Court Monitor/ Court Reporter
26

27
```