# EXHIBIT 34

```
DKT NO: X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA V. LAFFERTY                :  JUDICIAL DISTRICT WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 :  SEPTEMBER 21, 2022


DOCKET NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMERIC JONES
```

**P.M. SESSION**
**VOLUME 4 OF 4**

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
AND A JURY


A P P E A R A N C E S:


   Representing the Plaintiff(s):

      ATTORNEY CHRISTOPHER MATTEI
      ATTORNEY JOSHUA KOSKOFF
      ATTORNEY MATTHEW BLUMENTHAL
      ATTORNEY ALINOR STERLING


   Representing Defendant(s):

      ATTORNEY NORMAN PATTIS


                Recorded By:
                Kendyl Henaghan

                Transcribed By:
                Kendyl Henaghan
                Court Recording Monitor
                Waterbury Superior Court
                300 Grand Street
                Waterbury, Connecticut 06702

1           (AFTERNOON RECESS ENDS)

2           THE COURT:  Good afternoon, Marshal, good

3     afternoon, everyone, please be seated.

4           All right, so one thing I was thinking as I was

5     walking back to my chambers, when we started our

6     recess; is during one of our many, many, many side

7     bars, Attorney Pattis, you had come up with – what I

8     thought was a really good suggestion, and I thought

9     I'd take you up on it.

10          That if there was any anticipation of any

11    references or questions regarding presidents or

12    presidential elections, or politics, that you would

13    ask - I thought, for a side bar.

14          I did not play it back to see if you were

15    referring just to presidential elections and

16    presidents, or if you – if we had also encompassed

17    the political arena; but I believed that we were

18    talking about presidents, presidential elections, and

19    politics.

20          So, I think - and then of course, I heard – I

21    was a little surprised when I heard your question to

22    Ms. (indiscernible) about um, the ex-mayor of New

23    York City, Bloomberg, found in the organization that

24    she worked for.

25          So, I think moving forward, is that if any

26    counsel is looking to ask a question regarding

27    presidents or presidential elections, or political

1    figures, that you'll just ask please, for the Jury to

2    be excused and we will proceed that way; because I am

3    not going to make this case about politics, and I

4    think the Defense keeps trying inject politics into

5    it and it's – I'm not gonna change my course on it.

6    So, I just want to avoid any unpleasantness.

7        ATTY. PATTIS: All right, and may we have a side

8    bar in an unrelated issue; a real quick one?

9        THE COURT: Well, do you understand what I just

10   said though, about . . .

11       ATTY. PATTIS: I do.

12       ATTY. MATTEI: Oh, yes.

13       THE COURT: So . . .

14       ATTY. PATTIS: Yes, absolutely.

15       THE COURT: So, instead of a side bar, just ask

16   for the Jury to be excused and it's a lot easier to

17   do it that way.

18       ATTY. PATTIS: Right.

19       THE COURT: So, just so we're on same page;

20   presidents, presidential elections, political

21   figures, politics – okay?

22       ATTY. PATTIS: Okay.

23       THE COURT: All right.

24            (SIDE BAR BEGINS)

25       THE COURT: My neck hurts from turning to the

26   left so much.

27       ATTY. MATTEI: You – your (indiscernible) though?

1          I know, I get that too from my monitor at home – I
2          get a crick in my neck.
3                ATTY. PATTIS: It looks like Mr. Jones is gonna
4          be here tomorrow.
5                THE COURT: Um-hmm.
6                ATTY. PATTIS: I understand . . .
7                THE COURT: I'm calling in sick, (indiscernible)
8          I've never gotten covid . . .
9                ATTY. MATTEI: Ron, you're in charge.
10               THE COURT: I'm going to get covid for the first
11         time.
12               ATTY. PATTIS: I would ask the Court to consider
13         not requiring every side bar be on the record. I am
14         trying to be an Officer of the Court . . .
15               THE COURT: I know you are.
16               ATTY. PATTIS: . . .  and there are times where
17         it is (indiscernible) speak when the whole public
18         isn't hearing me, and I want to survive this trial if
19         I can. So, I am requesting it to be considered.
20               THE COURT: And I – here's my problem; you may
21         not be on this case forever, and I don't know the
22         next lawyer that may be filling in, and things can
23         get said that were inaccurate. So, I'm gonna continue
24         the way that we're doing it. I'm happy (phonetic) if
25         you don't wanna do it – you know - if you want to do
26         it a different way, but it's gotta be on the record.
27               ATTY. PATTIS: No, I – I just (indiscernible) but

1       I understand what you meant. It came up in an earlier

2       colloquy at side bar today and I thought – I wanted

3       to follow up and see if there's any room there

4       to . . .

5           THE COURT: I'm (indiscernible).

6           ATTY. PATTIS: That's life.

7           THE COURT: Okay, anything else?

8           ATTY. PATTIS: Nothing else from us.

9           ATTY. MATTEI: None for us.

10       THE COURT: (indiscernible) we're in today?

11       ATTY. MATTEI: We have a - we have one more

12       Plaintiff, and then we have some very short

13       deposition testimony.

14       THE COURT: I mean could . . .

15       ATTY. MATTEI: The Jury instruction on deposition

16       testimony?

17       THE COURT: When you told me, you were gonna give

18       me the a-okay . . .

19       ATTY. MATTEI: Okay.

20       THE COURT: . . . and I was gonna do it.

21       ATTY. MATTEI: You have it though, to . . .

22       THE COURT: Yeah (indiscernible).

23       ATTY. MATTEI: Okay.

24       ATTY PATTIS: The only thing, Judge, I don't know

25       you want to (indiscernible) talk – we talk more than

26       you think. The trial is moving quickly, quicker than

27       we expected.

1          THE COURT: I was gonna ask (indiscernible) at

2     some point, but then I didn't want to jinx us -

3     because even like, today, we said we're gonna end at

4     (indiscernible) and court ended so early. So, what -

5     I don't know. I think we're gonna say we're gonna end

6     in a week, or whatever.

7          ATTY. MATTEI: Yeah, I wouldn't - I think we'll

8     know more after Mr. Jones tomorrow, and you'll know

9     more too at that point.

10          ATTY. PATTIS: Yes.

11          So, what we've talked about, Judge,

12     (indiscernible) other cases (indiscernible) and

13     neither side has concluded . . .

14          THE COURT: Oh, I know that.

15          ATTY. PATTIS: No, no, but we get it; and so, you

16     know, Mr. Jones is - I don't think they're gonna

17     permit me to take him outside of the scope of the

18     direct. So, I'll have to bring him back, and that'll

19     be an ordeal, but that's life. I mean, I could ask

20     you to use your discretion to permit me to go all the

21     way, but I'm not gonna.

22          THE COURT: I might get covid first.

23          ATTY. PATTIS: And, so, I think that he'll be,

24     right now, my only witness and they - they'll

25     work . . .

