# EXHIBIT 35

```
DKT NO:  X06-UWY-CV186046436-S   :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY

v.                               :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                 :  SEPTEMBER 22, 2022

DKT NO:  X06-UWY-CV186046437-S
```

WILLIAM SHERLACH

v.

ALEX EMRIC JONES

DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES

                    TRIAL (A.M. SESSION VOLUME 2)

        BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
                          AND A JURY

(TESTIMONY OF ALEX JONES)

A P P E A R A N C E S :

    Representing the Plaintiff(s):

        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        ATTORNEY MATTHEW BLUMENTHAL
        ATTORNEY JOSHUA KOSKOFF
        Koskoff, Koskoff & Bieder
        350 Fairfield Ave. Ste 501
        Bridgeport, Connecticut 06604


        ATTORNEY NORMAN PATTIS for Jones Defendants


                          Recorded By:
                          Darlene Orsatti

                          Transcribed By:
                          Darlene Orsatti
                          Court Recording Monitor
                          400 Grand Street
                          Waterbury, CT 06702

1                    *              *              *

2              (Jury panel exits the courtroom).

3         THE COURT:  I think he's following the rules

4    here.  I think he was probably going to say one of

5    the bankruptcy –

6         ATTY. MATTEI:  Who was he going to say?

7         THE WITNESS:  Just the bankruptcy people are in

8    control of it.

9         ATTY. MATTEI:  Who sends you the daily sales

10   report?

11        ATTY. PATTIS:  Objection.  Objection.

12   Objection.

13        THE COURT:  All right.

14        THE WITNESS:  They don't – they've taken

15   it all –

16        ATTY. PATTIS:  Objection.

17        THE COURT:  Well that was nice and loud.

18        ATTY. PATTIS:  I'm getting there, Judge.

19        THE COURT:  So –

20        ATTY. MATTEI:  That calls for the identity of

21   the person.

22        THE COURT:  No – no.  So in fairness to Mr.

23   Jones, he could have said whatever the lingo is for a

24   bankruptcy – what were you going to say Mr. Jones?

25        THE WITNESS:  Yes, until yesterday the CRO, the

26   bankruptcies in full control of everything.

27        THE COURT:  All right.

1        THE WITNESS:  And they –

2        ATTY. MATTEI:  That's not responsive to my

3   question.

4        ATTY. PATTIS:  Objection.

5        THE COURT:  No –

6        THE WITNESS:  Cause I can't say –

7        THE COURT:  So the question – no, you did the

8   right thing.

9        THE WITNESS:  Okay.  Yeah.

10       THE COURT:  You asked who sends him the daily –

11  who gets the daily sales reports now, and if the

12  answer was the bankruptcy person, then he knows he's

13  not supposed to say that.

14       ATTY. MATTEI:  I said who sends you daily sales

15  reports.

16       ATTY. PATTIS:  And he said no one does.  When he

17  gets them, he gets them from the bankruptcy people.

18       ATTY. MATTEI: I don't think he said no –

19       ATTY. PATTIS:  He said no on two or three times.

20       THE WITNESS:  That is correct.

21       THE COURT:  All right.  So what do you propose

22  to do?  Because he's following the rules –

23       ATTY. MATTEI:  Move on.

24       THE COURT:  Okay.  Well done Mr. Jones.

25       THE WITNESS:  Thank you.

26       THE COURT:  You're welcome.  All right.  So why

27  don't we get the panel.  I think it's a good thing we

 1          brought the coffee pot today.

 2              ATTY. PATTIS:  And can the jury be informed that

 3          the was an appropriate break because there was some

 4          concern about compliance with a Court order?

 5              THE COURT:  No.

 6              (Jury panel enters the courtroom).

 7              THE COURT:  All righty.  Welcome back.  Take

 8          your seats whenever you're comfortable.  So, I hope

 9          you don't think we're - please be seated.  I hope you

10          don't think we're being impolite.  We have issues to

11          discuss, and it's so much easier to have you all get

12          up and go to your room, than us trying to all set up

13          somewhere else.  So just bear with us.

14              ATTY. MATTEI:  Thank you, your Honor.

15   DIRECT EXAMINATION RESUMES OF MR. JONES

16   BY ATTY. MATTEI:

17    Q   Mr. Jones, I want to shift gears a little bit.  Would

18   you agree with me that your reputation is very important to

19   you?

20              ATTY. PATTIS:  Objection to the form, Judge.

21              THE COURT:  Overruled.

22    A   No, I don't agree with you.

23    Q   But you agree that protecting your identity from lies

24   and false things about you is something that you care about.

25    A   I care about freedom.

26    Q   That wasn't my question.  So, my question was, would

27   you agree that protecting your identity, your own identity,

1  from people lying about you and spreading false things about

2  you, that's important to you, is it not?

3        THE COURT:  It's a yes or a no or I don't know.

4     A   Yes.

5     Q   And that's just a human thing, isn't it?  Nobody

6  wants to be lied about, right?

7     A   No.

8     Q   And particularly about the core things that make them

9  who they are.  Correct?

10    A   Yes.

11    Q   And you have those things in your life.  Your family,

12  yes?

13    A   Yes.

14    Q   Your work?

15    A   Yes.

16    Q   Your relationships with your loved ones, right?

17    A   Yes.

18    Q   The lessons you learned as a young person about how

19  to be in the world.  Yes?

20    A   Yes.

21    Q   All of things that go into who you are as a person,

22  right?

23    A   Yes.

24    Q   And you would never want to be maligned or lied about

25  without those things that are core to you.  Correct?

26    A   Yes, but I have been plenty.

27    Q   You have been, and that's been hurtful, isn't it?

1    A    The world isn't a easy place.  When people become

2  political figures, they get in the arena.

3    Q    You know, I think that that was probably what you

4  were just trying to do there was to suggest that –

5              ATTY. PATTIS:  Objection.

6              THE COURT:  Sustained.  And as I told the jury,

7          and I know you're probably sick of hearing it from

8          me, but this case is not about politics.  Okay.  It's

9          a hearing in damages.  Why don't you move on.

10   Q    Were you just trying to suggest that my client's,

11  these families, deserve what they got because they had

12  stepped into the area?  Is that what you were just trying to

13  say?

14             ATTY. PATTIS:  Objection.  Argumentative.

15   A    No.

16             THE COURT:  Overruled.

17   Q    That's not what you're – okay.  Thank you.

18   A    But I'm saying, when you get –

19   Q    That's not what you were saying.

20             THE COURT:  Just wait for the – Mr. Jones.

21   A    Yes, ma'am.

22   Q    So the – what I'm trying to get at though Mr. Jones,

23  is that these things that are core to who you are or anybody

24  is, they're lied about, and defamed.  Even just a small

25  group of people, that can be very hurtful, can't it?

26   A    Yes.

27   Q    And although you've been critical of this Court and

1    the judicial system, you yourself have sought protection in

2    the courts when people have lied about you.  Haven't you?

3      A    I mean, I had before.

4      Q    Yeah.  And in fact, during this very lawsuit, you

5    yourself have brought a lawsuit against others who you

6    claimed had defamed you.  Correct?

7      A    You talking about the Young Turks?

8      Q    Yeah.

9      A    Um-hum.

10      Q    You did that, right?

11      A    Yes.

12      Q    Can we bring up Exhibit 434 for Mr. Jones, please?

13           THE COURT:  Is it full or ID?

14           THE CLERK:  ID, your Honor.

15           THE COURT:  134.

16           ATTY. MATTEI:  434, your Honor.

17           ATTY. PATTIS:  Politics.  Motion in limine.

18       Politics.

19           THE COURT:  Why don't I take a look at it first?

20           ATTY. MATTEI:  Sure.

21           THE COURT:  So, Mr. Jones, just give me –

22           ATTY. MATTEI:  Mr. Jones was asked about this in

23       his deposition, your Honor.

24           ATTY. PATTIS:  It's non – it doesn't matter,

25       Judge.

26           THE COURT:  How many pages is this?

27           ATTY. MATTEI:  Your Honor, I could tell you.

1   Nine pages, I believe.  There's an exhibit in the

2   back that's attached.

