# EXHIBIT 36

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 27, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

                    TRIAL (A.M. SESSION) VOLUME 2

             BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
                            AND A JURY


     A P P E A R A N C E S :


         Representing the Plaintiff(s):


         ATTORNEY CHRISTOPHER MATTEI
         ATTORNEY ALINOR STERLING
         ATTORNEY MATTHEW BLUMENTHAL
         ATTORNEY JOSHUA KOSKOFF
         Koskoff, Koskoff & Bieder
         350 Fairfield Ave. Ste 501
         Bridgeport, Connecticut 06604


         ATTORNEY NORMAN PATTIS for Jones Defendants




                              Recorded By:
                              Darlene Orsatti

                              Transcribed By:
                              Darlene Orsatti
                              Court Recording Monitor
                              400 Grand Street
                              Waterbury, Connecticut 06702

```
 1              *              *              *

 2         THE COURT:  Good morning again, marshal.  Good

 3    morning, everyone.  Please be seated.  All right.  We

 4    ready for our panel or have you worked out your

 5    issues, or no?

 6         ATTY. PATTIS:  Yeah.  I will have brief

 7    objections that I gather you'd want me to do when the

 8    panel's back.  But I've had a chance to review

 9    things, and Attorney Mattei was kind of enough to

10    share with me four exhibits that weren't on the list

11    and he intends to use this afternoon.  So, I feel I

12    have notice.

13         THE COURT:  Okay.

14         ATTY. MATTEI:  Your Honor, would you care to

15    hear any objection now and rule, rather than do it -

16    I don't think there's going to be any foundation

17    objections, it's more hearsay relevance objection.

18    You might be able to just rule now.  See the stuff

19    now -

20         THE COURT:  If you want me to.  Whatever's

21    easier.  What do you think, Attorney Pattis?

22         ATTY. PATTIS:  I'd wait for the panel.  They're

23    brief objections.

24         THE COURT:  Okay.

25         ATTY. MATTEI:  Okay.

26         THE COURT:  I'll do it in front of the panel.

27         ATTY. KOSKOFF:  Should I have Mr. Hockley
```

1    resume?  Mr. Hockley.

2         THE COURT:  Just watch your step when you come

3    up, sir.  And let us know if you run out of water.

4         THE WITNESS:  Do you have people trip up that?

5         THE COURT:  I've tripped.  Yes.

6         (Jury panel enters the courtroom).

7         THE COURT:  Okay.  Hope you all had a nice

8    morning break.  All right.  The record will reflect

9    that the panel has returned.  Please be seated.  Make

10   yourselves comfortable.

11        ATTY. KOSKOFF:  Was that the go ahead?

12        THE COURT:  Yes, that was the go ahead.

13        ATTY. KOSKOFF:  Thank you.  Thank you, your

14   Honor.

15   CONTINUED DIRECT EXAMINATION OF IAN HOCKLEY:

16   Q   Ian, before we had the break, we were talking about

17   instances or the idea that you were hearing about this story

18   that was percolating about you being an actor.  Dylan not

19   having lived.  Nobody being killed.  And doing it for some

20   ulterior motive.  Do you recall that?

21   A   Yes.

22   Q   And I think you recalled a particular example that

23   having to do with something about the party boy.

24   A   Yeah.  We had a – I believe this was on the Facebook

25   page we had set up for the foundation.  So, we set that up

26   so we could share what we were doing.  And we had some

27   friends help as administrators for that.  That means they

1  can see comments and deal with things.  So, they would be

2  dealing with comments that came in.  They just deal with it.

3  But this is one I saw, and I think I screenshotted just - I

4  just particularly caught it.

5  Q   So would they often run interference so to speak, on

6  things that came in that were hostile and -

7  A   Yeah.

8  Q   Okay.

9  A   Yes.

10  Q   And if you take a look at your screen, we'll show you

11  what's now still marked 534, which I - the record should

12  reflect that I read the four as a nine.

13          THE COURT:  A nine.  So, this is 534 for ID.

14          ATTY. KOSKOFF:  Right.

15  Q   This is in fact 534.  And is this the type of thing

16  that you would get and to what you were referring to?

17  A   Yes.

18          ATTY. KOSKOFF:  Okay.  And I'd offer it, your

19      Honor.

20          ATTY. PATTIS:  Hearsay.  Relevance.  Foundation,

21      Judge.

22          THE COURT:  Overruled.

23          ATTY. KOSKOFF:  Okay.  Can we bring it up?

24  Q   Okay.  Now I'm not a - no kind of social media

25  expert.  Is that - do you know whether or not that is a

26  Facebook post or an Instagram post?

27  A   This was on Facebook, and this is a comment.

1    Q    Okay.  And the Facebook that you believe this was on

2  was Sandy Hook Wings of Change?

3    A    Dylan's Wings of Change.

4    Q    Sorry.  Dylan's Wings of Change.  So these were not

5  just – these types of things were not just coming to you and

6  Nicole, but also to your foundation?

7    A    Yes.

8    Q    Okay.  Is says be warned Sandy Hook traitor – Sandy

9  Hook traitor Ian Party Boy Hockley comes here.  He's the

10 douche that laughed and smiled through his son's funeral,

11 which was scripted and for some reason broadcasted on T.V.

12 You talked about the memorial service that you held for

13 Dylan to help remember him.

14   A    Yeah.  Yes.

15   Q    And was there a part of that – you said it was

16 uplifting.  I think you said.

17   A    Yes.  Yeah.

18   Q    And that I think you even said that you were – to

19 excuse the expression when you told the jury that.  Did you

20 smile at some point during that?

21   A    Yes.

22   Q    Okay.  Could you go down to the next part.  Just look

23 at his dimples.  Never cried once.  Just proving further

24 Sandy Hook is a hoax.  And who is that in that picture with

25 you?

26   A    So, there's Nicole.  The short fella's Jake.  Me, and

27 behind us is Pastor John Dischinger is one of the pastors at

1    Walnut Hill Church.  That's taken outside the church.

2    Q    And about what year was this particular example that

3    you brought our attention to, posted?

4    A    I believe it was '17 or '18.  I'm not sure.

5    Q    So this is five or six years after the memorial

6    service?

7    A    Yes.  Twelve – yes.

8         ATTY. KOSKOFF:  Thank you.  You can take it

9         down.

10   Q    And have there been instances in public where you

11   have been approached or got the feeling that somebody was

12   watching you and relating you to the Sandy Hook –

13        ATTY. PATTIS:  Compound, Judge.  Objection.

14        THE COURT:  Sustained.

15        ATTY. KOSKOFF:  Rephrased.

16   Q    Have there been instances where you've found messages

17   in other parts of your life?  Like in your home?  In your

18   car?  That kind of thing.

