# EXHIBIT 37

1

```
DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  SEPTEMBER 27, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES
```

**A.M. SESSION, VOLUME I**

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
AND A JURY


<u>A P P E A R A N C E S</u> :


  Representing the Plaintiff (s):
    ATTORNEY CHRISTOPHER MATTEI
    ATTORNEY JOSHUA KOSKOFF
    ATTORNEY ALINOR STERLING

  Representing the Defendant (s):
    ATTORNEY NORMAN PATTIS for defendant Alex Jones


```
                        Recorded By:
                        Darlene Orsatti

                        Transcribed By:
                        Debbie Ellis
                        Court Recording Monitor
                        400 Grand Street
                        Waterbury, CT  06702
```

1          THE COURT:  We are here on Lafferty versus Jones

2     week three, day nine.  Counsel could identify

3     themselves for the record, please.

4          ATTY. MATTEI:  Good morning, your Honor.  Chris

5     Mattei on behalf of the plaintiffs joined by Alinor

6     Sterling and Josh Koskoff.

7          ATTY. STERLING:  Good morning, your Honor.

8          ATTY. KOSKOFF:  Good morning, your Honor.

9          ATTY. PATTIS:  Good morning, Judge, Norm Pattis on

10     behalf of Mr. Jones and Free Speech Systems.

11          THE COURT:  So I saw the recent filings, is that

12     something we need to address now or do you want to get

13     started with the jury so that and address it later?

14          ATTY. STERLING:  Your Honor, I think it can be

15     addressed now at least preliminarily, depending on what

16     the court's wishes are.  This is docket number 996 our

17     motion for order to protect against mistrial.  And what

18     we did, your Honor, is we provided to the court the

19     record of Mr. Jones' press conference on the steps of

20     the courthouse on Friday including a transcript and a

21     video.

22          THE COURT:  And provided it to Attorney Pattis as

23     well?

24          ATTY. STERLING:  Yes, your Honor.  And Attorney

25     Pattis has made a filing in response which I --

26          THE COURT:  I've seen it.

27          ATTY. STERLING:  -- have had a chance to review.

1          THE COURT:  You have or have not?

2          ATTY. STERLING:  I have.  I have, your Honor.

3          So what we want to bring to the court's attention

4     is Mr. Jones' remarks directed to the jury.  There have

5     been already five press conferences last week by

6     Mr. Jones on the courthouse steps; one on Tuesday, one

7     on Wednesday, two on Thursday one going into the

8     courthouse before he began to testify and one at the

9     lunch break and then there was the Friday press

10    conference.  And in the Friday press conference

11    Mr. Jones received a question concerning what he would

12    say to the jury.  And his response was I'm basically

13    barred from being able to talk.  If I could talk to the

14    jury, I would say go research history and understand

15    how dangerous it is where they'll pick one event of

16    speech and say it's for full and then use that to set a

17    precedent to knock over all the dominos.

18         Then what we hear on the video, your Honor,

19    although it's not transcribed as and take everybody's

20    free speech away.  That is the same nullification

21    argument that Attorney Pattis has been making.

22         Your Honor, in our view, this is very much the

23    domain of the court.  Attorney Pattis has argued in his

24    response to our motion that we are seeking a gag order

25    that's obviously an argument that he wants to make.

26    What we have done is brought the conduct to the court's

27    attention, provided the court with the record but we

1      understand that it is the court's core function to

2      protect this process and it's not our function to

3      determine how that might be.

4           So I do have some responses to Attorney Pattis'

5      filing that I think at this point, what I would, if the

6      court would --

7           THE COURT:  I'll hear from Attorney Pattis and

8      then you can respond.

9           ATTY. STERLING:  Yes, your Honor.  Thank you.

10          THE COURT:  Attorney Pattis, I did read your

11     filing.

12          ATTY. PATTIS:  And I won't repeat it.  I thought

13     the court addressed these issues Friday, my

14     recollection is when it was first brought to the

15     court's attention representations were made that

16     Mr. Jones had made comments about counsel and their

17     families and directed comments to the jury both of

18     which I think would be deeply disturbing to any court.

19     Upon review of the tape, I think, representations were

20     made that there were no threats that they were ridicule

21     comments were ridiculing in character and that the

22     comments to the jury, I don't recall what was said.  I

23     reviewed them now and I think the court's ruling Friday

24     should stand.  There is no gag order.  No one has

25     sought one.  There is no precedent in the United States

26     for prospective limitations on speech under both the

27     state or federal constitution as to a trial

1    participant.

2        I don't think Mr. Jones' comments even reach the

3    jury which would be a threshold question and even if

4    they did, they a harmless in the contexts of this case.

5    He didn't attempt to tamper with the jury.  He was

6    asked a question what he would say and what he said

7    was, you know research history.  Well, one would

8    presume that would be a good thing to do.  It's

9    dangerous when one event is pulled out of contexts or

10   one event is used to set precedent to knock over others

11   and if what Attorney Sterling heard, which I'll credit

12   as there take free speech away, that's Jones' view.

13   But the court has not sequestered the jury.  It has

14   given them admonitions to avoid press coverage.  Its

15   repeated those at the end of each day and it is

16   inquired of the jury each day whether there were notes,

17   I think at the beginning of the proceedings, and there

18   have been none.  So I don't think there's anything for

19   the court to address.

20       THE COURT:  Attorney Sterling.

21       ATTY. STERLING:  Your Honor, there is absolutely

22   precedent for issuing orders in this contexts and my

23   bet is that the court is already familiar with it which

24   is and certainly Attorney Pattis is, Judge Blawie's

25   order in the Fotos Dulos case in which he issued an

26   order restricting speech of parties.

27       Now again, we're not arguing as to what the court

1      should do.  It's the court's determination as to

2      whether the process is being threatened and as to what

3      remedy would be appropriate.  But certainly Judge

4      Blawie's reasoning and order would be potentially

5      helpful to the court in determining how to proceed and

6      that citation is --

7           THE COURT:  I've read it.  I've read it at the

8      time it was issued.

9           ATTY. STERLING:  Good.

10          ATTY. PATTIS:  May I respond briefly to that?

11          THE COURT:  Briefly.

12          ATTY. PATTIS:  Judge Blawie's order was the

13     subject of a public interest appeal to the State

14     Supreme Court.

15          THE COURT:  I also recognize that and then it was

16     mooted out.

17          ATTY. PATTIS:  And a good portion of the brief

18     that you read was taken from the Dulos brief.  It was

19     mooted out when Mr. Dulos committed suicide.  There's

20     been no appellate court or supreme court decision.  We

21     say the three part factor Nebraska Press Court governs

22     here and there's not been a preliminary showing that

23     there is a necessity for any.

24          THE COURT:  I don't think there's a need to test

25     the appellate waters at this time.  I'm going to deny

26     the motion without prejudice, however, it certainly

27     could be renewed if circumstances change and I might

1    feel differently frankly if it comes to my attention

2    there's an issue with the jury that it's reached the

3    jury.  So if that is the case, I will reconsider my

4    ruling.

