# EXHIBIT 38

```
X06-UWY-CV18-6046436-S :  SUPERIOR COURT

ERICA LAFFERTY          :  COMPLEX LITIGATION DOCKET

v                       :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES         :  SEPTEMBER 27, 2022
.......................................................
X06-UWY-CV18-6046437-S :  SUPERIOR COURT

WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

v                       :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES         :  SEPTEMBER 27, 2022
.......................................................
X06-UWY-CV18-6046438-S :  SUPERIOR COURT

WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

v                       :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES         :  SEPTEMBER 27, 2022
```

          BEFORE THE HONORABLE BARBARA BELLIS, JUDGE AND JURY

**VOLUME III OF IV**
**WITNESS:  NICOLE HOCKLEY CONTINUED DIRECT AND CROSS VIDEO**
**DEPOSITION OF JOSHUA OWEN UNTIL AFTERNOO RECESS**

A P P E A R A N C E S:


     Representing the Plaintiffs:
         ATTORNEY CHRISTOPHER MATTEI
         ATTORNEY ALINOR STERLING
         ATTORNEY JOSHUA KOSKOFF
         ATTORNEY MATTHEW BLUMENTHAL



     Representing the Defendant:
         ATTORNEY NORMAN PATTIS

                         RECORDED BY:
                         KENDYL HENAGHAN
                         TRANSCRIBED BY:
                         LINDA COON, RPR
                         Court Monitor/Court Reporter
                         400 Grand Street
                         Waterbury, CT   06702

```
1                    THE COURT:  Good afternoon.
2               Please be seated.
3               All right.  So, counsel, I had the opportunity
4      to review what we said on Friday about Mr. Jones'
5      testimony.  Remember from our earlier discussion?
6      And what I said was along the lines of I told you
7      that the defense exercised -- or I told them that the
8      defense exercised it's right not to cross-examine
9      Mr. Jones, and then I reported the defense'
10     expectation that they would call Mr. Jones at the end
11     of next week which would be this week.  So, based on
12     that, do you want to talk to each other and see if
13     you agree that something should be said?
14          ATTY. PATTIS:  Attorney Mattei deferred to me,
15     and so I'll ask for directed verdict.
16               Bad joke.
17               We estimated that Mr. Jones would testify at
18     the end of this week, last week, but we now expect
19     him -- the expectation is he will return to the stand
20     next week.
21          THE COURT:  I mean, I --
22          ATTY. MATTEI:  I don't know that it's necessary,
23     Judge.
24          THE COURT:  Well, when we -- if we -- I was
25     asked to say it in the first place, which I did, and
26     it was really agreed upon language, that's what they
27     expect.  If we are going to change course, I just
```

1          think in fairness to our jury that we just mention

2          the scheduling issue.  I mean, would could also

3          mention -- I think we are also ahead of -- we still

4          remain ahead of schedule.  I can say that, as well,

5          if you would like, that we still remain ahead of

6          schedule in the case, and I will tell you with

7          respect to Mr. Jones' testimony, that the defense

8          expects to call him next week.

9              ATTY. MATTEI:  Would it make -- I'm sorry.  I'm

10         looking at Attorney Pattis, I'll wait.

11             THE COURT:  Well -- Attorney Pattis?

12             ATTY. PATTIS:  No objection to that.

13             ATTY. MATTEI:  Would to make sense to wait until

14         we know whether we are going to do the charge

15         conference Thursday afternoon?  Because that may --

16         you know, that's obviously a scheduling issue as

17         well.

18             THE COURT:  Yeah.  I'll talk to you on a sidebar

19         in that.  I wasn't going to interrupt the witness'

20         testimony with this.

21             ATTY. MATTEI:  Right.

22             THE COURT:  I was thinking after this witness'

23         testimony.

24             ATTY. MATTEI:  Sure.

25             THE COURT:  I'll see you on a sidebar though, if

26         you don't mind.

27             (SIDEBAR).

```
 1            THE COURT:  So, who do you --  who do you have

 2      scheduled for Thursday?

 3            ATTY. KOSKOFF:  We have our plaintiffs.  We

 4      have -- our schedule is fluid, but we have three,

 5      potentially four, plaintiffs, but we think --

 6            THE COURT:  So, how long would it take you?

 7            ATTY. KOSKOFF:  I don't know, Judge, but we

 8      think that even if we have to take some court time to

 9      do the charge conference, it would be better because

10      we are not going to fully finish until Tuesday

11      morning.

12            THE COURT:  So, here is what I tell you.  I'm

13      almost done with the charge now.

14            ATTY. KOSKOFF:  Okay.

15            THE COURT:  And I'm almost done with it, but the

16      worst case scenario, so I want to get it to you not

17      tonight but tomorrow.

18            ATTY. KOSKOFF:  Okay.

19            THE COURT:  I worked on it all weekend.

20            ATTY. KOSKOFF:  We appreciate that.

21            THE COURT:  What I really want you to do was

22      talk to each other first and give me all your agreed

23      upon issues --

24            ATTY. KOSKOFF:  Yeah.

25            THE COURT:  --  first.  Because --

26            ATTY. KOSKOFF:  Yeah.  I hope we can agree on a

27      lot.
```

```
1          THE COURT:  I think you have.  I think you will.
2     There's three --
3          ATTY. KOSKOFF:  There's some complications, Your
4     Honor.
5          THE COURT:  I think you are not going to not
6     agree on some of it.
7          ATTY. KOSKOFF:  Right.
8          THE COURT:  Some of it you'll agree on more
9     where in certain claims --
10         ATTY. KOSKOFF:  That's great.
11         THE COURT:  -- certain language.  Um, but
12    just -- so, I have Friday off because I'm driving to
13    Washington D.C., so I'm going to (INDISCERNIBLE).
14         ATTY. KOSKOFF:  Okay.
15         THE COURT:  (INDISCERNIBLE) if we have some
16    flexibility I would rather --(INDISCERNIBLE) start to
17    do the trial conference --
18         ATTY. KOSKOFF: (INDISCERNIBLE).
19         THE COURT:  -- from 9:00 to 10:00 and then we
20    will do it over lunch --
21         ATTY. KOSKOFF:  Sure.
22         THE COURT:  -- and then we would hit the road.
23    I wasn't going to do that if you have a solid
24    testimony all afternoon, but if you don't, I would
25    like to let --
26         ATTY. PATTIS:  I think we are heading north, so
27    I will do anything to be able to leave earlier
```

