# EXHIBIT 43

```
DKT NO: X06-UWY-CV186046436-S      :  COMPLEX LITIGATION DKT

ERICA V. LAFFERTY                  :  JUDICIAL DISTRICT WATERBURY

v.                                 :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                   :  OCTOBER 4, 2022


DOCKET NO: X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S

WILLIAM SHERLACH

v.

ALEX EMERIC JONES
```

**P.M. SESSION**
**VOLUME 3 OF 3**

BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE,
AND A JURY


A P P E A R A N C E S:


   Representing the Plaintiff(s):

      ATTORNEY CHRISTOPHER MATTEI
      ATTORNEY JOSHUA KOSKOFF
      ATTORNEY MATTHEW BLUMENTHAL
      ATTORNEY ALINOR STERLING


   Representing Defendant(s):

      ATTORNEY NORMAN PATTIS


                          Recorded By:
                          Kendyl Henaghan

                          Transcribed By:
                          Kendyl Henaghan
                          Court Recording Monitor
                          Waterbury Superior Court
                          300 Grand Street
                          Waterbury, Connecticut 06702

1          (RETUEN FROM AFTERNOON RECESS)

2          THE COURT: Good afternoon, please be seated.

3          ATTY. KOSKOFF: Good afternoon, Your Honor.

4          THE COURT: All right, so, I'm told that someone

5     pulled the fire alarm in the garage, and I plan on

6     just telling that – telling the Jury that so they're

7     not left wondering; any objection?

8          ATTY. MATTEI: None.

9          ATTY. PATTIS: Nope.

10         ATTY. KOSKOFF: Your Honor, I just want to thank

11    the Court and the Marshal's for doing such a calm and

12    professional job of getting us out.

13         THE COURT: Well, you beat me to; so, I was gonna

14    do that in front of the Jury – I wish I had had the –

15    I don't take my phone out here with me,

16    obviously . . .

17         ATTY. KOSKOFF: Right.

18         THE COURT: . . . I wish I had filmed how

19    professionally the Marshal's did their jobs – one

20    attach themselves to the Jury, and the other ones

21    attach themselves to you folks . . .

22         ATTY. KOSKOFF: Really excellent.

23         THE COURT: . . . and it doesn't get any better

24    than that.

25         ATTY. KOSKOFF: And it made – and I just want to

26    say, it made – it did make a difference to the

27    families; because obviously this is a very nerve-

1     wracking situation – something like this.

2          THE COURT: Yes, thank you; and I was gonna say

3     that in front of the Jury, but – I will.

4          ATTY. KOSKOFF: Sorry, just – you can still do

5     it, Judge, they didn't know I said it.

6          THE COURT: But I know this, I'm gonna commend

7     him, our one Juror who always holds the door; held

8     that door the whole time for everyone to file out –

9     didn't stop him.

10          Okay, Ron.

11          THE CLERK: All set? (indiscernible) stand?

12          THE COURT: Um . . .

13          THE CLERK: Or do you want to address it

14     (phonetic) first?

15          THE COURT: No, he can come back on the stand

16     now, if he wants, or he can wait – whatever you're

17     most comfortable with.

18          (WITNESS MARK BARDEN TAKES STAND)

19          THE COURT: And obviously, help yourself to the

20     water, there, if you want it.

21          MR. BARDEN: Thank you, I will.

22               (JURY ENTERS COURTROOM)

23          THE COURT: Okay everybody, welcome back. That's

24     one way to take the afternoon recess.

25          Please be seated, counsel will stipulate that

26     our entire Panel is back.

27          ATTY. PATTIS: Yes, Your Honor.

1          THE COURT: So, I – please be seated. So, I told

2     the attorney's already, and I'll tell you now – that

3     was simply – someone pulled the fire alarm in the

4     parking garage – in the outdoor parking garage. So,

5     you were – everyone was safe and sound the whole

6     time.

7          I did want to commend our Marshal's and staff,

8     in front of you, because – and I said, I wish I had –

9     I don't take my camera on the bench, I wish I had; I

10     would of filmed how they handled it so

11     professionally. I know one of the Marshal's

12     immediately escorted you all and Mr. Ferraro went

13     with you; and the other Marshal's took care of

14     everyone else – and of course, our door holder over

15     there, through the whole alarm blaring, held that

16     door until you all were out and our staff was out.

17          So, we have some special people in this

18     courtroom.

19          THE CLERK: Of course, Your Honor, we'd have to

20     admonish you if you did film in the courtroom.

21          THE COURT: Oh, that's true (indiscernable), so,

22     it's a good thing my phone wasn't out here.

23          ATTY. KOSKOFF: Thank you, Your Honor

24          THE COURT: All right, so, I think we're ready to

25     resume.

26          ATTY. KOSKOFF: Thank you - and the families join

27     in that commendation of the staff – not staff, but

1     our guardians here.

2          I think that were trying to figure out - when

3     the alarm went off - wait, where did we leave off;

4     and I think we figured it out, Mark.

5          I think you were explain to the Jury about the

6     dynamic in the household between you, and Jackie, and

7     Natalie; and what it was like - just give us a flavor

8     of what it was like to have - you know, Daniel's

9     older-brother and sister, and having to care for them

10    while you were being attacked from all these

11    different - in all these different ways from - you

12    know, what was going on with these lies.

13         MR. BARDEN: It nearly broke us, to be quite

14    honest with you; because managing the shooting-murder

15    of your seven-year-old, in his classroom, is about

16    all we could manage, and to provide love and normalcy

17    for James and Natalie.

18         Then to have to manage and navigate this attack

19    from unknown forces out there, in world - that seemed

20    to be increasing and getting darker, and more ominus,

21    and menacing - I didn't know how to do it; it was - I

22    didn't know how to do it.

23         First and foremost, my job is always been to

24    protect my family - in normal times. I did not know

25    how to try to navigate this - this grief and horror

26    of our child's murder with his siblings, and then

27    have to figure out what was going on with this

1    harassment and death threats that was coming from the

2    outside.

3        We kind of – not really consciously, but

4    realized that our family had evolved into this kind

5    of system of protecting each other, it wasn't just

6    me. As we just learned, our little Natalie had

7    learned of one of the letters that came to our

8    mailbox; that said they were going to dig up Daniel's

9    grave.

10        Daniel's grave – I don't know, but I don't think

11    that James and Natalie have been there yet. It's –

12    well, it's just too hard, first of all – Jackie and I

13    have only been there a handful of times. I go there

14    sometimes on my own, privately, and I don't share

15    that with them. It's a very hard thing to do; I'm

16    kind of caught between honoring him and needing to go

17    there, but then it's just so hard to go see your

18    seven-year-old child's headstone.

19        To hear – and so, this is so sacrosanct and

20    hallowed a place for my family, and to hear that

21    people were desecrating it, and urinating on it, and

22    threatening to dig it up – I don't know how to

23    articulate to you what that feels like, but that's

24    where we are.

25        ATTY. KOSKOFF: You have managed to continue to

26    raise James and Natalie, and also establish quite a

27    foundation for – in honor of Daniel, is that right?

1          MR. BARDEN: Yes, we . . .

2          ATTY. KOSKOFF: We heard from Nicole (phonetic)

3     about Sandy Hook Promise . . .

4          MR. BARDEN: Yeah.

5          ATTY. KOSKOFF: . . . and you were one of the co-

6     founders.

7          MR. BARDEN: Yeah, and just to your earlier

8     point, we are so, so proud of who James and Natalie

9     have become. They've just – wonderful, amazing,

10    beautiful kids, and they deserve to live a normal

11    life.

12         So, what we do at Sandy Hook Promise, is – quite

13    literally, is to prevent other families from having

14    to navigate this and having to endure this kind of

15    pain. It is a national non-profit school safety,

16    violence prevention organization – and we're doing

17    just that.

18         We have prevented eleven school shootings now. I

19    think we can confirm that 361 lives have been saved

20    by students who are trained in our programs – who

21    have observed at-risk behavior in themselves or in

22    peers and have gotten help to them before it became a

23    tragedy.

24         Hundreds of suicides have been averted – we're

25    very proud of that – and I feel it's a very

26    appropriate way to honor Daniel; who was that kid who

27    looked out for everybody. He was gonna go on to do

1  great things, and he can't – it was taken from him.

2  So, this is our way of honoring his life.

3       ATTY. KOSKOFF: I have to ask you – we're gonna

4  do something pretty difficult right now; so we're

5  just preparing you and the Jury.

6       MR. BARDEN: Something more difficult, really?

7       ATTY. KOSKOFF: Yes.

8       You were here during opening statements, I

9  believe?

10      MR. BARDEN: I've been here every day, but last

11 Tuesday – which was Daniel's seventeenth birthday.

12      ATTY. KOSKOFF: You heard Mr. Jones, through his

13 lawyer, argue that you, along with everybody else -

14 these families, are in fact, exaggerating your

15 damages, "for political reasons", because he –

16 meaning Alex Jones, disagrees with your point of

17 view. Did you hear that?

18      MR. BARDEN: Yeah.

19      ATTY. KOSKOFF: So, we can't sugar-coat this. So,

20 if it's okay - I know it's tough, but I'd like to

21 show the Jury first – said that there was a

22 performance of your children, a band, and you – tell

23 us about the band.

24      MR. BARDEN: Oh, yeah, okay. You mean the – yeah.

25 So, just – almost exactly 10 years ago, it was

26 September 30, 2012, Jackie's Father – the patriarch

27 of the family – and I'd really, pretty much adopted

1     myself into my wife's family; and her Father, the

2     patriarch, was turning ninety – last Fall. As Jackie

3     mentioned, he's now turning one-hundred – and bless

4     his heart.

5         But lest (phonetic) – but this video that

6     Attorney Koskoff is referencing was, we put together

7     our little family band to honor Papa on his ninetieth

8     birthday. The family from Ireland came over, we had a

9     big gathering for him on the honor of his nintieth

10    birthday, and we played one of his favorite songs,

11    "What a Wonderful World".

12        Natalie sang, James played bass, and Daniel

13    played the drums – and I think it was his first gig,

14    and he kept really good time; but, yeah, the family

15    has recorded that.

