# EXHIBIT 76

```
X06-UWY-CV18-6046436-S          :  SUPERIOR COURT

ERICA LAFFERTY                  :  COMPLEX LITIGATION DOCKET


v.                              :  AT WATERBURY, CONNECTICUT


ALEX EMERIC JONES               :  SEPTEMBER 21, 2022
---------------------------------------------------------------
X06-UWY-CV18-6046437-S          :  SUPERIOR COURT

WILLIAM SHERLACH                :  COMPLEX LITIGATION DOCKET


v.                              :  AT WATERBURY, CONNECTICUT


ALEX EMERIC JONES               :  SEPTEMBER 21, 2022
---------------------------------------------------------------
X06-UWY-CV18-6046438-S          :  SUPERIOR COURT

WILLIAM SHERLACH                :  COMPLEX LITIGATION DOCKET


v.                              :  AT WATERBURY, CONNECTICUT


ALEX EMERIC JONES               :  SEPTEMBER 21,2022
```
_____

          BEFORE THE HONORABLE BARBARA BELLIS, JUDGE
VOLUME:  I OF 4
WITNESS:  David Wheeler - 10:28:23 to 11:22:17

A P P E A R A N C E S :


    Representing the Plaintiffs:
          ATTORNEY CHRISTOPHER MATTEI
          ATTORNEY ALINOR STERLING
          ATTORNEY JOSHUA KOSKOFF
          ATTORNEY MATTHEW BLUMENTHAL

    Representing the Defendant:

          ATTORNEY NORMAN PATTIS


                              Recorded By:
                              Darlene Orsatti
                              Transcribed By:
                              Peggy DiVito
                              Court Recording Monitor
                              300 Grand Street
                              Waterbury, CT  06702

1          THE CLERK:  Good morning, Marshal.  Good morning

2     everyone, please be seated.

3          ATTY. MATTEI:  Good morning, Judge.

4          THE COURT:  All right.  So this is the Lafferty

5     versus Jones matters.  Week two, day six of trial.

6     If counsel could please identify themselves for the

7     record.

8          ATTY. MATTEI:  Good morning, Your Honor, Chris

9     Mattei on behalf of the plaintiffs, joined this

10     morning by Attorneys Josh Koskoff and Matthew

11     Blumenthal.

12          ATTY. PATTIS:  Norm Pattis on behalf of Jones

13     and Free Speech Systems, Judge.

14          THE COURT:  All right.

15          ATTY. MATTEI:  Your Honor, I don't know if you –

16          THE COURT:  Let me –

17          ATTY. MATTEI:  - have any business to deal with

18     before the jury comes in.  We –

19          THE COURT:  I –

20          ATTY. MATTEI:  - have a couple of –

21          THE COURT:  - I do so –

22          ATTY. MATTEI:  - issues we wanted to raise.

23          THE COURT:  - let me go first.

24          ATTY. MATTEI:  Thank you.

25          THE COURT:  In accordance with judicial branch

26     policy, only those entities that have been

27     specifically authorized may photograph or record.  If

1        anyone violates that policy their device or devices

2        will be confiscated and they will be removed from the

3        courtroom, if not the courthouse.

4            Also, I'm sure the marshal already said it but

5        please make sure all your cell phones, and Apple

6        watches and any devices are either off or on silent.

7        One matter that I have is that although he did report

8        today, one of your alternate jurors would prefer not

9        to continue to serve in light of certain financial

10       restraints.  So, he did appear today and I have not

11       released him.  He is an alternate.

12           ATTY. PATTIS:  Is this the individual who had a

13       time-limited reimbursement policy from his employer?

14           THE COURT:  Ron, is it the same one?

15           THE CLERK:  No, it is not.

16           ATTY. MATTEI:  Your Honor, we defer to the Court

17       but if he's expressed that concern and it's gonna be

18       distracting to him and a hardship for him, we don't

19       object to you releasing him.

20           THE COURT:  Well, the information I got is that

21       it would be a hardship and then what he determined

22       was that the state does not reimburse the $50 per day

23       until the end of the proceedings, so he – it would be

24       a hardship for him.  But he did appear today.  So I

25       wanted to raise it with you.

26           Attorney Pattis, do you have a position?

27           ATTY. PATTIS:  I mean, it would have been enough

1          to disqualify him or - or excuse him during jury

2          selection, so if the same standard applies, then I

3          think it's - I agree with the -

4              THE COURT:  All right.

5              ATTY. PATTIS:  - plaintiffs.

6              THE COURT:  So we will - Mr. Ferraro, will

7          release him with our thanks.  And he did do the right

8          thing and appear today, so I'm grateful for that.

9          And I will just briefly mention to the remaining nine

10         jurors that - I'll make a comment so - and let -

11         they're not left wondering.

12             Okay.  You had a housekeeping matter, Attorney

13         Mattie?

14             ATTY. MATTEI:  Yeah, we have two issues.

15         Attorney Kodkoff will handle the first one and I'll

16         handle the second, Your Honor.

17             THE COURT:  Okay.

18             ATTY. KOSKOFF:  Good morning, Your Honor.

19             THE COURT:  Good morning.

20             ATTY. KOSKOFF:  I - I hope - I - I'm asking the

21         Court just for a few minutes here to entertain and

22         just what is an oral motion reconsideration

23         concerning the ruling regarding the - the eliciting

24         testimony from the plaintiffs regarding their

25         position on - position on guns.  I'll use that in

26         quotations 'cause it's a little - it's un -

27         indefined - ill-defined I think currently.

1      THE COURT:  I – I – I – I'm – I'm really not

2    going to entertain a motion to reconsider at this

3    point, but I think I've made it pretty clear that

4    it's going to be a very narrow line of inquiry

5    regarding their activities and such.  And there's not

6    going to be any extrinsic evidence, and I would

7    entertain any objections from the plaintiffs if the

8    questioning goes beyond that very narrow area.  So –

9    but I'm –

10     ATTY. KOSKOFF:  Could –

11     THE COURT:  – not going to reconsider the

12    ruling.

13     ATTY. KOSKOFF:  So I should not argue it then.

14     THE COURT:  Well, I'm not going to – I –

15     ATTY. KOSKOFF:  I just wanted to –

16     THE COURT:  – I would say –

17     ATTY. KOSKOFF:  – make sure the record is

18    protected on it.  So I don't –

19     THE COURT:  Oh, I think –

20     ATTY. KOSKOFF:  – I don't know what –

21     THE COURT:  – the record – we have a good

22    record.

23     ATTY. KOSKOFF:  Okay.

24     THE COURT:  Okay.

25     ATTY. KOSKOFF:  And then in – in light of that,

26    Judge, can we –

27     THE COURT:  Well, let me just ask –

1          ATTY. KOSKOFF:  - have some -

2          THE COURT:  - Attorney Pattis, anything you need

3     to bring up.  You understand the Court's ruling on

4     the limited inquiry?

5          ATTY. PATTIS:  I do.

6          ATTY. KOSKOFF:  What - I - I - I think maybe

7     then I'm not - the person in this trio that doesn't

8     fully understand the - the scope of it and - and the

9     questions that are within the - will be permitted and

10    those that won't.  And I think an offer of proof

11    would be helpful, before we get into this in front

12    of a jury.

13         THE COURT:  I understood it and Attorney Pattis,

14    correct me if I'm wrong that the inquiry was going to

15    be along the lines of the plaintiffs' activities and

16    views that they've expressed, is that fair to say?

17         ATTY. PATTIS:  Yes.

18         ATTY. KOSKOFF:  Well, I - then I would like the

19    opportunity, Judge, for two minutes to put on the

20    record my opposition to that.

21         THE COURT:  I think the record's clear, so I'm -

22    I'm - and I understand your objection but that is

23    what it is.

24         All right.  Do we have one other thing from the

25    plaintiffs?

26         ATTY. MATTEI:  Yes, Your Honor.  I - I want to

27    raise this now because it relates to Alex Jones'

1      testimony.  We expect to call him either later today

2      or tomorrow.  It came to my attention last night that

3      he put out a broadcast yesterday in which he told his

4      audience that you were going to instruct him at the

5      outset of his testimony that he was essentially

6      required to testify falsely, based on what he

7      believes the truth is.  And he used that as further

8      evidence to attack these proceedings.

9          Of course, the reality is that defense counsel

10      last week requested that you canvass him, even though

11      defense counsel acknowledged that it's his

12      responsibility to make sure that Mr. Jones is

13      cognizant of the Court's orders.

14          And so, I wanted to - we of course defer to the

15      Court on whether you think it's appropriate for you

16      to personally canvass him, but I wanted to advise you

17      of that because I don't think anybody here should be

18      a willing participant in Mr. Jones' attack on the

19      credibility of this trial.  And so I wanted to give

20      you some time to consider that dynamic, as you

21      consider whether to accept the defense's invitation

22      to canvass him.  Of -

23          THE COURT:  I made a -

24          ATTY. MATTEI:  - course any canvass should

25      happen outside -

26          THE COURT:  Attorney Mattei -

27          ATTY. MATTEI:  - the presence -

1          THE COURT:  - I might have even made the offer

2     to Attorney Pattis, who -

3          ATTY. PATTIS:  Yeah, you - that you -

4          THE COURT:  - happily accepted my offer.  I

5     think there's nothing wrong with doing it.  I think

6     it could avoid any unpleasantness or other

7     situations.

8          ATTY. PATTIS:  And Judge -

9          ATTY. MATTEI:  We -

10          ATTY. PATTIS:  - I'll wait -

11          ATTY. MATTEI:  - of course ask that it happen

12     outside the presence of the jury.

13          THE COURT:  Oh, of course.  Oh, my goodness.

14          ATTY. PATTIS:  My recollection -

15          THE COURT:  Listen, I'm doing this so that we

16     avoid any unpleasantness in front of the jury.

