# EXHIBIT 78

```
1   X06-UWY-CV18-6046436-S :  SUPERIOR COURT

2   ERICA LAFFERTY         :  COMPLEX LITIGATION DOCKET

3   v                      :  AT WATERBURY, CONNECTICUT

4   ALEX EMERIC JONES       :  SEPTEMBER 22, 2022
    .......................................................
5   X06-UWY-CV18-6046437-S :  SUPERIOR COURT

6   WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

7   v                      :  AT WATERBURY, CONNECTICUT

8   ALEX EMERIC JONES       :  SEPTEMBER 22, 2022
    .......................................................
9   X06-UWY-CV18-6046438-S :  SUPERIOR COURT

10  WILLIAM SHERLACH        :  COMPLEX LITIGATION DOCKET

11  v                      :  AT WATERBURY, CONNECTICUT

12  ALEX EMERIC JONES       :  SEPTEMBER 22, 2022

13        BEFORE THE HONORABLE BARBARA BELLIS, JUDGE AND JURY

14  VOLUME III OF IV
    WITNESS:  ALEX JONES CONTINUED DIRECT EXAMINATION 2:00 UNTIL
15  P.M RECESS

16  A P P E A R A N C E S:

17

    Representing the Plaintiffs:
18      ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
19      ATTORNEY JOSHUA KOSKOFF
        ATTORNEY MATTHEW BLUMENTHAL
20

21
    Representing the Defendant:
22      ATTORNEY NORMAN PATTIS
        ATTORNEY ZACHARY REILAND
23
                             RECORDED BY:
24                           KENDYL HENAGHAN
                             TRANSCRIBED BY:
25                           LINDA COON, RPR
                             Court Monitor/Court Reporter
26                           400 Grand Street
                             Waterbury, CT   06702
27
```

```
 1                    (2:00 IN SESSION)
 2              THE COURT:  Good afternoon, marshal.  Good
 3         afternoon, everyone.
 4              ATTY. STERLING:  Good afternoon, Your Honor.
 5              ATTY. MATTEI:  Good afternoon.
 6              ATTY. PATTIS:  Good afternoon.
 7              THE COURT:  Please be seated.
 8              Are we ready for the jury?
 9              Okay.  Mr. Jones, do you want to resume the
10         stand, sir?
11              Mr. Ferraro refilled your water pitcher, sir.
12         You should be all set.
13              MR. JONES:  Thank you.
14              THE COURT:  You're welcome.
15              (JURY ENTERS)
16              THE COURT:  Hello.  Hello.  Welcome back from
17         the lunch break.  Good afternoon, everyone.
18              Please be seated.   When you find your seats.
19         Assigned seats.
20              Counsel will stipulate that the entire panel
21         has returned?
22              ATTY. PATTIS:  Yes.
23              ATTY. MATTEI:  Yes, Your Honor.
24              THE COURT:  Please be seated.
25              Make yourself comfortable, Mr. Jones.
26         We'll let Mr. Ferraro hand out the notepads.
27              Thank you, Mr. Ferraro.
```

1          Whenever you are ready, Attorney Mattei, you

2     may continue.

1   ALEX EMRIC JONES,

2   CONTINUED DIRECT EXAMINATIN BY ATTY. MATTEI:

3       Q   Mr. Jones, do you remember before the break I showed

4   a video of your deposition?

5       A   Yes.

6       Q   All right.  And in that video, what you were

7   acknowledging, is that your claims that the parents were

8   actors; do you remember that?

9       A   No it was a hypothetical about the Potemkin village.

10      Q   That's what you think that was?

11              ATTY. MATTEI:  Let's play it again.  Can you

12          pull up, please, that clip?

13              THE COURT:  And that is an exhibit?

14      Q   I want you to watch carefully, Mr. Jones.

15              THE COURT:  What exhibit is that?

16              ATTY. PATTIS:  372, Judge.

17              THE COURT:  Thank you.

18              (VIDEO PLAYED).

19              (VIDEO STOPPED).

20              ATTY. MATTEI:  Did you lose it?  Take your time.

21          Take your time.

22              (VIDEO PLAYED)

23              ATTY. MATTEI:  Continue.

24              (VIDEO PLAYED)

25      Q   That was your testimony, sir?

26              (VIDEO PLAYED)

27      A   (INDISCERNIBLE).

```
1      Q    That's your testimony, right, Mr. Jones?  That's a
2  yes or no question.
3      A    It's highly edited.  No, that's not my testimony.
4  And so --(INDISCERNIBLE) why can't you just play it --
5      Q    Is that you speaking?
6           ATTY. PATTIS:  Objection.  Mr. Jones was not
7      witness.
8           THE COURT:  Sustained.
9      A    But it's, I mean, I --
10          THE COURT:  No. No. No. Just wait until the next
11     question.
12     A    I mean, I said in the interview I thought it
13 happened.  It's edited.
14          THE COURT:  Mr. Jones.  Mr. Jones. Mr. Jones.
15          THE WITNESS:  Yes.
16          THE COURT:  I said several times to stop --
17          THE WITNESS:  Okay.
18          THE COURT -- and you didn't stop.
19          THE WITNESS:  He's just airing the end of the
20     tape.
21          THE COURT:  And you don't -- you don't want him
22     to become unpleasant.  So, just, when I tell you to
23     stop, you need to stop.
24          THE WITNESS:  Okay.
25     Q    This was your deposition testimony, was it not, that
26 I just played?
27     A    Yes.  Clips of it.
```

1    Q   And you -- and you acknowledge during your deposition

2    that you had said that the parents were clearly actors,

3    quote, clearly actors; correct?

4    A   No.  I said it looked like Robbie Parker was acting.

5    Q   Mr. Jones, are you aware having watched some of this

6    trial that this jury has actually seen a lot of your videos

7    already?

8    A   I watched all the trial.

9    Q   Sir.  Please just, if can you answer my question.

10   Are you aware, having watched some of the trial, that this

11   jury has already seen a lot of the videos that you made

12   about Sandy Hook?

13   A   Yes.

14           ATTY. PATTIS:  Objection.  Improper.

15   Q   And do you know --

16           THE COURT:  Sustained.

17           ATTY. PATTIS:  Move to strike.

18           THE COURT:  So ordered.

19   Q   Mr. Jones, did you watch the parts of the trial where

20   I showed a video of you saying -- a video of you saying the

21   parents were clearly actors?  Did you watch that part?

22   A   I don't remember.

23   Q   Okay.  You are not telling this jury that you never

24   said they were clearly actors; are you?

25   A   No.  There had been a point in time where I believed

26   it probably was a hoax.  It was all the stuff surrounding

27   it.

```
 1              ATTY. MATTEI:  Judge, I just move to strike
 2         that.
 3              ATTY. PATTIS:  I think it's responsive.
 4              THE COURT:  I'm going to strike it.
 5    Q    So, let's see if we can do this again.
 6              You're not telling this jury that you never
 7    said they were clearly actors; right?
 8    A    No, I'm not telling the jury --
 9    Q    You acknowledge you said that?
10    A    I said something might have been --  it looked like
11    some might have been, yes.
12    Q    And we just -- and we just saw you say, when I asked
13    you what you meant by a cutout, and you acknowledged that
14    you meant that it was just a set on which this fake hoax
15    could play out; right?  Do you see that testimony there?
16    A    Yes.  You are asking a hypothetical of what it is,
17    yes.
18              ATTY. MATTEI:  Move to strike, Your Honor.
19              THE COURT:  So ordered.
20    Q    So, when you called --
21              Let's do it this way.  You acknowledged that
22    among the things that you said about Sandy Hook, was that it
23    was fake; yes?
24    A    Yes.
25    Q    Synthetic?
26    A    Yes.
27    Q    Manufactured?
```

```
 1      A    Yes.

 2      Q    With actors?

 3      A    Yes.

 4      Q    Total hoax?

 5      A    Yes.

 6      Q    You acknowledge that repeatedly you mocked parents by

 7 saying that they had done the fake -- the laughing and then

 8 the fake crying; right?

 9      A    No, not parents.  I said Robbie Parker.  It looked

10 fake to me.

11      Q    Did you remember the video we just saw earlier in

12 which you said, it's not just one, you have a bunch of

13 parents doing that; do you remember?

14      A    I told you I didn't say their names, so I can't say I

15 said the parents.

16      Q    So, did you remember when we just played the video,

17 not long ago, that I showed you on this very point where you

18 say, it's not just one parent doing this but a bunch of

19 parents.  Did you remember seeing --

20      A    I remember the video.

21      Q     -- a video?

22      A    Yes.

23      Q    That was you in it; right?

24      A    Yes.

25      Q    You chose to say that, nobody made you say that;

26 right?

27      A    Yes.
```

