# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re<br><br>Alexander E. Jones,<br><br>      Debtor, | Bankruptcy<br>Case No. 22-33553 (CML)<br><br>Chapter 11 |
| David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as Chapter 7 Trustee for the Estate of Erica Lafferty,<br><br>      Plaintiffs,<br><br>   v.<br><br>Alexander E. Jones and Free Speech Systems, LLC,<br><br>      Defendants. | Adv. Pro. No.: 22-03037 (CML) |

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................... 1

THE FACTUAL RECORD FROM THE CONNECTICUT ACTION........................................... 4

    A.  Jones's Intentional and Malicious Lies About the Sandy Hook Shooting Caused Catastrophic and Irrevocable Harm to Plaintiffs........................................................... 4

        i.  Jones Lied About the Sandy Hook Shooting to Drive Profits ............................... 4

        ii.  Jones's Lies Profoundly Damaged Plaintiffs.........................................................7

    B.  Plaintiffs File the Connecticut Action............................................................................ 10

    C.  Jones's "Bad Faith Litigation Misconduct" Leads to Initial Sanctions........................... 10

    D.  Jones's Repeated Discovery Violations and Process Abuses Lead to the Entry of a Disciplinary Default...................................................................................................... 11

    E.  The Damages Trial, Jury Verdict, and Punitive Damages Award ................................... 13

LEGAL STANDARD.................................................................................................................... 15

    A.  Standard for Summary Judgment................................................................................... 15

    B.  Non-dischargeability Under Section 523(a)(6) ............................................................... 16

ARGUMENT................................................................................................................................ 17

I.  Jones Is Collaterally Estopped from Arguing That His Debt to Plaintiffs Is Not for a "Willful and Malicious" Injury ................................................................................................. 18

    A.  Jones's Willful and Malicious Conduct Was "Fully and Fairly Litigated" in the Connecticut Action ...................................................................................................... 19

    B.  Jones's Willful and Malicious Injury Was Actually Decided and Necessary to the Connecticut Judgment.................................................................................................. 21

        i.  The Court's Damages Ruling Establishes That Jones's Willful and Malicious Conduct Was Actually Litigated and Necessarily Determined ................................. 21

        ii.  The Jury Verdict and Supporting Record Confirm That Jones's Willful and Malicious Conduct Was Actually Litigated and Necessarily Determined ................. 25

        iii.  The Allegations Admitted as True by Virtue of the Default Judgment Are Also Entitled to Preclusive Effect .............................................................................. 28

II.  The Record from the Connecticut Action Confirms That the Judgment Arises from Jones's "Willful and Malicious Injury" ..................................................................................... 30

    A.  Bankruptcy Courts May Look to the State Record to Determine Non-dischargeability ............................................................................................................ 30

    B.  Jones's Conduct Was Objectively Substantially Certain to Cause Harm ........................ 32

    C.  Jones Acted with a Subjective Motive to Cause Harm.................................................... 36

CONCLUSION............................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arguello* v. *LaFavers*,
448 F. Supp. 3d 655 (S.D. Tex. 2020) ........................................................................17

*In re Backal*,
2013 WL 951232 (Bankr. E.D. Tex. Mar. 12, 2013) ...................................................19

*Bank of Am., N.A.* v. *Testa*,
2016 WL 4744100 (Conn. Super. Ct. Aug. 8, 2016) ...................................................27

*In re Boland*,
946 F.3d 335 (6th Cir. 2020) ......................................................................................26

*Bowles* v. *Quigley*,
2006 WL 1627921 (N.D. Tex. June 7, 2006) ..............................................................36

*In re Bowles*,
2005 WL 6443632 (Bankr. N.D. Tex. Oct. 27, 2005) .................................................38

*Bridgeport Harbour Place I, LLC* v. *Ganim*,
30 A.3d 703 (Conn. App. Ct. 2011).............................................................................22

*In re Bugnacki*,
439 B.R. 12 (Bankr. D. Conn. 2010) ...........................................................................20

*Burrell* v. *Dr. Pepper/Seven Up Bottling Group, Inc.*,
482 F.3d 408 (5th Cir. 2007) .......................................................................................15

*In re Caton*,
157 F.3d 1026 (5th Cir. 1998) ...............................................................................29, 30

*In re Cong Nguyen*,
2015 WL 6941301 (Bankr. S.D. Tex. Nov. 9, 2015) ..................................................24

*Custom Pools* v. *Underwriters Inc.*,
1996 WL 66264 (Conn. Super. Ct. Jan. 19, 1996)......................................................19

*In re Daily*,
47 F.3d 365 (9th Cir. 1995) .........................................................................................21

*DeBlasio* v. *Aetna Life & Cas. Co.*,
441 A.2d 838 (Conn. 1982) .........................................................................................29

*In re Delaney*,
504 B.R. 738 (Bankr. D. Conn. 2014) .........................................................................23

*In re Dhaliwal*,
630 B.R. 24 (Bankr. S.D. Tex. 2021) ..........................................................................17

*Fordoche, Inc.* v. *Texaco, Inc.*,
463 F.3d 388 (5th Cir. 2006) .......................................................................................15

*In re Gharbi*,
   2011 WL 831706 (Bankr. W.D. Tex. Mar. 3, 2011) ......................................................36, 37

*In re Gober*,
   100 F.3d 1195 (5th Cir. 1996) ..................................................................................21, 23, 24

*In re Gold*,
   375 B.R. 316 (Bankr. N.D. Tex. 2007) ..................................................................................30

*Grogan* v. *Garner*,
   498 U.S. 279 (1991) ..........................................................................................................16, 18

*Harrison* v. *Kiwi Servs., Inc.*,
   2005 WL 4157412 (S.D. Tex. July 21, 2005) ........................................................................25

*Hawkins* v. *Tyree*,
   483 B.R. 598 (S.D.N.Y. 2012) ...............................................................................................28

*In re Horowitz*,
   103 B.R. 786 (Bankr. N.D. Miss. 1989) ................................................................................25

*In re Huizar*,
   609 B.R. 482 (Bankr. W.D. Tex. 2019) .................................................................................19

*In re Kahn*,
   533 B.R. 576 (Bankr. W.D. Tex. 2015) ...........................................................................31, 38

*Kawaauhau* v. *Geiger*,
   523 U.S. 57 (1998) ..................................................................................................................16

*In re Keaty*,
   397 F.3d 264 (5th Cir. 2005) .................................................................................................18

*In re Lance A. Phillips*,
   2017 WL 113599 (Bankr. E.D. Tex. Jan. 9, 2017) ...............................................................19

*Little* v. *Liquid Air Corp.*,
   37 F.3d 1069 (5th Cir. 1994) .................................................................................................15

*In re Mahadevan*,
   617 F. Supp. 3d 654 (S.D. Tex. 2022) ..............................................................................28, 30

*In re Marx*,
   171 B.R. 218 (Bankr. N.D. Tex. 1994) ..................................................................................19

*In re Massie*,
   2018 WL 3218847 (Bankr. D. Conn. June 29, 2018) ............................................................20

*Mazziotti* v. *Allstate Ins. Co.*,
   695 A.2d 1010 (Conn. 1997) ..................................................................................................18

*McClendon* v. *Springfield*,
   505 B.R. 786 (E.D. Tex. 2013) ..............................................................................................35

*In re Miller*,
   156 F.3d 598 (5th Cir. 1998) .................................................................................................16

*In re Murray*,
    2023 WL 310344 (Bankr. S.D. Miss. Jan. 18, 2023) ........................................35, 36

*Nishimatsu Constr. Co.* v. *Houston Nat'l Bank*,
    515 F.2d 1200 (5th Cir. 1975) ...............................................................................31

*In re Platt*,
    2012 WL 5337197 (Bankr. W.D. Tex. Oct. 29, 2012) ...........................................38

*Pursuit Partners, LLC* v. *Reed Smith, LLP*,
    233 A.3d 1092 (Conn. App. 2020) ....................................................................21, 23

*In re Rabalais*,
    2012 WL 42101 (S.D. Tex. Bankr. Jan. 9, 2012) .................................16, 18, 28, 30

*In re Roberti*,
    183 B.R. 991 (Bankr. D. Conn. 1995) ....................................................................21

*In re Rossman*,
    2019 WL 3330781 (Bankr. D. Conn. July 24, 2019)........................................25, 28

*In re Saxton*,
    2011 WL 2293320 (Bankr. N.D. Tex. June 8, 2011).................................18, 19, 24

*In re Scarborough*,
    171 F.3d 638 (8th Cir. 1999) ..................................................................................25

*In re Scarbrough*,
    836 F.3d 447 (5th Cir. 2016) ..................................................................................26

*In re Shuler*,
    722 F.2d 1253 (5th Cir. 1984) ............................................................................3, 31

*In re Silvestri*,
    2018 WL 736146 (Bankr. D. Conn. Feb. 6, 2018) .................................................27

*Smith* v. *Snyder*,
    839 A.2d 589 (Conn. 2004) ...............................................................................12, 29

*Sossamon* v. *Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) ..................................................................................15

*Stokes* v. *Ferris*,
    150 B.R. 388 (W.D. Tex. 1992)...............................................................................16

*In re Vollbracht*,
    276 F. App'x 360 (5th Cir. 2007) ......................................................................17, 36

*In re Weatherford*,
    2022 WL 174213 (Bankr. N.D. TX. 2022)................................................30, 31, 38

*Wiacek Farms, LLC* v. *Shelton*,
    30 A.3d 27 (Conn. App. 2011) ...............................................................................18

*In re Williams*,
    337 F.3d 504 (5th Cir. 2003) ..................................................................................32

*World Wrestling Entertainment, Inc.* v. *THQ, Inc.*,
  2008 WL 4307568 (Conn. Super. Ct. Aug. 29, 2008)...........................................................23

**Other Authorities**

Bankruptcy Code Section 523(a)(6),
  *codified at* 11 U.S.C. § 523(a)(6) ......................................................................*passim*

*Collier on Bankruptcy* § 523.12[4] (16th ed. 2012).............................................19, 27

Connecticut Unfair Trade Practices Act,
  *codified at* Conn. Gen. Stat. § 42-110a *et seq.* ...............................................*passim*

Federal Rule of Bankruptcy Procedure 8015..............................................................1

Federal Rule of Bankruptcy Procedure 7056.............................................................15

Federal Rule of Civil Procedure 56 .........................................................................15

<u>**PRELIMINARY STATEMENT**</u>

This is an action to determine whether Alexander Jones's debt to Plaintiffs is dischargeable under Section 523(a)(6) of the Bankruptcy Code.  Under Section 523(a)(6), a debt is not dischargeable if it is "for willful and malicious injury," meaning that the debtor's conduct reflects an objective substantial certainty of harm or a subjective motive to cause harm.  The debt here is a $1.4 billion judgment that was the result of five years of contested litigation that culminated in a four-week damages trial.  At the conclusion of the trial, the trial judge issued a forty-five-page opinion that surveyed Jones's entire course of conduct and concluded:

> The **record clearly supports** the plaintiffs' argument that the **defendants' conduct was intentional and malicious, and certain to cause harm** . . . .  The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs.  This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.

