## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  | § |  |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
|  | § |  |
| ALEXANDER E. JONES | § | CASE NO. 22-33553 (CML) |
|  | § |  |
| Debtor. | § |  |
|  | § |  |
|  | § |  |
| ------------------------------------------------------- | § |  |
| DAVID WHEELER, FRANCINE | § |  |
| WHEELER, JACQUELINE BARDEN, | § | Adv. Proc. No. 23-3037 |
| MARK BARDEN, NICOLE HOCKLEY, | § |  |
| IAN HOCKLEY, JENNIFER HENSEL, | § |  |
| DONNA SOTO, CARLEE SOTO-PARISI, | § |  |
| CARLOS M. SOTO, JILLIAN SOTO | § |  |
| MARINO, WILLIAM ALDENBERG, | § |  |
| WILLIAM SHERLACH, ROBERT | § |  |
| PARKER, AND RICHARD M. COAN, as | § |  |
| chapter 7 trustee for the estate of ERICA | § |  |
| LAFFERTY, | § |  |
|  | § |  |
| Plaintiffs, | § |  |
|  | § |  |
| v. | § |  |
|  | § |  |
| ALEXANDER E. JONES | § |  |
|  | § |  |
| Defendant. | § |  |
|  | § |  |

---

## DEFENDANT'S OBJECTION AND RESPONSE
## TO MOVANTS' MOTION FOR SUMMARY JUDGMENT

---

**Submitted by:**

Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
CROWE & DUNLEVY, P.C.
2525 McKinnon Avenue, Suite 425
Dallas, TX 75201
Telephone: 737- 218-6187
dallaseservice@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT**

J. Christopher Davis
OBA #16629 (admitted *pro hac vice*)
Deric J. McClellan
OBA # 32827 (admitted *pro hac vice*)
CROWE & DUNLEVY, P.C.
222 N. Detroit Ave., Suite 600
Tulsa, Oklahoma 74120
dallaseservice@crowedunlevy.com
**ATTORNEYS FOR DEFENDANT**

DATED: June 13, 2023

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................1

II.  DEFENDANT'S ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT ..........3

   A.  The State-Court Action ...............................................................................3

   B.  Additional Facts about Defendant ...............................................................4

III. ARGUMENT AND BRIEF IN SUPPORT .........................................................8

   A.  Under Connecticut's collateral-estoppel law, the issue of the § 523(a)(6) exception to discharge in bankruptcy would not be precluded from litigation by default judgments of emotional distress and defamation ......................................................................9

     1.  Connecticut law requires that an identical issue be actually litigated and necessarily decided before giving an issue the preclusive effect of collateral estoppel .................9

     2.  The § 523(a)(6) issue was not necessarily decided by the default judgment in the prior proceeding ...........................................................................................11

        a.  A judgment for emotional distress does not necessarily decide the § 523(a)(6) issue...............................................................................................11

        b.  A judgment for defamation does not necessarily decide the § 523(a)(6) issue. ...............................................................................................13

        c.  Common law punitive damages do not necessarily decide the § 523(a)(6) issue...............................................................................................15

        d.  CUPTA punitive damages do not necessarily decide the § 523(a)(6) issue. ....17

     3.  The § 523(a)(6) issue was not actually litigated in the prior proceeding.  .................19

   B.  The Default Judgment and the Connecticut Damages Order violates the First Amendment and is thus not entitled to the preclusive effect of collateral estoppel via the Full Faith and Credit statute, codified at 11 U.S.C. § 1738. ..................................................23

     1.  The First Amendment protects against tort claims that intrude on free speech..........24

     2.  Defendant's speech is protected from tort liability by the First Amendment.............27

   C.  Under Connecticut law, even when applicable, the doctrine of collateral estoppel must give way when, as here, the convenience it affords is outweighed by questions concerning the quality, extent, or fairness of the prior proceeding. ..................................30

i

D.  Bankruptcy courts will not apply collateral estoppel when, as here, a party skews the prior proceeding with the specific intention to obtain a non-dischargeable judgment. .....36

E.  Viewed in the light most favorable to the non-moving party, the record provided does not establish that Movants are entitled to judgment as a matter of law. ...............................38

IV. CONCLUSION .......................................................................................................................39

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ............................................................................................8

*Advanced Fin. Servs., Inc. v. Associated Appraisal Servs., Inc.*,
   830 A.2d 240 (Conn. App. 2003) ........................................................................17

*Arizona v. Mayorkas*,
   143 S. Ct. 1312 (2023) .......................................................................................28

*Automated Salvage Transp. Co. v. Swirsky (In re Swirsky)*,
   372 B.R. 551 (Bankr. D. Conn. 2006) ...........................................................8, 38

*B.B. v. Bradley (In re Bradley)*,
   466 B.R. 582 (B.A.P. 1st Cir. 2012) ...................................................................13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................................38

*Birnie v. Elec. Boat Corp.*,
   953 A.2d 28 (Conn. 2008) .............................................................................10, 31

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ...........................................................................................32

*Boos v. Barry*,
   485 U.S. 312 (1988) ...........................................................................................27

*Bui v. Do (In re Do)*,
   Adv. No. 11-01027-CAG, 2013 WL 1429435 (Bankr. W.D. Tex. Apr. 9,
   2013) ...................................................................................................................13

*Bush v. Balfour Beatty Bahamas Ltd. (In re Bush)*,
   62 F.3d 1319 (11th Cir. 1995) ............................................................................20

*Cohen v. California*,
   403 U.S. 15 (1971)..............................................................................................30

*Cooper Tire & Rubber Co. v. Farese*,
   423 F.3d 446 (5th Cir. 2005) .........................................................................8, 38

*Crain v. Limbaugh (In re Limbaugh)*,
   155 B.R. 952 (Bankr. N.D. Tex. 1993).....................................................20, 21, 23

*Cumberland Farms, Inc. v. Town of Groton*,
　　808 A.2d 1107 (Conn. 2002) ........................................................30

*Cweklinsky v. Mobil Chem. Co.*,
　　837 A.2d 759 (Conn. 2004) ..........................................................13

*Deutsche Bank AG v. Sebastian Holdings, Inc.*,
　　166 A.3d 716 (Conn. App. 2017) ..................................................10

*Dodson v. Church (In re Church)*,
　　69 B.R. 425 (Bankr. N.D. Tex. 1987).............................................36

*Doughty v. Hill (In re Hill)*,
　　265 B.R. 270 (Bankr. M.D. Fla. 2001) ...........................................12

*Dowling v. Finley Assocs.*,
　　727 A.2d 1245, 1252 (Conn. 1999) ...........................................10, 14

*Efthimiou v. Smith*,
　　846 A.2d 222 (Conn. 2004) ............................................................9

*FDIC v. Daily (In re Daily)*,
　　47 F.3d 365 (9th Cir. 1995) ...........................................................20

*Fitch v. Fitch (In re Fitch)*,
　　349 B.R. 133 (Bankr. N.D. Tex. 2006), *as amended* (Aug. 2, 2006) ....................................31

*Freedman v. State of Md.*,
　　380 U.S. 51 (1965)........................................................................33

*Gambardella v. Apple Health Care, Inc.*,
　　969 A.2d 736 (Conn. 2009) .......................................................14, 16

*Gilbert v. Dang (In re Dang)*,
　　560 B.R. 287 (S.D. Tex. 2016) .......................................................12

*Gladysz v. Plan. & Zoning Comm'n of Town of Plainville*,
　　773 A.2d 300 (Conn. 2001) .................................................10, 11, 30

*Gleason v. Smolinski*,
　　125 A.3d 920 (Conn. 2015) .......................................................12, 14

*Gober v. Terra + Corp. (In re Gober)*,
　　100 F.3d 1195, 1201 (5th Cir. 1996) ........................................9, 16, 20

*Grogan v. Garner*,
　　498 U.S. 279 (1991).................................................................19, 20

*H.J. Bushka Lumber & Millwork v. Boucher (In re Boucher)*,
    336 B.R. 27 (Bankr. D. Conn. 2005) .................................................................10, 19

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
    515 U.S. 557 (1995) .................................................................................................25

*Independent Party of CT–State Central v. Merrill*,
    200 A.3d 1118 (Conn. 2019) ..................................................................................10

*Irvin v. Faller (In re Faller)*,
    547 B.R. 766 (Bankr. W.D. Ky. 2016) ...................................................................15

*Jackson v. R.G. Whipple, Inc.*,
    627 A.2d 374 (Conn. 1993), *abrogated on other grounds by Macomber v.*
    *Travelers Prop. & Cas. Corp.*, 804 A.2d 180 (Conn. 2002) ..................................11

*Jefferson v. Holland (In re Holland)*,
    428 B.R. 465 (Bankr. N.D. Ill. 2010) .....................................................................15

*Kawaauhau v. Geiger*,
    523 U.S. 57, 61-62 (1998) ...............................................................13, 15, 17, 19, 36

*King v. Huizar (In re Huizar)*,
    609 B.R. 482 (Bankr. W.D. Tex. 2019) ......................................................21, 23, 24

*Kremer v. Chem. Const. Corp.*,
    456 U.S. 461 (1982) ...........................................................................................24, 30

*Label Sys. Corp. v. Aghamohammadi*,
    852 A.2d 703 (Conn. 2004) ....................................................................................17

*Langan v. Evers (In re Evers)*,
    212 B.R. 945 (Bankr. E.D. Wis. 1997) ..................................................................15

*Laurel Beach Ass'n v. Zoning Bd. of Appeals of City of Milford*,
    785 A.2d 1169 (Conn. App. 2001) ...................................................................10, 18

*Leon v. Rabalais (In re Rabalais)*,
    Adv. No. 11-03167, 2012 WL 42101 (Bankr. S.D. Tex. Jan. 9, 2012) .....................8

*Mahadevan v. Bikkina (In re Mahadevan)*,
    617 F. Supp. 3d 654 (S.D. Tex. 2022) ..............................................................12, 14

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
    470 U.S. 373, 383 (1985) ........................................................................................23

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996) ................................................................................................24

*Merritt v. Rizzo (In re Rizzo)*,
337 B.R. 180 (Bankr. N.D. Ill. 2006) ..................................................................15

*Miller v. J.D. Abrams, Inc. (In re Miller)*,
156 F.3d 598 (5th Cir. 1998) ..................................................11, 12, 15, 16, 17, 19

*Montana v. United States*,
440 U.S. 147 (1979)...............................................................................................31

*O'Gara v. Hunter (In re Hunter)*,
610 B.R. 479 (Bankr. M.D.N.C. 2019)..................................................................15

