# EXHIBIT 3

```
DKT NO:  X06-UWY-CV186046436-S    :  COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :  JUDICIAL DISTRICT WATERBURY.

v.                                :  AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :  SEPTEMBER 6, 2022

DKT NO:  X06-UWY-CV186046437-S

WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES

                        MOTIONS

        BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE


A P P E A R A N C E S :


    Representing the Plaintiff(s):


        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        ATTORNEY MATTHEW BLUMENTHAL
        Koskoff, Koskoff & Bieder
        350 Fairfield Ave. Ste 501
        Bridgeport, Connecticut 06604

        ATTORNEY NORMAN PATTIS for Jones Defendants
```

```
                                Recorded By:
                                Darlene Orsatti

                                Transcribed By:
                                Darlene Orsatti
                                Court Recording Monitor
                                400 Grand Street
                                Waterbury, CT 06702
```

**EXHIBIT 3**

```
1          THE COURT:  All right.  Good morning, everyone.

2     This is Judge Bellis, we're on the record in the

3     three Lafferty versus Jones related matters.  Lead

4     docket number 18-6046436.  If counsel could please

5     identify themselves for the record.

6          ATTY. STERLING:  Yes, your Honor.  Alinor

7     Sterling for the plaintiffs, and with me are my

8     colleagues Matt Blumenthal and Chris Mattei.

9          ATTY. PATTIS:  Good afternoon, Judge.  Norm

10    Pattis for Free Speech Systems and Alex Jones.

11         THE COURT:  Thank you.  All right.  So just by

12    my count we have 11 sets of motions to get through

13    this afternoon.  I did see some recent filings, and

14    so my first question is whether Attorney Pattis has

15    had an opportunity to review them.

16         ATTY. PATTIS:  Attorney Sterling, Judge, gave me

17    a heads up an hour and half or so, and we reviewed

18    them orally.  I'm prepared to argue them, even though

19    I've not yet studied them, but I'm confident that

20    I've been adequately briefed and understand the

21    issues.

22         THE COURT:  Okay.  So two issues with jurors.

23    So – and I prefer not to state names, so hopefully we

24    can avoid that.  But, alternate number 5.  Our last

25    alternate.  Although she never raised an issue with

26    us, contacted Mr. Ferraro and is claiming an extreme

27    hardship because she will only get paid for two
```

1    weeks.  I will also tell you that the juror that we

2    were waiting to hear back from, alternate juror

3    number 3.  Has gotten back to Mr. Ferraro.  He will

4    only get paid for four weeks, and he's claiming a

5    hardship.  He also apparently works a second job,

6    which I don't think we heard.  So I've been giving it

7    some thought.  I mean if we excuse both, it sounds

8    like we're going to have to pick another alternate.

9    But I wanted to just briefly explore the issue of how

10   long the trial is going to be.  Because I'm wondering

11   if in fact it ends up being only four weeks, if we

12   can just keep alternate number 3.

13        So I think I probably overestimated the length

14   of trial.  So I think what I'm possibly putting out

15   there is, if everyone agrees, and I'm not asking you

16   to agree with me because I don't know.  But if we

17   think that we can get it done within the four weeks,

18   we can tell him that we overestimated and that we

19   think it will be done in four weeks.  And if in fact

20   there are delays, we could always excuse him after

21   the four weeks if he chooses to opt out.  So that's

22   one thought.

23        So Attorney Pattis, why don't I start with you

24   for a change, and see what your thoughts are on

25   alternate number 3 and alternate number 5.

26        ATTY. PATTIS:  Well, alternate number 5, Judge,

27   it's unfortunate that it seems to me that the way

1      this has been going, an ex post facto claim of

2      extreme hardship's been enough, I think in at least

3      one other occasion.  So I would defer to the Court on

4      that.  I wouldn't object if the person were excused.

5      As to number three.  Judge, I think I have to defer

6      to Attorney Mattei because he's got the bulk of the

7      evidence.  My case now I suspect will take two days.

8      Earlier I thought three or four.  I haven't seen the

9      plaintiffs exhibit list yet.  We exchanged them

10     today.  But I've got a pretty good idea what's in it.

11     But Attorney Mattei and I have had discussions about

12     whether they were going to call all the experts

13     they've disclosed and so forth.  And so I think I

14     have to defer to him, Judge.  I think four weeks is

15     tight from my prospective.  They're four-day trial

16     weeks.  On the theory that Murphy's Law applies,

17     we're likely to lose a day or two for one thing or

18     another.

19          THE COURT:  All right.  Attorney Mattei.

20          ATTY. MATTEI:  Your Honor, I think that we are

21     going to be able to do it in four weeks.  Our case,

22     as often happens as we approach trial is slimming.

23     And I think that your suggestion of kind of keeping

24     him on, and if it appears that we're going to go into

25     a fifth week, giving him the option at that point, it

26     may be that having sat on the jury for four weeks, he

27     wants to stay if we go into a fifth week.

```
 1          I have shared the Courts concern from the
 2     beginning, that we want to make sure that we can get
 3     to the end with six jurors.  And so my thought is to
 4     keep him, given my expectation that I think we will
 5     be done within four weeks.  And if not, only very
 6     slightly over.
 7          ATTY. PATTIS:  Judge, may - did our potential
 8     juror give any indication about the nature of his
 9     second job?  Is he going to be able to defer it and
10     give us his full attention and so forth?  And get
11     enough sleep, you know -
12          THE COURT:  I suppose we can have Mr. Ferraro
13     get more information.  But my thought was, he didn't
14     raise it at all, and I think his main concern was the
15     full-time job that he would get paid in full for four
16     weeks for.  So, I think it sounds like we all agree
17     to let alternate number 5 go based on her claim of
18     hardship.  Is that correct?  So we'll do that.
19          ATTY. MATTEI:  Right.  I didn't mention juror
20     number 5, Judge, but that's fine.  Yes.
21          ATTY. PATTIS:  Yes.
22          THE COURT:  Okay.  And so why don't we do this.
23     Why don't we have Mr. Ferraro reach out to alternate
24     number 3 and give him - tell him that we believe we
25     might be able to get it done in the four weeks, and
26     that if it does in fact go longer than the four
27     weeks, he can immediately opt out.  And if he is
```

1    agreeable with that, Ron will – Mr. Ferraro will let

2    me know, and if he's not, I will report back to you.

3     My only concern is if we lose someone else.  One or

4    two people before now and Tuesday.  And you never

5    know with Covid and everything else.  The only time

6    that I can see to pick is Monday if we really need

7    to.  Does anyone have a real problem with Monday, if

8    we needed to pick another alternate?

9         ATTY. MATTEI:  If we have to Judge, we'll be

10    there.

11         ATTY. PATTIS:  Yeah, I'm in the same – I mean –

12         THE COURT:  Nobody wants to.  Right.

13         ATTY. PATTIS:  Knocking on wood here.  Covid is

14    moving through my office knocking off one lawyer at a

15    time.  Fortunately, my office is separated from

16    everyone else's.  They – so, hopefully I'll be fine.

17         THE COURT:  All right.  So why don't we see what

18    happens with alternate number 3.  And we may not have

19    any problems, and we may have a full panel, but we

20    will definitely know.  Maybe Ron, you could make the

21    calls Thursday, so that we will know Thursday night

22    or Friday morning whether we're going to have to pick

23    on Monday.  Okay.

24         THE CLERK:  Sure, your Honor.  I was planning on

25    calling him today if we're done before five, or I

26    will call him tomorrow morning.

27         THE COURT:  Okay.  All right.  That sounds like

1    a plan.  Then the only other housekeeping thing I had

2    on my agenda was, to address the plaintiff's

3    objection to the media coverage.  So what we need to

4    do is slot a time for that and then notify the media

5    representatives.

6        ATTY. PATTIS:  I missed that filing.  Is there a

7    docket number on that?

8        THE COURT:  There is.

9        ATTY. STERLING:  Your Honor, Attorney Sterling

10   for the record.  Are you referring to the sort of

11   paragraph long filing we made, where we said that it

12   was possible some of our clients –

13       THE COURT:  Yes.

14       ATTY. STERLING:  I think that we have worked

15   through that, and the Court doesn't need to address

16   that.  We're not going to object to the media

17   coverage.

18       THE COURT:  Okay.  So we can cross that off the

19   list.  All right.  So any – before I get to these 11

20   sets of motions here, any housekeeping issues,

21   Attorney Pattis, from your end?

22       ATTY. PATTIS:  No.  I think Attorney Mattei and

23   I have been in extensive communication trying to

24   arrange – trying to reach agreements on everything

25   possible.  So I don't think we need – I don't

26   perceive us as needing Court intervention at this

27   point.

 1          THE COURT:  All right.  You agree, Attorney

 2     Mattei?  You're muted.

 3          ATTY. MATTEI:  Yeah.  At this point I don't

 4     think we have any housekeeping matters other than,

 5     your Honor, I'm not going to be arguing today.  Would

 6     it be all right if I shut off my video while I kind

 7     of observe?

 8          THE COURT:  I don't see why not.  Who's arguing,

 9     Attorney Sterling or Attorney Blumenthal, or you're

10     taking turns?

11          ATTY. STERLING:  Your Honor, Attorney Sterling.

12     I have the bulk of it.  Attorney Blumenthal has two.

13          THE COURT:  Okay.  Which two do you have,

14     Attorney Blumenthal?

15          ATTY. BLUMENTHAL:  Your Honor, I have the motion

16     to compel regarding the Dew Bidondi text, and I have

17     the motion in limine, or objection to the motion in

18     limine, regarding anti-government extremism and white

19     supremacy.

20          THE COURT:  Thank you.

21          All right.  So because we are up to entry

22     number, I think 965.  I just want to make sure for

23     each set of motions that I am ruling on the exact

24     right motion, and the exact right objection and

25     reply.  And that I've reviewed everything.  And I

26     think with the – I was able to review the recent

27     filings.  I was more concerned about Attorney Pattis.

1    But I think when it comes to the recent filings, you

2    will definitely need to correct me with respect to

3    some of the entry numbers, because I have a long

4    list, and I did not correct and add in the new entry

5    number.

6        So I have a certain spread across my whole desk

7    here, and I would like to – I'd like to take it in

8    the order that I've sort of spread it out.  So

9    hopefully you all can work with me on that.  So what

10   I have first, and this would be with Attorney

11   Sterling.  I have - and again, I definitely want you

12   all to correct me with your entry numbers.  And this

13   is regarding the requests for admissions.  So I have

14   the plaintiffs' motion to compel entry number 923.

15   Then I have the defendant's objection at 941.  And I

16   have the plaintiffs reply at 953.

17       ATTY. STERLING:  And your Honor, which motion to

18   compel is this?  I just –

19       ATTY. PATTIS:  The request –

20       THE COURT:  I have the – regarding the request

21   for admissions dated – this is your underlying motion

22   is 923, dated August 16th.  And I understand that

23   it's now limited to one request, which is number 244.

24   And the –

25       ATTY. STERLING:  Your Honor, that's -

26       THE COURT:  Okay.  So this is not an objection

27   that was made, it was an insufficient knowledge

```
 1        answer.  Okay.  So Attorney Sterling, do you have
 2        anything that you want to say about this?
 3            ATTY. STERLING:  Well, first let me, your Honor,
 4        go through the docket numbers, confirm them back to
 5        you.  So I have 923, the motion to compel adequate
 6        answers.  Responded to in docket number 941, which is
 7        the omnibus response.  And then there is a reply,
 8        which is docket number 953.  Okay.  There isn't a lot
 9        to cover here, your Honor.  And the request was 244
10        to the content of each of the foregoing videos was
11        broadcast by some or all of the following media.
12            It's already – so and then per – there's an
13        affidavit.  I think the defendants already agreed to
14        consider this response an answer.  So I mean, I think
15        – I think we should have an answer here.  There's
16        also a stipulation regarding the authenticity of all
17        the videos in issue.  It's really not in dispute that
18        they were broadcast.  So it seems to me it should be
19        admitted.  I'm not sure what the remaining issue is
20        on the defendants' side.
21            THE COURT:  I don't know either.  Attorney
22        Pattis.
23            ATTY. PATTIS:  So I – initially we had some
24        discussions about this.  We entered a stipulation
25        that all of the videos that we produced are authentic
26        and they'll be no need to authenticate them.  One of
27        the problems with the case is being – my client's
```

1      inability to tell what was broadcast where.  And so I

2      understand what Attorney Sterling is saying.  If

3      we're not going to object to their authenticity, why

4      are being coy or hesitant about where they were

5      broadcasting.  And the fact is, we simply don't know.

6      I mean and I don't know – and hence insufficient

7      knowledge.  And there's no means to find out.  Much

8      to my surprise in working with these clients over the

9      years, there is no central registry log or database

10     that you can consult.

11        THE COURT:  Well, Attorney Pattis, normally I

12     would say that there's a response to part of the

13     inquiry.  But here, the whole entire inquiry and each

14     sub-part was a no knowledge.  It would seem to me

15     that some of it could be responded to.  No?

16        ATTY. PATTIS:  Possibly.  But it's going to be

17     speculative.  If it's directed to Alex Jones, I mean,

18     I don't think he knows.  I genuinely don't.

19        ATTY. STERLING:  Your Honor, for the record,

20     Attorney Sterling.  If I may?  The request over 244

21     asks for the admission.  The content of each of the

22     foregoing videos was broadcast by some or all of the

23     following media.  Not all.

24        THE COURT:  Right.

25        ATTY. STERLING:  So –

26        ATTY. PATTIS:  I get that –

27        THE COURT:  I understand that, Attorney

1    Sterling.  That's why I asked Attorney Pattis why we

2    don't have a partial answer.

3         ATTY. PATTIS:  I don't know that he knows.  I

4    mean he says he doesn't know.  So we're not trying to

5    stonewall anyone here, but by stipulating to the

6    authenticity of them, we've given what I can.  I'm

7    not going to dispute that what I gave them is

8    authentic.  But I don't think Alex knows.

9         THE COURT:  But isn't it not just what he knows

10   that he has an obligation to find out the information

11   within his power?

12        ATTY. PATTIS:  Good luck with that, Judge.

13   We've been defaulted for a reason.  I don't think it

14   - and I didn't mean to be glib or sarcastic, I saw

15   you raise your eyebrows.  I wasn't trying to be

16   sarcastic.  There is just no their, their, when it

17   comes to an internal organization, or ability to

18   reconstruct historic facts.

19        THE COURT:  Do I think when I look at this there

20   is an obligation to - there's clearly some part of

21   this that can be admitted.  I'm sure based on what

22   you're saying that some part of it is a no knowledge.

23   Whether some part can be denied, I don't know.  But,

24   I don't - I understand that, and I accept your

25   representation that Mr. Jones personally can't answer

26   the entire question fully.  But it would seem to me

27   that at least part of it can be responded to.

1          So, I think what I'm going to do here is, order

2     that an amended answer be filed on or before

3     September 8th.  And otherwise the matter that's not

4     responded to will be admitted – deemed admitted.

5          ATTY. PATTIS:  May I request of Attorney

6     Sterling, that she send me that in a separate

7     pleading as a new request to admit, just number 244,

8     for ease of transmission to people who are going need

9     to review it.