26          ATTY. MATTEI: Yeah, so, I mean, I think if Mr.

27     Jones wraps up relatively quickly, then - you know, I

1      think we'll be able to have a better assessment of
2      like, how far out, how (indiscernible) we can go.
3          THE COURT: All right, well we need to have a
4      fairly good idea.
5          ATTY. MATTEI: Yeah.
6          THE COURT: And let me know.
7          ATTY. MATTEI: And give them a heads up.
8          THE COURT: And then I will give them the heads
9      up, because they have lives too.
10          ATTY. MATTEI: Sure.
11          THE COURT: They don't have to – and plus, you
12      know, if we lose another Juror or something because
13      they think it's gonna go for . . .
14          ATTY. MATTEI: We are still off Friday, the 30th,
15      correct?
16          THE COURT: Yes.
17          ATTY. MATTEI: Okay.
18          THE COURT: (indiscernible).
19          ATTY. MATTEI: Okay, okay.
20                  (SIDE BAR ENDS)
21          THE COURT: All right, so, we're ready for our
22      Panel?
23          ATTY. KOSKOFF: Yes, Your Honor.
24                  (JURY ENTERS COURTROOM)
25          THE COURT: Okay, welcome back, please be seated.
26          Counsel will stipulate that the Panel has
27      returned.

1          ATTY. PATTIS: Will do.

2          ATTY. MATTEI: Yes.

3          THE COURT: All right, whenever you're ready

4     counsel; take your time.

5          ATTY. KOSKOFF: Thank you, Your Honor.

6          We're gonna call Jen Hensel.

7          THE COURT: Very well.

8          Watch your step; and if you could just remain

9     standing, we'll swear you in.

10          (TESTIMONY OF WITNESS JENNIFER HENSEL BEGINS)

11          THE CLERK: Please raise your right hand; do you

12     solemnly swear or sincerely affirm that the evidence

13     you shall give concerning this case to be the truth,

14     the whole truth, and nothing but the truth, so help

15     you God or upon penalty of perjury?

16          MS. HENSEL: I do.

17          THE CLERK: Thank you, you may be seated.

18          Then I just need you to state your name, slowly

19     spelling your last name for the record and the state

20     and county you live in.

21          MS. HENSEL: Jennifer Hensel, H-E-N-S-E-L, and

22     Fairfield County, Connecticut.

23          THE CLERK: Thank you.

24          THE COURT: Ms. Hensel, I'm sure you've heard me

25     say it to everyone, you help yourself at any time if

26     you'd like any water, okay?

27          MS. HENSEL: Okay.

1      THE COURT: And you may inquire whenever you're

2  ready, counsel; take your time.

3      ATTY. KOSKOFF: Thank you very much, Judge.

4      And good afternoon, Jen, thank you for being so

5  flexible; we had you scheduled - I think every day of

6  this trial and we finally got to you.

7      MS. HENSEL: It's okay.

8      ATTY. KOSKOFF: Can you just tell the Jury -

9  first of all, can you tell us who - what the name of

10  your daughter was?

11      MS. HENSEL: Oh, her name was Avielle.

12      ATTY. KOSKOFF: And did Avielle - did you lose

13  Avielle in the Sandy Hook shooting?

14      MS HENSEL: She died in the Sandy Hook shooting.

15      ATTY. KOSKOFF: Okay. Now, I wanted you to talk

16  to the Jury, explain to them who you are, where you

17  come from, where you grew up - things like that,

18  okay?

19      MS. HENSEL: Um-hmm.

20      So, I grew up in rural Iowa, eastern Iowa, we

21  were close to the Mississippi River, on a farm. My

22  parents weren't farmers, they were - my Mother was a

23  nurse and my Dad was an electrician, but we lived on

24  a farm and I had a farming lifestyle.

25      All my friends were farmers - well, parents of

26  all my friends - were children of farmers. It was -

27  it was a magical place to grow up. We were outside

1    all the time – all through winters and summers; we

2    spent a lot of time outside playing and working – we

3    did a lot of work. Just because my parents weren't

4    farmers didn't mean that the local farmers didn't

5    employ us; all the children had jobs.

6        My entire family was there; my father's family

7    was close by, my mother's family was close by – so I

8    had first, second, third-cousins, great-aunts, great-

9    uncles, great-grandparents - I was just surrounded by

10   amazing people and a lot of love growing up.

11       ATTY. KOSKOFF: And uh – give us a sense of the

12   size of this town – what was the name of the town?

13       MS. HENSEL: The town's name was Sabula; it means

14   "Sandy Beaches" – it's in an American-Indian language

15   that was close to where I grew up - or what was

16   formally there, and it's spelled S-A-B-U-L-A and it's

17   an island on the Mississippi River. The island itself

18   is a town of about five-hundred people, and our

19   residence was on the bluffs of the Mississippi River.

20       ATTY. KOSKOFF: And were there sandy beaches?

21       MS. HENSEL: There were sandy beaches.

22       ATTY. KOSKOFF: In Iowa?

23       MS. HENSEL: Yes.

24       ATTY. KOSKOFF: Did there come a time when you

25   went to college?

26       MS. HENSEL: There was a time, but it was so cold

27   – I ended up moving to the University of Arizona –

1    well, I didn't move to the University of Arizona, I

2    moved to Tucson, Arizona because it was so cold in

3    the winter – I was tired of that, and I enrolled in

4    the University of Arizona where I did an

5    undergraduate degree there.

6        ATTY. KOSKOFF: Okay, so did you start college in

7    Iowa and then – you just suddenly hit the wall?

8        MS. HENSEL: I did and – so, I started in Iowa.

9    There happened to be a blizzard one year and I just,

10    I thought, "I've lived here my whole life, it's time

11    to move and do something new". So, I moved to where

12    it's really, really hot.

13       ATTY. KOSKOFF: And you said you got an

14   undergraduate degree; can you tell the Jury what you

15   got an undergraduate degree in?

16       MS. HENSEL: Um, I've always been interested in

17   the sciences, so – especially diseases, and so my

18   bachelor's degree was in Microbiology Immunology.

19       ATTY. KOSKOFF: In an undergraduate?

20       MS. HENSEL: That's an undergraduate degree, yes.

21       ATTY. KOSKOFF: Okay, and where did this interest

22   in science come from?

23       MS. HENSEL: My parents; there was always talk of

24   science, and engineering, and math, and physics in my

25   home. Despite them not having graduate degree

26   educations, they always were so good about always

27   exploring; everything was an exploratory exercise in

1   our house.

2       'What did you learn, why did you do that?' When

3   we were getting in trouble, it was always, 'What made

4   you think about doing that?'. Broken bones were that

5   way; 'How did you jump off that hay mound and think

6   that that was gonna be okay? What kind of choices

7   were you thinking about at that time?'. So, science

8   and exploration were always just secondary to who we

9   were growing up, and my entire – both my siblings are

10  in science as well.

11      ATTY. KOSKOFF: And did there come a time when

12  you, perhaps, fell in love?

13      MS. HENSEL: Oh, um, yes. So, um . . .

14      ATTY. KOSKOFF: I'm talking about all of you

15  (phonetic) – well, go ahead.

16      MS. HENSEL: Well, I'm sorry, can you say that

17  again?

18      ATTY. KOSKOFF: Did your time to get – did there

19  come a time when you met somebody, fell in love, who

20  had later become somebody you married?

21      MS. HENSEL: Oh, yeah, definitely. So, I had

22  gotten myself into a situation where I just was not

23  at all happy in this relationship, and I broke up

24  with this boy at the time – young man. I was just

25  miserable and I wanted to take, at that time, the

26  hardest course you could possibly take as an

27  undergraduate in my field.

1     When I say this, it may seem silly, but at that

2     time, it was a degree – or a class called,

3     *'Recombinant Methods in D.N.A. Biology'*, and that

4     was . . .

5     ATTY. KOSKOFF: That's a – everybody's taken that

6     class.