3        THE COURT:  Are the ID in here too?

4        ATTY. MATTEI:  Can I give you – I can give you

5   my copy, Judge, if you want to look at it.

6        THE COURT:  No, that's – I don't want to take

7   your copy.  Just give me a minute.  We have to keep

8   Ron on his toes.  Thank you.  May I see counsel on a

9   sidebar, please?

10        (Sidebar conversation begins).

11        THE COURT:  I don't know who the Young Turks, or

12   I didn't see anything in that complaint that's about

13   politics at all.

14        ATTY. PATTIS:  He's going to talk about why he

15   sued the Young Turks.  And he believes that they're

16   part of another political conspiracy.  I mean, the

17   problem with this fella, everything is part of a

18   conspiracy.

19        ATTY. MATTEI:  The complaint, it's just an

20   admission.  It's offered to show his knowledge in

21   damages with the understanding that's that the -

22        THE COURT:  Yeah.

23        ATTY. MATTEI:  - Young Turks are another media

24   organization.

25        THE COURT:  They're a media organization.

26        ATTY. MATTEI:  They're a media organization.

27        ATTY. PATTIS:  Right.

1       ATTY. MATTEI:  That's it.

2       ATTY. PATTIS:  They're competing people who he

3 thinks got co-opted as part of a conspiracy against

4 him.

5       ATTY. MATTEI:  But look, that to me isn't

6 politics.  And beyond that, that's not relevant for

7 the prudist to which – for which this is Inaudible).

8       ATTY. PATTIS:  But you don't get to – my – my

9 position is, Judge, that the plaintiff's don't get to

10 choose the purpose without opening – they can't say,

11 well, we get to hurt, but you can't help your own

12 client.  It doesn't work that way.

13       ATTY. MATTEI:  Well, I –

14       ATTY. PATTIS:  In the same way that many of the

15 exhibits contain the very figures who's names I'm

16 permitted from mentioning.

17       THE COURT:  You can – I understand –

18       ATTY. MATTEI:  I'm using it.  And so –

19       ATTY. PATTIS:  Well, I don't about you're using

20 it.  The Court needs to rule on it.

21       ATTY. MATTEI:  I'd ask you – this opens the door

22 to anything beyond the issues that I'm asking.

23       ATTY. PATTIS:  I'll ask him why he sued the

24 Young Turks, and then they're going to have to live

25 with that answer.

26       THE COURT:  And is it going to violate my order?

27       ATTY. PATTIS:  It might.

1        THE COURT:  But you don't know.  It might, it

2    might not.  I mean, I don't know –

3        ATTY. PATTIS:  If he answers truthfully – if he

4    answers truthfully, he will talk about them being

5    part of – having been co-opted by a political

6    opponent.  Yes.

7        ATTY. MATTEI:  Based on what?  Hearsay?

8        ATTY. PATTIS:  He doesn't have to give you

9    that – it's his understanding.

10        THE COURT:  But we could still – you discuss it

11    then I'll just instruct the jury like I did politics.

12        ATTY. PATTIS:  Well, I mean my contention Judge,

13    is they don't – that the plaintiff's do not get to

14    open a door and then say you can't look inside the

15    room.  And so there are ways to do this without

16    opening that door.  But if they're going to open it,

17    we're going to walk.

18        THE COURT:  So how do you do it without opening

19    the door?

20        ATTY. PATTIS:  We've sued, you know about

21    damages – if the contention is, you sued.  You know

22    how people can sue for defamation for another group.

23    Correct.  He acknowledged he did.  You were seeking

24    damages – damages for your reputation – yes. That's

25    because you believe that's an appropriate thing to

26    do, isn't that right?  I think that's what they're

27    trying to get.

1        ATTY. MATTEI:  Nothing political.

2        THE COURT:  I don't always agree with him, but

3    I'm agreeing with him now.

4        ATTY. PATTIS:  Can I order this piece of the

5    record, Judge?

6        ATTY. MATTEI:  I'm going to ask the questions

7    about it, and we can argue about what door.

8        ATTY. PATTIS:  No, I'm objecting.

9        THE COURT:  Be much better if you did it along

10    those lines, so it doesn't open a door.

11        ATTY. MATTEI:  I don't want to talk about

12    politics with this guy at all.  I'm not asking about

13    his lawsuit and his claim that he was –

14        ATTY. PATTIS:  Okay, well.  Judge, I think they

15    do so at their peril.

16        ATTY. MATTEI:  Fine.

17        (Sidebar conversation ends).

18        ATTY. MATTEI:  I'd offer it, your Honor.

19        ATTY. PATTIS:  Judge, may the jury be excused?

20    I'd like to make a more complete record based on what

21    I just heard -

22        ATTY. MATTEI:  No.

23        ATTY. PATTIS:  - at sidebar.

24        THE COURT:  So that is on the record.  So we

25    have the record, and it will be admitted over

26    objection.

27  BY ATTY. MATTEI:

1     Q   So before we pull it up.  Let's just give the jury a

2  little background.  So you brought this lawsuit against an

3  individual named Brianna Wu, correct?

4     A   Yes.

5     Q   An individual name Andrew Kimmel, yes?

6     A   Yes.

7     Q   And an entity called the Young Turks, LLC, correct?

8     A   Yes.

9     Q   And you brought that lawsuit in September of 2019.

10  Correct?

11     A   Yes.

12     Q   Okay.  So about a year and a half after this lawsuit

13  that you filed, yes?

14     A   Yes.

15     Q   And do you know who Brianna Wu is?

16     A   It was a – people online, so-called journalists

17  saying –

18     Q   I just asked you about Brianna Wu.  So I want to ask

19  you –

20     A   I don't remember who she is now.

21     Q   You don't remember who she is.  Thank you.  Do you

22  remember who Andrew Kimmel is?

23     A   Not really.

24     Q   Okay.  But you sued them.

25     A   I mean – yes.

26     Q   Okay.  And the Young Turks, LLC, am I correct that

27  that's a media organization.

1    A    Yes.

2    Q    Okay.  And you brought this lawsuit because you

3    claimed that these people had spread a lie about you, right?

4         ATTY. PATTIS:  Objection.  Motion in limine.

5    Opens door -

6    A    I -

7         THE COURT:  I'm going to allow it.

8    A    I brought the lawsuit to get them to retrack and stop

9    saying it.

10   Q    But what you wanted -

11   A    It wasn't money.

12   Q    Well, we'll get to that.  But what you wanted was

13   to - you used them because you believed they had spread a

14   lie about you.  Correct?

15   A    Yes.  It was directly connected in this case.

16   Q    Correct.  So let's get into that.  So what happened

17   was, back in 2019, you were required to produce some

18   documents to the plaintiffs in this case.  Correct?

19   A    And I did.

20   Q    Okay.  And among the documents that you gave to your

21   lawyers, and that your lawyers produced to us, were some

22   emails.  Correct?

23   A    Yes.

24   Q    And -

25   A    I think 200 and something thousand.

26   Q    So, sir - really, you just have to answer my question

27   yes or no.

1          THE COURT:  All right, so —

2          ATTY. PATTIS:  Objection to the comments.

3          THE COURT:  So — excuse me.  So if anyone,

4     either of you need any help with any witness not

5     answering the questions that you're asked.  Ask me to

6     do it.  That's my job.  I like to do my job.  I'm not

7     bad at my job.  I know you know what I'm going to

8     say, Mr. Jones.

9          THE WITNESS:  Just yes or no.

10         THE COURT:  Yeah.  Yeah.  Or I don't know.

11         THE WITNESS:  Okay.

12         THE COURT:  Okay.  Just answer, sir.

13         ATTY. MATTEI:  And —

14         THE COURT:  No — no.  I'm still speaking.

15         ATTY. MATTEI:  I'm sorry.  I thought you were

16    done.  Thank you.  I'm sorry.

17         THE COURT:  Mr. Jones, just look at me when I

18    talk to you.

19         THE WITNESS:  Yes.

20         THE COURT:  Just yes, no, or I don't know.

21         THE WITNESS:  I understand.  Yes.

22         THE COURT:  Thank you.

23    BY ATTY. MATTEI:

24    Q   Your lawyers, you gave your lawyers some emails to

25    send to us, and they sent them.  Right?