19   A    We would get mail posted to our house in Sandy Hook.

20   After that house we were renting, we bought a house

21   eventually in Sandy Hook as well.  So, mail would come

22   there.

23   Q    And I do want to ask you, did there come a time when

24   you and Nicole separated and ultimately got a divorce?

25   A    Yes.  I believe it was in 2015.  We were struggling

26   as a couple.  We went to therapy; we saw a therapist to try

27   and work things out.  And ultimately took the decision that

1  we should get divorced.

2     Q   Okay.  And do you remain friends with Nicole?

3     A   Yes.

4     Q   Okay.  And who – the house that you were living with

5  up until the time of the divorce with Nicole and Jake, was

6  that the house that you initially rented when you moved over

7  here?

8     A   No.  We'd moved out of that house because of where it

9  was on Yogananda Street, and some friends, they were in

10  Florida for the winter, so they just let us use their house

11  for a couple of months while we worked out what was going

12  on, and then we started house hunting and bought a house in

13  Sandy Hook.

14     Q   Okay.  And did Nicole stay in the house that you

15  bought, and did you move out?

16     A   Yes.  We did some kind of sharing arrangement what we

17  would work out, but ultimately, I moved out and found an

18  apartment in another town but would co-parent and look after

19  Jake part of the time.  Ultimately the house was sold.

20     Q   Okay.  So, you continued to co-parent Jake and look

21  after him and - as you were struggling through this time?

22     A   Yes.

23     Q   Okay.  And can you recall, give us any other examples

24  of any other instances in which you've been approached or –

25  other than the type of instances that you've shown about

26  online type of harassment.  Anything else that you can –

27  that is - you know, just comes to mind as an example of the

 1  kind of things that you have to endure?

 2     A    Yeah.  Just an example.  Last year I was at Costco in

 3  Brookfield and came back to our car and - my car, and there

 4  was a small white business card-shaped piece of paper stuck

 5  underneath the windscreen wiper.  And pulling it out,

 6  there's a picture of Robbie Parker on one side with some

 7  words about being fake, and on the other side the McDonnell

 8  family as well.  And that was on my car, and only my car -

 9  like the cars on the side didn't have it.  Just my car had

10  it on.

11     Q    So somebody put something -

12            ATTY. KOSKOFF:  And can we pull up 473 for Ian?

13            THE CLERK:  That's not a full exhibit.

14            ATTY. KOSKOFF:  It's ID at the moment.  And I've

15         shared this with counsel at the break.

16     Q    Is that the - there's a front part, you said there's

17  a back part.

18     A    That was one side.

19     Q    Okay.

20            ATTY. KOSKOFF:  Is 473 both sides?  So, we'll

21         show you the next page.

22     A    That was the other side.

23     Q    Okay.

24            ATTY. KOSKOFF:  I'd offer this, your Honor.

25            ATTY. PATTIS:  No foundation.

26            ATTY. KOSKOFF:  Well, it's a card that was laid

27         on his -

1          THE COURT:  Overruled.

2          ATTY. KOSKOFF:  Can we pull up 473?

3   BY ATTY. KOSKOFF:

4     Q    So is this the – you talked about it being a card,

5   and was this what you mean?  It's like a business card?

6     A    Yeah.  That is that kind of shape.  Yeah.

7     Q    And is this the – is this the card that was on your –

8   you said windscreen?

9     A    Yeah, tucked under the – where you put a flyer if you

10   were out putting flyers on cars.

11    Q    Okay.  That's a British for windshield?

12    A    I guess.

13    Q    Okay.  And this was at Costco?

14    A    Yes, in Brookfield.

15    Q    I'm sorry?

16    A    In Brookfield.

17    Q    Okay.  And you looked at other cars and there were

18   none – there no cars on other cars.

19    A    I glanced at the cars on either side.  I didn't do a

20   march all the way up and down the row.

21    Q    So, do you know whether or not somebody saw you and

22   put this on the car?

23    A    I don't know, but that was my assumption.

24    Q    And can you show the other side of this card.  This

25   is another family that was involved and lost a child.

26    A    Yes.

27    Q    And when was this?

1    A   Last year.  Sometime last year.  I don't recall.

2    Q   Did you ever find out who put this on your car?

3    A   No.

4         ATTY. KOSKOFF:  You can take it down.

5    Q  Now, I asked you about your lifestyle and how it

6 might have been affected for you personally, and the way you

7 go about your daily life and your professional life.  Can

8 you explain whether or not that has changed over the years

9 as it relates to this Alex Jones narrative?

10   A  I started becoming reticent – you know when you meet

11 people, you're traveling out of state especially, and you

12 introduce yourself and where you're from.  And so, I become

13 reticent saying where I'm from.  They'll pick up on accent

14 anyway, so it's always a joke.  Oh, this is a Connecticut

15 accent.  But, apart from that, I wouldn't go any further

16 than that.  And believe that I certainly wouldn't mention I

17 was from Sandy Hook, and Newtown's too well a name known

18 connected with it.  So, I just leave it Connecticut,

19 Fairfield County and just leave it like that.

20   Q  Why?

21   A  I didn't want any questions.  I didn't want to come

22 across someone that believed it was a hoax.  In some way

23 also I didn't want someone that really felt badly about what

24 had happened, as well, because of all of that emotion that

25 would be generated by that.  But most definitely I didn't

26 want to run into someone that wanted to confront me about

27 Sandy Hook.

1    Q    Now, in order to educate the community, the larger

2  community about the mission and goals of Dylan's Wings for

3  Change, does that – did that require you or did you take any

4  steps to further that education, and did that require you to

5  do public speaking and things like that?

6    A    Once we started the Wingman Program, which was 2015,

7  and that started to grow.  We only started with two schools

8  running the program.  But either to share about it to a

9  school or a community or district, or to go into the school

10  that's running the program.  I developed the talk.  I

11  developed the journey from Sandy Hook.  The story about

12  Dylan to share him.  What the program is about, and what our

13  goals are, what we're hoping to do and then I would wrap it

14  up with the story about the butterfly effect.  So that

15  became about a 40-minute presentation.

16    Q    And do you do this to an audience of children or

17  young folks, and also an audience of parents and adults?

18    A    If I'm going into a school, then it will be during

19  the school day, and they might hold an assembly, and I get

20  to speak to them.  But some schools will add on an evening

21  session to invite parents to come in.  So, they understand

22  what's going on in the school, and this new program they

23  brought in.  So, it can be both.

24    Q    Okay.  And in what way or ways if any, has the

25  narrative of you being an actor, faking your child's death

26  for some other purposes of Dylan never having lived, affect

27  your – the way you go about that?