5        ATTY. PATTIS:  At the close of court Friday, the

6    court inquired whether I'd be willing to extend the

7    court's concerns about attempting to communicate with

8    jurors, you can infer that that was done.

9        THE COURT:  Any other housekeeping matters before

10   we bring the panel in?

11       ATTY. STERLING:  Your Honor, one question and one

12   other matter.  The question is so just so we understand

13   the court's ordinary instructions to the jury will be

14   what happens this morning.  In other words, the court

15   isn't going to do anything --

16       THE COURT:  I try to canvas them.  I mention it

17   everyday.  I think on Friday I specifically pointed out

18   to them that they might be urged to do independent

19   research by others and that my ruling stands and I'll

20   say that as I think it's necessary.  But if

21   circumstances change, if there are new developments, or

22   if it turns out the jury has been affected, then I'll

23   reconsider.

24       ATTY. STERLING:  So the court's instructions will

25   be much the same as they have been on previous days?

26       THE COURT:  Yes.

27       ATTY. STERLING:  We have one scheduling matter

8

1    which is that we would like to schedule a charge

2    conference with the court.

3        THE COURT:  Yes.  Have you spoken to each other to

4    figure out, given your witness schedule, when that

5    would be appropriate?

6        ATTY. STERLING:  We have and we think Thursday

7    afternoon could be a good time, if that works for the

8    court.

9        THE COURT:  Let me --

10       ATTY. PATTIS:  It appears as though the plaintiffs

11   could rest as early as Tuesday of next week.  And I'm

12   just repeating a conversation I had with counsel.

13       Mr. Jones, we were unable to reach an agreement

14   about bringing Mr. Jones back this week, so he will be

15   returning to Connecticut and will testify Tuesday and

16   or Wednesday if at all given whatever the court rules.

17   And so we expect the case to get to the jury sometime

18   next week.  So I believe a charge conference this week

19   would be helpful so that we'd know what we're shooting

20   at as we prepare our closing arguments.

21       THE COURT:  All right.  Let me consider it.  What

22   else?  Anything else?

23       ATTY. STERLING:  Nothing here, your Honor.

24       THE COURT:  Okay.

25       ATTY. PATTIS:  And Judge, I can't recall whether

26   this took place in the presence of the jury or outside.

27   Did the court tell the jury Mr. Jones would be back

9

1      this week?

2           THE COURT:  I read the agreed upon comments and I

3      thought that we said Wednesday or Thursday.

4           ATTY. PATTIS:  Could you alert the jury that

5      there's been a change in plans and if he testifies, it

6      will be next week rather than this week, in case

7      they're thinking that, you know --

8           THE COURT:  Why don't you talk to each other and

9      give me some language.

10          ATTY. MATTEI:  Your Honor, my recollection is we

11     weren't that specific that we said that he would be

12     returning to testify.  I think we may have said when

13     called by defense.

14          THE COURT:  Why don't we look at the transcript.

15     We don't have to mention it now and see exactly what

16     was said and then talk to each other and let me know if

17     it needs to be mentioned again.

18          ATTY. PATTIS:  Yes, Judge.

19          THE COURT:  I would like to keep our jury informed

20     and I surely don't want to misinform them, so if we did

21     say specific dates, I think it might be worth

22     mentioning.

23          ATTY. MATTEI:  We'll take a look at that.

24          THE COURT:  Okay.  Anything else?

25          ATTY. PATTIS:  Nothing from the defense.

26          ATTY. MATTEI:  No, your Honor.

27          THE COURT:  And while Mr. Ferraro is getting our

1    panel, I neglected to mention that in accordance with

2    judicial branch policy only those entities that have

3    been specifically authorized may film or record and if

4    anyone violates that policy they can expect their

5    device or devices to be confiscated and to be removed

6    from the courtroom.  So please make sure you obey the

7    policy.

8         (Whereupon, the jury is present.)

9         THE COURT:  Good morning.  Good morning.  Welcome

10   back.  Good morning.  Good morning.  Good morning,

11   everyone.

12        Counsel will stipulate that our nine fine folks

13   are all present and accounted for.

14        ATTY. MATTEI:  Yes, your Honor.

15        ATTY. PATTIS:  Yes.

16        THE COURT:  Please be seated.  I hope everyone had

17   a nice weekend.  As I try to do everyday, I just want

18   to reiterate the remarks that I've made about avoiding

19   media coverage and not doing research.  Mr. Ferraro has

20   not given me any notes but again, if you see or hear

21   anything of a prejudicial nature anything that you

22   think would compromise the proper conduct of this

23   trial, it is okay, I encourage you to give Mr. Ferraro

24   a note.  We would rather deal with any problems as they

25   occur rather than later on, so would you please

26   continue to follow that instruction if you would.

27   Attorney Mattei.

1          ATTY. MATTEI:  Yes, your Honor.  Attorney Koskoff

2     will be leading us off this morning, thank you.

3          THE COURT:  Attorney Koskoff.

4          ATTY. KOSKOFF:  Thank you very much, your Honor,

5     and good morning.

6          THE COURT:  Good morning.

7          ATTY. KOSKOFF:  Recalling Ian Hockley.

8          THE COURT:  Good morning, sir, just watch your

9     step as you come up and just remain standing and we'll

10    swear you in.

12

1          I A N   H O C K L E Y        ,

2     called as a witness on behalf of the Plaintiffs, having

3     been first duly sworn by the clerk to tell the truth,

4     the whole truth and nothing but the truth, testified on

5     his oath as follows:

6          THE CLERK:  You may be seated.  And I need you to

7     state your name and slowly spelling your last name for

8     the record and state and town in which you live.

9          THE WITNESS:  Ian Hockley, H-o-c-k-l-e-y;

10     Fairfield, Connecticut.

11          THE COURT:  And I'm sure you heard me say this a

12     dozen times at this point.  There is fresh water in the

13     pitcher and you'll help yourself whenever you would

14     like.  Get yourself situated.  And you may inquire

15     whenever you're ready, Attorney Koskoff.

16          ATTY. KOSKOFF:  Thank you, your Honor.

17 DIRECT EXAMINATION BY ATTY. KOSKOFF:

18   Q.  Good morning, Ian.

19   A.  Good morning, Josh.

20   Q.  Ian, could we find out a little bit about you and your

21 background.  Can you tell the jury where you hale from and

22 about your background.

23   A.  I was born in England, 1970 a small town Cowes Beach

24 about an hour north of London.  My father was a green grocer he

25 sold fruits and vegetables in his father's shop.  And my mother

26 was a telephone exchange operator.  So she put the socks in the

27 yale punching machines.

1    Q.   The younger generation if just totally confused right

2    now.  But can you explain what the town that you grew up in is

3    it a town, a city, doesn't sound like a major acropolis.