1          myself.
2               ATTY. KOSKOFF:  Okay.  So, why don't we do this.
3          Because it's really nightly.  It's very helpful to
4          know that we may have a draft charge from you, Judge.
5               THE COURT:  You will.  You definitely will.
6               ATTY. KOSKOFF:  Okay.  Good.  Then we'll have a
7          better idea as to what -- how many issues there are.
8               THE COURT:  Yeah.
9               ATTY. PATTIS:  And, Judge, will that include a
10         draft jury interrogatory?
11              THE COURT: I haven't gotten to (INDISCERNIBLE).
12              ATTY. PATTIS:  Okay, just asking.
13              THE COURT:  I'm not going to get to this by then
14         (INDISCERNIBLE).
15              ATTY. KOSKOFF:  So, Judge, are you going to be
16         back in town Monday or were you planning on taking
17         Monday?
18              THE COURT:  I have Monday booked.
19              ATTY. KOSKOFF:  Jammed.
20              THE COURT:  So that --
21              ATTY. KOSKOFF:  I have argument I think
22         elsewhere.  So, maybe.
23              Why don't we visit this again once we get the
24         charge and I will talk to.
25              THE COURT:  Why don't we plan on Thursday 9:00
26         to 10:00 --
27              ATTY. KOSKOFF:  Okay.

```
 1              THE COURT:  --  and then 1:00 to 2:00, and end
 2      it.
 3              ATTY. KOSKOFF:  Sounds good.  And end at 2:00?
 4              THE COURT:  Let them go at lunch time and we'll
 5      end at 2:00.
 6              ATTY. PATTIS:  No objection.
 7              THE COURT:  You can go get the jury, Ron.
 8               It's like, I'm not an example of greatest
 9      skier, but I always loved to ski, so when I was
10      young, I would be the last one.  One more run, one
11      more run.  I was that jerk.  Now, my husband and I go
12      skiing, and I can't even make it till lunch now.  We
13      have lunch at 11:00.
14              ATTY. KOSKOFF:  Is it time for hot coco yet?  I
15      know.
16              THE COURT:  So, I'm glad we agreed on something.
17              ATTY. KOSKOFF:  Yeah.
18              THE COURT:  And letting the jury go at --  so,
19      I'll tell them now.
20              ATTY. KOSKOFF:  Maybe we wait until tomorrow.  I
21      would like to talk to Alinor, and to run this by,
22      just make sure I'm not over committing us.  She'll
23      (INDISCERNIBLE).
24              THE COURT:  (INDISCERNIBLE).
25              ATTY. KOSKOFF:  Can we talk?  Can we talk?  Can
26      we just revisit this tomorrow morning when I have
27      just gone over this, everything?  I just don't want
```

```
1          to make a promise that gets us in trouble.
2               THE COURT:  Attorney Pattis --
3               ATTY. KOSKOFF:  I know, you guys have really
4          been --
5               THE COURT:  (INDISCERNIBLE).
6               ATTY. KOSKOFF:  But we may want to stay and
7          continue our (INDISCERNIBLE).
8               THE COURT:  Good luck.
9               ATTY. PATTIS:  Thanks you, Your Honor.
10               (END SIDEBAR).
11               (JURY ENTER).
12               THE COURT:  Welcome back.
13          I hope everybody had a nice lunch break.  I
14          hope you got some fresh air.
15          Counsel will stipulate that the entire panel
16          has returned?
17               ATTY. PATTIS:  Yes.
18               ATTY. MATTEI:  Yes, Your Honor.
19               ATTY. KOSKOFF:  Yes, Your Honor.
20               THE COURT:  All right.  Please be seated,
21          everyone.
22          And just give me one moment to reorganize
23          myself and you can get situated as well.
24          And just as a reminder, you folks have been
25          really great with the breaks.  No one has raised
26          their hand at any time for an additional bathroom
27          break, but at any time if anyone needs a quick
```

1          bathroom break, we can always take a two or three

2          minute break.  You just have to raise your hand.  I

3          won't ask -- I won't even mention who you are, I'll

4          just take a break, so that offer stands throughout

5          your trial.

6               You may resume the stand.

7               Good afternoon.  And just, again, watch your

8          step.

9               Whenever you are ready, Counsel.

10              ATTY. MATTEI:  Thank you, Your Honor.

```
 1   N I C O L E   H O C K L E Y

 2   CONTINUED DIRECT EXAMINATION BY ATTY. MATTEI:

 3       Q    And welcome back, Nicole.

 4              When we left, we had just started talking about

 5   the fall of 2012, and Dylan, and I intended to bring up

 6   picture 322, and I brought up 321 by accident.  I apologize

 7   for that.

 8              ATTY. MATTEI:  If I could bring up 322 now?

 9              I believe this is in full, Attorney Ferraro?

10              THE CLERK:  Yes, it is.

11              THE COURT:  Okay.

12              ATTY. PATTIS:  Agreed.

13       Q    So, who is this young man?

14       A    That's Dylan.  That's D.

15       Q    And do you know when this may have been taken?

16       A    It was -- golly.  I think it was earlier that spring

17   or summer, and it's in that little garden area that's next

18   to what was the old police station in Newtown.

19       Q    Okay.  And who is Dylan's teacher in the fall of

20   2012?

21       A    2012, his teacher was Miss Soto, Vicki.

22       Q    Okay.  And I take it you had a chance to meet and

23   spend time with Vicki?

24       A    Yeah.  A little bit.  You know, at the first

25   parent/teacher conference when you all sit down and you try

26   to cram yourself into the little first grade seats and desks

27   and got to meet Miss Soto then and she talked about what are
```

1    kids could expect that year.  And she was just a very

2    lovely, warm, beautiful, beautiful woman, but also just very

3    warm and engaging.

4        Q    And what about the other folks at the school, you

5    know, who provide support for Dylan?  Who was he working

6    with?

7        A    So, that year for first grade, he was working with

8    Mrs. Ann Marie Murphy who was his special education

9    assistant.  That would be with him in the classroom to help

10   him with his tasks and through any challenges.

11       Q    So, tell the jury what was going on in Dylan's life

12   that fall leading up to December?  What was happening with

13   him, you know, developmentally?  You mentioned that he would

14   have a play date with his friend every now and again, but

15   please share that?

16       A    Yeah.  So, the fall of 2012, he was doing pretty well

17   developmentally.  His speech was coming on.  You know, it

18   was still delayed, but it was definitely coming on.  His

19   handwriting, which Mrs. Murphy really worked hard with him

20   on -- but it was atrocious.  You know, it was be a gigantic

21   scroll across a piece of paper.  Whenever they did art, he

22   would just take purple markers and draw gigantic purple dots

23   so that he came home every single day from school, but we

24   were making a lot of progress on other things as well.  He

25   had very specific routines around food and what he would eat

26   and what he would not eat, and we were working on trying to

27   expand that.  Like, get, you know, something besides just

```
 1   fish sticks and garlic bread into his life.  You know, some
 2   carrots, Red Delicious apples were his favorite.  It had to
 3   be Red Delicious apples.  His six squares of Hershey's
 4   chocolate after every single lunch.  And but we were working
 5   on expanding his range of foods, and we were working with a
 6   lot of auditory stuff.  He would have headphones that he
 7   would listen to different tracks for -- that his therapist
 8   had given him.  So, he was -- I mean, he didn't realize he
 9   was different from everyone else.  You know, he was a very
10   happy boy.  And one of the things that I truly loved the
11   most that I think Ian and I were blessed with, is that he
12   really loved cuddles.  Like, really really, deep deep
13   cuddles.  He was always close.  And for me, even though he
14   was, you know, six, he still liked to be carried and he
15   would just kind of cling on to me like a Koala Bear kind of
16   thing.  But I loved -- I loved that because he was always
17   wanting to sit right next to you, or be right up against
18   you, and be pressing up against.  But he was coming on.  And
19   he played, you know, kickball at Jake's birthday party.
20   Again, he had no idea what he was doing.  The kids would
21   just say, run, and he would run.  He would attend the Cub
22   Scout meetings with Jake and he would just sit there with me
23   and some of the younger siblings of the scouts.  And he
24   just -- he was a happy -- a happy little boy, you know, as
25   six-year olds should be.
26      Q   You said he got six squares of Hershey chocolate for
27   dessert every meal?
```

1      A   Yes.  Yes.  Every -- not breakfast, just lunch and

2  dinner, but it had to be six squares.  That was his treat.