16        ATTY. KOSKOFF: And just – we're gonna show the

17    video, but there are other videos of Daniel singing

18    on your – this YouTube page?

19        MR. BARDEN: Yeah, we used to host an open mic at

20    one of the restaurants that I used to play in; we

21    would host an open mic for kids. James, and Natalie,

22    and Jackie were there just to watch, and out of the

23    middle of nowhere, Daniel said,

24        *I want to go up and sing what I'm singing in*

25    *kindergarten."*

26        So, he came up and sang '*Mr. Sun, Mr. Golden*

27    *Sun'*, and we have that preserved on video, as well.

1        ATTY. KOSKOFF: I think that the Jury got the

2     idea, but to show (indiscernible), and I don't mean

3     to . . .

4        MR. BARDEN: No, it's . . .

5        ATTY. KOSKOFF: So . . .

6        MR. BARDEN: . . . fine.

7        ATTY. KOSKOFF: . . . why don't we show 590,

8     'What a Wonderful World' – actually, give me one

9     second, Your Honor.

10       Now we – sorry.

11          (EXHIBIT 590 PRESENTED)

12       THE CLERK: I'm sorry, before we move on,

13    counsel, just for the record there's no objection to

14    that exhibit.

15       ATTY. PATTIS: Um, not now, no.

16       THE CLERK: Thank you.

17       ATTY. KOSKOFF: I'd like to offer 565 - let me

18    back-up actually; that video – that beautiful video

19    was on YouTube at the time of Daniel's death, right?

20       MR. BARDEN: Yes.

21       ATTY. KOSKOFF: I'd like to offer 565, YouTube

22    comments, eight-years ago; and I'd offer it for full.

23       ATTY. PATTIS: No objection, Judge.

24       ATTY. KOSKOFF: Can we pull it up?

25          (EXHIBIT 565 PRESENTED)

26       ATTY. KOSKOFF: "I see blue and red lights

27    flashing outside the door – their door arresting the

1      *Barden's for fraud."*

2            That was a comment left eight-years ago?

3            MR. BARDEN: Yeah.

4            ATTY. KOSKOFF: 566, eight years ago.

5                  (EXHIBIT 566 PRESENTED)

6            ATTY. KOSKOFF: *My only question is, who do you*

7      *serve, Barden Family? God sees all. Sure, I'm scared*

8      *for our country, but I'm even more worried about the*

9      *souls of the corrupt. Do yourself a favor and confess*

10     *your misdeeds."*

11           Did I read that correctly?

12           MR. BARDEN: That's correct.

13           ATTY. KOSKOFF: 567, for a full exhibit.

14                 (EXHIBIT 567 PRESENTED)

15           ATTY. KOSKOFF: Sorry (phonetic), three-years ago

16     now, 567, bottom –

17           And this is the other video you were talking

18     about, by the way, Mark? The video of Daniel singing?

19           MR. BARDEN: That was, *'Mr. Sun, Mr. Golden Sun'*,

20     yeah.

21           THE COURT: Is this a full exhibit?

22           ATTY. KOSKOFF: I'm offering it, yes.

23           ATTY. PATTIS: Yes.

24           ATTY. KOSKOFF: *"LOL, this is so fake. They don't*

25     *even remember what year their son died in."*

26           Did I read that correctly?

27           MR. BARDEN: Yes.

1          ATTY. KOSKOFF: 568, seven-years ago.

2              (EXHIBIT 568 PRESENTED)

3          ATTY. KOSKOFF: *"You couldn't possibly support a*

4      *family on that guitar playing, dude. The whole thing*

5      *is as phony as a $3.00 bill. Such a coincidence that*

6      *so many of these parents are wannabe musicians and*

7      *wanna be actors. 'Our kids died so please (phonetic)*

8      *give us all money' LOL."*

9          Seven-years ago – did I read that correctly?

10          MR. BARDEN: Yes.

11          ATTY. KOSKOFF: 569, two-years ago, offered as a

12      full exhibit.

13          ATTY. PATTIS: No objection to any in this

14      series, Judge.

15          ATTY. KOSKOFF: Okay, put up . . .

16              (EXHIBIT 569 PRESENTED)

17          ATTY. KOSKOFF: You have a nice comment here, and

18      then right under it, two-years ago,

19          *"What a sick charade."*

20          Did I read that correctly?

21          MR. BARDEN: Yes.

22          ATTY. KOSKOFF: 570, four-years ago; I offer it

23      as a full exhibit.

24              (EXHIBIT 570 PRESENTED)

25          ATTY. KOSKOFF: "Mark Barden, why was your buddy

26      Robert Parker smiling and laughing live on TV after

27      his daughter was murdered?"

1        Did I read that correctly?

2        MR. BARDEN: Yes.

3        ATTY. KOSKOFF: 571, seven-years ago.

4            (EXHIBIT 571 PRESENTED)

5        ATTY. KOSKOFF: It's a picture of you and the

6        family - is this on your YouTube, or is this *What*

7        *Would Daniel Do'*?

8        MR. BARDEN: That's on the – that was from the

9        *'What Would Daniel Do'* Facebook page.

10       ATTY. KOSKOFF: And that's a picture of you, and

11       Jackie, and the three kids, right?

12       MR. BARDEN: Yes, correct.

13       ATTY. KOSKOFF: Seven-years ago,

14        *"Major photo editing in these pics. Try asking*

15       *why the length of James Barden's arm defies the laws*

16       *of physics in its length at 0:20 . . ."*

17       Evidently this must have been a video.

18       MR. BARDEN: Probably, yeah.

19       ATTY. KOSKOFF: So, the twenty-second mark,

20       somebody noticed – made a comment,

21        *". . . Barden's arm defies the laws of physics*

22       *at twenty? And where has Daniel's heel disappeared to*

23       *at 0:26? I wonder how James feels about his childhood*

24       *vid being made into his imaginary brothers."*

25       Did I read that correctly?

26       MR. BARDEN: Yes.

27       ATTY. KOSKOFF: What's *'Safe Say Something, a*

1          *Vision for Safer Schools'*?

2               MR. BARDEN: What are you referring to?

3               ATTY. KOSKOFF: Bring it up, 572.

4               THE COURT: And am I correct, Attorney Pattis, no

5          objection to this one (phonetic)?

6               ATTY. PATTIS: Yes, Judge.

7                    (EXHIBIT 572 PRESENTED)

8               MR. BARDEN: Oh . . .

9               ATTY. KOSKOFF: Do you recognize that?

10              MR. BARDEN: Yes.

11              ATTY. KOSKOFF: What is that?

12              MR. BARDEN: It's an anonymous reporting system

13         in – that we operate in the State of Pennsylvania.

14              ATTY. KOSKOFF: Okay, can we go to the comment

15         three-weeks ago – by the way, when did you see this?

16         When did you pull (phonetic) this?

17              MR. BARDEN: Oh, just probably last week, I found

18         it.

19              ATTY. KOSKOFF: Okay, so, it's within this last

20         month?

21              MR. BARDEN: Yeah.

22              ATTY. KOSKOFF: While the – well, either while

23         the case was going on or shortly before, is that your

24         understanding?

25              MR. BARDEN: Yes, yes.

26              ATTY. KOSKOFF: "*FEMA L-366, look that document*

27         *up because this lying DHS-owed swamp liar, Mark*

1    *Barden, has continually profited off of the lie that*

2    *his child was murdered at a decommissioned elementary*

3    *school . . ."*

4         Did you see the video in court of Alex Jones

5    talking about the school being a toxic waste dump and

6    being closed?

7         MR. BARDEN: I did, yes.

8         ATTY. KOSKOFF: *". . . at a decommissioned*

9    *elementary school that had been closed since 2008 and*

10   *was only being used for storage. I've printed out the*

11   *actual property tax documents for the Newtown area*

12   *that clearly prove that nearly every homeowner, such*

13   *as Gene Rosen, Nicole Hockley . . ."* -

14        Who's here in this courtroom,

15        *". . . Scarlett Lewis and Mark Barden*

16   *Was bribed in the form of a forgiven home mortgage on*

17   *Christmas Day, 2009, one year after the home – one*

18   *year after the school had been decommissioned and*

19   *closed due to the school being contaminated with mold*

20   *and other biohazards, and was only being used for*

21   *storage."*

22        Was Sandy Hook Elementary School a beautiful

23   school?

24        MR. BARDEN: Yes.

25        ATTY. KOSKOFF: Was it a clean school?

26        MR. BARDEN: Yes.

27        ATTY. KOSKOFF: Was (phonetic) there a lot of

1      school pride there?

2          MR. BARDEN: Very much; I was in that school a

3      lot, as a stay-at-home Dad, I was in there reading,

4      doing projects with the kids – I was in that school a

5      lot, and it was fully functioning, right up until the

6      shooting, and it was a beautiful little place.

7          ATTY. KOSKOFF: *"Homeland security used younger*

8      *photos of older children as 'victim' propaganda. How*

9      *do I know they were older? I compared the photos to*

10     *the children singing behind Jennifer Hudson at the*

11     *Superbowl just over a month later. One child seen*

12     *there might have been just a coincidence, but not*

13     *eight of them, and to this day, the Newtown School*

14     *Board has denied sending said children to the*

15     *Superbowl. None of these 'parents' lost a child. Mark*

16     *Barden and the rest of these players are DHS-owned*

17     *for life. There is an old saying that says that it's*

18     *just easier to fool the people than to convince them*

19     *that they have been fooled. The Sandy Hook Promise*

20     *organization is a confirmed fraud, stemming from a*

21     *government fabricated event that was produced as gun*

22     *control propaganda. Obiden knows . . ."* -

23          I guess that's a play on President Biden . . .

24          ATTY. PATTIS: Objection, Judge.

25          THE COURT: Sustained.

26          ATTY. KOSKOFF: Sorry, I'll just read it,

27          *"Obiden knows these are drills, along with*

1       *Obama, Obama played us all with these drills-gone-*

2       *live in the media as soon as he was elected. The*

3       *media are in the loop that these events are drills,*

4       *that's why the media were in Newtown on the 13th."*

5       Would the 13th of been the day before the

6   shooting?