17     That's why I'm doing it.  But I will canvass him and

18     if - if he - if there's - if there are issues the

19     jury's going to be sitting there and I'm not going to

20     have the jury jump up and down a million times.

21          Attorney Pattis?

22          ATTY. PATTIS:  My recollection is as follows and

23     I stand to be corrected.  We had a motion in limine

24     argument prior to the proceedings.  The Court made

25     issue - made - made - the Court made rulings about

26     what the scope of the testimony could be offered and

27     I made the - I responded by suggesting that Mr. Jones

 1      intended to testify in a certain vein.  And my

 2      recollection is that the Court took exception,

 3      perhaps to my tone and the suggestion that Jone –

 4      Mr. Jones might be offering testimony inconsistent

 5      with your orders and you made it clear that there

 6      could be contempt.  And that you would hesitate to

 7      impose a contempt finding and that you would question

 8      him out – you would canvass him.

 9          I didn't object to that.  We followed up on that

10      several days later.  I said I thought it was a good

11      idea.  I saw as he arrived in court part of a press

12      conference, in which he made statements to that

13      effect.  And I think that – I've alerted – I've

14      alerted counsel that – that there may be testimonial

15      privilege issues arising from Mr. Jones' posture and

16      the law of the case and alerted him yesterday to

17      cases that he should read in anticipation of that.

18          So, I think I – I've done my job.  I don't know

19      what the Court wants to do.  That's a trial

20      management issue.  I think based on the comments I

21      saw Mr. Jones make, he is aware of the Court's ruling

22      and will choose to obey them or not and beyond that

23      I'm not sure what more I am to do.

24          THE COURT:  Right.  My recollection and the

25      record will control of course, is that before I made

26      the offer on more than one occasion, Attorney Pattis,

27      you had expressed concerns to your credit that while

1    you understood, not necessarily agreed with the

2    Court's orders and rulings, but that while you would

3    obey them as an officer of the court you're - you

4    were concerne3d that Mr. Jones would not, is that

5    fair to say?

6         ATTY. PATTIS:  It is.

7         THE COURT:  Okay.

8         ATTY. PATTIS:  And I thought that that was my

9    responsibility to alert you to that as an officer of

10   this court.

11        THE COURT:  All right.  Okay.  So, I don't think

12   we'll have problem.  I think, you know, I'll plan on

13   doing what I said I would do, of course outside the

14   presence of the jury, canvass Mr. Jones and I don't

15   anticipate that we will have a problem.  And if -

16        ATTY. PATTIS:  Now -

17        THE COURT:  - we do -

18        ATTY. PATTIS:  - that this issue has arisen, may

19   we approach briefly, so I -

20        THE COURT:  In a minute, I just -

21        ATTY. PATTIS:  All right.

22        THE COURT:  - wanted to finish what I was

23   saying.  And if we do have an issue Mr. Jones will be

24   dealt with just like any other witness or party whose

25   appeared before the Court.  So he's not going to get

26   special treatment, he's not going to get more harsh

27   treatment.  The - unfortunately, over my career I

```
 1        have had the opportunity to have contempt hearings,

 2        it's not pleasant but that's what you do and –

 3             ATTY. PATTIS:  I think we understand that.  May

 4        we approach, please?

 5             THE COURT:  Sure.

 6             (Sidebar without transcription)

 7             (Court confers with the clerk)

 8             THE COURT:  All right.  Are we ready for the

 9        jury?

10             ATTY. MATTEI:  Yes, Your Honor.

11             THE COURT:  And – and Mr. Ferraro, you will let

12        our one juror go with our thanks.

13             THE CLERK:  Yes, Your Honor.

14             THE COURT:  Okay.

15             (Jury enters)

16             THE COURT:  Good morning.  Happy Wednesday to

17        everyone.  Good morning.  Good morning.

18             A VOICE:  Good morning.

19             THE COURT:  Welcome back.  Please be seated.

20             So you might remember from my beginning remarks

21        how important it is for this trial that we have the

22        four alternates serve because there are oftentimes

23        unforeseen circumstances that make it impossible for

24        a juror or an alternate juror to continue to serve

25        and in fact that has happened today.  So I have

26        excused your – one of your alternate jurors and it's

27        extremely important that barring any emergency that
```

1    the rest of you do appear, as you've been appearing

2    on time, so that we can reach a verdict because we do

3    need our jury.  So, I am now going to be doing the

4    mental count 9 instead of 10.  And so, I will just

5    state for the record that our entire panel now has

6    returned.

7         Counsel, you agree?

8         ATTY. MATTEI:  Yes.

9         THE COURT:  We dealt with some housekeeping

10   issues this morning.  The lawyers were here very

11   early and I know you were down here waiting, so we

12   thank you for your patience, but it's better to try

13   to deal with them ahead of time rather than bring you

14   out, have you go back in, back and forth.  So this

15   trial actually had way less disruption with the jury

16   going in and out than a typical trial, so, you know,

17   hopefully that – that works for you.

18        All right.  So, I think we are ready to

19   continue.  And Mr. Ferraro you will do what needs to

20   be done with that remaining notebook, correct, if

21   that –

22        THE CLERK:  Yes, Your Honor.

23        THE COURT:  – juror had a notebook.

24        THE COURT:  All right.  Whenever you're ready,

25   please.

26        ATTY. MATTEI:  Thank you, Your Honor.

27        ATTY. KOSKOFF:  And good morning, Your Honor.

1          We call – good morning.  We call David Wheeler.

2               (Court confers with the clerk)

3               THE COURT:  Good morning, sir.

4               MR. WHEELER:  Good morning.

5               THE COURT:  Just watch your step there.  I see

6     you've brought your own water, but if you run out you

7     can refill with the pitcher there.