1    Q   Now, Mr. Jones, am I correct that over time there

2    have been many instances in which you have learned that

3    there are members of your audience who have been provoked to

4    violence by --

5             ATTY. PATTIS:  Objection at the form.  Am I

6             correct?  Nobody cares about Mr. Mattei's --

7    A   No.

8             ATTY. PATTIS:  --  opinion.

9    Q   Okay.  I'm not correct about that, that to this

10   day --

11            ATTY. PATTIS:  I --

12   Q   -- you are --

13            THE COURT:  Just one second, Attorney Mattei.

14             If your client is going to speak through your

15            objection, there is nothing I can do about it at this

16            point.

17            ATTY. PATTIS:  Understood.

18            THE COURT:  So, should I remind him again?

19            ATTY. PATTIS:  Yes, please.

20            THE COURT:  So, Mr. Jones, when your attorney

21            objects, just stop speaking so that I can rule.  You

22            are getting your answer out before I can rule.

23            THE WITNESS: I understand.

24            THE COURT:  Okay.

25   Q   You expect, of your many, many, many, millions of

26   audience members, that many of them believe what you say;

27   right?

1    A    Yes.

2    Q    And you know that over time, members of your audience

3    have committed violence; correct?

4    A    That question -- I can't answer that.

5    Q    You don't know the answer to that is what you are

6    saying?

7    A    I mean.  Yeah.

8    Q    And are you familiar with a 2011 *Rolling Stone*

9    article in which you were profiled?

10    A    Vaguely.

11    Q    You say, vaguely.  Isn't that an article that you

12    prominently featured on your website?

13    A    There's been a lot of articles on my website.

14    Q    Okay.  But let me see if I can refresh your

15    recollection.

16         ATTY. MATTEI:  Why don't we pull up Exhibit 74.

17         THE CLERK:  That is a full exhibit, Your Honor.

18         THE COURT:  Thank you.

19         ATTY. MATTEI:  And let's go down a page.

20    Q    Okay.  Here we go.  All right.

21         You recognize that this was part of your

22    website in which you were telling your audience about you,

23    about Alex Jones; right?

24         ATTY. PATTIS:  Objection.

25         When, Judge?

26         THE COURT:  Sustained.

27         ATTY. MATTEI:  This is in evidence with the

```
 1          date, Your Honor.

 2                  THE COURT:  (INDISCERNIBLE).

 3                  ATTY. PATTIS:  My client needs to know the date.

 4                  ATTY. MATTEI:  Well, let me ask him.

 5                  Let's go back to the top.

 6     Q    This is a web page of yours that's about Alex Jones;

 7   right?

 8     A    Yes.

 9                  ATTY. MATTEI:  And if we go --

10     Q    And you don't dispute that you published this; yes?

11     A    It looks like an old -- something old -- it looks

12   like my site.

13     Q    Yeah.

14                  ATTY. MATTEI:  And if we go down to the bottom.

15                  That's okay.  We'll need that.

16                  Go ahead.  Yeah.  Let's pull that up.

17     Q    You could see here, Mr. Jones, that you quoted a 2011

18   Rolling Stone article; right?

19     A    Yes.  I mean, I acknowledge there was an article.

20   There have been a lot of Rolling Stone articles.

21     Q    How many have there been about you?

22     A    Quite a few.

23     Q    Okay.  And is this the only one that you featured on

24   your website?

25     A    I don't remember any of this.

26     Q    All right.  And you don't remember any of the what?

27     A    I mean, I vaguely remember what you are talking
```

1   about.  So, I said, yes.

2       Q   All right.  You remember that you were profiled in

3   2011 in *Rolling Stone*, yes?

4       A   Same answer I gave a few minutes ago, yes.

5       Q   And you decided to feature that -- quotes from that

6   article on your website; right?

7       A   Somebody did, yes.

8       Q   Is this your website?  Do you take responsibility for

9   anything, Mr. Jones?

10      A   Nobody --

11              ATTY. PATTIS:  Objection to the form.  Move to

12          strike that.

13              Argumentative.

14      A    Posted it often.

15              THE COURT:  Sustained.

16      Q   And in this 2011 *Rolling Stone* article, you actually

17  cooperated with the author.  You gave him an interview; did

18  you not?

19      A   I remember the interview now.  Probably from seeing

20  his name.

21      Q   And in that interview, you told the author, quote,

22  some unstable people are drawn to the bright flame of

23  enlightenment that is so-called conspiracy culture.  Some

24  trees are going to become uprooted in a storm like this, but

25  we can't stop telling the truth for fear of what telling the

26  truth is going to do.  Do you remember that?

27      A   I do.

1    Q    Okay.  That's what you said; right?

2    A    Yes, sir.

3    Q    Some people become uprooted, don't they?  Right?

4    A    In whole culture, yes.

5    Q    People in your audience; right?

6    A    I'm just stating a general.

7    Q    And these are people that you used, don't you?

8    A    No.

9    Q    Okay.  We are not Dan Bidondi.  Do you know Dan

10   Bidondi?

11   A    Yes.

12   Q    Dan Bidondi was an employee of yours; correct?

13   A    Oh, briefly for a time and he did some stuff for us,

14   yes.

15   Q    Yeah.  And when you got sued, you were very very

16   nervous about being connected to Dan Bidondi; weren't you?

17   A    No.  I mean, I like Dan, but he -- he-- he was -- he

18   -- I mean, (INDISCERNIBLE) I'm not like him.

19   Q    Is that a no, you weren't nervous about being

20   connected to him?

21   A    I mean, later when he did some things we didn't like,

22   I said we couldn't work with him anymore.

23   Q    I'm talking about when you were sued.  When you were

24   sued here, 2018; do you remember that?