(Statement of Uncontested Material Facts ("SUMF") ¶ 43 (emphases added).)  The trial court thus determined that the conduct at issue—Jones's "attacks on the plaintiffs for nearly a decade"—was willful and malicious.

There is no legal basis for this Court to reach a different determination than the judge who oversaw the state court action.  Nor is there any legal basis to absolve Jones from accountability by granting him a discharge from Plaintiffs' claims.  In enacting Section 523(a)(6), Congress determined that—notwithstanding the strong public policy of granting honest debtors a "fresh start"—debtors who inflict "willful and malicious" injuries on third-parties do not deserve a clean slate.  It has already been determined that Jones's reprehensible conduct was willful and malicious and inflicted substantial injury on Plaintiffs.  And it is no secret that the *only* reason Jones filed this bankruptcy case was to escape his obligations to Plaintiffs.  To grant Jones his desired relief, this Court would have to disregard the express findings of the trial judge *and* Congressional intent.

Simply put, Alex Jones does not deserve—and is not legally entitled to—a fresh start. His heinous conduct towards Plaintiffs is a textbook case for the proper application of Section 523(a)(6), and his years' long efforts to avoid accountability for his intentional cruelty should end now.

Plaintiffs are the surviving relatives of victims murdered in the Sandy Hook shooting and one first responder. For years following the shooting, Jones lied to his legions of followers by telling them that Plaintiffs were "crisis actors" who faked their loved ones' deaths. Jones urged his followers to "investigate" Plaintiffs and the Sandy Hook shooting. Jones's followers responded by stalking, harassing, and threatening Plaintiffs, who suffered severe emotional and reputational harm.

Plaintiffs sued Jones in Connecticut for defamation, intentional infliction of emotional distress ("IIED"), and other torts. After years of prolonged discovery abuses and violations of court orders, Jones was defaulted. The disciplinary default established Jones's liability and caused Plaintiffs' allegations—including those concerning the degree of his culpability—to be deemed admitted. A four-week damages trial to a jury and the court followed, in which twenty-five witnesses, including Alex Jones, testified, and 405 full exhibits were submitted. The jury assessed $965 million in compensatory damages. The trial court then assessed punitive damages and, notwithstanding the significant compensatory award, determined that a significant award of punitive damages was also necessary because Jones's conduct was "intentional and malicious," "certain to cause harm," and reflected "the highest degree of reprehensibility and blameworthiness." The damages opinion, jury verdict, and admitted allegations from the Connecticut Action[1] each establish that Jones's conduct was "willful and malicious" under Section 523(a)(6) and preclude any efforts to reopen that determination. These issues were fully contested

---

[1] Terms not otherwise defined herein have the meanings ascribed to them in Plaintiffs' Adversary Complaint, ECF No. 1.

and fully determined in Connecticut and Jones cannot relitigate the nature of his conduct here.

Even if collateral estoppel did not apply, the record from the state court proceeding—which is properly part of a Section 523(a)(6) analysis—confirms that Jones's debt is for willful and malicious injury because his conduct created an "objective substantial certainty" of harm and reflected his "subjective motive to cause harm." The default and damages trial record establish that Jones knew his conspiracy theories about Plaintiffs and the Sandy Hook shooting were false and knew they were harming the families. Within weeks of the shooting, one Sandy Hook parent specifically told Jones about the harm he was causing and asked him to stop. Yet Jones continued to disseminate his lies to tens-of-millions of active followers, claiming Plaintiffs' grief was "acting" and encouraging his followers to "investigate" the supposed hoax. Jones perpetuated these lies to drive profits from his supplement sales business and closely monitored the engagement they drove among his audience. As a result, Plaintiffs were stalked, harassed, and tormented. Plaintiffs were sent death and rape threats; they were physically confronted; and their homes were invaded. Several Plaintiffs were forced to remove website memorials dedicated to their murdered children; some went into hiding.

No additional evidence is needed to determine whether Jones's conduct was willful and malicious. And none would be appropriate. The Fifth Circuit has cautioned that, in the non-dischargeability context, facts that are discernible from a state court record "should not be reopened absent a compelling reason to avoid injustice." *In re Shuler*, 722 F.2d 1253, 1256 (5th Cir. 1984). Here, permitting Jones to take additional discovery or introduce new evidence would not avoid injustice; rather, it would *be an injustice* to reward his years of discovery abuses and litigation misconduct that resulted in a disciplinary default. Plaintiffs respectfully request that this Court grant summary judgment in their favor and hold Jones fully accountable for the harm

he caused.

<div align="center">

**THE FACTUAL RECORD FROM THE CONNECTICUT ACTION**

</div>

The following facts are drawn exclusively from the closed record in the Connecticut Action, which includes orders from the trial court and the Connecticut Supreme Court, trial testimony (including from Jones himself) and exhibits, the jury verdict, the trial court ruling on punitive damages, and allegations from the Connecticut Complaint that were admitted as true by virtue of Jones's default judgment.

**A.      Jones's Intentional and Malicious Lies About the Sandy Hook Shooting Caused Catastrophic and Irrevocable Harm to Plaintiffs**

On December 14, 2012, a young man shot his way into Sandy Hook Elementary School with a semi-automatic Bushmaster XM15-E2S rifle, and in less than five minutes, he killed twenty first-grade children and six adults while wounding two others.  (SUMF ¶ 61; Jones's Answer, ECF No. 56 ("Answer") ¶ 1.)  That terrible day left behind twenty-six families struggling with grief and senseless loss.   (SUMF ¶ 61; Answer ¶ 2.)   Over the next several years, Jones engaged in a deliberate campaign of malicious lies about the shooting—a campaign that made him wealthier and inflicted immeasurable harm on Plaintiffs.

**i.      Jones Lied About the Sandy Hook Shooting to Drive Profits**

When the shooting occurred, Jones hurried to claim it was a hoax in which the Sandy Hook Families were participating as "actors."  Just hours after the shooting, Jones published headlines stating that, according to "witnesses," the shooting was a "false flag."  (SUMF ¶ 62.)  As FSS admitted during trial, Jones knew there were no witnesses who said the shooting was a false flag. (SUMF ¶ 63.)  The day after the shooting, Plaintiff Robert Parker—whose six-year-old daughter Emilie was killed—spoke at a press conference in which he thanked supporters and expressed forgiveness for the shooter's family.  (Answer ¶ 36.)  On December 19, 2012, Jones published an

article on Infowars.com which falsely claimed that Mr. Parker had read off a card at the press conference. (SUMF ¶ 65.)

On January 27, 2013, Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax," in which he described "what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors." Jones scapegoated Mr. Parker again, playing a video of Mr. Parker's statement during which he commented that "They staged fast and furious . . . . Our government, to blame the Second Amendment, they'd stage anything." He continued: "***This needs to be investigated***. They're clearly using this to go after our guns." (SUMF ¶¶ 66–67 (emphasis added).)

On January 29, 2013, Leonard Pozner, the father of a Sandy Hook shooting victim and a plaintiff in the Texas case against Jones, emailed Jones explaining the harm Jones's comments were causing and asking him to stop:

> Alex,
> I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown. Accusing us of being actors . . . . Haven't we had our share of pain and suffering? All these accusations of government involvement, false flag terror, new world order etc. I used to enjoy listening to your shows prior to 12-14-12. Now I feel that your type of show created these hateful people and they need to be reeled in!

(SUMF ¶ 68.)

Rather than change his behavior or retract his lies, Jones doubled down. On April 9, 2013, Jones again told his audience that Sandy Hook was staged, stating, "It's a government operation at the movie theater. No doubt . . . . Sandy Hook, it's got inside job written all over it." (SUMF ¶ 68.)

To create more content to feed that lie, Jones elevated and amplified prominent Sandy Hook deniers like Wolfgang Halbig. (SUMF ¶ 69.) In a May 13, 2014 video on YouTube titled

"Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," Jones featured Halbig and stated, "You're saying a motive for the locals to go along with the fraud is money." Jones continued that, "you've got parents acting . . . it is just the fakest thing since the three-dollar bill." In this same "interview," Jones again played the video of Mr. Parker and ruthlessly mocked him and the Sandy Hook Families:

> I mean, it's fake! Blue screens, it's fake! . . . You got parents laughing [mocking laughing], 'Watch this,' and then [mocking crying] method acting [mocking crying and wailing], 'Oh, my child!' I mean, it's just ridiculous! You've got coroners that start laughing—and I don't mean uncomfortably, I mean like laughing—with the State Police when they're giving press conferences.

(SUMF ¶ 69.)

Jones perpetuated these lies to generate personal profit, and he carefully monitored their effect on his website and social media traffic. For example, a September 24, 2014 article titled "FBI Says No One Killed at Sandy Hook," published on Infowars.com, described the shooting as a "carefully-scripted false flag event" and drove significant new social media traffic, resulting in massive spikes in visits and pageviews to Infowars.com. (SUMF ¶¶ 70–71.) FSS monitored this audience engagement—as Jones did every day—and circulated analytics data for Infowars to emphasize the effectiveness of the false narrative. (SUMF ¶¶ 69–71.) Throughout the years following the shooting, Jones asked for and received sales numbers on a daily basis, providing him a detailed look into how his lies drove website traffic and profits. (SUMF ¶ 73.)