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1 (1991)...................................................................................................33

*Parklane Hosiery Co., Inc. v. Shore*,
439 U.S. 322 (1979)...............................................................................................31

*Peterson v. iCare Mgmt., LLC*,
250 A.3d 720 (Conn. 2021) ..............................................................................10, 14

*Raspanti v. Keaty (In re Keaty)*,
397 F.3d 264 (5th Cir. 2005) .................................................................................12

*Richter v. Thibodaux (In re Thibodaux)*,
112 B.R. 173 (Bankr. S.D. Tex. 1989) ...................................................................8

*Rizzuto v. Davidson Ladders, Inc*.,
905 A.2d 1165 (Conn. 2006) .................................................................................21

*Rzasa v. Bugnacki (In re Bugnacki)*,
439 B.R. 12 (Bankr. D. Conn. 2010) ................................................................19, 20

*Snyder v. Phelps*,
562 U.S. 443, 451 (2011)............................................24, 25, 26, 27, 29, 30, 33

*Sommers v. Fitzhenry (In re AFGO Dev. Co., Inc.)*,
625 B.R. 324 (Bankr. S.D. Tex. 2020) ...................................................................8

*State Farm Fire & Cas. Co. v. Mhoon*,
31 F.3d 979 (10th Cir. 1994) .................................................................................37

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)...............................................................................................35

*Texas v. Johnson*,
491 U.S. 397 (1989)...............................................................................................25

*Thompson v. Durrance (In re Durrance)*,
    84 B.R. 238 (Bankr. M.D. Fla. 1988) .......................................................................14

*Ulbrich v. Groth*,
    78 A.3d 76 (Conn. 2013) ..........................................................................................18

*United States v. Irvin*,
    787 F.2d 1506 (11th Cir. 1986) ...............................................................................10

*Usowski v. Jacobson*,
    836 A.2d 1167 (Conn. 2003) ...................................................................................34

*W.R. Berkley Corp. v. McGurk (In re McGurk)*,
    Adv. No. 16-05013, 2018 WL 1632896 (Bankr. D. Conn. Apr. 2, 2018) ...............16

*Weiss v. Weiss*,
    998 A.2d 766 (Conn. 2010) ......................................................................................31

*Wheeler v. Laudani*,
    783 F.2d 610 (6th Cir. 1986) ...................................................................................14

*Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*,
    337 F.3d 504 (5th Cir. 2003) ..............................................................................11, 19

*Wolstein v. Docteroff (In re Docteroff)*,
    133 F.3d 210 (3d Cir. 1997) .....................................................................................20

**Statutes**

11 U.S.C. § 523(a)(6) .......................................................................................... Passim

28 U.S.C. § 1738 ....................................................................................1, 9, 23, 24

11 USC §§ 101 *et seq.* ...................................................................................................1

Conn. Gen. Stat. Ann. § 42-110b(d) ...........................................................................34

Conn. Gen. Stat. Ann. § 42-110f ................................................................................34

Conn. Gen. Stat. Ann. § 42-110g(a) ...........................................................................34

Connecticut Unfair Trade Practices Act ........................................................................9

**Other Authorities**

Fed. R. Bankr. P. 7056 ............................................................................................8, 39

Fed. R. Civ. P. 56(a) .....................................................................................................8

Defendant Alexander E. Jones ("Defendant") respectfully requests this Court deny the Motion for Summary Judgment (Doc. 58), (the "Motion") filed by David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as Chapter 7 trustee for the Estate of Erica Lafferty ("Movants"). The Motion seeks to deny Defendant the opportunity for a discharge and effectively deny Defendant any opportunity to reorganize in Chapter 11 bankruptcy. Seeking to offensively apply collateral estoppel, Movants claim that a default judgment for defamation and emotional distress under Connecticut law actually litigates and necessarily decides the "willful and malicious injury" exception to discharge under the Bankruptcy Code[1] at 11 U.S.C. § 523(a)(6). By pursuing the application of collateral estoppel, Movants imply that the Default Judgment and resulting Connecticut Damages Order (defined below) are entitled to full faith and credit under 28 U.S.C. § 1738. Both the claim and the implication are incorrect. In the alternative, Movants argue that the lower court record supports a finding of summary judgment on § 523(a)(6). For the reasons set forth herein, this argument also fails.

## I.     PRELIMINARY STATEMENT

Movants argue that Defendant "does not deserve—and is not legally entitled to—a fresh start." (Doc. 60 at 2). Instead, they insist that Defendant should have to pay every cent of the $1,438,139,556.00 (One Billion, Four Hundred Thirty-Eight Million, One Hundred Thirty-Nine Thousand, Five Hundred Fifty-five Dollar) Connecticut Damages Order entered against him in the State Court Case based on the Default Judgment. Movants ask this Court to deny Defendant a trial on a judgment with damages so large that he could not repay them in 100 lifetimes. Movants'

---

[1] 11 USC §§ 101 *et seq.*

argument purposefully obfuscates why Defendant filed his Chapter 11 case. Defendant did not file a Chapter 7 case and seek to wipe out the Connecticut Damages Order debt entirely. Defendant chose to file a Chapter 11, where he could confirm a plan of reorganization and pay Movants through that plan a realistic amount over a reasonable amount of time, and when that time is over and payments have been made in full, to receive a discharge so that all parties could move forward with their lives. Defendant has not sought to evade the Connecticut Damages Order debt entirely, but rather to find some amount he could realistically pay. Characterizations to the contrary are false.

Irrespective of Movants' opinion that Defendant should be punished for his actions until the day he dies, the Court can and should deny the Motion for at least four reasons:

*First,* under Connecticut law, for a judgment to support collateral estoppel, the issue considered must be exact and essential to the judgment. Any nonessential findings are treated as dicta—particularly when, as here, the judgment was rendered by default. The issue of "willful and malicious injury" as used in § 523(a)(6) was not essential to the Default Judgment or the Connecticut Damages Order because the State Court (defined herein) could have rendered these without deciding that issue. Furthermore, the issue was not exact due to differing legal standards between the torts at issue and dischargeability.

*Second,* federal law does not require federal courts to grant full faith and credit to unconstitutional state court judgments. Here, Movants seek full faith and credit of a judgment for defamation and emotional distress that violates the Defendant's First Amendment protection from tort suits for exercising his free speech. Thus, even if the state court would use the Default Judgment or the Connecticut Damages Order to bar litigation of the § 523(a)(6) exception to dischargeability in bankruptcy, full faith and credit is not warranted for the reasons set forth herein.

*Third,* even if the mechanical application of collateral estoppel under Connecticut law could be viewed as appropriate, Connecticut law allows for the doctrine to give way when the convenience afforded by finality of judgments is outweighed by other public policy considerations. Here, the convenience afforded by finality of judgment is slight, while the Default Judgment and Connecticut Damages Order are laden with serious concerns as to the quality, extent, and fairness of the proceeding.

*Fourth,* in discharge cases, bankruptcy courts should not and will not apply collateral estoppel if it appears that bankruptcy was anticipated by the parties and the prior proceeding was skewed with the intent to obtain a non-dischargeable judgment. After discussion of bankruptcy, Movants' strategic actions in the State Court Case, including dismissing their negligence claim and seeking a punitive damage finding beyond recklessness, show that they intended to skew the proceedings to obtain a non-dischargeable judgment.

Furthermore, viewed in the light most favorable to the non-moving party, the record evidence provided by Movants—much of which would be inadmissible under evidentiary rules outside this context[2]—does not independently establish that Movants are entitled to judgment as a matter of law on the § 523(a)(6) exception to dischargeability.

## II.   DEFENDANT'S ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT

### A.  The State-Court Action

1.      On November 15, 2021, the Superior Court of Judicial District of Waterbury at Waterbury, Connecticut (the "State Court") in *Erica Lafferty, et al. v. Alex Emric Jones, et al.*, Cause No. XO6-UWY CV18-6046436-S, *William Sherlach, et al. v. Alex Emric Jones, et al.*, Cause No. XO6-UWY-CV18-6046437-S, and *William Sherlach, et. al v. Alex Emric Jones, et al.*,

---

[2] Defendant's Objection and Response to Movants' Statements of Uncontested Material Facts and Exhibits, Doc. 62.

Cause No. XO6-UWY-CV18-6046438-S (together, the "State Court Case") entered a certain default judgment in favor of Movants and against Defendant and related entities, InfoWars, LLC, Free Speech Systems, LLC, InfoWars Health, LLC, and Prison Planet TV, LLC (together, the "Connecticut Defendants") (the "Default Judgment"). (Doc. 1-5).

2.      On October 12, 2022, the jury of the State Court Case reached a verdict regarding compensatory damages in favor of Movants and against the Connecticut Defendants (the "Compensatory Damages Verdict"). (Doc. 57-22).

3.      On November 10, 2022, the court in the State Court issued a memorandum opinion ordering punitive damages in favor of Movants and against the Connecticut Defendants (the "Punitive Damages Order"). (Doc. 58-2).

4.      The Compensatory Damages Verdict and the Punitive Damages Order awarded total damages to Movants in the amount of $1,438,139,555.94. (the "Connecticut Damages Order").

**B. Additional Facts about Defendant**

5.      Defendant is currently an employee of FSS. FSS operates the InfoWars website and owns the domain. Declaration of Alexander E. Jones' in Support of His Objections and Response to Plaintiffs' Motions for Summary Judgment ("Jones Decl.") at ¶ 2, attached hereto as **Exhibit 1**.

6.      Defendant is the 100% owner of FSS. Defendant has spent over twenty-five years as a talk show host on radio, television, and internet platforms. *Id*. at ¶ 3.

7.      Defendant currently hosts a show on FSS's platform for approximately three to four hours a day, five days a week, where he discusses current events that are being reported by other news outlets. *Id*. at ¶ 4.

8.      Over 99% of the content on the InfoWars website is not written by Defendant. Defendant writes certain headlines and comments that are specifically attributed to Defendant.

Defendant rarely edits or posts videos to InfoWars' website – less than 20 per year. Defendant's position at InfoWars is not as an editor and he does not maintain control of the editorial systems at FSS. *Id*. at ¶ 5.

9.     Defendant is a skeptical person and has a general distrust of the government. One of the first stories Defendant covered was siege of the Branch Davidians' compound in Waco, Texas by the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Defendant did not believe the official government narrative of the event. *Id*. at ¶ 6.

10.     Two years later, in 1995, Defendant expressed skepticism that Timothy McVeigh acted alone during the Oklahoma City bombing. *Id*, at ¶ 7.