10          ATTY. STERLING:  That's fine.  Of course.

11          ATTY. PATTIS:  Thank you.

12          THE COURT:  So just bear with me, please?

13          So I would like to take up next – and again, we

14     just need to triple check these entry numbers.  The

15     plaintiffs' motion for order.  And this is on the

16     issue of the Free Speech Systems and PQPR.  I have

17     that at entry number 926.  I have the defendant's

18     objection at 941.  And I have the plaintiff's reply

19     at 951.

20          ATTY. PATTIS:  Judge, the plaintiff's reply?

21     I'm sorry, you cut out.

22          THE COURT:  951.

23          ATTY. PATTIS:  Thank you.

24          THE COURT:  But I just want them confirmed if

25     you don't mind.

26          ATTY. STERLING:  Yes, your Honor.  Attorney

27     Sterling here.  And sorry your Honor, I keep stepping

1          out of the camera because my sort of rainbow of

2          motions is spread just outside camera reach.

3          So I have this is 926, the motion.  Line 41, the

4          omnibus response.  951, the reply in support.

5                THE COURT:  Okay.  So whenever you're ready,

6          please?

7                ATTY. STERLING:  Yes, your Honor.

8                So, this is really straight forward, and there

9          are a couple motions like this.  This is a situation

10         where Attorney Brittany – excuse me, this is – sorry.

11         Apologizes.  This is Alex Jones testimony

12         establishing the existence of a management agreement

13         between PQPR, or a management agreement for PQPR.

14         That's testified to by him.  It's also testified to

15         by Lydia Hernandez.

16               We requested the production of that management

17         agreement.  The management agreement is significant

18         because the Jones defendants are claiming that PQPR

19         is an independent corporate entity.  That does not

20         appear from the evidence to be the case at all.  So

21         having the management agreement would allow us to

22         cross-examine their contention that it exists

23         independently.  The failure to produce it, indicates

24         otherwise.

25               So what we've done, your Honor, is we moved to

26         compel.  Nothing has been produced.  The response is

27         that counsel has been advised that it does not exist.

```
 1        And so - but that's just contrary to the sworn

 2        testimony in the case.  So what we've requested is a

 3        sanction, and this would be a sanction under 13 14 3

 4        or 13 14 4.  13 14 4 allows the Court to preclude the

 5        entry and evidence of certain matters.  13 14 3 gives

 6        the Court the ability to take some matters as

 7        established.

 8             THE COURT:  Attorney Sterling, I -

 9             ATTY. STERLING:  Yes.

10             THE COURT:  - want to interrupt you.  So, I read

11        this motion as asking for an order that it be

12        compelled.  What did I miss?

13             ATTY. STERLING:  We did ask for an order that it

14        be compelled.  There was then a representation by

15        Attorney Pattis, that it can't be produced.  In our

16        reply we then requested a sanction.

17             THE COURT:  All right.  So go ahead.  I

18        interrupted you.

19             ATTY. STERLING:  Okay.

20             So what the sanction, your Honor, should be is

21        that it is taken as established that Free Speech

22        Systems and PQPR are not independent entities.

23        They're one in the same.  And that's the - you know,

24        that's the core issue that we're dealing with here.

25        That's what we were trying to explore.  That's what

26        we can't explore because we're not able to get the

27        management agreement.
```

1          THE COURT:  All right.  Attorney Pattis, the

2     ball's in your court.  But I have to agree with the

3     movant on this, that what we have are I suppose as

4     evidence under oath from Ms. Hernandez and Mr. Jones,

5     that there is an agreement and that I merely have

6     unsupported statements that it doesn't exist.  Are

7     you in a position that you are going to be submitting

8     some evidence?  Should there be an evidentiary

9     hearing on this?  Because I'm not –

10          ATTY. PATTIS:  I can –

11          THE COURT:  - going to just consider it's not

12     proper for me to just consider unsupported

13     statements.  So what do you suggest?

14          ATTY. PATTIS:  I will get an affidavit from the

15     debtor in possession, Free Speech Systems.  He

16     checked his files.  I'm in a better position post-

17     bankruptcy then I was before, because there's a

18     management team in there trying to create structures

19     of accountability and whatnot.  I'm told that there

20     is none – no such thing.  And so if the – and I will

21     be happily – I will happily get you a brief affidavit

22     that Mr. Schwartz has searched and cannot find it.

23     If it exists.

24          THE COURT:  All right.  But then I think we have

25     an evidentiary hearing, because Mr. Schwartz, what is

26     his role?

27          ATTY. PATTIS:  He's the management consultant

1    for the debtor in possession in the bankruptcy.

2        THE COURT:  Right.

3        ATTY. PATTIS:  And so he is effectively the

4    manager of the entity right now.

5        THE COURT:  I understand.  But it would seem

6    that he's even further removed from – it would seem

7    that Mr. Jones would have knowledge and be more

8    familiar with it.  So I suppose when we – if we have

9    an evidentiary hearing, and I have to weigh the

10   evidence, that's going to be an issue.  And Ms.

11   Hernandez.  Refresh my memory as to her role.

12       ATTY. PATTIS:  Home or business office person,

13   for lack of a better word, who had personal knowledge

14   of the relationship and the cash flow.  And

15   apparently saw at some point, what she testified was

16   a management agreement between Jones and PQPR.  Or at

17   least FSS and PQPR.

18       THE COURT:  All right.  So just tell me

19   procedurally how you want to proceed here because we

20   are on the eve of trial.  So I assume I have what I

21   have.  I assume Attorney Pattis will get something

22   that says in essence, I looked, and I couldn't find

23   anything.  And then I'll have to weigh the evidence.

24   Are we going to have – are you wanting to rely on

25   affidavits, or you're wanting an evidentiary hearing

26   on Monday?  Tell me what your proposal is.

27       ATTY. PATTIS:  I'd rely on the affidavit's,

1      Judge.  I mean, I think – I mean, candidly it depends

2      on what the stakes are.  I mean my view is that

3      frankly it would support my claim that they were

4      independent entities to find this agreement if there

5      is one.  Because you don't make an agreement in

6      writing with yourself.  So the sanction seems

7      counterintuitive to me.

8           In the absence of it, I don't know how we prove

9      that – I don't know how we establish that they're not

10     independent.  That seems like a logical leap to me.

11     It strikes me that if we don't produce it, that's

12     cross - for cross-examination of Mr. Jones.  Who

13     apparently once testified that he saw it and will – I

14     presume testify now that he doesn't have it.  Doesn't

15     know where it is.

16          So I – if the Court – I mean it is a central –

17     it is a hotly contested issue, the degree to which

18     FSS and PQPR interact.  And there has been an IRS

19     finding on that, just within the last several days.

20     I have not seen a writing to that effect yet.  So

21     they are in fact independent of one another, at least

22     from the eyes of one federal agency.  The plaintiffs

23     need to establish that they're not to eliminate a

24     source of debt and try to inflate the net worth of

25     the conglomerated entities.

26          So I don't want to give that issue up without a

27     fight.  But if my witnesses say it doesn't exist, I

1    don't know what else I can do.

2         THE COURT:  Right.  Well, if I were ruling on it

3    right now, I would – the only evidence that's before

4    me are – is the testimony that was mentioned of Mr.

5    Jones and Ms. Hernandez.  So I could rule now, but

6    what I'm trying to do is, give you an opportunity to

7    support your position –

8         ATTY. PATTIS:  Well, we'll take the

9    opportunity –

10        THE COURT:  – with some evidence.

11        ATTY. PATTIS:  We'll take the opportunity.  We'd

12   also ask you to consider rejecting it as untimely.

13   We're on the eve on trial.  There's no reason this

14   couldn't have been done long ago.  And I've got

15   plenty to do to get ready for next week, and I'm not

16   looking to gather more affidavits.

17        But if the Courts not persuaded by that

18   argument, I'd ask for a brief period to get these

19   affidavits.

20        ATTY. STERLING:  Your Honor, may I – may I –

21        THE COURT:  Sure.

22        ATTY. STERLING:  So we are late.  This was filed

23   some time ago, and it really does require an

24   affidavit responding to it.

25        THE COURT:  Well, that's – I – we covered that.

26        ATTY. STERLING:  Exactly, your Honor.  But so

27   what I am saying is, if the defendants are going to

1        be given an opportunity to provide the Court with an

2        affidavit, we'd really like to see it right away.

3        Because I can't judge whether we need an evidentiary

4        hearing until I see the affidavit.

5             ATTY. PATTIS:  Well, Alinor, I'll tell you what

6        it's going to say.  I mean, it's not going to say any

7        more than I am Mark Schwartz, I became debtor in

8        possession or whatever his title is on such and such

9        a date.  I have complete access to the files.  I was

10       approached on such and such a date to look for such

11       and such a document.  I have diligently inquired and

12       made inquiries through others.  I find no evidence

13       that there is – I find no document, do not believe

14       there is one.  That's what he's going to say.  And

15       what Alex is going to say, we'll find out.  It's not

16       going to be any more than that.

17            THE COURT:  All right.  So I would say any

18       counter affidavit, or I mean – was there any other

19       deposition testimony, Attorney Pattis, that you would

20       have wanted to submit, that you didn't submit?

21            ATTY. PATTIS:  No.

22            THE COURT:  Okay.  So any counter affidavit on

23       or before the close of business tomorrow.

24            ATTY. PATTIS:  Judge, I'm in the State Supreme

25       Court tomorrow morning, and going to lose part of the

26       day.  Is it possible to give me until Thursday?

27            THE COURT:  Okay.  That's the 8th.

1        ATTY. PATTIS:  Yes, ma'am.

2        THE COURT:  And Attorney Sterling, you may want

3    to respond to the affidavit.  If it says nothing more

4    than what Attorney Pattis represented, and I accept

5    his word, I'm not imagining you're looking to respond

6    or have – and Attorney Pattis is not asking for an

7    evidentiary hearing.

8        ATTY. STERLING:  No.

9        THE COURT:  All right.  So I'm going to rule on

10   it either the night of September 8th, or the next

11   morning.  But if it does – if it has any material

12   detail that's different, I will let Mr. Ferraro know

13   and he'll reach out and we'll see what we're going to

14   do.

15       ATTY. STERLING:  Thank you, your Honor.

16       THE COURT:  Okay.  So Attorney Blumenthal, I

17   think this is you.  So I now have the plaintiffs

18   notice or motion regarding the Dew Bidondi text.  I

19   have that at 929.  I have the defendant's omnibus

20   objection at 941.  And I have the plaintiffs reply at

21   945.  But again, I don't know if any of the new

22   filings are going to change any of these entry

23   numbers.

24       ATTY. BLUMENTHAL:  That sounds – those are

25   correct, your Honor.  Your underlying – well, our

26   underlying motion was at 875.  Your order was at

27   875.20.  And the defendant's objection to the

1    original motion was at 882.  And your docket numbers

2    otherwise are correct.

3        THE COURT:  All right.  So we have my ruling.

4    We have no production and you're now going to address

5    sanctions.

6        ATTY. BLUMENTHAL:  Yes, your Honor.  There are

7    really two things at issue with regard to the

8    sanction at issue, which is an adverse inference with

9    regard to what the text that were failed to be

10   produced and were destroyed would show.  The

11   prejudice or materiality of them, and also the

12   intentionality with which they were destroyed.

13       I'll start with the prejudice, which the

14   defendants have said there is none.  But just the

15   opposite.  These texts are on an issue that is hotly

16   contested in this case and is highly significant to

17   the plaintiffs' damages case.  And that is the

18   control that Free Speech Systems exercised over Dan

19   Biondi, and the timing of that control.  And having

20   those text would provide the plaintiffs an ability

21   potentially to prove the timing of that control,

22   specifically that it extended through the time that

23   they were exchanged.

24       It also deprives the plaintiffs of the ability

25   to test the veracity of the accounts that were given

26   of those texts in the depositions.  The defendants

27   have essentially said, we have their deposition

1     testimony.  Good enough.  But that's the whole

2     purpose of documentary evidence and exhibits at a

3     deposition. At least in part.  That purpose is to

4     allow the person taking the deposition, or the party

5     taking the deposition, to test those statements.  And

6     so the plaintiffs have been deprived of that.

7          They've also been deprived of quality evidence.

8     Of high-quality evidence.  Documentary evidence on

9     this subject matter would be the equivalent of a star

10    witness and having just witnesses recollection

11    through deposition testimony or live testimony, is

12    far less high quality for the plaintiffs and for the

13    jury.

14         And moreover archingly these text are

15    fundamentally about Dan Bidondi's deposition

16    testimony.  And the veracity of that testimony more

17    generally.  And also whether and how it may have been

18    affected by Free Speech Systems and Rob Dew.  And so

19    the plaintiffs have been deprived of documentary

20    evidence to test, first of all the veracity of Mr.

21    Biondi's deposition testimony more generally, but

22    also with regard to what they said in particular.

23         On the intentionality issue.  The defendants

24    have said essentially that Mr. Dew did not intend

25    when he slammed his phone in his pickup trucks

26    tailgate, to destroy evidence for the purpose of

27    depriving the plaintiffs of it.  But that's not the

1          test of intentionality recognized by our courts.

2          Beers, the Beers case specifically says that by

3          intentionality we do not mean that there must have

4          been intent to perpetrate a fraud by the party or his

5          agent.  But merely that the evidence had been

6          disposed of intentionally and not merely destroyed

7          inadvertently.

8               And in this case, we think that the Court can

9          only come to the conclusion that under that

10         definition, and the definition that the courts have

11         generally observed, that these texts were destroyed

12         intentionally.  First of all, Bidondi himself is a

13         potential agent of Free Speech Systems, depending on

14         how you interpret their testimony, and depending on

15         what the text show at the time.  And he admits that

16         he destroyed them intentionally.

17              Additionally, given the realities of cell phones

18         in the moderate age, the failure to provide or

19         preserve these text over the time period that Free

20         Speech Systems knew that it needed to preserve and

21         provide them.  Three years from the beginning of the

22         first discovery that demanded them, and nine months

23         from multiple specific demands for those texts in

24         particular.

25              THE COURT:  Attorney Blumenthal, can you just –

26              ATTY. BLUMENTHAL:  Yes.

27              THE COURT:  – refresh my memory, please?  So the

1      text messages were what dates?

2          ATTY. BLUMENTHAL:  Let's see.  The text messages

3      in particular were from July, I believe July 2021.

4      I'm just looking it up right now.  In advance of Mr.

5      Bidondi's deposition.  So Mr. Bidondi said it was

6      about the fourth of July.

7          THE COURT:  That the text messages were

8      exchanged.

9          ATTY. BLUMENTHAL:  Yes.

10         THE COURT:  2021.  And when – so put aside Mr.

11     Bidondi.  But what is Mr. Dew's relationship with

12     Free Speech Systems?

13         ATTY. BLUMENTHAL:  At the time –

14         THE COURT:  At the time the text messages were

15     exchanged.

16         ATTY. BLUMENTHAL:  He was Alex Jones' right-hand

17     man.  One of the most senior members of the

18     management team.

19         THE COURT:  All right.  So he's an employee of

20     Free Speech Systems.

21         ATTY. BLUMENTHAL:  Yes, your Honor.

22         THE COURT:  Okay.  And at the time the text

23     messages were exchanged, was there – were there

24     discovery requests that were propounded that would

25     have required Free Speech Systems or Mr. Jones to

26     produce the text messages?  Putting aside the

27     subpoena on Mr. Bidondi.