7     MS. HENSEL: . . . a – that was a big class at

8     the time - but really, fifth, sixth, seventh-graders

9     learn all of these techniques now so, it's not that

10    big of a deal anymore, but at the time it was.

11    I met this man – young man, he was younger than

12    I was. He had long, black curly hair, half of his

13    face smiled; when he'd smile, his eyes would

14    disappear, you couldn't see his eyes. I walked into

15    this classroom and he just smiled at me, and I sat

16    next to him – I'm like, how could I not sit next to

17    this person?

18    We became friends and we were friends for a long

19    time before we decided to become romantic partners,

20    and the reason wasn't my fault, it was his. He was on

21    some sort of journey; he called it his *'Years of*

22    *Isolation'*, where he chose not to date anyone, not to

23    go out and hang-out with anybody. He was reading all

24    the time, and the only way I could spend time with

25    this man was to study with him; I made him become my

26    study partner.

27    So, that's how we fell in love; over D.N.A.

1    ATTY. KOSKOFF: Does this man have a name, by any

2    chance?

3    MS. HENSEL: He has a few names, but I always

4    called him Jer; but his name is Jeremy. He was just

5    Jer to me.

6    ATTY. KOSKOFF: And did there come a time when

7    you were able to extract Jeremy from his state of

8    isolation and further the relationship?

9    MS. HENSEL: We had to get into graduate school

10   for that, so, we had both applied to graduate school.

11   He was in a pharmacology and toxicology program with

12   an emphasis on the brain; neuroscience. I continued

13   my explorations in diseases and worked towards a

14   master's degree and achieved that eventually in

15   what's called pathobiology – and it's just how

16   diseases interact with your body.

17   ATTY. PATTIS: Judge, I'm having a hard time

18   hearing her.

19   THE COURT: If you could just speak up into the

20   microphone a little bit.

21   MS. HENSEL: Should I repeat that?

22   ATTY. PATTIS: No.

23   MS. HENSEL: Okay.

24   ATTY. KOSKOFF: So, you were explaining, you were

25   getting a master's in pathobiology?

26   MS. HENSEL: I was; and there was one night when

27   Jer just asked me, he's like,

1      "Do you – do you want to date me?"

2      And I'm like,

3      "Yeah, yeah I do."

4      So, that's just how we ended up and it was just

5      that simple. Life was simple with him; it was just

6      straight-forward. On other days, other things weren't

7      so simple, but it was pretty obvious we really,

8      really loved each other, even then.

9      ATY. KOSKOFF: Where were you physically located

10     at this point?

11     MS. HENSEL: Tucson.

12     ATTY. KOSKOFF: Tucson, still in Tucson, okay.

13     Did there come a time when you and Jeremy got

14     married?

15     MS. HENSEL: We were together ten-years before we

16     married.

17     ATTY. KOSKOFF: So, did you – did there come a

18     time when you and Jeremy moved from Tucson to

19     somewhere else?

20     MS. HENSEL: So, we traveled with these degrees –

21     we needed to travel for our professions; and so, you

22     often have to continue your education outside of

23     these – of achieving these degrees.

24     So, we moved, at that point, to Nashville,

25     Tennessee and attended a university there,

26     Vanderbilt, to continue these professions that we

27     were interested in – are interested in, and we were

1    there for three-years.

2         ATTY. KOSKOFF: At Vanderbilt?

3         MS. HENSEL: At Vanderbilt.

4         ATTY. KOSKOFF: And were you each earning

5    different degrees at the same time?

6         MS. HENSEL: No, Jeremey was doing what's called

7    a post-doctoral fellowship, which is, after you get a

8    PhD, you do that before you go out and you get a job.

9         I had a master's degree and so, what I needed to

10   do was expand - just expand my techniques and skill

11   levels, and so I worked in a couple of different labs

12   there.

13        ATTY. KOSKOFF: And did there come a time when

14   you and Jeremey moved out west?

15        MS. HENSEL: We did. When we moved to Nashville,

16   we knew that it wasn't going to be a life-long event,

17   and so we put a three to four-year cap on that and

18   wherever we would go from there was going to be up in

19   the air – and it just happened to be San Diego where

20   we ended up.

21        ATTY. KOSKOFF: Any particular reason?

22        MS. HENSEL: I think because Jeremy, um – I could

23   get a job almost anywhere, but Jeremey couldn't. The

24   higher your level of education, the less opportunity

25   there is for a position. So, he was able to actually

26   get a position there that he really loved and he

27   really wanted.

1      There were other options around the country, but

2    San Diego – we had friends there - really, really

3    good friends there; and San Diego is a beautiful

4    place to live. So, we thought, let's give that a try,

5    and that's what we did.

6      ATTY. KOSKOFF: And di there come a time when you

7    and Jeremy had a child?

8      MS. HENSEL: Yes – we did get married before her

9    though.

10      ATTY. KOSKOFF: I – I'll ask the question again,

11    I wasn't sure.

12      MS. HENSEL: yeah, um, so we got married because

13    – he asked me to marry him on the beach in San Diego,

14    and it was just so – it was just the two of us. It

15    was – he's like,

16      "You've been my partner and my friend for so

17    long"

18      You've been my partner for so long, and he asked

19    me to marry him and I, of course, said "Yes"; and we

20    had a great party, a great wedding.

21      A few years after that – we were never going to

22    have children; we just didn't think that was in our

23    cards, and then one day I woke up and I'm like,

24      *'Wow, my biological clock really does exist, I*

25    *really want to have a child.'*

26      And so, I asked him, I said,

27      "This may be a deal breaker for us . . ." – a

1     deal breaker.

2          ". . . we never wanted to have children, and

3     now, I want to have one, and I want to have one with

4     you. So, can you consider that? Can you please

5     consider that?"

6          And he was really nervous about that; he was

7     scared about it; it was not something that we had

8     ever planned. It took him about five-days, and I was

9     getting a little nervous about it. He came back, he's

10    like,

11         "Yeah, let's have a baby."

12         And so, we had this gorgeous little girl and she

13    was just – she was just so magical; and we named her

14    Avielle.

15         ATTY. KOSKOFF: And uh, I'd like to move to

16    introduce 485 – 484 and 485; two photographs that

17    have been marked for ID.

18         ATTY. PATTIS: No objection, Judge.

19         ATTY. KOSKOFF: You talked about – well actually,

20    I just want ed to show the Jury picture 485, please.

21         Can you . . .

22              (EXHIBIT 485 PRESENTED)

23         So, who is that – who are these people?

24         MS. HENSEL: That's me on the left, and Jeremy is

25    on the right, and that's Avielle in the middle.

26         ATTY. KOSKOFF: And about how old was Avielle and

27    where were you, do you think, at the time this

1        picture was taken?

2            MS. HENSEL: She was three, so that would have

3        been 2009, the December of 2009.

4            ATTY. KOSKOFF: Did there come a time when – oh,

5        well let me ask you, well yeah – did there come a

6        time when you and Jeremy moved Avielle – the three of

7        you went and moved to Sandy Hook?

8            MS. HENSEL: We spent quite a few years in San

9        Diego and there was just a time when I wanted to

10       think about leaving San Diego, and Jeremy was

11       considering leaving San Diego; and so he began a job

12       search.

13           We were looking at various parts of the country

14       again, and I said,

15           "Please consider the north-east corridor, I

16       would like to – I would like us to maybe try living

17       there. We had never lived out here before."