26    A   Yes.

27    Q   And attached to some of those emails were images of

1   child pornography.   Correct?

2   A   Yes.

3   Q   And the FBI was alerted by this.   Right?

4   A   Yes.

5   Q   And the FBI concluded that while those emails were in

6   your organization and possession, they had been sent to your

7   organization from outside.   Correct?

8   A   Yes.

9   Q   And that there wasn't any evidence that you or

10  anybody in your organization had opened them.   Correct?

11  A   Yes.

12  Q   In other words, that although they had been sent to

13  us, that had been done inadvertently.   Correct?

14  A   Yes.

15  Q   And when you were advised of this you were upset,

16  yes?

17  A   Yes.

18  Q   And so you went on the air.   Correct?

19  A   Yes.

20  Q   And you blamed my office for having planted it.

21  Correct?

22  A   No.

23  Q   Mr. Jones, do you want to see the video, sir?

24  A   Go ahead and roll it.

25  Q   Would you like me to?

26  A   I mean if you want to.

27  Q   You offered a million dollars to have my head on a

1   pipe –

2          ATTY. PATTIS:  No.  Objection.  That

3      mischaracterizes it.  May we approach?

4          ATTY. MATTEI:  I don't think we need to.  That's

5      a yes or no.

6          ATTY. PATTIS:  I do.

7          THE COURT:  So – come on.

8          (Sidebar conversation begins).

9          ATTY. PATTIS:  He didn't.  I was sitting right

10     there.  He was never charged with a crime.

11         ATTY. MATTEI:  The judge has seen the video.

12         ATTY. PATTIS:  You've seen the video and he said

13     he talked about who his suspicions about Mr. Mattei,

14     but he never said he – he said he'd offer a million

15     dollars for the person who did it.  He had suspicions

16     about him.  To suggest as an officer of the court

17     otherwise – Excuse me.  To suggest otherwise as an

18     officer of the court, I'm asking for a curative

19     instruction and admonishment of counsel.

20         ATTY. MATTEI:  I (Inaudible) with you.

21         ATTY. PATTIS:  I was sitting there.  I don't

22     need to.

23         THE COURT:  No – can you ask – so I'm not going

24     to give a curative instruction.  I'm not going to

25     admonish.  Can you ask it in a different way?

26         ATTY. MATTEI:  Well, he hasn't answered it.

27         THE COURT:  Right.  So it was objected to.

1          ATTY. MATTEI:  So he can say no again.

2          THE COURT:  So, can you ask it in a different

3      way.

4          ATTY. MATTEI:  Your Honor, he can say no if he

5      wants.  Then I can impeach him.

6          THE COURT:  Can you ask it in a different way.

7          ATTY. MATTEI:  I'll ask it in a different way.

8          THE COURT:  So then I'll sustain the objection,

9      and you can try to ask it a different way.

10         ATTY. MATTEI:  Thank you.

11         (Sidebar conversation ends).

12         THE COURT:  And attorney, we're due for a break

13     anytime between now and the next ten minutes.  I'm

14     going to leave it up you as to when is a good point.

15         ATTY. MATTEI:  Great.  Yup.  Thank you.  Yup.

16  BY ATTY. MATTEI:

17     Q   So Mr. Jones, when you found out about this, you went

18  on your show, right?

19     A   Yes.

20     Q   And you held my picture up to your audience, yes?

21     A   You have to refresh my memory.

22     Q   Oh, Mr. Jones you know you did that, don't you?

23         ATTY. PATTIS:  Objection.

24         THE COURT:  Overruled.

25     Q   You know you did that?

26     A   No.  I believe you conflated your picture being on

27  the pile of stuff, and me saying there was a reward to find

1   who did it.  So how was there reward if we don't –

2            THE COURT:  All right.  So Mr. Jones, the

3       question was you held my picture up.  And I'm not

4       sure I got your answer.  Was it yes, no or I don't

5       know.

6            ATTY. PATTIS:  Or I don't recall, Judge –

7   A   I don't recall.

8            ATTY. PATTIS:  – I think is what he said.

9   A   I don't recall.

10  Q   Do you recall pounding on my picture?  Do you recall

11  that?

12  A   I pound my desk all the time.  There was a pile of

13  papers.  I remember that.

14  Q   Okay.  All right.  And the reason I'm doing this is

15  because when you went on the air and did all that, people

16  found out that there was this issue about your company

17  having sent child pornography in my office.  Correct?

18  That's how people found out about it.

19  A   Well, you're not going to be clear that someone sent

20  it to me?

21  Q   No – no – no.  I think we've established that –

22  A   No, but you're getting it set up for clips though.  I

23  know what you're doing.

24  Q   Mr. Jones, really.  I think it's established.  And

25  nobody contests that you had nothing to do with that child

26  pornography.  Okay.  Let's make that clear.

27  A   That you guys found it.

1    Q    Correct.  We found it because it was sent to us,

2  right?

3    A    Cause it was hidden – hidden embedded and then you

4  guys found it.  Really good job.

5              THE COURT:  So, Mr. Jones –

6              THE WITNESS:  I know I'm not supposed to –

7        sorry.

8          .  THE COURT:  No, no – look at me.

9        No commentary –

10             THE WITNESS:  I understand.

11             THE COURT:  Answer the question that's asked,

12        sir.

13             THE WITNESS:  Yes, ma'am.

14             THE COURT:  Thank you.

15 BY ATTY. MATTEI:

16    Q    But when you went on the air, that's how it became

17  public that there was this whole issue that child

18  pornography had been sent from your company to my law

19  office.  Correct?

20             ATTY. PATTIS:  Objection, Judge.  That calls for

21        speculation.  That - well maybe one avenue –

22             THE COURT:  Overruled.

23    A    I don't remember.

24    Q    All right.  But in any event, once it became public,

25  you claimed that Brianna Wu and Andrew Kimmel and the Young

26  Turks, had lied about you having sent it.  Correct?

27    A    They said more than that if I remember.

1   Q   Right.  And you allege that in your complaint.

2   Right?

3   A   Yes.

4   Q   And that was deeply harmful to you, that they have

5   lied about the fact that you had sent child pornography.

6   Right?

7   A   People still say it all the time everywhere.

8   Q   It's a terrible thing to be accused of, correct?

9   A   Yeah.  But they quit saying it, so I dropped the

10   suit.

11   Q   And they were spreading to all over the internet this

12   lie about you, that you had sent child pornography.

13   Correct?

14   A   Purposely.  That was the issue.

15   Q   And that's why you brought this lawsuit, yes?

16   A   Yeah.

17   Q   Okay.  Your Honor, this would be a fine time for a

18   break.

19         THE COURT:  All righty.  So we will take our

20         morning recess now, 15 minutes.  I know you're

21         probably saying to yourself why do we need another

22         recess?  We just got up and down.  But our staff has

23         been here, and we've been working the whole entire

24         time.  And so I'm required to give them a break.

25         So you'll continue to obey the rules of juror

26         conduct.  Ron, 15 minutes puts us at what time?  I

27         turned my Apple watch off so much that I can't even

1        find the clock.

2               THE CLERK:  12:07.

3               THE COURT: Let's say 12:10, okay.  So we'll take

4        a recess.

5               (Jury panel exits the courtroom).

6               (Recess.  Resumed).

7               THE COURT:  Good afternoon, everyone.  Please be

8        seated.  All right.  We're ready for our panel.  Mr.

9        Jones, you want to come up here, sir.

10              I'm going to need a minute once he brings the

11       panel in, because I left my notes on my desk.

12              ATTY. PATTIS:  You're welcome to mine, Judge.

13              (Jury panel enters the courtroom).

14              THE COURT:  All right.  Counsel stipulate the

15       entire panel has returned.

16              ATTY. PATTIS:  I do.

17              THE COURT:  Please be seated.  Just give me one

18       moment.  Just bear with me for a moment.  Mr.

19       Ferraro's getting my notes that I left in my

20       chambers.  Thank you, Mr. Ferraro.  Thank you.