1    A    I'm very intentional just to make sure that story is

2   there.  And I will warn the audience that we will be talking

3   about the events of 12/14, because I want to establish my

4   truth and my journey.  So, I'm very definite I'm doing that.

5   But I'm also aware that that could draw out someone who's

6   there who wants to stop me.  Obstruct me.  You know, attack

7   me.  And I'm just constantly aware that that's a thing.  But

8   I'm in weighing those two out, this wins out that I'm going

9   to tell this story, I'm going to share about Dylan.  And so

10  I just have to be careful.  I just have to be careful about

11  where I go and speak.  Who I go to.  I go through my own

12  little routine every single time I do it.  It's just about

13  knowing who is there.  Watching the people come in.  These

14  are schools.  They might have a resource officer there, but

15  I don't get security to go to these things, so it's just

16  simple precautions to be safe.  But I know there's a couple

17  of points in my talk I'll be talking in depth about Sandy

18  Hook.  I'll be talking about Dylan.  If something's going to

19  happen, I expect that's when it will be.  But I also don't

20  stereotype anyone.  Not looking for any particular type of

21  person.  I'm just on my guard.  Yeah.

22    Q    And is - prior to this part of it percolating for

23  you, were you the type of person who was always on their

24  guard that something was going to happen?

25    A    No.  No, I never had that experience in life.

26    Q    You said there's no – you don't stereotype people.

27  Is that right?

1    A   Yes.  Actually, it's part of our beliefs in Wingman,

2  that we're all unique, we're all very different, we all have

3  great qualities.  So, I don't stereotype the sort of person

4  that might choose to attack me, same as I don't stereotype

5  the type of person that might want to hug me.

6    Q   Okay.  But are you – and are you on constant

7  vigilance for these types of what could out of the ordinary

8  situations that could develop?

9    A   Yes.

10   Q   You were – were you in the courtroom when Mr. Watts

11  explained the reach – the reach of this narrative to the

12  jury?

13   A   Yes.

14           ATTY. PATTIS:  Objection.

15   Q   And do you –

16           ATTY. PATTIS:  Relevance.

17           THE COURT:  Overruled.

18   Q   You heard Mr. Watts explain that based simply on six

19  years between 2012 and 2018, and only three social media

20  platforms, YouTube, Twitter, and Facebook.  The minimum

21  reach was 550 million impressions.  Is that right?

22   A   Yes.

23   Q   What is that like to have that much said to that many

24  people in so many – everywhere in the United States for you.

25   A   So it's frightening.  It's abominable that it should

26  even happen.  But personally, I feel it's staggering and

27  it's frightening, the sheer number of people that this has

1   reached.  And I will extrapolate that therefore the people

2   its affected.  The people that it has inspired to attack us.

3   To attack me.

4       Q   And you said there's no stereotype.  Can you identify

5   what these people look like?

6       A   No.

7               ATTY. PATTIS:  Objection.  Speculation.

8               THE COURT:  Sustained.

9               ATTY. KOSKOFF:  Can we show 19 igloo – 19-I.

10          Igloo.

11  (Video played)

12              ATTY. KOSKOFF:  Let's take him down.

13      Q   Did you hear Mr. Jones say photos of kids still

14  alive?

15      A   Yes.

16      Q   That are supposed to be dead, or something like that?

17  Did you hear that?

18      A   Yes.

19              ATTY. KOSKOFF:  Can we show Exhibit 533.

20              THE CLERK:  That is not a full exhibit.

21              ATTY. KOSKOFF:  I'm sorry.  It's a photograph of

22          Mr. Hockley and his son.  If we could pull it up for

23          Mr. Hockley.

24      Q   Is that a picture of you and Dylan?

25      A   Yes.

26              ATTY. KOSKOFF:  We would offer it.

27              ATTY. PATTIS:  No objection, Judge.

1          THE COURT:  Full exhibit.

2     Q    Is this a picture of you and your son?

3     A    Yes.

4     Q    And what year was this taken?  What month?

5     A    I think it was the fall of 2012.  Maybe it was 2011.

6     Q    He's on one of those thingies?

7     A    I can't remember what they're called.  Zipline-type

8     thing.  Yeah.

9     Q    This was a –

10    A    It was one of his friend's birthday parties.

11    Q    This was a photo of Dylan while he's still alive?

12    A    Yes.

13         ATTY. KOSKOFF:  I have no further questions,

14         your Honor.

15         THE COURT:  Attorney Pattis.

16         ATTY. PATTIS:  May I have one moment, Judge.

17         THE COURT:  Take your time, please?

18    CROSS-EXAMINATION BY ATTY. PATTIS:

19    Q    I think it's still morning.  Good morning, Mr.

20    Hockley.

21    A    Good morning Mr. Pattis.

22         THE COURT:  Attorney Pattis, I didn't see you

23         come up.  Whenever you're ready.

24         ATTY. PATTIS:  I beg your pardon, Judge.

25         THE COURT:  I didn't see you approach.  You

26         asked for a minute, and I did not see you come up.

27         ATTY. PATTIS:  I didn't mean to startle you.

```
 1            THE COURT:  All right.  You may inquire.
 2   BY ATTY. PATTIS:
 3      Q    We've never met before, I don't believe.
 4      A    If maybe attended my deposition for – but -
 5      Q    I don't think I questioned you though.
 6      A    - no – no – no.
 7      Q    I have very few questions, sir.  When is the first
 8   you heard about this person Alex Jones.
 9      A    I believe it was 2015.
10      Q    But in 2013 you began to hear that there are folks
11   out there saying things, false things about what happened in
12   Sandy Hook.  That you were an actor, and your son hadn't
13   died – that was just -
14      A    The comments on that video from the memorial
15   contained that.  Yeah.  That was coming -
16      Q    And I listened carefully to your testimony, I'm a
17   little - I didn't get some dates.  So, I just want to nail
18   dates down here.  You created a foundation, Dylan's Wings of
19   Change.
20      A    Yes.
21      Q    And when did you create that, sir?
22      A    In March of 2013, we took the decision – I said there
23   was a decision, you could give it to the community
24   foundation or create your own.  And to create our
25   foundation, we got a physical sponsor charity.  It's like an
26   umbrella charity and took the fund and put it there, thereby
27   we got our 501-C3.  So that is when we created the
```

1    foundation.

2    Q    You say take it – monies were coming into Newtown,

3    and you directed some to Dylan's Wings of Change?

4    A    No.  The friend that had set up the bank account that

5    was specifically designated, he took care of that and had it

6    transferred into this other fund.  Yeah.

7    Q    Okay.  How much was in that account when it was

8    transferred?

9    A    I think about 120,000.

10   Q    And you describe the course of your career at IBM,

11   correct?