4    A.   No.  We moved I think when I was two.  We moved to a

5    small village called East Street.  A very small village I think

6    there were probably 500 people lived there at the time.  We

7    didn't have a stove.  We had one pub and one stall.  We went to

8    elementary school in one village two miles one way and went to

9    middle and high school in another town the other way.  And then

10   actually went back to my hometown for my final two years of

11   high school before I went to college.

12   Q.   Okay.  And do you have siblings?

13   A.   Yes.  I have one younger brother and one older

14   stepbrother.

15   Q.   Are they still in England or?

16   A.   My older stepbrother is in Naperville, Chicago and my

17   younger brother lives back in England.

18   Q.   And you said you went to school.  You went to high

19   school and then did you go to college after that?

20   A.   Yes.  Wasn't actually common in the 1980's not everybody

21   went to college about 30 percent of the people but I worked

22   hard and I got to college it was called the University of East

23   Anglia.  The city was called Norwich.

24   Q.   Sorry.  The city was called what?

25   A.   Norwich.

26   Q.   Norwich?

27   A.   Norwich.  We have a Norwich over here but we call it,

14

1    "Norwich."

2    Q.  Okay.  And is that a four year program or is it similar

3    to U.S. college?

4    A.  Three year, three year undergraduate.

5    Q.  Okay.  And did you have a particular field of study?

6    A.  Yes.  I was interested in finance and economics, so I

7    started studying that.  I wanted to be a public accountant.

8    Q.  Really.  Okay.  And did you earn a degree?

9    A.  Yes.

10   Q.  And did there come a time when you met a special

11   person?

12   A.  In my third year which is my final year, a mutual friend

13   introduced me to this young lady, an American, Nicole and we

14   started dating.  In my final year she was an exchange student

15   from Connecticut.  She went to Trinity and she came over to my

16   college for the last semester.

17   Q.  She was a college student here in Trinity in

18   Connecticut?

19   A.  Yes.

20   Q.  And was it a senior year when she came over?

21   A.  She was a junior.  She was in her third year but being

22   part of a four year course so she still had another year of

23   college.  I was graduating that year.

24   Q.  Oh, I see.  Okay.  It would have been your last year

25   because you have three years?

26   A.  Yes.

27   Q.  Okay.  And so you were introduced by a friend and then

15

1    tell us a little bit how you, I don't want to embarrass you

2    but was there a courtship and?

3        A.   We got talking, we got to know each other.  There were a

4    lot of Americans that came to our college.  It was a popular

5    transfer program for English Literature and other programs.

6    And I remember running into Nicole at the laundromat and we

7    were washing our clothes on the campus.  And I didn't have a

8    jacket.  It was January and she had this really nice leather

9    jacket and she very kindly offered it to me and it was her

10   dad's flying jacket from the states.  So she let me borrow

11   that.  I happen to let her borrow my leather jacket the next

12   time I saw her and for the next six months of college we just

13   wore each other's jacket around.  So I guess that made us an

14   item.

15       Q.   And so you were -- Nicole had another year but you were

16   done.  So tell us about what happened after that.

17       A.   Yes.  In the last few months of your college course you

18   start applying for jobs so I started applying for jobs in that

19   City of Norwich to train to be a public accountant so I joined

20   Coppers and Lybrand when I graduated so I joined there in

21   September of '91.

22       Q.   And did Nicole go back to finish her studies at

23   Trinity?

24       A.   Yes.

25       Q.   All right.  What happened next?

26       A.   We kept in touch.  We weren't officially dating but we

27   kept in touch, kept each other updated and when Nicole

1    graduated she moved out to England I think in September of that

2    year after she had graduated and we started living together

3    then.

4        Q.   Where were you living when Nicole came back?

5        A.   We were in Norwich.  We were in a small apartment in a

6    complex in Norwich.

7        Q.   Okay.  And for how long, take us through the next

8    several years, how long did that situation last?  I don't mean

9    with Nicole, I mean in is it Norwich or Norwich?

10       A.   Norwich.

11       Q.   I repeat my question.

12       A.   It's all I got.

13       Q.   That's all you got.  W or are there any G's in it?

14       A.   Same spelling.

15       Q.   So for how long were you still in Norwich?

16       A.   Yes.  Nicole had come over with a work Visa for six

17   months.  She started working.  She got some part-time work to

18   help support ourselves but after four or five months of that,

19   we knew she'd have to go home.  The Visa was up and she'd be in

20   breach of that, so we decided to get married.

21            We decided amongst ourselves that we would do that we

22   were both 22 and something, but we thought it would be a great

23   idea when her mom came over to visit at Christmas and meet my

24   parents for the first time, that we would tell them.  And so we

25   did.  We had Christmas dinner altogether at my parents' house

26   and when all the plates were cleared away, I just stood up and

27   said that we had some news and said that we were getting

1  married.

2     Q.  How did that go over?

3     A.  Silence.  Someone dropped a plate.  There was a lot of

4  discussion.  There was actually a lot of discussion that we

5  were very young.  We were rushing into this and that was a good

6  discussion with the parents.  And things they shared about

7  their life and getting married relatively young and how that

8  didn't work out for them.  But after a good discussion, we

9  reaffirmed that's what we wanted to do.  We wanted to spend our

10  life together so we carried on.  We got married at a small

11  civil ceremony in Norwich.

12     Q.  And how old were you?

13     A.  I think we were 22 or 23.  Yeah, a year, year and a half

14  out of college, yes.

15     Q.  And then when you're married -- does that mean that

16  Nicole got an instant Visa or?

17     A.  You can apply.  It's kind of like the green card system

18  over here which is what I came through when I came.  So you get

19  a right of residency but no citizenship.

20     Q.  Okay.  And now take us through the next several years

21  up until the time you guys have children.

22     A.  Yes.  We were trying to establish our careers.  I

23  qualified as a public accountant.  I left that firm, started

24  working in industry.  Try to move around a few jobs in getting

25  more experience and then I got a job in London which is about a

26  two-hour commute each way but it was a good career move.  While

27  I was doing that, Nicole got a job across the other side of the

18

1    country south of London, well south of London so that we pick

2    up sticks and we moved down to the south coast.

3        Q.   Okay.  Is that to South Hampton?

4        A.   Yes.

5        Q.   And then did there come a time when you and Nicole had

6    children or decided to have children, not that they're two

7    different things?

8        A.   Yes.  We decided it was the right time we were in our

9    early 30's and we just bought a house.  We'd been renting for a

10   few years and we wanted to settle down so we got a house with

11   two extra bedrooms so we knew we would be able to start some

12   small family and we started that.  So Jake was born on July

13   4th, 2004?

14       Q.   July 4th?

15       A.   Yes.

16       Q.   Of 2004, okay.  And then and Jake is the older brother

17   of who?