3  He wasn't really into cookies or cakes.  Still have a very

4  fond memory of one of his birthdays, me making him a cake,

5  that he cried when he first tasted it.  And I'm not a great

6  cook but it wasn't that bad.  But, he, you know, that just

7  wasn't his thing.  It had to be Hershey's chocolate bars,

8  the six squares.

9      Q   Because Dylan was so particular about his food, I

10  understand that you all had to started working with him on

11  vitamins?

12      A   Yes, vitamins.  So, one of the things his doctor said

13  because he was so restricted in what he would eat, that a

14  vitamin supplement might be a good idea to insure that he

15  was getting all the nutrients that he needed.  And him being

16  six, I figured it would be impossible to get him to swallow

17  a pill, and I don't think that there were necessarily a lot

18  of chewable aspirins at that point, or I wasn't aware of

19  them, so I got liquid vitamins.  And November into December,

20  we were trying to get him to drink, I think it was like five

21  mil, maybe, out of one of those little paper cups of his

22  vitamins every morning.  And, you know, I tried every flavor

23  under the sun, and he really didn't like it, but he -- he

24  wanted to make me happy, so he would keep trying to finish

25  the vitamins.  And he never did until Friday, 12/14.  That

26  was the first day he ever finished all the vitamins.  He was

27  so proud of himself because he knew that that's what I

1   wanted for him.

2       Q    That was the morning before he got on the bus that

3   day?

4       A    Yes.

5       Q    That morning when you learned that something was

6   happening at the school, you, like all the other families,

7   went to the area; right?

8       A    Yeah.  I --

9       Q    You waited in the firehouse with all the other

10  families?

11      A    I was in the firehouse.

12      Q    Ian mentioned, I think, that maybe that Wednesday,

13  the Wednesday after, was when you had a service for Dylan?

14      A    Yut.  Wednesday, the 19th, at one of the local

15  funeral homes.  He was in his -- a casket by that point.  We

16  thought it was just going to be family and friends --

17          ATTY. PATTIS:  Judge, I'm having a hard time

18      hearing her.

19          THE COURT:  I understand that.

20          THE WITNESS:  I apologize.

21          THE COURT:  If you can just try to keep -- yes,

22      thank you.

23      A    This is hard.

24          Yes.  We had the funeral on Wednesday, the

25  19th.

26      Q    Now, you didn't -- I take it at that time, you didn't

27  know who Alex Jones was?

1      A    On the 19th of December?  No.

2      Q    You weren't aware that on that day, the day of the

3   service for Dylan, Mr. Jones put out a statement accusing

4   Robbie Parker of having been given a card and being told

5   what to say?

6      A    I wasn't aware of that on the 19th of December.  I

7   became aware of that in January.

8      Q    After the services for Dylan, what did you, and Ian,

9   and Jake do to -- how did you spend those next few weeks?

10     A    We got out-of-town.  It was very overwhelming.

11   Everything was happening, and there were so many people

12   wanting to help, and it was -- it was overwhelming me and,

13   you know, we lived kitty-corner across the street from the

14   shooter.  We had all our -- you know, family from England,

15   family from across the country with us in our little rental

16   house.  It was -- it was too much.  And then, you know, it

17   was four days after the shooting was my birthday, and then

18   you had the funeral, and then the memorial, and then

19   Christmas, and trying to pretend that something was normal

20   when none of us had any idea what normal was, it was -- it

21   was just too much.  So, the three of us, Jake, and Ian, and

22   I, we left.  And we -- right after Christmas, I think the

23   day after Christmas, we flew to California and just thought,

24   you know, let's -- let's try to do something just the three

25   of us where we are away from Newtown, we are away from all

26   the noise, and can just focus on us.  And in retrospect, you

27   know, you make stupid decisions.  You know, you don't go to

1     the happiest place on earth when you can't stop crying.  So,

2     it was a hard -- a hard trip, but we were away for a little

3     while and then came back shortly before New Years if I

4     recall correctly.

5          Q    But you were trying to make things normal for Jake?

6          A    For Jake.

7          Q    And when you came back in January, you didn't want to

8     go back to the house?

9          A    No.

10         Q    So, this was was Ian was talking about, some friends

11    who were out-of-town for the winter, let you use their

12    house?

13         A    Yeah.  It was a friend of a friend.  They were --

14    they were snow birding.  They were retired and living in

15    Florida during the winter, so their house was empty, and

16    they allowed us to borrow it.

17         Q    And when you came back in January, is this when you

18    first started to pick up on these lies that were circulating

19    about the shooting, about you, and Dylan?

20         A    Yeah.  I remember that that house, then -- I call it

21    the transition house.  I remember sitting -- I had my

22    computer set up on the dining room table.  And I certainly

23    wasn't looking for lies about Sandy Hook, I was looking for

24    information.  It was the first time I had gone online and

25    started looking, you know -- I wanted to learn about the

26    other families, I wanted to learn about what was going on

27    and, instead, I found the comment section of a lot of

1    articles and started to see horrible things being said.  The

2    first one that I clearly remember is, our comments about

3    Robbie Parker and his video statement.  I saw his video.  I

4    never saw the full statement for a long time, but I saw

5    those first few seconds and all the horrible things that

6    people were saying about Robbie and crisis actors, and then

7    started to see the same things levied at Ian from our

8    memorial video, and then just broadly that the whole thing

9    was a hoax and that we were all actors.  And you just --

10   you start going down the rabbit hole on comments.  And this

11   would keep me up at night just reading these things and

12   responding to them.

13   Q   So, you would -- you would see comments with some of

14   the news coverage around Sandy Hook and you would respond to

15   these people who were posting this?

16   A   Yeah.  Because what they were saying was so

17   ridiculous, you know, that this was all a hoax, that Dylan

18   didn't exist, that none of this had happened.  So, that's --

19   I couldn't understand it.  I was incredulous that anyone

20   would even think -- how -- why -- what sane person, what

21   reasonable person would ever think that this was a hoax.

22   So, I would respond in my own name and say, no, my son was

23   killed there, this really happened.  My surviving son was

24   there that day too.  This -- you know, I would respond, and

25   that was the wrong thing to do.

26   Q   Did you know in early January, Alex Jones had

27   featured this lie about there being crisis actors involved?