7       MR. BARDEN: Yes.

8       ATTY. KOSKOFF: 576, I offer as a full exhibit –

9   I guess I'll just state the names or the numbers from

10   here on in, as I understand they're all in.

11         (EXHIBIT 576 PRESENTED)

12       ATTY. KOSKOFF: Three-months ago, this is a – you

13   see – oh, this is the picture that the Jury saw, is

14   it not? Or maybe – Daniel kissing you on the cheek?

15       MR. BARDEN: Yeah.

16       ATTY. KOSKOFF: Somebody actually says,

17       *"Horrible what happened . . ."* –

18       Which obviously, you would agree with,

19       *". . . they were paid actors, every single one*

20   *of them. They even photoshopped pictures, they*

21   *admitted this, wake the f up."*

22       Did I read that correctly?

23       MR. BARDEN: Yes.

24       ATTY. KOSKOFF: 577.

25         (EXHIBIT 577 PRESENTED)

26       ATTY. KOSKOFF: Not a single – sorry, I'll slow

27   down a little bit.

1          Five-years ago,

2          "Not a single tear, not even a wet eye. A parent

3     losing a precious six or seven-year-old would have

4     hot salty tears at the thought of them. Period."

5          And that – did I read that currently?

6          MR. BARDEN: Yes.

7          ATTY. KOSKOFF: And that has 22-Likes, right? Is

8     that what that is?

9          MR. BARDEN: I can't see the Likes.

10          ATTY. KOSKOFF: Can you – maybe you can see them

11     now.

12          MR. BARDEN: That is 22-Likes, correct.

13          ATTY. KOSKOFF: Do you know that Alex Jones

14     brought a lawsuit against *The Young Turks* for

15     something that had 20-Likes? Did you know that?

16          MR. BARDEN: Yes, we learned that in the hearing.

17          ATTY. KOSKOFF: And this single instant, in your

18     – five-years ago, had 22-Likes, is that right?

19          MR. BARDEN: That's correct.

20          ATTY. KOSKOFF: And that wasn't true, was it?

21          MR. BARDEN: No.

22          ATTY. KOSKOFF: And that's a slanderous thing to

23     say, isn't it?

24          ATTY. PATTIS: Objection, Judge.

25          THE COURT: Sustained.

26          ATTY. KOSKOFF: Anyway, let me move on.

27          578, eight-years ago.

1                   (EXHIBIT 578 PRESENTED)

2       ATTY. KOSKOFF: *"Adam Lanza is a fictitious*

3       *character; he is made up of the smallest of spare*

4       *parts. Those players with real faces whom have*

5       *offered their services for a few pieces of silver*

6       *will eventually be silenced forever. There can be no*

7       *other way."*

8       Did I read that correctly?

9       MR. BARDEN: Yes, you did.

10       ATTY. KOSKOFF: 579, one-year ago.

11               (EXHIBIT 579 PRESENTED)

12       *"Jackie joins Carlee Soto and Jillian Soto as*

13       *911 callers, pretending to be 'teachers in the*

14       *school'. What a goofy, shady, hoax."*

15       Did I read that correctly?

16       MR. BARDEN: Yes.

17       ATTY. KOSKOFF: Eight-years ago,

18       *"When have you ever seen a bunch of grieving*

19       *parents give interviews about their dead child with*

20       *smiles on their faces? Especially just a few days*

21       *after the event?"*

22       Did I read that correctly?

23       MR. BARDEN: Yes.

24       ATTY. KOSKOFF: 580, two-years ago - I think you

25       may have seen this before (indiscernible).

26              (EXHIBIT 580 PRESENTED)

27       *"Total hoax, his mom was caller number one on*

1       *the Sandy Hook 911 calls, proving it was staged."*

2       Did I read that correctly?

3       MR. BARDEN: Yes.

4       ATTY. KOSKOFF: That's a picture of you and

5       Jackie with a framed picture of who?

6       MR. BARDEN: Of Daniel.

7       ATTY. KOSKOFF: That you chose for that photo?

8       MR. BARDEN: Yeah, that's a - Jackie, with her

9       Irish heritage, would take the kids out of school on

10      St. Patrick's Day and we'd go to the parade in New

11      York; and that's Daniel in the New York City subway -

12      and that's that picture.

13      ATTY. KOSKOFF: *"Total hoax, his mom was caller*

14      *number one on the Sandy Hook 911 calls, proving it*

15      *was staged."*

16      Was Jackie a caller?

17      MR. BARDEN: No, she was not.

18      ATTY. KOSKOFF: You can take it down.

19      Mark, Jackie told us that you've been a

20      different person since this all happened?

21      MR. BARDEN: Yes.

22      ATTY. KOSKOFF: And she said you're - you go into

23      grocery stores and you look around and you . . .

24      ATTY. PATTIS: Objection, leading, Judge.

25      THE COURT: Sustained.

26      ATTY. KOSKOFF: Well, can you describe, for the

27      Jury, what this does - what this has done to your

1    feelings of security and safety for yourself and your

2    family?

3         MR. BARDEN: Yes, over time in this time period –

4    having to navigate all of these things and much more

5    – that you have just seen, I have developed a layer

6    of constant hypervigilance, and it's exhausting. It

7    interferes with your sleep, it interferes with your

8    conscious, it interferes with your thinking, your

9    ability to process.

10        As Jackie testified earlier, we're grocery

11   shopping, and I'm looking at the faces and who we're

12   in the room with – why are they looking at us like

13   that, who is this person - instead of focusing on

14   grocery shopping with Jackie.

15        One of the security protocols we've installed at

16   our house are motion sensor lights, and I have

17   amotion sensor light right outside our bedroom window

18   - so that I know when something sets it off, in my

19   sleep. I get up to the – I get up in the middle of

20   night several times and walk around – look out the

21   windows, look at the driveway, everything is locked –

22   Natalie used to say,

23        "Daddy, the three L's before bed."

24        And that's lights, locks, 'larm.

25        ATTY. KOSKOFF: 'Larm?

26        MR. BARDEN: And that's – and as Jackie said, I'm

27   constantly observing the cars going around. I hear a

1    car coming up the road, I stop and I look down my

2    driveway, 'Who is that?'. It's just- it's constant

3    hypervigilance – who is watching us, what are they

4    thinking, what's coming next; and it's exhausting.

5         ATTY. KOSKOFF: The word hypervigilance, is that

6    a psychiatric word?

7         MR. BARDEN: I don't know where it comes from.

8         ATTY. PATTIS: Objection, Judge.

9         THE COURT: Sustained.

10        ATTY. KOSKOFF: Do you know – all right.

11        What is it like to have to be in your home and

12   have that level of awareness?

13        MR. BARDEN: It's exhausting, and as we've heard

14   others testify, we feel the same way. We are so

15   concerned for our children, that they have to – that

16   this life has been forced upon them now. They have to

17   be thinking about this, they have to be looking over

18   their shoulder all the time – who's gonna say what,

19   who's gonna call them a fraud or a liar or an actor?

20        It's – it becomes who you are. You're constantly

21   thinking about having to defend against that –

22   defending your honor, your integrity, and defend our

23   little Daniel's honor, and his memory, and his life,

24   and his death.

25        It's constant, and everything that we have to

26   hold onto, to preserve Daniel's memory – our little

27   home-movies, and our pictures, and our thoughts, and

1    our memories have all been compromised. It's all been

2    taken away from us.

3        All of our abilities to hold onto Daniel's

4    memory, and to cherish him, and to honor him has been

5    – has been tarnished with toxic hate and lies and

6    danger, and –

7        I kinda went off, I'm sorry, it's . . .

8        ATTY. KOSKOFF: It's all right.

9        MR. BARDEN: Yes, I've changed. I'm not the

10   happy, grateful, Dad, guitar-player – I still play

11   guitar, but I'm not that same person that used to

12   just enjoy walking around the block with my kids.

13       ATTY. KOSKOFF: And do you have fear for your

14   personal safety and the safety of your family?

15       MR. BARDEN: Yeah, yes.

16       ATTY. KOSKOFF: Does a day go by that you don't

17   have that fear?

18       ATTY. PATTIS: Objection, Judge.

19       THE COURT: Sustained.

20       ATTY. KOSKOFF: How often – can you tell the Jury

21   about, how often?

22       MR. BARDEN: All the time, it's constant – it's

23   literally constant. I watch the cars, I follow cars

24   into my neighborhood and wonder who they are, wonder

25   who's stopping, I'm thinking of protocols – if

26   there's a car in my driveway, what am I gonna do? If

27   somebody comes to the house, how do I handle that?

1    It's constant.

2        ATTY. KOSKOFF: The - I have to ask you a

3    technical question, which is that - you mentioned

4    that you added home security and motion sensor

5    lights, and was that something that you - do you

6    share finances with your wife?

7        MR. BARDEN: Well, Jackie does all the finances

8    in our family, and yes, we - Jackie and I both bear

9    the financial burden of the security cameras, and the

10   lights, and alarms - the three L's - all of the stuff

11   that we have to do now, we share them.

12       ATTY. KOSKOFF: And you put those in because of

13   these threats, these . . .

14       ATTY. PATTIS: Objection.

15       THE COURT: Sustained.

16       ATTY. KOSKOFF: For what reason have you put

17   those in?

18       MR. BARDEN: We put in all of these systems to

19   try to feel safe, to try to make our children feel

20   safe. Jackie mentioned before, it is heartbreaking to

21   learn that our daughter feels safer at somebody

22   else's house, than in her own bed; safer at school,

23   than at home.

24       So, we were just trying to put in some kind of

25   systems, some kind of protocols and procedures to

26   hopefully make all of us feel safer, but mostly for

27   our kids.

1      ATTY. KOSKOFF: Thank you, Mark.

2      MR. BARDEN: Thank you.

3      ATTY. PATTIS: No questions, Judge.

4      THE COURT: All right, sir, you may step down,

5   please watch your step.