8               MR. WHEELER:  Thank you.

9               THE COURT:  Okay.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
 1   D A V I D    W H E E L E R,
 2        Fairfield County, Connecticut, having been duly
 3        sworn, is examined and testifies as follows:
 4             THE CLERK:  Thank you.  You may be seated.
 5        Would you please state your name, slowly spelling
 6        your last name for the record and then the state and
 7        county in which you live.
 8             THE WITNESS:  My name is David Wheeler, last
 9        name's spelled W-h-e-e-l-e-r.  And I am in Fairfield
10        County, Connecticut.
11             THE COURT:  You may inquire, Attorney Koskoff,
12        whenever you're ready.
13             ATTY. KOSKOFF:  Thank you, Your Honor.
14   DIRECT EXAMINATION BY ATTY. KOSKOFF:
15     Q   Good morning, David.
16     A   Good morning.
17     Q   You and I know each other, obviously –
18     A   Yes.
19     Q   – for some time.  I want to begin by ask – by asking
20   you, are you the father of Benjamin Wheeler?
21     A   Yes.
22     Q   And did Benjamin Wheeler die in the Sandy Hook
23   shooting?
24     A   Yes.
25     Q   And I want to ask you about your background and just
26   where you're from, things like that.  Can you tell the jury
27   a little bit about your background up and through –
```

1     A    Sure.

2     Q    - until you get to college let's say.

3     A    Sure.  I - I was born in northern California.  My dad

4  was in the air force and he was transitioning into the navy

5  reserve to get closer to the - to the ocean.  He wanted to

6  study oceanography.  So we left northern California and

7  moved to Rhode Island, until my dad got his - got his - his

8  doctorate in ocenograph6y.  And then we kind of bounced back

9  and forth between the coasts, as he was following the jobs -

10  excuse me - following the jobs back to Rhode Island, where

11  he got his degree and then we went to California, where he

12  worked at a marine biology station there.  And then back to

13  New Hampshire, where he got a job on the faculty of the

14  University of New Hampshire.

15          And that's - so that's - I was 9 when he got there

16  and I stayed there through - sixth grade through graduating

17  high school.  And then I had had enough of the New Hampshire

18  winters, so I went to college in San Diego.

19     Q    That was an upgrade.

20     A    It - yeah.  Yeah.

21     Q    And where did you go to college and can you tell the

22  jury what you studied?

23     A    Sure.  I went to San Diego State.  I got - I got a

24  degree in theater.  I was a theater major.  And then I

25  stayed in San Diego for a couple of years after graduating

26  and then moved back to New York to try to work as an actor.

27     Q    Okay.  And can you give us when you - when you moved

1   to New York – back to New York from San Diego, to try – to

2   try your luck as an actor I guess –

3   A   Mm-hmm.

4   Q   – when – when – when was that, David.

5   A   It was 1987.

6   Q   Okay.  And – and did there come a time – first of

7   all, how did the – how did the acting career go, at least

8   early on?

9   A   Well, I – I – you know - not good.  I – I think I –

10  out of the years I spent in New York trying to do that I

11  think I made money as an actor maybe three out of the entire

12  number of years I was there.

13  Q   And – and were you in anything that we would have

14  seen?

15  A   Probabl6y not.  I mean, I did extra work in some

16  films but, you know, it's the blink and you miss it kind of

17  thing.

18  Q   Okay.  So – and – and – by the way, do you know

19  whether Alex Jones ever saw any of your pictures or any

20  films –

21  A   No.

22  Q   – or theater?

23  A   No, I've no idea.

24  Q   Okay.  Do you know whether he knew you were a – had

25  tried your luck as an actor?

26  A   I don't know, no.

27  Q   Okay.  And so you're in New York – just give us the –

1  how – how many years total were you in New York?

2     A    Twenty.

3     Q    Twenty.

4     A    Yeah.

5     Q    Okay.  And did there come a time when you met a

6  particular person that you were particularly interested in

7  of the opposite sex?

8     A    Yes.  So one of them – of the things that I did in

9  the city as an actor that sort of got the most traction was

10  that a buddy of mine and I formed a comedy duo, like a

11  sketch comedy duo.  We were both musicians as well, he

12  played piano and I played guitar.  And so, we would do

13  sketch comedy and we would write new sketches that had a lot

14  of music in them and then, you know, just that sort of

15  thing.

16         And that started to get a little bit of notice from

17  people and we had a show that we put together.  It was kind

18  of a variety show.  And we started – we did it at all the

19  comedy clubs in the city.  We started at Carolina's on 48th

20  and Broadway and then we were at Catch a Rising Star for a

21  while and then at Gotham and Comedy for a while.  And, you

22  know, we moved the show around a little bit.  And the way

23  the show worked was that we would have a standup comedian do

24  a short 5 or 10 minutes at the beginning and then we would

25  do a bunch of sketches.  And then we would have a stand-up

26  comedian do another 5 or 10 minutes at the end.  And then in

27  the middle we'd have a, like, some kind of a small band that

1    would do a, you know, a straight legit musical act that we'd

2    do either a single person doing singer/songwriter thing or a

3    small combo or something.

4         And we were doing the show at a venue up on Amsterdam

5    and we were trying to get a musical act for the show and we

6    were asking this friend who had a band and she said we can't

7    do it, but you should ask my friend she's got this trio.

8    And they were a close harmony trio like Andrews Sisters'

9    stuff, like, you know, and girl group stuff, Motown, that

10   kind of thing.  And so, we hired them to do the show.  And I

11   say we hired them, but I don't think they got paid.  And –

12   and one of the people in that band was the woman who ended

13   up being my wife.  It was my wife, Francine.  And that's how

14   we met.

15   Q    And Francine's in this courtroom?

16   A    Yes.

17   Q    Can you just point her out?  She –

18   A    Right.

19   Q    – and –

20   A    Second in the front row there.

21   Q    The – the jury – the jury will get to know Francine

22   later on –

23   A    Right.

24   Q    – we'll get to her later on.

25   A    Right.

26   Q    But so, was it – was the rest history or – or –

27   A    Well, we – it was you know, we're both very busy

1  trying to live that – those kinds of lives, where juggling

2  was your everyday experience.  And I think I called her and

3  I think she thought I was calling her for a date, but in

4  fact I was calling her to work the door on our next show

5  because our door person had bailed.

6      Q   How'd that go over?

7      A   Not well.  She didn't – wasn't happy about that.  But

8  then we continued to sort of know each other and then we

9  decided that we wanted to go out on a date.  But I think it

10 took almost a month before we could find the time to have a

11 date, because we were both so busy with work and pursuits

12 and following everything we were doing.

13     Q   And I'll – we'll let Francine tell her version of the

14 story in Part Two when –

15     A   Right.

16     Q   – she gets up there, but did there come a time when

17 you and Francine decided to get married or –

18     A   Well, yeah.  So, you know, I – very shortly after –

19 after dating seriously we knew that this was not like other

20 relationships we'd had, and at the same time we knew that we

21 were done with the business and wanted to pursue other

22 careers.  I had always been an illustrator as well and done

23 some design work and illustrations.  So, I got out of the

24 business and after a brief stint working at an executive

25 placement place, I got hired in 2000.

26         So Francine and I met in 98.  And then in 2000 I got

27 hired to do book jacket design at a publishing company in

1   the city, trade publishing – trade books.  So, I was doing

2   jackets for books and then around the same time she was

3   transitioning into a – a career as a pre-school music

4   instructor and a music specialist.

5      Q   And – and so the 20 – you – you gave up act – acting,

6   your career in acting after about 20 years or –

7      A   Yeah, well, rough – I mean – yeah, roughly.  I mean,

8   a little less than that.  I think I went on my last real

9   audition in 2004, maybe, 2003.  It kind of dribbled off, you

10  know, I – I kept going out.

11     Q   And – and did there come a time when you and Francine

12  decided to have children?

13     A   Yes.

14     Q   All right.  And can you tell us when did you – when

15  did you have your –

16     A   Well, we –

17     Q   – were you in –

18     A   – while –

19     Q   – New York when you had your –

20     A   Yes.  One of the things we recognized when we

21  realized that this relationship wasn't like others was that

22  we both – we both wanted kids.  And, you know, we – we were

23  not dewy-eyed youngsters at that point.  So we knew we had

24  to –

25     Q   You were dewy-eyed older –

26     A   Yeah.

27     Q   – than youngsters?

1    A    Right.  And so, you know, we – we – the way I like to

2  describe it it was the first time in my whole life that I'd

3  met somebody and, like, looked down the avenue and all I saw

4  were green lights.  You know, what I mean, it's just –

5  everything lined up in terms of what we wanted from life and

6  from each other.

7            And – and so our first son, Nate, was born in 2003.

8  We got married in 2001 and then our son Nate was born in

9  2003.  We were living in Queens at the time, in Sunnyside,

10  and then Ben was born three years later in 2006.  And after

11  Bennie was born we realized that we – we weren't – you know,

12  have – having kids in the city is hard.  It's a tough thing

13  to do.  And we wanted to have a kind of easier time of it,

14  so then we started looking for other places to live after

15  Ben was born before he was a year old.

16    Q    So Nate is – Nate is how many years – or was how many

17  years older than Ben?

18    A    Three.

19    Q    And when did you move to Newtown?

20    A    So in 2007 we left Queens and we did that thing where

21  you sort of make a circle and try to find a place that you

22  can afford to live.  And we wound up in Newtown.  We had

23  friends who had moved to Sandy Hook several years before.

24  And we'd been visiting them up there and they were saying

25  the schools are great, the town is great, there's something

26  about this town and about Newtown and the Sandy Hook area

27  that's great.

1    And I had grown up in New Hampshire and so moving to

2    Connecticut was kind of a little bit like coming home for

3    me, in a way, after 20 years in the city.  And it really,

4    really appealed to me the idea of living in a place where

5    there's trees and woods and you can – you know, around that

6    sort of thing.  So – so we moved in 2007, we rented what I

7    like to say is the – the only house in Newtown that was

8    smaller than our apartment in Queens.  And – and we were

9    there a couple of months and then we found a place in – and

10   we bought a place in Sandy Hook.

11   Q   And in – excuse me – and did Nate – is it – and did

12   Benjamin go to the elementary or the preschool and the

13   elementary?

14   A   Right.  So Nate and Ben both went to Trinity Day

15   School, which was a – a preschool, a Pre-K program.  And

16   then they both went through the system.  Nate in 2012 was in

17   fourth grade.  And so, Ben went to Trinity for the Pre-K and

18   then he started first grade in September of 2012 at Sandy

19   Hook Elementary.

20   Q   And who was his teacher?

21   A   So his teacher was a woman named Mrs. Demateo but on

22   December 14th, of 2012 she was not in the school.  She had a

23   doctor's appointment.  She had recently discovered that she

24   was –

25          ATTY. PATTIS:  Objection.

26          THE WITNESS:  - pregnant.

27          ATTY. PATTIS:  Hearsay.  Relevance.