25   A    Yes.

26   Q    And one of the first things you did was direct Rob

27   Dew to figure out when was the last time you paid Dan

```
1    Bidondi, isn't it?

2       A    I don't remember that.

3       Q    You don't?

4            Do you deny it?

5       A    No.  I'm just -- I mean --

6       Q    And during your first deposition in Texas you said,

7    under oath, that the last thing Dan Bidondi ever did for you

8    was cover the Boston Marathon bombing; correct?

9       A    I mean, it all just plays together.  This was years

10   ago.  I don't remember.

11      Q    No, sir.  You weren't deposed years ago.

12      A    (INDISCERNIBLE).

13      Q    You were -- you testified --

14      A    I wasn't deposed years ago?

15      Q    You testified in Texas, did you not, that the last

16   thing Dan Bidondi ever did for you, was cover the Boston

17   Marathon Bombing?

18           ATTY. PATTIS:  Objecting to form, Judge. It's

19           impeachment.  The rules require -- witness.

20      A    I -- I -- I had already covered that.

21           ATTY. PATTIS:  The rules require --

22           THE COURT:  Overruled.

23           ATTY. PATTIS:  --  that he be shown the item.

24           THE COURT:  Hold it.

25           Overruled.

26      Q    Do you not know if you testified to that?

27           ATTY. PATTIS:  Objection.
```

```
1       A   I don't --
2               THE COURT:  Overruled.
3       A   I don't remember.
4               ATTY. MATTEI:  Let's pull up Exhibit 185.  This
5           is in evidence.
6               THE CLERK:  It is a full exhibit, Your Honor.
7               ATTY. MATTEI:  Now, let's just pull up the
8           header in the first sentence there.
9       Q   This is from Rob Dew; right?
10      A   Yes.
11      Q   Rob Dew, one of your long-time, top employees;
12  correct?
13      A   Yes.
14      Q   In fact, Rob Dew came up to Connecticut with you for
15  your deposition; right?
16      A   Yes.
17      Q   And he came up to Connecticut with you for your trial
18  testimony.  He's here right now, isn't he?
19      A   Yes.
20      Q   And Rob Dew is e-mailing Melinda Flores.  Melinda is
21  your bookkeeper; correct?
22      A   Was.
23      Q   Was.
24              And, Tim Fruge, that's your long-time business
25  director; correct?
26      A   Yes.
27      Q   And he's copying an M. Behlan(PHONETIC) at Baker Law,
```

```
 1   that's one of your lawyers; right?

 2       A    Was.

 3       Q    He was at this time, yes?

 4       A    Yes.

 5       Q    And what's the date?

 6       A    5-24-18.

 7       Q    Right.  And the subject?

 8       A    Dan Bidondi.

 9       Q    It says, from what I can tell, we paid our last

10   invoice to Dan on January, 2016.  The invoice was from

11   December 2015; right?  That's what it says?

12       A    It does say that.

13       Q    And this is the day after you were sued by these

14   families that Rob Dew is looking into this; right?

15       A    I don't know this.

16       Q    Correct?  You don't -- you don't remember --  the

17   question is, was this the day after you were sued?

18       A    If you tell me so.

19       Q    No, sir.  You are the witness here.

20       A    I don't remember.

21       Q    Well, let me see if I can refresh your recollection.

22            ATTY. MATTEI:  Let's bring up that -- the

23            complaint we were looking at earlier.

24       Q    Do you remember we were looking at your lawsuit

25   earlier where you sued somebody else?

26       A    Yes.

27            ATTY. MATTEI:  And let's go down a page.  Let's
```

1          go to paragraph five.

2     Q    May 23, 2018, Infowars, Jones' employer was sued by a

3    range of people, including those related to the victims of

4    the Sandy Hook shooting.  Did I read that right?

5     A    Yes.

6     Q    So, if that's true, and this is your complaint,

7    right --

8     A    Yes.

9     Q    -- rob Dew, the day after, is trying to figure out

10   when Dan Bidondi last worked for you guys; right?

11    A    I guess that's an e-mail, yes,

12    Q    And then --

13         ATTY. MATTEI:  Pull that down.

14    Q    I think your testimony is that you don't recall

15   whether you said the last thing he ever covered for you was

16   the Boston Marathon bombing; right?

17    A    Actually, I don't remember any of this, yes.

18    Q    And the reason that you were so concerned about Dan

19   Bidondi, is because you knew exactly what you had him do for

20   you; right?