Jones also encouraged his listeners to "investigate" the Sandy Hook shooting and the Sandy Hook Families. On December 28, 2014, Jones took a call during his radio show from a listener who claimed to live close to Newtown, Connecticut. Jones told him, "[t]he whole thing is a giant hoax . . . . The general public doesn't know the school was actually closed the year before . . . They don't know they've sealed it all, demolished the building. They don't know that they had the kids

going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using." He concluded, "I did deep research—and my gosh, it just pretty much didn't happen." (SUMF ¶ 75.)

Jones's malicious, profit-generating lies continued unabated. Between April 8, 2013 and October 4, 2021, Alex Jones discussed the Sandy Hook shooting on his radio show over one hundred times. (SUMF ¶ 76.) For example, on January 13, 2015, Jones described the shooting as "synthetic completely fake with actors, in my view, manufactured." (SUMF ¶ 77.) Jones was once again told to stop because of the harm to the families, this time by Infowars Chief Editor Paul Watson, who told Jones in December 2015: "This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway. Plus it makes us look really bad to align with people who harass the parents of dead kids." (SUMF ¶ 78.) But Jones continued. On November 18, 2016, during an Infowars broadcast, Jones stated, "the only problem is I've watched a lot of soap operas and I've seen actors before, and I know when I'm watching a movie and when I'm watching something real. Let's look into Sandy Hook." (SUMF ¶ 79.)

ii.    Jones's Lies Profoundly Damaged Plaintiffs

Jones attacked Plaintiffs at the lowest and most vulnerable moment of their lives. Plaintiff Mark Barden—whose son Daniel was killed in the shooting—testified that the "lie going on around [him] about [] being an actor[,] about Sandy Hook being a staged event, about Daniel being a fraud and never existed" was "harder beyond what we could ever imagine trying to deal with, trying to deal with the fact that our little boy had just been shot to death in his first grade classroom and how to literally manage one minute to the next, like literally manage from one minute to the next and then also still be parents to [his surviving children] and still be strong for them and still give them some sense of normalcy in what we didn't understand." (SUMF ¶ 81.) Plaintiff Jennifer

Hensel similarly described the devastation of losing a child while being attacked by Jones's followers for having faked it:

> Then you add on the idea that people think that you made all this up for money, or that your child didn't exist—that compounds everything on top of anything you do, and you can't—I couldn't work. I write for a living, and I couldn't form sentences.

(SUMF ¶ 82.)

Plaintiff Robert Parker described how the harassment he and his family suffered "would come in these waves, and it was almost like I knew when Alex Jones had said something, because we would get a huge wave of stuff." (SUMF ¶ 84.) Plaintiff William Aldenberg was targeted as "not a real FBI agent" and "an actor." (SUMF ¶ 85.) Plaintiff Erica Lafferty received a letter stating that she "should die, and then be buried next to [her] fake, dead mother," and received rape threats. (SUMF ¶ 86.) Plaintiffs Francine and David Wheeler received death threats at their child's funeral; intruders later invaded their home and "demanded to see" their son Ben, saying, "I know he's here. I know he's alive." (SUMF ¶ 87.) Several other Plaintiffs, including Mark Barden, William Aldenberg, and Ian Hockley, testified about receiving "death threats" and "violent, threatening messages" at their homes and even in their car windshields. (SUMF ¶¶ 88–90.) Plaintiff Carlee Soto Parisi—whose sister Victoria, a teacher, was killed in the Sandy Hook shooting trying to protect her students from the shooter—testified about how the hoax penetrated her community and that people she had known since middle school thought she was an "actress." (SUMF ¶ 91; Answer ¶ 56.)

Plaintiffs also experienced unrelenting online harassment. For example, Plaintiff Mark Barden was forced to delete his music website "because this hateful stuff threatening stuff, dangerous stuff was coming in so just shut it off." (SUMF ¶ 92.) Plaintiff Francine Wheeler explained that online harassers "took my videos, and my work of 20 years, and they doctored them,

and they made fun of them, and they said, look, see, she's an actor." (SUMF ¶ 93.) Plaintiff Carlos M. Soto described online comments "saying that I wasn't real. Saying that [my sister] wasn't real. And that my family wasn't real." (SUMF ¶ 94.)

The harassment poured into online memorials and foundation websites, many of which Plaintiffs were forced to take down. For example, in connection with his daughter Emilie's memorial page, Plaintiff Robert Parker explained:

> [W]e had eight people that we had allowed to be administrators on the [Emilie memorial] page, who just spent as much free time as they could report-ban-delete, report ban-delete, report-ban-delete—trying to get rid of the stuff, just trying to get it far enough down on the page so that if anybody came to the page, the first thing they would see was something about Emilie and not all of this filth. Then by the middle of January, I finally just turned the page off. I couldn't—I couldn't—I felt like I couldn't protect Emilie's name or her memory anymore. So, I had to get rid of it.

(SUMF ¶ 95.) Plaintiff Ian Hockley did the same with memorial videos for his son:

> I can't remember all the comments that that is what that video started to attract is people saying this must be fake. He's an actor. He's smiling . . . All those things started to appear until we took our video down.

(SUMF ¶ 96.) Plaintiff Jennifer Hensel—whose daughter Avielle was killed in the Sandy Hook shooting—described how "[F]iltering in were people who were attacking our idea and attacking us as actors, and telling us that Avielle didn't exist and that we [were] just trying to get money from the public—and how dare we do something like that." (SUMF ¶ 97.)

Jones's campaign of lies has forced Plaintiffs to live in fear for their own safety and for the safety of their surviving loved ones. For example, Plaintiff Nicole Hockley—whose son Dylan was killed in the Sandy Hook shooting—bought a house "that is purposefully exposed, so you can't get near my house without someone else in the neighborhood seeing you from any angle. I have security lights throughout the whole exterior of the house." (SUMF ¶ 98.) Plaintiff Mark Barden explained, "I have developed a layer of constant hypervigilance, and it's exhausting.

It interferes with your sleep, it interferes with your conscious, it interferes with your thinking, your ability to process." (SUMF ¶ 99.) Plaintiff Robert Parker moved away from Newtown, but the move did not protect his family: "[W]e weren't even halfway through the remodel on this new house, and I see this video on YouTube of all of the county documents about the sale of our house—how much it cost, the address, and the person going through all of that and following— basically, following our steps and the steps of this house and everything. So, immediately, that sense of security that I thought that we had was totally shattered." (SUMF ¶ 100.)

**B.**   **Plaintiffs File the Connecticut Action**

On May 23, 2018, thirteen of the Plaintiffs filed the Connecticut Action in the Judicial District of Fairfield at Bridgeport in Connecticut Superior Court, which was assigned to Judge Barbara N. Bellis. In December 2018 and January 2019, two more Plaintiffs brought suit and their complaints were consolidated with the first complaint in the Connecticut Action. (SUMF ¶¶ 1–2.) Plaintiffs asserted five causes of action: (i) invasion of privacy by false light, (ii) defamation and defamation *per se*, (iii) intentional infliction of emotional distress, (iv) negligent infliction of emotional distress,[2] and (v) violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), codified at Conn. Gen. Stat. § 42-110a *et seq.* (SUMF ¶ 4.)

**C.**   **Jones's "Bad Faith Litigation Misconduct" Leads to Initial Sanctions**

Jones appeared in the Connecticut Action and began an extremely active defense. (SUMF ¶ 25.) On November 21, 2018, Jones moved to dismiss under Connecticut's anti-SLAPP statute. (SUMF ¶ 5.) The Connecticut court granted Plaintiffs' request for discovery to respond to Jones's motion. (SUMF ¶ 6.)

Jones delayed and resisted discovery. He refused to produce even basic analytics data that

---

[2]   Plaintiffs withdrew the negligent infliction of emotional distress claim during trial.

would inform Plaintiffs of daily traffic flows on Infowars.com and its mirror websites and other significant information.  Meanwhile, the limited documents that Jones *did* produce included child pornography.  (SUMF ¶ 8.)  Jones falsely claimed on his show that Plaintiffs' counsel had planted these materials and offered a $1 million bounty to his audience for proof.  (SUMF ¶ 9.)  Following this broadcast, the Connecticut trial court sanctioned Jones by denying him the opportunity to proceed under Connecticut's anti-SLAPP statute.  (SUMF ¶ 10.)  It also warned Jones that it would default defendants "if they from this point forward continue with their behavior with respect to discovery." (SUMF ¶ 12.)

Jones appealed the sanctions to the Connecticut Supreme Court, which affirmed the trial court's ruling.  The Connecticut Supreme Court held that Jones's behavior "posed an imminent and likely threat to the administration of justice" and was "one part of a whole picture of bad faith litigation misconduct."  (SUMF ¶ 13.)

**D.      Jones's Repeated Discovery Violations and Process Abuses Lead to the Entry of a Disciplinary Default**

Following remand, Jones continued actively defending the case, including by seeking extensive discovery from every Plaintiff and by deposing every Plaintiff but one.

Jones also continued his discovery misconduct.  For example, in the very first deposition of a Plaintiff—and while that deposition was ongoing—Jones violated the protective order by using testimony designated as "Confidential-Attorneys Eyes Only" as the basis for a frivolous motion to depose former presidential candidate Hillary Clinton.  (SUMF ¶ 15.)  Jones had previously threatened Plaintiffs' counsel on air in a manner designed to chill their advocacy. (SUMF ¶ 10.)  Now he sought to intimidate Plaintiff Erica Lafferty and all the witnesses who would testify after her.  The trial court understood this, writing that Jones's refusal to conform to the protective order was "frightening" and that it had "grave concerns that [defendants'] actions,

in the future, will have a chilling effect on the testimony of witnesses." (SUMF ¶ 16.)