11.     In 1999, Defendant argued that the World Trade Organization protests in Seattle were infiltrated by violent, property destroying government agent provocateurs to discredit the protestors. *Id*. at ¶ 8.

12.     In 2001, like many people, Defendant expressed skepticism about the immediate media reports and official government accounts of the 9-11 attacks. At the time, Defendant was nationally syndicated on approximately 100 radio stations. Defendant's 9-11 skepticism costed him 70% of his affiliates. Defendant was told that if he stopped covering this story, he would be the next Rush Limbaugh. But Defendant believed it to be true on the basis of various sources of information, including conflicting news reports, and he felt a need to report on it. *Id*. at ¶ 9.

13.     In 2011, news organizations began reporting on Operation Fast and Furious. Operation Fast and Furious was an operation where ATF agents allowed licensed firearms dealers to sell weapons to illegal straw buyers in hopes of tracking the guns to Mexican drug cartel leaders. The ATF did this over the concerns that the guns might be used in future crimes or that the dealers would be unfairly prosecuted. Approximately 2,000 firearms were sold in the operation, the

majority of which were never recovered. Multiple Fast and Furious guns ended up at crime scenes on both sides of the US-Mexico border. United States Border Patrol Agent Brian Terry was killed in December 2010 with a gun purchased in Operation Fast and Furious. Defendant discussed Operation Fast and Furious numerous times on his show. In Defendant's view, the Obama administration came up with Operation Fast and Furious to pin border crime on gun dealers in an effort to generate public support for new gun regulations. *Id*. at ¶ 10.

14.     When the shooting at Sandy Hook happened, Defendant viewed the official narrative coming from local government and mainstream media with skepticism, as he does with almost all news events covered by the mainstream media. As part of his normal and ordinary course of preparation for his daily show, Defendant reviewed content from non-mainstream media coverage questioning the authenticity of the event as reported. On-air, Defendant stated that he did not know what happened but that it would not surprise him if the government staged this event to restrict Americans' access to guns. Defendant warned his audience that politicians in the Democratic Party would use this event to pass legislation that would restrict access to guns, in violation of the Second Amendment. Threats to the Second Amendment are a particular concern of Defendant's. *Id*. at ¶ 11.

15.     Defendant continued to cover the event's official narrative with skepticism because certain events surrounding the shooting did not make sense to him. For example, in an interview between one of the parents and Anderson Cooper, it looked like Anderson Cooper was standing in front of a blue screen in a CNN studio rather than on location at the town square vigil. Defendant commented that one could draw from it what one wanted, but he could not understand why CNN would use a blue screen. *Id*. at ¶ 12.

16.     In March 2014, Defendant had a guest, Wolfgang Halbig, on his show. Defendant often invited guests on his show who were associated with viral news stories. In Defendant's opinion, Mr. Halbig had an impressive resume, and Defendant was initially persuaded by Mr. Halbig's views that the shooting at Sandy Hook never happened. Defendant's belief at the time that certain individuals he saw on media coverages were actors—whom he now know to be legitimate relatives of Sandy Hook victims—was a result of his cynical view of mainstream media and the views of Mr. Halbig and those expressed online. *Id.* at ¶ 13.

17.     By July 2015, Defendant began to realize that some of the evidence that Mr. Halbig had relied on was not true, and Defendant started to believe that there actually were victims of the Sandy Hook shooting. While Defendant still thought there were some anomalies in coverage of the event by the mainstream media, and he never stopped doubting that the government could fake such an event, Defendant no longer believed that the victims of the Sandy Hook shooting were fake or that their relatives were actors. *Id.* at ¶ 14.

18.     On June 18, 2017, NBC aired Megyn Kelly's interview with Defendant. In that interview, she asked Defendant about his coverage of the Sandy Hook shooting and his past allegations that the event was faked. Defendant explained that he now believed that children probably did die at Sandy Hook, but he could see why some people think they did not. Defendant also stated that at the time he made the statements in 2015 questioning the reality of the event, he believed them. *Id.* at ¶ 15.

19.     In October 2017, though he once again mentioned the anomalies surrounding the shooting event at Sandy Hook, Defendant did not question the fact that children actually died there. *Id.* at ¶ 16.

20.     Throughout Defendant's entire evolution on the veracity of the official Sandy Hook narrative, he never once said something on air that he did not believe to be true. Everything Defendant ever said about the Sandy Hook shooting, he believed to be true at the time he said it. Defendant never at any time intended to cause harm to any of the Plaintiffs, nor did he ever believe his statements with respect to the event, or the veracity of the official narrative regarding the shooting would be likely to cause harm to any of the Movants. *Id.* at ¶ 17.

### III.      ARGUMENT AND BRIEF IN SUPPORT

21.     Summary judgment is proper only if the movant shows that there is both no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056 (incorporating standard in Fed. R. Civ. P. 56(a)). The moving party bears the burden as to both. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see Sommers v. Fitzhenry (In re AFGO Dev. Co., Inc.)*, 625 B.R. 324, 333 (Bankr. S.D. Tex. 2020). Meanwhile, the court views the material in the motion in the light most favorable to the opposing party. *Id.* Given that, summary judgment is generally ill-suited for resolving cases involving allegations of intent. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005); *Automated Salvage Transp. Co. v. Swirsky (In re Swirsky)*, 372 B.R. 551, 565 (Bankr. D. Conn. 2006). Moreover, when interpretation is at issue, exceptions to discharge in bankruptcy are to be narrowly construed in favor of the Defendant. *Richter v. Thibodaux (In re Thibodaux)*, 112 B.R. 173, 174 (Bankr. S.D. Tex. 1989). "[I]t is only with the greatest caution that this Court will make [a finding of non-dischargeability under § 523], particularly on a summary basis." *Leon v. Rabalais (In re Rabalais)*, No. 11-03167, 2012 WL 42101, at *4 (Bankr. S.D. Tex. Jan. 9, 2012).

**A. Under Connecticut's collateral-estoppel law, the issue of the § 523(a)(6) exception to discharge in bankruptcy would not be precluded from litigation by default judgments of emotional distress and defamation.**

22.     Applying Connecticut law, collateral estoppel does not preclude a trial on the merits in this case because the judgments on intentional infliction of emotional distress ("IIED") and defamation do not necessarily determine the issue of nondischargeability for "willful and malicious injury" under § 523(a)(6) of the Bankruptcy Code, nor does the imposition of common law or CUTPA[3] punitive damages. The Default Judgment and Connecticut Damages Order employ different legal standards under a lighter burden than § 523(a)(6) as applied in the Fifth Circuit.

**1. Connecticut law requires that an identical issue be actually litigated and necessarily decided before giving an issue the preclusive effect of collateral estoppel.**

23.     Under 28 U.S.C. § 1738, bankruptcy courts must apply the requirements of collateral estoppel as defined by state law if the issue was litigated in state court. *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1201 (5th Cir. 1996). In Connecticut, for collateral estoppel to apply, the issue must have been "actually litigated" and "necessarily determined" in the first case. *Efthimiou v. Smith*, 846 A.2d 222, 227 (Conn. 2004).  It is clear in this matter that the relevant § 523(a)(6) standards were not "actually litigated." As the State Court noted, the discovery sanctions precluded Defendant's ability to present the merits of his liability defense. (Doc. 57-17 at 4). Defendant was prohibited from even contesting liability or raising affirmative defenses considering the disciplinary default entered against him. (Doc. 57-20).

24.     In determining what was "actually litigated" and "necessarily decided," it is essential to first conduct a precise "identity of issues" analysis between the first and second case. *Id*. For collateral estoppel to be applicable, the issues being litigated in the new proceeding must

---

[3] The Connecticut Unfair Trade Practices Act ("CUTPA"), Connecticut General Statutes §§ 42-110a – 42-110q.

be "identical" to those considered in the prior proceeding. *Peterson v. iCare Mgmt., LLC*, 250 A.3d 720, 729 (Conn. 2021). Overlap, even significant overlap, of issues is not enough to preclude subsequent litigation (*Independent Party of CT–State Central v. Merrill*, 200 A.3d 1118, 1142 (Conn. 2019)); nor is the relitigation of an issue precluded if the party invoking collateral estoppel has a heavier burden in the second action than in the first. *Birnie v. Elec. Boat Corp*., 953 A.2d 28, 38 (Conn. 2008). The Connecticut Supreme Court regularly overturns applications of collateral estoppel when similar but differing standards are "improperly merged." *Gladysz v. Plan. & Zoning Comm'n of Town of Plainville*, 773 A.2d 300, 308 (Conn. 2001) (rejecting merger of aggrievement and standing issues).

25.     If a judgment does not specify the issue on which it was based, collateral estoppel does not preclude subsequent litigation. As set forth in *Dowling v. Finley Assocs.*, the doctrine of collateral estoppel is inapplicable when there are multiple possible reasons for the judgment and the court cannot determine whether one is inherent in the judgment. 727 A.2d 1245, 1252 (Conn. 1999) (*quoting United States v. Irvin*, 787 F.2d 1506, 1515-16 (11th Cir. 1986)). For example, when a complaint pleads "both fraud and non-fraud counts" and "the Judgment does not specify if it was rendered on a fraud or non-fraud count," it becomes "impossible to conclude [whether fraud] was actually litigated or necessarily decided." *H.J. Bushka Lumber & Millwork v. Boucher (In re Boucher)*, 336 B.R. 27, 36 (Bankr. D. Conn. 2005).

26.     Moreover, "the court must specifically determine that an issue that is presented in the second case was necessary to the judgment in the first case.'" *Laurel Beach Ass'n v. Zoning Bd. of Appeals of City of Milford*, 785 A.2d 1169, 1176 (Conn. App. 2001). An issue is necessary only if "in the absence of a determination of the issue, the judgment could not have been validly rendered." *Deutsche Bank AG v. Sebastian Holdings, Inc*., 166 A.3d 716, 727 (Conn. App. 2017).

If "the judgment is not dependent upon the determination of the issue, the parties may [litigate]

the issue in a subsequent action." *Jackson v. R.G. Whipple, Inc*., 627 A.2d 374, 378 (Conn. 1993),

*abrogated on other grounds by Macomber v. Travelers Prop. & Cas. Corp*., 804 A.2d 180 (Conn.

2002). Thus, when a judgment is rendered by default, courts considering collateral estoppel must

presume that the judgment was rendered on the narrowest possible grounds. *See id.* (discussing

"actually litigated" standard).