1      ATTY. BLUMENTHAL:  Yes, your Honor.

2      THE COURT:  And then just refresh my

3   recollection so I don't have to go through all my

4   notes here.  When was the – when did Mr. Dew's cell

5   phone get damaged?

6      ATTY. BLUMENTHAL:  In either late January or

7   early February 2022.  He couldn't determine with more

8   specificity.

9      THE COURT:  So that was the timeframe they were

10   created in July of 2021, and his phone was not

11   damaged until around six months later?

12      ATTY. BLUMENTHAL:  Yes, your Honor.

13      THE COURT:  Okay.  Go ahead.

14      ATTY. BLUMENTHAL:  So your Honor, as I was just

15   saying.  Basically with the realities of the way cell

16   phones work and how people use cell phones these

17   days.  If you fail to preserve or cause to be

18   preserved these sorts of texts, or data, over this

19   sort of length of time, it's almost inevitable that

20   something is going to happen to them.  The way people

21   use their phones and replace them.  And that's

22   exactly what happened in this case.

23      In addition, Dew was a senior member of the

24   management team.  He should have known that he needed

25   to preserve these texts.  He didn't do so.  He's

26   admitted it.  He should have taken measures, even

27   after he put them in his pickup trucks tailgate, and

1      then slammed the tailgate on them – or on the phone.

2      He should have and he should have known to go to some

3      measure to recover them.  Some sort of technical

4      assistance.  He failed to do that.  And he's admitted

5      it in his deposition.  And I just think it's useful

6      to think about this from a more broad context, about

7      what the evidence shows happened here.  Most of the

8      cases that have decided that evidence was not

9      destroyed intentionally, deal with parties who do not

10     have notice that they need to preserve it.  Or some

11     sort of external factor, like a cleaning service

12     picking up a soda can that's on a desk and throwing

13     it in the trash.

14         And what we have here is, an individual who knew

15     that he had to preserve these texts, and an entity

16     that knew that they had to preserve them.  Failed to

17     do it over an extended, extended period of time.  And

18     we have an admission from the individual himself,

19     that he took the phone, he placed it in the tailgate

20     of the truck, and then he slammed the tailgate of the

21     truck on it.  And then failed to take any additional

22     measures besides attempting to turn it on, to try to

23     recover the data.

24         And so what the defense is really asking us to

25     do, is to look – or the Court to demand evidence of

26     what was in Mr. Dew's heart, with regard to these

27     texts.  And that's exactly what courts have said here

1          in Connecticut, is not required.

2              THE COURT:  All right.  Attorney Pattis, it

3          looked to me when I looked at it the first time, and

4          it looks to me now.  That it should have been

5          produced.  It should have been preserved.  And okay,

6          neither were done, and the phone gets destroyed.

7              ATTY. PATTIS:  So addressing Attorney

8          Blumenthal's argument.  There is no prejudice because

9          strictly speaking, Dan Bidondi's not a relevant

10         witness to this case.  There is zero evidence that

11         Bidondi had any contact with any of the plaintiffs,

12         and to the degree that they'd keep – they'd seek to

13         assert that Infowars quote, unquote, harassed the

14         plaintiffs.  Bidondi came to Connecticut and harassed

15         other people.

16             And if they're going to advance a 4-4 theory,

17         they've not yet given me a notice of that, so

18         strictly there can be no prejudice because Mr.

19         Bidondi is irrelevant.  Whether he was under control,

20         Infowars control, when he went to visit third parties

21         and behaved like an ass.  Is neither here nor there.

22          Mr. Blumenthal – Attorney Blumenthal, sorry, places

23         a very charitable cast on the evidence.  He suggests

24         that Dew went to his truck, placed the phone in there

25         with the intention to destroy it.

26             I don't read the testimony that way.  I read it

27         more as an accident.  As to whether it should have

1   been preserved in July of 2021.  I don't recall when

2   the first request for communications of this sort

3   occurred.  I don't recall whether it pertained to

4   Bidondi.  So I reject the contention that its

5   prejudicial to the case that they're putting on or –

6   THE COURT:  Can we just back up for a second.

7   Attorney Pattis, my recollection is that at the

8   September deposition at the time Attorney Wolman was

9   appearing for the defendants.

10  ATTY. PATTIS:  Um-hum.

11  THE COURT:  There was a preservation request put

12  on the record then.  So when I look at this, it

13  produced and should have been preserved.  And then

14  this is what happens to evidence all the time when

15  people don't fully and fairly comply.  The passage of

16  time, things happen.  And so regardless of whether it

17  was intentional or not, it sure doesn't sound like

18  Mr. Dew, who was an employee of Free Speech Systems

19  produced it or preserved it.  And that's sort of a

20  problem.

21  ATTY. PATTIS:  It is sort of a problem.  But I

22  don't think that it's – it's neither prejudicial –

23  it's just not prejudicial.  And so to say that – to

24  draw this adverse – I don't think you can claim that

25  it was intentional spoliation.  I'm not sure that

26  Connecticut recognizes negligence spoliation.  So I'm

27  not sure that the plaintiff's are entitled to the

1    adverse inference that they seek.  And so that's my

2    answer.

3         THE COURT:  All right.  Attorney Blumenthal, did

4    you want to respond briefly?

5         ATTY. BLUMENTHAL:  Yes.  Just two very brief

6    notes.  Your Honor, one thing that I didn't mention

7    in my description of Mr. Dew, is that he on several

8    occasions served as Free Speech Systems corporate

9    representative in depositions, both here and

10   elsewhere.  And so that I think is a relevant fact in

11   evaluating intentionality.

12        Additionally, contrary to Attorney Pattis'

13   argument, the default establishes that what Mr.

14   Bidondi did was under the control of Free Speech

15   Systems.  So that relationship is important for the

16   plaintiffs to be able to explore through the highest

17   quality testimony, and as a result, the prejudice is

18   significant in addition to all the other reasons that

19   I've mentioned previously.

20        ATTY. PATTIS:  Briefly, Judge?

21        THE COURT:  Sure.

22        ATTY. PATTIS:  We obviously disagree about what

23   the default means.  And I'll address that later in

24   motions.  The fact of the matter is, that there is

25   zero evidence that Bidondi had anything to do with

26   any of these plaintiffs.  And I was startled to see

27   the plaintiffs - I guess the plaintiffs are serious

1    about offering him as a witness.  I may seek to

2    address that by way of a motion, because I don't see

3    any nexus between Bidondi and any of the people

4    claiming money damages here.

5        THE COURT:  Attorney Blumenthal, again, refresh

6    my recollection.  What are the allegations in the

7    complaint about Bidondi?

8        ATTY. BLUMENTHAL:  I'm not quoting, I'm

9    paraphrasing, your Honor.  But the allegations were

10    that he was an Infowars reporter at relevant times

11    under their control.  And that he harassed

12    individuals in and around Newtown, in a company – in

13    the company if Wolfgang Halbig.  And that the

14    plaintiffs were aware of him.

15        THE COURT:  All right.  So I'll take this under

16    advisement, and hopefully get you a ruling later this

17    afternoon or tomorrow.

18        ATTY. STERLING:  If I may?  Attorney Sterling

19    for the record.  I do want to flag – I know the Court

20    had an approach that it wanted to take with regard to

21    the motions.

22        THE COURT:  I do.

23        ATTY. STERLING:  And I don't mean to disorder

24    that approach.  But I did want to raise that I think

25    a lot of what we're doing dances around the central

26    issue –

27        THE COURT:  I understand that.

1          ATTY. STERLING:  Okay.  Thank you, your Honor.

2          THE COURT:  But I have to follow the way it's

3     laid out on this desk, or I'm going to get lost with

4     all these orders I have to do.  But I do understand

5     that.

6          ATTY. STERLING:  Of course, your Honor.  I just

7     don't want to have any of our arguments be understood

8     as –

9          ATTY. PATTIS:  No motion is an island.  I think

10    she's trying to say.

11         THE COURT:  Yes.

12         ATTY. STERLING:  Yes, exactly.  Thank you.

13         THE COURT:  I think we all know that.  All

14    right.

15         ATTY. STERLING:  Okay.  Thank you, your Honor.

16         THE COURT:  So I'm going to turn to defendants'

17    motion on the white supremacy issue.  I have it entry

18    number 866.  I have the plaintiff's objection at 890.

19    And I have no reply being filed.  So if those entry

20    numbers are correct –

21         ATTY. PATTIS:  They are in the defendants' view,

22    Judge.

23         THE COURT:  I beg your pardon?

24         ATTY. PATTIS:  They are in the defendants' view,

25    Judge.  Those entries are correct.  Yes.

26         THE COURT:  Okay.  So whenever you're ready.

27         ATTY. PATTIS:  This pertains to the proposed

1        testimony of a witness expert from the Southern

2        Poverty Law Center named Dr. Beirich.  And my

3        understanding is, she's being offered to provide

4        jurors with context of Mr. Jones in the American

5        political talking head landscape.  And that he will

6        be situated as a vocal and visible right-wing figure

7        on the airways.

8            All of that's fine and I think is appropriate

9        and will assist the jury.  Our argument is applying

10       4-3.  Having him characterized as a white supremist

11       is more pre – is unduly prejudicial.  Not one of the

12       plaintiffs in this case is anything other than

13       Caucasian, as near as I can tell.  Race isn't an

14       issue in this case.  It's become the third rail of

15       American politics.

16           And so we seek to eliminate issues that would

17       have the tendency to divert the jury from its task at

18       hand.  And that is, evaluating the extent to which,

19       if at all anything Jones said actually affected these

20       plaintiffs.  Or whether their role as visible

21       spokesman for gun safety, as they perceived it,

22       brought them attention they didn't want.

23           THE COURT:  So I understood, Attorney Sterling,

24       I thought you basically agreed on what such evidence

25       could be used for.  And I thought as I understood it,

26       Attorney Sterling, you would only be offering such

27       evidence if it got to that, with respect to the

1      composition of Mr. Jones' audience, and how the

2      audience responded to the topics and broadcasts.

3              ATTY. BLUMENTHAL:  Your Honor, this is –

4              THE COURT:  Oh.

5              ATTY. BLUMENTHAL:  – Attorney Blumenthal.

6      Apologizes for the confusion about taking this one.

7              THE COURT:  Sorry, you did tell me that.

8              ATTY. BLUMENTHAL:  But I think your Honor has

9      broadly characterized the testimony correctly.  The

10     reason why the testimony is relevant and vital, has

11     nothing to do with Mr. Jones' character.  In fact,

12     Dr. Beirich at her deposition explicitly declined to

13     characterize his character in this context.  And said

14     she would not be testifying as to his own beliefs.

15             Rather, it's relevant to describe his audience,

16     specifically the context around it, and Jones' place

17     within it, and his ability to communicate with it.

18     It – she'll be able to testify as to his prominence

19     in these circles.  His reach within these circles.

20     His ability to grow these movements.  The trust that

21     these segments of his audience have, and his message

22     and his statements.  And thus their resistivity to

23     them.  And it indicates who would believe those

24     statements and how they would receive them.  It also

25     talks about – it also is evidence relevant to the

26     ideology, the activities, the disposition of elements

27     of his audience.  And the centrality of these

```
1     specific messages.  The hoax messages and narratives
2     about mass tragedy events, specifically mass
3     shootings.  The centrality of those sorts of
4     narratives to this element of his audience's world
5     view, and their disposition to believe those
6     narratives, especially coming from him.  And also
7     their disposition to act as a result of those
8     narratives.
9          ATTY. PATTIS:  Judge, I think that the – I'm
10    sorry, I cut you off Attorney Blumenthal.
11         ATTY. BLUMENTHAL:  And I've just one more thing.
12    Sorry, your Honor, I'm –
13         THE COURT:  That's all right.
14         ATTY. BLUMENTHAL:  - not going at length.  But
15    the last thing I would say is, it's relevant to what
16    exact message they were receiving from his words.
17    Dr. Beirich will be able to essentially describe how
18    this element of Jones' audience will receive those
19    messages, and what they will believe him to be saying
20    when he uses the words that he does in the context
21    that he does.  And the claims at issue, intentional
22    infliction of emotional distress, defamation, and the
23    like.  Are ones that really demand evaluation in
24    context.  This is important context for evaluating
25    the plaintiffs' damages.  Dr. Beirich can provide
26    really helpful testimony to the jury on how they
27    should deal with that.
```

1          And one more.  Not to poke at Mr. Pattis at all.

2      But – or Attorney Pattis.  Dr. Beirich is formerly of

3      the Southern Poverty Law Center.  She does not work

4      there anymore.

5          ATTY. PATTIS:  Well, we may explore why she left

6      when we get – Judge, if you listen carefully to the

7      proffer made by Attorney Blumenthal, I'd be stunned

8      if you let 90 percent of that in.  Much though that

9      it may be appealing rhetoric in a discussion over

10     beers about what ails the American public.  It's

11     entirely speculative.  She's going to be able to say

12     how ill-defined groups that she can identify by

13     what – by some means would react to this and be

14     triggered by it, and what they'd do with it.

15         This is a case where the Sandy Hook parents have

16     chosen to attack Mr. Jones.  It's their

17     responsibility to prove if they can, that he

18     proximately caused them damages.  I think permitting

19     her to testify in this speculative manner would

20     undermine his rights to a fair trial.  And I stand on

21     the 4-3.  I mean I think the plaintiffs are entitled

22     to try their theory of stochastic terrorism.  Let's

23     see how far it goes.

24         But the basis that the motion was really a

25     narrow 4-3, you may recall Judge, at one point we

26     were going to submit a second motion on Dr. Beirich.

27     I had somebody in the office fall ill.  And so we

1     never did the Daubert Porter challenge, that much of

2     what I'm arguing about now sounds like.  So I want to

3     just focus on the 4-3.  As to the white supremist

4     stuff.  I think that's a third rail in American

5     politics and is unduly prejudicial.

6          THE COURT:  All right.  So I do agree with the

7     movant, that that kind of evidence can't be used to

8     attack Mr. Jones' character, to prove that he was

9     acting with any racial animus.  Or to characterize

10    him as a white supremacist or such.  But I do think

11    the evidence can be offered with respect to the – if

12    there's a foundation for it.  The composition of his

13    audience and how the audience responded to the

14    narratives.  So, I'm going to deny the motion.

15    Although I'm sure they'll be other reasons to object.

16    Okay.

17         All right.  Plaintiffs motion for order number

18    924.  This is on the Google analytics.  I have the

19    defendant's omnibus objection at 941.  And I have the

20    plaintiffs reply at 949.  Again, I don't know if any

21    of these numbers have changed, but if so, tell me

22    now.

23         ATTY. STERLING:  Your Honor, no they have not

24    changed.  I'm being able to – I can now anticipate

25    some of where the Court is going.  So I have this one

26    ready.  So this is the motion to compel production of

27    a Google analytics spreadsheet that was reviewed by

1    Free Speech Systems corporate designee Brittany Paz,

2    in preparation for her deposition.  Which was not

3    brought to her deposition.  And then when it was

4    requested that it be produced because she was

5    testifying based on it, it was not produced.  And

6    again, the defendants are indicating that they're not

7    sure – they can't produce it, and it's possible

8    that – well, that they can't produce it.