18           And so, we ended up here in 2011.

19           ATTY. KOSKOFF: Here, being in Sandy Hook?

20           MS. HENSEL: In Connecticut.

21           ATTY. KOSKOFF: In Connecticut.

22           MS. HENSEL: Yes.

23           ATTY. KOSKOFF: Okay, and how old was Avielle?

24           MS. HENSEL: She was four.

25           ATTY. KOSKOFF: When you moved out in 2011?

26           MS. HENSEL: Um-hmm.

27           ATTY. KOSKOFF: Can you just – can you tell the

1      Jury and me what Avielle was like? What was her

2      identity to you? Tell us about her.

3          MS. HENSEL: So, this girl had crazy, crazy curly

4      hair and she had her father's smile; just half of her

5      face was this smile, just like his. She was not at

6      all shy – to the point where it was actually quite

7      terrifying. She would just walk up to a stranger and

8      hang out with a stranger, want to know a stranger.

9          Sometimes she'd just rambunctiously run away –

10     run off, and we would find her because people would

11     be surrounded by her. We never lost her for long –

12     I'm not saying we lost her for more than maybe a

13     minute, but a minute is terrifying; and she'd be

14     surrounded by people who just wanted to be around

15     her.

16         She, um – gregarious and loud – she was so loud.

17     Funny, she – I guess she – we would lose her, and

18     occasionally we'd walk up and we would hear,

19         "A-V-I-E-L-L-E, Avielle."

20         Because people were just curious, like, 'What

21     does that name – I've never heard that name before',

22     and she got really, pretty tired of explaining her

23     name to people, but she did.

24         ATTY. KOSKOFF: She would let them know her name,

25     in no uncertain terms?

26         MS. HENSEL: She would always let them know her

27     name, yeah.

1    ATTY. KOSKOFF: And would she – was she a
2    troublemaker, would she – did she like art –
3    anything?
4        MS. HENSEL: She rode that line pretty tightly;
5    sometimes there was trouble.
6        I walked out of the house one day – and she knew
7    I kept a stash of bubblegum in my car, and she had
8    locked herself in my car and I went outside and she
9    knew she had been caught.
10       I saw the gum in her mouth and her pupils were
11   so black, because I think she got panicked – I think
12   she got scared that I was going to be like, '*What are
13   you doing in my car, eating all this gum?*', but all I
14   could do was just laugh at her, because I couldn't
15   even see her eyes, her pupils were so big; she was so
16   scared that I was gonna be mad at her.
17       But she would turn around and just – just crawl
18   into your arms and snuggle and just – just be our
19   only child. She was our only child, she was – she was
20   everything, it didn't matter if she was naughty, it
21   really didn't.
22       ATTY. KOSKOFF: Are – so, you're admitting that
23   you spoiled her?
24       MS. HENSEL: Yeah.
25       ATTY. KOSKOFF: Okay.
26       MS. HENSEL: I did.
27       ATTY. KOSKOFF: We've got to show the Jury a

1      picture of what you're talking about – 484.

2              (EXHIBIT 484 PRESENTED)

3          MS. HENSEL: Hm.

4          ATTY. KOSKOFF: What are – I don't know what

5      you're talking about with the hair.

6          Can you uh, can you tell the Jury – when was

7      this picture taken? First of all, can you just

8      identify this – is this Avielle?

9          MS. HENSEL: This is Avielle, yes.

10         ATTY. KOSKOFF: And can you tell the Jury when

11     this picture was taken?

12         MS. HENSEL: This picture was taken, um – she was

13     in first-grade, in the Fall of 2012.

14         ATTY. KOSKOFF: And um, who was her teacher?

15         MS. HENSEL: Victoria Soto.

16         ATTY. KOSKOFF: And who took this picture?

17         MS. HENSEL: Mrs. Soto took this photo; it's in

18     her classroom.

19         ATTY. KOSKOFF: The photo was taken in Victoria

20     Soto's first-grade classroom?

21         MS. HENSEL: yes.

22         ATTY. KOSKOFF: And, um . . .

23         MS. HENSEL: Mrs. Soto, um – Victoria's Mother

24     gave me this photo after – after she – after they

25     died.

26         ATTY. KOSKOFF: You can take it down.

27         We've already – the Jury's already heard about

1    the day from two – among other things, eye-witnesses,

2    Bill Aldenberg and Carlee Soto-Parisi, and I'm not

3    gonna ask you about that day.

4         I do – we would like to ask you though, what the

5    last – the last thing you remember about seeing Avi

6    (phonetic) and you know, what you remember about that

7    and what you can tell us.

8         MS. HENSEL: Um, so, we were supposed to go to

9    the Rockettes that day; she wasn't supposed to be in

10   school, but they had a special activity that they

11   were going to do.

12        So, my husband happened to stay home from work

13   that day and he was gonna work in the morning from

14   home, help her with her activity, and then we were

15   going to leave the school before lunch, around 11:00

16   A.M./11:15 A.M.

17        I – he walked her to the school bus – normally

18   that was me, and I noticed she was outside - it was a

19   chilly morning and she didn't have a coat. I thought,

20   '*Gosh, you know it's pretty darn cold*', so I ran a

21   coat out to her.

22        The bus pulled up – and there weren't very many

23   children on the bus, but there was a few. And she got

24   on and we were just blowing – we were blow – we were

25   just blowing kisses.

26        ATTY. KOSKOFF: Now, after December 14, 2012,

27   tell us a little bit about the week after or two

1    weeks after.

2         MS. HENSEL: Well, the week after, um – it was –

3    there were just funerals.

4         So, I live in a – I live on a real prominent

5    highway and we would see other families and their

6    funeral processions going by our house. We had people

7    from all over the country – because we had lived all

8    over the country, and they came to our house to help

9    us. They were there within twenty-four hours.

10        Um, – and one of those funerals, we were told

11   that there was – there was no space. We had heard –

12   because other people had had their family funerals

13   before ours, that the media was relentless.

14        We had heard things, at this point, that some

15   people had thought that this was not a real event,

16   that it was a hoax; and so, we did our best to not

17   publicly state where Avielle's funeral was or when it

18   was going to be, and it was through word-of-mouth by

19   family and friends only.

20        So, our funeral happened within a few days and

21   then – and then you just think, you know? The house

22   is quiet, the house doesn't have a child in it

23   anymore. Even though there's grown-ups around and

24   they're trying to help you, it's deafeningly quiet.

25        I couldn't sit in chairs; I was on the floor all

26   the time, because if you stood up, the whole world

27   was not right and you felt like you were just gonna

1      fly off the Earth - like you couldn't be held down to

2      the Earth, because everything was wrong. Everything

3      was wrong that week; everything was wrong.

4          ATTY.KOSKOFF: When did you first hear about this

5      issue about you being an actor or the thing about it

6      being a hoax – children not having died – can you

7      tell the Jury?

8          MS. HENSEL: We had heard about the hoax, but we

9      didn't think we were part of it, outside of just this

10     general thought, right? We didn't know.

11         We were staying away from the media, because it

12     was just relentless; everything was relentless, just

13     – it was really hard. So, I didn't realize that we

14     were truly part of this hoax for a few weeks.

15         ATTY. KOSKOFF: Well, you weren't, by the way.

16         It's been established that you weren't part of a

17     hoax.