21       Whenever you're ready, Attorney Mattei.

22              ATTY. MATTEI:  Thank you.

23  BY MR. MATTEI:

24    Q   Mr. Jones, before the break we were talking about

25  this lawsuit that you brought, right?  You remember that?

26    A   Yes.

27    Q   Okay.  And again, this lawsuit was brought against a

1    Mrs. Wu, and Mr. Kimmel and the Young Turks, LLC, for them

2    stating online that you had sent child pornography to the

3    plaintiffs in this case, correct?

4       A    They said more than that.

5       Q    Okay.  But was that the gist of it?

6       A    No.  They -

7       Q    Tell me what you sued them for?

8       A    I mean they said that I intentionally did it, and

9    that I was horrible.  They said a bunch of stuff.  It was a

10   lot of different program shows, and we - you know -

11      Q    Okay.  Okay.  But the gist of the lie here was that

12   you had sent child pornography to the plaintiffs in this

13   case.  Yes.

14      A    Yes.  Not that it had been sent to me unopened, then

15   discovered by you and discovery sent to you.

16      Q    They left that part out.  Correct?

17      A    I don't remember now.

18      Q    Okay.  But that would have been important context for

19   them to provide an accurate account of what happened here.

20   Correct?

21      A    Yes.

22      Q    Okay.  And they didn't do that.

23      A    Yes.

24      Q    Right.  And as a result of those statements, you

25   claim that this had resulted in viral spread of this lie

26   about you.  Correct?

27      A    Yes.

22

1    Q    The Young Turks had a Twitter account, they posted it
2    to that.   Correct?
3    A    They have a popular television show that's also on
4    television, and the issue was I was –
5    Q    I just asked you about the Twitter account, sir.   So
6    let's just go one step at a time.
7    A    Okay.
8    Q    I mean, the concern you had was that this lie about
9    you was spreading online.   Correct?
10   A    Yes.
11   Q    In a viral way, right?
12   A    Yes.
13   Q    And what you meant by that was, that it was taking
14   off online.   Correct?
15   A    Yes.
16   Q    And reaching a wide audience, yes?
17   A    Yes.
18   Q    And the more people who come into contact with this
19   as you called it, one of the worse smears that can be spread
20   about anyone, the more people that came in contact with
21   that, the more damage was being done to you.   Correct?
22   A    I mean, I think that's fair to say.
23   Q    And because the more people who see this, the more
24   people who might believe it, right?
25   A    Well, it's – I don't know they're going to believe
26   it, but it's –
27   Q    That's the concern, right?

1    A    Yes.

2    Q    Because if people believe, especially a large number

3    of people who encounter this line on the internet, that you

4    possess child pornography, that would be a horrible,

5    horrible stain on your reputation as an individual.

6    Correct?

7    A    I think it's 20 years in prison too.

8    Q    Correct.  They accused you of a felony, didn't they?

9    A    Yes.

10   Q    And not only just any felony, I mean – assault is a

11   felony, but this is a particular kind of felony, possessing

12   child pornography.  Right?

13   A    And distributing it.

14   Q    And distributing it.  And it's the type of allegation

15   that would provoke a lot of anger in people who – if they

16   were to believe that about you.  Right?

17   A    Yes.

18   Q    And it might provoke people to even want to confront

19   you about it.  Right?

20         ATTY. PATTIS:  Objection.  Calls for speculation

21      what might occur.

22         THE COURT:  Sustained.

23   Q    I think you testified earlier that you have come

24   across people who have accused you of this, right?

25   A    It's still ongoing.

26   Q    Right.  And if that happens, obviously there are

27   certain measures you need to take to try and protect

1  yourself from people who may need to do you harm as a result

2  of this.  Right?

3    A   And when they stopped saying it, we dropped the suit.

4  We just wanted them to stop saying it.

5    Q   But I'm just saying, when people believe something

6  horrible like this, that you're a child pornographer, that

7  could lead to people who believe it, to hate you.  Right?

8            ATTY. PATTIS:  Objection.  This calls for

9        speculation.

10           THE COURT:  Overruled.

11   A   I mean, I think that's fair to say.

12   Q   And if they really believe it and they really hated

13  you, you might have a few people come after you.  Right?

14           ATTY. PATTIS:  Objection.  Speculative now.

15           THE COURT:  Overruled.

16   A   Well, like the police.

17   Q   That's one, right?  But what about people who are

18  just out there and unhinged, thinking Alex Jones, the child

19  pornographer.  The next time I see him, boy.  That's a

20  concern, right?  It's a reasonable concern.

21   A   And they name my name.  I didn't name most of these

22  people's names.

23   Q   Yeah.  I'm not asking you about that.

24   A   Okay.

25   Q   I know you might kind of see where I'm going with

26  this –

27   A   Yeah, I did.

```
 1            ATTY. PATTIS:  Objection.  Move to strike.

 2            THE COURT:  Let's move on to the next question.

 3    Q    And as a result of that concern, you yourself have

 4    taken measures to protect you and your family.  Correct?

 5    A    We had to have more security since the Sandy Hook

 6    thing actually than that.

 7    Q    But you got security guards in the courtroom right

 8    now, don't you?

 9    A    Yeah.

10    Q    These two gentlemen over here in the black jackets,

11    those are your - that's part of your security team?

12    A    Yes.

13    Q    They follow you everywhere you go, right?

14    A    Yes.  Not due to the fake child porn, but due to

15    this.

16    Q    You - well, you had a security team for a long time,

17    haven't you?

18    A    That's - but the main - I mean you're asking me -

19    Q    I'm just asking you -

20            ATTY. PATTIS:  Objection.  Motion in limine.

21            ATTY. MATTEI:  Have you had a security team for

22        a long time?

23            ATTY. PATTIS:  Doors.

24            THE COURT:  It's a yes or no whether he's had a

25        security team for a long time.

26            ATTY. PATTIS:  Why?  Objection.

27    A    For years since the Sandy Hook.
```

1    Q    And this gentleman here on the right, that's Tim

2  Enlow, is that right?

3    A    Yes.

4    Q    Okay.  And he's your head of security?

5    A    Yes.

6    Q    And they walk around with earpieces, right?  So they

7  could communicate with one another?

8    A    I don't know they have those.

9    Q    You flew up here on a private jet, is that right?

10   A    A charter plane.

11   Q    Charter plane.  Okay.  And so you – one of the

12  reasons you do that it because you travel commercial, you

13  don't know who you run into.  Right?

14   A    Since this case, yes.

15   Q    Okay.

16   A    Since the Texas cases it's –

17   Q    Mr. Jones, do you really want to

18   A    Bad.

19   Q    It's not a big point here, but you are under oath,

20  and so I just want to ask you –

21        ATTY. PATTIS:  Objection, Judge, again.

22        THE COURT:  So let's just get the next question.

23   Q    Is it your testimony –

24        ATTY. PATTIS:  Objection.  Can we have a

25        curative instruction?

26        THE COURT:  All right.  Just one second.

27        Sidebar, please?

```
 1                    (Sidebar conversation begins).
 2            THE COURT:  Just one second.  I don't want the
 3       interrupting, so what do you suggest?
 4            ATTY. PATTIS:  Was I –
 5            THE COURT:  You're talking, you're talking,
 6       you're talking.  I can't hear what you're saying.
 7            ATTY. MATTEI:  I know.  Attorney Pattis doesn't
 8       like when I –
 9            THE COURT:  Can we just – can we stop it.
10            ATTY. PATTIS:  I objected to his instructing
11       counsel, which is the role of the Court –
12            THE COURT:  All right.  So if you have an issue,
13       just – I don't want to interject myself more than I
14       have to.  But if you're not, just ask me and I will –
15            ATTY. MATTEI:  Understood.  Understood.  Yup.
16            (Sidebar conversation ends).
17            THE COURT:  So just as a gentle reminder, Mr.
18       Jones
19            THE WITNESS:  Yes, ma'am.
20            THE COURT:  Just try to listen to the questions
21       as asked.  If there's an objection, we'll stop.  And
22       then –
23            THE WITNESS:  Sorry.
24            THE COURT:  No – no.  That's all right.  Again,
25       yes, or no or I don't know.  Okay.
26  BY ATTY. MATTEI:
27     Q  Is it your sworn testimony that you never chartered a
```