12   A    Yes.

13   Q    And ultimately you left IBM to work on Dylan's Wings

14   of Change.  Correct?

15   A    Yes.  I asked for the big leave of absence, I feel it

16   was the start of 2014.

17   Q    Okay.

18   A    And then had two years unpaid leave from IBM.  I

19   could always go back.  And then asked for another year

20   unpaid leave because I didn't know where I would be going.

21   We got the Wingman Program started, I asked for another

22   year, and they said times up, boy, you're fired.  And we

23   parted.

24   Q    They didn't do it that way, did they?

25   A    I was fired.

26   Q    Yeah.  Fair enough.

27   A    I was fired.  But that's the way you let someone go

1   who's been on a leave of absence.

2    Q   And are you now full time employed by Dylan's Wings

3   of Change?

4    A   I am.

5    Q   What's your salary there?

6    A   Right now $36,000.

7    Q   And the Wingman Program, you created that in 2015?

8    A   That's about when we started.  Yes.

9    Q   And this is a group that empowers children and adults

10  who participate in the program to learn about the importance

11  of empathy.  Correct?

12   A   Yes.  A facilitator comes in, runs a workshop or some

13  training, and then either that organization carries on the

14  program itself, or we come back next year and we do it

15  again.

16   Q   But placing yourself in another shoes, understanding

17  the world from their prospective.  Correct?

18   A   Yes.

19   Q   Is this your one way you continue to honor Dylan's

20  memory.  Correct?

21   A   Yes.

22   Q   And you are still an employee of Dylan's Wings for

23  Change?

24   A   Yes.

25   Q   And throughout – I want to go just briefly for a

26  couple years.  Are you saying you're not sure or you hadn't

27  heard the name Alex Jones by 2014?

1    A    I just don't remember if I had at that point.  There

2  was a lot going on in those early times.

3    Q    Well, obviously you're coping with the loss of your

4  son.  Correct?

5    A    Yes.

6    Q    Emerging tensions in your marriage?

7    A    Yes.

8    Q    Changing residence?

9    A    Yes, at some point in there after the divorce.  Yes.

10   Q    Changing jobs?

11   A    Yes.

12   Q    Accustoming yourself to a new country?

13   A    Yes.

14   Q    Where we can't even pronounce Norwich, right?

15   A    Or maybe you pronounce it right, I don't know.

16   Q    I don't know.  Now what led you to – what do you

17  recall about first hearing the name Alex Jones, if it was in

18  2015?

19   A    I do associate it with hearing that Lenny was being

20  attacked, because that seemed very concrete.  So, I could

21  attach it to that more than the date, and I know we saw

22  things on that earlier, I just didn't match in on that date.

23   Q    That's Lenny Pozner?

24   A    Yes.

25   Q    The parent of another child?

26   A    Yes.

27   Q    Who is not himself in this litigation, correct?

1    A    Correct.

2    Q    Or did you continue in 2015 to hear about people

3  denying your son's death and asserting that you were a

4  crisis actor?  Did that continue in 2015?

5    A    In 2015, yes.

6    Q    Had it increased, decreased, remained about the same?

7    A    I don't know.  I don't always know if we were told

8  everything.  So, my awareness of it is that it was still

9  happening.  But I couldn't say to you increased, decreased.

10    Q    My question is different than yours.

11    A    Okay.

12    Q    What happens in the world as judged from Gods

13  perspective, and then there's what we know.

14    A    Okay.

15    Q    To your knowledge, as you experienced the world, did

16  your awareness of this increase, decrease, remain about the

17  same in 2015.

18    A    I understand.  My awareness was increasing because I

19  think I was hearing more, and I was also open to hearing

20  more about it than the fog of the previous years.

21    Q    And how about during 2016.  Same question.

22    A    I couldn't now say if it was increasing.  I now have

23  that awareness, right.  So that awareness is established.  I

24  don't know about -

25    Q    But in 2016 you can't say.

26    A    I can't say.

27    Q    Same question for 2017.

1 A Again, not sure.  Again, it was still there.

2 Q You got to see a few clips today.  I think it was –

3 well, they were in the 19 series.  19-I and I believe 19-D

4 as in David.  You've seen other clips of Alex Jones over the

5 years, have you not?

6 A Not many over the years.  I didn't go investigate.

7 Q When is the first time you saw a clip of Mr. Jones?

8 A I don't honestly know.  I don't honestly know.

9 Q That's fair enough.

10 A Yeah.

11 Q Now you became aware in 2014 that Wolfgang Halbig was

12 coming to Newtown.

13 A Yes.

14 Q That Wolfgang Halbig was going to attend a school

15 board meeting.

16 A Yes.

17 Q And that you might be advised, parents of those who

18 lost children, might be advised to stay away from the school

19 board meeting.  Correct?

20 A Yes.

21 Q And at that point you understood that Halbig was

22 raising ridiculous questions.

23   ATTY. KOSKOFF:  Objection.  Mr. Halbig –

24  objection.

25   THE COURT:  Sustained.

26 Q At that point why did you think it would be – did you

27 take the advisement to stay away from the school board

1    meeting?

2       A    Yes.

3       Q    Why?

4       A    I was concerned if there would be any conflict or any

5    problem at all.  I didn't want to be a part of that.

6       Q    Okay.  So is it fair to say that prior to this

7    trial – are 19-D and 19-I the only videoclips you've seen of

8    Alex Jones?

9       A    No.  I think we've seen a number more during these

10   few weeks.  Yes.

11      Q    Before the trial, are those the only – had you seen

12   any videoclips of Alex Jones?

13      A    Before the trial date, I can't recall which ones I'd

14   seen.

15              ATTY. PATTIS:  Nothing further, Judge.

16              THE COURT:  Attorney Koskoff.

17   REDIRECT EXAMINATION BY ATTY. KOSKOFF:

18      Q    Do you understand that Mr. Jones is responsible for

19   Mr. Halbig's conduct?

20              ATTY. PATTIS:  Objection, Judge.

21              THE COURT:  Sustained.

22      Q    Prior to this trial did you know that – whether or

23   not Mr. Halbig coordinated with Infowars on the Sandy Hook

24   theories.

25      A    Prior to trial –

26      Q    Yeah.

27      A    – date hearing or prior to our action –

1    Q    Yeah.  Didn't know anything about the relationship

2  between Mr. Halbig and Mr. Jones?

3    A    I didn't know in detail the relationship.  No.

4    Q    And you know that now?

5    A    Yes.

6         ATTY. KOSKOFF:  Thank you.  No further

7         questions.

8         THE COURT:  Anything further, Attorney Pattis?

9         ATTY. PATTIS:  No, Judge.

10        THE COURT:  You may step down, sir.  Just take

11        your time and watch your step.