18       A.   Of Dylan.

19       Q.   And can you tell us when Dylan was born?

20       A.   Dylan was born March 8th, 2006 about two years later.

21       Q.   So Jake and Dylan were pretty close in age about 18

22   months, 19 --

23       A.   Yes, 21 months just under two years.

24       Q.   And how did -- did they develop a relationship from an

25   early age or were they mortal enemies or what?

26       A.   I have a younger brother who's two years younger and I

27   sort of saw them developing that same way, you know they fight

1   like cats but then they be best friends and play with each

2   other so I think they had what you think was a normal

3   upbringing.

4        Then as Dylan started to develop and we saw he was

5   missing some of the milestones, we noticed that things were

6   different in that took a different turn to their relationship

7   as well, I guess.

8   Q.  Okay.  Can you explain a little bit about that to the

9   jury about Dylan noticing things that were different about

10  Dylan that maybe you didn't see in Jake?

11  A.  Yes.  He wasn't so quick to start speaking.  I think he

12  was quite late walking but it was actually a preschool teacher

13  who I believe was doing some postgraduate work with special

14  education said we think you should have Dylan formally tested.

15  And again this was back in the '90s and back in England

16  awareness of disabilities and special needs was different then

17  the way it is now but we had him tested and they diagnosed him

18  with autism at about age three.

19  Q.  Age three, he was diagnosed with autism and this would

20  have been, Dylan was born in 2006?

21  A.  Yes.

22  Q.  So he was diagnosed with autism around 2009 at age

23  three?

24  A.  Yes.

25  Q.  What do you mean, can you explain a little more about

26  what you mean something about Britain not being --

27  A.  It was less understood maybe then we do now, causes and

1    how a child can be helped to develop with autism so they can be

2    the best person they can be.  And it was just very confusing as

3    well as a parent to navigate this.  You have, I guess you have

4    all your hopes and dreams and your thoughts about what your

5    child might be and because this was so different and confusing

6    we just didn't know what that meant for his upbringing.

7       Q.  And I think Nicole is going to testify later today I

8    was going to speak more about this, did there come a time

9    in -- where you and Nicole decided to change where -- your

10   living arrangements and come to this country?

11      A.  I worked, after I left my job in London go back in that

12   two hour commute from South Hampton, I took a job five minutes

13   up the road which is a relief at IBM as a finance analyst and

14   I'd been working there for a number of years started working my

15   way up through different roles there and was fortunate enough

16   to be offered a relocation to the United States in 2010, we

17   started working on that relocation.  It wasn't going to be an

18   assignment as in you get sent for two years, you get sent home.

19   It was going to be a permanent relocation.

20      Q.  And you were born and raised in the U.K. and what were

21   your thoughts about moving to this country?

22      A.  I was really excited.  I had been fortunate enough to

23   come here a few times as a kid.  My dad had brought us here on

24   vacation.  And then knowing Nicole and traveling back to see

25   her parents, we got to live here as it were by staying with

26   them, so I felt I understood.  I knew what it was like to live

27   in America.  I was really excited by the opportunities and what

21

1    it might offer for the boys as well.

2        Q.  And that's the decision to come to America but how did

3    you end up in the State of Connecticut and then how did you

4    end up in Newtown or Sandy Hook?

5        A.  Yes.  The relocation for my job was going to be at

6    Somers in New York so it's just over the line, the state line,

7    so I flew out in December 2010.  Nicole's mom came up from

8    Rhode Island, helped me tour around and we were shown different

9    houses that we might want to rent.  Looking in New York and

10   that area was too expensive.  Started looking into Connecticut,

11   started getting more affordable but still quite close to the

12   line New York City was just too expensive for my salary.  But

13   as we moved a little bit further east it became a bit more

14   affordable and I was visiting the village of Sandy Hook,

15   Newtown.  We were shown a lovely house with a lovely garden.

16   Went to the school, went to Sandy Hook School the principal

17   Dawn Hochsprung invited us in and met with her.  She showed us

18   the school.  She showed us the special education program that

19   they had and explained the sorts of support Dylan could expect

20   and she spent a great deal of time with us.  And I just think

21   the combination of all those things just said Sandy Hook is

22   where we needed to move to.

23       Q.  Thank you for that.  I'll ask you a few questions about

24   what you said.  And we talked about and even I've used the

25   Sandy Hook and Newtown interchangeably but can you just

26   describe to the jury are they the same place, you said the

27   village of Sandy Hook.

1      A.   Yes.   I guess we would refer to that Sandy Hook and

2   Newtown are the same town legally statutorily but Sandy Hook is

3   a subdivision own zip code also has a separate zip code so

4   they're referred to separately but it's part of greater

5   Newtown, same school system.   Sandy Hook Elementary feeds into

6   the intermediate, the middle, and the high school in the town.

7      Q.   And you talked about with visiting with Dawn Hochsprung

8   and that's Erica Lafferty's mother?

9      A.   Yes.

10      Q.   Who is the principal?

11      A.   Yes.

12      Q.   At Sandy Hook Elementary School, is that right?

13      A.   Yes.

14      Q.   And have you visited other schools and visited with

15   other principals prior to meeting with Dawn Hochsprung?

16      A.   No.   This was the first town on my visit to find a place

17   to live that we'd actually gone to the school.

18      Q.   And can you tell us a little about the physical aspects

19   of the school, was it like a school that you had seen back

20   home?

21      A.   I guess, yes.   It was similar.   The classrooms for the

22   elementary school everything is just a little smaller, look

23   laid out.   It was very neat.   Actually the boys' school back in

24   England, (name of school), was very similar, very neat, very

25   tidy.   Lovely little corridors, all the pictures up on all the

26   walls that the kids had made and I got to go there in December

27   so it was also very festive.

23

1    Q.  And in terms of Dawn Hochsprung, can you tell us what

2    was it about Dawn and the program that attracted you to the

3    school, if anything?

4    A.  Dawn just loved all the kids.  She was greeting them by

5    name and speaking with the teachers as we toured around.  As I

6    said they had a special education room.  You know back in

7    England, Dylan was getting one hour of services a week which we

8    were grateful for then but they explained as long as everything

9    fell into place, nothing was guaranteed the aids in the

10   classroom would be with Dylan all the while while he was in

11   school and they'd have appropriate breakouts where they go to

12   special education room to focus on things for him.  So it was

13   just night and day for his care.  So I really chose the school

14   for Dylan.

15   Q.  Was the school a toxic waste dump?

16   A.  No.  No.

17   Q.  Was it a cutout like, did it look like artificial?

18   A.  No.

19   Q.  And was there anything about the school in terms of its

20   ability to provide for Dylan that made it a good choice for

21   you?  Or rather what would the services if you could describe

22   to the jury, what services did Sandy Hook Elementary School

23   offer for Dylan?