1    A    I had not been aware of -- you know, I probably came

2  across Alex Jones before I knew who Alex Jones was, because

3  I -- I'd lived in England for 18 years.  I wasn't aware of

4  his personality.  I wasn't aware of a lot of American

5  culture, elements like that.  So, if I came across him at

6  all, it would have been in clips, it would have been in

7  reference, but he wouldn't have popped out as the instigator

8  of a lot of this, but I felt the impact of what he was doing

9  from his followers.

10    Q    Did there come a point where the comments that you

11  were reading started to reach you directly?

12    A    Yes.

13    Q    And did there come a point when they escalated in

14  what you viewed as their seriousness?

15    A    Yes.  And I hid a lot of this from Ian.  It was very

16  targeted comments.  There were direct messages, e-mails,

17  phone calls to my friends looking for me.  I received mail

18  at the house which I would tend to get to before Ian would

19  get home from work.  Mail -- let's see.  I got sent pictures

20  of dead kids because I was told that as a crisis actor, I

21  didn't really know what a dead kid looked like so this is

22  what it should look like.  I got mail saying that, you know,

23  F Dylan and F you.  We are going to extend an RIP greeting

24  to you, and in parenthesis RIP was "rot in pieces".  I got a

25  mail -- a piece of mail telling me to slit my wrists before

26  they did it for me, and a lot of other, just, hoax or crisis

27  actress, you know, your son never lived, your son never

1    died.  I got mail about the fact that I put on weight after

2    12-14, and that, you know, that was because I was guilty so

3    I was eating myself to get rid of my guilt.  I was living

4    rich off of payouts for being a crisis actress, and that's

5    why I put on weight.  There were some absurd ones too, but

6    it was -- it was -- it was very scary.

7        Q    This mail was coming to your residence?

8        A    The new house we bought after the transition house.

9        Q    So, then, in March?

10       A    There was a phone call.  Someone was looking for me

11   in March of 2013, and because we didn't have a landline at

12   that point, because we weren't in the rental anymore, they

13   had gotten a copy of the Sandy Hook School Student Directory

14   and were calling parents in Jake's classroom to try to get

15   my contact details.

16       Q    Were you here for Bill Aldenberg's testimony?

17       A    Yes.

18       Q    Do you recall his testimony that beginning in

19   January, he was supervising a woman named Ashley Hall?

20       A    Yes.

21       Q    And that for the next 18 months while Ashley Hall was

22   in that child -- all she did was respond to complaints of

23   threats and harassment against the families?

24       A    Yes.

25       Q    Do you know Ashley Hall?

26       A    I think I only met her once, but I certainly

27   corresponded with her a lot.

```
 1            ATTY. MATTEI:  Can we bring up for Nicole,
 2       please, and counsel, Exhibit 531, please?
 3            ATTY. PATTIS:  I'm sorry, sir?
 4            ATTY. MATTEI:  531.
 5            ATTY. PATTIS:  Thank you.
 6            THE CLERK:  That is not a full exhibit.
 7   Q    Do you have that in front of you, Nicole?
 8   A    Yes.
 9   Q    Is 531 correspondence between you and Ashley Hall,
10   concerning the issue you were just describing where somebody
11   was going through the Sandy Hook directory to try and get
12   ahold of you?
13   A    Yes.
14   Q    Did Miss Hall respond to you?
15   A    She did.
16            ATTY. MATTEI:  And if we can also pull up 530
17       just for Nicole, counsel, and the Court, please?
18   Q    This is a subsequent e-mail exchange between you and
19   Miss Hall the following month in April?
20   A    Correct.
21   Q    In which she is informing you that the individual you
22   had complained about, had been arrested; correct?
23   A    Yes.
24            ATTY. MATTEI:  Your Honor, I would offer both
25       531 and 530.
26            ATTY. PATTIS:  Hearsay, foundation, relevance.
27            ATTY. MATTEI:  I'm not offering it --  I think
```

1          I've laid the foundation.  We are not offering this

2          for the truth of it, to show the way in which Miss

3          Hockley, and the FBI were dealing with complaints

4          directed at her.

5               ATTY. PATTIS:  That is the truth, Judge.

6               THE COURT:  All right.  I'll overrule the

7          objection.

8               ATTY. MATTEI:  So, let's pull up 531, please,

9          first, and we'll pull up the bottom portion.  The

10         e-mail from Nicole to Miss Hall.

11              No, no, no.  I'm sorry.

12              THE WITNESS:  That's my friend.

13              ATTY. MATTEI:  Yeah.  That one there.  Thank

14         you.

15    Q    Okay.  So, this is -- you see this e-mail, Nicole,

16    from you to Miss Hall?

17    A    Yes.

18    Q    Miss Hall was the victim specialist for the FBI in

19    Connecticut?

20    A    Yes.

21    Q    And did you understand that to the extend that you

22    were having -- you or your family were having any

23    threatening or concerning interactions with people who are

24    claiming that you were an actress, or that Sandy Hook was a

25    hoax, that you could report that to her?

26    A    Yes.

27    Q    And, here, this is just three, three and a half

1    months after your son's death?

2        A    Yes.

3        Q    And you advised Miss Hall that your friend had been

4    telephoned by somebody and you just described for the jury

5    how your phone had been disconnected and this person was

6    looking for some alternative way to get ahold of you?

7        A    Correct.

8        Q    You said that you had to send an e-mail to the rest

9    of Jake's classmates parents to warn them, and to ask them

10   not to engage in conversation with this man, but send you

11   details so that you can forward them to the FBI; correct?

12       A    Yes.

13       Q    And if you would go down, you could see, yesterday,

14   this gentleman had he mailed you twice via Dylan's Fund

15   website, right?  That's the website that Ian had described

16   as being set up to basically be the start of Dylan's Wings

17   of Change; yes?

18       A    Yes.

19       Q    You've Googled him, and he's a hoaxer.  He also makes

20   very disturbing TWEETS suggesting people go kill themselves,

21   get cancer, or be shot; right?

22       A    Yes.

23       Q    And let's go up to the top here, to Miss Hall's

24   response.  For some reason, this guy's name rings a bell.  I

25   will certainly pass this along to the agents and see if

26   there is anything they could do.  I recently met with

27   Facebook, and will also forward this information to them as

1    well.

2              ATTY. MATTEI:  You could take that down.

3        Q    And, Nicole, beginning in 2013, and continuing

4    onward, was this the type of thing that you would be dealing

5    with and which you were trying to get assistance from the

6    FBI?

7        A    Yes.  The harassment, the comments, the threats

8    continued to escalate throughout 2013 and '14 in particular.

9        Q    And before we get to that, Nicole, because I do want

10   to bring up for the jury since we mentioned it, 530.

11   Because, on this particular occasion, the gentleman had

12   reported on April 11th, if you go to the bottom, Miss Hall

13   advises you that he had been arrested on harassment and

14   stalking; yes?

15       A    Yes.

16       Q    And after you thank her, she says, absolutely.  Let's

17   hope this starts the momentum; right?

18       A    Yes.

19       Q    You understood that to mean that she was hoping that

20   through some of this action, they could start to stem this

21   tied of attacks against you and the other families; correct?