6         (WITNESS MARK BARDEN STEPS DOWN)

7      THE CLERK: Your Honor, I have just one question,

8   I did not catch where he stopped in that series.

9      ATTY. KOSKOFF: 580.

10      THE CLERK: Five-eight-zero?

11      ATTY. KOSKOFF: (indiscernible), I think 580.

12      ATTY. PATTIS: Yes.

13      THE COURT: Can I have a side bar with counsel?

14         (SIDE BAR BEGINS)

15      ATTY. MATTEI: Does that say ten-of-four?

16      THE COURT: I can't (indiscernible).

17      ATTY. MATTEI: I think it's ten-of-four.

18      THE COURT: I don't know why they would have a

19   white clock on a white wall.

20      ATTY. MATTEI: I know.

21      ATTY. PATTIS: I can't hear you.

22      THE COURT: I said I don't know why they would

23   have a white clock on a wall – for the first two-

24   weeks I didn't even know there was a clock.

25      ATTY. KOSKOFF: (indiscernible).

26      THE COURT: Okay, I didn't even know there was a

27   clock there.

1    ATTY. MATTEI: Do you wanna know the plan?

2    THE COURT: I beg your pardon?

3    ATTY. MATTEI: Do you wanna know the plan?

4    THE COURT: Yeah, what – do you have an agreement

5    of what the plan is, because I can go along with it.

6    ATTY. PATTIS: We talked in general . . .

7    ATTY. MATTEI: So, there's still an open question

8    about Mr. Jones, but we would propose – and I think

9    the Defense would agree to, is that we end for the

10   day now.

11   THE COURT: Can we le the Jury go, and then we

12   can talk on the record?

13   ATTY. MATTEI: Oh, yeah.

14   ATTY. STERLING: Yes.

15   THE COURT: Why don't we do that, because we

16   gotta work on charge, about that issue where . . .

17   ATTY. MATTEI: Yeah, right. So, we were thinking

18   we work on the charge . . .

19   THE COURT: . . . where he was (indiscernible) we

20   can deal with.

21   ATTY. MATTEI: Right, right.

22   ATTY. PATTIS: Which issue is that?

23   ATTY. MATTEI: The offer of proof.

24   THE COURT: (indiscernible).

25   ATTY. PATTIS: (indiscernible).

26   ATTY. MATTEI: And then, I think our thought

27   within the – that we have probably about another ten

1    – twenty-minutes, we can argue.

2          THE COURT: Okay, (indiscernible) let him know

3    when (indiscernible) saying.

4          ATTY. MATTEI: Right, right. Let's do that.

5                    (SIDE BAR ENDS)

6          THE COURT: All right, so the consensus is, that

7    we have some housekeeping matters to deal with, that

8    we will deal with, but we can let you go until

9    tomorrow.

10         I know I don't have to continue to say the same

11   thing over and over again, because I am extremely

12   confident that you will continue to obey the rules of

13   Juror conduct, and I'm extremely confident that you

14   will let Ron know if there are any issues, in any

15   way, shape or form.

16         So, with that, you have safe travels home – Ron

17   will collect your notepads. Thanks for being such

18   good sports today and following Ron out during the

19   fire alarm; and we will see you tomorrow –

20         And I will stay on record.

21         Good night.

22                 (JURY EXITS COURTROOM)

23         THE COURT: Okay, so, please be seated. Why don't

24   you tell me what – if you have an agreement on how

25   we're proceeding just tell me what it is, and I'm

26   sure I'll honor it.

27         ATTY. PATTIS: Can we have a moment?

1      THE COURT: Sure.

2      ATTY. PATTIS: Judge, may we step out into the

3   hall, counsel and I, briefly for a moment?

4      THE COURT: Sure.

5      ATTY. MATTEI: Your Honor, may we approach?

6      THE COURT: Sure.

7      ATTY. MATTEI: Thank you.

8            (SIDE BAR BEGINS)

9      ATTY. PATTIS: (indiscernible).

10     ATTY. MATTEI: Sure, yeah.

11     THE COURT: It has to be on the record though.

12     ATTY. PATTIS: And I request that it not be, if

13  we can do that, for trial management purposes.

14     THE COURT: Will not, sorry.

15     ATTY. PATTIS: We have reached an agreement.

16     THE COURT: I like agreements.

17     ATTY. PATTIS: That . . .

18     ATTY. MATTEI: I would say an understanding.

19     ATTY. PATTIS: We've reached an understanding

20  (indiscernible) that the Plaintiffs are not gonna

21  call Mr. (indiscernible) and Mr. Jones is not gonna

22  testify - I knew that as of, about an hour ago. I

23  didn't want to stand up and make a (indiscernible) in

24  your presence, when I have every reason to believe

25  he's on his way home and could be (indiscernible) and

26  be suggested that I engaged in misrepresentation to

27  the Court.

1      THE COURT: Okay.

2      ATTY. PATTIS: So, we've reached that

3      understanding; the question then becomes how the

4      Court and counsel uses its time. So, I move to

5      (phonetic) (indiscernible) others. I have my ideas,

6      but I've done all the talking . . .

7      THE COURT: Do you want me to – what are you

8      gonna tell the Jury, since I've told them like, three

9      times that he was gonna testify? Do you want to come

10     up with some language?

11     ATTY. PATTIS: Well, he – I . . .

12     THE COURT: It's up to you.

13     ATTY. PATTIS: He's made an election – under the

14     consideration of the case as a whole, he's made a

15     decision not to testify.

16     ATTY. MATTEI: And I . . .

17     THE COURT: Listen, you got me involved in it –

18     if you didn't get me involved, then I wouldn't feel

19     an obligation to – I don't want to mislead my Jurors.

20     ATTY. PATTIS: Than you can say – I will . . .

21     THE COURT: You guys talk and tell me.

22     ATTY. PATTIS: I will take the hit, I'm

23     representing him.

24     THE COURT: No, you guys talk and then just give

25     me some agreeable language; only because we – if you

26     hadn't involved me, because I wouldn't – if I tell

27     them something and I have to keep them

1      (indiscernible) so, you talk to them.

2         ATTY. PATTIS: Well, and you told them that

3      because I said it; I will take that hit if necessary.

4         THE COURT: You all talk and let me know what to

5      say about . . .

6         ATTY. MATTEI: In terms of timing, so, what we

7      have tomorrow is, basically the end of our case –

8      some videos . . .

9         THE COURT: How long?

10         ATTY. MATTEI: I'm thinking about twenty-minutes,

11      total. We're gonna play a handful of video clips –

12      not depositions, broadcasts.

13         THE COURT: So, (indiscernible) rest . . .

14         ATTY. MATTEI: For the rest of the day

15      (phonetic).

16         THE COURT: Okay, I don't really wanna bring them

17      in here for twenty-minutes.

18         ATTY. MATTEI: Well . . .

19         THE COURT: (indiscernible) just maybe have them

20      come in on Thursday and just go from there and then

21      just close and charge, and use – we can come in and

22      work on the charge tomorrow, because we're not gonna

23      do our closing charge tomorrow. I mean, I guess we

24      could try.

25         THE CLERK: Judge, I'm not gonna have the proofs

26      (phonetic) ready by then.

27         THE COURT: Okay.

1      ATTY. PATTIS: (indiscernible) Thursday, I spent

2    a lot of time this weekend preparing to put my client

3    on the stand . . .

4      ATTY. MATTEI: I understand that . . .

5      ATTY. PATTIS: (indiscernible) more time

6    (indiscernible) . . .

7      ATTY. MATTEI: . . . I get the logistical issues,

8    especially for Attorney Ferraro; so, I think that

9    that's fine if we not close and charge tomorrow, but

10   we were anticipating resting tomorrow.

11     I know it's not great to bring them in for that,

12   but I also don't think it's great for us to end on a

13   case right before we close - when that's not what was

14   - what we had been anticipating.

15     THE COURT: I understand that too, and I'm trying

16   to make everyone happy; but do you wanna try to close

17   (indiscernible) tomorrow?

18     ATTY. MATTEI: It just doesn't seem like . . .

19     THE COURT: Oh, is it impossible?

20     THE CLERK: I have to see what exhibits I have

21   (indiscernible), we're gonna have to go through and

22   make sure that I have the right ones.

23     ATTY. PATTIS: Well, we still have amended

24   exhibits that we haven't really discussed or talked

25   about.

26     THE CLERK: I'm (indiscernible) suggest . . .

27     ATTY. STERLING: Your Honor, maybe you could also

1     – I know there were some issues on the charge that

2     the Court was considering.

3          THE COURT: Well (indiscernible) scratched the

4     surface on that, I'd like to do a little work on that

5     now that we have an hour.

6          ATTY. STERLING: Okay, yeah. So . . .

7          THE COURT: (indiscernible) you just want to do

8     that tomorrow?

9          ATTY. MATTEI: Oh no, I don't care, the charge

10    stuff, I think, makes sense to get it done sooner

11    rather than later.

12         THE COURT: Go right to 5:00 PM or maybe do like

13    a forty-five minute (indiscernible) . . .

14         ATTY. STERLING: Sure, sure.

15         THE COURT: You're gonna have a motion tomorrow?

16         ATTY. MATTEI: Um-hmm.

17         THE COURT: So, we're gonna (indiscernible) . . .

18         ATTY. PATTIS: (indiscernible), Judge

19    (indiscernible) Jury (indiscernible), I don't think

20    they have any clue (phonetic) that's coming.

21         ATTY. MATTEI: I . . .

22         THE COURT: Yeah, I'll do it, that's fine. It's

23    (indiscernible) the case and you didn't cause the

24    problem, but . . .

25         ATTY. MATTEI: Thank you.

26         THE COURT: . . . just trying to think of their –

27    you know, whatever, that's fine.

1          And I knew that for so many exhibits too – we've

2     got to get them right, that was my (indiscernible)

3     concern, that his (indiscernible) are all wrong. That

4     the exhibits are not ready, so at least if we do it

5     this way, we're not killing ourselves with the

6     exhibits.

7          THE CLERK: (indiscernible) back there

8     (indiscernible) rushed.

9          THE COURT: All right, so, and I think the

10     exhibits all haven't even been e-filed yet. I think

11     your office is not quite current with the exhibits –

12     because they ne dot not just be handed in here, they

13     need to be in the official file.

14          ATTY. MATTEI: No, yeah, of course. Yeah, we'll

15     double-triple check all that.