```
 1           THE COURT:  Sustained.
 2  BY ATTY. KOSKOFF:
 3     Q   What after – she –
 4     A   She – she was not in the school that day and there
 5  was a substitute in her place.
 6     Q   I want – let's not talk about December 14th for a
 7  minute –
 8     A   Sure.
 9     Q   – let's go back –
10     A   Yeah.  Yeah.  Yeah.
11     Q   – to a –
12     A   Okay.
13     Q   And – and I want to tell – I want you to tell the
14  jury a little bit about Ben.
15     A   Sure.
16     Q   What was Ben like?
17     A   Ben was in many ways a typical 6 year-old boy.  If
18  you have experience with 6 year-old boys a lot of energy, a
19  lot of rambunctious behavior.  He was the second kid, so he
20  was trying a little harder to get our attention in those
21  busy years.  He – you know, every parent thinks their kid is
22  the greatest and – and – he had a wonderful sense of humor.
23  Really funny kid.  And he moved very, very quickly through
24  the world.
25           Nothing really ever moved fast enough for him, he was
26  always going.  In fact, his nickname was Crash.  We called
27  him Crash and that was just the beginning of his nickname as
```

1  the years went by we sort of added on to the nickname with

2  stuff that happened to him or things he did to other people.

3  So his full nickname was Crash, Hop Along, Hurt Himself,

4  Jawbreaker, Shiner, Split Lip, Gash Eye, Face Plant, Nose

5  Buster Wheeler.  That's what we called him.

6      Q    Did he add those names as time went on?

7      A    Yes, as – as time went on each one of those sort of

8  added on.

9      Q    Well-earned nicknames?

10     A    Yeah.  Oh, yeah.  Yeah.  He – he was a very – as is

11 typical, 6 year-old boys are passionate and – and sometimes

12 a loud kid.  One night at the dinner table - if I could tell

13 this story - one night at the dinner table he was just

14 behaving terribly.  I mean, you know, holding the fork by

15 the wrong side and doing these – just being obnoxious and

16 loud and I had had enough.  And I – I picked him up from the

17 table and I – and I – at the end of a long day – and I was

18 holding him – I picked him up like this and I was holding

19 him like this and I was gonna take him up the stairs and sit

20 him down on his bed and have a conversation about how we

21 behave at the dinner table.

22      You know, another conversation about that.  And so,

23 I'm taking him up the stairs and I've got him like this and

24 half-way up the stairs he bites me, right here he bit me.

25 And I – I sat him down on his bed and I said sweetheart, I

26 said you can't bite people.  You – you - you know, you can

27 tell me that you're angry, you can tell me how frustrated

 1  you are, but you – you just can't bite people.  And he

 2  looked at me and he said but dad I had to bite something.

 3  And, I mean, it's weird but now I'm, you know, kind of glad

 4  he did.  I have this scar.

 5      Q   And Ben had a – Ben – let's show a picture.   Could

 6  we show a picture of Ben?

 7      A   Sure.

 8      Q   Let's show a picture of Ben.  We'll show a picture of

 9  Ben.

10              ATTY. MATTEI:  No, Brendan that's –

11              THE COURT:  This is just Exhibit?

12              THE CLERK:  Three sixteen, Your Honor, and it is

13          a full exhibit.

14              ATTY. KOSKOFF:  Thank you.

15              THE COURT:  Thank you.

16              ATTY. PATTIS:  Agreed.

17  BY ATTY. KOSKOFF:

18      Q   So this little – he kind of looks like a biter there.

19              ATTY. PATTIS:  Objection, Judge.

20              THE WITNESS:  Ben –

21              THE COURT:  Sustained.

22              THE WITNESS:  - never lost a tooth.  And he – he

23          really hated the fact that he was already 6 and

24          hadn't lost any teeth.  His friends were all losing

25          teeth and he hadn't lost a tooth yet.

26  BY ATTY. KOSKOFF:

27      Q   And never did.

1    A    No.

2    Q    And – and did – we're showing this picture and we'll

3  take it down in a second, but can you just tell the jury

4  about when this picture was taken?

5    A    Spring of 2012, yeah, spring of 2012.  So he was 5

6  there, his birthday was in – no, he was – I'm sorry.  His

7  birthday was in September, so he was 6 at that point.

8    Q    And Ben – Ben and his older brother, Nate, what was

9  their relationship like?

10    A    They were best friends.  And, you know, they

11  squabbled the way young brothers do, but they were very,

12  very, very close.  And – yeah, real close.

13    Q    Now, I just want to ask you about just the last – the

14  last time you saw Ben was when?

15    A    Well, the last time I saw him alive was the morning

16  of December 17th – or fourth – I'm sorry, December 14th,

17  2012.  And – but the last time I saw him was the following

18  Monday.

19    Q    Were you in court, David, when Bill Aldenberg

20  testified about his observations as a witness at Sandy

21  Hook –

22    A    Yes.

23    Q    – on December 14th, 2012?

24    A    Yes.

25    Q    And when Carlrr Soto Parisi gave her account?

26    A    Yes.

27    Q    And is it hard – I mean, I imagine it's hard to put

1  into words perfectly what happened, but is it – if it's okay

2  with you – well, let me ask you, did they do – did their

3  testimony strike you as being a – reasonably reflective of

4  the scene at Sandy Hook on that day?

5          ATTY. PATTIS:  Objection, Judge.  Commenting on

6      the testimony of another.

7          ATTY. KOSKOFF:  Well, I – I'm at this – I'm

8      using it as a predicate 'cause if – if that's the

9      case, we don't – I don't want to have to go through

10     with it.

11         THE COURT:  You're objecting?

12         ATTY. PATTIS:  Same objection.

13         THE COURT:  Sustained.

14 BY ATTY. KOSKOFF:

15   Q   Do you have anything to – that –

16         ATTY. KOSKOFF:  Well, withdrawn.

17 BY ATTY. KOSKOFF:

18   Q   If it's okay with you, I – I – I mean no disrespect,

19 but I'm going to skip your experience on that day.

20   A   Okay.

21   Q   But I do want to ask you some questions about what

22 happened after the shooting.

23   A   Mm-hmm.

24   Q   And it – in – in – in the weeks – in the week after

25 the shooting, were you out in the public much or –

26   A   No.

27   Q   – what was going –

1    A    No.  No.

2    Q    - on in your house?

3    A    No.  No.  We immediately hunkered down and stayed

4  home.  Friends and family started showing up right away.

5  And we were very lucky that a close friend of ours showed up

6  very soon after – perhaps even the next day and just took

7  charge of everything.  She just literally showed up with a

8  clipboard and a laptop and took over and it was – it was a

9  real blessing.  I don't know how – what we would have done

10 without her.

11   Q    And did there - did there – when – did there come a

12 time when you learned that your family, your experience,

13 Ben's existence, your credibility, Francine's credibility

14 was being smeared in some manner?

15   A    Yeah.  We had put ourselves in a kind of a bubble and

16 we weren't watching the news, we were staying way - away

17 from the TV and this friend of ours, who was helping us,

18 took us aside.  I believe it was about a week or so

19 afterwards and sat us down and said listen, there's this guy

20 saying these things and other people are saying them too and

21 this is what's happening and you need to know before you

22 find out in some other way.  And she told us what was - what

23 was going on and what people were saying and what – she told

24 us about Alex Jones and she told us what he was saying.

25   Q    And what was your understanding, at least at that

26 time, at – we saw – we saw – that you were in court we saw

27 videos that this was repeated over the course of years.

1    A    Yeah.  Oh, yeah.

2    Q    But at that time what was being said, what were you

3    made aware of was being said about the Sandy Hook

4    experience?

5    A    You know, the – the – the first thing I remember

6    hearing was that he was saying it was a hoax.  And that that

7    was being repeated by others.

8    Q    And this was through – you – you learned this through

9    your protective friend –

10    A    Yes.

11    Q    – so to speak?

12    A    Yes.  That's right.

13    Q    And did your friend make you aware of any specific

14    instances in terms of your –

15    A    In –

16    Q    – your family –

17    A    – well, not – not at that moment.  Not at that

18    moment.  But, you know, that came shortly thereafter.

19    Q    Okay.  So, you learned this about a week after.

20    You're in this club hall –

21    A    Right.

22    Q    – and this is the first time you learn this.  And can

23    you just give the jury a – a sense as to what that made you

24    feel like – or what you were thinking when you heard that?

25    A    Well, the – it – after the shock of – of Ben's

26    murder, where we were – I mean the best way to describe it

27    was we were like – I felt like I was under water and I

1  didn't know – I didn't know which way was up.  And so,

2  you're – you're grasping with that, you're trying to get

3  your head around that and to have someone publicly tell

4  you – to – telling the world that it didn't happen and that

5  you – you're a fraud and a phony is in – incredibly

6  disorienting.  It's like you're already fighting and I could

7  not understand why in the world why anyone would think this.

8  I – I – I couldn't figure it out.

9    Q   Did you – did there come a time when you came out of

10  the bubble enough to look into this or –

11    A   Right.  So it – yeah.  I mean, as our ability to

12  interact with the world increased as the days went by.  And

13  the weeks went by and the months went by, I started looking

14  into it a little bit, when people would say hey this and

15  that and the other thing.

16        And so, I started seeing, you know, what was – what

17  was out there on YouTube and what people were posting on

18  social media.  And around that same time or maybe a little

19  bit before that I had been using Facebook fairly early on

20  be – you know, I've lived all over the country and so I've

21  got friends, you know, all over the place.  And Facebook

22  really was the best way for me to let people know what was

23  going on.  And I would write posts about letting them know

24  sort of how we were doing and I – I felt that was kind of a

25  responsibility to let the people that we cared about know

26  that – know where sort of where we were, as we went through

27  this.

1      And it was not long after that, unsolicited messages

2  started coming through, primarily through Facebook.  And

3  people were – you know, accusing me of lying, telling me Ben

4  never lived, telling me that I was gonna burn in hell and

5  that I would pay for what I had done.  And that, you know,

6  that continued for quite a while.

7    Q   And in terms of they said – you got messages that –

8  to the effect that – accusations that Ben didn't live?

9    A   Yes.  Yeah, that it was a hoax that I was a – that I

10  was an actor.  That I was a liar.  I was a fake.

11    Q   They weren't referring to your earlier days?

12    A   No, not that I'm aware of.  No.

13    Q   What's the – can you give us just a – an inkling or

14  sense, as to what it's like to have gone through that and

15  lost Ben in the way you did and then to be told by some – by

16  the public that he didn't live?

17    A   An event like this makes you question everything,

18  you know.  If a kid who was that big of lifeforce in your

19  house could just be gone like that, what else is possible.

20  It makes you question everything.  So, you're already

21  completely off balance, right, and then something like this

22  comes along and people start saying stuff like this and it

23  derails you.  It completely derails you.

24      And I'll say that again it's the best way to describe

25  it, it's – it's completely disorienting.  Like you don't

26  even know – you don't know what's what anymore.  It's awe –

27  it's was – it's awful.

1    Q    And - and has the - has this interrupted your -

2   this - this part of it, this part, this Alex Jones' part of

3   it, has this interrupted your - your work life?

4    A    It - it took awhile before I could go back to work

5   and I was fortunate in that the company that I was working

6   for was very understanding.  And they gave me some time to

7   sort of get myself together before I went back.  But when

8   this really ramped up and a lot of this was going on, it was

9   very hard to be at the office.  It was difficult to

10  concentrate, it was difficult to focus on - on anything.

11       After I had been back at the office for a little

12  while I became aware of two fake Twitter accounts.  I - I

13  didn't use Twitter.  I wasn't on Twitter at the time.  And I

14  became aware - I was made aware of two fake Twitter accounts

15  that were put up in my name and my wife's name.  Using

16  images they'd found on the internet from stuff we had done

17  in the past and these were, you know, very - you know,

18  saying, like, you know, posting stuff like - like, you know,

19  I'm a - I'm a - I'm - I'm the best liar.  I'm an actor, I'm

20  a liar.  I'd - you know, I've fooled every - you know, I got

21  you all fooled and stuff like that.  And - and - and, you

22  know, just it - it was awful.  You know, very sarcastic

23  and - and - and belittling.

24   Q    And do you have any sense, as you sit here today, as

25  to how many millions of tens of millions of people out there

26  believe that you manipulated the situation for some ulterior

27  motive, that it didn't exist, that Ben didn't exist or that

1  you're –

2     A   Well, through the –

3     Q   - part of the hoax?

4     A   - through the course of the events of – of being here

5  in this trial, I've seen the size of the audiences we're

6  talking about.  And I've seen some of those numbers and it –

7  it – you know, at the time I – I – I sort of put it out of

8  my head.  I tried not to think about it too much, but it's –

9  it's – it's quite clear that it was enormous and

10 significant.

11    Q   Did people – did you have people - anybody invading

12 your own private property?

13    A   Yes.  Yes.

14    Q   Can you tell the jury about that?

15    A   Yes.

16    Q   And when.

17    A   So in the days and weeks after – a number of times

18 and – and fortunately both of these situations were dealt

19 with by this friend of ours who was helping us.  Someone

20 came to the house.  She told us that somebody had come to

21 the house, knocked on the door and she opened the door and

22 this person demanded to see Ben.  I know he's here.  I know

23 he's alive.  And she dispatched with that person and another

24 person came to the house in the guise of – of being a

25 reporter, telling her that he was reporter but then saying

26 things that she knew were just – you know, didn't sound

27 right.  And he didn't have any credentials and so, that, you

1    know, she sent him away.

2    Q   And you – you – Ben had an older brother that –

3    Nate – Nate was how old again?

4    A   So Nate was 9 –

5    Q   Okay.

6    A   – when Ben was killed.

7    Q   And so –

8    A   In the fourth grade.

9    Q   – four – you and Francine had to care for Nate and –

10   A   Yeah.

11   Q   – and be parents to Nate.  And – and –

12   A   Yeah.

13   Q   – can you tell us from – in terms of a parent and

14   your point of view, did – how did this Alex Jones part of it

15   effect your relationship with Nate and Nate's – and how –

16   how did you deal with this with Nate, if at all?

17   A   That was really, really hard.  I – I had to sit him

18   down at one point, when this stuff was starting to really

19   get into the news, and people were starting to be aware of

20   it and people were starting to talk about it.  The last

21   thing I wanted was for some kid to say something on the bus

22   or for him to hear it on the playground or something, you

23   know.

24       And so I – we had to sit him down and I had to tell

25   him what was happening.  And – and – and obviously, you

26   know, he said why.  Why would – you know, why – why is this

27   happening and I didn't have an answer. I didn't have an