21         ATTY. PATTIS:  Objection.

22    A    No.

23         ATTY. PATTIS:  Assumes a fact not in evidence.

24         THE COURT:  Overruled.

25         ATTY. MATTEI:  Okay.

26    Q    When you would send Dan Bidondi on a mission, what

27   would you call him?

```
1        A    All sorts of things.  I don't know.

2        Q    Well, why don't we see if we can refresh your

3    recollection.

4              ATTY. MATTEI:  Let's play Exhibit 11.

5              (VIDEO PLAYED)

6        Q    It's hilarious, isn't it, Mr. Jones?

7        A    I mean, I don't know the context of the clip.  We are

8    laughing.

9        Q    Yeah.  You can't tell from the clip what the context

10   is?

11       A    No.

12       Q    And when you send Dan Bidondi on a mission -- you

13   know what the Kraken is, that's mythological monster;

14   correct?

15       A    Yes.

16       Q    And when you release Mr. Bidondi, it's because you

17   want him to behave exactly in that way; right?

18             ATTY. PATTIS:  Objection as to form.

19             THE COURT:  Overruled.

20       A    I don't know what specifics you are talking about.

21   I'm unsure.  Refresh my memory.

22       Q    Let me do that.  Let me refresh your memory about

23   what happens when you send Mr. Bidondi on a mission.

24             ATTY. MATTEI:  It's Exhibit 27, Your Honor.

25             THE CLERK:  It is a full exhibit, Your Honor.

26             THE COURT:  Thank you.

27             (VIDEO PLAYED)
```

```
 1      Q    That's the Kraken right, Dan Bidondi?

 2      A    That's -- that's -- that's Bidondi.

 3      Q    Yeah.   And you thought so highly of Dan Bidondi that

 4  you actually allowed him to livestream this to your

 5  audience; correct?

 6      A    I don't believe so.

 7      Q    No?

 8      A    It looks like his -- remember he had his own show on

 9  another -- he just po -- I don't remember exactly.  But that

10  doesn't look anything we put out.  I think clips may have

11  been playing on one of the other shows.  I have a host, if

12  my memory serves --  but, I mean, first time I saw this was

13  a few years ago.

14      Q    What year do you think this was?

15      A    I don't remember.

16      Q    Your testimony is the first time you saw this was,

17  like, a few years ago?

18      A    I mean -- can you refresh my memory?

19      Q    Do you need your memory refreshed?

20      A    Yeah.  I don't remember what happened a few weeks ago

21  on my show.  So, a lot of, a lot of on-air stuff.  That

22  doesn't look like our graphics, so.

23           ATTY. MATTEI:  Go ahead.  Keep playing it.

24      Q    See if we can help you with this, Mr. Jones.

25           (VIDEO PLAYED)

26      Q    Did you ever hear him say, Mr. Jones, that he was

27  live right on the air?
```

```
1        A    I don't --

2        Q    Did you hear him say that?

3        A    I don't understand what you are trying to say.

4        Q    Did you hear him say, in that video, to the people he

5   was harassing, that they were live on the air?

6        A    Yes.

7        Q    Okay.  And are you familiar with your corporate

8   representative's testimony that, in fact, this had been

9   streamed through Infowars?  Are you familiar with that

10  testimony?

11       A    I'm not familiar with that.  I don't really get the

12  point you are getting at.

13       Q    Mr. Jones --

14       A    Yeah.

15       Q    Yeah.  It's not for you to get the point, it's for

16  the jury, okay?

17            ATTY. PATTIS:  Objection.  Move to strike that

18       again, Judge.

19            THE COURT:  So, Mr. Jones --

20            Overruled.

21            ATTY. PATTIS:  It's not Mr. Jones' testimony I'm

22       moving to strike.

23            THE COURT:  Excuse me.  I'm speaking.

24            So, listen to the question that's asked and

25       answer the question that's asked.  Your answer was

26       not responsive in any way, shape, or form.  So, I can

27       have the monitor read it back, or I can have
```

```
1              Mr. Mattei ask the question again.  Just listen to
2              the question that's asked and answer that question.
3              The whether or not you get the point of where
4              Mr. Mattei was going with it --
5                   THE WITNESS:  Okay.
6                   THE COURT:  --  is not a concern.
7                   ATTY. PATTIS:  Judge, my objection --
8                   THE WITNESS:  I understand.
9                   ATTY. PATTIS:  -- was to the gratuitous comments
10             from counsel.  I object to those and ask that they be
11             struck.
12                  THE COURT:  To the extent there were any
13             gratuitous comments by anyone, they are stricken.
14                  So, Mr. Mattei, do you want me to have the
15             monitor play the question back or do you have it?
16                  ATTY. MATTEI:  That's not necessary --
17                  THE COURT:  Okay.
18                  ATTY. MATTEI:  -- Your Honor.
19        Q   Because, I think, ultimately, where you are going to
20   land, Mr. Jones, is that you just don't know whether this
21   was streamed by Infowars; right?
22        A   Yes.  I know he put some stuff on the air.  This
23   looks like his show he would do and put Infowars on.  I know
24   he had his own streaming show, that's why I can't answer the
25   question.  I don't know.
26                  ATTY. MATTEI:  All right.  So I'm going to move
27             to strike that part.
```

```
1              THE COURT:  So ordered.

2              ATTY. MATTEI:  And let's --

3       Q   The answer is, you don't know?

4       A   I don't know.

5       Q   All right.  You do know that after this, Mr. Bidondi

6   came back on to talk about Sandy Hook; right?

7       A   I believe they had him on some shows; yes.

8       Q   You had him on; didn't you?

9       A   I had him on some.  I can't remember all the days.

10      Q   And what you wanted him on to talk about, was this

11  new revelation that an FBI agent, John Dew, Rob Dew's uncle,

12  was now investigating Sandy Hook; correct?

13      A   I do remember that that happened.

14      Q   Yeah.  And I think you titled that video, Mega

15  Massive Cover Up, FBI Agent Now Investigating Sandy Hook;

16  right?

17      A   Someone titled that.  Probably me.

18      Q   And are you familiar with Rob Dew's testimony that

19  the reality is, he doesn't even know if is uncle was a

20  janitor for the FBI; are you aware of that?

21      A   I think that was a sarcastic comment.  Did you ask

22  him that?

23              ATTY. MATTEI:  Move to strike.

24              THE COURT:  Sustained.

25      Q   Are you aware that that was his testimony?

26      A   I think I heard about it secondhand.

27      Q   From who; Rob?
```

```
1    A    Yes.  He said it was a joke.

2    Q    Oh, he did.  That's what he said?

3    A    Yeah.

4    Q    He was under oath when he made that joke?

5    A    Like I told you, I heard it secondhand.

6    Q    All right.  Is Rob in the area today?

7    A    I think he is.

8    Q    Yeah?  Does he live close by?

9    A    I'm not sure where he's at right now.

10   Q    Would you be willing to present him to testify here?

11        ATTY. PATTIS:  Objection, Judge.

12        THE COURT:  Sustained.

13   A    (INDISCERNIBLE).

14        ATTY. PATTIS:  There is an objection pending and

15        it's been sustained.  Mr. Jones.

16        THE COURT:  I can't keep telling your client

17        that.  If he wants to keep answering, I can only say

18        it so many times.

19        THE WITNESS: I finally stopped myself that time.

20        I finally --

21   Q    In addition to Dan Bidondi, are you familiar with a

22   gentleman named Matthew Mills?

23   A    No.

24   Q    Do you recall in your deposition, I showed you a

25   broadcast of your show in which you had invited somebody on

26   named Matthew Mills that had in filtrated the Super Bowl?

27   A    You mean a caller?  I do you remember that now, yes.
```

```
1      Q    What do you remember about that?

2      A    I vaguely remember -- I remember that name about a

3  caller from the Super Bowl.

4      Q    So, somebody just called into your show, you didn't

5  know who he was?

6      A    Can you refresh my memory?

7      Q    I can if you need it refreshed?

8      A    Yeah.  I don't -- I'm trying to help you, so I'm

9  actually trying to answer the questions, but I don't have

10  all the answers.

11      Q    Okay.  Because what you just said -- and please don't

12  help me.  I just want you to testify truthfully.  If the

13  answer -- you kind of volunteered that somebody had called

14  in, but the reality is, that that's -- you don't know

15  whether that's true or not; right?

16      A    There's so much.  I think -- you know, like -- I

17  remember that name.  Maybe you brought it up to me in a

18  deposition or something.

19      Q    And, so, the video you remember is of you

20  interviewing somebody who had infiltrated the Super Bowl; do

21  you remember at least that much?

22      A    Yes.

23      Q    Okay.

24          ATTY. MATTEI:  Your Honor, this is not yet in

25          evidence.  If I can get the right number here.

26              This is Exhibit 13, Your Honor.  I would offer

27          it.
```

```
 1              ATTY. PATTIS:  No found -- no foundation as yet.
 2              THE COURT:  I agree.  Lay a foundation.
 3              ATTY. MATTEI:  Your Honor, it might be useful
 4         for me to lay the foundation outside the presence of
 5         the jury.  Mr. Jones could look at it.
 6              THE COURT:  He can't look at it on his own
 7         screen?
 8              ATTY. MATTEI:  Unless we have headphones,
 9         because it's a video.
10              THE COURT:  Oh, okay.
11              All right.  So, this will be a quick one.
12              You can leave your notepads, and Ron will take
13         you into the jury room.
14              (JURY EXIT).
15              THE COURT:  Please be seated.
16    VOIR DIRE EXAMINATION BY  ATTY. MATTEI:
17     Q   All right, Mr. Jones.
18              ATTY. MATTEI:  Why don't we pull up, first, page
19         662 of Volume II of Mr. Jones' deposition?
20              ATTY. PATTIS:  Which deposition, sir?
21              ATTY. MATTEI:  April 6, 2022.
22              ATTY. PATTIS:  Thank you.
23              ATTY. MATTEI:  662, line 12.
24              I'm trying to do this quickly, Your Honor.
25              THE COURT:  Take your time.
26     Q   Now, Mr. Jones, do you recall that in your deposition
27    I asked you about this video and I played it for you?
```

```
 1      A    No.  I remember vaguely.

 2      Q    Okay.  All right.

 3               ATTY. MATTEI:  And I can represent to the Court

 4           and counsel, that the deposition testimony we are

 5           about to review relates to the same exhibit that's

 6           being offered here.

 7               ATTY. PATTIS:  I accept their representation.

 8               ATTY. MATTEI:  May I approach, Your Honor?

 9               THE COURT:  You may.

10      Q    Showing you page 662.  I'm just going to read this to

11    you, Mr. Jones, and you tell me is that a fair question.

12               Are you familiar with a gentleman named Matthew

13    Mills?

14               Answer: It doesn't ring a bell.

15               Question: Okay.  Let me see if I can refresh

16    your recollection.

17          Do you recall interviewing a gentleman who had in

18    filtrated a press event at the Super Bowl?

19                Answer: No.

20                In 2014?

21                No.

22                Question:  And he had snuck into the press

23    event and grabbed the microphone, and said that 9-11 was

24    perpetrated by the U.S. government?

25                Answer: I do remember that now.

26                Question: That's ringing your bell?  And you

27    had that gentleman, Matthew Mills, on the air; correct?
```

```
 1              Answer: Yes.

 2              Do you recall interviewing him now?

 3              Answer: Now.  Yeah.

 4              And then we played that --  according to the

 5         transcript we then played that?

 6    A    Yeah, I remember.

 7    Q    Okay.

 8              ATTY. MATTEI:  I would offer it, Your Honor.

 9              ATTY. PATTIS:  No objection.

10              THE COURT:  Okay.

11              Whenever you are ready, Ron.

12              THE CLERK:  I'm sorry, Your Honor.

13              THE COURT:  That's all right.  No, no.

14              THE CLERK:  (INDISCERNIBLE).

15              THE COURT:  I think you are making your notes.

16              ATTY. MATTEI:  You know what, Your Honor?  I

17         could have done that with the jury here.  And it just

18         didn't occur to me at first.  That's all --

19              ATTY. PATTIS:  May I speak to Attorney Mattei

20         briefly?

21              THE COURT:  You may.

22              (JURY ENTERS).

23              THE COURT:  Thank you for your patience.  We

24         were quick, as promised.

25              All right.  You may be seated.

26              Counsel, stipulate that our entire panel is

27         present?
```

```
 1                    ATTY. PATTIS:  I do.

 2                    ATTY. MATTEI:  Yes, Your Honor.

 3                    May I proceed, Your Honor?

 4                    THE COURT:  You may.

 5                    ATTY. MATTEI:  Thank you.

 6      CONTINUED DIRECT EXAMINATION BY ATTY. MATTEI:

 7          Q    Mr. Jones, while the jury was out, were you able to

 8      refresh your memory that you did, in fact, interview a

 9      gentleman named Matthew Mills on your Alex Jones show;

10      correct?

11          A    Yes.

12          Q    Okay.  And this has been offered and admitted as the

13      Alex Jones portion of the Alex Jones broadcast on

14      February 3, 2014.  I'm going to play it and then I'm going

15      to ask you some questions about it; all right?

16          A    All right.

17                    ATTY. MATTEI:  This is Exhibit 13 for the

18                    record, Your Honor.

19                    (VIDEO PLAYED)

20          Q    Do you remember that now?

21          A    I do remember now, yes.

22          Q    Pretty clear to you now that actually you and your

23      people reached out to him to have him on; right?

24          A    I think there are many, guests.  Yeah.  I remember

25      this.  They got him off the social media, and -- yeah.

26          Q    And you offered him a job?

27          A    Yes.  I mean, I talked about it with him.
```

```
1     Q    And you said anything else, soldier; right?

2     A    Yup.

3     Q    And this broadcast went out to millions and millions

4   of people; right?

5     A    The Super Bowl?

6     Q    No, no.  This wasn't the Super Bowl, was it,

7   Mr. Jones?  This was your broadcast.  That's what I'm asking

8   you about.

9     A    Well, I don't know how many went out that day, but

10   definitely a lot.  Hundreds of thousands at least.

11     Q    All of them are watching you praise Matthew Mills;

12   right?

13              ATTY. PATTIS:  Objection, Judge.  Argumentative.

14              THE COURT:  Overruled.

15              ATTY. PATTIS:  Speculative.  I don't know --

16     A    Yeah.  At first I mean, I believe that there was a

17   cover up by all of them.

18     Q    I'm not asking you about your beliefs about 9-11.

19   You were praising Matthew Mills; right?

20     A    For 9-11.  For what he did at the Super Bowl.

21     Q    Right.  He infiltrated the Super Bowl; right?

22     A    Yeah.  I thought that was good.  So --

23     Q    Let's just see if we can do yes or no; okay?

24     A    Okay.

25     Q    He took over the stage of the post Super Bowl press

26   conference; yes?

27     A    Yes,.
```

```
1        Q    He yelled into the microphone as the MV P was being
2   interviewed that 9-11 was staged by criminal elements of the
3   United States government; yes?
4        A    Yes.
5        Q    You admired that about him; right?
6        A    Yes.
7        Q    You communicated to your audience that you admired
8   that about him?
9        A    Yes.
10       Q    You even offered him the job on air; yes?
11       A    Yes.
12       Q    You called him a soldier; right?
13       A    Yes.
14       Q    Anything else you want to add, soldier; right?
15       A    Mm-hmm.
16       Q    He said he was a big fan of yours; right?
17       A    Yes.
18       Q    He had been following your work for a long time?
19       A    Yes.
20       Q    And then he said, hey, I've got a couple of other
21   things I would like to infiltrate, I could talk to you about
22   off air; right?
23       A    Yes.
24       Q    This is February 2014; right?
25       A    I believe that's the date you said.
26       Q    Do you know he was arrested for trespassing at the
27   Super Bowl?
```