The discovery misconduct continued. After Jones and FSS violated a court order by failing to produce trial balances for FSS, the court explained that "[t]here is no excuse for the defendants' disregard of not only their discovery obligations, but the two court orders," and stated that it would address sanctions in a future hearing. (SUMF ¶ 17.) When Jones and FSS failed (again) to produce Google Analytics data in violation of multiple court orders, the court found the misconduct sanctionable and indicated that "the court will address the appropriate sanctions at the next status conference." (SUMF ¶ 18.)

Unable to prosecute meaningful discovery, Plaintiffs filed a motion for default judgment on October 6, 2021, which Jones and FSS opposed. (SUMF ¶ 20; Answer ¶ 75.) In its ruling defaulting Jones, the trial court described Jones's deliberate obstruction:

> Here the Jones defendants were not just careless. Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a pattern of obstructive conduct that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.
> . . .
> The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was caused by the Jones defendants willful noncompliance, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims.

(SUMF ¶ 22.) Following the default judgment, Jones and the other defendants filed a notice of defenses. (SUMF ¶ 23.) In a December 24, 2021 order, the court struck those defenses, finding that Jones was "prohibited from contesting liability or raising affirmative defenses in light of the disciplinary default entered against [him]." (SUMF ¶ 24.)

Under Connecticut law, the consequence of a default is that the allegations of the complaint are admitted, and liability is established. *See Smith* v. *Snyder*, 839 A.2d 589, 598 (Conn. 2004).

E.      **The Damages Trial, Jury Verdict, and Punitive Damages Award**

On September 13, 2022, the Connecticut Action proceeded to a trial on damages, in which Jones and his counsel once again fully participated.  (SUMF ¶ 25; Answer ¶ 82.)  The testimony of twenty-five witnesses was presented, including Jones; Brittany Paz, FSS's designee; and FSS current and former employees David Jones, Rob Dew, Tim Fruge, Joshua Owens, Robert Jacobson and Jacob Acosta.  Each Plaintiff testified.  (SUMF ¶ 25.)  Over four hundred full exhibits were entered in evidence.  (SUMF ¶ 25.)  Jones's trial counsel was present throughout the trial, had the opportunity to cross-examine each Plaintiff, and had the opportunity to call witnesses.  (Answer ¶ 82.)

At the close of evidence, the court instructed the jury on October 7, 2022 to "award those damages [they] find to have been proven by a preponderance of the evidence[.]"  (SUMF ¶ 27.)  The court further instructed that, in addition to compensatory damages, common law "[p]unitive damages may be awarded if you find that the defendants' actions in this case were willful[,] wanton or malicious."  (SUMF ¶ 27.)  Punitive damages under CUTPA would be determined by the court.

On October 12, 2022, the jury assessed $965 million in compensatory damages in favor of Plaintiffs and against Jones and FSS for both defamation and emotional distress.  (Answer ¶ 84.)  The jury also found that Plaintiffs were entitled to common law punitive damages.  (SUMF ¶ 36.)

The trial court then assessed the degree of reprehensibility of Jones's course of conduct, beginning shortly after the shooting and continuing through trial.  Even though the compensatory and common law punitive damages already totaled $1.29 billion, the trial court determined that, due to the extreme reprehensibility of Jones's course of conduct, a substantial award of CUTPA punitive damages was also warranted.  (SUMF ¶ 43.)

In its discussion of the first and "most important consideration"—the "degrees o[f] relative blameworthiness"—the court held that Jones's conduct was not merely "reckless," but instead was

13

"intentional and malicious and certain to cause harm":

> ***The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors."*** The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, ***wanton, malicious, and heinous conduct*** that caused harm to the plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the ***highest degree of reprehensibility and blameworthiness***.

(SUMF ¶ 43 (emphases added).)

The court further held that Plaintiffs had clearly established that Jones's and the other defendants' conduct was "motivated by profit":

> [P]laintiffs clearly established that the defendants' conduct was motivated by profit, by virtue of the convincing evidence including the text messages between Alex Jones and Tim Fruge regarding daily sales figures, the business model used by the defendants whereby they emulated content including Sandy Hook content to reap more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook engaged the audience and drove up sales and profit, the spikes in sales revenue following the article 'FBI Says No One Killed at Sandy Hook,' and their use of the plaintiffs even during the trial to make money.

(SUMF ¶ 44.) The court also held that the "trial record establishes that the defendants remain in the unique position of having—and continuing to utilize—an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected. It is, quite simply, unprecedented in American jurisprudence." (SUMF ¶ 45.)

Based on these findings, the court awarded $10 million in CUTPA punitive damages to each of the fifteen plaintiffs in the Connecticut Action. (SUMF ¶ 47.)

On December 22, 2022, the court denied a motion by Jones and the other defendants for a new trial and remittitur, holding that "the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform to spread lies to a massive

audience clearly supports the verdicts, and that the verdicts are within the limits of a fair and just award of damages."  (SUMF ¶ 48.)

On December 29, 2022, Jones and FSS appealed.  (SUMF ¶ 49.)   As a result of the jury's damages verdict, Jones owes debts to the Sandy Hook Families for compensatory and punitive damages in the total amount of $1,438,139,555.94 (the "Connecticut Judgment"), which comprises fifteen separate debts owed to the fifteen different Plaintiff-creditors.[3]  (SUMF ¶ 50.)

## LEGAL STANDARD

### A.    Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, as applicable to this case through Federal Rule of Bankruptcy Procedure 7056, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Plaintiffs may satisfy their burden by pointing to the absence of evidence supporting the non-movant's case. *Sossamon* v. *Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009).  An issue is only "material" if its resolution could affect the outcome of the action, *Burrell* v. *Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007), and a fact is "genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc.* v. *Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

After Plaintiffs meet their initial burden, the burden shifts to the opposing party to set forth "specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed. R. Civ. P. 56(c); *Little* v. *Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Jones may not satisfy his burden as the non-movant "with some metaphysical doubt as to the material facts, by conclusory assertions, by unsubstantiated assertions, or by only a scintilla of evidence." *Id.*

---

[3]    Other parents of children killed in the Sandy Hook shooting filed three defamation lawsuits in Texas in 2018 against Jones and FSS based on the same underlying campaign of lies and harassment by Jones. (SUMF ¶ 101.)

Here, Plaintiffs seek the entry of summary judgment based on the Connecticut Judgment. Thus, there are no disputed issues of fact; the only issue is the effect of the Connecticut Judgment based on the record in the Connecticut Action. *See In re Rabalais*, 2012 WL 42101 (Bankr. S.D. Tex. Jan. 9, 2012) (where creditor seeks summary judgment in adversary proceeding based on state court judgment, "there are no genuine factual issues"); *see also Bowles* v. *Quigley*, 2006 WL 1627921, at *2 (N.D. Tex. June 7, 2006) (when creditor in adversary proceeding relies on state court judgment, bankruptcy court should look to record of the state proceeding).

**B.      Non-dischargeability Under Section 523(a)(6)**

The Supreme Court has explained that "a debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy" and that the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan* v. *Garner*, 498 U.S. 279, 286–87 (1991).  Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt incurred for "willful and malicious injury" by the debtor to another entity.  11 U.S.C. § 523(a)(6).  To prevail under Section 523(a)(6), a creditor must prove by a preponderance of the evidence that the debt is not dischargeable.  *Grogan*, 498 U.S. at 291.  The term "willful" in this provision refers to a deliberate or intentional injury, not a deliberate or intentional act that leads to injury.  *Kawaauhau* v. *Geiger*, 523 U.S. 57, 61 (1998).  "[I]t is the nature of the debtor's conduct and not the nature of the liability which is determinative under Section 523(a)(6)."  *Stokes* v. *Ferris*, 150 B.R. 388, 393 (W.D. Tex. 1992), *aff'd sub nom.*, 995 F.2d 76 (5th Cir. 1993).

"[A]n injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."  *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998).  To establish an objective substantial certainty of harm, the court "analyze[s] whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's subjective intent

16

was to inflict a willful and malicious injury on the plaintiff." *In re Dhaliwal*, 630 B.R. 24, 32 (Bankr. S.D. Tex. 2021). The subjective prong is satisfied if the debtor had an "actual intent to cause injury." *Arguello* v. *LaFavers*, 448 F. Supp. 3d 655, 663 (S.D. Tex. 2020). This prong requires that the debtor intended only "some harm, not just serious harm." *In re Vollbracht*, 276 F. App'x 360, 362 (5th Cir. 2007).

## **ARGUMENT**

The judge who presided over the Connecticut Action summarized the Connecticut record as "clearly" establishing that Jones's decade-long "target[ing]" of Plaintiffs was "certain to cause harm," "intentional and malicious," "cruel," and "persistent," establishing "the highest degree of reprehensibility and blameworthiness." (SUMF ¶ 43.) Both the subjective and objective prongs of Section 523(a)(6) are established as a matter of law.

Collateral estoppel resolves this case. The *precise* question posed by Section 523(a)(6)— whether Jones inflicted willful and malicious injury on Plaintiffs—was litigated and decided against Jones over his active defense in the Connecticut Action. The question of Jones's culpability was determined by the trial court, which held that Jones's entire course of conduct was "intentional and malicious, and certain to cause harm"; the jury verdict, which assessed nearly $1 billion in compensatory damages for Jones's willful and malicious conduct; and admitted facts from the Connecticut complaint. (SUMF ¶¶ 36, 43)

Even without collateral estoppel, the fact that Jones's ten-year course of conduct was willful and malicious was also confirmed by the overwhelming evidence in the Connecticut record. This evidence shows that Jones knew from the beginning that his statements about the Sandy Hook shooting and Plaintiffs were false, yet he continued to peddle lies to drive website traffic and profits. Even after being directly confronted about his lies and the injuries they caused, Jones continued to tell his millions of listeners that the Sandy Hook shooting was "fake," "synthetic,"

and "manufactured." (SUMF ¶ 78.) Jones repeatedly mocked Plaintiffs and encouraged his listeners to "investigate" them, causing Plaintiffs to be harassed, stalked, physically confronted, threatened with rape and death, and forced to remove website memorials to their murdered children. (SUMF ¶¶ 67, 87, 96–97.) All of these facts and many more are established in the Connecticut record, and none of them are subject to dispute or revision here.