27.     Accordingly, a court considering collateral estoppel need not look beyond

essentiality. Even outside the default judgment context, the first court's findings or statements on

issues that go beyond what is essential to the judgment are treated as dicta. *Gladysz*, 773 A.2d at

307. Dicta is given no preclusive effect. *Id*.

### 2. The § 523(a)(6) issue was not necessarily decided by the default judgment in the prior proceeding.

28.     In this case, neither the default judgment on IIED nor the default judgment on

defamation collaterally estops the issue of nondischargeability under § 523(a)(6).

### a. A judgment for emotional distress does not necessarily decide the § 523(a)(6) issue.

29.     Beginning with IIED, it is important to recognize that not all intentional torts meet

the requirements of § 523(a)(6). *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 604 (5th

Cir. 1998). Although the IIED Judgment is labeled as an intentional tort, it does not necessarily

fall within the scope of § 523(a)(6). As noted by the Fifth Circuit, "[d]espite similarities in the

language used to describe an injury under Section 523(a)(6) and intentional torts, Section 523(a)(6)

creates a narrower category of tortious conduct." *Williams v. Int'l Bhd. of Elec. Workers Local 520*

*(In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003).

30.     To prevail on a claim of IIED in Connecticut, Movants must demonstrate "that the

actor intended to inflict emotional distress or that he knew or should have known that emotional

distress was the likely result of his conduct." *Gleason v. Smolinski*, 125 A.3d 920, 933 n.14 (Conn. 2015). They must also show that the conduct was extreme and outrageous, that it caused the plaintiff's distress, and that the emotional distress sustained by the plaintiff was severe. *Id.* In contrast, under Fifth Circuit precedent, an "injury" is considered "willful and malicious" only when there is an objective substantial certainty of harm or a subjective intent to cause harm. *Miller*, 156 F.3d at 606; *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005) (noting that the Fifth Circuit "define[s] 'malicious' as an act done with the actual intent to cause injury" and, unlike other circuits, "aggregate[s] [the phrase] 'willful and malicious' into a unitary concept.").

31.     Based on this definition, collateral estoppel fails at the intent element of IIED. Although there is overlap regarding subjective intent, that overlap is not inherent in the Default Judgment or the Connecticut Damages Order. A willful and malicious injury requires, at minimum, a showing of substantial certainty of harm. *Mahadevan v. Bikkina (In re Mahadevan)*, 617 F. Supp. 3d 654, 660 (S.D. Tex. 2022). It is well-recognized that "'[s]ubstantial certainty of harm' [under § 523(a)(6)] … require[s] more than a 'high probability.'" *Id.* Yet a Connecticut court can enter a valid judgment for IIED if it is shown that the actor merely "should have known that emotional distress was the likely result of his conduct." *Gleason*, 125 A.3d at 933 n.14. This language sounds in recklessness, and recklessness is not enough to support a finding of willful and malicious injury under § 523(a)(6). *See Gilbert v. Dang (In re Dang)*, 560 B.R. 287, 293 (S.D. Tex. 2016) ("Disjunctive jury instructions in state-court judgments make it difficult for a bankruptcy court to give preclusive effect to that judgment in deciding whether the judgment debt is nondischargeable."); *see also Doughty v. Hill (In re Hill)*, 265 B.R. 270, 276-77 (Bankr. M.D. Fla. 2001) ("Because the jury's finding of [IIED] could have based upon a finding of reckless disregard, the elements of [IIED] under California law do not closely mirror the requirements for excepting

a debt from discharge under § 523(a)(6). Accordingly, collateral estoppel does not apply to the jury's finding of [IIED]. The Court need not address whether the remaining requirements of collateral estoppel, as to the [IIED], are met."); *B.B. v. Bradley (In re Bradley)*, 466 B.R. 582, 589 (B.A.P. 1st Cir. 2012) ("If the judgment were based upon reckless disregard, a 'strong probability' is not identical to 'substantial certainty.'").

32.     Consequently, because the legal standards differ—and the first action's burden is lighter—the issue of "willful and malicious injury" is not barred from being litigated in a second action by collateral estoppel for an IIED default judgment.

>   **b.  A judgment for defamation does not necessarily decide the § 523(a)(6) issue.**

33.     The same holds true for the default judgment on defamation. Contrary to Movants' contention, "[a] defamation verdict in state court will not always support a finding of willful and malicious injury under 11 U.S.C. § 523(a)(6)." *Bui v. Do (In re Do)*, Adv. No. 11-01027-CAG, 2013 WL 1429435, at *3 (Bankr. W.D. Tex. Apr. 9, 2013). In fact, defamation makes for an easier case against collateral estoppel than IIED. The elements of defamation never overlap with the "willful and malicious injury" standard.

34.     To establish a prima facie case of defamation in Connecticut, the plaintiff must show that the defendant published a defamatory statement, which identified the plaintiff to a third person, and that the plaintiff's reputation suffered because of the statement. *Cweklinsky v. Mobil Chem. Co*., 837 A.2d 759, 763-64 (Conn. 2004). Importantly, defamation requires only that the defendant commit the act of publishing a defamatory statement, not necessarily intending the resulting injury to reputation as § 523(a)(6) requires. The Supreme Court, in *Kawaauhau v. Geiger*, rejected the notion of holding a judgment nondischargeable when the plaintiff need only show intent to perform the act itself, but not necessarily intending the consequences of the act. 523 U.S. 57, 61-62 (1998).

35.     The introduction of defamation *per se* does not change this analysis. To begin, because it was not essential to the judgment, ambiguous statements in the jury charge suggesting defamation *per se* are treated as dicta and given no preclusive effect. *See Peterson*, 250 A.3d at 730-31. In any case, even if defamation *per se* was the holding,[4] (and there is no clear indication that it was) defamation *per se* does not necessarily meet the § 523(a)(6) standard.

36.     When asserting defamation *per se*, the elements of defamation, which have no overlap with § 523(a)(6), do not change. Rather, one element (injury to reputation, not intent of publisher) is presumed. *Gleason*, 125 A.3d at 947. Moreover, "actual malice," which is the most stringent standard available in Connecticut law for defamation, can be met with mere recklessness as to the veracity of the statement—not even recklessness as to injury. *Gambardella v. Apple Health Care, Inc.*, 969 A.2d 736, 744 (Conn. 2009). While the Fifth Circuit has not had occasion to opine on this exact situation, other courts have recognized quite regularly that "mere reckless disregard for the truth or falsity of the statement . . . is not a willful and malicious injury for purposes of § 523(a)(6)." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986); *see also In re Mahadevan*, 617 F. Supp. 3d at 664 (holding willful and malicious conduct was not necessarily decided by state-court judgment for defamation when the "jury was not asked to decide whether [the defendant] knew that the statements were false, but spread them anyway, knowing they would harm [the plaintiff]"); *Thompson v. Durrance (In re Durrance)*, 84 B.R. 238, 239-40 (Bankr. M.D. Fla. 1988) ("Although the Plaintiff pled intentional defamation in the state court proceeding, the default judgment does not necessarily imply a finding of 'willful and malicious' conduct on the part of the Debtor due to the fact that the Plaintiff's Complaint alleged that the statements were

---

[4] Defamation and defamation per se were merged as a single count in the complaint. (Doc. 57-4 at 35). They were also treated the same on the damages form. (Doc. 57-22). And the jury charge did not even *use* the phrase "defamation per se." (Doc. 57-21). This muddling prevents this Court from giving defamation *per se* preclusive effect because it is impossible to determine whether defamation *per se* is inherent in the judgment. *Cf. Dowling*, 727 A.2d 1245 at 1252.

made either 'with knowledge ... or reckless disregard for the truth.'"); *Irvin v. Faller (In re Faller)*, 547 B.R. 766, 771 (Bankr. W.D. Ky. 2016) (holding collateral estoppel did not apply where state court verdict found the defendant liable for defamation *per se* because the defendant's conduct was potentially reckless, which does not satisfy § 523(a)(6)); *Langan v. Evers (In re Evers)*, 212 B.R. 945, 949 (Bankr. E.D. Wis. 1997) ("Reckless disregard may be sufficient to establish libel but it is not sufficient to establish maliciousness under § 523(a)(6)."); *O'Gara v. Hunter (In re Hunter)*, 610 B.R. 479, 509 (Bankr. M.D.N.C. 2019) ("Here, Plaintiffs plausibly pleaded actual malice under California law, but actual malice is a broader scienter requirement than that found in willful and malicious under § 523(a)(6)."); *Merritt v. Rizzo (In re Rizzo)*, 337 B.R. 180, 189 (Bankr. N.D. Ill. 2006) (stating "defamatory statement is not 'malicious' unless the debtor knew the statement was false when he made it"); *Jefferson v. Holland (In re Holland)*, 428 B.R. 465, 474 (Bankr. N.D. Ill. 2010) (same).

37.     As such, the Connecticut Judgment for defamation cannot meet the standard for collateral estoppel as to 11 U.S.C. § 523(a)(6).

### c.   Common law punitive damages do not necessarily decide the § 523(a)(6) issue.

38.     For similar reasons, the issue of nondischargeability under § 523(a)(6) was not necessarily decided by the imposition of common-law punitive damages in the Connecticut Damages Order. In fact, the § 523(a)(6) issue was not even "actually litigated" because Connecticut uses the words "willful" and "malicious" differently when considering punitive damages compared to how the Fifth Circuit uses the phrase "willful and malicious injury" when considering dischargeability. The Fifth Circuit expressly rejected defining "malicious" in § 523(a)(6) as "without just cause or excuse," reasoning that after *Kawaauhau*, "the roots of the 'just cause or excuse' standard … have now been cut off." *Miller*, 156 F.3d at 605 (citing

*Kawaauhau*, 523 U.S. at 63). Instead, the Fifth Circuit requires that to meet the § 523(a)(6) standard "acts [be] done with the actual intent to cause injury," and recklessness is not sufficient. *Id*. at 606. However, in this case, the Connecticut court used the rejected "without just cause or excuse" definition. (Doc. 57-21 at 25).

39.     Notably, varying uses of these terms are not uncommon, and even Connecticut courts acknowledge that "the use of the term 'malice' may itself be susceptible to confusion." *Gambardella*, 969 A.2d at 745. Other federal courts do not adopt the Fifth Circuit's "unitary concept." *See, e.g.*, *W.R. Berkley Corp. v. McGurk (In re McGurk)*, Adv. No. 16-05013, 2018 WL 1632896, at *5 (Bankr. D. Conn. Apr. 2, 2018) (noting—contrary to Fifth Circuit precedent—that "[t]he 'malice' requisite of § 523(a)(6) is distinct from the 'wil[l]fulness' element and the two elements cannot be 'lumped' together."). For that reason, looking beyond post-*Kawaauhau* Fifth Circuit cases for persuasive authority on this topic is of little value.