9        Those representations again, are not sworn.

10   This – I would say your Honor, this is a little bit

11   different because here we're dealing with a corporate

12   representative's testimony.  It binds the

13   corporation.  So the fact that the corporation is

14   unable to produce the basis for the designee's

15   testimony, should bear some more significance.

16       The Court had inquired before, this is like the

17   PQPR management agreement motion, in which we had

18   moved to compel.  The objection indicated that the

19   document can't be produced.  We've noted in reply,

20   that that representation is made just simply by

21   counsel in the pleading, but not by affidavit.  And

22   we have requested sanctions in the reply brief.  So

23   I'll stop there.

24       THE COURT:  So this is the one, Attorney Pattis,

25   were Blake Roddy said it doesn't exist?

26       ATTY. PATTIS:  Yes.

27       THE COURT:  Is that –

1        ATTY. PATTIS:  Upon being –

2        THE COURT:  And just –

3        ATTY. PATTIS:  I cut you off.  I'm sorry.

4        THE COURT:  Just refresh my recollection as to

5    who Mr. Roddy is again.  So I don't have to –

6        ATTY. PATTIS:  He works in the – well, in the

7    distribution network.  So when people make orders

8    from the online stores and enterprise – he sort of a

9    gate keeper who would oversee that function.  I don't

10   know if there are additional questions in that

11   regard, but that –

12       THE COURT:  No, I just –

13       ATTY. PATTIS:  – is his function there.  And so

14   when this issue first arose, there were several

15   items.  I contacted the corporate rep., she told me

16   that Blake had shown her this.  I contacted Mr. Roddy

17   on several occasions.  I will get you an affidavit or

18   this may be something where you want to hear from the

19   two of them.  Because it's not at all clear to me

20   that Attorney Paz was correct in what she said based

21   on what I know of the Google analytics there.

22       But I will concede that she said what she said.

23   The problem I have is, that Roddy doesn't know what

24   she's talking about.  And this is a confounding set

25   of factors that – that this is a confounding set of

26   factors.

27       THE COURT:  So do I hear you saying you would

1       like an opportunity to provide a counter affidavit

2       again?

3              ATTY. PATTIS:  Yes.

4              THE COURT:  Are we looking at an evidentiary

5       hearing?  What are we doing?

6              ATTY. PATTIS:  Well I agree with Attorney

7       Sterling, that the stakes are higher here, in that

8       Ms. Paz or Attorney Paz was the corporate rep.  If I

9       could produce Mr. Roddy for a hearing by way of

10      video, I don't know that I can get him up here on

11      short notice from Texas.  But I would like you to

12      hear from him and make your own evaluation as to his

13      credibility.  It is entirely possible to me that

14      Attorney Paz made a mistake.  The Court may recall,

15      there – the google – the topic of Google analytics

16      has been quite controversial in this case.  The

17      company continues to maintain it doesn't use them.

18              The Court's already made findings in various

19      other sanctions motions about that, that we're not

20      asking you to reconsider at this point.  We obviously

21      disagree with them.  But I'd like you to hear from

22      Mr. Roddy.

23              THE COURT:  So are you also anticipating filing

24      an affidavit from the Free Speech System, I forget

25      his – the –

26              ATTY. PATTIS:  Mr. Schwartz?

27              THE COURT:  Yes.  Because the other one you were

1    saying that you would - that Mr. Schwartz would

2    search the records since he is –

3         ATTY. PATTIS:  I can ask him to do so.  That

4    hadn't occurred to me.  That's helpful.  I mean

5    presumably –

6         THE COURT:  Do you want me to just consistent

7    because you're – Free Speech Systems is in

8    bankruptcy, right?  So –

9         ATTY. PATTIS:  No, that's true.  But I mean, one

10   of the agreements – I mean lifting stay, I now have

11   access to everybody.  But Schwartz would be starting

12   at the top.  So I would like the opportunity to

13   submit a brief affidavit for Mr. Schwartz and Mr.

14   Roddy.

15        THE COURT:  And I would like to do that.  The

16   only problem is, this – how do I say this?  It would

17   have been helpful to have the evidence before today.

18        ATTY. PATTIS:  It would -

19        THE COURT:  Because all I have –

20        ATTY. PATTIS:  I think I did make a pass and an

21   objection on timeliness grounds.  I mean, we're on

22   the eve of trial.  This is ample fodder for cross-

23   examination.  I'm not sure that this is something we

24   need to or should be litigating now.  And it seems to

25   me that on this record, they'd have ample grounds to

26   impeach, and they could ask the jury to do something,

27   rather than have the Court do it.  So, I would ask

1    you to consider whether this is timely perfected.

2         THE COURT:  And I will just state for the record

3    I will – I'm not in agreement with that position,

4    Attorney Pattis, because of all the activity that has

5    gone on with Free Speech Systems. It makes it sort of

6    impossible to get these kinds of documents when the

7    cases are in bankruptcy and removed.  I mean, like

8    you said, you might be in a better position now.  But

9    in any event –

10        ATTY. PATTIS:  I might be.

11        THE COURT:  – I will enter the same order on

12   this.  The same timeframe.

13        ATTY. PATTIS:  Yes, Judge.

14        THE COURT:  And we'll see what – we'll see – so

15   now, once you have the affidavit, what do you want me

16   to do?

17        ATTY. PATTIS:  I will obviously provide it to

18   opposing counsel, and maybe we should meet and confer

19   about whether we think anything additional is

20   necessary.  I suspect we will.  But I think I'd like

21   them to see it.  I – as your officer, Judge – I've

22   not discussed this issue with Schwartz.  I've

23   discussed it with Roddy.  So I'm not as confident in

24   making representations about what I'll be able to

25   produce.

26        ATTY. STERLING:  Your Honor, Attorney Sterling.

27   I am trying to think about how we can do this

1        efficiently, because part of my concern is that here

2        we are, our side is preparing for trial, and we are –

3        this is going to impact our trial preparation as

4        well.  And I just – it seems to me that under the

5        circumstances it is not we who should be prejudiced

6        here.

7            So I understand that the Court is going to give

8        the defendants an opportunity to submit an affidavit.

9        I'm just struggling with how we can address that in

10       time to know where we stand by opening arguments on

11       Tuesday.

12           THE COURT:  I agree.  It's going to be very

13       tricky.  And I don't see how I assess credibility on

14       affidavits either.  What happens if I – I don't know.

15           ATTY. PATTIS:  It doesn't strike me as a central

16       part of either an opening statement or a rebuttal.

17       And so I think there may be an unrealistic sense of

18       urgency about this.  If it were that urgent,

19       presumably it wouldn't have waited all this time to

20       be perfected and argued.  And so I hear what the

21       plaintiffs are saying.  But I'm less persuaded that

22       the case is – that the opening of the case is

23       affected by disposition of this.

24           THE COURT:  I just think it diverts all our

25       resourced to have –

26           ATTY. PATTIS:  Well that it does.

27           THE COURT:  - to have evidentiary hearings and –

1          ATTY. PATTIS:  Well, Judge, when this issue

2     arose, I was engaged in collateral proceedings of a

3     pressing personal matter, over which I had no

4     control.

5          THE COURT:  Well, it looks like some of these

6     motions were filed back in mid-August, so I don't

7     know how much – and then we also had the bankruptcy

8     and the removal.  So, it's challenging.

9          ATTY. PATTIS:  And where I was unable – where I

10    was unable to have contact with the stayed –

11    representatives of the stayed defendant as a matter

12    of federal law.

13         THE COURT:  It's a challenge.

14         ATTY. PATTIS:  One of the reasons that the –

15    that Free Speech agreed to lift the stay, was to

16    provide me with access to people that I wouldn't

17    otherwise have access to.

18         THE COURT:  All right.  I have plaintiffs'

19    motion in limine.  This is on the extent of the Sandy

20    Hook coverage.  I have, I think it's entry number

21    932, but I'm not sure.  Then I have the defendant's

22    omnibus objection at 941.  And I have the plaintiff's

23    reply at 952.

24         ATTY. STERLING:  Your Honor, I apologize.  I

25    missed that.  What was the opening docket number?

26         THE COURT:  That's a good question.

27         THE COURT:  I think it's 932.  Let me look.

1           THE CLERK:  Your Honor, it's 931.

2           THE COURT:  931.  931.  This is regarding the

3       percentage or amount of Sandy Hook coverage.

4           ATTY. STERLING:  Yes.

5           THE COURT:  Then I have the omnibus objection at

6       941.  And I have the plaintiffs reply at 952.

7           ATTY. STERLING:  Okay, your Honor.

8           THE COURT:  Are those –

9           ATTY. STERLING:  Let's –

10          THE COURT:  Are those correct?

11          ATTY. STERLING:  They are.  931. 941. 952.

12          THE COURT:  Perfect.  All right.  Whenever

13      you're ready.

14          ATTY. STERLING:  Okay.  Yeah.  So your Honor,

15      this is the motion to preclude evidence and argument

16      regarding maximum total purported coverage.  The

17      evidence on this from a whole range of witnesses, is

18      that – and actually Attorney Pattis just made the

19      point himself in connection with the request for

20      admission.  Is that it's their position that they

21      don't know how many videos they created, or in

22      connection with the request for admission, all the

23      places that they were broadcast.

24          So – and this is testimony from corporate

25      designee's, Rob Dew, who said most of our video

26      library got wiped out.  I don't even think God knows

27      all the videos because they're gone.  They don't

1    exist anymore.  Alex Jones.  I don't know the number

2    of total videos about Sandy Hook.  Many videos have

3    been reedited by others countless times.  So there's

4    no way for me to know.  Alex Jones again.  A lot of

5    the live show was only archived on YouTube, and then

6    that was taken down.  There were over 30,000 videos',

7    we don't save those videos, most of them.

8         The point being, your Honor.  That we have

9    identified some of the Sandy Hook coverage.  But

10   nobody knows the full extent of the Sandy Hook

11   coverage by Alex Jones.  And so an argument that the

12   full extent is known, and then can be used to support

13   a sort of a drop in the bucket argument that the

14   defendants want to make.  The defendants would like

15   to say, that this is only a small percentage of their

16   coverage.  Of their – sorry, of their total all

17   broadcasts.

18        And there's a number of problems with that

19   argument.  But the problem that we're flagging here,

20   is that there just isn't a basis for them to say what

21   exactly their claim is as to the – as to the amount

22   of coverage.  They can't say what the maximum amount

23   was.  They've given us that response over and over

24   again.  So that's the motion, your Honor.  We're

25   asking simply for a preclusion of that particular

26   argument.

27        ATTY. PATTIS:  Judge, this issue came up in

1           Texas.  And I think the Court may have granted a

2           similar motion at closing argument counsel for Mr.

3           Jones, confined himself to what was in the evidence.

4           And said that within the evidence, given the number

5           of hours they were on the line, that what the jury

6           was shown represented something like one tenth of one

7           percent or one – one and half tenths of one percent

8           of their total coverage.  This is a problem that the

9           plaintiffs in some respects created for themselves.

10               The Sandy Hook shootings occurred in 2012.  They

11          were broadcast then.  They were broadcast in 2103.

12          They were broadcast in '14, '15, '16, '17, '18.  Mr.

13          Jones was de-platformed in '18, at or about the time

14          this suit was brought.  They did not maintain a set

15          of hard drives or a server with a history of their

16          stuff –

17               THE COURT:  Attorney Pattis, I'm sorry.  I just

18          want to get to understand something.  Are you taking

19          the position that there's a basis for an argument on

20          the defense, that there is a percentage or an amount

21          of the total amount of coverage?  I mean, are you

22          actually saying, putting aside fault of any party.

23          Are you saying that there will be a basis for that

24          argument?

25               ATTY. PATTIS:  There will be a basis for what

26          was admitted into evidence at trial.  The testimony

27          will be that they're on – they're on the air for

1      roughly 10,000 hours over this period.  And the jury

2      will have been shown 20 hours, 15 hours.

3            THE COURT:  All right.  So what they're shown

4      versus how many hours on the air is one thing.  But

5      what existed versus how long they were on the air, is

6      another thing.

7            ATTY. PATTIS:  I don't think either side should

8      be permitted to speculate about what existed.  They

9      can't say that there are hours, and hours, and hours

10     that were destroyed, in part because they waited six

11     years to bring the action.  And no one took a step to

12     preserve it at that point.

13           So I think it's a live issue for both sides.  I

14     think what we've – how we comment on the evidence

15     that is offered.  You will hear testimony that – from

16     Mr. Jones, that this was not something that he

17     covered often.  That he covered it sporadically.  And

18     then you'll hear testimony, presumably, from him

19     about the wide range of topics that he covered.

20           He doesn't know how often it was done.  His

21     stuff was published, or how often it was republished

22     by others.  I mean, for example, in the Texas trial,

23     there's a small cottage industry of bloggers.

24     There's something called Knowledge First or Knowledge

25     Fight.  These people apparently live by loving to

26     hate Alex Jones.  And they pounce on every piece of

27     video they can find.  One of them even attended as a

1  paralegal, a deposition with Texas counsel to get

2  more access to Jones.  So we don't know what's been

3  republished by whom.  But I think there will be a

4  certain number of videos offered.  I expect to argue

5  that the plaintiffs have spared no time or effort to

6  develop their case.  And this is the most damaging

7  case they can find.  All of it.

8      And that represents a minuscule portion of the

9  total programming, in that if there were more, the

10  jury would have been shown more.  And it wasn't until

11  2018, for reasons of their own, which we'll explore

12  at trial.  That the plaintiffs brought this suit.  If

13  it hurt in '13, where was the lawsuit?  If it hurt in

14  '14, where was the lawsuit?  If it hurt in '15.  And

15  some of these plaintiffs helped participate in the

16  drive to de-platform Mr. Jones.  And it was the

17  de-platforming that deprived them of the archive that

18  they used to rely on with Google.

19      ATTY. STERLING:  Your Honor if we can come back

20  to the issue in the motion.  They just can't argue

21  that there is a minimum number – excuse me, a maximum

22  number here of videos.  And one of the reasons that

23  they can't argue that is because the evidence is

24  going to be, that not only were these videos

25  broadcast on Infowars.com, and PrisonPlanet.com, and

26  Newswars.com.  But they were broadcast on radio

27  stations.  There's a network of 150 radio stations.

1        And then they were republished again by Infowars

2     employees on YouTube, and Twitter, and Facebook.  So

3     the idea that they can argue that there is a maximum

4     total number, and that they know what it is.  I mean,

5     certainly there's a minimum.  We can establish that

6     there is a minimum.  But we cannot establish the

7     maximum.  So the argument that they want to make,

8     this sort of percentage-type argument, there is not

9     going to be a basis for it.

10        ATTY. PATTIS:  Judge, I haven't announced an

11    intention to make a percentage-type argument.  And

12    I'll certainly object if the plaintiffs try to say it

13    was everywhere always.  That would be every bit as

14    speculative.  My suggestion, Judge, would be to defer

15    ruling on this.  I certainly understand the

16    plaintiffs' position, and let's see what the evidence

17    develops.  I think this is a time of trial motion.  I

18    certainly don't intend to make a representation in my

19    opening statement that X percentage of their content

20    and no more was devoted to Sandy Hook.  I do not

21    intend to do that.