18         ATTY. PATTIS: Objection.

19         ATTY. KOSKOFF: All right, we'll withdraw.

20         When did you first become aware that people were

21     saying things about you or families?

22         MS. HENSEL: In January of 2013.

23         ATTY. KOSKOFF: And what's your first

24     recollection, tell the Jury about that time period.

25         MS. HENSEL: So, we had heard – Jeremy and I just

26     walking through our home, and our home had people

27     there helping us and they were whispering and – and

1      they didn't want to tell us what was happening. They

2      didn't want to tell us that it was out there that –

3      this idea that this didn't happen, was out there.

4          I think Jeremy might of just said,

5          "You guys, what's happening? What are you doing?

6      What are you talking about?"

7          And um, and that's when we heard that there were

8      people talking about this not being real.

9          ATTY. KOSKOFF: And did you and Jeremy uh,

10     establish any Foundations in the aftermath of Sandy

11     Hook?

12         MS. HENSEL: One does that because you have to do

13     something – when everything you hold dear is taken

14     away from you, and it's taken away in such a way that

15     is, not, at all, okay – we had to do something. We

16     had to put this energy that was no longer being a

17     parent into something else.

18         ATTY. KOSKOFF: And what was that thing?

19         MS. HENSEL: So, we established a Foundation to

20     try to help what happened to us, not happen to

21     anybody else again.

22         ATTY. KOSKOFF: What was the name of that

23     Foundation?

24         MS. HENSEL: It was named after our daughter; it

25     was a way to honor her legacy, and it was called,

26     *"The Avielle Foundation"*.

27         ATTY. KOSKOFF: And did you establish this early

1      one? Like, when was this established?

2           MS. HENSEL: January of 2013 it became an entity,

3      yes.

4           ATTY. KOSKOFF: January of 2013?

5           MS. HENSEL: That early.

6           ATTY. KOSKOFF: And what was – can you just

7      describe to the Jury the idea or the mission behind

8      it?

9           MS. HENSEL: So, Jeremy and I are scientists and

10     we knew that there were factors about December 14th

11     that were being addressed by others - that maybe we

12     could have been a part of or helped, but we knew that

13     for someone to do what they did to our children and

14     our educators, that brain must have been really,

15     really sick. And how do you – how do you help fix

16     that?

17          So, we established a neuroscience foundation to

18     study the underpinnings of what causes somebody to be

19     violent and what protects from becoming violent. It

20     was a research and community organization that we

21     developed and put into place; and it's still in

22     existence, just under another name.

23          ATTY. KOSKOFF: Did you and Jeremy create content

24     for this, or have a website? Tell us a little bit

25     about that.

26          MS. HENSEL: So, we had - we had to create all of

27     our own content. This was an original idea, at this

1      point, not – there were no other people in science

2      working on the biological effects of what causes

3      violence; there's nobody else doing that.

4           My husband was skilled in neuroscience - so he

5      knew the brain, I'm a skilled scientist – so yes, we

6      created all the content for that website and for our

7      – just everything that came from *'The Avielle*

8      *Foundation'*, we worked on that together.

9           ATTY.KOSKOFF: Did there come a time when the

10     claims, the lies about Sandy Hook that were being

11     said about families – actors – not happening,

12     intersected with the Foundation?

13          MS. HENSEL: Almost immediately.

14          ATTY. KOSKOFF: Can you tell the Jury about that?

15          MS. HENSEL: So, when the website was launched,

16     we had buttons for donations, we had *'Email us here*

17     *at www.'* – well not, it was like *'Jeremey.Richmond'* -

18     at that time, there was only two of us;

19     *'Jermemy.Richmond@theaviellefoundation'* or

20     *'Jennifer.Hensel@theaviellefoundation'*.

21          We had a few other people onboard, so there was

22     a few emails there, but we received, at that point,

23     so many great supporters. We were receiving so - so

24     much support for the idea that we wanted to help

25     that.

26          ATTY. PATTIS: It's not responsive at this point,

27     Judge, objection.

1        THE COURT: Overruled.

2        MS. HENSEL: However, filtering in were people

3    who were attacking our idea and attacking us as

4    actors, and telling us that Avielle didn't exist and

5    that we just trying to get money from the public -

6    and how dare we do something like that.

7        Eventually, those became more and more, but the

8    idea for us was, *Let's not pay attention to that,*

9    *let's pay attention to what's good here . . .'*

10        ATTY. KOSKOFF: And how do you do that?

11        MS. HENSEL: *'. . . let's put some beauty back*

12    *into the world, and let 's not pay attention to the*

13    *ugliness that's happening to us right now'*; so, we

14    would delete those.

15        ATTY. KOSKOFF: Could you ever get ahead of

16    those?

17        MS. HENSEL: No, they - they filtered in and then

18    they ended up flooding in. If we did any sort of

19    media to promote our – our mission for our

20    Foundation, then it would just – it would come at us

21    like the flood gates were opening.

22        They would take any sort of – any sort of

23    content that we had and try to manipulate that in

24    ways that were trying to portray us a liars and

25    fraudsters – I think 'fraudster' came up numerous

26    times, and how we were trying to falice (phonetic)

27    money form the American public and that – and worse,

1    it wasn't just that. It ended up being that – you

2    know, our daughter is alive.

3         "How can you do that? She's alive – there's

4    proof out there that she's alive."

5         Then, eventually it became,

6         "She never existed."

7         This – that she never existed, and that we were

8    actors and . . .

9         ATTY. KOSKOFF: Jen, tell us, tell the Jury about

10   that "she never existed" and what that's like.

11        MS. HENSEL: Um, okay.

12        So, going from one child in this house that

13   takes up all your space, who – she shouldn't have

14   died; none of these people in this event should have

15   died. That – so, how do you go from living – I don't

16   know.

17        It's, um – she was such a big presence, how do

18   you - how do you negate a presence?  How do you do

19   that and say that somebody doesn't exist anymore? How

20   do you do that? That's what happened – that's what

21   happened to us.

22        ATTY. KOSKOFF: Did you receive a letter saying

23   that you're a liar, how could you do this, your

24   children . . .

25        ATTY. PATTIS: Objection, leading, best evidence,

26   hearsay.

27        ATTY. KOSKOFF: Did there come a time when you

1          received a letter that talked about your children not

2          deserving – that you and your children didn't deserve

3          a life?

4                    ATTY. PATTIS: Objection, leading again.

5                    ATTY. KOSKOFF: I'm asking its subject (phonetic)

6          – I'm asking . . .

7                    THE COURT: What was the question?

8                    ATTY. KOSKOFF: I'm sorry, Judge.

9                    THE COURT: That's all right.

10                   ATTY. KOSKOFF: Did you receive letters

11         challenging your daughters very existence and your

12         existence?

13                   MS. HENSEL: We did, there was also a website

14         that challenged my daughter's existence, with

15         theories behind it. It just – it was on the internet.

16                   ATTY. KOSKOFF: Do you have any sense as to have

17         many people – or how many millions of people – or how

18         many tens of millions of people believed that your

19         child didn't exist?

20                   MS. HENSEL: At that time, no. I do now.

21                   ATTY. KOSKOFF: Can you describe whether it – to

22         the Jury whether or not being repeatedly told that

23         your child didn't exist interfered with your ability

24         to come to grips and heal from Avielle's death?

25         Assume – have you ever healed, fully? Does one ever

26         heal? Did you?