28

```
1   private jet before this lawsuit, sir?

2     A   Yes.

3     Q   Never before 2018 had you chartered a private jet?

4   Are you sure you want to say that?

5     A   Yes.

6     Q   All right.  So in the financials that you turned over

7   to us, we won't see any expense prior to 2018 for any

8   private charter air travel.  Correct?

9     A   You said a jet.  I mean, I think we rented Cessna's

10  for aerial news shows the border.  One time me and my wife

11  and children were in Canada.  We rented a sea plane that

12  flew us for a couple hours up to a place to eat.  But other

13  than that, I've never.  Not until this.

14    Q   So your testimony is that prior to this lawsuit, you

15  actually did fly on a charter plane.  Correct?

16    A   No.  You said a jet.

17    Q   I'm sorry.  If I was confusing you with the word

18  jet –

19    A   Would a hot air balloon count?  I have also rented

20  those a few times in my life.

21          THE COURT:  Okay.  Let's –

22    Q   No.  That's not what I was referring to.  But –

23    A   I have rented –

24          THE COURT:  So, just wait for a question.

25        There's no question.

26    Q   Just see if you can answer this yes or no, sir.

27  Prior to this lawsuit, you had paid for a chartered private
```

1    air travel.  Correct?

2      A    Yes.  Not jets.

3      Q    And in addition to this security team that you have

4    and your private air travel arrangements.  I take it that

5    you have security systems at your homes, correct?

6      A    Sure.

7      Q    And obviously at your office you have pretty

8    extensive security at the Infowars offices.

9      A    Yes.

10     Q    So with this lawsuit, why don't we bring up – bring

11   up paragraph 7 on page 3.

12             ATTY. PATTIS:  Has it been admitted, Judge?  I

13        don't remember.

14             ATTY.  MATTEI:  I did offer it.  I don't that

15        there was a ruling.  I think you ruled at the

16        sidebar.

17             THE COURT:  Ron, did we –

18             THE CLERK:  Which number was this, your Honor?

19             ATTY. PATTIS:  424.

20             THE COURT:  424.

21             THE CLERK:  424?

22             ATTY. MATTEI:  34.

23             THE COURT:  And it was objected to?

24             THE CLERK:  34.

25             ATTY. MATTEI:  434.

26             THE CLERK:  Yes.  434 was made a full exhibit.

27             ATTY. PATTIS:  Thank you.

```
 1              THE CLERK:  About 45 minutes ago.
 2              THE COURT:  Okay.
 3   BY ATTY. MATTEI:
 4     Q   So let's pull up paragraph 7, please?  Okay.  And
 5   this is a complaint that one of your lawyers, Robert Barnes
 6   drafted on your behalf.  Correct?
 7     A   Yes.
 8     Q   It was filed in a lawsuit to commence this lawsuit
 9   against these people.
10     A   Yes.
11     Q   And one of the claims you made was that on June 17,
12   2019 at 9:44 p.m., the Young Turks, by and through Saint
13   Weigert, that's somebody associated with that group, yes?
14   Saint Weigert is a person associated with the Young Turks.
15     A   Yes.
16     Q   Published on its Twitter account, quote, Alex Jones
17   sent child porn to Sandy Hook parents.  See exhibit one.
18   The Young Turks Twitter account.  And that's at the same
19   headline made the Young Turks video page, where it still
20   stands today.  And so there was a tweet, right?  And there
21   was a headline associated on their video page, according to
22   this paragraph.  Correct?
23     A   I believe so.
24     Q   All right.  And if you go further down, you see here
25   that they hold themselves out as, quote, serious journalists
26   with millions of followers across multiple social media
27   platforms, and the biggest media network on YouTube that is
```

31

1   completely monetized by YouTube, etcetera, etcetera.

2   Correct?

3       A    Yes.

4       Q    And the point of that is to show that these people

5   who you claim lied about you had a significant platform that

6   could result in significant harm to you.  Yes?

7       A    Yes.  And we weren't allowed to respond back because

8   we were on that platform.

9       Q    Okay.

10           ATTY. MATTEI:  So I move to strike, your Honor.

11           THE COURT:  Sustained.

12      Q    So the - you then go down further and let's go to

13  paragraph 12.  One of the things that you were bringing in

14  this case were - or was something called defamation per se.

15  Right?  And a claim for defamation per se, the words are so

16  obviously hurtful, that they require no proof that they

17  caused injury, in order for them to be actionable.  Accusing

18  a professional of deliberately sending child pornography to

19  opposing attorneys.  A serious felony.  Raises no questions

20  as to its negative effect on your professional reputation.

21  Right?

22      A    Yes, they said my name.

23      Q    Right.  The idea is that this type of allegation is

24  so hurtful, that just the fact that it was made shows that

25  there was damage done.  Right?

26      A    I'm not a lawyer, but I know the law.  If you say

27  their name too - you have to say that person's name.

 1    Q   Yeah.  You're not a lawyer, are you?

 2    A   But I —

 3    Q   Right.  So you're not, right.

 4    A   No.

 5    Q   Okay.  And when you did this, you attacked as proof —

 6   oh, let's go to page 6.  Yeah, page 6.  And at the end of

 7   it, after you've made these allegations, you said, wherefore

 8   plaintiff respectfully prays for judgment against the

 9   defendants in a sum to be determined by a jury.  Right?  Did

10   I read that correctly?

11    A   Yes.

12    Q   And as proof of the harm that you suffered as a

13   result of this, you included an exhibit.  And let's go to

14   Exhibit 8.  I'm sorry, page 8.  This is Exhibit 1.  Thank

15   you.  Appreciate it.

16             THE CLERK:  And I'm sorry to interrupt counsel,

17        but you're referring to exhibits that's part of this

18        exhibit?

19             ATTY. MATTEI:  Yes.  Thank you.  There was an

20        Exhibit 1 attached to the complaint.  Thank you.

21             ATTY. PATTIS:  Judge, can I come around to see

22        the board here?

23             THE COURT:  Sure.

24             ATTY. MATTEI:  Yeah.  Thank you.

25             THE COURT:  Let Mr. Pattis —

26             ATTY. MATTEI:  Yeah, I'm not going to use it

27        just yet.

1    THE COURT:  Well let him just get situated so he

2    can take his notes.

3  BY ATTY. MATTEI:

4    Q   And as you see – thank you.  As you see here, this is

5  the tweet that was so concerning to you, right?  And there's

6  a video associated with it.  Obviously not here on the –

7    A   No, it was what they said in the video, where they

8  said I was going to jail, and I did it on purpose and a

9  bunch of incredible stuff.

10    ATTY. MATTEI:  I'll move to strike that, your

11    Honor.

12    THE COURT:  Sustained.

13    Q   What you included in support of your lawsuit was

14  this.  Yes?

15    A   Yes.  An image of the videos, you can see the video.

16    Q   And the headline was Alex Jones sent child porn to

17  Sandy Hook parents.  Correct?

18    A   Yes.

19    Q   Now, as a technical matter, your agents did send

20  child pornography to the Sandy Hook families, as a technical

21  matter, correct?

22    A   Yes.

23    Q   Okay.  And down here if you look at the bottom.  How

24  many retweets did this tweet have?  You might have it in

25  front of you, sir, if that's easier.

26    A   Twenty.

27    Q   Twenty.  And how many likes?

1    A    Thirty-seven.

2    Q    Okay.  And then over here, this 132, those are

3    comments, yes?

4    A    I don't know.

5    Q    You don't remember that?  Okay.

6    A    The issues the video, not a link –

7    Q    I didn't ask you any questions, sir.

8         THE COURT:  Please –

9    Q    All right. We can take that down.  So there were 20

10   retweets and 37 likes.  Right?

11   A    Yes.

12   Q    Okay.  So we're going to put TWT, that's Young Turks,

13   right?

14   A    Yes.

15   Q    So there were 20 retweets –

16        THE COURT:  Do you need Mr. Jones to see that

17        board?  Because I'm not sure he can.  Can you see

18        that board?