12        (WITNESS STEPS DOWN)

13        THE COURT:  You may call your next witness.

14        ATTY. MATTEI:  Your Honor, what we would like to

15        do now is play the audio recorded deposition of

16        former producer for the Alex Jones Show, Nico Acosta.

17        THE COURT:  All right.  You will recall what I

18        had said to you before you watched Mr. Jacobson's

19        video testimony and I'll just refresh your

20        recollection since that was last week.

21             The testimony of a witness is recorded under

22        oath at an earlier time, is what you're going to be

23        presented with now.  Your role as jurors in assessing

24        testimony presented in this manner is no different

25        than if the witness were here in court to testify,

26        and you should pay careful attention as the

27        videotaped testimony is played.

1          You should not make any adverse inference from

2      the fact that the witness was not present in person

3      to testify, but rather you should consider this

4      testimony in the same way that you consider all the

5      other evidence in this trial.

6          ATTY. MATTEI:  All set.

7  (Audio recording played of Jacob Nico Acosta.)

8          ATTY. PATTIS:  Judge, may we approach for a

9      sidebar.

10         (Sidebar conversation begins.)

11         ATTY. PATTIS:  I'm sorry.  The lips aren't

12     moving if that's the video deposition.  It's just

13     disconcerting.

14         ATTY. MATTEI:  And I said we were playing the

15     audio recording.

16         ATTY. PATTIS:  Oh, I didn't hear that.  My

17     mistake.  I didn't hear that.  I thought it was the

18     video.

19         THE COURT:  All right.

20         ATTY. PATTIS:  I misheard.

21         ATTY. MATTEI:  The reason that is, is because

22     this was in the early days of Zoom depositions –

23         THE COURT:  Can I just give them an

24     Explanation, so –

25         ATTY. MATTEI:  Sure.  Would you like me to do

26     that?

27         ATTY. PATTIS:  I wish the Court would do it.

1        THE COURT:  Why don't you come up with

2   something - tell me right now and I'll tell them.

3        ATTY. MATTEI:  The reason that this is just the

4   audio recording is because the video recording is –

5        THE COURT:  Something – (Inaudible) –

6        ATTY. MATTEI:  Right.

7        ATTY. PATTIS:  I heard that.

8        ATTY. MATTEI:  The video recording goes back and

9   forth between the court reporter, defense lawyers,

10   witness.  So it just – it wouldn't make any sense to

11   play the video.

12        THE COURT:  So, what can I do?

13        ATTY. PATTIS:  This is merely an audio – the

14   Court inform you that there should be a video

15   recording, it is in fact an audio recording with a

16   picture.

17        ATTY. MATTEI:  Okay.  Of the deposition.  Yeah.

18        ATTY. PATTIS:  I'm sorry, Chris, I didn't hear

19   that.

20        ATTY. MATTEI:  Well maybe I wasn't – I may not

21   have been clear, but yeah, that's what it is.

22        THE COURT:  Okay.

23        (Sidebar conversation ends).

24        THE COURT:  So just to clarify when I was giving

25   you the instructions.  I referred to a video

26   recording, and as I'm sure you all figured out this

27   is actually an audio recording with a picture of the

1    deponent.  So, we just wanted to make sure that you

2    understood that.

3         ATTY. MATTEI:  Thank you, your Honor.

4         ATTY. PATTIS:  Thank you, Judge.

5         THE COURT:  Thank you, counsel.  Can you maybe

6    go back like ten seconds, because I think I lost

7    that.  Thank you.

8  (Audio recording of Jacob Nico Acosta.  Audio recording

9  ends).

10        ATTY. MATTEI:  Your Honor, that concluded Mr.

11   Acosta's testimony.

12        THE COURT:  And can I get his full name for the

13   record?  I didn't get it.  First and last name.

14        ATTY. MATTEI:  First name, Jacob Nico Acosta.

15        THE COURT:  Thank you.

16        ATTY. MATTEI:  May we call our next witness,

17   your Honor?

18        THE COURT:  You may.

19        ATTY. MATTEI:  We call Nicole Hockley, please.

20        THE COURT:  Just watch your step and please

21   remain standing, if you would, and we'll swear you

22   in.

23        THE COURT:  So, I'm a broken record.  Oh, you

24   brought your own water, but -

25        THE WITNESS:  Yes.  Thank you.

26        THE COURT:  - in case you run out, Mr. Ferraro

27   refilled the pitcher.  Thank you, Mr. Ferraro.

1          THE WITNESS:  Thank you.

2          THE COURT:  You may inquire.

3          ATTY. MATTEI:  Thank you, your Honor.

1          N I C O L E   H O C K L E Y, of Fairfield,

2       Connecticut, having been duly sworn, testified under

3       oath as follows:

4   DIRECT EXAMINATION BY ATTY. MATTEI:

5     Q   Hi, Nicole.

6     A   Hi.

7     Q   The good news is that Ian was up here this morning.

8   So, I'm not going to cover everything that Attorney Koskoff

9   covered with Ian.  But let's just start by having you tell

10  the jury a little bit about your own background.  Obviously,

11  you're Dylan and Jake's mom.  But tell them a little bit

12  about your upbringing and what that was like.  Your family

13  life.  Where you went to school.  Those kinds of things.

14    A   Sure.  I grew up in Rhode Island, and my mom still

15  lives in the house that we lived in in Cranston, Rhode

16  Island, from when I was about five years old.  My parents –

17  my father just passed a little over a year ago.  They were

18  incredibly good parents.  I'm an only child, so I was it.

19  And they were very strict, fairly conservative parents.  I

20  had to get good grades.  I was involved in a lot of things.

21  I was a Girl Scout from first grade all the way through the

22  senior year of high school.  Was very close to my

23  grandparents.  One set of grandparents living in Washington

24  State, and the other in Newport, Rhode Island, where my

25  families from.  They are both Navy families, so there was a

26  lot of Navy traditions in the family as well.  And I was,

27  you know, although I was alone a lot, I had a lot of great

1  friends.  Some of my dearest friends are people that – a

2  little tribe of girls that we've been friends since 7th

3  grade.  We still talk together every single day.  The five

4  of us.  We call each other sisters.  Especially as an only

5  child, that was important to me.  And when I wasn't at

6  school, I was in activities.  I did a lot of dance classes,

7  and was then fortunate to be a teacher's assistant to the

8  little kids, which I loved.  I did sports.  Field hockey and

9  swim team.  I did theater.  I was not a good actress, to be

10  perfectly honest, but one of my high school teachers, Mrs.

11  Siperstein, really turned me on to writing.  Which is when I

12  fell in love with English and writing, which I did a lot for

13  theater.  And it was a good life.  We didn't go on a lot of

14  vacations.  My parents were really hard workers, so they

15  were always working.  So, I would get myself to clubs and

16  stuff after that, and my sporting events after school.