24   A.  One of Dylan's challenges was his speech, his syntax was

25   jumbled.  It's just, all the words would come out just not

26   necessarily in the right order so we could understand him.  So

27   they explained that there would be speech therapy there just to

24

1   help him develop that, I don't want to say develop normally,

2   but just help him with his development so he could communicate

3   because that was often causing him to have trouble integrating

4   with the other kids because they couldn't understand him, he

5   couldn't always understand them.  So that would help his

6   integration, help his socialization.  Some children with

7   autism, socializing is very hard but that would allow him to

8   engage with other kids.  And equally having an aide in the

9   classroom not always 100 percent dedicated to him but if he was

10  struggling would be able to come over to him, again, compared

11  to one hour services a week back in England and that's it.

12      Q.  So you noticed a difference between what the school

13  system in England could provide versus the school system here?

14      A.  Yes.

15      Q.  And what was the difference, a vast difference or?

16      A.  It's a huge difference.  I mean there was very clearly a

17  focus on special education needs and Newtown was able to invest

18  in that and provide the staff and the services and the

19  expertise to help the children.

20      Q.  Now, when you were embarked on this looking for a home

21  and a community, was Nicole part of this process?

22      A.  I come out by myself but we spoke every night about what

23  I was looking at, where I was going.  We had a spreadsheet

24  running between us so we could log everything and right out of

25  the green for did they hit, you know, was the school system be

26  good, was it a good town, could we afford it, distance to work,

27  opportunities.  We were pretty rigorous on how we approached

1    this move.  This was going to be a good fit.

2        Q.  So Nicole remained back in U.K. with the children?

3        A.  Yes.

4        Q.  Okay.  And do you remember making the decision to move

5    to Connecticut to Sandy Hook and to enroll the children in the

6    elementary school?

7        A.  We had three days of touring around, looking at New York

8    and Connecticut and then on the fourth day we made the

9    decision.  We had a phone call and decided that Sandy Hook was

10   the place to move to.

11       Q.  Okay.  And did you buy a house?

12       A.  No.  We rented a house for sale.

13       Q.  And this was what year?

14       A.  We moved in January 2011.  I think it was the 17th, just

15   before two feet of snow landed.  I remember that.

16       Q.  I'm sorry.

17       A.  I just remember we arrived and there was snow on the

18   ground and we woke up the next day and there was two more feet

19   of snow.

20       Q.  No kidding?

21       A.  And the boys had never seen three feet of snow before.

22       Q.  Did they want to go back to England or were they pretty

23   happy about it?

24       A.  They loved it.

25       Q.  You talked about the boys and Nicole, would you mind if

26   we showed the jury a picture, exhibit 472 family photo?

27             THE CLERK:  It's not full.

26

1          ATTY. KOSKOFF:  Is there any objection?

2          ATTY. PATTIS:  May I have just a moment, Judge?

3          THE COURT:  Take your time.

4          ATTY. PATTIS:  No objection, Judge.

5          ATTY. KOSKOFF:  Okay.

6          THE COURT:  Full exhibit.

7    BY ATTY. KOSKOFF:

8      Q.  Is this a photograph you had taken here or rather in

9    Sandy Hook?

10     A.  Yes.

11     Q.  Can you just tell us who these folks are.

12     A.  Yes.  On the left in the blue is Dylan.  It's me in the

13   red and Jake is in the green on the right.

14     Q.  Were these professionally done photos?

15     A.  A friend of ours was, she was trying to develop her

16   photography business so she offered to take them to be able to

17   practice on us.

18     Q.  Okay.  Thank you.  You've been in court and you

19   understand we're not -- were you in court when Bill Aldenberg

20   and Carlee Soto Parisi described the scene at the Sandy Hook,

21   at Sandy Hook on December 14th, 2012?

22     A.  I couldn't be here that day, no.

23     Q.  The -- I'm not going to ask you specifics about that

24   day but I do want to ask you, do you recall the last time you

25   saw Dylan?

26     A.  December 13th, I came home late from work.  It was

27   budget season at IBM and so we were working pretty late hours

1    and the boys were both asleep.  So I did see them.  I looked in

2    their room but I didn't wake them up.  Dylan was a very light

3    sleeper and if he woke up, it was hard to get him back to

4    sleep.  So I try not to wake them up.

5         The next morning, the Friday the 14th, I needed to be at

6    work by seven, so I got up very early, again, looked in their

7    room, they were still asleep so just whispered good-bye and got

8    in my car and went to work.

9    Q.  So you didn't see them on Thursday or on Friday?

10   A.  I may have seen them Thursday morning, they might have

11   been awake but I don't remember that.

12   Q.  Okay.  Was it your habit to go in when they were

13   sleeping even though at the risk of waking Dylan up, to see

14   them?

15   A.  Yes.

16   Q.  And did there came a time when you were apprised that

17   something was happening at the school?

18   A.  I was in my office.  I was standing at my desk.  We all

19   had laptops and an e-mail came in 9:30, 9:45 Newtown schools

20   are in lockdown because I got my work e-mail was attached to

21   the school system and I just pressed delete because I didn't

22   know what that meant.  I didn't know if it was a drill.  I'd

23   only been in the country less than two years, so I didn't

24   really know what a lockdown was.  I didn't have any discussion

25   of what that means, so I pressed delete.

26   Q.  So it didn't dawn on you that that was something

27   serious?

1    A.  No.

2    Q.  And we can infer obviously that you eventually were

3    notified that something happened?

4    A.  My manager came into my room and he knew that the boys

5    were in the Sandy Hook school and which I confirmed.  He just

6    said we need to go and I grabbed my stuff and he drove me back

7    to Newtown.

8    Q.  Your manager did?

9    A.  Yes.

10   Q.  How far a drive was that?

11   A.  Normally about 30, 35 minutes.

12   Q.  And I want to skip the details of what happened then

13   but there came a time when you did learn that Dylan was among

14   the children who had died?

15   A.  Yes.

16   Q.  And about what time of day did you learn that?

17   A.  It was the second press conference the governor had

18   given.  I'm guessing it was 3:00 in the afternoon.

19   Q.  Had you guys had any plans that weekend or do you

20   recall?

21   A.  I don't remember.

22   Q.  And you and Nicole had to make some arrangements, is

23   that right?

24   A.  Can you be more specific.

25   Q.  You had to bury Dylan?

26   A.  That was a lot of support given, so, yes, we had to.

27   But we were put in touch with a funeral home and Community

29

1   Church in Bethel got in touch with us to help start planning a

2   memorial service.  So we had two services which we planned,

3   yes.

4       Q.  So there was a is it a burial?

5       A.  No.  Just a funeral service, friends and family came on

6   the Wednesday to a small funeral home in Newtown and we

7   received him there and then Dylan was cremated.

8       Q.  And you talked about a memorial, you set up a memorial

9   for Dylan?