22       A    That's how I understood it.

23       Q    But they didn't stop, did they?

24       A    No.  They did not stop.

25       Q    Did there come a point where as a result of the

26   threatening communications you were receiving, you -- you

27   started to become a concerned for your own life?

1    A    Yes.

2    Q    Why?

3    A    Because they could be anywhere, and I had no way

4    to -- no real means to protect myself, and I was very scared

5    that one of them would go from just sending mail or

6    comments, to actually acting out on things that they said

7    they were going to do.

8    Q    Did you do anything to try to make sure that if this

9    did happen, that your son Jake would be taken care of?

10   A    Yeah.  I took out a really large life insurance

11   policy on me so that if they got to me, he will be okay --

12   financially okay.

13   Q    Are you still paying that premium for that policy?

14   A    I am still paying that premium.

15   Q    And you think you took this out in 2013?

16   A    I took to out in 2013.

17   Q    During this, let's say, two year period in 2013 into

18   2015, in addition to grieving for Dylan and dealing with all

19   of this, you and Ian started to drift apart?

20   A    Yeah.  We -- we just grieved very differently and

21   it -- we just lost the ability to communicate with each

22   other.

23   Q    You mentioned earlier that one of the things that you

24   had come across in January was a claim that, like Robbie,

25   Ian was an actor because he had been caught smiling at your

26   son's memorial; is that right?

27   A    Yes.

1    Q    And did you -- what did you observe of Ian's reaction

2    to that allegation against him?

3    A    I'm not sure we ever really talked about it.  I mean,

4    I took the video down from YouTube.  You know, I had started

5    off by just deleting the comments whenever they came up, and

6    there were just too many so I took it down. I -- I don't --

7    I don't think we ever really talked about this, because I

8    was trying to protect him from it.

9    Q    When you and Ian separated and divorced, you had

10   stayed in the home that you had purchased in March of 2013,

11   but eventually you moved into a new home?

12   A    Yes.

13   Q    When would that have been?

14   A    I moved in around March of 2017.  I lived in the

15   house for one more year after our divorce was finalized.

16   Q    And even through the whole divorce and even now, you

17   and Ian are -- you co-parent Jake and you are both very

18   involved in his life?

19   A    Oh my gosh, yeah.  There has been -- and we don't

20   dislike each other.  We just couldn't find our way back.

21   And he's still someone that I care for, he's my friend, and

22   we both prioritize Jake.  There has been too much pain, why

23   on earth would we ever do anything to hurt Jake?

24   Q    When you moved into this new house, you were going to

25   be alone and Jake --

26   A    Yes.

27   Q    -- was with you?  Did you take any measures to

1    insure that the home was secure, and safe, from people who

2    might be after you?

3    A   Yes.  Especially now as a single mom, I purposefully

4    bought a house that is in a very quiet cul-de-sac that you

5    don't come in or out of it unless you live there.  I bought

6    a house that is purposefully exposed, so you can't get near

7    my house without someone else in the neighborhood seeing you

8    from any angle.  I have security lights through out the

9    whole exterior of the house.  I have a security system.

10   Even so, you know, I never leave the car unlocked in the

11   driveway or even if I'm just returning the grocery cart, I

12   lock the door.  The house is very secure and I can monitor

13   anything that enters or exits it.

14   Q   Are you aware, as you go through life now, of the

15   risk that you faced just by being out in the world?  How

16   does that -- how does that affect you?  What do you do?

17   A   It affects me more than I let show most of the time,

18   because it is a constant fear.  I can't stop living, so I

19   still have to go out and do things, and go to events, and

20   help spread my work.  But I can't -- I'm always conscious of

21   who is around me.  I mean, I've even had moments of anxiety

22   in this courtroom if there are people sitting behind me that

23   I don't know.  It's -- it's a constant fear of checking the

24   back seat before I get into the car even though it's been

25   locked.  If a car has been behind me for too long, if I'm

26   driving home, and I know that I live in a secluded

27   neighborhood, I'll -- I'll call my boyfriend and be on the

1   phone with him while I just circle the blocks until the

2   person there leaves because I'm that afraid that they are

3   around all the time.  But I take precautions that I can, but

4   I can't stop -- I'm not going to just seclude myself in my

5   home and never live, but I have to be ultra-aware at all

6   times.

7        Q   Tell the jury what you keep next to your bedside?

8        A   I, um -- I have weapons in my bedroom.  I have a

9   baseball bat, I have several knives, and a can of mace.

10       Q   You would never think to have any of that before all

11  of this -- these lies started, would you?

12       A   No.  But there are definitely times that I've taken

13  that baseball bat to bed with me because of -- a couple of

14  weeks ago there was a power outage, and my first thought is,

15  someone has cut the line.

16       Q   Okay.  And let's just take a look at what's still

17  going on.

18           ATTY. MATTEI:  This is Exhibit 532, Your Honor,

19       for ID.

20       Q   Do you have it in front of you, Nicole?

21       A   Not yet.  Yes.  Yes.

22       Q   Can you just identify that?

23       A   That was a message sent to me through Facebook

24  Messenger.

25       Q   When?

26       A   The first one was August 23rd, then August 24th,

27  28th, and September 6th.

1    Q   Of this year?

2    A   Yes.

3    Q   September 6th, a week before this trial started?

4    A   Correct.

5            ATTY. MATTEI:  I would offer it, Your Honor.

6            ATTY. PATTIS:  No Objection, Judge.

7            THE COURT:  Full exhibit.

8    Q   And, Nicole, I take it that this is just one example

9    of the type of stuff that you receive what, on a daily,

10   weekly, basis?

11   A   In terms of Direct Messages to me, they are not daily

12   anymore, but there is not a day that goes by that there

13   isn't a comment made about Sandy Hook hoax and crisis

14   actors.

15   Q   And, here, the first question you are asked here is,

16   "hi, are you related to Sandy Hook Promise page"; right?

17   A   Yeah.

18   Q   And we are going to talk about Sandy Hook Promise in

19   a minute.

20           And, then, as it goes down, there is this

21   diagram here that says, Sandy Hoax; right?

22   A   Yes.

23   Q   And it's showing all of you, or a number of you,

24   deplaning from Airforce One; is that right?

25   A   Yes.

26   Q   And you are referred to as an actor; yes?

27   A   Yes.

1    Q    Neil Heslin lost his son Jesse, and he's referred to

2    as a felon; correct?

3    A    Yes.  Yes.

4    Q    Bill Sherlach, who's wife, Mary, was killed, referred

5    to there as a fraud; correct?

6    A    Yes.

7    Q    The President of the United States, referred to as a

8    CIA Muppet; yes?

9    A    Yes.

10    Q    David Wheeler referred to as a movie actor?

11    A    Yes.

12    Q    And then if we go down, it says, is that really you?

13    And then in September it says, seriously, how do you sleep

14    at night?

15    A    Yes.  And I don't know what the YouTube video is

16    because I never clicked on the link.

17              ATTY. MATTEI:  Okay.  You can back out of that.

18    Q    And, Nicole, you mentioned that one of the things

19    that you are committed to doing is continuing your work.