16          THE COURT: Okay. So, why don't we just go for a

17     half an hour on the (indiscernible).

18          ATTY. PATTIS: Do we say anything right now,

19     about what's happening on the . . .

20          THE COURT: No, because I'm not – the Jury's not

21     here and I'm not here for the press, Attorney Pattis.

22          ATTY. PATTIS: I . . .

23          THE COURT: I don't – that's not my . . .

24          ATTY. PATTIS: . . . I didn't suggest you are, I

25     just asked because I don't know.

26          I think I've been a reasonably compliant Court

27     Officer, for most days of this trial, I didn't think

1          I (indiscernible).

2               THE COURT: (indiscernible).

3               ATTY. PATTIS: Me (phonetic)?

4               ATTY. MATTEI: It's not over yet.

5               THE COURT: When he's (indiscernible) just

6          (indiscernible).

7               ATTY. PATTIS: That's what we were talking about;

8          I don't believe so, but you know, I expected that

9          it . . .

10              THE COURT: Well, listen (phonetic), I don't know

11         – I mean, right now he's . . .

12              ATTY. MATTEI: I thought I just had a

13         representation that he wasn't coming?

14              ATTY. PATTIS: Well, the question the Court asked

15         me is, he's not gonna change his mind, okay?

16              THE COURT: How do you know he's not gonna fly

17         back tomorrow morning and want to testify – I'm not

18         gonna . . .

19              ATTY. MATTEI: Because his Attorney has

20         represented that he's not calling him.

21              ATTY. PATTIS: Well, now wait a minute – I've

22         represented he's left; I have no intention of – what

23         if he calls me tonight and says, 'I've changed my

24         mind'? What then?

25              ATTY. MATTEI: Well, then I guess we're ready to

26         go.

27              ATTY. PATTIS: No, I don't believe that's gonna

```
 1      happen, but I mean (indiscernible) the Court's
 2      question.
 3           THE COURT: Just saying that . . .
 4           ATTY. MATTEI: I think we can put off the Offer
 5      of Proof, I guess, in that event – till tomorrow
 6      morning.
 7           ATTY. PATTIS: Yeah, I think that makes sense,
 8      because I don't think – I genuinely don't – I didn't
 9      want to get up and make an Offer of Proof against
10      him, is what (indiscernible) at the airport
11      (phonetic).
12           THE COURT: I understand, well look it up on the
13      bright (phonetic) side, the Jury will be here
14      tomorrow; so, if he changes his mind and fly's back,
15      we'll have a Jury.
16           ATTY. PATTIS: So, let me talk to you for a
17      minute.
18           THE COURT: All right
19           ATTY. MATTEI: We don't have a choice, so.
20           ATTY. PATTIS: (indiscernible) he's not planning,
21      there's not (indiscernible).
22           THE COURT: Ron, any chance you could go on my
23      desk and get – right on my blotter, there's two
24      versions of the Jury charges; is there any chance you
25      could go get that for me now?
26           THE CLERK: Sure.
27           THE COURT: Thank you so much.
```

1          (SIDE BAR ENDS)

2          THE COURT: All right, so while Ron's getting our

3     versions of the proposed charge, why don't we just

4     plan on going - since we'll have more time tomorrow,

5     why don't we just go 4:30 PM with the charge today.

6          ATTY. STERLING: Yes, thank you.

7          THE COURT: Put a half an hour into it.

8          ATTY. STERLING: Your Honor, we have a couple

9     things that ought to just put on record – I don't

10    know that we've ever put them on record when we

11    weren't at side bar.

12         So, with regard – and can we just wait until

13    Attorney Pattis is ready.

14         ATTY. PATTIS: I'm ready.

15         ATTY. STERLING: Are you?

16         One moment, Your Honor.

17         So, with regard to - and this we have covered,

18    but I want to make sure we do both, the Common Law of

19    Punitive Damages, which would result in attorney's

20    fees and costs. We have agreed that the Court will

21    reserve the determination of the amount of reasonable

22    attorney's fees and costs if those are allocated to

23    the Plaintiff's.

24         THE COURT: I thought we already put that on the

25    record?

26         ATTY. STERLING: We did, and the reason I wanted

27    to cover it, is because it's the CUTPA fees

1        (phonetic) and attorney's fees and costs also go to

2        the Court, but we have an agreement that that – the

3        determination of the amount will be in a later

4        proceeding.

5            That's really the point of this, Your Honor, is

6        to say we're not putting on evidence right now of the

7        amount of attorney's fees and costs, because we have

8        an agreement that that's reserved to a later

9        proceeding.

10           ATTY. PATTIS: And in part, that agreement

11       spawned (phonetic) from the disclosure of – an

12       arguably late disclosure of an expert on the

13       (indiscernible). In the run up to trial, we agreed to

14       defer that and our right to depose that person should

15       that question arise; and I think we did put that on

16       the record, maybe even before evidence began.

17           ATTY. STERLING: I think we put it on –

18       well in any event, it's on the . . .

19           THE COURT: Okay, well the record's nice and

20       clear.

21           ATTY. STERLING: . . . it's very nice and clear

22       right now; and the other issue we had, Your Honor, is

23       that technically, the Plaintiff standing in for Erica

24       Lafferty is Rich Cohen – the bankruptcy trustee.

25           Throughout the proceedings, we have referred to

26       Erica Lafferty as the Plaintiff; we have an agreement

27       that we will refer to Erica Lafferty on the verdict

1     form and any Jury interrogatories; and it will be

2     then, understood, that judgement will enter in favor

3     of the formal plaintiff in the case - but we'll

4     (phonetic) just handle the Jury interrogatories and

5     verdict form that way.

6          ATTY. PATTIS: Agreed.

7          THE COURT: Okay, all right.

8          ATTY. STERLING: Thank you.

9          THE COURT: So, are we ready to go on the

10    proposed charge?

11         ATTY. STERLING: Yes, Your Honor; where did the

12    Court want to begin?

13         THE COURT: Well, I think - just bear with me for

14    one second.

15         ATTY. PATTIS: Did the Court ever get a copy that

16    wasn't all page-tens?

17         THE COURT: I did, I did, and it's actually got

18    colors on it - it's very exciting.

19         One of the things that, I think Attorney

20    Sterling was gonna look at - and you were gonna look

21    at, Attorney Pattis, was the implicit bias charge -

22    whether you thought there was a need for it or not;

23    have you had an opportunity to talk to each other on

24    that - about that?

25         ATTY. STERLING: We have not; so, let's defer

26    that one until tomorrow.

27         THE COURT: Okay. All right, so, on the

1    corporation or other entity as party – I was going to

2    look at that, and I have to say, I agree with

3    Attorney Pattis on that. I'm not going to instruct

4    the Jury that Mr. Jones and Free Speech Systems are

5    one entity; I didn't see that in the complaint.

6       ATTY. STERLING: Let me pull the allegations of

7    the complaint, Your Honor, then and go over them with

8    you; and maybe we could do that tomorrow.

9       THE COURT: Why don't we - I don't want to keep

10   kicking the can on everything. Why don't we – I

11   looked at the . . .

12      ATTY. STERLING: Okay, well then let me grab a

13   copy of the complaint, just one moment.

14      THE COURT: Okay.

15      ATTY. MATTEI: While Attorney Sterling is doing

16   that, Your Honor, may I be excused so that I can

17   inform our clients about the game plan, and they can

18   then get on with their day?

19      THE COURT: Sure, absolutely.

20      ATTY. MATTEI: Thank you.

21      THE COURT:  Ron, would you mind getting your

22   steps in and getting my – I left a part of a copy of

23   the complaint on my desk. I think it's either on my

24   desk or on the table, I'm pretty sure it's on my

25   desk.

26      THE CLERK: (indiscernible).

27      THE COURT: And I worked off – Attorney Sterling,

1     of the complaint – the operative complaint at the

2     time the default entered.

3          ATTY. STERLING: So, and would that be – is that

4     Lafferty or is that Sherlach-one or Sherlach-two,

5     because all . . .

6          THE COURT: I looked at the Lafferty.

7          ATTY. STERLING: Lafferty, okay.

8          THE COURT: Operative complaint at the time the

9     default entered.

10          ATTY. STERLING: So, I'm not sure which complaint

11     this is - I'm looking in the first set of allegations

12     that go to this issue, at paragraph 34.

13          THE COURT: Thank you, very much. Oh of course

14     (indiscernible) see.

15          You want to just read into the record, and I'll

16     just listen to you, rather than try to pull it up?

17          ATTY. STERLING: The above-mentioned taxes

18     (phonetic) business entity Defendant, is owned,

19     controlled and operated by Defendant, Alex Jones; and

20     employed (phonetic) to hold and generate revenue for

21     him.

22          So, that . . .

23          THE COURT: Well, there's - but the language that

24     you proposed here is that they're one entity.

25          ATTY. STERLING: I think that's – we did, Your

26     Honor, and it's short-hand; and what it's short-hand

27     for is the fact that there are allegations of agency

1      conspiracy, joint venture (phonetic), control – all

2      of those allegations, which lead to the same place,

3      which is that they're one actor.

4           THE COURT: So, I am not going to charge that

5      they're one entity; are you making a counter proposal

6      on other language that you want to run past Attorney

7      Pattis?

8           ATTY. PATTIS: Judge . . .

9           ATTY. STERLING: I can, Your Honor.

10          THE COURT: Go ahead, Attorney Pattis.

11          ATTY. PATTIS: I – given the law of the case, I

12     feel that I can't agree to anything when F.S.S. moved

13     into bankruptcy, the Court concluded that Mr. Jones

14     was distinct, and absolvent (phonetic) Defendant –

15     such that the action couldn't proceed.

16          THE COURT: Well, that's not – that's a different

17     Court; I'm looking at . . .

18          ATTY. PATTIS: No, you – here, when F.S.S. moved

19     into bankruptcy and Mr. Jones didn't get the benefit

20     of (indiscernible), we proceeded in the bankruptcy

21     proceedings. We agreed to a lift of stay (phonetic),

22     but we didn't – we never agreed that they would be

23     treated as one. They were treated as two . . .