```
 1   answer.
 2      Q   You couldn't answer his question?
 3      A   I - I couldn't.  I - I didn't know what to tell him.
 4      Q   And did you observe how - and how that had affected
 5   Nate, how did Nate deal with it and what was the impact on
 6   you of that?
 7      A   So Nate -
 8              ATTY. PATTIS:  Compound, Judge.  Relevance -
 9          relevance -
10              THE COURT:  Overruled.
11              ATTY. PATTIS:  - and compound.
12              THE WITNESS:  Nate reacted to this situation
13          by - by - it - he - he wanted to - to remain
14          completely and totally anonymous.  He didn't want
15          anyone knowing who he was.  He didn't want anyone
16          knowing - giving him special treatment for any
17          reason.  He didn't want to be associated with it at
18          all.  And the idea that we were now the focus of some
19          other kind of notoriety or some other kind of
20          spotlight was being put on us was - was difficult for
21          him.
22   BY ATTY. KOSKOFF:
23      Q   So he didn't want to be, you know, singled-out as a
24   result of being the brother of -
25      A   Yes.
26      Q   - of Benjamin at the shooting and -
27      A   That's correct.
```

1    Q   - and he didn't - he didn't want the - he didn't want

2    the people to know - for the - for another reason because of

3    what -

4    A   Right.

5    Q   - was going on with - with Alex Jones?

6    A   Right.  And for years he would ask me why anyone

7    would ever do such a thing.

8    Q   Meaning who -

9    A   Why anyone like Alex Jones would - why Alex Jones

10   would say these things.  Why anyone would say these things.

11   Q   And for you as a parent, how did you absorb that

12   what -

13   A   Well, we had to have conversations about it.  We - we

14   had to sit down and talk about it and I had to - I had to

15   try to explain to him my thoughts of why someone might do

16   this.

17   Q   Now, you - you mentioned your fledgling - am I

18   overstating it, your acting career?

19   A   You might be.

20   Q   You did have some - did you - did you have some

21   student films or - or films as -

22   A   Yeah.  Yeah, I did.  I did.  Years ago I did a

23   student film with a guy who I - I think he was an NYU film

24   student.  That's common fodder for young actors in the city

25   trying to get a leg up their - you know, you get a student

26   film and -

27   Q   The -

1    A   - so I did that, yeah.

2    Q   And a - and did - and so you had some online

3  footprint of some kind?

4    A   Right.  So that film was up on YouTube.

5    Q   Can you tell the jury whether that became used in

6  any -

7    A   Oh -

8    Q   - way?

9    A   - it - yeah, it absolutely did.  I mean, hoaxers

10  grabbed it and - and - and pointed to it as, you know, proof

11  that it was a hoax.  Proof that I was an actor.  The fact

12  that I was in this film - it - implying that everything

13  about me was - was fake and false.  And, you know, it - the

14  guy - and I hadn't talked to him in years, the guy who'd

15  made the film, you know, he - he didn't know what to do.  We

16  didn't know what to do.

17    Q   And - and in what way were these people using the

18  film to make their - the case that -

19    A   Oh, so -

20    Q   - this -

21    A   - they would take it and - and cut it up and edit it

22  and - and post it as parts of other videos, as proof that I

23  wasn't a real person and that I didn't have a family and

24  that I didn't have a son.

25    Q   What was that like for you?

26    A   It's - it's very distressing and it's - you know,

27  it - it kind of makes you second-guess everything.

1    Q    What do you mean by that?

2    A    Well, you - you, you know, I'd wrack my brain about

3    what else is out there that someone would get a hand - a

4    hold of and try to use in some way like this.  And - and -

5    and it was demeaning.  It felt like, you know, I - I mean,

6    it - it felt like being - being delegitimized in a way.

7    Like, being, you know, basically being - people - you know,

8    it makes you feel like you don't matter.  You know, it makes

9    you feel like what you went through doesn't matter.

10    Q    Now, acting made - you may not have been the most

11    successful actor ever, but do you consider acting - your

12    acting past as part of your identity?

13    A    Sure.  Sure, I mean I spent 20 years trying to do it,

14    you know.  And so to - to have that used as - and it's hard,

15    it's really hard.  It's not an easy thing to do.  So to have

16    that used as - as some sort of ammunition against me and as

17    a person is - is really awful.

18    Q    And did there come a time - we - oh, you were here

19    when - when Bill Aldenberg testified -

20    A    Yes.

21    Q    - too.

22    A    Yes, I was.

23    Q    And Bill, I believe - I - I - if I recall correctly,

24    actually apologized to you, but - can you tell us did there

25    come a time when you became aware of some part of this whole

26    Alex Jones piece that -

27    A    Right.

1    Q   - had you - go - go ahead and tell -

2    A   Right.

3    Q   - the jury -

4    A   So -

5    Q   - what happened.

6    A   - so after awhile I'd been, you know, sort of looking

7    to see what was out there and what people were saying and I

8    came across this thing that - the idea that - that people

9    were posting that Bill Aldenberg and I were the same person.

10   That I played two parts in the tragedy.  That I was playing

11   the grieving dad and playing the FBI agent and that we were

12   actually the same person.  And - you know, it - and it's

13   insane.  It's just absolutely insane.

14   Q   Did you know Bill Aldenberg?

15   A   No.  No.

16   Q   When was the first time you met Bill Aldenberg?

17   A   I first met Bill summer before last.  He emailed me

18   and asked me if we could have coffee.  And I invited him

19   to - I invited him to our house and -

20   Q   Are you talking about 20 21?

21   A   Yeah.  Yeah.

22   Q   That's the first time you met.

23   A   I - I believe - I believe it was -

24   Q   I'm just trying to establish that.

25   A   - I believe it was, yeah.

26   Q   Okay.

27   A   I believe it was.

1    Q    Okay.  Sorry for interrupting you.

2    A    It certainly – yeah, I believe it was the summer

3  before last.  Summer of 20 21.  And – and so, I invited him

4  to the house and we sat outside and talked.

5    Q    Can you tell the jury about what you observed about

6  Bill's – about that discussion, what you observed about your

7  own –

8    A    Right.  It was a hard conversation for both of us.

9  But it was – it was very hard for Bill because it became

10  very clear to me, almost immediately, that he felt a

11  tremendous amount of responsibility for what had happened to

12  me because of what happen – of what he went through that

13  morning.  And it became clear to me that he had come to

14  apologize, which was, of course, ridiculous.  He had no

15  reason to apologize.  I had – there's nothing that he did

16  that would merit any kind of an apology to me.  But I

17  respect him for doing it, it was not easy for either of us,

18  but I have a lot of respect for Bill.

19    Q    What was – what was he – what was he specifically

20  apologizing for?

21              ATTY. PATTIS:  Objection.  Hearsay.

22              ATTY. KOSKOFF:  But it's all his damages.

23              ATTY. PATTIS:  If that –

24              THE COURT:  Sustained.

25              ATTY. KOSKOFF:  Bill – he's a witness, Bill

26         Aldenberg's damages.

27              ATTY. PATTIS:  That's for Mr. Aldenberg.

1          Objection.  Hearsay.

2              ATTY. KOSKOFF:  Okay.  I'll – well –

3    BY ATTY. KOSKOFF:

4    Q    The – you – you were in court when we played Alex

5    Jones' video, within three hours of the Sandy Hook?

6    A    Yeah.

7    Q    And – and that – is this December 14th that will be –

8    will this be the 10-year anniversary of the Sandy Hook

9    shooting?

10   A    Yes.

11   Q    And will it be the 10-year anniversary of Alex Jones

12   lies about you?

13   A    Yes.

14   Q    And can you tell – can you tell the jury whether this

15   Alex Jones' piece effects your feelings of security to – to

16   this day?

17   A    Yes.

18   Q    Can you explain that to the jury?

19   A    Yes.  When we –

20   Q    And your family's?

21   A    – when we first learned about what people were saying

22   and how they were behaving regarding these theories, this

23   conspiracy stuff, we became very aware of being in large

24   crowds.  We would often make a decision about going

25   somewhere, whether or not we were gonna be with friends or

26   have friends around us or if it was a place where we felt

27   safe or comfortable.  How many people would be there?  There

1   are – were a number of situations for me, personally.

2       I was invited to – around 20 14 I was invited to talk

3   to some college students about my experience and the things

4   that I have learned that I didn't know before the shooting.

5   The things I had learned in the time since.  And so, I

6   started giving a presentation to college students and every

7   time I would be asked, I would make sure that there was a

8   security person, an officer of some kind in the room because

9   I was concerned.

10  Q    And did this concern – did you notice this concern in

11  Francine and – and in –

12  A    Oh, yeah.

13  Q    – in –

14  A    Sure, more so than me.  Yes.

15  Q    Can you just –

16  A    Yeah.

17  Q    – explain that?

18  A    Sure.  She was afraid of being attacked.  She was

19  afraid of being harassed.  And, you know, in the immediate

20  days and weeks after, we would – you know, if we had to go

21  somewhere – all of – we – we all – all of – all of the

22  families had a – a law enforcement officer assigned to them,

23  December 14th in the afternoon.  And we had a Connecticut

24  State Trooper assigned to our family.  And so, when we would

25  go anywhere we would go in his car.  He would drive us.  And

26  he would put his dress uniforms in the windows, so that no

27  one could see in, because we didn't – you know, we were – as

1  performers we - we were already sort of public people in a

2  way.  And so we - we were - you know, making sure that -

3  that opportunity for someone to do something didn't arise

4  where - we tried.

5      Q   And - and you had built a - you said you moved to

6  Newtown in 2007, am I understanding that correctly?

7      A   Yeah, that's right.