1       A    I don't remember.

2       Q    Okay.  Do you know whether he was arrested in

3   Connecticut a little over a year later?

4       A    I do remember the story now.  I don't remember

5   exactly what he did, but I remember about it.

6       Q    You remember enough to know that the next event he

7   infiltrated, was the Vicki Soto memorial 5-K; right?

8                ATTY. PATTIS:  Objection --

9       A    No.

10               ATTY. PATTIS:  --  argumentative.

11               THE COURT:  Overruled.

12               ATTY. PATTIS:  Assumes a fact not in evidence.

13      Q    You don't know that?

14      A    I mean, we never hired him -- I never really talked

15  --  I don't think he ever talked to me or not, so.

16      Q    You don't know though, do you, Mr. Jones?

17      A    Well, I mean --  I mean.  It would be in our records.

18  You've got all the records.

19      Q    Wait a minute.  If you got a phone call with Matthew

20  Mills after this when he said I got a couple other things I

21  would like to infiltrate, I want to talk to you about.

22  Where would that record be?

23      A    Why don't you call him and ask him, because I

24  believe --

25      Q    Oh, an e-mail.  I'm asking you, now.  Did you talk to

26  him?

27      A    I think (indiscernible) you're the bright one, and

1    we -- it was a. Break coherent.  This is a long time ago,

2    so, I can't exactly remember.  I -- I don't think I ever

3    talked to him again after that.

4        Q   You know who showed up in Stratford though, right,

5    Connecticut?

6        A   No.

7        Q   You know who showed up in Stratford and confronted

8    the Soto family when they were trying to put on a charity

9    race in memory of their did your and sister?

10       A   No.  I didn't know about that.  He told me about a

11   deposition.

12       Q   Well, but that's the type of thing that you love;

13   right?

14           ATTY. PATTIS:  Objection.  Argumentative.

15       A   No.  I never get into that.  No.

16           THE COURT:  Overruled.

17       Q   Just another uprooted tree; yeah?

18       A   And you are just mixing things together.

19       Q   Do you want to answer the question?

20       A   No.  It's not just another uprooted tree.

21       Q   In fact, even as this trial has been going on, the

22   Jones Army has been active, hasn't it?

23           ATTY. PATTIS:  Objection as to form, Judge.

24       Argumentative.

25           THE COURT:  Overruled.

26       A   I don't know what that means.

27       Q   Mr. Jones, do you remember referring to yourself in

1   your broadcast as a, precision guided munition?

2       A    That's a metaphor.  Information war --

3       Q    I know it's a metaphor.  I know you are not actually

4   a missile.  It's a metaphor, right?

5       A    Yes.  It refers to nonviolent soliciting

6   (INDISCERNIBLE) you name it.

7       Q    Okay.  It's an interesting nonviolent metaphor that's

8   used.  A precision guided --

9               ATTY. PATTIS:  Judge, objection.  As to the.

10      Q    --  munitions?

11              ATTY. PATTIS:  -- form.  Argumentative.

12              THE COURT:  Sustained.

13              Just ask the next question.

14      Q    You refer to yourself as a precision guided munition;

15   right?

16      A    I think you played me a clip of me saying that.

17      Q    And you lay yourself down on the barbed wire so the

18   rest of your Army can come in over the top; right?

19      A    I think you are quoting me.

20      Q    And that Army has been coming over the top right here

21   in Waterbury this week, hasn't it?