**I.    Jones Is Collaterally Estopped from Arguing That His Debt to Plaintiffs Is Not for a "Willful and Malicious" Injury**

Collateral estoppel may apply in a bankruptcy proceeding to establish that a debt is non-dischargeable because it is for a "willful and malicious" injury under Section 523(a)(6). *See Grogan*, 498 U.S. at 285; *In re Keaty*, 397 F.3d 264, 270 (5th Cir. 2005). Collateral estoppel, also known as issue preclusion, "express[es] no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest." *Mazziotti* v. *Allstate Ins. Co.*, 695 A.2d 1010, 1017 (Conn. 1997) (citations omitted). "When giving preclusive effect to a state court judgment, this court must apply the issue preclusion rules of that state." *Keaty*, 397 F.3d at 270. Under Connecticut law, collateral estoppel applies "when three requirements are met: "[1] [t]he issue must have been fully and fairly litigated in the first action, [2] it must have been actually decided, and [3] the decision must have been necessary to the judgment." *Wiacek Farms, LLC* v. *Shelton*, 30 A.3d 27, 32 (Conn. App. 2011).

"The language of Section 523(a)(6) addresses the nature of the debtor's conduct, not the nature of the liability. Thus, all debts from a 'willful and malicious injury' are non-dischargeable, including debts for punitive damages." *In re Saxton*, 2011 WL 2293320, at *8 (Bankr. N.D. Tex. June 8, 2011). "In determining whether collateral estoppel is appropriate, the bankruptcy court should not rely just on the judgment itself, but should also look to the record of the state proceeding." *In re Rabalais*, 2012 WL 42101, at *4.

Bankruptcy courts routinely determine that debts are non-dischargeable under Section 523(a) based on the preclusive effect of state court judgments for defamation, IIED, CUTPA violations, and related torts. *See, e.g.*, *In re Saxton*, 2011 WL 2293320, at *9 (slander and punitive damages); *In re Huizar*, 609 B.R. 482, 491–92 (Bankr. W.D. Tex. 2019) (IIED and punitive damages); *In re Marx*, 171 B.R. 218, 223 (Bankr. N.D. Tex. 1994) (same); *In re Lance A. Phillips*, 2017 WL 113599, at *2 (Bankr. E.D. Tex. Jan. 9, 2017) (invasion of privacy); *In re Backal*, 2013 WL 951232, at *7 (Bankr. E.D. Tex. Mar. 12, 2013) (sanctions order); *In re McGurk*, 2018 WL 1632896, *5 (Bankr. D. Conn. Apr. 2, 2018) (CUTPA); *see also Collier on Bankruptcy* § 523.12[4] (16th ed. 2012) ("[C]laims based on [IIED] have typically been held nondischargeable.").

Here, the Connecticut Judgment and the evidence in the Connecticut record establish that collateral estoppel is appropriate and that the conduct giving rise to this debt—Jones's years of on-air attacks against Plaintiffs—was willful and malicious.

### A.   Jones's Willful and Malicious Conduct Was "Fully and Fairly Litigated" in the Connecticut Action

An issue is "fully and fairly litigated" for purposes of issue preclusion when the party sought to be estopped "had an adequate opportunity to litigate the matter in the earlier proceeding." *Custom Pools* v. *Underwriters Inc.*, 1996 WL 66264, at *2 (Conn. Super. Ct. Jan. 19, 1996). In the damages phase of the case, the issue of Jones's culpability was litigated during a four-week trial in which more than four hundred full exhibits and twenty-five witnesses' testimony were presented; and in which Jones's attorney cross-examined witnesses, had the opportunity to call witnesses, and Jones himself testified. (SUMF ¶ 25.) Plaintiffs presented evidence that Jones's attacks on Plaintiffs began the day of the shooting and continued at trial; that Jones was told in 2013 by a parent that his attacks were causing harm, and he continued his attacks anyway; that Jones's effective social media infrastructure was pushing these attacks out to tens of millions of

19

listeners, and ultimately to hundreds of millions; and that Jones knew these lies were growing his business. Plaintiffs called Jones to testify, and both the jury and the court had the opportunity to assess his malicious intent directly. The jury returned a verdict in Plaintiffs' favor, and the trial court explicitly addressed the willful and malicious nature of Jones's conduct in its damages ruling. (SUMF ¶ 39.) These proceedings easily establish that Jones's willful and malicious intent was "fully and fairly litigated."

The merits proceedings that led to Jones's default and admission of allegations independently satisfy the "fully and fairly litigated" element. Under Connecticut law, when the party to be precluded "participated" in the previous action by, for example, being served, represented by counsel, and filing motions and papers, the "actually litigated" element is met. *See In re Massie*, 2018 WL 3218847, at *1, 3 (Bankr. D. Conn. June 29, 2018) (finding default judgment non-dischargeable where debtors were represented by counsel in state court proceeding and filed responsive pleadings and motions); *In re Bugnacki*, 439 B.R. 12, 25–28 (Bankr. D. Conn. 2010) (finding default judgment non-dischargeable where debtor had been "serve[d]," "represented by counsel," and "fil[ed] papers," and default was awarded because debtor had "failed to comply with various discovery requests as ordered by that court").

Here, Jones removed the action to federal court four times; pursued a special motion under Connecticut's anti-SLAPP statute; was fully heard on his motion to strike, which was denied; insisted on extensive production of Plaintiffs' medical records, personal email correspondence and other documents; deposed every Plaintiff but one; resisted discovery sought from him by every possible means; and opposed default. (SUMF ¶¶ 5, 7, 14, 26.) Jones's participation goes far beyond the level of participation deemed sufficient to invoke collateral estoppel against other defaulted defendants in subsequent non-dischargeability proceedings.

Collateral estoppel is particularly appropriate here to ensure that Jones's bad-faith litigation conduct is not rewarded. "[C]ourts are more likely to afford collateral estoppel effect to default judgments that are entered as a sanction against the defendant for dilatory or otherwise improper litigation tactics." *In re Roberti*, 183 B.R. 991, 1000 (Bankr. D. Conn. 1995). In *In re Gober*, for example, the Fifth Circuit applied collateral estoppel in a Section 523(a)(6) proceeding based on a default judgment that was entered "only after [the debtor] had repeatedly impeded the course of the proceedings by refusing to comply with discovery and by defying court orders," explaining that the debtor's discovery abuses "bolster[ed]" the rationale for collateral estoppel. 100 F.3d 1195, 1205–06 (5th Cir. 1996); *see In re Daily*, 47 F.3d 365, 368 (9th Cir. 1995) ("[D]enying preclusive effect to the [prior default] judgment . . . would permit [a debtor] to delay substantially and perhaps ultimately avoid payment of the debt by deliberate abuse of the judicial process."). As in *Gober* and *Daily*, Jones's litigation misconduct and disciplinary default strongly weigh in favor of preclusive effect and should not be rewarded by allowing him to "avoid payment of his debt."

**B. Jones's Willful and Malicious Injury Was Actually Decided and Necessary to the Connecticut Judgment**

"An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." *Pursuit Partners, LLC* v. *Reed Smith, LLP*, 233 A.3d 1092, 1105 (Conn. App. 2020). The issue of whether Jones inflicted "willful and malicious injury" on Plaintiffs was actually decided and necessary to the Connecticut Judgment in several respects.

      i.     The Court's Damages Ruling Establishes That Jones's Willful and Malicious Conduct Was Actually Litigated and Necessarily Determined

The damages trial concerned the damages arising from Jones's attacks on Plaintiffs.

The  jury's role was to assess compensatory damages and determine whether Plaintiffs should be awarded common law punitive damages.  The trial court likewise heard the evidence as a trier of fact and considered Jones's conduct and the harm he caused to assess punitive damages under CUTPA.

In its post-trial ruling on damages, the trial court determined whether Plaintiffs were entitled to statutory punitive damages under CUTPA and set the amount of common law punitive damages.  To award CUTPA or common law punitive damages, the "evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *See Bridgeport Harbour Place I, LLC* v. *Ganim*, 30 A.3d 703, 732 (Conn. App. Ct. 2011). The "basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive, and violence."  *Id.*

These issues were fully briefed and argued by the parties.  The Connecticut court then issued a forty-five-page decision awarding $150 million in CUTPA punitive damages based on its evaluation of the trial record.  (SUMF ¶¶ 39, 47.)  The Connecticut court described Jones' conduct by giving examples of Jones's statements over a period of years, noting "plaintiffs allege many more examples of comments made by Jones," and that Jones "repeated the conduct and attacks on the plaintiffs for nearly a decade."  (SUMF ¶¶ 41–42.)  The court found that Jones's entire course of conduct was "intentional and malicious," and did ***not*** reflect mere "reckless[ness]."  Critically, when discussing "the most important consideration—the degrees o[f] relative blameworthiness," the trial court had to decide "whether the defendants' conduct was reckless, intentional, or malicious."  (SUMF ¶ 43.)  The court concluded:

> ***The record clearly supports the plaintiffs' argument that the defendants' conduct was intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors."*** The record also establishes that the defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, ***wanton, malicious, and heinous conduct*** that caused harm to the plaintiffs. ***This depravity, and cruel, persistent course of conduct*** by the defendants ***establishes the highest degree of reprehensibility and blameworthiness***.

(SUMF ¶ 43 (emphases added).)  The court also held that "the plaintiffs clearly established that the defendants' conduct was motivated by profit," and that Jones used "an immense media platform and audience to continue to target the plaintiffs." (SUMF ¶ 44.)