40.     For example, Movants (Doc. 60 at 23-24) rely heavily on *Gober*, a pre-*Kawaauhau* case applying Texas collateral estoppel law to a default judgment on the tort of conversion under Texas law that tells us little about applying Connecticut law to IIED and defamation under the Fifth Circuit's post-*Kawaauhau* understanding of "willful and malicious injury." Movants also assert that if any part of the judgment for either IIED or defamation is non-dischargeable then none of it is dischargeable. (Doc. 60 at 27-28), but that cannot be correct under the Fifth Circuit's understanding of "willful and malicious injury," which requires that the harm be intentionally inflicted. The harms for IIED and defamation are different—surely one can intend to inflict one harm without the other. Unsurprisingly, Movants (at 16, 18, 24, 27) rely on cases that are either pre-*Kawaauhau* or outside the Fifth Circuit—not to mention outside Connecticut, dealing with a different tort, or blended with other grounds for nondischargeability—to support this proposition.

41.     Presently, both the U.S. Supreme Court and the Fifth Circuit hold that when the terms "willful" or "malicious" are used to modify the word "injury," they carry a different meaning compared to when they are used to modify the word "act." *See Kawaauhau*, 523 U.S. at 61-62; *Miller*, 156 F.3d at 606. Here, § 523(a)(6) uses the terms to modify "injury," while in Connecticut "[t]o furnish a basis for recovery of punitive damages, … the evidence must show wanton or willful malicious misconduct." *Label Sys. Corp. v. Aghamohammadi*, 852 A.2d 703, 731 (Conn. 2004). Because in Connecticut, those terms modify the "act," it cannot be said that the issues are identical.

42.     Even if Connecticut adopted the same definition, the issue would not be estopped because a finding of willful or malicious misconduct is not needed for the Connecticut Damages Order. Rather, the Connecticut Damages Order can be rendered if the misconduct was merely reckless. As the court charged the jury, "[p]unitive damages may be awarded if you find that the defendants' actions in this case were wilful, wanton, or malicious." (Doc. 57-21 at 24-25). "Wanton misconduct is reckless misconduct." *Id.*  Recklessness is not enough to meet § 523(a)(6) standards.

### d.  CUTPA punitive damages do not necessarily decide the § 523(a)(6) issue.

43.     Furthermore, nondischargeability under § 523(a)(6) was not necessarily decided by the CUTPA punitive damages award. Like common-law punitive damages, a finding of "willful and malicious injury" was not necessary for the Connecticut Damages Order. Under CUTPA, an award of punitive damages may be justified by either "an intentional and wanton violation" of another's rights or "a reckless indifference to [those] rights." *Advanced Fin. Servs., Inc. v. Associated Appraisal Servs., Inc.*, 830 A.2d 240, 250 (Conn. App. 2003). This standard lacks the precise terminology required by the Fifth Circuit for § 523(a)(6) and therefore cannot be considered "identical." CUTPA punitive damages can be awarded under a less stringent standard

than that required for the § 523(a)(6) exception. In fact, a Connecticut appellate court upheld a CUTPA punitive damages award based on mere recklessness. *Id.*

44.     It is important to consider the context and limitations of Movants' reliance on the trial judge's single statement that "defendants' conduct was intentional and malicious, and certain to cause harm." (Doc. 60 at 14; Statement at ¶ 43). While that statement does use the words that conjure up the "objective substantial certainty of harm" criteria under § 523(a)(6), this simplistic view fails to consider that, in Connecticut, even "[i]f an issue has been determined, [if] the judgment is not dependent upon the determination of th[at] issue, the parties may relitigate [it] in a subsequent action... ." *Laurel Beach*, 785 A.2d at 1176.

45.     A CUTPA punitive damages award does not require an objective finding of substantial certainty of harm. Instead, Connecticut courts consider a range of factors to determine the propriety of such an award, with no single factor being dispositive or essential to the Connecticut Damages Order. These factors include concealment of wrongdoing, profit-seeking motive, low damages resulting in low incentive to bring suit, whether the award will deter the conduct without financially destroying the defendant, and the reprehensibility of conduct. *Ulbrich v. Groth*, 78 A.3d 76, 126 (Conn. 2013). In turn, reprehensibility (the factor giving rise to the statement) is assessed based on another list of nonessential factors, such as the nature of harm caused, indifference or reckless disregard for health or safety, financial vulnerability of the target, repeated actions versus isolated incidents, and whether the harm resulted from intentional malice, trickery, deceit, or mere accident. *Id.* at 127.

46.     Therefore, the only way to link the CUTPA award to the § 523(a)(6) standard is through a double layer of nonessential considerations. A finding of reprehensibility is not necessary to establish a CUTPA award, and the objective substantial certainty of harm is not

necessary to establish reprehensibility. Relevant here is the fact that the Connecticut court found that every factor favored high punitive damages and thus the concept of "substantial certainty" cannot be isolated amongst many factors. Where these facts are found, Connecticut allows parties to litigate the issue in subsequent cases.

### 3.  The § 523(a)(6) issue was not actually litigated in the prior proceeding.

47.     The § 523(a)(6) issue was not "actually litigated" in the State Court Case. It could not have been litigated because the issue of "willful and malicious injury" was not "properly raised in the pleadings," which is essential to a finding of "actually litigated." *In re Boucher*, 336 B.R. at 34. Though there is an exception to "actually litigated" allowing for default judgments to be given preclusive effect, this case does not fit the requirements of that exception.

48.     Applying collateral estoppel is less straight-forward with § 523(a)(6) compared to other § 523(a) provisions. Unlike § 523(a)(6), the fraud exception elements in § 523(a)(2)(A) align closely with fraud under Connecticut law. *Rzasa v. Bugnacki (In re Bugnacki)*, 439 B.R. 12, 25 (Bankr. D. Conn. 2010) (holding that default judgment precluded issues related to fraud for § 523(a)(2) exception, but not to § 523(a)(6)). The definition of fraud is uniform across states and consistent with the fraud exception under § 523(a)(2). *Grogan v. Garner*, 498 U.S. 279, 290 (1991). Thus, nearly every time a court finds fraud, the judgment will be nondischargeable in bankruptcy. It is not the case with "willful and malicious injury" under § 523(a)(6).

49.     The terms "willful" and "malicious" are used in various combinations in different states, often modifying words related to the "act" rather than the "injury." *Kawaauhau v. Geiger* explains that the significance of these terms depends on the word they modify. 523 U.S. at 57-58. Moreover, the Fifth Circuit has held that "willful and malicious injury" does not encompass every intentional tort. *Williams*, 337 F.3d at 509.  The unitary-concept approach used in the Fifth Circuit gives these terms a distinct meaning that differs from other states and federal circuits. *Miller*, 156

F.3d at 606. Simply associating these terms with an intentional tort in a state-court pleading does not necessarily put the precise standard of § 523(a)(6) at issue.

50.     Additionally, it is doubtful that the discovery-sanction exception to "actually litigated" applies under the precise circumstances of this case. The general rule is that judgments by default are not "actually litigated" for collateral estoppel purposes. *Crain v. Limbaugh (In re Limbaugh)*, 155 B.R. 952, 955 (Bankr. N.D. Tex. 1993). While there is an exception for default judgments rendered as a sanction for discovery violations, *see, e.g.*, *Bugnacki*, 439 B.R. at 24-25, the intended application does not fit the facts of this case.

51.     As this doctrine emerged, application of the exception seemed to require a nexus between the discovery withheld and the issue estopped. Consider fraud cases.[5] Typically, evidence withheld in fraud cases was crucial to establishing the issue of fraud. And it is only because such evidence was withheld that the first court could not litigate fraud. *See, e.g.*, *In re Docteroff*, 133 F.3d at 215. Here, setting aside disagreement that discovery was actually withheld,[6] there is no indication that the requested discovery (web traffic data analytics) would shed any light on the specific § 523(a)(6) issue at hand.

52.     Conversely, the reason collateral estoppel generally does not apply to a default judgment is that "a party may choose not to litigate issues for reasons that have nothing to do with the merits of the case." *Gober*, 100 F.3d at 1205. Here, Defendant may have chosen not to engage in discovery for reasons that have nothing to do with the merits. Defendant may have chosen not

---

[5] The doctrine of applying collateral estoppel to default judgment from discovery violations in bankruptcy cases arose out of fraud cases. *See, e.g.*, *Grogan*, 498 U.S. at 290 (fraud); *Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 215 (3d Cir. 1997) (fraud); *Bush v. Balfour Beatty Bahamas Ltd. (In re Bush)*, 62 F.3d 1319, 1322-23 (11th Cir. 1995) (fraud); *FDIC v. Daily (In re Daily)*, 47 F.3d 365, 368 (9th Cir. 1995) (fraud).

[6] Per (Doc. 57-15 and 57-17 at 5-6), the record shows that Defendant's offers to allow for inspection of the requested data were rejected by Movants and shared with Movants via Zoom, and at some point such data was emailed to opposing counsel, but none of these were deemed acceptable by the State Court. Even if unacceptable, it is certainly misleading to say that none of the data was ever received.

to engage in discovery due to a belief in the panoply of First Amendment protection (discussed below), willingly accepting the adverse inference related to the data that often arises in similar situations rather than shouldering the burden and expense of discovery, or he may not have been able to acquire the web traffic data from old or incomplete business records, or as in this case, he may have offered the data in another format and been rebuffed. Either way, there is a wide gap between this data and Movant's burden of proof in the underlying State Court Case or under § 523(a)(6).

53.     It should be noted that the discovery violation does not warrant an adverse inference on every element all claims, let alone on the § 523(a)(6) issue. An adverse inference requires that "the destroyed evidence was relevant to the issue or matter for which the party seeks the inference." *Rizzuto v. Davidson Ladders, Inc*., 905 A.2d 1165, 1174-75 (Conn. 2006). It defies logic that a discovery violation insufficient to establish the issue in that case through an adverse inference would nonetheless be deemed sufficient to establish that issue in a different case through collateral estoppel.

54.     Another court's rationale for applying collateral estoppel to § 523(a)(6) proceedings was the extensive nature of a damages hearing that followed a default judgment. In *In re Limbaugh*, for example, the bankruptcy court said, "despite the fact Defendant's liability was determined by default, Plaintiff was required to establish through evidence that the degree and type of Defendant's misconduct warranted punitive damages." 155 B.R. at 958. Similarly, *In re Huizar* the fact that debtor was allowed to "present any and all evidence he desired during the five days of hearing on the issue of damages" was vital to the court's determination to apply collateral estoppel. *King v. Huizar (In re Huizar)*, 609 B.R. 482, 491-92 (Bankr. W.D. Tex. 2019).