22        THE COURT:  All right.  So I am going to grant

23    the motion.  No evidence or argument regarding the

24    total amount of Sandy Hook coverage or percentage, or

25    proportion of Sandy Hook coverage.  Doesn't mean –

26        ATTY. PATTIS:  By either side?

27        THE COURT:  That's what I said.  That's the

1    ruling.

2         ATTY. PATTIS:  I didn't hear it that way.

3         THE COURT:  No evidence or – you'll get it in

4    writing.  No evidence or argument regarding the total

5    amount of Sandy Hook coverage, or the percentage or

6    proportion of Sandy Hook coverage.  So certainly

7    whatever evidence is put in, everyone can comment on.

8    But no percentage or proportion can be argued.

9         ATTY. STERLING:  Your Honor?

10        THE COURT:  Um-hum.

11        ATTY. STERLING:  May – so, I think I do need to

12   make a clarification here.  So we have an expert who

13   is disclosed to testify regarding the spread, the

14   reach of this content.

15        THE COURT:  I understand that.

16        ATTY. STERLING:  Okay.  And so I just want to

17   make sure that this ruling isn't foreclosing that

18   testimony –

19        THE COURT:  Absolutely not.  It's ruling on the

20   issue that was raised in the motion.  So –

21        ATTY. STERLING:  Okay.

22        THE COURT:  No percentage – no argument that

23   it's a minuscule, for example, a minuscule portion of

24   what he covered over the 10,000 hours and the like.

25   So whatever evidence ends up coming in otherwise, of

26   course is – can be commented on during closing

27   argument.  But –

1          ATTY. PATTIS:  Judge, he will testify that it

2     was a minuscule portion and his recollection.  And I

3     think that's fair testimony.

4          THE COURT:  The rulings the ruling, Attorney

5     Pattis, so…

6          ATTY. PATTIS:  Well, we'll get to his testimony

7     when we get to it.

8          THE COURT:  Attorney Pattis, listen to me

9     carefully.  The ruling is the ruling.  If someone,

10    and it's the law of the case, and I know you disagree

11    with it.  And that's fine.  We don't want a situation

12    where I have entered these orders, and someone tries

13    to circumvent the orders.  I don't think that would

14    be appropriate.

15         So I think you heard you suggesting that he is

16    going to testify along the lines of what I just said

17    was not permissible.  I cannot accept that.  So, I

18    assume I misunderstood?

19         ATTY. PATTIS:  No, you didn't misunderstand.

20    I'll ask to be heard outside the presence of the jury

21    when he's on the witness stand.  I think he's

22    entitled to testify from his recollection.

23         THE COURT:  So we have a record.  We're on the

24    record now.  I'm entering the order in writing.  I

25    will personally, if I need to, personally if you're

26    suggesting to me that he is not going to abide by

27    this order, I can personally canvas him prior to

1           taking the stand.  Because I don't want any

2           misunderstandings about –

3                ATTY. PATTIS:  You should do so, Judge.

4                THE COURT:  - what this ruling is.

5                ATTY. PATTIS:  You should do so.  And I'd like

6           you to hear from him on the stand, so that I have the

7           record that I need for appeal.

8                THE COURT:  I'm not going to make an offer of

9           proof through him.  I'm simply going to make sure

10          that he understands what the Court order is, and that

11          he is not going to –

12               ATTY. PATTIS:  I think that would be

13          appropriate.

14               THE COURT:  Beg your pardon?

15               ATTY. PATTIS:  That would be an appropriate step

16          for the Court to take.

17               THE COURT:  An appropriate or inappropriate?

18               ATTY. PATTIS:  An appropriate.  That would be

19          the right thing for the Court to do.

20               THE COURT:  All right.  Because I assume that we

21          all have our roles, and we all have clients, and we

22          all have our job to do.  And I also know that you

23          will do your job and explain to your client these key

24          rulings.  But I am happy to do it in addition to, but

25          I will tell you this Attorney Pattis.  I'm not going

26          to have a contempt situation in the courtroom, where

27          an order is blatantly violated.  So I assume –

1        ATTY. PATTIS:  I don't intend to violate your

2     orders.

3        THE COURT:  No, I was referring to your client.

4     But I think you'll do what's necessary, and

5     whatever's necessary.  But I'm not going to have –

6     this is a simple order.  It literally couldn't be

7     simpler.  It's probably 20 words, and I am not going

8     to have a situation where we now have to go off

9     course from the middle of the trial, and I have to

10    deal with a contempt of court situation with your

11    client, where he's blatantly disregarding an order.

12    So –

13       ATTY. PATTIS:  Judge, I hear you.  I also

14    watched portions of the Texas trial, and there were

15    moments that were difficult for all involved.  So I

16    think it would be the right thing.  I don't want you

17    to misunderstand my word.  For the Court to review

18    that topic with Mr. Jones prior to his testimony.  I

19    would encourage you to do so.

20       THE COURT:  Okay.  All right.  We can take up

21    one more, or would you like to take the 15-minute

22    recess now?  Does it matter to anyone?

23       ATTY. PATTIS:  It doesn't matter to me, Judge.

24       THE COURT:  Does anyone need a –  Attorney

25    Sterling, go ahead.

26       ATTY. STERLING:  I'm fine, your Honor.  Why

27    don't we do one more?

1          THE COURT:  Okay.  Why don't we do plaintiffs

2     872.  This is on the Soto versus Bushmaster case.

3     Defendant's objection at 888.  And the plaintiffs

4     reply at 905.  Just tell me if I got it right first.

5          ATTY. STERLING:  One second, your Honor.  For

6     some reason I can't find it –

7          ATTY. PATTIS:  I don't have my docket sheet in

8     front of me, Judge, so I can't –

9          ATTY. STERLING:  That is -

10          THE COURT:  I'm sure Attorney Sterling will

11     correct it if it's wrong.

12          ATTY. STERLING:  Well, that is one of the ones

13     with corrected filings.

14          THE COURT:  Okay, good.  That's what I want to

15     make sure I rule on the right thing.

16          ATTY. STERLING:  Yup.  And unfortunately though

17     Judge, my wonderful organizational system is not

18     suppling it to me.

19          THE COURT:  All right.  I can find it.  Just

20     give me one moment.

21          THE CLERK:  Your Honor, I believe they're the

22     last two filings.  961 says corrected motion in

23     limine precluding questioning evidence or argument on

24     Soto.  And 962 is a corrected reply.

25          THE COURT:  That's it.  Whenever you're ready.

26          ATTY. STERLING:  Just a housekeeping matter.

27     With regard to the original motion in limine and the

1       original reply, would it – is it – we can withdraw

2       those in addition to filing corrections.  I take it

3       the Court is just not going to review 872 –

4            THE COURT:  Well, I had originally reviewed the

5       original ones, but I –

6            ATTY. STERLING:  Uh-huh.

7            THE COURT:  – then reviewed the new ones, and –

8            ATTY. STERLING:  Okay.

9            THE COURT:  My only concern, I didn't know if

10      Attorney Pattis had reviewed them because –

11           ATTY. PATTIS:  I'm prepared to argue them,

12      Judge, based on my discussion with Attorney Sterling.

13           THE COURT:  Right.  Well that's why I checked

14      earlier, because there were a lot of filings today,

15      and honestly, I had to do a sort of a side by side to

16      see what was changed.  It wasn't that easy.  And I

17      just wanted to make sure Attorney Pattis was good to

18      go.  All right –

19           ATTY. PATTIS:  Despite the difficulties in this

20      case, Judge, dealing with Attorney Sterling has been

21      nothing but delightful.

22           THE COURT:  All right.  Whenever you're ready,

23      counsel.

24           ATTY. STERLING:  All right.  Your Honor, so

25      this – especially with the corrections we made this

26      morning, this is just an extremely straight forward

27      issue.  What we did is moved in limine to preclude

1       evidence questioning our argument regarding Soto

2       versus Bushmaster, which is a case in which some of

3       the plaintiffs in this case were involved as

4       representatives for the estates and plaintiff Bill

5       Sherlach was involved as a result of a loss of

6       consortium claim.

7           There is no reason, your Honor, to get into Soto

8       versus Bushmaster at all anymore.  And this does –

9       this is one of the motions that is directly

10      implicated by the law of default.

11          THE COURT:  All right.  So I just want to back

12      up for a minute.  When I originally ruled, I think in

13      the defendants' favor, on the issue of the inquiry,

14      at the depositions and on this issue.  That was when

15      we still had a full trial as to Genesis

16      Communications, who's no longer a party.  Is that

17      correct?  I just want to make sure that –

18          ATTY. STERLING:  Yes.  Yes, your Honor.

19          THE COURT:  All right.  So at that point they

20      were a party.  It was a full trial.  It wasn't a

21      hearing in damages.  And I sort of looked at it as

22      what's likely to lead to admissible evidence in that

23      light.  So, go ahead.

24          ATTY. STERLING:  So your Honor, and that's

25      exactly the point.  Is that we have the default

26      having entered, there are a number of consequences

27      that flow from that.  Liability is established in

1    favor of the plaintiffs, and nobody disputes that.

2    Liability includes both fault and causation.

3        So that is done.  Then the allegations of the

4    complaint are also established in favor of the

5    plaintiffs.  It's tantamount to an admission.  And

6    there is a disagreement between the parties about the

7    difference between material allegations and

8    allegations.  We've cited the Smith versus Schneider

9    case, which I think is going to be the leading

10   Connecticut Supreme Court case to guide the Court on

11   these issues.

12       And I can get into that.  I didn't realize that

13   we were going here, so if the Court decides that a

14   break is necessary, you know – just please let me

15   know.

16       THE COURT:  I think it's almost 3:30.  So I

17   think we should try to break it up now.

18       ATTY. STERLING:  Yup.

19       THE COURT:  So we'll take a 15-minute recess.

20       ATTY. STERLING:  Okay.  Thank you, your Honor.

21       (Recess.  Resumed.)

22       THE COURT:  We are back on the record.  Attorney

23   Sterling had the floor.  And I think she was starting

24   to address Smith versus Schneider.

25       ATTY. STERLING:  Yes, your Honor, I was.

26       And before I do that.  This motion, I think it's

27   incredibly straight forward.  I think it's also

1    really, really important.  It's important for a

2    couple different reasons.  One is there is an exhibit

3    on the defendant's exhibit list of a video titled

4    Will Bushmaster lawsuit reveal Sandy Hook hoax.  I

5    have not reviewed that video.  But it – clearly this

6    is an area that they want to get into.  Mr. Jones has

7    talked repeatedly about the 73-million-dollar

8    settlement in Soto versus Bushmaster.  We expect this

9    is an area he's going to want to get into.

10   So, I just want the Court to be aware of what we

11   expect to be Mr. Jones interest in bringing this into

12   the case, and why it is so important not to.  So let

13   me turn back to default law.

14   I was addressing Smith versus Schneider, which

15   is a 2004 Connecticut Supreme Court case.  That case

16   is very helpful on the question of what does a

17   default mean in the context of no notice of defenses

18   being filed.  Any contested evidentiary hearing in

19   damages.  In that case, there was a defendant who was

20   no longer a party.  So a non-party defendant who was

21   alleged to be a co-conspirator with two party

22   defendants.  Those two-party defendants were

23   defaulted.  And the Court considered a number of

24   challenges by them to the damage's awards in favor of

25   the plaintiff.

26   The one that I think is most – I mean there are

27   a number of helpful directions from the Court, but

1    one of the things that the defendants did was, they

2    challenged the award of CUTPA punitive's to the

3    remaining party's defendant.  And in examining that

4    challenge, what the Supreme Court did is, it looked

5    to the allegations of the plaintiff's complaint.  And

6    it saw that the complaint alleged a breach of

7    fiduciary duty by the non-party defendant, and

8    conspiracy by the non-party defendant, with the

9    remaining defendants.

10        Based on those allegations, it affirmed the

11   trial courts award of CUTPA punitive damages.  And

12   the reason I raise all that, your Honor, is because

13   that directs the Court about the scope of what the

14   complaint establishes.  So the complaint here, we

15   know it establishes proximate cause.  That's really

16   not in dispute at all.  And the defendant's have

17   conceded that that is not in dispute.  And I can cite

18   to there is a docket number 892 at page 2.

19   Defendants agree that they might not – may not

20   challenge the threshold proposition that they have

21   caused damages to the plaintiffs.

22        So it's undisputed.  Proximate cause is decided.

23   And other allegations of the plaintiff's complaint

24   are also effectively admitted.  That is what Smith

25   versus Schneider is teaching.  Is that allegations

26   like conspiracy and intent, are already established.

27   All that remains an issue, and again, this is black

1      letter default law is the amount of damages.

2          So the question is not whether the plaintiffs

3      are damaged, it is how much are they damaged?  What

4      is the impact on them in terms of their reputation

5      and wellbeing?  It's not whether the contacted issue

6      is reprehensible, it is how reprehensible was it.

7      And that's the frame for deciding whether evidence

8      about something like Soto versus Bushmaster could

9      possibly be admissible.  The Court's ruling had

10     initially recognized that Soto could be a – I think

11     the Court had allowed discovery questioning about

12     Soto, in terms of would it have been a source of

13     harassment or were there other sources of harassment

14     for these plaintiffs.

15         And that ruling was appropriate at the time, but

16     it cannot guide the admissibility of this evidence.

17     Now, because now we're in a full default posture.

18     And as the Court correctly pointed out, that ruling

19     was made when there was an un-defaulted defendant.

20     So I'll stop there, your Honor.  I think – well, let

21     me stop there.

22         THE COURT:  Attorney Pattis.

23         ATTY. PATTIS:  Well the Supreme Court had made

24     it clear in such cases as Mahoney versus Batura at

25     110 Connecticut 184, 196.  That what – there must be

26     a causal connection in whole or in part between the

27     act of negligence and the injury.  Plaintiff is

 1          ordinarily entitled, the Court goes on to say, to at

 2          least nominal damages following an entry of default.

 3          But it does not follow that the plaintiff is entitled

 4          to judgment to the full amount of relief claimed.  It

 5          still has to show how much of the judgment prayed for

 6          he is entitled to.

 7               And the significant thing, Judge, is an

 8          Appellate Court decision.  I believe it's

 9          Richie versus Main Street Stafford.  The Appellate

10          Court went on to say, we conduct a plenary review of

11          the pleadings to determine whether they are

12          sufficient to establish a cause of action upon

13          default.  And we will have –

14               THE COURT:  Attorney Pattis, the Richie versus

15          Main Street, that was the Appellate Court.  Didn't

16          that say that the default establishes the liability

17          for the distress, and that the trial court improperly

18          considered that the plaintiffs' emotional distress

19          might have been caused by other sources?  Isn't that

20          what that case clearly said?

21               ATTY. PATTIS:  In part.  But it also in the

22          analysis of damages said, we conduct a – and this is

23          a significant case.  I thought we'd get to it later.

24          The money question in this case is going to be,

25          Judge, whether the Court gets the right to assess an

26          open-ended punitive damages and CUTPA.  And that's

27          the ball that everyone's eye needs to be on.  And we

1        will have a motion for a directed verdict at the

2        conclusion of the plaintiffs' case, even in the face

3        of the default, because there has never been a case

4        in Connecticut history that warranted CUTPA damages

5        for protected speech about politics.  CUTPA is a

6        trade practice claim, or a trade practice act  And

7        Mr. Jones made no defective – made no comments.  He

8        didn't engage in unscrupulous advertising about the

9        products he sold.  He may have made outrageous claims

10       about the world, and people may have purchased his

11       items.  And in plaintiff's version of reality, the

12       reason he made those claims was to drive people to

13       purchase his products.  But those claims are not

14       claims about products.