27                   MS. HENSEL: I don't think you heal from

1    something like this. I think you forever hold grief

2    and you rebuild some joy back into your life, and it

3    balances. And some days, on other days, one takes

4    over the other and the other days the grief is just

5    so awful.

6        Then you add on the idea that people think that

7    you made all this up for money, or that your child

8    didn't exist – that compounds everything on top of

9    anything you do, and you can't – I couldn't work. I

10   write for a living, and I couldn't form sentences.

11       So, when they told – I was told that my daughter

12   – like, on this website, that she never existed, – it

13   makes it hard to work, it makes it hard to get out of

14   bed every day. It makes it hard to just push that

15   away; because you have to push that away, that

16   continual noise of all of the people saying that we

17   faked this, and that it never happened, and that

18   she's still alive somewhere - God, if she were,

19   wouldn't that be amazing?

20       If she wasn't and then that she never existed;

21   yeah, that's incredibly difficult.

22       ATTY. KOSKOFF: Do people use photographic

23   evidence as proof that Avielle was still alive?

24       MS. HENSEL: There's a photo out there, yes.

25       ATTY. KOSKOFF: Can you tell the Jury about that?

26       MS. HENSEL: Oh, there's this beautiful little

27   girl in my hometown – well, at that time, in

1    Connecticut, Sandy Hook, and these two little girls

2    happened to be at same school. They both had dark

3    curly hair, gigantic smiles, they looked a lot alike,

4    but they were separated in age by a few years.

5         My daughter came home and she's like,

6         "There's this girl at school, she looks just

7    like me, Mom, and she's my reading partner."

8         Because the older kids would help the younger

9    kids with their reading, and I thought that was

10   really, really sweet that the school put them

11   together, because they looked alike.

12        When my daughter died, her reading partner, her

13   peer at school, this other little girl became central

14   to many of these people who propagate the hoax that

15   Avielle never died and that this is evidence with

16   this child – this other child's photo. That this was

17   proof that she never died.

18        ATTY. KOSKOFF: They took a child – they took a

19   photograph of another child and said it was Avielle?

20        MS. HENSEL: That was – yeah, it was at an event.

21        ATTY. KOSKOFF: What was the event?

22        MS. HENSEL: The Superbowl of 2013.

23        ATTY. KOSKOFF: So, did – I don't – who, somebody

24   – where was this disseminated? Where did it go out,

25   to your knowledge?

26        MS. HENSEL: Where di d it go out?

27        ATTY. KOSKOFF: Let me rephrase that – how did

1    you become aware of it?

2         MS. HENSEL: Probably multiple ways; we still had

3    people in our home and occasionally we would find out

4    what was happening through friends, who were watching

5    what was happening on the internet; and through local

6    people who knew this other family, and said,

7         "This is happening to this other family, as well

8    as to you."

9         ATTY. KOSKOFF: Now, you're bringing this case

10   yourself, right? Jeremy died in March of 2019?

11        MS. HENSEL: Yes.

12        ATTY. KOSKOFF: By suicide?

13        MS. HENSEL: By suicide.

14        ATTY. PATTIS: Objection, Judge.

15        THE COURT: Overruled.

16        ATTY. KOSKOFF: And did the hoax – what did the

17   hoaxers, people who were doing these things to you –

18   this is the Alex Jones part, okay?

19        What did they do with Jeremy's death, by

20   suicide? Can you tell the Jury?

21        ATTY. PATTIS: Objection, foundation.

22        THE COURT: Overruled.

23        MS. HENSEL: We had heard from people in town

24   that some of these people who believed in this hoax,

25   um . . .

26        ATTY. PATTIS: Objection, double (phonetic)

27   hearsay.

1    THE COURT: Sustained.

2    ATTY. KOSKOFF: Well, let's hear damages at this

3    point, they were not (phonetic) offering it for the

4    truth.

5    THE COURT: Can you do it without hearsay?

6    ATTY. KOSKOFF: Okay, what did you – come to

7    mind?

8    MS. HENSEL: I received phone calls that said

9    people were in the cemetery looking for

10    Jeremy's . . .

11    ATTY. PATTIS: Objection, it's hearsay.

12    ATTY. KOSKOFF: It's not.

13    THE COURT: Can I have a side bar?

14              (SIDE BAR BEGINS)

15    THE COURT: Is there an exception that I'm

16    missing?

17    ATTY. PATTIS: Yeah.

18    ATTY. KOSOKFF: Yeah, everything we've been

19    talking about . . .

20    THE COURT: Yeah, but now she's . . .

21    ATTY. KOSKOFF: Sorry – everything here we've

22    been talking about – getting these emails is hearsay,

23    we're getting . . .

24    THE COURT: Well, no, he was objecting to this

25    question . . .

26    ATTY KOSKOFF: Sorry?

27    THE COURT: . . . which is – I mean, she's

```
 1          talking about whether other people told her
 2          something . . .
 3               ATTY. KOSKOFF: Now, she's getting a phone
 4          call . . .
 5               THE COURT: (indiscernible).
 6               ATTY. KOSKOFF: She's gonna get a phone call,
 7          explaining what's going on; that's her damages. That
 8          she had found out . . .
 9               ATTY. PATTIS: About your complaint - the
10          complaint was never amended to include any
11          (indiscernible).
12               ATTY. KOSKOFF: Well, I – sorry.
13               ATTY. PATTIS: Excuse me, I'm talking to the
14          Judge for a second, I'm sorry – to include any
15          allegations of incidents in Mr. Richmond's death.
16          There was (indiscernible) estate (indiscernible)
17          form; I'd ask for  an instruction if there's other
18          (indiscernible) of suicide . . .
19               ATTY. KOSKOFF: We're not talking about . . .
20               ATTY. PATTIS: . . . about Jones' behavior
21          causing him – could you instruct that? I'm worried
22          about them (indiscernible).
23               ATTY. KOSKOFF: Hang on, one (indiscernible) at a
24          time, sorry.
25               ATTY. PATTIS: Judge, that's concerning, it came
26          up to suicide – he didn't mention anything about that
27          before trial.
```

1    ATTY. KOSKOFF: But we're not claiming suicide.

2    ATTY. PATTIS: So, so . . .

3    THE COURT: So, can you come – so, you're not?

4    ATTY. KOSKOFF: That's right.

5    THE COURT: So, why don't you tell me what I'm

6    gonna tell the Jury, so that they're not confused.

7    ATTY. KOSKOFF: Well, nothing, right now. We'll

8    have to somewhat – I can establish my claim here but

9    not claiming any suicide, but the hoax – this

10   extends, it's all in – he gets brought into the hoax.

11   So, it's now . . .

12   THE COURT: How (indiscernible) bringing into the

13   hoax is one thing.

14   ATTY. KOSKOFF: I'm sorry?

15   THE COURT: That's one thing.

16   ATTY. KOSKOFF: Right, this is all – I have a

17   predicate for bringing him – now becomes part of the

18   whole hoax that he – and that's her damages.

19   ATTY. PATTIS: Remind me when Mr. Richmond died?

20   I forgot.

21   ATTY. KOSKOFF: (indiscernible)) March of 2019.

22   ATTY. PATTIS: There was no amended complaint

23   there, (indiscernible) . . .

24   ATTY. KOSKOFF: No, no, I know. (indiscernible)

25   stipulates it . . .