19   A    I can see it.

20        THE COURT:  Oh.  Never mind.

21   A    A little bit

22   Q    You can see it?

23   A    Little bit.

24   Q    And 37 likes, right?

25   A    Yes.

26   Q    Now you said you've been watching some of this trial.

27   Right?

1    A    Yes.

2    Q    You know that Clint Watts testified here earlier this

3    week.  Correct?

4    A    Yes.

5    Q    And did you hear his testimony that at a minimum,

6    your lies about Sandy Hook reached 550 million, just on

7    social media alone.  Did you recall that testimony?  That's

8    a yes or no.

9    A    Yes.  Yes, I recall.

10   Q    You recall it.

11   A    Preposterous.

12        ATTY. MATTEI:  Move to strike, your Honor.

13        THE COURT:  Stricken.

14        So, sir, just remember no comments, just answer

15        the question.

16   A    Oh, yes.  Thank you.

17        THE COURT:  Thank you.

18   Q    I'm done with this.  Now Mr. Jones, the lie you

19   spread for years and years, was that the families behind me

20   were actors.  Correct?

21   A    I can't answer –

22   Q    That's a yes or no.

23        ATTY. PATTIS:  No.  Objection.

24   A    It's too complex to – sorry.

25        ATTY. PATTIS:  Motion in limine.

26        THE COURT:  Can I have a sidebar on that?

27        (Sidebar conversation begins).

1      THE COURT:  The lies that you spread –

2      ATTY. PATTIS:  He doesn't think they were lies.

3   And the Court has made that finding.  And so this is

4   the heart of that Fifth Amendment issue I alerted the

5   Court to. If he agrees with the characterization,

6   it's a lie and he's testifying falsely.  If he

7   testifies truthfully, he's in contempt of a prior

8   ruling.

9      THE COURT:  Okay.  So –

10     ATTY. MATTEI:  I'll do something a little

11  different.

12     THE COURT:  That's a good point though.

13     ATTY. MATTEI:  I mean look, he could take the

14  Fifth, so –

15     ATTY. PATTIS:  If we're going to get to that,

16  I'd rather do it outside the jury's presence, because

17  my claim –

18     THE COURT:  We have to deal with it now?  Can

19  you –

20     ATTY. MATTEI:  I'll try something.

21     THE COURT:  Okay.

22     (Sidebar conversation ends).

23     THE COURT:  So just wait for the next question,

24  Mr. Jones.  Okay.

25 Q  Mr. – I'm sorry, your Honor.

26     THE COURT:  Well, let them –

27 Q  Mr. Jones, for years and years and years, you called

1   these families actors, correct?

2     A   No.

3     Q   That's not correct?

4     A   No.

5     Q   Do you remember in your deposition sir, it's true

6   about Robbie Parker, right?

7     A   Yes.

8     Q   And you called Robbie Parker an actor many times,

9   didn't you?

10    A   No, I said it looked like he was acting.

11    Q   You said it looked like he was acting?

12    A   The internet is a huge thing –

13    Q   Mr. Jones, is your testimony –

14        ATTY. PATTIS:  Objection.  My client wasn't

15        permitted to finish his answer.

16        THE COURT:  All right.

17    A   These are not yes or –

18        THE COURT:  No – no – no, Mr. Jones.  I'm sorry

19        because now I've lost the question.  So can you ask

20        the question again?

21        ATTY. MATTEI:  You know what?  Let's do it this

22        way.

23    Q   Mr. Jones, would you agree with me that if somebody

24   were to lie about a group of people and call them actors,

25   and having faked their children's death, that would be a

26   horrible thing to say about somebody.

27        ATTY. PATTIS:  Improper form –

1    A    I did not call them liars –

2    Q    That's a yes or no –

3         ATTY. PATTIS:  – as to the vouching.  Improper

4         form.  It's a contrarian voucher – nobody cares

5         whether he agrees with Mr. Mattie or not.

6         THE COURT:  All right.  Sustained.

7    Q    Mr. Jones, if someone were to falsely claim that a

8    group of families who have lost loved ones were actors.  And

9    had faked the deaths of their loved ones.  That would be a

10   horrible thing to say.  Correct?

11   A    In the context it could be.  Yes.

12   Q    It could be.  And if somebody were to spread that

13   claim to millions and millions and millions of people, one

14   would expect those families who have been falsely accused to

15   be damaged.  Correct?

16        ATTY. PATTIS:  Objection.  Speculation, Judge.

17        THE COURT:  Overruled.

18   Q    Yes or no, sir.

19   A    I cannot answer this question truthfully without

20   violating the Courts order.

21   Q    Well, why don't we have an invocation then?

22   A    What's an invocation?

23        ATTY. PATTIS:  Oh, no way Judge.  There's – we –

24        this is improper.

25        THE COURT:  All right.

26        ATTY. PATTIS:  I'm going to object.

27        THE COURT:  So why don't I excuse the jury for a

1    minute.  This shouldn't be too, too long.

2    (Jury panel exits the courtroom).

3    THE COURT:  Okay.  So the question again?

4    ATTY. PATTIS:  Well, Judge before we do.  We had

5    an agreement that if there was going to be any Fifth

6    Amendment claims here, it would be done outside the

7    presence of the jury.  And then we're asking for an

8    invocation in its presence –

9    THE COURT:  When you say we had an agreement,

10   you, and Attorney Mattei?

11   ATTY. PATTIS:  Attorney Mattei.

12   ATTY. MATTEI:  Well, no Attorney Pattis

13   requested that.  I wasn't prepared for him to invoke

14   on that question, Judge.

15   THE COURT:  Well, I don't know, I wasn't part of

16   that agreement.  But let's –

17   ATTY. PATTIS:  I'd ask for an order that if

18   there's going to be any further effort to evoke the

19   Fifth Amendment – or to elicit a Fifth Amendment

20   response, it be done outside the presence of the

21   jury.

22   ATTY. MATTEI:  That's fine.  That's not what I

23   was doing.  I think the question will show that

24   there's no valid assertion there.

25   THE COURT:  All right.  Well, why don't you –

26   can you give me the question again or do you want me

27   to play it back?

1              ATTY. PATTIS:  Yes.

2              ATTY. MATTEI:  Why don't we play it back.

3              THE COURT:  Okay.  Take your time madam monitor.

4  (Playback begins)

5     Q  - were actors.  And had faked the deaths of their

6  loved ones.  That would be a horrible thing to say.

7  Correct?

8     A  In the context it could be.  Yes.

9     Q  It could be.  And if somebody were to spread that

10 claim to millions and millions and millions of people, one

11 would expect those families who have been falsely accused to

12 be damaged.  Correct?

13             ATTY. PATTIS:  Objection.  Speculation, Judge.

14             THE COURT:  Overruled.

15    Q  Yes or no, sir.

16    A  I cannot answer this question truthfully without

17 violating the Courts order.

18    Q  Well, why don't we have an invocation then?

19    A  What's an invocation?

20             ATTY. PATTIS:  Oh, no way Judge.  There's - we -

21       this is improper.

22             THE COURT:  All right.

23 (Playback ends)

24             THE COURT:  We could go back.  Just before

25       anybody else - Okay.

26             ATTY. PATTIS:  So we alerted the Court earlier

27       on that there may be an unusual Fifth Amendment issue

1     in this case arising from the law of the case.  Mr.

2     Jones has suffered a disciplinary default in this

3     case resulting in his inability to contest liability.

4     The Court has established during the law of the case

5     that —

6          THE COURT:  Could we just back up.  So the

7     question wasn't about Mr. Jones specifically.

8     Although maybe it was getting there.  The question

9     was, if someone spread that claim to millions and

10    millions of people, one would expect people to be

11    damaged.  There's no —

12         ATTY. PATTIS:  No.  You're missing a predicate

13    in there.  Falsely.  If they falsely spread this

14    information.  This is —

15         THE COURT:  Right.  But this is not talking

16    about Mr. Jones or Free Speech Systems.  This was a

17    hypothetical.

18         ATTY. PATTIS:  He's not an expert and he can't

19    be questioned as an expert.  He's here as a fact

20    witness.  And this is an attempt to sidestep the

21    ruling, and once again have a motion in limine be

22    used as a sword rather than a shield.