17  And – but in summers I would go to Girl Scout Camp.

18  Residential camp started off like in second grade.  I went

19  for a week, and I loved it so much that by the end of, kind

20  of my junior year of high school, I was going to summer camp

21  the entire summer, which gave me great experiences with

22  horseback riding, and canoeing, and camping.  And then I

23  ended up being a counselor at the camp because I loved it so

24  much before I went to college.

25  Q   You mentioned that you come from a Navy family.

26  A   Yeah.

27  Q   Was your grandfather, was he stationed in Newport at

1  the Navy?

2     A    Well, my grandpa – so my grandpa, my mom's dad, who –

3  so his boat is still in Pearl Harbor right now.  He died

4  when I was six years old.  He was a lot older.  And my other

5  grandpa, Grandpa Erickson up in Washington State, he was a

6  Captain in the U.S. Navy, and by my – like early, I think he

7  retired from the U.S. Navy when I was about ten or twelve,

8  and settled – they settled over in Vancouver Island.

9     Q    Okay.  In Washington.

10    A    Yeah.

11    Q    You said that – you describe a lot of activities you

12  were in.  Have you always been a bit of a joiner?

13    A    Yeah.  I think I – I don't like having a lot of time

14  on my hands.  I like to be involved doing all the time.  And

15  I don't think I've ever really thought about that before.

16  But I've always been involved in clubs, activities, you

17  know, throughout my life.  Throughout college.  Throughout

18  after college.  I'm always doing something.

19    Q    You mentioned that your parents worked really hard.

20  Did you start working when you were relatively young as

21  well?

22    A    Really young.  I lied about my age to get my first

23  job.  I was actually 13 when I started working at kind of a

24  private Dunkin Donuts up the street.  So, I would get up

25  weekends at like 5 o'clock in the morning and go up and be

26  there to open up the store, serve the morning coffee.  And

27  it was just, you know – I wasn't allowed to like go out and

1  hang out with friends at the mall and stuff like that,

2  because it was grades, it was clubs.  I wasn't even allowed

3  to date a boy until I was 16, because my parents were like,

4  no, you're not doing any of that.  But I could work and that

5  was fun engaging with customers, but learning how to make

6  donuts and serve coffee.  And it was – it was good.

7      Q    You went to – you went to Trinity College in

8  Hartford.

9      A    Yeah, in Hartford.

10     Q    You focused on writing there.

11     A    Yeah.  So, I was in English and theater.  Double

12 major.

13     Q    Ian talked about how he met you when you went to

14 England for part of your junior year.

15     A    Yeah.

16     Q    And he told a story about you guys exchanging

17 jackets.

18     A    Yeah.  I'd forgotten about that until he mentioned

19 it.  But, yeah, I remember.  My dad was pretty angry when I

20 came back from my six months in England, and I didn't have

21 my dad's leather jacket anymore, but I had some other – and

22 he was like, what is this?  But it was – yeah, that's how we

23 met in a laundromat.

24     Q    You came back from England after the semester that

25 you spent over there, and you kept in touch with Ian

26 throughout your senior year.

27     A    Yeah.

1    Q    He described it as you kind of kept in touch, but I

2    understand it's a little bit more than that.

3    A    Well, I did chuckle when he said today that we

4    weren't officially dating, because we were very officially

5    dating my senior year of high school –

6    Q    College.

7    A    College.  Pardon.  College.  He literally wrote me a

8    letter every single day that we were apart.  Every day.  And

9    we're not just talking like a card with a little sentiment

10   and lovie on the inside.  It was like pages of handwritten

11   notes on the blue airmail paper that you used to get back

12   then.  Every single day.  I, being a writer, was not as

13   prolific as Ian, and I would – I had a stereo, a tape

14   recorder in my room, and I would voice tapes to him instead

15   while I was like getting ready for classes or stuff.  So, I

16   probably sent him a tape every two weeks or so.  But

17   literally every single day he sent me a new letter.

18   Q    And I guess keeping in touch so closely is part of

19   what caused you to resell full time in England just after

20   graduating.

21   A    Yeah, I knew.  I was very, very, very much in love

22   with Ian.  You know, he – I don't believe in love at first

23   sight.  I, having been through a couple of divorces with my

24   mom, I didn't even ever necessarily want to get married.

25   But with Ian, it was just so easy, and I saw a future with

26   this guy, and I wanted to live that future.

27   Q    You heard him say that you told your parents over

1    Christmas, and you were married by January.

2       A    Yeah, I got married three weeks later.

3       Q    And did you have any plans like at that point, about

4    what you're going to do professionally or how you were going

5    to make it all work?

6       A    No.

7       Q    You're a recent college graduate, living in England

8    away from your family.

9       A    I knew we'd figure it out.  Didn't really have a

10   plan.  I was – he was on his – we were living on his 10,000

11   pound a year job as a trainee accountant.  I literally took

12   every temp job that I could find.  I was washing dishes.  I

13   was doing the tea trolly at the tax office.  I was a

14   purchasing clerk.  I was an office adman.  I did the

15   mailroom at a law firm.  I mean I literally, whatever job I

16   could get I took to help contribute.  And I kind of fell

17   into a role shortly after we married, I was a purchasing

18   clerk at a turkey food production company.  Kind of like

19   Frank Perdue.  Over here does chicken, Bernard Matthews does

20   Turkey.  So that was the English equivalent.  And someone

21   was on long term leave, and I did her job and someone else's

22   job for a while.  And then when an entry level marketing

23   assistant job came up at that same firm, I applied and got

24   it.  And that was actually when I first even learned what

25   marketing was.

26      Q    Okay.  So after a bunch of jobs, you kind of just –

27   you were able to fall into a marketing job because that's

1   the first one that opened up in a permanent way.

2      A    In that – that was the first offer I was made.  I

3   mean, I was applying for jobs quite regularly, but my visa

4   to permanently stay hadn't come through, so we had to go

5   through all that process, and – but it was a good job and a

6   great opportunity.

7      Q    And you said that that's the first time you even

8   learned about marketing.

9      A    Yeah.

10     Q    And from that entry level job, just describe where

11  things went from there for you professionally.

12     A    I was able to progress really quickly in the

13  organization.  I think my skill at writing really lended

14  itself well.  And in the five or six years I was there from

15  the time I left; I had multiple – I had done multiple

16  television campaigns.  I'd set up a PR function.  I'd been

17  managing a product line.  I was in charge of all of the

18  international events and exhibitions.  It was really an

19  excellent training ground.  And at night I did a two-year

20  professional course to actually get a degree in marketing,

21  as well.  So, it was the practical and the theoretical mixed

22  together.