10      A.  A memorial service was arranged.  The funeral was on the

11  Wednesday and then on the Friday as I say it was Walnut Hill

12  Community Church in Bethel.  I have met a pastor from there at

13  the firehouse on 12-14 and they had kept in touch with us and

14  they just really offered to do this.  To help create the

15  funeral service was not very long and it was very hard and they

16  wanted to help us create something to celebrate Dylan's life.

17      Q.  And was that something that you would have done in any

18  event?

19      A.  I don't think we had the desire to.  We probably didn't

20  have the wherewithal ourselves at that point.  We were in such

21  turmoil then but they were extremely caring and supportive and

22  provided people to help us create that, to help guide us on

23  what some of the content would be someone at the church who was

24  great with video but together a lovely compilation of Dylan

25  that we were able to show there.  So we wouldn't have been able

26  to do it ourself.  It was everything we would have wanted to do

27  to remember Dylan.

1    Q.  And the memorial service was then very close to the

2    service for Dylan's to his death, right?  Can you tell us

3    about that memorial service, what it was like, whether it was

4    helpful?

5    A.  Obviously incredibly helpful.  Our friends offered to do

6    readings.  Some friends from Newtown and those that had flown

7    out from England offered to share their memories of Dylan's

8    life.  One of the beautiful singing of alleluia.  The lady who

9    sang it, Dylan loved alleluia because it was in the movie Shrek

10   and he just loved watching that.  And but the lady that was

11   going to sing it called us and said the words are very dark,

12   it's an amazing song but very dark and is it okay if we change

13   the words?  And she changed the words.  Her sister rewrote it

14   to really remember Dylan and AnneMarie Murphy who had died and

15   made it something beautiful, so that was great and then Nicole

16   and I had the chance to get up at the end and really to share

17   with all of them Dylan.

18   Q.  And did you find this comforting yourself in the wake

19   of this terrible loss?

20   A.  Looking back definitely yes.  You know it was, I don't

21   want to sound wrong it was a wonderful event, we were able to

22   remember Dylan whoever we were sharing with eight nine hundred

23   people were there and we had something that we could treasure

24   him and remember it.  It's like we encapsulated his few short

25   years everything right there.

26   Q.  I think anybody, for anybody who's a parent the concept

27   of losing a child is unthinkable, yet it happens.  I wonder if

1    you could, Ian, just sort of explain from your point of view,

2    you know, describe what it's like to have lost Dylan, to lose

3    a child, not the circumstances so much but the feeling.

4        A.  I think I can only put it in perspective my mom passed

5    away last month, I was able to go out to England.  I was really

6    fortunate to go out and be with her and the family was with her

7    and she lived a good life and she raised us well and we were

8    able to celebrate her.  We had a small service for her, myself

9    and my younger brother got up to talk and it just seemed right,

10   you know.  She had raised us.  We cared for her, my brother

11   especially cared for her in her later years and we had a good

12   send off.  That just seemed the right way to do it and I'm

13   blessed that we could do it that way.

14       It's just completely wrong and topsy-turvy.  It's the

15   wrong way round, losing a child with so few years, where they

16   had so much ahead of them that you of course had all your hopes

17   and dreams, well, that's true that they had so much life that

18   they could have lived.  So it just seems wrong.

19   Q.  What did you have to hang onto given that feeling, that

20   feeling of wrong and that loss, how did you manage to get

21   through that?  What gave you some degree of comfort, if

22   anything?

23   A.  His memories were one thing but his older brother Jake

24   to do our best for him.  He was seven or eight.  He was also in

25   Sandy Hook.  He was in third grade at the time.  And seeing how

26   he was struggling.  So these twin things of making sure that

27   Jake could have the best life for himself and always

1    remembering Dylan, keeping that memory safe.  Keeping that

2    memory for us and keeping that memory for Jake.  It's always

3    ask younger brother.

4        Q.  You're talking about the memory of Dylan, are there

5    certain things that you would say made Dylan who he was for

6    the short time?

7        A.  He had his quirks, autism, struggling with his speech I

8    mentioned.  When he got really really animated and excited he

9    would jump up and down and flap his hands, that's how he kind

10   of got all the energy out.  And he'd jump up and down and flap

11   his hands which was you couldn't help but laugh, it was really

12   cute.  And he certainly was a servant to repetition.  He liked

13   to have an ordered day with specific foods and like to know

14   what is going on so our world would often revolve around him.

15   If we're trying to plan a family trip out, just making sure

16   that Dylan knew where we were going, what we were doing, when

17   we'd be home, would he have his favorite things.

18        So that was made it really weird when he was gone, we

19   didn't have to do that.

20       Q.  And were these the types of memories that you were

21   sharing at the memorial and that others were sharing?

22       A.  Yes.  Yes.  We shared a lot about he loved the color

23   purple.  He would come home from preschool with his big sheet

24   full of purple dots and he loved bouncing on the trampoline.

25   The lawn in England was probably not much bigger then the jury

26   area there so we were happy to move here and have a bit more

27   space and bought a big trampoline.  And the boys used to love

1    bouncing on the trampoline.  They worked out, they didn't need

2    to bounce.  They just they on there and I would jump and they

3    would fly up in the air and I think Dylan could have done that

4    all day if you let him.

5       Q.  And did thinking about Dylan and telling stories about

6    Dylan, remember his existence and his identity, did you find

7    comfort in that as you were trying to deal with the grief of

8    losing him?

9       A.  Yes.  Incredibly.  Like I say I found that to be

10   uplifting to be happy to share the memories and remember him.

11   It's amazing what you can pack into six or seven years.  Yes.

12      Q.  Prior to losing Dylan, have you ever heard of Alex

13   Jones?

14      A.  No.

15      Q.  Had you ever done anything to aggrieved him?

16      A.  No.

17      Q.  Did there come a time when you learned shortly after

18   Dylan's passing that there were something about Dylan never

19   having existed, something about you being an and families

20   being actors and the hoax?

21      A.  We put some of the memorials filmed and we put some of

22   those videos on youtube.  Some of just the video of Dylan that

23   had been created but what others were who spoke or sang and

24   Nicole and mine eulogy we also posted that.  And that started

25   attracting comments about my behavior because I was called out

26   for smiling.  As I said, I was uplifted and happy by it and,

27   you know, as happy as you can be, please don't take that the

34

1    wrong way.  But so I have been attacked for that, how can you

2    be smiling, you know.  I can't remember all the comments that

3    that is what that video started to attract is people saying

4    this must be fake.  He's an actor.  He's smiling.  You're out

5    of character.  All those things started to appear until we took

6    our video down.

7        Q.  Was putting the video up a way of sharing Dylan's

8    memory of the fact that he existed, was that part of the

9    reason you put it up?

10       A.  Yes.  We created a small website, Dylanhockley.com just

11   to be able to then link to those and we wanted to put together

12   captures that memorial as well so we shared the text that the

13   thing that people have read and then there was a link to those

14   videos.  So it was a way to get that out there.

15       Q.  And did the types of things you started to hear force

16   you to change direction?