20    What's your work?

21    A    I lead an organization called Sandy Hook Promise.

22    Q    And what is Sandy Hook Promise?

23    A    Sandy Hook Promise is a national nonprofit,

24    completely non-partisan, that's focused on educating kids

25    how to recognize when someone might be in crisis and need

26    help, and teach them to be in that standard, intervene

27    before something bad happens.

1    Q    So, the idea is you want kids who are around other

2    kids, to be able to tell when one of those other kids might

3    be in crisis?

4    A    Correct.

5    Q    Because you want to be able to equip those children

6    with the tools to intervene if something wrong was

7    happening?

8    A    Yes.  At the one end, we teach them how to reach out

9    to someone who is alone and create connection and inclusion,

10   ,and at the other end when someone is threatening self-harm

11   or harm to someone else, we teach them how to say something

12   and get help for that person.

13   Q    And as part of Sandy Hook Promise's work, is there

14   also a focus on keeping children safe in other ways?

15   A    It's all focused on kids and keeping them safe.  So,

16   it's safety from bullying, through substance abuse, dating

17   violence, all the way to suicide and homicide.

18   Q    And last thing I want it talk to you about is your

19   son Jake.  How old is Jake now?

20   A    He's 18 now.

21   Q    And can you share with the jury the concerns you have

22   for him in connection with these lies that have now been

23   going on for close to ten years?

24   A    I've tried to.  In the same way, I hid a lot from

25   Ian, I tried to, as a mom would, not show my son these

26   things.  He's very tech savvy, but he never talked about it,

27   I didn't bring it up.  And I overheard him in his room in

1    2017, and that's when I first became aware that he was aware

2    of Jones and his followers, because he mentioned him by

3    name, and he was upset, talking to his friend.  And we've

4    had conversations about that since.  He doesn't understand

5    why people would think such a thing because he was there.  I

6    mean, Dylan was his brother, and he was there that day.

7    Jake was there.  He heard everything.  He saw things.  He --

8    that's part of his lived experience.  And we talked a lot

9    about how to react if one of these people ever approached

10   him in real life because I get really scared about that.

11   Um, but as a young man, he won't know the right choice to

12   make if he's approached and that, because what that might do

13   to him in terms of making him angry that someone is

14   questioning his own life, questioning the life and death of

15   his brother, his parents.  And, you know, he tries to play

16   the tough guy, but he's not tough, he's 18.  And that is my

17   biggest fear, is that this is my life for the rest of my

18   life.  I know my son lived, I know what happened that day, I

19   will figure that out, but this is the rest of his life too,

20   and I don't know if he knows how to cope with that.  And I

21   --  I don't know if you can hurt me anymore, but I am

22   terrified that someone will hurt my son.

23        Q    Because they believe he's a fraud too?

24        A    Yes.

25             ATTY. MATTEI:  Thank you, Your Honor.

26             Nothing further.

27             THE COURT:  Cross-examination, Attorney Pattis?

```
 1              ATTY. PATTIS:  Thank you, Judge.
 2    CROSS-EXAMINATION BY ATTY. PATTIS:
 3        Q    Good afternoon, Miss Hockley.
 4              I'm Norm Pattis.  I think I observed a
 5    deposition that someone took of you?
 6        A    You were on the phone --  you were on the phone for
 7    it.
 8        Q    I just have very few questions.
 9              Do you know Eric Sanstrum?
10        A    I have no idea who we is.
11        Q    That's the fellow who sent you the e-mail, or the
12    electronic communication, are you related to Sandy Hook
13    Promise; correct?
14        A    He sent me a Facebook messenger.
15        Q    And then he asked you, seriously, how do you sleep
16    night; correct?
17        A    Yes.
18        Q    You mentioned the life insurance premium.  What are
19    the premiums?  How much?  Do you know?
20        A    At the moment, it's $126 a month.
21        Q    Now, you were shown an exhibit after communication
22    with Ashley Hall about a person, man or woman arrested for
23    harassing or stalking.  Do you know whether it was a man or
24    a woman?
25        A    It was a man.
26        Q    Did you ever attend a court proceeding and give your
27    input in to what should become --
```

```
1      A    No, I just gave it to Ashley.

2      Q    Was anyone else, to your knowledge, ever arrested for

3   harassing or stalking you?

4      A    For harassing or stalking me?

5      Q    Correct.

6      A    Not that I'm aware of.

7      Q    Has anyone ever approached you and threatened you

8   into violence face to face?

9      A    Not face to face.

10     Q    You mentioned that, home, in your bedroom, you keep a

11  baseball bat, several knives, and a can of mace?

12     A    Correct.

13     Q    Why no gun?

14     A    I just haven't decided to do that yet.

15     Q    Fair to say that the death of your son, Dylan,

16  changed your attitude toward gun violence?

17     A    I didn't even know what gun violence was before then.

18  I lived in England 18 years.  You don't have guns there.

19     Q    You wrote a piece in 2021.  I was apathetic about gun

20  violence until my six-year old son was killed; correct?

21     A    Correct.

22     Q    At any point prior to attending trial, had you become

23  aware of whether Alex Jones had an issue towards guns or the

24  Second Amendment?

25     A    The truth is, I probably had seen stuff over the

26  years, but I never really linked it until this trial until

27  your opening statement.
```

1    Q    So, you never thought, for example, the work of Sandy

2    Hook Promises might benefit from this trial in any way

3    directly or indirectly?

4    A    Absolutely not.  In no way.

5    Q    And you remain actively involved in Sandy Hook

6    Promise?

7    A    It's my full-time job.

8    Q    How long have you been full-time employee with Sandy

9    Hook Promise?

10   A    Since March, 2013.

11   Q    And have you offered testimony to legislative bodies

12   on the topic of gun violence and gun safety?

13   A    I have written testimony around school safety, mental

14   health, and gun violence prevention.

15   Q    And you became aware of Mr. Jones, I believe, in

16   January, 2013?

17   A    No.  I became aware of the claims against Robbie

18   Parker in January, 2013.

19   Q    Okay.  But not of Mr. Jones?

20   A    Not as I could name him, no.

21   Q    When do you first think you became aware that there

22   was a person named Alex Jones that you could name?

23   A    Around 2014 or '15.

24   Q    And what -- and not at all during 13?

25   A    He would have just been another name.  I had no idea

26   who he was.

27   Q    So you couldn't associate any name or a case number

1    with him in 2013?

2         A    Not at that time.

3         Q    In 14 you became aware that he was a person who was

4    referring to you as a crisis actress?

5         A    Correct.

6         Q    And denying that your son lived?

7         A    Yes.

8         Q    And that was deeply hurtful?

9         A    Yes.

10        Q    And devastating?

11        A    To think that anyone would think that Dylan didn't

12   live is devastating.

13        Q    You say, why would anyone in their right mind say

14   that?