24          THE COURT: All right, but I didn't make any

25     finding along those lines; I simply pointed out in my

26     order that Mr. Jones hadn't declared bankruptcy . . .

27          ATTY. PATTIS: Recognizing that he was different,

1    because if he were the same then they wouldn't . . .

2        THE COURT: Well, that's what you're reading into

3    it, I just recognized that he had not filed

4    bankruptcy and still has not.

5        ATTY. PATTIS: I hear you, and for that reason, I

6    feel that I can't – I'm going to assert an

7    opposition.

8        THE COURT: All right.

9        ATTY. STERLING: Your Honor, so, I think the

10   other thing to point out, is that all the allegations

11   in the complaint are as against both of these

12   Defendants. So, the idea that – for purposes of the

13   default, the complaint establishes that they're doing

14   the same thing – that's another reason to treat them

15   as the same.

16       ATTY. PATTIS: I don't know that that's

17   necessarily true, I can imagine a Universe in which

18   liability as to F.S.S. is larger than as to Mr.

19   Jones; and that is if the Jury credits some of the

20   (indiscernible) or information and says it wasn't

21   necessarily chargeable to Mr. Jones.

22       THE COURT: Well, I'm going – I'm not going to

23   consider the language as proposed – if you want to

24   propose something else, at some other time, you can

25   do that.

26       ATTY. STERLING: Okay, Your Honor.

27       THE COURT: I mean, the only evidence in the case

1    has been along the lines that he makes all decisions

2    and control – so, if you want to make some counter

3    proposal, I'll consider it.

4         ATTY. STERLING: Right, okay. Thank you, Judge.

5         THE COURT: So, let me see where we're up to with

6    that. So, I think - did we address – all right,

7    corporate designate (phonetic) testimony, we

8    addressed - we deleted that sentence by agreement.

9    Responsibility for actions of others who broadcast on

10   *Infowars* – we did that?

11        ATTY. PATTIS: I thought we had, Judge, yes.

12        ATTY. STERLING: Yeah, we did; I think we had

13   resolved that one completely.

14        THE COURT: Okay, adverse inference – did we

15   resolve that?

16        ATTY. STERLING: Your Honor, in the interest of

17   moving things along, we're not gonna claim that one.

18   That's the Dew/Bidondi texts.

19        THE COURT: Right, that you were going to think

20   about that, okay.

21        ATTY. STERLING: Yeah, we did think about it and

22   we're not gonna press that.

23        THE COURT: Would you, since you – do you mind,

24   making the changes once again for Attorney Pattis and

25   the Court?

26        ATTY. STERLING: I don't mind, Your Honor.

27        THE COURT: Okay, that direct and circumstantial

1      evidence?

2           ATTY. PATTIS: I think we'd agreed on that,

3      Judge.

4           THE COURT: Okay, credibility of witnesses?

5           ATTY. PATTIS: Agreed.

6           THE COURT: Use of depositions?

7           ATTY. PATTIS: Agreed.

8           THE COURT: All right expert witnesses – did we

9      finish that?

10          ATTY. STERLING: We did, Your Honor, I think I

11     prevailed on one word, and otherwise . . .

12          ATTY. PATTIS: And I see that, that's at the top

13     – may I be seated Judge, during this?

14          THE COURT: Yes, and you too, Attorney Sterling.

15          ATTY. PATTIS: Okay, I see in line 6, of page 16,

16     what I believe was what we discussed yesterday – is

17     that, am I correct? Changing – making your decision

18     whether to believe to considering?

19          ATTY. STERLING: That's correct.

20          ATTY. PATTIS: Okay, agreed.

21          THE COURT: So, causes of action; that's the – I

22     was going to see how cumulative the nominal damages

23     charge was, I never go the chance to count it up, but

24     I did say we'll come back to this.

25          ATTY. STERLING: I can't do sitting down, Judge,

26     I apologize – I prefer standing up.

27          You know, I gave some thought to this overnight,

1    and I understand the Court's concern here; and

2    mindful of Court's question yesterday about what is

3    the appropriate charge here, how can you give a

4    nominal damages charge – and here's the issue I'm

5    running into, the Court is instructing the Jury on

6    certain facts – which are established by the default.

7         One of those facts, is the fact that each

8    Plaintiff suffered severe emotional distress as a

9    result of outrageous conduct by Mr. Jones. Those are

10   not – the question yesterday was, *'Well how could you*

11   *have damages in the absence of evidence?'*; the answer

12   is, the facts that the Court is instructing – those

13   are equivalent to evidence, right?

14        That's – that is an instruction about what the

15   facts are; and so, where that takes us then, is –

16   because is the question of what can the Jury do, what

17   discretion does it have in the face of severe

18   emotional distress?

19        The answer to that question is in the Maldonado

20   (phonetic) case, that recent case written by Justice

21   Ecker (phonetic), where he says – and with was with

22   regard to pain and suffering,

23        "But once the evidence of pain and suffering is

24   established, the Jury is not free to award zero

25   damages as compensation . . ."

26        So, that's where I think we land with regard to

27   emotional distress, Your Honor, and that's the

1    problem with the nominal damages charge.

2        ATTY. PATTIS: I disagree with Attorney

3    Sterling's reading of it – and I'll repeat what I

4    said yesterday, I looked for guidance to the question

5    of proof of damages in a 1980 – in a case arising out

6    of *42 United States, Cade 1983*, where this is a

7    common problem.

8        "*If a Plaintiff proves the elements of the*

9    *offense, but fails to prove damages – fails to prove*

10    *an amount, they're entitled, as a matter of law, to*

11    *nominal damages . . .*"

12        So, I think what Justice Ecker (phonetic) said,

13    is zero is an inappropriate amount – as it would be

14    in a 1983 case. The proper answer is, it's $1.00.

15        Now, having opened the – having made that

16    finding, by way of a defaults or having to determine

17    that by way of a default, the Plaintiffs are welcome

18    to come in here and prove as much damages as they can

19    persuade the Jury to award them – but they are not

20    relieved of the responsibility of proof.

21        So, our view is, the nominal damage charge is

22    correct.

23        THE COURT: Right, well I'm not – so, why don't

24    we – let's come back to whether we need to leave it

25    under causes of action – if it's five or six other

26    places, let's look at in context; but I understand

27    your arguments.

1    Okay, intentional (phonetic) infliction of

2    emotional distress – we have no problems with, right?

3        ATTY. PATTIS: Correct.

4        THE COURT: And false lead (phonetic) invasion of

5    privacy, we have no problems with, am I right?

6        ATTY. STERLING: Yes.

7        ATTY. PATTIS: Yes.

8        THE COURT: Okay, so, now we're at defamation?

9        ATTY. STERLING: Yes, and the defamation language

10   was – is the Court's proposal – I had proposed one –

11   which was a rejection of our proposal, I had proposed

12   one change in the language, which I feel is

13   important; and we were waiting on Attorney Pattis's

14   response to that change in the language.

15       ATTY. PATTIS: I don't recall what that was,

16   Attorney Sterling.

17       ATTY. STERLING: It's right there, in the red

18   line (phonetic) – hopefully you all have the same

19   page numbers, on page 21.

20       THE COURT: 21?

21       ATTY. PATTIS: Yeah, I'll agree to the charge as

22   drafted, Judge. I had a chance to check my proposed

23   charge and my notes – I couldn't recall what I had

24   proposed to this Court (phonetic) on the phone,

25   yesterday; so, I will agree to the Plaintiff's charge

26   on page 21.

27       THE COURT: All right, approximate cause – I have

1    in my notes here – I have to work on this; so, I'll

2    work on that.

3        ATTY. STERLING: So, we're tabling that one for

4    now, Your Honor?

5        THE COURT: Well, I'm gonna try to do it tonight.

6    Do you have anything to add to what we've talked

7    about? I'd be happy to hear you again, if anyone has

8    anything to add on that.

9        ATTY. PATTIS: Yesterday's session was preserved,

10    Judge – recorded, or by court reporter?

11        THE COURT: Yes, indeed.

12        ATTY. PATTIS: I have nothing to add.

13        ATTY. STERLING: Your Honor, I don't think we

14    have anything to add at this time; because we,

15    primarily, accepted the Court's charge and then just

16    made a few red line (phonetic) suggestions.

17        ATTY. PATTIS: Well, now I'm gonna have to

18    comment. As I said, yesterday, I think that the

19    Plaintiffs tried to compress proximate (phonetic)

20    case into but-for (phonetic) causation; and that I

21    take to be the thrust of their – what they might

22    refer to as minor edits. I view that as a

23    (indiscernible) in what's required.

24        THE COURT: Okay, so, now were on standard of

25    proof damages - just give me one second.

26        ATTY. KOSKOFF: Excuse me, Your Honor, I'm going

27    to join Mr. Mattei; we're very well taken care of

1      here.

2           THE COURT: That's fine; have a good afternoon,

3      safe travels.

4           ATTY. KOSKOFF: Thank you.

5           ATTY. STERLING: So, Your Honor, at the beginning

6      of this charge, we have the same nominal damages

7      problem; and we do continue to object to that.

8           Your Honor, though, I feel like we went through

9      this yesterday because I had an objection to the

10     instructions regarding wait (phonetic) and my memory

11     is that I was overruled.

12          THE COURT: That is correct.

13          ATTY. STERLING: So, what's hanging there, is how

14     the Court treats nominal.

15          THE COURT: Okay, damages compensatory - did we

16     finish this?

17          ATTY. PATTIS: I think this is where we got

18     bogged down and decided to quit for the day.

19          THE COURT: We might do that again today; we've

20     only got 10 more minutes.

21          ATTY. STERLING: So, I agree, I think this is

22     where we got bogged down - and I think we hang up on

23     the nominal issue, again here, in the middle of this

24     charge.

25          THE COURT: Okay, besides the nominal issue, what

26     else can you tell me?

27          ATTY. STERLING: Let's see - we had agreed to

1      change injuries to harm.

2           ATTY. PATTIS: Correct.

3           THE COURT: Yes.

4           ATTY. STERLING: Attorney Pattis had agreed to

5      that - and I see that I've missed some. At the end of

6      that charge, there is a portion regarding non-

7      economic damages; it's the last two sentences.