8      Q   So you were there for approximately five years?

9      A   Yes.

10     Q   And had you ever felt insecure or unsafe in your own

11  home in Newtown?

12     A   God, no.  No.  No.

13     Q   What - what do you mean?

14     A   No.  I mean, it's - it's - it's a terrific community.

15  I - you know, the first - right after we moved in someone

16  had left a - a phone book.  You know how they used to

17  deliver phone books in plastic bags?  Somebody left a phone

18  book at - at the bottom of the driveway, you know, the way

19  they used to do.  And somehow, I don't know if it was a

20  cigarette flicked out of a window, as a car goes by or

21  something, but I came out one morning and saw this phone

22  book had been left in the driveway and it was burned.  It

23  was all - and this was 2207 or 8 I suppose, very soon after

24  we moved in.  And it was - it had caught fire and I called

25  the - the local police and I was, like, what is this.  You

26  know, I'd just come from Queens.  I was, like, what is this?

27  And - and they said no, no, no.  No, that doesn't happen

1    here.  No.  Not here.

2    Q    And did you ever get to the bottom of it what -

3    A    Never got to the bottom of the burned phonebook but -

4    Q    And so - and had - had you - when you went out into

5    the community in Newtown, did you ever feel any feelings

6    that people were looking at you strange or anything like

7    that, prior to all this -

8    A    No.

9    Q    - Alex Jones?

10   A    No.  No.

11   Q    What's this like - so you - what's it like to have

12   this feeling of - of safety and security taken away, can you

13   tell the jury just in your own words?

14   A    I didn't want to admit it for a long time.  I didn't

15   want these kinds of behaviors.  I didn't want the stuff that

16   was being said about us to change my life, right, I didn't

17   want to give in.  It made me feel like I had lost somehow or

18   something.  So I was stubborn about, you know, getting a

19   home security system, because I didn't want to admit that

20   that was a reality.  And I ended up getting one because I

21   realized that you know, these fears are not unfounded.

22   Q    You were - were you - did you say you were a stand-up

23   comic at one point?

24   A    I never really did - I tried, you know, in - in the

25   context of this variety show that my friend and I had, I

26   tried it once or twice and -

27   Q    Were you heck - you've been heckled before, a time or

1   two?

2      A    I tried to avoid situations where that's – where that

3   might happen but I suppose.

4      Q    Isn't this just a bunch of heckling, can't you just

5   turn the channel, isn't Alex Jones just Dennis the Menace?

6      A    No.  No.  No.

7      Q    Why not?

8      A    This is my life.  This isn't something I'm trying to

9   put over on somebody.

10     Q    Who's Dennis the Menace by the way?

11     A    I – I – a cartoon character, as far as I remember.  I

12   think it was a TV show, too.

13     Q    Is – do you think Alex –

14     A    It's fiction.

15     Q    – do you find Alex Jones to be funny?

16     A    No.

17     Q    Has Alex Jones harmed you and your family?

18     A    Yes.

19     Q    Has he destroyed your name or tried to at least?

20     A    Yeah.

21     Q    But he hasn't, has he?

22     A    No.

23     Q    So what, so if he hasn't destroyed your name –

24     A    Well, it – he – you know, every time he uttered the

25   words crisis actor, I know he was talking about me.  And us,

26   you know.

27     Q    Did you do anything to – ever to Alex Jones to

1    warrant this attack on you?

2      A    No.

3      Q    And these lies about you and –

4      A    Of course –

5      Q    – your family?

6      A    – not.

7      Q    And these lies about Ben?

8      A    No.

9           ATTY. KOSKOFF:  Thank you, very much.  No

10          further questions.

11          THE COURT:  Attorney Pattis.

12   CROSS EXAMINATION BY ATTY. PATTIS:

13     Q    I think it's morning, good morning, Mr. Wheeler.

14     A    Good morning.

15     Q    We met in June on that kind of occasion where a

16   colleague of mine deposed you?

17     A    Yes.

18     Q    It's good to meet you and I'm sorry for your loss.

19     A    Thank you.

20     Q    Prior to your son's murder, had you ever heard the

21   name Alex Jones?

22     A    Yes.

23     Q    How had you heard it?

24     A    Just in the sort of a general awareness of an

25   internet personality.

26     Q    And after the murder of your son, I believe his name

27   was used – do you need something, sir?

1    A    I was looking for a trash can.

2          THE COURT:  It's alright.

3          THE WITNESS:  Sorry.  I'll just leave it there.

4    BY ATTY. PATTIS:

5    Q    And after your son's murder, I - I believe you said a

6    friend of yours who was housesitting - well, had come to

7    care for you in the -

8    A    Yes.

9    Q    - wake of this, mentioned that he was using your - or

10   he was referring to Sandy Hook.  Correct?

11   A    Yes.

12   Q    He - he never - did - are you aware, have you seen

13   any video where he's maimed you or used your name?

14   A    No.

15   Q    Have you seen anything in print, or he names you, or

16   he used your name?

17   A    No.

18   Q    Has - you're aware - are you aware that - and you

19   saw - did you see the - you were in court and saw the video

20   that was posted hours - within - after hours of your son's

21   shooting.  Correct?

22   A    Yes.

23   Q    And had you seen that video before seeing it -

24   A    No.

25   Q    - in court here?

26         Or did you become aware -

27   A    Well, I - I'm sorry, let me - let me correct that.

 1  I – I'm – I may have seen it in the time that I was starting

 2  to research.  I saw a number of his videos in the – in the

 3  recent weeks months following, as I sort of became more able

 4  to take these things in.

 5      Q   Okay.  Did – did you see it before you accompanied

 6  your wife, when she stood in for a – President Obama to give

 7  a weekly address?

 8      A   I don't recall.

 9      Q   You appeared with her –

10          ATTY. KOSKOFF:  Objection.  This is a –

11          THE COURT:  Sustained.

12          ATTY. PATTIS:  May we approach, Judge –

13          THE COURT:  No.

14          ATTY. PATTIS:  – I believe I'm within the scope

15      of your ruling.

16          I – I'd like to be heard.  Briefly, may we

17      approach?

18          THE COURT:  Well, why don't you – why don't

19      you – yes.

20          **(Sidebar begins)**

21          THE COURT:  So, you're asking when – when he –

22          ATTY. PATTIS:  He doesn't know and so –

23          ATTY. KOSKOFF:  (Inaudible) – know.

24          ATTY. PATTIS:  So – the question – and this is

25      the only question –

26          THE COURT:  No.  No.  No.  We've got to stay on

27      the record.

1      ATTY. PATTIS:  I know, but I don't understand –

2      THE COURT:  No, you can't – otherwise we'll have

3   to let the jury –

4      ATTY. PATTIS:  Right.  I know.  Okay.  All

5   right.  He appears with his wife to give a message

6   in – as she gave a message, in lieu of President

7   Obama, to urge the Senate to pass gun control

8   legislation.

9      ATTY. KOSKOFF:  No.

10      ATTY. PATTIS:  And I believe that in –

11      THE COURT:  (Inaudible).

12      ATTY. PATTIS:  She – she appeared – he appeared

13   with her (sic) wife to give a presidential address

14   along – with his wife to urge the Senate to –

15      THE COURT:  Shhhh.

16      ATTY. PATTIS:  – pass gun control legislation.

17   And I think that his attitude towards guns – he saw

18   the video where Alex is talking about our guns, our

19   guns, our guns.

20      ATTY. KOSKOFF:  (Inaudible) –

21      THE COURT:  Then lets –

22      ATTY. KOSKOFF:  – (inaudible).

23      THE COURT:  – let's move – move along and focus

24   on his views on guns and his gun activities.  So, you

25   can ask him about his gun activities and his views –

26      ATTY. PATTIS:  My view – and, Judge, I

27   understand you disagree and I'm trying as an officer

1      of the court to understand the disagreement.  It's a

2      large platform (inaudible) – Obama.  And it mentions

3      about getting into (inaudible) – it's a – it's a one

4      (inaudible) –

5          ATTY. KOSKOFF:  - imperceptible -

6      (indiscernible) –

7          THE COURT:  Did you ask him about the –

8      (indiscernible) – his.

9          ATTY. PATTIS:  Okay.

10          THE COURT:  His.

11          ATTY. PATTIS:  Okay.

12          THE COURT:  So – I – but –

13          ATTY. PATTIS:  If there is –

14          ATTY. KOSKOFF:  (Indiscernible) – even knows

15      it – (indiscernible) –

16          THE COURT:  Right.  If there is.

17          ATTY. PATTIS:  (Indiscernible) – position on

18      guns.

19          THE CLERK:  (Indiscernible) he saw –

20          ATTY. PATTIS:  I think I've laid the foundation

21      for this question.

22          ATTY. KOSKOFF:  Sorry.

23          ATTY. PATTIS:  (Indiscernible) – at some point.

24          ATTY. KOSKOFF:  Yes, at some point.

25          THE COURT:  He – there's no foundation that he

26      (indiscernible) Alex Jones (indiscernible) and we

27      don't know what his position is about guns, we have

1          no idea what his gun –

2               ATTY. PATTIS:  Well, when he stands – he sits

3          next to his wife on national television to ask the

4          Senate to –

5               THE COURT:  But we need to know the politics –

6               ATTY. PATTIS:  No, it's gun control legislation.

7               ATTY. KOSKOFF:  - there's no foundation.

8               ATTY. PATTIS:  You've got to expect –

9               THE COURT:  So, I'll sustain the objection and

10          do it another way.

11               **(Sidebar end)**

12               THE COURT:  All right.  So the objection is

13          sustained.

14   BY ATTY. PATTIS:

15     **Q**   **Did** the Alex Jones –

16               ATTY. PATTIS:  Withdrawn.

17   BY ATTY. PATTIS:

18     Q   Did the shooting of your son at Sandy Hook Elementary

19   School change your view about guns and gun safety –

20               ATTY. KOSKOFF:  Objection.

21               ATTY. PATTIS:  - legislation.

22               ATTY. KOSKOFF:  There's no foundation – it isn't

23          probative.

24               THE COURT:  Well, why don't we first see if he

25          had any views that didn't change.

26   BY ATTY. PATTIS:

27     Q   Did you have views about gun control or gun safety,

1   prior to the Sandy Hook shooting?

2      A    No.

3      Q    Did the shooting change your –

4              ATTY. KOSKOFF:  Objection.  There's no

5          foundation that – that – that David Wheeler has any

6          understanding laid – excuse me, let me rephrase.

7              No foundation established.  David Wheeler no –

8          knows or knew about Mr. Jones' position on guns.

9          That has to be laid –

10             THE COURT:  I agree.  So –

11  BY ATTY. PATTIS:

12     Q    Sir, you were sitting in Court that – throughout the

13  trial.  Correct?

14     A    Yes.

15             ATTY. KOSKOFF:  Objection.

16  BY ATTY. PATTIS:

17     Q    You've seen the video –

18             THE COURT:  Overruled.

19  BY ATTY. PATTIS:

20     Q    – of Mr. Jones saying they're coming for our guns

21  within hours of your son's shooting.

22     A    Yes.

23     Q    Correct?

24     A    Yes.

25             ATTY. KOSKOFF:  Objection.  He hasn't

26          established when Mister –

27             THE COURT:  So right –

1          ATTY. KOSKOFF:  - Wheeler first -

2          THE COURT:  - now we know that during the trial

3      he saw that video.  So that -

4    BY ATTY. PATTIS:

5      Q   You saw the video before this trial.  Correct?

6      A   I may have.  I honestly don't recall.

7      Q   At any point, did you become aware that Alex Jones

8    believed that the Sandy Hook shooting was a pretext for

9    coming after the guns of the American -

10          ATTY. KOSKOFF:  Objection.

11          THE COURT:  Overruled.

12          ATTY. KOSKOFF:  So -

13    BY ATTY. PATTIS:

14      Q   When did you become aware of it?

15      A   I - I couldn't honestly tell you, I don't remember

16    exactly.  At some point, when I started becoming aware of

17    what was being said and what he was saying it became clear

18    that that was part of this presentation of his.

19      Q   And you say at some point, would that have been in

20    weeks after your son's shooting, while you were emerging

21    from this fog?

22      A   More or - yes, generally speaking, at some point I

23    would say within probably two to three months, the outside.

24      Q   You accompanied your wife to give a national - when

25    she gave the national address -

26          ATTY. KOSKOFF:  Objection.

27          ATTY. PATTIS:  - on April -

1          THE COURT:  Sustained.

2          ATTY. KOSKOFF:  Excuse me, Your Honor, I –

3          THE COURT:  So – so this question I –

4          ATTY. KOSKOFF:  – can I request argument outside

5     the presence of the jury.

6          ATTY. PATTIS:  That would be a good idea.

7          THE COURT:  All right.  So we'll – just bear

8     with us.  You'll put your notebooks down.  Let me

9     just see what time it is – you know, this is actually

10    a good time for the morning recess anyway.  We're

11    just approaching it, so we'll give you a 20-minute

12    recess.  And we will stay on the record to address

13    this issues.  All right.

14          Mr. Ferraro.

15          (Jury exits)

16          THE COURT:  Shall we excuse the witness?

17          ATTY. PATTIS:  Oh, he's –

18          THE COURT:  Please –

19          ATTY. PATTIS:  – the plaintiff, I'm not sure we

20    can.

21          THE COURT:  Please be seated.

22          Or we don't need to.

23          ATTY. PATTIS:  I don't think we can excuse him

24    from the courtroom, he has a right to be here.

25          THE COURT:  We don't need him on the stand.

26          ATTY. KOSKOFF:  Mister – David, you can step

27    down.

1          THE COURT:  I didn't know if there was going to

2     be an offer of proof or something.

3          ATTY. KOSKOFF:  Are we moving into – are we

4     taking a break, Judge?

5          THE COURT:  After this.  But now we're on the

6     records and we're going to deal with this issue.

7          ATTY. KOSKOFF:  So there –

8          THE COURT:  So I'm – just so I'm – so – so

9     there's a foundation now that at some point, within

10    two to three months after the shooting, the witness

11    became aware of Mr. Jones' –

12         ATTY. KOSKOFF:  Well –

13         THE COURT:  – platform –

14         ATTY. KOSKOFF:  – so that's the – so – so as the

15    Court – the record is clear, the Court denied our

16    request to preclude this type of – eliciting this

17    testimony of the individual plaintiffs' position on

18    guns, before the shooting, after the shooting,

19    anytime, as not being –

20         THE COURT:  I don't want to hear –

21         ATTY. KOSKOFF:  – relevant to damages.

22         THE COURT:  – re-argument of that.

23         ATTY. KOSKOFF:  So but to –

24         THE COURT:  Tell me what your issue is.

25         ATTY. KOSKOFF:  – to – right.  And I think – I

26    believe I understand the Court's position is that it

27    has some relevance to damages – the owners have

1     relevance in that way of thinking.  There has to be a
2     foundation that each of – for each individual
3     plaintiff that they are even aware of Mr. Jones'
4     position on gun control.
5          THE COURT:  I agree with you.  I think that –
6          ATTY. KOSKOFF:  And it has –
7          THE COURT:  – he's – he's lain –
8          ATTY. KOSKOFF:  – it has to be specific.
9          THE COURT:  – he's lain the foundation but we're
10    having a lot of objections.
11         ATTY. KOSKOFF:  I –
12         THE COURT:  So there's testimony now that this
13    witness became aware of Mr. Jones' platforms on guns,
14    didn't say that he knew what it was, just that he
15    became aware.  I –
16         ATTY. KOSKOFF:  It needs to –
17         THE COURT:  – suppose –
18         ATTY. KOSKOFF:  – be specifically established
19    foundation or there's no – there's no – absolutely no
20    probative of value or relevance to this claim of – of
21    bias or motive.  And that's just the fundamental –
22         THE COURT:  Well, I don't disagree with you,
23    Attorney Koskoff.  So he became aware that Mr. Jones
24    had a –
25         ATTY. KOSKOFF:  But –
26         THE COURT:  – platform on guns.  We don't have
27    any evidence yet of what it is that he was aware of.

1          Attorney Pattis.

2          ATTY. PATTIS:  I – I – I disagree with you in

3     part.  And –

4          ATTY. KOSKOFF:  That he –

5          ATTY. PATTIS:  – may not recall –

6          THE COURT:  No, I – so –

7          ATTY. PATTIS:  He became aware, saw video here,

8     he doesn't recall when he first saw it.  Did you

9     become aware at some point that Mr. Jones had a

10    position on firearms, yes, when did you become aware

11    of –

12         THE COURT:  You know, I'm going to – I'm going

13    to place this back because I – I think it's –

14         ATTY. PATTIS:  That's helpful.

15         THE COURT:  – important enough.  So why don't we

16    hold off all – I'll ask the monitor to get to that

17    point.

18         So I think where Attorney Pattis started talking

19    about prior to the Sandy Hook shooting what was your

20    position, did you have a position, let's start from

21    there.

22         **(Playback occurs)**

23  BY ATTY. PATTIS:

24    Q    – accompanied your wife when she stood in for

25  a – President Obama to give a weekly address?

26    A    I don't recall.

27    Q    You appeared with her –

1          ATTY. KOSKOFF:  Objection.

2          **(Playback stops)**

3          ATTY. KOSKOFF:  Could we play the question

4      before that, Judge.

5          **(Playback occurs)**

6  BY ATTY. PATTIS:

7    Q   Has – you're aware – are you aware that – and you

8  saw – did you see the – you were in court and saw the video

9  that was posted hours – within – after hours of your son's

10  shooting.  Correct?

11    A   Yes.

12          **(Playback stops)**

13          THE COURT:  Before – before that.

14          **(Playback begins)**

15  BY ATTY. PATTIS:

16    Q   Had - and had you seen that video before seeing it –

17    A   No.

18    Q   - in court here?

19          (Playback stops and reoccurs)

20  BY ATTY. PATTIS:

21    Q   - to meet you and I'm sorry for your loss.

22    A   Thank you.

23    Q   Prior to your son's murder, had you ever heard the

24  name Alex Jones?

25    A   Yes.

26    Q   How had you heard it?

27    A   Just in the sort of a general awareness of an

1  internet personality.

2  Q   And after the murder of your son, I believe his name

3  was used - do you need something, sir?

4  A   I was looking for a trash can.

5             THE COURT:  It's alright.

6             THE WITNESS:  Sorry.  I'll just leave it there.

7  BY ATTY. PATTIS:

8  Q   And after your son's murder, I - I believe you said a

9  friend of yours who was housesitting - well, had come to

10  care for you in the -

11  A   Yes.

12  Q   - wake of this, mentioned that he was using your - or

13  he was referring to Sandy Hook.  Correct?

14  A   Yes.

15  Q   He - he never - did - are you aware, have you seen

16  any video where he's maimed you or used your name?

17  A   No.

18  Q   Have you seen anything in print, or he names you, or

19  he used your name?

20  A   No.

21  Q   Has - you're aware - are you aware that - and you

22  saw - did you see the - you were in court and saw the video

23  that was posted hours - within - after hours of your son's

24  shooting.  Correct?

25  A   Yes.

26  Q   And had you seen that video before seeing it -

27  A   No.

1    Q   - in court here?

2        Or did you become aware –

3    A   Well, I – I'm sorry, let me – let me correct that.

4  I – I'm – I may have seen it in the time that I was starting

5  to research.  I saw a number of his videos in the – in the

6  recent weeks months following, as I sort of became more able

7  to take these things in.

8    Q   Okay.  Did – did you see it before you accompanied

9  your wife, when she stood in for a – President Obama to give

10 a weekly address?

11   A   I don't recall.

12   Q   You appeared with her –

13          ATTY. KOSKOFF:  Objection.  This is a –

14          THE COURT:  Sustained.

15          ATTY. PATTIS:  May we approach, Judge –

16          THE COURT:  No.

17          ATTY. PATTIS:  – I believe I'm within the scope

18       of your ruling.

19          I – I'd like to be heard.  Briefly, may we

20       approach?

21          THE COURT:  Well, why don't you – why don't

22       you – yes.

23          **(Playback stops)**

24          (Court confers with staff)

25          **(Playback begins)**

26          THE COURT:  All right.  So the objection is

27       sustained.