22              ATTY. PATTIS:  Objection, Judge.

23              THE COURT:  Overruled.

24      A    I don't know of what you speak.

25      Q    Okay.  Didn't you go on the air just a couple of days

26   ago and commend your audience members for vandalizing

27   property around this courthouse?

```
 1      A    Oh, I mean, if you consider --

 2      Q    Is that a yes or no?

 3      A    No.  I didn't commend people for vandalizing.

 4      Q    You didn't.  Okay.

 5           ATTY. MATTEI:  Let's pull up Exhibit 520.  I

 6      don't think it's yet in evidence.

 7      Q    Do you see the frame, sir?

 8      A    I don't consider a sticker being --

 9      Q    I asked you whether you see something on the screen

10  in front of you.

11      A    Yes.  I see an Infowars sticker.

12      Q    You see an Infowars sticker on the street sign right

13  outside this courthouse; correct?

14      A    It looks like it.

15      Q    And you've talked about that on air, didn't you?

16      A    Yeah.  I believe you could say I did.

17           ATTY. MATTEI:  I'd offer it, Your Honor.

18           ATTY. PATTIS:  No objection.

19           THE COURT:  Full exhibit.

20           ATTY. MATTEI:  And, now, Your Honor, I would

21      like to offer 521.

22           ATTY. PATTIS:  I don't know what it is, Judge.

23      Q    521, sir, you broadcast on air commending people for

24  doing this; right?  Just this last week?

25      A    Well, I mean, I do want to commend people.  The first

26  amendment is under attack.

27      Q    Excuse me.  Excuse me, sir.  Excuse me.  Excuse me.
```

```
1        A    I want to commend them now.

2        Q    Okay.  You did it on air, didn't you?

3        A    I don't remember, but I commend them now.

4        Q    Okay.  Well, why don't we see if we can refresh your

5    recollection.

6             ATTY. MATTEI:  Your Honor, this is a video.

7             Do you have any objection to it?

8             ATTY. PATTIS:  May I speak?

9             ATTY. MATTEI:  Your Honor, I would --  I hate to

10            do this but if there is going to be an objection, I'm

11            going to have to play it.

12            ATTY. PATTIS:  But they haven't a proffer of

13            what it is.

14            ATTY. MATTEI:  Oh, this is --  I'm happy to

15            proffer it.

16            This will be a broadcast of Mr. Jones earlier

17            this week talking about this very thing on his show.

18            ATTY. PATTIS:  Unedited?

19            ATTY. MATTEI:  What do you mean unedited?  His

20            shows is four hours.

21            ATTY. PATTIS:  Unedited.  In other words --

22            May I speak to Attorney Mattei briefly, Judge?

23            THE COURT:  This might avoid having you get up.

24            ATTY. PATTIS:  The representation is, that it

25            will be an unedited clip.  No objection.

26            THE COURT:  All right.  Full exhibit.

27            ATTY. PATTIS:  521.  I think 522 is, thank you.
```

```
 1                    ATTY. MATTEI:  Go ahead.

 2                    (VIDEO PLAYED)

 3      Q   So, we are this puppet courthouse, yes?  Yes?  That's

 4   what you were referring to?

 5      A   It's not mostly peaceful protests where they burn

 6   down $2 billion but that's good, but the conservatives put

 7   up stickers, and we're bad.  I know, we all need to go to

 8   prison.

 9      Q   Are you done?

10                    THE COURT:  I'm going to excuse the jury for a

11              moment.

12                    ATTY. MATTEI:  Your Honor, I don't think that's

13              necessary.

14                    THE COURT:  No.  I'm going to excuse the jury

15              for a moment.

16                    (JURY EXIT).

17                    THE COURT:  I'll see counsel in a sidebar.

18                    (SIDEBAR).

19                    VOICE:  (INDISCERNIBLE).

20                    ATTY. PATTIS:  May I have a moment with my

21              client in a brief recess and?

22                    THE COURT:  No.  I don't want to interrupt.  I

23              just --

24                    ATTY. MATTEI:  Okay. Yeah.

25                    THE COURT:  I know, but -- we can't share with

26              (INDISCERNIBLE)

27                    ATTY. MATTEI:  (INDISCERNIBLE).
```

1        THE COURT:  No. I understand the purpose.

2        ATTY. MATTEI:  You told me not to cut him off.

3        ATTY. PATTIS:  My impression is, Mr. Jones

4   has -- he has been largely responsive to the

5   questions.  We've had few arguments, outbursts,  and

6   fewer than I had expected.  This was startling.  It

7   may be a sign of fatigue.  If the Court wants to take

8   an early afternoon break, I will remind him of your

9   orders and the concept --

10       THE COURT:  Okay, I'm going --  (indiscernible).

11       ATTY. PATTIS:  I'm talking to the Court not you

12  guys.  Okay.

13       THE COURT:  (INDISCERNIBLE) why don't we go till

14  3:15; how is that?

15       ATTY. PATTIS:  Thank you, okay.

16        (SIDEBAR ENDS).

17       THE COURT:  You can get them.

18       THE CLERK:  Oh, okay.

19        (JURY ENTERS).

20       THE COURT:  All righty.  Welcome back.

21        Please take your seats.

22        Just so everyone can plan accordingly, we are

23  going it take our --  even though you've had an

24  opportunity to get up and down, the staff has not, so

25  we will take our afternoon recess in about

26  15 minutes.  Okay.

27  CONTINUED DIRECT EXAMINATION BY ATTY. MATTEI:

1    Q   And every day, Mr. Jones, that you've been doing
2    stuff like we just saw, you've been encouraging --
3              ATTY. MATTEI:  Oh, I'm sorry, Attorney Ferraro.
4    Q    --  you've been encouraging your audience to give
5    you money; right?
6    A   Just like media, I raise money to stay on air.
7    Q   And the most recent website you've been encouraging
8    your audience to donate at is, 1776coin.com; right?
9    A   Well it's trade and buy silver coins.
10   Q   1776 coin.com is the website; right?
11   A   Yes.
12   Q   It's also known as patriotscollectibles.com; right?
13   A   1776coin.com.
14   Q   And you are telling your audience that they need to
15   go out right now to support you and buy a -- I think you say
16   .999 silver coin with Teddy Roosevelt on it?
17   A   Yes.
18   Q   How much are you offering that for right now?
19   A   Like $130.
20   Q   $130 for a coin worth about the size of a quarter?
21   A   No.  It costs about $35 to make.
22   Q   I said, how big it is?
23   A   Oh, it's the size of a silver dollar.  It's a silver
24   dollar.
25   Q   Okay.  You say it costs $35 to make?
26   A   Yeah.
27   Q   Okay.  You pulled that off pretty quickly?

```
 1              ATTY. PATTIS:  Objection, Judge.

 2       Q    So, what's the margin on it?

 3              THE COURT:  Sustained.

 4       Q    What's the margin on that?  How much did you say you

 5  are selling it for?

 6       A    Well, for sales -- on sale it's $99, but it is a

 7  fundraiser coin.  Like when PBS sells copper, it's a hundred

 8  bucks.

 9       Q    I asked you how much are you selling it for?

10       A    You can get it on sale for $99.

11       Q    What are you selling it for?

12       A    What?

13       Q    Did you say you were selling it for $99 earlier?

14       A    Yes.  There is a sale.

15       Q    You are running a sale on it.  What's it full price?

16       A    I just told you, $130.

17       Q    Thank you.  $130.  But they can get it right now, for

18  how much, $99?

19       A    The last time I was there a few days ago, there was a

20  sale on it, yeah.

21       Q    Okay.  And the cost to you is how much?

22       A    I said 35.  Depending on what it was -- $35

23  (INDISCERNIBLE).

24       Q    Okay.  So, if it's full price, you are talking about

25  what, a 300 percent markup?

26       A    And we tell the listeners it has that.  We need the

27  support.
```

```
1      Q    You tell the listeners what your cost is?

2      A    Absolutely.  They know.  They are smart.

3      Q    Okay.

4      A    Conservatives know all about silver and gold.

5      Q    Do you tell them that you get Vasobeets for four

6  bucks?

7      A    Get what?

8      Q    You sell a product call Vasobeet, don't you?

9      A    No.  Vasobeet.

10     Q    Thank you.  Vasobeet.  I'm sorry.  I'm not a

11 customer.

12          ATTY. PATTIS:  Objection, Judge.  Move to

13          strike.

14          THE COURT:  Sustained.

15     Q    Vasobeet you sell for how much?

16     A    I don't know.

17     Q    Okay.  Your retail is -- I'm sorry, your cost is $4;

18 right?

19     A    I think it's more than that.

20     Q    Okay.  Tim Fruge would know that?

21     A    Yes.  If you want me, I can get those numbers for

22 you.

23     Q    No.  No.  I think I can -- I think I can show them to

24 you.  Hold on one second.

25          We'll get that for you in a second.  They'll

26 let me know when it's ready.

27          Your testimony is that you tell your audience
```

1    what the markup is on your supplements you sell?