These factual findings easily satisfy the issue preclusion standard.  The issue of Jones's culpability was "actually litigated" because it was raised in Plaintiffs' complaint, the subject of discovery and trial testimony, briefed for the court, and the subject of the court's opinion and judgment. *See Pursuit Partners*, 233 A.3d at 1105.  The issue was also "necessarily determined" because the trial court considered Jones's mental state—"the most important consideration"—in awarding punitive damages, and held that Jones's conduct was "intentional," "malicious," "depraved," "cruel," and "certain to cause harm," and not merely "reckless."  SUMF ¶ 43; *see World Wrestling Entertainment, Inc.* v. *THQ, Inc.*, 2008 WL 4307568, at *6 (Conn. Super. Ct. Aug. 29, 2008) (applying collateral estoppel where prior judgment could rest on alternative grounds but court provided "clear and indisputable finding[s]" in its decision); *In re Delaney*, 504 B.R. 738, 749 (Bankr. D. Conn. 2014) ("[B]y making an additional award of punitive damages in this case, the Magistrate recognized that the Defendants' conduct was 'highly reprehensible,' thus raising the level of harm above that of mere recklessness.").

Courts in this circuit have applied issue preclusion to Section 523(a)(6) claims in similar circumstances.  In *Gober*, for example, the Fifth Circuit affirmed a determination that a debt for a state court judgment of conversion was not dischargeable under Section 523(a)(6) after the debtor

suffered a disciplinary default. 100 F.3d at 1205. The Fifth Circuit held that the debtor was "precluded from relitigating the issue of whether his conduct was willful and malicious" because the state court had held, "'after hearing the evidence and arguments of counsel,' that Gober acted 'maliciously and willfully when he converted [the debt], for which exemplary and punitive damages should be awarded.'" *Id.* (quoting state court opinion); *see also In re Cong Nguyen*, 2015 WL 6941301, at *3 (Bankr. S.D. Tex. Nov. 9, 2015) (applying collateral estoppel to Section 523(a)(6) where prior state court held that defendant's "acts were willful and malicious because of the substantial certainty of harm that would and did result" from the defendant's misappropriation of assets); *Harrison* v. *Kiwi Servs., Inc.*, 2005 WL 4157412, at *2 (S.D. Tex. July 21, 2005), *aff'd sub nom.*, 180 F. App'x 485 (5th Cir. 2006) (precluding defendant from relitigating willful and malicious injury based on the state court's finding that his conduct involved "an extreme degree of risk considering the probability and magnitude of the potential harm to others" and that defendant had "actual subjective awareness of the risks and dangers and damages involved but nevertheless proceeded with conscious indifference to the rights of the plaintiff").

The trial court's factual findings concern the nature of Jones's sustained attack on Plaintiffs. "The language of Section 523(a)(6) addresses the nature of the debtor's conduct, not the nature of the liability." *In re Saxton*, 2011 WL 2293320, at *8 (Bankr. N.D. Tex. June 8, 2011). Here, the different claims in the operative Connecticut complaint all arose from this single course of tortious conduct: Jones's lies about the Sandy Hook shooting and targeting of the surviving families. *Supra* § A. The parties' briefing on punitive damages surveyed the entire court record and the totality of Jones's conduct. The court's opinion discussed its review of "the record," and described Jones's "persistent course of conduct" that "continue[d] to target the plaintiffs," even through trial. (SUMF ¶¶ 37, 43.) The trial court's findings apply to the course of conduct that

gave rise to all of Plaintiffs' claims, thus no part of the Connecticut Judgment can be discharged. *See In re Rossman*, 2019 WL 3330781, at *5 (Bankr. D. Conn. July 24, 2019) (under Connecticut collateral estoppel principles, a determination that a certain course of conduct is nondischargeable renders all claims "based on the same facts . . . likewise nondischargeable"); *In re Horowitz*, 103 B.R. 786, 790 (Bankr. N.D. Miss. 1989) ("By subsequently awarding punitive damages, the jury made an implicit finding that the compensatory damages, as well as the punitive damages, arose from willful and malicious conduct."); *In re Scarborough*, 171 F.3d 638, 644 (8th Cir. 1999) ("[W]here the compensatory and punitive damage awards are based on the same underlying conduct, and the judgment for compensatory damages is nondischargeable because it is based on willful and malicious injury to another, then the punitive damages award is likewise nondischargeable.").

Accordingly, the trial court's findings collaterally estop Jones from relitigating the issue of his willful and malicious conduct here.

ii.   The Jury Verdict and Supporting Record Confirm That Jones's Willful and Malicious Conduct Was Actually Litigated and Necessarily Determined

The verdict and jury charge, as overwhelmingly supported by the record, further confirm that Jones is precluded from relitigating the question of whether he inflicted willful and malicious injury on Plaintiffs.

The verdict form reflects that the jury awarded Plaintiffs two types of compensatory damages: (i) defamation damages and (ii) emotional distress damages. (SUMF ¶ 32.) In the jury charge concerning defamation damages, the trial court explained that Jones was liable for defamation *per se*, and described Jones's conduct as *necessarily* causing harm: "[I]n this case, the court has determined that the defendants defamed the plaintiffs by accusing them of faking their children's death, being crisis actors, and fraudulently misrepresenting themselves to the public at

large.  The law presumes that there is injury to the plaintiffs' reputations." (SUMF ¶ 28.)  The trial court also charged that:  "[I]t has been established in this case that the defendants proximately caused harm to the plaintiffs by spreading lies about the plaintiffs to their audience and the public and by urging their audience and the public to investigate and look into the plaintiffs and to stop people supposedly behind the Sandy Hook hoax, resulting in members of the of defendants' audience and the public cyberstalking, attacking, harassing and threatening the plaintiffs, as you have heard in the evidence in this case."  (SUMF ¶ 28.).

These charges, and the jury's verdict awarding Plaintiffs $403,600,000 in defamation damages, (SUMF ¶ 33), also confirm the willful and malicious nature of Jones's course of conduct. Indeed, several courts have held that judgments for defamation *per se* necessarily meet the "willful and malicious" standard under Section 523(a)(6) and are not dischargeable.  *See, e.g.*, *In re Scarbrough*, 836 F.3d 447 (5th Cir. 2016) (affirming lower court's decision that judgment for defamation *per se* was not dischargeable based on, among other things, evidence that debtor posted an inflammatory video to YouTube to interfere with plaintiff's attempt to run for school board); *In re Boland*, 946 F.3d 335, 338 (6th Cir. 2020) ("[A]ll a creditor needs to prove to except a defamation *per se* judgment from discharge is that the debtor knew the facts which made his statements actionable: that they were false and published without privilege to a third party.").

In its discussion of emotional distress damages, the court explained to the jury that Jones was liable for IIED based on determinations that Jones "intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of [his] conduct," and that Jones's conduct was "extreme and outrageous."  (SUMF ¶ 30.)  The jury then awarded emotional distress damages of $561,400,000.  (SUMF ¶ 34.)  The IIED requirement that Jones "intended" to inflict emotional distress, or "knew or should have known" that his conduct would

cause emotional distress, is substantially similar to the Section 523(a)(6) standard that a debtor act with an "objective substantial certainty of harm." Accordingly, "claims based on [IIED] have typically been held nondischargeable." *Collier on Bankruptcy* § 523.12[4] (16th ed. 2012); *see, e.g.*, *Hawkins* v. *Tyree*, 483 B.R. 598, 600 (S.D.N.Y. 2012) (finding that IIED under New York law, which is substantially similar to Connecticut law, necessarily "satisfies the 'willful and malicious injury' standard" and is non-dischargeable) (collecting appeals court cases).

The court also charged the jury that Jones was liable for violating CUTPA because his "business conduct was predicated on damaging the plaintiffs and was immoral, unethical, oppressive, or unscrupulous," and instructed that CUTPA damages were "included in the other damages measures" described in the charge. (SUMF ¶ 35.) Courts applying Connecticut law routinely hold that violations of CUTPA necessarily satisfy the "willful and malicious" standard of Section 523(a)(6). *See, e.g.*, *In re McGurk*, 2018 WL 1632896, *5 (holding that CUTPA violation collaterally estopped debtor from relitigating "willful and malicious injury" where trial court held that "the conduct of the defendants . . . was unethical, immoral, unscrupulous and likely to cause substantial injury"); *In re Silvestri*, 2018 WL 736146, *3, 6 (Bankr. D. Conn. Feb. 6, 2018) (similar).

The jury verdict is entitled to preclusive effect. As discussed above, the question of Jones's knowledge and intent was actually litigated in the four-week damages trial. *Supra* § E. This issue was also "necessarily determined" because willful and malicious conduct is a "required element[]" of several claims for which the jury awarded significant damages. *Bank of Am., N.A.* v. *Testa*, 2016 WL 4744100, at *3 (Conn. Super. Ct. Aug. 8, 2016). Indeed, a determination that *any* claim satisfies the "willful and malicious" standard would necessarily apply to the entire Connecticut Judgment because all of Plaintiffs' claims are based on a single, unified course of tortious conduct.

*See In re Rossman*, 2019 WL 3330781, at *5 (holding that, where verdict on one tort favored nondischargeability, verdict on other torts "based on the same facts" were "likewise nondischargeable").

The nature of Jones's conduct—and Plaintiffs' entitlement to collateral estoppel on this issue—is also evident from the record supporting the jury's verdict. "In determining whether collateral estoppel is appropriate, the bankruptcy court should not rely just on the judgment itself, but should also look to the record of the state proceeding." *In re Rabalais*, 2012 WL 42101, at *4 (S.D. Tex. Bankr. Jan. 9, 2012). "[A] court can look beyond the [state court] judgment and [jury] instructions to see if the evidence produced in the state-court proceedings supports a finding of intent" under Section 523(a)(6). *In re Mahadevan*, 617 F. Supp. 3d 654, 665 (S.D. Tex. 2022).