55.     The circumstances of the damages hearings in the State Court damages hearing were quite different. While it is true that the damages hearing took a significant amount of time and many exhibits were introduced by Movants, Defendant was not allowed to "present any and all evidence he desired." Rather, Defendant was instructed as to things on which he could *not* testify (and there were many).  The State Court instructed the jury at the damages hearing that Defendant[7] was legally responsible for the statements of his guests on InfoWars (including Wolfgang Halbig). (Doc. 57-2). The State Court instructed the jury that the Defendant had been found liable for defamation, IIED, false light, invasion of privacy, and CUTPA. (*Id.*).

56.     At the damages hearing, the jury was instructed that the standard of proof was "more probable than not" and that the "scales of justice" needed to "incline even slightly" to find an assertion had been proved for preponderance of the evidence. *Id.* The jury was further instructed that because liability for each claim had previously been established, so had each element of each claim, including proximate cause. *Id.* However, in deposition, Defendant previously testified that he "wasn't trying to cause pain and suffering." *See* Motion in Limine filed by Defendant in the State Court Case at 6, attached hereto as **Exhibit 2**. Not only was Defendant prohibited from testifying on "intent," which is the crux of § 523(a)(6), he was also prohibited from testifying on the First Amendment (or anything political), fairness, or the possibility that Movants' grief and distress could be attributable to other causes (such as the tragic death of their children). *See* Transcript on Motion in Limine in the State Court Case, Sept. 6, 2022, at 59:26; 87:5-6, attached hereto as **Exhibit 3**. Meanwhile, Movants' expert was allowed to equate show listeners with members of al-Qaeda led by Defendant. (Doc. 58-11 at 81).

---

[7] Given the number of defendants in the State Court Case, this also raises confusion as to which defendant was liable for what statements.

57.     The Punitive Damages Order is also full of instances showing that "degree and type of misconduct" justifying the award of punitive damages that was not determined in the damages hearing independently of the default but was a mere continuation of the Default Judgment. (*See generally,* Doc. 58-2). Unlike in *Limbaugh*, where the punitive damages were established at the damages hearing, here the Connecticut court said the right to such damages was "established by virtue of the defaults." (Doc. 58-2 at 40).

58.     Indeed, Movants continue to rely on the Default Judgment. Movants highlight that "[t]he disciplinary default established [Defendant's] liability and caused Movants' allegations— including those concerning the degree of his culpability—to be deemed admitted." (Doc. 60 at 2). Movants thus unmoor their case from the rationale in *Limbaugh* and *Huizar* used to justify allowing a default judgment to collaterally estop a bankruptcy court from independently determining the § 523(a)(6) issue.

**B.  The Default Judgment and the Connecticut Damages Order violates the First Amendment and is thus not entitled to the preclusive effect of collateral estoppel via the Full Faith and Credit statute, codified at 11 U.S.C. § 1738.**

59.     If this Court determines that collateral estoppel would otherwise apply to the Default Judgment or the Connecticut Damages Order that does not end the inquiry.[8] Federal courts are not required to give full faith and credit to unconstitutional state court judgments under 11 U.S.C. § 1738. Section 1738 provides that properly authenticated state court judgments "shall have the same full faith and credit in [federal court] as they have by law or usage in the courts of such State … from which they are taken." Under this statute, principles of collateral estoppel derived

---

[8] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 383 (1985) ("Reference to state preclusion law may make it unnecessary to determine if the federal court, as an exception to § 1738, should refuse to give preclusive effect to a state court judgment. The issue whether there is an exception to § 1738 arises only if state law indicates that litigation of a particular claim or issue should be barred in the subsequent federal proceeding.").

from state court law generally apply to issues in federal bankruptcy dischargeability proceedings. *Huizar*, 609 B.R. at 489-90. However, there are exceptions to this general rule.

60.     One such exception arises from the Constitution. As Justice Ruth Bader Ginsburg stated, "[e]very State's law on the preclusiveness of judgments is pervasively affected by the supreme law of the land." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 395 (1996) (Ginsburg, J., dissenting). Accordingly, "[a] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and … federal courts are not required to accord full faith and credit to such a judgment." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 482 (1982). It follows then that whether to grant full faith and credit to a state court judgment is determined independently of the judgment. Even "if state law indicates that a particular … issue would be barred," the federal court must still independently determine if the constitutional exception to full faith and credit under § 1738 should apply. *Cf. Marrese*, 470 U.S. at 386, 383.[9]

### 1. The First Amendment protects against tort claims that intrude on free speech.

61.     Speech on matters of public concern is protected by the First Amendment and shielded from tort liability. The determination of whether speech falls into the category of public concern involves evaluating the content, form, and context of the speech. In the case of *Snyder v. Phelps*, the Supreme Court held that the Westboro Baptist Church's protest, although offensive and hurtful to grieving parents, addressed broader public issues, rather than purely private matters. 562 U.S. 443, 451 (2011). The Court emphasized that even controversial speech should be tolerated to preserve the freedoms protected by the First Amendment.

62.     Speech on public issues is granted broad protection under the First Amendment to ensure that courts do not inadvertently act as censors, as open and uninhibited discussion of public

---

[9] Like in the case of judicial review, applying the exception to full faith and credit should require an "independent second opinion when free speech is curtailed." *Cf. Gleason*, 125 A.3d at 933-34.

matters is essential to self-government. *Id.* at 451-52. The crude or controversial nature of a statement is irrelevant in determining whether it deals with a matter of public concern. *Id*. at 453. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

63. To ascertain whether speech is of public or private concern, courts must examine the content, form, and context of the speech by conducting an independent evaluation of the entire record to ensure that the judgment does not infringe on the realm of free expression. *Snyder*, 562 U.S. at 453-54. No single factor is conclusive, and the circumstances surrounding the speech, including what was said, where it was said, and how it was said, must be evaluated. *Id*. at 454. In doing so, courts must be mindful that "the point of all speech protection" is protecting speech that someone finds disagreeable—universally appealing speech does not require any constitutional safeguarding. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557, 574 (1995).

64. Under this legal standard, the U.S. Supreme Court, in an 8-1 decision, overturned a state-court judgment for intentional infliction of emotional distress, which awarded substantial compensatory and punitive damages to the father of a fallen soldier. The judgment arose from a protest conducted by the Westboro Baptist Church during the soldier's funeral. The church members, positioned outside the funeral, held signs with inflammatory messages falsely suggesting that the soldier was a homosexual destined for hell and expressing offensive viewpoints, including "Thank God for Dead Soldiers," "Thank God for 9/11," "Thank God for IEDs," and "You're Going to Hell." Although the father did not see the signs during the funeral

procession, he witnessed them on a news broadcast later, causing severe emotional distress. *Snyder*, 562 U.S. at 456.

65.     In overturning the judgment, the Court reasoned that the content of the signs related to broad societal issues rather than matters of purely private concern. Although some signs and online posts were directed at private individuals, the predominant focus of Westboro's demonstration—while crude and inartful—addressed public issues, such as "the political and moral conduct of the United States and its citizens, the fate of our Nation, [and] homosexuality in the military." *Id.* at 454. Nothing suggested a "pre-existing … conflict between [the parties] that might suggest Westboro's speech on public matters was intended to mask an attack on [the father] over a private matter." *Id.* at 455.

66.     The Court further noted that Westboro had engaged in similar forms of speech on numerous occasions, deliberately aiming to reach a wide audience. *Id.* at 454. They did so not only by directly protesting hundreds of funerals, but also exchanging airtime on news shows for cancelling protests at the funeral "of five Amish girls killed by a crazed gunman" and "of a 9–year–old girl killed in the shooting spree in Tucson" where the church members planned to "proclaim[] that she was 'better off dead.'" *Id.* at 468 (Alito, J. dissenting).

67.     The hurtful and offensive nature of the speech, while acknowledged, failed to justify restricting protected speech merely because it causes distress. The Court reasoned that "any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed." *Id.* at 443. Given the undisputedly "outrageous" nature of the speech, a factfinder is "unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression." *Id.* at 458 (cleaned up). "Such a risk is unacceptable," as a free society "must tolerate insulting, and

even outrageous, speech … to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* at 458 (quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988)).

**2. Defendant's speech is protected from tort liability by the First Amendment.**

68.     Under the same standard, the speech here must also be regarded as protected by the First Amendment. Upon evaluating all the circumstances surrounding the speech—its content, form, and context—it becomes evident that the speech was directly related to a matter of significant public concern and legitimate news interest, rather than purely private matters.

69.     Regarding the form of the speech, it is crucial to note its medium as pure speech on a radio show. In *Snyder*, Justice Samuel Alito, the sole dissenter, provided examples of forms that would not violate the Constitution, such as creating and disseminating video and audio recordings, posting messages on the internet or sending emails, or appearing on television and radio shows. 562 U.S. at 463 (Alito, J. dissenting). From this, we can conclude that, had the Westboro Baptists' speech been limited to a radio show or internet postings rather than an in-person protest at a funeral, the *Snyder* opinion would have been unanimous.

70.     As to context, the speech in question was expressed during a radio show that had been on the air for many years. Throughout these years, the show consistently addressed themes of broad public concern. The program's overall focus revolved around individual liberties, the nation's safety, political and moral decline, and hypervigilance against a government Defendant perceived as deceitful. It hits hard at the government and those in power Defendant believes seek to curtail individual rights if not outright control the population, often referred to as the "deep state."

71.     The show's heated style and uncomfortable content often elicit disapproval, disagreement, and scorn. Overall, the show blends reporting, opinion, sarcasm, satire, devil's advocacy, and hyperbole. The show's audience knows this. So do people outside the audience.

The show often hosts government dissenters, including individuals like Defendant, who are often seen as outside the mainstream. It has also hosted a presidential candidate, and as Movants emphasize, there is a substantial audience that appreciates and engages with the show's content. Over decades of programming, both before and after Sandy Hook, Defendant discussed various government conspiracy theories, such as FBI involvement in the 1999 WTO protests, the 9/11 terrorist attacks, weapons of mass destruction in Iraq, the Clinton Foundation, and the origins of COVID-19 and its vaccines. Jones Decl. at ¶¶ 6-10.