15            And so this is a misapplication about CUTPA.

16       And what's significant about the Richie Main Street

17       case is that the notion that there can be a plenary

18       review of the pleadings to determine whether the

19       pleadings are sufficient to establish a cause of

20       action after default.  So we don't take – that's one

21       point.  We don't take the position, and I think that

22       the Richie case goes on to say, entry of a default is

23       not the equivalent of admissions of facts pleaded.

24       And so this has been an issue that has come up

25       repeatedly in jury selection.

26            We don't think anything other has been

27       established then the fact that Mr. Jones was

1    defaulted as a result of the Courts conclusion that

2    his and his counsel's compliance with discovery was

3    an intentional flouting of these Courts rules.

4        So I think that with respect to Soto Bushmaster,

5    and I think we're kind of verging into arguments on

6    later motions.  The Soto Bushmaster claim, and I

7    think Mr. Jones does have an interest in this, Judge.

8    I've heard him talk about it on the air.  I know his

9    mind.  I think from his – as his advocate, my

10   perspective is motive and interest in the outcome is

11   never collateral.  I was startled during jury

12   selection to see the plaintiffs – I didn't – you

13   never know how your adversary's going to approach a

14   case until you get into a courtroom.

15       They raised in vior dire, people's reaction to

16   guns and gun violence, and whether they had strong

17   positions on it.  It will be one of our contentions

18   at trial that what – that these plaintiffs became in

19   effect, I don't know that we'll use the language

20   because we have been defaulted.  But they became

21   public figures, in most cases willingly.  And sought

22   to leverage the loss of their children into a

23   privileged position and a contentious debate.  And to

24   the degree they suffered the scorn of others.  What

25   did they expect?

26       And so it seems to me that they placed

27   themselves and their counsel has prided us with

1   notice that they intend to place at the center of

2   this case, the plaintiffs' attitudes towards gun

3   violence.  And thus, are they overstating the claims

4   that they have here against Mr. Jones, because of

5   their advocacy with respect to guns.  And doesn't the

6   73-million-dollar settlement against Remington

7   suggest that this is a powerful motive for them in

8   bringing this suit.

9       So we think it's central.  We think it's in the

10   case.  I don't know that there's an identity of

11   interest.  For example, I've not studied this

12   settlement in Soto v. Bushmaster yet, to know whether

13   there was a sum allocated for punitive or

14   compensatory damages.  But at some point, I think Mr.

15   Jones would say, how much is enough?  And if you've

16   already received 35, 40, 50 million dollars in

17   compensatory damages as a result of the suffering

18   from your child's death, cause presumably by the

19   unscrupulous advertising of gun makers, how do you

20   distinguish that from what you're claiming third

21   parties did in response to what Mr. Jones said.  And

22   isn't the fact finder entitled to conclude that at

23   some point enough is enough.  And I think Jones would

24   like to – I think Jones would like me to argue that.

25       So I disagree with the proposition that a

26   default is the functional equivalent of a request to

27   admit that has been admitted.  I think the cases are

1　　　　clear on that.  I don't think the default becomes a

2　　　　blank check for the plaintiffs to ask for anything.

3　　　　They still have to prove their case.  And I think the

4　　　　fact that other damages and other sources of damages

5　　　　are never collateral.  That's why we have laws about

6　　　　preexisting conditions and jury charges, and about

7　　　　superseding intervening causes.  And the plaintiffs'

8　　　　need to be held, in our view, in this case, to the

9　　　　burden of proving the claims that they have made, and

10　　　　that Mr. Jones has been defaulted on.

11　　　　　Are you suffering intentional infliction of

12　　　　distress as a result of what Mr. Jones said or did?

13　　　　Let's see your proof.  And if there are too many

14　　　　links in a chain of causation, such that it becomes

15　　　　essentially speculative, we'll ask the jury to reject

16　　　　it and we'll say that these are people who have

17　　　　entered the fray with respect to guns and gun

18　　　　violence in a major way.  They wrangled – they

19　　　　wrangled Soto and Bushmaster to the ground to the 73

20　　　　million dollars. There's no stopping them.

21　　　　　THE COURT:  But Attorney Pattis, how do I – if I

22　　　　were to do what you wanted me to do on this, I would

23　　　　be going against the law that I'm bound to follow.  I

24　　　　mean, it can't be clearer that it would be improper

25　　　　for the Court to allow evidence of other potential

26　　　　sources of, for example, the emotional distress.  And

27　　　　that's what you're –

1      ATTY. PATTIS:  Why would it be improper?  My

2   understanding is, that if there are superseding

3   intervening causes as we claim there are, and if the

4   Court says that the plaintiff is entitled, they must

5   show how much of the judgment prayed for they're

6   entitled to.  And I think in showing how much, we

7   fairly get the right to put on other sources.

8      THE COURT:  But what about what the Court says

9   in Richie versus Main Street, that said the trial

10  court improperly considered the other sources?

11     ATTY. PATTIS:  I think it did so because that –

12     THE COURT:  Because the default established the

13  liability for the distress.

14     ATTY. PATTIS:  I read it a little differently,

15  and perhaps incorrectly, Judge.  I thought that it –

16  that one of the things it said there was, there was

17  no evidence linking the third party, the corporation

18  there.  And so I thought that was the null of the

19  holding.

20     THE COURT:  Attorney Sterling.

21     ATTY. STERLING:  So Richie versus Main Street

22  absolutely says that Judge.  It says that the trial

23  court erred in considering another potential cause of

24  emotional distress in an emotional distress claim.

25  And then that was a case where it was a landlord who

26  evicted tenants, and then wrongfully continued the

27  eviction.  So let me – first of all Judge, I mean I

1    think the argument you just heard from Attorney

2    Pattis is exactly, exactly why we made this motion

3    and why it needs to be granted.  That is just – it

4    doesn't have to do with the facts of the case, and it

5    certainly can't be made post-default, when all that

6    remains an issue is the amount of damages.

7          ATTY. PATTIS:  Well, I don't –

8          ATTY. STERLING:  May I –

9          ATTY. PATTIS:  I cut you off.  I'm sorry.

10         ATTY. STERLING:  And the amount of damages, it

11    is established that the plaintiffs' damages are

12    caused by the Jones defendants wrongdoing as alleged

13    in the case.  I mean that's what a host of different

14    cases say.  And we filed a bench brief on causation,

15    your Honor, just to try to make sure that we had put

16    a collection of law on this issue since it does seem

17    to be –

18         THE COURT:  So Attorney Sterling –

19         ATTY. STERLING:  Yes.

20         THE COURT:  – the defendant can contest the

21    extend of the damages, correct?

22         ATTY. STERLING:  The defendant can contest the

23    amount of the damages.

24         THE COURT:  Right.

25         ATTY. STERLING:  What he cannot do – what he

26    cannot do, is ignore the fact that the default

27    establishes that Mr. Jones misconduct was a

1    substantial factor.  So that means that questioning

2    as to whether someone else potentially contributed to

3    the plaintiffs' emotional distress, is not

4    permissible.

5         ATTY. PATTIS:  I don't see the case as saying

6    that.

7         ATTY. STERLING:  That's –

8         ATTY. PATTIS:  I don't see a case that says

9    that.  We have the thin skulled –

10        THE COURT:  Well, why don't we let Attorney

11   Sterling finish and I'll give you another

12   opportunity to respond.

13        ATTY. PATTIS:  I apologize, Judge.

14        ATTY. STERLING:  Sure.  Sure.

15   So this is Richie versus Main Street 110 Conn. App.

16   at 224.  And it says, although we agree with the

17   plaintiffs, that the Court – let me see.  Hold on.

18   Okay.  So it's although we agree with the plaintiffs

19   that the Court improperly considered that Patricia

20   Richie's emotional distress may have been caused by

21   other sources.  So that's the key.  The Court

22   improperly considered that the plaintiff's emotional

23   distress may have been caused by other sources,

24   because the default established liability for the

25   distress.

26        That's the key language in Richie, and it's very

27   helpful.  I mean there are other causation cases that

1    we can also – we have also cited the Court to.  But

2    Richie is helpful because it is in the context of

3    emotional distress.  So – and it flows, your Honor,

4    from a number of places in default law.  So first of

5    all, liabilities established.  That necessarily means

6    causation is established.  Second.  The holding of a

7    case like Smith versus Schneider, which says that the

8    facts alleged are admitted.  Even, even if we accept

9    Mr. Pattis' argument that there is some distinction

10   between material facts and facts, which I don't think

11   there is under the case law.  I think that they're

12   used interchangeably.  But even if we accepted that,

13   causation is always going to be crucial in material.

14        So that is established.  And then – and I think

15   it is very helpful to think about it in terms of

16   substantial factor.  That it cannot be disputed that

17   the plaintiffs' emotional distress, that Mr. Jones

18   misconduct, was a substantial factor leading to the

19   emotional distress.  And that there's going to be

20   questioning and arguing about that, that – this is

21   really important, and because it's going to  -

22        THE COURT:  Attorney Sterling, I understand the

23   issues and I'm reading the cases the same way that

24   you're reading the cases.

25        ATTY. STERLING:  Yes.

26        THE COURT:  But that doesn't mean that the

27   defendants have to roll over.  Right.  They can still

1    cross-examine the witnesses on their emotional

2    distress.  Right.  The – and contest the extent of

3    what is claimed.

4         ATTY. STERLING:  Yes.  They can contest the

5    severity.

6         THE COURT:  Attorney Pattis.

7         ATTY. PATTIS:  There is another case,

8    Temple versus Woolworth 167 Connecticut 631 636.

9    There must be a causal connection in whole or in part

10   between the act complained of and the injury.  Then

11   it cites Mahoney versus Buckman.  See also Cardona

12   versus Ballantine at 160 –

13        THE COURT:  I agree with you too Attorney

14   Pattis.  But here causation is admitted, and

15   proximate cause is already established under the law

16   that I have to follow.

17        ATTY. PATTIS:  Something –

18        THE COURT:  I'm just following the law.

19        ATTY. PATTIS:  We agree that they've pled

20   causation.  But they have to prove the extent of it,

21   and you can't rule out other sources and say, well,

22   turn a blind eye to everything else, we sued

23   Remington and got 73 million dollars.  That was just

24   a frolicking detour.  Why'd you sue them?  Well, they

25   hurt us too.  And can you distinguish those damages

26   from the damages that Mr. Jones caused.  And by the

27   way, have you heard of James Fetzer's book, nobody

1      died at Sandy Hook?  Did that damage you?  How about

2      Mr. Piecznik.  How about the professor down in

3      Florida who lost his job for questioning whether

4      Sandy Hook occurred?  How about Wolfgang Halbig.

5          All these other people.  There was a tsunami of

6      activity out there, and what you'll learn at trial,

7      Judge, is almost nothing is directly linked to Alex

8      Jones.  The link will come through highly tenuous

9      expert testimony by people who have a political

10     agenda, which is different from Mr. Jones.  And so

11     this case is going to be transformed from a case that

12     should be about proximate cause and the sources of

13     injury, into a political vendetta.

14         And I don't think that's appropriate.  And I

15     don't think this Court does either.  What's

16     interesting in the cases is, did the Court say

17     plaintiffs are not necessarily entitled even to

18     nominal damages, which is why the Appellate Court

19     conducts a plenary review.  And we will say that at

20     the time of the closing to the plaintiffs' case, if

21     you take every allegation in the light most favorable

22     to the non-moving party, there simply is no CUTPA

23     claim here, period.

24         THE COURT:  Well, you'll file your motion at the

25     appropriate time on that.

26         ATTY. PATTIS:  When the time comes, yes.  Yes,

27     Judge.

```
 1              THE COURT:  Listen, I am declining the
 2         invitation to disregard the law that I am bound to
 3         follow.  So I am granting the plaintiff's motion.
 4         All right.  So I have the plaintiffs' motion at 873
 5         on former defendants.  Defendants' objection at 891.
 6         And the plaintiffs reply at 907.  So again, I want to
 7         see if any of the recent filings change those entry
 8         numbers.
 9              ATTY. STERLING:  It did, your Honor.
10              THE COURT:  Okay.
11              ATTY. STERLING:  So the corrected motion is at
12         docket number - oh, I'm sorry.  Let me just give you
13         what I have, your Honor, and then the corrected
14         motion is at 957.  The corrected reply is at 960.
15         And the objection is at 891.
16              THE COURT:  Okay.  Whenever you're ready.
17              ATTY. STERLING:  Yes, your Honor.  So this is
18         the motion in limine to preclude evidence and
19         argument regarding resolutions with former
20         defendants.  This takes us into very much the same
21         territory as the previous motion, which is we're now
22         dealing with the effects of the default.  And so the
23         argument is similar, in fact the overlap is - I mean,
24         partly concerned that they wanted to introduce the
25         Soto settlement.  And the Court as I understand it,
26         has just ruled that they cannot.
27              Specifically - so, and this also comes out of
```

1    the last argument.  One of the allegations of the

2    complaint is that the Jones defendants conspired with

3    Wolfgang Halbig and Mr. Sklanka.  That is throughout

4    the body of the complaint.  Under Smith versus

5    Schneider, that is established now.  And so one of

6    the Mr. Halbig's misconduct is attributable and

7    attributed to the Jones defendants by the default.

8         That – now let me turn away from that.  I just

9    wanted to make that point because I think it hasn't

10   been made sort of crystal clear yet.  And it's an

11   important consequence of the default.  With regard to

12   settlements and argument about settlements with Mr.

13   Halbig and any others, that's just inadmissible under

14   our basic case law.  That can't come in.  Settlement

15   amounts can't come in.  Releases can't come in.

16        So this motion addresses that.  I don't think

17   that requires much argument.  The other issue that is

18   raised by this motion is evidence and argument

19   regarding whether the plaintiff should have sued

20   third party harassers.  This gets into that proximate

21   cause issue that we were just talking about in

22   connection with the last motion.  Which is

23   essentially an argument by the defendants, that they

24   should be relieved of responsibility for the

25   plaintiff's emotional distress, because there were

26   other actors.  And that's exactly the argument that

27   Richie disallows them.

1          So that's it in a nutshell, your Honor.

2          THE COURT:  Attorney Pattis.

3          ATTY. PATTIS:  The plaintiffs want it both ways.

4     Mr. Halbig's conduct is attributable to Jones because

5     he's a co-conspirator presumably Jones is responsible

6     for that as well.  Halbig settled his case over his

7     objection for the policy limits.  Genesis

8     Communication settled at the Deck J phase in Federal

9     Court, presumably for the policy limits.  If these

10    people are co-conspirators and everybody's in

11    presumably for one another's misconduct, why isn't

12    Jones entitled to the benefit of that when

13    substantial monies have changed hands already?

14          THE COURT:  Attorney Sterling.

15          ATTY. PATTIS:  Because you're either a

16    co-conspirator or you're not.

17          ATTY. STERLING:  Your Honor –

18          THE COURT:  That was addressed in one of the

19    cases I read I thought.  That issue.

20          ATTY. STERLING:  It – so our law is just crystal

21    clear that settlement agreements and numbers do not

22    come in.  And there are – I mean, situations

23    certainly where a co-defendant resolves a case, but

24    the settlement amount does not come into evidence.