26   ATTY. PATTIS: I – they may have (indiscernible),

27   I'm sorry. I claim that this is beyond the scope of

```
 1          the complaint; if they wanted to claim this, and
 2          (indiscernible), I would - thought that there would
 3          be notice of this. So, I'm going to object on
 4          relevance grounds and the object that's it's outside
 5          (indiscernible).
 6               THE COURT: So, you trying to (indiscernible)?
 7               ATTY. KOSKOFF: I'm trying to get her to
 8          (indiscernible); it become part - it was to the
 9          effects of her damages - the result of this hoax
10          (indiscernible), right? That is what this case is
11          about.
12               So, this hoax starts - it's created by Jones;
13          all of this stuff flows from that. It gets brought
14               into . . .
15               THE COURT: So, part of the hoax is what he said
16          about the suicide.
17               ATTY. PATTIS: What'd he say?
18               THE COURT: Alex Jones - is that what you're
19          trying to say?
20               ATTY. KOSKOFF: No, no, no - others say - what
21          other . . .
22               THE COURT: What others, okay.
23               ATTY. KOSKOFF: So, it became that there were -
24          people were investigating; making it seem - saying
25          this fake guy, you know, is part of that fake - fake,
26          fake, fake.
27               THE COURT: Um-hmm, right.
```

```
1          ATTY. KOSKOFF: But I can make it clear that
2       we're not seeking – I mean, this is delicate, you
3       know? I can make it very clear when I . . .
4          THE COURT: How do you propose to do that?
5          ATTY. KOSKOFF: I will just – I will just ask
6       her, 'You're not – we're not making any
7       (indiscernible)', we can establish that; what could
8       be more clear than that?
9          THE COURT: What are you gonna say, that
10      (indiscernible) that fixes the problem?
11         ATTY. KOSKOFF: Oh . . .
12         THE COURT: (indiscernible).
13         ATTY. KOSKOFF: Oh, I would say like, 'Just to be
14      clear, you're not – we're not claiming that
15      any . . .'
16         ATTY. PATTIS: (indiscernible) and neither are
17      you claiming that . . .
18         ATTY. KOSKOFF: Right.
19         ATTY. PATTIS: . . .  and neither are you seeking
20      damages for it.
21         ATTY. KOSKOFF: Uh-huh.
22         THE COURT: All right, okay. Side bar can end.
23         ATTY. PATTIS: Josh (phonetic), please?
24         ATTY. MATTEI: Please.
25         ATTY. KOSKOFF: I'm sorry, Judge, (indiscernible)
26      just walk away?
27         THE COURT: No, I thought we were done.
```

1          ATTY. PATTIS: I still believe it's out of the
2      scope in pleadings; and it is such an - and I just
3      think it's outside the scope of pleading.
4          THE COURT: All right, on that issue, I will
5      overrule the objection.
6          But you're gonna say . . .
7          ATTY. KOSKOFF: (indiscernible).
8          THE COURT: . . . what you already said?
9          ATTY. PATTIS: I just want to make sure I heard
10     right . . .
11         ATTY. PATTIS: Considering we've got to get copy
12     of that transcript.
13         ATTY. MATTEI: Neither he, nor Alinor, nor I has
14     the ability to remember what was (indiscernible).
15         ATTY. PATTIS: You are – that you, we are not
16     claiming – 'You are not claiming that Mr. Jones
17     caused your husband's suicide, and you are not asking
18     this Jury to compensate you?'
19         ATTY. KOSKOFF: Right, (indiscernible) loss.
20         ATTY. PATTIS: That's what – that's what we
21     agreed.
22         THE COURT: That's exactly what he said.
23         ATTY. KOSKOFF: (indiscernible).
24         ATTY. PATTIS: Yeah, that'll – yeah, the
25     Defendant's, yes, thanks.
26         ATTY. KOSKOFF: The worst part . . .
27         THE COURT: I have a question, so it's ten after

```
1        four, how long is the deposition transcript?
2             ATTY. KOSKOFF: It's short.
3             ATTY. PATTIS: I have no cross at this point,
4        this is not a Witness I'm gonna go after.
5             THE COURT: Okay, so we can - we're gonna do
6        that.
7             ATTY. PATTIS: (indiscernible) say.
8             THE COURT: And I just want to make it . . .
9             ATTY. PATTIS: I just have something to say here
10       (indiscernible).
11            THE COURT: So, there's no confusion. So, there's
12       objections that they're gonna disregard, but they can
13       consider the answers. Is this one of the videos where
14       there are - is it a video deposition?
15            ATTY. MATTEI: It's (indiscernible) deposition,
16       there's no objection as to what we've designated.
17            THE COURT: But I thought that - so, some of
18       these submitted said that there were objections that
19       were made that should be disregarded. Is this one of
20       the . . .
21            ATTY. STERLING: Yes.
22            THE COURT: Yes - that they can consider the
23       answers - so, disregard the objections and they can
24       consider the answers.
25            ATTY. STERLING: (indiscernible) the objections?
26            THE COURT: beg your pardon?
27            ATTY. STERLING: (indiscernible) the objections?
```

1          THE COURT: One more time.

2          ATTY. STERLING: The way that the video is cut,

3     won't play the objections. So, they're gonna her

4     that . . .

5          THE COURT: Right, do we – so, the

6     (indiscernible) disregard the objections and you can

7     consider the response.

8          ATTY. PATTIS: Or focus only on the objections

9     and disregard the response.

10               (SIDE BAR ENDS)

11          ATTY. KOSKOFF: Sorry, Jen.

12          So, I just want to be clear, we were talking

13     about Jeremy; and I want to be clear with the Jury

14     and through you – you're not claiming that the

15     Defendant's caused Jeremy's suicide, is that right?

16          MS. HENSEL: Not as a direct cause, no.

17          ATTY. KOSKOFF: Okay, and you're not seeking –

18     we're not seeking damages as a result of his death?

19          MS. HENSEL: No.

20          ATTY. KOSKOFF: Okay.

21          The question though is – did the circumstances –

22     did Jeremy's death – did these people bring Jeremy's

23     death to this narrative that – you know, this lie

24     that Sandy Hook never happened and so-forth?

25          MS. HENSEL: Yes.

26          ATTY. KOSKOFF: And can you explain to the Jury

27     how that occurred?

1      MS. HENSEL: People were in the cemetery around

2      Avielle's grave-marker looking for evidence that

3      Jeremy had died; and I don't have a grave-marker for

4      Jeremy right now - I haven't quite figured out how I

5      want to do that yet, and to honor him in his way.

6          So, they wouldn't have found something there,

7      but that, for them, was enough proof to say that he

8      never died or that I was making this up.

9          ATTY. KOSKOFF: And they were saying you were

10     making this up, you were making up this - is this

11     part of you making up - being an actor, the whole

12     thing with Sandy Hook?

13         MS. HENSEL: It tied into the general, over-all

14     narrative of the hoax - of the hoax.

15     ATTY. KOSKOFF: And how did you become - how were you

16     made aware of this, that there were people lurking

17     around the gravestone - was it Avielle's gravesite?

18         MS. HENSEL: I received phone calls from people I

19     knew in town.

20         ATTY. KOSKOFF: And what was that like for you?

21         MS. HENSEL: It was relatively soon after

22     Jeremy's death, and I was still reeling from that - I

23     had to compartmentalize that. I couldn't - I couldn't

24     wrap my head around just one more family member being

25     part of this narrative.