23         We didn't make motions in limine to limit this,

24    the plaintiffs did.

25         THE COURT:  Right.

26         ATTY. PATTIS:  The contention here is that Mr.

27    Jones — that the law of the case is that the Court

42

 1      has concluded that these statements were false, not

 2      because they were litigation, but because of failure

 3      to comply with discovery.  We can't talk about that.

 4      The plaintiffs have earned the right to call him a

 5      liar in open court.  Whether we agree or not, that's

 6      the law of the case.  What they've not done is, earn

 7      the right to put him in a position where he either

 8      disagrees with their characterization of him, thus

 9      running afoul of a prior ruling of the Court.  Or

10      agreed with them, thus committing perjury.

11          We'd go further and say that if we get to a

12      point where in invocation is necessary, they're not

13      entitled to adverse inference, because that is giving

14      undue weight to a disciplinary default.

15          THE COURT:  So Attorney Pattis, what would be

16      wrong if his answer, his true answer, how would it

17      violate the order?  As if he says he denies the

18      extent of the damage.

19          ATTY. PATTIS:  I don't know that that's

20      responsive to the question candidly.

21          ATTY. MATTEI:  Yeah.  So, your Honor, I think

22      what's happening here is.  We had a sidebar to avoid

23      a proper assertion.  I said I'll do it a different

24      way.  And so I came back here, instead of telling Mr.

25      Jones that he had lied, I said if one did.  That

26      would cause damage –

27          ATTY. PATTIS:  Well, who cares.

1      THE COURT:  Well I think – well, so –

2      ATTY. PATTIS:  That's – yeah –

3      THE COURT:  I think it's got to be asked in a

4    way – and I don't want to tell you how to ask it.

5    But –

6      ATTY. MATTEI:  Your Honor, this is –

7      THE COURT:  No – no – let me just –

8      ATTY. MATTEI:  I'm sorry.

9      THE COURT:  – get it out.  Where we're not

10   putting Mr. Jones in a pickle.  But where the jury

11   understands that the issue has been decided, which

12   they've been told many, many times now.  So can you

13   think of a way to do it along those lines?  So here

14   the Court has already determined that liability is

15   not an issue.  The jury is just determining damages

16   and so what's the question for Mr. Jones?

17     ATTY. MATTEI:  Your Honor, there is no – first

18   of all, he's the defendant.  This is impeachment on

19   credibility grounds.

20     THE COURT:  But I'm just asking what the

21   question is though.

22     ATTY. MATTEI:  The question is, rather than ask

23   him directly, where he now thinks a truthful answer

24   would somehow incriminate himself.  I've asked him

25   whether or not one would expect that if one were to

26   do these things, it would cause harm.

27     Now, Attorney Pattis is still free to argue at

1    any point that that's – that the harm caused here

2    wasn't what the plaintiffs allege.  That's what he's

3    apparently claiming.  But Mr. Jones's response to

4    that question, if the answer is yes, one would expect

5    that type of harm.  That doesn't violate the Courts

6    orders and it's not false.

7         ATTY. PATTIS:  No, but –

8         ATTY. MATTEI:  If the answer is no, if the

9    answer is no, one wouldn't expect that.  That doesn't

10   violate the Courts orders.  And it's not false.

11   Right?  So either one.  He can testify truthfully

12   without violating the Courts order and putting

13   himself in contempt –

14        THE COURT:  Or I don't know.

15        ATTY. MATTEI:  Or I don't know.

16        THE COURT:  All right.  So how does –

17        ATTY. PATTIS:  The problem with that Judge, is

18   it's argumentative in tone.  He's not an expert, and

19   so what one does isn't what we're here to show.

20   We're here to show what he did.

21        THE COURT:  Right.  But that's a different –

22        ATTY. PATTIS:  And the purpose  –

23        THE COURT:  Attorney Pattis –

24        ATTY. PATTIS:  – is being offered to get into

25   his state of mind.

26        THE COURT:  Attorney Pattis – Attorney Pattis –

27   Attorney Pattis, how many times do I have to say when

1    I'm speaking, you stop.  You have a member of the Bar

2    for a long, long time, and you know the rules in all

3    the courts.  So, your objection was that it was a

4    motion in limine issue, I thought.  That it would

5    require him to lie.  I now hear that it's a different

6    objection, that it's speculative, he's not an expert.

7         ATTY. PATTIS:  I'm waiting to finish, so I don't

8    run afoul of your order.  And I - I have been an

9    officer of the court for a long time, and as you know

10   I insist on making my record.  So thank you, and I'm

11   sorry that I stepped on your question.  I thought I

12   wasn't done.  What I was trying to say was the

13   following: I objected because he's trying to get an

14   evocation in the jury's presence, which is entirely

15   improper without permission of the Court.

16        I objected further because he was asking Mr.

17   Jones a question and places him on the horns of the

18   dilemma.  In the course of all of his proffer outside

19   the jury's presence, he's now switched it to, one

20   would expect, one would expect.  That is simply not

21   relevant.  That's argumentative.  He's a fact

22   witness.  His state of mind about his conduct is -

23        THE COURT:  I can't disagree with that.  So I

24   will sustain the objection.  And where does that

25   leave us with respect to possible future invocation?

26        ATTY. PATTIS:  If there's going to be an

27   invocation, I request that it be - that the prelude

1    to it be outside the jury's presence, so that I could

2    argue about whether the plaintiffs are entitled to an

3    adverse inference.

4        THE COURT:  All right.  So how does that work

5    procedurally?  So there's a question.  You're going

6    to invoke on his behalf?

7        ATTY. PATTIS:  I can't do that I don't think.

8    Certainly in the jury's presence I'll argue - I'll

9    simply say -

10        THE COURT:  I think in a civil case -

11        ATTY. PATTIS:  - motion about evocation.  Motion

12    about evocation.

13        THE COURT:  Okay.  Does that work, Attorney

14    Mattei?

15        ATTY. MATTEI:  Sure.  That's fine.

16        THE COURT:  Okay.  So if that happens Mr. Jones,

17    if that happens, just put the brakes on, okay?

18        THE WITNESS:  Yes.

19        THE COURT:  So we can deal with it.  Okay.

20    Let's bring the jury out.  So can I just see counsel

21    in the meantime.

22        So I can count on one hand how many times I

23    argued in the Supreme Court my entire career, and

24    I've seen you argue, and you stop on a dime.  You got

25    to do that for me.  You have a good record.  You have

26    your -

27        ATTY. PATTIS:  You're right -

```
 1              THE COURT:  I -
 2              ATTY. PATTIS:  You're right.
 3              THE COURT:  It's a positive note.
 4              ATTY. PATTIS:  Look, Judge, here's the deal.
 5         I'm an advocate, I get lost in the moment.  You've
 6         admonished me and I'm working on it.
 7              THE COURT:  I know.  You're standing up for
 8         objections though.  Right?
 9              ATTY. PATTIS:  I'm a member of advocates
10         anonymous, Judge.  If I warm too much to my client's
11         cause, that's why Courts are here to assure fair
12         trials.
13              THE COURT:  We're good.
14              (Jury panel enters the courtroom).
15              THE COURT:  Okay.  Welcome back.  As promised,
16         we were pretty quick, so thank you for your patience.
17         Please be seated.  The record will reflect that our
18         entire panel has returned.  Let's give them a minute
19         to settle in.  And whenever you're ready, Attorney
20         Mattei, please.
21              ATTY. MATTEI:  Thank you, your Honor.
22    BY ATTY. MATTEI:
23      Q   You remember in your deposition, sir, you refer to -
24    I asked you some questions about Robbie Parker, correct?
25      A   I'm sorry, say that again.
26      Q   I asked you some questions about Robbie Parker.
27      A   Yes.
```

1    Q    I showed you some videos, right?

2    A    Yes.

3    Q    And I showed you a video where you were describing

4    not just one parent, but a bunch of parents coming up and

5    doing the fake crying and the laugh.  Do you remember that

6    video?

7    A    No, I don't.

8    Q    Why don't we show 19-I.

9         THE COURT:  Which exhibit is this?  I'm sorry.

10        19.