23     Q    And so this – you moved up and started to take on

24  these responsibilities, sounds like all before the time you

25  were 30.

26     A    Yeah.  Because we got married – I turned 22 a couple

27  of weeks before we got married.  And yeah, so that was all

1   by my mid-20's.

2       Q    You mentioned that you weren't even sure that you

3   were ever going to get married –

4       A    Nope.

5       Q    Until you met Ian.  What about kids?

6       A    No.

7       Q    Did you see kids in your future?

8       A    No.  That wasn't part of what I saw, and I didn't

9   have anything against children.  I just didn't really see

10  myself as a mom because I was so focused on – I mean, I get

11  incredibly focused on my work, like to the point that you

12  can be talking right next to me, and I won't even hear you

13  because I'll be so focused on what I'm doing.  And Ian and I

14  had a lot of fun.  So leading up to the idea of kids, I was

15  like why change what we've got.  And being so young, or at

16  that point, it sounds kind of silly perhaps, but I just

17  didn't know that I could make room in my heart.  I loved Ian

18  so wholly and so fully, that I didn't think I could – that

19  my heart could expand to have someone else in that

20  relationship as well.

21      Q    And at some point, that changed.

22      A    Yeah.

23      Q    When did that change?

24      A    So when I was about 32, I kind of just looked at Ian

25  and I said, yeah, I want a kid and I want it now.  And

26  biological clock, I don't know?  But it was just like

27  overwhelming the urge.  I must have a child.  He was already

1   there.  He was ready before me.  And it took us, I think

2   close to six months to get pregnant with Jake and then he

3   was born when I was 33.

4        Q    Jake your first.

5        A    Yeah.

6        Q    Then Dylan came a little under two years later.

7        A    Yes.

8        Q    Okay.  Tell us a little bit about Dylan.  When – so

9   you had Jake, you wanted him to have a sibling and you

10  wanted another one, I take it?

11       A    I wanted four at one point.

12       Q    Okay.

13       A    But, yeah, we stopped at two.

14       Q    So that – now you weren't – after Dylan you weren't

15  really able to have more children because of some of the

16  health risks, right?

17       A    Correct.

18       Q    Can you tell the jury how that – why that was.

19       A    So maybe because – I'm one of those people if you

20  start – if you're throwing a party, I will be there like

21  right on time or five minutes early.  I'm always early, and

22  my kids were like that too.  So I didn't carry either of

23  them to full 40 weeks.  Jake was born two weeks early, and

24  Dylan was born six weeks early, and the doctor told me that

25  each child would probably be progressively earlier.  And

26  that was a danger to them.  But also, there was - Jake

27  wasn't just early, he was really, really fast.  Like only a

1  few hours, and it caused a lot of damage.

2    Q   But you said Dylan was six weeks early.

3    A   Yes.

4    Q   And did that, as a result of him being premature did

5  he have some health complications early on, or at least

6  needed to be monitored early on.

7    A   He was in the Special Care Unit at Winchester

8  Hospital for his first few weeks.  I stayed with him

9  whenever I could, working with the midwives there.  He was

10  on a breathing tube and other tubes to support him.  Because

11  he was early, my milk wouldn't come in, so they were trying

12  to help feed him, as well.  And yeah, so he was in one of

13  those plastic-type cribs along with all the other kids for a

14  while.

15    Q   And like we call that here like the Neo-natal

16  Intensive Care Unit?

17    A   Yes.

18    Q   Okay.  And do you remember when he was finally

19  discharged and safe to come home?

20    A   I do, because I was allowed before – before bringing

21  him home, I was allowed to be – they had a separate room off

22  the side, and you could spend your last night there.  So I

23  was in a bed, and he was in a – not a cot, still like a

24  rolling medical tray, but next to me.  And he had his tubes

25  removed by this point.  So, I could hold him.  I could feed

26  him.  I could just be with him.  And it was a special moment

27  because I knew we were going home, but I just remember

1   really clearly saying to him you got through this; I will

2   never let anything happen to you.  It was very protective

3   that he'd survive these first few weeks, and that I was

4   going to be looking after him forever.

5       Q   Was Jake excited to have his brother home?

6       A   Not initially.  I remember when Jake first came to

7   the hospital to visit me and Dylan, Ian brought him, and

8   Jake looked everywhere except at the baby in the unit and

9   was just like crawling on me.  He was all over me.  But then

10  they - Jake was a great big brother and they played a

11  lot – a lot together.  And Dylan just adored Jake.

12      Q   And after you brought Dylan home and, did there come

13  a point where you felt like you wanted a change in your own

14  life and your family life, pull back from work, and that

15  kind of thing.

16      A   Not initially.  That didn't happen until we moved to

17  America - came back to America.  I was – there came a point

18  that I became dissatisfied with my work, because I loved my

19  job, I loved my career, it meant a lot to me, but it meant I

20  was away from the boys a lot.  Especially when I took a  job

21  up in London.  So, from Eastly where we lived to Winchester,

22  South Hampton up to London is two hours door to door

23  commute.  So, I would – I'd be gone before the kids woke up;

24  I would come home after they were asleep.  And I was really

25  kind of more of a weekend mom.  And that hurt.  We were able

26  to hire a nanny, so someone was with the boys all day long,

27  but I felt like I was missing out on too much.  That I

1  wanted to be there with them.

2      Q    Did this realization kind of correspond with when

3  Dylan first started getting tested and diagnosed with

4  autism.

5      A    Yes.  In part, started to notice Dylan was developing

6  differently around three, and I thought it was when he was

7  around four that we first had the official diagnosis of

8  autism, which I didn't know what autism was back then.  And

9  I remember being on a train coming back from London and just

10 crying my eyes out the whole train ride home, because I

11 thought this was going to be a huge limitation on his life.

12 That we would never be capable of having a loving partner,

13 an independent life, would even be able to finish school or

14 ever have any sort of employment.  And I kind of grieved for

15 him that day.  But then that experience in learning about

16 autism and learning about Dylan and all the sessions with

17 therapists with him and all that.  I got to – and I had such

18 a deep and intimate relationship with him from that point,

19 that I could really start to see how the experiences – what

20 he experienced within life as a child with autism, how if I

21 could get down at his level and try to experience those

22 things in the same way, that I could then figure out ways to

23 help him.  And that was important to me.  For both of my

24 boys, to help them develop, and that is why I did want to –

25 I wanted to find the perfect solution of a job where I could

26 also be with my kids all time, especially in those early

27 years.

1    Q    Ian mentioned that one of the things that Dylan was

2  delayed in developing was speech.

3    A    Yes.

4    Q    Can you tell the jury what was most helpful to Dylan

5  in kind of learning how to speak.