17       A.  Taking that video down made that stop, that seemed to go

18   away for a while.

19       Q.  So you took the video down because of all these

20   comments?

21       A.  Yes.

22       Q.  And because you took the video down you were not able

23   to share --

24              ATTY. PATTIS:  Objection, leading.

25       Q.  -- and you would put the video up, I think you said to

26   help share who Dylan was and that he existed?

27       A.  Yes.

1    Q.   Then over the next six months, year did you start to

2   hear more and more about this concept that you and the other

3   families were actors, that your children never existed, that

4   there was no deaths at Sandy Hook?

5    A.   It wasn't immediate for me.  One of my first memories

6   that this was going on.  We were warned that Wolfgang Halbig

7   was coming to Newtown and planned to come to the Board of Ed

8   and that was one of my first inklings.

9    Q.   And Wolfgang Halbig, do you know whether or not he was

10   made prominent by Alex Jones?

11    A.   In 2014 when that visit was, I didn't know that, no.

12   That came later.

13    Q.   We talked about, I asked you whether you thought Sandy

14   Hook Elementary School was a toxic waste dump; do you recall

15   that?

16    A.   Yes.

17    Q.   Let me show 19D?

18            THE CLERK:  That is a full exhibit, your Honor.

19            ATTY. PATTIS:  You said B as in boy, sir?

20            THE CLERK:  D as in David.

21            ATTY. PATTIS:  Thank you.

22   (Video played)

23    Q.   Is that Wolfgang Halbig's speaking with Alex Jones to

24   your knowledge?

25    A.   To my knowledge, yes.

26    Q.   Okay.  I take it you didn't become -- did you become a

27   regular Alex Jones follower at that time?

1    A.   No.

2    Q.   So can you describe to the jury Mr. Halbig came to town

3    and describe how that made you more aware of this.

4    A.   I can't remember how the communication came out.  There

5    were maybe it was an e-mail saying that the Board of Education

6    meeting will be attended by Mr. Halbig and that he's

7    investigating Sandy Hook.  My main takeaway was family members,

8    victim family members were advised to just stay away just for

9    whatever reason.  I don't remember what they called it safety

10   or you might be questioned but just best to stay away, so I

11   stayed away.

12   Q.   And this was about in 2014 you said?

13   A.   I believe so.

14   Q.   And had prior to that had you noticed any change in or

15   have you engaged in any changes in your own behavior or

16   curtailed your activities in any way?

17   A.   Not at that point, no.

18   Q.   Okay.

19   A.   No.

20   Q.   Following that and was that the first prominent thing

21   that you recall happening?

22   A.   That was the first one that afar from the comments that

23   were going on the video.

24   Q.   Right.

25   A.   Which, you know, once that was taken down that was

26   solved, that was one of the first.

27   Q.   Are you during this time, are you back at work and can

1    you tell us what your work situation was and whether you got

2    back full time and things like that.

3       A.  IBM was very good and gave me a couple of months leave

4    of absence.  I went back and was given a different role to see

5    if I could get back into work.  I lasted about four months in

6    that, I couldn't keep up.  I mean it's a high pressured

7    business environment I couldn't keep up with it.  I asked for a

8    little more leave of absence, this time without pay to take the

9    summer with Jake and did and then tried to go back to work

10   again in a different role, but now it wasn't I couldn't keep up

11   with the work.  This wasn't a particularly exciting role.  I

12   guess we all like to have fulfillment at work but I started

13   feeling that there was another direction to take and we had

14   started a small foundation or fund for Dylan.  Actually a

15   friend started it a couple of days after, he said, people don't

16   know what to do but money makes things happen and they want to

17   donate money so they're donating money to a fund and in March

18   of 2013, we made that into Dylan's Wings of Change, that's his

19   foundation.  And as I say after that my second failure to be

20   able to get back to IBM I asked for a full year's leave of

21   absence so I could start the work on the foundation and foster

22   the mission there.

23      Q.  So you said the organization that you founded was it in

24   March of 2013?

25      A.  That was really, yes.  That was its inception.  We had a

26   small group of advisors and they said you can give the money to

27   a community foundation and they will run the mission or you

1    could create something yourself, get your tax ID and, you know,

2    recruit a board and start your mission.  So we took the later.

3       Q.  So the initial funding for this what became Dylan's

4    Wings of Change came from the community or from friends or

5    both?

6       A.  People around the world throughout IBM people had heard

7    about the shooting and IBM was impacted and yes, from around

8    the country and around the world people donated.

9       Q.  I'd like to show the jury a little more about this

10   charity you founded or organization or yes or no or?

11      A.  We call it a foundation, technically it's a charity.

12      Q.  A foundation.  And I'm just going to pull up for

13   Mr. Hockley only.  It's marked as ID a homepage of Dylan's

14   Wings of Change, exhibit 539 for ID, is that the homepage for

15   Dylan's Wings of Change?

16      A.  Yes.

17      Q.  Would that be helpful in describing to the jury what

18   the organization is about?

19      A.  Yes.

20      Q.  I'd like to call it up?

21           THE COURT:  Is there an objection, Attorney

22           Pattis?

23           ATTY. PATTIS:  As to timing, Judge, when?

24   BY ATTY. KOSKOFF:

25      Q.  I think March of 2013 was when the organization was

26   started, right?

27      A.  That was when we started it.  This is today's website.

39

1    Q.   When was today's website last, was it substantially

2    changed and if so, when?

3    A.   It was probably overhauled three years ago.

4    Q.   Okay.

5    A.   Maybe reformatted.  Our programs change over time so we

6    have to add new things in.

7         ATTY. PATTIS:  No objection, Judge.

8    Q.   Okay.  If we can, I'd like to go to the -- we have the

9    static PDF image but I'd like to go -- if we can go to the URL

10   it would be preferable, can we do that or no?  Okay.  Just

11   give us a second because I think I want to just show --

12        So this is the homepage of Dylan's Wings for Change?

13   A.   Of Change.

14   Q.   Of Change, I apologize.  And it says using experiential

15   education pedagogues?

16   A.   Pedagogues.

17   Q.   To, hold on one second, sorry.  Using experiential

18   education pedagogues to foster empathy and empower people with

19   the belief that they matter.  Can you describe to the jury, I

20   guess it just scrolls automatically, right?

21   A.   It does.

22   Q.   All right.  Can you just describe to the jury what that

23   means?

24   A.   Yes.  We have a program we founded.  We founded the

25   program in 2015, it's called Wingman and it's one of our

26   programs and experiential education is it's a little different

27   to just traditional education for teacher telling someone

40

1   something.  It uses activities and games people engaging and

2   through those games and play, there are outcomes you have

3   discussions about those outcomes and what we learn about each

4   other because by playing games, we be our genuine self.  So the

5   activities are part of a program to foster connection, people

6   to build trust, respect, ultimately empathy and we use that

7   program in schools for social emotional development.  We use it

8   with corporations for team building, for team building type

9   programs.