15        A    Correct.

16        Q    Why would they do this?

17        A    Yes?

18        Q    Still don't know?

19        A    I have theories, but I don't know.

20        Q    What are they?

21             ATTY. MATTEI:  Objection, Your Honor.

22             Relevance.

23             ATTY. PATTIS:  Bias.

24             THE COURT:  I'll allow it.

25        A    I tried to explain to Jake when he asked why would

26   people think this.  My answer to him, was that it's too

27   horrific for people to consider the idea of children being

1    killed.  That even in movies or other mass culture, children

2    are taboo.  You don't commit violence against children.  And

3    I said to him, I think that there is just people that can't

4    get their heads around the fact that this genuinely

5    happened.

6        Q    Is Alex Jones one of those people in your view?

7        A    No.  I think -- I don't think he thinks, necessarily,

8    about what he's saying and how it harms people when he does

9    it.

10       Q    You were present in this trial throughout, I think

11   most days?

12       A    Yes.  I've been here every day.

13       Q    And you've seen the exhibits that were offered?

14       A    Yes.

15       Q    Including an exhibit of Alex saying that on the very

16   day of the shooting, they are coming, they are coming, they

17   are coming, they are coming for our guns?

18       A    Yes.

19       Q    Did you see him?

20            And you associate that as you sit here today

21   with his having a point of view about guns and gun safety?

22       A    The first time I saw that video was in this

23   courtroom.

24       Q    That's not my question.  Do you associate that, as

25   you sit here today, with his having a view about guns and

26   gun safety?

27       A    I believe that he is sharing what he thinks he should

1   be sharing on his show about his view on guns and gun safety

2   for his base.

3       Q   I'll repeat the question.  Do you believe, as you sit

4   here today, that he has a point of view about guns and gun

5   safety?

6       A   I don't know his personal view, I only know what he

7   says.  So, I don't know.

8       Q   So, you watched the video but you just can't tell?

9       A   I don't know if he's giving a script or his own

10  personal views.

11      Q   In either case, is it fair to say that he's

12  associated with a view  that's antithetical to yours?

13      A   Not antithetical, no.  I mean.  Let me try to

14  understand your question.  Do I believe they are coming,

15  they are coming, they are coming?  No.

16      Q   So, you were aware of Mr. Jones in 2014 in that he

17  held deeply hurtful --  well, he was expressing a deeply

18  hurtful point of view to you; correct?

19      A   He was saying lies, yes.

20      Q   In '15 he was saying those lies?

21      A   Yes.

22      Q   In '16 he was saying those lies?

23      A   Not sure about '16.

24      Q   '17 he was saying those lies?

25      A   '17, I think he tried to retract and back off, but it

26  was saying he was sorry while doubling down on things don't

27  look right.

1    Q   Why you do you say that?  What did you know --  what

2    did you observe to reach that conclusion?

3    A   I watched his interview with Megyn Kelley.

4    Q   And did that change your view about Mr. Jones?

5    A   No.  I already had a view on Mr. Jones.

6    Q   So, he tried to offer an apology, but he doubled down

7    in the course of the interview, is that what you are saying?

8    A   In my opinion, yes.

9    Q   Have you ever reached out to Mr. Jones?

10    A   No.

11    Q   Ever sent him -- had you ever offered -- well, other

12    than this lawsuit, have you attempted to make contact with

13    him?

14    A   No.

15    Q   Do you know whether he's ever used your name?

16    A   Haven't looked.  I don't know.

17    Q   You are not curious?

18    A   Whenever he says Sandy Hook parents, he's referring

19    to me as well.

20    Q   I appreciate that's your view?

21    A   That is my absolute opinion.

22    ATTY. PATTIS:  Thank you.

23    THE COURT:  Attorney Mattei, anything further?

24    ATTY. MATTEI:  Nothing further, Your Honor.

25    THE COURT:  All right.  You may step down.

26    Just watch your step and take your time.

27    ATTY. MATTEI:  Your Honor, may we just have a

```
1          couple minutes to -- maybe just 30 seconds to kind of
2          figure out what's next?
3               THE COURT:  Take your time.  That's fine.
4               ATTY. MATTEI:  Okay.  Thanks.
5               Your Honor, we do have a deposition to play.
6          Before we do, may we have just a quick sidebar?
7               THE COURT:  Absolutely.
8               ATTY. MATTEI:  Thank you.
9               (SIDEBAR).
10              THE COURT:  I think this is what I'll mention
11         (INDISCERNIBLE) on Mr. Jones.
12              ATTY. PATTIS:  I beg your pardon?
13              THE COURT:  This is what I'll mention
14         (INDISCERNIBLE).
15              ATTY. PATTIS: Oh, yeah.  (INDISCERNIBLE) I
16         couldn't remember again.
17              ATTY. MATTEI:  Do that at the end of the day not
18         now.  Okay, thank you.
19              THE COURT:  Can you remind me?
20              ATTY. PATTIS:  Yes.
21              So, Attorney Pattis reminded me earlier that
22         we had -- you had planned to give me instruction on
23         depositions to disregard any objections.
24              THE COURT:  I did.
25              ATTY. PATTIS:  Okay.  I didn't hear it in the
26         last one.  My attention may have lapsed.
27              THE COURT:  (INDISCERNIBLE) first time because
```

1          you told me that (INDISCERNIBLE).

2                  ATTY. MATTEI:  There were no objections in that

3          one, you are right.  I think there may be in this

4          one, but I'm not positive.  It doesn't hurt to just

5          remind them.

6                  ATTY. PATTIS:  Yeah.  I didn't hear it and I

7          mentioned it to Attorney Mattei.

8                  THE COURT:  (INDISCERNIBLE).

9                  ATTY. PATTIS:  I remember that one, but.

10                 ATTY. KOSKOFF:  I think just a heads up.  I

11         think after this, I'm going to ask for a break, and

12         then we've got one more plaintiff, and that will take

13         us to the end of the day.

14                 THE COURT: (INDISCERNIBLE).

15                 ATTY. KOSKOFF:  Right, right, right.  But after

16         this void yo is what I'm saying.

17                 THE COURT:  Just remind me (INDISCERNIBLE).

18                 ATTY. PATTIS:  Okay.

19                  (END SIDEBAR).

20                 THE COURT:  Okay.  This is video deposition

21         testimony.

22                 ATTY. MATTEI:  This is a video deposition, yeah.

23                 THE COURT:  Okay.  So, again, if I may, you are

24         going to hear, again, the testimony of a witness

25         recorded under oath at an earlier time.  And, again,

26         your role as jurors in assessing testimony presented

27         in this manner is no different than if the witness

1      were here in court to testify, and you should pay

2      careful attention as the video taped testimony is

3      played.  You should not make any adverse inference

4      from the fact that the witness was not present in

5      person to testify but rather you should consider this

6      testimony in the same way that you consider all the

7      other evidence in this trial.

8           Finally, should there be any objections, you

9      should disregard any objection that you hear which

10     means that you may consider the answer and all the

11     testimony.

12          ATTY. MATTEI:  Thank you, Your Honor.

13          And, at this time, the plaintiffs would present

14     the testimony of former Infowars employee, Joshua

15     Owens.

16          (VIDEO PLAYED)

17          THE COURT:  Can I pause it for a moment?

18          (VIDEO PAUSED).