8           THE COURT: All right.

9           ATTY. STERLING: I don't see any reason to

10     explain that, when we're not formally seeking

11     economic damages. So, I think those two sentences

12     should come out.

13          ATTY. PATTIS: I think they're entirely

14     appropriate, given the testimony we've just listened

15     to. Monies for harms they've suffered – likely to

16     suffer in the future as a result of the Defendant's

17     wrong – (indiscernible) they are awarded (phonetic)

18     for such things.

19          I don't know that we need physical pain and

20     suffering, but they are awarded (phonetic) for such

21     things as mental and emotional pain and suffering,

22     and the loss or diminution (phonetic) of the ability

23     to enjoy life's pleasures - I think I just heard

24     three-days of that.

25          ATTY. STERLING: I'm just looking at it, Judge.

26          THE COURT: Take your time.

27          ATTY. STERLING: So, I think if we take out the

1      physical pain and suffering, that makes it better.

2          ATTY. PATTIS: I would agree to that, Judge.

3          THE COURT: I agree; all right, what else besides

4      the nominal damages issue in this section?

5          ATTY. PATTIS: I don't recall that there was

6      anything else.

7          ATTY. STERLING: I think I already lost on our

8      objection to guess and speculate; that's my memory of

9      yesterday. I can remake that argument, but my memory

10     is I was overruled.

11         THE COURT: That's correct. All right so, now is

12     that it for that section?

13         ATTY. PATTIS: From my perspective, yes.

14         ATTY. STERLING: Your Honor, if I may, I just

15     want to look at it one more time overnight – and I

16     don't think I have anything else, but I would

17     like . . .

18         THE COURT: Okay. All right, damages for invasion

19     of privacy and emotional distress – so, we have not

20     talked about this yet?

21         ATTY. PATTIS: Correct.

22         THE COURT: Okay, so just give me one moment.

23         So, Plaintiff's comment?

24         ATTY. STERLING: Your Honor, we think this is

25     appropriate and tailored.

26         THE COURT: Right, and I did not keep track of –

27     has every Plaintiff testified?

1          ATTY. PATTIS: Yes.

2          ATTY. STERLING: Yes.

3          THE COURT: So, we can drop that line?

4          ATTY. STERLING: Yes, we can.

5          THE COURT: So, you'll do that?

6          ATTY. STERLING: Yes, once I find it, I'll drop

7      it.

8          THE COURT: All right, Attorney Pattis?

9          ATTY. PATTIS: I had an extensive comment, I'll

10     relay on the comments that I made there, Judge.

11         THE COURT: All right.

12         ATTY. PATTIS: Other than to note that I – I have

13     (indiscernible) in there, the next to last sentence

14     should end with the clause,

15         *"Unlike defamation per se and CUTPA, (phonetic)*

16     *is simple and requires no (indiscernible) instruction*

17     *(phonetic)."*

18         THE COURT: Right, I am gonna leave that in; I

19     think it's helpful for the Jury.

20         Okay, so, that takes us to damages for liable

21     and slander per se. Just give me a moment to get up

22     to speed.

23         All right, so, what's – where do we need to go

24     first? What's the first line we're tackling here?

25     here

26         ATTY. PATTIS: The Defendant's position is that

27     that Court's charge isn't accurate in the adequate

1       statement of the law, and no revisions are necessary.

2           THE COURT: All right, so, your first proposed

3       addition (phonetic)?

4           ATTY. STERLING: Yes, Your Honor. It's to repeat

5       to the Jury what was established to be defamatory.

6       So, the first – what I'm requesting to be included,

7       is actually the same language that comes out of the

8       defamation per se liability charge.

9           So, that language is already accepted in the

10      defamation per se liability charge.

11          ATTY. PATTIS: And our view is that – much like

12      Plaintiff's concern about repeating what nominal

13      damages are, there's no need to repeat this more

14      often (phonetic).

15          THE COURT: I actually think it's helpful; so, I

16      accept that first addition.

17          ATTY. STERLING: Okay, thank you.

18          Then, proceeding through the charge, the

19      sentence that begins,

20          *"In determining the amount of general damages to*

21      *award for the injury to a Plaintiff's reputation, you*

22      *should consider what reputation the Plaintiff had in*

23      *the community . . ."*

24          Is the charge that is – that's the standard

25      language, that's the charge that the Court adopted –

26      I don't think that 'in the community' is – I think

27      it's actually confusing in the modern world.

1    Right, because which community? People have

2   multiple communities - people exist in an online

3   community, but community suggests a physical

4   community. So, I think it's really a problem and the

5   better wording is what I proposed, which is to knock

6   it out.

7    THE COURT: I can't disagree with that, Attorney

8   Pattis.

9    ATTY. PATTIS: Well, I mean . . .

10    THE COURT: I think that's - that holds weight.

11    ATTY. PATTIS: . . . possibly - although they put

12   on no evidence about their reputation prior to these

13   events, so I'm not sure they're entitled to that at

14   all.

15    ATTY. STERLING: I certainly disagree with that.

16    ATTY. PATTIS: No one testified that - you know,

17   they're wonderful people - I'll concede that based on

18   what I saw of their testimony, but I didn't hear a

19   single person testify that we (phonetic) thought

20   worse beforehand - or after all this occurred -

21   beforehand, if anything, they've become more

22   sympathetic - iconic.

23    ATTY. STERLING: I'm surprised to hear that, I

24   think that - I mean, one of the reputations that

25   these people had - these families had, was as the

26   parents of children who were killed at Sandy Hook.

27    THE COURT: Right.

1    ATTY. PATTIS: No, the question – no, what it

2    says though,

3    *". . . In determining the amount of damages for*

4    *award for the injury to the Plaintiff's reputation,*

5    *you should consider what reputation the Plaintiff had*

6    *when the statements were made . . ."*

7    What evidence is there - none.

8    ATTY. STERLING: I disagree with that; I think

9    there's significant evidence about who these people

10   were before Alex Jones defamed them.

11   ATTY. PATTIS: They were parents, certainly – and

12   lovely parents . . .

13   ATTY. STERLING: And I mean . . .

14   ATTY. PATTIS: . . . but reputation in the

15   community is not what you think of yourself, it's

16   what others think of you - whether that community be

17   online, virtual, or not.

18   In the defamation cases that I've seen,

19   typically there's some testimony about how – not how

20   these people thought of themselves or what was said

21   of them, but that there was an alteration in the

22   point of view that others had of them.

23   These people who defamed them, whomever they are

24   - these unnamed people, probably never even heard of

25   them beforehand.

26   ATTY. STERLING: Well, actually I think they were

27   understood to be the parents of and family members of

1    people who were killed at Sandy Hook; and so, that
2    was their reputation – one of their reputation before
3    Alex Jones deemed them.
4        ATTY. PATTIS: Being a parent isn't a reputation,
5    it's a state – it's a classification. A reputation is
6    what others – look at the definition of reputation,
7    it's what other's think of you, your standing in the
8    world, the regard with which others hold you.
9        There has been no evidence of that – none.
10       ATTY. STERLING: That's just not true, the
11   evidence is that they were grieving family members
12   of . . .
13       THE COURT: All right so, I think I'll take out
14   'in the community', and you just (phonetic) consider
15   the Plaintiff's reputation or should consider what
16   reputation the Plaintiff – I actually like,
17       *'You should consider the Plaintiff's reputation*
18   *when the statements were made'.*
19       All right, so, next?
20       ATTY. STERLING: Yes, Judge; so, here what we
21   have asked to do – if the Court remembers our
22   originally proposed charge, we had a long description
23   of the things that the case law provides for Jurors
24   to consider, as they're determining reputational
25   harm.
26       One of the reasons I thought this was really
27   important, is because I think reputational harm is

1      something that the more you think about it, the more

2      you understand it; and what reputational means in an

3      internet age is changing.

4          So, I think it's absolutely necessary that the

5      Jury have some guidance here. I understand that the

6      Court was not comfortable with instructing the

7      entire list.

8          THE COURT: No, that was a long list.

9          ATTY. STERLING: That was a long list, so I have

10     pared it down.

11         THE COURT: Well, I mean I think we have to give

12     them some guidance here, as to what they should

13     consider. What do you suggest, Attorney Pattis? This

14     is a pretty short list, is there any . . .

15         ATTY. PATTIS: Well, I think it's revisiting

16     marshaling (phonetic), and I think they're free to

17     argue that. They're free to argue anything they like

18     that's supported by the evidence and that you let

19     them argue, but I don't think the Court should

20     endorse their theories of the case, and I don't think

21     the internet age presents need for a special charge.

22         I think the charge on liable and slander per se

23     covers what they're looking for, without drawing

24     undue attention to the theories of the case that they

25     want to argue. So, I think this will bolster and

26     marshal . . .

27         THE COURT: I agree with that. So, I think I'll

1     just leave it,

2          *"You should consider all the circumstances*

3     *surrounding (phonetic) and make (indiscernible)*

4     *another statement . . ."*

5          And you can cover that in your closing argument.

6          All right, next?

7          ATTY. STERLING: Your Honor, I know I don't have

8     to, but I'll say for the record that we accept to

9     that – that's important guidance.

10         THE COURT: I understand.

11         All right, so, where are we next?

12         ATTY. STERLING: Then if we proceed down the,

13         *"In addition to general damages awarded, you may*

14    *award . . ."*

15         THE COURT: Let me just get there.

16         ATTY. PATTIS: Where are you? Oh, okay.

17         THE COURT: Page 34?

18         ATTY. STERLING: Page 34, the line out

19    (phonetic). So, we're not seeking compensation for

20    special damages in this case, and so, I think that

21    the charge on specials is – you know, it doesn't make

22    sense – and Attorney Pattis and I had actually

23    discussed that.

24         THE COURT: So, that's by agreement?

25         ATTY. STERLING: Well, I want to give him an

26    opportunity to look at it, but I think we had

27    discussed that before.

1          THE COURT: Well, if you're not seeking

2      compensation for special damages, why would I charge

3      them?

4          ATTY. STERLING: Exactly.

5          ATTY. PATTIS: On defamation per se, even –

6      because isn't that the point, and part of defamation

7      per se?