```
1   BY ATTY. PATTIS:

2     Q    Did the Alex Jones –

3            ATTY. PATTIS:  Withdrawn.

4   BY ATTY. PATTIS:

5     Q    Did the shooting of your son at Sandy Hook Elementary

6   School change your view about guns and gun safety –

7            ATTY. KOSKOFF:  Objection.

8            ATTY. PATTIS:  - legislation.

9            ATTY. KOSKOFF:  There's no foundation – it isn't

10           probative.

11           THE COURT:  Well, why don't we first see if he

12           had any views that didn't change.

13  BY ATTY. PATTIS:

14    Q    Did you have views about gun control or gun safety,

15  prior to the Sandy Hook shooting?

16    A    No.

17    Q    Did the shooting change your –

18           ATTY. KOSKOFF:  Objection.  There's no

19           foundation that – that – that David Wheeler has any

20           understanding laid – excuse me, let me rephrase.

21           No foundation established.  David Wheeler no –

22           knows or knew about Mr. Jones' position on guns.

23           That has to be laid –

24           THE COURT:  I agree.  So –

25  BY ATTY. PATTIS:

26    Q    Sir, you were sitting in Court that – throughout the

27  trial.  Correct?
```

1      A    Yes.

2             ATTY. KOSKOFF:  Objection.

3   BY ATTY. PATTIS:

4      Q    You've seen the video -

5             THE COURT:  Overruled.

6   BY ATTY. PATTIS:

7      Q    - of Mr. Jones saying they're coming for our guns

8   within hours of your son's shooting.

9      A    Yes.

10     Q    Correct?

11     A    Yes.

12            ATTY. KOSKOFF:  Objection.  He hasn't

13        established when Mister -

14            THE COURT:  So right –

15            ATTY. KOSKOFF:  - Wheeler first –

16            THE COURT:  - now we know that during the trial

17        he saw that video.  So that –

18   BY ATTY. PATTIS:

19     Q    You saw the video before this trial.  Correct?

20     A    I may have.  I honestly don't recall.

21     Q    At any point, did you become aware that Alex Jones

22   believed that the Sandy Hook shooting was a pretext for

23   coming after the guns of the American –

24            ATTY. KOSKOFF:  Objection.

25            THE COURT:  Overruled.

26            ATTY. KOSKOFF:  So -

27   BY ATTY. PATTIS:

1    Q    When did you become aware of it?

2    A    I – I couldn't honestly tell you, I don't remember

3  exactly.  At some point, when I started becoming aware of

4  what was being said and what he was saying it became clear

5  that that was part of this presentation of his.

6    Q    And you say at some point, would that have been in

7  weeks after your son's shooting, while you were emerging

8  from this fog?

9    A    More or – yes, generally speaking at some point I

10  would say within probably two to three months, the outside.

11    Q    You accompanied your wife to give a national – when

12  she gave the national address –

13            ATTY. KOSKOFF:  Objection.

14            ATTY. PATTIS:  – on April –

15            THE COURT:  Sustained.

16            ATTY. KOSKOFF:  Excuse me, Your Honor, I –

17            THE COURT:  So – so this question I –

18            ATTY. KOSKOFF:  – can I request argument outside

19        the presence of the jury.

20            ATTY. PATTIS:  That would be a good idea.

21            THE COURT:  All right.  So we'll – just bear

22        with us.  You'll put your notebooks down.  Let me

23        just see what time it is – you know, this is actually

24        a good time for the morning recess anyway.  We're

25        just approaching it, so we'll give you a 20-minute

26        recess.  And we will stay on the record –

27            **(Playback ends)**

1          (Court confers with staff)

2          ATTY. PATTIS:  He a come – I believe I have –

3          THE COURT:  Yes.

4          ATTY. PATTIS:  - laid the foundation to ask the

5     following question.  On – on April 13th – or in April

6     2013, did you accompany your wife, sit alongside her

7     as she gave a national address urging the Senate to

8     pass gun control legislation.  I believe I've laid

9     the foundation, it showed he became aware of

10    Mr. Jones' position at two to three months, at the

11    outside, after his son's death otherwise no later

12    than March 31st and this is within weeks of that.

13         So, I believe I have laid the foundation and

14    that's the only question I intend asking this family

15    at this point.

16         ATTY. KOSKOFF:  There's no only question

17    exception to the proper question.

18         ATTY. PATTIS:  That wasn't the –

19         ATTY. KOSKOFF:  There was no –

20         ATTY. PATTIS:  - basis –

21         ATTY. KOSKOFF:  - no –

22         THE COURT:  No colloquy, please.

23         ATTY. KOSKOFF:  - there's no, Judge – there's

24    absolutely been no foundation laid as to what Alex –

25    that David Wheeler, this gentleman understood and

26    knew, what Alex Jones' position was on guns.  What he

27    had heard –

1          THE COURT:  I agree.  I think you have to lay a

2      better foundation.

3          ATTY. PATTIS:  Okay.  I could do it.

4          THE COURT:  Okay.  So, we will take our 15-

5      minute recess.  What time will that put us at, Ron.

6          (Court confers with staff)

7          THE COURT:  Well, we'll –

8          THE MARSHAL:  All rise.

9          THE COURT:  – return at –

10         ATTY. PATTIS:  Judge, can –

11         THE COURT:  – 11:45.

12         ATTY. PATTIS:  – can I – may I ask the court

13     reporter to mark the portion of the transcript where

14     he said that he became aware of Mr. Jones' position

15     two or three – within an outside of two or three

16     months.

17         THE COURT:  We could do that.

18         ATTY. PATTIS:  I may replay that to him for –

19     for impeachment.

20         ATTY. KOSKOFF:  I didn't hear that.

21         ATTY. PATTIS:  I'm asking that that portion of

22     the transcript, where he said he became aware of the

23     position of Mr. Jones in thinking that gun – taking

24     guns away was part of the whole Sandy Hook thing at

25     the outside within two or three months after his

26     son's death.  I'm asking that that be marked.

27         THE COURT:  For what purpose.

```
 1          ATTY. PATTIS:  If I get testimony at variance

 2      with that.  I don't know what's going to happen

 3      during the break, but it's my contention that the

 4      foundation is currently adequate.  I suspect he may

 5      or may not be prepared to testify and if it's a

 6      variance of that I'll impeach him with what he said

 7      10 minutes ago.

 8          ATTY. KOSKOFF:  This – no the foundation's has

 9      just been ruled to be –

10          THE COURT:  We'll take a recess.

11
```

```
X06-UWY-CV18-6046436-S          :  SUPERIOR COURT

ERICA LAFFERTY                  :  COMPLEX LITIGATION DOCKET

v.                              :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES               :  SEPTEMBER 21, 2022
----------------------------------------------------------------
X06-UWY-CV18-6046437-S          :  SUPERIOR COURT

WILLIAM SHERLACH                :  COMPLEX LITIGATION DOCKET

v.                              :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES               :  SEPTEMBER 21, 2022
----------------------------------------------------------------
X06-UWY-CV18-6046438-S          :  SUPERIOR COURT

WILLIAM SHERLACH                :  COMPLEX LITIGATION DOCKET

v.                              :  AT WATERBURY, CONNECTICUT

ALEX EMERIC JONES               :  SEPTEMBER 21,2022
```

E L E C T R O N I C

C E R T I F I C A T I O N


I hereby certify the electronic version is a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 21st day of September.


Dated this 22nd day of September, 2022 in Waterbury, Connecticut.


*Peggy DiVito*
Peggy DiVito
Court Recording Monitor