2       A    I think from time to time we've told people, yeah.

3       Q    What's the markup on the food buckets you are

4    selling?

5       A    It's 35 to 40 percent.  I know you have text messages

6    arrive, says hey you (INAUDIBLE).

7       Q    Okay.  So, when Tim Fruge told you that 70 percent of

8    the money you are making off storable food is pure profit,

9    that was a mistake?

10      A    That was definitely a mistake.

11      Q    You know better?

12      A    Absolutely, I know.

13      Q    Okay.  And you are interested in that; right?

14      A    I mean, I just know that's more disinformation.  Told

15   you how much coin was, told you what happens with the food,

16   told you point blank.

17      Q    So, Tim Fruge, when he's texting you is spreading

18   disinformation?

19                   ATTY. PATTIS:  Objection, Judge.  Argument --

20                   THE COURT:  Overruled.

21      A    I saw in the last -- okay, I can't talk about the

22   last thing.

23      Q    You know it's a text message --  (INDISCERNIBLE)?

24                   ATTY. PATTIS:  Objection.  Objection.

25      A    The text message, and it was not correct.

26                   ATTY. PATTIS:  My client is answering.

27      Q    But the Vasobeet markup, you don't know?

```
 1      A    I don't have that in front of me.

 2      Q    Anyway, back to this coin.  This is what you've been

 3   asking your audience to give you money for this week; right?

 4      A    We actually started making these coins, those six

 5   months ago.

 6      Q    But what you are running right now, this week, is

 7   you've been talking about this trial after you said in it,

 8   you are sending them the 1776 coin.com; right?

 9      A    Yes.  That's where we sell the collectible coins for

10   people that want to keep the show on the air.

11      Q    Okay.  And did you tell Brittany Paz about that

12   revenue platform?

13      A    We advertise it on air.  Yeah.  We did -- yeah.

14      Q    Okay.  Free Speech Systems owns that website?

15      A    No.  It's --  it's an outside the platform but it

16   advertises on Free Speech Systems.

17      Q    But you get a cut of what they sell, obviously,

18   that's why you are pitching it?

19      A    Yes.

20      Q    Yeah.  And what about 50 percentoff.com.  Do you have

21   that one?

22      A    No.  That's not my website.

23      Q    What about -- do you have an interest in it?

24      A    No.

25      Q    What about Prepare With Alex?

26      A    That is URL that links to -- the links -- preparewith

27   Alex.com links to preparetoday.com.  So, it's, I told you
```

1    the last time, it's a link, it's not a website.

2        Q    It has products for sale on it, prepare today?

3        A    Yes.

4        Q    In other words, what you are saying, this is -- this

5    idea of redundancy again; right?  People can get to

6    preparetoday.com by either going to Prepare With Alex over

7    preparetoday; right?

8        A    Preparetoday.com is the actual website.

9        Q    Right.

10       A    And all PreparewithAlex.com is is an another URL that

11   will take you there.

12       Q    Right.  So, if you -- if you typed in

13   preparewithAlex.com, you automatically go to

14   preparetoday.com; right?

15       A    I believe so.

16       Q    And you sell stuff on that?

17       A    No.  A third -- another party sells restorable foods

18   there then they pay us advertising.

19       Q    And wait a second now.  Are you saying that you don't

20   get a cut of the products that are sold on preparetoday.com?

21       A    I just said, it pays us advertising.

22       Q    You said they pay you advertising, but isn't it true

23   that you get a cut of whatever the sales are?  Or maybe you

24   don't know?

25       A    I don't understand what you are saying.  Of course we

26   get paid money.

27       Q    Okay.

```
 1              ATTY. MATTEI:  Do we have that Vasobeet --
 2         Vasobeet, excuse me.
 3              Yes.  It's a full exhibit, yes?
 4              VOICE:  No.
 5              ATTY. MATTEI:   Oh, let's pull it up in front
 6         of you, Mr. Jones.
 7              THE COURT:  And what exhibit is this, ID?
 8              THE CLERK:  It's ID, yes.
 9              ATTY. MATTEI:  This is a demonstrative, Your
10         Honor, that was shown in opening, all aspects of it
11         are in full, and so I would just ask to display it to
12         the jury?
13              ATTY. PATTIS:  If it has a number, I would like
14         to know it.
15              ATTY. MATTEI:  No, no -- it --
16              This is a demonstrative exhibit.
17              THE COURT:  Very well.
18              ATTY. MATTEI:  You can pull it up.
19    Q    Infowars store, that's your logo; right?
20    A    Yes.  Mm-hmm.
21    Q    Are you familiar with this text message from Tim
22    Fruge, e-mailed all the plugs to Drew, Dew, and all
23    producers.  The retail for Vasobeet will be39.95 and sale
24    for 19.95.  Our cost is $4?
25    A    I see that.
26    Q    Okay.  And if you go down.  If you just kind of back
27    out of that.  That's what you get, right, for 39.95 or 19
```

```
1   something?
2       A    Yup.   Same thing under another name sold on Fox News,
3   same price.
4       Q    Is that a yes?
5       A    Yes.
6       Q    Okay.
7       A    But I believe it that it comes in a bigger bottle,
8   it's ten bucks a bottle Infowars.
9       Q    Okay.  And you just pay four bucks for that?
10      A    I think we paid like eight bucks last time I checked,
11  but that's what it says.
12      Q    And, of course, you tell your audience, hey, listen,
13  we pay $4 for this, but we want you to give us 40 for it.
14  Do you tell them that?
15      A    Well, it usually sells for 19.
16      Q    Okay.  Do you tell them,  we pay four for this, but
17  we are going to mark it up --
18      A    Yup.
19      Q    -- 400 percent?
20      A    My audience are like --
21      Q    Can you just answer that?
22      A    Mm-hmm.  My audience is smart.  They actually work
23  for a living.  They understand markup.  They understand what
24  we are doing.
25      Q    Oh, okay.  All right.
26           And why don't we talk about cryptocurrency.
27      A    Okay.
```

```
1      Q    Because one of the ways that your audience -- you
2    encourage your audience to give you money, is in
3    cryptocurrency donations; right?
4      A    Yes.
5      Q    And I think we have that page.
6            And you have a page on your website that's just
7    for cryptocurrency donations; right?
8      A    Infowars.com forward slash crypto.
9      Q    Is that a little advertisement just there?
10     A    Well, we are fighting the Deep State.  We need money.
11     Q    Okay.  All right.  And now we'll end up as a  clip
12   for you on your show won't it?
13           ATTY. PATTIS:  Objection.  Move to strike.
14        Objection.
15           THE COURT:  Sustained.
16     Q   Warning --
17           ATTY. PATTIS:  Objection.  Move to strike again.
18           THE WITNESS: I'm sorry.  Will you turn around to
19        look at the corner and talk?  I can't hear you.
20     Q   I'm sorry.  That will end up as a clip on your show
21   tonight?
22           ATTY. PATTIS:  Objection. Move to strike.
23     Q   Your advertisement for your cryptocurrency page?
24           THE COURT:  Overruled.
25     A   You know, I mean -- I mean, people want to keep us in
26   the fight, so I -- I mean, I hope whoever the big whales
27   are, they'll give us money (INDISCERNIBLE) keep doing it.
```

```
 1       Q    We'll, just keep,0 we'll just keep, minting money as

 2   you are in this courtroom --

 3              ATTY. PATTIS:  Objection, Judge.

 4       Q    -- won't we, Mr. Jones.

 5              THE COURT:  All right.  Let's move on.

 6       A    Raw meat.

 7            People care about the First Amendment.

 8       Q    And in the cryptocurrency page, people can give to

 9   you in bitcoin; yes?

10       A    Yes.

11       Q    Aetherium; right?

12       A    Yes.

13       Q    And it says, support the Infowar; right?

14       A    Yes.

15       Q    But there is nothing on that page that tells your

16   audience that when they give you cryptocurrency, it goes

17   directly into your personal account; is there?

18       A    Oh.  I told the listeners that.

19       Q    Mr. Jones, listen to my question.  On the page, the

20   crypto page, where you say, support in the Infowar, there is

21   nothing on there that says that the crypto donations go

22   directly into your personal account, is there?

23       A    And indirectly into the company account.  That's how

24   crypto works.

25       Q    Okay.

26              ATTY. MATTEI:  Do we have the page?

27              VOICE: 516.
```

```
 1            ATTY.  MATTEI:  516.  Oh, I don't think it's
 2       admitted yet.
 3    Q    Take a look at your screen, Mr. Jones.
 4    A    I know the page.
 5    Q    Okay.  Well I need to admit it through you; is that
 6 it?
 7    A    Yes.
 8            ATTY. MATTEI:  I offer it, Your Honor.
 9            ATTY. PATTIS:  No Objection, Judge, on that
10       foundation.
11            THE COURT:  And that is Exhibit, what, Ron?
12            THE CLERK:  I believe he said it's 516.
13            THE COURT:  So ordered.
14    Q    This is it.  Give crypto, fund Infowars.  Sponsor us
15 with bitcoin and other cryptocurrencies; right?
16    A    Yes.
17    Q    And then it gives you another of --
18            ATTY. MATTEI:  I'm sorry.  You can back out of
19       that.
20    Q    And then it gives you all these different
21 cryptocurrencies you can give; right?
22    A    Yes.
23    Q    So, just to be real clear, this is a yes, or no.
24 When somebody gives cryptocurrency over this website, it
25 goes directly into your crypto wallet that you personally
26 control; yes or no?
27    A    Yes.
```