As discussed in great detail below, *infra* § II.B–C, the Connecticut record contains substantial evidence demonstrating that Jones knew his statements about the Sandy Hook shooting and Plaintiffs were false, yet he continued to disseminate his lies to drive website traffic and profits. The evidence demonstrates that Jones's attacks caused Plaintiffs catastrophic harm. The judge and jury that reviewed the record determined that Jones's conduct was "intentional and malicious, and certain to cause harm," and awarded Plaintiffs more than $1.4 billion in damages. When considered in connection with the record that produced it, there is no question that the Connecticut Judgment reflects a determination of willful and malicious conduct that is preclusive here. *See In re Rabalais*, 2012 WL 42101, at *4 (finding debt from state court judgment non-dischargeable on collateral estoppel grounds based on "the presentation of testimony and evidence" from the state court proceeding).

iii.   The Allegations Admitted as True by Virtue of the Default Judgment Are Also Entitled to Preclusive Effect

The factual allegations in the Connecticut complaint also estop Jones from contesting the

28

willfulness and maliciousness of his conduct. Jones's repeated discovery violations and defiance of court orders led the Connecticut court to enter a default judgment against Jones. *Supra* § D. Under Connecticut law, "the entry of the default judgment conclusively established the facts alleged in the plaintiffs' complaint." *Snyder*, 839 A.2d at 598; *DeBlasio* v. *Aetna Life & Cas. Co.*, 441 A.2d 838, 839 (Conn. 1982).

The default judgment against Jones thus "conclusively established" material facts about his knowledge and intent, including that:

- "Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has."

- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."

- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people," including "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."

- "Jones's outrageous, cruel and malicious conduct was the cause of the plaintiff's distress."

- "In light of [his] prior experience with similar sorts of reckless and false statements, [Jones] knew that [his] publications could cause the plaintiffs to suffer harassment and potential violence."

- Jones "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and . . . did so for profit."

- "In broadcasting [his] campaign of outrageous and false statements about the plaintiffs, [Jones] intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of [his] conduct."

(SUMF ¶ 21.)

The Fifth Circuit's reasoning in *In re Caton* is instructive. 157 F.3d 1026, 1029 (5th Cir. 1998), *as amended on reh'g* (Nov. 3, 1998). In evaluating the preclusive effect of a

default judgment for Section 523(a)(6) purposes, the Fifth Circuit noted: "[t]he default judgment must rest upon the allegations of the petition.  Thus, because the factual allegations are deemed admitted and the default judgment necessarily rests thereon, we are able to determine conclusively the issue decided by the court when rendering the default judgment."  *Id.*  The Fifth Circuit held that "there was a deliberate or intentional injury, precluding discharge under § 523(a)(6), as Caton's libelous statements were objectively substantially certain to result in the injury to Trudeau."  *Id.*; *see also In re Gold*, 375 B.R. 316, 334 (Bankr. N.D. Tex. 2007) (finding Section 523(a)(6) applicable based on factual allegations admitted by virtue of default judgment).

In addition to the trial court's damages opinion, the jury charge and verdict, and the trial record, the default judgment also conclusively established that Jones willfully and maliciously lied about the Sandy Hook shooting, its victims, and their surviving families, and precludes Jones from relitigating these issues.

## II. The Record from the Connecticut Action Confirms That the Judgment Arises from Jones's "Willful and Malicious Injury"

The expansive record from the Connecticut Action independently confirms the trial court's view that Jones's course of conduct was willful and malicious.

### A. Bankruptcy Courts May Look to the State Record to Determine Non-dischargeability

"[A] court can look beyond the [state court] judgment and [jury] instructions to see if the evidence produced in the state-court proceedings supports a finding of intent" under Section 523(a)(6).  *In re Mahadevan*, 617 F. Supp. 3d at 665 (citation omitted).  Accordingly, bankruptcy courts routinely find state court judgments non-dischargeable based solely on the state court record that produced the judgment.  *See, e.g.*, *In re Rabalais*, 2012 WL 42101, at *4 (finding debt from state court judgment non-dischargeable based on "the presentation of testimony and evidence" from the state court proceeding); *In re Weatherford*, 2022 WL 174213, at *1 (Bankr.

N.D. Tex. 2022) (finding debt non-dischargeable at the summary judgment stage based on documentary evidence from state court proceeding including an affidavit submitted by the debtor that "describe[d] his side of the story"); *see also In re Kahn*, 533 B.R. 576, 590 (Bankr. W.D. Tex. 2015) (deciding debt non-dischargeable at the summary judgment stage based solely on the prior state court record).

Jones may ask to take additional discovery and enter new evidence here that was not submitted in the Connecticut Action. As the Fifth Circuit has explained in the non-dischargeability context, however, "[t]he bankruptcy court may not relitigate the entire case; to do so would do violence to judicial finality, a fundamental tenet of our judicial system." *Shuler*, 722 F.2d at 1256 (5th Cir. 1984) (quoting another source). As a result, "[t]hose facts that were actually litigated and necessary to the decision in the court that rendered the judgment, ***and that are discernible from the record of the case***, should not be reopened absent a compelling reason to avoid injustice." *Id.* (emphasis added).

Jones has not identified any additional discovery or evidence he needs, and certainly has not provided a "compelling reason" to do so. All the facts material to the Court's decision—indeed far more than necessary—are "discernible" in the Connecticut record. *See Nishimatsu Constr. Co.* v. *Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("Attempts by a defendant to escape the effects of his default should be strictly circumscribed; he should not be given the opportunity to litigate what has already been considered admitted in law.").

Moreover, the plain language of Section 523(a)(6) confirms that any additional discovery would be irrelevant. A "debt" is not dischargeable under Section 523(a)(6) of the Bankruptcy Code if it is incurred "for willful and malicious injury." The relevant "debt" here is the Connecticut Judgment, which was issued by a judge and jury after nearly five years of litigation, including a

four-week damages trial featuring live testimony from Plaintiffs and Jones. The question of whether that debt is "for willful and malicious injury" is necessarily confined to the record that produced it. Even if Jones were permitted to introduce new evidence now, the evidence would be irrelevant because it would not have been considered in the Connecticut Action and formed no part of Jones's debt to Plaintiffs.

**B.** **Jones's Conduct Was Objectively Substantially Certain to Cause Harm**

There is no genuine dispute based on the Connecticut record that Jones's tortious conduct was "substantially certain" to harm Plaintiffs, such that it satisfies the "objective" prong of Section 523(a)(6). *See In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003). The Connecticut court explicitly held that Jones's years-long on-air targeting of Plaintiffs was "certain to cause harm." (SUMF ¶ 43.) Even if this finding alone did not resolve the analysis in Plaintiffs' favor, the record in Connecticut overwhelmingly confirms this conclusion.

The evidence shows that at the time of the Sandy Hook shooting, Jones had carefully built an infrastructure designed to spread his content as far as possible. Jones broadcast on Infowars.com to an audience of "tens of millions of listeners and viewers each month." (SUMF ¶ 55.) He systematically posted his content to YouTube, Twitter, and Facebook through multiple accounts. (SUMF ¶ 55.) This sprawling infrastructure allowed Jones to engage a "massive audience" of 49 million users on his website alone; according to unrebutted expert testimony, nobody else "operating in Alex Jones ['s] sphere of influence . . . came remotely close." (SUMF ¶ 56.) As a result of this reach, Jones's Sandy Hook lies secured an *absolute minimum of 550 million impressions* on social media alone. (SUMF ¶ 57.) The full reach of the defendants' lies could not be determined because of information that the defendants failed to produce. (SUMF ¶ 77.)

Jones conditioned his massive audience to believe that he—and only he—would tell them

the truth.  At trial, Jones testified that "of [his] many, many, many, millions of audience members,
. . . many of them believe what [he] say[s]."  (SUMF ¶ 26.)  Jones held himself out as a warrior
for the truth and a trusted newsman; he marketed Infowars as "the House that Truth Built," and
the show's tagline was "the frontline of truth journalism."  (SUMF ¶ 54.).  But Jones was not a
journalist.  He frequently peddled lies and conspiracy theories without investigating the facts.  For
example, FSS admitted during trial that Jones made *no attempt* to investigate the Sandy Hook
shooting before publishing his lies to millions, and that Jones lied when he told his audience that
he had done an "investigation" and "deep research" into the shooting.  (SUMF ¶ 63.)  Jones also
conditioned his audience to attack his perceived enemies as "infowarriors."  (SUMF ¶ 43.)

As the trial court explicitly found, Jones's tortious conduct "was motivated by profit."
(SUMF ¶ 44.)  The trial evidence demonstrates that Jones disseminated lies to drive spikes in
viewership and audience engagement.  For example, a September 24, 2014 article published on
Infowars.com titled "FBI Says No One Killed at Sandy Hook" drove new social media traffic,
resulting in massive spikes in visits and pageviews to Infowars.com. *See supra* § A.i; SUMF ¶ 69.
Infowars.com monitored audience engagement with the article and employees emailed each other
screenshots boasting of the huge spikes in engagement generated by the article.  (SUMF ¶ 71.)
The spikes in audience engagement led to spikes in sales revenue in the following days.
(SUMF ¶ 72.)  Witnesses testified that Jones personally focused on his store's performance after
each broadcast, and that Jones sought to "emulate spikes" by repeating and generating similar
content.  (SUMF ¶ 72.) Plaintiffs' expert explained that Jones exploited the Sandy Hook shooting
with messaging based in fear and anger "to create engagement with his audience . . . designed to
bring more sales over time."  (SUMF ¶ 74.)

It was against this backdrop—with tens of millions of highly-engaged and activated

audience members who viewed Jones as a beacon of truth—that Jones attacked Plaintiffs. Given the reach of Jones's platforms and the infrastructure he had built, even one lie about Plaintiffs would have caused profound harm. But Jones attacked Plaintiffs over and over again. Beginning on *the day of the shooting*, Jones told this massive audience that the Sandy Hook shooting was a hoax, publishing an Infowars video titled "Connecticut School Massacre Looks Like False Flag Says Witnesses." (SUMF ¶ 62.) Jones told his audience that Plaintiffs' murdered children and families never existed. Jones played videos of Plaintiffs on his show and told his audience that Plaintiffs were "crisis actors" and part of a conspiracy to take away their guns. *See supra* § A.i. Jones mocked a video of Plaintiff Robert Parker crying the day after his daughter was murdered and told his audience Mr. Parker was "read[ing] off [a] card" and "a worse actor than Glenn Beck." (SUMF ¶¶ 65, 81.) Jones accused Plaintiffs of "method acting," "heavy, heavy, heavy scripting," and "doing the actor breathing to cry." (SUMF ¶ 81.) Jones also encouraged his audience to "investigate" Plaintiffs and the Sandy Hook shooting, calling it "synthetic" and "completely fake." *See supra* § A.i.