72.      Defendant's initial suspicions regarding Sandy Hook were no different. When examining its content in context, it becomes clear that the speech's target remains the same: the government and the "deep state." The overall thrust of the content aligns with this focus. It emphasizes that when the government seeks to exploit an event to restrict individual liberties, the American people must thoroughly and vigorously question the event. For example, when the government used the 9/11 attacks to justify surveillance on law-abiding citizens, Defendant questioned the official narrative. *See* U.S.A. PATRIOT ACT, Title II, "Enhanced Surveillance Procedure," 115 Stat. 272 (2001). When the government claimed the existence of weapons of mass destruction in Iraq as a basis for war, Defendant questioned that claim—and he has also questioned the government's justification for other foreign interventions. Similarly, when the government imposed what Justice Gorsuch recently described as "the greatest intrusions on civil liberties in the peacetime history of this country" following the government's use of COVID-19 to lockdown the country and inject every citizen with an up-to-that-point-unheard-of substance, the defendant questioned. *Arizona v. Mayorkas*, 143 S. Ct. 1312, 1314 (2023). And when the government attempted to curtail Second Amendment rights following the Sandy Hook incident, Defendant

questioned the event, focusing on government deceit and gun control policies rather than targeting specific individuals. Jones Decl. at ¶¶ 11, 17.

73.     It is not the event that is key to Defendant's broadcast topics, but the government's response to that event. The government's responses—be it war, gun control, lockdowns, injections, foreign interventions—are matters of public concern. It can hardly be said that Sandy Hook was not a matter of public concern. The incident sparked a nationwide debate on gun control, which was within the overall theme of the show presented in the usual style. Clearly, many consider this style extreme and outrageous. Defendant sincerely believes that the moment rigorous critique and calls for investigation on any topic become off-limits, it will be precisely that topic that totalitarian regimes will exploit. Defendant further believes that "[i]f questioning public events and free speech is banned because it might hurt somebody's feelings, we are not in America anymore." Ex. 2 at 6. And the U.S. Supreme Court agrees: "[a]s a Nation we have chosen … to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 443.

74.     As we learned in *Snyder*, courts may not isolate individual statements that suggest a private personal attack, but must instead determine the overall thrust and dominate theme of the speech from the totality of the circumstances. Movants imply the whole show was about them, but that is not the case. (*See* Doc. 59-8). Further, nothing here suggests a pre-existing conflict between Defendant and Movants that would indicate his speech on public matters was intended to mask a personal attack.

75.     Furthermore, any distress caused by Defendant's speech is directly related to the content and viewpoint of the message conveyed. *Snyder*, 562 U.S. at 457. Some speech will certainly test a court's commitment to the First Amendment. But a court may not act as an

"instrument for suppression" or, at best, an "inadvertent censor." *Id.* at 452, 458. The First Amendment does not ask courts to the applaud the message—surely the Supreme Court was not condoning that anyone "F--- the Draft" in *Cohen v. California*, 403 U.S. 15, 16 (1971). Rather, such speech "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458. Overall, when considering the form, context, and content of the speech: the radio show format, the consistent themes of public concern, and Defendant's intention to critique government actions all contribute to the speech's protected nature.

76.     To be clear, Defendant is not seeking judicial review. It is recognized that the bankruptcy cannot modify or overturn the Connecticut Judgment even if it is unconstitutional. A debtor may nonetheless voluntarily seek to discharge an unconstitutional judgment in bankruptcy. *Kremer*, 456 U.S. at 482. This argument is presented solely for the purpose of determining whether to apply collateral estoppel under the full faith and credit statute. Because Movants have not introduced sufficient evidence to even begin this analysis, summary judgment may be denied for this reason alone.

**C. Under Connecticut law, even when applicable, the doctrine of collateral estoppel must give way when, as here, the convenience it affords is outweighed by questions concerning the quality, extent, or fairness of the prior proceeding.**

77.     Even when applicable, the application of collateral estoppel is always discretionary and never compelled by law. Even if collateral estoppel seems appropriate on its face, courts in Connecticut are "careful that the effect of the doctrine does not work an injustice." *Gladysz*, 773 A.2d at 308. The doctrine "should be flexible and must give way when [its] mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies." *Cumberland Farms, Inc. v. Town of Groton*, 808 A.2d 1107, 1117 (Conn. 2002).

78.     The purposes of collateral estoppel are to achieve finality, judicial economy, and prevent inconsistent judgments, but these considerations must be balanced against the competing interest of justice. *Weiss v. Weiss*, 998 A.2d 766, 779 (Conn. 2010). In certain cases, the collateral estoppel effect of a prior proceeding may depend on the specific approach taken by the courts addressing the petition. *Birnie*, 953 A.2d at 38. Redetermination of issues becomes warranted if there are doubts about the quality or fairness of procedures followed in the previous litigation. *Montana v. United States*, 440 U.S. 147, 164, n.11 (1979).

79.     Here, none of the interests promoting collateral estoppel weigh very strongly. In fact, awarding a discharge is one of the Bankruptcy Code's central tenants, and will bring about finality more quickly and with fewer judicial resources than the appeals that will follow. Discharging a state court judgment in bankruptcy (or denying a nondischargeability action) does not require the bankruptcy court to issue a ruling inconsistent with that judgment. Unlike its defensive use, offensive collateral estoppel is not favored, and courts have "broad discretion" as to whether to permit offensive collateral estoppel. Courts must tread cautiously because offensive collateral estoppel use may not promote judicial economy or fairness. *Fitch v. Fitch (In re Fitch)*, 349 B.R. 133, 140 (Bankr. N.D. Tex. 2006), *as amended* (Aug. 2, 2006) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979)).

80.     At the same time, there are legitimate concerns about the quality and fairness of the prior litigation. Chief among these concerns is the magnitude and impact of the sanction. The unusual path from failing to produce (sufficiently) web traffic data in the Movants preferred format to a default judgment resulting in approximately $1.5 billion in damages should cause anyone pause. The web traffic data is wholly immaterial to the § 523(a)(6) issues here. In fact, the web traffic data was not even needed in the State Court Case. Movants requested the data to show that

reporting on Sandy Hook was motivated by profit. In awarding damages, the court found that the profit motivation was "clearly established" supposedly without the discovery that caused the default. (Doc. 58-2 at 41-42). Thus, in retrospect, the requested evidence was disproportionate to the needs of the State Court Case.

81.     Beyond a questionable Default Judgment, doubt that the Connecticut Damages Order was in line with due process weighs heavily against collateral estoppel. And there is significant overlap between the due process and free speech issues. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). *BMW v. Gore* laid out "[t]hree guideposts" to determine whether there was "adequate notice of the magnitude of the sanction," including degree of reprehensibility, the disparity of actual damages to punitive damages, and "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 574-75.

82.     The first guidepost is problematic when speech is at issue. When speech is at issue, the degree to which one might find the speech reprehensible cannot be untangled from the degree to which one disagrees with the content or viewpoint of the speech. To make such a determination, it is necessary to examine the content of the speech. This factor will then turn on the viewpoint expressed therein. Indeed, that is what happened here. The many adjectives hurled toward Defendant would not have been used if it were viewed by someone in agreement with the viewpoint of the message on gun control and government deceit, with emotional distress being at most incidental and thus insufficient to warrant an exception from discharge.

83.     The second guidepost is also problematic in a case like this with both high emotions and intangible damages. Due to the substantial amount awarded, it is difficult to argue that the "actual damages" were not, in essence, punitive damages resulting from disagreement with the content and viewpoint of the speech. Moreover, the Supreme Court has also considered the ratio of punitive damages compared to actual "out-of-pocket" expenses. *See, e.g.*, *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991) (upholding punitive damages award of "more than 200 times the out-of-pocket expenses of respondent," but only when imprisonment under criminal law may be required). Using that standard, the ratio is well out of proportion. Situations like this highlight the Supreme Court's concern "that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 18.

84.     The third guidepost, however, is telling. No statutorily authorized civil penalty can be imposed on Defendant's speech, as a statute that preemptively prohibits such speech would be deemed unconstitutional as an impermissible prior restraint. *Freedman v. State of Md.*, 380 U.S. 51, 57 (1965) (citation omitted) ("[A]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."). Furthermore, in the comparable *Snyder* case, the father was awarded $2 million in compensatory damages and another $2 million in punitive damages when the church members personally showed up and waved offensive signs outside the funeral. For speech on his show, Defendant was saddled with the Connecticut Damages Order amounting to approximately $1.5 billion. This punishment exponentially exceeds the $4 million awarded in the *Snyder* case, further questioning its proportionality.

85.     The CUTPA award is particularly troubling. To begin, it is not immediately obvious that CUTPA applies from the allegations on the pleading. The CUTPA is a consumer protection statute that is intended to be purely remedial—even punitive damages are intended to be remedial. *See* Conn. Gen. Stat. Ann. § 42-110b(d). By its text, CUTPA does not apply to intangible harms to emotions or reputation. It allows a "person who suffers any ascertainable loss of money or property," due to unfair trade practices to "recover actual damages" in a judicial proceeding. Conn. Gen. Stat. Ann. § 42-110g(a). It also allows a person damaged by unfair trade practices to share in the distribution of the offending party's assets "to the extent [that person] has sustained out-of-pocket losses." Conn. Gen. Stat. Ann. § 42-110f.

86.     The Default Judgment was of questionable legality in other ways. In Connecticut, "[t]he primary purpose of a sanction for violation of a discovery order is to ensure that the [complying party's] rights are protected, not to exact punishment on the [noncomplying party] for its allegedly improper conduct." *Usowski v. Jacobson*, 836 A.2d 1167, 1174 (Conn. 2003) (citation omitted). Yet the trial court levied CUTPA punitive damages due to discovery violations. The State Court expressly held that discovery abuses, not the conduct that caused the injury, "militates in favor of a substantial award of punitive damages." (Doc. 58-2 at 42). For § 523(a)(6) purposes, "willful and malicious injury" does not extend to discovery violations. But the Connecticut court awarded damages based in part on discovery violations, not on objective substantial certainty or subjective intent to cause harm on the merits. Since that proportion of the damages cannot be separated out, the Court should deny collateral estoppel to the whole Default Judgment and the Connecticut Damages Order.

87.     Furthermore, the Connecticut Damages Order was of questionable consistency. The State Court simultaneously found both "concealment of the[] conduct" and that the conduct caused

harm precisely because it was not concealed, but rather broadcast to a "massive audience, including the 'infowarriors.'" (Doc. 58-2 at 42-44). The Connecticut court did this by using inconsistent standards to reach a rare result in which every factor points in the same direction. In addition, awarding half a billion dollars in punitive damages on top of the nearly billion dollars in compensatory damages, without financially destroying the defendants, implies that the Connecticut court thinks that Sandy Hook made Defendant a billionaire.[10] At the same time, the Connecticut court found that Movants had little incentive to bring this claim. *Id*.