25          ATTY. PATTIS:  We disagree in this particular

26    case because Mr. Halbig was deemed to be an agent of

27    Mr. Jones.  He's a co-conspirator.  They settled – I

1       know what the sum is.  Halbig has contacted us, told

2       us what it is.  He showed us his objection to the

3       settlement.  His instructions to his lawyer not to

4       settle.  But they settled over his objection.  That

5       sum was enough for the plaintiffs, why doesn't it

6       begin – if that's enough for a co-conspirator, why is

7       it for co-conspirator A, why isn't is enough for

8       co-conspirator B.  And why should we be precluded

9       from making that argument?

10              THE COURT:  Do you want to respond to that,

11      Attorney Sterling?

12              ATTY. STERLING:  It's Black Letter Law, your

13      Honor.

14              THE COURT:  I agree.

15              ATTY. PATTIS:  Well, Black –

16              THE COURT:  I agree.

17              ATTY. PATTIS:  - Letter Law are settlement

18      offers, not amounts.  Not in cases where there are

19      co-conspirators and plaintiffs are – or defendants

20      are entitled to an off set.

21              THE COURT:  The offset – the offset?

22              ATTY. PATTIS:  If you were damaged a million

23      dollars by the bad conduct of other people, and you

24      took 400 from somebody else, are you still entitled

25      to a million dollars from each person?  There's only

26      so much harm.  This isn't a blank check or a lottery

27      ticket.

1          ATTY. STERLING:  Your Honor, absolutely not.

2     That's just not the case law.

3          THE COURT:  No, it's not.  I'm going to grant

4     the motion.  Did we – we have 871.

5          ATTY. STERLING:  Hold on.  871 is not the ones

6     that the Court just addressed.

7          THE COURT:  871 is the plaintiffs motion

8     precluding evidence regarding the basis for the

9     Courts default ruling, and the defendant objected at

10    893, and no reply was filed by the plaintiff.

11         ATTY. PATTIS:  Judge, we independently moved for

12    permission to put it in.  So these motions may have

13    crossed.

14         THE COURT:  Well, it was the plaintiff's motion

15    at 871.  Defendants' objection at 893.  And I had, I

16    thought I had Mr. Ferraro reach out, and I thought I

17    was –

18         ATTY. PATTIS:  No.  I thought we filed a

19    separate motion in limine for permission to put in

20    the basis for the default.

21         ATTY. STERLING:  The defendants did, it's just a

22    different set of motions.

23         THE COURT:  Right.

24         ATTY. PATTIS:  Judge, I view it as the same

25    issue.  I guess that's my – the only point I'm trying

26    to make.

27         THE COURT:  Right.  So in 871, the plaintiff's

1      filed a motion precluding evidence regarding the

2      basis for the Courts default ruling, and the

3      defendant objected to that motion at 893.

4          ATTY. STERLING:  Yes.  And your Honor, there is

5      a reply in support of that.  It's docket number 904.

6          THE COURT:  I thought 904 was in – so I have a

7      plaintiff – I have the defendants' motion at 865

8      regarding the disciplinary default.  Then I have the

9      plaintiff's objection at 889.  And then I have the

10     defendant's reply at 904.  I have three different

11     sets, and I'm going to deal with each of them because

12     it's too easy to be confused.

13         So, why don't I go through the three sets now,

14     and at least we can get the number in right.  But I'm

15     going to hear argument separately and I'm going to

16     rule.  Unless somebody is withdrawing a motion, I've

17     got to do it this way.

18         So I have again, 871 filed on July 14th.

19     Plaintiff's motion in limine precluding evidence

20     regarding the basis for the Court's default ruling.

21     Then I have the defendant's objection at 893.  And

22     let me see the date that that was filed, because I

23     did not write down a date.  That was filed on July

24     26, 2022.  And I was told that no reply would be

25     filed on that set of motions, because we had other

26     similar sets of motions.  Then I have defendant's –

27         ATTY. STERLING:  Your Honor –

1          THE COURT:  Go ahead, Attorney Sterling.

2          ATTY. STERLING:  We ended up filing a reply,

3     which is docket number 904.  So we had thought we

4     would not file a reply.  That is correct.  And then

5     we ended up filing a reply because of some of the

6     things we observed in the Texas trial.

7          THE COURT:  Okay.  I reviewed 904 in connection

8     with another set of motions, but that must be my

9     mistake.  So then I – let's go through this.  Then I

10    have defendants' motion at 865 that was filed on July

11    12th.  Motion in limine regarding the admissibility

12    of the Court's ruling entering a disciplinary

13    default.  Then I have the plaintiff's objection to

14    that at 889.  Unless it changed.

15         ATTY. STERLING:  No, your Honor, it did not.

16         THE COURT:  And then did the defendant file a

17    reply?

18         ATTY. PATTIS:  No.

19         THE COURT:  Okay.  Then I have the issue on the

20    preliminary charge on the default.  I have the

21    plaintiff's entry at 876.  I have the defendant's

22    objection at 894.  I have the plaintiff's reply at

23    934.  I have the defendant's sur-reply at 941.  And I

24    have the plaintiffs sur-sur-reply if that's that

25    lingo at 954.  So did any of those entry numbers

26    change?  I'm going to think they did.

27         ATTY. STERLING:  Your Honor, actually those

1      entries did not change.

2           ATTY. PATTIS:  Yeah, I don't think they did.

3           ATTY. STERLING:  The one thing is, I have the

4      Jones defendant's July 25th objection as docket

5      number 892.

6           THE COURT:  It is 89 – okay.  Well, let me just

7      see.  I had 892 and I crossed it out and put 894.

8      But that could again be my mistake, which is why I'm

9      doing this.  No, I think 894 I have objection,

10     defendant's objection to motion in limine for

11     preliminary jury charge corrected.

12          ATTY. STERLING:  Oh, okay.

13          THE COURT:  I think it was originally at 892 and

14     then it was corrected at 894.

15          ATTY. STERLING:  Okay.  So I'll get my hands on

16     the corrected version.  That's my mistake.

17          THE COURT:  All right.  So just give me one

18     second.  So let's start with 871, which is the

19     plaintiff's motion in limine to preclude evidence

20     regarding the basis for the Courts default ruling.

21          ATTY. STERLING:  Okay, your Honor.

22          THE COURT:  Take your time.

23          ATTY. STERLING:  Thank you.

24          THE COURT:  This is why I had everything laid

25     across my desk in stacks and literally I just had to

26     go from one stack to the next without any deviations.

27          ATTY. STERLING:  My only issue here is that my

1        stacks have moved, so now I have to track them down

2        in different places.  Your Honor, so basically this

3        motion is both we anticipated that the Jones

4        defendants would want to explain and argue the

5        default in their presentation.  And so the first

6        relieve that this motion asked for is that they not

7        be permitted to do that.  Then the second motion –

8        the second relief that this motion asks for, is what

9        we anticipate some of their arguments will be at

10       trial.

11           So for example, criticism of the default ruling

12       coming in Mr. Jones testimony.  Criticism of the

13       Court coming through Mr. Jones or potentially other

14       witnesses.  Arguments that Mr. Jones was exercising

15       his First Amendment Rights, and – which would

16       contradict the default ruling.  He's not permitted to

17       do that because the First Amendment is longer an

18       issue.  So there are a number of different types of

19       arguments that we anticipated.  And I think I

20       should – let me spend a little more time on that,

21       just because I want to make sure that we address all

22       of the different kinds of arguments –

23           THE COURT:  So can we –

24           ATTY. STERLING:  Yes.

25           THE COURT:  On this one can we just – so there's

26       three areas that I'm understanding.  Can we take them

27       one by one, and then –

1          ATTY. STERLING:  Yes.

2          THE COURT:  - you make your argument and let me

3     hear Attorney Pattis response.  So the first thing

4     that you want to preclude is evidence or argument

5     that the Jones defendants satisfied their discovery

6     obligations by making substantial production.  Do you

7     have anything to add to that.

8          ATTY. STERLING:  I'm just asking myself if that

9     is the complete relief that we would want in that

10    connection.  Certainly, we don't - that argument

11    should not be admitted.  I think other - just trying

12    to think if my adversary will find a different way to

13    frame it.

14         THE COURT:  Well, I'm just pulling the language

15    off of what you want in this motion.

16         ATTY. STERLING:  Right.

17         THE COURT:  So number one, you -

18         ATTY. STERLING:  Right.

19         THE COURT:  - want the Court to preclude

20    evidence or argument that the Jones defendant

21    satisfied their discovery obligations by making

22    substantial production.  I just don't know if you're

23    adding anything to that before I turn it over to

24    Attorney Pattis.  On that issue before - then we have

25    number two, number three.

26         ATTY. STERLING:  Yeah.  Your Honor let's see.

27    Yes, I am adding something to that because I think

1      that we had argued it throughout the motion.  We did

2      include it in that list at the very end.  But

3      arguments that the default is unfair.  So in that, if

4      the Court would – I mean we certainly meant to

5      include that and what we were trying to do is give

6      examples of this kind of argument.  So absolutely

7      we'd want the Court to preclude evidence or argument

8      that the Jones defendant satisfied their discovery

9      obligations by making substantial production.  But we

10      would also like the Court to preclude arguments that

11      the default is unfair.

12          THE COURT:  Well that would be something that

13      would be argued to the Appellate Court, and I'm not

14      the Appellate Court.  Attorney Pattis.

15          ATTY. PATTIS:  No, but we are bound by article

16      first second six of the Connecticut Constitution.

17      That says in all prosecutions or indictments for

18      liables, the truth may be given in evidence and the

19      jury shall have the right to determine the law and

20      the facts under the direction of the courts.

21          So, that's – there's no case, Judge.  And I'm

22      aware of the broad policy prescription against jury

23      nullification.  There's no case that has given that

24      clause of the state constitution, the gloss that I

25      would like it to.  But this issue arose periodically

26      in jury selection, where in voir dire my colleagues

27      would say such things as, it's been established that

1    Mr. Jones violated - that this is no First Amendment

2    defense here.  And I would object.  And from time to

3    time the Court sustained those objections.  In one

4    early instance, which I realized isn't necessarily

5    binding as evidence.  But in one early instance,

6    saying that's not what the default did.  The default

7    was as a result of – it was a disciplinary default.

8        And I think jurors are going to wonder about

9    that.  And there is a substantial, potential

10   prejudicial impact of their believing that the merits

11   of these cases have been reached.  They were never

12   reached.

13       THE COURT:  We could make that clear in an

14   instruction that the merits were – but that's another

15   issue.

16       ATTY. PATTIS:  As to – as to the Texas trial, I

17   think Attorney Sterling was a close student of that

18   trial, as was I.  I did see Mr. Jones make these

19   sorts of claims that she is referring to here.  And

20   these were highly contentious moments at trial.

21       And so we believe that this issue should be put

22   before the jury.  That they should see it was a

23   disciplinary default.  We believe that it's fair

24   commentary on the default.  That's what earned the

25   liability here.  And we think that jurors have a role

26   in deciding both law, in fact, under our state

27   constitution in a case involving liable, as this

1   does.

2        THE COURT:  All right.  So on the first issue,

3   the motion is granted.  There will be no evidence or

4   argument that the Jones defendants satisfied their

5   discovery obligations by making substantial

6   production, nor can they attack at the trial court

7   level during the jury trial, that the decision was

8   unfair.

9        Number two.  Evidence or argument that prior

10   rulings in this case were the result of judicial bias

11   or plaintiffs' counsel lying in court.  Anything to

12   add to that, Attorney Sterling.

13        ATTY. STERLING:  No, your Honor.

14        ATTY. PATTIS:  Judge, I don't intend to make any

15   argument to that effect.  I mean, I don't know why

16   they filed that.  We talked about that – I'm not

17   going to attack my adversaries.  I'm not going to

18   impute the integrity of counsel or the Court in this

19   case.

20        ATTY. STERLING:  And -

21        THE COURT:  Well, Attorney Pattis, and I know

22   that.  It never occurred to me that you would do

23   that.  But these rulings bind your client.

24        ATTY. PATTIS:  No, I understand that.  I get

25   that, Judge.

26        THE COURT:  I – he needs to be crystal clear on

27   – and this is not complicated.  It is literally not

1     complicated.  If he needs to write it out, each of

2     these – there's not that much.  If he needs to write

3     it out ten times over and over again until he

4     understands it.  Then that's what he needs to do.  If

5     you need to meet with him for – I'm not going to

6     speak to that.  But, this – I'm not going to have

7     those kind of problems.  This is a different

8     courtroom, different law, different everything.  All

9     right.

10        And so that last one is, evidence or argument

11     that holding the defendants accountable for damages

12     is unfair and/or offends the First Amendment.

13     Attorney Sterling.

14        ATTY. STERLING:  Yes, your Honor.  And I do want

15     to go back.  This goes to the argument we'll be

16     making with regard to the preliminary instruction.

17     The Court had indicated that it would entertain a

18     potential jury instruction to say that this case

19     was –

20        THE COURT:  I haven't really –

21        ATTY. STERLING:  Okay.

22        THE COURT:  There's a lot of things that can be

23     said, or that – I want to deal with this separately.

24     That's how it's going to be.  Sorry to say.

25        ATTY. STERLING:  I will stay on track then, your

26     Honor.

27        Yes.  I have – what I want to do is elaborate a

1     bit on the kinds of argument that we anticipate would

2     come under that category.

3          THE COURT:  Under this third category?

4          ATTY. STERLING:  Under this third category.  So

5     and this is part of what we learned from watching the

6     Texas trial.  That they're – we would expect

7     testimony and argument that Mr. Jones was penalized

8     already for his conduct regarding Sandy Hook, through

9     de-platforming.  Other lawsuits.  And the cost of

10    defending those lawsuits.  And Mr. Pattis – Attorney

11    Pattis has already made some of those arguments here.

12         So that is all testimony that – or argument that

13    undercut the default ruling.  Challenges the default

14    ruling.  And so that's part of what we are trying to

15    address here.

16         THE COURT:  Attorney Pattis.

17         ATTY. PATTIS:  We don't agree that it undercuts

18    or challenges the default ruling.  The plaintiff will

19    testify that they want Mr. Jones held accountable.  I

20    suspect they will testify that they left it to their

21    lawyers to determine the amount the juries been

22    conditioned that they're going to be asking for a

23    quote, huge, huge amount.  This could be the largest

24    verdict in another iteration in Connecticut history.

25         They want Jones held accountable.  They want to

26    claim that others similarly situated shouldn't be

27    committed to do what he has done.  I think the juries

1      entitled to know what the cost of this has been to

2      him, as they calibrate accountability.

3            THE COURT:  You looking to respond?

4            ATTY. STERLING:  Your Honor, no.

5            THE COURT:  I'm granting the motion.  Let me

6      move onto the next one.  Just give me one moment.

7            ATTY. PATTIS:  Is this the tenth or eleventh

8      topic?  Judge, I'm losing track here in my notes.

9            THE COURT:  I think we're closing in.  I think

10     we have two left.  I think this might be number ten.