26         ATTY. KOSKOFF: Have you ever come to terms with

27     that?

1    MS. HENSEL: It simply doesn't end; so, I don't

2    know if you can come to terms with it.

3    ATTY. KOSKOFF: Have you?

4    MS. HENSEL: No.

5    ATTY. KOSKOFF: Now, you talked about moving to

6    Sandy Hook and raising Avielle – by the way, you do –

7    you did have subsequent children with Jeremy, right?

8    MS. HENSEL: I did.

9    ATTY. KOSKOFF: I didn't mean to . . .

10   MS. HENSEL: Oh, that's okay.

11   ATTY. KOSKOFF: Sorry about that.

12   You had two children with Jeremy.

13   MS. HENSEL: Right.

14   ATTY. KOSKOFF: And how old are they?

15   MS. HENSEL: They are seven and five.

16   ATTY. KOSKOFF: Okay, and so, you're raising

17   them?

18   MS. HENSEL: I am.

19   ATTY. KOSKOFF: And can you tell the – can you

20   give the Jury a sense as to whether or not this has,

21   the whole thing – Alex Jones's pieces, has affected

22   your sense of security. Your feelings of safety in

23   your own home and in public.

24   MS. HENSEL:  So, when I had Jeremy with me and

25   parenting with me, there were two eyes always around,

26   looking – we'd look in the back of our cars, we look

27   though – we look around us, circles of awareness.

1  Who's on the horizon that is going to create trouble

2  – it's just how we've grown used to living.

3   Now, it's – it feels like it's – and it doesn't

4  feel like it is, it's just all on my shoulders now -

5  their safety. Of my children, of my property – as a

6  sanctuary, um – they're so little, they don't know.

7   They don't - they simply don't know anything.

8  When they're old enough to find out, I'm gonna have a

9  lot of explain to do, and that's gonna be really,

10  really hard.

11   ATTY. KOSKOFF: Now, a single-parents – parents

12  and single-parents always are in control, to some

13  extent, of their kid's safety and security, right?

14   MS. HENSEL: Right.

15   ATTY. KOSKOFF: So, why – how is that different,

16  if at all, as a result of this Alex Jones piece? Can

17  you describe that to the Jury?

18   MS. HENSEL: Can you – can you ask me again,

19  please?

20   ATTY. KOSKOFF: Yeah, I'm just wondering, because

21  as parents – some of us are parents, some of us

22  aren't, but as parents we are concerned about our

23  kid's safety. We are in charge of our kid's safety;

24  so that is something that everybody has some of,

25  right?

26   MS. HENSEL: Right.

27   ATTY. KOSKOFF: And s, can you just tell the Jury

1          what is it about Alex Jones publication to tens-of-

2          millions of people, that affects that dynamic for

3          you, if anything?

4              MS. HENSEL: So, they're so young – they're

5          innocence is so beautiful right now; and at some

6          point – there are a hoard of people out there who

7          could hurt them. Shouldn't hurt them, shouldn't talk

8          about them, shouldn't even know about them; and

9          because of what has happened after December 14th and

10         this hoax, they will know about that at some point.

11             I want to keep them as innocent as I can for a

12         long time. They don't know why we check the

13         backseats; I say,

14             "What's in the backseat? Is there a dog back

15         there? We gotta make sure the dog's not there."

16             So, everything's a game right now for them. They

17         don't understand why we do, what we do – and there's

18         no reason for them to understand that at this point.

19             So, yeah, it's a big deal. A lot of people know

20         about us; they don't know about anybody.

21             ATTY. KOSKOFF: And when you go out with your

22         children – what are their names, by the way?

23             MS. HENSEL: Imogen (phonetic) and Owen

24         (phonetic).

25             ATTY. KOSKOFF: And when you go out with your

26         children, do you have any idea whether you're

27         surrounded by friends or enemies?

1          MS. HENSEL: I'm always looking - I'm always

2     looking and scanning, always. So, I don't know. I

3     hope not, but I'm always looking.

4          ATTY. KOSKOFF: Thank you, Jen.

5          THE COURT: Attorney Pattis?

6          ATTY. PATTIS: No questions, Judge.

7          THE COURT: All right, you may step down; just

8     take your time and watch your step.

9          (TESTIMONY OF WITNESS JENNIFER HENSEL ENDS)

10          Attorney Mattei?

11          ATTY. MATTEI: Your Honor, what we'd now like to

12     do is play the excerpt in the video recorded

13     deposition of Robert Jacobson.

14          THE COURT: All right, and this is an exhibit?

15          ATTY. MATTEI: It's been pre-marked as an

16     exhibit, I believe the fully designated deposition is

17     marked as an exhibit; I can get it from Attorney

18     Ferraro, I don't have it handy.

19          THE COURT: So, you're now going to hear the

20     testimony of the Witness that was mentioned, as

21     recorded under oath at an earlier time. Your role as

22     Jurors in assessing testimony that's presented in

23     this manner, is no different than if the witness were

24     here in court to testify; and you should pay careful

25     attention as the video tape testimony is played.

26          You should not make any adverse inference from

27     the fact that the witness was not present in court to

1      testify, but rather you should consider this

2      testimony in the same way that you consider all the

3      other evidence in this trial.

4            Finally, you should disregard any objection that

5      you hear, that is made – which means that you can

6      consider the answers, despite the objections.

7            THE CLERK: Excuse me, one second, Your

8      Honor . . .

9            ATTY. MATTEI: This is pre-marked as Exhibit 354.

10           THE CLERK: Okay, because I have two exhibits for

11     Jacobson.

12           ATTY. MATTEI: Yup – may I approach, Your Honor?

13           THE COURT: You may.

14           THE CLERK: (indiscernible) this is Connecticut

15     (indiscernible).

16           ATTY. MATTEI: Yes.

17           THE CLERK: Okay, thank you.

18           ATTY. PATTIS: I don't even know if it's the same

19     one (indiscernible) Texas one.

20           I don't even see it listed here.

21     (EXHIBIT 354, VIDEO TESTIMONY OF ROBERT JACOBSON)

22           ATTY. MATTEI: That concludes Mr. Jacobson's

23     deposition testimony; and that completes our

24     presentation for today as well, Your Honor.

25           THE COURT: All right, so we are going to end for

26     today.

27           Ron will collect and secure your notepads – it

1        is very important - and I know that you're prompt for

2        every morning, and every afternoon, and every recess;

3        but it's important that we continue to do so. And

4        extremely important that you continue to obey the

5        rules of Juror conduct - especially with respect to

6        avoiding any media coverage, all right?

7            So, I have - safe travels home, we will see you

8        tomorrow morning, and we are adjourned for the day.

9                    (JURY EXITS COURTROOM)

10                   (COURT IS ADJOURNED FOR THE DAY)

11

12

```
DKT NO: X06-UWY-CV186046436-S    :   COMPLEX LITIGATION DKT

ERICA V. LAFFERTY                :   JUDICIAL DISTRICT WATERBURY

v.                               :   AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 :   SEPTEMBER 21, 2022


DOCKET NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMERIC JONES
```

## C E R T I F I C A T I O N

I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 21st day of September, 2022.

Dated this 22nd day of September, 2022, in Waterbury, Connecticut.

*Kendyl Henaghan*
Kendyl Henaghan
Court Recording Monitor