11        ATTY. MATTEI:  19-I.

12        THE COURT:  A, as in -

13        ATTY. MATTEI:  19-I.

14        THE COURT:  I.

15        THE CLERK:  I as in India.  It is a full

16        exhibit.

17        THE COURT:  Thank you.

18   (Video played)

19   Q    So Mr. Jones, does that refresh your recollection

20   about referring to not just one parent, but a bunch of

21   parents the fake crying and the laughing?

22   A    Yes, it does.

23   Q    Okay.  And when you were deposed, you acknowledged,

24   did you not, that you had referred to the parents who have

25   brought this case as actors.  Didn't you acknowledge that

26   then?

27   A    The only person's name I ever said was Robbie Parker.

1   But I guess that clips from like seven years ago, or

2   whatever it is.  A long time ago.

3           THE COURT:  All right.  So Mr. Jones, just let's

4       get back to answering the questions, sir.

5   A   Oh, sorry.

6           THE COURT:  Thank you.

7   Q   The question was, do you remember at your deposition

8   where you acknowledged that the families who had brought

9   this case, you had called actors.  Do you remember that

10  testimony, sir?

11  A   I think we've had like four depositions.  Which one

12  was it?

13  Q   Do you remember you were in my office.

14  A   Yes.

15  Q   We were in a conference room.

16  A   Yes.

17  Q   Okay.  I was sitting just about as far as I am from

18  the court reporter from you.

19  A   I'm trying to remember the — we've had quite a few.

20  Q   You and I have only have two in person, correct?

21  A   Yes, and then several over the —

22  Q   We had one by Zoom, correct?

23  A   No, we had — we had two.

24  Q   All right.  Well, Mr. Jones, I'm talking about the

25  ones when you were in person sitting right next to me.

26  A   Okay.  That's why I'm trying to refresh my memory.

27  Q   So, am I correct that during that deposition, you

1   acknowledged under oath that you had referred to these

2   families as actors.

3   A   I don't remember the testimony, but until - I never

4   even seen their faces until most of them sued me.  I don't

5   know.  So I can't answer your question.  I don't have the

6   answer to that.

7   Q   You just don't remember that testimony is your

8   answer, right?

9   A   I believe it's the same testimony I gave here today.

10  Q   Okay.  Well, why don't we -

11          ATTY. MATTEI:  May I approach, your Honor?

12          THE COURT:  You may.

13  Q   Okay.  Mr. Jones, I'm going to ask you to look at

14  page 252.

15          ATTY. PATTIS:  Which exhibit, sir?

16  Q   You see there's a question where I say, I'm asking

17  you -

18          ATTY. PATTIS:  Which exhibit, sir?

19          ATTY. MATTEI:  This is Mr. Jones' deposition.

20          ATTY. PATTIS:  Well there were four of them.

21      Which one is that?

22          ATTY. MATTEI:  April 5, 2022.

23          ATTY. PATTIS:  Thank you.

24          THE COURT:  Page 252.

25          ATTY. PATTIS:  Thank you.

26  Q   I'm asking if you'd agree with that?  You've given me

27  two options here.  One option is, it's just an actor playing

1   a character.  The other option is it is somebody is really

2   who they say they are, but they are going along with the

3   official script.  Those are the options you gave me.

4   Answer, yes.  That's what you said, right?

5       A   Yes.

6       Q   The first – question, the first option, Robbie Parker

7   is an actor creating a role.  In that circumstance, Robbie

8   Parker is just a fictitious character.  Correct?  What'd you

9   say?

10      A   Yes.  That's role playing.

11      Q   You said yes, right?

12      A   Yeah.

13      Q   Question, in that context, the actor playing Robbie

14  Parker would be going out in front of the whole world to

15  give a statement knowing that he is just playing a

16  fictitious part.  Correct?  What did you say?

17      A   Yes.

18      Q   Do you remember in your deposition you acknowledged

19  that for this hoax to work, it couldn't just be Robbie

20  Parker who was an actor, they all had to be in on it.

21  Correct?

22      A   You've refreshed my memory.  I believe I was

23  answering your hypothetical questions.

24      Q   Listen to the question I just asked you.

25      A   Right.

26      Q   You acknowledged in your deposition, that when you

27  were calling this a hoax, that in order for this hoax to be

1  pulled off, it wouldn't just be Robbie Parker, it would have

2  to be all the families who were actors.  Correct?

3           ATTY. PATTIS:  Objection to the form.

4    A   We were covering the controversy of was is staged or

5  not.

6           THE COURT:  Overruled.

7           ATTY. MATTEI:  Move to strike, your Honor.

8           THE COURT:  Sustained.

9    Q   Can you answer that question, sir?

10   A   Can you refresh me with a transcript?

11   Q   Sure.

12   A   The last one was very helpful.

13   Q   Let's do that again.  In fact, you know what?  Let's

14  just pull it up for everybody.

15           THE COURT:  So this is Exhibit –

16           ATTY. MATTEI:  One moment, your Honor.  We have

17        this clip, right?  Your Honor, we're going to play a

18        portion of Mr. Jones's deposition.  It's an

19        admission.

20           ATTY. PATTIS:  What was the exhibit number on

21        this, Judge?

22           ATTY. MATTEI:  It's not an exhibit, it's an

23        admission.  But –

24           ATTY. PATTIS:  What – that has an exhibit for

25        ID.

26           ATTY. MATTEI:  – we'll get you the number for

27        the deposition.  While we're doing that.

```
 1      Q    Mr. Jones, what's a Potemkin Village?

 2      A    A Potemkin Village, I believe goes back to examples

 3   like the — before the Russian Revolution they would — the

 4   Czars would build fake villages for PR stunts.  Then I think

 5   there was some — I read the exact historic nature of — I may

 6   be wrong about that.  It's something to do in Russian

 7   History and government staging events.

 8      Q    Right.  And this Potemkin Village would be filled

 9   with people that play parts, as if they were builders,

10   correct?

11      A    Yes.

12      Q    Actors in a hoax that the government was staging.

13   Yes.

14      A    It's like the Truman Show.

15      Q    The Truman Show, that's a movie.  Yes?

16      A    Yes.

17      Q    Where this fake village is plopped down and everybody

18   populates it, is in on the hoax.  Yes?

19      A    I think that's what the movie's about.

20      Q    And that's what a Potemkin Village is to your

21   understanding.

22      A    It's got a lot of definitions, but I think that's a

23   fair one.

24      Q    Is that about right?  Is that how you were using it

25   when you were deposed?

26      A    You'd have to refresh my memory.

27      Q    That's what we're trying to do here.
```

```
 1    A    All right.

 2    Q    All right.  We'll play it now.

 3  (Deposition played of Alex Jones).

 4         ATTY. MATTEI:  This might be a good time for the

 5         lunch break, your Honor?

 6         THE COURT:  I think so.

 7         THE CLERK:  Your Honor, I just need to know what

 8         exhibit that was.

 9         THE COURT:  Can we get that too, Mr. Ferraro?

10         ATTY. MATTEI: Yes, this is 372.

11         THE COURT:  372.

12         ATTY. MATTEI:  Yes, your Honor.

13         THE COURT:  Okay.  So we will take our lunch

14         break.  We'll be back right for 2 p.m.  It is as

15         imperative as always that you continue to obey the

16         rules of juror conduct.  Ron will take your notepads.

17         If you go out - I'm not sure what the weather's like.

18         It's hard to tell.  But if you do venture out, just

19         make sure that as you come back in, you avoid any of

20         the witnesses or parties or lawyers associated with

21         the case, and any media that you might see.

22         So I hope everyone has a nice lunch.  We'll take

23         a recess.

24  (Lunch recess)

25

26

27
```

```
DKT NO:  X06-UWY-CV186046436-S    :   COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :   JUDICIAL DISTRICT WATERBURY

v.                                :   AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :   SEPTEMBER 22, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES

DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

*C E R T I F I C A T I O N*


I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #4, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 22nd day of September, 2022.



Dated this 23rd day of September, 2022 in Waterbury, Connecticut.


*Darlene Orsatti*

Darlene Orsatti

Court Recording Monitor