6    A    So we went to speech therapy for sure.  And Dylan had

7  this kind of lilt, this kind of sing-song voice.  It was

8  pretty high pitched, and it was almost like he was singing

9  all the time, but he wasn't.  But he – he would watch movies

10 over and over again, especially Disney and Pixar.  Ian

11 mentioned Shrek, Wally, Cars; all of those movies that he

12 would just constantly watch.  And we had a little portable

13 DVD player for him, and he would sit over on the floor and

14 watch these, but rewind and repeat scene after scene.  He'd

15 watch the same scene over and over and over and over again.

16 But then he would recite them.  So he – I believe part of

17 his speech development came from reciting the movies that he

18 saw.  And there was one, it's an English thing called the

19 Gruffalo, and he could recite the entire thirty-minute

20 movie.  He could act out all the parts.  I mean, I would be

21 behind the camera videoing him and Jake playing this in the

22 living room.  But I think that helped him learn more about

23 speech, how to talk.

24    Q    So when he was like four, five years old?

25    A    Yeah.

26    Q    And Ian discussed the decision to move back to the

27 United States and why you settled in Sandy Hook.  This would

1  have been about 2011?  Somewhere in there?

2     A   Yeah.  Yup.  Well, we started thinking in 2010.  We

3  moved in January 2011.

4     Q   Okay.  So just before our lunchbreak here, why don't

5  you tell the jury about that time from when you brought the

6  boys to the United States through that summer of 2012,

7  leaving the school year.  What was that like for all of you?

8     A   You know, that was – it was kind of a golden time.  I

9  think that I was – I had decided that I was going to take a

10  two-year leave of absence from work.  Just focus on the boys

11  and integrating into the community.  Let Ian really

12  transition into his role.  And I was excited about being a

13  full-time mom.  I was able to get them up every morning.

14  Have their breakfast.  Get them to school.  I was allowed –

15  I was able to get involved in the school in different

16  activities.  I was able to be there all the time to take

17  them to swimming lessons, or to take Dylan to his therapy,

18  or to take Jake to Cub Scouts.  I was just able to be super

19  present all the time.  It was probably one of the strongest

20  periods of my marriage with Ian, as well.  And I used to

21  feel, I just had so much joy in that period of time.  I used

22  to just think I was just going to burst.  I was just so

23  happy.  Being with my kids and having, just that time with

24  them was very precious.

25     Q   And did Dylan start to create relationships and hang

26  out with kids and that kind of thing?

27     A   Well, I wouldn't say he necessarily – he wouldn't

1    really hang out with kids.  One of my best friends who I met

2    at Dylan's preschool; she had an autistic child as well.

3    So – and she happened to live one street over.  So we would

4    get together after school sometimes.  And I don't know how

5    much experience everyone has with children with autism.  A

6    play date with two autistic children is a very special thing

7    in itself, because they're aware of each other, but they

8    don't play together.  But we had neighbors who had, oh,

9    golly, four children.  And we'd go up the driveway to the

10   bus stop every morning, and they would play tag.  And Dylan

11   had no clue what the rules were, but he just knew all the

12   kids were just all running around, and he would just be

13   yelling out who's the tagger - who's the tagger?  And the

14   kids were great with him.  They would never tease him.  They

15   would never like to keep – they would allow themselves to be

16   caught if he was the tagger, or even if he wasn't the

17   tagger.  It was just a really great – they were his wingmen.

18   You know, they included him and supported him all the time,

19   and he just loved being around kids.  He didn't always know

20   the rules or how to play, but the fact that they included

21   him, I mean, he would just be beaming the whole time.

22            ATTY. MATTEI:  If we can.  321 is another photo.

23        I know it – I believe there's no objection.

24            THE CLERK:  It is a full exhibit.

25            ATTY. MATTEI:  Oh, right.  So can we just pull

26        up 321 for Nicole, please.

27            ATTY. PATTIS:  Agreed.

1    Q    So this is you guys with Dylan?

2    A    That's Jake.

3    Q    That's Jake.  Do you see – were you here when Erica

4  Lafferty testified and was showing some photos from her moms

5  Twitter page?

6    A    Yes.

7              ATTY. MATTEI:  Let's pull up Exhibit 447.

8              THE COURT:  Full exhibit?

9              ATTY. MATTEI:  Yes, your Honor.

10             THE CLERK:  Yes, it is, your Honor.

11             ATTY. PATTIS:  Agreed.

12  BY ATTY. MATTEI:

13   Q    And that's Dawn, the principal as the book fairy,

14  right?

15   A    Yes.

16   Q    Do you see Dylan here?

17   A    Yes.

18   Q    Where's he?

19   A    He is sitting two kids next to Dawn.  He's got his

20  blue hoodie on, his winter jacket.

21   Q    Right here?

22   A    Yup.  That's D.

23   Q    It's kind a little over pixilated.  That's okay.  And

24  what was Dylan's first reaction when he saw his principal

25  dressed up as a book fairy?

26   A    It scared him because Dawn, first of all, he'd never

27  seen her in this full dress and crown.  And she had these

1  gigantic false eyelashes at the time, that had little

2  glitter balls at the end.  And he – that freaked him out.

3  He could not handle that.  But then Dawn was like, you know,

4  Dylan, it's me – it's me.  And he was fine.  But he kept his

5  distance.  But obviously by the time this photo was taken,

6  he obviously had gotten comfortable with her.

7     Q   And I think we have a picture of Dawn in full book

8  fairy regalia.  This is Exhibit 538.

9             ATTY. MATTEI:  There's not objection to this,

10        your Honor.  It's a new exhibit.

11            ATTY. PATTIS:  Correct.  No objection, Judge.

12            THE COURT:  So ordered.

13     Q   And this is Dawn Lafferty Hocksprung as the book

14  fairy.

15     A   Yes.

16            ATTY. MATTEI:  Your Honor, this would be a fine

17        time to take our lunch break, if it's all right with

18        you.

19            THE COURT:  I think so.  All right.  So you will

20        continue, of course, to obey your rules of juror

21        conduct.  It looks like a nice day out there for

22        those of you who are going to get some fresh air.

23        Ron will collect your notepads, and we will be back

24        right at 2 p.m. to continue.  So we'll take a recess.

25  (Lunch recess.)

26

27

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 27, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

                    C E R T I F I C A T I O N


     I hereby certify the foregoing pages are a true and

correct transcription of the audio recording of the above-

referenced case, heard in Superior Court, G.A. #4, Waterbury,

Connecticut, before the Honorable Barbara Bellis, Judge, on

the 27th day of September, 2022.



          Dated this 28th day of September, 2022 in Waterbury,

Connecticut.




                         Darlene Orsatti

                         Court Recording Monitor