10      Q.  In what way, if any, does the foundation reflect the

11   person that Dylan was?

12      A.  Our, he's in our logo.  Our color is purple, his

13   favorite color.  When I'm talking about Wingman, I share about

14   a person who has the qualities of empathy that they can see

15   someone else who is struggling that they can reach out and help

16   that person.  They've got the courage to help another person.

17   And Dylan when I think of it, was a kid who needed everyone to

18   be his Wingman.  If there were people around him who could

19   guide him and advice him, he could be his best self.  And

20   therefore, in the program we talk about being our best self for

21   other people and using Dylan as that example that they could

22   help.  They could help anyone.  It doesn't have to be a person

23   with disabilities.  It's a person who's struggling.  It's a

24   person who's lonely.  It's a person who's been bullied.  That

25   everyone has that power to lift someone over, lift someone else

26   up.

27      Q.  And it looks like, I can't tell what the ages are

1   anymore, they kind of all blend together at some point but

2   what is the age group of the kids that you work with?

3   A.  These are middle schoolers.  We work with high school,

4   elementary school.  We work with all ages and what we love most

5   about Wingman is that we train the students and they lead the

6   program so within their school they are running the activities

7   for the younger peers.  So juniors and sophomores for the

8   freshman, eighth graders with sixth graders.  So it's really

9   about their voice.  It's not about what me as a 50 year old guy

10  thinks what respect is.  It's what they think respect is and

11  how they generate it and how they keep it and how they take

12  care of each other.  That's pretty unique.

13  Q.  Okay.  Let's just scroll through the other picture.

14  Many small changes accumulate with massive effect the flapping

15  of the butterflies' wings might cause a hurricane.  Next.

16      We believe a world headed up by empathetic leaders will

17  act for the good of the planet as citizens, that's one of the

18  core principles?

19  A.  Yes.

20  Q.  Team bonding and trust building workshops unlike

21  anything you've experienced before.  So adults also

22  participate?

23  A.  Absolutely, yes.  Very effective.

24  Q.  And last, we are a community inspired to go above and

25  beyond for others, is that one of the other core principles.

26  A.  Go above and beyond was something we just were attracted

27  to early on and really fits again with the theme of Wingman,

1   that we could go around life just looking after ourself and

2   that's good and that's important but if we can go out and help

3   other people too and that's the go above and beyond piece.

4      Q.  You can take it down.  You talked about specific event

5   what you believe to be around 2014.  Did you become

6   increasingly aware over the last six years and including up

7   till today that there was this thing, this thing about you

8   being an actor and a hoax that Dylan never existed and has it

9   impacted your life from that point on and so how?

10     A.  Okay.  Yes.  It just awareness just seemed to grow.

11  Another spot point for me was when Mr. Pozner was attacked

12  again just someone told me another family member have you heard

13  what happened to Lenny.  So just this growing realization.

14          In 2018 pictures from the memorial was sent to me again,

15  hey, it's party boy Hockley.  The fake parent from Sandy Hook,

16  you know, great photoshop dude.  That one.  And so that

17  restarted and that may have also correlated with me myself

18  starting to talk more publicly as part of the Wingman program,

19  I got schools so I'll be sharing about the program and I guess

20  in 2018, I developed like a talk a keynote a speech to help

21  launch the program, to help communicate the students to help

22  communicate the parents to educators about what the program is

23  so, I was just starting to be more visible and out there.  So

24  that set me in personal professional life and getting this

25  increased awareness that there are attacks coming, you know,

26  messages sent to us or, you know, the potential for attacks,

27  you know, that started to weigh on my mind that, you know, we

43

1    can be sent stuff we can be harassed online.

2         You know, it's that accumulation of all these stories

3    coming up of people coming to Newtown, of attacks on Lenny.

4    This is the accumulation of this is really serious now.  This

5    is not something you just brush off now.  This is really real

6    and this could be really dangerous.

7    Q.  And I'm going to ask you about that in a minute, Ian,

8    and ask your response to that but you mentioned as an example,

9    one of these at least online type of attacks and Instagram I

10   think you said Ian Hockley party boy or something?

11   A.  Yes.

12   Q.  If we could call that exhibit up.

13             THE COURT:  What's the exhibit number?

14             ATTY. KOSKOFF:  ID for Mr. Hockley first.

15             THE COURT:  And what number?

16             ATTY. KOSKOFF:  I'm sorry, your Honor, I turned my

17        back.

18             THE COURT:  I'm sorry, what number?

19             ATTY. KOSKOFF:  I don't know the exhibit number

20        but I will report it most efficiently.  It's

21        exhibit 539 for ID at the moment and as far as it's

22        fine for us to use as a demonstrative but.

23             ATTY. PATTIS:  May we approach, Judge?

24             THE COURT:  You may.

25             (Sidebar conversation begins).

26             ATTY. PATTIS:  Neither were on the exhibit list

27        nor were we given a head's up that they're going to be

44

1        used.  I may or may not have foundation objection.

2             ATTY. KOSKOFF:  It's one of yours from Instagram.

3             ATTY. PATTIS:  I don't tell what it is but I don't

4        know why I didn't see it or have notice of it until he

5        got on the stand.

6             ATTY. KOSKOFF:  Do you want to see it?

7             THE COURT:  Why don't we excuse the jury.

8             ATTY. KOSKOFF:  Sure.

9             ATTY. PATTIS:  Do you want to take a break?  I

10       didn't object on the school thing.  Are there going to

11       be others in 530 series?  Because you can just show it

12       to me and I can deal with it very quickly.

13            ATTY. KOSKOFF:  Why don't we take a break and I

14       can show Mr. Pattis anything that's coming -- it's up

15       to you, Judge.

16            (Sidebar conversation ends.)

17            THE COURT:  All right.  So we're going to address

18       and issue so we figured this would be a great time to

19       take the morning recess.  So it is around 11:12 why

20       don't we come back right at 11:30 sharp.  Ron will

21       collect your notepads.  You'll continue to obey our

22       rules and I will see you then.  Recess.

23            (Whereupon, there was a recess.)

24       *         *         *         *         *

25

26

27

45

```
DKT NO:  X06-UWY-CV18046436-S    :  COMPLEX LITIGATION

ERICA LAFFERTY                   :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  SEPTEMBER 27, 2022


DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S

WILLIAM SHERLACH
V.
ALEX EMRIC JONES
```

C E R T I F I C A T I O N

        I hereby certify the foregoing pages are a true and
correct transcription of my stenographic notes of the
above-referenced case, heard in Superior Court, G.A. 4 of
Waterbury, Connecticut before the Honorable Barbara N. Bellis,
Judge, on September 27th, 2022.

        Dated this 28th day of September, 2022 in Waterbury,
Connecticut.


                    _____
                         Debbie A. Ellis
                    Court Recording Monitor