19          THE COURT:  Thank you.  Can I have a sidebar?

20          (SIDEBAR).

21          THE COURT:  (INDISCERNIBLE). Is there not a

22     transcript to go along we could read it?  I don't

23     know if we could hear. I'm having a hard time.

24          ATTY. MATTEI:  We don't have a transcript.

25     These are designations, and so they are, you know,

26     excerpts of the transcript.  We are not playing the

27     entire deposition, obviously, so we don't have a

```
1          transcript prepared for this.

2               THE COURT:  (INDISCERNIBLE).

3               ATTY. MATTEI:  What's the story with the audio

4          here?

5               THE COURT:  It's Zoom.

6               ATTY. MATTEI:  It's just Zoom.  It's just Zoom,

7          that's what it is.  They were in different locations,

8          so, it's like, it's just --

9               THE COURT:  Can I tell them --  I just --  I

10         can't even understand this one.

11              ATTY. MATTEI:  What we can do is --

12              THE COURT:  Put substitute.

13              ATTY. MATTEI:  -- play it and prepare a

14         deposition transcript just for this to present to

15         them.

16              ATTY. PATTIS:  No objection.

17              THE COURT:  I think --

18              ATTY. PATTIS:  No objection.

19              THE COURT:  Okay.  So I'm going to tell them --

20         (INDISCERNIBLE).

21              ATTY. PATTIS:  Don't tell them until after this

22         they've listened because then they stop listening and

23         we have to read.  But we will also have --

24              THE COURT:  He's just so tinny.

25              ATTY. PATTIS:  How much time is this going to

26         take?

27              ATTY. MATTEI:  I think it's about 20 minutes
```

```
 1            ATTY. PATTIS:  Oh. It's going to be a long
 2       20 minutes.
 3            ATTY. MATTEI:  This is what happens when
 4       somebody else does the depositions, Judge.
 5            ATTY. PATTIS:  Who did this one (INDISCERNIBLE)?
 6            THE COURT:  Does it make more sense to you, when
 7       I do the -- (INDISCERNIBLE).
 8            ATTY. MATTEI:  Let's just see how it goes.
 9            ATTY. PATTIS:  I mean, I can hear it.  It just
10       takes any kind of work to hear it.
11            VOICE:  It's an effort.
12            THE COURT:  That's a lot of effort.
13            VOICE:   Okay.  (INDISCERNIBLE).
14            VOICE:  We are not ready for this right now, I
15       think, let's just see if we can get through this.
16            THE COURT:  All right.  Can we start over again?
17            ATTY. MATTIE:  Yes.
18            (END SIDEBAR).
19            THE COURT:  I've asked counsel to start the
20       video from the start so that we can listen carefully.
21       I recognize that it might be a little difficult to
22       hear some of it, but you just do the best.
23            (VIDEO PLAYED JOSHUA OWENS).
24            (VIDEO PAUSED).
25            ATTY. MATTEI:  Brief technical difficulty, Your
26       Honor.
27            THE COURT:  Absolutely.  Take your time.
```

```
 1          ATTY. MATTEI:  Your Honor, so that -- it appears
 2      that the deposition was cut off right before
 3      Mr. Owen's last answer, but as we discussed at
 4      sidebar, we are going to prepare a transcript of
 5      this.
 6          THE COURT:  All right.
 7          ATTY. MATTEI:  So, that if anybody had any
 8      difficulty hearing, that will be available to the
 9      jury.
10          THE COURT:  Right.  So, I asked the lawyers in
11      that last sidebar, when it started, I had a little
12      difficulty hearing some of it, and I asked them if
13      they would prepare a transcript of what you just
14      listened to and file it as an exhibit.  So, they
15      will do that, and it will get that last question and
16      answer in, as well as everything else that you heard.
17      So, those of you who might have had a little
18      difficulty, will have that transcript available.
19          So, this will be the time that we take our
20      afternoon recess.  It's just about 3:15.  So, we'll
21      be back at 3:35 for our next witness.
22          Ron will collect the notepads.
23          You'll continue to follow the rules.
24          And I will have my friend here hold the door
25      for me.
26          Attorney Ferraro.
27          THE CLERK:  He's closer to the door.
```

1            THE COURT:  Yeah.  Okay.  We'll take a recess.

2        (AFTERNOON RECESS).

```
 1    X06-UWY-CV18-6046436-S :   SUPERIOR COURT

 2    ERICA LAFFERTY         :   COMPLEX LITIGATION DOCKET

 3    v                      :   AT WATERBURY, CONNECTICUT

 4    ALEX EMRIC JONES        :  SEPTEMBER 27, 2022
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 5    X06-UWY-CV18-6046437-S :   SUPERIOR COURT

 6    WILLIAM SHERLACH       :   COMPLEX LITIGATION DOCKET

 7    v                      :   AT WATERBURY, CONNECTICUT

 8    ALEX EMRIC JONES       :   SEPTEMBER 27, 2022
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 9    X06-UWY-CV18-6046438-S :   SUPERIOR COURT

10    WILLIAM SHERLACH       :   COMPLEX LITIGATION DOCKET

11    v                      :   AT WATERBURY, CONNECTICUT

12    ALEX EMRIC JONES       :   SEPTEMBER 27, 2022
```

13                    C E R T I F I C A T E

14

15        I, Linda A. Coon, hereby certify that this is a true

16    and accurate transcription of the above-referenced case,

17    heard in Superior Court, Judicial District of Waterbury,

18    Connecticut, before the Honorable Barbara N. Bellis, on this

19    27th day of September, 2022.

20

21        Dated this 27th day of September, 2022, in Waterbury,

22    Connecticut.

23

24

25                    Linda A. Coon,  RPR
                      Court Monitor/ Court Reporter

26

27

```
 1    X06-UWY-CV18-6046436-S :   SUPERIOR COURT
      ERICA LAFFERTY         :   COMPLEX LITIGATION DOCKET
 2
      v                      :   AT WATERBURY, CONNECTICUT
 3
      ALEX EMRIC JONES        :   SEPTEMBER 27, 2022
 4    ...........................................................
      X06-UWY-CV18-6046437-S :   SUPERIOR COURT
 5
      WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET
 6
      v                      :   AT WATERBURY, CONNECTICUT
 7
      ALEX EMRIC JONES        :   SEPTEMBER 27, 2022
 8    ...........................................................
      X06-UWY-CV18-6046438-S :   SUPERIOR COURT
 9
      WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET
10
      v                      :   AT WATERBURY, CONNECTICUT
11
      ALEX EMRIC JONES        :   SEPTEMBER 27, 2022
12

13          E L E C T R O N I C    C E R T I F I C A T E

14

15        I, Linda A. Coon, hereby certify that this is a true

16    and accurate electronic version of the above-referenced

17    case, heard in Superior Court, Judicial District of

18    Waterbury, Connecticut, before the Honorable Barbara N.

19    Bellis, on this 27th day of September, 2022.

20

21        Dated this 27th day of September, 2022, in Waterbury,

22    Connecticut.

23

24

25                         Linda A. Coon,  RPR
                           Court Monitor/ Court Reporter
26

27
```