8          ATTY. STERLING: No, defamation per se gives

9      rights to general damages.

10          ATTY. PATTIS: Right.

11          ATTY. STERLING: So, we're not seeking – there's

12      not going to be an itemized – we'd like to be paid

13      back for this, that, and the other thing.

14          ATTY. PATTIS: Okay, so, if that's not gonna be

15      argued, that's fine.

16          ATTY. STERLING: Right.

17          THE COURT: Okay, now we're on page 35?

18          ATTY. PATTIS: Yes.

19          THE COURT: And why don't we end with this

20      section of the charge.

21          ATTY. STERLING: Okay.

22          THE COURT: Okay, so, we'll finish this up and

23      pick up the CUTPA tomorrow.

24          ATTY. STERLING: Okay; so, then – just so I'm

25      clear, Your Honor, we're – the line out (phonetic)

26      continues through,

27          *". . . compensate the Plaintiff for his or her*

1        *loss . . .”*

2             We're taking that out.

3             Then I had proposed – the language is,

4             *“. . . If you find that the Plaintiff has*

5        *suffered a violation of his or her legal rights, as a*

6        *result of the default, the Plaintiff's legal rights*

7        *have been violated. . .”*

8             So, it should be,

9             *“. . . each Plaintiff has suffered a violation*

10       *of his or her legal rights . . .”*

11            ATTY. PATTIS: That's the consequence of the

12       default, Judge, I'll agree.

13            THE COURT: All right.

14            ATTY. PATTIS: Without waiving (phonetic) our

15       objection to the default.

16            ATTY. STERLING: Then here,

17            “. . . these damages may not be nominal or

18       substantial . . .”

19            So, this is – I think that the posture of the

20       emotional distress and the defamation per se is

21       slightly different, right? The emotional distress,

22       under IIED has established severe emotional distress.

23       So, here I understand that there could be nominal

24       damages for reputational harm, but I think that needs

25       to be explained.

26            So, when we had talked about nominal damages

27       before – you see here, the thorough explanation of

1    when nominal damages could be awarded in a defamation

2    per se situation, what we're then asking is that the

3    Court balance that nominal damages instruction with

4    the other side, right?

5        With, you know – that's the situation for

6    nominal damages, when the Plaintiff is – the

7    defamatory material is of an insignificant (phonetic)

8    character, because the Plaintiff has bad

9    character . . .

10        THE COURT: I understand.

11        ATTY. STERLING: We ask for the flip.

12        THE COURT: It looks like a good balance to me,

13    what do you say, Attorney Pattis?

14        ATTY. PATTIS: I don't think it is a balance; I

15    think that it's their burden to prove more than

16    nominal – even in the posture of a default.

17        So, it's a false equivalence – this balance.

18    There is no balance here; they started nominal and

19    earn every dollar beyond that, and to suggest that

20    there's a balance is to suggest that the Jury should,

21    you know – should proceed with an open question –

22    should proceed with a presumption that they're

23    entitled to more than $1.00.

24        My view is, if we start with $1.00, and they get

25    – and everything more than that that they prove, they

26    get.

27        THE COURT: What suggests that they're not

1   proving it though? I'm missing something.

2       ATTY. PATTIS: If, on the other hand, it's of

3   significant care of . . .

4        THE COURT: If, on the other hand,

5   (indiscernible) . . .

6       ATTY. PATTIS: The standard charge, I think, is

7   clear. Nominal damages are awarded when they are the

8   only damages claimed and the Plaintiff's – for

9   purposes of (indiscernible) character by the Jury,

10  that I think – okay, that's not clear. Excuse me, I

11  erred on that.

12       I think what the Plaintiffs continue to do is

13  object to the presence of nominal damages and they

14  want to say that – we start with the presumption of

15  war, and even in a default situation, they're

16  entitled only to what they prove.

17      So, our view is, that if they can't prove more,

18  they get no more.

19      THE COURT: I thought this really, actually,

20  highlights the nominal damages.

21      ATTY. PATTIS: It highlights them in the light,

22  most favorable to the Plaintiff's.

23      THE COURT: *"These damages may be nominal or*

24  *substantial, nominal damages of $1.00 may be*

25  *awarded . . ."*

26      And then there's a really long sentence there,

27  and then, if on the other hand – so, I mean, the

1    nominal damages are getting more airtime.

2        ATTY. PATTIS: They're getting re-cast. My view

3    is, the correct statement of the law is, the default

4    entitles them to damages. If they prove – in the

5    absence of proof of anything, they get nominal

6    damages - it's a matter of law.

7        Anything more, they need to get. So, this notion

8    that somehow, they – that we need to talk about the

9    circumstances under which they get more.

10       *". . .If, on the other hand, you find the*

11   *defamatory (indiscernible) character or because*

12   *you've defined that the Plaintiff had a good*

13   *character . . ."* -

14       And again, it's not character, it's reputation.

15       *". . . substantial harm has been done or you*

16   *find there's proof of serious harm, then you may*

17   *award very substantial damages . . ."*

18       That's argumentative - the law is that they –

19   the damages are presumed, they get nominal without

20   proof and beyond that, that's basically endorsing

21   their argument.

22       ATTY. STERLING: Your Honor, I think that

23   misunderstands the law of defamation per se. The

24   injury is established, the Plaintiff is entitled to

25   recover as general damages for injury to his or her

26   reputation, and for humiliation, and for mental

27   suffering – that's the law.

1          ATTY. PATTIS: But what – don't have to . . .

2          ATTY. STERLING: May I finish?

3          Then the standard charge gives the Jury guidance

4      about when it can find nominal damages, and it's

5      basically saying, as I read it, you gotta go

6      backwards, right?

7          What that nominal damages instruction, which

8      comes out of the standard charge, says when you can

9      award nominals, is if the defamatory materials is of

10     an insignificant character or because you find the

11     Plaintiff had a bad character; so that no substantial

12     harm has been done.

13         So, that's what the standard charge is telling

14     us; so, what I'm trying to do is simply balance it

15     out.

16         ATTY. PATTIS: But balancing, in this case, means

17     inflating the value of no proof; and if there were a

18     Plaintiff that had no proof of damages, the Juror

19     would be left saying,

20         *'Well, they've got substantial damages, so I*

21     *guess we've got to give them more than nominal, but*

22     *how much?'* –

23         And it's the Plaintiff's burden to prove that.

24         ATTY. STERLING: That's not it at all, Your

25     Honor. What we're dealing with is a default on

26     intentional torts (phonetic). So, the facts

27     established by the default carry weight in the

1      damages determination – I mean, we – they do.

2             So, Your Honor, I feel like . . .

3             ATTY. PATTIS: They carry weight, but they don't

4      deliver the goods. The Plaintiff is entitled to make

5      a run at the biggest number they think that this

6      evidence supports, but it's a number that the Jury

7      has to give because they're persuaded by a

8      preponderance of the evidence that that's a fair,

9      just, and reasonable award.

10            In the absence of any proof, it's nominal.

11     Otherwise, what's the number?

12            THE COURT: Let's end on this, I'll look at it

13     tonight.

14            When – so, what we'll do tomorrow is, after we

15     send the Jury home, we'll plan on finishing up,

16     hopefully, and I'll tell you what I've decided and

17     then we can finish it.

18            ATTY. STERLING: Yes.

19            THE COURT: It doesn't look like there's that

20     much left.

21            ATTY. PATTIS: Judge . . .

22            ATTY. STERLING: There's more.

23            ATTY. PATTIS: . . . will we get interrogatories,

24     tomorrow, too?

25            THE COURT: I thought you were – I know that we

26     left it off, that you sort of, pretty much assured me

27     that you would work on that, and you didn't think

1      that you would have a problem.

2          ATTY. STERLING: I think we need to work on that,

3      and I think what the Court does with the charge may

4      inform (phonetic) that, that we will certainly handle

5      it tomorrow.

6          THE COURT: All right, but that's how I

7      specifically recall; you felt very confident that

8      you'd be able to work together on that. If not, then

9      we'll deal with . . .

10          ATTY. STERLING: We'll certainly work together,

11      whether we'll agree is a different question.

12          THE COURT: Right, have you done anything, so

13      far, on it yet? Or not yet?

14          ATTY. STERLING: We have not, so, we'll take that

15      up.

16          THE COURT: All right, so, that should be

17      something that you try to do first; but that was my

18      recollection, so, hopefully –

19          Okay, what else?

20          ATTY. STERLING: A few more things, Your Honor;

21      so, we filed a supplemental charge - two sets

22      supplemental charges, and I apologize, I don't – I

23      think the docket number of one of them is -1006 –

24      that's the life expectancy charge.

25          Then we filed another set of supplemental

26      charges, which had an (indiscernible), the charge

27      that we've been briefing to the Court and having

1     rejected about the identity of the – not needing to

2     name the Plaintiff; and a charge about charging out

3     First Amendment, Second Amendment, arguments, and a

4     charge about missing information.

5          So, that – all that briefing is in and then –

6          Oh, and we filed our brief on ascertainable loss

7     already being decided.

8          ATTY. PATTIS: And I'll have something on that

9     tomorrow morning; I saw their brief this morning, I

10    didn't compose it this morning, I was preparing for

11    something else today.

12         THE COURT: Okay.

13         All right, safe travels home and we'll see

14    everyone tomorrow at 10:00 AM, we're adjourned.

15                    (COURT IS ADJOURNED)

```
DKT NO: X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT
ERICA V. LAFFERTY                :  JUDICIAL DISTRICT WATERBURY
v.                               :  AT WATERBURY, CONNECTICUT
ALEX EMRIC JONES                 :  OCTOBER 4, 2022


DOCKET NO: X06-UWY-CV186046437-S
WILLIAM SHERLACH
v.
ALEX EMRIC JONES


DOCKET NO: X06-UWY-CV186046438-S
WILLIAM SHERLACH
v.
ALEX EMERIC JONES
```

## C E R T I F I C A T I O N


I hereby certify that the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara N. Bellis, Judge, on the 4th day of October, 2022.


Dated this 5th day of October, 2022, in Waterbury, Connecticut.


*Kendyl Henaghan*
Kendyl Henaghan
Court Recording Monitor