1    Q   Okay.  And when that happens, you have full and sole

2  access to that asset; right?

3    A   Yes.

4    Q   It's password protected?

5    A   Yes.

6    Q   All right.  And earlier this year in a number of

7  donations, $8 million in bitcoin was donated through this

8  page to you personally; correct?

9    A   I think it was 9 million.

10   Q   9 million.  And you cashed out about 5 million of

11 that; right?

12   A   No.  That was when you deposed me.  We cashed all but

13 $60,000 out and it's all been put into Infowars.

14   Q   Okay.  So, let's just get at this real clear.

15           So, your sworn testimony to this jury and

16 anybody else who may be interested, is that that full amount

17 that went to you personally, you then put right into Free

18 Speech Systems.  That's your sworn testimony?

19   A   I don't have the exact accounting, but do the math.

20 60,000 left in the wallet, which is probably if I can go

21 look at it, you got it like it's all secret.  The whole

22 point of it, it's public.  And so there is the wallet.  And

23 then that's how my IT folks set it up.  That's how you do

24 it, is you get in your personal wallet, and then I put it in

25 my private bank account, and then I put it into the company,

26 and I think we put all the money I put in my account into

27 Free Speech Systems.  It's been -- am I allowed to say --

1  the rulings -- but it's trying to shore it up, and then

2  there is 60,000 left.  I'm hoping it goes backup.  We are

3  waiting.  But I don't think it's going to go back up for a

4  while.  And we are probably going to dump that out --  dump

5  that out next week and put it in Free Speech Systems.

6     Q   So, just to rap this up, your sworn testimony is that

7  everything other than $60,000 of that 8 million that you

8  got, went into your personal account, and then you

9  transferred into Free Speech Systems; yes or no?

10    A   Yes.  Other than bonuses of $100,000 in bonuses went

11 to the IT people and some of the graphics crew.  So, they

12 got $100,000.

13    Q   You got none of it yourself, is what you are saying?

14    A   Yes.  It would be nice if we could put on evidence

15 but we were blocked from it.  I could probably get you those

16 numbers.  Would you like those?

17    Q   No.  What I want you to do, is offer sworn

18 testimony --

19           ATTY. PATTIS:  Objection, Judge.

20    Q   --  that none of that money went to you --

21           ATTY. PATTIS:  Objection.

22           THE COURT:  Sustained.

23           Why don't we just rephrase the question.

24    A   I --

25    Q   I got a new question for you.

26           I just want to be crystal clear here.  None of

27 that money ended up with you personally; yes or no?

```
1      A    Well, you'll say -- technically.

2      Q    Yes or no?

3      A    Well, you'll say technically -- well, technically it

4    went in my bank account, and then I put it into Free Speech

5    Systems.  That's how it works.

6      Q    None of it remains in your personal possession?

7           ATTY. PATTIS:  Objection.  It's not --

8      A    I have to do the exact accounting.  I think may be

9    negative.  I mean, I think I may have put more money in.

10     Q    All right, Mr. Jones.

11     A    Well, Chris, you are trying to --

12          THE COURT:  Well, first of all, sir --

13     A    Oh, Mr. Mattei.

14          ATTY. MATTEI:  I think we can close that.

15          THE WITNESS: Okay.

16          ATTY. MATTEI:  We said about 3:15.

17          THE COURT:  This is a good time.

18          All right.  We will take the afternoon recess.

19      We will resume at 3:30.

20          Ron will collect your notepads.

21          You'll continue to obey the rules of juror

22      conduct.

23          (JURY EXIT).

24          (RECESS).

25

26

27
```

```
 1   X06-UWY-CV18-6046436-S :   SUPERIOR COURT

 2   ERICA LAFFERTY          :   COMPLEX LITIGATION DOCKET

 3   v                       :   AT WATERBURY, CONNECTICUT

 4   ALEX EMERIC JONES        :   SEPTEMBER 22, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 5   X06-UWY-CV18-6046437-S :   SUPERIOR COURT

 6   WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

 7   v                       :   AT WATERBURY, CONNECTICUT

 8   ALEX EMERIC JONES        :   SEPTEMBER 22, 2022
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 9   X06-UWY-CV18-6046438-S :   SUPERIOR COURT

10   WILLIAM SHERLACH        :   COMPLEX LITIGATION DOCKET

11   v                       :   AT WATERBURY, CONNECTICUT

12   ALEX EMERIC JONES        :   SEPTEMBER 22, 2022
```

## C E R T I F I C A T E

       I, Linda A. Coon, hereby certify that this is a true
and accurate transcription of the above-referenced case,
heard in Superior Court, Judicial District of Waterbury,
Connecticut, before the Honorable Barbara N. Bellis, on this
22nd day of September, 2022.


       Dated this 22nd day of September, 2022, in Waterbury,
Connecticut.


                         Linda A. Coon,  RPR
                         Court Monitor/ Court Reporter