Jones's own testimony during the trial confirmed that his conduct created an objective certainty of harm to Plaintiffs. While on the stand, Jones was asked: "[I]f someone were to falsely claim that a group of families who have lost loved ones were actors and had faked the deaths of their loved ones, that would be a horrible thing to say, correct?" He responded, "In the context, it could be, yes." (SUMF ¶ 26.) Jones admitted to mocking Plaintiff Robbie Parker because he thought Parker's video "looked fake." (SUMF ¶ 26.) Jones admitted that a video critical of Plaintiff William Aldenberg, and featuring his image, was posted to Jones's website *during the trial*, even *after* Jones had heard Mr. Aldenberg testify about the threats and harassment he'd received as a result of Jones's prior attacks. (SUMF ¶ 26.) Jones also admitted that lying about a

34

person to "even just a small group of people" can be "very hurtful," and that Jones had initiated his own defamation suit during the Connecticut trial against a news show based on a tweet that had received 37 likes and 20 retweets; Jones's lies about Sandy Hook, by contrast, had reached *550 million* impressions on social media alone.  (SUMF ¶ 57.)

All of this evidence was adduced in the Connecticut case by Plaintiffs as part of their case in chief.  When it was Jones's turn to present evidence, he called no witnesses and chose not to testify on direct.  Jones's counsel played only one video, which was already in evidence, and rested. (SUMF ¶ 26.)

The objective certainty that Jones's conduct would harm Plaintiffs is amplified by the fact that Jones targeted Plaintiffs at the lowest and most vulnerable moment of their lives.  Plaintiff David Wheeler testified that "after the shock of . . . Ben's murder . . . I felt like I was under water and I didn't know—I didn't know which way was up."  (SUMF ¶ 88.)  Plaintiff Mark Barden testified that the "lie going on around [him]" was "harder beyond what we could ever imagine trying to deal with, trying to deal with the fact that our little boy had just been shot to death in his first grade classroom."  *See supra* § A.ii.  Plaintiff Jennifer Hensel described the devastation of losing a child and then being attacked as having faked it: "you add on the idea that people think that you made all this up for money, or that your child didn't exist—that compounds everything on top of anything you do, and you can't—I couldn't work."  *See supra* § A.ii.

Courts routinely find that far less egregious conduct meets the objective certainty prong. *See, e.g.*, *McClendon* v. *Springfield*, 505 B.R. 786, 793 (E.D. Tex. 2013), *aff'd sub nom.*, 765 F.3d 501 (5th Cir. 2014) ("the pernicious nature of a false statement to a third party accusing another person of [theft] creates an objective substantial certainty of harm to that person"); *In re Murray*, 2023 WL 310344, at *8 (Bankr. S.D. Miss. Jan. 18, 2023) (defendant's conduct, which consisted

of publishing "tweets falsely stating that [the plaintiff] was promiscuous," was certain to cause harm); *In re Bowles*, 2005 WL 6443632, at *2 (Bankr. N.D. Tex. Oct. 27, 2005) (defendant's statements at a gathering that plaintiffs acted unethically were willful and malicious because it "should have been obvious that such statements would hurt the plaintiffs' future business"); *In re Gharbi*, 2011 WL 831706, at *10 (Bankr. W.D. Tex. Mar. 3, 2011), *aff'd*, 2011 WL 2181197 (W.D. Tex. June 3, 2011) (conduct was substantially certain to cause harm where the defendant continued to operate website domains that used the plaintiff's trademarks). Plaintiffs' evidence leaves no genuine dispute of material fact that Jones's conduct "was substantially certain to result in harm" and is therefore not dischargeable under Section 523(a)(6).

## C.    Jones Acted with a Subjective Motive to Cause Harm

A subjective motive to cause harm exists when someone acts "deliberately and intentionally in knowing disregard of the rights of another." *In re Gharbi*, 2011 WL 831706, at *9 (citations omitted). Such knowing disregard is demonstrated where a defendant has been put on notice that his conduct risked legal liability, yet continued to act. *See id.* at *10. This "subjective" prong of Section 523(a)(6) requires that the debtor intended only "some harm, not just serious harm." *In re Vollbracht*, 276 F. App'x 360, 362 (5th Cir. 2007).

The Connecticut record establishes beyond a preponderance that Jones knowingly disregarded the rights of Plaintiffs and intended to cause them harm.

Jones knew early on that his lies were false and harmed the Sandy Hook Families, yet he continued to attack Plaintiffs with his lies for years. *See supra* § A.i. Although Jones repeatedly told his audience that his statements questioning the Sandy Hook shooting were based on his "research" and "investigation," (SUMF ¶ 75), FSS confirmed at trial that these statements, too, were lies. (SUMF ¶ 63.) In November 2013, the Connecticut State's Attorney General published an exhaustive report of the Sandy Hook shooting, which again gave lie to any notion that the Sandy

Hook shooting was a hoax.  (SUMF ¶ 68.)  Indeed, Infowars Chief Editor Paul Watson wrote in

an email that he had conveyed to Jones that:

> This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people
> like Rense and Fetzer who all hate us anyway.  Plus it makes us look really bad to
> align with people who harass the parents of dead kids.

(SUMF ¶ 78.)  Jones also knew early on that his lies about the Sandy Hook Families caused them

harm.  On January 29, 2013, barely six weeks after the shooting, Leonard Pozner—the father of a

Sandy Hook shooting victim and a plaintiff in cases brought in Texas—notified Jones about the

injuries he was causing and asked him to change his behavior:

> Alex, I am very disappointed to see how many people are directing more anger at
> families that lost their children in Newtown. ***Accusing us of being actors* . . . .
> *Haven't we had our share of pain and suffering?*** All these accusations of
> government involvement, false flag terror, new world order etc. I used to enjoy
> listening to your shows prior to 12-14-12. Now I feel that your type of show created
> these hateful people and they need to be reeled in!

(SUMF ¶ 68 (emphasis added).)  The fact that Jones's attacks continued unabated demonstrates

his subjective intent to harm Plaintiffs.  *See In re Gharbi*, 2011 WL 831706, at *10 (finding

subjective motive prong satisfied where defendant was warned that "some of [it]s domains appear

to be . . . . infringements," yet the defendant continued to operate the domains "deliberately and

intentionally, in knowing disregard of the rights of the [p]laintiff").

    The harm Jones's lies inflicted on Plaintiffs was also glaringly obvious, and Jones's intent

can be inferred from the viciousness and directness of his attacks.  Jones intends his attacks on

others to unleash waves of harassment, describing himself as the first wave of artillery that allows

the infantry (his listeners) to press forward: "I am a precision guided heavy munition, coming in

on top of you. I'm here to stand up for the innocents.  I don't like you.  I don't like you getting

away with what you do. You make me sick.  So, I hit the barbed wire, and ***everybody else comes

in over me***."  (SUMF ¶ 60.)  Jones directed his audience to "investigate" the Sandy Hook shooting

and Sandy Hook Families; they day after the shooting Jones told his audience that, during Mr. Parker's press conference, "[i]t appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, *so this needs to be looked into*." (SUMF ¶ 65.)

Weeks later, in his January 27, 2013 broadcast titled "Why People Think Sandy Hook is A Hoax," Jones instructed his audience, "*This needs to be investigated*." *Supra* § A.i.  These direct attacks clearly prove Jones's subjective motive.  *See In re Platt*, 2012 WL 5337197, at *4 (Bankr. W.D. Tex. Oct. 29, 2012) (inferring subjective intent where the "[p]laintiff's injuries and the circumstances surrounding the incident foreclose[d] the possibility that the [d]efendant acted without the subjective intent to harm"); *In re Weatherford*, 2022 WL 174213, at *3 ("the escalating events" leading to an altercation and "the severity of the [p]laintiff's injury . . . support the court's conclusion that the [d]ebtor subjectively intended to harm the [p]laintiff").

This evidence leaves no genuine dispute of material fact that Jones intended to cause at least "some harm" to his victims.  *See In re Kahn*, 533 B.R. at 589 (granting summary judgment where defendant's action of bringing a suit that was fictitious, frivolous, and groundless evidenced an "intent to harm").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment.  Plaintiffs request judgment be entered in their favor declaring that Jones's debt to them, as reflected in the Connecticut Judgment, is non-dischargeable in Jones's chapter 11 bankruptcy proceeding.

Dated: New York, New York
         May 12, 2023

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, Texas  78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011

*Counsel to the Sandy Hook Families*

**KOSKOFF KOSKOFF & BIEDER PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, Connecticut  06604
Telephone:  (203) 336-4421

*Counsel to the Sandy Hook Families Other
Than Richard M. Coan, as Chapter 7 Trustee
for the Estate of Erica Lafferty*

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Daniel S. Sinnreich (admitted *pro hac vice*)
Daniel A. Negless (admitted *pro hac vice*)
Briana P. Sheridan (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990

*Counsel to the Sandy Hook Families Other
Than Richard M. Coan, as Chapter 7 Trustee
for the Estate of Erica Lafferty*

**ZEISLER & ZEISLER, PC**
Eric Henzy (admitted *pro hac vice*)
10 Middle Street, 15th Floor
Bridgeport, Connecticut  06604
Telephone:  (203) 368-5495

*Counsel to Richard M. Coan, as Chapter 7
Trustee for the Estate of Erica Lafferty*

## <u>CERTIFICATE OF WORD COUNT</u>

This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 12,662 words.

Dated: May 12, 2023

<div align="center">

By:    <u>*/s/ Ryan E. Chapple*          </u>
           Ryan E. Chapple

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was filed and served on all persons entitled to receive notice via operation of this Court's CM/ECF system on May 12, 2023.

<div style="margin-left: 45%;">

*/s/ Ryan E. Chapple*  
Ryan E. Chapple

</div>