88.    The implication itself is dubious. Even if we accept the upper limit on the record that FSS took in $1 billion in revenue over time since 2012, over the next decade had a 100% profit margin, 100% of profits came from Sandy Hook reporting, 100% of profits went to Defendant, and Defendant saved 100% of it, it still would financially destroy Defendant. Moreover, that assertion would be entirely inconsistent with Chief Editor Watson's statement that "[t]his Sandy Hook stuff is killing us." (*See* Doc. 59-14). Hardly the statement of one making billions from giant spikes in programming. In any event, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Indeed, the lack of effective due process provides another reason to deny full faith and credit to the Default Judgment and Connecticut Damages Order.

---

[10] The Defendant has sworn under penalty of perjury that his wealth is far below that of a billionaire. *See* Defendant's Schedules (Doc. 231) and Statements (Doc. 232) of Financial Affairs filed in the related Chapter 11 Bankruptcy Case No. 22-33553.

**D. Bankruptcy courts will not apply collateral estoppel when, as here, a party skews the prior proceeding with the specific intention to obtain a non-dischargeable judgment.**

89.     The Motion be denied without even considering Connecticut collateral estoppel law, the Default Judgment or Connecticut Damages Order's constitutionality, or the myriad irregularities with the prior proceeding.

90.     In discharge cases, bankruptcy courts will not apply collateral estoppel if it appears that "bankruptcy was anticipated by the parties and the [prior] proceedings [were] skewed with the specific intention to obtain a non-dischargeable judgment." *Dodson v. Church (In re Church)*, 69 B.R. 425, 431-32 (Bankr. N.D. Tex. 1987). In determining such skew, the court "looks to the overall posture of the parties to the prior litigation to determine whether that litigation was conducted with a view to pre-determine any aspect of the discharge question." *Id.* Orders or findings flowing from such actions are not given preclusive effect—particularly if they are nonessential. *Id.* (finding no skew because issue "w[as] the essence of the prior state court proceeding.").

91.     Here, Movants had foreseen the possibility of Defendant's bankruptcy and manipulated the State Court proceeding to pre-determine the discharge question now under consideration. FSS had already declared bankruptcy during the State Court Case, a fact mentioned in the Connecticut Damages Order, (*see* Doc. 58-2 at 20), and discussed it at length in the damages hearing, (*see generally,* Doc. 58-15). Armed with this knowledge, Movants strategically dismissed their negligence claim during the State Court Case, an action that served no purpose within that litigation. Its sole effect was to shift all damages from emotional distress out of the negligent-tort box and into the intentional-tort box. Given that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)," *Kawaauhau*, 523 U.S. at 64,

Movants would then find it easier to assert, as they do here, that the entire emotional distress award is nondischargeable.

92.     Next, Movants pressed hard for language beyond recklessness in the punitive damages order, even though recklessness would suffice, and the State Court obliged. Movants now rely heavily on that language for nondischargeability. Movants describe that statement as "[c]ritical[]" to their case, and dedicate three block quotes in their brief to that single paragraph. (Doc. 60 at 22). If accepted, the State Court's statement, which should be treated as nonessential dicta, would serve no purpose other than to insulate the Connecticut Damages Order from discharge in a subsequent bankruptcy. This is as Movants intended.

93.     These tactics, however, militate toward ruling in precisely the opposite way of that which they planned. By way of analogy, federal courts are wary that the Declaratory Judgment Act is not used "merely for the purpose of 'procedural fencing' or 'to provide an arena for a race to res judicata'" and will decline hearing declaratory actions based on such tactics. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994). The same reasoning should be applied here to deny collateral estoppel.

94.     Movants' manipulation was pure "procedural fencing." For that reason, it should be given no preclusive effect. Doing so would be particularly prejudicial to Defendant because at that point there was little incentive to fight against punitive damages. The compensatory damages were so unreasonably high that bankruptcy was his only viable option. This further goes to show that not only did the statement within the punitive damages order serve no purpose, but the entire punitive damages award served no purpose.

**E. Viewed in the light most favorable to the non-moving party, the record provided does not establish that Movants are entitled to judgment as a matter of law.**

95.     In closing, the underlying state court record, even presuming admissibility,[11] does not establish that the § 523(a)(6) standard has been met. Contrary to Movants' contentions, neither "motivated by profit" nor "a horrible thing to say" describe the § 523(a)(6) standard. (Doc. 60 at 33-34). Moreover, because material is viewed in the light most favorable to the non-moving party, summary judgment is generally ill-suited for resolving cases involving allegations of intent. *Cooper Tire*, 423 F.3d at 459; *Swirsky*, 372 B.R. at 565. Nor do mere legal conclusions establish any fact for summary judgment purposes, much less establish the § 523(a)(6) standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating courts "are not bound to accept as true legal conclusions couched as factual allegations").

96.     The worst of what Movants endured after Sandy Hook was perpetrated by anonymous hecklers and faceless internet trolls with no established connection to Defendant. The Court cannot translate the terms "investigation" and "looking into" as Movants suggest. Viewed in the light most favorable to the non-moving party, those terms undermine the claim that Defendant reported as solid fact that this was a government conspiracy. Asking for an "investigation" into something suggests that it is an open question. Despite cherry-picked phrases, anything after that is mere opinion on an open question. The full record shows that Defendant vacillated on this, but that runs counter to "willful and malicious injury" under § 523(a)(6).

97.     Defendant did not originate the story that Sandy Hook was a staged CIA conspiracy. Nor was he the only one reporting on it in the aftermath of the event. Movants themselves identify Rense, Fetzer, and Helbing as also broadcasting it. They also identify Halbig

---

[11] Defendant's Objection and Response to Movants' Statements of Uncontested Material Facts and Exhibits, Doc. 62.

and Sklanka hosting shows and operating websites dedicated to Sandy Hook. (Doc. 57-4 at ¶¶ 36-37). Defendant's radio show was not the only channel of communication for this content. Even if some of said wrongdoers listened to Defendant's programming, what these internet trolls did to Movants in no way resembled an "investigation" nor is there any way to know that Defendant's programming was their sole motivation for their actions, as that evidence was not put before the state court.

98.     Only by misleading edits and ignoring the summary judgment standard can Movants make this assertion. One edit is particularly telling. Movants attempt to twist Defendant's statement of December 19, 2012, that Sandy Hook needed to be "looked into" as a call to attack and harass the families. The full quote is as follows: "My deepest condolences go out to Mr. Parker and the rest of his family, as well as all the other families suffering from this tragedy. It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into." (Doc. 59-9). In context, viewing this statement in the light most favorable to Defendant, tells a much different story.

## IV.     <u>CONCLUSION</u>

99.     Finding a debt nondischargeable is an exception to the general rule for giving Defendant a fresh start, allowing him to utilize the Bankruptcy Code for the purpose of paying his disposable income and value of his nonexempt assets over a reasonable period of time to satisfy his debts through the Chapter 11 process. In this case, those debts arise nearly exclusively from tort claims of defamation and intentional infliction of emotional distress, where he has never had an opportunity to testify to his culpability (and Movants have never had to litigate proximate cause). Because of this, denying Movants' request to offensively apply collateral estoppel may provide Defendant his only opportunity to actually litigate the question of his intent.

100.    The Court should not apply collateral estoppel to the Default Judgment or the Connecticut Damages Order, because the issues required to be considered by this Court for a nondischargeability finding under Section 523(a)(6) were not considered by the State Court, and were not exact and essential to the Default Judgment or the Connecticut Damages Order.  This Court further should not apply collateral estoppel because it is clear from the underlying record that Movants manipulated the underlying proceedings to attempt to achieve judgments which would be nondischargeable.

101.    It is not hard to see why a court would want to find any means to justify the ends of punishing Defendant. His speech on his show is shocking, and his critique of the legal system and our government is in poor taste as well as tactically ill-advised. The subject matter of his shows is often unsettling. But, the First Amendment must protect offensive speech, if it is to protect any speech at all. Defendant's Sandy Hook skepticism was not unique. He had questioned many events before, centered around his skepticism of the government to be straight with its citizens. None of his speech was intended to harm any family member of the victims of Sandy Hook, or anyone else involved.

102.    Federal Courts are tasked with determining if state court judgments should be afforded full faith and credit. In a case as emotionally charged as this one, it is certainly understandable that the result could, in retrospect, be unconstitutional. Courts are not required to give unconstitutional judgments full faith and credit. Thus, in the event this Court finds itself struggling with the collateral estoppel argument, the Constitution provides an off-ramp for the Court to allow Defendant an opportunity to have a trial and present evidence as to the questions of willful and malicious injury under Section 523(a)(6).

103.    For the foregoing reasons above, Defendant respectfully requests this Court deny Movants' Motion for Summary Judgment (Doc. 57), and grant him such other and further relief, whether in law or in equity, to which he is justly entitled.

Respectfully submitted,

**CROWE & DUNLEVY, P.C.**

*/s/ Christina W. Stephenson*
Vickie L. Driver
State Bar No. 24026886
Christina W. Stephenson
State Bar No. 24049535
2525 McKinnon Avenue, Suite 425
Dallas, TX 75201
Telephone: 737- 218-6187
dallaseservice@crowedunlevy.com

-AND-

J. Christopher Davis
Oklahoma Bar #16629 (admitted *pro hac vice*)
Deric J. McClellan
Oklahoma Bar # 32827 (admitted *pro hac vice*)
222 N. Detroit Ave., Suite 600
Tulsa, Oklahoma 74120
Telephone: 737- 218-6187
dallaseservice@crowedunlevy.com

**COUNSEL FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on the 13ᵗʰ day of June 2023, a true and correct copy of the foregoing was served via electronic service on:

Ryan E. Chapple
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: (512) 477-5000
Fax: (512) 477-5011
*Counsel to the Sandy Hook Families*

Alinor C. Sterling
**KOSKOFF KOSKOFF & BIEDER PC**
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Telephone: (203) 336-4421

Kyle J. Kimpler
Christopher Hopkins Daniel S. Sinnreich
Daniel A. Negless
Briana P. Sheridan
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3990
*Counsel to the Sandy Hook Families other
than Richard M. Coan, as chapter 7 trustee
for the estate of Erica Lafferty*

Eric Henzy
**ZEISLER & ZEISLER, PC**
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
Telephone: (203) 368-5495
*Counsel to Richard M. Coan, as chapter 7
trustee for the estate of Erica Lafferty*

*/s/ Christina W. Stephenson*
Christina W. Stephenson