11     So now we have – and so I'm going to hear argument.

12     The first one, and then argument on the second one.

13     All right.  And then rule when I'm done with both

14     arguments.  So I have defendant's motion 865.  This

15     is on the disciplinary default issue.  Then I have

16     the plaintiff's objection at 889.  I had the filing

17     as 904, but now I've crossed that off my list.  And

18     then we have all the other filings with respect to

19     the plaintiff's request for the preliminary charge.

20           So why don't I start with you, Attorney Pattis.

21      So you want – tell me what you want.  You want –

22     with respect to the disciplinary default.  What are

23     you looking for?

24           ATTY. PATTIS:  To admit to the defaulted self as

25     an exhibit so that they can read it.

26           THE COURT:  I can't hear you.

27           ATTY. PATTIS:  I apologize.  To admit the

1      default ruling as an exhibit.  So they can read it

2      and understand why liability was found in this case.

3      The fear is that they'll be an implicit assumption

4      that will bolster the plaintiff's claim that this was

5      outrageous conduct.  And that the Court on a previous

6      occasion was so outraged by the speech, that it

7      entered the liability default, thus encouraging

8      jurors to overstate the value of the case.

9          I think that there is a universe in which this

10     item can be admitted without running a fowl of the

11     previous ruling.  I concede Judge, that a lot of the

12     arguments overlap in these two contexts.  But to

13     avoid an implicit suggestion to the jury that this

14     case must be worth a lot because he was already found

15     liable.  I think would be a disservice to Mr. Jones

16     and Free Speech Systems.

17         THE COURT:  All right.  I don't need to hear

18     argument in this.  You're asking in this motion for

19     the transcript to be admitted as an exhibit. I am

20     going to deny that.  Whether you're asking for

21     particular language if a preliminary charge is given,

22     that you want language that makes clear that it is a

23     disciplinary default for failure to comply, as

24     opposed to a determination on the merits.  Is a

25     different issue.  But this – your motion here just

26     asks for my transcript to go in as an –

27         ATTY. PATTIS:  It wasn't a transcript, I think

```
 1        there was a – I thought there was a marginal, a
 2        notation ruling as well.  Doesn't matter, I think
 3        it's the same ruling regardless of the form.
 4            THE COURT:  Whatever order it was.  I thought
 5        there was actually an order and a transcript.  But
 6        whatever the Courts articulation on it, I'm not going
 7        to allow that as an exhibit.  So now we have the
 8        last, all the filings.  There's six filings that I
 9        went through.  And whenever you're ready, Attorney
10        Sterling.
11            ATTY. STERLING:  Yes.  I think the arguments
12        today have made it clear exactly why we need a charge
13        like this.  We need a charge like this so that it's
14        clear to the parties and the Court and the jury, as
15        we go forward.  As we start opening statements.  As
16        we do evidence.  What is an issue and what is not an
17        issue?
18            We proposed a really quite simple charge, based
19        on the allegations of the complaint.  And that's the
20        charge that we're asking here.  And I think one of
21        the reasons why it's so important to give it is,
22        because there just cannot be a grey area here.  It
23        needs to be clear to everybody what is established.
24        This charge does not address every single aspect of
25        what the default establishes.  It actually is
26        tailored –
27            THE COURT:  Attorney Sterling –
```

1        ATTY. STERLING:  Yes.

2        THE COURT:  I don't recall in my 20 years on the

3    bench ever laying out in a preliminary instruction

4    when we're giving them all the logistics of how they

5    operate as a jury.  And how the mechanics of the

6    trial.  I don't ever remember telling them ahead of

7    time, well, here, these are the causes of action and

8    here are the elements.  And this is what you need to

9    listen to when you're waiting for the evidence.  I've

10   never done it.  In fact, I've never been asked to do

11   it.  So why would I do it now?

12       ATTY. STERLING:  So I think there are a couple

13   reasons to do it now, your Honor.  Number one is,

14   because this – it is important that the jury know

15   what is for them to decide and what is not.  And some

16   of those things –

17       THE COURT:  All right.  So why not just say,

18   like we did – this is a hearing in damages.  You are

19   not to consider liability and end it there.  You job

20   is to assess the damages.

21       ATTY. STERLING:  Your Honor, the Court could do

22   something like that.  Certainly – no, no, I

23   understand that.  I think that one of the issues with

24   doing that, is that that would then leave open the

25   question for the Court and counsel about what is

26   resolved.  So I do understand the Courts point that

27   there are two separate things going on here.  Number

1     one is, what is the minimum that the jury needs to

2     hear.  Number two is, are the Court and counsel

3     crystal clear on what is resolved by the default.

4     And in my –

5          THE COURT:  Well, that doesn't require a

6     preliminary charge.  Right?

7          ATTY. STERLING:  That's correct.

8          THE COURT:  You're saying that you want us, the

9     Court and counsel to be on the same page.  But you're

10    also saying but for us to be on the same page, we

11    have to tell the jury.  And that's not – that doesn't

12    follow.

13         ATTY. STERLING:  So your Honor, what I am trying

14    to say is, it is most important that we all be on the

15    same page.  I think that we have already told the

16    jury about some of the conduct, and about the fact

17    that liability is established.  Conveying this much

18    more, which is really not much more than what the

19    Court originally did when it introduced the case.  Is

20    important.  And it's not intended to be prejudicial,

21    judge.  What it intended to do is set the table so

22    that they understand the issues.

23         THE COURT:  Just give me one moment, please?  So

24    I just lost where I was.  So give me the entry number

25    of the docket number that you're laying out your

26    proposed language.  If you don't mind.  I had it and

27    I clicked out too many times and lost it.

1        ATTY. PATTIS:  I think it's 934.

2        ATTY. STERLING:  Sorry, your Honor.

3        THE COURT:  934.

4        ATTY. PATTIS:  That's what my notes reflect, but

5    I may be wrong.

6        ATTY. STERLING:  I'll get to it, Judge.

7        THE COURT:  That's it.  I think.  It was

8    revised, right?

9        ATTY. STERLING:  Yes.

10        THE COURT:  So 934 is the most recent iteration.

11        ATTY. STERLING:  Yes.  I mean, we filed a

12    version with citations to the complaint in the

13    sur-reply, but it's verbatim the same as what's

14    proposed.

15        THE COURT:  Right.

16        ATTY. STERLING:  In 934.

17        THE COURT:  What else, Attorney Sterling?

18        ATTY. STERLING:  Your Honor, I don't think I

19    have anything to add.  I mean, this is intended to be

20    faithful to the complaint, establish the sort of

21    basic parameters for the jury.  Obviously, I'd be

22    happy to go back and forth with counsel if there are

23    words that he objects to.  And I also acknowledge

24    that the Court has discretion about a charge like

25    this.

26        THE COURT:  Yeah.  I don't like it.  It's way

27    too long.  And – all right.  But Attorney Pattis –

1          ATTY. PATTIS:  The Court –

2          THE COURT:  But I think something is necessary,

3     and it sure would have been nice if you could have

4     been on the same page.  But Attorney Pattis, what do

5     you –

6          ATTY. PATTIS:  The Court has the benefit of

7     having sat through almost all of the voir dire.  But

8     for a couple hours one day when there was a meeting.

9     We had a joint non-argumentative statement that we

10    agreed upon.  I don't recall a juror having

11    difficulty with that statement.  I don't recall vior

12    dire being particularly difficult.  I think we all

13    expected it to last a lot longer than it did.  I

14    think it lasted seven, eight days.  I believe that

15    statement was sufficient to apprise –

16         THE COURT:  Ron tells me it was seven.  Is that

17    right, Ron?  I thought it was eight, but it was

18    actually seven.  And I think we ended up getting 12

19    and lost one.  So I can't disagree with that.  But,

20    listen, I think that the proposed language is not

21    even close to what I would say.  But here's the truth

22    of the matter.  I sure don't want to suggest because

23    it would not be true.  I sure don't want to suggest

24    to the jury that I made any substantiative

25    determinations on any of these facts or causes of

26    action.  Because that would just not be true.  But I

27    think there's probably a way to do it.  Telling them

1       not to speculate and just say the Court has

2       determined that liability is established for reasons

3       you don't have to concern yourself with.  And you

4       should not speculate on.  And your job is to address

5       damages.  Something along those lines.  And I don't

6       think I'm opposed to laying out what the basic causes

7       of action are by name.  But I'm not looking to do

8       anything this detailed.

9           I don't think there really can be any, based on

10      the rulings that we've gone through today, and I know

11      we still have the two minor ones.  But I don't think

12      that anyone here is not understanding what the

13      evidence will entail.  And I just don't see a need

14      for something this long.

15          So do you want –

16          ATTY. PATTIS:  Judge, give us an opportunity to

17      digest what has occurred here this afternoon, and

18      perhaps Attorney Sterling and I can compare notes

19      tomorrow afternoon with the aim of reaching an

20      agreement.  We did so on the preliminary voir dire.

21      If you think more is necessary then what was given

22      then, then I will work with Attorney Sterling to try

23      to come up with something.

24          THE COURT:  Not much more.  Just, you know, just

25      a – but I just want to be careful like I said, not to

26      suggest that the Court substantively addressed the

27      legal issues.  But I don't want them to speculate.

1         But I would like to just say these are the causes of

2         action or something along those lines, so they have

3         some minimal guidance.  And if you want to say

4         something along of the lines that, in light of the

5         Courts ruling, Mr. Jones is precluded from raising

6         defenses.  You know, follow the law, and see if you

7         can come up with something along those lines.  But

8         not too long.

9              ATTY. PATTIS:  Understood.

10             THE COURT:  Okay.  So I'm going to deny the

11        motion without prejudice for you to see if you can

12        reach agreement.  Listen, if you can't, I'm going to

13        have to be left to my own devices and come up with

14        something.  I'd much prefer that you put your

15        reasonable heads together.  You can do better than I

16        can probably, so I'm going to keep my fingers

17        crossed.

18             All right.  Any – did I miss anything?

19             ATTY. PATTIS:  Judge, you said there were two

20        more things, and I didn't know what those were.  You

21        just said it a couple of minutes ago, and I thought

22        we covered it all.

23             THE COURT:  No, the two – yeah – yeah - yeah.

24        The issue with Attorney Paz.  With the Google

25        analytics.  And then the issue with the Dew Bidondi

26        text messages.  Those are the two –

27             ATTY. PATTIS:  So I've already, during the break

1    I put out a request for affidavits to my contacts

2    down there.

3         THE COURT:  Right.

4         ATTY. PATTIS:  And my understanding is, I've got

5    to get them in Thursday.  I'll get them in as

6    promptly as I can.

7         THE COURT:  All right.  So those are the two

8    issues that I have to rule on.  Everything else on

9    the long list, I think we were able to get through.

10    Mr. Ferraro, anything that you can see that I missed,

11    or any other housekeeping issues?

12         THE CLERK:  No, your Honor.  Not for the

13    motions, not for those pending motions.

14         THE COURT:  Perfect answer for this time of day.

15         ATTY. STERLING:  Oh, your Honor, I apologize.

16    I've got one more.

17         THE COURT:  Oh, Attorney Sterling.

18         ATTY. STERLING:  I know.  I know.  Docket number

19    897.  It was never ruled on.  It's on consent.  It's

20    a late expert disclosure motion.

21         ATTY. PATTIS:  Yeah.  Attorney's fees guide.

22         ATTY. STERLING:  Yeah.

23         ATTY. PATTIS:  Is that right?

24         ATTY. STERLING:  Yeah, me and Chris.

25         ATTY. PATTIS:  Yeah – no, we – Judge, in the

26    event that a – in the event that punitive – in the

27    event the jury elects to award punitive damages, I

1      think the Courts going to have to decide the

2      reasonableness of attorney's fees.  And I think we've

3      agreed that that would take place post-trial, and

4      there'd be ample opportunity to depose that expert,

5      when the press of other business wasn't upon us.  I

6      don't know, Alinor, did I overstate that?

7            ATTY. STERLING:  No.  That's - that's correct.

8      We have agreed that reasonable amount of attorney's

9      fees would be deferred until after this proceeding.

10            THE COURT:  Okay.

11            ATTY. STERLING:  And I just wanted to make sure

12      because that's been a loose end.

13            THE COURT:  I just did it.

14            ATTY. STERLING:  Excellent.

15            THE COURT:  Okay.

16            ATTY. STERLING:  Thank you.

17            THE COURT:  All right.  So I just - very

18      quickly.  Ron will confirm our jurors on - today's

19      Tuesday - on Thursday.  And let's hope that we don't

20      have to pick on Monday.  Okay.  But just keep in mind

21      that there is a possibility that we would have to

22      pick Monday morning.  But let's keep our fingers

23      crossed.  All right.

24            ATTY. STERLING:  Your Honor.  I apologize.  I've

25      got one more thing to raise.

26            ATTY. PATTIS:  Just deny this one, Judge,

27      without even hearing it.

1       ATTY. STERLING:  I know I run that risk.  I am

2   concerned, I remain concerned that even with all of

3   the Court's rulings, that there may be some lack of

4   clarity.  For example, about what can be argued in

5   opening statement.  You know, I think it's clear that

6   causation cannot be argued.

7       THE COURT:  Attorney Sterling, why don't you

8   talk to Attorney Pattis, and see if there are any – I

9   mean for heavens sakes, it's opening statement.  I

10  can't imagine it's going to be issue.  If it in fact,

11  your concerned that somethings going to rise during

12  the opening statement, then we'll have you come in

13  Tuesday at 9, just let Ron know and I'll deal with it

14  Tuesday at 9.  Okay.

15      ATTY. STERLING:  I appreciate that.

16      THE COURT:  I would rather not do – and Attorney

17  Pattis, I've already made an note to myself, I've

18  diaried it, to make sure that I sort of canvas your

19  client on the issue that we talked about.  If there's

20  anything else that you think needs – obviously

21  outside the presence of the jury, but if there's

22  anything else along those lines that you would like

23  me to say on any of the other rulings.  And I know

24  you're going to do your job, but if you think that it

25  would be helpful for the Court to do so, talk to

26  Attorney Sterling and let me know before – let me

27  know by Friday.  Okay.

```
 1            ATTY. PATTIS:  He's not likely to testify before

 2        the end of next week.  So you need to know this

 3        Friday, Judge?

 4            THE COURT:  I do, because I have such a long

 5        list of things to do, not just in this case -

 6            ATTY. PATTIS:  Okay.  Got it - got it - got it.

 7        If you need it, you  need it.  Got it.

 8            THE COURT:  I have to - yeah.  Okay.  All right.

 9         Stay well everyone.  We're adjourned.

10            ATTY. STERLING:  Thank you, your Honor.

11  (The matter concluded).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
```

```
DKT NO:  X06-UWY-CV186046436-S    :   COMPLEX LITIGATION DKT

ERICA LAFFERTY                    :   JUDICIAL DISTRICT WATERBURY

v.                                :   AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES                  :   SEPTEMBER 6, 2022

DKT NO:  X06-UWY-CV186046437-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES


DKT NO:  X06-UWY-CV186046438-S


WILLIAM SHERLACH

v.

ALEX EMRIC JONES
```

*C E R T I F I C A T I O N*

     I hereby certify the foregoing pages are a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, G.A. #4, Waterbury, Connecticut, before the Honorable Barbara Bellis, Judge, on the 6th day of September, 2022.



          Dated this 8th day of September, 2022 in Waterbury, Connecticut.




                              _____

                              Darlene Orsatti

                              Court Recording Monitor